# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM,<br><br>*Plaintiff*,<br><br>v.<br><br>COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity,<br><br>*Defendants*. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND RETROSPECTIVE RELIEF

Plaintiff Justin Pulliam hereby sues Fort Bend County, Texas; Fort Bend County Sheriff Eric Fagan; officer Robert Hartfield; officer Jonathan Garcia; officer Taylor Rollins; and officer Ricky Rodriguez (collectively, "Defendants"), for Defendants' deprivation of Justin's rights under the First and Fourteenth Amendments to the United States Constitution.

## INTRODUCTION

1. This First Amendment lawsuit seeks to vindicate the free-speech rights of Justin Pulliam. Justin is a full-time new-media journalist who covers a variety of local government issues on his social media channels, especially YouTube and Facebook. He reports on everything from city council meetings to traffic stops, and his raw footage and political commentary have drawn the ire of the officials he covers—including police in Fort Bend County, Texas. In July 2021, Fort

Bend County Sheriff Eric Fagan excluded Justin from a press conference held at the entrance to a public park where a submerged car related to a high-profile missing-persons case had been discovered with human remains. In another act of retaliation, in December 2021, Fort Bend Sheriff's officer Taylor Rollins arrested Justin for filming a heated encounter with a citizen because Justin did not comply with an unconstitutional order to relocate across the street where filming was impossible.

2.       Journalism and political commentary are at the heart of the First Amendment. These unconstitutional attacks on Justin's journalism are a threat not only to Justin, but also to independent citizen-journalists everywhere who have the free-speech right to cover—and criticize—local government actions.

## JURISDICTION AND VENUE

3.       Plaintiff Justin Pulliam is suing under the First Amendment and the Fourteenth Amendment; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

4.       This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343.

5.       Venue lies in this Court under 28 U.S.C. § 1391(b)(2) because, as described below, the events giving rise to the claims in this action occurred in Fort Bend County, Texas.

## PARTIES

6.       Plaintiff Justin Pulliam is a citizen of the United States and a resident of Fort Bend County.

7.       Defendant Fort Bend County is a political and geographical subdivision of the State of Texas.

8.      Defendant Eric Fagan is the Fort Bend County Sheriff. He is sued in his individual capacity.

9.      Defendant Robert Hartfield is a police officer with the Fort Bend County Sheriff's Office. He is sued in his individual capacity.

10.     Defendant Jonathan Garcia is or was an officer with the then-Precinct 3 (now Precinct 1) Constable's Office in Fort Bend County. He is sued in his individual capacity.

11.     Defendant Taylor Rollins is a police officer with the Fort Bend County Sheriff's Office. He is sued in his individual capacity.

12.     Defendant Ricky Rodriguez is a police officer with the Fort Bend County Sheriff's Office. He is sued in his individual capacity.

## FACTS

**Justin Pulliam**

13.     Justin Pulliam is thirty-three years old and lives with his wife in Fort Bend County, Texas, just outside of Rosenberg.

14.     He has been concerned with and involved in local government issues since he was a student at Texas A&M University.

15.     Justin deeply believes that all members of the public should know what their local government is doing because local governments profoundly affect their constituents' everyday lives.

16.     Justin also believes that holding local governments accountable for their actions— through informed voting and civil discourse—is crucial to ensuring that members of the public remain free to exercise their constitutional rights.

3

17.     To that end, Justin has been a full-time independent journalist covering local government issues for approximately three years. His work is often critical of the government's actions.

18.     He primarily distributes his reporting via his social media channels, including YouTube and Facebook. He reaches millions of people each year. His YouTube channel alone has reached over one million unique viewers just in the past three months, and his Facebook page has reached three million viewers this year.

19.     Although much of his reporting focuses on law-enforcement topics, Justin covers a number of local government issues ranging from city council meetings to elections.

20.     For example, Justin broadcasts and reports on city council meetings in Texas cities such as Freeport and Leon Valley.

21.     Justin also covers current events involving local governments, such as the Black Lives Matter protests in Houston and accusations of race-based jury tampering in Brazoria County.

22.     Additionally, Justin regularly covers stories involving public-information requests—usually his own—and regularly reports on what he believes to be resistance to transparency by government administrators.

23.     Justin's reporting typically involves showing raw video footage, which he often records himself, of government officials performing their duties in public. Although he adds his own commentary, he ultimately wants the public to have easy access to raw footage so they can see for themselves what their governments are doing.

24.     Justin therefore sees his reporting as filling a gap in traditional media coverage that often does not even address local government issues or does so in a limited way.

25.     In addition to covering scheduled government activities like city council meetings, Justin regularly covers unscheduled incidents like police encounters with the public.

26.     Justin typically does this by either filming officers when he sees them out in his community or listening to a police scanner for nearby calls.

27.     Filming police responses is a particular contribution of citizen journalism because traditional media is rarely present at police calls, and almost never present for run-of-the-mill responses such as roadside stops or mental-health calls.

28.     In addition to furthering his reporting, Justin also films police responses to ensure the safety of all on scene—both members of the public and police officers. He believes that transparency and accountability make everyone safer.

29.     Justin is particularly concerned with filming certain kinds of police calls, such as mental-health calls, where the subject is at high risk of harm.

30.     He became passionate about this issue after witnessing firsthand the mistreatment of mentally ill people (or allegedly mentally ill people) at the hands of police while attending graduate school. Additionally, a good friend and colleague's daughter died due to mistreatment of a mental-health issue while in police custody.

31.     Justin typically records police in his community. Until recently, he regularly recorded officers from the Fort Bend County Sheriff's Office ("FBCSO").

32.     FBCSO officers generally—and defendants Garcia and Rodriguez specifically—were personally familiar with Justin's work at the time of the interactions that form the basis of this lawsuit.

**Fort Bend County, the FBCSO, and the Sheriff**

33.     The Fort Bend County Sheriff's Office is an agency of Fort Bend County, Texas, without jural authority. It is the County's largest law enforcement agency.

34.     The FBCSO has over 800 employees, including over 500 police officers.

35.     The FBCSO has law-enforcement jurisdiction over unincorporated areas of Fort Bend County, including all locations relevant to this lawsuit.

36.     Until early 2022, FBCSO officers either did not have body-worn cameras ("BWC") or did not consistently use them to record interactions with the public. On information and belief, the only recordings the FBCSO consistently had of officers' activities came from dashboard cameras in officers' vehicles.

37.     As a result, Justin's recordings were regularly the only meaningful video evidence—and sometimes the only video evidence, full stop—of FBCSO officers' encounters with the public.

38.     Sheriff Eric Fagan, the top official in the FBCSO, assumed office on January 1, 2021, and served in that office at all times relevant to this lawsuit.

39.     The Sheriff has publicly agreed that recording FBCSO officers is beneficial for both officers and the public. According to the Sheriff: "People have different versions of the incident. With body cameras, we can see what actually happened."[1]

40.     In fact, deescalating mental-health calls and ensuring that officers generated BWC footage of their interactions with the public were significant features of the Sheriff's campaign platform in 2020.[2]

---

[1] George Slaughter, *Fort Bend County purchases body cameras for law enforcement agencies*, Katy Times (Feb. 10, 2022), https://katytimes.com/stories/fort-bend-county-purchasing-body-cameras-for-law-enforcement-agencies,6416.

[2] Eric Fagan for Fort Bend County Sheriff, https://www.ericfagan.com/ (last visited Nov. 18, 2022).

41.     Likewise, Fort Bend County District Attorney Brian Middleton has publicly acknowledged that recording FBCSO officers changes their behavior for the better. In discussing the FBCSO's new body cams, Middleton stated: "We behave differently when we're being watched."[3]

42.     Top Fort Bend County officials, including the Sheriff, have therefore publicly acknowledged what Justin passionately believes to be true—that recording the police is good for everyone.

43.     The officials' actions, however, have been inconsistent with their words.

44.     Although Justin has been filming FBCSO officers for years, his relationship with the FBCSO deteriorated significantly after the Sheriff took office.

45.     This conflict came to a head in two incidents in the latter half of 2021.

**July 2021: Fort Bend County Sheriff's officers selectively exclude Justin from a public press conference by order of the Sheriff.[4]**

46.     On July 12, 2021, Justin traveled to Jones Creek Ranch Park in Richmond, Texas— a public park owned by Fort Bend County—after hearing that emergency services had been dispatched to the area.

47.     FBCSO officers, including the Sheriff, were also present at the park. They were responding to reports of a submerged vehicle, with a possible deceased victim, that was connected to a missing-persons case.

48.     After he arrived, Justin began streaming video of the scene to one of his YouTube channels, Justin Pulliam Live, and recording the scene with other devices.

---

[3] Slaughter, *supra* note 1.
[4] Video of this incident is available at https://www.youtube.com/watch?v=Xxcv6YZaNT4. The key events occur at 0:00–2:45 and 15:35–17:35.

49.     FBCSO officers ultimately closed the park and requested that Justin and other members of the media convene outside the park at a designated media area at the entrance to the park. An FBCSO officer, Dalia Simons, informed Justin and other members of the media that an FBCSO representative would speak to them there.

50.     The Sheriff and Simons specifically ordered Justin to leave the park within five minutes. Within a few seconds of the order, and even though Justin was already beginning to leave, the Sheriff and Simons both began physically crowding Justin in an apparent attempt to get him to leave more quickly. Justin expressed his disapproval of the FBCSO's handling of the investigation, including the closing of the park.

51.     While this was occurring, officers were permitting other individuals to film closer to the scene. Justin pointed this out to the Sheriff and Simons, to no avail.

52.     The Sheriff and Simons continued to physically crowd Justin, even after he protested. So he left and went to the entrance of the park as instructed.

53.     Justin joined representatives from local news stations at the end of a parking lot outside the park. At least two other camera crews were present.[5]

54.     After the Sheriff arrived and began talking to other members of the media, Justin approached him. The Sheriff summoned defendant Robert Hartfield, an FBCSO officer, and began gesturing toward and looking at Justin.

55.     Justin was not being disruptive in any way.

---

[5] Two represented news stations ultimately covered the case with footage from the Sheriff's press conference. *See Off-duty firefighter found missing Richmond woman's SUV with body inside, Fort Bend deputies say*, KHOU 11 News (July 12, 2021), https://www.khou.com/article/news/local/allison-kempe-suv-jones-creek-water/285-6590b97e-a0b8-438d-b084-89215391a26a; Charly Edsitty, *Body believed to be missing Richmond mom found in car pulled from Jones Creek*, ABC13 Eyewitness News (July 14, 2021), https://abc13.com/missing-woman-allison-kempe-car-found-body/10878915/.

56.     Nonetheless, as Justin approached, the Sheriff gestured toward him and appeared to be giving Hartfield instructions. The Sheriff appeared to say: "[If he] don't do it, arrest him. Cause he's not part of the local media, so [he has to] go back."[6]

57.     The Sheriff therefore personally ordered Justin's removal from the press conference even though Justin's behavior did not in any way merit removal.

58.     Hartfield did not remove Justin immediately. During that time, the Sheriff spoke to a couple other reporters and shook their hands.

59.     Another officer, Jonathan Garcia, arrived on scene from the then-Precinct 3 (now Precinct 1) Constable's Office in Fort Bend County to assist Hartfield.

60.     Hartfield and Garcia then approached Justin while the Sheriff looked on. Hartfield then stated: "Mr. Pulliam, uh, you are not, uh, media, so, at the Sheriff's request, could you step back this way with us please."

61.     Hartfield and Garcia physically walked near Justin while forcing him to move to another location. While they were walking, Garcia acknowledged that he had seen Justin's reporting before and was familiar with his work.

62.     Hartfield and Garcia escorted Justin to a location across the parking lot from the other members of the media. Hartfield then stated: "Mr. Pulliam, it would be greatly appreciated if you would just stick right here. You're more than happy to film from right here, if you would just stay back here that would be great, okay sir? I appreciate you."

63.     The location was approximately ten parking spots away from where the Sheriff was speaking to the media.

---

[6] Video of this incident is available at https://www.youtube.com/watch?v=Xxcv6YZaNT4 (15:43–58).

64.     After officers removed Justin, the Sheriff began hosting a press conference with other members of the media. However, Justin was too far away to hear what the Sheriff or the other members of the media were saying.

65.     For the rest of his time there, Justin was not permitted to go any closer to the press conference—and the Sheriff did not speak with Justin again that day.

66.     The Defendants did not have a compelling, or even legitimate, governmental interest in removing Justin from the open-air press conference, which occurred at a public park. Instead, the Defendants removed Justin because they did not deem him a member of the media, disagreed with his viewpoint, and disliked that he was critical of the police both earlier that day and in his work generally.

67.     As a result of his exclusion from the press conference, Justin was unable to gather firsthand footage of FBCSO officials' statements, including the Sheriff's. That prevented him from airing footage of the press conference to his viewers, even though the other local news outlets present were able to do so.[7]

68.     Also as a result of his exclusion, Justin was prevented from asking the Sheriff additional questions about the status of the search and how it was handled—for instance, why the FBCSO did not commit more resources to the search days earlier when (as Justin believed) they already knew approximately where the missing person's vehicle was located.

69.     These obstacles prevented Justin from reporting fully on the search, even though it was a high-profile case of significant interest to the public. Justin was specifically prevented from asking questions and gathering additional information on issues that interested him but not other

---

[7] *See supra* n.5.

news outlets—again, for instance, why the FBCSO chose to wait several days after the missing person disappeared to recover her vehicle.

70.     This exclusion has also significantly decreased Justin's willingness to attend FBCSO press conferences in the future. Since this incident, Justin has not attempted to attend any FBCSO press conferences out of fear of retaliation.

**December 2021: FBCSO officers arrest and jail Justin for filming them.[8]**

71.     After the July 2021 press conference incident, Justin significantly reduced his filming of FBCSO officers because he was concerned that they would retaliate against him for his recording and reporting.

72.     However, just before Christmas—on December 21, 2021—Justin saw an FBCSO vehicle (later discovered to be driven by FBCSO officer Ricky Rodriguez) pass at a high rate of speed. The vehicle ultimately began heading toward a remote area of Fort Bend County, and Justin knew that one of the only properties that direction was tied to a mentally ill man whose case Justin had followed for some time. Justin thus suspected that officers were heading to the property for a mental-health call on the man.

73.     Justin had recorded previous FBCSO interactions with the mentally ill man and believed officers had a history of unnecessarily escalating their responses to him.

74.     Justin was therefore concerned that officers would unnecessarily injure or kill the man during the mental-health call. So Justin and his wife drove to the scene of the call, and Justin began filming.

75.     At some point after Justin's arrival but before his interaction with any officers, defendant Rodriguez informed his colleagues via his police radio that Justin had arrived and

---

[8] Video of this incident is available at https://www.youtube.com/watch?v=Po7ZVCRQHM8.

identified Justin as a "local journalist." Officers on scene therefore knew who Justin was, by name, and knew that he was a journalist before they interacted with him.

76.     The incident took place at a gas station owned by the mentally ill man's mother. Justin and his wife, along with the man's mother and some mental-health advocates, were located in the station's parking lot.

77.     Officers believed the mentally ill man was located in a trailer house on the other side of the property—approximately 130 feet away, at the nearest point, and on the other side of the structure covering the gas pumps.

78.     The mother had initially been inside the trailer. But, according to an FBCSO incident report, an FBCSO officer ordered her to leave the location in her vehicle. So she left and drove to the gas-pump structure.



79.     Justin obtained the mother's permission to film on her property after assuring her that he was there to ensure her son's safety.

80.     While Justin was speaking to the mother, Rodriguez retrieved something from his car nearby and cautioned Justin and the mother, in substance, to "stay back over there." He promptly walked away and did not indicate that either needed to move.

81.     Justin remained on the far side of the gas pump structure and did not move any closer to the trailer. An FBCSO vehicle was parked nearby, and at no point did Justin ever move beyond the vehicle to get between it and the house.

82.     While Justin was filming the trailer, defendant FBCSO officer Taylor Rollins approached him from behind—the opposite direction from the house—and ordered him and the mental-health advocates near him to move across the street. Rollins did not appear to order the mentally ill man's mother to leave.

83.     There was no crime-scene tape or any indicator that a perimeter had been established.

84.     At no point did Justin approach Rollins.

85.     At no point after Rollins approached Justin did Justin move any closer to the trailer. Instead, Justin steadily moved away from it.

86.     After his initial interaction with Rollins, and after expressing concern that officers would hurt the mentally ill man, Justin turned around and began to leave in accord with Rollins's orders. He walked several yards away from Rollins but turned back around to face him when other bystanders began speaking to Rollins.

87.     Justin continued to move away from the trailer and Rollins before stopping to film again approximately fifteen to twenty feet away from where Rollins was speaking to the other bystanders. Justin was no more than a few yards from the road, which was not closed off to motorists.

13

88.    In the middle of his conversation, Rollins stopped and ordered Justin to leave. Justin responded that he had a right to remain there as long as the other bystanders were there, too.

89.    Rollins continued to insist that Justin leave and began counting down on his fingers while moving toward Justin. Justin continuously moved back, away from the trailer and away from Rollins, as Rollins approached.

90.    Rollins then arrested Justin.

91.    At the time of his arrest, Justin was approximately 170 feet away from the trailer.

92.    The other bystanders were still standing where Justin had been filming when Rollins first approached him. FBCSO officers did not arrest the other bystanders based on their proximity to the scene. While the bystanders later moved locations, to the front of the gas station's main building on the property, officers did not force them to move across the street until approximately an hour or more later.

93.    Additionally, the mentally ill man's mother remained in her car—very near where Justin had initially been filming—throughout the arrest incident.

94.    Justin did not move closer to the trailer after Rollins demanded that he leave.

95.    Besides Rodriguez's initial remark and the conversation that Rollins initiated, Justin did not interact with any law-enforcement officers on scene before his arrest.

96.    At no point did Justin's actions interfere with the officers' attempts to perform their duties.

97.    At no point did Justin's actions endanger officers, himself, or any other members of the public, including the other bystanders.

14

98.     After the arrest, Rollins handcuffed Justin and put him in the back of Rodriguez's police vehicle. The vehicle was roughly the same distance from the trailer as the spot where Justin had been filming when Rollins approached him.

99.     Rollins also confiscated all of the valuable recording equipment on Justin's person, including but not limited to:

a.   Panasonic S1 Camera (returned in January 2022);

b.   Battery (returned in January 2022);

c.   Wise CFExpress Memory Card: $339.00 value;

d.   Lexar SD Memory Card: $82.00 value;

e.   Cold shoe adapter (returned in January 2022);

f.   Phone Clamp (returned in January 2022);

g.   Rode VideoMic NTG & Windshield (returned in January 2022);

h.   Kessler Crane Kwik Mini Plate (returned in January 2022);

i.   iPhone XS Max: $1,352.04 value;

j.   iPhone XS Max Case: $5.99 value;

k.   iPhone XS Max Screen Protector: $14.86 value; and

l.   Cam Pro Body Camera: $163.30 value.

100.    The FBCSO has returned some, but not all, of the above equipment.

101.    Of particular importance, Rollins seized—and the FBCSO is still refusing to return—memory cards containing the most complete audio and video recordings of Justin's arrest. The recordings Justin currently has come from (1) the dashboard camera in his truck, (2) footage his equipment automatically uploaded to cloud storage before his arrest, and (3) cell phone video from Justin's wife.

15

102.     After his arrest, Justin remained in the back of Rodriguez's car while Rodriguez and other FBCSO officers interacted with the mentally ill man.

103.     Rodriguez later transported Justin to the Fort Bend County Jail.

104.     At the jail, Justin was booked and strip searched.

105.     After Justin arrived at the jail, Rodriguez and another unidentified officer discussed Justin's arrest in front of him. The unidentified officer, upon learning that Justin was an investigative journalist, replied in substance that Rodriguez should "teach [Justin] for fucking with us."

106.     During the booking process, the Sheriff himself—along with FBCSO Chief Deputy Provost and another individual—collected Justin and took him to a room next door.

107.     The Sheriff asked if Justin knew why he (Justin) was in jail. When Justin refused to talk and insisted that he be allowed to speak to his attorney, the Sheriff and Provost both became agitated.

108.     Either the Sheriff or Provost said, in substance: "Do you know who I am?" Justin understood this to mean that he should cooperate with them because of their rank within the Sheriff's Office, which gave them power over his case.

109.     When Justin continued to refuse to talk, the Sheriff said, in substance: "Fine, we'll do this the regular way." This implied that the Sheriff's Office would not have continued with the booking process or sought prosecution if Justin had waived his right to an attorney and promised to obey officers' orders in the future no matter what.

110.     Justin remained in custody at the jail for several hours until a colleague posted his $500 bail.

16

**2022: Justin endures continuing legal fallout from his December 2021 arrest.**

111.    Based on the December 2021 incident, Justin was charged with Interference with Public Duties, a Class B misdemeanor, under Texas Penal Code § 38.15. That case is currently pending as *State of Texas v. Justin Reid Pulliam*, 21-CCR-225419 (Fort Bend County, Texas, County Court at Law).

112.    That prosecution is based on Justin's filming at the gas station, and subsequent failure to relocate across the street, in December 2021. It is not related to the press conference incident.

113.    Despite Justin being booked on the interference charged in December, there were no developments in the criminal case through the spring of 2022.

114.    On May 5, 2022, Justin posted a video discussing his arrest and the criminal charge. The video was critical of FBCSO and Fort Bend County officials.

115.    On May 16, 2022, a grand jury returned an indictment against Justin for the interference charge even though the charge is a misdemeanor, making an indictment unnecessary and unusual.

116.    The indictment alleges that Justin interfered with Rollins's attempts to "secur[e] a scene and/or set[] up a perimeter."

117.    Justin's criminal case is still pending and is currently set for trial on February 28, 2023.

**INJURY TO PLAINTIFF**

118.    Justin has suffered severe harm from the prohibitions on his First Amendment right to gather information, especially when others were not so prohibited; the retaliatory arrest; and the confiscation of his recording equipment.

17

**The July 2021 Press Conference**

119.    Justin's selective removal from the July 2021 press conference effectively barred Justin from gathering significant information in a widely followed missing-persons case. Thus, Justin was unable to gather video or audio recordings of the Sheriff and other FBCSO officers at the press conference—which could have included additional details of the case or recovery effort as well as the Sheriff's official comments—even though other media outlets were permitted to do so.

120.    These recordings would have been valuable content for Justin's social media channels, including his monetized YouTube channel.

121.    Specifically, Justin would have used his presence at the press conference to ask questions of the Sheriff about the FBCSO's approach to the missing-persons investigation. And Justin would have used any resulting recordings to create more produced video content about the FBCSO's approach to the case. This content likely would have been critical of the FBCSO and thus would have been very different from coverage of the story by the traditional news outlets present.

122.    Additionally, but for the press conference incident, Justin would have continued his coverage of the story by driving to another location nearby where he could have seen the search efforts from a public bridge. Instead, after the Defendants escorted him from the press conference, Justin left the scene and stopped recording footage of the recovery efforts entirely. This deprived Justin of potentially valuable additional video content that would have enabled him to more thoroughly unpack the FBCSO's handling of the case for his viewers.

123.    Moreover, because of the press conference incident, Justin did not pursue additional research on the story and still has not published his final report to this day.

124.    Accordingly, Justin's viewers were also harmed by not having access to Justin's full coverage and political commentary.

125.    Justin also suffered intimidation at the hands of the officers who escorted him from the press conference, as the officers physically forced Justin to leave the scene by walking close by him across the parking lot. This placed Justin in a situation where his mere refusal to move, or accidentally bumping the officers as they walked close to him, could have resulted in serious criminal charges.

126.    Justin understands his First Amendment rights and knew that he had a right to be at the press conference, which occurred in a public forum without any safety or space restraints.

127.    Justin was not disruptive during the press conference in any way, and his behavior did not merit removal. The only possible explanation for his removal is the Defendants' desire to suppress Justin's speech because of his viewpoint, which was and is critical of the FBCSO.

128.    The July 2021 incident has chilled Justin's speech. Because of the incident, Justin significantly decreased his filming of and reporting on FBCSO officers. He also has not attempted to attend an FBCSO press conference since that time for fear of retaliation (which, as his December 2021 arrest demonstrates, was well founded).

129.    But for the July 2021 incident, Justin would have reported more frequently and more in depth on the FBCSO's activities for the latter half of 2021 until his arrest in December.

130.    The incident caused Justin to reconsider his commitment to being a citizen journalist. Unlike traditional media news outlets that have significant resources at their disposal in case of a conflict with the police, Justin has realized how vulnerable he is to government abuse and harassment as a one-man news agency.

131.    The Defendants' attack on Justin and his journalism, therefore, was not just an attack on him personally. It was a warning shot against citizen journalists generally, encompassing all of Justin's work and the work of other citizen journalists like him that provide unique and valuable coverage of local events.

**The December 2021 Arrest**

132.    As with the press-conference incident, Justin's December 2021 arrest was a warning to all citizen journalists that they would be harassed and persecuted in Fort Bend County. This threat again encompasses all of Justin's journalistic work, which is his full-time job.

133.    One of the most significant harms from Justin's arrest was the chilling of Justin's speech as a citizen journalist. Because of the arrest, Justin all but ceased filming and reporting on FBCSO officers in the field. He also significantly decreased his reporting on the FBCSO and its officers generally, and he has limited his reporting even on his own arrest.

134.    But for his arrest, Justin would have continued his thorough reporting on and criticism of the FBCSO. This would have included frequent filming of FBCSO officers in the field from an appropriate distance.

135.    Further, as a result of his arrest, Justin was unable to gather audio or video recordings of FBCSO officers on scene after he was taken into custody.

136.    But for his arrest, Justin would have continued to film on location and obtained additional footage of the call for use in his journalism and political commentary.

137.    The FBCSO has also retained possession of Justin's memory cards. Although some of that footage was automatically uploaded to cloud storage before his arrest, Justin still does not have access to significant parts of those recordings—including the moment of his arrest—from the cameras on his person.

138.    All of the lost or confiscated footage, again, would be valuable content for Justin's non-monetized and monetized media channels. Justin was unable to report fully on his arrest because of the missing recordings.

139.    But for his arrest, then, Justin would have had valuable additional footage of a high-stakes mental-health call, and he would have used that footage to report on that incident to his viewers. No other news station was at the scene, and it appears that no other news station covered the story at all.

140.    Justin's viewers were therefore harmed by not having access to any coverage, much less Justin's full coverage, of the incident.

141.    The seizure of his video equipment also prevented Justin from engaging in most of his usual journalistic activities—including filming—from at least December 21, 2021, to the property's partial return on January 7, 2022. The continued seizure of his property caused him to repurchase some equipment and still hampers his journalistic activities to this day. But for these seizures, Justin would still be using this equipment to further his reporting.

142.    Additionally, Justin spent four hours and fifty-eight minutes in police custody, including several hours in the Fort Bend County Jail where he was strip searched and held in a cell.

143.    Justin also suffered an injury to his right shoulder while being handcuffed that caused him pain for a week afterwards.

144.    Justin suffered further intimidation when the Sheriff and Provost personally appeared at the jail to meet with him, became angry when he did not treat them with the respect they believed they were due, and appeared to threaten harsher treatment when he invoked his

constitutional right to an attorney. This encounter, again, caused Justin to reconsider his commitment to his journalism career.

145.    Further, Justin has incurred expenses defending against the resulting criminal charge, including paying for a criminal-defense attorney, posting bail, and having to take time off of work for himself and his wife.

146.    The arrest has also caused Justin to fear for the safety of his person, his family, his property, and his business.

147.    As a result, Justin has spent significant amounts of time and money creating backups of his stored videos and other content.

148.    Justin has also been compelled to purchase and/or install numerous additional security measures for his physical and digital safety. These include:

- Adding backup power to existing home-security cameras;

- Streaming footage of his front yard to YouTube;

- Backup networking equipment in the event he loses internet service;

- Implementing a new server and cloud backup service for personal data; and

- Adding a home-based private email server for personal correspondence.

## CAUSES OF ACTION

### Count I

### 42 U.S.C. § 1983 –First and Fourteenth Amendments

### (Freedom of Speech Claim Against All Defendants—July 2021)

149.    Justin realleges and incorporates by reference the allegations in Paragraphs 1 through 148 of this complaint, as if fully stated herein.

150.    The First Amendment's robust free-speech protections apply equally to both members of traditional media and other members of the public, including independent journalists.

151.    The Defendants violated the First Amendment in July 2021 by engaging in unlawful speaker-based, content-based, and viewpoint-based discrimination against Justin and his criticisms of the police. The Defendants also violated the First Amendment by unreasonably restricting Justin's right to record.

152.    Specifically, in July 2021, the Defendants prevented Justin from gathering news by removing him from the press conference and forcing him to remain so far away that he could not meaningfully record the event.

153.    The Defendants did not have any compelling governmental reason—or any legitimate governmental reason at all—for removing Justin from the press conference and preventing him from meaningfully recording it.

154.    Instead, they removed him because they disapproved of him and his criticism of police. The Defendants therefore engaged in content-based, viewpoint-based, and speaker-based discrimination by excluding Justin from the press conference and preventing him from recording it.

155.    Their restrictions on his free-speech rights generally, and his right to record specifically, were therefore unconstitutional.

156.    At the time of the events in question, the law was clearly established that the government may not exclude an individual from a public forum, and restrict the individual's right to record, without any compelling or legitimate governmental reason. Any reasonable officer would have been on notice that doing so violated the First Amendment.

157.    Further, the officers' retaliatory animus was embodied in an official County policy or practice, and the retaliatory actions taken against Justin were attributable to County policymakers. Specifically, the Sheriff is a final policymaker of Fort Bend County on law-enforcement matters. And the Sheriff made a deliberate choice to have Justin removed from the press conference and thus prevent Justin from recording. The County's policy, then—as promulgated by the Sheriff just before Justin's removal—was the moving force behind the Defendants' violation of Justin's constitutional rights.

158.    For these violations of his First Amendment rights, Justin is seeking damages, declaratory relief, and injunctive relief against the County and the Sheriff, as well as damages against the remaining individual-officer defendants.

## Count II

## 42 U.S.C. § 1983 –First and Fourteenth Amendments

## (Freedom of Speech Claim Against All Defendants—December 2021)

159.    Justin realleges and incorporates by reference the allegations in Paragraphs 1 through 158 of this complaint, as if fully stated herein.

160.    In December 2021, the Defendants again violated Justin's First Amendment rights by engaging in content-based, viewpoint-based, and speaker-based discrimination and unreasonably restricting his right to record. They did this by imposing unreasonable restrictions on his right to record and arresting him for filming on private property, even though he had the permission of the landowner to be there and even though other bystanders remained on the property without being arrested.

161.    In taking these actions, the Defendants discriminated against Justin and his viewpoint that is critical of the police. The Defendants did not have a compelling, or even legitimate, governmental interest in restricting Justin's right to record or arresting him.

162.    At the time of the events in question, the law was clearly established that officers could not arrest someone, or restrict their right to record, without a compelling or even legitimate reason. Any reasonable officer would have been on notice that doing so violated the First Amendment.

163.    Defendant Fort Bend County, specifically the FBCSO, had a widespread policy, practice, or custom of discriminating against Justin and his viewpoint, as evidenced by:

    a.    Justin's removal from the July 2021 press conference, which the Sheriff himself personally ordered;

    b.    The Sheriff's personal visit to Justin in jail, where the Sheriff and at least one other FBCSO official impliedly expressed disapproval of Justin's First Amendment protected activities;

    c.    The unidentified officer's statement during Justin's intake process that they should "teach [Justin] for fucking with us"; and

    d.    The fact that Justin's prosecution for exercising his First Amendment rights has continued with the FBCSO's apparent cooperation.

164.    For these violations of his First Amendment rights, Justin is seeking damages, declaratory relief, and injunctive relief against the County and the Sheriff, as well as damages against the remaining individual-officer defendants.

**Count III**

**42 U.S.C. § 1983 –First and Fourteenth Amendments**

**(Retaliation Claim Against All Defendants)**

165.    Justin realleges and incorporates by reference the allegations in Paragraphs 1 through 164 of this complaint, as if fully stated herein.

166.    A defendant violates the First Amendment if (1) the plaintiff was engaged in a constitutionally protected activity, (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant's adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct.

167.    The Defendants' conduct during Justin's December 2021 arrest constituted retaliation in violation of the First Amendment in two ways:

      a.    First, officers arrested Justin in retaliation for recording officers at the scene; and

      b.    Second, officers arrested Justin for his previous journalistic activities of reporting, commenting, and otherwise expressing opinions on and distributing information about the government and its officials.

168.    **First**, Justin was engaged in First Amendment protected speech at the time of his arrest by recording officers at the scene.

169.    When the Defendants arrested Justin, the arrest prevented him from further recording them at the scene. The Defendants' actions thus caused him to suffer an injury that chilled him from continuing to record the officers' response to the mental-health call.

170.    The Defendants were substantially motivated to arrest Justin because he was recording them and they wanted it to stop.

171.    **Second**, even if Justin's journalistic activities at the scene of his arrest were not constitutionally protected, Justin was still engaged in First Amendment protected speech in a more general sense because he was actively working as a journalist at that time by reporting, commenting, and otherwise expressing opinions on and distributing information about the government and its officials on his social media channels.

172.    As a result of the arrest, Justin significantly decreased his reporting on the FBCSO and its officers, both in and out of the field. Additionally, Justin could not report on new stories while the FBCSO retained his reporting equipment, including his valuable professional-grade camera. Therefore, when the Defendants arrested Justin, the arrest chilled his speech.

173.    The Defendants were substantially motivated to arrest Justin because they wanted to retaliate against him based on his previous journalistic activities of reporting, commenting, and otherwise expressing opinions on and distributing information about the FBCSO and its officials.

174.    At the time of the events in question, the law was clearly established that officers may not arrest an individual for exercising their First Amendment free speech rights. Any reasonable officer would have been on notice that doing so violated the First Amendment.

175.    The Sheriff, the final policymaker for the County on law-enforcement matters, ratified Justin's arrest and the basis for it (i.e., his recording at the time of his arrest and his journalistic activities more generally), as evidenced by:

        a.   The Sheriff's visit to Justin in jail shortly after Justin's arrival; and

        b.   The Sheriff's apparent knowledge of the basis for Justin's arrest (i.e., the Sheriff asking Justin if he knew why he (Justin) was there).

27

176.    For these violations of his First Amendment rights, Justin is seeking injunctive relief, declaratory relief, and damages against the County and the Sheriff, as well as damages against the remaining individual-officer defendants.

### Count IV

### 42 U.S.C. § 1983 –Fourteenth Amendment

### (Equal Protection Selective Enforcement Claim Against All Defendants)

177.    Justin realleges and incorporates by reference the allegations in Paragraphs 1 through 176 of this complaint, as if fully stated herein.

178.    The Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by removing Justin from the July 2021 press conference but not removing other similarly situated individuals.

179.    As elaborated elsewhere in this complaint, other members of the media were similarly situated to Justin and present at the press conference. At no time did the FBCSO or any other law-enforcement officer remove them, or anyone else, from the area or ask them to move.

180.    Although other similarly situated individuals were permitted to stay, FBCSO officers escorted Justin from the press conference and forced him to stand far enough away that he could not create any meaningful recording of the event.

181.    The Defendants' true reason for selectively removing Justin was animus and ill will arising from a desire to retaliate against Justin for his journalism and critical coverage of the FBCSO and its officers.

182.    Such politically motivated retaliatory animus is not a legitimate, much less substantial or significant, government interest.

183.    Because the Defendants lacked a substantial, significant, or even legitimate government interest to exclude Justin but not others, their actions could not have been in any way tailored to that interest.

184.    At the time of the events in question, the law was clearly established that retaliatory animus is not a legitimate, much less substantial, government interest. Any reasonable officer would have been on notice that selectively using their law-enforcement powers because of retaliatory animus violated the Equal Protection Clause.

185.    As elaborated elsewhere in this complaint, the retaliatory animus was embodied in an official County policy or practice, and the retaliatory actions taken against Justin were attributable to County policymakers. Specifically, the Sheriff—as a final policymaker of Fort Bend County—made a deliberate choice to have Justin removed from the press conference.

186.    The County's policy, then—as promulgated by the Sheriff just before Justin's removal—was the moving force behind the Defendants' violation of Justin's constitutional rights.

187.    For these violations of his Fourteenth Amendment rights, Justin is seeking damages, injunctive relief, and declaratory relief against the County and the Sheriff, as well as damages against the remaining individual-officer defendants.

## REQUEST FOR RELIEF

Plaintiff Justin Pulliam therefore requests relief as follows:

A.    For an award of compensatory and punitive money damages against all Defendants for the injuries Justin suffered due to Defendants' violations of his constitutional rights, including but not limited to damages for his arrest and incarceration; expenses incurred as a result of his criminal prosecution; and the retention of his confiscated recording equipment;

B.      For an award of $1 in nominal damages based on Defendants' violations of Justin's constitutional rights;

C.      For a judgment declaring that Defendants' actions in, and the County's policy or practice of, selectively enforcing government orders in retaliation for political advocacy violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment;

D.      For an order permanently enjoining Defendants from taking actions against Justin based on retaliatory animus or from taking enforcement actions against Plaintiff that they would not take against others similarly situated, including but not limited to Justin's selective removal from press conferences;

E.      For an order permanently enjoining Defendants from continuing to retain the recording equipment and video files still in the County's custody;

F.      For an award of reasonable attorneys' fees and costs; and

G.      Such other relief that this Court deems appropriate.


Dated: December 5, 2022                    Respectfully submitted,

                                           /s/ Victoria Clark
                                           Victoria Clark, Attorney-in-Charge
                                           Texas Bar No. 24109731
                                           Federal ID No. 3749010
                                           Jeffrey Rowes*, of counsel
                                           TX Bar No. 24104956
                                           **INSTITUTE FOR JUSTICE**
                                           816 Congress Ave., Suite 960
                                           Austin, TX 78701
                                           Tel: (512) 480-5936
                                           Fax: (512) 480-5937
                                           Email: tclark@ij.org
                                                   jrowes@ij.org

                                           *Attorneys for Plaintiff*
                                           *Application *pro hac vice* to be filed

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2022, I electronically filed the foregoing Complaint with the Clerk of Court using the CM/ECF system.

I further certify that the foregoing Complaint and the Summons in this civil action will be served upon the following via a process server:

> **County of Fort Bend, Texas** by serving Fort Bend County Judge KP George
>
> **Sheriff Eric Fagan**, in his individual capacity
>
> **Officer Robert Hartfield**, in his individual capacity
>
> **Officer Jonathan Garcia**, in his individual capacity
>
> **Officer Taylor Rollins**, in his individual capacity
>
> **Officer Ricky Rodriguez**, in his individual capacity

/s/ Victoria Clark
Victoria Clark
*Attorney for Plaintiff*