# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM, | |
| *Plaintiff*, | |
| v. | Civil Action No. 4:22-cv-4210 |
| COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity, | |
| *Defendants*. | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................iv

SUMMARY OF THE ARGUMENT ........................................................1

LEGAL STANDARD...............................................................................3

BACKGROUND ......................................................................................4

    A. Justin Exercises His First Amendment Rights to Criticize the Fort Bend
       Sheriff's Office Through Online Journalism...................................................4

    B. July 2021: Sheriff Eric Fagan Personally Orders Justin Excluded from
       a Public Press Conference Even Though Other Reporters Are Allowed to
       Remain. ...................................................................................5

    C. December 2021: Officers Rollins and Rodriguez Arrest Justin, but No
       One Else, for Filming FBCSO Officers Responding to a Mental-Health
       Call at a Gas Station. ...................................................................7

    D. An Unrelated Detective Obtains Search Warrants Based on Unsworn,
       Secondhand Information.................................................................10

ARGUMENT ..........................................................................................12

  I.   PRESS CONFERENCE: The Amended Complaint States Claims that
       Justin's Removal from the Press Conference Violated the First
       Amendment and Equal Protection Clause.....................................12

  II.   GAS STATION ARREST: The Amended Complaint States Claims that
       Defendants Violated Justin's First Amendment Rights When They
       Arrested Him at the Gas Station. ...................................................16

 III.   IMMUNITIES: The County Is Not Shielded from Liability Under the
       *Monell* Doctrine, Nor Are the Individual Defendants Protected
       by Qualified Immunity. .................................................................18

 IV.   Count V Is Foreclosed by Wrongly Decided Supreme Court Precedent. ......23

CONCLUSION ....................................................................................................23

CERTIFICATE OF SERVICE ............................................................................25

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Allen v. Vertafore, Inc.*,
    28 F.4th 613 (5th Cir.), *cert. denied*, 143 S. Ct. 109 (2022) ..............................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................................3

*Bennett v. Pippin*,
    74 F.3d 578 (5th Cir. 1996) ..........................................................................20

*Brown v. Bryan County*,
    219 F.3d 450 (5th Cir. 2000) ........................................................................20

*Chiu v. Plano Indep. Sch. Dist.*,
    260 F.3d 330 (5th Cir. 2001) ................................................................... 13-14

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) ...........................................................................3

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011).............................................................................14

*Gonzalez v. Webb County*,
    No. 5:20-CV-52, 2022 WL 190709 (S.D. Tex. Jan. 21, 2022) ...........................1

*Howell v. Town of Ball*,
    827 F.3d 515 (5th Cir. 2016) ...............................................................20, 21, 22

*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191 (5th Cir. 2007) ............................................................................3

*Irizarry v. Yehia*,
    38 F.4th 1282 (10th Cir. 2022) .......................................................................14

*Jones v. United States*,
    362 U.S. 257 (1960)......................................................................................23

*LaBlanche v. Spring ISD*,
    No. H-16-3103, 2017 WL 6409031 (S.D. Tex. Oct. 4, 2017)..............................3

*Loftin v. City of Prentiss*,
    33 F.4th 774 (5th Cir. 2022) ........................................................ 17-18

*Monell v. Dep't of Social Servs.*,
    436 U.S. 658 (1978)................................................................2, 18, 19, 20

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019)...............................................................17, 18

*Police Dep't of Chicago v. Mosley*,
    408 U.S. 92 (1972).............................................................................22

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980).........................................................................14

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995).........................................................................14

*Saucier v. Katz*,
    533 U.S. 194 (2001).........................................................................19

*Sewell v. Smith Int'l, Inc.*,
    No. H-08-2063, 2009 WL 10694753 (S.D. Tex. July 28, 2009).........................1

*Turner v. Lieutenant Driver*,
    848 F.3d 678 (5th Cir. 2017) ..............................................14, 16, 22

*United States v. Salvucci*,
    448 U.S. 83 (1980).............................................................................23

*United Tchrs. of Dade v. Stierheim*,
    213 F. Supp. 2d 1368 (S.D. Fla. 2002) ..............................................14

**CONSTITUTIONAL PROVISIONS**

Const. Amend. I ....................................................................................*passim*

Const. Amend. IV ................................................................................3, 23

**RULES**

Fed. R. Civ. P. 12(b)(6)....................................................................3, 21, 22

Loc. R. 7.1 ................................................................................................1

## SUMMARY OF THE ARGUMENT

The Motion to Dismiss should be denied. Defendants' Motion (Dkt. 39) is a threadbare filing that, in most instances, fails to cite even a single case in support of its assertions. In particular, the sections of Defendants' brief arguing that Counts I through IV fail to state a claim do not cite a single legal authority. *See* Dkt. 39 at 5–7. For that reason alone, this Court should reject those arguments and deny the motion. *See* LR7.1 (opposed motions must "[i]nclude or be accompanied by authority"); *Sewell v. Smith Int'l, Inc.*, No. H-08-2063, 2009 WL 10694753, at *11 (S.D. Tex. July 28, 2009) (Hittner, J.) (motion denied for inadequate briefing); *Gonzalez v. Webb County*, No. 5:20-CV-52, 2022 WL 190709, at *2 (S.D. Tex. Jan. 21, 2022) (Marmolejo, J.) (issue inadequately briefed when the movant offered citations only to support a general statement of the elements of the claim).

But even if this Court considers the Motion's contentions, unsupported and largely unargued though they are, it should reject them and deny the Motion.

First, Defendants move to dismiss Counts I and IV, which relate to Justin's exclusion from an outdoor press conference at the scene of an investigation. Defendants assert that they had a good reason to remove Justin: At some point before the press conference, they say, he had supposedly been in an altercation with someone related to the deceased person found at the scene. But they cite no support for this contention in the Amended Complaint, so it carries no weight. Defendants

1

further argue that Justin should have complained to the Officers after he was removed. Yet again, they cite no authority for this position. No authority conditions Justin's First Amendment rights on whether he sufficiently protests at the moment his rights are violated.

Second, Defendants move to dismiss Counts II and III, in which Justin alleges he was unconstitutionally arrested while filming the police during a mental-health call at a gas station. Defendants argue, without citation, that his arrest was justified because he was subsequently indicted for interfering with the police, proving they had probable cause. But a subsequent indictment proves no such thing. And even if it did, the Supreme Court has held that probable cause does not automatically defeat claims for retaliatory arrest. If an arrest was for misdemeanor violations for which people are not normally arrested, that arrest might still be unconstitutionally retaliatory.

Third, Defendants suggest that the County and the Officers are immune from suit under the doctrines of *Monell* and qualified immunity, respectively. But they aren't. The Amended Complaint alleges that Justin's exclusion from the press conference and gas-station arrest were both done pursuant to County policy and practice—making the County liable. The Amended Complaint further alleges that the Officers violated clearly established law when they excluded and arrested Justin—making the individual Officers liable. Defendants cannot escape liability.

2

Finally, as to Count V, Defendants are correct that controlling precedent forecloses Justin's Fourth Amendment claim. He merely preserves it here for further appellate review.

In short, Defendants' motion is doubly deficient. It demands that the Court dismiss Justin's complaint based on factual assertions not in the Amended Complaint and without coherent legal argument supported by citation to authority. The Court should therefore deny Defendants' Motion.

## LEGAL STANDARD

"In deciding a Rule 12(b)(6) motion to dismiss . . . 'the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *LaBlanche v. Spring ISD*, No. H-16-3103, 2017 WL 6409031, at *2 (S.D. Tex. Oct. 4, 2017) (Hittner, J.) (cleaned up) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To avoid dismissal, a plaintiff need only plead "enough facts to state a claim to review that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In ruling on a motion to dismiss, courts are limited to the allegations in the complaint and any attachments or materials the complaint references. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338, 340 (5th Cir. 2008) ("[W]e may not consider any additional evidence . . . .").

3

## BACKGROUND

As alleged in the First Amended Complaint, Sheriff Fagan, officers Hartfield, Garcia, Rollins, and Rodriguez, and Fort Bend County (collectively, Defendants), have repeatedly retaliated against Justin for criticizing them in his reporting. This retribution came to a head in two separate incidents in the latter half of 2021, both of which give rise to the claims in this case.

### A.  Justin Exercises His First Amendment Rights to Criticize the Fort Bend Sheriff's Office Through Online Journalism.

Justin is a full-time independent journalist based in Fort Bend County, Texas. Dkt. 33 (First Amended Complaint) ¶¶ 13, 17. He primarily distributes his reporting through social media channels, where he reaches millions of unique viewers each year. *Id.* ¶ 18. Justin's reporting focuses on local government, including law-enforcement and public-information issues, and it is often critical of the government's actions. *Id.* ¶ 17.

Justin's reporting fills a gap in traditional media coverage that often does not cover local government issues or does so in a limited way. *Id.* ¶ 24. Of particular importance is his coverage of police responses, such as roadside stops or mental-health calls, where traditional media is rarely present but that can nonetheless be high stakes for the individuals involved. *Id.* ¶¶ 27–29. Justin's coverage typically involves showing raw footage of these incidents, which he often records himself. *Id.*

4

¶ 23. Although he often adds his own commentary to the footage, he ultimately just wants the public to see for themselves what government officials are doing. *Id.*

Justin typically films police in the Fort Bend area and, until recently, regularly recorded officers with the Fort Bend County Sheriff's Office (FBCSO). *Id.* ¶ 31. FBCSO officers are generally familiar with Justin and his reporting—and, during the events at issue in this case, Sheriff Fagan, Officer Garcia, and Officer Rodriguez all personally acknowledged that they knew who Justin was. *Id.* ¶¶ 32, 61, 75. Because FBCSO officers either did not have or did not consistently use body-worn cameras until early 2022, Justin's recordings were often the only meaningful video evidence—and sometimes the only video evidence, period—of the officers' public encounters. *Id.* ¶¶ 36–37. Although Justin has been filming FBCSO officers for years, his relationship with the FBCSO deteriorated after Sheriff Fagan took office. *Id.* ¶ 44.

### B. July 2021: Sheriff Eric Fagan Personally Orders Justin Excluded from a Public Press Conference Even Though Other Reporters Are Allowed to Remain.

Sheriff Fagan and FBCSO's openly antagonistic behavior first came to a head in July 2021, when Fagan personally ordered Justin removed from an outdoor press conference at a public park. Justin traveled to the park on July 12, after hearing that emergency services had been dispatched there, and began livestreaming FBCSO's response upon determining that the scene was connected to a missing-persons case.

*Id.* ¶ 46. FBCSO officers ultimately closed the park and requested that Justin and other members of the media convene at the park's entrance.[1] *Id.* ¶ 49. Sheriff Fagan and another FBCSO officer informed Justin that he had five minutes to leave, yet both officers immediately began physically crowding him to force him out. *Id.* ¶ 50. Justin was the only reporter who received this treatment, even though other reporters were still filming in the park even closer to the scene. *Id.* ¶ 51.

Justin went to the entrance of the park as instructed and joined reporters from local news stations at the end of a parking lot outside the park. *Id.* ¶ 53. Upon Sheriff Fagan's arrival, Justin decided to approach the area where Fagan was already speaking with the other journalists. *Id.* ¶ 54. Although Justin was not being disruptive in any way and his behavior did not otherwise merit removal, Sheriff Fagan appeared to gesture toward Justin and give Hartfield instructions. *Id.* ¶¶ 56, 57. Sheriff Fagan appeared to say: "[If he] don't do it, arrest him. Cause he's not part of the local media, so [he has to] go back." *Id.* Sheriff Fagan then went back to speaking to and shaking hands with other reporters. *Id.* ¶ 58.

---

[1] In their motion to dismiss, Defendants assert without support that Justin was involved in a physical altercation with one of the missing person's family members prior to being removed from the park. Dkt. 39 (Motion to Dismiss) at 5–6. As explained in Part I, below, the First Amended Complaint does not contain any allegations about this incident, so Defendants' unsupported assertion is not relevant to a motion at the pleadings stage.

After Officer Garcia arrived on scene, both he and Officer Hartfield approached Justin. *Id.* ¶ 60. Hartfield told Justin that "you are not, uh, media, so, at the Sheriff's request, could you step back this way with us please." *Id.* Hartfield and Garcia then physically escorted Justin to a location across the parking lot from Sheriff Fagan and the other journalists, and Hartfield ordered Justin to stay there. *Id.* ¶ 62. Sheriff Fagan then began hosting a formal press conference for the other journalists. *Id.* ¶ 64. Justin, however, was too far away to hear what Sheriff Fagan or the other journalists were saying. *Id.* Justin was not permitted to go any closer to the press conference at any time, and Sheriff Fagan did not otherwise speak with him that day. *Id.* ¶ 65.

## C. December 2021: Officers Rollins and Rodriguez Arrest Justin, but No One Else, for Filming FBCSO Officers Responding to a Mental-Health Call at a Gas Station.

After the July incident, Justin significantly reduced his filming of FBCSO officers out of concern that they would further retaliate against him for his reporting. *Id.* ¶ 71. He felt compelled to film again in December, however, when he observed an FBCSO vehicle traveling at a high rate of speed on what he suspected was a mental-health call for a man whose case he had been following closely. *Id.* ¶ 72. Justin had recorded the man's encounters with FBCSO officers in the past and believed that the man was at risk of being seriously injured or killed by the officers. *Id.* ¶ 73–74. Justin and his wife therefore drove to the scene of the response, a gas

station owned by the man's family. *Id.* ¶¶ 74, 76. Shortly after, Officer Rodriguez informed other officers via police radio that Justin, a "local journalist," had arrived at the scene. *Id.* ¶ 75.

Justin began filming approximately 130 feet away from the house where officers believed the mentally ill man to be—at the far side of a structure covering gas pumps. *Id.* ¶¶ 76–81. Several others—the mentally ill man's mother plus two mental-health advocates—were also observing from that location. *Id.* ¶¶ 78, 82. There was no crime-scene tape or any other indicator that officers had established a perimeter. *Id.* ¶ 83. Rodriguez observed Justin standing behind the gas-pump structure and cautioned him to "stay back over there" but did not indicate that he needed to move. *Id.* ¶ 80.



While Justin was standing with the other bystanders, Officer Rollins approached him from behind and ordered him and the mental-health advocates to move across the street. *Id.* ¶ 82. After stating his concern that FBCSO officers would harm the man, Justin turned around and began to leave according to Rollins's orders. *Id.* ¶ 86. However, when Justin realized that the mental-health advocates had stayed to speak to Rollins, Justin turned around and began to film again about fifteen to twenty feet from where Rollins was standing. *Id.* ¶ 87. Justin was no more than a few yards from the road, which was not closed off to the public. *Id.* And Rollins was standing with his back to the active scene. *Id.* ¶ 118(d) (and accompanying image).

Officer Rollins was speaking with the mental-health advocates when he paused and, from a distance, ordered Justin to leave. *Id.* ¶¶ 87–88. Justin responded that he had a right to remain there as long as the other people were there, too. *Id.* ¶ 88. But Rollins continued to insist that Justin leave and began to approach Justin while counting down on his fingers. *Id.* ¶ 89. Justin continuously backed away from Rollins and the active scene. *Id.* Nonetheless, Rollins continued to approach Justin and arrested him. *Id.* ¶ 90. At that time, Justin was approximately 170 feet away from the house. *Id.* ¶ 91. Officers did not order the others to leave at that time, much less arrest them. *Id.* ¶¶ 87, 92.

Officer Rodriguez later transported Justin to the Fort Bend County Jail. *Id.* ¶ 103. During the booking process, Sheriff Fagan himself—along with the FBCSO

9

Deputy Chief and another unidentified individual—arrived at the jail and took Justin to a different room. *Id.* ¶ 106. Sheriff Fagan then asked if Justin knew why he was in jail and became agitated when he would not speak without an attorney present. *Id.* ¶ 107. Either Sheriff Fagan or the Deputy Chief said, in substance, "Do you know who I am?" *Id.* ¶ 108. When Justin continued to refuse to speak, Fagan said, in substance, "Fine, we'll do this the regular way." *Id.* ¶ 109. Justin understood this interaction to mean that Sheriff Fagan was asserting his influence and would not have continued with the booking process or sought prosecution if Justin had waived his right to an attorney and agreed to obey officers in the future. *Id.* Justin remained in jail for several hours until one of his colleagues posted his $500 bail. *Id.* ¶ 110.

Based on that incident, Justin was charged with—and later indicted for—Interference with Public Duties, a Class B misdemeanor. *Id.* ¶¶ 111, 125. Notably, the unnecessary and unusual misdemeanor indictment came months after the arrest but less than two weeks after Justin posted a video discussing the charge and criticizing FBCSO and Fort Bend County officials. *Id.* ¶¶ 124–25. On March 30, 2023, Justin's trial resulted in a hung jury, with 5 out of 6 jurors voting to acquit.

## D. An Unrelated Detective Obtains Search Warrants Based on Unsworn, Secondhand Information.

On January 14, 2022, FBCSO Detective Travis James sought and obtained two search warrants for some of the items seized during Justin's arrest: one for Justin's body-worn camera and one for his video camera's memory cards. *Id.* ¶ 114.

10

James signed both supporting affidavits, which purport to be based on James's "personal knowledge of this case." *Id.* ¶ 115. However, James himself was not involved in the arrest in any way and had no firsthand knowledge of any of the relevant circumstances. *Id.* ¶ 116. James's "firsthand knowledge" was instead based solely on his review of Rollins's arrest report—which was not attached to the affidavit—and James's conversations with the officers involved. *Id.* ¶¶ 116, 118.

As detailed in the complaint, Officer Rollins's arrest report contains several misrepresentations that are material to establishing probable cause but are conclusively disproven by video evidence. *Id.* ¶ 118. For instance, Rollins reported that Justin was standing "directly in front of the residence where [the mentally ill man] was barricaded with a weapon," even though video demonstrates that Justin was standing on the other side of the gas station, far away from the house. *Id.* ¶ 118.a. However, because Detective James simply swore that Officer Rollins's report said what it said—which was true—Rollins did not need to repeat his report's false statements under oath before the FBCSO could obtain a search warrant. *Id.* ¶ 120.

FBCSO has used these warrants to search at least Justin's memory cards and possibly his body-worn camera. *Id.* ¶ 121. These devices contain the most complete videos of Justin's arrest. *Id.* ¶ 123. But FBCSO has refused to return them or allow Justin to access the videos. *Id.* ¶¶ 122–23.

11

# ARGUMENT

## I.   PRESS CONFERENCE: The Amended Complaint States Claims that Justin's Removal from the Press Conference Violated the First Amendment and the Equal Protection Clause.

Counts I and IV of the First Amended Complaint allege that Defendants violated Justin's First Amendment and Equal Protection rights when the Officers removed him from a press conference that other members of the traditional media were allowed to participate in. Dkt. 33 ¶¶ 173, 200. Defendants seek to dismiss both claims on two grounds: (1) "Plaintiff was moved to a nearby location to film the press conference on or about July 12, 2021 as a result of an earlier physical altercation Plaintiff had with a member of the deceased's family"; and (2) Justin "does not allege that he told any Defendant that he was unable to hear or ask questions." Dkt. 39 at 5. Not only do Defendants fail to cite a single case in support of this argument (or even really make the argument at all), they also premise their response on a supposed incident not in the Amended Complaint: that Justin had an altercation with the missing person's family. They then suggest Justin forfeited his rights by not complaining about his treatment. Each of these threadbare arguments fails.

**Altercation Theory:** First, Defendants argue that Justin was removed from the press conference "as a result of an earlier altercation with" the deceased's family. Dkt. 39 at 5. Defendants do not cite to the Amended Complaint for this allegation

because it is not there. This is an allegation Defendants have nakedly asserted in their Motion. That alone dooms their argument, because the "court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir.), *cert. denied*, 143 S. Ct. 109 (2022). If Defendants believe this is an important fact, then at the merits stage they can proffer supporting evidence and Justin can dispute it.

Apart from that fatal defect, Defendants entirely mischaracterize Justin's claim as the asserted right "to stand wherever he wants during a press conference." Dkt. 39 at 5. But, of course, Justin is not asserting any right to stand wherever he wants. As the Amended Complaint alleges, he is asserting the right to stand next to other members of the media at a public press conference in a public park and participate with them on equal terms in covering a story of public importance. He is also asserting the right not to be strongarmed away by armed police officers, on pain of arrest if he resists, at the specific order of the County Sheriff, an official whom Justin has publicly criticized. One can scarcely imagine a more clearly established right in America than the right of a journalist not to be removed by force based on disapproval of his viewpoint. "It is well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano*

13

*Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 829 (1995)); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980) (plurality opinion) (stating "First Amendment guarantees of speech and press" assure "the right of access to places traditionally open to the public"); *United Tchrs. of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1373 & n.2 (S.D. Fla. 2002) (collecting cases, and holding exclusion of some members of press from access to areas ostensibly open to all media is unconstitutional).

In addition, Justin is also asserting the clearly established right of a member of the public to film officials, particularly police, in the discharge of their duties. The Fifth Circuit "agree[s] with every circuit that has ruled on this question: . . . [T]he First Amendment protects the right to record the police." *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *see Irizarry v. Yehia*, 38 F.4th 1282, 1290–92 (10th Cir. 2022) (collecting cases). Justin had a right to "film[] . . . government officials engaged in their duties in a public place, including police officers performing their responsibilities." *Turner*, 848 F.3d at 690 (quoting *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011)).

In short, there is no merit to Defendants' altercation theory, which asserts facts not in the complaint, provides no legal citation or developed argument, and

mischaracterizes Justin's First Amendment and Equal Protection claims concerning the press conference. The Amended Complaint plainly states viable claims.

**Failure-to-Complain Theory:** Defendants next argue that Justin's inability to participate in the press conference is his own fault. According to Defendants, after officers muscled Justin away, there is no allegation he "told any Defendant that he was unable to hear or ask questions," or that "he was told that he could not ask questions," or that "he attempted to ask the Sheriff questions during the news conference." Dkt. 39 at 5. Defendants cite no case for the proposition that, when armed officers crack down on someone because of their viewpoint, the silenced speaker has no First Amendment claim unless he alleges that he pointed out to the officers that he would prefer not to be silenced.

Defendants cited no case for that absurd proposition because there is none. The First Amendment and Equal Protection violations were complete when the Sheriff singled Justin out and instructed his officers to physically relocate Justin away from the press conference, which others were allowed to attend and participate in. There is no requirement that, to state a viable claim, a speaker must also have begged or bargained with the officials trying to silence him in order to claw back some of his free-speech rights. To the contrary, as the previously cited cases establish and as is a matter of common sense across the country, the police must never single

15

out, or require special supplication from, a speaker based solely on disapproval of that speaker's viewpoint.

*     *     *

The bottom line is that Justin alleged that he was singled out for differential treatment at Sheriff Fagan's press conference *because the Sheriff disapproved* of Justin's viewpoint. Dkt. 33 ¶¶ 61, 66, 137, 182, 184. Those allegations plausibly state First Amendment and Equal Protection claims. Defendants' arguments, unsupported by case law and premised on allegations not in the complaint, do not remotely establish that Counts I and IV should be dismissed as a matter of law.

## II.   GAS STATION ARREST: The Amended Complaint States Claims that Defendants Violated Justin's First Amendment Rights When They Arrested Him at the Gas Station.

The Complaint brings two distinct First Amendment claims concerning the arrest. They are similar but not the same. Count II asserts that Defendants violated Justin's rights by arresting him (and seizing his equipment) for peaceably filming a police encounter with a mentally disturbed man at a gas station. This claim does not depend on any prior history between Justin and Fort Bend officials. It is clearly established that members of the public have a free-speech right to record officials. *Turner*, 848 F.3d at 685–86. Count III, by contrast, does depend on Justin's prior history with Fort Bend officials, especially the Sheriff's department. In Count III, Justin alleges that his arrest (and equipment seizure) was motivated by a desire to

16

retaliate against him for his negative coverage of county officials in the past. Dkt. 33 ¶¶ 194, 202.

Defendants seek to dismiss both counts on the ground that Justin "was subsequently indicted by a grand jury for [interfering with a police officer]." Dkt. 39 at 6. Because "a grand jury evaluated the evidence that Plaintiff had committed a crime and indicted him for that crime," Defendants contend that Justin cannot argue that the arrests were improper. As with the effort to dismiss the counts related to the press conference, Defendants cite no authority and fundamentally mischaracterize Justin's claims: the supposed "right or privilege arising under the First Amendment to interfere with a police officer's public duties." Dkt. 39 at 7.

Defendants cite no cases whatsoever, much less any case for the proposition that a grand jury indictment precludes a First Amendment claim related to the arrest. The question in a First Amendment case concerning an arrest is not whether the prosecutor's lopsided presentation of evidence convinced a grand jury to indict. The question is whether there was actual probable cause for the arrest. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019) ("The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim."). Under the allegations of the Amended Complaint, Justin presented no danger to Officer Rollins or others. It is, therefore, a question of fact whether Rollins had probable cause to arrest Justin. *Loftin v. City of Prentiss*, 33 F.4th 774, 780 (5th Cir. 2022) ("To determine

whether probable cause existed for an arrest, the court examines the events leading up to the arrest, and then decides whether these historical facts, viewed from the standpoint of a reasonable police officer, amount to probable cause." (cleaned up)). That cannot be resolved at the pleading stage, and certainly not by pointing to a grand-jury indictment.

Moreover, even the presence of probable cause may still not insulate an arrest from First Amendment liability. An arrest can be unconstitutional if officers, absent a retaliatory motive, would not ordinarily have made that arrest. *Nieves*, 139 S. Ct. at 1727 ("[T]he no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."). Here, the FBCSO Officers did not arrest other people standing the exact same distance from, or even closer to, the incident. Justin's indictment—*for a misdemeanor*—simply has no bearing on whether he has stated a claim for relief in this matter.

## III. IMMUNITIES: The County Is Not Shielded from Liability Under the *Monell* Doctrine, Nor Are the Individual Defendants Protected by Qualified Immunity.

Defendants vaguely—and only *very* vaguely—hint that Justin's claims against the County are barred by the *Monell* doctrine, and that his claims against the Officers in their individual capacity are barred by qualified immunity. In their introductory paragraphs, Defendants correctly note that "[f]or purposes of

establishing direct § 1983 liability against Fort Bend, Plaintiff is required to plead facts establishing the following three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom." Dkt. 39 at 3 (citing, *inter alia*, *Monell v. Dep't of Social Srvs.*, 436 U.S. 658, 694 (1978)). In the next paragraph, Defendants likewise fairly sum up the doctrine of qualified immunity: "A court considers whether 'the facts alleged show the officer's conduct violated a constitutional right,' and whether the right was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* at 4 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In the next paragraph, Defendants assert that "[a]s pleaded, the complaint's § 1983 claims should be dismissed because there is not a sufficient allegation of pattern or practice to allow for single-incident *Monell* or direct § 1983 liability." *Id.*

But then, Defendants never actually argue that Sheriff Fagan's order at the press conference was a single incident that, as a matter of law, does not constitute an official policy for which the County may be liable. Likewise, though the words "clearly established" pop up here and there in Defendants' brief, there is no actual argument, supported by citations to controlling cases, even attempting to show that the rights at issue are not clearly established.

19

As noted earlier, conclusory assertions unsupported by actual argument and case law may be summarily rejected. *See* Summary of Argument, above. But Defendants' assertions are meritless to boot.

As to *Monell* liability and the press conference, "municipal liability for constitutional torts arises when the execution of an official policy causes the plaintiff's injury." *Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016) (citing *Monell*, 436 U.S. at 694). Municipal liability claims usually involve generally applicable policies—and the Amended Complaint does allege a pattern of retaliatory incidents against Justin. Dkt. 33 ¶ 184. But a municipality can also be liable for a "single unconstitutional action . . . if undertaken by the municipal official or entity possessing 'final policymaking authority' for the action in question." *Howell*, 827 F.3d at 527 (citing *Brown v. Bryan County*, 219 F.3d 450, 461 (5th Cir. 2000)).

Here, Defendants excluded Justin from the press conference according to County policy set by the Sheriff. The Sheriff was a "final policymaker" for Fort Bend County on law-enforcement matters. Dkt. 33 ¶ 178; *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) ("In this circuit, it has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement . . . ." (quotation marks omitted)). And it was the Sheriff who "personally ordered Justin's removal from the press conference even though Justin's behavior did not in any way merit removal." Dkt. 33 ¶ 57. That removal policy was

20

content- and viewpoint-based discrimination, because the Sheriff's policy was based on an entirely viewpoint- and content-based determination that Justin was "not part of the local media." Dkt. 33 ¶ 56. And it was as a direct result of that policy that the Officers removed Justin from the press conference. Dkt. 33 ¶ 60 (Officer Hartfield said, "*at the Sheriff's request*, could you step back this way with us please" (emphasis added)); *see also* Dkt. 33 ¶ 178 ("The County's policy, then—as promulgated by the Sheriff just before Justin's removal—was the moving force behind the Defendants' violation of Justin's constitutional rights."). To the extent that the County might dispute this in the future, the existence of a policy is a factual matter that cannot be resolved at the Rule 12(b)(6) stage. *See Howell*, 827 F.3d at 528 (holding there was "a genuine dispute of fact" whether a policy motivated the acts against the plaintiff).

So, too, does the Amended Complaint allege an official policy of retaliation against Justin for his past negative coverage of the Sheriff's department. The Amended Complaint alleges a number of events that show that the County had a policy, practice, or custom of discriminating against Justin for his viewpoint:

- Justin was removed without cause from the July 2021 press conference, at the direction of the County's policymaker, the Sheriff;

- The Sheriff personally visited Justin in jail and expressed disapproval of Justin's First Amendment-protected activities; and

21

- Justin's prosecution for his First Amendment-protected acts has continued with FBCSO's cooperation.

Dkt. 33 ¶ 184. Defendant's Motion makes no attempt to argue that these acts do not form a policy, practice, or custom. And, again, to the extent the County disputes these allegations, the issue should go to a factfinder, not be decided at the Rule 12(b)(6) stage. *See Howell*, 827 F.3d at 528 (holding there was "a genuine dispute of fact" whether a policy motivated the acts against the plaintiff).

As to qualified immunity, the rights at issue here are as clearly established as any can be. They include the right to film officials discharging their duties, the right not to be singled out based on discrimination against your viewpoint, and the right not to be singled out and arrested as an act of retaliation for past speech. *See Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972) ("[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."); *see also Turner*, 848 F.3d at 687–88 (holding it is "clearly established" that "a First Amendment right to record the police does exist").

In short, the Amended Complaint, meticulously and at length, alleges that Fort Bend County violated Justin's rights, based on an official policy and practice promulgated by Sheriff Fagan, by singling out Justin for mistreatment because of his

22

speech. In addition, the Amended Complaint, just as meticulously and in as much detail, alleges that the individual officers violated Justin's clearly established rights to participate in a public press conference and to film the police at the gas station. The motion to dismiss should be denied as to Counts I-IV.

## IV.   Count V Is Foreclosed by Wrongly Decided Supreme Court Precedent.

Finally, Defendants argue that Count V fails to state a claim because search warrants may be issued based on secondhand information under controlling Supreme Court precedent. Dkt. 39 at 7–8. Justin concedes that is correct. *See Jones v. United States*, 362 U.S. 257 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980). He merely seeks to preserve this claim for Supreme Court review, where he will argue that, under the Fourth Amendment, warrants can be supported by only those kinds of sworn testimony admissible at trial.

## CONCLUSION

Defendants' half-hearted attempts at dismissal should be denied. Most are either inadequately briefed or improperly raised. And to the extent Defendants adequately raise issues, their arguments are meritless. Justin therefore respectfully requests that this Court deny Defendants' Motion to Dismiss (Dkt. 39).

Dated: April 3, 2023                     Respectfully submitted,

                                         /s/ Victoria Clark

23

Victoria Clark, Attorney-in-Charge
Texas Bar No. 24109731
Federal ID No. 3749010
Jeffrey Rowes*, of counsel
Texas Bar No. 24104956
**INSTITUTE FOR JUSTICE**
816 Congress Ave., Suite 960
Austin, TX 78701
Tel: (512) 480-5936
Fax: (512) 480-5937
Email: tclark@ij.org
       jrowes@ij.org

Joshua House*, of counsel
California Bar No. 284856
**INSTITUTE FOR JUSTICE**
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: jhouse@ij.org

*Attorneys for Plaintiff*
*Admitted *pro hac vice*

24

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2023, I electronically filed the foregoing motion with the Clerk of Court using the CM/ECF system and served by the CM/ECF system to all counsel of record.

/s/ Victoria Clark
Victoria Clark, Attorney-in-Charge
*Attorney for Plaintiff*
