# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM, | |
| *Plaintiff*, | |
| v. | Civil Action No. 4:22-cv-4210 |
| COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity, | |
| *Defendants*. | |

## <u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiff Justin Pulliam moves for partial summary judgment on liability. Defendants Sheriff Eric Fagan, Officer Robert Hartfield, and Officer Taylor Rollins violated Pulliam's First and Fourteenth Amendment rights when they (1) excluded him from a press conference and (2) arrested him in retaliation for his protected speech.[1] The individual defendants are not entitled to qualified immunity, and Fort Bend County is liable under *Monell*. Summary judgment on liability is warranted.

---

[1] Pulliam files this motion under Judge Hittner's procedures because this case was originally assigned to Judge Hittner and was only reassigned to Judge Hanks the day this motion was due.

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................ iv

Summary of the Argument ......................................................................1

Statement of Facts ...................................................................................1

   I.   Pulliam is a journalist with a reputation for criticizing FBCSO. ...................1

   II.   Sheriff Fagan ejected a peaceful Pulliam from a July 2021
       press conference ........................................................................2

   III.  Rollins arrested Pulliam 60 seconds after arriving at a welfare check ...........4

Standard of Review ..................................................................................7

Argument ..................................................................................................7

   I.   Sheriff Fagan, Hartfield, and the County violated Pulliam's First
       Amendment and equal-protection rights at the press conference. .................8

      A.   Defendants' speaker-based discrimination cannot survive
          strict scrutiny. ...............................................................8

      B.   Defendants' viewpoint discrimination cannot survive
          strict scrutiny. ...............................................................13

      C.   Defendants' different treatment of Pulliam cannot survive
          strict scrutiny. ...............................................................14

      D.   Sheriff Fagan, Hartfield, and the County are liable for
          violating Pulliam's constitutional rights. ..............................14

   II.   Rollins and the County are liable for violating Pulliam's First
       Amendment rights in arresting him. .............................................17

      A.   Key Fact: Sgt. Rollins arrested Pulliam while Pulliam was
          asking Rollins to clarify his instructions. ..............................18

B.   Rollins arrested Pulliam in retaliation for protected speech and is not entitled to qualified immunity for violating the First Amendment. ...............................................................................18

C.   The County is liable under *Monell* for the arrest. ...............................23

Conclusion ...............................................................................................25

Certificate of Service ...............................................................................27

# TABLE OF AUTHORITIES

**CASES**                                                                                   **Page(s)**

*Austin v. Kroger Tex., L.P.*,
   864 F.3d 326 (5th Cir. 2017).................................................................. 7

*Bailey v. Iles*,
   78 F.4th 801 (5th Cir. 2023)................................................................. 16

*Bennett v. Pippin*,
   74 F.3d 578 (5th Cir. 1996).................................................................. 15

*Branzburg v. Hayes*,
   408 U.S. 665 (1972)........................................................................ 8, 17

*Chiu v. Plano Indep. Sch. Dist.*,
   260 F.3d 330 (5th Cir. 2001)................................................................ 13

*Citizens United v. FEC*,
   558 U.S. 310 (2010)...................................................................*passim*

*Denton v. City of El Paso*,
   861 F. App'x 836 (5th Cir. 2021).......................................................... 12

*Est. of Davis ex rel. McCully v. City of N. Richland Hills*,
   406 F.3d 375 (5th Cir. 2005)................................................................ 16

*Forsyth County v. Nationalist Movement*,
   505 U.S. 123 (1992).......................................................................... 12

*Freeman v. Gore*,
   483 F.3d 404 (5th Cir. 2007)................................................................ 21

*Gallegos-Hernandez v. United States*,
   688 F.3d 190 (5th Cir. 2012)................................................................ 14

*Gorsky v. Guajardo*,
   No. 20-20084, 2023 WL 3690429
   (5th Cir. May 26, 2023) ..................................................................... 21

*Heaney v. Roberts*,
   846 F.3d 795 (5th Cir. 2017)................................................................ 17

*Hicks-Fields v. Harris County,*
860 F.3d 803 (5th Cir. 2017) ........................................................................ 14, 15

*Houston v Hill,*
482 U.S. 451 (1987) ...................................................................................... 18, 19

*Howell v. Town of Ball,*
827 F.3d 515 (5th Cir. 2016) ............................................................................ 15

*Keenan v. Tejeda,*
290 F.3d 252 (5th Cir. 2002) ...................................................................... 18, 23

*Milam v. City of San Antonio,*
113 F. App'x 622 (5th Cir. 2004) ..................................................................... 25

*Nieves v. Bartlett,*
139 S. Ct. 1715 (2019) ...................................................................... 19, 20, 22

*Packingham v. North Carolina,*
582 U.S. 98 (2017) ......................................................................................... 8, 9

*Peterson v. City of Fort Worth,*
588 F.3d 838 (5th Cir. 2009) ............................................................................ 24

*Police Dep't of Chi. v. Mosley,*
408 U.S. 92 (1972) ............................................................................................ 17

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995) .......................................................................................... 13

*Scott v. Harris,*
550 U.S. 372 (2007) ...........................................................................................11

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ............................................................................................ 9

*Turner v. Lieutenant Driver,*
848 F.3d 678 (5th Cir. 2017) ............................................................................

*Velazquez v. City of Long Beach,*
793 F.3d 1010 (9th Cir. 2015) ........................................................................... 19

**RULES AND CODES**

Fed. R. Civ. P. 56(a) ................................................................................ 7

Tex. Penal Code § 38.15(d) .................................................................... 21

## SUMMARY OF THE ARGUMENT

Plaintiff Pulliam—a social-media journalist known for biting criticism of Fort Bend County officials—is entitled to summary judgment on liability because Defendants violated his clearly established speech and equal-protection rights. In Part I, Pulliam explains that Sheriff Fagan, Detective Hartfield, and the County violated his rights when they ejected him from an outdoor Fort Bend County Sheriff's Office ("FBCSO") press conference in a public park based on his status as a disfavored speaker and hostility to his viewpoint. In Part II, Pulliam establishes that Sergeant Rollins and the County violated his speech rights when Rollins arrested Pulliam while he was filming a welfare check for a mentally ill man. Pulliam respectfully asks the Court to enter summary judgment on constitutional liability, enter a permanent injunction against future interference with his speech, and allow Pulliam to prove his damages.

## STATEMENT OF FACTS

### I.  Pulliam is a journalist with a reputation for criticizing FBCSO.

Justin Pulliam is an independent journalist who films the activities of local government officials, including the police, and uses social media to publish his reporting.[2]  His YouTube channel, "Corruption Report," has nearly 75,000

---

[2] Ex. 1 (Pulliam Decl.) ¶¶3, 7–8.

subscribers.[3] Pulliam has reported on officials in Fort Bend County for over 3 years.[4] Among FBCSO officers, Pulliam has a negative reputation due to his criticism.[5]

The prior sheriff barred Pulliam from entering FBCSO's building.[6] When Sheriff Fagan took office in 2021, he lifted that ban.[7] But FBCSO's public information officer, who coordinates media access, refused to add Pulliam to the list of journalists notified about press conferences.[8] Pulliam never imagined that FBCSO's efforts to stymie his speech would escalate as described below.[9]

## II. Sheriff Fagan ejected a peaceful Pulliam from a July 2021 press conference.

The hostility to Pulliam came to a head on July 12, 2021, at Jones Creek Ranch Park ("Park"). Pulliam was filming FBCSO activities concerning the discovery of a body.[10] Two TV news crews were also at the Park.[11] FBCSO officers closed the Park, in part to separate the media from the deceased's family.[12] Media members were told to convene for a press conference at the Park's entrance.[13] Within Pulliam's hearing,

---

[3] *Id.* ¶7.

[4] *Id.* ¶6.

[5] Ex. 1 (Pulliam Decl.) ¶12; Ex. 2 (Fagan Dep. Tr.) 29:18–30:18; Ex. 3 (Rollins Dep. Tr.) 20:20–22:1; Ex. 4 (Rodriguez Dep. Tr.) 31:19–32:5.

[6] Ex. 2 (Fagan Dep. Tr.) 100:19–101:3; 148:6–22; 150:16–151:1.

[7] *Id.* 15:1–7.

[8] Ex. 1 (Pulliam Decl.) ¶¶16–17; Ex. 5 (PIO Email).

[9] Ex 1 (Pulliam Decl.) ¶¶12, 15–17.

[10] Ex. 1 (Pulliam Decl.) ¶¶18, 22.

[11] *Id.* ¶21.

[12] Ex. 2 (Fagan Dep. Tr.) 69:25–70:16.

[13] Ex. 6 (July 12th Video) 0:00–0:32; Ex. 1 (Pulliam Decl.) ¶30.

Sheriff Fagan ordered an officer to arrest Pulliam if he didn't leave the Park within five minutes.[14] The Sheriff did not threaten the TV crews.[15]

At the media area in the Park's parking lot, Pulliam quietly approached to set up next to the other reporters when the Sheriff arrived with Detective Hartfield.[16] Without provocation, Sheriff Fagan ordered Hartfield to kick Pulliam out, stating that "if he don't do it, arrest him 'cause he is not part of the local media, so he have to go back."[17] Hartfield and another officer instructed Pulliam to "step back this way with us please" because he is "not media."[18] Pulliam complied to avoid arrest.[19]

Hartfield and the other officer escorted Pulliam 80–100 feet away from Sheriff Fagan and the TV crews.[20] After moving Pulliam, Hartfield positioned himself between Pulliam and the press conference.[21] Sheriff Fagan held the press conference with the TV crews.[22] After that, Sheriff Fagan left without speaking to Pulliam.[23]

Ejecting Pulliam under threat of arrest destroyed his ability to participate in the press conference.[24] Before Hartfield moved Pulliam, Sheriff Fagan's comments

---

[14] Ex. 6 (July 12th Video) 1:18–1:30; Ex. 1 (Pulliam Decl.) ¶31.
[15] Ex. 2 (Fagan Dep. Tr.) 64:14–21.
[16] Ex. 6 (July 12th Video) 15:34–16:00; Ex. 1 (Pulliam Decl.) ¶¶38–39.
[17] Ex. 6 (July 12th Video) 15:45–16:01; Ex. 1 (Pulliam Decl.) ¶¶38–39.
[18] Ex. 6 (July 12th Video) 16:01–16:37.
[19] Ex. 1 (Pulliam Decl.) ¶¶44, 47.
[20] Ex. 6 (July 12th Video) 16:37–17:20; Ex. 1 (Pulliam Decl.) ¶41.
[21] Ex. 6 (July 12th Video) 17:20–17:45; Ex. 1 (Pulliam Decl.) ¶43.
[22] Ex. 7 (Fagan RFA) Nos. 15–16.
[23] Ex. 6 (July 12th Video) 17:45–24:50; Ex. 1 (Pulliam Decl.) ¶48.
[24] Ex. 1 (Pulliam Decl.) ¶¶45–46.

and conversation with the TV news crews are audible on Pulliam's video.[25] After Pulliam was moved back 80–100 feet, his cameras could only capture distant figures, facial features were not visible, and the content of statements was inaudible.[26]

There was no investigation into or discipline regarding the decision to move Pulliam away from the press conference.[27] The County confirmed that it would not have done anything differently concerning its interactions with Pulliam at the Park.[28]

Exclusion from the press conference and the threats of arrest chilled Pulliam's coverage of the police, particularly FBCSO. Before the press conference, Pulliam filmed an average of 9 law enforcement events per week with approximately 3 of those events featuring FBCSO officers.[29] In the 5 months after the press conference, Pulliam's reporting on police activity dropped dramatically: he filmed an average of 2.2 police events per week and only a handful of incidents involving FBCSO.[30]

## III. Rollins arrested Pulliam 60 seconds after arriving at a welfare check.

On December 21, 2021, Pulliam witnessed an FBCSO officer speeding in the direction of a property where a man known to be mentally ill lived.[31] Concerned that officers would use excessive force, Pulliam went to the property to film FBCSO

---

[25] Ex. 6 (July 12, 2021 Video Footage)15:50–16:33; Ex. 1 (Pulliam Decl.) ¶39.
[26] Ex. 6 (July 12, 2021 Video Footage) 17:17–18:00; Ex. 1 (Pulliam Decl.) ¶¶45–46.
[27] Ex. 2 (Fagan Dep. Tr.) 92:15–18; 145:5–12.
[28] Ex. 8 (County Dep. Tr.) 75:10–19.
[29] Ex. 1 (Pulliam Decl.) ¶52.
[30] *Id.* ¶53.
[31] *Id.* ¶54.

officers.[32] Upon arrival, Pulliam got permission to film from the property owner, the mentally ill man's mother.[33] FBCSO officer Rodriguez radioed that "local journalist Justin Pulliam's on scene" and ordered Pulliam to "stay back over there."[34] Pulliam followed Rodriguez's order, staying where he was to film.[35] A few minutes later, two civilian women arrived and walked toward the mother.[36]

Then, Sergeant Rollins arrived.[37] 60 seconds passed from Rollins' arrival to his arrest of Pulliam.[38] The precise order of events matters:

(1)   Rollins arrived and ordered three civilians, one of whom was Pulliam, to go across the street;

(2)   Pulliam made a critical comment but began walking toward the street;

(3)   The two other civilians did not comply and instead approached Rollins to explain that they were Texana mental health workers; *Rollins rescinded his order that they had to go across the street*;

(4)   Pulliam likewise tried to explain his role to Rollins to see if he would change his mind about Pulliam too;

(5)   Rollins arrested Pulliam for doing the *same thing the Texana employees did*: asking Rollins to change his mind.[39]

Rollins put Pulliam in the back of a patrol car.[40] While Pulliam sat handcuffed in the car, the two Texana employees continued to walk freely around the property.[41]

---

[32] *Id.* ¶¶55–57.
[33] Ex. 1 (Pulliam Decl.) ¶58; Ex. 9 (SD card footage) 0:00–0:45.
[34] Ex. 10 (Rodriguez Dashcam) 10:15–10:55.; Ex. 9 (SD card footage) 0:35–4:19.
[35] Ex. 11 (Pulliam Dashcam) 0:20–4:30; Ex. 1 (Pulliam Decl.) ¶59.
[36] Ex. 11 (Pulliam Dashcam) 4:05–4:48; Ex. 1 (Pulliam Decl.) ¶60.
[37] Ex. 1 (Pulliam Decl.) ¶¶61, 72; Ex. 11 (Pulliam Dashcam) 4:20–4:27.
[38] Ex. 11 (Pulliam Dashcam) 4:50–5:36.
[39] Ex. 9 (SD card footage) 4:12–5:00; Ex. 11 (Pulliam Dashcam) 4:50–5:36.
[40] Ex. 1 (Pulliam Decl.) ¶71.
[41] Ex. 10 (Rodriguez Dashcam) 16:00–16:47.

After Pulliam was brought to jail, an unidentified officer stated that "we should teach [Pulliam] for fucking with us."[42] Sheriff Fagan and two senior FBCSO officers visited Pulliam in jail to ensure that he was not mistreated by officers hostile to him.[43] Pulliam refused to answer Sheriff Fagan's questions without a lawyer, and the Sheriff ordered officers to "[d]o it by the book" and left.[44] FBCSO held Pulliam for five hours.[45] After Pulliam was released, an FBCSO officer posted about Pulliam's arrest on Facebook, indicating laughter.[46]

FBCSO assigned a robbery and homicide detective to investigate Pulliam for the class B misdemeanor of interference with public duties.[47] The detective presented the case to the prosecutor, concluding that Pulliam's arrest was not a contempt-of-cop situation because he's "known Sergeant Rollins for years" and perceives him to be "usually very calm and professional[.]"[48] In March 2023, Pulliam was tried to a jury for interference with public duties. A hung jury—five jurors voting to acquit and one to convict—resulted in a mistrial.[49]

---

[42] Ex. 1 (Pulliam Decl.) ¶79.
[43] Ex. 2 (Fagan Dep. Tr.) 143:3–20.
[44] Ex. 1 (Pulliam Decl.) ¶81; Ex. 2 (Fagan Dep. Tr.) 143:3–7; 143:21–23.
[45] Ex. 1 (Pulliam Decl.) ¶84.
[46] Ex. 12 (Facebook Post); Ex. 1 (Pulliam Decl.) ¶86. The post shared a news story with Pulliam's mugshot and included the text "Ahahahahahaha." The post received at least 27 comments, the majority of which disparaged Pulliam.
[47] Ex. 13 (James Dep. Tr.) 13:11–14:1, 15:19–23.
[48] Ex. 13 (James Dep. Tr.) 14:20–25, 49:1–51:10, 65:5–66:6.
[49] Ex. 1 (Pulliam Decl.) ¶87. Pulliam's criminal case remains pending, and he has not been notified if he will be retried. *Id.*

Sheriff Fagan and other officers in FBCSO leadership reviewed the footage of Pulliam's arrest.[50] No officers were disciplined, orally reprimanded, or counseled for their role in Pulliam's arrest.[51] FBCSO would not have handled Pulliam's arrest any differently.[52] After the arrest, Pulliam's reporting on police activity dropped even more, and he rarely films FBCSO activity.[53]

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). All evidence is viewed in the light most favorable to the nonmoving party. *Austin v. Kroger Tex.*, *L.P.*, 864 F.3d 326, 328–29 (5th Cir. 2017).

## ARGUMENT

Pulliam is entitled to summary judgment on liability. In Part I, Pulliam establishes that ejecting him from the press conference constituted speaker- and viewpoint-based violations of his free-speech and equal-protection rights; that Defendants cannot survive strict scrutiny; and that neither *Monell* nor qualified immunity shield Defendants from liability. In Part II, Pulliam similarly shows that Rollins and the County violated his free-speech rights by arresting him at the welfare check, and that no immunities shield any Defendant. Respectfully, the Court should

---

[50] Ex. 8 (County Dep. Tr.) 103:21–104:18.
[51] *Id.* 104:19–105:4.
[52] *Id.* 105:5–8.
[53] Ex. 1 (Pulliam Decl.) ¶91.

enter summary judgment on liability, issue a permanent injunction to prevent future constitutional violations, and allow the parties to proceed to a damages phase.

## I. Sheriff Fagan, Hartfield, and the County violated Pulliam's First Amendment and equal-protection rights at the press conference.

The video of the press conference speaks for itself.[54] Pulliam is a journalist. He was live streaming a police press conference to his audience. Even though Pulliam was quiet and peaceful, a hostile Sheriff Fagan declared him "not media" and ordered his removal under threat of arrest. Pulliam had no choice but to comply. This is one of those situations in which it is not hyperbole to say: This is not supposed to happen in America.

### A. Defendants' speaker-based discrimination cannot survive strict scrutiny.

Pulliam's reporting is protected speech. Independent "new media" journalists like Pulliam, who create content for social media, possess the same First Amendment rights as everyone else. *See Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (Freedom of the press is "not confined to newspapers and periodicals" and includes "every sort of publication which affords a vehicle of information and opinion."); *Citizens United v. FEC*, 558 U.S. 310, 352 (2010) ("With the advent of the Internet . . . , the line between the media and others who wish to comment on political and social issues becomes far more blurred."); *see also Packingham v. North Carolina*, 582 U.S. 98,

---

[54] Ex. 6 (July 12th Video) 15:19–24:48.

8

105, 107 (2017) (noting that "social media users employ these websites to engage in a wide array of protected First Amendment activity" and describing social media as "the modern public square").

Sheriff Fagan and Detective Hartfield burdened that protected speech by making a speaker-based distinction between "media" and "not media." Fagan to Harfield: "[I]f he don't [move], arrest him 'cause he is not part of the local media, so he have to go back."[55] Hartfield to Pulliam: "[S]tep back this way with us please" because "[you are] not media."[56] FBCSO's General Order codifying policy for press conferences likewise draws a materially identical distinction between traditional "media," such as local TV stations, which may participate in press conferences, and "social media," such as "YouTube," which are excluded.[57]

Speaker-based discrimination as a proxy for regulating content is presumptively unconstitutional, and the government must prove that its speaker-based distinction satisfies strict scrutiny. *Citizens United*, 558 U.S. at 340; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) ("[S]peaker-based laws

---

[55] *Id.* 15:45–16:01; Ex. 2 (Fagan Dep. Tr.) 60:20–25.

[56] Ex. 6 (July 12th Video) 16:01–16:37.

[57] General Order #08-03 on media relations defines "media" as "[p]ersons associated with television, print, electronic, or radio news programs/services and related entertainment enterprises" and "does not generally include social media." Ex. 14 (General Orders #08-03) at 1, 6, 11; Ex. 2 (Fagan Dep. Tr.) 36:1–37:23. General Order #05-04 defines "social media" as "[o]nline sources that allow people to communicate and share information" and "includes social networking platforms including but not limited to facebook, twitter, youtube, [and] blogs." Ex. 15 (General Orders #05-04) at 1, 4; Ex. 2 (Fagan Dep. Tr.) 38:17–41:1.

demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say).")."[R]estrictions distinguishing among different speakers, allowing speech by some but not others," are "prohibited" not only because speaker-based restrictions are "all too often simply a means to control content" but also because they "deprive[] the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Citizens United*, 558 U.S. at 340–41.

In claiming in depositions that they did not exclude Pulliam from the press conference, Defendants cannot pass the laugh test, much less strict scrutiny. Sheriff Fagan testified that he intended Hartfield to move Pulliam "[f]ar enough away that he wouldn't be interfering with the *other* news media, but not so far away where he couldn't see it or film it."[58] Sheriff Fagan also testified that—despite twice threatening Pulliam with arrest and ejecting him from the press conference—he would have screamed back answers if Pulliam had screamed questions from at least 80 feet away.[59] That is preposterous. No person in Pulliam's shoes would have felt free to scream at the Sheriff; indeed, screaming would have been the sort of disruption that could justify expulsion or arrest. The Court need not credit absurd

---

[58] Ex. 2 (Fagan Dep. Tr.) 81:10–14 (emphasis added).
[59] *Id.* 90:5–17.

assertions. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (if "no reasonable jury could believe it, a court should not adopt that version of the facts . . . for summary judgment"). No reasonable jury could believe that the Sheriff thought Pulliam could still record and ask questions on equal terms with other reporters.

Failing the laugh test means that Defendants fail strict scrutiny, which "requires the [g]overnment to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (quotation omitted). Excluding Pulliam from an outdoor press conference (with no space or security constraints) did not further *any* government interest, much less a compelling one. The only conceivable reason Fagan and Hartfield ejected Pulliam was to silence him. Silencing a critical journalist is not a compelling interest; it is the *sine qua non* of a First Amendment violation.

Nor do Defendants' *post hoc* justifications save them. In deposition, Defendants asserted two *secret* reasons (never stated or written before this suit) for removing Pulliam: an earlier altercation with a member of the deceased's family and a supposed complaint from a TV reporter that Pulliam was "unprofessional."[60] These "heckler's vetoes" do not provide any compelling interest. To the contrary, they magnify the constitutional problem. **On the facts**: The deceased's family was not at

---

[60] *Id.* 70:22–71:11, 85:24–86:22, 146:20–148:2.

or near the press conference, so no altercation could occur[61]; FBCSO officers moved the media to parking lot in part to separate all press from the deceased's family.[62] And, even if another reporter complained about Pulliam's professionalism, Defendants ask the Court to believe that requiring Pulliam to scream his questions from 80 feet away is somehow *more* professional. **On the law**: There is no interest in silencing speakers based on the objections of others; Sheriff Fagan's only compelling interest was *protecting* Pulliam from hecklers who might object to his presence or coverage. "Speech cannot be . . . punished or banned, simply because it might offend a hostile mob." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). The government cannot "tak[e] the right to speak from some and giv[e] it to others" based on professionalism, popularity, or any other form of approval. *Citizens United*, 558 U.S. at 340. There are no "preferred speakers." *Id.*

The absence of any legitimate interest, much less a compelling one, is fatal. But even if Defendants' justifications were compelling interests, ejecting Pulliam is not the least restrictive means of advancing them. *Denton v. City of El Paso*, 861 F. App'x 836, 839 (5th Cir. 2021) ("Narrow tailoring requires that the regulation be the least restrictive means available to the government."). Defendants could simply have warned Pulliam that he would be removed if he caused a disruption and only

---

[61] *Id.* 83:6–13.
[62] *Id.* 69:25–70:16.

12

removed him if such a disruption occurred. Instead, Sheriff Fagan ordered Pulliam's removal on threat of arrest before Pulliam did anything.

## B. Defendants' viewpoint discrimination cannot survive strict scrutiny.

Imagine that Pulliam ran a YouTube channel called "Hero Report" and regularly posted videos praising Fort Bend County police. Is it plausible that an agitated, hostile Sheriff Fagan would have threatened Pulliam with arrest and kicked him out of the press conference because he is "not media"? Of course not.

That is viewpoint discrimination: "[T]he specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint discrimination, especially against political commentary, is so antithetical to the First Amendment that it is virtually unconstitutional *per se*. *Id.* (classifying viewpoint discrimination as "an egregious form of content discrimination"). Moreover, "viewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001).

For the reasons discussed above, Defendants cannot satisfy strict scrutiny. There is no compelling government interest in ejecting a journalist based on viewpoint, and, even if there were, ejecting a non-disruptive journalist (rather than a warning, for example) is not the least restrictive means of advancing any interest.

### C. Defendants' different treatment of Pulliam cannot survive strict scrutiny.

Pulliam is also entitled to summary judgment on his equal-protection claim. The distinction between "media" and "not media" burdened a fundamental right— free speech. The Equal Protection Clause therefore demands strict scrutiny here. *See Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) ("Strict scrutiny is appropriate only where a government classification implicates a suspect class or a fundamental right." (cleaned up)). Pulliam and the other reporters were similarly situated. For the same reasons Defendants cannot satisfy strict scrutiny on the speech claim, they fail strict scrutiny on the equal-protection claim.

### D. Sheriff Fagan, Hartfield, and the County are liable for violating Pulliam's constitutional rights.

#### i. The County is liable under Monell.

The elements of *Monell* liability are satisfied here. *See Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017) ("[T]o establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."). Two policies promulgated by an official policymaker—one written and one unwritten—caused the violation of Pulliam's constitutional rights.

First, the County's written policy impermissibly distinguishes between speakers: Traditional media is good; social media, like Pulliam's YouTube channel, is bad. FBCSO's written orders expressly excludes "social media" from its definition

14

of "media" when discussing the rules for "media relations."[63] And Sheriff Fagan

testified that the General Orders are official policy of FBCSO approved by the sheriff

himself, a final policymaker.[64] *See Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir.

1996) ("[I]n Texas, the county sheriff is the county's final policymaker in the area

of law enforcement[.]" (quotation omitted)).

Next, kicking Pulliam out based on his status and hostility to his viewpoint

was an official unwritten County policy the Sheriff created on the spot. Official

policy "includes . . . the acts of its policymaking officials." *Hicks-Fields*, 860 F.3d

at 808. A municipality can be liable for a "single unconstitutional action . . . if

undertaken by the municipal official or entity possessing 'final policymaking

authority' for the action in question." *Howell v. Town of Ball*, 827 F.3d 515, 527 (5th

Cir. 2016).[65] The Sheriff has that authority.

As to *Monell*'s last element, both policies were the driving force behind

Pulliam's ejection from the press conference. He was kicked out, in the Sheriff's

own words, solely for being "not media." Thus, the County is liable for the actions

of Sheriff Fagan and Detective Hartfield.

---

[63] Ex. 14 (General Orders #08-03) at 1, 6, 11; Ex. 15 (General Orders #05-04) at 1, 4; Ex. 2 (Fagan Dep. Tr.) 36:1–41:1.

[64] Ex. 2 (Fagan Dep. Tr.) 14:2–7; 22:14–23:20, 30:24–32:18, 33:15–35:19, 40:4–41:1.

[65] Further, the press conference was not the first time that Pulliam had run up against FBCSO's policy of discriminating against independent journalists. FBCSO refused to add Pulliam to its notification list for press conferences because "[a]ccording to FBCSO PIO policy, only accredited media outlets can be added to the list you're requesting to be added to." Ex. 1 (Pulliam Decl.) ¶17; Ex. 5 (PIO Email).

### ii.  There is no qualified immunity.

Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005). A defendant is not entitled to qualified immunity if "prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Bailey v. Iles*, 78 F.4th 801, 807 (5th Cir. 2023) (quotation omitted).

Because Sheriff Fagan and Hartfield intentionally and deliberately violated Pulliam's First and Fourteenth Amendment rights, qualified immunity does not shield them from liability, as the Court concluded in denying the motion to dismiss. The Court determined that Pulliam's allegations established that Hartfield was "deliberately interfering with Pulliam's clearly established rights" and that Sheriff Fagan was "aware of" and "directly involved" in the violations. Dkt. No. 48 at 10–11. The Court got it right. Pulliam has now proved those allegations. Sheriff Fagan and Hartfield knew Pulliam, knew of his critical reporting, and understood that Pulliam was at the Park to report the news.

One scarcely needs to be a constitutional lawyer to know that the First Amendment does not allow kicking peaceful journalists out of press conferences and threatening to arrest them based on their speaker status and critical viewpoint. In 2021, it was clearly established that:

- Citizens have a "First Amendment right to record the police . . . subject only to reasonable time, place, and manner restrictions." *Turner v. Lieutenant Driver,* 848 F.3d 678, 688 (5th Cir. 2017).

- "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972).

- The right to free speech includes "[t]he right of citizens to inquire, to hear, to speak, and to use information[.]" *Citizens United*, 558 U.S. at 339.

- "It is beyond cavil that a reasonable government official . . . would have known that it would be impermissible under the First Amendment to prevent [plaintiff] from speaking and to eject him from the meeting based on the message he was conveying." *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017).

- "Freedom of the press is a 'fundamental personal right' which 'is not confined to newspapers and periodicals.'" *Branzburg*, 408 U.S. at 704.

Defendants had more than reasonable warning that excluding Pulliam from the press conference was entirely unconstitutional. There is no qualified immunity.

## II. Rollins and the County are liable for violating Pulliam's First Amendment rights in arresting him.

On December 21, 2021, Rollins arrested Pulliam in retaliation for his protected speech, in keeping with FBCSO's policy of excluding and retaliating against Pulliam. After the arrest, Sheriff Fagan approved the arrest, and FBCSO continued its retaliatory policy by urging a baseless prosecution.

To prove First Amendment retaliation, one must show: (1) they were engaged in constitutionally protected activity; (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to

engage in that activity; and (3) the defendants' adverse actions were substantially motivated against the plaintiff's constitutionally protected conduct. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). There is no dispute that an arrest would chill a person of ordinary firmness and that the arrest did chill Pulliam.[66]

## A. Key Fact: Sgt. Rollins arrested Pulliam while Pulliam was asking Rollins to clarify his instructions.

Rollins arrested Pulliam within 60 seconds of arriving. It is critical to understand these 60 seconds: (1) Rollins arrives and orders Pulliam and two other civilians across the street; (2) Pulliam says to Rollins "so you can shoot him?" but complies and walks away; (3) the two other civilians do not comply and tell Rollins they are mental health workers; (4) Rollins changes his mind and lets them stay; (5) Pulliam asks Rollins whether he still has to go across the street too; (6) Rollins arrests Pulliam. In short, Rollins arrested Pulliam while Pulliam was doing what the other two civilians did—plead their case to be allowed to stay.[67]

## B. Rollins arrested Pulliam in retaliation for protected speech and is not entitled to qualified immunity for violating the First Amendment.

"The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston v Hill*, 482 U.S. 451, 462–63

---

[66] Ex. 1 (Pulliam Decl.) ¶91.
[67] Ex. 11 (Pulliam Dashcam) 4:50–5:36; Ex. 9 (SD card footage) 4:12–5:00.

(1987). Rollins ignored this bedrock principle when he arrested Pulliam for "interference with public duties"—a vague crime often called "contempt of cop."[68]

Pulliam engaged in protected speech. When Rollins arrived and instructed the civilians to go across the street, Pulliam pointedly asked "so you can shoot him?"[69] Particularly in the aftermath of George Floyd's murder, Pulliam believed that filming of police activities would make the police more likely to exercise restraint.[70] Pulliam was also aware of the subject's mental illness, and Pulliam's research indicated that the police use of force is much higher when someone is having a mental-health crisis.[71] Thus, although provocative, Pulliam's "so you can shoot him" question was protected speech rooted in concerns about excessive force. Pulliam engaged in protected speech again when, after Rollins changed his mind about the two other civilians, Pulliam asked Rollins to change his mind about Pulliam too.

Pulliam's protected speech was the but-for cause of his arrest. That is the only plausible inference from the undisputed record because Rollins treated the respectful mental health workers differently than Pulliam. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (confirming that but-for causation is satisfied if the adverse action

---

[68] The "offense of 'contempt of cop'" is a play on the phrase "contempt of court" and refers to when officers charge "minimal procedural offenses simply to punish or exact retribution on disrespectful or non-submissive individuals." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1022 (9th Cir. 2015) (quotation omitted).

[69] Ex. 9 (SD card footage) 4:12–5:00.

[70] Ex. 1 (Pulliam Decl.) ¶¶6, 13–14, 55, 62.

[71] Ex. 1 (Pulliam Decl.) ¶¶9, 54–55, 62.

against the plaintiff would not have been taken absent the retaliatory motive). Rollins

wanted to punish Pulliam for his "contempt of cop."

This inference is strengthened by five additional facts:

(1) Pulliam was widely known to FBCSO officers as a critic of local police (indeed, Rodriguez had already reported that "local journalist Justin Pulliam [was] on scene" before Rollins arrived);[72]

(2) Under the prior sheriff, FBCSO officers blocked Pulliam from reporting on FBCSO activities by preventing him from entering the FBCSO building and from accessing the sheriff;[73]

(3) Sheriff Fagan singled Pulliam out at the press conference in July 2021;

(4) Sheriff Fagan and his senior staff went to the jail after Pulliam's arrest to ensure that Pulliam was not mistreated by jail staff;[74] and

(5) FBCSO employees circulated Pulliam's mugshot on Facebook, making comments like "[a]n early Christmas present for law enforcement" and "[a]bout damn time."[75]

These facts permit only one conclusion: the arrest was an act of retaliation for what

Pulliam said before he was arrested, for not acting in complete supplication to

Rollins, and rooted in a pervasive hostility to Pulliam throughout FBCSO.

Although probable cause will normally defeat a claim of retaliatory arrest, *see*

*Nieves*, 139 S. Ct. at 1724, there was no probable cause to arrest Pulliam. FBCSO

witnesses agreed that the mental health workers did not commit the crime of

interference when they failed to comply with Rollins' order and approached him to

---

[72] Ex. 10 (Rodriguez Dashcam) 10:15–10:55.

[73] Ex. 2 (Fagan Dep. Tr.) 100:23–101:3; 148:6–22; 150:16–151:1.

[74] *Id.* 143:3–20.

[75] Ex. 12 (Facebook Post); Ex. 1 (Pulliam Decl.) ¶86.

explain why they thought they should be allowed to stay on scene.[76] In fact, Pulliam's behavior was better than the mental health workers': He started going across the street but only stopped when he saw that Rollins might reconsider his order. When Pulliam tried to explain why he should get to stay, Rollins arrested him.

The lack of probable cause to arrest either the mental health workers or Pulliam is evident on the face of the statute. Speech alone is not the crime of interference. Tex. Penal Code § 38.15(d) ("It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only."). And the Fifth Circuit has held that "'merely arguing with police officers about the propriety of their conduct . . . falls within the speech exception to section 38.15' and thus does not constitute probable cause to arrest someone for interference[.]" *Gorsky v. Guajardo*, No. 20-20084, 2023 WL 3690429, at *8 n.16 (5th Cir. May 26, 2023) (quoting *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007)). A reasonable officer would have known that Pulliam hadn't interfered when he tried to explain that he had a right to stay—just like the mental health workers.

To be clear: There was no non-retaliatory "safety" reason to arrest Pulliam (and only Pulliam) for asking Rollins to clarify his order. As just explained, Pulliam was arrested for challenging Rollins' decision, something the mental health workers

---

[76] Ex. 3 (Rollins Dep. Tr.) 48:8–49:9; Ex. 13 (James Dep. Tr.) 57:16–58:11.

had just done without getting arrested. There was no emergency. This was a welfare check.[77] The officers there before Rollins hadn't ordered anyone across the street. They had relayed via radio that the scene was stable, something Rollins should have known.[78] Rollins didn't act like anyone was in danger. He moved slowly, spoke calmly, and stood with his back to the house.[79] He did not act like a man worried about gunfire. And after arresting Pulliam, Rollins let the mental health workers freely walk around the property.[80] Rollins' actions show that Rollins did not arrest Pulliam for any safety reason. He arrested Pulliam because he expressed concern about police violence and questioned Rollins' decision to exclude only him.

The fact that Rollins did not arrest the mental health workers has another implication. Even if probable cause exists, that will not defeat a retaliatory arrest claim if there is "objective evidence that [plaintiff] was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves,* 139 S. Ct. at 1727. Where a plaintiff provides that evidence, the showing "help[s] to establish that non-retaliatory grounds were in fact insufficient to provoke the adverse consequences." *Id.* (cleaned up). Therefore, even if the Court concludes that there was probable cause for the arrest (which it should not), the fact

---

[77] Ex. 4 (Rodriguez Dep. Tr.) 49:22–50:20.
[78] *Id.* 39:21–40:15; Ex. 16 (Call Slip); Ex. 8 (County Dep. Tr.) 37:17–42:11, 43:16–44:8, 78:11–19, 85:24–86:4, 93:10-95:17.
[79] Ex. 11 (Pulliam Dashcam) 4:50–5:36; Ex. 9 (SD card footage) 4:12–5:00.
[80] Ex. 10 (Rodriguez Dashcam) 16:30–16:50, 51:10–51:34, 1:00:43–1:01:16, 1:19:33–1:19:57.

that Rollins arrested Pulliam but not the other two civilians (the Texana employees) means that any interference was not enough to trigger arrest. The conclusion that Rollins arrested Pulliam in retaliation for his protected speech is strengthened by the fact that FBCSO's 58 other arrests for interference from 2020–23 do not resemble Pulliam's.[81] The other arrests involved domestic disputes, intoxicated citizens, threats of violence, and violence against the police.[82] None involved political speech.

Finally, Rollins is not entitled to qualified immunity for at least two reasons: First, because "no reasonable police officer could have believed that probable cause existed for the law enforcement action[,] . . . the[] retaliation violated clearly established law." *Keenan*, 290 F.3d at 262. Second, the baseless arrest violated the right to film the police, which this Court already recognized as clearly established.

## C. The County is liable under *Monell* for the arrest.

The requirements for municipal liability are satisfied for the arrest. The County has an official unwritten policy of retaliating against and excluding Pulliam. Beyond the facts in Part II(B), Sheriff Fagan approved Rollins' retaliatory arrest:

- At the jail, Sheriff Fagan had Pulliam brought to an office space that did not have a video camera. The Sheriff knows where some of the jail's blind spots—places not filmed by a video camera—are located.[83]

---

[81] Ex. 17 (Interference Offense Reports).
[82] *Id.*
[83] Ex. 2 (Fagan Dep. Tr.) 138:4–13, 140:5–141:11.

- When Pulliam refused to answer Sheriff Fagan's questions in jail, the Sheriff approved booking Pulliam for interfering with public duties by ordering "do it by the book."[84]

- Sheriff Fagan and several officers in FBCSO leadership reviewed the footage of Pulliam's arrest, but no officer has been disciplined, orally reprimanded, or even counseled for future improvement.[85]

- Sheriff Fagan, the County's representative, testified that nothing concerning Pulliam's arrest on December 21, 2021 should have been handled differently.[86]

That's enough to hold the County liable. *See Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009) (concluding a municipality would be liable "[i]f the authorized policymakers approve a subordinate's decision and the basis for it").

But still more evidence confirms that the County had an established policy of restricting Pulliam's speech and retaliating against him *before* the arrest:

- Sheriff Fagan lifted the ban on Pulliam entering the FBCSO building but did not instruct employees to treat Pulliam like other journalists.[87]

- In December 2021, when Pulliam arrived at the property, Rodriguez radioed that "local journalist Justin Pulliam's on scene" because of "the history that [FBCSO officers] have with Justin Pulliam."[88]

- After Rollins arrested Pulliam, Rodriguez asked Rollins if he wanted to release Pulliam, but Rollins refused, saying that Pulliam was "going to jail."[89]

- While Pulliam was handcuffed in the back of a patrol car, Rodriguez told Pulliam that "you probably should have left when you had a chance."[90]

---

[84] *Id.* 143:3–7; 143:21–23.
[85] Ex. 8 (County Dep. Tr.) 103:21–105:4.
[86] *Id.* 105:5–8.
[87] Ex. 2 (Fagan Dep. Tr.) 100:23–101:3; 148:6–22; 150:16–151:1.
[88] Ex. 4 (Rodriguez Dep. Tr.) 42:20–43:13.
[89] Ex. 18 (County RFA) No. 39.
[90] *Id.* No. 40.

- Someone at the jail notified Sheriff Fagan that Pulliam was there, but Sheriff Fagan is not notified every time a new inmate arrives.[91]
- While Pulliam was in jail, an unidentified officer stated that "we should teach [Pulliam] for fucking with us."[92]

It is no wonder that Rollins believed he could arrest Pulliam with impunity.

*See Milam v. City of San Antonio*, 113 F. App'x 622, 628 (5th Cir. 2004) ("[T]he failure to take disciplinary action in response to an illegal arrest, when combined with other evidence, could tend to support an inference that there was a preexisting de facto policy of making illegal arrests[.]"). And Rollins was right. Rather than drop the case, FBCSO made the unusual decision to assign a robbery and homicide detective to investigate a class B misdemeanor and present the case to a prosecutor.[93]

## CONCLUSION

Pulliam is entitled to summary judgment on liability. Pulliam respectfully requests that the Court (1) declare Defendants' actions excluding and retaliating against him unconstitutional, (2) permanently enjoin Defendants from treating him differently than others and from retaliating against him; and (3) allow him to prove damages.

---

[91] Ex. 2 (Fagan Dep. Tr.) 133:2–18, 139:10–21.
[92] Ex. 1 (Pulliam Decl.) ¶79.
[93] Ex. 13 (James Dep. Tr.). 13:11–14:1, 15:19–23, 19:13–20:1, 49:1–51:3.

Dated: October 6, 2023  Respectfully submitted,

<u>/s/ Christen Mason Hebert</u>
Christen Mason Hebert, Attorney-in-Charge
Texas Bar No. 24099898
Federal ID No. 3844981
Jeffrey Rowes*, of counsel
Texas Bar No. 24104956
**INSTITUTE FOR JUSTICE**
816 Congress Ave., Suite 960
Austin, TX 78701
Tel: (512) 480-5936
Fax: (512) 480-5937
Email: chebert@ij.org
   jrowes@ij.org

*Attorneys for Plaintiff*
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2023, I electronically filed the foregoing motion with the Clerk of Court using the CM/ECF system and served by the CM/ECF system to all counsel of record.

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge

*Attorney for Plaintiff*

27