# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM,<br><br>　　　　*Plaintiff*,<br><br>v.<br><br>COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity,<br><br>　　　　*Defendants*. | Civil Action No. 4:22-cv-4210 |

## DECLARATION OF JUSTIN PULLIAM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Justin Pulliam, declare and state as follows:

1. I am the plaintiff in this action. I have knowledge of the facts set forth herein, and if called upon to testify as a witness thereto, I could and would competently do so under oath.

2. I am a citizen of the United States. I live in Fort Bend County, Texas, outside of Rosenberg.

3. I work full time as an independent journalist, filming local government

activities in Fort Bend County including police interactions with civilians.

4.      When I was a student at Texas A&M University, I became concerned with and involved in local government issues.

5.      I attended graduate school at the University of Texas Health Science Center in San Antonio. My studies, laboratory work, and clinical work included how to recognize mental illness, treat it, and interact safely with mentally ill patients.

6.      I believe that all members of the public should know what their local government is doing because local governments profoundly affect their constituents' everyday lives. I am a firm believer that holding local governments accountable for their actions—through informed voting and civil discourse—is crucial to ensuring that members of the public remain free to exercise their constitutional rights. To that end, I began filming local government activities, especially police activity, while in college. In 2019, I began filming and reporting on local government activities full time.

7.      I use social media to share my reporting. I have multiple YouTube channels, one of which is called "Corruption Report" and has nearly 75,000 subscribers. My reporting reaches millions of people each year. For example, Corruption Report alone had approximately 4.5 million views in 2020 and approximately 2.6 million views in 2021. In 2021, my Facebook video reports had at least two million views.

8.    My reporting typically involves showing raw video footage of government officials performing their duties in public, which I usually record myself. When I publish the footage, I often add commentary, pointing out what I think officials have done wrong and noting what I think they did right.

9.    From my studies, research, and experience, I know certain kinds of police calls, such as mental-health calls, have a much higher risk of the police using force and harming the subject. While attending graduate school, I became passionate about this issue after witnessing firsthand the mistreatment of mentally ill people (or allegedly mentally ill people) at the hands of police. Additionally, a good friend and colleague's daughter died due to mistreatment of a mental-health issue while in police custody.

10.    Fort Bend County Sheriff Eric Fagan first ran for the position of sheriff in 2020 and took office in January 2021. Part of his campaign was securing body cameras for officers with the Fort Bend County Sherriff's Office ("FBCSO"). Sometime in 2022, Sheriff Fagan fulfilled that campaign promise.

11.    Before 2022, FBCSO officers did not have body cameras. My footage was often the only footage of FBCSO officers carrying out their duties.

12.    Under Sheriff Fagan's predecessor, Sheriff Nehls, FBCSO officers prevented me from entering FBCSO's building and would refuse my requests to interview the sheriff. I believe that this was because of my criticism of FBCSO, its

officers, and law enforcement in general.

13.    In 2019, Houston police shot a 59-year-old disabled Navy veteran, Dennis Tuttle, and his wife, Rhogena Nicholas, in their home when the police were executing a no-knock warrant that turned out to be based on a lie from the lead narcotics officer on the case. I extensively reported on this incident.

14.    In the wake George Floyd's murder and the protests against police, I became increasingly concerned about police officers' use of force. I covered the Black Lives Matter protests in Houston, Texas.

15.    As part of Sheriff Fagan's political campaign, Sheriff Fagan confirmed in multiple interviews that citizens have the right to film the police and encouraged citizens to speak up if officers were doing something wrong. Fagan promised to correct officer misconduct if video footage of misconduct was brought to him. I understood Sheriff Fagan to be advising citizens to speak up to make sure that their right to film the police wasn't violated when interacting with officers. At that time, I genuinely believed that Sheriff Fagan supported filming officers, and that he would address officer misconduct if you brought video of that misconduct to him.

16.    On January 11, 2021, a few days after Sheriff Fagan took office, I approached Sheriff Fagan in the parking lot outside his office. Sheriff Fagan invited me inside where I recorded a short interview with him. During the interview, Sheriff Fagan confirmed that FBCSO was working on getting body cameras for officers.

4

Sheriff Fagan also stated that it was "fine" if I wanted to speak to him directly. I told the Sheriff that I wanted to attend FBCSO press conferences, and Sheriff Fagan directed me to contact the FBCSO public information officer.

17.    The next day, January 12, 2021, I emailed the FBCSO public information office. Exhibit 5 to my summary judgment motion is a true and correct copy of my email exchange with the public information office.

18.    On July 12, 2021, I traveled to Jones Creek Ranch Park in Richmond, Texas—a public park owned by Fort Bend County—after learning that emergency services had been dispatched to the area.

19.    FBCSO officers were already at the park. They were responding to reports of a submerged car that was connected to a missing-persons case. It was believed that the body of the missing person was in the car.

20.    I believe that Sheriff Fagan arrived at the park after I did.

21.    At least two television news crews eventually arrived at the park to report on the discovery of the body of the missing person.

22.    After I arrived, I began streaming video of the scene to one of my YouTube channels, Justin Pulliam Live, and recording the scene with other devices, including my phone and a body camera.

23.    At one point, I spoke to the ex-father-in-law of the deceased. He criticized FBCSO for not finding the missing car during the prior weekend.

24.    While filming FBCSO activities at the scene of the submerged car, I became concerned when workers started mowing the park's grass near where the car was discovered. I sought to capture footage via my cell phone of the mowers' activities and how close those activities were to the submerged car and the investigation. In doing so, I momentarily caught some of the family members of the deceased on camera from 20 to 30 feet away.

25.    The deceased's ex-husband then ordered me to get the camera out of his face, walked over to me, grabbed my cell phone out of my hand, and threw it into the grass. The ex-husband incorrectly thought that the family was the subject of my filming. After that interaction, the ex-husband returned to where other family members were standing.

26.    I then had a brief conversation with the ex-husband's father, who expressed how it was a difficult and emotional time for the family. After that conversation, I retrieved my cell phone.

27.    I did not press charges. Nor did I publish any footage of the ex-husband's actions toward me. I understood the family of the deceased was going through a traumatic, difficult event, and I did not take the ex-husband's actions personally.

28.    Shortly after that interaction, FBCSO officers moved the family of the deceased away from where I, and some other members of the media, were standing.

The officers moved the family to the other side of an FBCSO vehicle, closer to where the submerged car was located.

29.    I had no further interaction with the family of the deceased.

30.    FBCSO officers ultimately closed the park and requested that I, and other members of the media, go to a designated media area at the entrance to the park. An FBCSO officer, Dalia Simons, informed me and the other reporters that an FBCSO representative would speak to us there.

31.    Within my hearing, Sheriff Fagan ordered Simons, "after five minutes, make, give him proper time to leave, then make the arrest" with "him" referring to me.[1] To my knowledge, Sheriff Fagan did not give a five-minute time frame to leave the park to anyone else.

32.    Within a few seconds of the order, and even though I was already beginning to leave, the Sheriff and Simons both began physically crowding me. I expressed disapproval of FBCSO's handling of the investigation, including the closing of the park.

33.    While this was occurring, officers permitted the TV news crews to continue to film closer to the scene. I pointed this fact out to the Sheriff and Simons, but they still physically escorted me toward where my truck was parked.

34.    I left the area of the park by the creek and went to the parking lot at the

---

[1] Ex. 6 (July 12th Video) 1:18–1:30.

front of the park, which I understood to be the designated media area. Two, maybe three, TV crews were present. No one else was at the parking lot.

35.   I parked my truck approximately 10 parking spots away from where the other reporters were standing. It's my habit to park my truck so it is out of the way whenever I am filming and so I can leave easily after the events that I film are over.

36.   I immediately walked over to where the other reporters were standing. We had a polite conversation where I offered them B-roll video footage of FBCSO's activities at the creek and they declined.

37.   I then returned to wait by my truck. I was live streaming my reporting in the park, and I wanted to be able to chat and interact with my viewers without disrupting the other media.

38.   When Sheriff Fagan arrived at the parking lot via a Polaris Ranger with an officer who I knew to be Detective Hartfield, I walked back over to where the sheriff and the other reporters were standing. I was still live streaming.

39.   As I approached, Sheriff Fagan was talking to Hartfield while gesturing toward and looking at me. I caught the end of what Sheriff Fagan was saying: ". . . if he don't do it, arrest him 'cause he is not part of the local media, so he have to go back."[2] Although I knew that Sheriff Fagan was referring to me, I continued to quietly set up my equipment to record the press conference. I did not speak to anyone

---

[2] Ex. 6 (July 12th Video) 15:45–16:01.

as I waited for the press conference to start.

40.     Hartfield, accompanied by another officer who I knew to be Jonathan Garcia, then approached me. Hartfield ordered me to "step back this way with us please" because I was "not media."[3]

41.     Hartfield and Garcia then escorted me approximately ten parking spots, approximately 80–100 feet, away from where Sheriff Fagan stood with the TV crews. Upon reaching that spot, Hartfield stated, "Mr. Pulliam, it would be greatly appreciated if you would just stick right here. You're more than happy to film from right here. If you just stay back here, that'd be great. Okay, sir?" Hartfield and Garcia turned their backs and walked away from me.

42.     I said to their backs, "So, I can be right here?" Hartfield and Garcia continued walking away and did not respond.

43.     Hartfield walked to where the press conference was set up. He stood between me and the other reporters. I believe that Hartfield stood there to either further obstruct my view or to prevent me from returning to the press conference and to intimidate me.

44.     I remained standing where Hartfield said I could film. I felt that I had to follow Hartfield and stay where he had instructed me to be or be arrested, especially given the Sheriff Fagan had already threatened me with arrest twice that

---

[3] Ex. 6 (July 12th Video) 16:01–16:37.

day.

45.     After Hartfield and Garcia removed me from the press conference, I believe that Sheriff Fagan began speaking to the TV news crews. I was too far away to hear what the Sheriff or the other members of the media were saying or even see facial expressions.

46.     I adjusted my equipment to try and capture what was being said at the press conference, but it was just too far away for even my equipment to capture the statements.

47.     Given that I had heard Sheriff Fagan order officers to arrest me twice that day already and Hartfield stood between me and the press conference, I did not think I could return to the press conference, complain about my inability to see or hear the press conference, or shout questions without being arrested.

48.     After the press conference was over, Sheriff Fagan left the area. He did not speak with me, and I was unable to ask him any questions.

49.     I made no threats and took no violent actions on July 12, 2021.

50.     Although I expressed my disapproval of FBCSO actions while at the park on July 12, 2021, I followed all FBCSO orders and tried to stay out of the way of the investigation.

51.     Exhibit 6 to my summary judgment motion is a true and correct copy of video footage that I recorded on July 12, 2021 at the park. I recorded the footage

that day using multiple different devices, including my cell phone, a handheld camera, my body camera, and the dash camera mounted at the front of my truck. Exhibit 6 consists of synced footage from those four devices.

52.     Before being excluded from the press conference and threatened with arrest by Sheriff Fagan twice on July 12, 2021, I filmed an average of nine law enforcement events per week with approximately three of those events focusing on the activities of FBCSO officers.

53.     Immediately after I was excluded from the press conference, my reporting on police activity dropped significantly. From July 12, 2021 to December 21, 2021, I filmed an average of 2.2 police events per week and only a handful of incidents involving FBCSO. I was afraid that I would be arrested if I went to places where police officers were carrying out activities, and I felt that filming FBCSO activities would be futile because I would likely be removed or excluded. I was also humiliated that Sheriff Fagan and Officer Hartfield had called me "not media" while I was live streaming and had separated me from the other reporters. I interpreted the Sheriff's and Hartfield's statements that I was "not media" to mean that I was not eligible for constitutional protections afforded to the press, and that I might be arrested for any effort to cover the news in the County.

54.     Although I had dramatically reduced my reporting on police and FBCSO activity, on December 21, 2021, I saw an FBCSO car speed by me toward

a remote area. I knew that one of the only properties in that direction was a property where a mentally ill man lived with his mother. I had followed this man's situation and his interactions with the police for some time. I had previously recorded police interactions with this man, and I believed that officers had a history of unnecessarily escalating their responses to him.

55.     I suspected that the officer was heading to the mentally ill man's property, and I grew concerned about how officers might treat him if I was not there to film. Even though I had generally avoided filming FBCSO officers for the prior few months, I decided the risk was too great that the officers would unnecessarily injure or kill the man if someone wasn't there to record their actions.

56.     My wife was driving our truck, so I directed her to head to the property of the mentally ill man. Just as we pulled up to the property, I began recording video with several different devices: a dashboard camera, a body camera, and a handheld camera.

57.     When we arrived, my wife parked the truck at the edge of the property, near the road. I got out of the truck, and she stayed inside.

58.     Recording, I walked toward a gas canopy on the property. Under the canopy, I could see the mentally ill man's mother parked. She spoke to me, and I approached her to explain why I was filming. After I assured her that I was filming to ensure her son's safety, the mother gave her permission for me to film the officers

on her property.

59.     While I was speaking to the mother, an FBCSO officer who I knew to be Deputy Ricky Rodriguez went to get something from his patrol car, which was nearby. He cautioned me, "Sir, you need to stay back over there."[4] I followed his order and did not take any steps toward the home on the property. I simply stood still, did not speak, and filmed.

60.     After I had been filming for a few minutes, two women arrived at the property. They did not appear to be police and were dressed in civilian clothes. One of the women appeared to have on high heels. The two women walked to where the mother was still located under the gas canopy.

61.     Shortly after that, another officer arrived. He immediately walked toward me and the two women who had recently arrived, ordering all three of us to go across the street.

62.     I grew concerned that witnesses were all being moved across the street and that no one would be there to see what happened with the mentally ill man. I thought that I had only a few seconds to make sure that this officer knew that I was concerned that he might harm the man and to put the officer on notice that he needed to avoid a violent outcome. I responded to the officer's order to go across the street

---

[4] Ex. 9 (SD card footage) 0:35–4:19.

with a targeted question: "So you can shoot him?"[5]

63.     The officer seemed insulted by my question, asking "What's wrong with you, man?"[6] To that I responded, "What's wrong with you?"[7] I asked that question because I didn't understand why the officer thought it was okay to order all the civilians across the street immediately after he arrived.

64.     Even though I didn't agree with the order, I still turned around and began walking toward the street, intending to comply with the officer's order.

65.     After taking a few steps, I heard the two women speak to the officer. I turned back around to film what was happening and hear what was being said. After a couple more steps, I stopped walking.

66.     After the women started talking to the officer, it appeared that the officer was allowing these two women to stay on the property.

67.     When the officer looked up and saw that I had stopped moving across the street, he again ordered me to go across the street.

68.     I then questioned the officer about whether the order was for safety. If the officer's order was not for a safety reason, I had permission from the landowner, the mother, to film on the property.

69.     I also wanted to make sure that I wasn't the only one being excluded.

---

[5] Ex. 9 (SD card footage) 4:12–5:00.
[6] *Id.*
[7] *Id.*

Especially after being excluded from the FBCSO press conference on July 12, 2021, I knew that FBCSO and its officers applied a different standard to me because they did not like me and did not like my reporting. Given the situation, I also wanted to know if the officer was removing only me, the citizen with the video camera.

70.     The officer refused to answer my questions. I began walking backward in the direction of the street, keeping my camera directed at the officer. Without any warning or explanation, the officer began quickly counting down from five as he walked in my direction. When he reached one, he arrested me.

71.     The officer handcuffed me, took all my equipment, and placed me in the back of a patrol car. As I sat handcuffed in the back of the patrol car, I saw the other two civilian women continue to walk around the property. The mother also remained on the property under the gas canopy.

72.     I later learned that the officer who arrested me was Sergeant Taylor Rollins.

73.     Before I was arrested, I did not see any FBCSO officer acting like the situation was acutely dangerous. I filmed Deputy Rodriguez stretching while he waited. When Sergeant Rollins arrived, he walked slowly toward me, spoke unhurriedly, and then stood with his back to the home where the subject was located. I did not get the feeling or sense that I was in danger by remaining where the mother and the two other civilians were standing.

74.     At no point did my actions interfere with the officers' attempts to perform their duties. At no point did my actions endanger the officers, myself, or any other members of the public, including the other civilians on the property.

75.     After over 30 minutes from when the officer arrested me, it appeared that the officers were either giving up on speaking with the mentally ill man or the incident was over. Deputy Rodriguez returned to the car I was being held in and began driving. I told him that I would like to be buckled in. Deputy Rodriguez went to buckle my seatbelt. While he was doing that, he told me, "You probably should have left when you had the chance."[8]

76.     Deputy Rodriguez then drove his car with me inside to a nearby property.

77.     After a few minutes, Deputy Rodriguez drove back to the original property, where the man and his mother live. With me still handcuffed in the back seat, he ordered the two civilian women and the mother to leave the property.

78.     Eventually, after the mentally ill man was arrested, Deputy Rodriguez took me to the Fort Bend County Jail. At the jail, I was booked and strip searched.

79.     While I was in the jail, an unidentified officer, upon learning who I was, said in substance that "we should teach him for fucking with us."

80.     During the booking process, I was brought to a small office space with

---

[8] Ex 10 (Rodriguez Dashcam) 53:00–53:30.

Sheriff Fagan, FBCSO Chief Deputy Provost, and another individual.

81.     The Sheriff asked if I knew why I was in jail. To avoid saying anything that would be used against me later, I refused to talk and insisted that I be allowed to speak to my attorney. Sheriff Fagan and Provost both became agitated.

82.     Either Sheriff Fagan or Provost said, in substance: "Do you know who I am?" I understood this to mean that I should cooperate with them because of their rank within FBCSO, which gave them power over my case.

83.     When I continued to refuse to talk, Sheriff Fagan said, in substance: "Fine, we'll do this the regular way." This implied that FBCSO would not have continued with the booking process or sought prosecution if I had waived my right to an attorney and given some kind of promise, perhaps to stop filming.

84.     I remained in custody at the jail for several hours until a colleague posted my $500 bail. In total, from the time I was arrested until my release, I was held five hours.

85.     Exhibit 11 to my summary judgment motion is a true and correct copy of video footage that I recorded on December 21, 2021 from the dash camera mounted at the front of my truck.

86.     Exhibit 12 to my summary judgment motion is a true and correct copy of a screenshot that I took of a Facebook post from December 21, 2021. I knew the author of the post, Gabe Cardenas, was an FBCSO officer at the time.

87.     Based on the December 2021 incident, I was charged with Interference with Public Duties, a Class B misdemeanor, under Texas Penal Code § 38.15. In March 2023, I was tried to a jury for the offense of interference with public duties. The trial was declared a mistrial because of a hung jury. Five jurors voted to acquit, but one juror voted to convict. That case against me remains pending as *State of Texas v. Justin Reid Pulliam*, 21-CCR-225419 (Fort Bend County, Texas, County Court at Law), and I have not been informed whether I will be retried.

88.     I believe that the County has left the criminal trial pending as part of its policy of retaliating against me and in response to my efforts in this case.

89.     When I was arrested, Sergeant Rollins confiscated all the recording equipment that I had on me, including but not limited to:

      a.  Panasonic S1 Camera (returned in January 2022);

      b.  Battery (returned in January 2022);

      c.  Wise CFExpress Memory Card;

      d.  Lexar SD Memory Card;

      e.  Cold shoe adapter (returned in January 2022);

      f.  Phone Clamp (returned in January 2022);

      g.  Rode VideoMic NTG & Windshield (returned in January 2022);

      h.  Kessler Crane Kwik Mini Plate (returned in January 2022);

      i.  iPhone XS Max;

18

j.   iPhone XS Max Case;

k.   iPhone XS Max Screen Protector; and

l.   Cam Pro Body Camera.

90.    FBCSO has returned some, but not all, of the above equipment to me. Specifically, FBCSO still has two memory cards, an iPhone and its accessories, and a body camera. I have been unable to access any of the video files stored on the equipment that FBCSO still has.

91.    After the arrest, my reporting on police activity dropped even more, and I generally avoid filming FBCSO activity because I am afraid that I will be arrested or retaliated against in another way.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of October, 2023.

_____
Justin Pulliam