# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT 2

```
 1                 UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   JUSTIN PULLIAM,

 4      Plaintiff,

 5   v.                        Civil Action No. 4:22-cv-4210

 6   COUNTY OF FORT BEND, TEXAS;
     SHERIFF ERIC FAGAN, in his
 7   Individual capacity; OFFICER ROBERT
     HARTFIELD, in his individual capacity;
 8   OFFICER JONATHAN GARCIA, in his
     Individual capacity; OFFICER TAYLOR
 9   ROLLINS, in his individual capacity;
     And OFFICER RICKY RODRIGUEZ, in
10   His individual capacity,
     Defendants

11

12
                       ORAL DEPOSITION
13
                            OF
14
                     SHERIFF ERIC FAGAN
15

16              Taken at the Offices of
              Fort Bend County Attorney
17         401 Jackson St., 3rd Floor Conference
                     Richmond, Texas
18

19   August 9, 2023                       9:03 a.m.

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2    FOR PLAINTIFFS:

 3                        INSTITUTE FOR JUSTICE
                          816 Congress Ave., Suite 960
 4                        Austin, TX  78701
                          By: Christen Mason Hebert
 5                            CHebert@IJ.org
                              Jeff Rowes
 6                            JRowes@IJ.org

 7    FOR DEFENDANTS:

 8                        Kevin Hedges
                          Assistant County Attorney
 9                        Litigation Division
                          401 Jackson Street
10                        3rd Floor
                          Richmond, TX  77469
11                        Kevin.Hedges@FBCtx.gov

12

13    ALSO PRESENT:      Molly Hanis

14    REPORTED BY:       Sarah B. Townsley, CSR, CRR, RPR

15

16

17

18

19

20

21

22

23

24

25
```

1                         STIPULATIONS

2        IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR

3     THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF SHERIFF

4     ERIC FAGAN WAS TAKEN BEFORE SARAH B. TOWNSLEY, CRR, CCR,

5     CSR, RPR, CERTIFIED REALTIME REPORTER IN AND FOR THE

6     STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE AND IN

7     ACCORDANCE WITH THE FEDERAL RULES OF CIVIL PROCEDURE AS

8     PROVIDED BY LAW, AT THE COUNTY ATTORNEY'S OFFICE, 401

9     JACKSON STREET, 3RD FLOOR, RICHMOND, TEXAS, ON AUGUST 9,

10    2023, AT 9:03 A.M.;

11       THE PARTIES HEREBY WAIVE ALL FORMALITIES IN

12    CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE

13    EXCEPTION OF THE SWEARING OF THE WITNESS AND THE

14    REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;

15       THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED

16    TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;

17       COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT

18    AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE

19    ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND

20    THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE

21    TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF

22    MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF

23    THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;

24       SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN

25    ADMINISTERING THE OATH TO THE WITNESS.

```
 1                            INDEX

 2   EXAMINATION BY                          PAGE NO.

 3   Mrs. Hebert                                5

 4   Mr. Hedges                               148

 5   Mrs. Hebert                              149

 6

 7                          EXHIBITS

 8   NO.    DESCRIPTION                       PAGE NO.

 9   1      deposition notice                  9

10   2      video footage                     18

11   3      org chart                         21

12   4      RFA responses                     23

13   5      video footage                     26

14   6      FBC001401 - 08                    33

15   7      FBC001399 - 403                   34

16   8      FBC001394 - 1398                  35

17   9      FBC001412 - 1414                  38

18   10     FBC001409 - 1411                  39

19   11     RFP responses                     43

20   12     RFA responses                     46

21   13     video footage                     53

22   14     screen shot                       56

23   15     FBC001385 - 1390                 102

24   16     GO #09-03                        103

25
```

Sheriff Eric Fagan

1    PROCEEDINGS:

2                    SHERIFF ERIC FAGAN,

3    having been first duly sworn by the court reporter,

4    testified on oath as follows:

5                    COURT REPORTER:   We're on the record at

6    9:03 a.m.

7                    [Witness was sworn.]

8    EXAMINATION BY MS. HEBERT:

9       Q.   Good morning, Sheriff Fagan.

10      A.   Good morning.

11      Q.   I'm Christy Hebert.  We just introduced

12   ourselves, and, as you know, I represent the plaintiff,

13   Justin Pulliam.

14        The court reporter, Sarah, just swore you in.

15   Just to kind of refresh -- this is Jeff Rowes.  You

16   just met him, and this is my paralegal Molly Hanis.

17   Your attorney, Kevin Hedges, is here today.  Thanks for

18   being with us, Kevin.

19                   MR. HEDGES:      Sure.

20      Q.   So we'll just kind of do the usual stipulations.

21   By being here, you're waiving any objections to your

22   notice of deposition, and you're waiving any objections

23   to Sarah's qualifications.  Sarah's a great court

24   reporter.  I just met her, you know, but -- by putting

25   this on the record, we're waiving any objections to

1   Sarah's qualifications.

2      A.   I like court reporters.  My wife is a court

3   reporter.

4      Q.   So then you know all about court reporters and

5   all the things they see on their day-to-day basis, I'm

6   sure.

7           So will you state your full name for the record?

8   I know you already did, but --

9      A.   Eric Wayne Fagan.

10     Q.   Eric Wayne Fagan.  So, Wayne; you kind of have a

11  Bruce Wayne connection?

12     A.   No.

13     Q.   Just checking.  Before we go on, I'd like to go

14  over a couple of housekeeping matters, to make things

15  easier on us today.  Have you ever testified under oath

16  before?

17     A.   Yes.

18     Q.   Have you ever taken a deposition before?

19     A.   Yes.

20     Q.   So you understand that, today, you're under

21  oath, the same as if you were in a courtroom testifying

22  before a judge?

23     A.   Yes.

24     Q.   And that means you swore to tell the truth?

25     A.   Yes.

```
 1    Q.   Great.  We'll go over a couple things for the

 2    record.  It's important to have a clear record.  That

 3    means I need to ask clear questions, and you need to

 4    provide clear verbal answers.  So that means,

 5    obviously, don't shake your head -- "yes" or "no", and

 6    no "uh-huh" or "uh-uh."  Say for the record in the

 7    future -- and if you slip up and start shaking your

 8    head, or say "uh-huh" or "uh-uh", I'll try to ask you

 9    to say "yes" or "no."  If you don't understand a

10    question, please let me know, and I'll either ask Sarah

11    to read it back, or I'll try to rephrase it; and then,

12    similarly, try not to begin answering a question before

13    I've finished asking it, and I will try not to

14    interrupt you when you're answering something.  So

15    we'll try not to interrupt each other.

16          And then, finally, I think it's generally safe

17    to assume that I'm not asking you any questions about

18    what you've talked about with Mr. Hedges, that we are

19    not going to try to ask any questions about

20    attorney-client communications, so you can just assume

21    that, and I'll try to, like, distinguish that anytime I

22    ask about who you talked to or something like that.  If

23    you do not know the answer to a question, you can say

24    "I don't know", but if you do know the answer to the

25    question, you are required to provide that answer.  Mr.
```

```
 1   Hedges, who, obviously, you're familiar with, and who

 2   represents the county, he may state an objection after I

 3   ask the question, but that doesn't necessarily mean that

 4   I asked a bad question.  It just means that Mr. Hedges

 5   is trying to preserve the right to later object to the

 6   question because it doesn't follow the rules of

 7   evidence.  Do you understand all that?

 8       A.   Yes.

 9       Q.   If you would like to take a break or need to get

10   a drink or use the restroom, that's fine.  Please let

11   either of us know, either Mr. Hedges or myself, and we

12   will try to take a break.  I only ask that you finish

13   answering the question before you take a break, so in

14   between questions is when we would really look to take

15   a break.  Is there any reason that you couldn't give

16   your fullest or best testimony today, such as you're

17   taking an impairing medication or something along those

18   lines?

19       A.   No.

20       Q.   We're going to look at some documents today.

21   You have the right to read and understand everything

22   that's in the document, and I don't want to rush you

23   through them, so please let me know if I'm asking you a

24   question before you're ready.  We're also going to look

25   at some video clips today.  To save time, I've
```

```
 1    identified relevant timestamps or portions of the

 2    video, and we'll go to those particular time stamps, but

 3    it is your right to watch the video in its entirety with

 4    Mr. Hedges at any particular time.  Some videos are

 5    longer than others.  I'm not trying to trick you, here.

 6    Rather than just watching every video every time I ask a

 7    question.  I'm looking to focus on particular parts,

 8    but, again, if you need to see more of the video,

 9    please let us know.  Do you have any other questions

10    before we continue?

11        A.   No.

12        Q.   Do you understand all of that?

13        A.   Yes.

14        Q.   I'm going to start by looking at your deposition

15    notice for today.  We're going to mark that as Exhibit

16    1.

17                    [Exhibit 1 was marked.]

18    BY MS. HEBERT:

19        Q.   Have you seen this notice before?

20        A.   Yes.

21        Q.   Did you do anything to prepare for today's

22    deposition, other than talking to Mr. Hedges?

23        A.   No.

24        Q.   Did you review any documents?

25        A.   No.
```

```
 1      Q.   Okay.  Did you discuss this deposition with
 2   anybody besides Mr. Hedges?
 3      A.   No.
 4      Q.   Did you bring any documents with you to the
 5   deposition, other than your newspaper?
 6      A.   No.  Just the newspaper.
 7      Q.   And did you watch any videos in preparation for
 8   this deposition?
 9      A.   Yes.
10      Q.   What videos did you watch?
11      A.   The one at the park.  I saw that video.
12      Q.   Okay, and how did you watch that video?
13      A.   On my computer.
14      Q.   Did you -- did Mr. Hedges send you a link, or
15   did you access the link from somewhere else?
16      A.    His computer.
17           MR. HEDGES:     We watched it together.  I
18   said my computer.  I meant his computer.
19   BY MS. HEBERT:
20      Q.   So Mr. Hedges accessed the link for you and you
21   watched it?
22      A.   Yes.
23      Q.   Okay.  Thank you.  We're going to talk a lot
24   about Fort Bend County Sheriff's Office today.  When I
25   -- to short-cut that, rather than say "Fort Bend County
```

Sheriff Eric Fagan

```
 1    Sheriff's Office" every time, can we agree that every

 2    time I say "the sheriff's office, I'm referring to Fort

 3    Bend County Sheriff's Office?

 4        A.   Yes.

 5        Q.   And anytime I say "the sheriff", can we agree

 6    that I'm going to be referring to you or your position

 7    as the sheriff of Fort Bend County Sheriff's Office?

 8        A.   Yes.

 9        Q.   Thank you.  All right, so just to get some

10    background stuff out of the way, before you became the

11    sheriff, what did you do?

12        A.   I was a Houston police officer.

13        Q.   And what was your role as a Houston police

14    officer?

15        A.   I worked on the mayor's protection security

16    detail with my last position.

17        Q.   So you had other positions with the Houston

18    Police Department?

19        A.   You want to know all of them?

20        Q.   Just give me a general list.

21        A.   I worked at the patrol station southeast for

22    Mykawa.  From Mykawa, working there -- from there, I

23    worked in IAD.  I worked in --

24        Q.   Wait, wait.  What's IED?

25        A.   IAD; internal affairs.  From there, I worked
```

Sheriff Eric Fagan

```
 1    mediations.  From there, I went to the mayor's

 2    protection detail.  From there, I went to Chief

 3    Flanders' office, and, from there, I retired.

 4         Q.   So you retired from the Houston Police

 5    Department?

 6         A.   Yes.

 7         Q.   And it sounds like you had a long career at the

 8    Houston Police Department.  How long were you there?

 9         A.   35 years.

10         Q.   Wow.  Any other agencies besides the Houston

11    Police Department, before you were sheriff?

12         A.   I worked at the marshal's office, but the

13    marshal got taken in by the Houston Police Department.

14         Q.   The United States Marshal's Office?

15         A.   No.  City marshal.

16         Q.   How long were you with the city marshal's --

17         A.   I think it was four years before they got taken

18    in.

19         Q.   Four years?

20         A.   Uh-huh; four to five years before they got taken

21    in.

22         Q.   Four to five; not 45?

23         A.   No, four to five.

24         Q.   And you were elected sheriff in 2020?

25         A.   Yes.
```

Sheriff Eric Fagan

```
 1      Q.   And before that, did you work with the Fort Bend

 2  County Sheriff's Office at all?

 3      A.   No.

 4      Q.   So this was your first position?

 5      A.   Yes.  I've worked for Harris County Sheriff's

 6  Department.  I forgot about that; for a year.

 7      Q.   When did you work for the Harris County

 8  Sheriff's Department?

 9      A.   It was the time Captain Whitmire was mayor.  I

10  went for a year and then I came back.

11      Q.   Came back to?

12      A.   Houston Police Department.

13      Q.   Okay, so let me just summarize the order.  You

14  worked for the rangers --

15      A.   City marshal.

16      Q.   City marshal.  So you worked for the city

17  marshal, they got absorbed into the Houston Police

18  Department --

19      A.   Police department.

20      Q.   You took a hiatus year to work for the Harris

21  County Sheriff's Office, and then you came back to the

22  Houston Police Department?

23      A.   Correct.

24      Q.   And, all in all, that was, let's say -- 39 years

25  of law enforcement before you became sheriff?
```

```
 1      A.   Yes.

 2      Q.   And what are the main responsibilities of being

 3   sheriff?

 4      A.   I have to make policies for the department, the

 5   county jail, which is one of the largest

 6   responsibilities.  Patrol, investigations, Raven,

 7   everything.

 8      Q.   Raven?  What is that?

 9      A.   Helicopter.  I'm sorry.  Helicopter.

10      Q.   That's okay.  I'm new to the law enforcement

11   world, so I might ask you a bunch of questions that

12   probably seem basic as I get an understanding.  Thank

13   you for explaining it.  And what made you decide to run

14   for sheriff?

15      A.   I lived in Fort Bend County for 31 years while I

16   worked in Houston.  At the time I decided to run, the

17   former sheriff made a statement that there was no human

18   trafficking here in Fort Bend, and there was no gang

19   problem here in Fort Bend, and so I decided to run.

20      Q.   To fix some of those problems?

21      A.   Yes.

22      Q.   And when did you take office as sheriff?

23      A.   January of 2020.

24      Q.   So you took office January of 2020?

25      A.   (Witness nods head.)
```

Sheriff Eric Fagan

1    Q.   But you ran -- did you run -- you ran for office

2    in 2020?

3    A.   Yes.

4    Q.   So you would have taken --

5    A.   January 2021, yes.

6    Q.   So you took office in January of 2021?

7    A.   Yes.  I'm sorry.

8    Q.   That's okay.  And, as taking office as sheriff

9    -- in taking office as sheriff, was part of that taking

10   office you taking an oath of office?

11   A.   Yes, I had to take a oath.

12   Q.   And was part of the oath swearing that you would

13   preserve the Constitution of the United States?

14   A.   Yes.

15   Q.   And are you seeking re-election?

16   A.   Yes.

17   Q.   Is your term four years?

18   A.   Yes.

19   Q.   And so you're looking for another four years?

20   A.   Yes.

21   Q.   Is it like a pie-eating contest, where you get

22   more pie?

23   A.   No.

24   Q.   I want to talk a little bit about your campaign

25   before you became sheriff.  Was securing body cameras

Sheriff Eric Fagan

```
 1   for front-line sheriff's officers part of your campaign

 2   in 2020?

 3       A.   Yes.

 4       Q.   Can you tell me about that?  Why did you want

 5   body cameras for officers?

 6       A.   To be more transparent, not only for the

 7   security and for the safety of my officers.  Body

 8   cameras works both ways for the citizens and the

 9   officers, because a lot of officers get a lot of

10   complaints, and they'll say the officer did something,

11   then you can look at the body camera and see what

12   actually happened, or vice versa.  An officer might say

13   he did or didn't do something, and body cameras, we can

14   see what actually happened.

15       Q.   So it kind of provides impartial evidence to

16   protect both the officer and civilians --

17       A.   The citizen, yes.

18       Q.   Thank you.  And I understand that you fulfilled

19   that campaign promise; is that correct?

20       A.   Yes.

21       Q.   When did you obtain body cameras for the

22   officers?

23       A.   I don't remember the exact date, but I want to

24   say it was in February or March.  I don't know the

25   exact date.  I can --
```

Sheriff Eric Fagan

```
 1      Q.   Of what year?

 2      A.   2021.

 3      Q.   2021.  So --

 4           MR. HEDGES:     Wouldn't it have been

 5   after the budget, though?

 6      A.   Yeah, after the budget.  I just don't remember

 7   the exact date.

 8           MR. HEDGES:     Our fiscal year is October

 9   to October, so I suspect that it was actually 2022 if

10   you got them approved in your budget for '21.

11           THE WITNESS:    Yeah.

12   BY MS. HEBERT:

13      Q.   So you got body cameras for your officers

14   sometime in 2022; is that correct?

15      A.   I think we've had them, I want to say, at least

16   ten months.

17      Q.   So at least ten months, so counting back ten

18   months sometime in 2022 from today?

19      A.   Uh-huh.

20      Q.   Before then, did you have no body cameras at all

21   for the sheriff's officers?

22      A.   Before I became sheriff, I couldn't -- they

23   didn't have it.  As far as I know, they didn't have it.

24   When I came here, they didn't have it.

25      Q.   Thanks.  And let's watch a short clip from your
```

Sheriff Eric Fagan

```
 1    campaign before you were sheriff.  Molly, I think you

 2    were starting to play it a little bit earlier.

 3              MS. HEBERT:      We'll mark this exhibit as

 4    Exhibit 2, Sarah.

 5                  [Exhibit 2 was identified.]

 6    BY MS. HEBERT:

 7      Q.   So I'm going to show you this video.  It's a

 8    relatively short video clip, so we'll just watch the

 9    entire thing.

10                  [Clip was played.]

11    BY MS. HEBERT:

12      Q.   Do you recall giving that interview?

13      A.   Yes.

14      Q.   Would it be fair to say that interview was from

15    sometime in 2020?

16      A.   Probably 2019.

17      Q.   2019?  Well, it'd be after the George Floyd

18    events which were in 2020 --

19      A.   Yeah.  Okay.

20      Q.   So would it be fair to say that's sometime in

21    2020?

22      A.   Yes.

23      Q.   And you, in the film, you said something along

24    the lines of you believe that most officers are good.

25    I would agree with that.  Do you still believe that
```

Sheriff Eric Fagan

```
 1   today?

 2       A.   Yes.

 3       Q.   And in the -- this footage of an interview, you

 4   stated that it's not against the law to film an

 5   officer.  You have every right to film; is that

 6   accurate?

 7       A.   Yes.

 8       Q.   And so before you became sheriff in 2021, you

 9   knew that citizens had the right to film the police?

10       A.   Yes.

11       Q.   And you knew that the right to film the police

12   was protected by the first amendment?

13       A.   Yes.

14       Q.   And you also stated in the footage that you have

15   the right to be a certain distance away.  What did you

16   mean by that?

17       A.   A safe distance away.

18       Q.   And how did you come up with that rule?

19       A.   I didn't come up with the rule.  It's just a

20   safe distance; what the officer feels is a safe

21   distance.

22       Q.   Okay, and what is a safe distance away?

23       A.   Depends on what the situation is, what's a safe

24   distance; a safe distance would be 50 feet, 40 feet, a

25   hundred feet, 200 feet.  Whatever that officer feels is
```

1    a safe distance in that situation; depends on what the

2    situation is.

3        Q.   Okay.  And you talked about a Baytown example,

4    where people were filming the police from a hundred

5    feet away, and you said that the officers walked over

6    to them, "them" being the folks who were filming -- and

7    said, "Stop videoing.  You in my crime scene", and the

8    officers were absolutely wrong.  Why were those

9    officers wrong?

10       A.   They had already, from what I can remember of

11   the Baytown is that -- I want to say a gas station,

12   store, something like that, they had made the arrest

13   and, from what I can remember, the officers went away

14   from the -- after they had that guy covered, went away

15   from them and then went over to the person that was

16   filming.

17       Q.   Okay.  So should the officers not have left the

18   person who was in handcuffs, then?

19       A.   I'm saying that they had finished the arrest.

20   It was over with, so there was no reason for them to go

21   over to the guy that was filming.

22       Q.   Oh, I understand.  You advised kind of the

23   viewers of the interview that we just watched to tell

24   an officer who tries to stop them from filming that

25   they should tell the officer -- and I'm going to quote

```
 1   -- "they have every right to record"; is that accurate?

 2       A.   Yes.

 3       Q.   And it seems like a natural variation on that

 4   statement would be if an officer sees someone filming

 5   and orders that person to leave, but does not order

 6   anyone else, any other civilians to leave a situation,

 7   that you should also tell that officer you have every

 8   right to record; is that fair?

 9       A.   Yes.

10       Q.   So I want to look at another exhibit.  I'd like

11   to look at what's going to be marked Exhibit 3.

12                   [Exhibit 3 was marked.]

13   BY MS. HEBERT:

14       Q.   When you're done reviewing, just let me know.

15       A.   Okay.

16       Q.   Do you recognize this document?

17       A.   Yes.  Command chart.

18       Q.   Excuse me?

19       A.   Command chart.

20       Q.   So it's a command chart of the sheriff's office?

21       A.   Yes.

22       Q.   And does it show the organization of the

23   sheriff's office?

24       A.   Yes.

25       Q.   And it looks like you're at the top, Sheriff
```

Sheriff Eric Fagan

```
 1   Eric Fagan; is that correct?

 2      A.   Yes.

 3      Q.   And that means you're in charge of a lot of

 4   people.  Is that difficult?

 5      A.   Is it difficult?

 6      Q.   Uh-huh.

 7      A.   Yes.

 8      Q.   And it looks like you're in charge of the

 9   operations bureau and the administration bureau; is that

10   correct?

11      A.   Correct, yes.

12      Q.   And there is no one above you; is that fair?

13      A.   Yes.

14      Q.   So does that mean, when you give orders,

15   everybody underneath this chain has to follow what you

16   say?

17      A.   Yes.

18      Q.   Even if some of these folks below you are

19   supervisors themselves?

20      A.   Yes.

21      Q.   And does that mean you have the authority to

22   override other officers' orders?

23      A.   Yes.

24      Q.   I'd like to walk through a couple of specifics

25   on this chart.  In supervising the operations half of
```

```
 1    the chart, do you supervise both the field operations,

 2    the investigations command, and the detention command?

 3         A.   Yes.

 4         Q.   And then the administration side, do you see --

 5    oversee the grants, the public information office, the

 6    human resources, professional development and support

 7    services?

 8         A.   I have to clarify this.  I have people that I

 9    delegate to do it, but I have the final say-so.

10         Q.   Sure.  That's helpful.

11         A.   Okay.

12         Q.   And so you oversee all the -- and, just to look

13    at a specific one, you oversee the public information

14    office, even though you might be supervising folks in

15    that office?

16         A.   I don't personally supervise.  I have people

17    delegated, but I have the final say, yes.

18         Q.   Thank you.  Before we continue, do you have any

19    supervisors?  Who do you report to?

20         A.   I don't report to anyone.  I'm the sheriff.

21         Q.   Okay.  And before we continue, I want to kind of

22    look at your -- your responses to some of our requests

23    previously.  I'm going to hand you another Exhibit that

24    we're going to mark Exhibit 4.

25                      [Exhibit 4 was marked.]
```

```
 1   BY MS. HEBERT:

 2      Q.   Let me know when you have a chance to look at

 3   it.

 4              MR. HEDGES:      This was 4, Christy?

 5              MS. HEBERT:     Yes.

 6              MR. HEDGES:      And the org chart was 3?

 7      A.   Yes, sir.

 8      Q.   It took you a few minutes to review that

 9   exhibit, correct?

10      A.   Yeah, I've read it.

11      Q.   Have you seen this exhibit before?

12      A.   Yes.

13      Q.   Did you review the answers to this document

14   before you produced them to our side to make sure the

15   answers were correct?

16      A.   Yes.

17      Q.   And did you do anything to prepare your

18   responses to that document, other than talk to Mr.

19   Hedges?

20      A.   No.

21      Q.   And did you review the July 12, 2021, press

22   conference video as part of answering those questions?

23      A.   I don't know what video you're talking about.

24   Press conference?

25      Q.   Sure.  The video from Jones Creek Ranch Park?
```

1    A.   Oh, yes.  Watched it today.

2    Q.   Did you review that video in answering these

3    questions?

4    A.   No.

5    Q.   Okay.  And did you review videos of Justin

6    Pulliam's arrest from December 21, 2021, in answering

7    those questions?

8    A.   No.

9    Q.   Okay.  I think you can move that to the side for

10   now, and we'll come back to that exhibit later.

11        I want to talk to you a little bit about Justin

12   Pulliam.  You already admitted that you knew him before

13   July 2021.  When did you meet Justin Pulliam?

14   A.   The very first time I met Justin Pulliam, he was

15   in the parking lotting lot of the sheriff's office

16   filming me as I was parking my car -- trying to park to

17   get in, and deputies was stopping him from filming me,

18   so I told him to stop, I got out the car, told Justin

19   to wait till I park the car, come into the office.  If

20   you want to talk to me, come in, sit down and talk with

21   me.

22   Q.   That's fair.  And do you remember about when

23   that was?  Would January 11, 2021, sound familiar?

24   A.   Yes.

25   Q.   Okay.  And how would you describe Justin Pulliam

1    to someone who was looking to pick him out of the

2    crowd?

3        A.    Red-headed, about 5'6", a little chubby, white

4    male.

5        Q.    Okay.  We're going to look at some video of, I

6    think, that interaction.  I'm going to mark that as

7    Exhibit 5.

8              MS. HEBERT:     Molly, would you mind

9    pulling that up?

10                   [Exhibit 5 was marked.]

11                   [Video clip was viewed.]

12   BY MS. HEBERT:

13       Q.    Thank you for watching that.  So this video was

14   probably shortly after you took office?

15       A.    Yes.

16       Q.    In January of 2021?

17       A.    I don't remember the date.

18       Q.    And as we watch on this video, Justin asked you

19   about getting body cameras for your officers; is that

20   correct?

21       A.    Yes.

22       Q.    And you said that was one of the goals, correct?

23       A.    That we were working on it.

24       Q.    Yeah.  And, as we saw on that video, did Justin

25   Pulliam tell you he wanted to be at press conferences?

Sheriff Eric Fagan

```
1      A.   Yes.

2      Q.   And, as we watched this video, you said you

3   weren't the PIO -- which I believe stands for "public

4   information officer" --

5      A.   Yes.

6      Q.   So you said that you weren't the PIO?

7      A.   Yes.

8      Q.   But you said a little bit earlier that you

9   supervise the PIO.

10     A.   Correct.

11     Q.   And you said that you weren't afraid to speak to

12  anybody, correct?

13     A.   Yes.

14     Q.   And did you say that -- to Justin Pulliam that

15  if he wanted to speak to you, just you directly, fine?

16     A.   Told him to contact the PIO; I believe that's

17  what I said.

18     Q.   We can watch it again.  Did you say to Justin

19  Pulliam that if he wanted to speak to you directly,

20  fine, you can do it directly?

21     A.   If i said that, okay.

22     Q.   We'll cue that up, Molly.  I think it's towards

23  the end of the video.

24                  [Video clip played.]

25  BY MS. HEBERT:
```

Sheriff Eric Fagan

```
1     Q.    When you said to Justin Pulliam if he wanted to

2   speak to you, "fine" -- to quote you directly -- is what

3   you said?

4     A.    Yes.

5     Q.    I know it might be a little bit difficult to

6   separate your thoughts on Justin Pulliam from now,

7   versus then, but do you have any memory of what your

8   perception was of Justin Pulliam back in the beginning

9   of 2021?

10    A.    Same perception.

11    Q.    And that is?

12    A.    Redhead, white male.

13    Q.    No, not physically.  Just, like, perception of

14  his attitude, or his personality, any of like that, or

15  his reporting?

16    A.    I don't think about Justin Pulliam one way or

17  the other, no.

18    Q.    Are you familiar today with Justin Pulliam's

19  YouTube channel called "Corruption Report"?

20    A.    Yes.  I've seen some.

21    Q.    Okay.  And you've watched some of the videos

22  from Justin's YouTube channel?

23    A.    Saw two of them, matter of fact, yes.

24    Q.    And what were those two videos about?  Do you

25  remember?
```

```
 1      A.   One when he was in my jail, this guy that was

 2   following me, and then the other one was -- I forgot

 3   what the other one's about, but I know I saw two of them

 4   and after that, I quit watching.

 5      Q.   Sure.  Do you remember when you watched those

 6   videos?

 7      A.   No.

 8      Q.   Was it before today?

 9      A.   Yes.

10      Q.   Was it before 2022?

11      A.   Yes.

12      Q.   Was it before mid-2021?

13      A.   Don't know.

14      Q.   And have you ever seen Justin Pulliam at a

15   police incident other than the incident at Jones Creek

16   Ranch Park in 2021?

17      A.   No.

18      Q.   And, in your experience, when you took office in

19   2021, was Justin Pulliam generally known to the

20   sheriff's office, to folks working in the sheriff's

21   office?

22      A.   That's when I found out about it, when I became

23   sheriff, but the people at the sheriff's office knew

24   about him.

25      Q.   And what did you learn from people at the
```

1    sheriff's office about Justin Pulliam?

2        A.    People warned me about him, saying that he -- he

3    likes to come film people and try to catch people

4    off-guard, try to upset people, things like that.

5        Q.    Did Justin Pulliam have a reputation of being

6    violent?

7        A.    Not that I know of, no.

8        Q.    Did he have any reputation of physically

9    attacking any officers?

10       A.    Not that I know of, no.

11       Q.    Did Justin Pulliam have a reputation of yelling

12   at officers or telling people at the scene of a incident

13   that they should lie or run away?

14       A.    No.

15       Q.    Okay.  And did Justin Pulliam have any

16   reputation for physically altering evidence or changing

17   a scene?

18       A.    No.

19       Q.    And how has your perception -- you can say that

20   you don't really have a change of perception, but how

21   has your perception of Justin Pulliam changed from when

22   you first met him in the beginning of 2021 to today?

23       A.    It hasn't changed.

24       Q.    Okay.  Before we get into the specifics of

25   looking at some of your general orders, can you tell me

1    what a general order of the sheriff's office is?

2       A.    Rules and policies that officers must follow.

3       Q.    And when you take office as the sheriff -- or

4    took office as the sheriff, do you review all of the --

5    kind of the policies and the general orders?

6       A.    I go over them.

7       Q.    Okay.  And are there general orders on topics

8    other than public information and media relations and

9    social media that we might look at today?

10      A.    That you -- I don't know what you're going to

11   look at today, so I can't answer that.

12      Q.    Sure.  I guess the broader question is:  What's

13   the scope of things that general orders are on?

14      A.    I'm not understanding your question.

15      Q.    That's okay.  What kind of topics do general

16   orders cover?

17      A.    They cover a broad range of topics.

18      Q.    Okay.  Give me some examples.

19      A.    Use of force, driving, officer safety, proper

20   procedures, jail; just a whole range of things.

21      Q.    Okay, so trying to kind of cover most of the

22   topics that a front-line law enforcement officer, or

23   even supervisors, might have to interact with or deal

24   with on a day-to-day basis?

25      A.    Okay.

Sheriff Eric Fagan

1    Q.    Is that fair?

2    A.    Yes.

3    Q.    Are sheriff's employees expected to be aware of

4  general orders?

5    A.    Yes.

6    Q.    So do you presume that officers have knowledge

7  or know about kind of the substance of general orders?

8    A.    Yes.

9    Q.    And can you, as the sheriff, order a general

10  order to be altered or changed?

11   A.    Yes.

12   Q.    Have you ever done that?

13   A.    Yes.

14   Q.    And what was the context?  Do you remember?

15   A.    No.

16   Q.    And how are general orders distributed to

17  sheriff's office personnel?

18   A.    Through our e-mail.

19   Q.    And is there any training that officers receive

20  to make sure that their behavior is consistent with a

21  general order?

22   A.    I don't know if you call it training for the

23  general orders, but officers take in-service training --

24  have to take in-service training.  They don't take

25  training over the general orders.  They're expected to

Sheriff Eric Fagan

1    read the general orders.

2        Q.   Okay.   And in-service training, does that come

3    from your office?

4        A.   Comes from TCOLE.

5        Q.   So the State of Texas law enforcement --

6        A.   Yes.

7        Q.   -- training is where they get their training?

8        A.   Yes.

9        Q.   And does the sheriff's office ever recommend

10   certain TCOLE courses?

11       A.   Yes.

12       Q.   All right, I'm going to hand you an exhibit that

13   we're going to mark Exhibit 6.

14                    [Exhibit 6 was marked.]

15   BY MS. HEBERT:

16       Q.   Would you mind reviewing this document, and then

17   when you've had a chance to look it over, just let me

18   know.

19       A.   Okay.

20       Q.   So it looks like the date on the top of this

21   general order is 2017 -- a date in 2017; is that

22   correct?

23       A.   Yes.

24       Q.   And what's the title of this general order?

25       A.   "Public Information & Media Relations."

1    Q.    And have you seen this general order before?

2    A.    Yes.

3    Q.    And you're familiar with it?

4    A.    Yes.

5    Q.    And I understand 2017 was before you became

6    sheriff --

7    A.    Correct.

8    Q.    -- so you inherited, for lack of a better word,

9    this general order?

10   A.    Uh-huh.

11   Q.    And if I refer to this as the 2017 media

12   relations order, you'll know what I'm talking about?

13   A.    (Witness nods head.)

14   Q.    I'd like to look at another exhibit, and I'm

15   going to mark that Exhibit 7.  Keep this 2017 order.  We

16   might come back to that.

17              [Exhibit 7 was marked.]

18   BY MS. HEBERT:

19   Q.    And is the title of this document the same as

20   Exhibit 6; "Public Information & Media Relations"?

21   A.    Yes.

22   Q.    What's the date at the top of this?

23   A.    10/1/2021.

24   Q.    Okay, so this would be after you took office as

25   sheriff?

```
 1     A.    Yes.

 2     Q.    Was this order approved by you?

 3     A.    Yes.

 4     Q.    And I'll look at, kind of one more order and

 5   we're going to mark this as Exhibit 8.

 6                 [Exhibit 8 was marked.]

 7   BY MS. HEBERT:

 8     Q.    Let me know when you're done.

 9     A.    Okay.

10     Q.    Are you familiar with this document, Exhibit 8?

11     A.    Yes.

12     Q.    And is the top -- the title of this document

13   also "Public Information & Media Relations"?

14     A.    Yes.

15     Q.    And what's the date on this?

16     A.    12/29/2022.

17     Q.    And this order replaced the document that was

18   marked as Exhibit 7; is that correct?

19     A.    Yes.

20     Q.    So I can refer to this as "the 2022 media

21   relations order" --

22     A.    Yes.

23     Q.    -- and you'll understand?  And I can refer to

24   Exhibit 7 as "the 2021 media relations order"?

25     A.    Yes.
```

1    Q.    So let's go back to the 2017 media relations

2    order, and I think that's Exhibit 6.

3    A.    Yes.

4    Q.    Would you please look at the first page?  Kind

5    of halfway down, looks like there's a "Definitions"

6    section, and there's a definition of "media."  Do you

7    see where I'm talking about?

8    A.    Yes.

9    Q.    And I'm going to read that.  "Media:  Persons

10   associated with television, print, electronic, or radio

11   news programs/services and related entertainment

12   enterprises.  For the purposes of this general order,

13   this term does not generally include social media", and

14   then there's parentheses.  "This is defined and

15   governed under General Order 0504", and close

16   parentheses.  Did I read that correctly?

17   A.    Yes.

18   Q.    And would you agree that this definition makes a

19   distinction between traditional media, such as

20   television, print and radio, and social media, on the

21   other hand?

22   A.    Yes.

23   Q.    And would you agree that, under this definition,

24   social media is excluded from the definition of

25   "media"?

1    A.    Yes.

2    Q.    Okay.  And would you agree that this 2017 social

3    -- or media relations order, so this -- I'll say that

4    again.  Would you agree that this 2017 media relations

5    order references the general order 0504 for social

6    media?

7    A.    Yes.

8    Q.    Let's go to the 2021 media relations order,

9    which was Exhibit 7.  Did the definition of "media"

10   change at all from the 2017 order to the order that you

11   approved in 2021?

12   A.    No.

13   Q.    Thank you.  And let's kind of ask the same

14   question for the order for 2022, which is Exhibit 8.

15   Did the definition of "media" change at all from 2017,

16   to 2021, to 2022?

17   A.    No.

18   Q.    So in all three orders, the definition of

19   "media" is the same?

20   A.    Yes.

21   Q.    And all three orders reference this general

22   order 0504 for the definition of "social media"?

23   A.    Yes.

24   Q.    Let's look at that, how social media's defined.

25   Let's go to Exhibit -- what's going to be marked Exhibit

1   9.

2                    [Exhibit 9 was marked.]

3   BY MS. HEBERT:

4      Q.   Would you review this document and let me know

5   when you're done?

6                    MR. HEDGES:     So this is 9, right?

7                    MS. HEBERT:     Yes, sir.

8      A.   Okay.

9      Q.   Are you familiar with this general order?

10     A.   No, not really.  No.

11     Q.   Why is that?

12     A.   I probably read it, but I don't remember it.

13     Q.   Okay, so you probably read it in your course of

14   being sheriff; you just don't remember as you sit here

15   today?

16     A.   Yes.

17     Q.   Okay.  Can we agree that this is the 0504 order

18   that is referenced in the media relations orders that we

19   just looked at?

20     A.   No.

21     Q.   Okay.  Does this order, at the top say "0504"?

22     A.   Yes.

23     Q.   And let's go back to Exhibit 8.  And in the

24   definition of "media", you see that parentheses, "This

25   is defined and governed under General Order 0504"?

```
 1    A.   Yes.

 2    Q.   And then let's flip back to Exhibit 9.  Is this

 3  General Order 0504?

 4    A.   Yes.  I misunderstood you.  I thought you meant

 5  it was parenthesized there, and I was like, no it's

 6  not.

 7    Q.   No, I understand.  You're fine.  I probably

 8  asked a bad question.  Is "social media" defined in

 9  Exhibit 9, the General Order 0504?

10    A.   Yes.

11    Q.   And I'm going to read that definition, and you

12  tell me if I get it correctly.  "Social media:  Online

13  sources that allow people to communicate and share

14  information, such as photographs, texts, video,

15  multimedia files, and related items via online or

16  cellular network platforms.  In this general order,

17  this also includes social networking platforms, but not

18  limited to Facebook, Twitter, YouTube, blogs..."; is

19  that correct?

20    A.   Yes, that's what it reads, yes.

21    Q.   And would someone who uses a YouTube channel

22  fall  under the definition of "social media"?

23    A.   For the person who wrote this, yes.

24    Q.   Thank you.  And let's look at Exhibit 10.

25         MS. HEBERT:    Molly, would you mind handing
```

```
 1   the Sheriff Exhibit 10?

 2                  [Exhibit 10 was marked.]

 3   BY MS. HEBERT:

 4     Q.   Would you mind reviewing this document, Sheriff,

 5   and letting me know when you're done?

 6     A.   Uh-huh.   Okay.

 7     Q.   From the 2017 version that we looked at in

 8   Exhibit 9 to this version in Exhibit 10, are you

 9   familiar with Exhibit 10?

10     A.   Yes.

11     Q.   Is this the same order that we just looked at

12   for Exhibit 9, just updated to 2021?

13     A.   Yes.

14     Q.   And that's 0504; is that correct?

15     A.   Yes.

16     Q.   Would you look at the definition of "social

17   media" on this order?

18     A.   Yes.

19     Q.   And can you tell me if the definition of "social

20   media" has changed at all from 2017 to 2021?

21     A.   No.

22     Q.   And this order was issued while you've been

23   sheriff, correct?

24     A.   Yes.

25     Q.   Did you approve this order?
```

Sheriff Eric Fagan

```
 1      A.    Yes.

 2      Q.    Now, looking at all five of the general orders

 3   together that we just talked about, is it accurate to

 4   say that, from 2017 to today, someone who films for a

 5   YouTube channel does not fall under the definition of

 6   "media" as defined by the sheriff's office?

 7      A.    Yes.

 8      Q.    Okay.  Let's continue for a few minutes, and

 9   then we'll take a break if that's okay with you.

10      A.    Yes.

11      Q.    I want to talk a little bit about your press

12   conference experience.  I understand you took office in

13   2021, and that you had over 39 years of law enforcement

14   experience before becoming sheriff.  Did you have

15   experience with press conferences before you became

16   sheriff?

17      A.    Yes.

18      Q.    And can you estimate how many press conferences

19   you've done in 39 years, or participated in, or

20   attended?

21      A.    A lot.

22      Q.    Over a hundred?

23      A.    Yes.

24      Q.    Over two hundred?

25      A.    I don't know.
```

Sheriff Eric Fagan

1    Q.   So, ideally, somewhere between a hundred and two

2    hundred, maybe?

3    A.   Maybe.

4    Q.   Okay.  And for those press conferences, did law

5    enforcement require the people to -- attending the

6    press conference to provide their credentials?

7    A.   Yes.

8    Q.   And what do those credentials look like?

9    A.   They had them around their neck.  They had the

10   station letters and, like, "Channel 13", "Channel 2",

11   whatever station they're from.

12   Q.   And does every press person have their

13   credentials around their neck?

14   A.   Yes.

15   Q.   So every press person you've ever interacted

16   with in 39 years of law enforcement has been wearing

17   their credentials around their neck?

18   A.   I don't know.

19   Q.   In your experience, do you recall anyone being

20   excluded from a press conference because they weren't

21   media?

22   A.   Yes.

23   Q.   Do you recall anyone being excluded from a press

24   conference because they used social media?

25   A.   No.

Sheriff Eric Fagan

```
 1      Q.   And after becoming sheriff, approximately how

 2  many press conferences would you say you've attended or

 3  participated in?

 4      A.   I don't know; fifty, sixty.  I don't know; a

 5  lot.

 6      Q.   That's fine.  And does the sheriff's office have

 7  a -- as you sit here today, does the sheriff's office

 8  have a policy of asking for media credentials for

 9  someone to attend a press conference?

10      A.   I don't ask, and, like I said, they wear them

11  around their neck, and I see it.

12      Q.   So you don't have a formal policy of asking to

13  see media credentials at press conferences?

14      A.   No.

15      Q.   I'd like to look at what I'm going to mark as

16  Exhibit 11.

17                    [Exhibit 11 was marked.]

18  BY MS. HEBERT:

19      Q.   And when you have a second to review that, let

20  me know when you're finished.

21      A.   Okay.

22      Q.   Okay, and I'll represent to you that these are

23  the county's -- Fort Bend County's responses to our

24  requests for admissions.  Have you seen this document

25  before?
```

```
 1                    MR. HEDGES:      I think these are

 2   production.

 3   BY MS. HEBERT:

 4      Q.   Excuse me.  Request for production.  You're

 5   right.  They are why don't we take a break right now,

 6   then?  Do you mind?

 7      A.   No.

 8                    MS. HEBERT:      Let's take a brief

 9   intermission.  Sarah, would ten minutes, fifteen minutes

10   work for you?

11                    COURT REPORTER:   That's fine.

12                    MS. HEBERT:      We'll take a break for

13   fifteen minutes.

14                    COURT REPORTER:   Off the record at 9:58.

15                    [Short recess was taken.]

16                    COURT REPORTER:   We're back on the record

17   10:13.

18   BY MS. HEBERT:

19      Q.   Before we get to this lovely exhibit that Amy

20   has printed for us, let's go back a little bit.  We were

21   talking about your press conference experience,

22   Sheriff.

23      A.   Okay.

24      Q.   And you talked a little bit about being on the

25   mayor's security detail, and you had experience with
```

1   kicking folks out of press conferences; is that

2   correct?

3        A.   Uh-huh.

4        Q.   Can you tell me a little bit about who gets

5   kicked out of a press conference, based on your

6   experience on the mayor's security detail?

7        A.   On the security detail, a individual who was

8   disruptive -- not a media person, but a disruptive

9   person, something like that, we might have to escort

10  out.

11       Q.   And what does a disruptive person look like?

12       A.   Someone yelling and screaming during a press

13  conference, someone who's trying to rush up on the stand

14  where the mayor is, something like that.

15       Q.   And would you, when someone was yelling and

16  screaming, would you give that person a warning to

17  stop?

18       A.   Yes.

19       Q.   And then if they did not comply with that

20  warning, would you remove them?

21       A.   Yes.

22       Q.   And is there any difference between an indoor

23  press conference versus an outdoor press conference?

24  It would seem like to me that maybe an indoor press

25  conference is where maybe there was something taking

1    place at the mayor's office, and there would be a

2    couple of differences; for instance, there might not be

3    enough space, or that there were going to be security

4    concerns that you have to vet people beforehand.  So

5    would it be fair to say there's a difference between

6    indoor and outdoor press conferences?

7        A.   Yes.

8        Q.   And do you have different security concerns for

9    indoor press conferences?

10       A.   Yes.

11       Q.   And different space concerns for outdoor press

12   conferences?

13       A.   Yes.

14       Q.   And outdoor press conferences may or may not

15   have space constraints?

16       A.   Depending on the situation.

17       Q.   Okay.  Let's turn to what is being marked as

18   Exhibit 12.

19                    [Exhibit 12 was marked.]

20   BY MS. HEBERT:

21       Q.   This is the exhibit that I meant to introduce

22   earlier when we talked about Exhibit 11, so if you

23   wouldn't mind reviewing, Sheriff, Exhibit 12, and let me

24   know when you've had a chance to review this exhibit.  I

25   won't ask you about all of it.

```
1      A.   Do I need to read all of it?

2      Q.   I won't ask you about all of it, but we can --

3      A.   If I need to read all of it, I will, but if I

4   don't need to read all of it, I won't.

5      Q.   Sure.  How about this general question:  Are you

6   familiar with this document?

7      A.   Yes.

8      Q.   And how are you familiar with this document?

9      A.   I answered the questions.

10     Q.   Okay.  Let's go to No. 7, which I believe is on

11  page 4; so the bottom of page 4.

12          And I'll read this so it's clear on the record.

13  "Admit that on July 12, 2021, FBCSO had no policy of

14  asking for media credentials and restricting press

15  conferences to those with media credentials before

16  making statements intended for pubic dissemination."

17  And the response there was "deny."  So has -- a

18  follow-up question:  Has the sheriff's office changed

19  its policy on media credentials since July 12, 2021?

20     A.   No.

21     Q.   So earlier today, you testified that the

22  sheriff's office does not have a policy for asking folks

23  attending press conferences for media credentials.  In

24  light of that conversation, would you change your answer

25  to Request for Admission No. 7?
```

1    A.   No.  I can clarify what I mean by that.  Like,

2    when I was telling -- most people from the press, when I

3    see them, they have credentials around their neck, so I

4    never needed to ask for it.

5    Q.   Okay, but this request for admission is talking

6    about asking.  So did the sheriff's office have a policy

7    of asking for credentials?

8    A.   No.

9    Q.   When you do see media credentials around

10   someone's neck, how do you evaluate their authenticity?

11   A.   They being with a camera person that has

12   credentials, as well, and the credentials, like I said,

13   has the letters of the -- KHOU or -- I'm just thinking

14   off the top of my head, the letters and channel number.

15   Q.   So you look to see if someone has credentials

16   around their neck and if they're with a camera person?

17   A.   Yes.

18   Q.   Anything else?

19   A.   No.

20   Q.   Okay.  Since becoming sheriff, do you recall any

21   press conference other than the events at Jones Creek

22   Ranch Park on January -- July 12, 2021?  Other than

23   that press conference, do you recall any press

24   conference since becoming sheriff, where someone was

25   asked to leave or excluded?

Sheriff Eric Fagan

```
 1     A.    No.

 2     Q.    In the course of your 39-year career as law

 3    enforcement, have you seen members of the media --

 4    traditional media or otherwise -- push the boundaries

 5    of what's news by reporting on, maybe, personal or

 6    sensitive issues?

 7     A.    I'm not understanding the question.

 8     Q.    Sure.  For example, have you seen members of the

 9    media show up at some event that might be insensitive

10    for them to report -- for instance, a funeral or where

11    there was a victim?

12     A.    Yes.

13     Q.    And, in your experience, after such -- I'll call

14    this less-than-courteous behavior, were those members of

15    the media excluded from press conferences?

16     A.    You asked first showing up.  I don't think

17    that's discourteous, just showing up.

18     Q.    Sure.  So maybe my question was less than

19    artful.  If someone was being disrespectful at a press

20    conference in general, would they be excluded from

21    future press conferences?

22     A.    If they -- if they were being disrespectful

23    where it would cause an incident to happen, yes.

24     Q.    Okay, so if a member of the media disrupts a

25    press conference today, you would expect to exclude
```

1    them from future press conferences?

2       A.   No.   It -- every situation -- how can I put

3    this?   It depends on what happened at that situation.

4    I can't exclude somebody because they did something one

5    day, and I'm going to expect them to do the same thing

6    the next day.   I won't do that, no.

7       Q.   Okay, sure.   And let's say a member of the media

8    tried to question a victim who was obviously distraught,

9    and an officer said no, no, no, you need to get back to

10   this victim, and then you were holding a press

11   conference later that day.   Would you exclude that

12   member of the media?

13      A.   It depends.

14      Q.   Okay.

15      A.   Because -- if someone -- it depends on the

16   situation.   If it's a act of violence or something like

17   that's going to happen, yes, I'm going to exclude them,

18   but asking a question, no.

19      Q.   Okay.   So based on what I think your answer is,

20   it -- if the media person posed a threat of violence,

21   you would exclude them?

22      A.   If the family member pose a threat of violence

23   towards the media person or vice versa, I'm going to

24   separate them.

25      Q.   You'd separate them, okay.   And regardless of

 1   kind of the justification, have you ever, other than

 2   the events on July 21st, 2021, ever moved a media

 3   person away from a press conference to a distance other

 4   than the press conference?

 5              MR. HEDGES:     I think you misspoke about

 6   the date, Christy.

 7              MS. HEBERT:     I'll rephrase.  Thanks.

 8   BY MS. HEBERT:

 9   Q.   Other than July 12, 2021, the day of the Jones

10   Creek Ranch press conference, other than that day, have

11   you ever moved a media person or a person attending a

12   press conference to some physical distance away from the

13   press conference?

14   A.   Never had to, no.

15   Q.   And I'd like to kind of get into the specific

16   events of July 12th, 2021, at Jones Creek Ranch Park,

17   and I'm sure you remember that, on that day, a vehicle

18   was discovered submerged in the water, and,

19   unfortunately, someone was discovered deceased in that

20   vehicle.  Do you remember that?

21   A.   Yes.

22   Q.   And I'd like to walk you through some of your

23   admissions on that day.  You previously -- and this is

24   Exhibit 4.  We can look at No. 4.

25              So we're looking at Exhibit 4, which is your

1    response to request for admissions.  I'm going to look

2    at page 3, number 4, and in this request for admission,

3    your response was you admitted that you closed the park

4    in connection with an investigation, and then number 7,

5    which is page 4, you admitted that there were certain

6    people who remained after in the park, and that there

7    were other individuals in the park previously who were

8    recording, press folks who were recording; is that

9    correct?

10    A.    Yes.

11    Q.    Let's go back to your admission number 8 which

12    is also on page 4, and I'm going to read this one.

13    "Admit that on July 12, 2021, you did not ask any person

14    either in or outside of Jones Creek Ranch Park for

15    documentation to prove his or her identity as a member

16    of the media."  Your response was, "Admitted.  Media

17    that was there displayed their credentials, so that I

18    did not need to ask to see their credentials."  Is that

19    accurate?

20    A.    Yes.

21    Q.    And what did you mean by "the media displayed

22    their credentials"?

23    A.    They had a lanyard around their neck.

24    Q.    Let's look at some footage from the press

25    conference that day, and we're going to mark this

1    footage as Exhibit 13.

2                   [Exhibit 13 was marked.]

3    Q.   And I'll represent to you that this footage was

4    taken by my client, Justin Pulliam, on July 12, 2021,

5    using various cameras.  You'll see how the four panels

6    put together.  You might be familiar with kind of some

7    of the footage that you reviewed with your attorney,

8    Mr. Hedges, and some of it's from a cellphone, a body

9    camera, a higher-resolution camera that he had on a

10   tripod, and a dash camera.  Molly, would you pull that

11   up and we'll watch from timestamp 3:28 to 4:29.

12                   [Clip was played.]

13   Q.   Thank you, Molly.  Were there four other people

14   in this clip of the footage other than Justin Pulliam?

15   A.   Yes.

16   Q.   And did you allow all these four folks to remain

17   in this area for the press conference that happens after

18   this?

19   A.   I don't remember.

20   Q.   Let me rephrase this.  Did you have any of those

21   four escorted away from the press conference?

22   A.   No.

23   Q.   And after reviewing this footage, can you tell

24   me where the media credentials of these folks were

25   displaying were located?

1      A.   If you go back to when I first arrived at the

2    park, I believe they had the cameraman with them, and

3    they had the credentials on them.  This was after they

4    found the body, so maybe I'm assuming that they had to

5    -- because I'm used to seeing it around the necks, but

6    I'm -- they had the credentials earlier.  That's what

7    I'm thinking.  I may be wrong.  If I am, I was wrong.

8      Q.   Okay, so your testimony is you're not sure if

9    they were displaying their credentials.  They may have

10   displayed them earlier --

11     A.   I think they would -- yes.

12     Q.   But there are no credentials in this footage we

13   see here?

14     A.   No.

15     Q.   Okay.  And if we review other footage, we might

16   see the credentials?

17     A.   Yes.

18     Q.   But at this press conference -- or at this media

19   area, to be more precise, that the sheriff's office had

20   designated, none of those four folks were displaying

21   credentials?

22     A.   Correct.

23     Q.   Let's go back to your RFAs, which are Exhibit 4,

24   and we'll look at page 5, and we'll go down to number 9

25   just at the top.  I don't think I need to read this,

1    but you admitted that there were two news crews present

2    in the parking lot outside of the Jones Creek Ranch

3    Park on July 12, 2021; is that correct?

4        A.   Yes.

5        Q.   And were these four folks that we just watched

6    in the video clip with this timestamp ending at 4:29,

7    the two news crews, you admitted were present in the

8    parking lot?

9        A.   I believe so, yes.

10       Q.   Have you ever ordered members of a TV news crew

11   to be ex -- to leave a press conference?

12       A.   No.

13       Q.   Let's skip to another portion of the video.

14            MS. HEBERT:      Molly, would you minute

15   cuing up timestamp 6:26 to 6:34?

16   BY MS. HEBERT:

17       Q.   And, Sheriff, I know there's four panels, so it

18   might be helpful, most clear to pay attention to the

19   panel in the upper left corner.

20            [Clip was played.]

21       Q.   Did you see what looked like a golf cart or a

22   Gator pull up to the media area?

23       A.   Yes.

24       Q.   Were you in that golf cart?

25       A.   Yes.

Sheriff Eric Fagan

1      Q.    And who was with you?

2      A.    One of my deputies.

3      Q.    Would it be accurate to say Detective Hartfield,

4   is his title?

5      A.    Okay.

6      Q.    Well, we can look at the footage, but you're

7   familiar with Detective Hartfield?

8      A.    Yes.

9      Q.    How tall would you estimate Detective Hartfield

10  is?

11     A.    5'9", 5'10".

12     Q.    And how much would you estimate Detective

13  Hartfield weighs?

14     A.    Never thought about it.  I don't know.  I just

15  need to see the video, I guess, then.

16     Q.    Sure.

17              MS. HEBERT:     Let's play a little

18  bit further ahead, Molly, from 6:53 to 6:58.  We might

19  have to go back, but we'll look at that.

20              [Clip was played.]

21     Q.    All right, it's a little hard to see, but in the

22  bottom left corner, is that Detective Hartfield?

23     A.    Yes.

24     Q.    And, refreshing your memory, would you estimate

25  how much he might weigh?  Over two hundred pounds?

Sheriff Eric Fagan

```
 1     A.    I'll say about 210, 215.

 2     Q.    That's fair; and where were you and Detective

 3   Hartfield coming from?

 4     A.    Inside the park.

 5     Q.    Inside Jones --

 6     A.    -- Ranch Park.

 7     Q.    And where, exactly, inside the park?

 8     A.    I don't remember.

 9     Q.    Were you by the creek where the car was

10   discovered?

11     A.    Yeah, I was there earlier, but where we left

12   from exactly then, I don't know.

13     Q.    Sure.  How far would you estimate the creek was

14   from the front of this -- from the parking lot in the

15   front of this park?

16     A.    A hundred yards?  I don't know.

17     Q.    It would be fair to say it's some distance away,

18   that you had to take a Gator?

19     A.    Yes.

20     Q.    And what did you and Detective Hartfield discuss

21   on the way over on your ride in the Gator?

22     A.    Don't know.

23     Q.    Did you say anything about Justin Pulliam?

24     A.    Probably did, yes.

25     Q.    Do you remember the gist of what you had said?
```

Sheriff Eric Fagan

```
 1      A.    Yes.  Probably told them if he was there, keep
 2   him away from the rest of the media.
 3      Q.    Did you give Detective Hartfield a reason why?
 4      A.    I don't remember, but my reason was that the
 5   media was complaining about him earlier.
 6      Q.    When you arrived at this media area, who was
 7   there?
 8      A.    Myself, the deputy, my PIO officer, Jacqueline
 9   Preston, Justin Pulliam, and those -- and the other
10   media people.
11      Q.    So when you said Jacqueline Preston, is that
12   your PIO officer?
13      A.    Yes.
14      Q.    Okay.  Just making sure.  So we are paused --
15   Molly, can you show the timestamp?  We're paused at
16   7:01, and in the bottom left corner --
17              MS. HEBERT:     Molly, can you move your
18   mouse off --
19   BY MS. HEBERT:
20      Q.    In the bottom left corner that woman with a
21   light blew shirt --
22      A.    Yes.
23      Q.    -- is she your PIO officer?
24      A.    Yes.
25      Q.    And what was she doing there?
```

Sheriff Eric Fagan

```
 1      A.    Just there; any media outlet, my PI director

 2   comes out.

 3      Q.    Do you recall if she spoke at the press

 4   conference?

 5      A.    No, I don't recall.

 6      Q.    Let's go back and 7:53 to 7:05 a little bit and

 7   we'll look specifically at the --

 8            MR. HEDGES:     Say that again.  What

 9   timestamp?

10            MS. HEBERT:     Sure.  6:53 to 7:05.

11            MR. HEDGES:     Thank you.

12   BY MS. HEBERT:

13      Q.    And, Sheriff, if you wouldn't mind focusing on

14   the top right-hand panel.

15                   [Clip was played.]

16      Q.    And what was Justin Pulliam doing in this clip

17   of the footage?

18      A.    Walking up to the rest of the media.

19      Q.    And did he set down a camera on a tripod?

20      A.    Yes.

21      Q.    Did Justin Pulliam say anything to you?

22      A.    No.

23      Q.    Did Justin Pulliam say anything at all?

24      A.    Not that I can remember, no.

25      Q.    And did you say anything to him?
```

```
 1    A.    No.

 2    Q.    All right, let's return to Exhibit 4 again and

 3   look at your responses to the request for admission.

 4   We'll go to page 5, with number 10; and would you mind

 5   reading that?  I don't think I'm going to read it out

 6   loud.

 7    A.    You want me to read it out loud, or just read it

 8   --

 9    Q.    No, just read it.

10    A.    Okay.

11    Q.    And you said -- your response was, "I admit that

12   I said words to that effect."  Let's watch the same

13   portion of the video that we just watched, 6:53 to 7:05,

14   and we may need to crank up the volume a little here,

15   because I know you hear Justin's feet walking, but let's

16   listen for what you said, and I think the best panel is

17   the bottom left panel.

18                       [Video clip played.]

19   BY MS. HEBERT:

20    Q.    Okay, now having reviewed the relevant portion

21   of the video, did you say to Detective Hartfield, "If

22   you don't do it, arrest him, because he's not part of

23   the local media, so he has to go back", with "he" and

24   "him" referring to Justin Pulliam?

25    A.    Yes.
```

Sheriff Eric Fagan

1    Q.    And why did you say that Justin Pulliam was not

2    a part of the local media?

3    A.    Like I said -- oh, why did I say he's not part

4    of the local media?

5    Q.    Yeah.

6    A.    Because he's not.

7    Q.    Okay.  By saying, "If he don't do it, arrest

8    him", were you authorizing Detective Hartfield to

9    arrest Justin Pulliam if he did not move away from the

10   mead?

11   A.    No.

12   Q.    So if Justin had said, "No, I'm not moving

13   back", would you have expected Detective Hartfield to

14   arrest him?

15   A.    No.

16   Q.    Okay.  Would you have -- so you wouldn't have

17   ordered Detective Hartfield to order -- you wouldn't

18   have ordered Detective Hartfield to arrest Justin

19   Pulliam if he refused?

20   A.    No.  You're forgetting what I'm answering

21   earlier.  Justin Pulliam had got into it with the media

22   earlier that day, and with the family that day.  I

23   wanted to make sure the confrontation wouldn't happen.

24   If Justin Pulliam would have stayed there and erupted

25   again with the media or have conversation, then I would

Sheriff Eric Fagan

```
 1   expect him to be arrested.

 2      Q.   Okay.  Let me just write that down.

 3         So when you said to Detective Hartfield, "If he

 4   don't do it, arrest him", you were referring to moving

 5   back, correct?

 6      A.   Yes.

 7      Q.   So you were saying:  If he don't do it, if he

 8   don't move back, arrest him, to Detective Hartfield?

 9   That's what you're saying?

10      A.   What I meant by, like I said earlier, Justin had

11   got into it with --

12      Q.   I don't think you're answering.  Listen to the

13   question.  When you said, "If he don't do it", you were

14   referring to move back, correct?

15      A.   Yes.

16      Q.   And you were telling Detective Hartfield that if

17   he don't do it, if he don't move back, arrest him?

18      A.   Yes.

19      Q.   And do you -- an arrest is a pretty serious

20   thing, correct?

21      A.   Yes.

22      Q.   And the threat of arrest is a pretty serious

23   thing?

24      A.   Yes.

25      Q.   Do you normally go around telling your officers
```

1    to arrest someone if they don't do something and not

2    actually mean it?

3        A.    No.

4        Q.    So when you tell someone if you give -- when you

5    give an order to arrest an individual, you would expect

6    your officer to arrest that individual?

7        A.    Yes.

8        Q.    And if Justin Pulliam had said, "I have the

9    right to record the police", like you recommended in the

10   2020 interview, would you have expected Hartfield to

11   arrest him?

12       A.    Just for recording, no.

13       Q.    But for refusing to step back?

14       A.    Yes.

15       Q.    Let's go back to Exhibit 4, your responses to

16   the RFAs, specifically number 10 on page 5 that we

17   already looked at.  Now I want to look at the second

18   half of your response.  You said, "Admit that I also

19   said that plaintiff had five minutes to leave the

20   taped-off investigation area."  Had Justin Pulliam

21   crossed any police tape that day?

22       A.    We put up police tape.  Yes.

23       Q.    So he'd crossed police tape --

24       A.    No.  We put up police tape.  He was in the area

25   already.

1    Q.   Okay, so let me make sure I understand that.

2    The sheriff's office put up police tape.  Did Justin

3    ever cross that police tape in a way that was entering

4    the area that he was not supposed to be in?

5    A.   No.

6    Q.   So he never entered an area after it had been

7    set off?

8    A.   No.

9    Q.   And, ultimately, even if, you know, he expressed

10   some reluctance or some criticism, did Justin Pulliam

11   leave the area that you told him to leave, the

12   taped-off investigation area?

13   A.   Yes.

14   Q.   And your answer here was that, "I also said that

15   plaintiff had five minutes to leave."  Did you give

16   anyone else a five-minute time frame to leave the

17   investigation area?

18   A.   Didn't have to.

19   Q.   And what do you mean by that?

20   A.   I didn't need to.  No one else would -- gave me

21   a reason to give that order to.  Just him.

22   Q.   Okay.  Let's look at number 7.  I Exhibit 7?

23   A.   Page 7 or the response to the --

24   Q.   Number 7, page 4.  On the same exhibit, which is

25   Exhibit 4.  I'm going to read this.  "Admit that on July

1    12, 2021, as seen beginning at 1:20 on July 12, 2021,

2    video footage, you told Lieutenant Simmons that after

3    five minutes --

4              MR. HEDGES:     This is different than

5    what I've got.

6    A.    Yeah.  I'm not seeing it.  You said page 4 --

7    Q.    I'm reading the wrong one.  You're right.  Page

8    4, number 7.  I was reading number 5, excuse me.  Admit

9    that -- I'm going to read this again.  Request number

10   7, page 4, "Admit that on July 12, 2021, as seen

11   beginning at 1:56 on July 12, 2021, video footage, you

12   allowed individuals other than plaintiff Justin Pulliam

13   to continue recording the activities of FBCSO officers

14   in Jones Creek Ranch Park while personally escorting

15   Justin out of the park."  Your response was, "Admitted

16   that certain employees of the district attorney and

17   sheriff's office may have continued to film after the

18   park was closed.  Otherwise, deny.  Admitted, however

19   that not all people at the park, including those

20   filming, were able to leave at exactly the same time."

21   Did I read that correctly?

22   A.    Uh-huh.

23   Q.    Were there people who were filming the taped-off

24   investigation area after Justin Pulliam was told to

25   leave?

1    A.   Yes.

2    Q.   I'm going to use an exhibit -- I think this is

3    No. 14 that we are on now.

4              MS. HEBERT:     Molly; would you mind

5    handing the Sheriff what is marked as Exhibit 14.

6              [Exhibit 14 was marked.]

7              MS. HEBERT:     And, Sheriff, would you

8    mind reviewing this.

9    A.   Uh-huh.  Yes.

10   Q.   Is this you in the picture?  It looks like

11   you're there four times -- or three time, given the

12   panel --

13   A.   Yes.

14   Q.   And it looks like you're looking at your watch;

15   is that correct?

16   A.   Yes.

17   Q.   Is this the point where you were telling

18   plaintiff, Justin Pulliam, to leave the park within five

19   minutes?

20   A.   Yes.  Not leave the park, leave that area.

21   Q.   Thank you.  So this is the time that you were

22   telling Justin Pulliam to leave that area within five

23   minutes?

24   A.   Yes.

25   Q.   And it looks like there are some people behind

Sheriff Eric Fagan

```
 1   you in that photo.  What are those people doing?

 2      A.   Filming.

 3      Q.   And are these, looks like maybe three people

 4   employees of the district attorney?

 5      A.   Don't know.

 6      Q.   Are these people employees of the sheriff's

 7   office?

 8      A.   Dolly is.  Dolly Simon, the one in front of me.

 9      Q.   What about the three folks behind you?

10      A.   I don't know who they are.  Look like a

11   cameraman and look like a female.  That's all I can see.

12      Q.   And what's the female wearing?

13      A.   Pants.

14      Q.   What color?

15      A.   Black or blue.

16      Q.   And the shirt?

17      A.   Don't know; green.  I don't know.

18      Q.   Some kind of dark color; is that fair?

19      A.   Yes.

20      Q.   And what is the cameraman wearing?

21      A.   Plaid shirt.

22      Q.   And just behind the cameraman, can you see a

23   little bit of pink over his shoulder?

24      A.   No.

25      Q.   You don't see any pink there?
```

```
 1    A.    No.

 2          MS. HEBERT:      Molly, would you mind

 3    going to Exhibit 13, and going to timestamp 4:29.

 4          MR. HEDGES:      4:39?

 5          MS. HEBERT:      29.

 6          MR. HEDGES:      Thank you.

 7          MS. HEBERT:      Sure.

 8    BY MS. HEBERT:

 9    Q.    And looking at both the still shot of what's at

10    timestamp 4:29 of Exhibit 13 --

11          MS. HANIS:       4:31?

12    Q.    Okay, now, looking at the still shot of what's

13    at timestamp 4:31 of Exhibit 13, and comparing that with

14    what's at Exhibit 14, is that the same gentleman in the

15    plaid shirt?

16    A.    I believe so.

17    Q.    And is that the same woman in the dark outfit,

18    for lack of a better descriptor, leaning against the

19    vehicle there?

20    A.    I believe so.

21    Q.    So -- and you testified earlier that these four

22    folks shown at 4:29 and now 4:31 were the two news crews

23    that you admitted were present?

24    A.    Yes.

25    Q.    And so you would say that you believe that the
```

Sheriff Eric Fagan

```
1    folks standing behind you in Exhibit 14 are news or TV

2    crews?

3        A.   Yes.

4        Q.   Thank you.  I'd like to just follow up and ask

5    why did you tell Lieutenant Simmons or Simons -- is it

6    "Simmons" or "Simons"?

7        A.   Simons.

8        Q.   Why did you tell Lieutenant Simons to arrest

9    Justin Pulliam if he did not leave the park within five

10   minutes?

11       A.   He'd just had -- when I got there, I was told

12   that he'd just apparently gotten into a altercation with

13   one of the family members, and one of the family members

14   wanted to attack Justin Pulliam, and, in fact, I was

15   told that one of the family members slapped the camera,

16   or phone, or something out of Justin Pulliam hand, and

17   they had to physically restrain the two apart, so I

18   wanted him away from them.

19       Q.   Okay.  And is that one of the reasons you asked

20   the press, media folks, to leave the park?

21       A.   No.

22       Q.   Why did you ask the press and media folks to

23   leave the park?

24       A.   I never asked anyone to leave the park.

25       Q.   Okay.  To go to the designated media area.  Is
```

1    that one of the reasons you asked the media to go to the

2    designated media area at the other end of the parking

3    lot?

4        A.    That was after the car came up and the body was

5    found.  I told him I would speak to him over there,

6    because I didn't want to speak to him over there by the

7    family.

8        Q.    So you wanted to speak to the press and media

9    away from the family?

10       A.    Yes.

11       Q.    So you designated a media area at the parking

12   lot?

13       A.    Yes.

14       Q.    And how far away from the family was the

15   designated media area?

16       A.    It was far.

17       Q.    Okay.  A mile?

18       A.    No.  It wasn't a mile, no.  Couple of blocks.

19       Q.    Couple of blocks away, okay.  Let's go back to

20   your RFAs, which are Exhibit 4.

21       A.    Exhibit 4?

22       Q.    Yes, sir.  And let's turn to page 6, and let's

23   look at number 13.  I'll just read your response, here,

24   rather than the whole admission, but if you wouldn't

25   mind just reviewing the question.  "Admit that I

 1    ordered Deputy Hartfield to move plaintiff a short

 2    distance away, based on plaintiff's conduct earlier that

 3    day.  I deny that the reason was so that plaintiff could

 4    not participate in the news conference."  Did I read

 5    that correctly?

 6       A.   Yes.

 7       Q.   And what did you mean by "based on plaintiff's

 8    conduct earlier that day"?

 9       A.   Getting in a altercation with the family

10    members, and getting in a altercation with the rest of

11    the news media.

12       Q.   Okay.  And although you're talking about an

13    altercation with the family and an altercation with the

14    news media, the only reason that you provided Detective

15    Hartfield why he needed to move Justin Pulliam back

16    from the press conference was because Justin was not

17    media, correct?

18       A.   You said that's the only reason I told

19    Hartfield?

20       Q.   Yes.

21       A.   Maybe.  I don't know.  I could have told him

22    about the altercation.  He's the one that told me about

23    the altercation.

24       Q.   He's the one that told you about the

25    altercation?

Sheriff Eric Fagan

```
1      A.    Yeah.  That happened before I got there.

2      Q.    Sure.  So let me just kind of break all of that

3  down.  At some point when you arrived at Jones Creek

4  Ranch Park, Deputy/Detective Hartfield -- he was kind of

5  in a deputy capacity, right?

6      A.    Yes.

7      Q.    So, at some point when you arrived at Jones

8  Creek Ranch Park, Deputy Hartfield told you there had

9  been an altercation?

10     A.    I don't know which deputy told me that.  Could

11 have been Hartfield or Simons.  One of my deputies told

12 me --

13     Q.    Okay, so some deputy told you there had been an

14 altercation, you didn't witness said altercation

15 between Justin Pulliam and the family, personally?

16     A.    Correct, yes.

17     Q.    And when you gave Deputy Hartfield the order to

18 move Justin back, the only reason you gave him that

19 order, at the time, was because Justin was not media,

20 correct?

21     A.    No.

22     Q.    You gave another explanation?

23     A.    The reason I did it was because of the

24 altercation earlier.  I didn't have to explain that to

25 my deputy why I wanted that all taking place.  That was
```

1    my reasoning.

2       Q.   Okay, let's look at request for admission number

3    11, and that is on page number 5.  Let's read that.

4    "Admit that on July 12, 2021, as seen beginning at 15:50

5    on July 12, 2021, video footage, you did not identify

6    any reason for instructing FBCSO officer Robert

7    Hartfield to move plaintiff Justin Pulliam back from the

8    designated media area, other than plaintiff Pulliam is

9    not part of the local media, and you responded, "Admit."

10         So, to confirm, you didn't tell Deputy Hartfield

11   that he needed to move Justin away from the media area

12   based on Justin's behavior that day?

13      A.   Yes.

14      Q.   I don't think that answer was particularly

15   clear, so let's -- let me rephrase that.  You did not

16   tell Detective Hartfield that he needed to move Justin

17   away from the media area based on Justin's behavior

18   earlier that day?

19      A.   Yes.  I don't know what you want me to answer.

20   I did tell him to move back.  Yes, I did.

21      Q.   Okay, and when did that conversation occur?

22      A.   It wasn't a conversation.  I told him to move

23   him back.

24      Q.   Okay.  I understand that you may have had this

25   other justification for moving plaintiff Pulliam back,

Sheriff Eric Fagan

1    but I'm specifically asking what you told Detective

2    Hartfield, and when you gave Detective Hartfield the

3    order to move Justin Pulliam back, you did not say,

4    verbalize, "move Justin back because of his behavior

5    earlier today"?

6        A.   No.

7        Q.   You did not make a verbal statement to Detective

8    Hartfield that he needed -- that Detective Hartfield

9    needed to move Justin Pulliam back because Justin had

10   done something?

11       A.   I don't think so, no.

12       Q.   Did you tell anyone else that Justin's behavior

13   had been problematic so that you needed to remove him

14   from the media area?

15       A.   I was told that his behavior was problematic.

16   His -- that the altercation had taken place, so I

17   already knew that, so that's why.

18       Q.   Okay, so you didn't tell anybody, "We need to

19   remove Justin from the media area because of an

20   altercation"?

21       A.   No.

22       Q.   Okay.  And are you aware that Detective

23   Hartfield relayed your explanation almost word-for-word

24   to Justin himself in moving Justin back from the media

25   area?

1     A.    He could have.

2     Q.    Okay.  Let's look at the relevant portion of the

3  video.

4             MS. HEBERT:      Molly, would you go to

5  7:28, and we'll watch until 7:44.

6     Q.    And, Sheriff, I think the bottom left panel is

7  probably the best one to look at?

8                 [Clip was played.]

9  BY MS. HEBERT:

10    Q.    Detective Hartfield didn't say anything about

11 Justin Pulliam's behavior earlier in the day, did he?

12    A.    What are you asking me?

13    Q.    So, in ordering Justin to step back from the

14 media area, did Detective Hartfield say anything about

15 Justin Pulliam's behavior earlier in the day?

16    A.    I don't know if he was the one that told me

17 about the altercation, if that's what you're asking.  He

18 could have.  I don't know.

19    Q.    Sure, sure.  That's not what I'm asking.  I'm

20 not asking about your conversation with Detective

21 Hartfield.  I'm asking about the conversation that we

22 just saw from 7:28 to 7:44.  It's not really a

23 conversation.  It's just the order that Detective

24 Hartfield gave, so, to rephrase, I'm asking you about

25 the order that Detective Hartfield gave to Justin

Sheriff Eric Fagan

```
1   Pulliam and that order occurred from 7:28 to 7:44.  In
2   giving that order to Justin Pulliam to step back, did
3   Detective Hartfield say anything about Justin's
4   behavior earlier in the day?
5       A.   When you say "earlier in the day", that's the
6   whole day before that --
7       Q.   Yeah.
8       A.   -- so if he's the one that told me about the
9   altercation, then yes.  I don't remember who told me
10  about the altercation.
11      Q.   I understand that.
12      A.   So I can't answer that question a hundred
13  percent honestly.  I don't remember.
14      Q.   Yeah, and I'm not asking about what Detective
15  Hartfield said to you.  I'm asking about this
16  conversation right here between Detective Hartfield and
17  Justin Pulliam, so let me ask the question --
18      A.   What's confusing me, you keep putting "earlier
19  that day."  Well, earlier that day is that whole day,
20  so if he said something about that altercation, then
21  yes, he did.  If he -- so I can't answer that a hundred
22  percent.
23      Q.   Sure.  I'm going to look at your response to
24  request for admission number 13 that we just looked at,
25  and your response was "Admit that I ordered Deputy
```

1   Hartfield to move plaintiff a short distance away, based

2   on plaintiff's conduct earlier that day."

3       A.   Yes.

4       Q.   I'm using your language.

5       A.   Yes.

6              MS. HEBERT:      And, Molly, would you mind

7   cuing up 7:28 to 7:44 again.

8                  [Clip was played.]

9   BY MS. HEBERT:

10      Q.   So the only reason that Detective Hartfield said

11  to Justin Pulliam for the reason he was escorting

12  Justin Pulliam back from the media area was because

13  Justin was not media; "at the sheriff's request, could

14  you step back this way"?

15      A.   Yes, that's what he said, yes.

16      Q.   And that's the only thing that Detective

17  Hartfield said to Justin Pulliam in that moment?

18      A.   In that moment, yes.

19      Q.   Okay, so Detective Hartfield didn't say anything

20  like, "Justin, you've been disruptive.  Please step

21  back", correct?

22      A.   No.

23      Q.   Detective Hartfield didn't say anything like,

24  "You've been rude to the family of the deceased.  Please

25  step back"?

Sheriff Eric Fagan

```
1      A.    No.
2      Q.    At any point on July 12, 2021, did Justin
3   Pulliam refuse to follow orders issued by sheriff's
4   office personnel, that you know of?
5      A.    No.
6      Q.    Had Justin Pulliam made any threats that he was
7   going to attack you or other people --
8      A.    No.
9      Q.    -- that you know of.
10     A.    No.
11     Q.    I'm sorry, I stepped on you a little bit, there.
12  Had Justin Pulliam made any threats that he was going to
13  attack you?
14     A.    No.
15     Q.    Had Justin Pulliam made any threats that he was
16  going to attack anyone else?
17     A.    No.
18     Q.    Sometimes we think back to what happened in the
19  past, and we, like, come up with other reasons why that
20  action made sense at the time.  So, is that kind of
21  what happened here?  After the dust settled and you had
22  time to think about it, it made sense to ask Justin to
23  leave based on his behavior earlier in the day, even
24  though you didn't say it at the time?
25     A.    It made sense to me then.
```

Sheriff Eric Fagan

```
 1      Q.   Okay, it made sense to you at the time.  So

 2   other than the interactions with the family that we've

 3   talked about a little bit, and some kind of altercation

 4   with other members of the media, and then the third

 5   item of Justin not being media, was there any other

 6   reason that you ordered Detective Hartfield to escort

 7   Justin Pulliam back from the media area?

 8      A.   No.

 9      Q.   So just those three, kind of, reasons?

10      A.   Yes.

11      Q.   So, to confirm, your testimony under oath is

12   that on July 12, 2021, you had a secret reason -- the

13   media altercation and the family altercation, for your

14   order to move Justin Pulliam back from the media area

15   that  you didn't tell Detective Hartfield in giving him

16   the direct order, and that wasn't used to explain to

17   Justin Pulliam why he needed to leave the media area?

18              MR. HEDGES:    Object to the form.  It's

19   argumentative.

20      A.   It was not a secret.

21      Q.   Okay.

22      A.   That was my reason, but it wasn't a secret.

23      Q.   But you didn't tell anybody else?

24      A.   I didn't tell -- I was told about the situation,

25   so Hartfield knew about it already.  I'm just saying I
```

1    don't know if it was Hartfield that told me about it or

2    not, so if he's the one that told me about it, then he

3    knew.

4       Q.   But you didn't explain your rationale to anybody

5    about why you were excluding Justin from the media

6    area?

7       A.   No.

8       Q.   Let's watch another portion of the video,

9    timestamp 7:44 to 8:53.

10                   [Clip was played.]

11      Q.   Did Detective Hartfield and Deputy Garcia escort

12   Justin Pulliam away from where you were going to hold

13   the press conference?

14      A.   Yes.

15      Q.   And Justin estimated there that he was ten

16   parking spots back from where you were going to hold

17   the press conference.  Was that about accurate, give or

18   take?

19      A.   I believe, yes.

20      Q.   And what if Detective Hartfield had only moved

21   Justin Pulliam back two feet from the press conference

22   area?  Would that have been far enough for your order?

23      A.   Yes.  I didn't tell him how far back to move

24   him; just move him back.

25      Q.   Okay, so if he had moved Justin Pulliam two feet

Sheriff Eric Fagan

```
1    back from where he'd set up his tripod, that would have
2    complied with your order?
3        A.   Moving back, yes, it would have complied.  I'm
4    not going to say I'd be satisfied with it, though, but
5    yeah, it would have complied.
6        Q.   It would have complied with, maybe, the
7    technical words of your order, but not the spirit of
8    your order?
9        A.   Correct.
10       Q.   And in the spirit of your order, where did you
11   want Detective Hartfield to move Justin Pulliam?
12       A.   Far enough away that he wouldn't be interfering
13   with the other news media, but not so far away where he
14   couldn't see it or film it.
15       Q.   Okay.  That's fair.  We are paused on timestamp
16   8:54, and would you mind looking at the two panels on
17   the left; and you see the man in the black shirt
18   standing kind of closest to Justin Pulliam?  Is that
19   Detective Hartfield?
20       A.   I believe so.
21       Q.   And did you see -- if we need to go back, we can
22   go back a little bit.  Is that where Detective
23   Hartfield walked after escorting Justin Pulliam back?
24       A.   I'm looking at it now, yes.
25            MS. HEBERT:      Let 's go back just a
```

1    couple of seconds, Molly, just so we can follow

2    Detective Hartfield's path.

3                    [Clip was played.]

4        Q.   And now we're paused on 8:44, which is a little

5    bit earlier, but did you see Detective Hartfield walk

6    from where he had escorted Justin Pulliam to this point

7    where he's standing?

8        A.   Yes.

9        Q.   And is Detective Hartfield standing in between

10   the media area and Justin Pulliam?

11       A.   Yes.

12       Q.   Let's go back to your RFAs, and that is Exhibit

13   4; and we're going to look at number 13 and look at the

14   second half of your response to number 13.

15            You said, "I deny that the reason was so that

16   plaintiff could not participate in the news

17   conference."  And you have the same sentence in response

18   to request for admission number 14 at the end.  I deny

19   the reason that Deputy Garcia walked with plaintiff was

20   so that plaintiff could not participate in the news

21   conference, and you have a similar for the next page,

22   number 16.  "I deny the reason was so that plaintiff

23   could not participate in the news conference."  Can you

24   explain your reason for having Justin Pulliam moved

25   away from the press conference if the purpose wasn't to

Sheriff Eric Fagan

1   prevent Justin from participating in the press

2   conference?

3       A.   Earlier, when I stated he had a confrontation

4   with the news media and the family before.  The same

5   reason.

6       Q.   Sure.  And when you arrived at the media area,

7   you had identified four folks who were news media

8   present in the parking lot.  Was any member of the

9   deceased's family present in the parking lot?

10      A.   No.

11      Q.   Were any of the family members near the parking

12  lot?

13      A.   No.  Not that I know of, no.

14      Q.   Sure.  So then why was moving Justin further

15  back from the press conference respectful to the

16  members of the deceased's family?

17      A.   I didn't say that.  I said because of the

18  confrontation he had with the media.

19      Q.   With the media?

20      A.   With the media.

21      Q.   Okay, so you moved Justin back just because of

22  the confrontation that he had had with the media?

23      A.   Yes.

24      Q.   And tell me a little bit more about this

25  confrontation with members of the media.

```
 1      A.    I wasn't there when the confrontation happened.
 2  I was told by members of the media.
 3      Q.    Who on the media told you about this
 4  confrontation?
 5      A.    One of the females.
 6      Q.    And which -- can you tell me which female it
 7  was?
 8      A.    No.
 9      Q.    Okay.  Let's go to 7:15, Molly, on Exhibit 13 in
10  the video.
11              MR. HEDGES:     7:15?
12              MS. HEBERT:     Yes.
13              MR. HEDGES:      Thank you.
14  BY MS. HEBERT:
15      Q.    So there are two -- in this video clip, there
16  are two women who introduced themselves as members of
17  the media.  There's the one in pink and then the one
18  we'd looked at previously, which was in dark clothing.
19  Do you remember which one of the ladies told you that
20  they had had an altercation with Justin?
21      A.    No.
22      Q.    And it looks like both of these women introduced
23  themselves.  Did you recall meeting them before?
24      A.    Yes.
25      Q.    Can you tell me about that?
```

Sheriff Eric Fagan

```
 1     A.   It was at the park when I first got there

 2  earlier.

 3     Q.   Okay, so you had had some kind of interaction

 4  with them at the park earlier?

 5     A.   Yes.

 6     Q.   And, just for the record, you didn't ask either

 7  of these two ladies for their credentials?

 8     A.   No.  I don't think I did, no.

 9     Q.   And you were telling me a little bit about one

10  of these ladies saying to you that they had some kind of

11  negative interaction with Justin Pulliam.

12     A.   Yes.

13     Q.   Can you tell me kind of what you remember about

14  that conversation, the substance of it?

15     A.   No.

16     Q.   Do you remember where that conversation

17  occurred?

18     A.   At the park.

19     Q.   Where at the park?

20     A.   By the creek.

21     Q.   Okay, so somewhere by the creek, one of these

22  ladies spoke to you about Justin Pulliam?

23     A.   Yes.

24     Q.   And you can't remember the substance of that

25  conversation?
```

1    A.    Some type of altercation.  It was -- they was

2    telling me about the -- they also told me about the

3    altercation with the family, and that he's not a part

4    of the media, he's making it difficult for us, he's

5    embarrassing us, he won't -- they said something about

6    he won't listen.  He's fussing and stuff; exactly what

7    they said, I don't remember.

8    Q.    That's okay, but you've given me the general

9    gist --

10   A.    Yes.

11   Q.    -- which is fine.  If -- and it seems like the

12   general gist of the media's complaint was that he

13   wasn't media and he wasn't acting very professional; is

14   that fair?

15   A.    Yes.

16   Q.    So why didn't you give Justin Pulliam a warning

17   of, look, Justin, you need to be professional and

18   courteous, here, and hold your comments to the end, or

19   not speak to the other media members, before ordering

20   Detective Hartfield to escort Justin away from the press

21   conference?

22   A.    He's not my employee.

23   Q.    Okay.  Earlier today, we talked a little bit

24   about press conferences before you were sheriff, and

25   you mentioned that if someone was going to be -- was

1    being really disruptive -- was yelling, or screaming,

2    or threatening the press conference, you would give

3    them a warning before you escorted them out of the

4    press conference.  Why wouldn't you give the same kind

5    of warning here?  "Justin don't disrupt the press

6    conference."

7        A.    Because those are the rules I had to follow as a

8    officer with the Houston Police Department, was the

9    orders that I was given.

10       Q.    So they're not your kind of rules today?

11       A.    No.

12       Q.    So, today, as we sit here, do you have a general

13   rule that if someone shouts something in a press

14   conference, you're going to remove them immediately?

15       A.    Depends on the situation.

16       Q.    What does it depend on?

17       A.    Violence, act of violence.

18       Q.    Okay.  And Justin hadn't threatened you at all

19   --

20       A.    No.

21       Q.    -- before you removed him?

22       A.    No.  Never said that, no.

23       Q.    And, to your knowledge, had Justin threatened

24   any members of the media?

25       A.    No.

Sheriff Eric Fagan

1    Q.   And the complaint that you received from one of

2    the members of the media, did that member of the media

3    say anything about Justin potentially being violent?

4    A.   No.

5    Q.   You admitted previously that you made statements

6    at this press conference on July 12, 2021, outside of

7    -- at the front of Jones Creek Ranch Park; is that

8    correct?

9    A.   Yes.

10   Q.   And, for clarification, why did you give the

11   statement in this press conference, rather than your

12   PIO?

13   A.   Can --

14   Q.   Sure.  Why did you lead the press conference,

15   rather than your public information officer?

16   A.   Because I was there.

17   Q.   Because you were there.  So if you're onsite,

18   you're going to give the press conference, rather than

19   the PIO?

20   A.   Correct.

21   Q.   And that's typical?

22   A.   Yes.

23   Q.   At the July 12th press conference, were the

24   reporters there, the four reporters we've previously

25   identified, able to ask you questions?

Sheriff Eric Fagan

```
 1     A.    Yes.

 2     Q.    And was Justin Pulliam able to ask you questions

 3  at all during this press conference?

 4     A.    If he wanted to.

 5     Q.    Were you able to hear Justin Pulliam said from

 6  where he had been moved --

 7     A.    Yes.

 8     Q.    -- at the part of the parking lot?

 9     A.    Yes.

10     Q.    What did you recall Justin Pulliam saying?

11     A.    Nothing.

12     Q.    So he didn't say anything?  You were able to

13  hear him?

14     A.    Yes.

15     Q.    So your position is that Justin asked -- if

16  Justin asked a question, you would have heard him from

17  where he was standing?

18     A.    Yes.  And I even told Justin, after this, if he

19  wanted to speak to me, he could.

20     Q.    And when was that?

21     A.    When they -- earlier, because I'm the one that

22  told him where we were going to.

23     Q.    Yes, okay, so before the press conference, you

24  told Justin that you were all going to the designated

25  media area?
```

1    A.    Yes.

2    Q.    And then at the press conference, you did not

3    speak to Justin Pulliam directly?

4    A.    No.

5    Q.    And if Justin had asked a question from where he

6    was located, approximately ten parking spaces back from

7    where you were, you would have answered it?

8    A.    Yes.

9    Q.    And so, to make sure he was being heard, would

10   you have shouted the answer to your question down to him

11   at the end of the parking lot?

12   A.    Yes.  If I had to, yes.

13   Q.    So it is your position that you believe that

14   Justin Pulliam could have fully participated, just like

15   all the other members of the media, from where he was

16   located?

17   A.    Yes.

18   Q.    Let's watch another portion of the video.

19         MS. HEBERT:     Molly, would you mind

20   cuffing up Exhibit 13, 8:53 to 9:06.

21                    [Clip was played.]

22   BY MS. HEBERT:

23   Q.    From this portion that we watched, can you tell

24   if you had started the press conference yet?

25   A.    Can I tell?

1     Q.   Yes.

2     A.   No.

3          MS. HEBERT:      Let's watch an earlier

4     portion of the video, 7:15 to -- we already watched

5     this.  We'll skip this.  Let's skip to another portion

6     of the video, of Exhibit 13.  Let's start at timestamp

7     15:17, Molly, so we'll skip to Exhibit 13, timestamp

8     15:17, and we'll watch to the end of the video, 15:59.

9     Q.   And, Sheriff, I think that the top left panel

10    might be the best to look at.

11    BY MS. HEBERT:

12    Q.   On the video clip that we just watched, can you

13    hear what you said at the end of the press conference?

14    A.   No.

15    Q.   And it looks like you got in a golf cart, or the

16    Gator, for lack of a better descriptor, with Detective

17    Hartfield, and drove off.  Is that what happened at the

18    end?

19    A.   Yes.

20    Q.   And where did you guys go?

21    A.   Probably back to my car.

22    Q.   Did you discuss Justin Pulliam with Detective

23    Hartfield on that drive back away from the press

24    conference?

25    A.   I don't recall.

Sheriff Eric Fagan

1    Q.   Did you say anything like, "Man, that Justin

2    Pulliam's a real jerk."

3    A.   Don't recall.

4    Q.   Sure.  After the press conference, did you

5    create any kind of written document, such as an incident

6    report or an e-mail, saying that you had to remove

7    Justin Pulliam from the press conference?

8    A.   Don't remember doing that.

9    Q.   Okay.  What about a formal text -- or a

10   less-formal document, like a text message.  Did you have

11   to text anyone and say, "Hey, just heads up:  I asked

12   that Justin Pulliam be escorted away from the press

13   conference."

14   A.   Don't remember doing that.

15   Q.   That's okay.  And after the press conference,

16   was there any sort of investigation about your decision

17   to move Justin Pulliam away from the press conference?

18   A.   Not to my knowledge, no.

19   Q.   And I think that's probably a good time for a

20   break.

21             MR. ROWES:      A lunch break.

22             MS. HEBERT:     Yeah, let's take a lunch

23   break.  What time is it now?

24             MR. HEDGES:     11:26.

25             MS. HEBERT:     So how about like 12:45,

```
 1   for come-back.  Give everybody enough time to get

 2   lunch.

 3   [Lunch recess was taken from 11:26 a.m. till 12:43 p.m.]

 4             COURT REPORTER:      Back on the record,

 5   12:43.

 6   BY MS. HEBERT:

 7      Q.   Okay, we are coming back from lunch.  I'm

 8   probably going to take the snooze button and go through

 9   some of the policies, so bear with me as we kind of go

10   through some of the paperwork this afternoon.  Kind of a

11   general question:  Earlier, we talked a little bit

12   about TCOLE.  Can you explain to me what "TCOLE" stands

13   for?

14      A.   Texas Law Enforcement -- gosh, you would have

15   asked me that.

16      Q.   Sorry.  I'm not trying to put you on the spot.

17             MR. HEDGES:      Texas Commission on Legal

18   -- Texas Commission on Law Enforcement.

19   BY MS. HEBERT:

20      Q.   So Texas Commission on Law Enforcement.  So,

21   "TCOLE" stands for "Texas Commission on Law

22   Enforcement", okay.  And does the sheriff's office do

23   any independent training?  Do you guys provide training

24   to your office?

25      A.   We have an academy.
```

Sheriff Eric Fagan

```
 1      Q.    You have a Fort Bend County Sheriff's Office
 2  academy?
 3      A.    Uh-huh.
 4      Q.    And is that for before you become an officer?
 5      A.    It's an academy -- many agencies.  We have
 6  Richmond, Sugar Land -- anybody who want to be a police
 7  officer, they have go through an academy, and that's a
 8  State-certified academy, but it's under my office.
 9      Q.    All right, so it's a precursor to becoming an
10  officer, the academy?
11      A.    Yes.
12      Q.    And not all of the folks who go to your
13  sheriff's office academy become officers at Fort Bend
14  County?
15      A.    No.
16      Q.    They go --
17      A.    Yeah.
18      Q.    -- all sorts of places?
19      A.    Yes.
20      Q.    Other than the academy, so putting the academy
21  as a precursor to becoming an officer aside, does the
22  sheriff's office host or hold independent training?
23      A.    Yes.  States mandate that officers have to have
24  at least 40 hours, and we do all of that.
25      Q.    Okay, so you do more than 40 hours; and the
```

1    sheriff's office provides its own training sessions?

2        A.    Yes, but they have to be TCOLE-approved.  I just

3    can't just give a training session just to be giving a

4    training session.  It wouldn't count for nothing.  Have

5    to be TCOLE approved.

6        Q.    Right.  So they have to be TCOLE so the officers

7    get credit, presumably?

8        A.    Right.  Correct.

9        Q.    And do you -- do you develop those -- does the

10   sheriff's office develop those trainings independently

11   an then go get TCOLE approval?

12       A.    Some classes are independently made, but the

13   class courses have to be approved by TCOLE.

14       Q.    And some courses, I would guess --

15       A.    Come straight from the --

16       Q.    -- (interruption) straight from TCOLE --

17       A.    Correct.

18       Q.    And does the sheriff's office, if it's not going

19   to provide a training directly, recommend certain

20   trainings from TCOLE.  For example, to just clarify what

21   I mean, you say to Detective Hartfield, "Detective

22   Hartfield:  We want you to take X, Y, and Z courses this

23   year."

24       A.    Yes, you can do that.

25       Q.    And you, independently as the sheriff, might say

```
 1    to an officer, hey, I attended this training.  It was

 2    really good.  You should attend it?

 3         A.    Yes, I can do that.

 4         Q.    Are officers with the sheriff's office trained

 5    by the sheriff's office on how to interact with members

 6    of the media?

 7         A.    I didn't understand the question.  Does -- TCOLE

 8    approved the class that they have to take; media

 9    relations.

10         Q.    So let me just unpack that and make sure I

11    understand what you're saying.  There's a TCOLE class

12    that the sheriff's office recommends -- requires

13    officers to take that is media relations?

14         A.    Yeah.  I don't recommend it.  It's required by

15    TCOLE.

16         Q.    So there is a class that TCOLE requires all

17    officers across the state of Texas, called "media

18    relations", that they have to take?

19         A.    I don't know what it's called, but I know you

20    have to take a class on media.

21         Q.    I mean, the specific title is -- we can let that

22    go.  There's some class that the State of Texas

23    requires every officer to take that has to do with

24    media?

25         A.    Yes.
```

Sheriff Eric Fagan

1    Q.   And have you taken that class?

2    A.   Yes.

3    Q.   And you would presume that all of your -- your

4    officers have taken that class?

5    A.   Yes.

6    Q.   And would that class be on their training record

7    from TCOLE, then?

8    A.   Yes.

9    Q.   So if an officer took some kind of media class,

10   it would be on whatever training record TCOLE provides

11   officers?

12   A.   Yes.

13   Q.   Do you know what the main takeaways are of the

14   training for officers on interacting with media?

15   A.   No.

16   Q.   Do you know if -- are your sheriff's officers

17   trained on how to balance concerns like safety with

18   First Amendment rights?

19   A.   Yes.

20   Q.   What does that training look like?  What are the

21   main takeaways of that?

22   A.   When you go through the academy, you have the

23   course.

24   Q.   And what does that course teach the officers to

25   do?

```
1     A.   To protect people's freedom of speech, and

2   things like that.  That's something I had when I was --

3   when I went through the academy.  You're talking

4   something over forty years ago.  I don't remember the

5   class.  I know I had it --

6     Q.   That's okay.  I don't remember what I had for

7   breakfast, so it's -- I entirely understand that you

8   don't remember something that you did forty years ago.

9   So today's sheriff's academy in Fort Bend County -- the

10  academy that you guys run today, is there a training

11  that y'all provide today that includes some kind of

12  media relations aspect?

13    A.   I'm sure it is.  I don't teach at the academy,

14  but I know there's a course that they have to go through

15  that, yes.

16    Q.   So if there was an officer who's looking -- or a

17  person who's looking to become an officer today through

18  the Fort Bend County Sheriff's Office training program,

19  the academy, they would receive some kind of training

20  from your office saying:  Hey, this is how you deal with

21  media.

22    A.   I'm sure -- yes.

23    Q.   Based on your kind of long experience, you know,

24  30-plus years of being a law enforcement officer, how do

25  free speech rights differ for members of the media
```

Sheriff Eric Fagan

```
1    versus, like, your average citizen?
2        A.   Well, on, like -- I'm not really sure of the
3    question you're asking me.  I mean, everyone has the
4    freedom of speech.  It doesn't differ, but if you mean
5    access, well, you have that different.  Media can come
6    into places where a average citizen can't come in.
7        Q.   Okay, so if I'm understanding your statement
8    correctly, freedom of speech is the same for everybody,
9    but there's a difference in access?
10       A.   Yes.
11       Q.   And how do you -- how does the sheriff's office
12   control that access?  How do you determine who gets to
13   have access to the information as a media -- as a member
14   of the media?
15       A.   Well, I'm not sure what you're asking me.  Like,
16   do I pick and choose what media come in?
17       Q.   Yeah, I guess -- we just talked about that
18   there's a difference in access to information based on
19   those folks who are media, versus your Average Joe on
20   the street, and I was just wondering how you kind of
21   determine that.  How you determine what access, like,
22   your average person on the street gets, versus someone
23   who's part of the media.
24       A.   I'm not sure -- like, when I first became
25   sheriff, I had a press conference where I had all the
```

Sheriff Eric Fagan

```
1   law enforcement agencies come talk about school safety
2   -- active shooters and school safety.  I invited all the
3   media to come.  At that meeting, people from all
4   different newspaper outlets, radio, TV, Justin Pulliam,
5   was there at that meeting, so everyone had access.  No
6   citizen -- I didn't see a person -- like, my next-door
7   neighbor or somebody like that.  No, they couldn't have
8   came in, but anybody can come in.  Like I said, even
9   Justin Pulliam came to that.  I didn't stop him then.
10      Q.   Okay, so, just to be clear, if your next-door
11  neighbor had said, "Hey, Sheriff Fagan, I want to come
12  to this school shooting press conference", he could
13  have come?
14      A.   No.
15      Q.   It was exclusive to people who were part of the
16  media?
17      A.   Yes, because it was going into a secure place in
18  my office; my media room.
19      Q.   And someone like Justin Pulliam or someone else
20  who was, like, filming for their YouTube channel, how
21  did you check to determine they were media to come into
22  your office?
23      A.   Like, when I first got here, people told me
24  about Justin Pulliam here at the sheriff's -- they had a
25  negative opinion about him.  I didn't know the guy.
```

1    Never met him before in my life, so it didn't really

2    affect me one way or the other.  I told them let him in.

3    I didn't have a problem with it.

4        Q.   Okay, thanks.

5             We talked a little bit about the right to film

6    the police previously?  How are folks from the

7    sheriff's office trained on folks who are filming the

8    police, generally?

9        A.   They're told that people have the right to film.

10   It's not my -- you have the course -- in the academy

11   class, you have that course.

12       Q.   And do you recall -- the answer to this might be

13   no.  Are there any materials that are provided -- you

14   know, sometimes I go to trainings -- law, education

15   trainings, and they give us, like, a PowerPoint, and

16   then you have the PowerPoint to review, or there's a

17   PowerPoint that, you know -- if I call them up and say,

18   "Hey, there's a PowerPoint you can send me later", are

19   there any materials that are part of this training for

20   training officers on how to film the police, or how to

21   interact with people filming the police, to be more

22   precise?

23       A.   I wouldn't know.  I mean, there's information

24   they have to take.  Whoever teaches the class will have

25   to answer that question.  I don't know.

1    Q.   Okay, so there could be, you know, PowerPoint

2    presentation or worksheets, or whatever, that someone

3    who teaches the class on media relations, or how to

4    interact with the public that say when you film the

5    police, you should do -- or when someone's filming the

6    police, you should do X, Y, and Z?

7    A.   Yes.

8    Q.   I'd like to look -- let's look at what should be

9    marked as Exhibit 15.

10                  [Exhibit 15 was marked.]

11   BY MS. HEBERT:

12   Q.   And, Sheriff, would you mind reviewing this

13   document and letting me know when you're ready?

14   A.   Okay.

15   Q.   What is this document?

16   A.   It's a general order on arrests and

17   investigatory stops.

18   Q.   And was this order issued during your tenure as

19   sheriff?

20   A.   Yes.

21   Q.   Did you review it?

22   A.   Yes.

23   Q.   I want to look at the section titled "Core

24   Principles", and there's four core principles listed

25   here.  The first is "Sanctity of human life."  The

1  second is, "De-escalation"; the third is "Procedural

2  Justice"; and the fourth is "Fair and Impartial Policy."

3  Did I get those right?

4      A.   Yes.

5      Q.   And would you say that these four principles

6  were something that -- are something that you, as the

7  sheriff, stand behind, generally?

8      A.   Yes.

9      Q.   So when you took office in 2021, these were four

10  principles that you would say were policy of the

11  sheriff's office?

12     A.   Yes.

13     Q.   So even though the date on this general order

14  looks like it's February 2022, you would say these core

15  principles predated this general order?

16     A.   Yes.

17     Q.   Let's look at what I'm going to mark Exhibit 16.

18                  [Exhibit 16 was marked.]

19              MS. HEBERT:     That would be, Molly, from

20  our index, P.

21                  [Exhibit 16 was marked.]

22  BY MR. HEBERT:

23     Q.   While Molly's getting that, sheriff, would you

24  mind looking at Exhibit 15 at the top?  The order from

25  2022 says, "Replaces or modifies GO #09-03, dated

Sheriff Eric Fagan

```
 1   8/15/2015."  Did I read that correctly?

 2       A.   Yes.

 3       Q.   Let's look at Exhibit 16; and what is this?

 4       A.   Traffic enforcement.

 5       Q.   And is this a general order?

 6       A.   Yes.

 7       Q.   What's the date on this general order?

 8       A.   August 15, 2017.

 9       Q.   And what's the number?

10       A.   GO 09-03.

11       Q.   So is this general order that is at Exhibit 16

12   the order that Exhibit 15 -- 09-10 -- was replacing?

13       A.   Yes.

14       Q.   And this 2017 order looks like it just governed

15   traffic enforcement; is that correct?

16       A.   Yes.

17       Q.   And the 2022 order looks like it was the title

18   is "Arrests & Investigatory Stops."  Am I reading that

19   right?

20       A.   Yes.

21       Q.   So before the 2022 order was issued, did the

22   sheriff's office have a general order that governed

23   arrests?

24       A.   Before the 2022?

25       Q.   Yeah.
```

1    A.    Yes.  I'm sure they did, yes.

2    Q.    So is there probably out there a written general

3    order on arrests that would have been governing 2017?

4    A.    I would think so, yes.

5    Q.    And even if there wasn't a general order out

6    there on arrests, would you say that the sheriff's

7    office had a policy on arrests --

8    A.    Yes.

9    Q.    -- in 2017?

10   A.    Yes.

11   Q.    Okay.  I want to walk through Exhibit 15, so you

12   can put Exhibit 16 away.  I don't think we're going to

13   look at that again.  Let's go back to those four core

14   principles, and one of those core principles is

15   "de-escalation."  I'm going to read that principle.

16   "All FBCSO employees shall use de-escalation techniques

17   and tactics to reduce any threats or gain compliance to

18   lawful commands without the use of force or with the

19   lowest possible" -- "with the lowest level of force

20   possible."  Did I read that correctly?

21   A.    Yes.

22   Q.    Sorry.  I messed up a little bit, there.  What

23   does de-escalation look like?

24   A.    Trying to calm a situation down.

25   Q.    Okay.  And, so as part of de-escalation, would

Sheriff Eric Fagan

```
 1   you expect that an officer's going to try to defuse the
 2   situation as much as possible?
 3        A.   Correct.
 4        Q.   And maybe -- does that -- does defusing a
 5   situation mean that maybe if the stakes are low -- not
 6   a high-stakes crisis situation, but if the stakes are
 7   low, you can give someone a warning as, like, the first
 8   step, before arresting them, for example?
 9        A.   Yes.
10        Q.   And if there was an order, you might give them a
11   warning to comply with the order before taking a more
12   severe action?
13        A.   You try to do it in a continuum.  You know,
14   steps.
15        Q.   So talk to me a little bit about the continuum.
16   Keep in mind that I'm not familiar with the law
17   enforcement arena.
18        A.   That's the officer's discretion.  That's an
19   individual officer, what I might do or another officer
20   might not do, so I can only tell you from my viewpoint
21   what I would do, because everybody thinks differently.
22        Q.   Of course, yeah.  And so what might be, like,
23   step A on your continuum might be, like, step A.2 on Joe
24   Officer B's continuum, right?
25        A.   My continuum is verbal -- just verbal; second,
```

1   hands on; step three, arrest.

2      Q.   And is that continuum consistent with your

3   training and experience?

4      A.   Yes.

5      Q.   And do you know if your officers are trained to

6   kind of follow that continuum?

7      A.   To de-escalate, yes.

8      Q.   To try to use verbal first?

9      A.   Yes.

10     Q.   Followed by some kind of hands-on, maybe

11  escorting, maybe putting your hands literally on

12  someone?  Is that kind of the second step, as I

13  understand?

14     A.   Uh-huh.

15     Q.   You're going to have to say yes --

16     A.   I'm sorry, yes.

17     Q.   And then third step might be, kind of, arrest or

18  citation?

19     A.   Yes, and then it's all the way up.

20     Q.   Right.  Proactively, how do you ensure that your

21  officers are carrying out the de-escalation policy?

22     A.   Watching the body cameras.

23     Q.   So do you, like, spot-check the body cameras to

24  just see how -- like, how things are going?

25     A.   Yes, I have someone that does that, and then if

Sheriff Eric Fagan

1    something goes wrong, they bring it to my attention.

2        Q.   So is that review of body camera footage

3    independent of a complaint being made?

4        A.   Yes.

5        Q.   So you're already looking at the body camera

6    footage before someone ever, you know --

7        A.   In some cases, yes.

8        Q.   I mean, obviously, you can't review hundreds of

9    hours of body camera footage every day.  That would be

10   incredible and require a number of resources.

11       A.   That's impossible.

12       Q.   Right.  You're spot-checking?

13       A.   Yes.

14       Q.   Okay.  Let's go back to the core principles

15   again, and I want to look at that Procedural Justice

16   piece, and this is, again, in Exhibit 15.  I'm going to

17   read the Procedural Justice section.  "Procedural

18   justice is defined as the fairness of processes used by

19   those in positions of authority to reach specific

20   outcomes or decisions.  Procedural justice is based

21   upon four central principles -- treating people with

22   dignity and respect, giving citizens a voice during

23   encounters, being neutral in decision-making, and

24   conveying trustworthy motives.  I want to ask about

25   giving citizens a voice during encounters.  What do you

1   mean by that?

2       A.   Hear what they have to say.

3       Q.   So does that mean a citizen can voice a

4   complaint about an order, for example?

5       A.   Yes.  They have a right to ask a question, yes.

6       Q.   So not only can they voice a complaint; they can

7   also ask a question?

8       A.   Yes.

9       Q.   And can a citizen assert a right in response to

10  a police order?  So here's an example:  Let's say, you

11  know, Mr. Hedges is walking down the street and an

12  officer comes at him from nowhere and says, "Mr. Hedges,

13  can I search your backpack?"  Mr. Hedges says, "No.  I

14  have the right to refuse to search."  Can a citizen like

15  Mr. Hedges do that?

16      A.   Yes.

17      Q.   Would Mr. Hedges or any other citizen have

18  committed an offense by asserting that right?

19      A.   No.

20      Q.   How are sheriff's officers trained to give voice

21  to citizens during an encounter?

22      A.   Their academy class.

23      Q.   And what, like -- rather than just the mechanism

24  of training, what's the methodology?  What are the

25  officers instructed to do?

1    A.    Follow the law.

2    Q.    I understand that, but when -- how are the

3    officers trained so that they can give voice to

4    citizens during encounters?

5    A.    That's the de-escalation.  You're going back to

6    de-escalation.

7    Q.    Okay.  Has the sheriff's office ever disciplined

8    some of its officers or any of its officers for failing

9    to de-escalate a situation?

10   A.    Yes.

11   Q.    What did that look like?

12   A.    It varies.

13   Q.    Okay.  Tell me more.  What is the range of

14   discipline --

15   A.    Termination.

16   Q.    Okay.  To, maybe, a counseling session, like:

17   Joe, you've really got to handle the situation better.

18   A.    Yeah, oral or written, all the way up to

19   termination.

20   Q.    Okay.  The other parts of procedural justice --

21   treating people with dignity and respect, being in

22   control of decision-making, conveying trustworthy

23   motives -- can you discuss in broad stakes how you

24   expect officers to achieve those things?

25   A.    Just treat people with respect.  I tell my

1    officers when I speak to them, you want to treat people

2    the way you treat your mother, your brother, your

3    sister, like that.

4        Q.   So kind of in achieving these core principles,

5    you would expect your officers to talk to citizens,

6    have citizens talk to them, engage in conversation?

7        A.   Yes.

8        Q.   I want to talk about active scenes with

9    potential shooters.  In general, when a sheriff's

10   officer arrives on a -- at an incident or a scene with a

11   potential shooter, what should be the officer's first

12   steps?

13       A.   Safety.

14       Q.   Tell me about that.  How do they ensure safety?

15       A.   Take cover, get positioned, make sure there's no

16   one in the line of fire.

17       Q.   So the first step would be take cover, get in

18   position; and then the second would be check to make

19   sure no one's in the line of fire?

20       A.   Yes.

21       Q.   And then what would you expect the officer to

22   do?

23       A.   To conduct the investigation.

24       Q.   Okay.  And then, you know, radio what's kind of

25   going on on the ground, when it was safe to do so?

Sheriff Eric Fagan

```
 1      A.   What resources do they need?  Is this person a
 2  CIT?  Is this person someone that needs mental help, or
 3  is it just someone that we need to get S.W.A.T. out
 4  there?  So it varies.
 5      Q.   Okay, and I don't want to put words in your
 6  mouth, but let me summarize.  The first step is to take
 7  cover and make sure your position is safe; the second
 8  stuff is kind of line of fire, make sure other people
 9  are safe; and then the third step is to do
10  investigation and/or radio or other resources or give
11  updates?
12      A.   As needed.
13      Q.   As needed; is that accurate?
14      A.   Yes.
15      Q.   If an officer saw that there were civilians near
16  a potential shooter, what should the officer do?
17      A.   Get that citizen away from them.
18      Q.   Okay.  If the officer allowed civilians to just
19  stay in the same place, does that mean that the officer
20  concluded that that same place, that original location,
21  was safe?
22      A.   When you say "allowed" --
23      Q.   So, yeah, the first question, we talked about if
24  an officer saw civilians kind of in the line of fire, he
25  or she would move those civilians?
```

Sheriff Eric Fagan

1    A.   Yes.

2    Q.   And then, presumably, the kind of converse of

3    that is if the officer allows someone just to stay

4    where they were, that means the officer concluded those

5    civilians were as safe, as far as he or she could tell?

6    A.   Yes.

7    Q.   Would there ever be a situation where an officer

8    said:  Generally, we've got to get people out of the

9    line of fire, but I'm going to leave these particular

10   people -- these exceptions in the line of fire, this --

11   maybe they can provide a special service.

12   A.   Yes.

13   Q.   And tell me more about that.

14   A.   When I said CIT, we have where we have people

15   from Texana to come out for individuals that we deem to

16   have a mental issue.  They help to de-escalate, so

17   they'll be in the area.  Still want to keep them out of

18   the line of fire, as well, but they may be closer than

19   what a regular civilian would be.

20   Q.   I understand.  So when someone -- what does

21   "CIT" stand for?

22   A.   "Critical incident training."

23   Q.   So if someone of critical incident -- for a

24   critical incident, and you have a Texana employee you

25   still want to move them out of the line of fire, but

Sheriff Eric Fagan

```
 1   they may be able to be closer to the incident --

 2       A.   Yeah.  Than a regular citizen, yes.

 3       Q.   Would the officer warn the mental health

 4   professional or Texana to stay behind cover?

 5       A.   Yes.  I would think so, yes.

 6       Q.   And is there any written policy on, you know,

 7   Texana or CIT professionals that the sheriff's office

 8   has?

 9       A.   Any written policy on how to --

10       Q.   I understand that that question was a little

11   unclear.  We talked a little bit about how CIT folks,

12   or Texana, or mental health folks might get a special

13   exception to stay closer to the scene.  Is there a

14   policy anywhere that says effectively that?

15       A.   I don't think so, but they train with us.

16       Q.   They train with you.

17       A.   Go through training, yes.

18       Q.   So tell me what that training looks like.

19       A.   Just -- we do scenarios on active shooters and

20   things like that, so we do training on what to do, how

21   to respond.

22       Q.   Okay.  And the Texana employees participate in

23   said training?

24       A.   Yes.

25       Q.   Do they ever participate in role-playing?
```

Sheriff Eric Fagan

```
1      A.    Yes.
2      Q.    If there was an -- if there was an active
3    shooter potential situation, would the officer ever
4    explain the risks of remaining onsite to someone like a
5    Texana or CIT worker?
6      A.    They should know that.
7      Q.    And what would the officer do to make sure those
8    folks were protected?  Would the officer stay with
9    them?
10     A.    Yeah, they would be on the scene with them, yes.
11     Q.    Not only be on the scene with them, but let's
12   say there's an active or potentially active shooter.
13   Is it protocol for an officer to remain with the CIT
14   employee or CIT professional?
15     A.    Yes.
16     Q.    When dealing with a potential shooter situation,
17   do officers wear special vests?
18     A.    Yes.
19     Q.    And front-line officers, on a daily basis, they
20   wear some kind of body armor?
21     A.    Yes.
22     Q.    A special vest -- what's the right term for
23   that?
24     A.    "Vest."
25     Q.    So, on a daily basis, officers are wearing a
```

Sheriff Eric Fagan

```
 1   special vest, a bulletproof vest?

 2       A.   I don't like the term "bulletproof", because all

 3   of them are not bulletproof.

 4       Q.   Right, so I was trying to find the right term.

 5   Let's say a safety vest.

 6               MR. HEDGES:     Maybe ballistic vest.

 7               THE WITNESS:    Yes.

 8   BY MS. HEBERT:

 9       Q.   And the idea behind a ballistic vest is to try

10   to keep the officer safe if they get shot?

11       A.   With certain weapons.

12       Q.   With certain weapons, that they're going to be

13   protected?

14       A.   Yes.

15       Q.   At least more protected than if they weren't

16   wearing said vest?

17       A.   Yes.

18       Q.   And when dealing with a potential shooter

19   situation, would you expect the officer to try to keep

20   they were eyes on where the shooter might be?

21       A.   Yes.

22       Q.   When would it be appropriate for an officer to

23   turn their back on where a potential shooter might be?

24       A.   If they're trying to protect someone else --

25   themselves or someone else, something like that.
```

1   That's rare, but other than that, you keep your eye --

2       Q.   Okay, so let me make sure I understand.  So

3   other than when an officer -- and this would be

4   incredibly rare -- is trying to use his or her body to

5   literally shield someone from bullets --

6       A.   Yes.

7       Q.   -- an officer should not be turning his back to

8   a potential shooter?

9       A.   Yes.

10      Q.   If an officer had to arrest someone on a scene

11  with a potential shooter, how would the officer ensure

12  that he and the arrestee stayed safe?

13      A.   Arrest that person and take them away from the

14  scene.

15      Q.   Okay.  And what if that wasn't feasible?  What

16  if you couldn't take the arrestee away from the scene,

17  given the reality on the ground?

18      A.   Then we call -- radio in for some help to have

19  that person removed.

20      Q.   Okay.  How are you doing?  Do you need a break?

21      A.   I'm good.  Just came back from lunch.

22      Q.   Let's talk a little bit about offenses under

23  Texas law, and we'll get to the offense that Justin

24  Pulliam was arrested for in a little bit, but under

25  Texas law, is it generally an offense to fail to comply

1    with a police order?

2       A.    Yes.

3       Q.    And do you know what offense that is?

4       A.    Not off the top of my head, no, I can't read the

5    law, but I know it's a law.

6       Q.    So generally, if you don't do what the police

7    say, you're committing offense?

8       A.    In certain situations, yes.

9       Q.    Okay.  And what kind of situations?

10      A.    Like we was just talking about; a active shooter

11   in there.

12      Q.    A potential shooter.  So if you didn't

13   immediately comply with a police order in an active

14   shooter event, you would be committing an offense?

15      A.    Yes.

16      Q.    What about when you have, like, a less critical

17   incident?  Let's say, you know -- we'll go back to Mr.

18   Hedges' example.

19              MR. HEDGES:     Why do I always have to be

20   the criminal?

21   BY MS. HEBERT:

22      Q.    Well, you're not the criminal.  That's why

23   you're so great.  Mr. Hedges is walking down the

24   street, and the officer orders Mr. Hedges to cross the

25   street.  If Mr. Hedges failed to do that, would he be

 1    committing an offense?

 2       A.    No.

 3       Q.    And is it an offense to question a police

 4    officer order?

 5       A.    No.

 6       Q.    Is it an offense to ask for clarification for a

 7    police officer order?

 8       A.    No.

 9       Q.    What is your understanding of the offense of

10    interference with public duties?  And, by that, I mean

11    what kinds of conduct is interference with public

12    duties?

13       A.    Hindering the officer from doing his legal duty,

14    hindering the officers from making arrests.

15       Q.    So there's a lot of things that could,

16    presumably, hinder an officer from doing his duty or

17    making an arrest.  You know, if you were hungry, and you

18    were doing your duty, and I had a pizza, I mean, that

19    might distract you from doing your duty and making an

20    arrest, no?

21       A.    No.

22       Q.    You wouldn't be distracted based on this

23    awesome-smelling pizza that I had?

24       A.    No.

25       Q.    All right.  Presumably, if I started shouting at

Sheriff Eric Fagan

```
 1   you, "Hey, Sheriff Fagan, come get this awesome pizza",
 2   as you were trying to make an arrest, would that
 3   distract you?
 4       A.   No.
 5       Q.   If I --
 6       A.   Hunger is a bad example.  No.
 7       Q.   Okay, so hunger doesn't work.  But if I decided
 8   to, like, you know, chuck the pizza at you.
 9       A.   Yes.
10       Q.   Okay.  If I decided to say -- you know, protest
11   the fact that you had shut down all the pizza shops in
12   town, and I kind of walked into the middle of where you
13   were making an arrest, would that be interference with
14   your duties?
15       A.   If you walk in between me and my subject -- yes.
16       Q.   So, kind of to summarize, something more than
17   being present for -- you know, enticing you with pizza
18   is needed to commit the offense of interference with
19   public duties?
20       A.   Yes.
21       Q.   Any idea on how to really articulate what that
22   "something more" is?
23       A.   It depends on the situation and the type of
24   arrest you're going to do.
25       Q.   Okay.  Would the person who, you know, is
```

Sheriff Eric Fagan

```
 1   potentially committing this offense, what would their
 2   mental state have to be?
 3        A.   What you --
 4        Q.   Would they have to have any -- would they have
 5   to have the specific purpose of interfering with your
 6   duty?
 7        A.   No.
 8        Q.   So just by the fact that they did something that
 9   interfered with your carrying out of the arrest or the
10   duty, that means that they are liable for the offense?
11        A.   Yes.  After being warned and it continuing, yes.
12        Q.   So you would have to warn them first?
13        A.   Would I have to?  No.  I don't have to, but will
14   I?  Yes.
15        Q.   Okay, so there is no requirement to say, "Hey,
16   Christy, stop throwing pizza at me"?
17        A.   No.
18        Q.   So you could just arrest me for throwing pizza
19   at you?
20        A.   Yeah.  If you hit me with it, yeah.
21        Q.   Well, I'm not a very good shot, so probably not.
22   But if I decided I was protesting the arrest, or, you
23   know, you shutting down pizza shops, would you have to
24   give me a warning?
25        A.   For?
```

Sheriff Eric Fagan

1    Q.    Before I, you know, was going to be arrested for

2    the interference with your duties; if I was being

3    obnoxious or getting in your way?

4    A.    It would be a warning.

5    Q.    Okay, so if I was potentially getting in your

6    way, you would have to give me a warning to make sure

7    that I knew?

8    A.    Yes, I'll give you a warning.  That's the

9    deescalation part of it, yes.  I would give you a

10   warning.

11   Q.    Okay.  To your knowledge, is there any specific

12   training that a sheriff's office gives officers on the

13   offense of public interference with duties?

14   A.    The de-escalation.

15   Q.    Okay, so you would classify the de-escalation

16   as, like, the training?

17   A.    Yes.

18   Q.    When is a countdown supposed to be used?  What's

19   a -- how is a countdown used?

20   A.    It's officer discretion.  There's no such thing

21   as a countdown that we're trained on.  That's a

22   discretion -- I use that when the situation merit it, so

23   if it's a dangerous situation, I'm not going to wait

24   that long.  If it's not that dangerous, you might get

25   more time.  If it's something I think needs to be

1    expedited, then I'll probably give a countdown.

2        Q.   Okay, so let me make sure I understand, then.

3    You personally, as the sheriff and the law enforcement

4    officer that you are -- many years, you've been on the

5    force -- you personally have used countdowns as a

6    tactic?

7        A.   Yes.

8        Q.   And are officers trained to use countdowns?  Is

9    that, like, a technique that they train officers --

10       A.   That's a tactic.  I don't know if they're

11   trained, but that's a technique that I use.  In law

12   enforcement -- I don't know if I'm getting off your

13   question, but --

14       Q.   No, you're fine.

15       A.   In law enforcement, you're trained in a lot of

16   different things, so you take some things and put in

17   your toolbox.  Other things, you don't.  Like, no, I'm

18   not going to use that, I'm going to use this.  So I

19   don't know where I learned -- I know I got that in the

20   class, some training, so that's something that I use.

21   Now, I have some officers that use it, as well, too,

22   but if you're saying that countdown, is it TCOLE, I

23   never saw it as TCOLE training, no.

24       Q.   And you wouldn't know if the sheriff's office

25   specifically has given trainings on countdowns?

Sheriff Eric Fagan

1     A.   No.

2     Q.   And you talked a little bit about, you know --

3     let me rephrase that.   You talked a little about when

4     you personally would use a countdown, and you said that

5     you would use a countdown when it wasn't, like, a

6     critical, immediate situation?

7     A.   Uh-huh.

8     Q.   Was that correct?

9     A.   Yes.

10    Q.   And you wouldn't use a countdown if complying

11    with a police order or doing a certain action was, like,

12    mission critical for that moment?

13    A.   Yes.

14    Q.   And then when you do use a countdown, you

15    provide some kind of warning; is that right?

16    A.   Yes.

17    Q.   You would say something like I tell my two-year

18    old; "If you don't pick up your toys in five seconds,

19    you're going to have no dessert.   Five, four, three,

20    two, one"; is that correct?

21    A.   Yes.   It's a de-escalation technique.

22    Q.   Okay.   And this is what happens with my two-year

23    old:   If I just start randomly counting, he thinks it's

24    super-fun to count with me, and -- he's not really

25    great at number 3, so it goes "1, 2, 1, 2", a lot and

1    then "1, 2, 1, 2", and won't get to 3.  If you were to

2    use the countdown technique without warning someone

3    what's going to happen at the countdown, that wouldn't

4    be very effective; is that correct?

5        A.   No, it's really effective.  I look at my watch

6    instead of -- that's a technique.

7        Q.   Okay, so you look at your watch.  Do you ever

8    tell the person when you're looking at your watch and

9    counting down, "Look, dude.  You're going to do what I

10   say", or, "If you don't leave the area", or, "If you

11   don't X, Y, or Z" --

12       A.   No.  I say, "You have five minutes", and I'll do

13   that.

14       Q.   And you don't tell them what the consequence of

15   five minutes might be?

16       A.   Beforehand, if you don't leave, you'll get

17   arrested in five minutes.  I'm not even really looking

18   at the watch.  I'm just looking down at the watch.

19       Q.   Okay.  So the implication --

20       A.   Yes.

21       Q.   -- if I'm understanding you, is anytime you're

22   looking at your watch or counting down, if you don't do

23   whatever I said you're going to do beforehand, you're

24   going to be arrested?

25       A.   Yes.

Sheriff Eric Fagan

1      Q.   Okay.  I'd like to talk a little bit about

2   welfare checks.  I understand what was going on with

3   Edwin Kraft on December 2021 -- December 21, 2021 --

4   there's a lot of "2s" and "1s" -- was kind of a welfare

5   check performed out in the public.  What is a welfare

6   check?

7      A.   Checking on the person's wellbeing and mental

8   health, or their physical health.

9      Q.   And does the sheriff's office have written

10  policies on welfare checks performed out in the world?

11     A.   I'm not sure what you --

12     Q.   Yeah, so does the sheriff's office have any kind

13  of written policy of:  This is the procedure for

14  performing a welfare check on someone who's, you know,

15  at their house or --

16     A.   If we're talking about that situation, we knew

17  he was a person in crisis, so, yeah, we have a certain

18  way we handle that.

19     Q.   So you have a policy on how you handle someone

20  in crisis?

21     A.   Yes.

22     Q.   And if they weren't someone in crisis -- let's

23  say my mom calls your office and says go check this

24  college kid's apartment, or something like that, do you

25  have a policy for that kind of welfare check, too?

Sheriff Eric Fagan

```
 1      A.    Yes.

 2      Q.    Is that written down somewhere?

 3      A.    Yes.

 4      Q.    Would it be, like, a general order on welfare

 5   checks?

 6      A.    Just probably a SOP.

 7      Q.    What does that stand for?

 8      A.    "Standard operating procedure"; so -- because

 9   you still have to follow the law.  If your mother called

10   to go check on this college student, knock on the door,

11   don't get a answer, I don't have a warrant to get into

12   that house.  I have to have a reason.  Like, say, I see

13   flies on the windows or something like that.  I'll call

14   the D.A. and get a warrant to go in.

15      Q.    And, generally, how do welfare checks come

16   about?  Seems like it might be someone calling in.  Is

17   --

18      A.    A loved one usually calls because of someone.

19      Q.    Okay, that's the typical way it surfaces?

20      A.    Yes.

21      Q.    And then what's the procedure for a welfare

22   check?  What's the first step?

23      A.    Get a unit out there first, try to get all the

24   information that we can, find out if this person's in

25   crisis or not, or find out if they have some type of
```

Sheriff Eric Fagan

1    medical emergency, try to find out why you need the

2    welfare check, trying to figure out what we're doing

3    there.

4        Q.   And then, you know, before body cams in 2022

5    were a part of your sheriff's office, was there a way

6    that welfare checks were recorded?

7        A.   I wouldn't know.  I didn't work here there --

8    before this.

9        Q.   Well, you worked at the sheriff's office --

10       A.   Before the body cameras --

11       Q.   -- in 2021, you were there?

12       A.   Yeah.

13       Q.   So how were welfare checks recorded in 2021?

14       A.   By offense reports.

15       Q.   Okay, and did officers have dash cameras in

16   2021?

17       A.   Yes.

18       Q.   Did every officer have a dash camera?

19       A.   I believe so.  Patrol.

20       Q.   Every patrol officer?

21       A.   Yes.

22       Q.   And what's the difference -- how do you

23   distinguish between patrol versus non-patrol?

24       A.   I have people who work in the jail, dispatchers,

25   investigators.

Sheriff Eric Fagan

```
 1      Q.   Okay, so anybody who's not out in a police
 2   cruiser driving around is not patrol -- it would be
 3   anybody who's in a police cruiser driving around,
 4   regardless of what rank, they are going to have a dash
 5   camera?
 6      A.   No.  There's certain ones that have dash camera.
 7   People in patrol, the sergeants in patrol.  Some
 8   lieutenants, I mean, won't have one.  We don't have a
 9   unlimited budget, so I have to be --
10      Q.   Judicious?
11      A.   Yeah.
12      Q.   Okay.  So, you know, deputies probably have
13   them?
14      A.   Yes.
15      Q.   Sergeants probably have them?
16      A.   Yes.
17      Q.   After a welfare check is completed, how is that
18   documented?  Just an offense report?
19      A.   Offense report, yes.
20      Q.   And what -- would the conclusion of that
21   incident was -- would be written down in that offense
22   report?
23      A.   Yes, unless if it was one that had a mental
24   health person there, it would be two reports; a offense
25   report and a report from Texana.
```

Sheriff Eric Fagan

```
 1     Q.   And anytime there's, like, a person in mental

 2   crisis, would you expect that there would be some kind

 3   of mental health professional with an officer?

 4     A.   We try to get a mental health professional with

 5   us, yes.  Not all the time, but we try to.

 6     Q.   So if you have enough notice -- I mean,

 7   obviously, if an officer interacts with someone who's

 8   having a nervous breakdown on the street, they're not

 9   going to have a mental health officer --

10     A.   Right.

11     Q.   But if there's enough notice, you're going to

12   try to call someone with specialized mental health

13   training?

14     A.   Yes.

15     Q.   What about welfare checks done in the jail?  Now

16   do those come about?

17     A.   Well, they have to check on inmates on every

18   hour, so they're always having welfare checks, and then

19   if it's someone that's in a mental crisis if we have

20   them in a certain room, they'll check every thirty

21   minutes; suicide watch, every fifteen minutes.

22     Q.   So within the jail itself, the employees of the

23   jail are doing checks --

24     A.   Called rounds.

25     Q.   Rounds.
```

Sheriff Eric Fagan

```
 1     A.    Yes.

 2     Q.    They're doing rounds at regular intervals?

 3     A.    Yes.

 4     Q.    What does that kind of welfare round look like

 5  in the jail?

 6     A.    They're looking -- physically looking to see if

 7  a person's all right.

 8     Q.    And do they, like, have a clipboard or write

 9  down every time, or -- like, "Inmate 1, fine"; Inmate 2,

10  fine" --

11     A.    No.

12     Q.    They just kind of --

13     A.    It has a secure -- I forgot what the name of

14  this computer thing.  It has a little thing on the -- on

15  the cell, and we look in to see about -- you scan it and

16  it writes things down for you.

17     Q.    That's pretty cool.  All right, so maybe I'm a

18  little antiquated, here, but, you know, everybody has a

19  QR code on their jail that you scan to make sure they're

20  -- so, you know, when they're doing their rounds, they

21  scan all the people to, like, mark that they've checked

22  on them?

23     A.    Yes.

24     Q.    And if someone were in a mental health crisis,

25  but the jail professional -- what's the right word
```

Sheriff Eric Fagan

```
 1    there?  "Jailer"?

 2        A.    Uh-huh.  You can say "jail employee", yes.

 3        Q.    A jail employee determines that no treatment is

 4    necessary, you would expect that to kind of be written

 5    down or indicated in their, like, QR code log?

 6        A.    Uh-huh.  Yes.

 7        Q.    And if a welfare check was prompted by some kind

 8    of, let's say medical concern, someone was having heart

 9    palpitations.  Would you expect some kind of medical

10    professional to be involved?

11        A.    Yes.

12        Q.    So if someone was complaining or had a medical

13    condition, you would have a doctor or a nurse check

14    them?

15        A.    Yes.

16        Q.    Not just a conventional jail employee?

17        A.    Yes.

18        Q.    Do you have an estimate for how many people get

19    arrested in Fort Bend County on a daily basis?

20        A.    No.

21        Q.    Do you guys have records on, maybe, how many

22    people get arrested on a monthly basis?

23        A.    Yes, I'm sure we do.

24        Q.    Without having to, like, look at the specific

25    records, could you give me an estimate on what that
```

Sheriff Eric Fagan

1    looks like?

2       A.    I don't look at that estimate.  I never have.  I

3    look at the number in my jail each and every day.  Like

4    today, I know I have 803, and 107 of them are females;

5    so I'll look at that.

6       Q.    Is that, you think, typical of a day at the

7    sheriff's office?  800 inmates?

8       A.    803 today.

9       Q.    803; so you know that really well?

10      A.    Yeah, I look at it every day.

11      Q.    And is that a typical amount, 803 folks in the

12   jail?

13      A.    It varies.

14      Q.    What's the kind of range?

15      A.    When I first got here, it usually ranged from

16   675 to 700, and now it's -- for the last two months,

17   it's been averaging 800 to 803, to 806; 800 to 803, 806;

18   806 is the highest so far.

19      Q.    So you've been kind of having more folks in the

20   jail lately?

21      A.    Yeah.  More people are moving to Fort Bend.

22      Q.    Yeah, it's a growing area.  And each time

23   someone is arrested by a sheriff's officer, do they

24   bring that arrestee to the Fort Bend County Jail?

25      A.    Yes.

Sheriff Eric Fagan

```
 1     Q.    So you wouldn't, like, arrest someone and then

 2  let them go?

 3     A.    That has happened, yes.

 4     Q.    Okay, so you would arrest someone and then say:

 5  Eh, we're not bringing this person into the jail?

 6     A.    Yeah, if that person's ill or something like

 7  that, we may have to take them to the hospital or

 8  something like that.  Well, they'll still be under

 9  arrest, but we have to take them to the hospital or

10  something like that.

11     Q.    Okay, so other than, like, taking someone who's

12  ill or in, like, a condition, to the hospital, do you

13  ever just arrest someone and say, "Nah, sorry, go ahead.

14  Go home."

15     A.    I don't arrest people.  No.

16     Q.    Do you know if your officers do?

17     A.    No.  I don't know that.

18     Q.    Do you personally perform welfare checks on

19  every person who's in the Fort Bend County jail?

20     A.    On every person?  No.  I have done it several

21  times.

22     Q.    Okay.  So how many times a day would you say you

23  check on someone in the jail?

24     A.    I've done it five times since I've been sheriff.

25     Q.    Okay, so five times since you've been sheriff,
```

Sheriff Eric Fagan

1    you've checked on someone in the jail?

2        A.    Yes.

3        Q.    And can you tell me about those five times?

4        A.    Once, a mother called me worried about her son,

5    and I went over and checked on him and then called her

6    back.  One, I had a autistic young man that was

7    arrested.  The parents were in the -- in the bonding

8    area when I walked through and I saw the lady crying,

9    and I asked what was wrong, and she said her autistic

10   son was arrested, so I went back in the jail to check

11   on the autistic son.  I stayed with that young man

12   until they got through with the bonding.  I made sure

13   they didn't place him into a cell, because he didn't

14   understand.  He was autistic, and so I stayed with him

15   until they got through, and brought him back out to the

16   parents.  That was the second time.  Third time I went

17   in, the mother had called and said her son wrote and

18   said he was going to commit suicide.  I went in to go

19   check on that individual; and the fifth time was -- I

20   figure you're going to ask me questions about that --

21   was Pulliam.

22       Q.    So you had the mother of the autistic, the

23   potential suicide; what was the fourth time?

24       A.    Another suicide.

25       Q.    And then the fifth time was Pulliam?

1    A.    Pulliam.

2    Q.    So how do you decide who warrants a personal

3   welfare check from the sheriff?

4    A.    Some parents -- I'm like that.  I'm a parent, so

5   I'll do it.  On Pulliam, I knew that he had a bad

6   relationship with the sheriff's office.  I went over

7   there so people could see me with him so he would be

8   treated fairly and nobody would -- I'm not saying

9   nobody was going to do anything to him, but I wanted

10  them to know that I had eyes on him, so that's why I

11  went.  Or that's what warrant me to go over there.

12   Q.    I understand.  And I'm just asking generally

13  now -- walk me through the process of, like, performing

14  a welfare check at the jail.  What's the first step you

15  take when you're going to go over there?

16   A.    You're talking about when I go do a wel --

17   Q.    Yes, sir.

18   A.    I ask where this inmate is, I ask for that

19  inmate, find out where they are, and I just go look.

20   Q.    Okay.  And after you complete a welfare check

21  for the other four examples that you talked about, do

22  you write anything up?

23   A.    No.

24   Q.    Any documentation at all?

25   A.    No.

```
 1    Q.   Nothing to say, like, "I checked on this woman's
 2    son and he was fine."
 3    A.   No.
 4    Q.   And if, in any situation where you did a welfare
 5    check, you determined that treatment was necessary, you
 6    would call for that treatment --
 7    A.   Yes.
 8    Q.   -- or document that you were going to get the
 9    treatment?
10    A.   Yes.
11    Q.   And are there cameras in the jail?
12    A.   Yes.
13    Q.   So there would be footage of you kind of when
14    you come in and out of the jail?
15    A.   Yes.
16    Q.   And would there -- are all areas of the jail
17    covered by cameras?
18    A.   No.
19    Q.   What areas are?
20    A.   By law, you can't video where people are taking
21    showers at.  You can't video certain areas where --
22    where it's not -- where anyone is going to take
23    showers, you can't be --
24    Q.   Be indecent.
25    A.   Yeah.  Indecent; you can't do things like that.
```

1    Q.   So other than where people are going to be

2    indecent, would you estimate that there are cameras in

3    the rest of the jail?

4    A.   Yes, but there are some spots that we don't

5    catch everything.  There's some blind spots.  We don't

6    let them know about it, but we have blind spots.

7    Q.   So there are some bind spots, but there's no

8    cameras capturing it?

9    A.   Yes.

10    Q.   And you would know where those blind spots are?

11    A.   I don't know every one, no.

12    Q.   You know some of them?

13    A.   Yes.

14    Q.   I want to talk a little bit about that

15    interaction you mentioned with Justin Pulliam in the

16    jail on December 21, 2021, and that was the date that

17    Justin Pulliam was arrested for that offense of

18    interference with public duties.  Let's start by going

19    back to Exhibit 4, which are your RFAs, and I would

20    like to turn to page 7, number 19.

21         We've already kind of talked about this.  You

22    admitted that you visited Justin Pulliam in the jail.

23    Chief Deputy Matty C. Provost was with you, and another

24    individual.  Can you tell me who that other individual

25    was?

```
 1      A.    I think it was -- I'm not really sure.  I think

 2   it was Wong, but I might be wrong.

 3      Q.    Who --

 4      A.    Assistant Chief Wong.

 5      Q.    And can you tell me what Assistant Chief Wong's

 6   first name is?

 7      A.    Norman.

 8      Q.    Norman.  Okay.

 9      A.    But, like I said, I might be wrong about that.

10      Q.    Okay.  And how did you learn that Justin Pulliam

11   had been arrested?

12      A.    They notified me.

13      Q.    Do they notify you every time someone's

14   arrested?

15      A.    No.

16      Q.    So Justin Pulliam's arrest was a special case?

17      A.    Yes.

18      Q.    Okay, and who notified you?

19      A.    Someone over at the jail.

20      Q.    And what did they say?

21      A.    "Justin Pulliam is in our jail."

22      Q.    And what was your reaction?

23      A.    "Okay"; and I went over.

24      Q.    And your office and the Fort Bend County Jail

25   are not in the same building, correct?
```

```
 1    A.    No.

 2    Q.    So you had to walk outside and then go to the

 3    jail?

 4    A.    Yes.

 5    Q.    And where was Justin Pulliam in the jail when

 6    you first saw him?

 7    A.    In booking.

 8    Q.    In booking; and did you check in with Justin in

 9    booking?

10    A.    What you mean, "check in"?

11    Q.    So you were doing a welfare check with Justin

12    Pulliam?

13    A.    Yes.

14    Q.    By going to booking, did you try to talk to

15    Justin in booking?

16    A.    I asked where Justin was, and they pulled Justin

17    out to me.

18    Q.    Where did they pull him out to?

19    A.    They pulled him from wherever he was in booking,

20    into a room where I was.

21    Q.    So you were -- in summary, you told some other

22    employee to go get Justin Pulliam?

23    A.    Uh-huh.

24    Q.    They fetched and brought Justin Pulliam to you

25    in a room?
```

Sheriff Eric Fagan

```
 1     A.    Yes.

 2     Q.    Okay.  Is the room that you were in -- what's

 3   the room that you were in?

 4     A.    Just a office.

 5     Q.    Some kind of office space?

 6     A.    Yes.  I believe it was the sergeant's office.

 7     Q.    And is that room, the sergeant's office, did it

 8   have a -- a video camera?

 9     A.    On the outside.

10     Q.    On the outside, but not inside the office?

11     A.    Not inside the office; that I know of.

12     Q.    Sure.  Not that you know of.  Let's look at

13   number 20, which I think is on page 8.  So, again, this

14   is Exhibit 4, number 20, page 8.

15         Now, this request for admissions asks about the

16   conversation.  You denied that a conversation happened.

17   Your response, to be precise, is "Denied.  Plaintiff

18   said nothing.  There was no conversation."  Did you say

19   anything to Justin Pulliam?

20     A.    Yes.

21     Q.    And what did you say?

22     A.    "Justin, are you all right", and, "Why are you

23   arrested?"

24     Q.    And what did he say?

25     A.    Nothing.
```

1    Q.   Did he ask to speak to his attorney?

2    A.   No.

3    Q.   Did you continue to ask Justin any questions?

4    A.   No.

5    Q.   So just asked Justin one question?

6    A.   No, that's not true.  I asked Justin, "Are you

7    all right?  Do you know why you're here?"  He didn't

8    say anything.  I said, "Justin, are you all right?"  He

9    said nothing, and that was the end.  So I asked that

10   twice.

11   Q.   Did Chief Deputy Provost ask Justin any

12   questions?

13   A.   I think she did.

14   Q.   Do you recall what she asked?

15   A.   No.

16   Q.   And then the other individual, who we're going

17   to classify as Wong, for lack of a better descriptor,

18   did he ask Justin any questions?

19   A.   No.

20   Q.   Did you ask Justin any kind of health-related

21   questions?

22   A.   "Are you all right?"

23   Q.   And did you determine that Justin looked okay?

24   A.   Yes.

25   Q.   Did you evaluate Justin for any, maybe, suicidal

Sheriff Eric Fagan

1    ideation?

2        A.    Did I evaluate him?  No.

3        Q.    Did you -- when Justin refused to talk to you,

4    did you say something like, "Fine.  We'll do it the

5    regular and normal way."

6        A.    No.  I just said, "Do it by the book."  I made

7    that statement.  "Do it by the book."

8        Q.    And what does "by the book" mean?

9        A.    Treat him fairly, like everyone else in the

10   jail.  Like I said, I knew that the people at the

11   sheriff's office didn't like Justin Pulliam.  That's

12   before I got there, and I don't know the guy from

13   anyone else.  I just wanted to make sure he was treated

14   fairly.  That's why I went over there.  If the sheriff

15   goes over to see a inmate, that inmate is not going to

16   be jacked with.  So that's the reason.

17       Q.    Got it, but if a sheriff doesn't necessarily go

18   over to see an inmate, they might mess around with him a

19   little?

20       A.    No.  No, I'm just making sure that nobody would.

21       Q.    Okay.  What happened after you met with Justin

22   Pulliam?  Did you go back to your office?

23       A.    Yes.

24       Q.    Did Chief Deputy Provost accompany you?

25       A.    Yes.

```
 1     Q.   And Mr. Wong?

 2     A.   I believe that was him, yes.

 3     Q.   And did you guys discuss what happened?

 4     A.   No.

 5     Q.   Did you discuss Justin Pulliam at all?

 6     A.   No -- cameraman -- I assume it was one of his

 7  cameramen -- was asking him questions.

 8     Q.   So there was some cameraman somewhere who was

 9  asking questions as you were leaving?

10     A.   Yes.

11     Q.   And what did you say?

12     A.   Nothing.  I kept walking, and he kept asking

13  questions, and I turned and answered the questions, and

14  he made the statement, "Oh, now you're going to hit me?"

15  I smiled, turned back around and -- I laughed because I

16  was like, "You stopped me, and I turned and now you're

17  saying I'm attacking?"  So I turned back around and kept

18  walking.

19     Q.   Okay.  Did you send any follow-up e-mails or

20  text messages after you visited the jail?

21     A.   I was done.

22     Q.   I think now is a great time for a break before

23  we talk about anything else.  We're relatively close to

24  being done, so let's take a brief intermission.

25               COURT REPORTER:   Off the record, 1:47.
```

```
 1                    [Off the record.]

 2                    COURT REPORTER:   Back on the record,

 3      1:57.

 4      By MS. HEBERT:

 5        Q.   I have a couple of questions about the December

 6      21, 2021, arrest of Justin Pulliam.  Other than

 7      Detective Travis James, who investigated Justin for

 8      that offense -- putting that aside, did anyone in the

 9      sheriff's office, or yourself personally, investigate

10      the decision to move Justin away from the press

11      conference in July?

12        A.   No.

13        Q.   And did anyone investigate the decision to

14      arrest Justin, other than Detective Travis James?

15        A.   No.

16        Q.   There was no internal investigation?

17        A.   No.

18        Q.   Was anybody disciplined for actions dealing with

19      the December of 2021 arrest?  To be more precise, was

20      anybody disciplined or counseled after Justin Pulliam

21      was arrested?

22        A.   No.

23        Q.   Related to that arrest.

24        A.   No.

25        Q.   We talked a little bit about welfare checks, and
```

Sheriff Eric Fagan

```
 1   folks in CIT and crisis, and we talked a little bit

 2   about Texana employees, and you indicated that, when

 3   there's some kind of incident -- a mental health

 4   incident, there will be the offense or incident report,

 5   and some kind of Texana report.  Does the Texana report

 6   get shared with the sheriff's office?

 7       A.   If we request it.

 8       Q.   So the sheriff's office has the right to request

 9   the Texana report?

10       A.   Yes.

11       Q.   Okay, I just have a couple more questions to

12   clean up about the July 2021 press conference.  You're

13   aware that, following the July 2021 press conference,

14   the discovery of someone's remains in the creek was

15   reported by several news outlets?

16       A.   Yes.

17       Q.   And are you aware that Justin Pulliam did not

18   have any footage of the press conference?

19       A.   No.

20       Q.   When the -- earlier, we talked about when one of

21   the media people complained to you about Justin

22   Pulliam, when they made that complaint, did the media

23   person say they were in fear for their life?

24       A.   No.

25       Q.   Did they say anything like they were being
```

1    threatened by Justin?

2        A.    No.

3        Q.    Did the media person say anything like Justin

4    was being physically inappropriate?

5        A.    They said that he's escalating the situation.

6        Q.    With the media people?

7        A.    The term was "escalating the situation."  I'm

8    assuming they were meaning about -- I don't know if it

9    was a brother or what relation he was to the deceased.

10       Q.    Okay, so the only really -- the complaint was

11   Justin did something with the family of the deceased?

12       A.    Yes.

13       Q.    So it was not a complaint that Justin did

14   something inappropriate to the media person him or her

15   self?

16       A.    They were just saying that he was being

17   unprofessional and making it bad because he was

18   escalating the situation with the family, from I can

19   remember.

20       Q.    Okay, so, as far as you can remember, there was

21   one incident with the family, and you heard about that

22   incident from --

23       A.    One of my deputies.

24       Q.    One of your deputies and the media person?

25       A.    Yes.

Sheriff Eric Fagan

```
 1     Q.    And that was it?

 2     A.    That was it.

 3           MS. HEBERT:      We don't have any other

 4   questions at this time.  Pass the witness.

 5   EXAMINATION BY MR. HEDGES:

 6     Q.    Sheriff, I know you've got something fairly

 7   emergent to do this afternoon, but there is one thing I

 8   wanted to follow-up on.  Right before we took our last

 9   break, you mentioned that people from the sheriff's

10   office didn't necessarily like Mr. Pulliam.  Tell us

11   about the time frame you're talking about there.

12     A.    The prior administration that, when Nehls was

13   sheriff here, they wouldn't allow him -- they said he

14   was a troublemaker and things like that.  That was one

15   of the reasons why I allowed him in that video right

16   there to come into the office, and told him he can come

17   -- if he wanted to speak to me, just call and make an

18   appointment to speak with me, and that's the reason I

19   let him come into that -- when I had all the law

20   enforcement come in.  I don't know him from anyone.  I

21   never met the guy, so nothing personal to me, no.  No

22   big deal to me.

23     Q.    All right, well that's all I wanted to clear up,

24   and like I said, I know you've got someplace you need to

25   be.
```

Sheriff Eric Fagan

```
 1   FURTHER EXAMINATION BY MS. HEBERT:

 2      Q.   Just kind of one quick -- or two quick questions

 3   about that.  When you said "that video", I just want to

 4   clarify for the record you were referring to Exhibit 5,

 5   the video from 2021 where you were having a

 6   conversation with Justin Pulliam?

 7      A.   In my coat and my mask.

 8      Q.   Yes.  And it said "Eric Fagan" on the mask?

 9      A.   "Sheriff Fagan", yes.

10      Q.   "Sheriff Fagan" on the mask.

11      A.   Okay.

12      Q.   You're referring to the video that's Exhibit

13   5 --

14      A.   Yes.

15      Q.   -- when you say "that video"; I just wanted to

16   clean that up for the record.

17      A.   Yes.

18      Q.   And when you were answering Mr. Hedges'

19   questions about folks who didn't like Justin Pulliam,

20   and that was the prior administration, when you took

21   office, did you clean house?  Were most of the people

22   fired?

23      A.   No.

24      Q.   Did most of the people stay on?

25      A.   Yes.
```

Sheriff Eric Fagan

```
1     Q.   Did anyone leave?

2     A.   Yes.

3     Q.   Who left?

4     A.   Mackerel, Barfield... I don't remember all the

5  names, but a few left.

6     Q.   A few left, and then you filled their positions

7  with new people?

8     A.   Yes.

9     Q.   But the majority of folks under the prior

10 administration are the same folks working for you

11 today?

12    A.   Yes.  I'm talk -- my command staff.  Now, the

13 deputies and all, all of them are still there from the

14 prior administration.  I would have to fire 800 people.

15 I wouldn't do that.

16    Q.   Sure.  And after you were sworn in as sheriff,

17 did you issue any statements with regard to Justin

18 Pulliam of -- to the nature of:  Please provide Justin

19 Pulliam access, or please be nice to Justin Pulliam.

20    A.   No.  I just told them that the sheriff's office,

21 nobody's denied to come into this office.  When they

22 told me that, it didn't make sense to me.  What if he

23 come in to file a complaint, and you're saying he can't

24 -- just -- even if I don't like you, I'm not going to

25 tell you you can't come into the sheriff's office.  To
```

Sheriff Eric Fagan

1   me, that's ridiculous; so that's the only thing I did.

2      Q.   Sure.   That's the only thing you did?

3      A.   Yes.

4      Q.   Okay.   I don't have any other questions.   Pass

5   the witness, in case there's anything else you want to

6   talk about.

7                  MR. HEDGES:       No.   Thank you.

8                  COURT REPORTER:   Okay, read and sign and

9   copies.

10                 MR. HEDGES:       Yes, please.

11                 COURT REPORTER:   You want me to handle both

12  the copy and read and sign through you?

13                 MR. HEDGES:       Yes.

14                 COURT REPORTER:   We're off the record 2:04

15  p.m.

16                 [Deposition was concluded.]

17

18

19

20

21

22

23

24

25

Sheriff Eric Fagan

```
 1                    REPORTER CERTIFICATION

 2      ORAL DEPOSITION of ERIC FAGAN, taken on August 9,

 3  2023.

 4      I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify to

 5  the following:

 6      That the witness, ERIC FAGAN, was duly sworn by me,

 7  and that the transcript of the deposition is a true

 8  record of the testimony given by the witness;

 9      That examination and signature of the witness to the

10  deposition transcript was reserved by the witness at the

11  time of the deposition;

12      I further certify that I am neither counsel for,

13  related to, nor employed by any of the parties in the

14  action in which this proceeding was taken, and, further,

15  that I am not financially or otherwise interested in the

16  outcome of this action.

17      Certified by me on this 23rd day of August, 2023.

18

19      _____

20          Sarah B. Townsley CRR CCR CSR RPR

21          Certified Realtime Reporter

22          TX CSR #5746; LA CCR #92016; RPR 814558

23

24

25
```