# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT 3

```
 1                 UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION
 3   JUSTIN PULLIAM,
 4      Plaintiff,
 5   v.                      Civil Action No. 4:22-cv-4210
 6   COUNTY OF FORT BEND, TEXAS;
     SHERIFF ERIC FAGAN, in his
 7   Individual capacity; OFFICER ROBERT
     HARTFIELD, in his individual capacity;
 8   OFFICER JONATHAN GARCIA, in his
     Individual capacity; OFFICER TAYLOR
 9   ROLLINS, in his individual capacity;
     And OFFICER RICKY RODRIGUEZ, in
10   His individual capacity,
11      Defendants.
12
13                   ORAL DEPOSITION
14                        OF
15               LIEUTENANT TAYLOR ROLLINS
16
                   Taken at the Offices of
17                 Fort Bend County Attorney
             401 Jackson St., 3rd Floor Conference
18                    Richmond, Texas
19
20   August 10, 2023                        9:06 a.m.
21
22
23
24
25
```

```
 1    APPEARANCES:
 2    FOR PLAINTIFFS:
 3                        INSTITUTE FOR JUSTICE
                         816 Congress Ave., Suite 960
 4                       Austin, TX  78701
                         By: Christen Mason Hebert
 5                           CHebert@IJ.org
                             Jeff Rowes
 6                           JRowes@IJ.org
 7    FOR DEFENDANTS:
 8                       Kevin Hedges
                         Assistant County Attorney
 9                       Litigation Division
                         401 Jackson Street
10                       3rd Floor
                         Richmond, TX  77469
11                       Kevin.Hedges@FBCtx.gov
12
13    ALSO PRESENT:      Molly Hanis
14    REPORTED BY:       Sarah B. Townsley, CSR, CRR, RPR
15
16
17
18
19
20
21
22
23
24
25
```

Lieutenant Taylor Rollins

```
 1                    STIPULATIONS

 2      IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR

 3  THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF

 4  LIEUTENANT TAYLOR ROLLINS WAS TAKEN BEFORE SARAH B.

 5  TOWNSLEY, CRR, CCR, CSR, RPR, CERTIFIED REALTIME

 6  REPORTER IN AND FOR THE STATES OF TEXAS AND LOUISIANA,

 7  PURSUANT TO NOTICE AND IN ACCORDANCE WITH THE FEDERAL

 8  RULES OF CIVIL PROCEDURE AS PROVIDED BY LAW, AT THE

 9  COUNTY ATTORNEY'S OFFICE, 401 JACKSON STREET, 3RD FLOOR,

10  RICHMOND, TEXAS, ON AUGUST 10, 2023, AT 9:06 A.M.;

11      THE PARTIES HEREBY WAIVE ALL FORMALITIES IN

12  CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE

13  EXCEPTION OF THE SWEARING OF THE WITNESS AND THE

14  REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;

15      THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED

16  TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;

17      COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT

18  AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE

19  ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND

20  THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE

21  TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF

22  MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF

23  THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;

24      SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN

25  ADMINISTERING THE OATH TO THE WITNESS.
```

Lieutenant Taylor Rollins

```
1                            INDEX

2   EXAMINATION BY                            PAGE NO.

3   Mrs. Hebert                                   5

4

5                           EXHIBITS

6   NO.    DESCRIPTION                         PAGE NO.

7   1      deposition notice                       8

8   2      video footage from Justin camera       27

9   3      dash cam footage                       65

10  4      Rodriguez dash cam footage             71

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Lieutenant Taylor Rollins

```
 1    PROCEEDINGS:

 2                      LIEUTENANT TAYLOR ROLLINS,

 3    having been first duly sworn by the court reporter,

 4    testified on oath as follows:

 5             COURT REPORTER:     It's 9:06.  We're on

 6    the record.

 7                  [Witness was sworn.]

 8    EXAMINATION BY MR. ROWES:

 9      Q.   Good morning, Lieutenant Rollins.  Would you

10    please state your name and rank for the record?

11      A.   Lieutenant Taylor Rollins.

12      Q.   My name is Jeff Rowes.  We met a minute ago.

13    I'm an attorney with the Institute for Justice, and we

14    represent Plaintiff Pulliam in this case.  I'd like to

15    go through a bit of deposition logistics before we

16    begin.

17         As a law enforcement officer -- well, I know you

18    testified under oath because I read it from the trial.

19    Have you ever been deposed before?

20      A.   No, sir.

21      Q.   And I have no doubt you understand the

22    seriousness of your oath, but I'm going to sort of give

23    the same rigmarole that I give other people.  A moment

24    ago, you were sworn in by the court reporter, who will

25    produce a transcript of what we discuss.  Do you
```

1   understand that you have given an oath to answer my

2   questions truthfully?

3       A.   Yes.

4       Q.   And do you understand you should treat your

5   oath with the same seriousness that you would treat

6   testimony in front of a judge?

7       A.   Yes.

8       Q.   It's important that we have a clear record,

9   which means I need to ask clear questions, and I would

10  kindly ask you to provide clear verbal answers, so our

11  court reporter can't easily record "uh-huh" or "uh-uh",

12  or if you just shake your head, so please just say "yes"

13  or "no."

14      A.   Got it.

15      Q.   And because our court reporter is recording what

16  we say, please let me finish asking the question before

17  you keep speaking.  It's -- in normal conversation, you

18  might see where I'm going and you just sort of jump in

19  and give the answer.  It's just really tough to have a

20  clear record when that happens, and, likewise, I won't

21  interrupt you until you're finished.

22      A.   Got it.

23      Q.   If you don't understand a question, please let

24  me know, and our court reporter can read it back, or I

25  can rephrase it.  If you don't know the answer to a

1    question, that's fine.  "I don't know" is fine, but if

2    you do know you're required to answer it.

3        A.    Okay.

4        Q.    Mr. Hedges represents you and the county, and

5    he may state an objection after I ask a question.

6    Doesn't mean that it's a bad question, and it doesn't

7    necessarily mean you don't have to answer it.  It's

8    just, he wants to have an objection on the record in

9    case we decide to use your answer in the future and want

10   to argue to the judge about whether it's proper under

11   the rules.

12       A.    Understood.

13       Q.    If Mr. Hedges directs you not to answer a

14   question, then you don't have to, and we as the lawyers

15   can decide what to do, and, you know, I'm going to ask

16   you questions today, but I'm -- the meaning of my

17   question is never:  You should tell me what you talked

18   about with Mr. Hedges.  So I don't want you to

19   accidentally say anything that's covered by

20   attorney-client privilege, so just assume that my

21   questions never mean that.  If you have to take a break

22   or have a drink, just let me know, and I would just ask

23   that you answer any pending question before we have a

24   break?

25       A.    Got it.

Lieutenant Taylor Rollins

1    Q.   Is there any reason today why you can't give

2    your full and best testimony, such as you're taking an

3    impairing medication or something?

4    A.   No.

5    Q.   We're going to look at some documents today, and

6    we're going to go through a couple of videos.  I might

7    -- just to expedite things so we're not here all day,

8    what we've been doing is just sort of jumping to the

9    relevant parts of the video and maybe watching ten

10   seconds here or there, but I want to emphasize that you

11   completely have the right to watch the whole video; and

12   the same thing with the documents.  If we're going to

13   discuss a document, if you want to some time to read the

14   whole thing, then that's absolutely your right.

15   A.   All right.

16   Q.   I'd like to introduce Exhibit No. 1, please,

17   which is the notice for today's deposition.

18                  [Exhibit 1 was marked.]

19   BY MR. ROWES:

20   Q.   And if you'd just take a peek at that, please,

21   Lieutenant Rollins, and let me know once you've had a

22   chance to at least scan it.

23        Have you had an opportunity to look at Exhibit 1?

24   A.   Yes.

25   Q.   And have you seen this document before?

```
 1      A.    I don't remember.  I've seen a lot of documents.

 2      Q.    Yeah, I -- I know that law enforcement officers,

 3   like paperwork is as big a part of their life -- maybe

 4   even bigger than -- lawyers.  I'll represent to you this

 5   is the notice pursuant to which you're here today for

 6   your deposition.  Did you do anything to prepare for

 7   today's deposition?

 8      A.    No.

 9      Q.    Did you review any written documents?

10      A.    No.

11      Q.    And did you review any videos?

12      A.    Yes.

13      Q.    What videos did you review?

14      A.    I saw one of his YouTube videos.

15      Q.    Okay.  And by "his", you mean Justin Pulliam?

16      A.    Yes.

17      Q.    And was it the video of the December 21, 2021,

18   arrest?

19      A.    More or less.  It looks -- some of it was

20   different than what I saw in court.

21      Q.    Okay.  And besides the video of the arrest,

22   although it was a different one than the one you saw in

23   court, did you watch any other videos?

24      A.    No.

25      Q.    And did you discuss your deposition today with
```

```
 1    anyone besides Mr. Hedges?

 2        A.    No.

 3        Q.    And so it's safe to assume you didn't discuss

 4    your deposition with Sheriff Fagan or Deputy Rodriguez?

 5        A.    No.

 6        Q.    Okay, I just want to probably spend five minutes

 7    or so just on your professional background so we

 8    understand who you are.  How long have you been with the

 9    Fort Bend County Sheriff's Office?

10        A.    A little over 16 years.

11        Q.    And by the way, if I say "sheriff's office",

12    let's agree that I'm referring to the Fort Bend County

13    sheriff's office, okay?

14        A.    Okay.

15        Q.    And if I refer to "the sheriff", let's agree

16    that I mean Sheriff Eric Fagan.

17        A.    Okay.

18        Q.    Before you joined the sheriff's office, had you

19    worked in law enforcement at a different agency?

20        A.    No.

21        Q.    And did you -- did you go to the police academy

22    that Fort Bend County operates?

23        A.    I did.

24        Q.    But that police academy's not just for the

25    sheriff's office, right?  People can go on to different
```

```
 1   agencies?
 2      A.   Correct, but I was hired first, and then they
 3   put me through the po -- Gus George Academy.
 4      Q.   And what rank did you have when you started out?
 5      A.   A cadet.
 6      Q.   And it goes up to, like, deputy, and then
 7   sergeant, and then lieutenant?
 8      A.   Yes.
 9      Q.   And you were a sergeant during the December 2020
10   arrest, but you were recently promoted to lieutenant; is
11   that correct?
12      A.   Correct.
13      Q.   And who are your superiors in the chain of
14   command now?
15      A.   Currently, it's captain Tim Chesser and Captain
16   Sam Hayes, and then Major Webb, and then Assistant
17   Deputy Chief Wong, Assistant Deputy Chief Zamora and
18   then Chief Deputy --
19      Q.   Provost?
20      A.   Yes, thank you -- and then the sheriff.
21      Q.   And what division are you in within the Fort
22   Bend County Sheriff?
23      A.   Currently, I'm in the detention division.
24      Q.   And what are your responsibilities in the
25   detention division?
```

Lieutenant Taylor Rollins

```
 1      A.   I am a night shift lieutenant, and I work in --
 2   supervise the towers.  What the towers are are
 3   basically the jail part of it.  There's the booking
 4   part, and then there's the towers, supervise the towers.
 5      Q.   Got it.  And supervising the towers, does that
 6   mean you're kind of keeping an eye on the detainees, or
 7   does it mean you're trying to prevent them from escape,
 8   or --
 9      A.   I'm more of an admin type person, so I just kind
10   of supervise the sergeants, and then the sergeants do
11   all that.
12      Q.   Got it.  Your role now, when you were a sergeant
13   during December 2021, what was your role in --
14      A.   I was a patrol sergeant.
15      Q.   And what were the responsibilities of a patrol
16   sergeant?
17      A.   Day to day, I would put out the -- put out shift
18   briefing, and make the schedules, read and approve
19   reports, and then you would have about three sergeants
20   on the shift.  Each sergeant would supervise or monitor
21   a channel on the radio, and I normally had Channel 2,
22   which, on Channel 2, there's certain districts that
23   operate on that channel, and I would supervise the
24   deputies that were assigned to those districts for that
25   day.
```

1    Q.    Got it.  And I think I read in the transcript of

2    the criminal trial that you had S.W.A.T. training?

3    A.    Yes.  I'm currently still on S.W.A.T.

4    Q.    Oh, you are?  Okay.  And did your training in

5    S.W.A.T. include the ability to assess dangers at an

6    incident scene?

7    A.    Yes.

8    Q.    Did you ever have to discipline your

9    subordinates as a lieutenant?

10    A.    It's part of my job.

11    Q.    And was it the same thing when you were a

12    sergeant?

13    A.    Yes.

14    Q.    What about mentoring your subordinates?  And

15    what I'm thinking of is, not formal written discipline,

16    but, saying to something, like:  Hey, Joe, you didn't

17    break any rules today, but, like, the best practice in

18    this kind of situation, I think, is X.

19    A.    Yes.

20    Q.    It's probably like every other occupation that

21    we mentor the younger people around us?

22    A.    (Witness nods head.)

23    Q.    As you know, the -- part of this case is about

24    Justin Pulliam and his First Amendment rights.  Have you

25    received any training from the sheriff's office on

Lieutenant Taylor Rollins

```
 1    interacting with members of the media in general?
 2        A.   Not that I recall.
 3        Q.   The sheriff mentioned yesterday that he thought
 4    it's on the curriculum.  He was trying to remember back
 5    like nearly 40 years ago, but he thought it was on the
 6    curriculum studying First Amendment, or free speech, or
 7    something.  Do you recall that from your training?
 8        A.   I don't recall.  I've got thousands of hours of
 9    training in schools.  I can't remember -- if there was a
10    class it would have been one, and that's why I wouldn't
11    remember.
12        Q.   Okay, and after you graduated, you joined the
13    Fort Bend County Sheriff's Office formally.  Do you do
14    ongoing training?
15        A.   Yes.
16        Q.   And can you just -- in broad strokes, just so I
17    understand it -- because I'm not very familiar with the
18    law enforcement world -- what are the ongoing
19    requirements for training?
20        A.   So it's not as easy as it sounds.  There are
21    certain levels of peace officer certifications.  You
22    have your basic peace officer, which you get from the
23    academy, and then you have your -- I believe your
24    intermediate and then you -- I'm at master peace
25    officer.  Once you make it to your master peace
```

Lieutenant Taylor Rollins

```
 1   officer, there's only, I think, one required class that
 2   I have to take every four years, and that is the Penal
 3   Code Update class.  Other than that, I can take whatever
 4   classes I want to meet my hours.
 5       Q.   Got it.  And are there particular kinds of
 6   classes you concentrated on in the past?
 7       A.   I'm still in S.W.A.T. and it's all
 8   TCOLE-accredited, so I don't have to worry about
 9   classes.  All my extra S.W.A.T. training covers it.
10       Q.   Got it.  So since you can't recall having
11   specific training on interacting with the media -- I
12   may know the answer to this, but have you had any
13   specific training on interacting with nontraditional
14   media?  In other words, not newspaper reporters or TV
15   reporters, but citizens like Justin who film the police
16   for YouTube channels?
17       A.   No.
18       Q.   Based on your training and experience, do
19   citizen journalists like Justin Pulliam have a right to
20   film the police while the police are performing their
21   duties in public?
22       A.   Yes.
23       Q.   And just -- I recognize you're not a First
24   Amendment lawyer.  I'm not asking for a formal legal
25   opinion, but what's your -- just in broad strokes --
```

```
 1   your general understanding of the right to film the

 2   police?

 3      A.   As long as they're not interfering with our

 4   duties and responsibilities, they can film.

 5      Q.   So that's actually a good statement -- that's

 6   like, basically a statement of law.  There's some

 7   balance between the right to film, and then also the

 8   right of police officers to be able to perform their

 9   things.  We'll talk about that a little bit more later

10   on.  Besides Justin Pulliam, have you ever seen private

11   citizens filming the police while they're conducting

12   their official activities?

13      A.   I've seen family members do it on scenes.

14   That's it.

15      Q.   Okay.  So, in other words, setting aside family

16   members -- or even just random members of the public,

17   have you ever seen anyone who you believed is like

18   Justin Pulliam, in that he was filming for the specific

19   purpose of putting the video on social media such as

20   YouTube?

21      A.   I saw -- I think one time, I saw a guy at the

22   parking gate, where we go in and out of our parking lot,

23   standing out there.  I didn't know what he was doing at

24   first, but it looked like he might have had a phone in

25   his hand filming, and I think that's it, though.
```

```
 1      Q.    And you just ignored him?

 2      A.    Yeah.

 3      Q.    Have you ever watched videos online of someone

 4   like Justin has -- and including Justin -- has posted

 5   about the Fort Bend Sheriff's Department?

 6      A.    I have come across a couple.

 7      Q.    And what was the context of coming across it?

 8   Did you actively seek it out or did someone send you a

 9   link?

10      A.    Somebody shared it, and it came across like a

11   social media feed, I think it was.

12      Q.    And that was one of Justin's videos?

13      A.    I don't believe it was.  I believe it was

14   somebody else.

15      Q.    And what was the, kind of -- like, why did

16   someone send it to you?

17      A.    They didn't send it to me.  They shared it, and

18   I'm friends with them, so it came across my Facebook

19   feed.

20      Q.    I got it, okay.  Did you watch the video?

21      A.    I did shortly, and it was somebody that was

22   filming in the parking lot over here, and that was it.

23      Q.    Have you ever discussed with your fellow law

24   enforcement officers these kind of citizen journalists

25   who film the police and then post videos about it?
```

1    A.    A couple times, yes.

2    Q.    And what's the general perception of your

3    colleagues about people like Justin Pulliam who post

4    videos of the police?

5    A.    What do you mean, exactly?

6    Q.    Like, in other words, when you're discussing the

7    people who film the police for the purposes of posting

8    those police activities on with YouTube, do your

9    colleagues like those people, or do they feel like they

10   portray the police unfairly?

11   A.    I think that most of them understand that the

12   majority are trying to gain or get some type of

13   reaction from law enforcement to make their video maybe

14   get more views and stuff, so we try to tell them to not

15   fall into that trap and just ignore them, if you can.

16   Q.    And that's actually one of the questions I had

17   for later on, but maybe it's a good time now to ask it.

18   Part of law enforcement professionalism is not being

19   provoked by someone who says something insulting to you

20   as an officer, correct?

21   A.    Uh-huh.   Yes.   Sorry.

22   Q.    And police officers are not supposed to respond

23   to insults or other verbal provocations by getting

24   angry and taking actions just based on their own sense

25   of honor?

```
 1     A.    Correct.

 2     Q.    I will -- I will say that I've seen some of

 3   these videos, and I am continually impressed that law

 4   enforcement maintained a cool demeanor in the face of

 5   some of the things people say to them.

 6     A.    For the most part.  There are videos out there

 7   that kind of show that some of them don't.

 8     Q.    Well, every barrel has a bad apple or two.  So,

 9   you know, we discussed a minute ago that, as a general

10   rule, citizen journalists have a right to film wherever

11   they want, but, also, there has to be a balance of not

12   interfering with an active scene, and so one example I

13   had in mind if there's a hostage situation, a citizen

14   journalist wouldn't have any right to creep in the

15   window or something and interview the person taking the

16   -- the hostage-taker.  That seems obvious so my kind of

17   question to you is whether you have any sort of general

18   rules about how you would balance the practical needs

19   of police in a situation against the right of someone to

20   film the police?

21     A.    That all comes back to safety.  Everyone is --

22   securing the scene and safety.  That's basically --

23   that's what you go off of.

24     Q.    And so would it be fair to say that each

25   situation kind of presents its own mix of safety
```

```
 1   concerns that officers would have to evaluate right
 2   there?
 3   A.    Yes.
 4   Q.    Prior to arresting Justin at the Kraft property
 5   on December 21, 2021, had you ever arrested someone
 6   before who was filming the police?
 7   A.    No.
 8   Q.    And have you, since that arrest in -- December
 9   21st, 2021 of Justin Pulliam, had you ever arrested
10   someone else for filming the police after that?
11   A.    No.
12   Q.    Have you ever heard of anyone in the sheriff's
13   office arresting someone who was in the course of
14   filming the police?
15   A.    No.
16   Q.    By the way, if I say "Kraft property", will you
17   understand that that's the Kraft residence where the
18   arrest took place on December 21, 2021?
19   A.    Yes.
20   Q.    Prior to the incident at the Kraft property, did
21   you know who Justin Pulliam was, by reputation?
22   A.    Yes.
23   Q.    And can you describe what his reputation was, as
24   you understood it?
25   A.    That he sometimes would show up on scenes and
```

1  film.

2    Q.   Besides the basic fact that he showed up on

3  scenes and filmed, did he have a reputation for having

4  a particular opinion of the police in videos he posted?

5    A.   The only thing that I had heard was that he

6  liked to provoke officers and to -- some type of

7  encounter, to -- he liked to provoke encounters.

8    Q.   And you mentioned earlier that he had the

9  reputation as someone who might be trying to provoke an

10  officer to get a reaction on camera, which he can then

11  post to YouTube?

12    A.   Yes.

13    Q.   And so, probably, his reputation was negative

14  among your colleagues in law enforcement?

15    A.   Yes.

16    Q.   Did your understanding of Justin's reputation

17  include any story you'd heard that he had been

18  physically violent with a police officer?

19    A.   No.

20    Q.   And was his reputation -- I'm sorry, let me

21  re-ask that.  Did his reputation among your fellow

22  police officers, as you understood it, include yelling

23  things to the people the police were -- such as "run

24  away", or "don't talk to him", or, "fight the police

25  officer", or anything like that?

```
 1    A.    I've never heard anybody say that.

 2    Q.    When you arrested -- I'm sorry, the arrest is

 3    irrelevant for this question.

 4          When you encountered Justin on December 21,

 5    2021, were you familiar with his specific YouTube

 6    channel, "Corruption Report"?

 7    A.    I was not.

 8    Q.    So then you had never watched the Corruption

 9    Report, obviously, before the incident?

10    A.    No.

11    Q.    And have you since watched any videos of

12    "Corruption Report"?

13    A.    Yes.

14    Q.    And do you recall about how many you've watched?

15    A.    Just mine.

16          MR. HEDGES:    Is that where yours was

17    posted?  I don't even know.

18    A.    I believe so.  I think.  Somebody sent me a link

19    and say, "Hey, you're on this video", and that's when I

20    opened it and it went to YouTube, and that was the video

21    of the Kraft residence.

22    Q.    Did that video include commentary from Justin,

23    in addition to just the video depicting the scene?

24    A.    Yes.

25    Q.    And do you feel that Justin's commentary was
```

Lieutenant Taylor Rollins

1    fair to you?

2        A.    Honestly, I turned it off.  I didn't really

3    listen to it.  It doesn't -- I didn't care.

4        Q.    And have you spoken to Justin Pulliam at a

5    different police incident prior to the one at the Kraft

6    property?

7        A.    I'd never met him.  I didn't even know what he

8    looked like.

9        Q.    I think the answer to this question will be

10   obvious, but no -- do you know anyone in the Fort Bend

11   County Sheriff's Office who goes and watches

12   "Corruption Report" in order to improve their policing

13   based on Justin's criticisms?

14       A.    I don't.

15       Q.    And would it -- right now, based on your

16   training and experience, would you ever think that

17   going and watching Justin Pulliam's "Corruption Report"

18   would be a good source of information about how the

19   police can improve their tactics?

20       A.    I don't think so.

21       Q.    We're flying through this, so that's good.  You

22   recall you arrested Justin for interference with public

23   duties, correct?

24       A.    Yes.

25       Q.    And that is -- interference with public duties

Lieutenant Taylor Rollins

```
 1    is a criminal statute under the Texas Penal Code,

 2    correct?

 3       A.   Yes.

 4       Q.   And prior to arresting Justin for interference,

 5    had you ever arrested someone before for interference?

 6       A.   I'd say probably.  I'd have to go back and pull

 7    out some old records.  It'd been a while.

 8       Q.   I mean, how many people, roughly, do you think

 9    you're arrested in your 16 years?  Hundreds?

10             MR. HEDGES:     For that or in general?

11    BY MR. ROWES:

12       Q.   I'm sorry, just in general.  Not for

13    interference.

14       A.   In general?  Probably.  I spent the majority of

15    my 16 years in patrol.

16       Q.   Right.  I'm just trying to establish that it's

17    not surprising that you wouldn't remember, because you

18    probably have arrested at least hundreds of people --

19    would you arrest -- would a typical shift involve

20    having to arrest someone, or is an arrest of someone

21    that happens once a week or once a month?

22       A.   No, I mean, it also depends on what shift you're

23    working, you know, and also depends on the type of

24    officer you are.  You could sit under a tree in the

25    shade all day and not arrest anybody, you know.
```

```
1    Q.   But probably if you're working night shift on a

2    Friday night when the bars are open --

3    A.   You're probably going to make -- most likely,

4    make an arrest.

5    Q.   So probably if we dug into the Lieutenant

6    Rollins archives, we might find an arrest for

7    interference here and there, but you don't recall,

8    sitting here, what those were?

9    A.   I don't.

10   Q.   It's probably safe to say that, before the

11   incident at the Kraft Country Store, you had never

12   arrested a traditional journalist, like, you know, a Fox

13   News cameraman or something like that?

14   A.   No.

15   Q.   Have you ever heard of any traditional

16   journalist -- and when I say "traditional journalist",

17   I mean, like, TV news or the newspaper, Houston

18   Chronicle.  Have you ever heard of a traditional

19   journalist being arrested by the Fort Bend County

20   sheriff's office?

21   A.   I don't think so.

22   Q.   We can watch it later, if you want, but maybe

23   you recall it from the criminal trial.  Before you

24   arrived on-scene at the Kraft residence, Deputy

25   Rodriguez radioed that local journalist Justin Pulliam
```

```
 1    is present at the scene.  Do you recall hearing that?
 2       A.   I remember them asking me that at the criminal
 3    trial, and I don't recall that.  And I was also running
 4    lights and sirens to the scene, so -- and I don't
 5    remember hearing or seeing that, when I pulled up, it
 6    was definitely, like, who's that?  So I don't remember
 7    hearing that.
 8       Q.   Got it.  So when you arrived on-scene that day
 9    and saw Justin Pulliam, he was just some red-headed guy;
10    you didn't know who that was?
11       A.   I did not.
12       Q.   You testified a few months ago in Justin's
13    criminal trial, correct?
14       A.   Correct.
15       Q.   And when you testified, you understood that you
16    were doing so under oath, correct?
17       A.   Yes.
18       Q.   And did you testify truthfully, to the best of
19    your knowledge?
20       A.   I did.
21       Q.   If I was to rely on your answers and your
22    testimony in the criminal trial in this case, is there
23    any reason for me to worry that those answers were
24    untruthful?
25       A.   No.
```

1           MR. ROWES:       To save time, Kevin,

2    would you be willing to stipulate that we can use

3    answers that Lieutenant Rollins gave at the criminal

4    trial.

5           MR. HEDGES:      I haven't read the

6    testimony of the criminal trial.  I'm sure he's

7    testified truthfully, but without seeing it...

8           MR. ROWES:       I'll probably have to run

9    through some of the basic facts, anyway, but I asked

10   you to let me know earlier, Kevin, if you had taken a

11   peek at it; because I think you covered a lot of the

12   basics.

13   BY MR. ROWES:

14   Q.   I just want to back up.  A second ago when I

15   discussed with you your rolling up to the scene and

16   there was an unidentified red-headed guy there, did you

17   assume that that was Justin Pulliam?

18   A.   I started having some thoughts that this might

19   be that Justin Pulliam guy that I've heard people talk

20   about, but I wasn't sure.

21          MR. ROWES:       Molly, can you cue up the

22   first video.  It's Justin's camera.

23          I'd like to introduce this video as Exhibit

24   No. 2, please.

25               [Exhibit 2 was marked.]

Lieutenant Taylor Rollins

```
 1     Q.   And this is a video that Justin himself took,

 2   and it has audio of what's going on.  That's one of the

 3   main reasons, because we can at least hear what y'all

 4   are talking about, and then there's another video later

 5   on that's a dash cam video from Justin's own truck,

 6   which doesn't have audio, but we can see what's going on

 7   from a different perspective, so I just want to walk

 8   through these couple of videos and discuss with you

 9   what transpired on December 21, 2021.

10        In your criminal trial, just looking at the big

11   picture, you testified that you wanted Justin across

12   the street from the Kraft property for his own safety,

13   because he was in a potential line of fire; is that

14   correct?

15     A.   Yes.  Basically, just further away, basically,

16   because I'm -- I was trying to get everybody, at first,

17   before I found out who the other people were but, yes,

18   for safety reasons.

19     Q.   I recall -- I'm not sure how I recall this.

20   Maybe it was at the criminal trial, you were in the

21   military before you came to the Fort Bend County

22   Sheriff, correct?

23     A.   Yes.

24     Q.   And how long were you in the military?

25     A.   Four years.
```

Lieutenant Taylor Rollins

```
1    Q.   And what was your occupation?

2    A.   I was in the infantry.

3    Q.   And so, probably, your experience in the

4    infantry for four years also gave you a familiarity with

5    identifying where there might be people shooting at you

6    from; is that correct?

7    A.   Yes.

8    Q.   And did your S.W.A.T. training also give you

9    additional experience in how to identify where there

10   could be potential danger?

11   A.   Yes, and that's part of -- I knew that we had a

12   barricaded person, so I knew that I was going to be

13   calling out S.W.A.T., and there was going to be lots of

14   people, lots of vehicles, lots of equipment, crisis

15   negotiation team, and their vehicles taking up this

16   whole parking lot, so I needed to secure that area as

17   best as possible.

18   Q.   Okay.  Let's take a look at -- let's take a look

19   at the video at 37 seconds.  As I said, before you're

20   welcome to watch the whole seven-minute video, if you

21   want.  It's kind of like Justin standing around.  This

22   is where Deputy Rodriguez comes by.

23            MR. ROWES:     Can you just play to 058,

24   please?

25            [Clip was played.]
```

1    Q.    Lieutenant Rollins, do you recognize sheriff's

2  Deputy Rodriguez as the law enforcement officer who

3  walked through the screen?

4    A.    Yes.

5    Q.    And did you hear him at the beginning of the

6  clip say, "Sir, you need to stay back"?

7    A.    Yes.

8    Q.    And by "sir", he was referring to Justin

9  Pulliam, correct?

10   A.    Yes.

11   Q.    And Deputy Rodriguez didn't order Justin to go

12  across the street, correct?

13   A.    Correct.

14   Q.    And, at least in this particular part of the

15  clip, Deputy Rodriguez didn't speak to the woman who we

16  heard on the clip talking to Justin Pulliam, correct?

17   A.    Correct.

18   Q.    And I think you didn't know then -- and we can

19  get into that a little bit, but is the elderly woman

20  who we hear speaking, do you now recognize that as being

21  Edwin Kraft's mother, who was on-scene?

22   A.    Yes.

23   Q.    It looked to me -- do you see how Deputy

24  Rodriguez walked over and kind of took up a position

25  next to that blue semi trailer?

Lieutenant Taylor Rollins

```
 1    A.    Yeah.  Looks like he's behind the wheel, there.
 2    Q.    Right.  And it sort of looked to me -- I went
 3  through basic training like 30-plus years ago, but it
 4  looked to me that he's kind of walking to position
 5  himself so that he's not in a direct line of fire, or
 6  something like that.  Would you share that assessment?
 7    A.    Yeah, I think he's giving some -- some cover and
 8  concealment there behind the engine block on the
 9  18-wheeler and the axle.
10    Q.    And that would be sensible -- that particular
11  place would be -- would provide good cover because you
12  just said the engine block, right?  A bullet's not going
13  to go through the engine block?
14    A.    Well, it's better than nothing.  It's probably
15  the best spot for now.
16    Q.    We discussed earlier, and I think you testified
17  at the criminal trial that you understand that citizen
18  journalists, as kind of a baseline rule, have the right
19  to film the police, correct?
20    A.    Yes.
21    Q.    And so you would agree that merely filming the
22  police is not interfering with public duties, correct?
23    A.    Yes.
24    Q.    And so, in order to arrest someone for
25  interference who is filming the police, there has to be
```

```
 1    some legitimate concern in addition to just the mere act
 2    of filming, right?
 3        A.   Yes.
 4        Q.   Okay, so there's about three minutes of nothing
 5    happening but Justin filming Lieutenant Rodriguez and
 6    just kind of hanging out, so I'd like to bump us up to
 7    4:15, and this is actually where you roll up on-scene.
 8             MR. ROWES:   Can you just hang on a sec,
 9    Molly?  Just kind of cue it up there to 4:15.  So, at
10    the -- at the criminal trial, I remember you testified
11    that you were the incident commander for this scene; is
12    that correct?
13        A.   Yes.
14        Q.   And was that related to the fact that you were
15    the supervisor of the deputies who were already there,
16    or how were you the incident commander?
17        A.   Well, so the first deputy on-scene assumes the
18    incident commander, and then once the supervisor arrives
19    on-scene, then they take it over.
20        Q.   Got it.  And is that the sort of thing where
21    it's just automatic that you would take it over because
22    you had higher rank, or is it like on a Navy ship where
23    the captain says, "All right, you're the captain now",
24    and passes it over to someone else?
25        A.   Basically, like I said, the first officer
```

```
 1   on-scene gets on the radio and says, "I'm assuming
 2   incident commander of the scene", and then once the
 3   first supervisor shows up, they take it over.
 4      Q.   And I realize we talked before evaluating --
 5   it's pretty hard to evaluate -- it's -- let me back up.
 6   We discussed before how each scene is different, and
 7   there are probably general rules for securing a scene,
 8   but each one, you have to make an individual
 9   determination, correct?
10      A.   Yes.
11      Q.   And so when you arrived on this scene, what were
12   your immediate priorities as the incident commander, in
13   light of the facts of what you saw on the ground?
14      A.   Well, the first thing that came to mind when I
15   was in route was that it was Edwin Kraft.  We've had
16   many, many, many dealings with Edwin, and the majority
17   of the incidents we had with him, he was armed with a
18   firearm or some type of weapon, so I knew that, more
19   than likely, he was armed, so that thought process
20   started to kind of get me thinking about how I'm going
21   to need to secure the scene, the perimeter, make sure
22   that the deputies that are there are behind cover.  Now
23   I'm thinking that he's probably going to be barricaded
24   in the house.  I'm going to have to call out S.W.A.T.
25   Just kind of all these things -- the wheels are moving
```

```
 1   now, so this is kind of my thought process.
 2      Q.   Right.  And Edwin Kraft was known to be a
 3   mentally unstable person, to the sheriff's department,
 4   as well, correct?
 5      A.   And violent, yes.
 6      Q.   So not just that he'd been armed in previous
 7   encounters, but known to be violent and mentally
 8   unstable?
 9      A.   Yes.
10      Q.   We'll see it later in the video, but just to
11   kind of keep things straight, there were three women
12   on-scene when you arrived, in addition to Justin,
13   correct?
14      A.   Yes.
15      Q.   And you later determined that those three women
16   were two employees of Texana and Edwin Kraft's mother,
17   correct?
18      A.   Yes.
19      Q.   But the moment you rolled up on the scene, you
20   didn't know who those four civilians were?
21      A.   Correct.
22      Q.   And just for a clear record, Texana is a mental
23   health organization?
24      A.   Yes.
25      Q.   What's your understanding of Texana's
```

1    partnership with the sheriff's office?

2      A.    We actually have a contract with them.  We

3    actually have screeners that ride out with our crisis

4    intervention team deputies, one per shift.  We use them

5    daily.  They come out, and if we have a person in

6    crisis, to be able to get them into a mental health

7    hospital facility, they have to be screened first by a

8    screener, and that's a Texana screener.  That's what

9    these ladies do, they're screeners.  So they deal with

10   our mental health population daily, and I found out

11   later that that's -- Edwin's mom actually called Texana

12   first, and they sent out their screeners, and then once

13   they realized that he was armed, and making these

14   threats, and what-not, they were calling the police.

15     Q.    And so I think I remember reading that, too, so

16   it was actually the Texana employees who dialed 9-1-1

17   and said "Get out here"?

18     A.    Yes.  I found that out later.  I thought his mom

19   called, but I found out later it was the screeners.

20            MR. ROWES:        And, Molly, can we just

21   watch from 4:15 to 4:30?

22     Q.    And you actually start speaking before Justin

23   moves the camera, so the audio's not perfect, but maybe

24   just pay a little extra attention to the audio.

25            MS. ROWES:        Go ahead, Molly.

Lieutenant Taylor Rollins

```
 1                    [Clip was played.]
 2     Q.   So you've arrived on the scene in this clip from
 3   4:15 to 4:30, and the first thing you say is, "Sir, you
 4   need to go across the street"; and by "sir", you mean
 5   Justin, correct?
 6     A.   I actually said, "Y'all need to go across the
 7   street."
 8     Q.   Actually, I think we'll hear -- and I felt like
 9   -- so this is actually kind of important.  It sounded to
10   me like you said, "Sir, you need to go across the
11   street", meaning Justin -- and then I think you say a
12   second thing, where you say "Y'all need to go across the
13   street", and you're speaking, actually, to the Texana
14   women.
15     A.   Maybe.
16     Q.   Let's try and give it another listen.
17                    [Clip was played.]
18     A.   I heard -- so I couldn't tell.  I heard "across
19   the street", and then I heard, "I need y'all to go
20   across the street."
21     Q.   The audio's a bit shaky, but I think we can
22   agree that when you said "go across the street", you
23   weren't referring just to Justin.  You were referring
24   to all of the civilians you saw, including Justin,
25   correct?
```

```
 1     A.    Correct.

 2     Q.    And based on your testimony a few minutes ago,

 3  you wanted them to go across the street just to be away

 4  from the scene because of concerns about Edwin Kraft,

 5  and then maybe the arrival of other units; is that

 6  correct?

 7     A.    Correct.  I had reason to believe that he was

 8  probably going to be armed with some type of firearm.

 9     Q.    And I don't recall from the radio stuff, but was

10  -- was it confirmed that Edwin was in the house at this

11  point when you rolled up, or it was just folks thought

12  he might be in there?

13     A.    We -- I was told he was in the house.  His mom

14  said he was in the house.  The deputies told me he was

15  in the house.  Obviously, we find out later that he was

16  not in the house, and I don't know when he got out.  I

17  don't know if he got out before we got there, before

18  the first deputy got there.  I don't know.

19     Q.    Right.  So just walking through -- one of the

20  things I want to walk through in our deposition is to

21  figure out when Justin's conduct rose to the level of:

22  Okay, now you're interfering with public duties.  So

23  when you rolled up and saw the four civilians and said,

24  "Y'all, please go across the street", the fact that you

25  had to say that to them didn't mean that they were
```

```
 1    interfering with public duties at that point; is that
 2    correct?
 3        A.   Correct.
 4        Q.   And so you asked everyone to go across the
 5    street, and then Justin sharply responds, "So you can
 6    shoot 'em?"  Correct?
 7        A.   Correct.
 8        Q.   Was Justin's statement "so you can shoot him"
 9    the offense of interfering with public duties?
10        A.   No.
11        Q.   So I think we discussed it before.  Just making
12    an insulting statement to a police officer is not
13    interference?
14        A.   Correct.
15        Q.   So -- and then you said, "What's wrong with you,
16    man?"  Right?
17        A.   Correct.
18        Q.   And I sort of took your statement to mean that,
19    like, you couldn't believe that somebody would be so
20    dumb as to say, "so you can shoot him" in response to a
21    request to go across the street.  Was it specifically
22    about what Justin said then, or was it, like, what
23    Justin said then, plus, you had this knowledge about
24    Justin's critical videos, or what?
25        A.   Well, I still didn't know at the time that
```

```
 1    that's who it was.  I didn't know if it was -- I mean,
 2    he had a nice camera.  I didn't know if it was a news
 3    reporter or what-not, but at that point, as many times
 4    as I've dealt with media, I knew that he was not a news
 5    reporter.  He was not working for Channel 2.  This was
 6    somebody else, and then I started thinking, okay, this
 7    is probably one of the -- I don't know what they call
 8    themselves.
 9    Q.    Auditor?
10    A.    Yeah, maybe one of the auditors or whatever.
11    Q.    Yeah, I've heard some people use the term
12    "auditor" to describe themselves, who do this, and I've
13    heard other things like "citizen journalist" or
14    something.
15    A.    By that statement, it gave me the understanding
16    that he was there to cause issues.
17    Q.    Okay.  And -- even though you didn't know
18    specifically it was Justin at this moment, this was the
19    -- was this the kind of behavior that we had discussed
20    earlier, where he had a reputation of saying
21    provocative things to try to elicit a response from
22    sheriff's department personnel?
23    A.    Yes.
24    Q.    When you said, "What's wrong with you, man", it
25    struck me as almost like breaking character for a
```

1    second, like you had a genuine kind of emotional

2    reaction to what Justin said; is that right?

3        A.    I wasn't expecting him to say that.  I've never

4    been confronted with somebody like that.  You know, we

5    were there to help people, and his mom was in a pretty

6    -- in a predicament.  Her son was mentally ill and

7    threatening her life, and we were there to help

8    de-escalate the situation, and, you know, coming across

9    somebody like that is just different.

10       Q.    Right.  I understand.  And I had a -- I mean, it

11   was terrible.  I had a neighbor -- or I still have a

12   neighbor who's a very nice lady, and she had a very

13   mentally unstable son, and a few years ago, he came to

14   our neighborhood, went into her house and put a gun to

15   her head, and said he was going to kill her, and he was

16   chased by the Austin police and he was actually shot.

17   It felt like that was a special kind of tragedy when a

18   son threatens to kill his own mother, so I can

19   understand why that would be concerning.

20            So one thing I want to talk about -- and it's

21   kind of a sensitive topic, and I want to say that I

22   insincerely don't mean it as any kind of insult or

23   something like that.  I actually added it to my

24   questions last night after chatting with Sheriff Fagan

25   -- or my colleague chatted with Sheriff Fagan yesterday

1   afternoon, and we watched a video.  It was a campaign

2   video for the sheriff that he did about filming the

3   police, and the sheriff discussed the George Floyd

4   incident, and the sheriff endorsed filming the police,

5   in part, to be able to protect police officers so that

6   they don't have false accusations, but also to be able

7   to identify mistakes that police might be making.  When

8   I say the name "George Floyd", do you know who I'm

9   talking about?

10       A.   Yes.

11       Q.   And so we agree that that's the gentleman who

12   died during the course of an arrest in Minneapolis in

13   2020?

14       A.   Yes.

15       Q.   I'm going to represent to you that it was on May

16   5, 2020, that he died.  You probably don't know the

17   exact date, but does that sound about right?

18       A.   Yes.

19       Q.   And his death during his arrest was filmed by a

20   civilian with a camera, correct?

21       A.   Yes.

22       Q.   There were a bunch of protests in Austin, I

23   know, where I live.  Was that true in -- like, in the

24   wake of -- you might remember in the wake of the George

25   Floyd incident during the summer of 2020, there were a

Lieutenant Taylor Rollins

```
 1   bunch of protests across the country about police

 2   violence  and things like that.  Do you recall that kind

 3   of national phenomenon?

 4        A.   Yes.

 5        Q.   Were there any protests here in Fort Bend

 6   County, do you know?

 7        A.   I don't believe so.

 8        Q.   After the George Floyd death, did the sheriff's

 9   department communicate anything to law enforcement

10   about being more careful about arrests or anything

11   along those lines?

12        A.   I don't recall.

13        Q.   And do you recall getting any kind of

14   communications about law enforcement officers being

15   aware of the possibility of protests directed at the

16   police following the George Floyd incident?

17        A.   Yes.

18        Q.   And, if you can recall, what, generally

19   speaking, were those notifications about?

20        A.   Just telling everybody to be aware that there

21   could be possibly protests, or people that are upset,

22   and can take it out on, you know, on us, even though we

23   weren't involved.  That's a different state, different

24   part of the country, but just to be aware, and also if

25   anything does occur, we were to notify the command staff
```

```
 1   immediately.
 2      Q.   And, like I say, I'm not bringing it up because
 3   I think everybody who works in the police or anything
 4   like that, like, sincerely is like the officers in the
 5   George Floyd case, and that this case is not about
 6   whether that was a good case, or bad case, or the
 7   convictions, or legitimate or anything like that, but
 8   the reason I bring it up, is -- relates to the video
 9   where Justin says, "So you can shoot him?"  Did it
10   occur to you, in the moment you were interacting with
11   Justin, that he might have actually been sincerely
12   concerned about the safety of Edwin Kraft because of the
13   George Floyd incident, and the national prominence of
14   the police violence recently?
15      A.   No.
16      Q.   In doing some research for this case, I read
17   that when the police encounter one someone who is having
18   a severe mental health crisis, it is more likely for
19   the police to have to use for than when dealing with
20   someone who is not experiencing a mental health crisis.
21   Is that consistent with your experience?
22      A.   Possibly.  I've had a pretty good track record
23   with mental health people, so...
24      Q.   Right.  And so just going back to the moment
25   when Justin says, "so you can shoot him", did it occur
```

Lieutenant Taylor Rollins

```
 1    to you that Justin might have been sincerely concerned

 2    for Edwin Kraft's safety because he was having a mental

 3    health crisis, and Justin wanted to record everything?

 4      A.   No.

 5           MR. ROWES:      How are you doing, by the

 6    way?  We're at 10:00.  Is everyone doing okay?  Sarah,

 7    do you need a break?

 8           COURT REPORTER:      I'm good.

 9    BY MR. ROWES:

10      Q.   We're over halfway through.  You want to keep

11    going for a bit?

12      A.   Sure.

13           MR. ROWES:      Can we watch, Molly, from

14    4:18 to 4:30?

15      Q.   And I think I just want to pay attention to the

16    fact that you say, "What's wrong with you?"  Justin

17    says, "What's wrong with you?"  And then you direct him

18    to go across the street.

19                 [Clip was played.]

20      Q.   Okay, so you say, "What's wrong with you", and

21    then Justin replies, "What's wrong with you", and then

22    you direct him to go across the street -- you politely

23    ask him to go across the street, correct?

24      A.   Yes.

25      Q.   And when Justin says, "What's wrong with you",
```

Lieutenant Taylor Rollins

1   in response to you saying, "What's wrong with you,

2   man", was that interference with public duties at that

3   point?

4       A.   No.

5       Q.   By the way, you mentioned a minute ago that

6   Justin -- when he made that statement, that indicated to

7   you that he was not part of traditional media like Fox

8   News or something like that, correct?

9       A.   I just knew that, out of all my interactions

10  with the media, none of them went like that.

11      Q.   Right, so it felt like the statement would have

12  been extremely unprofessional for a traditional

13  journalist to say to a police officer; is that correct?

14      A.   Yes.

15      Q.   And you mentioned before that you've had some

16  interactions with -- have you ever given a statement to

17  the media or something like that?

18      A.   Yes.

19      Q.   And about how many times have you kind of

20  formally given a statement to the media?

21      A.   Maybe a handful, but I try not to be on camera,

22  so I usually talk to them off camera a little bit, you

23  know.  I worked in criminal investigations for a while

24  as a supervisor, and I went to a lot of scenes that

25  they were already there, and when we'd show up, we'd

Lieutenant Taylor Rollins

```
 1   typically have to get them to move back a little bit
 2   further, and that's basically the majority of them, you
 3   know, talking to them about moving back and then
 4   letting them know that somebody would be over there to
 5   give them a statement when we concluded the
 6   investigation.
 7       Q.   And I think this is consistent with what we
 8   talked with Sheriff Fagan about, and Detective
 9   Hartfield, the other day, which is the front-line law
10   enforcement people are not supposed to be giving
11   statements to the media on behalf of the sheriff's
12   department, correct?
13       A.   Correct.
14       Q.   So you basically just interact with them, like
15   you were saying, and then it's the responsibility of
16   the public information officer to make the formal
17   statement?
18       A.   Correct.
19       Q.   And would you, as a matter of course, like, if
20   the media's there and you're saying:  Hey, folks, we
21   need to establish a perimeter.  Can you move back over
22   there, if they say, "What's going on", do you tell
23   them?
24       A.   Normally, we'll -- I would always tell them,
25   "Hey, I'll let you know when I know.  I just got here.
```

```
1    Let me find out some more information, and we'll get

2    with you in a little bit."

3        Q.   And would you actually go and find out the

4    information, or would that be more like:  Hey, now this

5    person -- I don't have to deal with them, and we'll let

6    the public information officer handle it?

7        A.   It would either be the public information

8    officer, the lead detective on the scene, or sometimes

9    the sheriff.  Not Sheriff Fagan; it was the prior

10   sheriff.

11            MR. ROWES:       Molly, can we watch from

12   about 4:25 to 4:40.

13                 [Clip was played.]

14            MR. ROWES:       Can you go back to 4:25

15   again, Molly?  Just go ahead and play it and we can see

16   it, and we can see when Justin turns around.

17                 [Clip was played.]

18       Q.   So after you had your interaction with Justin

19   about, you know, so you're going to shoot him, what's

20   wrong with you, man, what's wrong with you, that's in

21   the past.  You ask him politely to go across the street

22   again, and he actually turns around and starts walking

23   towards the street, correct?

24       A.   Yes.

25       Q.   So at the moment he turns around and starts
```

1   walking towards the street, he's in compliance with your

2   order, right?

3      A.   Yes.

4      Q.   Okay, so turning around walking towards the

5   street, at that moment, he's not yet committed the

6   offense of interference?

7      A.   Correct.

8      Q.   And so, referring to this clip again from 4:25

9   to 4:40, as Justin is walking away, one of the civilian

10  females says, "Sir, we're with Texana", correct?

11     A.   Yes.

12     Q.   And when the Texana employee said, "Sir, we're

13  from Texana", was she committing the offense of

14  interference?

15     A.   No.

16     Q.   And before she said that she was from Texana,

17  you expected her to go across the street, just as you

18  were with Justin, correct?

19     A.   Yes.

20     Q.   And then we saw that -- you can see from the

21  screen here that you engage in a conversation with both

22  of the women from Texana, correct?

23     A.   Yes.

24     Q.   And is this where they're actually explaining to

25  you:  We're from Texana.  We made the Edwin Kraft call,

Lieutenant Taylor Rollins

1    we have some history with him, that kind of thing?

2        A.    Yes.

3        Q.    And I think I just asked this, but I'm going to

4    ask again.  When these two women are having a

5    conversation with you, they're not committing

6    interference at that point, correct?

7        A.    No, because once they told me they were with

8    Texana and what they were doing there, they're actually

9    part of the scene.  They're involved.

10       Q.    And so once you found out that they're part of

11   the scene, you rescinded your order to go across the

12   street as applied to them, correct?

13       A.    Yes.  I actually told them to go -- most of the

14   cars were on the side of the gas station out of view of

15   the house.  I told them to go over there, because even

16   if they weren't there, we were going to be calling a

17   screener out, anyway, so they were already there, so

18   that's one of my checklist items already checked off.

19       Q.    So, in speaking to you, the Texana women gave

20   you information that persuaded you to change your mind

21   about your prior order?

22       A.    Well, yes.  They told me they were Texana

23   screeners, and they were already there.

24       Q.    One other point.  At this moment in which you're

25   talking to the Texana women from your first rolling up

Lieutenant Taylor Rollins

```
1   on the scene and directing people to go across the

2   street, you've told them to go across the street, but

3   you haven't actually said the reason why to anybody,

4   correct?

5      A.   No.

6      Q.   And when Justin made the statement "so you can

7   shoot him", you didn't tell Justin to go across the

8   street for his own safety, correct?

9      A.   No.

10     Q.   Okay, so at 4:34 of the video.  Exhibit 2, while

11  you're talking to the Texana women, you have your back

12  to the -- to the Kraft residence, correct?

13     A.   Uh-huh.

14     Q.   Is that a "yes", sir?

15     A.   Yes.

16     Q.   And the fact that you have your back to the

17  house means, at least in that minute, you don't believe

18  that there's a realistic chance you're going to get shot

19  in the back, correct?

20     A.   Incorrect.

21     Q.   You believe that there is a realistic chance you

22  could get shot standing there?

23     A.   There's definitely a possibility.

24     Q.   And so why wasn't your immediate reaction to the

25  Texana women to -- and for yourself to get out of the
```

1    way from standing right there.  Instead, you're having a

2    conversation with them?

3         A.   Well, like I said, the first thing I told them

4    to do was get across the street, and then they told me

5    they're Texana, that's what they're doing right now,

6    and I immediately told them:  Okay, y'all go over here,

7    so we're talking in a matter of less than a minute,

8    we're taking care of this.  Could I have done it

9    faster?  Sure, I could have, probably.  Nobody's

10   perfect.

11        Q.   I understand.  And you have a ballistic vest on,

12   I think I can tell; is that correct?

13        A.   Yes.

14        Q.   And was that standard for you to wear when you

15   were on patrol?

16        A.   Yes.

17        Q.   It's not -- one of the things that Sheriff Fagan

18   said yesterday, it's not a bulletproof vest; is that

19   correct?

20        A.   Well, it only stops pistol rounds, so I have a

21   -- I have a rifle vest in my car.

22        Q.   Okay, and does that -- is that, like, a military

23   vest or -- that you had from --

24        A.   No.  It's issued.

25        Q.   It's issued, okay.

1    A.   Like I said, I'm on the S.W.A.T. team.  Someone

2  -- normally, on these scenes if I'm working patrol and

3  S.W.A.T. gets called out, I have to wait for another

4  supervisor to take over, and then I would change to my

5  S.W.A.T. uniform.

6    Q.   You had a -- you had a separate uniform in your

7  vehicle that would include -- what's the uniform for

8  S.W.A.T. that would be different from your regular

9  uniform?

10    A.   I mean, it's just like BDU pants, and then, you

11  know, your tactical vest, helmet, all that stuff.

12    Q.   I see.  And how do you change into that if

13  you're, like, at a scene like this?  You just do it in

14  the parking lot?

15    A.   In the car, if you can.

16    Q.   That sounds awkward.

17    A.   It is.

18    Q.   Yeah.  I do a lot of mountain-climbing, and, in

19  the morning trying to change in the backseat of the car

20  with all this gear is a real pain, and it's probably ten

21  times as bad for a S.W.A.T. person.

22    A.   Uh-huh.

23         MR. ROWES:       Molly, can we watch --

24  right around here to, say, 4:50.

25              [Clip was played.]

1    Q.   So, as you saw from the video, Justin stops

2    walking backwards, and he's now filming your

3    interaction with the Kraft -- I'm sorry, with the

4    Texana women, correct?

5    A.   Yes.

6    Q.   And Justin says, "Well, hold on.  If it's not

7    for safety", and he says that he has permission from

8    Kraft's mother, and then you said the order is for

9    safety, correct?

10   A.   Yes, but, I mean, we don't have to sit there and

11   explain every decision that we make on the scene.

12   Q.   I understand.  But that's the first time that

13   safety was explicitly discussed, correct?

14   A.   Because he asked.

15   Q.   Right, so Justin brought up safety?

16   A.   Uh-huh.

17   Q.   Yes?

18   A.   Yes.

19   Q.   It's okay.  It's totally natural.  I get it.  A

20   deposition is not like a normal conversation.

21        MR. ROWES:       Can we watch, Molly, from

22   4:45 to the 5:01 mark?

23   Q.   And this is where you actually come on over and

24   arrest Justin.

25        [Clip was played.]

```
 1     Q.    Thank you, Molly.

 2           So at this point, Justin is asking you if he

 3    still has to go across the street after it became clear

 4    that the Texana women could stay, correct?

 5     A.    Yes.

 6     Q.    And so I think a question at this moment,

 7    because I feel like we're obviously getting to the

 8    moment where interference with public duties begins.

 9     A.    We met it.

10     Q.    Okay.  And so, given that you had just changed

11    your mind seconds before about the Texana women, why

12    wasn't it reasonable for Justin to believe that he

13    could keep talking to you to see if you would change

14    your mind about him, too?

15     A.    I told him to go across the street again.

16     Q.    But you didn't offer an explanation about why

17    the Texana women get to stay, and Justin had to leave,

18    correct?

19     A.    I did not.

20     Q.    And so why, at this moment when Justin is asking

21    about whether he gets to stay, too, or he still has to

22    go across the street, how did that cross the line of

23    becoming interference at that point?

24     A.    Because now he's making me turning my attention

25    and he's arguing.  Now he's instigating an arguing
```

Lieutenant Taylor Rollins

1    match with me, taking all my attention away from scene

2    security of the scene, and now I'm having to deal with

3    him, delaying everything and putting everybody's safety

4    in jeopardy.

5        Q.   Was it the tone of voice -- you said now he's

6    arguing with you --

7        A.   I think it's the totality of everything; from

8    the initial contact until the time of arrest.  It's

9    everything in between that pointed to me that he was

10   there to interrupt, to cause a scene, to make my job

11   more difficult, to pull me away from the safety,

12   securing the scene and making everybody as safe as

13   possible as I could, and I didn't have time for that,

14   and it was clear to me what his intentions were.

15       Q.   Did you say it was clear what his intention

16   were?

17       A.   It seemed clear to me, yes.

18       Q.   And, just to sum up, what was clear to you about

19   his intentions is that he was going to be disruptive and

20   distract you from what was going on?

21       A.   Yes.

22       Q.   In addition to Deputy Rodriguez, Deputy Lacy is

23   on the scene when you arrived; is that correct?

24       A.   Yes.

25       Q.   And were both dep -- Deputies Rodriguez and Lacy

1    under your supervisory control?

2        A.   Yes.  Deputy Lacy was actually a night shift

3    deputy.  I didn't even know he was there until I got

4    there and found out he was there, but he was kind of in

5    between.  I think he got hung over on his shift or

6    something, and ended up going out there.

7        Q.   But Deputy Rodriguez was working under your

8    supervision on that day?

9        A.   Yes.

10       Q.   Okay.  And is that the reason why you went out,

11   because Deputy Rodriguez was already there, and is

12   like:  Okay, one of the guys who I'm supervising is

13   on-scene at an incident.  I need to get out there.

14       A.   I needed to go, no matter what.  Those types of

15   scenes, the supervisor has to go to.

16       Q.   Would you -- if Deputy Rodriguez was, you know,

17   pulled someone over for speeding, that's not something

18   you have to show up to and supervise, is it?

19       A.   No.

20       Q.   Okay.  We mentioned before that kind of a common

21   thing that, you know, people do when they're in a

22   leadership role is to sometimes mentor the folks beneath

23   them on the org chart.  When you rolled up and Justin --

24   Justin was still out in the open standing there with the

25   Texana women, correct?

Lieutenant Taylor Rollins

```
1      A.    Yes.

2      Q.    Did you ever take Deputy Rodriguez aside -- and

3   I'm not talking, like, formal discipline, write him up

4   or anything like that, but did you take him aside after

5   and say, you know, when I rolled up, everybody was kind

6   of standing there.  You were taking cover behind the

7   semi trailer.  It would have been a better practice to

8   move people.

9      A.    I think so.  Sounds familiar I think we did talk

10  about his cover position.  I think when I got there --

11  I don't think he was standing behind the 18-wheeler.  I

12  can't remember, but I remember talking to him about his

13  cover telling him he could have gotten a better cover --

14     Q.    And did you talk to him about it was a best

15  practice to have let Justin and the other people

16  continue standing there while he was over in the cover

17  position?

18     A.    I can't give you -- it seems like we talked a

19  little bit about it, but I can't say for sure.

20     Q.    That's fine.  And did the sheriff talk to you

21  personally after the arrest about whether it was really

22  necessary to relocate Justin across the street?

23     A.    I haven't talked to the sheriff about this --

24  anything about it.

25     Q.    Not talking about formal discipline, did anybody
```

```
 1   above you in the chain of command contact you and

 2   question your decision to arrest Justin for

 3   interference that day?

 4       A.   No.

 5       Q.   Was there any sort of more formal review of the

 6   arrest that day that you participated in?

 7       A.   What -- define "a formal review" --

 8       Q.   Sure.  Sorry, that's -- that probably means a

 9   whole bunch of different things to a law enforcement

10   officer.  What I mean is:  Did anybody contact you and

11   say, "We are going to take a closer look at the

12   decision that day, and we want to get your side of the

13   story of what happened."

14       A.   I believe so.  I think so.

15       Q.   And --

16       A.   I remember getting a phone call from one of the

17   district attorney investigators -- I don't remember his

18   name -- asking me, hey, can you give me a quick synopsis

19   of what occurred?

20       Q.   Okay, and you've probably talked to district

21   attorneys before about different criminal cases, right?

22       A.   Yes.

23       Q.   So there wouldn't be anything unusual about a

24   district attorney contacting you to just discuss the

25   facts of an arrest for which there might be a potential
```

Lieutenant Taylor Rollins

```
 1  charge, correct?

 2     A.   Correct.

 3     Q.   So when the district attorney contacted you, it

 4  was just to get facts as the investigating officer.  It

 5  was not:  We think it's possible you did something

 6  wrong, then Sergeant Rollins.

 7     A.   Correct.  It wasn't a district attorney.  It was

 8  an investigator.

 9     Q.   Got it.  But someone from the district

10  attorney's office?

11     A.   Correct.

12     Q.   Did anybody ever counsel or mentor you by

13  saying:  Hey, Sergeant Rollins, not saying you were

14  wrong, but you could have de-escalated a little better

15  in that situation?

16     A.   No.

17     Q.   And I assume, then, that you weren't formally

18  disciplined for arresting Justin for interference that

19  day?

20     A.   No.

21     Q.   And, in fact, Justin was taken to criminal trial

22  on that charge?

23     A.   Correct.

24     Q.   Okay.  And do you know the outcome of that

25  trial?
```

 1     A.    The last I heard, it was a hung jury.

 2     Q.    It was like one voted to convict and then the

 3   rest voted to acquit, as I recall.

 4         So now we're sitting here in August 2023.  It's

 5   been a year and a half since the arrest, and, you know,

 6   having gone through the criminal trial, having a year

 7   and a half to reflect, watching the video, do you think

 8   it was a mistake to arrest Justin that day for

 9   interference?

10     A.    No.

11     Q.    Same thing; having gone through the trial and

12   having had time to reflect and look at the videos, even

13   if you don't think you made any mistakes, are there

14   things you wish you would have done differently in your

15   encounter?

16     A.    Yes.

17     Q.    Could you describe that?

18     A.    We didn't have body cam video -- cameras at the

19   time, and, and I wish that I would have been able to

20   review the evidence, which was his video, before I wrote

21   my PC statement.

22     Q.    Can you, for the record, tell us what a PC

23   statement is?

24     A.    Probable cause affidavit.

25     Q.    I remember that was an issue about the criminal

1    trial.  You were questioned about possible

2    discrepancies between the video and your PC affidavit,

3    correct?

4        A.    Correct.  It was bad wording in one sentence on

5    my part, and not that I was telling a lie.  It was just

6    what I remembered and what, actually, you see on the

7    video.

8        Q.    Yeah.  I mean, I'm not asking you questions

9    about that, because, if somebody -- you know, if

10   somebody told you to write down something that happened

11   yesterday, and I wrote it down and they showed me a

12   video of what happened, maybe there's going to be a few

13   details that are off?

14       A.    And it was the angle, too.

15       Q.    Okay.  And has -- sitting here today, has anyone

16   above you in the sheriff's department chain of command

17   given you any indication that your arrest of Justin

18   Pulliam that day for interference was inconsistent with

19   the policies of the sheriff's department?

20       A.    No.

21       Q.    So nobody said to you:  Sergeant Rollins, you

22   went rogue that day, and didn't discharge your duties

23   properly?

24       A.    No.

25       Q.    And besides wishing that you'd had the body

Lieutenant Taylor Rollins

```
 1   camera to be able to review a video prior to doing your
 2   probable cause affidavit, is there anything else that
 3   you would have done differently with respect to Justin
 4   Pulliam that day?
 5        A.   Not that I can think of.
 6        Q.   So one thing that's clear to me, sitting here
 7   now, and one thing that seemed clear from the video is
 8   that you seem to be calm and in control of your
 9   emotions during the encounter with Justin from start to
10   finish.  Would you say that's accurate?
11        A.   Yes.
12        Q.   Did you serve in Iraq?
13        A.   Yes.
14        Q.   And I sincerely appreciate your service.
15        A.   Thank you.
16        Q.   And so have you been in situations before that
17   involved live combat?
18        A.   Yes.
19        Q.   So you don't strike me this way at all:  You're
20   not the kind of man that goes to pieces under pressure.
21        A.   No, sir.
22        Q.   When you were having your encounter at the Kraft
23   residence, were you in a state of fear, secretly, that
24   might have compromised your professional judgment?
25        A.   No.
```

1    Q.   And the day of the arrest at the Kraft property,

2    did Justin's statements provoke you into a state of

3    anger that might have compromised your professional

4    judgment?

5    A.   No.

6    Q.   And at any point during your encounter with

7    Justin that day at the Kraft property, were you

8    concerned that Justin was going to physically attack you

9    and overpower you?

10   A.   No.

11   Q.   He's not a very big guy compared to you,

12   correct?  Or do you remember?

13   A.   I...

14   Q.   I mean, do -- do law enforcement officers

15   generally evaluate people for whether they present a

16   physical danger when they're around them?

17   A.   Sure.  I think most people do, even non-law

18   enforcement officers.

19   Q.   But if you walk up to someone that's like a

20   250-pound ripped guy with a Hell's Angels jacket on,

21   you're going to be a little bit more on-guard than if

22   you're talking to a little old lady, correct?

23   A.   Yes.

24   Q.   Makes sense.  Were your decisions that day at

25   the Kraft property deliberate and based on the facts as

Lieutenant Taylor Rollins

```
 1    you understood them at the time?

 2        A.    Yes.

 3        Q.    And when you allowed the Texana personnel to

 4    remain on the scene rather than relocate across the

 5    street, was that for what you continue to believe was a

 6    rational reason?

 7        A.    Yes.

 8        Q.    And the reason was that -- I'm sorry --

 9    actually, you know, I don't think I -- I know, because

10    we chatted about it earlier but the reason was that

11    they were crisis intervention team members who had a

12    previous relationship with Kraft, correct?

13        A.    Yes.

14        Q.    And so they could be useful to law enforcement

15    on the scene dealing with Kraft?

16        A.    Yes.  I was going to call out our crisis

17    negotiation team, and they routinely call out Texana

18    screeners to help them talk to the people on the phone.

19        Q.    So you didn't change your -- excuse me.  Let me

20    start again.  When you allowed the Texana personnel to

21    remain on the scene, you didn't do so because they made

22    you flustered or you thought that they would be angry at

23    you if you didn't let them go?

24        A.    No.

25        Q.    Why don't we take a break.  Like, we're through
```

```
1   13 of 17 pages, here -- maybe even more, and I just --
2   I want to go through the -- Justin's dash cam video --
3   not to ask too many questions about it, but just so we
4   can watch it and you can agree -- it's the same thing
5   but from a different perspective?
6      A.   Sure.
7           MR. ROWES:      We can take a break for
8   just ten minutes.
9              [Short recess was taken.]
10          COURT REPORTER:      Back on the record,
11  10:40.
12  BY MR. ROWES:
13     Q.   I appreciate your testimony, earlier, Lieutenant
14  Rollins, and, hopefully, we can wrap up really quickly.
15  I'd like to introduce Exhibit 3, which is a dash cam
16  video from Justin Pulliam's pickup truck.
17              [Exhibit 3 was marked.]
18  BY MR. ROWES:
19     Q.   This video doesn't have any audio, so I just
20  want to walk through it.
21          MR. ROWES:      Can you go the 4:00 to
22  4:15 in the video, or four minutes in the video, please,
23  Molly?  Could you go ahead and play till 4:50, please,
24  Molly?
25              [Clip was played.]
```

```
 1              MR. ROWES:      Okay, you can stop.

 2     Q.   So we just watched Exhibit 3 from the

 3   four-minute mark to 4:15, and I just wanted to ask you

 4   to confirm that the women who walk in from the right are

 5   the Texana employees, correct?

 6     A.   It looks like it, yes.

 7              MR. ROWES:   And can you go till 4:26,

 8   please, Molly?

 9     Q.   And so this is where you enter the scene from

10   the right and then the Texana women we can see now who

11   aren't in Justin's camera view are over by the car,

12   correct?

13     A.   Yes.

14     Q.   And you later determine that Edwin Kraft's

15   mother was in that car, correct?

16     A.   Yes.

17     Q.   And so you're rolling up and you see these three

18   civilians standing there, and you don't know who any of

19   those people are?

20     A.   Correct.

21     Q.   Okay.  And can you go until 4:35, please, Molly?

22              [Clip was played.]

23     Q.   Okay, and so this is the interaction we see

24   where you ask Justin to go across the street, and he

25   says, "so you can shoot him", and then you have the
```

Lieutenant Taylor Rollins

```
 1    "what's wrong with you, man", and then Justin turns

 2    around and starts complying with your order, correct?

 3    A.   Correct.

 4    Q.   So from this angle, we can see Justin hasn't

 5    committed the offense of interference yet; is that

 6    correct?

 7    A.   Correct.

 8         MR. ROWES:        And can you go till 4:40,

 9    Molly?

10         [Clip was played.]

11    Q.   Okay, and so this is the point when the Texana

12    women start to explain to you that they're from Texana

13    and believe that they should haven't to go across the

14    street, correct?

15    A.   Well, they just told me that they're from

16    Texana.  I don't know if they believed they didn't need

17    to go, but they just told me who they were.

18    Q.   So they thought it was relevant information for

19    you, and then you made the decision to say you guys are

20    part of the scene; why don't you just stay here?

21    A.   Correct.

22    Q.   And where we paused at 4:40, I think, as we

23    discussed earlier, the Texana personnel are not

24    committing interference at this point by talking to you,

25    correct?
```

Lieutenant Taylor Rollins

1    A.    Once I told them, "I need y'all to stay over

2    here", then they knew they weren't going across the

3    street.

4    Q.    But the mere act of them having this

5    conversation with you wasn't interference, was it?

6    A.    No, it was all ongoing, but, you know.

7    Q.    Because part of your job as an incident

8    commander is to kind of gather the information about

9    what's going on at the scene; is that correct?

10   A.    Yes.

11            MR. ROWES:        Can we -- hang on a sec,

12   Molly.  Can you just play through to the end of where

13   Justin gets arrested, please, Molly?

14            [Clip was played.]

15   Q.    Okay, you can stop there.  Lieutenant Rollins,

16   you testified earlier when we were watching Exhibit 2

17   the other video, that you didn't believe you made a

18   mistake in arresting Justin for interference at this

19   point, correct?

20   A.    Correct.

21   Q.    And is there anything about seeing the incident

22   from this new perspective that would cause you to change

23   your mind and believe that you might have made a mistake

24   in arresting Justin?

25   A.    No.

Lieutenant Taylor Rollins

1    Q.   If Justin had actually, as you were counting

2    down 4, 3, 2, 1, if he had turned around and skedaddled

3    across the street, would have you have arrested him at

4    that point, or was it because he was still standing

5    there filming you?

6    A.   I would have not arrested him.

7           MR. ROWES:      Molly, can we keep playing

8    to where Lieutenant Rollins leads Justin off, which

9    might be like 4:15 or 4:20 -- I'm sorry, 5:20, or

10   something like that.

11          [Clip was played.]

12          MR. ROWES:      Okay, you can stop, Molly.

13   Q.   And so the whole time you're arresting Justin,

14   the Texana women just continued to stand there, correct?

15   A.   Correct.

16   Q.   And when you were leading Justin off to the

17   side, you didn't say anything to the Texana women about

18   taking immediate cover, did you?

19   A.   Did not.

20   Q.   And you walked away with Justin calmly, correct?

21   A.   Yes.

22   Q.   And Justin wasn't resisting, was he?

23   A.   No.

24   Q.   Do the Texana -- I mean, I don't think I see it

25   but do the Texana women wear vests?  Do they have them?

```
 1     A.   The screeners that ride with us have a vest,

 2   yes.

 3     Q.   And do you know whether these women had one or

 4   on or not?

 5     A.   I do not.

 6     Q.   I think you answered this, but when you were

 7   speaking to the Texana personnel, you had told them to

 8   relocate over to -- somewhere off to the side by the

 9   other sheriff's county vehicles, right?

10     A.   Correct.

11     Q.   I said "sheriff's county", but I mean the

12   sheriff's department.

13     A.   Correct.

14     Q.   But they're not immediately complying with that

15   order in standing there, are they?

16     A.   They're not, and I'm not -- I had my attention

17   directed elsewhere because of Mr. Pulliam.

18     Q.   I understand.  Do the -- in your experience with

19   the Texana screeners working with someone in a mental

20   health crisis, is it a priority to protect the safety of

21   the Texana people?

22     A.   It's part of the responsibility.  I mean, it's

23   not top tier on the list, but it is part of it.

24     Q.   And would there ever be a situation where law

25   enforcement -- let's think back to your S.W.A.T. thing.
```

```
 1   So you're actually dealing with someone who's verifiably

 2   dangerous, someone who's armed.  Would it ever be

 3   protocol to say to the screener, "Listen, we need to

 4   negotiate with this guy.  We think you're the one to do

 5   it, but there's a good chance you're going to get shot,

 6   but we need you to go up there and talk to him,

 7   anyway."

 8      A.   No.  We don't do it that way.  We use a

 9   telephone.

10      Q.   I see.  So it wouldn't be protocol to put a

11   Texana person into the line of fire?

12      A.   No.

13              MR. ROWES:  Can we move on, Molly, to the

14   last exhibit, which I just wanted to look at a couple of

15   excerpts from Deputy Rodriguez's dash cam.

16         You can pause it --

17              MR. HEDGES:     Is this going to be 4?

18              MR. ROWES:     I'm sorry, it is.  I'd

19   like to introduce as Exhibit 4 Deputy Rodriguez's dash

20   cam.

21                 [Exhibit 4 was marked.]

22              MR. ROWES:     If you can go to 16:10,

23   Molly.

24                 [Clip was played.]

25   BY MR. ROWES:
```

Lieutenant Taylor Rollins

```
 1     Q.    And, Lieutenant Rollins, you put Justin Pulliam
 2   into Deputy Rodriguez's vehicle, correct?
 3     A.    Yes.  My backseat was full of stuff.  I don't --
 4   as a supervisor, I don't normally put people in my
 5   backseat.
 6     Q.    And so when someone's arrested, are they always
 7   put into a vehicle just to kind of make sure they don't
 8   run away or something?
 9     A.    Yes.
10     Q.    And can you go ahead and play till about 16 --
11   and can you actually turn up the sound, Molly -- there,
12   it's all the way up.
13          Okay, so I think this is just -- basically, what
14   I want to do is make sure it's your voice who's
15   talking.  I think you say to Justin, like, "Do you have
16   any weapons", and stuff like that.
17          Can you go ahead, Molly?
18                    [Clip was played.]
19     Q.    So when you -- you put Justin in the -- you took
20   his camera off at some point, and you put it on the hood
21   of the car; is that correct?
22     A.    Yes.
23     Q.    And was that -- I think we heard Deputy
24   Rodriguez talking over the radio, but the person who
25   wasn't talking over the radio, that was you, correct?
```

1    A.    That -- right.  Say that again.

2    Q.    Yeah, sorry.  I realized in watching the video

3    now that there was a moment in which you can see

4    Rodriguez talking to his radio, and it sounds like his

5    voice comes over the radio in the car.

6    A.    Yes.

7    Q.    But then there's also a man who is speaking, who

8    is in person, not over the radio, and I believe that

9    that's you talking to Justin?

10    A.    Correct.

11    Q.    And Justin says, "I'm not going to answer any

12    questions", "I want to talk to a lawyer", that kind of

13    thing, right?

14    A.    Correct.

15              MR. ROWES:        Can you go back to

16    16:35, please, Molly.

17          And I just want to watch it.  You can see -- just

18    to see that the Texana personnel walk in from the right

19    and cross off to the left.  Can you play --

20                  [Clip was played.]

21    BY MR. ROWES:

22    Q.    So the two women that we saw walk through the

23    frame of the camera, those were the Texana screeners,

24    correct?

25    A.    Correct.

1    Q.    And, at this point, while you're processing

2    Justin's arrest and putting him in the vehicle, they're

3    obviously not over in the cover, correct?

4    A.    Correct.

5    Q.    And it looked to me like they were walking from

6    right to left, kind of back towards where the -- Edwin

7    Kraft's mother's vehicle was; is that correct?

8    A.    It looked like it.

9    Q.    Yeah.  Do you recall saying anything to the

10   Texana personnel as they walked by?

11   A.    I don't even remember seeing them.  I was

12   dealing with Justin.

13   Q.    Kind of focused on Justin?

14   A.    Uh-huh.

15   Q.    Had you -- in the process of dealing with

16   Justin, had you said to either of the other sheriff's

17   office employees who were present on the scene to get

18   the Texana women into cover?

19   A.    No.  I don't believe I did.  Honestly, I don't

20   even -- I thought they walked over there.  I don't

21   remember seeing them standing around.

22          MR. ROWES:        Can you play to 17:24,

23   Molly.  Actually, can you stop there, Molly?

24   Q.    So this looks like a shadow of Jus -- I think

25   the camera Justin had around his neck; is that correct?

```
 1    Were you were just putting it on the hood or something?

 2       A.   Possibly.

 3       Q.   Okay.

 4            MR. ROWES:       It's not a big deal.  Okay,

 5    could you keep going, Molly, to 17:24.

 6                  [Clip was played.]

 7    BY MR. ROWES:

 8       Q.   So then you walk from left to right, and where

 9    are you going at this point?

10       A.   I don't know.  I don't remember this.

11            MR. ROWES:       Okay.  And then can you

12    back it up like two or three seconds, Molly, and then

13    play it till 17:36.

14                  [Clip was played.]

15       Q.   You can stop.

16            Okay, so Rodriguez, sounds like he asks you if

17    you want the mom to go, who is in the vehicle.  Did you

18    know that the mom was in the vehicle at that point?  Do

19    you know?

20       A.   I didn't.  I don't -- it gets kind of foggy

21    right there.  I thought -- I remember somebody telling

22    me, but I think maybe that's when I was told the mom was

23    there.

24       Q.   So it -- like when you were ordering people to

25    go across the street -- I just want to make sure we're
```

 1    a hundred percent clear.  When you were ordering people

 2    to go across the street when you first rolled up, you

 3    were really just talking to the Texana -- who you would

 4    later find out to be the Texana personnel and Justin,

 5    correct?  The mom wasn't visible to you?

 6    A.    I don't believe -- I believe you're correct.

 7    Q.    Her car was there.  I think she was in the car

 8    and the windows were tinted.

 9    A.    I think so.

10    Q.    Yeah.  So we just saw you walk -- when you

11    talked to Deputy Rodriguez and let him know that the

12    women were from Texana and you were walking over in

13    that direction, do you remember what happened after you

14    walked over in the direction of where the Texana women

15    were?

16    A.    I think, at that point, I told them they needed

17    to go on the side of the building where I initially told

18    them to go.

19    Q.    And did you talk to Mrs. Kraft at that point?

20    A.    I think I did.

21    Q.    What do you remember talking to her about, if

22    anything?

23    A.    I think I briefly asked her, you know -- god,

24    it's been so long.  I think I asked her who she was, she

25    told me she was his mom, and I think I asked her if he

1    had -- if he had any weapons or not.

2        Q.   So this is all part of your process of trying to

3    figure out what the facts are?

4        A.   Correct.

5                MR. ROWES:        Molly, can you go up to

6    about 3015.

7                    [Clip was played.]

8        Q.   SO there's JUST a whole lot of Justin sitting in

9    the car and we watch Deputy Rodriguez kind of warming

10   up.

11                   [Clip was played.]

12       Q.   So we heard a male voice say to Deputy Rodriguez

13   "Can you move your car back?"  Was that you talking to

14   him?

15       A.   Yeah.  I remember, at this point, I realized

16   that his car was not -- it was on the side of the

17   building, but it was still kind of protruding out, and

18   now that  we had Justin in the car, I needed to make

19   sure that it was in a much better position, so I told

20   him to back it up a little bit more.

21       Q.   I see.  So we can see the house is kind of in

22   the background; so, in theory, that's not in a great

23   spot, right?

24       A.   Right.  From the backseat, it's a little bit

25   better, but it wasn't good enough.

```
 1     Q.   And the windows of police cars aren't
 2  bulletproof glass, are they?
 3     A.   No.
 4     Q.   Okay, I would like to thank you for your candor
 5  this morning, and I'll pass the witness to Mr. Hedges if
 6  you have any questions.
 7               MR. HEDGES:      We'll reserve ours till
 8  time of trial.
 9               COURT REPORTER:  Off the record, 11
10  o'clock.
11               MR. ROWES:       Do you want to do the read
12  and sign?
13               MR. HEDGES:      Yes, we do want to read
14  and sign.
15               COURT REPORTER:  And a copy?
16               MR. HEDGES:      Yes.
17               [Deposition was concluded 11:00 a.m.]
18
19
20
21
22
23
24
25
```

1                    REPORTER CERTIFICATION

2        ORAL DEPOSITION of TAYLOR ROLLINS, taken on August

3     10, 2023.

4        I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify

5     to the following:

6        That the witness, TAYLOR ROLLINS, was duly sworn by

7     me, and that the transcript of the deposition is a true

8     record of the testimony given by the witness;

9        That examination and signature of the witness to the

10    deposition transcript was reserved by the witness at the

11    time of the deposition;

12       I further certify that I am neither counsel for,

13    related to, nor employed by any of the parties in the

14    action in which this proceeding was taken, and, further,

15    that I am not financially or otherwise interested in the

16    outcome of this action.

17       Certified by me on this 23rd day of August, 2023.

18

19

20            Sarah B. Townsley CRR CCR CSR RPR

21            Certified Realtime Reporter

22            TX CSR #5746; LA CCR #92016; RPR 814558

23

24

25