# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT 4

```
 1                UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   JUSTIN PULLIAM,

 4      Plaintiff,

 5   v.                      Civil Action No. 4:22-cv-4210

 6   COUNTY OF FORT BEND, TEXAS;
     SHERIFF ERIC FAGAN, in his
 7   Individual capacity; OFFICER ROBERT
     HARTFIELD, in his individual capacity;
 8   OFFICER JONATHAN GARCIA, in his
     Individual capacity; OFFICER TAYLOR
 9   ROLLINS, in his individual capacity;
     And OFFICER RICKY RODRIGUEZ, in
10   His individual capacity,

11      Defendants.

12

13                     ORAL DEPOSITION

14                          OF

15                     RICKY RODRIGUEZ

16

17                  Taken at the Offices of
                  Fort Bend County Attorney
               401 Jackson St., 3rd Floor Conference
18                      Richmond, Texas

19

20   August 11, 2023                         9:02 a.m.

21

22

23

24

25
```

Ricky Rodriguez

```
 1   APPEARANCES:

 2   FOR PLAINTIFFS:

 3                       INSTITUTE FOR JUSTICE
                         816 Congress Ave., Suite 960
 4                       Austin, TX  78701
                         By: Christen Mason Hebert
 5                            CHebert@IJ.org
                              Jeff Rowes
 6                            JRowes@IJ.org

 7   FOR DEFENDANTS:

 8                       Kevin Hedges
                         Assistant County Attorney
 9                       Litigation Division
                         401 Jackson Street
10                       3rd Floor
                         Richmond, TX  77469
11                       Kevin.Hedges@FBCtx.gov

12

13   ALSO PRESENT:      Molly Hanis

14   REPORTED BY:       Sarah B. Townsley, CSR, CRR, RPR

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        STIPULATIONS

 2        IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR

 3   THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF RICKY

 4   RODRIGUEZ WAS TAKEN BEFORE SARAH B. TOWNSLEY, CRR, CCR,

 5   CSR, RPR, CERTIFIED REALTIME REPORTER IN AND FOR THE

 6   STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE AND IN

 7   ACCORDANCE WITH THE FEDERAL RULES OF CIVIL PROCEDURE AS

 8   PROVIDED BY LAW, AT THE COUNTY ATTORNEY'S OFFICE, 401

 9   JACKSON STREET, 3RD FLOOR, RICHMOND, TEXAS, ON AUGUST

10   11, 2023, AT 9:03 A.M.;

11        THE PARTIES HEREBY WAIVE ALL FORMALITIES IN

12   CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE

13   EXCEPTION OF THE SWEARING OF THE WITNESS AND THE

14   REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;

15        THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED

16   TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;

17        COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT

18   AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE

19   ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND

20   THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE

21   TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF

22   MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF

23   THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;

24        SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN

25   ADMINISTERING THE OATH TO THE WITNESS.
```

Ricky Rodriguez

```
1                         INDEX

2    EXAMINATION BY                        PAGE NO.

3    Ms. Hebert                               5

4

5                        EXHIBITS

6    NO.    DESCRIPTION                     PAGE NO.

7    1      deposition notice                 9

8    2      video footage (dash cam)         36

9    3      Google Maps image               55

10   4      Google Maps image               55

11   5      Google Maps image               56

12   6      offense report                  57

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ricky Rodriguez

```
 1   PROCEEDINGS:

 2                     RICKY RODRIGUEZ,

 3   having been first duly sworn by the court reporter,

 4   testified on oath as follows:

 5                     COURT REPORTER:   We're on the record at

 6   9:02 a.m.

 7                     [Witness was sworn.]

 8   EXAMINATION BY MS. HEBERT:

 9     Q.   Good morning, I'm Christie Hebert.  As you know,

10   I represent the plaintiff, Justin Pulliam, in this case,

11   and you just had the court reporter -- this is Sarah.

12   She swore you in -- I'll just quickly introduce

13   everybody.  I know you shook hands, but just so you

14   know, we're on the record.  This is my colleague, Jeff,

15   this is my colleague, Molly, and you're familiar with

16   Kevin Hedges, who is your attorney today.

17             We'll do the usual kind of stipulations, here.

18   By being here today, you have notice, you've been here,

19   and you don't have any objections to notice and you

20   don't have any objections to Sarah's qualifications to

21   be our court reporter today.  Would you mind, for the

22   record, stating your full name?

23     A.   Ricky Rodriguez.

24     Q.   And is your first name "Richard", but you go by

25   "Ricky" --
```

Ricky Rodriguez

```
 1      A.    No.  That's my legal name.

 2      Q.    And you're a deputy today.  You didn't get

 3   promoted from 2021 to today?  You're still a deputy?

 4      A.    I'm still a deputy.

 5      Q.    I just want to make sure I address you

 6   correctly.

 7      A.    Yes, ma'am.

 8      Q.    And before we kind of get into any, like,

 9   substantive matters, I want to go over some general

10   housekeeping.  I understand that you testified in Justin

11   Pulliam's criminal trial previously, so you've testified

12   under oath before?

13      A.    Correct.

14      Q.    Have you ever done a deposition before?

15      A.    No.

16      Q.    And so you understand that, today, you're under

17   oath, and that's the same as if you were testifying in a

18   courtroom before a judge?

19      A.    Correct.

20      Q.    And that means you're sworn to tell the truth,

21   you're under oath, all those things; you understand

22   that?

23      A.    Yes.

24      Q.    So one thing that might be a little bit

25   different with a criminal trial is, it's really
```

```
 1   important during a deposition to have a clear record,
 2   and so that means I need to ask clear questions, and you
 3   need to have clear responses, so things like nodding
 4   your head, or shaking your head, or saying "uh-huh" or
 5   "uh-uh" aren't going to be clear on the record, so
 6   we'll just need you to say "yes" or "no" and clearly
 7   state your answer.  If you don't understand a question,
 8   please speak up, let me know, and I can rephrase or ask
 9   the court reporter to read it back, to make sure that
10   there's clarity for you.
11        Also, I would ask that, before I finish asking a
12   question, you let me get to the end of the question, and
13   then answer it, rather than kind of jumping in in the
14   middle.  You might know where it's going and then say,
15   "Okay, I'm going to just start answering it", so we'll
16   try to not step on each other, because that makes
17   Sarah's job pretty difficult.
18      A.   Okay.
19      Q.   And then if you don't know the answer to the
20   question, it's okay to say "I don't know", but if you do
21   know the answer to the question, then, obviously, it's
22   truthful to give the answer.
23        Mr. Hedges, who represents the county, has
24   probably heard this now I don't know how many times,
25   but he may state an objection after I ask a question,
```

```
 1   but that doesn't necessarily mean I've asked a bad

 2   question.  Mr. Hedges is just preserving the right to

 3   say that the question doesn't follow the rules of

 4   evidence later, before a judge, and you still generally

 5   have to answer the question, unless Mr. Hedges says, "I

 6   instruct you not to answer the question."  If you need

 7   to take a break or take a drink, that's fine.  I would

 8   just ask that you try to finish answering a question

 9   before taking a break, so we don't, like, take a break

10   in the middle of your answer, is there any reason today

11   why you wouldn't be able to give your fullest and best

12   testimony, such as you're taking an impairing medication

13   or something like that?

14       A.   No.

15       Q.   And we're going to look at some documents today.

16   You have the right to review the entirety of the

17   document before you answer any questions about the

18   document.  We're also going to look at some video clips

19   today, and, to save time, I've identified relevant

20   portions, timestamps.  There's clips of the video to

21   look at, but if -- it is your right to watch the

22   entirety of the video.  Some of them are rather long.

23   I'm just trying to save time.  I'm not trying to trick

24   you, and it's your right to say, hey, I want to watch

25   more, or, I want to watch the entirety with Mr. Hedges;
```

Ricky Rodriguez

```
 1    you understand that?
 2        A.    Yes.
 3        Q.    I like to show you an exhibit.  Molly, would you
 4    mind handing Deputy Rodriguez the first exhibit?
 5                    [Exhibit 1 was marked.]
 6        Q.    Molly's handing you what is marked Exhibit 1,
 7    and I'll represent to you this is your deposition notice
 8    for today.  Have you seen this notice before?
 9        A.    Yes.
10        Q.    And did you do anything to prepare for today's
11    deposition?
12        A.    Yes.
13        Q.    What did you do to prepare?
14        A.    Met with my attorney.
15        Q.    Okay, and you can generally assume that I'm not
16    looking to ask you questions about what Mr. Hedges said
17    to you, or invade any of the attorney-client privilege
18    that you have with Mr. Hedges, so other than talking
19    with Mr. Hedges, what did you do to prepare for today's
20    deposition?
21        A.    I reviewed the case itself, in question.
22        Q.    Excuse me?
23        A.    The case -- I reviewed the case that we're all
24    here to talk about.
25        Q.    Okay, when you reviewed the case, what do you
```

Ricky Rodriguez

1    mean by that?

2        A.    I pulled the report, the incident report, viewed

3    the video that we had access to, and that's it.

4        Q.    So can you help me understand what video you had

5    access to?

6        A.    Our own body -- well, at the time, we didn't

7    have body cam.  We had dash cam video and audio.

8        Q.    Okay, so you reviewed some dash cam.  What dash

9    cam video are --

10       A.    My own.

11       Q.    Your own dash cam video; any other dash cam

12   video that you reviewed?

13       A.    No.

14       Q.    Did you discuss the deposition with anyone

15   besides Mr. Hedges?

16       A.    No.

17       Q.    Did you discuss Mr. -- Sheriff Fagan's

18   deposition with him?

19       A.    No.

20       Q.    Did you discuss anything with Lieutenant

21   Rollins?

22       A.    No.

23       Q.    And how about Detective Hartfield?

24       A.    No.

25       Q.    Did you bring any documents with you to --

Ricky Rodriguez

```
1     A.   No.

2     Q.   -- today's deposition?

3          MR. HEDGES:    Not related to the

4    deposition.  I think he's got his work notebook.

5    BY MS. HEDGES:

6     Q.   Oh, that's fine.  Sheriff Fagan brought his

7    newspaper in.  That was fine, too.  We're going to talk

8    a lot about the Fort Bend County Sheriff's Office today.

9    Can we generally agree that, when I say "Sheriff's

10   Office", I'm referring to the Fort Bend County Sheriff's

11   Office?

12    A.   Yes.

13    Q.   And when I say -- if we talk about "Sheriff",

14   Eric Fagan of Fort Bend County Sheriff's Office, I'm

15   referring to.  If I say "sheriff", I'm referring to

16   Sheriff Eric Fagan of the Fort Bend County Sheriff's

17   Office; can we agree to that?

18    A.   Okay.

19    Q.   I just want to walk through some personal

20   background stuff for you.  How long have you been with

21   the Sheriff's Office?

22    A.   For eight years.

23    Q.   For eight years.  And what was your position in

24   December of 2021?

25    A.   I was a deputy; patrol deputy.
```

Ricky Rodriguez

```
 1    Q.    And who were your superiors at that time in the

 2   chain of command?

 3    A.    It's really hard to say, because we have a

 4   change of sergeants.  Probably every six months, we have

 5   different ones come in, and some leave and promote, so

 6   all I remember is Sergeant Rollins at the time.

 7    Q.    Okay.  And have you worked for any law

 8   enforcement agencies other than the Sheriff's Office?

 9    A.    No.

10    Q.    And as someone who's generally unfamiliar with

11   law enforcement, what are the responsibilities of a

12   patrol deputy?

13    A.    First and foremost, we answer calls for service.

14   When the public calls in and requests help with an

15   investigation or to notify of a criminal offense, we go

16   out and investigate and generate reports, preliminary

17   reports.

18    Q.    Okay.

19    A.    Besides that, there are, obviously, the other

20   laws.  As we're out there, we're enforcing traffic law,

21   we're be observant of any possible criminal offenses

22   that are occurring in front of us, and then just your

23   meeting with the public and just sustaining just a

24   general -- relationships with the public.

25    Q.    Thank you.  A couple of follow-up questions.
```

Ricky Rodriguez

```
 1   Sounds like you have to be familiar with a lot of laws;

 2   is that correct?

 3       A.    Yes.

 4       Q.    So how do you stay up-to-date on all the laws

 5   that you have to enforce?

 6       A.    Well, we have continuing education, and from

 7   time to time, we do have to reference books or our hand

 8   guides to confirm, you know, the elements of a crime.

 9       Q.    Okay.  And you talked a little bit about

10   interacting with the public.

11       A.    Uh-huh.

12       Q.    Can you tell me a little more about that?  What

13   are you trained to do in terms of interacting with the

14   public?

15       A.    Well, in our general area where we get assigned,

16   we're asked to stop in in businesses, talk to the clerk

17   or manager, ask them if they've got any issues, if

18   they've had any issues lately.  Talk to them about

19   what's been going on.  If you're just in a store taking

20   a break, you can conversate with a civilian, themselves,

21   so it's just a matter of being personable with people.

22       Q.    And what does that mean -- when you interact

23   with citizens, let's say in a traffic stop, what are

24   your kind of goals there?

25       A.    With a traffic stop, it's just stopping them
```

Ricky Rodriguez

```
 1    because of the infraction, and letting them know -- at
 2    that point, we have discretion whether to give them a
 3    citation to enforce the infraction, or a warning, and
 4    so that whole interaction is supposed to be positive,
 5    so, that way, they leave there, going, okay, well, let's
 6    not speed twenty miles an hour over the speed limit.
 7        Q.   So would it be fair to say, then, that every
 8    interaction you where have with civilians, you're
 9    trying to leave it with a positive impression, if you
10    can?
11        A.   Yes.
12        Q.   I want to talk a little bit about just some
13    general practices and training.  Let's talk about some
14    crime incident scene procedures specifically with a
15    potential shooter.  If an officer were the first officer
16    on the scene with a potential shooter, what would that
17    officer do?  What would be the steps that an officer
18    would be expected to take?
19        A.   Well, it just depends.  If the shooter -- if
20    it's a potential shooter, that means they haven't shot
21    off any rounds yet, and they're in a location, so the
22    first thing is to keep them there, keep an eye on them,
23    try to make contact with them, if they can, and, if at
24    all possible, make the scene safe for the civilians, and
25    then give information over the radio for each additional
```

Ricky Rodriguez

```
 1   unit that's coming in -- each additional deputy that's

 2   coming in to let them what's going on, so they know what

 3   to be expecting.

 4       Q.   Sorry.  I didn't mean to interrupt you, there.

 5       A.   Uh-huh.

 6       Q.   Okay, to follow up on some of the stuff, sounds

 7   like the first scene is to kind of figure out where the

 8   shooter is.  How do you do that?

 9       A.   Well, based on -- if we had a call, if somebody

10   that knows more information, we may talk to them over

11   the phone or whatever information they gave to us

12   preliminary, we'll go off of that and just look for this

13   person.

14       Q.   Okay.  And then I think the second step you

15   talked about was making sure the scene was safe and any

16   civilians were safe.  How do you do that?

17       A.   Anyone that may be in an area that may be

18   unsafe, according to the deputy's perception, you ask

19   them to leave, get out of the area.

20       Q.   And where do you generally tell them to go?  You

21   just tell them to leave?

22       A.   Just to leave, yeah.  And it's just a

23   case-by-case scenario because sometimes you're in a

24   neighborhood where residents are twenty feet apart.  You

25   have them shelter-in-place and don't come out, or if
```

Ricky Rodriguez

1    it's an open area, then you tell people to not come --

2    just keep going, keep driving.

3        Q.    And then you talked a little bit about radioing

4    back.  What information do you try to relay?  How does

5    that interaction go?

6        A.    First, it's going to be where your location is,

7    where the subject's location is, a description of them,

8    and what other imperative information.  Do they have --

9    do you think they have a pistol or a handgun, or

10   shotgun, rifle?  All that is radioed out so, that way,

11   each additional officer coming in knows what to expect.

12   How far out do we need to be?  If he has a rifle, we

13   need to be out a bit further.  If he just has a handgun,

14   then we can maybe close in a little bit and take shelter

15   behind our patrol cars, so, like I said, it's an

16   evolving thing that happens within seconds.

17       Q.    Thank you.  We talked a little bit about

18   civilians, and making sure the location was safe.  Would

19   there be any situation where an officer decided that a

20   civilian should remain in an unsafe location?  Let's

21   say, for instance, if the civilian were injured?

22       A.    So you're asking if there's a reason why?

23       Q.    (Ms. Hebert nods head.)

24       A.    If there's a good reason why.  If we're tied up

25   with something more important, but if it's a injured

Ricky Rodriguez

```
 1   civilian, you know, we try to get them out and get

 2   medical attention to them.

 3       Q.   Okay, so, unless there were another situation

 4   that were more important --

 5       A.   Something more pressing.

 6       Q.   Something more pressing, you would generally try

 7   to get the civilians out of the unsafe location, kind of

 8   first?

 9       A.   Uh-huh.

10       Q.   Would you mind saying --

11       A.   Yes.

12       Q.   Let me back up and say that again.  So if there

13   were any situation -- unless there was something more

14   pressing, the first step an officer would take would be

15   to try to get the civilians to a safe location?

16       A.   Correct.

17       Q.   If an officer had to wait to see what was

18   happening with a potential shooter -- let's say you

19   radioed for backup, or you didn't know exactly where

20   the shooter was, or might be, or you're just kind of

21   waiting for the situation to diffuse, would that officer

22   try to stay behind cover?  We talked a little bit about

23   that, but what does "cover" look like?

24       A.   Yes.  So if we do know that the person we're

25   dealing with is armed, yes, we would want to stay behind
```

Ricky Rodriguez

1    cover, so that's something that's going to be hard

2    enough to where it would give us a protection, and then

3    also concealment, so it'll give us a little bit of

4    concealment from the person that we're trying to take

5    into custody.

6        Q.    Okay.  And it seems like the officer would try

7    to keep eyes -- like of some kind of cover that allows

8    them to keep eyes on where the shooter might be?

9        A.    Correct.

10       Q.    And let's change that situation a little bit.

11   Can you walk me through what an officer who arrives

12   second on the scene, the steps that he or she might

13   take?  So when one someone's already there and an

14   officer comes to the scene second, what steps would that

15   officer take?

16       A.    It's going to be dependent on the first officer,

17   because the policy says that the first officer on scene

18   will assume scene commander, and so they have more

19   information most of the time, and they will give orders,

20   and so -- and, obviously, that depends on the second

21   officer, third officer, what they agree with if it's not

22   safe.  So they'll confer with the other officers or the

23   deputies, and determine what the next course of action

24   is and then most of the time, if it's a person that's

25   inside of a building, they're just going to keep watch

```
 1    of that building and make sure they don't come out, and

 2    only engage if that person starts shooting.

 3        Q.   So the first or second or third officer comes on

 4    the scene, they get the update, kind of what's going on

 5    on the ground from the first officer?

 6        A.   Uh-huh.

 7        Q.   If the second officer thinks the first officer

 8    might need to change something or make a decision,

 9    they're going to say that?

10        A.   Right.

11        Q.   Kind of have a conference?

12        A.   Right.

13        Q.   And then kind of take steps of what's

14    appropriate, depending on the situation.  Is that a fair

15    summary?

16        A.   That's fair.

17        Q.   Now, you talked a little bit about a scene

18    commander.  Can you tell me what are the

19    responsibilities of a scene commander?

20        A.   Well, a scene that is something like this, or

21    even more complex, or -- that's going to be the first

22    officer, like I said, deputy that's on the scene that

23    has most of the information.  They'll start giving

24    orders, directing people where they need them, because

25    most of us understand a little bit, that we've already
```

Ricky Rodriguez

```
 1   had some experience so something like this, we might
 2   tell the deputy to set up on the north side of the
 3   building, and another one on the south side and one on
 4   the west.  That's what a scene commander does until the
 5   higher-rank officer comes on, and we pass that off.
 6       Q.   So when the more senior officer comes on the
 7   scene, they get promoted to the scene commander --
 8       A.   So what I'm referring to is the sergeant or
 9   lieutenant.  Those are obviously higher-rank so, once
10   they get there, they assume scene commander, but it's
11   kind of silly to hear a deputy being scene commander,
12   but you have to -- somebody has to call the shots, and
13   be active in putting out information over the radio --
14       Q.   And, presumably, the first person on the scene
15   --
16       A.   That's usually the first person.
17       Q.   -- has the most information?
18       A.   Uh-huh.
19       Q.   I want to ask a couple of general questions
20   about setting up a perimeter.  We hear about setting up
21   a perimeter on TV, but what does that really mean?
22       A.   So a perimeter would be something wide enough
23   around the area we're trying to set, so, that way, we
24   can, one, keep a safe distance; two, keep an eye on what
25   we're trying to keep an eye on, and that's really what a
```

Ricky Rodriguez

1    perimeter would be and then, also, keeping people out of

2    the area.

3        Q.    Okay, and how do you decide when a perimeter is

4    needed?

5        A.    It's just -- it's going to depend on -- a

6    subject with a weapon that would be -- would require

7    one.  A criminal that is -- that we're trying to

8    capture, so these are just some examples of why we would

9    need a perimeter.

10       Q.    Or maybe if there's, like, a crime scene that --

11       A.    Correct.

12       Q.    -- been already committed?

13       A.    Uh-huh.

14       Q.    And how do you determine where the perimeter

15   should be located?

16       A.    It's -- one, it's going to be how much distance

17   do we need for it to be safe, and reasonable, like,

18   based on how many officers or units that we have, can we

19   do that with, so the more that we have, the better

20   perimeter we can create.

21       Q.    I think sometimes we conventionally think of the

22   police barrier tape of "do not cross" as like, the

23   quintessential barrier, but when you don't have barrier

24   tape, what do you use to demark where the perimeter is?

25       A.    Most of the time, if we have the -- the ability

Ricky Rodriguez

```
 1    and safely do it, we're going to mark off with crime
 2    scene tape.  Obviously, if we we have a crime scene,
 3    we're trying to preserve evidence, keep people from
 4    coming in and out in that area, so we're going to mark
 5    it off and we'll do that, but if it's an active scene
 6    that's evolving, we don't have time to do that, and so
 7    we'll just have to, with our units, using a deputy in
 8    that area to mark it off.
 9        Q.   So I want to break that down a little bit.
10    "With our units", do you mean patrol --
11        A.   Patrol deputies.
12        Q.   Patrol deputies.  So you use the people that you
13    have to, say --
14        A.   Correct.
15        Q.   -- this is the barrier?
16        A.   Correct.
17        Q.   I want to talk a little bit about the training
18    that you receive on filming the police.  Where did you
19    attend the academy?  With the Sheriff's Office?
20        A.   With Gus George Law Enforcement Academy.
21        Q.   But not the Fort Bend County Sheriff's Office
22    Academy?  That's a different county's police academy --
23        A.   So this is the academy that the county has.
24    It's under the control of the sheriff's office, but it's
25    open for anyone to --
```

Ricky Rodriguez

```
 1     Q.    Okay, so you just said something like "Gustav"

 2  or --

 3     A.    Gus George.

 4     Q.    Gus George?  And that's just the name --

 5     A.    That's the name of the academy.

 6     Q.    So Gus George is the name of the police academy

 7  for Fort Bend County?

 8     A.    Yes.

 9     Q.    And, at academy, did you receive any training

10  about how to interact with the media?

11     A.    Not that I recall.

12     Q.    While you've been at the sheriff's office for

13  the past eight years, have you received any training on

14  how to interact with the media?

15     A.    The only thing we have to govern that is

16  Sheriff's Office policy on media; restricting us from

17  speaking with the media, keeping them -- advising

18  supervisors that they're there, so, that way, the

19  supervisor can interact with them.  As deputies, we

20  typically are not allowed to and requested not to

21  interact with the media.

22     Q.    Okay, so you aren't trained on interacting with

23  the media, but you have an understanding of what the

24  Sheriff's Office policy is?

25     A.    Correct.
```

Ricky Rodriguez

```
 1      Q.    And, based on that policy, the general main
 2   takeaway is try not to interact or talk to the media or
 3   give statements to the media?
 4      A.    Correct.
 5      Q.    Based on your, kind of training or -- well, you
 6   don't have any training, but based on your experience,
 7   how about that -- how are you supposed to interact with
 8   someone who is, let's say, recording a scene for a TV
 9   station?
10      A.    Uh-huh.  Allow them to record.
11      Q.    Do you generally talk to that person, ask them
12   who they're with?
13      A.    Not typically.  I mean, whether or not they have
14   credentials hanging around their neck, or they tell us
15   who they are, it really is irrelevant, as long as
16   they're not interfering with the scene or the
17   investigation, or they're not in an unsafe area.
18      Q.    Tell me a little bit about that.  What does
19   interfering with the scene look like?
20      A.    Well, when we talked about taping off an area
21   for an investigation, that tells the public they are
22   not to cross that line.  It's very easy for the public,
23   so that's why we use it.  If we are involved in the
24   active scene where we have multiple deputies that are
25   trying to keep whoever's in the building there and the
```

Ricky Rodriguez

1  public out, then that's -- it's not very easy for the

2  public to see, so we have to verbally warn them and tell

3  them to get back, so those are just some examples, but

4  as far as interacting with them -- I mean, we can talk

5  to the media.  We're just not going to give an official

6  statement or give any details about what's going on in

7  the investigation.  Unless it just pertains to them as

8  far as safety reasons, that's all they're -- the

9  information that we're going to convey.

10     Q.   Sure.  Thank you.  And have you ever had an

11  instance where someone from, like, a TV station gets too

12  close or tries to pursue the story in a way that you

13  feel is unsafe?

14     A.   Not that I can remember.

15     Q.   And I think you talked a little bit about this,

16  but based on your experience, do citizens generally have

17  a right to film the police?

18     A.   Yes.

19     Q.   Have you received any training -- and I think

20  the answer is no, based on our conversation already --

21  with how to interact with citizen journalists?

22     A.   No.  We haven't had any official training.

23     Q.   Okay.  And, based on your experience, if a

24  civilian or citizen arrives to film the police, what --

25  what is your understanding of what you should do in that

Ricky Rodriguez

```
1    situation?

2       A.   Just allow them to, in a safe manner, continue

3    filming.

4       Q.   Sure.  Other than one-off occurrences where a

5    passerby films the police, or somebody was already in a

6    car, say, at a traffic stop, have you seen people other

7    than Justin Pulliam who make a point to show up at

8    various police scenes to film police?

9       A.   Can you repeat that question?

10      Q.   Sure.  I'm just trying to disregard some of the

11   other examples of when you've seen filming of the

12   police.  Other than, like, a passerby who just happened

13   to see a scene who films that scene --

14      A.   Okay.

15      Q.   -- and other than Justin Pulliam, have you seen

16   anyone who makes a point to film police at various

17   places?

18      A.   Yes.  I mean, I can't tell you who they were,

19   but I have had at least one or two more experiences

20   besides Justin Pulliam.

21      Q.   And you could, sitting here today, tell us the

22   context of those interactions?

23      A.   One I can remember where there was a group of

24   guys that came in -- I think they were all in black.

25   They might have even had what appeared to be body armor
```

Ricky Rodriguez

```
 1    on, and they had cameras, and they came in to the --
 2    they came in to the records lobby of the Sheriff's
 3    Office, and maybe the front where bonding is, where the
 4    jail is, so -- and they were just recording and asking
 5    questions and stuff like that.  I just -- I think what
 6    we did is we notified a supervisor to let them deal with
 7    it, but I didn't have any interaction with it.
 8         Q.   Do you remember the other instance that comes to
 9    mind?
10         A.   There was another one where that's -- that was
11    at the Sheriff's Office in the very front where the
12    bonding is.  There was a man with a camera there that
13    was waiting for the deputy to get there, which was me,
14    to record them.
15         Q.   And what happened in that situation?
16         A.   Well, that was following the arrest of Justin
17    Pulliam, so I had seen this man before, and it seemed to
18    be they were all familiar with each other.  I'm not sure
19    what the relationship was, but we had also received
20    numerous calls to dispatch, and one of them was a group
21    of individuals that sounded like they were harassing the
22    staff in bonding, and threatening them, and that's
23    whenever I got a call for service to go there to check
24    it, and he was standing out front waiting for me, to
25    record.
```

Ricky Rodriguez

```
 1     Q.    I just want to break down some of the pronouns
 2  you used.  When you say "go there", you meant the
 3  bonding office of the sheriff's department?
 4     A.    Correct.  Yeah, I was dispatched there to
 5  investigate what was going on.
 6     Q.    Okay.  And when you said all of them were
 7  familiar with each other, who were you referring to?
 8     A.    We do know individuals that do the same thing.
 9  They go out to police scenes.  They do listen in, and
10  they follow these scenes that they'll record, and I'm
11  not sure, exactly, what their intent is, but I know that
12  they're all pretty similar.
13     Q.    Okay, so you're aware there are folks who go out
14  and -- with the purpose of recording police scenes?
15     A.    Correct.
16     Q.    Based on your experience, do you have a general
17  perception of the attitude of these folks who film
18  police towards police?
19     A.    A general perception?  No.  I try to separate
20  each one.  I know from being in the field, as far as in
21  the profession, there are some bad apples, and so I can
22  see how some of them are genuinely trying to expose
23  some, but, at the same time, they make it difficult for
24  the rest, because we could be doing more important
25  things.
```

Ricky Rodriguez

1    Q.   Understand.  So I just want to talk generally

2    about Justin Pulliam, then.  Before December 21, 2021,

3    you were familiar with Justin Pulliam; is that right?

4    A.   Yes.

5    Q.   How did you know Justin?

6    A.   I think, if we go back far enough, he probably

7    started about the same time I started.  He's been doing

8    this for a while.  Most of his and his friends'

9    activities were filming at night, and I don't know when

10   he made the transition to day shift, but he's been on

11   several of my scenes; two, that I can remember and

12   recall over the last few years, so I'm familiar with him

13   personally, because I've dealt with him.

14   Q.   And can you tell us about those two scenes?

15   A.   Sure.  The first one, I believe, if I could put

16   it into a timeline, it had to have been a coupe years

17   ago, maybe between two and three years ago, there was a

18   medical emergency.  It was a driver that stopped at a

19   traffic light and was not responding.  People called in

20   for EMS to get there, so fire and EMS got there before

21   the deputies, so it was myself and another deputy, and

22   it was his scene, so he conducted the investigation,

23   and I remember that the driver was not responding, so

24   fire department had to break the window and take him

25   out, and EMS began doing some -- checking his vitals,

Ricky Rodriguez

```
 1    asking him what's going on if he was under medication
 2    or some kind of medical emergency, and so while they
 3    were doing that, myself and the other deputy were far
 4    back, maybe in the parking lot, and the vehicle was
 5    still there, and we noticed Justin park in the parking
 6    lot, walk across the street, and stand on the corner
 7    next to the vehicle and start filming it, and he filmed
 8    all the way around, staying on the sidewalk, so we
 9    didn't interact with him because we didn't see him
10    doing anything that needed to be dealt with, so... the
11    next time was probably about a year later, and, again,
12    it was another crash incident where there was two or
13    three vehicles and maybe six people involved, so
14    getting all that off the road, and clearing that, we
15    moved into the parking lot to conduct investigation.  I
16    was the only deputy there, so it's a lot to deal with.
17    You had emergency vehicles blocking the roadway, you've
18    also got all the people involved emotional, and you've
19    got all their vehicles on tow trucks.  So I'm dealing
20    with all that, and Justin pulls into that same parking
21    lot and gets out and starts recording, walking around
22    all the vehicles, recording the vehicles, recording the
23    people, walking right by them as close as I am to you,
24    and recording them, and, from far off, I knew -- I
25    didn't know who it was and then realized, so I told him
```

Ricky Rodriguez

```
 1   don't get in the way.  Stay out of the way, and then he
 2   started asking me several questions, one right after
 3   another.  What's your name?  What's your badge number?
 4   Does the Sheriff's Office own this property?  I think he
 5   was expecting me to make him leave, and I did not, so I
 6   told him just stay out of the way, don't harass any of
 7   these people here.  So after I answered his questions, I
 8   ignored the following, and after a couple minutes, he
 9   finished what he was doing and left.  Those are the ones
10   that come to mind, and offhand, I don't remember any
11   other ones.
12       Q.   Thank you.  And, in your experience in 2021, was
13   Justin Pulliam generally known to other officers in the
14   Sheriff's Office?
15       A.   Yes.
16       Q.   And based on your experience at the time -- you
17   were on the force for, what, six or seven years?
18       A.   Correct.
19       Q.   What was your general perception of how the
20   Sheriff's Office viewed Justin Pulliam?
21       A.   Well, I can't tell you how the Sheriff's Office
22   as a whole viewed him; only with the deputies that I
23   worked with.  For the most part, they just didn't like
24   him because, when we're -- when we're dealing with
25   situations and having to deal with an extra party in
```

Ricky Rodriguez

```
 1    there with a camera, it's almost -- it's very close to

 2    interfering, so it's -- it's one of those things where

 3    we have enough to deal with on the scene, so we'd

 4    rather not have somebody else there trying to stir

 5    whatever they're trying to stir up.

 6        Q.   I get it.  Did Justin Pulliam have a reputation

 7    for being violent at all?

 8        A.   No.

 9        Q.   Did he have a reputation for maybe shouting at

10    people, or telling them not to answer questions from the

11    police, or that they needed to run away?

12        A.   Yes.

13        Q.   And did Justin Pulliam have a reputation for

14    altering evidence at all?

15        A.   No.

16        Q.   And I've watched some of Justin Pulliam's

17    videos.  I understand how severe and biting some of his

18    criticism can be, and I understand why an officer would

19    not want him on the scene or would not want to be

20    featured on a YouTube video or any of those kinds of

21    things.  How do you keep your cool when someone like

22    Justin is at your scene or is peppering you with

23    questions?

24        A.   Personally, I think it has to do with a little

25    bit of experience, and knowing the law has everything to
```

Ricky Rodriguez

```
 1   do with it, as well, what you can and cannot do.
 2   Probably the third thing is, I kind of have an idea of
 3   why he's there, so I give him a little bit of room, a
 4   little bit of grace, and that's it, and so having dealt
 5   with individuals like him, I know where my line is, and
 6   I think he knows where it is, too.  Matter of fact, I
 7   know he knows where the line is.  That's why he walks
 8   it.
 9      Q.   And when you refer to that line, help me
10   understand what makes -- what do you mean by "that
11   line"?
12      A.   Well, he knows where he can be in a public area,
13   which is maybe a sidewalk, and filming is not illegal,
14   and as long as he is not physically interfering with an
15   investigation or impeding the investigation, that's
16   typically where he does his activity, in that area.
17      Q.   I'd like to walk through some of the events that
18   happened at the Krafts' property on December 21, 2021.
19   I understand that you were dispatched to the Krafts'
20   property on that day; is that correct?
21      A.   Yes.
22      Q.   And what had you been doing beforehand?
23      A.   Well, another deputy my the name of Matthey Lacy
24   was initially dispatched there and I think it was a
25   check welfare.  I was in another part of the county
```

Ricky Rodriguez

1    dealing with whatever call I was on, and after I

2    finished what I was doing, I went out there to help him;

3    just knowing Edwin Kraft and the history that we have

4    with him, so I knew that this is going to take more than

5    just a couple deputies.

6        Q.    So you were already familiar with Edwin Kraft

7    when you were going to this call?

8        A.    Yes.

9        Q.    And you talked a little bit about Deputy Lacy.

10   He arrived first on the scene?

11       A.    Yes.

12       Q.    And were you second?

13       A.    Yes.

14       Q.    And when you arrived at the Krafts' property,

15   parked your vehicle, and got out, then what happened?

16       A.    I think at this time, Deputy Lacy had already

17   notified everybody over the radio that he had seen Edwin

18   Kraft exit the residence and then go back in, then he

19   saw something in his hand, which he believed to be a

20   weapon.  At this time, he didn't understand -- didn't

21   know quite to identify what kind of weapon it -- as far

22   as, like, the caliber of the gun, so we were already on

23   defense, so when I got there, I understood -- he said

24   that he was going to keep an eye on the back side of the

25   residence, because there's a rear door and a front door,

Ricky Rodriguez

```
 1   so my -- our jobs were going to be just to keep an eye

 2   on the house until extra deputies could arrive and we

 3   could secure it a little bit.

 4      Q.   The "he" you're referring to about -- "he" going

 5   to the back side, that was Deputy Lacy?

 6      A.   Deputy Lacy.

 7      Q.   And the fact that Deputy Lacy got there first,

 8   that meant he was the scene commander at the time?

 9      A.   Yes.

10      Q.   And did he, therefore, give you orders?

11      A.   Yeah, he -- if I remember correctly, he asked me

12   to keep an eye on the front while he was going to the

13   back.

14      Q.   And did you?

15      A.   Yes.

16      Q.   And what did you do next after Deputy Lacy gave

17   you that order?

18      A.   Well, I set up in an area in a place that

19   offered me concealment and some cover, and then I also

20   could see the front door, the front of the residence.

21      Q.   We talked a little bit about this before,

22   talking about the deposition notice, but your patrol

23   vehicle had a dash camera on it on December 21, 2021?

24      A.   Correct.

25      Q.   At the time, did every patrol vehicle have a
```

Ricky Rodriguez

```
 1   dash camera?

 2       A.   Yes.

 3       Q.   So every person on patrol would have had a dash

 4   camera.  Does that mean, like, every deputy?

 5       A.   Every deputy that would be patrolling.  We do

 6   get issued a patrol vehicle, and they're all outfitted

 7   with the 03 dash camera, as well as the one in the

 8   backseat.

 9       Q.   I understand that a deputy who's on desk duty or

10   something like that wouldn't have a dash camera --

11       A.   Yes.

12       Q.   And what about lieutenants and sergeants, would

13   they all have dash cameras, as well?  If they were

14   patrolling.

15       A.   Yes, they should, uh-huh.

16       Q.   Let's look at some of the footage from your dash

17   camera.  Molly, would you mind cuing that up?  And we're

18   going to mark this footage as Exhibit 2.

19                  [Exhibit 2 was marked.]

20   BY MS. HEBERT:

21       Q.   Let's start with time stamp 7:41 and stop at

22   around 8:21, Molly.  Before we get started, is this the

23   dash camera footage from your vehicle on December 21,

24   2021?

25       A.   It looks like it.
```

Ricky Rodriguez

```
1     Q.   And, generally, where is the dash camera mounted
2  on your vehicle?
3     A.   Just to the side of the rearview mirror that's
4  on the windshield.
5     Q.   Why don't we press "play."
6                [Video was played.]
7     Q.   Okay, now having watched the clip, can you
8  confirm this is your dash camera footage?
9     A.   Yes.
10    Q.   And the person on the left of the screen, is
11 that you?
12    A.   Yes.
13    Q.   And the person kind of further back on the right
14 of the screen, is that Deputy Lacy?
15    A.   Yes.
16    Q.   And it looks like you're wearing a vest
17 underneath your uniform.  Is that a ballistics vest?
18    A.   Yes.
19    Q.   And do you usually wear a ballistics vest --
20    A.   Yes.
21    Q.   -- when you're out on patrol?
22    A.   Yes.
23    Q.   At this point when you had just arrived, where
24 did you believe Edwin Kraft was?
25    A.   In that mobile home there.
```

Ricky Rodriguez

1    Q.    Okay.  And how did you learn that information?

2   From Deputy Lacy?

3    A.    From Deputy Lacy.

4    Q.    Let's watch the next clip and see what happens;

5   8:21 to 9:21.

6                    [Clip was played.]

7   BY MS. HEBERT:

8    Q.    So at the beginning of this clip, you went back

9   to your vehicle.  What were you going?

10   A.    Looks like I was wrapping my beanie.  It was a

11  little cold, I remember, that day.

12   Q.    I get it.  And when you don't have a lot of

13  hair, you head would get --

14   A.    Yeah, wouldn't last very long out there.

15   Q.    I understand.  We don't hear anything on the

16  video besides, like, a buzzing noise, right?

17   A.    Uh-huh.

18   Q.    It looked like Deputy Lacy was talking to you

19  and gesturing.  Do you remember what he was discussing?

20   A.    I don't, and just, I mean, from every scene that

21  I've ever been on, that's going to be a debriefing time;

22  quickly and the high points.  What did he see, what do

23  we need to do, so I think we were probably coming up,

24  formulating a plan.

25   Q.    Okay, and at this timestamp at 9:21, where are

Ricky Rodriguez

```
 1   you and Deputy Lacy standing?

 2       A.   Well, we're moving around from vehicle to

 3   vehicle, but right there, we're right in front of the

 4   house.

 5       Q.   Okay.  Because you can't see it on the

 6   transcript, just describing it for the record.

 7       A.   Uh-huh.

 8       Q.   And how close would you estimate you and Deputy

 9   Lacy are to the house where you believed Edwin Kraft was

10   located?

11       A.   From this angle, it's kind of hard to estimate,

12   but I would say maybe 40 to 50 yards away from the

13   house.

14       Q.   And you can't see the gas pumps from this

15   perspective, but give me a rough estimate how far do you

16   think you were from the gas pumps?

17       A.   Maybe another fifty yards.

18       Q.   Okay, so, in total, the house would be, what, 90

19   to a hundred yards from the house to the gas pumps?

20       A.   To the gas pumps, sure.

21       Q.   And, at this point, where was Frances Kraft --

22   Edwin Kraft's mother -- located?

23       A.   She was standing over by the pumps.

24       Q.   Did you believe that she was in an unsafe

25   location at all when you first arrived?
```

Ricky Rodriguez

```
1     A.    No, not at that time.

2     Q.    And during this initial part of the time at the

3   Krafts' property, did you or Deputy Lacy ever tell Mrs.

4   Craft, Frances Kraft, that she needed to move away from

5   the gas pumps?

6     A.    Uh-uh.

7     Q.    And just kind of a general question, not trying

8   to insinuate anything here, but if you thought that

9   Edwin Kraft might be inside the house with a gun, why

10  did you and Deputy Lacy have your guns drawn at that

11  time?

12    A.    Well, at this time, we didn't perceive any

13  danger, there was nobody shooting at us, and we were

14  still trying to figure out where we were going to set

15  up.

16    Q.    Let's look at the next portion of the dash cam

17  from timestamp 9:31 to 10:33.

18                 [Clip was played.]

19    Q.    Okay, at the beginning of this clip, where were

20  you standing?

21    A.    Behind this semi truck.

22    Q.    And that was for cover purposes?

23    A.    Yes.

24    Q.    And you decided to walk towards your patrol

25  vehicle; what were you doing?
```

Ricky Rodriguez

1    A.   I believe I realized I didn't have my body

2    microphone, so the components of the camera, so it's

3    only filming, but there's no audio, so we'd have to --

4    we had to carry around a little box, which was a

5    microphone, a wireless microphone, so we went back to

6    pick it up, and so, from this point forward you'll

7    notice there's no audio with me with my video.

8    Q.   Well, it seemed like we heard what you said

9    there.  Where were we hearing that from?

10   A.   From the vehicle radio.  So when I have this

11   radio, and I'm talking on the radio, the radio in the

12   vehicle, the patrol car, is loud enough to where the

13   inside microphone picks it up.

14   Q.   And what does -- you know, if you are

15   communicating everything on the radio, what does the

16   purpose of having the additional microphone serve?  To

17   capture things that you don't radio?

18   A.   Correct, to capture anything that happens

19   outside the patrol vehicle, because the vehicle inside

20   it has a microphone, but, with you, it's supposed to be

21   recording video and audio wherever you are in front of

22   the patrol vehicle.

23   Q.   And I understand that in December of 2021, the

24   Sheriff's Office did not, generally, have body cams.  Is

25   that one of the reasons you were using the dash cam

Ricky Rodriguez

```
1   video?

2       A.    Correct.  We had not been issued body cams yet?

3       Q.    And, from your perspective, what do you

4   understand the purpose of the body cams to be now?

5       A.    The body cameras are multipurpose.  They assist

6   in recording our investigation, any interaction with

7   suspects, or even civilians.

8       Q.    And so it seems like -- you can correct me if

9   I'm wrong -- at this time you were kind of using the

10  dash camera as a default mechanism to record things on

11  scene?

12      A.    Correct.  We just got real good at positioning

13  our patrol vehicle in a place where the camera was

14  going to pick up, where we knew we were going to work

15  and with your -- a body microphone on.  It was basically

16  doing what a body camera does now.

17      Q.    That seems really smart.  Work with what you

18  have to work with at the time.

19      A.    Correct.

20      Q.    Now, we heard a male voice on the radio, radio

21  that local journalist Justin Pulliam is on-scene.  Is

22  that your voice?

23      A.    Yes.

24      Q.    Why did you radio that Justin Pulliam was on the

25  scene?
```

Ricky Rodriguez

1    A.   Just to radio to let them know that we had

2    somebody else there, and -- because of the history that

3    we have with Justin Pulliam, so now the supervisor

4    that's coming in understands who else is there.

5    Q.   And did the fact that Justin Pulliam was on the

6    scene change your behavior at all?

7    A.   No.

8    Q.   And why did you use the term "local journalist",

9    to refer to Justin Pulliam?

10    A.   For one, if I remember correctly, just to let

11    the dispatcher know, who she may not know who Justin

12    Pulliam is, and, two, I mean, that's what he refers to

13    himself as.

14    Q.   How did you see Justin Pulliam arrive there?

15    And by that, I mean did he walk into the scene, did he

16    drive into the scene?

17    A.   No, at the time when I was taking cover, I do

18    look back several times, and I did see a pickup truck

19    drive onto the driveway of this parking lot, and when I

20    took my eyes off of it, I -- next thing I knew, he was

21    walking from it, so I thought he had driven there, but,

22    apparently, he was a passenger of that truck.

23    Q.   Sure.  And how soon after Justin Pulliam arrived

24    at the Krafts' property did you radio that Justin

25    Pulliam was on-scene?

Ricky Rodriguez

1       A.    Immediately.

2       Q.    Let's watch another portion of the video.  Let's

3    go to timestamp 10:33 to 10:48.

4                     [Clip was played.]

5       Q.    And was that your voice we heard say, "Sir, we

6    need you to stay back over there"?

7       A.    Yes.

8       Q.    And can you explain what you meant by that

9    statement?

10      A.    Well, just not to come any closer to the

11   residence.  If he stayed where he was, by the road,

12   just -- it was really general, so just don't come any

13   closer was really my attitude.

14      Q.    Sure.  And when you were saying "over there",

15   where did you mean for Justin to stay?

16      A.    Like I said, by the roadway or next to the

17   roadway, or maybe by his vehicle.

18      Q.    Sure.  The next portion of the video is 10:48.

19   Would you mind cueing that up, Molly, and let's go --

20   let's press "play."

21                     [Clip was played.]

22      Q.    Is that you positioned to the left -- to our

23   left of the tractor/trailer there?

24      A.    Yes.

25      Q.    And what were you doing in this part of the

Ricky Rodriguez

```
 1   footage?

 2       A.   I was warming up.  Stretching.

 3       Q.   And did you have your gun drawn now?

 4       A.   No, not yet.

 5       Q.   And do you recall what Justin Pulliam was doing

 6   at this point?

 7       A.   He was filming.  I think he was talking to Mrs.

 8   Kraft.

 9       Q.   Sure.  And it seems like you're pretty focused

10   on the Krafr Residence and stretching, correct?

11       A.   Correct.

12       Q.   At this point, was Justin Pulliam getting in

13   your way at all?

14       A.   No.

15       Q.   And did Justin Pulliam say anything to you while

16   you were over here by the tractor-trailer and he was

17   kind of by the gas pumps and Mrs. Craft?

18       A.   No.

19       Q.   And did you see Justin Pulliam walk closer to

20   you?

21       A.   No.

22       Q.   Did you see Justin Pulliam walk closer to the

23   Krafts' residence?

24       A.   No.

25       Q.   At this point, before Sergeant Rollins had
```

Ricky Rodriguez

```
 1   arrived, did you see Justin commit the offense of
 2   interference with public duties?
 3      A.   No.
 4      Q.   Let's skip ahead to 14:21, and before we press
 5   "play", I just want to look at kind of where you're
 6   standing.  At this point, you were still to the left of
 7   the tractor-trailer, correct?
 8      A.   Correct.
 9      Q.   And had you seen any sign of Edwin Kraft?
10      A.   No.
11      Q.   And had you heard anything indicating that Edwin
12   Kraft was nearby or in the trailer at this point?
13      A.   No.
14      Q.   Let's press "play."
15               [Clip was played.]
16      Q.   You can pause it, Molly.
17         So we just watched from about 14:21 to 14:31, and
18   it's a little soft on -- the volume is a little soft on
19   this portion of the footage, but can you hear someone
20   say, like:  I need y'all to go across the street.
21      A.   I couldn't make out what it was, but I could
22   hear somebody talking.
23      Q.   Did you know -- do you recall whose voice this
24   is?
25      A.   Most likely, it's going to be Sergeant Rollins.
```

Ricky Rodriguez

```
1      Q.   Sure.  And did you hear the statement, or

2   whatever Sergeant Rollins had said at -- when you were

3   standing over by the tractor-trailer?

4      A.   No.

5      Q.   And Sergeant Rollins kind of began speaking

6   basically as soon as he arrived at the Krafts' property;

7   is that right?

8      A.   From my understanding.

9      Q.   Let's play till -- 16:14, to 14:29 or 14:31, so

10  it'll be two minutes so bear with me, Deputy Rodriguez.

11                  [Clip was played.]

12     Q.   Okay, on this clip, you can hear some of the

13  interaction between Sergeant Rollins and Justin Pulliam,

14  but from where you were standing at the tractor-trailer,

15  could you hear what was being said?

16     A.   No.

17     Q.   It seems like you unlocked your vehicle for

18  Sergeant Rollins.

19     A.   Uh-huh.

20     Q.   Did Sergeant Rollins put Justin Pulliam in your

21  vehicle?

22     A.   Yes.

23     Q.   Why not his own vehicle?

24     A.   I'm not sure.

25     Q.   And is it typical for, you know, a superior
```

Ricky Rodriguez

```
 1    officer to maybe take someone into custody and put that

 2    person into a junior officer's vehicle?

 3        A.    You're asking is it --

 4        Q.    Is that a practice?

 5        A.    It happens, yeah.

 6        Q.    Sure.  On the footage, it seemed like you were

 7    trying to keep your head on a swivel, focusing on what

 8    was going on at the Kraft residence, and then kind of

 9    keeping an eye on what was going on with Sergeant

10    Rollins; is that fair?

11        A.    Yes.

12        Q.    At any point during the exchange between

13    Sergeant Rollins and Justin Pulliam, did you think to

14    yourself:  "I'm going to go have to go over there to

15    help Sergeant Rollins out."

16        Q.    When we talked about not being able to hear

17    exactly what was going on, that's true, but what I could

18    hear was him and Justin Pulliam getting heated, so their

19    voices were getting loud, and I couldn't make out

20    exactly what was being said, but with that being the

21    case, I did pay a little bit more attention with him,

22    just in case I needed to go over there.

23        Q.    Sure, but did you ever kind of think that maybe

24    Sergeant Rollins might need your assistance?

25        A.    No.  Not from what I could see.
```

Ricky Rodriguez

1    Q.    Based on what you saw and heard at the time,

2    what did you believe that Sergeant Rollins was taking

3    Justin Pulliam into custody for?

4    A.    Well, along with the loud talking and Sergeant

5    Rollins gesturing, pointing across the street, I

6    believed that he was telling him to move away further,

7    and I know whenever another superior gets on scene, he

8    can expand the scene a little bit further, and that's

9    what I believed was going on.  I couldn't hear anything,

10   so that's all I can assume.

11   Q.    Sure.  Let's watch the next portion of the

12   video:  You know, let's take just a break.  We've been

13   going for over an hour.  Let's take a restroom break,

14   and just a break, in general, and then we'll come back.

15   A.    Okay.

16   Q.    You okay?

17   A.    Sure.

18   Q.    Let's take a ten-minute break.

19            COURT REPORTER:   Off the record, 10:07.

20               [Short recess was taken.]

21            COURT REPORTER:   Back on the record 10:16.

22   BY MS. HEBERT:

23   Q.    Okay, we are paused at what looks like 6:15.

24   We're about to watch another clip, but Deputy Rodriguez,

25   you're still to the left -- our left of the tractor

Ricky Rodriguez

1  trailer; is that right?

2      A.    Correct.

3      Q.    And, at this point, you are still in kind of

4  welfare check mode for Edwin Kraft?

5      A.    Correct.

6      Q.    Let's watch the next portion of the video.

7                  [Clip was played.]

8      Q.    At this point, it looks like you're interacting

9  with some of the officers, giving them information; is

10 that fair?

11     A.    Yes.

12     Q.    It seems like you could hear some of the

13 exchange between Sergeant Rollins and Justin Pulliam at

14 the beginning of this clip.  Was Justin Pulliam under

15 arrest at this point?

16     A.    That, I did not know.

17     Q.    Seems like the audio of Justin Pulliam's voice,

18 at least, gets pretty clear.  Does that mean he was in

19 your vehicle?

20     A.    He was in the backseat, yes.

21     Q.    Molly, would you go back a little bit to 16:44?

22 Just scroll back a little bit.  And why don't you just

23 press "play", and stop at 1644.  Oh, pause there.

24         We saw kind of two women go across in front of

25 your vehicle.  Who were these two women?

Ricky Rodriguez

1    A.    These are going to be TXANA employees.  They're

2    the -- one of them called to check welfare.

3    Q.    On Edwin Kraft?

4    A.    Yes.

5    Q.    And are they -- are TXANA employees part of the

6    the Sheriff's Office?

7    A.    No.

8    Q.    And these women aren't in uniform like you are?

9    A.    Correct.

10   Q.    And they aren't wearing any kind of ballistics

11   vests?

12   A.    No.

13   Q.    When these two women walked in front of your

14   vehicle, were you concerned about their safety at all?

15   A.    Well, I was concerned who they were.  At this

16   time, it's a little bit outside of my reach.

17   Q.    Oh, so you didn't know they were TXANA employees

18   at this time?

19   A.    Yeah, I had an idea of who they were and I think

20   we were -- we were advised over the radio or something

21   later on, but they were close enough to Sergeant

22   Rollins that I knew that he would be able to deal with

23   them.

24   Q.    So you basically weren't concerned about kind of

25   dealing with these civilians right now.  If Sergeant

Ricky Rodriguez

```
 1    Rollins had a problem with it, he would take care of

 2    that?

 3        A.   Correct.

 4        Q.   And you personally didn't fear for their safety

 5    at this point?

 6        A.   Correct.

 7        Q.   To your knowledge, the relationship between the

 8    Sheriff's Office and TXANA employees, does the Sheriff's

 9    Office typically permit TXANA employees to remain on the

10    scene?

11        A.   If necessary, yes.

12        Q.   Sure.  But the Sheriff's Office wouldn't allow

13    or permit the TXANA employees to be in a dangerous

14    situation?

15        A.   No.

16        Q.   Would you classify TXANA employees as civilians?

17        A.   Yes.

18        Q.   And if -- in general, you allow a civilian to

19    remain on a scene that is potentially dangerous, how do

20    you ensure that that civilian stays safe?

21        A.   Well, TXANA employees, they always assume a bit

22    of risk because the individuals that they deal with,

23    that they help us with, sometimes they can get violent.

24    They don't always go in -- up until recently, they

25    don't go into the scene with ballistics vests, or a gun
```

Ricky Rodriguez

1   or a Taser, so they are assuming quite a bit a risk

2   already as it is, so we can do what we can to mitigate

3   that by getting in between the persons that we're

4   dealing with and the TXANA screener.

5       Q.    Okay, so you try to make sure you kind of stay

6   between the dangerous situation and the TXANA employees?

7       A.    Yes.

8       Q.    Do you -- I understand you just said that the

9   TXANA employees assume a bit of risk.  Do you ever kind

10  of give them a warning like, "Hey, we're going into this

11  situation.  Stay behind me", for instance?

12      A.    Yeah, in a perfect scenario where we have time

13  to brief each other, yes.

14      Q.    And let's go to the next portion of the

15  timestamp, Molly.  We're going to go to 17:23, and I'll

16  just summarize the stuff that happens between --

17  basically you're standing there stretching for a period

18  of time waiting to see what's going to happen.

19              [Clip was played.]

20      Q.    And on this portion, it sounded like you said

21  something to Rollins about Mom being over somewhere, and

22  to maybe have her go move around to the back side; is

23  that fair?

24      A.    Right, yeah.

25      Q.    And the mom you're referring to at that point

Ricky Rodriguez

```
 1   was Frances Kraft?

 2       A.    Correct.

 3       Q.    And you pointed and said she's in that vehicle.

 4   Where was that vehicle at that point?

 5       A.    It was parked on the far side of the gas pumps.

 6       Q.    And what happened after you asked that question?

 7       A.    He gave me a response.  I couldn't hear, and I

 8   don't remember.

 9       Q.    Did Sergeant Rollins go talk with Frances Kraft?

10       A.    Yes.

11       Q.    And do you know what he told Frances Kraft at

12   all?

13       A.    No.

14       Q.    And it seemed at that point, you learned that

15   these two women wandering around were TXANA employees;

16   is that fair?

17       A.    Yes.

18       Q.    And do you know if Sergeant Rollins went and

19   talked to the TXANA employees?

20       A.    Yes.

21       Q.    And, at this time, did either Frances Kraft or

22   the two TXANA employees leave the Kraft property?

23       A.    No.

24       Q.    Let's take a little bit of a break from the

25   video, and I just want to get a better understanding of
```

 1    kind of where everyone was in proximity to each other.

 2    Let's look at Exhibit 3, Molly.

 3                    [Exhibit 3 was marked.]

 4    Q.   Now, I'll kind of represent to you that this

 5    image -- I need to pull it up on my on -- is kind of a

 6    Google image of the Kraft property to give you kind of a

 7    bird's-eye view of where everything was, and I've added

 8    some shapes based on where the vehicles were located at

 9    the time that Sergeant Rollins and Justin Pulliam kind

10    of had their interaction.

11         Can you take a look at this image, and we'll get

12    to kind of where everyone was standing in a minute, but

13    does this image fairly and accurately represent the

14    scene at the time that Justin and Sergeant Rollins

15    interacted?

16    A.   Yes.

17    Q.   I'm going to introduce another copy of the --

18    this exact same image as Exhibit 4.

19                    [Exhibit 4 was marked.]

20    Q.   And why don't you put Exhibit 3 to the side,

21    there -- this is not the one I want, Molly.  Can you

22    hand me the one that has the tractor-trailer on it?  Can

23    we get another copy of the tractor-trailer one?  Just

24    the same exact thing.

25                    [Exhibit 5 was marked.]

Ricky Rodriguez

```
 1      Q.   So we'll mark this one as Exhibit 5.  Once you

 2   introduce an exhibit, you can't go back in time and say

 3   "Let's replace it."

 4           Is this the same image that you saw as Exhibit 3?

 5      A.   Yes.

 6      Q.   I'm not trying to trick you.  I just --

 7      A.   Looks like it, yes.

 8      Q.   Can you mark with this orange marker which

 9   vehicle of the police vehicles was yours?

10      A.   I'll just put an "R."

11      Q.   You put an orange "R" next to your police

12   vehicle, where you parked it when you arrived; is that

13   fair?

14      A.   Yes.

15      Q.   And just for, like, ease of reviewing it later,

16   can you use this red marker to put a small "X" where you

17   were standing at the time that Rollins and Justin

18   Pulliam interacted?

19      A.   (Witness indicates.)

20      Q.   And I'm going to give you another color, so bear

21   with me.  We're having a coloring exercise.

22      A.   Okay.

23      Q.   Would you maybe make a little green circle where

24   Justin Pulliam was standing when Rollins approached him?

25      A.   It's going to be general.
```

Ricky Rodriguez

```
 1      Q.   It can be approximate.

 2      A.   Be about right there (indicating).

 3      Q.   Sure.  And then would you -- I'm going to give

 4   you a blue marker.  Would you please mark, like, a blue

 5   triangle where Frances Kraft was?

 6      A.   I believe she was going to be under the carport

 7   next to her car (indicating).

 8      Q.   And you can keep the blue marker.  Can you maybe

 9   draw two blue squares where the TXANA women were at this

10   point, if you remember?

11      A.   I know they passed in front of my car and I

12   believe they stood and talked with Frances Kraft, so

13   we'll just put them next to her (indicating).

14      Q.   And then would you mind putting -- I know Deputy

15   Lacy kind of went around the back a little earlier.  Can

16   you put a black X where Deputy Lacy was?

17      A.   While I couldn't see him, he told me he was

18   going to be right there on the corner of the residence.

19      Q.   That's it.  I just wanted to kind of get a

20   better sense of where everybody was.

21                    [Exhibit 6 was marked.]

22      Q.   Let's look at another exhibit.  Molly, would you

23   get Exhibit D and this will be Exhibit 6.  Take a

24   second to review it and let me know when you're

25   finished.
```

Ricky Rodriguez

```
 1     A.    Okay.

 2     Q.    What is this document?

 3     A.    This is going to be the -- my offense report for

 4   this incident.

 5     Q.    And by "this incident" you mean the arrest of --

 6     A.    The arrest, uh-huh.

 7     Q.    -- Justin -- not the Edwin Kraft events?

 8     A.    Correct.

 9     Q.    How do you know?

10     A.    Well, I've reviewed it and I remember it.

11     Q.    Okay.  Does someone in the Sheriff's Office

12   review reports after you write them?

13     A.    Yes.

14     Q.    And what does that review usually include?

15     A.    Well, the review will go -- the supervisor will

16   go through the report and make sure that everything

17   everything on the report is correct as far as the -- we

18   have different categories for the report, make sure the

19   evidence is all in there, and it's showing that it

20   belongs to or was taken by for evidence and just going

21   through and reading the report, the narrative of the

22   report, and making sure that there are no typos and it

23   flows.

24     Q.    So I would presume, as a patrol deputy you've

25   done, like, tons of reports.  Is that a fair assumption?
```

Ricky Rodriguez

```
 1      A.   Yes.

 2      Q.   I want to look at the first page.  There's a box

 3  for, I think, the officer who did the reviewing, and

 4  correct me if I'm wrong.  It says "approving officer."

 5  It's kind of on the left-hand side, and it says "SXG

 6  004."  Did I read that correctly?

 7              MR. HEDGES:      Where are you seeing that?

 8              MS. HEBERT:      "Approving officer"; it's

 9  -- one, two, three, four, five, sixth line down on the

10  right side.

11              MR. HEDGES:      On the right side.

12  BY MS. HEBERT:

13      Q.   I think I said left.  Sorry.  Do you see

14  approving officer, it says "SXG 004"; is that right?

15      A.   Yes.

16      Q.   Who is SXG 004?

17      A.   I don't recall.  It's going to be another

18  sergeant on day shift, most likely.  How would -- how do

19  you know who is SXG 004?  How would I find out that

20  information?

21      A.   How you would find out, I'm not really sure.

22  For me, when I log in to this reporting system, we can

23  hover over that with the mouse, and it usually

24  expands --

25      Q.   Pops up?
```

Ricky Rodriguez

```
 1     A.    Yeah.

 2     Q.    And does that ever change?  So the reason I'm

 3  asking is, like, if -- you know, patrol today, if I

 4  hover over "SXG 004" today, would that be the same

 5  person or does that sometimes change?

 6     A.    As far as once it's done, it won't change, no.

 7  We have multiple sergeants on duty, so they all split

 8  the responsibilities of reviewing incoming reports and

 9  approving them, so they kind of pass through, so once

10  it's already done, it's stamped digitally in the system

11  and doesn't change.

12     Q.    Got it.  So there might be a different SXG 004,

13  but the SXG 004 that was -- that reviewed this report

14  would be identifiable?

15     A.    Correct, right, so that initial in the system

16  that's assigned to a specific person, so it would never

17  be reassigned, so I can tell you that the letters on

18  there, that's going to be someone's initials, first,

19  middle and last, and so if there's ever multiple

20  employees that share the same initials, which is -- I

21  mean, I have a supervisor by the name of Richard

22  Rodriguez, and so they add the numbers to the end of

23  it, so if there are officers or employees that have the

24  same initials, they just add a number 1, number 2,

25  number 3.
```

Ricky Rodriguez

```
 1     Q.    Are you number 1 or number 2?

 2     A.    I'm number 2.

 3     Q.    Sorry.

 4     A.    He came first.

 5     Q.    He came first?

 6     A.    By a few years.

 7     Q.    The approval date on this is 12/27/21, and I'm

 8   not trying to insinuate anything, here.  I'm just

 9   generally curious.  That's almost a week after the

10   offense.  How long does it usually take for approval of

11   a report to kind of run its course?

12     A.    It just depends.  It depends on if it is dealt

13   with immediately.  Also depends on if the officer is off

14   duty and doesn't come back to make the correction, so it

15   could prolong it being approved by a supervisor.

16     Q.    I understand that this was the week of

17   Christmas; is that fair?

18     A.    Correct.

19     Q.    And by "officer", you're referring to whether

20   the reviewing officer was off duty?

21     A.    The original officer that created the report;

22   so, like, myself.  If I -- if I submitted and -- let's

23   just say that they allowed me to go home.  It would be a

24   whole 'nother day before they got to -- and they said

25   well, there's some corrections that you need to make.
```

Ricky Rodriguez

```
 1   Go ahead and make them, and if those corrections are
 2   done and it's resubmitted, and they find more errors on
 3   it, it could continue to prolong it down the road, and
 4   if I go on my weekend, then it'll be two or three days
 5   before it'll get corrected.
 6       Q.   That's helpful.  The corrections process, how
 7   does that get documented?  Is there, like, you send an
 8   e-mail to whoever's reviewing it and say, "Hey, I've
 9   done my report.  Please review it now"; or is there an
10   internal, like notification system?  How does that all
11   work?
12       A.   The reporting system that we create the reports
13   and manage them with, it has a documentation section of
14   this report specific for this one, so it logs every
15   time somebody opens the report, with that person's
16   initials, so it's a digital fingerprint, you could say,
17   and every time that the officer, the original officer
18   approved it, it sits in this approval status and you
19   notify a supervisor.  Usually, the supervisors, they
20   come in and they do, you know, probably once or twice a
21   day, they pull up all the newly-submitted reports and
22   they read through them, and if it has errors, they will
23   kick it back, and so every deputy has the duty to,
24   every time they come in in the morning or the evening
25   when they're done with their shift, pull up your
```

Ricky Rodriguez

```
 1   reports and review what has been disapproved, and your

 2   own report.  You have the duty to get those in in a

 3   timely manner.

 4      Q.   Okay, so when I submit things for Jeff, my

 5   supervising attorney, to review, he'll, like, maybe

 6   comment on things, let's say, "Christie, fix X, Y, or,

 7   Z", and the document version that we use, I can go back

 8   in time to my original version, look at it, and then

 9   Jeff usually redlines it for me, and I can make changes

10   on that.

11      A.   Correct.

12      Q.   It sounds like you guys have something similar.

13      A.   There's a notations section in the correction.

14   So once they disapprove the report and send it back to

15   us, they will notate in there of what needs to be fixed.

16      Q.   So there's, like, notes that the supervisor

17   says, "Look, this part wasn't filled out right."

18      A.   Uh-huh.

19      Q.   And then you see that and you make the change?

20      A.   Correct.

21      Q.   And can you go back in time if you, you know,

22   the -- let's say you make changes and you send it, and

23   the supervisor goes, "No, no.  I like it better the way

24   you did it the first time."  Can you go back in time to

25   see the first version of the report?
```

Ricky Rodriguez

1      A.   No, we don't -- it doesn't have that capability.

2      Q.   Okay.  And as you -- like, once you submit a

3   report, so you're done.  Can you go back and check what

4   your supervisor said about a given report at any time?

5   So here's a great example.  Sometimes I'm working on a

6   new case, and I go back to what Jeff said in the last

7   case and say, "Okay, he didn't like how I phrase it on

8   this way, so I'm going to go back to his comments."

9   Can you do that?

10     A.   Yeah, so all that is documented and saved.

11     Q.   Okay.  You wrote in this offense report -- and

12  you can see it kind of the second line, that Justin was

13  arrested for interference with duties of peace officer.

14  Can you tell me a little bit about that offense?  What

15  is the nature of that offense?

16     A.   In the instance where someone is impeding or

17  getting in the way of an investigation, and so I don't

18  know the verbatim in the Penal Code, but it is going to

19  -- you do have to understand a working knowledge of the

20  offense.

21     Q.   Sure.  I understand that you have to know a lot

22  of offenses, kind of like what we talked about earlier.

23     A.   Yeah.

24     Q.   So it would be an impressive feat of memory if

25  you could list off every element of every offense you

Ricky Rodriguez

```
 1   are expected to know.
 2      A.   I don't think I'd be a police officer if I had
 3   that kind of memory.  I'd be doing something else.
 4      Q.   Fair.  I guess that's not what I'm asking, but
 5   your general perception of what the offense is is super
 6   helpful.  So have you ever arrested someone for
 7   interference of public duties other than this situation
 8   with Justin Pulliam?
 9      A.   I'm sure I have.  I just cannot recall
10   specifics.
11      Q.   Okay, so kind of in the general scheme of
12   things, what kinds of things do you arrest folks for
13   when they interfere with public duties?
14      A.   Many times, it's just a physical interference,
15   where they are -- where they're physically fighting
16   with a deputy, and they may not have been involved in
17   the whole incident, but they insert themselves in, and
18   they start physically getting in the way, where we have
19   to stop what we're doing, place them in handcuffs, and
20   put them in the backseat.  It could be that, or it would
21   just -- they are arguing and allowing for these
22   individuals that we're dealing with to not be dealt
23   with.  They would get away.  It's been instances like
24   that.
25      Q.   And, so we have a clear record, we already kind
```

Ricky Rodriguez

```
 1   of know the answer to this question.  Although you wrote

 2   this initial offense report that is Exhibit 5, you

 3   weren't the officer who decided to arrest Justin

 4   Pulliam?

 5       A.   Correct.

 6       Q.   That was Sergeant Rollins who decided to arrest

 7   Justin Pulliam?

 8       A.   Correct.

 9       Q.   So how did you end up writing the initial

10   report?

11       A.   Well, because I was involved in the both of

12   them, and they just kind of went hand in hand.  I

13   believe it might have been -- we might have been so

14   involved with the Edwin Kraft incident, and this was

15   kind of part of it, so, in order to report it and it be

16   documented properly, they have to be separated into case

17   numbers, and just referencing both reports, but as far

18   as being able -- getting the report or getting the

19   arrest or  having to book them in, sometimes it just

20   happens like that, yeah.

21       Q.   And is it -- like you said sometimes it happens

22   like that.  Is it normal for, you know, maybe a

23   lower-ranking officer to write the report for an arrest

24   that a higher-ranking officer made?  Is that normal?

25       A.   Sometimes it is like that, but we don't do the
```

1    entire report.  So the arresting officer may -- is

2    going to have to complete his own supplement to the

3    report, so it all -- it all documents, so they have the

4    initial interaction, they started the offense, and it

5    was handed off to a deputy to conduct the booking

6    process, and so sometimes, like I said, it happens like

7    that.

8        Q.    And I think -- I think what you're talking about

9    is actually in your report.  Can you go to page -- 5, I

10   think it is?  Page 5.  In this narrative section that's

11   towards the bottom, would you mind going to one, two --

12   the third paragraph?  And right before the last sentence

13   of the third paragraph, there's something in parentheses

14   there, and I'm going to read it.  It says, "See SGT

15   supplement."  Does "SGT" refer to "sergeant"?

16       A.    Yes.

17       Q.    And, by writing this section here, were you

18   saying go look at Sergeant Rollins' supplement?

19       A.    Yes.

20       Q.    And did Sergeant Rollins write his supplement

21   before you wrote your offense report?

22       A.    I'm not sure.

23       Q.    Okay, so you don't know if you read Sergeant

24   Rollins' supplement before writing this report?

25       A.    No.  I did not read Sergeant Rollins's

Ricky Rodriguez

1    supplement.

2        Q.    So you wouldn't know whether he had written it

3    or not when you're writing this?

4        A.    Correct.

5        Q.    Is it just your general practice when you kind

6    of write up a initial offense report for someone who's

7    more senior to you, to say go look at their report?

8        A.    Yeah, that's normal.

9        Q.    I think we're done with this exhibit.  Let's

10   turn back to your dash camera footage, which is Exhibit

11   2, and let's go to time stamp 3002, so 30 minutes and 2

12   seconds, and we're going to just watch a short part

13   that's about two minutes long, so let's go to stop at

14   32:07.

15                    [Clip was played.]

16       Q.    Was that Sergeant Rollins who asked you to move

17   your car back?

18       A.    Yes.

19       Q.    And he said something like "because I've got him

20   in there."  Is that "him" referring to Justin Pulliam?

21       A.    Yes.

22       Q.    And would it be accurate to say that Justin

23   Pulliam had already been in your vehicle for 10, 15

24   minutes?

25       A.    Possibly.  I'm not -- I don't remember.

Ricky Rodriguez

1    Q.   So some -- he'd already been in your vehicle for

2    some period of time.  You're not exactly sure how long

3    that was?

4    A.   Yes.

5    Q.   When you moved your car back, it looks like Mrs.

6    Kraft's vehicle's no longer under the gas canopy.  Do

7    you recall where her car went?

8    A.   No, but I think they may have moved over to

9    where we were, so maybe on the other side of our

10   vehicles, but I don't -- I don't know where this is.

11   Q.   Sure.  After you moved your car, would it be

12   accurate to say there weren't any cameras anymore on the

13   Kraft residence, or were there other dash cams that

14   would have been pointing at the Kraft residence?

15   A.   I believe these two other control cars in front

16   of me, they should have their dash cams on.

17   Q.   Sure.  But you're not going to reason why?

18   You're just following orders?

19   A.   Yeah.  It was just for the safety of the

20   prisoner.

21   Q.   Sure.  Let's go to timestamp 51:10, and we're

22   going to watch just to 51:34.

23                    [Clip was played.]

24   Q.   This footage showed one of the women who we

25   earlier identified as one of the TXANA employees; is

Ricky Rodriguez

1    that correct?

2       A.    Correct.

3       Q.    It looked like she was wearing high heels; is

4    that accurate?

5       A.    Something like that, maybe.

6       Q.    And was she accompanied by anybody from the

7    Sheriff's Office at this time?

8       A.    No.

9       Q.    And it looked like there was another person.

10   I'm not sure if it was a man or a woman -- who kind of

11   walked out from a vehicle.  Do you know who that was?

12      A.    Yeah, that's going to be one of our CIT

13   deputies, a mental health deputy.

14      Q.    And it looked like that person, that CIT deputy,

15   was wearing some kind of vest; is that accurate?

16      A.    Yes.

17      Q.    Would that be some kind of ballistics vest, as

18   well?

19      A.    It's going to be more -- it's going to be for a

20   rifle, to stop rifle rounds, so it's going to be heavier

21   than the soft ones that we wear every day.

22      Q.    And just to be clear, this TXANA employee who is

23   potentially in high heels, she's not wearing any vest?

24      A.    Not that I know of.

25      Q.    Let's -- at one point, I think you can hear the

1    audio of the TXANA employee say something like, "He's

2    not here anymore."  Was the "he" referring to Edwin

3    Kraft?

4        A.   Yes.

5        Q.   Did you ever see Edwin Kraft while you were

6    waiting outside of the front of the Kraft residence?

7        A.   No.

8        Q.   Let's watch the next portion, 51:34 to 52:24.

9                  [Clip was played.]

10       Q.   Okay, we heard a voice that said, "What do you

11   want me to do with this guy?  Release him?"  Is that

12   your voice?

13       A.   Yes.

14       Q.   And were you directing that question to Sergeant

15   Rollins?

16       A.   Yes.

17       Q.   Did "him" refer to Justin Pulliam?

18       A.   Yes.

19       Q.   I think -- what was the reason you asked that

20   question to Sergeant Rollins?

21       A.   I was not clear on whether he was just under

22   detention, or fully under arrest at this time.  Sergeant

23   Rollins had not told me yet.

24       Q.   And so you didn't know what the reason was that

25   Justin was really in the back of your patrol vehicle?

Ricky Rodriguez

```
 1      A.   I didn't.  Yeah, I didn't want to assume
 2   anything, so I just kind of went back to -- it was just
 3   an open question.
 4      Q.   And, again, lack of familiarity with law
 5   enforcement, what is the difference between detention
 6   and an arrest?
 7      A.   Sure.  It's a form -- detention is a form of
 8   arrest.  It's -- what we have the authority to do to
 9   keep people from moving while we're investigating
10   something.  Sometimes we'll detain somebody because
11   they're fighting us.  It's just for safety purposes or
12   we may even just put somebody in the backseat, because
13   we believe them to be a witness or part of, maybe, a
14   suspect so they -- while we're investigating, that's
15   what we refer to as detaining somebody, restricting
16   them from moving and leaving.
17      Q.   And it sounds like detention doesn't always mean
18   handcuffs; is that fair?
19      A.   Right.
20      Q.   And you talked about, like, maybe putting a
21   witness in the back of the patrol car.  If it was just a
22   witness, you wouldn't handcuff them?
23      A.   Yeah, typically, witnesses, we would leave out,
24   but sometimes we'll handcuff somebody and put them in
25   the back seat, even if they are detained.
```

Ricky Rodriguez

1    Q.    And do you ever just let someone go after

2    they've been detained and handcuffed in the back of the

3    vehicle?  Is that something you do?

4    A.    Sometimes.

5    Q.    Okay.  How do you make that decision about who

6    gets detained and handcuffed and put in the backseat,

7    and then just released, or who gets -- who goes to

8    jail?

9    A.    Well, it depends on if they broke -- if they

10   committed a crime, so that's based on that.

11   Q.    Okay, so if they've committed a crime, you take

12   them to jail?

13   A.    Correct.

14   Q.    You don't make the decision about if something's

15   going to happen to the crime -- the criminal, for lack

16   of a better descriptor, you don't make that decision?

17   A.    I'm not quite following you on that.

18   Q.    Yeah, so if they committed a crime, they go to

19   jail.  If they didn't commit a crime, they go free.

20   A.    Correct.

21   Q.    And then you don't make that decision what to do

22   with them after they've been arrested?  Beyond going to

23   jail.

24   A.    No.  I mean, it'd depend on who's making the

25   arrest.  They make the decision.

Ricky Rodriguez

1    Q.    And if someone committed a crime, you don't make

2    the decision; you would not release them?

3    A.    Correct.

4    Q.    Let's watch 52:34 to 53:32.

5                    [Clip was played.]

6    Q.    52:20 is fine.

7          Was that your voice we heard talking in this clip

8    with Justin Pulliam?

9    A.    Yes.

10   Q.    And in response to Justin's statement that he'd

11   prefer to be buckled when he started moving the car.

12   You responded, "I'm sure there's a lot of things you

13   would prefer"; is that correct?

14   A.    Yes.

15   Q.    But even though you said that kind of

16   sarcastically, you went and buckled Justin Pulliam in?

17   A.    Yes.

18   Q.    Which I thought was a super-kind gesture, and

19   incredibly thoughtful as an officer, that showed you

20   were really concerned.  But then you said, "You probably

21   should have left when you had the chance."  Did I get

22   that right?

23   A.    Yes.

24   Q.    What did you mean by that statement?

25   A.    Well, I'm sure he didn't want to be there and

Ricky Rodriguez

```
 1    handcuffed in the back of the vehicle, so that's what I

 2    meant by that.

 3         Q.    Were you saying that if Justin had just left

 4    when you arrived, that things would have turned out

 5    better for him?

 6         A.    He would not have interfered, and he would have

 7    not been arrested for a crime.

 8              MS. HEBERT:       Let's watch, together --

 9    let's go to one hour and 43 seconds, Molly.

10                   [Clip was played.]

11         Q.    Thank you.   It looked like you returned to the

12    gas station from somewhere else.   Where had you gone

13    kind of in between the clips that we just watched?

14         A.    So there's this -- this field behind the house.

15    It is a huge pasture, which is used for livestock.

16    Apparently, Edwin Kraft must have slipped out very early

17    and he walked across the field, and there's another

18    residence there, and I believe that's going to be a

19    family member of the Kraft family, and so we went over

20    there and so that's -- when we saw on the video earlier,

21    that the TXANA employee came up to me and she was

22    telling me that he wasn't here anymore, he was at

23    another person's house, and he was threatening them,

24    and so I believe Deputy Lacy went over there, I

25    followed, we -- by the time we got there, Lacy had
```

```
 1   already interacted with them and he was walking back
 2   across the field, so my thought process was, "Let me
 3   get back over here, clear everybody out of the area",
 4   because now he's not confined to a house.  Edwin Kraft
 5   is out in the open with a gun, and, by this time, Deputy
 6   Lacy already had a face-to-face interaction with Edwin
 7   Kraft and had the gun pointed at him, so we knew for a
 8   fact, so that was what I was doing, is returning back
 9   to this gas station, telling everybody to leave, and
10   try to possibly intercept Edwin Kraft as he came back.
11       Q.   And, at this point, were you in welfare check
12   mode anymore?
13       A.   No.
14       Q.   At this point, did you transition to more of a
15   potential shooter situation?
16       A.   Well, I wouldn't say that we're not completely
17   check welfare anymore.  He may have been -- we don't
18   know what his mental state was, and he has not started
19   shooting at anybody, so, at that point, we're not
20   shooting back.  We're trying to talk to him and have --
21   disarm, so that way, we can take him somewhere to get
22   help.  I don't remember -- at this point now, he
23   already pointed a gun at the officer, so we have an
24   offense so we're now looking to try to disarm him and
25   take him into custody, too.
```

Ricky Rodriguez

```
1     Q.    At this point in the video, this clip that we

2   just watched, you pulled up to three women and said

3   something like, "Ladies, I need you to go across the

4   street"; is that correct?

5     A.    Correct.

6     Q.    Who were you talking to?

7     A.    Those were the TXANA ladies.  I believe that

8   third one was Edwin's mom, Frances Kraft.

9     Q.    Frances Kraft?

10    A.    Correct.

11    Q.    And were these three women, Frances Kraft and

12  the two TXANA employees, were they still at the property

13  at this time?

14    A.    Yes.

15    Q.    Was any sheriff's officer with these three

16  women?

17    A.    I believe Deputy Guajardo was still there the

18  whole time.

19    Q.    By "there", you mean at the Kraft property?

20    A.    At the Kraft property.  So this -- they were

21  waiting in front of what used to be the Kraft store

22  right there on the corner, so it was far enough away

23  from the residence that it was safe, but there was a

24  deputy there with him.

25    Q.    Sure.  So somewhere on the property, Deputy --
```

1     A.    Guajardo.

2     Q.    Guajardo, was present, so could you see Deputy

3  Guajardo in the --

4     A.    This is going to be the deputy with the heavy

5  vest.  She's short, and she has a very short haircut.

6     Q.    And we can go back a little bit.  Could you see

7  Deputy Guajardo at all in that footage?

8     A.    Not in this dash cam footage.

9     Q.    Sure.  Why did you give these three women the

10  order to go across the street?

11     A.    I believed that it was for their own safety.

12     Q.    And when you said he was out, you were referring

13  to Edwin Kraft is out?

14     A.    Correct.

15     Q.    Let's skip ahead to 1:19:33 seconds, and we'll

16  watch a couple of seconds to 1:19:57 seconds.

17         We're going to skip ahead in the footage for a

18  pretty substantial point, and I'll just say to you we've

19  skipped ahead a bit, and this portion of the footage is

20  after -- after you apprehended Edwin Kraft; is that

21  right?

22                    [Clip was played.]

23     Q.    Okay, in this clip, you are leaving the Kraft

24  property; is that fair?

25     A.    Yes.

Ricky Rodriguez

1    Q.    And Edwin Kraft had already been apprehended,

2    correct?

3    A.    I believe so, yes.

4    Q.    And he had already been put in a patrol vehicle

5    at this point?

6    A.    Yes.

7    Q.    As you're leaving, your dash cam captures kind

8    of the two TXANA employees; is that correct?

9    A.    Yes.

10   Q.    Where were the two TXANA employees at this time?

11   A.    They were right around their gas pumps.

12   Q.    So they were still at the Kraft property?

13   A.    Where they had returned.

14   Q.    Did you ever see them leave the Kraft property?

15   A.    Yeah, when I told them to leave, they got up and

16   they started to move across the street, but, at that

17   point, I never saw them again until I'm leaving,

18   myself.

19   Q.    So you saw them get up and start to leave the

20   property, but you never saw them actually leave the

21   property?

22   A.    Correct.

23   Q.    And at this point when you are leaving the Kraft

24   property, they weren't in their vehicle; is that

25   correct?

A

Ricky Rodriguez

```
 1      A.   I don't remember.  I mean, when they -- I saw

 2   them get up, and when I drive off, I don't pay

 3   attention to see where they're getting -- where they're

 4   going.  I assumed they were getting in their vehicle.  I

 5   just saw them walking across the street.

 6      Q.   Sure.  So you gave the order to Frances Kraft,

 7   and the two TXANA employees to go across the street, and

 8   then you left the Kraft property, to go back to where

 9   you thought Mr. Kraft was?

10      A.   At that point, I was actually arriving, and I

11   parked my patrol car somewhere on the right side of the

12   map, here.

13      Q.   Okay.  I get it.  So after you --

14      A.   I was on the opposite side from them, so I

15   wasn't --

16      Q.   Sure.  And I mis-remembered where you went.  So

17   you gave them the order, the TXANA employees, and

18   Frances Kraft, to leave the property, and then you

19   moved your vehicle to another spot on the Kraft

20   property?

21      A.   Right.  Over here (indicating).

22      Q.   So you weren't paying attention to what the

23   TXANA employees and Frances Kraft did after you told hem

24   to go across the street?

25      A.   No.
```

Ricky Rodriguez

1    Q.    So you can't say whether they ever went across

2    the street?

3    A.    I can't, no.

4    Q.    But you do know that when you were in the

5    process of leaving the Kraft property at the end of the

6    incident, they were still there?

7    A.    Yeah.

8    Q.    And "they", referring to the TXANA employees?

9    A.    Right.  We see them on the video.

10    Q.    So, sitting here today, you can't tell whether

11    they were following you over there?

12    A.    Correct.

13    Q.    After the incident at the Krafts' property on

14    December 21st, did Sergeant Rollins ever speak to you

15    about what happened at the Krafts' property?

16    A.    No.  Not that I can remember.

17    Q.    So you don't remember if he ever, like,

18    counseled you about the decisions you made at the Kraft

19    property?

20    A.    No.

21    Q.    Okay.  So he didn't say anything, like, "Deputy

22    Rodriguez, you could have done X, Y, or Z better.  Let's

23    get better next time"?

24    A.    No.

25    Q.    Did anyone from the sheriff's office ever speak

1    to you about how you interacted at the Krafts' property

2    that day on December 21, 2021?

3        A.   No.

4        Q.   And just so the record is clear -- I think the

5    answer is no -- were you ever reprimanded by anyone at

6    the sheriff's office for any of the events that

7    occurred at the Krafts' property on December 21, 2021?

8        A.   No.

9        Q.   And after Justin Pulliam's arrest, was there any

10   internal discussion at the sheriff's office about maybe

11   how to handle interactions with citizen journalists in

12   general?

13       A.   Afterwards?  Not that I can remember.

14       Q.   And did any new Sheriff's Office policies emerge

15   after the arrest of Justin Pulliam?

16       A.   No.

17       Q.   I'm going to take a quick break, and then we'll

18   hopefully be close to being done.

19            COURT REPORTER:   Off the record, 11:07.

20            [Short recess was taken.]

21            COURT REPORTER:   Back on the record at

22   11:11.

23            MS. HEBERT:      I don't have any other

24   questions at this time.  I'm going to pass the witness.

25            MR. HEDGES:      We'll reserve ours till the

Ricky Rodriguez

```
 1   time of trial.

 2              COURT REPORTER:   Off the record, 11:11.

 3              MR. HEDGES:       And he'll read and sign,

 4   and I do need a copy.

 5              [Deposition was concluded.]

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ricky Rodriguez

```
 1                    REPORTER CERTIFICATION

 2      ORAL DEPOSITION of RICKY RODRIGUEZ, taken on August

 3   11, 2023.

 4      I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify to

 5   the following:

 6      That the witness, RICKY RODRIGUEZ, was duly sworn by

 7   me, and that the transcript of the deposition is a true

 8   record of the testimony given by the witness;

 9      That examination and signature of the witness to the

10   deposition transcript was reserved by the witness at the

11   time of the deposition;

12      I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties in the

14   action in which this proceeding was taken, and, further,

15   that I am not financially or otherwise interested in the

16   outcome of this action.

17      Certified by me on this 5th day of September, 2023.

18

19   _____

20      Sarah B. Townsley CRR CCR CSR RPR

21      Certified Realtime Reporter

22      TX CSR #5746; LA CCR #92016; RPR 814558

23

24

25
```