# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT 8

```
 1   APPEARANCES (all via remote):

 2   FOR PLAINTIFFS:

 3                       INSTITUTE FOR JUSTICE
                         816 Congress Ave., Suite 960
 4                       Austin, TX  78701
                         By: Christen Mason Hebert
 5                            CHebert@IJ.org
                              Jeff Rowes
 6                            JRowes@IJ.org

 7   FOR DEFENDANTS:

 8                       Kevin Hedges
                         Assistant County Attorney
 9                       Litigation Division
                         401 Jackson Street
10                       3rd Floor
                         Richmond, TX  77469
11                       Kevin.Hedges@FBCtx.gov

12

13   ALSO PRESENT:      Molly Hanis

14   REPORTED BY:       Sarah B. Townsley, CSR, CRR, RPR

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        STIPULATIONS

 2      IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR

 3   THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF SHERIFF

 4   ERIC FAGAN WAS TAKEN BEFORE SARAH B. TOWNSLEY, CRR, CCR,

 5   CSR, RPR, CERTIFIED REALTIME REPORTER IN AND FOR THE

 6   STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE AND IN

 7   ACCORDANCE WITH THE FEDERAL RULES OF CIVIL PROCEDURE AS

 8   PROVIDED BY LAW, VIA REMOTE VIDEOCONFERENCE, ON AUGUST

 9   29, 2023, AT 9:06 A.M.;

10      THE PARTIES HEREBY WAIVE ALL FORMALITIES IN

11   CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE

12   EXCEPTION OF THE SWEARING OF THE WITNESS AND THE

13   REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;

14      THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED

15   TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;

16      COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT

17   AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE

18   ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND

19   THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE

20   TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF

21   MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF

22   THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;

23      SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN

24   ADMINISTERING THE OATH TO THE WITNESS.

25
```

Sheriff Eric Fagan

```
 1                        INDEX

 2   EXAMINATION BY                        PAGE NO.

 3   Ms. Hebert                               5

 4   Mr. Hedges                             113

 5   Ms. Hebert                             113

 6

 7                       EXHIBITS

 8   NO.    DESCRIPTION                     PAGE NO.

 9   1      topic list from deposition notice    11

10   2      discovery responses              16

11   3      call slip                        76

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sheriff Eric Fagan

```
 1   PROCEEDINGS:

 2                       ERIC FAGAN,

 3   having been first duly sworn by the court reporter,

 4   testified on oath as follows:

 5                COURT REPORTER:   We are on the record.

 6   It's 9:06 a.m.

 7                       [Witness was sworn.]

 8   EXAMINATION BY MS. HEBERT:

 9      Q.   Good morning, Sheriff.  As you know, my name is

10   Christie Hebert.  We met previously, and before we

11   start, I'm going to go through a couple of things.  I

12   know that you previously testified in this case, so a

13   lot of these things will sound familiar to you, but I

14   need to state them on the record, nevertheless; do you

15   understand?

16      A.   Yes.

17      Q.   Okay.  As you know, my colleague, Jeff Rowes, is

18   joining us today, as is my colleague, Molly Hanis, and

19   then, in the room with you, you have your attorney, the

20   county's attorney, Mr. Kevin Hedges.  Is anybody else in

21   the room with you today?

22      A.   No.

23      Q.   And then we also have the lovely Sarah as our

24   court reporter today, who's been with us before.  Just

25   wanted to introduce Sarah, and she will write down
```

 1   everything that's said during this deposition, unless

 2   she's instructed otherwise, just as a heads-up.

 3   Because you're here today, you're just generally

 4   waiving any objections to deficiencies in your

 5   deposition notice, and you're generally waiving any

 6   objections to the lovely Sarah's qualifications as the

 7   court reporter to record today.

 8        We'll start with opening questions.  Can you

 9   state your name for the record, please?

10   A.   Eric Wayne Fagan.

11   Q.   And, as you previously testified, you are the

12   sheriff of Fort Bend County; is that correct?

13   A.   Yes.

14   Q.   And you are here today testifying on behalf of

15   Fort Bend County; is that correct?

16   A.   Yes.

17   Q.   And you previously testified under oath in this

18   case?

19   A.   Yes.

20   Q.   And before we kind of go on, I'll go over the

21   general housekeeping matters for a deposition.  You

22   understand, that today, like you previously testified,

23   that you are under oath today, and that's the same as if

24   you were in court testifying before a judge?

25   A.   Yes.

 1    Q.   And that means that you swore to tell the truth?

 2    A.   Yes.

 3    Q.   And, as a reminder, it's important that we need

 4  to have a clear record.  That means I need to ask clear

 5  questions, and you need to provide clear answers, and,

 6  generally, that means don't shake your head or say

 7  "uh-uh" or "uh-huh", because those responses --

 8  especially via Zoom -- are difficult for Sarah to

 9  capture.  Do you understand that?

10    A.   Yes.

11    Q.   And if you don't understand a question or

12  something that I'm asking, please let me know.  I will

13  either ask Sarah, the court reporter, to read back the

14  question, or I will attempt to rephrase.  And, again,

15  like last time, let's try to avoid interrupting each

16  other.  I'll try and finish my question, and I'll try

17  to avoid interrupting you when you're answering.

18  Finally, you can generally assume that I'm not asking

19  you anything about what your attorney, Mr. Hedges, told

20  you, or any conversations that you had with Mr. Hedges.

21       Your attorney, Mr. Hedges, may state an objection

22  after I ask a question, and this doesn't mean that I've

23  asked a bad question.  It just means that Mr. Hedges is

24  preserving his right to make an objection before a judge

25  at a later date to a specific answer or question, and

1   so, in general, you just continue to answer the

2   question after Mr. Hedges' objection, unless he

3   specifically directs you not to answer.

4          We're taking this deposition via Zoom, so if I

5   cut out or freeze, please let me know as soon as

6   possible, and I know that we can all have technical

7   difficulties via Zoom, despite our familiarity in the

8   post-pandemic era, but let's try to agree to be patient

9   with each other if technology issues pop up; is that

10  okay, Sheriff?

11     A.   Yes.

12     Q.   And, like last time, if you need a break, need

13  to use the restroom, need to get a drink, that's fine.

14  Just let me know, and I'd ask you to try to finish

15  answering a question before taking a break.  Is that all

16  right?

17     A.   Yes.

18     Q.   Is there any reason why you are not able to give

19  your fullest and best testimony today, such as you're

20  taking impairing medicine or something else?

21     A.   No.

22     Q.   And do you have -- do you understand how you'll

23  access the exhibits that I plan to use today?

24          MR. HEDGES:     What we've done,

25  Christie, is we've downloaded those locally to this

 1   computer, so I think I can switch screens and play

 2   them.

 3             MS. HEBERT:      Okay, so you have the

 4   videos if we need those, and then Molly just shared the

 5   link for exhibits as they get marked, as we introduce

 6   them, so you'll be able to open that folder, Kevin.

 7             MR. HEDGES:      In the chat?

 8             MS. HANIS:       I can always share my

 9   screen if that's easier.

10   BY MS. HEBERT:

11     Q.   She sent it in the chat, so you guys have your

12   ability to -- she can also share her screen as we go.

13             MR. HEDGES:      Okay, well, hopefully,

14   we'll be able to figure that out.

15   BY MS. HEBERT:

16     Q.   Okay.  If we have unclarity about what document

17   that I'm referring to, or need to sort that out, feel

18   free to just stop me, and we'll make sure that we're all

19   looking at the same place and the same document, in

20   whatever form we need to.  And, just like your

21   deposition previously, Sheriff, you have the right to

22   read the document in its entirety.  We're not trying to

23   trick you, here, but some documents obviously include

24   material that we're not asking you about today, so I've

25   tried to highlight or identify the particular portions

Sheriff Eric Fagan

```
 1   of a document that might be relevant, but it is your

 2   right to review the entirety of the document with Mr.

 3   Hedges.  Do you understand that?

 4       A.   Yes.

 5       Q.   And, similarly, we are going to look at some

 6   video clips today.  To save time, I have identified

 7   relevant portions of those video clips, but, again, you

 8   have the right to review the entirety of those video

 9   clips with Mr. Hedges.  To be clear, we're not trying

10   to trick you, or we're not cutting out a specific

11   portion, or trying to make you look bad.  Instead,

12   we're just trying to focus on the specific portions of

13   the video that are relative for our conversation today.

14   Do you understand?

15       A.   Yes.

16       Q.   There's a couple things that I just want to make

17   sure we're clear about on shorthand.  If I say "the

18   county", can we agree that I'm referring to Fort Bend

19   County?

20       A.   Yes.

21       Q.   And if I say "the sheriff's office", can we

22   agree that I'm referring to the Fort Bend County

23   Sheriff's Office?

24       A.   Yes.

25       Q.   And if I say "the sheriff", can we agree that I
```

 1   am saying the sheriff of Fort Bend County?

 2      A.   Yes.

 3      Q.   I want to talk about your deposition notice.

 4           MS. HEBERT:     Molly, would you mind

 5   bringing up Exhibit A and marking that as Exhibit 1?

 6              [Exhibit 1 was marked.]

 7   BY MS. HEBERT:

 8      Q.   Molly, would you mind just scrolling over this

 9   document so the sheriff can see the entirety of it?

10           MR. HEDGES:     Are you sharing your

11   screen?

12           MS. HEBERT:     She is.

13           MR. HEDGES:     Okay, I'm in the actual

14   exhibit, so hold on.

15           MS. HEBERT:     I was just trying to make

16   it easier for all of us; that way, you can see what I'm

17   seeing.

18           MR. HEDGES:     All right, so I think we're

19   good now.

20           MS. HEBERT:     So, Molly, would you mind

21   scrolling again just a little bit so the sheriff can

22   see all of the pages?

23           Page 2 and page 3, page 4, and page 5.  Let's go

24   back to page 1, Molly.

25   BY MS. HEBERT:

Sheriff Eric Fagan

```
 1      Q.    Sheriff, have you seen this document before?

 2      A.    Yes.

 3      Q.    And I'll represent to you that this is the

 4   notice of deposition for the County of Fort Bend.  Do

 5   you understand that?

 6      A.    Yes.

 7            MS. HEBERT:     And, Molly, let's go to

 8   page 2; and page 3.

 9   BY MS. HEBERT:

10      Q.    Sheriff, have you seen this topic list before?

11      A.    Yes.

12      Q.    And you understand that, today, you are here to

13   testify on the county's behalf as the representative of

14   Fort Bend County?

15      A.    Yes.

16      Q.    And that means that the county has designated

17   you as its representative; do you understand?

18      A.    Yes.

19      Q.    And I know that testifying on behalf of an

20   entity -- specifically here, the county -- can make

21   things a little bit awkward, especially when I ask

22   questions about the sheriff, but, because you are

23   answering on the county's behalf, I need to kind of

24   phrase the questions specifically to ask about the

25   county's answers, so, although you are the sheriff, I
```

Sheriff Eric Fagan

```
 1    might be asking some third-person questions about the

 2    sheriff.  Do you understand?

 3        A.   Yes.

 4        Q.   Okay.  Did you do anything to prepare for this

 5    deposition, other than speak to Mr. Hedges?

 6        A.   No.

 7        Q.   Did you speak to anybody else at the county?

 8        A.   No.

 9        Q.   Did you review any particular documents?

10        A.   My own deposition last night.  I read over it

11    and made corrections.

12        Q.   Sure.  Anything else?

13        A.   No.

14        Q.   And did you watch any videos in preparation for

15    this deposition?

16        A.   No.

17        Q.   Okay.

18             MS. HEBERT:     Kevin, I think this is a

19    great time to stipulate on the record, and what I have

20    is that the county is willing and agrees to stipulate

21    that Sheriff Fagan's answers in his deposition can serve

22    as the county's answers to the same questions that were

23    posed to the sheriff.

24             MR. HEDGES:     Yes, that's correct, and

25    just to specify that his deposition was taken on August
```

Sheriff Eric Fagan

1    9th of 2023.  We agree to that.

2              MS. HEBERT:      Thank you.  At this time,

3    I think it would be helpful for us all to take a

4    fifteen-minute break, and I will review the questions

5    that I -- I'm planning to ask the sheriff and make sure

6    that we're trying to be as efficient as possible.  So

7    fifteen minutes from now... let's come back at 9:35.

8              MR. HEDGES:      Perfect.

9              MS. HEBERT:      Okay.  Talk to you soon.

10             COURT REPORTER:  Off the record, 9:18.

11                   [Short recess was taken.]

12             COURT REPORTER:  We're back on the record

13   at 9:37 a.m.

14   BY MS. HEBERT:

15   Q.    Thank you, Sheriff, for the brief break for us

16   to revise kind of what we're going to ask you today.

17   I'll start with a few basic questions.  How many peace

18   officers does the county employ?

19   A.    Well, when you ask that question, I'll have to

20   put in the constables, as well, so I couldn't give you

21   an exact number, but I would say over a thousand; well

22   over -- close to 2,000.  I have 800 employees at my

23   agency, and different constables' office have their

24   employees.  I couldn't give you an exact number.

25   Q.    That's okay.  And so just let me rephrase to

1    make sure that I am understanding.  You would say the

2    sheriff's office has approximately 800 employees; is

3    that correct?

4        A.   Yes.

5             MR. HEDGES:      Peace officers.

6        A.   You're talking about peace officers, correct?

7        Q.   I wasn't sure.  I wasn't clear.  So the

8    sheriff's office has approximately 800 peace officers?

9        A.   Certified officers, not including civilian

10   employees.

11       Q.   Okay, thank you.  And then the constable's

12   office, which is separate from the sheriff's office --

13       A.   Yes.

14       Q.   -- they have another number, and you're not

15   exactly sure of the amount that the constable's office

16   has?

17       A.   Yes.  I don't remember.  I have no idea the

18   numbers they have.

19       Q.   I understand, but both categories of officers

20   are technically employed by the county?

21       A.   Yes.

22       Q.   Okay.  And about how many or what percentage of

23   the 800 peace officers employed by the sheriff's office

24   will go on patrol?

25       A.   On patrol is my second-largest.  I'll say

Sheriff Eric Fagan

```
1    anywhere between 575 to 600.

2       Q.   So anywhere from 75 officers to --

3       A.   475 -- I said 5 -- 475.

4       Q.   So let me make sure that we have a clear record

5    on that.  Anywhere from 475 to 700 of the officers of

6    the -- of the peace officers of the sheriff's office go

7    on patrol?

8       A.   About 475 go on patrol.  I have peace officers

9    that works inside the jail, as well, so they don't go

10   on patrol, and I have peace officers who are

11   investigators, so they don't go on patrol.

12      Q.   So approximately 475 peace officers from the

13   sheriff's office patrol?

14      A.   Yes.  If you give me two minutes, I can call and

15   get the exact number, if that's what you want.

16      Q.   No, that's okay.  475, approximately, is fine.

17   About how many people live in Fort Bend County, based on

18   the county's estimates?

19      A.   I'll say close to over nine hundred thousand.

20   We're close to -- 885 thousand, close to nine hundred

21   thousand individuals from the last census.

22      Q.   Okay.  Thank you.  That was helpful.  We can

23   skip a lot of this.  Before we continue, just so Molly

24   has advance notice, Molly, would you mind bringing up

25   Exhibit I?  "I", as in "ice cream."
```

Sheriff Eric Fagan

```
 1                    [Exhibit 2 presented.]

 2   BY MS. HEBERT:

 3      Q.   Before we continue, I'd like to talk about the

 4   county's responses to request for admissions, which

 5   we're going to label as Exhibit 2.

 6                MS. HEBERT:     And, Molly, would you mind

 7   scrolling through the pdf of this document just so that

 8   the sheriff can see all the pages?  We're on page 2,

 9   page 3, page 4, page 5, page 6, page 7, page 8, page 9,

10   page 10, page 11, page 12, page 13, page 14, page 15,

11   page 16, page 17, and I believe that's all the pages.

12   Can you scroll back to the top, Molly, the first page?

13   BY MS. HEBERT:

14      Q.   Sheriff, have you seen this exhibit before?

15      A.   Yes.

16      Q.   Did you, on behalf of the county, review the

17   answers to Exhibit 2 to make sure the answers are

18   correct?

19      A.   Yes.

20      Q.   And did anyone besides Mr. Hedges help you

21   answer these questions?

22      A.   No.

23      Q.   And, to be explicit, you, on behalf of the

24   county, answered the questions in Exhibit 2?

25      A.   Yes.
```

Sheriff Eric Fagan

```
 1    Q.   In preparing the responses to the questions in
 2   Exhibit 2, did you review the -- the video of July
 3   12th, 2021, that is referenced in the questions as part
 4   of providing the county's response?
 5    A.   Yes.
 6    Q.   And did you review any footage of the events of
 7   December 21, 2021, relating to Justin Pulliam's arrest
 8   in answering the questions that are part of Exhibit 2?
 9    A.   Yes.  I'd like to qualify those answers.  I
10   watched the videos before I answered the questions, but
11   when I watched the videos, I had no idea the questions
12   were coming, so I did watch them -- if you understand
13   what I mean.
14    Q.   I do.  So let me just break that down.  When you
15   say "watch the videos", can you tell me which videos
16   you're referring to?
17    A.   At Jones Creek; that -- that video, I watched
18   that one, and then the one with Justin Pulliam was
19   arrested at the standoff at the home.
20    Q.   Okay.  And how did you access those videos?  Did
21   you access those videos as linked in plaintiff's
22   complaint?
23    A.   The first time I did it from my office -- my
24   officers, on their body cam, and then the next time I
25   watched them was from the complaint.
```

Sheriff Eric Fagan

```
 1      Q.    When you say "officer's body cam", I understand
 2    that the officers did not have body cameras in December
 3    21, 2021, so --
 4      A.    Correct.  So the vehicle.  Thank you for
 5    correcting me.  It's the vehicle.
 6      Q.    Okay, so what I understand you to be saying is
 7    that you reviewed the dash camera footage from Deputy
 8    Ricky Rodriguez; is that fair?
 9      A.    Yes.
10      Q.    And you reviewed the footage from Justin
11    Pulliam's body camera; is that also accurate?
12      A.    Yes.
13      Q.    Okay.  And then later, you --
14      A.    Well, I take that -- if that's the video that
15    Mr. Hedges had that he showed me, I'm assuming it came
16    from Justin Pulliam.
17      Q.    I can't answer what Mr. Hedges showed you, so I
18    guess I'm asking you about what videos you reviewed
19    before the complaint, and you just explained that you
20    reviewed the footage from -- Deputy Rodriguez's dash
21    camera footage.
22      A.    Yes.
23      Q.    Was there any other footage of the December 21,
24    2021 events that you reviewed before the complaint?
25      A.    No.
```

Sheriff Eric Fagan

```
 1     Q.   And then after the complaint, did you review the
 2   footage that Justin Pulliam linked in the complaint from
 3   December 21, 2021?
 4     A.   Yes.
 5     Q.   I'd like to return to the topic of the county's
 6   policies on press conferences.  Generally, sheriff, how
 7   does the sheriff's office announce that it is holding a
 8   press conference?
 9     A.   My PIO would reach out to the media outlets to
10   come for the press conference.
11     Q.   And how does your PIO -- how does the county's
12   PIO reach out to the media?
13     A.   I guess by e-mail or call.
14     Q.   And is there an e-mail list that the sheriff's
15   office then uses to announce press conferences?
16     A.   I wouldn't know.  My PIO would have to answer
17   that question.  I wouldn't know that.  I'm sure they do
18   have a e-mail link, but I never had to use it.
19     Q.   Okay, and who is on the list of folks who get
20   the e-mail?
21     A.   I wouldn't know that, either.  Like I said, my
22   PIO handles that, but I'm sure it's the local news media
23   outlets.
24     Q.   Okay, and how does someone get added to the list
25   that the sheriff's office maintains for press
```

Sheriff Eric Fagan

```
 1   conferences?
 2      A.   I couldn't answer that question, either.  Well,
 3   I don't know.
 4      Q.   A press conference is planned in advance, if
 5   it's going to be, let's say, held onsite at the
 6   sheriff's office, where does the sheriff's office hold
 7   the press conference?
 8      A.   Either in my media room or my bunker room.
 9      Q.   What was that second one?
10      A.   Bunker room.
11      Q.   Bunker room.
12      A.   Just a big room.  We just call it a bunker.
13   It's not a bunker.  It's a big room.
14      Q.   Okay.  That sounded pretty intense, but thank
15   you for clarifying.  Who gets to attend a press
16   conference?
17      A.   People from the news media outlets that the PIOs
18   invited.
19      Q.   And if your average Joe heard about the press
20   conference, would he or she be able to walk in and
21   attend?
22      A.   No.
23      Q.   Okay.  Is there typically someone at the door
24   who's checking IDs?
25      A.   Yes, because the press conferences are behind
```

Sheriff Eric Fagan

```
 1   the secured area.  You have to have a access code to

 2   get there.

 3      Q.   You need to have a what?  What was that?

 4      A.   A access card to get there.

 5      Q.   And tell me about an access card.

 6      A.   It's just a ID card that has -- you scan at the

 7   door, and it'll allow you in, because it's behind a

 8   secured area.

 9      Q.   And how does a member of the media get an access

10   code -- or access card, excuse me?

11      A.   My deputy at the front desk, after they sign in,

12   she will scan them in.

13      Q.   Okay, so let me make sure I understand that.  If

14   someone from a Houston TV channel comes to a press

15   conference because they were allegedly invited by a PIO

16   officer, they walk in the door; is that right?

17      A.   Yes.

18      Q.   They sign in with the deputy at a front desk; is

19   that right?

20      A.   Yes.

21      Q.   And then the deputy at the front desk hands them

22   an access card --

23      A.   No.

24      Q.   -- is that right?

25      A.   No.  The deputy at the front desk then walks
```

Sheriff Eric Fagan

1    them over to the door, uses his or her scan card to scan

2    the door and let them in.

3        Q.   Okay, so the press person, the media -- the

4    member of the media does not receive an access card him

5    or her self?

6        A.   Correct.

7        Q.   Okay, so the deputy lets the media person in,

8    and then the media person proceeds to whatever room

9    you've designated as the location for the press

10   conference?

11       A.   Yes.

12       Q.   When the media person is signing in with the

13   deputy at the front desk, is that when the media

14   person's ID is checked?

15       A.   By the deputy, yes.

16       Q.   Okay, and what kind of identification does the

17   deputy check?

18       A.   They'll see the call letters of the television

19   or the media outlet, and it asks for ID.

20       Q.   Okay, so what kind of identification does the

21   sheriff's office accept?

22       A.   For media?

23       Q.   Yes.

24       A.   The ID and, like I said, the camera has the call

25   letters.

Sheriff Eric Fagan

```
 1      Q.   Okay.  So when you say "ID", do you mean
 2   someone's driver license?
 3      A.   No.  Their ID card from the news station, but
 4   when people do come in, we do look at the driver's
 5   license, as well, too.
 6      Q.   Okay, so, to summarize, the deputy at the front
 7   door asks for their -- their ID from their employer,
 8   and potentially the driver's license?
 9      A.   Yes.
10      Q.   Anything else?
11      A.   No.
12      Q.   Okay, and how does the sheriff's office make
13   sure that the media identification that someone is
14   providing at the front door is authentic?
15      A.   Actually, just take their word for it.  Like,
16   they come in with a camera man and all that, so they
17   just take their word.  We don't vet them at the door.
18   That would be too time-consuming.
19      Q.   Sure.  Is there any vetting process that occurs
20   before a member of the media comes to the door?
21      A.   If the PIO contacted them, that would be the
22   only way they would know about it.
23      Q.   Okay.  Let me revisit that, then.  So the PIO
24   contacting folks and inviting them to press
25   conferences, how does the PIO decide who to send
```

Sheriff Eric Fagan

```
 1   invitations to?

 2      A.   It's the PIO's discretion.  They handle that.  I

 3   hired them for that purpose.  It's not a media person,

 4   so that's why I hired people to do that, so that

 5   question would have to go to the media person.  The

 6   PIOs, public information officers, that's their job who

 7   to pick and not to pick if it's -- I can't -- I don't

 8   know how they do it.

 9      Q.   But the sheriff supervises the PIO; is that

10   correct?

11      A.   Yes.  I delegate a person to supervise the PIOs,

12   yes.

13      Q.   I'd like to talk about the sheriff's office's

14   policy for behavior that warrants removing someone from

15   a press conference.  I expect that the sheriff's office

16   has a policy on removing people who are acting violent

17   or, perhaps, threatening violence; is that a correct

18   statement?

19      A.   No, we don't have a policy.  We'll just act if

20   someone does it.  I don't have a policy for media people

21   on removal.

22      Q.   You may not have -- the county might not have a

23   written policy, or the sheriff's office might not have

24   a written policy, but would it be fair to say that that

25   is an informal or unwritten policy that if someone were
```

Sheriff Eric Fagan

```
 1   threatening violence at a press conference or was being

 2   violent at a press conference, they would be removed?

 3       A.   Yes.

 4       Q.   What other types of behavior warrant removing a

 5   person from a press conference?

 6       A.   Being disruptive.

 7       Q.   And what does "disruptive" mean to the sheriff's

 8   office?

 9       A.   As far as my standards, interrupting the press

10   conference, not allowing other people to speak, things

11   of that nature.  Using vulgarity, things like that.

12       Q.   Under the sheriff's office policy, if someone is

13   being disruptive at a press conference, does the

14   sheriff's office require an officer to give a warning

15   to that person before removing them from the press

16   conference?

17       A.   It depends on the severity of the disruption.

18   In some cases, you can give a warning.  In other cases,

19   you might to act right away.

20       Q.   But it depends on the severity of the

21   disruption?

22       A.   Yes.

23       Q.   I'd like to get some clarification about the

24   training that the sheriff's office provides its

25   officers.  Does the training -- does the sheriff's
```

Sheriff Eric Fagan

1   office provide any training to its officers that

2   specifically focuses on the policies of the sheriff's

3   office?

4        A.   The sheriff's office -- we have general orders,

5   in that when a person get hired, they're told that they

6   have to read over those general orders and policies.

7   Do we have a class for general orders and policies?

8   No.  It's the officer's duty to read over those general

9   orders and policies.

10       Q.   Sure.  So let me make sure I understand what

11  you're saying.  When a peace officer is hired, he or she

12  is expected to read the general orders and whatever

13  other written documents that the sheriff's office

14  delivers as policies, but other than that, there's no

15  specific training the sheriff's office provides on its

16  orders and policies?

17       A.   No.

18       Q.   Okay.  So you previously talked about in-service

19  training in your deposition?

20       A.   Yes.

21       Q.   Can you -- can the county clarify what it means

22  by a in-service training for the sheriff's office?

23       A.   By state law, officers have to take a certain

24  number of hours each year to keep their licenses

25  active.  It's called TCOLE hours, the state of Texas,

Sheriff Eric Fagan

```
 1   that they have to take.  These courses vary in topics.

 2   Like legal updates; we have to have legal updates.

 3   That's every year you have to do that.  Diversity

 4   training; that's every year.  Now, because of mental

 5   illness, we have mental illness training.  Like I said,

 6   it varies.

 7       Q.   So when you -- when you are referring to -- or

 8   the county is referring to in-service training, the

 9   county is referring to training -- TCOLE training that

10   officers are attending?

11       A.   Yes.

12       Q.   And I understand that "TCOLE" stands for the

13   Texas Commission on Law Enforcement, and that,

14   generally, TCOLE sets kind of the minimum standards for

15   what it means to be a peace officer, and then verifies

16   for provides the requirements for -- the continuing

17   education requirements for maintaining your peace

18   officer license; is that a good summary?

19       A.   Yes.

20       Q.   And how does the sheriff's office verify that

21   its officers are satisfying TCOLE's continuing

22   education requirements?

23       A.   We have a list that the academy staff keeps of

24   every officer's TCOLE hours, and the state notifies

25   each law enforcement agency if someone's in jeopardy of
```

1    not completing their hours within that time period.

2        Q.   Okay, thank you.  And I understand that the

3    TCOLE training is kind of general training that is

4    consistent across the state of Texas; is that fairly

5    accurate?

6        A.   Yes.

7        Q.   So any of the TCOLE training would not be

8    specific to the sheriff's office; is that correct?

9        A.   Yes.

10       Q.   Does the sheriff's office provide its officers

11   with a list of training topics that they are required

12   to take from TCOLE separate from the state's

13   requirements?

14       A.   Yes.

15       Q.   And what's on the sheriff's office list of

16   training that an officer must take that is -- that is

17   separate from the -- the states?

18       A.   Training that I feel or someone on my command

19   staff feel that it's important for the officer to take.

20   Like mental illness, they're taking more classes on

21   mental -- more than what the state requires because

22   that's something I think is important for them to take.

23   I had a situation about domestic violence here in Fort

24   Bend, so I'm taking some other courses on how to handle

25   family violence situations, so it could be courses that

Sheriff Eric Fagan

```
 1    I myself feel they need to take or someone on the
 2    command staff think that our officers need more
 3    training on, we can require them to take these classes.
 4        Q.   Okay, I understand.  So how is that -- how is
 5    the training requirement that you -- you identify, how
 6    is that communicated to other officers, to the rest of
 7    the sheriff's office officers?
 8        A.   We send out a e-mail blast through our web --
 9    through our e-mail at the sheriff's office that just
10    goes to our employees.
11        Q.   So when the sheriff's office identifies a
12    training that its officers need to have that's in
13    addition to the state requirements, there will be an
14    e-mail blast saying everybody needs to take X training
15    by a certain date?
16        A.   Yes.
17        Q.   What happens if someone fails to take the
18    required training?
19        A.   The TCOLE training or the training that --
20        Q.   The training that the sheriff's office mandates
21    that they take.
22        A.   They could be reprimanded.
23        Q.   Okay.
24        A.   Anywhere from an oral reprimand, written
25    reprimand to days off.
```

 1    Q.   Okay.  I'll ask more questions about that in a

 2   minute.  Let's circle back to that in a minute, but how

 3   does -- we talked a little bit about you identifying or

 4   a command officer identifying a deficiency in officer

 5   training but, how, generally, does the sheriff's office

 6   go about evaluating the adequacy of the training that

 7   is provided to its officers as a whole?  Is there any

 8   kind of process?

 9    A.   Some classes, they have to take tests, and they

10   have to have, like, a minimum score in that class to

11   say that they successfully took the class, but it

12   varies.  Some classes don't have tests, so it varies.

13    Q.   Okay, so let me make sure I understand that.  So

14   the way that you, as the sheriff, and the way the

15   county, through the sheriff's office and any of its

16   command staff identifies inadequacy in officer training

17   is if officers score a certain range on a test?

18    A.   In some classes, yes, like I said, but some

19   classes don't have tests that they're in.

20    Q.   Okay.  I think we might be getting our wires

21   crossed a little bit.  You previously said that when

22   the sheriff's office identifies an additional training

23   above and beyond the TCOLE requirements that its

24   officers need, the sheriff's office will send out an

25   e-mail blast saying, hey, officers, you need to take X

1    training by a certain date.  How does the sheriff's

2    office identify those kinds of courses that its officers

3    need or are missing?

4        A.   Like I said before, it's a class that I feel

5    that I want them to take, get more instruction on.

6    They're still TCOLE classes, but I want them to get

7    more instructions on them.  Like the mental illness;

8    they might have several classes on mental illness, and

9    TCOLE said they need eight hours.  Well, I want them to

10   take 16 hours, so they need to take another course in

11   that -- I'm just using that as an example.

12       Q.   Sure.

13       A.   They're still TCOLE classes, but they're extra

14   in that particular area that we want them to take.

15       Q.   Sure.  So the sheriff, based on his discretion,

16   identifies a particular class, or a command officer

17   identifies a particular class or a particular number of

18   credits in their discretion that they want the rest of

19   the sheriff's officers to take.  Is that a fair

20   summary?

21       A.   Yes.

22       Q.   Okay.  Is there any other process for evaluating

23   whether sheriff's office officers need additional

24   training?

25       A.   Yes.  By the supervisors in the field watching

1    them -- watching body cameras, looking at a certain

2    body camera video, and we see certain things, so we

3    assess that they need more training in certain areas.

4        Q.   Okay, so let me just make sure I understand

5    that.  Particular supervisors will watch body camera

6    videos and identify areas of need for a particular

7    officer, and then -- and then instruct that particular

8    officer to get additional training?  Is that a fair

9    understanding of what you just said?

10       A.   That's one of the ways.  I said that the -- the

11   supervisors in the field may see a officer deficient in

12   some area, and may think they need more training and

13   also the body camera, as well.

14       Q.   Okay, and before body cameras, presumably, it

15   would just be based on a supervisor's field observation

16   of an officer; is that correct?

17       A.   Yes, and the dash cam.

18       Q.   Okay.  That's fair.  I understand.  So there's

19   kind of two categories, as I'm understanding your

20   testimony, or the county's testimony today.  There's

21   the category of the sheriff's office identifies a

22   particular training based on the sheriff's discretion,

23   or a command officer's discretion, and then issues an

24   e-mail blast telling officers they need to take this

25   particular course, and then, additionally, supervisors

```
 1    may identify a particular training for a particular

 2    officer based on field performance, whether viewed in

 3    the field or via body camera.  Are those the two ways

 4    that training -- additional training is identified as

 5    needed?

 6        A.   Yes.  Pretty much, yes.

 7        Q.   Okay.  And the officers themselves can

 8    voluntarily take extra classes if they want?

 9        Q.   Sure.  Of course.  Let me just check my notes,

10    here.

11           I want to just ask a couple of questions about

12    discipline in general.  So, speaking generally, what

13    are the forms of discipline that the sheriff's office

14    can give when an officer makes a mistake?

15        A.   It can vary all the way from oral reprimand, to

16    a written reprimand, to days off, all the way up to

17    termination.

18        Q.   When you say "days off", can you explain that to

19    me?

20        A.   Not days off.  One, two, three days off with no

21    pay.

22        Q.   Kind of like a suspension, then?

23        A.   Yes.

24        Q.   Okay.  So, to continue on to something like an

25    oral reprimand, a written reprimand, some kind of
```

1    suspension, there might be a couple of other actions,

2    and kind of the end result is some kind of termination?

3         A.   Yes.

4         Q.   And when -- let's start at the beginning.  When

5    there is an oral reprimand, is there a written record

6    of that?  So let's say, to explain what I mean, let's

7    say a supervisor makes an oral reprimand of a deputy.

8    Would the supervisor write up that oral reprimand at

9    all?

10        A.   It'll be documented that he had a oral

11   reprimand, yes.

12        Q.   Okay, so every form of the action, from an oral

13   reprimand to, obviously, termination would be written

14   down somewhere in some form?

15        A.   Yes.  It will be documented, yes.

16        Q.   Okay.  And how does a supervisor decide what

17   level of reprimand or what level of discipline to use

18   for a particular officer's mistake?

19        A.   For minor infractions, it's the supervisor's

20   discretion.  When it's something major, it has to go

21   through IAD.

22        Q.   What is IED?

23        A.   IAD.

24        Q.   Oh, internal affairs department?

25        A.   Internal affairs division, yes.

1    Q.   Okay, and what kinds of things are minor enough

2    that it's just within the supervisor's discretion?

3    A.   A officer missed a training period.  A officer's

4    maybe came in late to work two or three times and you

5    need to talk to them, things like that.  That's minor

6    infraction.  A officer not completing a report; a minor

7    infraction, but they do it over and over again, then it

8    escalates to, like I said, the continuum -- oral,

9    written, and things like that, but it's the supervisor's

10   discretion.

11   Q.   And what kinds of things would you expect, or

12   would the county expect would be immediately referred to

13   the internal affairs department?

14   A.   Excessive force, any actions of excessive force,

15   unjustifiable rudeness -- depends on the -- depends on

16   the type of rule like that, we would look to.

17   Dereliction of duty; a lot of things it could be.

18   Q.   Sure.  So if someone, a citizen, made a

19   complaint to the sheriff's office that an officer was

20   incredibly rude, would that go to the internal affairs

21   department?

22   A.   Yes.  The supervisor would immediately look at

23   the body cam -- the body cam, and, also, I started

24   something here when I became sheriff.  It's called

25   mediation.  Sometimes we mediate the offense if a

Sheriff Eric Fagan

```
 1   offense was rude to -- a citizen felt like they were

 2   rude, we can mediate it.

 3       Q.   And what does "mediate it" mean?

 4       A.   Mediation.  You go before a mediator, you have a

 5   third non-biased person in the room with them, a

 6   certified mediator, where the officers sit down with

 7   the citizen, and they discuss the issue that the

 8   complaint is on, and they try to work it out there,

 9   and, by mediate -- mediating it, it doesn't have to go

10   to IAD, and this citizen feel like they have a part of

11   it and the officers also feel like a part of it.

12   That's something new that I started when I became

13   sheriff.  Mediation.  I should have said that.  We don't

14   always go to IED and that's a part of the -- we have

15   mediation.

16       Q.   I understand.

17            Okay, I'm going to switch topics and discuss the

18   sheriff's office response to just calls and incidents

19   and policies on that.  In general, can you tell me

20   about how the sheriff's office classifies, calls and

21   responses?  And, to clarify what I mean, there, for

22   example, I'm thinking about the Department of Homeland

23   Security and how they have their various color

24   classifications of threats and how security folks need

25   to respond to a particular threat level.  Does the
```

Sheriff Eric Fagan

```
 1    sheriff's office have a system for classifying, let's

 2    say, the priority of calls that come in?

 3        A.    Yes.   Code 1, 2, and 3.

 4        Q.    And can you explain what the codes 1, 2, and 3

 5    mean?

 6        A.    Code 3 is not that serious.   Code 2 is a little

 7    serious.   Code 1 is very serious.

 8        Q.    So there are three levels, 1 being the worst and

 9    3 being not serious at all?

10        A.    Not that it's not serious at all.   Just get

11    there when time permit you to get there.   Code 2, more

12    expedient to get there.   Code 1, you immediately head

13    that way.

14        Q.    How is that code communicated to officers in the

15    field?

16        A.    They learn the different codes in the academy

17    before they get to the field, and then when they get

18    with the trainer, they go over it again.   They also get

19    trained -- they just don't go straight to the car.

20    They have to have a trainer, and they go over the codes

21    with them to explain the importance of it, things like

22    that.

23        Q.    So officers on patrol are familiar with the

24    codes, to be fair?

25        A.    Yes.
```

```
 1      Q.    And then for a particular call, how does the

 2   classification work?  What's the system?

 3      A.    I'm not really sure --

 4      Q.    Sure.  How does a call get a priority level?

 5      A.    Oh, it depends on the severity of the call.

 6   Dispatch decides what type of code is it.  If a weapon

 7   is involved, if there's a mental patient involved, if

 8   someone committed a -- say they're going to harm

 9   themselves.  It varies.  Could be a illness; it just

10   varies.

11      Q.    So would it be fair to say, then, that dispatch

12   assigns the priority number based on the facts that are

13   called in?

14      A.    Yes, and then when the officer get there, he

15   could upgrade it.  He or she could upgrade the call if

16   seen necessary.

17      Q.    Okay, so let me understand that.  Like, if it's

18   level 3, the lowest-priority call, the officer on-scene

19   can say, no, really, it's a level 2 --

20      A.    Yes.

21      Q.    -- and upgrade the -- okay.

22      A.    Yes.

23      Q.    And how -- how are the priority codes -- the

24   priority numbers -- is that the right way to phrase

25   that?  Priority numbers?  How are they communicated to
```

Sheriff Eric Fagan

```
 1   officers for a particular call?  So how would an

 2   officer know what calls are number 1, for example?

 3        A.   It can either go through the radio by mic, or it

 4   can be typed to a -- teletyped to them on the MDT, the

 5   computer in their car.

 6        Q.   MDT, can you explain what that stands for, for

 7   me?

 8        A.   Mobile data terminal.

 9        Q.   And that's just the computer that officers have

10   in their vehicle?

11        A.   Yes.

12        Q.   So we talked through a couple of prior

13   scenarios, just so I can understand the priority

14   system.  If there was, a -- let's say a car accident

15   where no one was injured, but were parked on the side

16   of the road, what priority level or what number would

17   the sheriff's office assign to that type of call?

18        A.   No injuries, just a minor accident, side of the

19   road be a code 3, minor.  It would be a low-priority

20   call.

21        Q.   And what about a general welfare check?

22        A.   We do welfare checks.  It depends on the type of

23   welfare check.  If it's something that we on a regular

24   basis -- because people can call in to ask us to do

25   welfare checks on their loved ones.  That's a code 1.
```

1    When they have time, they'll go by there.  If we get

2    called in for a welfare check, because someone called

3    in and said, "I haven't heard from my mother in two or

4    three days, and she's known to be sickly.  We want to

5    check on her", that probably will code a code 2 call.

6    We'll try to call and see if we can contact, then we'll

7    send a unit over.  If we know that someone's hurt or

8    they said that someone's hurt, that will be a code 1.

9    We know we need to get emergency people out there right

10   away.

11       Q.   Let me just make sure I understand, because I

12   think you might have misspoke there, a little bit.  The

13   first scenario that you just walked through where

14   someone just, like, generically calls in asking for a

15   welfare check, that would be the lowest priority of 3;

16   is that correct?

17       A.   No.  The first one I was saying, we have a -- a

18   program here --

19       Q.   Sure.

20       A.   -- where people can sign up and ask us to check

21   on their loved ones.  It's called -- we just check on

22   them.  We check on them periodically, and we'll go by

23   and check on them, because they ask us, would you mind

24   checking on my mother, she lives alone, things like

25   that, so that's a low priority.  It's not low priority,

1    because that's your loved one, but, to us, we'll go to

2    check on them when -- like, you don't have any calls

3    holding, you'll go check on that house to make sure

4    she's all right; or he.

5        Q.   I understand.  And it's not that it -- it would

6    be classified as a number 3, not because it's not a low

7    priority.  It's just, relative to the other calls that

8    come in, it's when you have time --

9        A.   Yes.

10       Q.   Okay.

11       A.   Yes.

12       Q.   And I understand that we just talked about the

13   ways that the sheriff's office classifies the priority

14   levels of a -- of a -- of a call, but is there a way

15   that the sheriff's office classifies -- separate from

16   the priority level, is there a way that the sheriff's

17   office classifies the type of response that might be

18   needed?  So here's kind of what I'm thinking, here.  Is

19   there a way that the sheriff's office communicates to

20   its officers that you need to be in your S.W.A.T. gear,

21   for example, when responding to this call, even though,

22   you know, you wouldn't necessarily need to be in your

23   S.W.A.T. gear for every priority one call?

24       A.   Yes.

25       Q.   And can you tell me about that system?

1    A.   If you get there -- get the call that there's a

2  barricaded person, or if there's a possible hostage

3  situation, something like that, we know to send out

4  S.W.A.T., more than just one unit, because of the

5  safety of the officers and the safety of the public, so

6  you know you want to -- you know, the S.W.A.T., like

7  you said, bring S.W.A.T. out there, not just one unit.

8    Q.   And how would dispatch, I think -- I believe it

9  would be dispatch.  How would dispatch communicate that

10  need?

11    A.   The same way -- by radio or over the radio, or

12  Teletype.  Most likely, in these type of situations it's

13  going to be the radio, because you make sure that they

14  have -- got the message, and also using the MDT, as

15  well.

16    Q.   Okay.  So let me break that down a little bit,

17  then.  If dispatch wants to be sure that its officers

18  -- that the sheriff's office officers generally got a

19  particular message, the dispatcher will put it on the

20  radio?

21    A.   Put it on the radio, yes.

22    Q.   But if something is maybe conveyed in text via

23  the MDT system, there's not necessarily the presumption

24  that an officer's going to know it?

25    A.   No, it is a presumption, because they're ordered

1    to watch the MDT, as well.  It's just -- how can I put

2    it?  They send it over -- something like a S.W.A.T.

3    situation, they're going to send it over the mic, but

4    they're also going to send it through MDT, as well.

5    It's presumed all officers at all time to monitor their

6    MDTs and monitor the radio, so it's presumed that they

7    receive the message, regardless.  This is just a extra

8    step that we do.

9        Q.   I understand.  Thank you.  And thank you for

10   your patience with me as I understand the -- learn the

11   acronyms, too.

12       A.   Not a problem.

13       Q.   I'd like to talk a little bit about the crisis

14   intervention team, and I understand that the sheriff's

15   office has a particular team called the crisis

16   intervention team, and that is a specialized unit

17   within the sheriff's office; is that fair?

18       A.   Yes.

19       Q.   And can you tell me under what umbrella of the

20   sheriff's office, under what part of the organization

21   the crisis intervention team falls?

22       A.   Under the chief.  I take that one very

23   seriously.  I personally made that up under my chief

24   deputy.  I placed them under her.

25       Q.   The crisis intervention team is directly

Sheriff Eric Fagan

1    supervised by the sheriff's office chief deputy?

2        A.    Yes.

3        Q.    Okay.  And I understand from the crisis

4    intervention team's website that there's approximately

5    15 sheriff's officers who are devoted to the crisis

6    intervention team.  Is my understanding correct?

7        A.    Yes, 16 with the lieutenant that's over, so when

8    you count him, it's 16, but 15, yes.

9        Q.    Sure.  I understand that the crisis intervention

10   team works pretty closely with different healthcare

11   providers, such as the focus from TXANA; is that

12   correct.

13       A.    Yes.

14       Q.    And are TXANA employees classified as part of

15   the sheriff's office?

16       A.    No.

17       Q.    And are, to your knowledge, and to the county's

18   knowledge, are TXANA employees peace officers?

19       A.    No.

20       Q.    What types of calls are classified as crisis

21   intervention calls?

22       A.    When someone's in mental crisis, someone with

23   mental illness, these types of calls, calls where we

24   know a personal with mental illness is there.  We want

25   to send someone specially-trained to deal with these

```
 1    individuals, to deescalate it.  In the past, in law

 2    enforcement, we didn't really understand mental

 3    illness, and some people got harmed -- the officer or

 4    the individual got harmed because we didn't have the

 5    knowledge of mental illness.  The CIT people are

 6    specialty-trained to recognize mental illness, so we

 7    have them there, and we have TXANA there because

 8    they're even more trained.  That's their job, to know

 9    mental illness, so, sometimes, we want to -- we want

10    TXANA to be there with us; licensed counselors and

11    things like that to be with us to help better -- help

12    better serve the public with mental illness.

13        Q.   I understand, and that makes a lot of sense to

14    me.  What is the typical -- and I think you were

15    talking about this a little bit, but I want to kind of

16    make it explicit.  What is the typical response for a

17    crisis intervention call?  Does that mean that, when

18    there's a crisis intervention call, when someone, for

19    example, calls in and says there might be someone with a

20    mental health need, does that mean only a crisis

21    intervention team member responds to that call?

22        A.   No.  If they're available.  If they're

23    available.  Mental illness is vast, and sometimes when

24    we have a call for mental illness, a CIT, the other CIT

25    officers, all fifteen, they might be at other -- other
```

Sheriff Eric Fagan

```
 1  calls and they're not booked.  Well, I can't ignore that
 2  call, so we have to send a officer out there that's not
 3  a CIT officer, but we do our best to try to send a CIT
 4  person to a mental illness when we can, but does it
 5  happen all the time?  No, and I'm sorry -- because I
 6  don't have all of them trained -- all CIT-trained
 7  officers.  I wish I did, but I don't.
 8      Q.   Sure.  So does the CIT -- if there is a CIT
 9  officer available, and that officer can respond, is
10  that the -- that officer the only person who goes to
11  the call, or do other deputies also go to the call?
12  What's the ideal response to a crisis intervention call
13  for service?
14      A.   A call for service for a mentally ill --
15  possibly a mental -- person in crisis, we send an
16  available CIT person out there.  That CIT -- he or she
17  see that they need more help, they can call for backup
18  either from a regular officer or another CIT officer to
19  come out there.
20      Q.   Okay, so let me make sure that I understand
21  that.  If there is a CIT person available, he or she
22  goes out by themselves and just kind of does an
23  assessment of what's going on, and he or she will then
24  radio for backup to see if additional deputies are
25  needed.  Is that a fair summary of the ideal response?
```

1     A.    Yes, if the CIT deputies feel like they need

2  more help, they can request for more help, yes.

3     Q.    And when a call for service comes in where

4  there's someone in crisis, would the dispatch

5  specifically contact CIT team members or -- go ahead.

6     A.    Sorry.  They will bump to see if a CIT unit is

7  available.

8     Q.    What does that mean, I'm sorry?

9     A.    I'm sorry, they would radio to see if a CIT

10  person is available.  "Bump" mean -- I apologize,

11  they'll radio to see if a CIT unit is available.

12     Q.    So the dispatcher would radio out something

13  like:  Any CIT folks available to respond to a call of a

14  -- someone who might have bipolar disorder, and if they

15  said yes, the dispatcher would send whatever team

16  members said they were available; is that fair?

17     A.    Yes.

18     Q.    And if there were no CIT members available, what

19  would happen?

20     A.    A regular unit would go.

21     Q.    A regular unit would go?

22     A.    Yes.

23     Q.    But that conversation would be reflected on the

24  dispatch log or the radio; is that fair?

25     A.    Yes.

1    Q.   Okay.

2    A.   Yes.

3    Q.   How does TXANA usually get informed of a

4  potential crisis intervention call?  What's the process

5  for getting them out there?

6    A.   We actually have TXANA people inside our

7  dispatch, as well.  They listen for the calls, or if

8  it's a call where a person is having a weapon or

9  harming someone, it's kind of a high level.  We

10  probably want to take a TXANA person with us to help

11  bring the person down.

12    Q.   So does that mean that there are TXANA people at

13  the sheriff's office every day?

14    A.    In our dispatch.  We have a grant that pays --

15  pays them.  I don't know if the grant ran out yet or

16  not.  I hope they're still there.

17    Q.   Okay.  So the county believes that there are

18  TXANA employees in the dispatch center?

19    A.   Yes.

20    Q.   Okay.  And what about TXANA employees who might

21  ride along, or come with a -- an officer who's

22  responding to a call?  Where do those TXANA employees

23  come from?

24    A.   From TXANA.  Both.  I'm not saying all TXANA's

25  in my dispatch.  I said we have some in dispatch, and we

Sheriff Eric Fagan

```
 1    do have some that ride along with us, as well.
 2       Q.   Okay.  So let me make sure I understand that.
 3    So if the sheriff's office determines that a TXANA
 4    employee is needed, will they pick up -- will an
 5    officer pick up someone from the dispatcher center?
 6       A.   No.
 7       Q.   Okay, so the dispatched TXANA focus just stay in
 8    dispatch?
 9       A.   Yes.  Now, if they ever have picked up someone
10    from dispatch, I don't know.  They may have --
11       Q.   Sure.
12       A.   But I don't believe they have, but I don't know.
13       Q.   That's okay.  You're just testifying about the
14    county -- on behalf of the county and the county's
15    policy.  So, generally, it's not the county's policy
16    that a deputy or another officer should go pick someone
17    up from dispatch to use as a TXANA person?
18       A.   Yes.
19       Q.   And so when an officer determines that they need
20    a TXANA person to come out to a call, does the officer
21    then call the TXANA center and then go pick someone up
22    and drive out to the call?  Is that a fair understanding
23    of what happens?
24       A.   Yes, but, like I said, some TXANA people ride
25    along with our CIT, so some of them may be already
```

Sheriff Eric Fagan

```
 1    there.  If someone is not there, yes, they can request
 2    for TXANA person to come.
 3         Q.   Okay.  So let me make sure I understand that.
 4    There are TXANA people who go out on patrol with the
 5    crisis intervention team members; is that right?
 6         A.   Yes.  On some occasions, yes.
 7         Q.   And --
 8         A.   That's not every day -- I wish it was every day,
 9    but it's not a everyday thing.
10         Q.   So how often does that usually happen, then?
11         A.   I don't know.  I couldn't answer that question.
12         Q.   Okay.  Other than -- I might come back to the
13    TXANA piece in a minute, but other than members of the
14    crisis intervention team, do sheriff's officers receive
15    specialized training on crisis intervention calls?
16         A.   Yes.
17         Q.   And can you tell me about that specialized
18    training?
19         A.   It's the T -- well, I'm saying TCOLE.  It's also
20    requested also requested a meet-up (unintelligible) to
21    come to my office to give a class.  We can request
22    people to come over from the mental health side to come
23    and give courses on things like that to all the
24    deputies, but, like I said, CIT take special training
25    they constantly take -- like, say my officers have to
```

1    take 16 hours of mental health.  Well, TXANA -- I'm

2    sorry, not TXANA -- my CIT people would probably take

3    24 hours of courses.  They usually take way more mental

4    health courses than what my regular -- a regular deputy

5    does.

6        Q.    I understand.  I understand.

7              MR. HEDGES:      Christie, I just got a

8    notice that my battery's running low, and I think I'm

9    plugged in, so I'm going to be rooting around under the

10   table for a second.

11             MS. HEBERT:      Let's take a brief break.

12   I've got to use the restroom, anyway.  Why don't you

13   get that sorted out, and let's come back at, say,

14   10:45.

15             MR. HEDGES:      Okay.  We'll be here.

16             COURT REPORTER:  Off the record, 10:32.

17                [Short recess was taken.]

18             COURT REPORTER:  Back on the record at

19   10:44 a.m.

20             MS. HEBERT:      Kevin, we asked the

21   sheriff, on behalf of the county, a bunch of questions

22   about the list for press conferences, and who gets

23   contacted, who's on the list for notification about

24   press conferences, and, essentially, how the PIO

25   officer decides who gets notified of a press

```
 1    conference.  One of the topics you might recall from

 2    the deposition notice is the sheriff's office practices,

 3    generally, with press conferences, and I know that the

 4    sheriff's been designated as the county's

 5    representative, and he's testified that he doesn't know

 6    this information.  Given that it's like 10:45, I wanted

 7    to suggest that perhaps the sheriff could either call

 8    the PIO officer and get that information and,

 9    therefore, be able to testify about it now, or e-mail

10    the PIO officer, and then be able to read the e-mail

11    into the record as his testimony.  What are your

12    thoughts on doing that now, Kevin?

13                MR. HEDGES:     I think that's fine.

14    It's -- it's not lunchtime, so someone ought to be

15    available.

16                MS. HEBERT:     Right.  That's why I

17    brought it up now rather than waiting till lunchtime or

18    the afternoon.

19                MR. HEDGES:     Okay, well, the sheriff's

20    making the call right now.

21                MS. HEBERT:     Sure.  Sheriff, do you

22    want to take a break to make that call, or do you want

23    to just make it here?

24                THE WITNESS:    I can make it here.

25                MR. ROWES:      We can go off the record
```

```
 1   while the sheriff makes the call.

 2              COURT REPORTER:  Off the record, 10:46.

 3                   [Off the record.]

 4              COURT REPORTER:  Back on the record at

 5   10:52.

 6   BY MS. HEBERT:

 7      Q.   Sheriff, I understand that you have collected

 8   additional information from your PIO officer on the

 9   sheriff's office's practices for press conferences; is

10   that correct?

11      A.   Yes.

12      Q.   And with whom did you speak to collect that

13   information?

14      A.   Michelle, Domenico -- Damonico -- I cant

15   pronounce her last name.

16      Q.   Michelle Domenico, we'll call her for lack of a

17   better pronunciation; and she's part of the public

18   information office?

19      A.   Yes.

20      Q.   And as I understand it, Ms. Domenico testified

21   that the PIO office maintains a list of folks that the

22   sheriff's office will invite to press conference; is

23   that contact?

24      A.   Yes.

25      Q.   And the PIO office will e-mail that list when
```

1    the sheriff's office is holding a press conference in

2    advance; is that correct?

3        A.   Yes.

4        Q.   And the PIO office decides who is on that list;

5    is that correct?  They assemble the list?

6        A.   Yes.

7        Q.   And, as I understand it, the folks who are on

8    the PIO office's press conference list get added in one

9    of two ways.  First, they get added if they ask to get

10   added, and then the PIO office confirms that they

11   should be on the list, and then the second way is if

12   the PIO office asks the media person the -- if the

13   office directly asks the media person if they want to

14   be on the list, and the media person says yes.  Are

15   those the two ways that the folks get added to the PIO

16   office's list?

17       A.   Yes, from what I understood, yes.

18       Q.   And if I understood Ms. Domenico's information,

19   the PIO office assesses whether a particular person who

20   wants to be on the list is credible or not credible; is

21   that a fair assessment?

22       A.   Yes.  From what I understood, she said she

23   researched the social media to see if they have a media

24   presence, yes.

25       Q.   And so, as I understand it, Ms. Domenico said

1    that she has not come into contact with any person that

2    didn't have an online media presence with a media

3    outlet that she was familiar with; is that correct?

4        A.   Yes.

5        Q.   And that, if she has any questions about whether

6    a particular person should be on a list or not, on if

7    -- if Ms. Domenico -- let me clarify that and start

8    over.  If Ms. Domenico has any questions about whether a

9    person should be on the PIO office's press conference

10   list, she will speak to her direct supervisor for

11   clarification; is that correct?

12       A.   Yes.

13       Q.   And to summarize, the sheriff's office creates

14   and maintains the list of who gets invited to press

15   conferences; is that fair?

16       A.   Yes.

17       Q.   Okay.  I think that's all that I'm going to ask

18   about the press conferences for now.  If something else

19   comes up, we can revisit the topic.  I want to talk a

20   little bit about what we were talking about with --

21   with the TXANA folks.  We were talking -- before Kevin

22   had a battery issue, we were talking about the TXANA

23   folks who go along with the sheriff's office officers

24   on service calls.  Who determines when a TXANA employee

25   needs to attend a call with a CIT team member or another

1    deputy?

2        A.    The field supervisor.

3        Q.    So a call comes in, and a field supervisor makes

4    the decision of whether we need -- they need a TXANA

5    person or not?

6        A.    Yes.

7        Q.    And who would be a field supervisor?  Would that

8    be a sergeant who was on patrol?

9        A.    Sergeant or lieutenant.

10       Q.    Okay.  And I understand from your deposition as

11   the sheriff, that TXANA folks sometimes train with Fort

12   Bend County sheriff's officers; is that correct?

13       A.    Yes.  When I say "trained", I don't mean they're

14   out there in the field with us or anything like that.

15   We sit down to discuss scenarios and things like that;

16   what you should do when certain things happen.  They're

17   not at my academy, or running routes and stuff like that

18   with us, no.

19       Q.    So they're not, like, in a field where they're,

20   you know, practicing certain things where the sheriff's

21   office?  It's more of a meeting?

22       A.    Yeah, across the table sitting down and talking,

23   yes.

24       Q.    Sure.  That's helpful, thank you.  And,

25   presumably, TXANA has all sorts of employees, just like

Sheriff Eric Fagan

```
1    the sheriff's office does.  You know, accounting
2    people, HR, maybe administrative assistants.  Can you
3    help me understand what type of TXANA employees will go
4    on call with the sheriff's office?  Is there a specific
5    category?
6        A.   Mental health counselors; people in mental
7    health.  Those are the people we deal with with TXANA.
8    If they deal with anyone else other than that, I
9    wouldn't know about it.
10       Q.   Sure.  So some kind of mental -- mental
11   health-specific -- to the county's knowledge, do the
12   folks -- the TXANA employees who do ride-alongs or come
13   on particular calls with the sheriff's office, do they
14   have to have any particular training or certification?
15       A.   Yes.
16       Q.   Can you tell me about that?
17       A.   That would be verified through TXANA.  It would
18   be a certified counselor, someone like that; certified
19   counselor in mental health.
20       Q.   But the sheriff's office itself doesn't do any
21   independent verification of the qualifications of TXANA
22   employees?
23       A.   No.  We trust -- I'm sorry, we trust TXANA to do
24   that.
25       Q.   Sure.  And do does the sheriff's office itself
```

Sheriff Eric Fagan

1    do any independent training of folks who ride along

2    with the sheriff's office?  So, for instance, "This is

3    how you need to proceed on -- on a call", and, "Here's

4    what you're doing wrong, here", that kind of training?

5        A.   After the incident, I'm pretty sure they discuss

6    what we can do better, what could be done better, things

7    like that, yes.

8        Q.   Okay.  So, as I understand your answer, there's

9    no advanced training for a TXANA employee who's

10   accompanying a sheriff's office officer, but there

11   might be some kind of after-action review?

12       A.   Yes.  When we say "advanced", I'm pretty sure

13   that they talked to them -- the field people do talk to

14   them.  S.W.A.T. do talk to them.  I'm not there

15   personally to say that they do or don't do, but I'm

16   pretty sure that they do before a situation to take

17   place, I'm pretty sure they have a plan of action of

18   what they want them to do in their roles -- what their

19   roles would be.

20       Q.   Okay, so let me make sure that I understand

21   that.  In general, is -- these meetings that you talked

22   about about how the sheriff's office and TXANA

23   structures its relationships.  Is that one of the forms

24   of communication that's going on?

25       A.   Yes.

Sheriff Eric Fagan

```
 1     Q.   Okay.  And then before a specific call, officers

 2   will have conversations with the TXANA employees of

 3   saying something along the lines of:  This is the call

 4   that we're responding to, here's what we want you to do,

 5   here's how this is going to go.  Is that fair?

 6     A.   Yes.  Plan of action, yes.

 7     Q.   Yeah, a plan of action for that particular call?

 8     A.   Yes.

 9     Q.   And then after the call, the TXANA and the

10   sheriff's office officers may review how the call went

11   and discuss how things can go better in the future?

12     A.   Yes.

13     Q.   Is that a fair summary of kind of the

14   relationship, in terms of training or how a call should

15   go between TXANA and the sheriff's office?

16     A.   Yes.

17     Q.   Okay.  That's helpful, thank you.  And for a

18   welfare check, how would the sheriff's office expect,

19   generally speaking, TXANA to conduct him or herself

20   during a welfare check?

21     A.   For a TXANA to go to a welfare check, it have to

22   be a certain criteria.  They don't go on every welfare

23   check.  There's no reason for them to go to every

24   welfare check, so if a TXANA person is going with

25   someone on a welfare check, certain criterias must have
```

```
 1   taken place for them to call for a TXANA person to come

 2   with them.  Like, a welfare check that a person is

 3   planning on harming themselves, or a person has a -- a

 4   weapon and things like that might have a TXANA person to

 5   go out there.  If a person's barricaded, known to be

 6   mentally ill, might have a TXANA person to go -- to go

 7   out there to try to talk to the person from a safe

 8   distance, counsel them.  They'll be more trained on how

 9   to handle that person; better equipped, I should say, on

10   how to handle that person without anyone getting hurt or

11   harmed.

12       Q.   Okay.  Thanks.  Let me summarize and make sure

13   that I have all of that.  So the kinds of criteria for

14   situations where a TXANA employee would be asked to

15   accompany an officer, those types of situations include

16   where someone threatened to harm themselves, maybe has

17   a weapon, barricaded him or herself -- and/or has a

18   known mental illness.  Am I summarizing that correctly?

19       A.   Yes.  TXANA would be called.  On the barricade

20   one, we probably would add S.W.A.T., as well.

21       Q.   Can you explain to me what barricade means?  How

22   do you identify whether someone's barricaded something?

23       A.   When we say "barricaded", we mean that the

24   person is locked into a room or some type of structure

25   that he has blocked off where we can't reach him or
```

Sheriff Eric Fagan

1   her, or the -- and the person has a weapon, a weapon

2   that could harm someone on the outside or on the inside

3   that's being barricaded.  We can't reach them, and they

4   -- and it's blocked -- the entranceway is blocked in

5   some fashion by a locked door or some type of debris.

6       Q.   Okay, so there's specific criteria for

7   barricading, which you just outlined, and to determine

8   whether someone has barricaded him or herself in, an

9   officer would try to enter, and then would see that they

10  couldn't enter; is that fair?

11      A.   Or you'll scan the area.  We're talking about

12  things that have to take place in seconds.  Not

13  minutes.

14      Q.   Sure.

15      A.   They have to evaluate real quick to see if that

16  person is barricaded or not.  We'll ask them -- the

17  person to come to the door.  We'll ask the person by

18  loudspeaker to come to the door.  We'll ask if the door

19  was checked.  We'll go up with a -- a shield, a

20  ballistic shield sometimes to check the door to see if

21  it's locked or something like that, so it's things that

22  we have to do very quickly to see if we need to call

23  S.W.A.T. out, or it could be the call that we got that a

24  person say my loved one is barricade -- we'll take their

25  word for it.  We're not going to take a -- we're going

Sheriff Eric Fagan

```
 1    to take their word for it, and we'll assume that that
 2    person is barricaded, and we're going to treat that as a
 3    barricaded situation.
 4       Q.   Sure, and if there was a barricaded situation,
 5    that would be -- I can't remember the acronym you told
 6    me.  I want to say the MDT --
 7       A.   You got it.  You got it.  Yes.
 8       Q.   Okay.  So if someone were barricaded, that would
 9    be relayed and confirmed via the radio and the MDT
10    system?
11       A.   Yes.
12       Q.   Okay.  A couple of other questions about the
13    TXANA and the relationship -- the relationship of the
14    sheriff's office with the TXANA folks.  At a welfare
15    check or another call, are there specific
16    responsibilities or actions that the sheriff's office
17    would generally expect a TXANA employee to take?
18       A.   Well, we're not the specialists in the mental
19    part of it, so we follow their lead, but we make -- they
20    have to make sure that they have to stay as safe as
21    possible, and to also stay away from application
22    actions, let us do our job, but we take the lead on how
23    to do escalate.  If they say, look, give me more time to
24    talk with the person.  We're dealing with a mental
25    person, it -- like, say -- y'all picked on my friend
```

Sheriff Eric Fagan

```
 1    Hedges all the time.  I'm going to pick on your people

 2    now.  Say we have to go to Molly's house, and she's

 3    mentally ill with a weapon, and then we go to Sarah's

 4    house.  Well, she's not mentally ill, but she has

 5    barricaded herself in.  It might take us five hours to

 6    deal with Sarah, whereas it might take us anywhere from

 7    16 to 18 hours with Molly because of the mental

 8    illness.  We'll take more time and caution with those.

 9        Q.   I understand.  And I appreciate the example.  So

10    it would be fair to say that the TXANA folks from the

11    sheriff's office perspective are the experts on the

12    mental health side in your consulting with the experts;

13    is that fair?

14        A.   Yes.

15        Q.   And would it be fair to say that the sheriff's

16    office officers -- the deputies, lieutenants,

17    sergeants, you name it -- they're the experts on safety,

18    and TXANA folks should listen to the officers on issues

19    of safety?

20        A.   Yes.

21        Q.   That's fair.  I would like to talk about the

22    sheriff's office's policy on filming the police.  Does

23    the sheriff's office have a formal written policy on

24    citizens filming the police and how its officers should

25    interact with those citizens?
```

Sheriff Eric Fagan

```
 1      A.   I don't know if we have a formal policy.  I
 2  think we have a GO.  I don't read them all off, because
 3  I have a lot of things to do.  I would think they do.
 4  I've told them a citizen has the right to film.  There's
 5  no problem with a citizen's filming, as long as they're
 6  a safe distance.  I always say that.
 7      Q.   Okay, let me make sure I break that down, then.
 8  As you sit here today testifying on behalf of the
 9  county, you are not sure if there is a formal written
10  policy that the sheriff's office has for how all
11  officers should interact with citizens filming police?
12      A.   We have a GO about media relations.  I'm not
13  sure if it covers that, but, like I said, officers
14  should know -- if there's legal updates we have every
15  year, they address that, so there is a policy that
16  officers should know that citizens have every right to
17  film -- I mean, First Amendment right.  They have a
18  right to -- if it's out in the public, you can't stop
19  someone from filming, but maintain a safe distance.
20      Q.   Sorry, I missed that last bit.
21      A.   As long as it's in a safe distance and not
22  interfering with police actions.
23      Q.   I got it.  So you referenced the media relations
24  order, and I know that we've already stipulated that
25  your testimony -- your previous testimony also counts
```

1    for the sheriff's office, and we've looked at that

2    general order on media relations and the various

3    versions of that GO previously, so we can kind of put

4    that one to the side, but you talked a little bit about

5    a legal update.  Can you tell me more information about

6    the legal update?

7        A.    Every year, we have a legal update.  When

8    legislation comes to do the -- like, the 85th

9    legislation, they have new laws and things like that.

10   Well, we have to have a legal update where all officers

11   are required to have -- to go over that legal update.

12       Q.    Sure.  And so that legal update comes from

13   TCOLE?  It's a state-mandated legal update; is that

14   fair?

15       A.    It come from the legislation.  TCOLE require us

16   to do it, but the -- the actual law come from the

17   legislation.

18       Q.    Sure.  That makes total sense; but the TCOLE

19   training is summarizing the legislation from that --

20       A.    Yes.

21       Q.    -- year's legislature?

22       A.    Yes.

23       Q.    And you mentioned that you have told your

24   officers that they should let someone film police

25   activity, so long as that person is doing so from a safe

Sheriff Eric Fagan

```
 1   distance; is that correct --

 2      A.   Yes, and not interfering with police actions.

 3      Q.   And can you tell me how you've told your

 4   officers that?  How did that get communicated to -- of

 5   the eight-hundred-some-odd peace officers that you have

 6   under your authority?

 7      A.   From my command staff to their -- to the

 8   supervisors, from the supervisors to the officers.  I

 9   tell my command staff, who tell the captain, who tell

10   their lieutenant, who tell the sergeants, and it get

11   down to the men and women in the field.

12      Q.   Okay.  Sure, I understand.  And can you tell me

13   more about the sheriff's office's policy?  I know you

14   talked a little bit about the fact that folks are

15   supposed to be able to film, so long as they're at a

16   safe distance and not interfering with what's going on.

17   How does an officer determine what a safe distance is?

18      A.   That's the officer's discretion on that scene.

19   That's that officer's discretion.

20      Q.   And is that discretion ever evaluated?  How does

21   -- how does the sheriff's office determine whether its

22   officers are abusing that discretion in its decision to

23   determine where folks filming police should be located?

24      A.   If the person that was-- in a scenario where a

25   person was told to stop or to get back too far, anything
```

Sheriff Eric Fagan

```
 1    like that, they would have to make a complaint and then

 2    we'll hear about it and we'll investigate it, or we

 3    catch it on a body camera.  If we saw something on body

 4    camera we didn't think was right, we'll investigate it.

 5    Q.   So those are the two ways that an abuse of

 6    discretion might be flagged --

 7    A.   Yes.

 8    Q.   -- complaint or body camera, so before body

 9    camera, it would just be complaint?

10    A.   Correct.  Yes.

11    Q.   Thank you.  And then you talked a little bit

12    about interfering with police activity.  How would an

13    officer evaluate if filming was interfering with police

14    activity?

15    A.    It could be many ways.  It could be where

16    someone's -- let's say they had a barricaded area, and

17    we had a barricaded person with a high-powered rifle,

18    and we tell the person, "look, you need to get back.

19    You need to get back", and they're in the line of fire.

20    Well, my officer would have to turn their back.  Him or

21    her would have to turn their back to have that person

22    to move if they wouldn't do it verbally.  Now, you're

23    interfering, now you're causing my officers in danger,

24    you're endangering your life, as well as the officer's

25    life.
```

1    Q.   Sure.  Under the sheriff's office policy, when

2   can an officer essentially prevent or prohibit someone

3   from filming?  What are the categories of situations

4   when an officer from the sheriff's office should prevent

5   or prohibit someone from filming?

6    A.   Well, like the scenario I just gave you, it's

7   not -- it's not necessarily preventing them from

8   filming, but if you arrest that person, they can't film

9   anymore.

10   Q.   Sure.

11   A.   So I don't -- if you understand what I'm saying,

12   it's not that we're stopping that person from filming.

13   We're arresting that person because they were

14   interfering, so once we make that arrest, he or she

15   can't film anymore.

16   Q.   Of course.  Under sheriff's office policy, does

17   an officer have a duty to state their justification

18   before arresting someone for -- while they were

19   filming, if possible?  So, unless there's, I don't

20   know, a scenario where it makes it not feasible to give

21   a warning, is an officer required to give a warning

22   before arresting that person who was filming?

23   A.   If it's -- if time permits, yes.  Like you said,

24   depends on the situation.  Is it a requirement?  No.

25   It's not a requirement.

1    Q.   So there's no requirement, but is it recommended

2    by the sheriff's office that, if time permits, you warn

3    a person that's filming:  Hey, look, you're not safe,

4    orb or, hey, look you're in the way.  If feasible?

5    A.   Yes, if feasible, yes.

6    Q.   But that's not a requirement.  That's just the

7    sheriff's office recommendation?

8    A.   Yes.

9    Q.   And, again, that recommendation is probably

10   conveyed down the chain of command to folks in the

11   field; is that fair?

12   A.   Yes.

13   Q.   Does a sheriff's officer generally have a duty

14   to inform their supervisor of their justification before

15   arresting someone who's filming police, if it's

16   feasible?

17   A.   No.

18   Q.   So there's no kind of obligation or

19   recommendation that an officer run it up the flag pole

20   before arresting someone who's filming?

21   A.   No.

22   Q.   Does an officer -- a sheriff's officer have a

23   duty to inform him or her supervisor that they arrested

24   someone who was filming police after the arrest, as

25   soon as possible?  So, immediately after the arrest,

1    let your supervisor know:  Hey, I arrested someone.

2    They were filming, but this is why I arrested them.  If

3    feasible.

4        A.   It's not a policy, no.

5        Q.   Does the sheriff's office have a policy on the

6    responsibilities of the supervisor when a citizen is

7    arrested while filming police?  And by that, I mean, if

8    it's feasible, if it's tactically feasible or possible,

9    does the supervisor have any kind of responsibility to

10   interact with the person filming police, maybe warn

11   that citizen that their actions, if continued, may arise

12   to the level of an offense?

13       A.   If a supervisor is on the scene -- if that

14   supervisor's there on the scene, yes.  I'm not really

15   understanding your question.  You mean if a person

16   making an arrest of a person they felt was interfering

17   when they were filming and they make the arrest, if a

18   supervisor wasn't on that scene, is that officer

19   obligated to go tell the supervisor later:  Look, I

20   arrested someone.  He was filming, and these are the

21   reasons why.  Is that what you're asking me, or are you

22   asking me, every time they make an arrest, they have to

23   inform the supervisor of it?

24       Q.   I had asked -- this is kind of a separate

25   question from what I'm asking now, but I had asked you

Sheriff Eric Fagan

```
 1   previously if a subordinate officer had any obligation
 2   to immediately notify their supervisor after they
 3   arrested someone for -- while that someone had been
 4   filming, of their justifications for the arrest, and
 5   you had answered no.  Do you -- do you want to change
 6   that?
 7       A.   No.
 8       Q.   Okay.  And then, now, I was kind of asking you
 9   about any unique responsibilities of a supervisor him
10   or herself.  So if a supervisor is on-scene, does that
11   supervisor have any obligation or duty to interact with
12   someone who was filming police.  For example, if the
13   citizen who was filming, if their actions, if
14   continued, would rise to the level of some kind of
15   offense, would the supervisor have a duty to inform
16   that citizen:  Hey, stop what you're doing, or it's
17   going to rise to the level of offense?  If tactically
18   feasible.
19       A.   If tactically feasible.  Yes, I would agree with
20   that.  Yes.
21       Q.   And how does the sheriff's office ensure that
22   its officers are correctly carrying out this policy
23   that's been conveyed via the chain of command?
24       A.   By the field supervisor's observation, and by
25   body cameras.  And by complaints.
```

1    Q.   Sure.  I'm writing that down, too.  Thanks.  And

2    before body cameras, it would be just observations and

3    complaints; is that fair?

4    A.   And dash cams.

5    Q.   Yes, and dash cams, okay.  Does the county have any

6    any information about where field officers have

7    observed the sheriff's officers not following this

8    policy?  So we just talked a little bit about the four

9    ways that the sheriff's office uses to check whether

10   its officers are complying with the policy on filming

11   the police, and I'm asking about the first category,

12   observations by field officers.  Does the county have

13   any examples or knowledge about specific observations

14   of its officers failing to comply with the county's

15   policy on filming the police?

16   A.   Not that I know of.

17   Q.   Sure.  And does the sheriff's office have any

18   knowledge of any instances where body camera footage,

19   for instance, showed that its officers were not

20   complying with the policy on filming the police?

21   A.   Not that I know of.

22   Q.   And does the county have any complaints about

23   its sheriff's officers not complying with the policy on

24   filming the police?

25   A.   Yes.

Sheriff Eric Fagan

1    Q.    And can you tell me about those complaints?

2    A.    I only know of one; Justin Pulliam's.

3    Q.    Okay.  And does the sheriff's office have any

4  dash camera footage of sheriff's office officers not

5  complying with the policy on filming the police?

6    A.    No.  And I should make a correction.  We also

7  receive calls about -- complaints about not allowing

8  people filming from out of state, and we get

9  threatening calls about things like -- I don't know who

10  these people are.  It's just out of state numbers,

11  calls, and e-mails, and stuff like that, so, yeah, we've

12  got numerous -- this all happened after the Pulliam

13  incident.

14    Q.    So other than the Pulliam -- the facts

15  surrounding Justin Pulliam's arrest, the sheriff's

16  office and the county has never received a complaint

17  about its officers restricting the rights of citizens to

18  film the police?

19    A.    Since I've been sheriff, no, I -- can't say

20  never, because I wasn't sheriff before 2021, so --

21    Q.    Sure.

22    A.    -- since I've been here, that 's the only one

23  that I can recollect, is Pulliam's.

24    Q.    Bear with me, because we've covered a lot of

25  this already, so I'm just going through my list.

Sheriff Eric Fagan

```
 1              I'd like to jump quickly, Sheriff, to the events
 2      at Jones Creek Ranch Park on July 12, 2021.  We already
 3      previously talked about the events in the park and just
 4      outside of the park in your prior deposition, but, to
 5      make things easier today, if I say "Jones Creek", can
 6      we generally agree that I'm referring to Jones Creek
 7      Ranch Park, and if I'm referring specifically to the
 8      creek, I will let you know?
 9      A.    Yes.
10      Q.    So in your prior testimony, we talked a lot
11      about the video footage and we reviewed the video
12      footage of the press conference, and your comments to
13      Detective Hartfield and Detective Hartfield's comments
14      to Justin Pulliam, and what happened with Justin
15      Pulliam, but as you sit here today testifying on behalf
16      of the county, is there anything that should have been
17      done differently concerning the sheriff's office
18      interaction with Mr. Pulliam on July 12, 2021?
19      A.    No.
20      Q.    Okay.  I'd like to talk about the events on
21      December 21st, 2021, and you're aware that a sheriff's
22      officer arrested Justin Pulliam for interference with
23      public duties on that date, correct?
24      A.    Yes.
25      Q.    And I understand on -- on December 21, 2021,
```

Sheriff Eric Fagan

```
 1   that sheriff's officers were dispatched to the

 2   residence of Edwin Kraft and his mother, Frances Kraft;

 3   is that correct?

 4       A.   Yes.

 5       Q.   And I'd like to take a look at a document

 6   concerning that event.

 7            MS. HEBERT:  Molly, will you bring up

 8   Exhibit O and mark that as Exhibit 3?

 9            [Exhibit 3 was marked.]

10   BY MS. HEBERT:

11       Q.   Now, Sheriff, I'll represent that Exhibit 3 is a

12   document received by plaintiff, Justin Pulliam, in

13   response to an open records request to the sheriff's

14   office.  Can you have tell me what this document is?

15       A.   A call slip.

16       Q.   So when I say "call slip", I'll refer to this

17   type of document; is that fair?

18       A.   Yes.

19       Q.   And is a call slip created for every call that

20   the sheriff's office receives?

21       A.   Yes.

22       Q.   And what's the purpose of the call slip?

23       A.   It shows you the time the call went in, and

24   different radio traffic that went on during that call.

25       Q.   Can we start at the top of this document and
```

1    just kind of work our way down, so that I understand

2    what it's saying?  At the very top, it says a police --

3    and it's a little bit obscured by the "you are viewing

4    Molly Hanis screen", but it says, "Police event", and

5    then there's a pound sign and a number -- just leave it

6    there, Molly, on page 1.

7         At the very top of this page that says, "Police

8    event", there's a pound sign and then a number.  Can you

9    tell me, does a number get assigned to every call?  Is

10   that -- is that correct?

11   A.    Yes.

12   Q.    And then the next line says "Detail history for

13   police event."  The detail history, is there -- is that

14   the automatic -- what's generated for this police event

15   for a call slip; is that fair?

16   A.    Yes.

17   Q.    And I see that the date listed in this line,

18   "Detailed history for police event number", is as of

19   1/3/2022.  Why is the date on this document about two

20   weeks after the event?  Can you explain that to me?

21   A.    It probably generated the form at that time when

22   they requested it.  That's the time that they printed it

23   out; the date --

24   Q.    Okay, so that's -- that's telling you when the

25   document was generated, when it's pulled off the

1    system?

2       A.    Yes.

3       Q.    And what does, "Output for SCP001" mean?

4       A.    I assume it's coming from a certain computer.

5    I'm not really sure about that one.

6       Q.    That's fine, so as far as the county is aware,

7    it's some kind of indicator, maybe, that it's coming

8    from a particular computer or a particular officer, or

9    something along those lines?

10      A.    Yes.

11      Q.    Can we go to the next line, "Priority 3, types",

12   and it looks like "assault" -- a dash, and "assault" to

13   me.  Let's break that down.  What does "priority 3"

14   mean?

15      A.    Type of call, the urgency.

16      Q.    Okay, so this is what we talked about earlier

17   with the, like, numeric classification system of 1, 2,

18   3?

19      A.    Yes.

20      Q.    And then "type" what does that mean?

21      A.    Type of call.  Is it an assault call?  Is it a

22   accident?  It's just the title of the call.  What

23   offense or what -- why are we going to that location?

24   The reason we're at that location.

25      Q.    Sure, and "ASLT-assault", do you know what that

1    means?

2        A.    Abbreviation for assault.

3        Q.    So abbreviation for assault and dash "assault",

4    does that mean anything in particular, versus just a

5    regular assault?

6        A.    No.  Doesn't mean -- just abbreviation.

7        Q.    Sure.  And bear with me.  I understand, like,

8    the next lines are about location, then there's a -- a

9    box that starts with the line that says "created", and

10   then a timestamp and other things.  Can you walk me

11   through what this box generally shows?

12       A.    "Created" is when the time the call came in,

13   when created, and then the next line, "entered", it was

14   entered by the dispatcher at that time, and then

15   "dispatch", that's when they radioed it to a unit, and

16   "en route", the unit that accepted the call gave them

17   the time they were en route, gave a control number at

18   that time.  Then "outcome", if the -- the time it was

19   completed, if a report was made, then it -- it was

20   completed with a report or an arrest, then "closed",

21   they closed it at that time.

22       Q.    Okay, thanks for that clearer summary.  I want

23   to just ask a couple of follow-up questions.  You said

24   the "en route" line indicates when the first officer was

25   en route to the scene; is that fair?

1    A.   Yes.

2    Q.   And then "on scene", does that mean that's the

3    time when the first officer was on the scene; is that

4    correct?

5    A.   Arrival time, yes.

6    Q.   And what does the line for "control" mean?

7    A.   That line is where the officer or officers feel

8    like they're taking action.  What's going on at the

9    scene?  They're doing something.  They're in action

10   right then.

11   Q.   Okay.  So would "control" mean that the

12   situation is under control at that time?  Is that a

13   fair --

14   A.   Yes.  They took some type of action, and they

15   have it handle -- well, not really handled, but under

16   control.

17   Q.   Okay, so the -- the line "control" and a

18   timestamp means, at this time, the officers radioed or

19   confirmed that the situation was under control; is that

20   correct?

21   A.   Yes.

22   Q.   Okay.  I think I understand all of that box,

23   then.  I want to go down to the next line that says "IC

24   unit prime."  Can you explain to me what that means?

25   A.   Oh.  The unit number of the officer.

Sheriff Eric Fagan

```
1     Q.   Oh, okay.  I see it.  So "IC unit prime" and the
2  primary responder is that next unit of 24P10?
3     A.   Yes.
4     Q.   And what does "dispo ARPF" mean?
5     A.   The secondary unit, and then the -- the district
6  and beat that the call came from.
7     Q.   No, I think --
8     A.   I'm sorry, that's the dispatcher.  I'm sorry.
9  That's the dispatcher -- radio pat 2, radio 2 from the
10  dispatcher.
11     Q.   So wait.  To the "DISPO ARPF", is that the
12  dispatcher's initials, then?
13     A.   Yeah -- "pat 2" is radio 2.  That could be the
14  dispatcher's initials, but "pat 2" mean radio 2.
15  That's where the dispatcher is sitting at in dispatch.
16     Q.   I'm going to try something here.  Bear with me.
17  I just -- I want to be clear.  I'm going to draw an
18  arrow to the thing that I'm referring to.  Can you see
19  that?
20     A.   Yes.
21     Q.   "DISPO ARPF"; I'm specifically asking about
22  that.  What does that mean?
23     A.   I think that's the initials for the actual
24  dispatcher.
25     Q.   Okay.  I just wanted to make sure I understand.
```

```
 1   Thank you.  That's helpful.  I think I understand,

 2   generally, the rest.  The agency is the sheriff's

 3   office, that's correct?

 4      A.   Yes.

 5      Q.   Okay, and then the others would be the location

 6   of -- that the officers were going to, and the dispatch

 7   area.  The case numbers, I think that's

 8   self-explanatory, and the next line -- I want to

 9   continue to the line after that.  It starts with

10   "9/24/19, CST", and then there's a bunch of numbers

11   following that in the left column.  Do these indicate

12   the timestamp of various events?

13      A.   It has the location --

14      Q.   So I'm asking generally, and I'm going to -- I

15   don't know how to undo -- we're experimenting here

16   together, Sheriff.  This column here, are these the time

17   stamps --

18      A.   Yes.

19      Q.   -- and by "here", I'm referring to the numbers

20   on the very left-hand side of the page.  Are these the

21   timestamps for the actions that are taken on the rest of

22   the columns going right?

23      A.   Yes.

24      Q.   Okay.  And then I want to talk about the first

25   one, which is this one that starts with "9/24 /19 CST"
```

Sheriff Eric Fagan

1    --

2        A.    Okay.

3        Q.    -- and that one says "create."  What is that

4    talking about?

5        A.    This is the location.  It gives the location,

6    what -- the location, the name, phone number.  It's just

7    the descriptors of the location.

8        Q.    And then I see that it says "Type description:

9    Check on welfare" -- that was a terrible zero -- circle.

10   My apologies, Sheriff.  I see where it says,

11   "Type/description:  Check on welfare."  You see where my

12   indicator is?

13       A.    Yes.

14       Q.    What does that mean?

15       A.    Just the type of call.  Is it welfare check,

16   possible -- just giving details of the call, why we

17   were there.  The location and the type of call, why we

18   were there; and then we go down further, they explain

19   it.

20       Q.    Okay, it seems like that type description is

21   different from the type that we talked about before with

22   assault; is that -- is that accurate?

23       A.    Yes.  And that could happen.

24       Q.    Tell me about that.

25       A.    Okay.  It -- on this call, the mother had called

1    in for her son that was in mental crisis.  He had a

2    weapon; that brought in an assault.  It was still a

3    welfare check, checking on his wellness and to try to

4    bring him down, so it can be an assault and a welfare

5    check all at the same time.

6        Q.   Okay, so let me make sure that I understand what

7    you're saying there.  Initially, this call was

8    classified as a check on welfare, and then it later got

9    changed to a type assault based on the subsequent

10   events; is that fair?

11       A.   It all happened at the same time.  You never --

12   it was assault at the very -- because he had a weapon

13   and threatening, and it's a welfare check because we

14   know he's mentally ill, so it's -- it happens at the

15   same time.  It could be two things at one time.

16       Q.   Okay.  So wouldn't, then, the -- okay, so it

17   could -- well, then why wouldn't it list up at the top,

18   "Type:  Welfare check", comma, "assault"?

19       A.   Because we don't do it that way.  It's just more

20   detailed.

21       Q.   Sure.  And I guess, then, one of the questions I

22   have -- Molly, can you go -- we'll come back to this

23   page.  Molly, can you scroll down to the next page,

24   please?  Oops.  I've got to take all these marks off.

25   Hold on, Sheriff.  Apparently, they stay on the thing.

Sheriff Eric Fagan

```
 1              Molly, can you go to the next page, please?
 2              Okay, Sheriff, I'm going to highlight a section.
 3    It starts down here at 11:09:09, and can you explain to
 4    me what this entry means?
 5    A.    "Type:  Check, assault.  Description:  Check
 6    welfare, assault."  What we talked about earlier.
 7    Q.    It seems like, to me, based on this indicator,
 8    that the type was changed from a check to assault and
 9    then the type description was changed from check on
10    welfare to assault.  Is that fair?
11    A.    When you're saying "changed" --
12    Q.    And it says "11:09:09", and the next line says
13    "change."
14    A.    Yes.
15    Q.    So is it fair for me to say that, at 11:09:09,
16    type of call was changed from a welfare check to
17    assault --
18    A.    Yes.
19    Q.    -- and the type description was changed from
20    "check on welfare" to "assault"?
21    A.    Yes.
22    Q.    Okay.  That's all.  I just wanted to make sure I
23    was reading this document correctly.
24              Molly, can you go back to the first page?
25              Sheriff, I want to go back to this first entry
```

Sheriff Eric Fagan

1   here.  We already talked about priority 3, but can you

2   tell me what this "Response:  Standard" means?

3       A.   Standard response?  I'll get there as soon as

4   possible, when time permits.

5       Q.   Okay.

6       A.   Well, I shouldn't say when time permits.  En

7   route; get there as soon as possible.

8       Q.   Okay.  And then I want to look at the next

9   entry.  It looks like at 9:28:08, someone entered a

10  comment.  Who would -- where would this comment come

11  from?

12      A.   I would think -- it could either come from the

13  dispatcher or from the MDT from the officer.

14      Q.   Okay.  So we're not really sure who put the

15  comment in, but there's some kind of comment here?

16      A.   Yes.

17      Q.   And then at 9:28, same timestamp, the next line

18  below, and there's two timestamps.  It says "subject."

19  I think that this seems pretty apparent to indicate

20  that there's two subjects, potentially, at the

21  property, and their names, date of births, and ages; is

22  that fair?

23      A.   Yes.

24      Q.   The next line starts with "09:28:08", and there

25  is a -- after that time stamp there's a dash, "NPREMS."

Sheriff Eric Fagan

```
 1    What does that mean?
 2        A.   I don't see -- would you --
 3        Q.   Yeah, sure, I'll circle it.  What does this
 4    indicate?
 5        A.   No more.  No more comments.
 6        Q.   No, no.  This one.  Let me see if I can make it
 7    clearer.  Hold on.  I'll do it in red.  This "NPREMS"
 8    thing right there.
 9        A.   Not really sure.
10        Q.   Okay.  Let's go to 9:28:26 where it says "no
11    more" right there.  What does that mean?
12        A.   No more comments at this time.
13        Q.   Okay.  So if I -- if I were to conclude that all
14    of the stuff before "no more", that's the preliminary
15    information coming from the dispatch, for lack of a
16    better descriptor?
17        A.   Yes.
18        Q.   Okay.  And then at 9:30:16, this line here, I'll
19    try to highlight it -- what's going on on that line?
20        A.   The operator -- where you have it highlighted is
21    from dispatch.  Just the dispatcher's name.
22        Q.   Okay, and then what is this -- what's going on
23    with Officer Rodriguez here?  Is it -- is this number
24    indicating -- this "22P14", does that mean Officer
25    Rodriguez?
```

Sheriff Eric Fagan

```
 1      A.    His radio number.

 2      Q.    Okay, so 22P14 -- am I saying that right?

 3      A.    Yes.  I think "24 Paul" -- I can't see it --

 4      Q.    Yeah, sure.  So I'll say -- we can zoom in

 5   there, Molly, a little bit, I think.  Well, if we

 6   can't, we can't.  Thank you.  And I'm going to take

 7   these marks off and see if that helps.

 8      A.    Yes, 22 Paul 14 Rodriguez.

 9      Q.    So 22 Paul 14, whenever we see that, that means

10   Officer Rodriguez; is that fair?

11      A.    Yes.

12      Q.    And I guess that means that 22P10, does that

13   mean Officer Lacy?

14      A.    Yes.

15      Q.    And so at 9:30:16, is the dispatcher indicating

16   that these two officers are responding to the call?

17      A.    Yes.

18      Q.    Okay.  I want to talk about these entries with

19   "backer."  9:30:24, there's two indicators, two

20   timestamps that say "backer."  I'm circling that there.

21   What does "backer" mean?

22      A.    I'm assuming this is the dispatcher.  Not really

23   sure.

24      Q.    So something about "backer."  And it looks like

25   this Officer Guajardo was, maybe, dispatched; is that
```

1    fair?

2        A.    Yes.

3        Q.    And then is -- maybe Officer Rosalyn Jenkins was

4    dispatched?

5        A.    Yes.

6        Q.    And then it looks like Officer Rollins was

7    dispatched.

8        A.    Yes.  Oh, backup units.  Backer.

9        Q.    At 9:30:24, these were the backup units

10   dispatched?

11       A.    Yes.

12       Q.    So at 9:32:42, there was this message relayed.

13   What does this mean?

14       A.    On-scene.

15       Q.    Okay, so 9:32:42, 24 Paul 10, which was --

16   Officer Lacy was on-scene; is that what that means?

17       A.    Yes.

18       Q.    And then the next time entry, 09:36:15, says,

19   "LOGM."  What does "LOGM" mean.  Do you see where I'm

20   referring to --

21       A.    Yes, I'm reading the message to the side,

22   because it states what's going on.

23       Q.    Sure.  And I guess that gets to the point, this

24   is a lot of text, here, so I'm curious, like, how the

25   officer who's responding to the scene has the time to

Sheriff Eric Fagan

```
 1    type all this up, and so I'm just curious.  What is

 2    this, where does it come from, how does the officer do

 3    it?

 4       A.   Well, other officers are on the scenes.  While

 5    one person is doing something, they might go back and

 6    type in, so it varies.  That's why you have different

 7    radio numbers, sometimes, on a call slip.

 8       Q.   Well, it looks like, though, only Officer Lacy

 9    was on-scene this time, and it looks like the 24 Paul

10    10, which is Officer Lacy, this looks like the message

11    is coming from him -- or her --

12       A.   Him.

13       Q.   -- or her, okay.  This message is coming from

14    him, but then there's a giant message number, and

15    message type text.  Can you -- do you know what this is

16    about?

17       A.   No.

18       Q.   Okay.  Let's skip to the next page.  I'm going

19    to try to clear my markers off.  Go back.  Sorry,

20    Sheriff.  I didn't mean to cut you off.

21       A.   That's all right.  I was reading, and it looked

22    like prior convict -- prior things that happened with

23    this location, because it said, "intoxication",

24    "includes stalking" -- just a prior history.

25       Q.   So how -- how would this be generated?  How did
```

1    this information come to be?  And how did it end up in

2    this report?  I'm not trying to catch anybody, here.

3    I'm just trying to understand what this thing is --

4       A.   No --

5                   [Reporter warning.]

6    BY MS. HEBERT:

7       Q.   We're overlapping each other too much, so we'll

8    try to stop interrupting each other as much.  Just as a

9    reminder, a deposition can always be a natural

10   conversation.

11        So this entry at 9:36:15 that says "LOGM", how

12   does this information get here?

13      A.   They probably ran -- ran the subject -- and that

14   takes seconds -- out of a computer and got prior

15   history, or trying to get a warrant, and it's coming

16   from the 434th Court, Judge Becerra -- I was just

17   reading it, then I saw what it was.  Got height and

18   weight descriptors of the suspect, and things like that.

19      Q.   Okay, so would it be --

20      A.   And that's --

21      Q.   No.  Go ahead.  I didn't mean to cut you off.

22      A.   I was just going to say that could be a quick

23   check.  You can ask the dispatcher to do it and --

24   you're talking seconds.

25      Q.   Okay, so it would be fair to say, at 9:36:15,

1    Officer Lacy ran Edwin Kraft through the system, and

2    this is what came back?

3        A.   Yes.

4        Q.   Okay.  Molly, would you scroll down to the next

5    page?  And look at -- I want to start with the

6    timestamp that says "9:49:02", and I'm going to circle

7    that, just to help identify it, and it says, "OK", and

8    then it says 24 Paul 10, which I understand to be

9    Officer Lacy, and then there's a comment, "Standing by

10   for another unit.  Have P14 stop it up."  Did I read

11   that correctly?

12       A.   Yeah, I think they meant to say "step it up."

13       Q.   Oh, okay.  So "have P14", which I understand to

14   be Officer Rodriguez, step it up?  Like, get there

15   sooner?

16       A.   Yes.

17       Q.   So at 9:49:02, what does "okay" mean?

18       A.   I think it's from the MDT, coming from the

19   officer on the mic.

20       Q.   Right, and so, I mean, you see "MISC", "MISC",

21   "MISC", and then you see, "OK" at 9:42:02.  What does

22   "OK" mean, compared to "MISC", which I assume stands for

23   "miscellaneous"?

24       A.   I'm thinking it's either the MDT or by mic.  We

25   can call dispatch and find out real quick.

 1    Q.   Sure.

 2            MS. HEBERT:        Sarah, why don't we take a

 3    brief moment off the record while the sheriff founds out

 4    this information.

 5            COURT REPORTER:  Off the record, 11:50.

 6            [Off the record.]

 7            COURT REPORTER:  Back on the record at

 8    11:58.

 9    BY MS. HEBERT:

10    Q.   Okay, Sheriff, so we were just talking about

11    9:49:02, and the message right next to that is "OK."

12    Can you tell me what that means?

13    A.   They checked on the officer to see if the

14    officer was okay.

15    Q.   And then the officer relayed that they were

16    okay?  That's what that means?

17    A.   Yes.

18    Q.   Okay.  So just to make sure we've got a clear

19    record, because we were stepping on each other little

20    there -- sorry, Sarah.  Don't be mad -- at 9:49:02, the

21    dispatcher was checking on the officer and the officer

22    relayed that they were okay and that they were on

23    standby, essentially?

24    A.   Yes.

25    Q.   Okay.  I want to look at the next line.  I'm

Sheriff Eric Fagan

```
 1    going to try to remove the annotation.  At 9:42 --

 2    9:49:42.  I'm going to circle that annotation.  At

 3    9:49:42, there's a indicator of miscellaneous, and it

 4    looks like 24 Paul 10, which we understand to be Officer

 5    Lacy, commented subject -- which -- "SUBJ", which I

 6    assume means "subject", "at back of residence with

 7    baseball bat."  Am I reading that correctly?

 8        A.    Yes.

 9        Q.    And does that mean that Officer Lacy radioed

10    that the subject, which I assume was Edwin Kraft, was at

11    the back of the residence with a baseball bat?

12        A.    Yes.

13        Q.    Okay.  And then I want to look at the next

14    entry, which is 9:50:16, and then it says "MISC", and

15    then we see 24 Paul 10, which we understand to be

16    Officer Lacy, and then, "Comment:  Parties separated -

17    mom outside with me- SUBJ inside the residence."  Did I

18    read that correctly?

19        A.    Yes.

20        Q.    And I understand that to be saying, based on

21    your prior testimony, that at 9:50:16, Officer Lacy

22    radioed that the parties were separated.  The mom, Mrs.

23    Kraft, was outside with Officer Lacy, and the subject,

24    Edwin Kraft, was inside the residence; am I reading that

25    correctly?
```

1     A.   Yes.

2     Q.   If you want to look at the next line, which

3  starts at "9:55:23, miscellaneous", and then I'm going

4  to read that.  24 Paul 10, "Comment:  Keeping an eye on

5  the door from a distance until SUPV make LOC."  Did I

6  read that correct?

7     A.   Yes.

8     Q.   Correctly.  And based on your prior testimony, I

9  understand that at 9:55:23, Officer Lacy, 24 Paul 10,

10  radioed that he was keeping an eye on the door from a

11  distance until something happened.  Can you explain to

12  me what "SUPV make LOC" means?

13     A.   Until the supervise make the location.

14     Q.   Okay, so based on this entry, Officer Lacy was

15  standing outside the door from a distance until a

16  supervisor arrived; is that fair?

17     A.   Yes.

18     Q.   And then the next line has "09:55:29, on-scene",

19  which I think you already testified this means

20  on-scene -- 22 Paul 14, "comment:  Out."  Did I read

21  that correctly?

22     A.   Yes.

23     Q.   And what does "comment:  Out" mean?

24     A.   Arrival.

25     Q.   Okay, so at 9:55:29, this means that 22 Paul 14,

Sheriff Eric Fagan

 1   which you previously testified is Officer Rodriguez,

 2   arrived on the scene; is that accurate?

 3       A.   Yes.  They use the term "out."  I didn't use

 4   that when I was on the street.  "I used AR", but he used

 5   "out."

 6       Q.   And you understand that means "arrived"?

 7       A.   Yes.

 8       Q.   This next line, it says, "9:55:42,

 9   miscellaneous", the 24 Paul 10, "Comment:  W/M BLK over

10   BLU."  Did I read that correctly?

11       A.   Yes.

12       Q.   And based on your prior testimony, I understand

13   this to mean that Officer Lacy made some kind of

14   comment over the radio.  Can you tell me what the

15   comment was?

16       A.   White male, black over blue clothing.  I'm

17   thinking descriptors.

18       Q.   Okay, so in this point -- at this time, Officer

19   Lacy was describing Edwin Kraft; is that fair?

20       A.   I would -- I would think so, yes.

21       Q.   The next line, 10:00:16, we see, "OK" again, and

22   then we see 22 Paul 14, 22 Paul 10.  Did I read that

23   correctly?

24       A.   Yes.

25       Q.   And based on your prior testimony, I would

1    understand this line to indicate that the dispatcher

2    checked on the two deputies in the field, and they

3    radio back -- they radioed back that they were okay?

4        A.   Yes.

5        Q.   The next line, 10:00:42 miscellaneous, 22 Paul

6    14 comment "Justin Pulliam, journalist on-scene", did I

7    read that correctly?

8        A.   Yes.

9        Q.   Based on what we talked about already today, I

10   would understand this to be saying that at 10:00:42,

11   Officer Rodriguez radioed that Justin Pulliam -- which I

12   think is a typo or a misspelling of Justin Pulliam, was

13   on-scene as a journalist; is that correct?

14       A.   Yes.

15       Q.   Okay, and then I'm going to look at the next

16   line, which I'm going to circle.  10:01:41, on-scene

17   22S7, comment:  Out."  Did I read that correctly?

18       A.   Yes.

19       Q.   And at this time, some other officer is on the

20   scene; is that what this is indicating?

21       A.   Yes.

22       Q.   And I can't remember who this one was.  Molly,

23   can we go back to the first page, please?  Let's --

24   22S7, does that refer to Taylor Rollins?

25       A.   Yes.

Sheriff Eric Fagan

```
1      Q.   So left's go back to page 2, Molly.

2           At 10:01:41, "On-scene 22S7.  Comment:  Out."

3  Does that mean that officer Rollins had arrived?

4      A.   Yes.

5      Q.   And then at 10:03:05, "On-scene 2M7", does that

6  mean whoever that officer, I think that was the officer

7  Guajardo -- Guajardo that we looked at previously; is

8  that correct?

9      A.   Yes.

10     Q.   And then I want to look at this 10:16:40.  There

11  was a radio -- at 10:16:40, we see the message, "OK 22

12  Paul 14, 2M7, 22S7, and 24 Paul 10"; is that correct?

13  Did I read that correctly?

14     A.   Yes.

15     Q.   And does this mean all the -- the dispatcher --

16  the dispatcher checked on all the officers on-scene, and

17  they radioed back that they were okay?

18     A.   Yes.

19     Q.   I think we can skip a lot of this next couple of

20  entries.  Let's look down -- Molly, could you scroll

21  down just a little?

22          I want to look at 10:39:56, and I'm going to

23  circle that.  I'm going to read that.  10:39:56, "Misc

24  2M7, Comment:  Mom said he left the house", and then

25  there's some numbers, "down there screaming."  Did I
```

Sheriff Eric Fagan

```
 1   read that correctly?

 2       A.   Yes.

 3       Q.   And does this mean that the mom, Frances Kraft,

 4   relayed to some officer -- I assume 2M7 -- that Edwin

 5   Kraft was no longer in the house?

 6       A.   Yes.

 7       Q.   Okay, I want to look at the next line of

 8   10:42:25, and this says, "Miscellaneous:  24 Paul 10.

 9   Comment:  Subject on foot headed out.  Poss have a

10   weapon.  Set up perimeter."  Did I read that correctly?

11       A.   Yes.

12       Q.   And does that mean at 10:42:25, Officer Lacy

13   radioed a message to the dispatch and to the other

14   officers; is that correct?

15       A.   Yes.

16       Q.   And, as I understand Officer Lacy's comment

17   that's memorialized here, he was saying that the

18   subject, Edwin Kraft, was on foot; is that a correct

19   understanding of this writing?

20       A.   Yes.

21       Q.   And that Edwin Kraft was headed out, and we

22   don't know exactly what "headed out" means, but it says

23   "headed out."

24       A.   Yes.

25       Q.   And "poss have a weapon", does that mean that
```

 1   Officer Lacy at that time thought that Edwin Kraft

 2   possibly had a weapon?

 3        A.   Yes.

 4        Q.   And when Officer Lacy said, "set up perimeter",

 5   was Officer Lacy instructing other officers to set up a

 6   perimeter?

 7        A.   Yes.

 8        Q.   I want to look at the next line of 10:42:31, and

 9   it looks like this comment came shortly after -- seconds

10   after the last comment.  The line says, "10:42:31, MISC

11   24 Paul 10.  Comment:  May be a long gun."  Did I read

12   that correctly?

13        A.   Yes.

14        Q.   And, as I understand it, based on your prior

15   testimony about this document, this line is saying that

16   at 10:42:31, Officer Lacy radioed that the weapon that

17   Edwin Kraft may have might be a long gun; is that

18   accurate?

19        A.   Yes.

20        Q.   Let's skip down to 10:46:33.  This one right

21   here, Sheriff.  It's easy to get lost in these numbers.

22   Do you see where I'm indicating 10:46:33?

23        A.   Yes.

24        Q.   I'm going to read this line.  "10:46:33, MISC,

25   22 Paul 14.  Comment:  Call mother ADVD her to leave LOC

1   with screeners."  Did I read that correctly?

2       A.   Yes.

3       Q.   And, as I understand this line, Sheriff, this

4   line is memorializing the fact that at 10:46:33,

5   Officer Rodriguez radioed that someone needed to call

6   the mother, Frances Kraft, and advise her to leave the

7   location with some screeners.  Is that correct?

8       A.   Yes.

9       Q.   And would the screeners refer to TXANA

10  employees?

11      A.   I would assume so.

12              [Off-the-record discussion.]

13              MR. HEDGES:     I'm back, Christie.  Thank

14  you for the break.

15  BY MS. HEBERT:

16      Q.   Sure.  So I want to look at the -- another line,

17  which is 10:49:07.  Can you see where I'm circling?

18      A.   Yes.

19      Q.   And I'm going to read that line.  "10:49:07,

20  MISC.  Comment:  CT ADVD mother to leave LOC."  Did I

21  read that correctly?

22      A.   Yes.

23      Q.   And, as I understand it, some comment was

24  entered that CT advised mother to leave location.  Is

25  that understanding correct?

```
 1    A.   Yes.

 2    Q.   Does this doesn't -- this line doesn't have the

 3    radio number or indicator for officer.  Why is that?

 4    AND I guess the next question is what does "CT" mean, so

 5    maybe that answers the question, but help me unpack this

 6    line.

 7    A.   I'm thinking "CT" probably the TXANA person, but

 8    let me -- can I make a quick call?

 9    Q.   Sure.

10                [Off the record.]

11    A.   "CT" stands for "call taken"; the dispatcher.

12    Q.   Okay, so the dispatcher advised the mother to

13    lever location; is that accurate?

14    A.   Yes.  They're confirming that she was advised to

15    leave.

16    Q.   Okay.  That's fine.  That's helpful.  Thank you.

17    I would not have -- I would not have bet that.

18         Let's go down to 10:53:09, and I will circle

19    that.  "10:53:09, MISC 22S7.  Comment:  1X detained at

20    10:53."  Did I read that correctly?

21    A.   Yes.

22    Q.   What does this line mean?

23    A.   One subject was detained.

24    Q.   At 10:53?

25    A.   Yes.
```

1    Q.   And then let's look at 10:55:40.  That's the

2  next page.  10:55:40, I'm going to circle that one.

3  That was a terrible circle.  I'm just going to circle

4  the time, because that's safer.  At 10:55:40, "Clear

5  5D11.  Comment:  Clear at 10:54."  Did I read that

6  correctly?

7    A.   Yes.

8    Q.   And, as I understand this line, whoever the

9  officer was 5D11 -- that's probably in the call log

10  somewhere -- was radioing that everything was all clear

11  at 10:54.  Is that accurate?

12    A.   That he cleared the scene; that he left the

13  scene.

14    Q.   Okay.  So this means at 10:55:40, 5D11 left the

15  scene?

16    A.   Yes.

17    Q.   Okay.  That's helpful.  Thank you.  We can --

18  thank you, Sheriff, for helping me understand what a

19  call slip is and how that works.  I want to talk about a

20  couple more things, first of which after Justin

21  Pulliam's arrest on December 21st, 2021.  Other than

22  Detective Travis James, who at the sheriff's office

23  reviewed the footage of events on December 21, 2021?

24    A.   On the day of the arrest.

25    Q.   Yeah, so just to be clear, I know that you

Sheriff Eric Fagan

```
 1    previously testified that you reviewed Officer

 2    Rodriguez's dash camera, and then subsequently reviewed

 3    the footage from the complaint, so I'm asking you who

 4    else in the sheriff's office besides yourself and

 5    Detective Travis James reviewed the footage?

 6        A.   My chief.

 7        Q.   And who would your chief be?  Would that be

 8    Chief Deputy Provost?

 9        A.   Yes.  Chief Deputy Matty Provost.

10        Q.   Okay.  Anyone else?

11        A.   I would believe the captain of patrol.  Captain

12    Mike Fisher.

13        Q.   Okay.  So you have Detective Travis James

14    reviewed the footage, yourself, Chief Deputy Provost,

15    and the person in charge of the patrol; is that

16    correct?

17        A.   Yes, and the -- the head -- Major Burger.  So

18    myself, Chief Provost, Major Burger, Captain Fisher.

19        Q.   Okay.  Thank you for helping me clarify.  And

20    was any sheriff's officer disciplined for their role in

21    Justin Pulliam's arrest?

22        A.   No.

23        Q.   Was there any -- we talked a little bit earlier

24    today about oral reprimand.  Was there any oral

25    reprimand?
```

Sheriff Eric Fagan

```
1      A.    No.

2      Q.    Was there any conversation among anybody about,

3   hey, you could have handled X, Y, or Z better?

4      A.    No.

5      Q.    And, as you sit here today testifying on the

6   county's behalf, is there anything that should have been

7   done differently on December 21, 2021?

8      A.    No.

9      Q.    Couple more questions.  I want to talk a little

10  bit about the investigation of Justin Pulliam for the

11  offense of interference with public duties.  I

12  understand that detective James investigated Justin

13  Pulliam for the offense.  How did Detective James come

14  to be tasked with investigating Justin Pulliam for the

15  offense?

16     A.    He was assigned to it by his supervisor.

17     Q.    Okay, and is that the ordinary course of how

18  someone get tasked with investigating an offense?

19     A.    Yes.  It -- it'd be assigned, yes.

20     Q.    So the supervisor of some division hands out

21  assignments of what the detectives should be

22  investigating; is that fair?

23     A.    Yes.

24     Q.    And is it typical for the sheriff's office to

25  assign a detective to investigate interference with
```

1    public duties?

2       A.   It depends, yes.  It depends on the situation.

3       Q.   And what does it depend on?

4       A.   Well, all arrests are investigated by either the

5    officer or, if it needs to be further investigated,

6    we'll assign it to an investigator, depending on the

7    situation.

8       Q.   So every arrest that a sheriff's officer makes

9    is investigated?

10      A.   Yes, by that officer, or by a supervisor, and,

11   if needed, by an investigator.

12      Q.   Okay, so how does the sheriff's office determine

13   if an investigator is needed?

14      A.   If it's a situation that garners media

15   attention.  If it's a situation that have multiple

16   suspects, or multiple injuries, or if it's a major

17   crime.

18      Q.   Okay, I want to break that down.  What's a

19   situation that garners media attention?

20      A.   Multiple -- multiple injuries, multiple

21   suspects, something that can cause injury or death;

22   something like that.

23      Q.   Okay, so those are the types --

24      A.   Basically, injury or death -- I'm sorry, I

25   should have said major injuries or death.

1      Q.   No, that's okay.  So those are the types of

2   situations where an investigator would be assigned -- a

3   detective would be assigned to investigate what

4   happened?

5      A.   Yes.

6      Q.   And who reviewed Detective James' findings or

7   report from the investigation of Justin Pulliam?

8      A.   Supervisor of the investigator's division.

9   Would have to be that supervisor.

10     Q.   And so if the supervisor -- in general, if a

11   supervisor reviews a detective's report, would the

12   supervisor tell the detective:  Hey, this report has

13   certain deficiencies, and you should go back and look

14   again?

15     A.   Yes.

16     Q.   But if the supervisor approved the report, what

17   would happen next?

18     A.   It'd just go forward, be filed --

19     Q.   What is --

20     A.   It gets filed.  Our report will be filed in the

21   computer.  It'll go as the officer wrote it.  If there

22   was no corrections need to be made or anything like

23   that, it'll just go into our system, or cloud, however

24   they say it.

25     Q.   I get you.  So, how -- how does a -- a report --

Sheriff Eric Fagan

```
 1    a detective's report that goes into the system, like it

 2    gets finalized, gets done, how does that get transferred

 3    to the district attorney's officers?

 4        A.   We send the charges over.

 5        Q.   And does the sheriff's office always send the

 6    charges over to the district attorney's office?

 7        A.   Yes.

 8        Q.   So it's a matter of course that every time an

 9    offense investigation is completed, the report gets sent

10    to the district attorney's office?

11        A.   Yes.

12        Q.   Is there ever a situation where the sheriff's

13    office decides not to send the investigation results

14    along to the district attorney's office?

15        A.   If charges are going to be filed, we send them

16    over all the time.

17        Q.   I understand that, but, like, what if -- if it's

18    not sure if charges are going to be filed.  How does

19    that -- I guess what I'm saying is separate and apart

20    from the district attorney's decision to charge someone

21    or not, there's got to be some communication between the

22    sheriff's office and the district attorney's office

23    saying, hey, here's the offenses that you need to pay

24    attention to.  How does that work?

25        A.   It's -- it's different in Fort Bend.  In
```

1    Houston, we have to call the D.A. to see if they'll

2    accept charges.  Here in Fort Bend, we don't do that.

3    The officer's discretion is to make that arrest, and

4    then after writing the report, they send the charges

5    over, then the D.A. can either say he or she's going to

6    accept the charges or not accept the charges.  If the

7    D.A. decides not to accept the charges, we have to

8    release that individual.

9        Q.   Okay, so that's helpful, thank you.  Let me

10   break that down.  So every time someone is arrested in

11   Fort Bend County, the officer who did the arresting

12   writes a report, and there may be an investigation if

13   it's a serious crime with multiple suspects or serious

14   injuries, and then every time those reports and

15   findings get sent to the district attorney's office,

16   and then the district attorney's office decides what to

17   do from there?

18       A.   Yes.

19       Q.   Okay.  Thank you.  I'd like to talk a little bit

20   about search warrants.  Does the sheriff's office have a

21   policy on who the appropriate officer is to request a

22   particular search warrant?

23       A.   No.  We -- I shouldn't have said no.  The

24   detectives do the search warrants.  Each detective can

25   do the search warrant.  It varies from detective to

Sheriff Eric Fagan

```
 1    detective, what division it's in.  Not just one person

 2    does it.

 3        Q.   So, in general, patrol officers don't request

 4    search warrants?

 5        A.   Correct.

 6        Q.   Detectives request -- detectives in the

 7    sheriff's office for Fort Bend County are the ones who

 8    are responsible for requesting search warrants?

 9        A.   Yes.

10        Q.   Does the sheriff's office generally require a

11    detective to have firsthand knowledge to request a

12    search warrant?

13        A.   I'm not sure of your question.  Firsthand

14    knowledge of the case?

15        Q.   Yes.

16        A.   No.

17        Q.   Does the sheriff's office have a policy on the

18    requirements for an affidavit to request a search

19    warrant?

20        A.   Yes.

21        Q.   And what is that policy?

22        A.   If the officers are being truthful at the time,

23    making their -- making their affidavit, that, to the

24    best of the knowledge, they're giving a true and

25    accurate statement.
```

Sheriff Eric Fagan

```
 1     Q.    Sure.  And is there any rule about relying on

 2   the statements of other officers in the affidavit for a

 3   search warrant?  Is it permissible to rely on the

 4   statements of other officers for a search warrant?

 5     A.    Yes.

 6     Q.    So a detective who's seeking to complete an

 7   affidavit to get a search warrant can rely on the

 8   statements of other officers?

 9     A.    Yes.

10     Q.    Can -- can a detective who's seeking to write an

11   affidavit to get a search warrant rely solely on the

12   statements of other officers?

13     A.    In some situations, yes.

14     Q.    In what kind of situations?

15     A.    If the officers were the only person there at

16   the time.  The officer's the same as the detectives.

17   They're obligated to be truthful and accurate as

18   possible when giving statements, as well.  It could be

19   a situation that there's no complainant there, or

20   someone -- you know, other than just the officer.

21     Q.    Sure.  And so I guess that naturally leads me to

22   the next question of if there's only one officer who

23   witnessed or was in the field and understands what's

24   going on, why wouldn't that officer who has the direct

25   knowledge and direct information be the one to complete
```

Sheriff Eric Fagan

1    the affidavit?

2       A.   That officer's responsibility is to write the

3    offense report.  They write the offense report and get

4    sent over to that investigative agency.

5       Q.   And then whoever's investigating writes the

6    affidavit based on the report; is that correct?

7       A.   Yes.

8       Q.   Okay.  Why don't we take a brief break, and I'll

9    just check my notes to make sure I don't have anything

10   else, and, hopefully, we'll be done from there.

11              COURT REPORTER:  Off the record, 12:30.

12                   [Short recess was taken.]

13              COURT REPORTER:  Back on the record,

14   12:33.

15   BY MS. HEBERT:

16      Q.   Sheriff, thank you for your candor, and your

17   patience with me today.  I don't have any other

18   questions at this time.  I pass the witness.  Kevin, do

19   you have anything you want to discuss?

20              MR. HEDGES:     There was one thing that I

21   think we need to clarify.  Molly, could you please put

22   up Exhibit 3 for me?  We're going to look at the very

23   first page at the very top.  Thank you for making it

24   bigger.  You've got young eyes.  I don't.  This is a lot

25   easier for me to read.  Thank you.

1    EXAMINATION BY MR. HEDGES:

2       Q.   Sheriff, when you called your office to find out

3    what "OK" meant to response to questions, did you also

4    ask what -- in this top box here, what "control" means?

5       A.   Yes.

6       Q.   All right, I think earlier, you mentioned that

7    you thought it meant when the officer had the scene

8    under control.  Is that what you were told when you

9    inquired?

10      A.   No.

11      Q.   Tell us what "control" means.

12      A.   Megan said that it was officer onsite.

13      Q.   So the officer was controlled to be onsite?

14      A.   Yes.

15      Q.   That's all I've got.  I pass the witness.

16           MS. HEBERT:     Sure.  Thanks, Kevin.

17   FURTHER EXAMINATION BY MS. HEBERT:

18      Q.   I don't think I entirely understand what that

19   means, Sheriff, so I'm going to just ask a couple of

20   follow-up questions.  I understand the line before

21   "criminal" in Exhibit 3 to be saying on scene, and

22   that's when an officer is on-scene at the location; is

23   that fair?

24      A.   Yes.

25      Q.   Okay, so then control, what -- what does

Sheriff Eric Fagan

```
1    "control" mean based on the additional clarification you

2    received --

3        A.   Pretty much the same thing.  They were on-scene

4    and okay.  On-scene.  Pretty much the same thing.

5        Q.   So --

6        A.   But --

7        Q.   Go ahead.  I don't mean to interrupt you.

8        A.   No, I was going to say I'm going to call her

9    again.  That'll just take two seconds.

10       Q.   Sure, because there's two different timestamps,

11   so I'm just unclear, to I'm trying to understand.

12   That's it.

13                  [Off the record.]

14       A.   "Control" is the same as "OK."  I'm sorry.  Are

15   y'all ready?

16       Q.   Sure.  We've stayed on the record, so continue.

17       A.   "Control" means the same as "OK."

18       Q.   Okay, it seems like there's -- there's these

19   different numbers, then, in the columns, and I'm just

20   trying to understand who's communicating this at times.

21   I'm going to just circle these.  We've got these

22   numbers here (indicating).  What's going on in this

23   column?

24       A.   CT11, CT... I don't know if that's the

25   dispatcher's number or what.
```

```
 1                [Off-the-record discussion.]

 2     A.   That's the dispatcher's workstation.

 3     Q.   Okay.  So "DW07" means "dispatcher workstation."

 4  What does "S321" mean?

 5     A.   The S stands for what?

 6                [Off-the-record discussion.]

 7     A.   That's the deputy's MDT number.

 8     Q.   Okay.  So at 12:21:09, 32, 42, this was likely

 9  Officer Lacy arriving on scene?

10     A.   Yes.

11     Q.   And then we've got this "12/21 control",

12  "12/21/2021", and "09:49:02", this is the dispatcher

13  indicating that everything is controlled on-scene is

14  okay; is that fair?

15     A.   Yes.  The same as okay.  Just checking.  Yes.

16     Q.   I understand.  Thank you for clarifying that.

17          Pass the witness, Kevin, if there's anything else

18  you want to clean up.

19                MR. HEDGES:     No, we have nothing

20  further.

21                MS. HEBERT:     Thank you sheriff for your

22  time today.

23                THE WITNESS:    Thank you.

24                COURT REPORTER:  Off the record 12:39.  All

25  right, guys, thanks.
```

Sheriff Eric Fagan

1    MR. HEDGES:      And we do want a copy.

2    COURT REPORTER:  Okay, thanks a lot, guys.

3    [Deposition was concluded.]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sheriff Eric Fagan

```
 1                    REPORTER CERTIFICATION

 2        ORAL DEPOSITION of ERIC FAGAN, taken on August 29,

 3    2023.

 4        I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify

 5    to the following:

 6        That the witness, ERIC FAGAN, was duly sworn by me,

 7    and that the transcript of the deposition is a true

 8    record of the testimony given by the witness;

 9        That examination and signature of the witness to the

10    deposition transcript was reserved by the witness at the

11    time of the deposition;

12        I further certify that I am neither counsel for,

13    related to, nor employed by any of the parties in the

14    action in which this proceeding was taken, and, further,

15    that I am not financially or otherwise interested in the

16    outcome of this action.

17        Certified by me on this 13th day of September, 2023.

18

19    _____

20        Sarah B. Townsley CRR CCR CSR RPR

21        Certified Realtime Reporter

22        TX CSR #5746; LA CCR #92016; RPR 814558

23

24

25
```