# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT 13

```
 1                UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION
 3   JUSTIN PULLIAM,
 4      Plaintiff,
 5   v.                         Civil Action No. 4:22-cv-4210
 6   COUNTY OF FORT BEND, TEXAS;
     SHERIFF ERIC FAGAN, in his
 7   Individual capacity; OFFICER ROBERT
     HARTFIELD, in his individual capacity;
 8   OFFICER JONATHAN GARCIA, in his
     Individual capacity; OFFICER TAYLOR
 9   ROLLINS, in his individual capacity;
     And OFFICER RICKY RODRIGUEZ, in
10   His individual capacity,
11      Defendants.
12
13                     ORAL DEPOSITION
14                           OF
15              DETECTIVE TRAVIS JAMES
16
                 Taken via remote videoconference
17
18
19   August 30, 2023                              9:05 a.m.
20
21
22
23
24
25
```

```
 1   APPEARANCES:
 2   FOR PLAINTIFFS (all via Zoom):
 3                        INSTITUTE FOR JUSTICE
                          816 Congress Ave., Suite 960
 4                        Austin, TX  78701
                          By: Christen Mason Hebert
 5                            CHebert@IJ.org
                              Jeff Rowes
 6                            JRowes@IJ.org
 7   FOR DEFENDANTS:
 8                        Kevin Hedges
                          Assistant County Attorney
 9                        Litigation Division
                          401 Jackson Street
10                        3rd Floor
                          Richmond, TX  77469
11                        Kevin.Hedges@FBCtx.gov
12
13   ALSO PRESENT:        Molly Hanis
14   REPORTED BY:         Sarah B. Townsley, CSR, CRR, RPR
15
16
17
18
19
20
21
22
23
24
25
```

| | |
|---|---|
| 1 | STIPULATIONS |
| 2 | IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR |
| 3 | THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF DETECTIVE |
| 4 | TRAVIS JAMES WAS TAKEN BEFORE SARAH B. TOWNSLEY, CRR, |
| 5 | CCR, CSR, RPR, CERTIFIED REALTIME REPORTER IN AND FOR |
| 6 | THE STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE |
| 7 | AND IN ACCORDANCE WITH THE FEDERAL RULES OF CIVIL |
| 8 | PROCEDURE AS PROVIDED BY LAW, VIA REMOTE |
| 9 | VIDEOCONFERENCE, ON AUGUST 30, 2023, AT 9:05 A.M.; |
| 10 | THE PARTIES HEREBY WAIVE ALL FORMALITIES IN |
| 11 | CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE |
| 12 | EXCEPTION OF THE SWEARING OF THE WITNESS AND THE |
| 13 | REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING; |
| 14 | THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED |
| 15 | TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED; |
| 16 | COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT |
| 17 | AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE |
| 18 | ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND |
| 19 | THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE |
| 20 | TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF |
| 21 | MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF |
| 22 | THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT; |
| 23 | SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN |
| 24 | ADMINISTERING THE OATH TO THE WITNESS. |
| 25 | |

```
 1     A.    Well, for clarity, from 2006 to 2010, I was a
 2   jailer, and then from 2010 to March '21, I was a patrol
 3   deputy, yes, sir.
 4     Q.    I see.  And did you go to the Fort Bend County
 5   police academy?  I think it's called Gus George.  I
 6   can't quite remember what it's called.
 7     A.    No, sir.
 8     Q.    Where did you attend your training?
 9     A.    I went to Wharton County Junior College, their
10   basic academy.
11     Q.    Are you still a detective in the criminal
12   investigation division's robbery and homicide section?
13     A.    Yes, sir.
14     Q.    And have you been a detective in that section
15   since you started as a detective?
16     A.    Yes, sir.
17     Q.    And is most of your time spent on major crimes
18   like robberies and homicides?
19     A.    I investigate everything from homicides and
20   robberies to misdemeanor assaults, and aggravated
21   assaults and major crimes, such as threats to schools
22   and -- yeah, threats to schools; pretty much, that's it.
23     Q.    How often do you investigate class B
24   misdemeanors, like the one we have here about
25   interfering with public duties?
```

```
 1      A.   I wouldn't say very often.
 2      Q.   Okay.  And when you're doing an investigation,
 3   as I said before, basically, my knowledge is, like,
 4   whatever I've seen on TV and in the movies, and I'm
 5   sure, obviously, an investigation is more involved, but
 6   what's the basic approach to investigating?  Like, how
 7   do you decide when you've talked to enough people, that
 8   kind of thing?
 9      A.   My investigations -- I speak from my
10   experience -- I usually start by either reading an
11   offense report or if I've been called out a scene,
12   meeting with the deputy or an officer, figuring out
13   what they did on the scene, figuring out if they've
14   talked to any witnesses, any suspects, victims, and,
15   from there, I'll figure out who do I need to talk to,
16   what evidence do I need to obtain, such as video
17   evidence, crime scene evidence, which is not really
18   here, but stuff like that, and then move forward from
19   there.
20      Q.   And we'll dig into a little bit more detail
21   later, but I know, reading the incident report, that in
22   April of 2022, you presented this case, after your
23   investigation, to the district attorney.  Do you recall
24   that?
25      A.   In April '22?  Yes.
```

```
 1    Q.   Yes.  Okay, so is it exclusively detectives who
 2  present their investigations to the district attorney to
 3  proceed, or do patrol deputies also do that?
 4    A.   Patrol deputies can present cases; however, if a
 5  specific patrol deputy takes a report, say, on an
 6  arrest, it will go to a -- I guess an intake deputy, and
 7  they will then file that case.
 8    Q.   I see, so it's not the case -- it's not usually
 9  the situation where the arresting officer is the one who
10  fully completes the investigation and then presents the
11  case?
12    A.   I'm sorry, could you repeat that?
13    Q.   Sure.  Sorry if it's confusing.  What I meant to
14  say is that if a patrol deputy makes an arrest, it's
15  not usually the situation where the arresting officer
16  will then do the complete investigation him or herself,
17  and present it directly to the ADA; is that right?
18    A.   I would say that was -- that is correct.
19    Q.   Okay.  So was there anything unusual fact that a
20  homicide detective -- a major crimes detective was
21  investigating this class B misdemeanor that Justin
22  Pulliam was accused of?
23    A.   Maybe a little unusual.
24    Q.   How did you come to be -- how did you come to be
25  assigned to investigate this?
```

1   or, like -- it could be dash cam videos, it could be
2   Justin's videos, any video evidence you recall reviewing
3   at any point.
4       A.   I reviewed Mr. Pulliam's video once I obtained
5   it.
6       Q.   And did you -- I've listened to -- sorry, I've
7   listened to Deputy Rodriguez's dash cam.  I don't think
8   he had video of the incident on his dash cam, but there
9   was a little bit of noise off to the side, and you
10  could kind of hear what was going on.  Did you look at
11  Deputy Rodriguez's dash cam at all?
12      A.   Briefly.
13      Q.   And who was the person who assigned you the
14  Justin Pulliam case in December of 2021?
15      A.   Lieutenant Scott Heinemeyer.
16      Q.   And do you know -- is it just, like, the cases
17  are dished out at random, or did he assign it to you
18  because you had this past history of investigating Edwin
19  Kraft?
20      A.   So, typically, the cases are just out of kind of
21  at random; however, in this instance, he was walking
22  down the hall, I happened to be kind of standing in the
23  hall, and he was looking for somebody to kind of work
24  on this, and when he explained it to me, I said, "Well,
25  I've worked on the Edwin Kraft incident.  I'll go ahead

```
 1   take this on, as well."
 2       Q.   And I know, in the incident report, you spoke to
 3   a couple of people within the sheriff's office, and you
 4   spoke to the TXANA people, and we'll get into some of
 5   those details, but did you speak with other people that
 6   you recall who were neither TXANA nor part of the
 7   sheriff's office?
 8       A.   No, sir.
 9       Q.   Did you try to speak with Justin Pulliam,
10   himself, as part of your investigation?
11       A.   No, sir.
12       Q.   Do you -- would you normally, in the course of
13   investigations, actually try to arrange a talk with the
14   -- the criminal suspect?
15       A.   Yes, sir, I would; however, in this instance, my
16   understanding, when he was arrested, he didn't wish to
17   provide a statement or anything like that, so I was
18   like, okay, if you don't want to give us a statement,
19   fine.
20       Q.   So if Justin had spoken to the sheriff and the
21   other folks who were with him after the arrest indicated
22   a willingness to do so, you might have talked to Mr.
23   Pulliam; is that correct?
24       A.   That is correct, yes, sir.
25       Q.   But you just thought, "Oh, well, he's going to
```

1    Q.   And if you take a look at the -- at the
2  narrative, it says, "On this date, I, Detective Travis
3  James, presented this case to the Fort Bend County
4  district attorney's office."  What does it mean that
5  you "presented" it to the district attorney's office?
6    A.   So "presented", basically what that means is
7  I've taken all available evidence that I have known to
8  me at the time, assembled it into what we call a case
9  packet, and taken it over to the district attorney's to
10 their intake, and given it to them so that they may
11 begin their work on it.
12   Q.   And when you present it, is your investigation
13 over at this point?
14   A.   Considering I'm in CID, not necessarily.
15   Q.   Okay.  And what does the fact that you're in CID
16 have to do with whether the investigation is over once
17 you present the evidence?
18   A.   So sometimes evidence will come back -- such as
19 DNA evidence, crime scene evidence, that would come
20 back after the case has been presented, potentially, so
21 then you would supplement the case, present that
22 supplement to the district attorney's office as a
23 follow-up.
24   Q.   And so -- but your pre -- when you presented the
25 case to the district attorney on April 13th, you had

1  concluded, based on your investigation, that probable
2  cause existed that a crime had been committed, so
3  you're recommending to the D.A. to move forward; is that
4  correct?
5     A.   I'm not recommending that the D.A. move forward.
6  I'm just presenting the case as it is at that moment.
7     Q.   I see.  And it's the D.A.'s independent judgment
8  about whether to move forward that decides whether the
9  case gets prosecuted; is that right?
10    A.   Correct.
11    Q.   But setting aside the recommendation, when you
12  presented the case on Wednesday, April 13th, you had
13  concluded that probable cause existed that Justin had
14  committed crime, after reviewing all of the evidence,
15  clueing the evidence from his cameras; is that correct?
16    A.   Are you asking my personal beliefs, or --
17    Q.   Yeah.
18    A.   Yes.
19    Q.   Okay.  If you -- if you did an investigation and
20  you believed that probable cause didn't exist, would you
21  say so in your presentation to the D.A.?
22    A.   Yeah.  Yes, sir.
23    Q.   So -- it seems obvious.  Like, if you don't
24  think a crime's been committed, you don't recommend that
25  -- you don't give it to the D.A. and say, "Here's the

1   evidence"; you would tell them, "I don't think a crime

2   was committed."

3       A.   Correct.

4       Q.   And, obviously, you didn't have just tin's

5   videos when you did your original search warrant

6   affidavit because that was the point, but I think we've

7   established that once you got those, you reviewed those

8   before you presented the case to the district attorney;

9   that's correct, right?

10      A.   Correct.

11      Q.   Okay.

12           MR. ROWES:   And actually, Molly, can

13  you just go to page 17 of Exhibit No. 4, please?  You

14  can go ahead and stop there, actually.

15  BY MR. ROWES:

16      Q.   Do you see that you sort of have a time-stamped

17  narrative of the SD card video; do you see that in the

18  middle of the page?

19      A.   Yes, sir.

20      Q.   And is this the narrative that you made based on

21  watching the video from Justin's camera, of the arrest

22  that Sergeant Rollins made?

23      A.   Yes.

24           MR. ROWES:   Molly, can you scroll

25  down to the bottom of this time-stamped narrative of

```
 1   escalates the situation, maybe, if you have a civilian
 2   mental health worker, that sort of helps diffuse it; is
 3   that right?
 4       A.   Potentially, yes.
 5       Q.   Potentially?  Yeah.  Okay, and so when Justin
 6   turns around and starts walking away, at that point,
 7   Sergeant Rollins has still ordered all three people
 8   across the street, right?
 9       A.   Correct.
10       Q.   And then the TXANA person -- actually, Molly,
11   why don't we play from about 4:25 to 4:40, and we can
12   see the TXANA employees start talking to Sergeant
13   Rollins, and then Justin starts to turn around with his
14   camera.
15               [Video was played.]
16       Q.   Okay, so, at this point in the video, Justin is
17   walking backwards now, because he wants to document the
18   conversation with TXANA, apparently, and you saw that
19   the TXANA civilians were talking to Sergeant Rollins,
20   correct?
21       A.   Yes.
22       Q.   And did you -- did you hear -- so they announce
23   that they're from TXANA and was the purpose of that,
24   based on your personal judgment, that they were trying
25   to explain to Sergeant Rollins why their presence might
```

1  be permissible, and they shouldn't go across the
2  street?
3      A.   Yes.
4      Q.   Did the TXANA employees commit interference when
5  they explained to Sergeant Rollins why they didn't
6  think that they should have to go across the street?
7      A.   No.
8      Q.   And then Sergeant Rollins, in fact, rescinded
9  his order to go across the street with respect to them,
10 right?  They were allowed to stay?
11     A.   Correct.
12     Q.   And we discussed earlier, but we didn't get into
13 it.  You mentioned that, at some point in your
14 investigation between January 14th when the search
15 warrants went in, and April 13th when you presented the
16 case to the ADA, you spoke to the TXANA employees; is
17 that right?
18     A.   Yes, sir.
19     Q.   Did you speak to both of them, or just one?
20     A.   Both of them.
21     Q.   Okay.  And you know, just kind of in broad brush
22 strokes, kind of what was the gist of what they told
23 you?
24     A.   So, from my understanding, they were called to
25 the residence of Edwin Kraft, who was experiencing

 1   actually, and we didn't ask the other officers about
 2   this, but it occurs to me, I've heard of -- a criminal
 3   defense attorney told me that interference with public
 4   duties is also known among criminal defense lawyers,
 5   and maybe among the police, as "contempt of cop."  Have
 6   you ever heard that expression, "contempt of cop"
 7   before?
 8       A.   Yes.
 9       Q.   And what does that mean to you, or, like, when
10   you hear "contempt of cop", what do you think that that
11   means?
12       A.   It means that -- to me, that law enforcement has
13   become upset at somebody who maybe is doing something
14   or saying something to law enforcement that is upsetting
15   to them, and they will take them to jail.
16       Q.   I see.  And did you consider the possibility
17   that there was the kind of contempt of cop dynamic
18   going on, because Justin had said that insulting
19   phrase, "So you can shoot him", that kind of thing?
20   Had you considered that possibility in investigating
21   this?
22       A.   Yes.
23       Q.   And how -- so, obviously, you moved ahead and
24   made the presentation that you did to the ADA.  How did
25   you conclude that this was not maybe a contempt of cop

```
 1   situation, but was, in fact, a legitimate arrest for
 2   interference?
 3        A.   Just based off my -- I've known Sergeant Rollins
 4   for years.  I also know that his interaction with
 5   individuals is usually very calm and professional, just
 6   like I am.
 7        Q.   And, for the record, I know he's Lieutenant
 8   Rollins now.  I'm just using "Sergeant Rollins" because
 9   it seems easiest because that's what it says in all the
10   documents about the case.
11        A.   Correct.
12             MR. ROWES:   Can we go, Molly, please, to
13   Exhibit No. 4, and that's the offense report, on page
14   10.
15        Q.   We're almost finished, by the way.  You can take
16   a break at any time you want, but we're almost finished
17   so maybe we can just, like, push through.  I'll take a
18   break in a few minutes when I'm finished talking about
19   this, and decide if I'm actually finished.
20             MR. ROWES:       Can you just move it up a
21   little bit, Molly?  I'm sorry, the -- move it -- so not
22   the Fort Bend County -- get rid of the Fort Bend County
23   Sheriff stuff so we can see more of the -- there we go.
24        Q.   I was just hoping you could walk through some
25   things, here, that I don't completely understand, since
```

1                   REPORTER CERTIFICATION

2        ORAL DEPOSITION of TRAVIS JAMES, taken on August

3   30, 2023.

4        I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify

5   to the following:

6        That the witness, TRAVIS JAMES, was duly sworn by me,

7   and that the transcript of the deposition is a true

8   record of the testimony given by the witness;

9        That examination and signature of the witness to the

10  deposition transcript was reserved by the witness at the

11  time of the deposition;

12       I further certify that I am neither counsel for,

13  related to, nor employed by any of the parties in the

14  action in which this proceeding was taken, and, further,

15  that I am not financially or otherwise interested in the

16  outcome of this action.

17       Certified by me on this 19th day of September, 2023.

18

19       _____

20       Sarah B. Townsley CRR CCR CSR RPR

21       Certified Realtime Reporter

22       TX CSR #5746; LA CCR #92016; RPR 814558

23

24

25