# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT 19

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION
 3
 4        JUSTIN PULLIAM,              )
                                       )
 5           Plaintiff,                )
                                       )
 6        VS.                          ) CIVIL ACTION NO.
                                       ) 4:22-cv-04210
 7        COUNTY OF FORT BEND,         )
          TEXAS; SHERIFF ERIC          )
 8        FAGAN, in his               )
          individual capacity;        )
 9        OFFICER ROBERT              )
          HARTFIELD, in his           )
10        individual capacity;        )
          OFFICER JONATHAN            )
11        GARCIA, in his              )
          individual capacity;        )
12        OFFICER TAYLOR ROLLINS,     )
          in his individual           )
13        capacity; and OFFICER       )
          RICKY RODRIGUEZ, in his     )
14        individual capacity,        )
                                       )
15           Defendants.               )
16
17     _ _ _ _ _ _ _ _ _ _
18        DEPOSITION OF DETECTIVE ROBERT HARTFIELD
                 August 8, 2023, 1:04 p.m.
19        Location: Fort Bend County Attorney's Office
                 Volume 1 of 1 - Pages 1 - 79
20                         _ _ _ _ _ _ _ _ _ _
21
22
23
      Stenographic Reporter:
24    DENYCE M. SANDERS, TX CSR, RDR, CRR, CCR (LA)
      dsanderscsr@gmail.com          JOB NO. 341509
25
```

```
 1              A P P E A R A N C E S

 2

    ON BEHALF OF PLAINTIFF:

 3

 4         INSTITUTE FOR JUSTICE
           816 Congress Avenue, Suite 960
 5         Austin, Texas 78701
           Mr. Jeffery Rowes
 6         512.480.5936
           jrowes@ij.org
 7         Ms. Christie Hebert
           Ms. Molly Hanis
 8

 9   ON BEHALF OF DEFENDANTS:

10         FORT BEND COUNTY ATTORNEY'S OFFICE
           401 Jackson Street, 3rd Floor
11         Richmond, Texas 77469
           Mr. Kevin Hedges
12         281.341.4555
           kevin.hedges@fbctx.gov

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         INDEX

 2                    ORAL DEPOSITION OF

 3         DETECTIVE ROBERT HARTFIELD, AUGUST 8, 2023

 4                                              Page
```

```
 5      APPEARANCES.............................    2

 6      BY MR. ROWES............................    5

 7      BY MR. HEDGES...........................   64

 8      BY MR. ROWES............................   68
```

```
 9

10

11      Start time - 1:04 p.m. End time - 2:35 p.m.

12      Total pages: 79

13
```

```
14       WITNESS CORRECTIONS AND SIGNATURE........   75

15       REPORTER CERTIFICATION...................   77
```

```
16

17

18

19

20

21

22

23

24

25
```

Detective Robert Harerfield

```
 1                    EXHIBIT INDEX
 2                  ORAL DEPOSITION OF
 3      DETECTIVE ROBERT HARTFIELD, AUGUST 8, 2023
 4                  Description                 Page
 5
    Exhibit 1       Plaintiff's Second Amended ... 9
 6                  Notice of Deposition of
                    Officer Robert Hartfield
 7                  Federal Rule of Civil
                    Procedure 30
 8
    Exhibit 2       6/1/2017 Public Information .. 22
 9                  and Media Relations
10  Exhibit 3       6/1/2017 General Order ....... 25
                    Social Media and Related
11                  Communications
12  Exhibit 4       Video........................ 33
13  Exhibit 5       Defendant, Officer Robert .... 34
                    Hartfield's Responses and
14                  Objections to Plaintiff's
                    First Set of Requests for
15                  Admission
16
17               •_____•
18
19
20
21
22
23
24
25
```

```
 1                 DETECTIVE ROBERT HARTFIELD,

 2     having been first duly sworn, testified as follows:

 3                     E X A M I N A T I O N

 4     BY MR. ROWES:

 5          Q.     Good morning, sir.  Would you please

 6     state your name and rank with the Fort Bend County

 7     Sheriff's Office?

 8          A.     Robert Hartfield, and I'm an auto theft

 9     detective.

10          Q.     My name is Jeff Rowes, and I met you a

11     moment ago, and I'm an attorney for Plaintiff Justin

12     Pulliam.

13                     And as you may know, his lawsuit

14     asserts First Amendment free speech rights and

15     search and seizure rights under the Fourth

16     Amendment.

17                     Before we jump into the questions, I

18     just want to go through a couple of logistics.

19                     I have no doubt as a law enforcement

20     officer you've probably testified under oath, and

21     you understand the seriousness of it; but I'm just

22     going to kind of walk through my usual explanation.

23                     Have you -- have you been deposed

24     before?

25          A.     Yes, sir, I have.
```

1      Q.      Okay.  So you were sworn in a moment ago

2   by the court reporter, and she's going to produce a

3   transcript of everything we say.

4                Do you understand that you have

5   given an oath to testify truthfully?

6      A.      Yes.

7      Q.      And do you understand that you should

8   treat your oath with the same seriousness that you

9   would treat testimony in front of a judge?

10     A.      Yes.

11     Q.      It's important for us to have a clear

12  record, and that means I need to ask clear

13  questions.

14               And I would ask you to give clear

15  answers, please.  And that means verbal answers.  So

16  please don't just, like, shake your head or say

17  "huh-uh," or "uh-huh" because it's hard for Denyce,

18  our court reporter --

19     A.      I understand.

20     Q.      -- to record.

21               Let's try not to interrupt each

22  other.  And I know there's a lot of questions where

23  you'll kind of know where I'm going.  And in a

24  normal conversation, you might jump in.  But we just

25  need a clear record.  So question, answer; question,

```
 1    answer.

 2                    If you don't understand something,

 3    just let me know.  I don't want to ask an unclear

 4    question.  There aren't any tricks or traps or

 5    minefields or anything like that.  So just let me

 6    know, and I'll try to rephrase it.

 7                    If you don't know the answer to a

 8    question, that's fine; just say so.

 9                    But if you do know, you're required

10    to answer to the best of your knowledge.

11         A.     Yes, sir.

12         Q.     Mr. Hedges, who works for the County,

13    may state an objection after I ask a question.

14                    It doesn't mean the question is bad,

15    but -- and it doesn't mean you -- usually, it

16    doesn't mean you don't have to answer it; but the

17    purpose of the objection is just to get it on the

18    record in case we want to discuss with the judge in

19    the future about whether your answer can be used.

20                    The one exception to that is if

21    Mr. Hedges gives you a directive not to answer a

22    question, for example, for attorney-client

23    privilege; then you do not have to answer.

24                    And I will -- my questions will

25    never be about asking you to tell me what you talked
```

 1    about with Mr. Hedges.  So I don't want you to

 2    inadvertently say, "Oh, this is what Kevin told me

 3    the other day."

 4        A.     I understand.

 5        Q.     Okay.  If you need to take a break or

 6    have a drink, that's fine; just let me know, and we

 7    can do it.

 8               If there's a question pending, we

 9    usually like the witness to answer the pending

10    question before the break, but it's no problem.

11               Is there any reason why you're not

12    able to give your full and best testimony today?

13        A.     No, there's not.

14        Q.     We're going to look at some documents,

15    not many, actually, only three or four, and then

16    we're going to watch a few minutes of video.

17               You have the right to completely

18    read everything if you want.  And in the video -- I

19    think our video's about 15 minutes long, but most of

20    it is just people standing around, but -- and so I'm

21    going to just want to ask about specific things.

22               But if you want to take some time

23    with Mr. Hedges and watch the entire video beginning

24    to end, that's fine.  I'm not trying to just sort of

25    chop things up in a way that will make anybody look

Detective Robert Hartfield

```
 1   bad.
 2        A.    I understand.
 3        Q.    Okay.  Before we -- so I'd just like to
 4   show you Exhibit 1, please.
 5                    (Exhibit 1 marked/introduced.)
 6        Q.    (BY MR. ROWES)  My colleague will pass
 7   it up to you and to Kevin.
 8        A.    Okay.
 9        Q.    Here you go.
10              So Detective Hartfield, Exhibit No.
11   1 is the deposition Notice for today.  I'd like to
12   ask you if you've seen this document before.
13        A.    I don't know.  I don't know if I have or
14   not, sir.
15        Q.    Okay.
16        A.    I've seen a lot of documents.  I just
17   don't know if that is one of them.
18        Q.    Yeah, I sympathize.  It may be that
19   lawyers are the only people who probably see more
20   documents than law enforcement officers having to do
21   their paperwork.
22              Did you do anything to prepare for
23   today's deposition?
24        A.    I had spoken with Mr. Hedges
25   yesterday --
```

Detective Robert Hartfield

```
 1        Q.     Yeah, don't tell me anything what he
 2  said.
 3        A.     Okay.  That's about it.
 4        Q.     Okay.  Did you speak to any of your
 5  fellow law enforcement officers about it?
 6        A.     No.
 7        Q.     And did you review any documents to
 8  refresh your recollection?
 9        A.     Just the answers to my -- the responses.
10        Q.     Requests for admission?
11        A.     Yes.  Yes, sir.
12        Q.     And we'll take a peek at those a little
13  bit later this afternoon.
14               And did you review any video
15  footage?
16        A.     Yes, sir.  The only video footage that I
17  did review was whatever Mr. Hedges had that was
18  supplied to him.
19        Q.     Okay.  And what was the video depicting?
20        A.     Of the incident at the park.
21        Q.     Okay.  And did you bring any documents
22  with you to the deposition today?
23        A.     No, sir.
24        Q.     Okay.  I'm going to just jump into a
25  little bit of background so that we can establish
```

1    what you do for the sheriff's office.

2                How long have you been with the

3    sheriff's office?

4         A.    Come next month, it will be 19 years.

5         Q.    And if I say "sheriff's office," by the

6    way, can we agree we mean -- I mean the Fort Bend --

7         A.    Yes, sir.

8         Q.    -- County Sheriff's Office?

9                Okay.  And if I say "sheriff," I'm

10   going to be referring to Sheriff Eric Fagan.

11        A.    Okay.  I understand.

12        Q.    Sure.

13                And did you work as a law

14   enforcement officer with other agencies before you

15   came to Fort Bend County?

16        A.    No, sir, I have not.

17        Q.    And you mentioned it before that you're

18   a detective; correct?

19        A.    Correct.

20        Q.    And you're a detective in the automobile

21   theft...

22        A.    That's correct, sir.

23        Q.    Okay.  And what do you do?  Just like

24   a -- you know, what's kind of your ten-second

25   pitch -- I will give you -- as a detective?

```
 1       A.      We investigate, basically, in the auto
 2   theft crimes, when the cars get stolen, anything
 3   dealing with cars, BMVs, theft of license plates,
 4   theft of tires and rims, theft of catalytic
 5   converters, and then heavy machinery.
 6       Q.      But it looks like, based on the fact
 7   that you were at the Jones Creek Ranch State Park
 8   that day, that sometimes you'll be asked to help out
 9   with other stuff too; is that correct?
10       A.      Correct.
11               Whenever we are on what we call an
12   on-call schedule, we can get called out to other
13   things besides what I'm currently assigned to.
14       Q.      And so is -- so I guess as a detective,
15   which I only know from TV, frankly -- but as a
16   detective, you're the person who comes in after the
17   crime has occurred but nobody knows who it is.
18               You're not the -- you're not the
19   first person who responds to the 911 call; is that
20   correct?
21       A.      That's correct.
22       Q.      Okay.  So most of your work is actually,
23   like, pretty deliberate piecing together clues and
24   that kind of thing?
25       A.      Yes, sir.  You're correct.
```

1      Q.      Who are your superiors in the chain of

2  command up to Sheriff Fagan?

3      A.      So my -- my sergeant is Sergeant Baudat,

4  then my captain would be Captain Whichard, then

5  Major Burger, and then it goes on up to the chief,

6  Wong, and then to Chief Provost, and then to the

7  sheriff.

8      Q.      So is -- as a detective, is that the

9  same level as a deputy, or is it above a deputy but

10 below a sergeant?  Or is that, like, a touchy

11 subject for you guys?

12     A.      A long time ago, they used to consider

13 detectives like a corporal, which was right below a

14 sergeant.

15             So, yes, we are above a deputy just

16 because it's -- it's a tested position.  So, yes, in

17 the eyes of, like, I guess, the sheriff's office is

18 concerned, yes, we are, like, just one step above a

19 deputy but below a sergeant.

20     Q.      I want to ask you just for a moment

21 about the sheriff's role in the chain of command.

22             Under your chain of command, if the

23 sheriff orders you to do something, you have a

24 professional responsibility to execute that;

25 correct?

Detective Robert Hartfield

```
 1        A.      Correct.

 2        Q.      You mentioned before that there's a few

 3   people above you, in between you and the sheriff.

 4                Does the sheriff have the authority,

 5   based on your understanding and experience, to

 6   override an order that one of your immediate

 7   supervisors gives?

 8        A.      Yes, that is correct.

 9        Q.      So I'm sure you remember that the

10   plaintiff's name is Justin Pulliam; correct?

11        A.      Correct.

12        Q.      And as you probably know, one of the

13   things Justin does is go out and film members of the

14   Fort Bend County Sheriff's Office while they're

15   executing their duties; correct?

16        A.      Correct.

17        Q.      And setting aside Justin, have you ever

18   encountered, in the course of your work, other

19   private citizens who film the police for the

20   purposes of posting it to social media sites like

21   YouTube?

22        A.      No, I have not.

23        Q.      So it's not the case, based on your

24   experience, that in Fort Bend County, there's this

25   known group of people who are always filming the
```

```
 1   police?
 2        A.      No, I'm not aware of anything like that.
 3        Q.      So, I guess, then, besides Justin on the
 4   day of the incident at Jones Creek Ranch Park, you
 5   haven't interacted with someone who's been filming
 6   the police; correct?
 7        A.      No, sir, I have not.
 8        Q.      Have you ever had a discussion with your
 9   colleagues in this sheriff's office about people who
10   film the police to put their videos up on YouTube?
11        A.      No, not really.
12        Q.      Have you ever received written guidance
13   from your superiors or the sheriff about what rights
14   people have when they're engaged in filming the
15   police, as Justin was the day at the park?
16        A.      I don't believe we've ever had any type
17   of written guidance of that nature.
18        Q.      Do you ever get written guidance?  And
19   it can be in whatever form comes to your mind, like
20   an email or a memo or something that feels formal,
21   like it's coming down from the top.
22               Do you ever get written guidance to
23   the effect of a court has just issued a new ruling
24   on something important, so, therefore, these are our
25   new practices?
```

```
 1        A.      We've -- honestly, I think we have
 2   received, you know, things of that nature.
 3                And usually, they would say, "Okay.
 4   With this being said," we will then conform to
 5   writing a policy of that nature to fit this in; but
 6   yes.
 7        Q.      Okay.  So as a law enforcement officer
 8   who's worked for 19 years, from time to time, your
 9   policies get updated based on what courts have done?
10        A.      Correct, sir.
11        Q.      Okay.  So I should just clarify to make
12   sure that we're both on the same page.
13                So when I talk about Jones Creek
14   Ranch State Park, I'm talking about July 12, 2021,
15   in which Sheriff Eric Fagan held a press conference,
16   and Justin Pulliam was there.
17                Do you recall that?
18        A.      Yes, sir.
19                MR. HEDGES:  Is it a state park?
20        Q.      (BY MR. ROWES)  Or is that a county
21   park?
22        A.      County.
23        Q.      Or I'm sorry.
24                I'm just going to call it "Jones
25   Creek Park" because the name is too big, and Denyce
```

1    will run out of energy writing that down every time.

2                    So prior to the incident at Jones

3    Creek Park in this case, did you know who Plaintiff

4    Justin Pulliam was?

5        A.    Yes, I knew who he was.

6        Q.    And what did you know about him at that

7    time?

8        A.    I -- I was aware he was an individual

9    that would, you know, go around not only in Fort

10   Bend County but around Texas and, you know, film law

11   enforcement.

12       Q.    And did -- what was your kind of --

13   what's your perception of Justin's reputation among

14   your fellow law enforcement officers?

15       A.    I don't think too many people like him,

16   unfortunately.

17       Q.    I -- I can understand that.  I

18   understand.

19                    Yeah, I mean, I've watched his

20   videos, and I know he says things that are often

21   very sharp criticism of law enforcement.

22                    And do you recall how you personally

23   became aware of Justin?  Was it watching a video of

24   his or someone talked to you, for example?

25       A.    Yes.  I believe it first started

1    whenever, I believe, Sheriff Nehls was in office,

2    when he was filming some of the other admin at the

3    sheriff's office and then became the talk of the

4    sheriff's office or whatever, and -- so I think

5    that's the point in time whenever that came to light

6    of who he was.

7         Q.    And what was the name again of the

8    previous sheriff?

9         A.    Sheriff Nehls.

10        Q.    Is that spelled N-A-I-L-S?

11        A.    N-E-H-L-S.

12        Q.    Oh, okay.  Just so we make sure we get

13   it down correctly.

14              So Justin has a YouTube channel

15   called "Corruption Report."

16              Have you ever watched the YouTube

17   "Corruption Report"?

18        A.    No.  I've not seen that one.

19        Q.    And I think because you testified a

20   moment ago, I might know the answer to this, but

21   I'll ask it anyway.

22              Prior to encountering Justin in

23   Jones Creek Park on July 12, 2021, had you ever seen

24   him at a different police incident before?

25        A.    No, I have not.

1      Q.     Just thinking back to what you

2  understood based on Justin's reputation, your

3  conversations with fellow officers, did Justin have

4  a reputation for acting violently towards law

5  enforcement?

6      A.     No.

7      Q.     Was Justin's reputation at all that he

8  would yell to people that the police were trying to

9  interview and try to tell them not to answer or

10  cooperate with the police or anything like that?

11      A.     I believe some of the videos I have

12  seen, I have seen him act of that nature, yes.

13      Q.     And what are the -- could you tell me a

14  little bit more about what the context was for the

15  videos you saw?

16      A.     I -- I do not know.  I don't remember.

17      Q.     So, like, maybe you were just watching

18  it on your phone or someone might have sent you a

19  link or something like that?

20      A.     Correct.

21      Q.     Was Justin's reputation among law

22  enforcement officers based on his attitude towards

23  the police?

24      A.     Correct.

25      Q.     And just to have a clear record, the

1   perception of Justin's attitude towards the police

2   is generally negative; correct?

3       A.    Correct.

4       Q.    Yeah.

5             I want to show a document in a

6   moment, which is a general order on media.  You've

7   probably seen it before, but we'll chat about it.

8             But I wanted to ask you, if you can

9   -- do you know, generally speaking, what a general

10  order is?

11      A.    Yes.

12      Q.    And can you just give me your -- based

13  on your experience, what is a general order?

14      A.    Basically, it's a rule that -- that the

15  administration implemented at the sheriff's office

16  that we, as employees, will follow.

17      Q.    I see.

18            And how are the general orders

19  distributed when they're handed down?

20      A.    If there's -- if there's, say, like, a

21  new one that just came out because of what we were

22  discussing earlier, you know, something changed, we

23  would receive an email with that updated general

24  order, and then they would advise us that it would

25  be placed into the general order manual.

1      Q.      Okay.  And when you mentioned a moment

2    ago the things we were discussing before, did you

3    mean when we were talking about courts making new

4    decisions, or did you mean Justin Pulliam?

5      A.      When the courts are making new

6    decisions.

7      Q.      And a general order -- would you agree

8    that a general order represents a policy that the

9    members of the sheriff's department have to follow?

10     A.      Correct.

11     Q.      And do you have a duty as a law

12   enforcement officer to learn the general orders?

13     A.      Yes.

14     Q.      So it wouldn't be an excuse if a law

15   enforcement officer made a mistake; it would be a --

16   not a good excuse to say, "Oh, I never read the

17   general order"?

18     A.      Correct.

19     Q.      Do members of the sheriff's office build

20   in time once a month or once a week or on some other

21   interval to sort of like study updated policies or

22   anything like that?

23     A.      No, sir.

24     Q.      It's more like -- is it more like on a

25   rolling basis?  A general order comes in; you read

Detective Robert Hartfield

```
 1    it; you say, "Okay, now I understand it," and then

 2    carry on?

 3         A.    Correct.

 4               (Exhibit 2 marked/introduced.)

 5         Q.    (BY MR. ROWES)  Okay.  I would like to

 6    introduce Exhibit No. 2, which is a general order

 7    entitled "Public Information and Media Relations."

 8               Okay.  Detective Hartfield, do you

 9    recognize Exhibit No. 2 to be a general order of the

10    Sheriff's Department?

11         A.    Yes, sir.

12         Q.    Okay.  I'm going to -- the title of this

13    is "Public Information and Media Relations," but I'm

14    just going to refer to it as "media relations

15    order"; is that okay?

16         A.    Yes, sir.

17         Q.    I'd like to direct your attention to the

18    very top line where it says: "Effective 06-01-17."

19               So I'm going to represent to you

20    that this was the version of the media relations

21    order that was in effect on July 12, 2021.

22               We've worked with Mr. Hedges to pin

23    down which is the right document for that date, and

24    this is the one we figured out.

25               Have you seen this general order
```

```
 1    specifically about media relations before?

 2        A.    Yes.

 3        Q.    And based on your general understanding

 4    of the media relations order, let's say you're

 5    investigating a car theft, and a member of the press

 6    comes up to you and says, "Detective Hartfield, can

 7    I get a statement for the media on your

 8    investigation?"

 9              What do you say?

10        A.    "No."  And --

11        Q.    And -- sorry.  Go ahead.

12        A.    I would refer them to our public

13    information officer.

14        Q.    I see.

15              So the kind of -- the information

16    that goes to the press is supposed to go through the

17    public relations officer rather than from just

18    individual law enforcement on the street?

19        A.    Correct.

20        Q.    Have you ever -- would the public

21    information officer ever direct you to go ahead and

22    give a statement, or would it always come directly

23    from the public relations office?

24        A.    If the PI was not available, a

25    supervisor would be the one that would be asked to
```

```
1     do a press conference or speak on whatever matter's

2     going on.

3          Q.     Okay.  And when you say "supervisor," do

4     you mean a sergeant or a captain level or something

5     like that?

6          A.     Sergeant to a lieutenant to a captain to

7     a major.

8          Q.     Okay.  So has it ever been the case that

9     you've been quoted in the newspaper, for example,

10    about an investigation?

11         A.     No.

12         Q.     If you could take a look at the first

13    page, about a third of the way down, there's a

14    definition of the word "media."

15               I'm just going to read it out loud,

16    and if you could follow along with me...

17               "Media - Persons associated with

18    television, print, electronic, or radio news

19    programs/services and related entertainment

20    enterprises.  For purposes of this General Order,

21    this term does not generally include social media

22    (this is defined and governed under General Order

23    05-04)."

24               Were you able to follow along with

25    me, Detective?
```

Detective Robert Hartfield

```
 1        A.     Yes, sir.

 2        Q.     Do you agree with me that this

 3   definition makes a distinction between media like

 4   television and social media?

 5        A.     Correct.

 6        Q.     And social media is excluded from the

 7   definition of media from this; is that correct?

 8   Based on your understanding?

 9        A.     Yes, sir.

10        Q.     And on the -- were you -- so you were

11   generally familiar with this order on the -- July

12   12, 2021, when the press conference happened in the

13   park; correct?

14        A.     Correct.

15               MR. ROWES:  And I would like to

16          introduce Exhibit No. 3, please.

17               (Exhibit 3 marked/introduced.)

18        Q.     (BY MR. ROWES)  And you can keep No. 2

19   handy because we're just going to do a quick

20   comparison.

21               So Exhibit No. 3 is titled "Social

22   Media and Related Communications."

23               Do you see that at the top, sir?

24        A.     Yes, sir.

25        Q.     Okay.  And likewise, you see the
```

Detective Robert Hartfield

```
 1   effective date is 06-01-17?

 2        A.    Correct.

 3        Q.    If you take a -- if you take a quick

 4   peek back at Exhibit No. 2 that had the definition

 5   of "media," it refers to the definition of social

 6   media as being in General Order 05-04; correct?

 7        A.    Correct.

 8        Q.    And do you see at the top of

 9   Exhibit No. 3, this is order number 05-04?

10        A.    Correct.  Yes, sir.

11        Q.    And so, then, about a third of the way

12   down, pretty similar to the previous one, it

13   says: "Definitions" of "Social Media."

14              And it says: "Online sources that

15   allow people to communicate and share information

16   such as photographs, text, video, multimedia files,

17   and related items via online or cellular network

18   platforms.  In this General Order, this also

19   includes social networking platforms including but

20   not limited to facebook, twitter, and youtube,

21   blogs... [as read]."

22              Did you understand that?

23        A.    Yes, sir.

24        Q.    I think for the purposes of the

25   deposition, to make it clear, for media, I'm going
```

1    to say "traditional media."  Is that okay?  Because

2    that's like newpapers, TV, radio, or something?

3         A.     Sure.  Yes, sir.

4         Q.     Is that okay?  You'll understand what I

5    mean.

6                And I'll say "social media" for

7    people who put stuff up on Facebook or YouTube or

8    that kind of thing.

9         A.     Yes, sir.

10        Q.     Okay.  So based on your experience as

11   someone who has to read and understand orders, would

12   someone like Justin Pulliam, who films for his

13   YouTube channel, fall under the definition of

14   traditional media or social media?

15        A.     Social media.

16        Q.     So, before the press conference that

17   Sheriff Fagan held at the park on July 12, 2021, had

18   you ever been present at a press conference before?

19        A.     Yes.

20        Q.     And was it just once?

21        A.     Yes.  I believe so -- no -- yes.  Just

22   once.

23        Q.     Okay.  I mean, I realize I'm

24   asking over --

25        A.     Yeah.

1    Q.    If you ask me what I've done in the last

2    19 years, I wouldn't be able to remember everything

3    either.  So that's perfectly fine.

4              Do you recall what the subject of

5    the press conference was that --

6    A.    Uh -- I'm sorry.

7              Yeah.  Yes.  It was -- we -- I had

8    investigated an auto theft ring where we recovered

9    several luxury vehicles that were -- had been

10    stolen, and the VIN numbers had been changed on

11    them.  It was around ten of them.

12              So the sheriff did have a press

13    conference where we kind of put that out as a news

14    story.

15    Q.    Okay.  That's great.  I appreciate that,

16    by the way.  It makes life better when the police

17    can stop stuff like that.

18              So -- but it sounds like attending

19    press conferences is not your daily bread and

20    butter; is that correct?

21    A.    That is correct.

22    Q.    Do you know -- and you may not know

23    this, based on the fact -- that is perfectly fine if

24    you know -- but do you know if sheriff's department

25    law enforcement personnel ask media for credentials

Detective Robert Hartfield

```
1    at the press conferences typically?

2         A.    No, I don't know that.

3         Q.    Okay.  And are you aware of any press

4    conferences the sheriff's office has held in the

5    past in which a social media journalist like Justin

6    Pulliam did not -- was present but did not

7    participate?

8         A.    No, I'm not aware of anything of that

9    nature.

10        Q.    Are you aware of any press conferences

11   that have happened with sheriff's office personnel

12   in which someone who wanted to cover the press

13   conference as a journalist, whether traditional

14   media or social media, was excluded from it?

15        A.    I'm not aware of anything of that

16   nature.

17        Q.    So I'm going to jump into the actual

18   press conference that occurred in Jones Creek Park

19   on July 12th.  And this is one of the two main

20   incidents in this case.  And the thing about which I

21   think you have personal knowledge.

22              If you recall -- you probably recall

23   a vehicle was found in the creek with the remains of

24   an unfortunate woman; correct?

25        A.    Yes.
```

```
 1        Q.     Okay.  And had you -- did I remember

 2   reading that you had participated in the search for

 3   her in the days leading up to the discovery of her

 4   vehicle?

 5        A.     Correct.  Yes, sir.

 6        Q.     And was that one of those situations

 7   where you were on-call, and so they mobilized you to

 8   help out with this urgent missing person thing, and

 9   you kind of set aside your duties as a detective for

10   that day?

11        A.     Yes, sir.

12        Q.     How frequently does that happen, by the

13   way, in which you're called away from your main

14   detective responsibilities?

15        A.     I'm on-call once every eight weeks --

16   eight to nine weeks; so it could happen during that

17   time frame.

18        Q.     And is -- is -- on-call, does that mean

19   there's a 24-hour period where you carry your radio,

20   and you just have to be ready to go?  Or what does

21   it mean?

22        A.     We -- I start on-call on a Friday

23   evening, and my on-call stops the following

24   Thursday -- or Friday morning, I'm sorry.

25               And basically, we have to carry our
```

Detective Robert Hartfield

```
 1   cell phones around with us, and we're subject to
 2   callout.
 3        Q.    Yeah, my brother-in-law's a firefighter,
 4   and so when he's on-call, it's very similar to that.
 5   Okay.  Got it.
 6              Now, you were present at the park --
 7   are you okay?  Do you want to take a break?
 8              (Comments off the stenographic
 9   record.)
10        Q.    (BY MR. ROWES)  So you were present at
11   Jones Creek Park when the car was discovered; is
12   that correct?  Or did you come after?
13        A.    I was there when it was discovered --
14   well, just after it was discovered, I should say.
15        Q.    And how was the car discovered there?
16   Is it that the water had subsided or something like
17   that?
18        A.    That is correct.
19        Q.    Okay.  And I think it will become
20   obvious in a moment when we look at the video, but
21   I'll just ask you to be clear.
22              You were at the press conference
23   that Sheriff Fagan held that day for the traditional
24   media on the discovery of this person's remains in
25   the car; correct?
```

Detective Robert Hartfield

```
 1        A.      Yes, sir, that is correct.

 2        Q.      And prior to the press conference that

 3   day, had you seen members of the media, such as TV

 4   reporters, with cameras in other parts of the park?

 5        A.      Yes, sir.

 6        Q.      And do you recall if they were actively

 7   filming?  Were they talking to officers?

 8        A.      I -- I knew their cameras were out, but

 9   as far as them -- I didn't see them speaking with

10   anyone, but, you know, them filming, probably they

11   were.

12        Q.      I'm going to -- I want to back up.

13                You remember we talked before about

14   if a media member asks you for a statement, you

15   refer them to the public information office?

16                What if -- what if someone's not

17   asking you for a statement to put in, but, you know,

18   you're at the park, and someone comes up and says,

19   "Is that the missing woman?"

20                And you know it's the missing woman.

21   Let's say you know.  Are you allowed to answer that,

22   or do you direct them to the public information

23   office?

24        A.      I wouldn't give them that information,

25   no.
```

Detective Robert Hartfield

```
 1                    I would -- you know, if I suspected
 2     they were media, I would just say, "You need to
 3     speak with our public information officer."
 4                    (Exhibit 4 marked/introduced.)
 5          Q.    (BY MR. ROWES)  Okay.  Okay.  I would
 6     like to look at Exhibit 4, which is the video of the
 7     press conference that I'll represent to you is
 8     something that my client, Justin Pulliam, took.
 9                    And he actually had four cameras
10     going.  And so you see Exhibit 4 is a four-pane
11     view.  One is a dashcam, one is a body cam, one
12     might be a cell phone, and the other one is a
13     higher-resolution camera.
14                    And sometimes I might say to pay
15     attention to the bottom left panel, which will just
16     be the clearest.
17          A.    Okay.
18          Q.    The video is -- you can see, if you look
19     all the way to the right-hand side of the screen,
20     it's 16 minutes long.
21                    If at any point you want to sit
22     down, as I said before, and watch the entire 16
23     minutes, that's fine, no objections at all, and --
24     but otherwise, to make things go a little bit
25     faster, I'm just going to go ahead and jump forward
```

Detective Robert Hartfield

```
 1   a little bit.
 2                    And, actually, before we look at the
 3   video, I'd like to introduce the last exhibit, which
 4   is Exhibit 5.
 5                    (Exhibit 5 marked/introduced.)
 6        Q.    (BY MR. ROWES)  And these are your
 7   answers to those requests for admission.
 8                    Can you just take a look at that,
 9   please?
10        A.    Yes, sir.
11        Q.    I'm going to represent to you that these
12   are -- these are a true and correct copy of what we
13   received from Mr. Hedges.
14                    Have you seen this exhibit before
15   with these questions?
16        A.    Yes.
17        Q.    And did you assist Mr. Hedges with its
18   preparation, without telling me anything you guys
19   discussed?
20        A.    Yes, sir.
21        Q.    Besides talking to Mr. Hedges, did you
22   do anything to prepare your answers, like consult
23   documents or watch videos or talk to your fellow
24   officers?
25        A.    No, sir.
```

1      Q.     All right.  So Molly has pulled up the

2  video to 6 minutes and 19 seconds, and you can see

3  in the bottom right Justin -- that's the plaintiff,

4  Justin Pulliam, standing there with one of his

5  cameras.

6             He's got a body camera around his

7  neck, and he's being captured in that lower right

8  frame from his dashcam.

9             Do you recognize this scene shown at

10  time stamp 6:19 as the Jones Creek Ranch Park on

11  July 12th?

12      A.     Yes, sir.

13             MR. ROWES:  Molly, would you please

14         play the video to 6:45?

15             (Video playing.)

16      Q.     (BY MR. ROWES)  Okay.  Did you see the

17  golf cart pull up just before Justin says that the

18  sheriff has arrived?

19      A.     Yes, sir.

20      Q.     Okay.  I think that's actually maybe a

21  Kawasaki MULE or something, like -- it's not a golf

22  cart, is it?

23      A.     It's a Polaris RANGER.

24      Q.     Oh, okay.

25             So I'm going to call it a golf cart

Detective Robert Hartfield

```
 1   because that's easy.
 2              So Sheriff Fagan was in the golf
 3   cart; correct?
 4        A.    Yes, sir.
 5        Q.    And were you in the golf cart with him?
 6        A.    Yes, sir.
 7        Q.    And how did you two come to be in the
 8   golf cart together at that point?
 9        A.    The sheriff had asked me if I would
10   drive him up to the front where he was going to hold
11   the press conference.
12        Q.    I see.
13              And how did you get assigned to be
14   the person who was in charge of the golf cart that
15   day?
16        A.    I don't know.  Honestly, I don't know.
17        Q.    Okay.  And is it -- because this was a
18   big, potential crime scene, is that why there was
19   a -- someone brought the golf cart to the scene so
20   people could get around if they had to?
21        A.    I actually borrowed it from the park
22   staff.
23        Q.    Oh.  I see.  Okay.
24              So that's not a -- that's not a
25   sheriff's department golf cart?
```

```
 1        A.      That's correct.

 2        Q.      Okay.  And if -- if I recall the

 3   geography correctly, the actual part of the creek

 4   where the car was found is at least a mile or so

 5   away from where the press conference is; is that

 6   right?

 7        A.      Give or take, yes, sir.

 8        Q.      Okay.  In other words, it's not that the

 9   car is 100 feet away from where the press conference

10   is or something close like that?

11        A.      Yes.  You're correct, sir.

12        Q.      And so, was the sheriff's purpose in

13   coming to the press conference to inform the media

14   about the missing person who had been discovered in

15   the creek?

16        A.      That is correct, sir.

17        Q.      If you take a look at Exhibit 5, on

18   page 3, in the Request for Admission No. 3, it says

19   that you admit that two news crews were present in

20   the parking lot; is that correct?

21        A.      Yes, sir.

22        Q.      And do you know if there were other

23   members of the press present besides the two news

24   crews?

25        A.      I'm -- I'm not sure.
```

Detective Robert Hartfield

```
 1        Q.    Okay.  Besides the news crews that were
 2    present at the sheriff's press conference, were
 3    there other members of the public just observing?
 4    Do you recall?
 5        A.    I don't recall.
 6        Q.    Do you know if the family of the, like,
 7    relatives of the missing person who was discovered
 8    deceased were there at the press conference?
 9        A.    I don't recall.
10        Q.    And how did the members of the press
11    know, if you know, that the press conference was
12    going to be held in that location?
13        A.    I do not know.
14        Q.    Okay.  So, like, basically, were you
15    just kind of standing around, and the sheriff said,
16    "Detective Hartfield, can you give me a hand and
17    drive me over here?"
18        A.    You nailed it.  Yes, sir.
19        Q.    Okay.
20              MR. HEDGES:  So there's not going to
21        be commissioner's court tomorrow or the
22        rest of the week.
23              MR. ROWES:  Okay.  Thank you.  It's
24        okay.
25        Q.    (BY MR. ROWES)  By the way, because we
```

1    have the commissioner's court thing going on, if you

2    need us to crank the volume, if at any point the

3    sound matters, we'll go back and do it as many times

4    as necessary, or we can get headphones or something

5    like that.

6        A.    Okay.  I understand.

7              MR. ROWES:  So, Molly, can you

8        please just run the video to seven

9        minutes?

10             (Video playing.)

11       Q.    (BY MR. ROWES)  If we can just pause

12   here.

13             As you can tell, Justin has walked

14   up a little bit closer to where the press conference

15   is happening.

16             And if you look in the bottom left

17   panel, is that you standing there with the sheriff?

18       A.    Yes, sir, it is.

19       Q.    Okay.  And when Justin was walking up,

20   did the sheriff say anything to you about him

21   coming?

22       A.    I don't recall if it was at that point

23   in time or not.

24       Q.    Okay.  So if we look at Exhibit 5,

25   Request for Admission No. 4, it says that in the

Detective Robert Hartfield

```
 1   video footage you reviewed, that Sheriff Fagan
 2   instructed you that "'if he don't do it, arrest him
 3   'cause he's not part of the local media, so he have
 4   to go back'" -- with "he" and "him" referring to
 5   Justin Pulliam.
 6              And you admitted the sheriff said
 7   that; correct?
 8        A.    Correct.
 9        Q.    Okay.  This is kind of the part where he
10   says it, but it might be hard to hear; but anyway,
11   we can agree that for the purposes of the video, the
12   sheriff said something to that effect?
13        A.    Correct, sir.
14              MR. HEDGES:  Not at this part of the
15         video.
16              MR. ROWES:  Oh.
17              MR. HEDGES:  That's at 1550.
18              MR. ROWES:  Oh.  You know, this is a
19         different video.  The time stamp is
20         different on this video.
21              MR. HEDGES:  Oh, okay.
22              MR. ROWES:  Actually, before you
23         play it, Molly, can you turn the volume up
24         some more, please?
25              Just turn it up as loud as it goes,
```

```
 1                    basically.  Okay.  Let's try, and we might
 2                    be able to catch it.
 3                         (Video playing.)
 4         Q.    (BY MR. ROWES)  Okay.  So this is the
 5    interaction where the sheriff says he's not part of
 6    the media, so he has to go back; correct?
 7         A.    Correct.
 8         Q.    Okay.  And what did the sheriff say to
 9    you at this point about Justin?
10         A.    If I would be able to remove him from
11    that location.
12         Q.    Okay.  And the -- when you say "that
13    location," do you mean the immediate vicinity where
14    he's about to hold the press conference?
15         A.    Correct.
16         Q.    And did he give you a reason why you had
17    to remove Justin?
18         A.    I don't recall.
19         Q.    Is this the kind of situation where you
20    would say to the sheriff, "Why should I do that?" or
21    do you just follow his order in that context?
22         A.    I would just follow his order.
23         Q.    Okay.  And I -- it looks like you're --
24    rather than looking at Justin, you're facing up the
25    street in the opposite direction; correct?
```

Detective Robert Hartfield

```
 1        A.      Yes, sir.
 2        Q.      Okay.  And what are you sort of planning
 3   on doing at this point when you're facing away from
 4   Justin?
 5        A.      I was going to have the other deputy
 6   there come with me.
 7                    MR. ROWES:  Okay.  Why don't we
 8           actually watch, Molly, until 7:28?
 9        Q.      (BY MR. ROWES)  And then we can see you
10   gesture to the deputy.
11                    (Video playing.)
12        Q.      (BY MR. ROWES)  And is the deputy you're
13   talking to Deputy Garcia?
14        A.      Yes.
15        Q.      And had you met Deputy Garcia before
16   today?
17        A.      Before that date, I probably have ran
18   across him on a -- on different -- new incidents or
19   whatever, but yeah.
20        Q.      Okay.  So you knew him but more as an
21   acquaintance or colleague?
22        A.      Correct.  Yes, sir.
23        Q.      Got it.
24                    And so what are you telling Deputy
25   Garcia about your assignment?
```

```
1        A.      I asked him that -- or I told him that

2   the sheriff had asked to have Justin step back away

3   from the press conference and asked him if he would

4   come and assist me.

5        Q.      And why did you want assistance for

6   that?

7        A.      Just due to the fact that I don't have a

8   camera.  We're not with body cameras, so I knew he

9   had one, so I asked, you know, just to CYA for

10  myself to come walk with me so nothing would be

11  taken out of context.

12       Q.      Okay.  And is that because you were

13  concerned about Justin's behavior that you would

14  want to have it on camera?

15       A.      It wasn't more so -- it wasn't just

16  because of his behavior.  It was just the task that

17  I was tasked with.

18       Q.      Okay.  Have there been other situations

19  where you've wanted to have someone with a body

20  camera present when you're doing something in the

21  course of your detective work?

22       A.      Honestly, no.

23       Q.      Okay.  And did you confirm with Deputy

24  Garcia that he had a body cam on?

25       A.      No, I did not, but I believe he did have
```

```
 1   one.
 2        Q.     Okay.  And did you ever review any video
 3   from Deputy Garcia's body cam, if it exists?
 4        A.     No, sir.
 5        Q.     When you mentioned to Deputy Garcia that
 6   you would like his assistance to remove Justin from
 7   the press conference, did you give a reason why?
 8        A.     No, sir.
 9        Q.     So it was -- the sufficient reason, from
10   your point of view, was, "The sheriff asked me to"?
11        A.     Correct, sir.
12        Q.     And just as a matter of just pulling
13   back a little bit since I don't quite understand how
14   law enforcement works on the inside.
15               Would it be common, or is it okay to
16   say to the superior officer, "Why do I have to do
17   that?"
18               And not to be a jerk.  Not saying
19   you'd say it to be a jerk, but "I don't understand
20   this order," or "What's the purpose of this order?"
21        A.     It could be very frowned -- it could be
22   frowned upon.
23        Q.     Okay.  So, probably, the Fort Bend
24   County Sheriff's Department, obviously, is not the
25   military, but it's probably closer to the military
```

Detective Robert Hartfield

```
 1   than something else in which people are expected to

 2   execute their orders without too much questioning of

 3   their supervisors?

 4        A.    Correct.

 5        Q.    When the sheriff said that "Justin is

 6   not media," what did you understand the sheriff to

 7   be saying, if you -- if you can say?

 8        A.    That he's not media.

 9        Q.    And does "not media" mean, according to

10   the definitions we looked at before, about the

11   distinction between traditional media and social

12   media?

13        A.    Correct.

14        Q.    Okay.  How are you doing, Detective

15   Hartfield?

16        A.    I'm good.

17        Q.    We don't have much more.

18              MR. ROWES:  Are you doing okay,

19         Denyce?

20              THE REPORTER:  Yeah.

21              MR. ROWES:  Okay.

22              MR. HEDGES:  If you want to take a

23         break, I won't oppose it.

24              MR. ROWES:  I mean, I'm okay.  I

25         just want to make sure the witness and
```

Detective Robert Hartfield

```
 1              everybody else is okay.
 2                   So can we watch, Molly, until 7:44?
 3              And this is -- actually, hang on a sec.
 4                   If you could just take a look at
 5              Exhibit No. 5, page 4, Request for
 6              Admission No. 5.
 7                   And it says that you instructed
 8              Plaintiff Justin Pulliam to "'step back
 9              this way with us please' because he is
10              'not media.'"
11                   And you admitted that you said those
12              things to Justin?
13      A.      Correct.
14      Q.      I just want to -- I just want to
15   clarify, again, in case we can't hear it very well.
16                   MR. ROWES:  So could you play,
17              Molly, until 7:44, please?
18                   (Video playing.)
19      Q.      (BY MR. ROWES)  Okay.  So could you hear
20   yourself saying the things that are in Request for
21   Admission No. 5?
22      A.      Yes, sir.
23      Q.      When you said to Justin he is not media,
24   did you understand yourself to be making the
25   distinction we discussed earlier between traditional
```

1    media and social media in the general orders?

2        A.    I wasn't trying to specify general order

3    at that point in time.

4        Q.    So you were just saying, "You're not

5    media" because the sheriff told you he's not media?

6        A.    Correct.

7        Q.    Okay.  If you look at Response No. 6 on

8    Exhibit 5.  And just read it and let me know when

9    you're finished, please.

10       A.    Yes, I'm done.

11       Q.    And so you admitted that you did not

12   give Plaintiff Pulliam a reason other than he's not

13   media to escort him away from the press conference;

14   correct?

15       A.    Correct.

16       Q.    And at that point, when you were

17   escorting him away, you were acting on the sheriff's

18   order; correct?

19       A.    Correct.

20       Q.    And as you approached Plaintiff Pulliam,

21   do you recall what he was doing, like what his

22   demeanor was, or...

23       A.    I do not remember, sir.

24       Q.    As part of your law enforcement

25   training, do you evaluate people as you approach

```
 1    them to determine whether or not they might be a

 2    threat to either run away or to hurt you or to hurt

 3    someone else?

 4         A.    Correct, sir.

 5         Q.    Okay.  And if you're approaching

 6    someone, say, in the course of your detective

 7    duties, you're investigating an auto theft ring,

 8    sometimes those people can be violent; correct?

 9         A.    Correct, sir.

10         Q.    Okay.  And are you concerned when you

11    might be interacting with someone who you suspect is

12    involved in organized auto theft, that they could be

13    armed?

14         A.    Yes, sir.

15         Q.    And do you take precautions when your

16    police spider-sense, so to speak, tells you that

17    somebody might be dangerous?

18         A.    Yes, sir.

19         Q.    Okay.  So when you were approaching

20    Justin Pulliam that day in the park, did you

21    perceive him as a physical danger, like he could

22    engage in violence against you?

23         A.    No, sir, not against me.

24         Q.    Okay.  Or were you concerned that he

25    might engage in violence against someone else?
```

1      A.      No.

2      Q.      Is -- you know, I used the word

3   "spider-sense" a minute ago as a bit of a joke, but

4   it might not actually be a joke.

5              Like, do you have gut instincts

6   about people as a law enforcement officer?

7      A.      Yes, sir.

8      Q.      Do you recall having a gut instinct

9   about Justin Pulliam?

10     A.      No, sir.

11     Q.      So -- and there was nothing remarkable

12  about Justin Pulliam that made you especially scared

13  or made you especially think he was going to be an

14  easygoing guy; you just didn't have an impression at

15  all; is that correct?

16     A.      No, sir.

17     Q.      And based on your personal knowledge

18  having been there, was Justin -- did the sheriff ask

19  Justin to move away from the press conference based

20  on anything Justin had said to the sheriff there?

21     A.      I don't think it's anything that Justin

22  had specifically said to the sheriff.  I don't think

23  that was the reasoning.

24     Q.      So we mentioned earlier that Justin says

25  some inflammatory things on his social media

```
 1    channels about law enforcement in general, about the
 2    sheriff's office in particular.
 3                    And I can actually understand why an
 4    officer would not want to be featured on that kind
 5    of thing.  So I get that.
 6                    And do you know if the sheriff
 7    wanted you to relocate Justin away from the press
 8    conference so that he wouldn't say something
 9    insulting or inflammatory during it?
10        A.    I don't know that.
11        Q.    Do you know whether Justin had
12    previously participated in a press conference with
13    the sheriff and that the sheriff didn't like his
14    behavior, then, and, therefore, excluded him now?
15        A.    I do not know that.
16        Q.    So I think the takeaway, what I'm
17    getting is that you don't know the specific reason
18    why the sheriff said that other than the sheriff's
19    stated reason of, "He's not media"?
20        A.    Correct.
21                    MR. ROWES:  Molly, can you run it to
22            8:20, please?
23                    (Video playing.)
24        Q.    (BY MR. ROWES)  So, actually, Deputy
25    Garcia didn't look like he had a body cam on him.
```

Detective Robert Hartfield

```
 1   I --
 2        A.    Yeah.  Yeah, I'm looking at that.  Yes.
 3        Q.    Okay.  I just wanted to make sure there
 4   wasn't, like, some video floating around out there
 5   that we don't know about.
 6                  MR. HEDGES:  I don't believe he had
 7           a body cam.
 8                  MR. ROWES:  Yeah, it doesn't -- it
 9           doesn't look like he did.
10        Q.    (BY MR. ROWES)  And was the purpose of
11   having Deputy Garcia come with you just in case
12   there was some altercation with Justin and you
13   needed a little bit of backup?
14        A.    Yes, sir.
15        Q.    So you saw in the video clip we just
16   watched, up to 8 minutes and 20 seconds, you and
17   Deputy Garcia escort Justin down to in front of his
18   truck, basically.
19                  And you told Justin that he'd be
20   welcome to film from there?
21        A.    Correct, sir.
22        Q.    How did you decide how far away you
23   should take Justin, and that would be enough?
24        A.    I really didn't have any guide.  I
25   just -- I just walked to his truck, and then that
```

1    was the spot that I chose.

2        Q.    Okay.  Now, when you were walking Justin

3    back, did you say to yourself, "Well, I need to get

4    him at least far enough back so that he can't shove

5    questions at the sheriff," or something like that?

6        A.    No, sir.

7        Q.    And did you escort him back to that

8    point so it would be difficult for him to hear what

9    the sheriff was saying?

10       A.    No, sir.

11       Q.    We discussed a few minutes ago in, I

12   think, your Admission No. 4 that the sheriff said

13   something to the effect of, "If he doesn't listen,

14   arrest him"; correct?

15       A.    I -- we'd have to hear that again, I

16   don't know.

17       Q.    Okay.  So if you look at Request for

18   Admission No. 4, Sheriff Fagan instructed you that

19   "if he don't do it, arrest him 'cause he's not part

20   of the local media, so he have to go back

21   [as read]"?

22       A.    Okay.  Correct.  Yes, sir.

23       Q.    Yeah.

24             So if Justin had stood his ground

25   and said, "I'm not going anywhere.  I'm a member of

1    the media, and I want to participate," would you

2    have understood your order at that point to you need

3    to arrest him?

4        A.    I don't know if he would have actually

5    been arrested or not.  I don't know.  I couldn't --

6    couldn't say.

7        Q.    How do you make that -- how would you

8    make a decision about that?

9        A.    I don't know.  I don't know how I would

10   do that.

11       Q.    Would you ask the sheriff, say, "Do you

12   really want me to arrest this guy?"

13       A.    I -- yes, sir.

14       Q.    When the sheriff said words to the

15   effect of, "He's got to go back.  He's not media.

16   If he doesn't listen, arrest this guy," was the

17   sheriff's tone or demeanor one of frustration?

18       A.    I don't recall, sir.

19            MR. ROWES:  Molly, can you go to

20            9:46, please?  Wait a minute.  Just keep

21            going a little bit.  I'll tell you when to

22            stop.

23            MS. HANIS:  Play?

24            MR. ROWES:  Yeah, play, please.  I'm

25            sorry.

Detective Robert Hartfield

```
 1                    Okay.  We can stop.  We can stop
 2            there.  I'm sorry.
 3       Q.     (BY MR. ROWES)  So if you take a look,
 4  maybe two-thirds of the way, Detective Hartfield, it
 5  looks like you and Deputy Garcia are standing next
 6  to a white SUV; correct?
 7       A.     Yes, sir.
 8       Q.     You didn't go all the way back to the
 9  press conference; correct?
10       A.     Yes, sir.
11       Q.     And to my eyes, it looks like you're
12  standing there so that if Justin decides to disobey
13  you and starts walking back towards the press
14  conference, you would then be able to serve as a
15  barrier between Justin and the press conference.
16                    Is that why you stood there?
17       A.     No.  Honestly, the reason I'm standing
18  there is because I don't want to be on the camera.
19  I don't like being on TV.
20       Q.     And when you were standing there with
21  Deputy Garcia, were you talking about Justin at all?
22       A.     No, sir.  I believe that's actually
23  Deputy Hines --
24       Q.     Oh, I'm sorry.
25       A.     -- not Garcia.
```

```
 1        Q.      Oh, okay.  You're right.  It actually
 2   does look different seeing them -- on this big TV
 3   seeing it.
 4                 Okay.  So -- and who is Deputy
 5   Hines?
 6        A.      He's also another deputy with -- what is
 7   that? -- at that point in time, I was Precinct 4.
 8        Q.      3.
 9                 MR. HEDGES:  3.
10                 THE WITNESS:  3?
11                 MR. HEDGES:  I think it's 3.
12                 THE WITNESS:  I can't keep up how
13           they change.  I'm sorry.
14        Q.      (BY MR. ROWES)  It's okay.  I doesn't
15   matter.
16                 And from where you were standing,
17   could you hear Sheriff Fagan conducting the press
18   conference?
19        A.      I do not recall.
20        Q.      But you agree he did a press conference
21   with the media; correct?
22        A.      Correct, sir.
23        Q.      Okay.  But you can't recall that if you
24   could personally hear him from there?
25        A.      No, sir.
```

```
 1                    MR. ROWES:  Molly, can we watch
 2          to -- let's see here.
 3                    Can you skip ahead to 1454?  Right
 4          there's fine.
 5     Q.    (BY MR. ROWES)  So the part we just
 6  skipped over is Justin standing there with his
 7  camera pointed down the length of the parking lot,
 8  just kind of watching the press conference
 9  occurring.
10                    MR. ROWES:  Okay.  Go ahead and play
11          it, Molly.
12                    (Video playing.)
13     Q.    (BY MR. ROWES)  So, at this point, it
14  looks like where we've stopped it at 1538 that the
15  press conference has come to a conclusion; correct?
16     A.    Yes, sir.
17     Q.    And you jump back in the golf cart with
18  Sheriff Fagan; is that correct?
19     A.    Yes, sir.
20     Q.    And where do you take him after that?
21     A.    I believe I drove him to his vehicle at
22  that time.
23     Q.    Okay.  And then, after you dropped him
24  off at his vehicle, then what did you do?
25     A.    I continued staying there at the scene
```

```
 1   conducting the rest of the investigation with the

 2   other staff that was there on-scene.

 3       Q.     Okay.  Do you recall how long you

 4   remained on-scene that day?

 5       A.     I do not recall.

 6       Q.     Was it, like, another hour after this

 7   or, like, ten hours or...

 8       A.     It was probably an hour or so, possibly.

 9       Q.     Okay.  When you got in the golf cart

10   with the sheriff, did you talk about Justin being

11   there?

12       A.     No, sir.

13       Q.     Did you discuss -- did the sheriff ask,

14   "Did you have any problems with Justin" or to that

15   effect?

16       A.     No, sir.

17       Q.     Did you personally create any kind of

18   written document about the press conference and what

19   occurred there?

20       A.     No, sir.

21       Q.     Any emails or incident reports or texts

22   or anything?

23       A.     No, sir.

24       Q.     After the fact, did you tell any other

25   sheriff's department law enforcement personnel that,
```

1    you know, "I had to relocate this guy, Justin

2    Pulliam, away"?

3         A.    I don't remember talking to anybody of

4    that nature, no.

5         Q.    Is that the kind of thing that -- I

6    mean, do -- just based on your experience there for

7    19 years, I mean, do law enforcement officers just

8    kind of talk to each other about the people they

9    encounter, the citizens, or the suspects?

10        A.    Correct.

11        Q.    They do talk about that?

12        A.    Was he -- what do you have a -- you'll

13   have to redo that part --

14        Q.    Yeah.  Sorry.  I don't mean to --

15        A.    -- rephrase that question.

16        Q.    So sorry.  I don't mean to -- I -- like,

17   you know, when -- I just think about our -- our jobs

18   as attorneys, like, we might go to court, and we'll

19   be like, "Oh, that witness was nuts," or, you know,

20   "That lawyer blew it," or something like that.

21              So we just kind of talk about the

22   people we encounter in our job.

23              And I'm just wondering whether it's

24   common in law enforcement, like, someone comes to

25   you and says, "Hey, Detective Hartfield, you're not

Detective Robert Hartfield

```
 1   going to believe this idiot I picked up the other

 2   day drunk on the sidewalk."

 3                    Do you guys have conversations like

 4   that?

 5        A.    Yes, sir.  Sure.

 6        Q.    Okay.  And -- but you didn't have a

 7   conversation like that with anyone about Justin

 8   Pulliam?

 9        A.    Nothing to the degree of anything

10   dealing with the press conference, no.

11        Q.    Okay.  And did you talk about Justin

12   with people like unrelated to the -- like talk about

13   Justin but unrelated to the press conference?

14                    MR. HEDGES:  Excluding me.

15        Q.    (BY MR. ROWES)  Right.  Excluding

16   Mr. Hedges.

17        A.    Yes.

18        Q.    Okay.  You did talk to other people?

19        A.    Yes.

20        Q.    And who did you talk to?

21        A.    Well, mainly my children.

22        Q.    You don't have to tell me what you told

23   your kids.

24                    I mean, what -- did you just tell

25   them you had an encounter with someone who had to be
```

Detective Robert Hartfield

```
 1   walked away?
 2       A.    Yes -- well, not -- it wasn't nothing to
 3   do with the press conference.  It was -- it was the
 4   entire -- the rest of the video that's not here.
 5       Q.    Oh, okay.  So in -- if you can take a
 6   look at Exhibit No. 5 again and just answers 9 -- 8,
 7   9, and 10, and 13.
 8             If you can just take a look at your
 9   responses.  You have the same sentence at the end of
10   each one.  "I deny that the reason was so that
11   Plaintiff could not participate in the news
12   conference."
13             And just let me know when you've had
14   a chance to read 8 --
15       A.    Yes, sir.
16       Q.    -- 9, 10, and 13.
17             So what was the purpose of escorting
18   him away from the press conference other than to
19   prevent him from participating in it?
20       A.    I did it because the sheriff asked me
21   to.
22       Q.    So this goes back to what we talked
23   about before.
24             It's not that there's some -- I
25   mean, the sheriff might know something, and we can
```

1    talk to him about that tomorrow.

2                But there's not a reason that you

3    know other than, "I was just following the sheriff's

4    order"?

5        A.    Correct.

6        Q.    If I were to ask you to speculate, why

7    do you think the sheriff asked him -- knowing

8    Justin's reputation around the sheriff's department,

9    why do you think the sheriff asked you to take him

10   away?

11       A.    I --

12                MR. HEDGES:  Objection; calls for

13         speculation.

14       A.    Yeah, I have no idea.

15       Q.    (BY MR. ROWES)  If Justin -- after --

16   after you and Deputy Garcia relocated him, Justin

17   actually says it's ten parking spots.  I don't know

18   how long that is.  It's probably 80 to 100 feet.

19                When you escorted him back to in

20   front of his truck, if he had started shouting

21   questions to the sheriff from back there, would you

22   have intervened?

23       A.    I can't answer that, I mean, because it

24   didn't happen, so I can't answer that.

25       Q.    Okay.  What do you think -- I realize it

Detective Robert Hartfield

```
 1   didn't happen, but just transport yourself back to

 2   that moment.

 3               Justin starts yelling questions,

 4   "Hey, Sheriff, why did you stick me back here?"

 5   And -- what do you think you would have done?

 6       A.    Probably nothing.

 7       Q.    Probably nothing.  Just ignored it.

 8               What if the sheriff had said, "Hey,

 9   go tell Justin to be quiet"?

10       A.    I don't know.

11       Q.    But you would have followed the

12   sheriff's orders if he had given you an order to do

13   it; is that correct?

14       A.    Correct.

15       Q.    Okay.  Did the sheriff ask you to

16   relocate either of the traditional news crews that

17   were there?

18       A.    No, sir.

19       Q.    And was there anybody else that the

20   sheriff asked you to relocate away from the press

21   conference?

22       A.    No, sir.

23       Q.    Based on your experience -- and I

24   recognize that your experience doesn't include many

25   press conferences.
```

Detective Robert Hartfield

```
 1                    But based on your experience, have

 2    you ever heard of someone being escorted away from a

 3    press conference before?

 4         A.     No, sir.

 5                    MR. ROWES:  Can we take a break for

 6            a few minutes?

 7                    MR. HEDGES:  Absolutely.

 8                    (Break.)

 9         Q.     (BY MR. ROWES)  I just have a couple of

10    follow-up questions.

11                    I think you mentioned earlier in the

12    deposition that under Sheriff Nehls, before Sheriff

13    Fagan came in, that Justin Pulliam was the talk of

14    the town, so to speak?

15         A.     Yes, sir.

16         Q.     And what did you mean that he was "the

17    talk of the town"?

18         A.     I knew that he has been to the sheriff's

19    office and made several videos there with the

20    administrative staff there at the office.

21         Q.     And was the -- him being the talk of the

22    town, did people have a negative attitude towards

23    Justin?

24         A.     I'm not going to say it was a negative

25    attitude; it was kind of one, like, stay away.
```

1    Q.    Like Justin should stay away, or you

2    should stay away from Justin?

3    A.    We should stay away from him.

4    Q.    I see.  Like, avoid getting yourself

5    filmed for his "Corruption Report" or something like

6    that?

7    A.    Correct.

8    Q.    Got it.

9          And after -- you mentioned he was

10   the talk of the town under Sheriff Nehls, and then

11   Sheriff Fagan came in.

12         Did that attitude towards Justin

13   change, or did something change with Sheriff Fagan?

14   A.    I do not know.

15         MR. ROWES:  Okay.  I want to thank

16        you for your candor and for your patience

17        and for your professionalism during our

18        deposition.  I appreciate it.

19         THE WITNESS:  Thank you, sir.

20         MR. ROWES:  Mr. Hedges, do you have

21        any questions?

22         MR. HEDGES:  I do.  Just a couple.

23         E X A M I N A T I O N

24   BY MR. HEDGES:

25   Q.    The video that we've been looking at is

```
 1   Exhibit 4?

 2       A.     Correct.

 3       Q.     Okay.

 4              MR. HEDGES:  Could we tee that up to

 5          about 1530?

 6       Q.    (BY MR. HEDGES)  And I want to play it

 7   for a few seconds.  And then, Detective, I want you

 8   to tell me if you recognize anyone's voices that you

 9   hear.

10              MR. HEDGES:  So if you can play,

11          please.

12              (Video playing.)

13              MR. HEDGES:  Actually, it was a

14          little bit before that, so let's go back

15          to 1510 just so we get it.

16              MR. ROWES:  Sure.

17              And do you want to -- Molly, do you

18          want to use the remote and really crank it

19          up too because the commissioner's meeting

20          is going on?

21              MR. HEDGES:  Yeah.  And I apologize

22          for that.

23              MR. ROWES:  That's okay.  That's not

24          on you.  You can't...

25              (Video playing.)
```

```
 1                    MR. HEDGES:  You can stop it.  Thank
 2          you.
 3          Q.    (BY MR. HEDGES)  All right.  Detective,
 4    did you recognize any voices from that video in the
 5    second that was just played?
 6          A.    Yes, sir.
 7          Q.    Whose voices did you recognize?
 8          A.    One voice was the sheriff.
 9          Q.    Sheriff Fagan?
10          A.    Yes, sir.
11          Q.    Did you hear any other voices?
12          A.    I could hear other -- what sounded like
13    a female's voice, but I don't know who that female
14    is.
15                    MR. HEDGES:  And I guess the time
16          stamps have me a little buffaloed on this
17          one.  Where is -- where is this video?
18                    MS. HEBERT:  It's just a portion of
19          the same video that is referenced in the
20          RFAs.  It's just a cut so that we didn't
21          have to play the whole thing.
22                    MR. HEDGES:  Got it.  Got it.
23                    MS. HEBERT:  So it's the same video,
24          just a clip.
25                    MR. HEDGES:  Okay.  Got it.  Thank
```

```
 1              you.
 2       Q.     (BY MR. HEDGES)   The only other subject
 3   I want to cover briefly, Detective, is, are you
 4   aware of any interactions that Justin Pulliam had
 5   with any nonlaw-enforcement folks there at the park
 6   on July 12, 2021?
 7       A.     Yes, sir.
 8       Q.     Tell us about that.
 9       A.     I caught the end of the incident, but
10   Pulliam, Justin Pulliam, was confronted by the
11   family of the deceased person, and some type of
12   physical altercation had occurred between them.
13              And when I caught the rear end of
14   that altercation, I removed the family from that
15   general area of where that altercation had occurred.
16       Q.     Okay.  And was that before or after the
17   video that we've been watching as Exhibit 4?
18       A.     That was before.
19       Q.     Okay.  Can you tell me -- it looks like
20   this video is time-stamped 9:32, up in the top right
21   corner.
22              Can you -- do you know about what
23   time that physical altercation took place?
24       A.     No, sir.  I don't know the exact timing.
25              It was at least longer than 15
```

1    minutes prior to that, this -- the press conference

2    time.

3         Q.    Okay.

4              MR. HEDGES:  That's all I've got.  I

5         pass the witness.

6         F U R T H E R   E X A M I N A T I O N

7    BY MR. ROWES:

8         Q.    May I ask just a couple of follow up

9    questions on that?

10              So when you saw Justin have a

11    physical altercation, can you explain what you mean

12    by "physical altercation," like were people throwing

13    blows at each other or...

14         A.    I seen a family member of the decedent

15    yelling and screaming at -- at Justin Pulliam, and

16    Justin Pulliam's voice was raised also back at that

17    individual.

18              I then went over there and tried to

19    pull the family away --

20         Q.    I see.

21         A.    -- at that point in time.

22         Q.    And so this was a verbal altercation; it

23    wasn't actually people engaged in battery with each

24    other?

25         A.    Well, I could tell -- I just -- there

```
 1   was a lot going on --
 2        Q.     Sure.
 3        A.     -- honestly.  I don't recall if anything
 4   physical occurred.  I don't know if there was some
 5   maybe hand-swatting going on.  I don't know.
 6               Because, you know, people were
 7   talking with their hands, and I did see hands up.
 8               If anybody was touched, I don't
 9   know.  But I know there was -- it was a verbal -- at
10   the bare minimum, it was a verbal altercation.
11        Q.     And if you witnessed someone punch
12   someone -- physically punched them, would you arrest
13   them for battery?
14        A.     Yes.  If I had seen someone physically
15   assault someone, then yes, I would.
16        Q.     And so, in this case, you were trying to
17   diffuse what looked like a tense situation by
18   escorting the family away; is that correct?
19        A.     Correct, sir.
20        Q.     And that happened prior to the press
21   conference?
22               And so -- and the -- I think you
23   testified earlier that the sheriff asked you to use
24   the golf cart to drive him up to the press
25   conference; right?
```

```
1        A.      Correct.

2        Q.      And did you talk to the sheriff during

3    that drive up to the press conference and say, "By

4    the way, I had to separate Justin from the family of

5    the deceased"?

6        A.      I don't recall.  I know he was also in

7    the general area too when that all occurred.

8        Q.      So you think the sheriff potentially

9    witnessed the altercation with Justin?

10       A.      I would say possibly.

11       Q.      Okay.  Do you -- and just to clarify.

12               I think we testified earlier that

13   you were just following the sheriff's order to

14   escort Justin away from the press conference; you

15   didn't actually know the specific reason in the

16   sheriff's head; correct?

17       A.      Correct.

18       Q.      Other than what he stated, which is,

19   "You're not media"?

20       A.      Correct.

21       Q.      And when you escorted the family away,

22   do you know where they went after that?

23       A.      It was -- from that general area where

24   that occurred, I probably moved them back maybe 50

25   feet to where my truck was located on the other side
```

```
 1    of my truck.

 2         Q.    And what -- did you give an explanation

 3    to the family why you were moving them away or ask

 4    them to move away?

 5         A.    Just to get them away from that

 6    situation.

 7                   I knew I could probably speak to him

 8    and calm him down due to the situation that was

 9    occurring.

10                   I figured I could calm him down and

11    get him away.

12         Q.    And just to be clear, the "him" you're

13    referring to is the relative of the deceased --

14         A.    Correct.

15         Q.    -- not Justin?  Okay.

16                   And do you know if any further

17    altercations occurred between Justin and the family

18    after that?

19         A.    With the family, no, sir.

20         Q.    And did you see -- so you recognized the

21    family members; correct?

22         A.    Correct.

23         Q.    And so when you went to the press

24    conference, you didn't see anyone there who looked

25    like they were from the family?
```

```
 1        A.      From where I was at, no, sir.

 2        Q.      Okay.  In the clip of the video we

 3   watched with Mr. Hedges from a few moments ago when

 4   he asked you to -- if you could recognize the

 5   voices, like Sheriff Fagan, and there was an

 6   unidentified woman speaking, do you remember that?

 7        A.      Yes, sir.

 8        Q.      Were you able to actually tell what

 9   people were saying, or you just sort of recognize it

10   as the sheriff's voice?

11        A.      I recognize it as the sheriff's voice.

12        Q.      And you couldn't -- you couldn't hear

13   from the video clearly what they were saying because

14   it was far away from the camera; correct?

15        A.      Not necessarily.

16        Q.      Okay.  Now, when you were escorting the

17   family away -- we're just going -- sort of going

18   back to that verbal altercation you mentioned a

19   minute ago.

20                When you were escorting the family

21   away, did any of them ask you to arrest Justin or do

22   something to Justin?

23        A.      They didn't want him there.

24        Q.      And did you go and talk to Justin

25   himself after that?
```

```
 1        A.      No, sir.

 2        Q.      And why didn't you go talk to Justin and

 3   say, "Don't be such a jerk" or something like that?

 4        A.      I didn't feel like there was no need to

 5   do that.

 6        Q.      And why did you choose to move the

 7   family away as opposed to going up to Justin and

 8   saying, "Listen, I'd like you to step back.  This

 9   is -- feels like it's getting out of hand"?

10        A.      Yeah, I believe the rest of the media

11   personnel was in the same general area, so I thought

12   it was just a better idea of removing the family

13   away from the rest of the media so they -- whatever

14   was occurring, nobody else could film.

15        Q.      Do you feel like it -- just thinking

16   back -- and it -- and it's fine if you don't know or

17   just sort of, you know, you didn't think about it

18   this deeply -- did you choose to talk to the family

19   rather than Justin because you thought the family

20   would be reasonable and that Justin might not be

21   reasonable?

22        A.      No.  I -- I talked to the family because

23   I've had interactions with them throughout that

24   weekend, so I thought they felt comfortable with me.

25   If I would tell them to do something, they would
```

1    say, "Okay," and they would just follow my lead and

2    come with me.

3         Q.    Okay.  And, in fact, the family did

4    follow your lead on that day; correct?

5         A.    Correct.

6              MR. ROWES:  Okay.  Those are all the

7         questions I have.

8              MR. HEDGES:  I think we're done.

9              (Deposition concluded at 2:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Detective Robert Hartfield

```
 1                  REPORTER CERTIFICATION

 2    THE STATE OF TEXAS :

      COUNTY  OF  HARRIS :

 3

 4     I, DENYCE SANDERS, a Certified Shorthand Reporter

 5    and Notary Public in and for the State of Texas, do

 6    hereby certify that the facts as stated by me in the

 7    caption hereto are true; that the above and

 8    foregoing answers of the witness, DETECTIVE ROBERT

 9    HARTFIELD, to the interrogatories as indicated were

10    made before me by the said witness after being first

11    duly sworn to testify the truth, and same were

12    reduced to typewriting under my direction; that the

13    above and foregoing deposition as set forth in

14    typewriting is a full, true, and correct transcript

15    of the proceedings had at the time of taking of said

16    deposition.

17            That the original deposition was delivered to

18    Mr. Jeffery Rowes;

19                    That a copy of this certificate was

20    served on all parties and/or the witness shown

21    herein on _____.

22            I further certify that pursuant to FRCP No.

23    30(f)(i) that the signature of the deponent was

24    requested by the deponent or a party before the

25    completion of the deposition and that the signature
```

Detective Robert Hartfield

```
 1   is to be returned within 30 days from date of
 2   receipt of the transcript.  If returned, the
 3   attached Changes and Signature Page contains any
 4   changes and the reasons therefor.
 5              I further certify that I am not, in any
 6   capacity, a regular employee of the party in whose
 7   behalf this deposition is taken, nor in the regular
 8   employ of this attorney; and I certify that I am not
 9   interested in the cause, nor of kin or counsel to
10   either of the parties.
11
12        That the amount of time used by each party at
13   the deposition is as follows:
14        MR. ROWES  - 01:16:44
          MR. HEDGES  - 00:03:33
15
16              GIVEN UNDER MY HAND AND SEAL OF
     OFFICE, on this, the 14th day of August, 2023.
17
18
19
20        DENYCE SANDERS, CSR, RDR, CRR, TCRR
          Notary Public in and for
21        Harris County, T E X A S
22   My Commission Expires:  4-14-25
     Certification No.:  4038
23   Expiration Date:  4-30-24
     Golkow Litigation Services
24   One Liberty Place, Suite 5150
     Philadelphia, PA 19103
25   877.370.3377
```