# DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*

Case No. 4:22-cv-4210

# EXHIBIT 1

CINDIBENCHREPORTING.COM

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM ) | |
| ) | |
| VS. ) | CAUSE NO. 4:22-CV-04210 |
| ) | |
| COUNTY OF FORT BEND, ) | |
| TEXAS; SHERIFF ERIC FAGAN,) | |
| IN HIS INDIVIDUAL ) | |
| CAPACITY; OFFICER ROBERT ) | |
| HARTFIELD, IN HIS ) | |
| INDIVIDUAL CAPACITY; ) | |
| OFFICER JONATHAN GARCIA, ) | |
| IN HIS INDIVIDUAL ) | |
| CAPACITY; OFFICER TAYLOR ) | |
| ROBBINS, IN HIS INDIVIDUAL) | |
| CAPACITY; AND OFFICER ) | |
| RICKY RODRIGUEZ, ) | |
| IN HIS INDIVIDUAL CAPACITY) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

JUSTIN PULLIAM

AUGUST 11, 2023

VOLUME 1 OF 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF JUSTIN PULLIAM, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on August 11, 2023, from 12:57 p.m. to 4:23 p.m. before Karen Romeo Rothman, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine wherein all parties were present at 401 Jackson, Richmond, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions state on the record or attached hereto.

CINDIBENCHREPORTING.COM

```
                                                            2
 1                          APPEARANCES

 2    FOR PLAINTIFF:

 3    Mr. Jeffrey T. Rowes
      Texas Bar No.
 4    The Institute for Justice
      901 N. Glebe Road, Suite 900
 5    Arlington, VA   22203
      Telephone:  703.682.9320
 6    Email:  jrowes@ij.org

 7    Ms. Christie Hebert
      Texas Bar No. 24104956
 8    The Institute for Justice
      806 Congress Avenue, Suite 960
 9    Austin, TX   78701
      Telephone:  512.480.5936
10    Email:  chebert@ij.org

11    FOR THE DEFENDANTS:

12    Mr. Kevin Hedges
      Texas Bar No. 0937000
13    Assistant Fort Bend County Attorney
      401 Jackson Street, 3rd Floor
14    Richmond, TX   77469
      Telephone:  281.341.4555
15    Email:  kevin.Hedges@co.fortbend.tx.gov

16         Also Present:  Ms. Nina Liddi, VWA Video
                          Ms. Molly Hanis
17

18

19

20

21

22

23

24

25
```

CINDIBENCHREPORTING.COM

3

| | | |
|---|---|---|
| 1 | INDEX | |
| 2 | JUSTIN PULLIAM | AUGUST 11, 2023 |
| 3 | | PAGE |
| 4 | Examination by Mr. Hedges ............... | 4 |
| 5 | Examination by Mr. Rowes ................ | 53 |
| 6 | Continued Examination by Mr. Hedges ...... | 54 |
| 7 | Further Examination by Mr. Rowes.......... | 129 |
| 8 | Signature Page ........................... | 133 |
| 9 | Court Reporter's Certificate ............. | 134 |

10701 Corporate Drive ***   Suite 172 **   Stafford, Texas 77477
281.565.8222

CINDIBENCHREPORTING.COM

```
                                                              44
 1      Q     Right.
 2      A     From that press conference.
 3      Q     All right.  And so tell me the dollar
 4 figure that you're seeking to recover from Jonathan
 5 Garcia for the conduct that you've described.
 6      A     Ten thousand dollars.
 7      Q     And are you seeking punitive damages in
 8 addition to that from Officer Garcia?
 9      A     Yes.
10      Q     How much?
11      A     A hundred thousand dollars.
12      Q     So, the total money that you are seeking
13 from Jonathan Garcia for the conduct that you've
14 described is a hundred and ten thousand dollars.
15 Did I understand that correctly?
16      A     Yes.
17      Q     All right.  I understand that prior to
18 this news conference at the park, you had some
19 interactions with the family of the victim.  Is that
20 true?
21      A     Yes, I did.
22      Q     Tell me about that.
23      A     Uh-huh.  I talked to the ex-husband's dad.
24 I was very concerned about him.
25      Q     What other interactions did you have with
```

CINDIBENCHREPORTING.COM

45

1 the family that day?
2     A    They -- the ex-husband confronted me.
3     Q    About what?
4     A    He didn't like that I was filming.
5     Q    Okay. Tell me -- well, first of all, tell
6 me what you were filming, what time of day it was,
7 and what he said when you say he confronted you.
8     A    I was filming the scene generally, how
9 they had mowers adjacent to the scene that they were
10 working to expand. This was --
11     Q    You said mowers, I'm sorry?
12     A    Yes, like people mowing on a lawnmower.
13     Q    Okay.
14     A    Right adjacent to the scene that they were
15 expanding. It was the morning, and he said
16 something like, "Get the camera out of my face,"
17 which was weird, because I was a large distance
18 away.
19     Q    How far?
20     A    Probably around 20 or 30 feet.
21     Q    Okay. So, what happened?
22     A    What happened?
23     Q    Next.
24     A    Next. He confronted me.
25     Q    What does that mean?

CINDIBENCHREPORTING.COM

```
                                                          46
 1      A    He came up to me and grabbed my camera.
 2      Q    So, he actually grabbed your camera?
 3      A    Yes, he took possession of my camera.
 4      Q    So, you were closer than 20 feet away.
 5      A    He rapidly approached me.  I did not
 6  approach him.
 7      Q    Okay.  So, your understanding, this is the
 8  ex-husband of the victim?
 9      A    Yes.
10      Q    And he said, "Get the camera out of my
11  face"?
12      A    Yes.
13      Q    And then took the camera from you?
14      A    Well, he approached me rapidly and then
15  took the camera out of my hands.
16      Q    Were you talking to him or the family at
17  that point?
18      A    No.
19      Q    All right.  So, he took the camera, and
20  was it a camera, or was it your phone?
21      A    It was a cell phone.
22      Q    Okay.  So, what happened?
23      A    He eventually threw it -- like threw it
24  into the grass.
25      Q    So, eventually meaning five minutes later?
```

CINDIBENCHREPORTING.COM

47

1  A   Oh, it was very -- very quick.  Maybe five
2  seconds.
3  Q   You would agree with me, wouldn't you,
4  that when violence erupts, it often has very fast
5  timing?  (Snapping fingers)
6  A   I've never been in a fight before
7  personally.  I guess it could be, yes.
8  Q   Okay.  Well, at least in this case in the
9  park, from what you're describing, things escalated
10 very, very rapidly?
11 A   Yes, but I wouldn't describe it as
12 violence.
13 Q   Did I?
14 A   You said violence occurring quickly.
15 Q   Okay.  So, you didn't feel like the
16 husband violently took your phone away?
17 A   No.  He grabbed it out of my hands.
18 Q   Peacefully?
19 A   It wasn't peaceful.
20 Q   Okay.  Well, I'm trying to understand the
21 distinction you're drawing, and I'm -- I'm not.  So,
22 did you give him the phone?
23 A   No.
24 Q   He forcibly took it away?
25 A   Yes.

CINDIBENCHREPORTING.COM

```
                                                        48
 1        Q    Because he was angry that you, in his
 2   words, had the camera in his face?
 3        A    Yes.
 4        Q    So, he grabbed the phone and pretty
 5   quickly tossed it away?  Is that what happened?
 6        A    Yeah.  And he held onto it for maybe five
 7   seconds and then tossed it away.  (Nodding.)
 8        Q    What happened next?
 9        A    He went back to where he was.
10        Q    And then what happened?
11        A    I talked to his dad briefly.
12        Q    Did -- before you got your phone?
13        A    Yes.
14        Q    Okay.  Then what happened?
15        A    Then the dad went back, too, and I talked
16   to another person who was there.  He wasn't a family
17   member.
18        Q    And again, this is before you picked up
19   your phone?
20        A    Correct.
21        Q    Okay.  Then what happened?
22        A    Then I went and found the phone and picked
23   it up.
24        Q    And then what happened?
25        A    I think I talked briefly to one of the
```

CINDIBENCHREPORTING.COM

49

1 other video crews that was there.
2     Q   I forget which two stations were there.  I
3 think there were two stations, maybe KHOU and KTRK,
4 maybe?
5     A   I couldn't tell you his name or what
6 station it was.
7     Q   But you talked to somebody there?
8     A   Yes.
9     Q   With a news crew?
10     A   Yes.
11     Q   All right.  So, how would you describe the
12 interaction you had with the ex-husband of the
13 victim?
14     A   I think it was unpleasant, but I certainly
15 understand -- well, I guess I couldn't fully
16 understand, but I would try.  I had a lot of empathy
17 for what they were going through.  I was very
18 concerned about them.
19     Q   Were -- were you filming at that time?
20     A   Briefly, yes.
21     Q   Okay.  So, did you actually film that
22 interaction?
23     A   Yes.
24     Q   And the reason I ask is I've looked
25 through your YouTube channel, and I haven't seen it.

10701 Corporate Drive  ***   Suite 172 **         Stafford, Texas 77477
281.565.8222

54

1  to interrupt.
2       MR. HEDGES:  Oh, no worries.  It's always
3  good for everybody to understand the factual
4  background.
5              CONTINUED EXAMINATION
6  Q   (By Mr. Hedges) So, do you still have the
7  video of the altercation with the ex-husband?
8  A   Well, when he grabbed -- yes, I do, but
9  when he grabbed my phone, it turned off.
10 Q   So, up to the point where he grabbed your
11 phone, you've got it, and after that, you don't?
12 A   Not on that phone, but I do have a body
13 camera.
14 Q   Okay.  So, your body camera was also
15 recording?
16 A   Yes.
17 Q   And he did not grab your body camera?
18 A   Correct.
19 Q   And do you still have the body cam?
20 A   Yes.
21 Q   And the footage from that altercation?
22 A   Yes.
23 Q   Okay.  And you've never posted that to the
24 Internet?
25 A   No, I don't think I published that.

CINDIBENCHREPORTING.COM

```
                                                              58
 1    away.
 2         Q    Okay.  So, to kind of summarize what I've
 3    heard --
 4         A    Uh-huh.
 5         Q    -- and there's more, I get it, but what
 6    I've heard so far, the ex-husband and you did have
 7    an altercation at the park that morning, and the
 8    Sheriff's office, or at least members of the
 9    Sheriff's office were aware of that?
10         A    Yes.  They were standing in close
11    proximity when this happened.
12         Q    And they moved the family away from you?
13         A    They moved the family closer to the scene,
14    yes.
15         Q    And not you closer to the scene?
16         A    I didn't go over there.  I mean, I
17    electively chose not to even go over there.  So. . .
18         Q    Did a member of the -- did a deputy with
19    the Sheriff's office stay with you?
20         A    No.  I mean, no one came up to me, if
21    that's what you're asking.
22         Q    Did you ask anyone or did you tell anyone
23    that you wanted to press charges against the
24    ex-husband of the victim?
25         A    No.  And I did not.  I would not.
```

CINDIBENCHREPORTING.COM

87

1  request, you're not media," and then something like,
2  "Please come with me" or "Come back over here," and
3  then he escorted me back.  And I -- I was very
4  certain and scared that Sheriff Fagan absolutely
5  would have me arrested.
6         Q    And why were you certain of that?
7         A    Because at the park previously, as we --
8  by the creek previously, he stated that after five
9  minutes, make the arrest, and, you know, after five
10 minutes, that he would go hands on.  And it was a
11 very, you know, abrasive, serious threat.  I don't
12 know what the possible offense could possibly be,
13 but I was worried that if I -- I mean, I felt
14 certain that if I stayed there to cover that press
15 conference, that I would be arrested.
16        Q    So, you walked with Hartfield and Garcia
17 back to your truck?
18        A    Well, I -- I didn't know where we were
19 going.  Hartfield led the way, and we stopped when
20 we got past my truck.
21        Q    Well, maybe we're talking about the same
22 thing, but as I recall, you could see you and the
23 tripod on your truck's dash cam.
24        A    No, I think I just wanted to clarify.  I
25 didn't know where we were going.  It was -- happened

10701 Corporate Drive *** Suite 172 **        Stafford, Texas 77477
281.565.8222

CINDIBENCHREPORTING.COM

88

1    to be that after he got beyond my truck, he said,
2    like, "Mr. Pulliam, you know, stay here," or, you
3    know, I think he even said, "You can film from
4    here," or something like that.
5        Q    Yeah.  He said, "We're happy if you film
6    from here," or something like that?
7        A    Yes.
8        Q    Okay.  And what happened next, from your
9    perspective?
10       A    So, I wanted definitive -- like, I --
11   well, he was talking and then I'm getting --
12   absolutely have like my camera tripod on the ground,
13   and I'm standing in the spot.  You know, I'm -- like
14   I am scared about this threat of arrest.  I do not
15   want -- I do not want to get arrested, I don't want
16   to go to jail, I don't want to face charges.  Like,
17   "Hey, so I can be right here?"  You know, I wanted
18   that affirmative, you know, like yes or whatever,
19   "We're not going to do anything to you if you're
20   right there."  But they had their backs to me and
21   didn't acknowledge me.  They were walking away.
22       Q    Well, so -- did I cut you off?
23       A    (Shaking head.)
24       Q    Okay.  Because I never mean to cut you
25   off.  So, when Hartfield says, "You can film from

90

```
 1   this press conference.  So, I was getting my -- on
 2   the microphone, you can also set the -- kind of like
 3   the amplitude, the audio signal, like how much --
 4        Q    Like volume?
 5        A    -- power.  It's the volume, but it's a
 6   little more nuanced than that.  And so, that's a
 7   deal where you can't just crank it up all the way,
 8   you're just going to get noise, so depending on the
 9   situation.  So -- but anyway, I moved my camera to
10   the side maybe to try to get a window where I could
11   kind of see, kind of try to get Sheriff Fagan in the
12   shot.  As he started talking, I was watching the
13   levels.  I was trying to get it dialed in, but it
14   became apparent that I was not going to get
15   meaningful coverage of it.
16        Q    Watching the levels, what does that mean?
17        A    The audio levels.
18        Q    So, where are you watching the audio
19   levels?
20        A    So, on the -- on the big camera, on the --
21   it has a display on the back, and there's a meter
22   that measures the audio signal, the amplitude.
23        Q    Okay.  And at any point when you realize
24   that you didn't think you were going to get audio,
25   did you tell anybody with the Sheriff's office?
```

10701 Corporate Drive   ***   Suite 172 **        Stafford, Texas 77477
                              281.565.8222

91

```
 1        A    I wasn't -- no, I wasn't going to
 2   interrupt a press conference, and they were all far
 3   away.  They hadn't answered me before, so why would
 4   I expect differently then?
 5        Q    Okay.  So, you -- you didn't tell anybody
 6   you were having trouble?
 7        A    Not anyone who was there.  I may have
 8   mentioned it -- I probably mentioned it at some
 9   point to my audience, yes, but not any Sheriff's
10   office people who were on scene.
11        Q    Okay.  So, your audience, just so that I'm
12   clear, they're all on the Internet somewhere,
13   they're not there, right?
14        A    Yes, sir.
15        Q    So, the people who could have allowed you
16   to move closer to where the Sheriff was talking, you
17   didn't mention to them that you were having trouble
18   recording or seeing?
19        A    I was -- no.  I was too far away to have
20   any sort of dialogue like that, and I certainly
21   wasn't going to approach them and allow them to do
22   whatever -- you know, to arrest me.
23        Q    Okay.  So, what happened next, from your
24   perspective?
25        A    I stayed there until the press conference
```

93

1   Q   So -- did you have anything else to add?
2   A   Well, I guess I'd like to say that I was
3   very -- genuinely wanted to cover that press
4   conference, and I was going to do the best I could
5   while I was there, because who knows, maybe, you
6   know, I could get home and make something, you know,
7   get that audio recovered.  But it -- I tried.  I
8   couldn't.
9   Q   Okay.  So, you found out after you had
10  stopped the live stream and gotten home that the
11  audio couldn't be recovered?
12  A   At some point, I tried to make the audio
13  and -- de-noised, enhanced, get the audio where you
14  could understand what was being said, and I was --
15  it wasn't within my technological ability to do
16  that.
17  Q   Okay.  So, that's at some point later,
18  after you'd left the park?
19  A   Correct.
20  Q   All right.  Have -- have you since that
21  time told anybody with the Sheriff's office that you
22  need to be closer in order to capture video and
23  audio with the equipment that you have?
24  A   Yeah, I haven't filmed much since then.  I
25  have filmed a few incidents, and those incidents,