# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM, | |
| *Plaintiff*, | |
| v. | Civil Action No. 4:22-cv-4210 |
| COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity, | |
| *Defendants*. | |

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ........................................................................... iv

Introduction and Summary of the Argument in Reply ...................................... 1

Argument in Reply ............................................................................ 2

I.     There is no genuine fact dispute: The videos speak for themselves. .................. 2

II.    Pulliam is entitled to summary judgment on his press conference claims. ........ 4

    A.   Sheriff Fagan and Hartfield do not even try to satisfy any First Amendment burden or explain why Pulliam's rights were not clearly established. ......................................................................... 4

    B.   None of the supposedly "disputed facts" preclude summary judgment against the Sheriff and Hartfield. ................................. 8

        i.  Saying that Plaintiff Pulliam wasn't excluded changes nothing. ........ 8

        ii.  The Sheriff's secret reasons for his actions are immaterial. ............. 9

        iii.  The fact that Pulliam was told "he could record video and audio at the press conference" is immaterial. ................................. 11

        iv.  Pulliam does not have to push back after being threatened with arrest. ...................................................................... 11

    C.   The County is liable for the First Amendment violations at the press conference. .................................................................. 12

III.   Pulliam is entitled to summary judgment on his retaliatory arrest claim. ........ 14

    A.   Plaintiff's retaliatory arrest claim is not about the failure to arrest the mental-health workers from Texana or the other deputies on scene. ........ 14

    B.   The claim is that Rollins arrested Pulliam for asking Rollins to clarify whether Pulliam still had to go across the street after Rollins changed his mind about the Texana workers. .......................................... 15

C.     Detective James is wrong about probable cause and the grand jury finding is tainted because it never saw videos of the arrest. ................... 18

D.     The County is liable for the retaliatory arrest ............................................ 23

Conclusion ........................................................................................................... 24

Certificate of Service ........................................................................................... 26

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Bennett v. Pippin*,
   74 F.3d 578 (5th Cir. 1996) ......................................................................... 13

*Betts v. Brennan*,
   22 F.4th 577 (5th Cir. 2022) .......................................................................... 2

*Brown v. Bolin*,
   500 F. App'x 309 (5th Cir. 2012) ................................................................... 3

*Carnaby v. City of Houston*,
   636 F.3d 183 (5th Cir. 2011) .......................................................................... 2

*Chiu v. Plano Indep. Sch. Dist.*,
   260 F.3d 330 (5th Cir. 2001) .......................................................................... 4

*Citizens United v. Federal Election Comm'n*,
   558 U.S. 310 (2010) ............................................................................... 10–11

*City of Houston v Hill*,
   482 U.S. 451 (1987) ...................................................................................... 17

*CQ, Inc. v. TXU Mining Co.*,
   565 F.3d 268 (5th Cir. 2009) .......................................................................... 7

*Forsyth County v. Nationalist Movement*,
   505 U.S. 123 (1992) ...................................................................................... 10

*Freeman v. Gore*,
   483 F.3d 404 (5th Cir. 2007) .................................................................... 16–17

*Gericke v. Begin*,
   753 F.3d 1 (1st. Cir. 2014) ....................................................................... 5, 8–9

*Gonzalez v. Trevino*,
   42 F.4th 487 (5th Cir. 2022) ............................................................... 4, 17, 23

iv

*Gorsky v. Guajardo*,
No. 20-20084, 2023 WL 3690429 (5th Cir. May 26, 2023) ...................................... 16

*Hartman v. Moore*,
547 U.S. 250 (2006) ...................................................................................... 17–18

*Hayes v. Jones County*,
633 F. Supp. 3d 806 (S.D. Miss. 2022) ........................................................... 3

*Hicks-Fields v. Harris County*,
860 F.3d 803 (5th Cir. 2017) ....................................................................... 3

*Howell v. Town of Ball*,
827 F.3d 515 (5th Cir. 2016) ........................................................................ 13

*Kariuki v. Tarango*,
709 F.3d 495 (5th Cir. 2013) ........................................................................ 3

*Melear v. Spears*,
862 F.2d 1177 (5th Cir. 1989) ...................................................................... 3

*Nieves v. Bartlett*,
139 S. Ct. 1715 (2019) ........................................................................... 16, 22

*People v. Tiger*,
32 N.Y.3d 91 (2018) .................................................................................... 20

*Peterson v. City of Fort Worth*,
588 F.3d 838 (5th Cir. 2009) ........................................................................ 3

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ..................................................................................... 4

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ..................................................................................... 5

*Salas v. Carpenter*,
980 F.2d 299 (5th Cir. 1992) ........................................................................ 6

*Sanchez v. Oliver*,
995 F.3d 461 (5th Cir. 2021) ........................................................................ 3

*Scott v. Harris*,
  550 U.S. 372 (2007) ................................................................................. 2

*Smith ex rel. Est. of Smith v. United States*,
  391 F.3d 621 (5th Cir. 2004) .................................................................... 7

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ................................................................................. 4

*Turner v. Lieutenant Driver*,
  848 F.3d 678 (5th Cir. 2017) ............................................................... 4, 5

*United States v. Marcucci*,
  299 F.3d 1156 (9th Cir. 2002) ............................................................... 20

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ................................................................................. 5

*Villarreal v. City of Laredo*,
  17 F.4th 532 (5th Cir. 2021),
  *cert. granted*, No. 22-1025, 2023 WL 6780371 (U.S. Oct. 13, 2023) .................... 4, 17

*Wease v. Ocwen Loan Servicing, L.L.C.*,
  915 F.3d 987 (5th Cir. 2019) ............................................................... 7–8

*Wilson v. Stroman*,
  33 F.4th 202 (5th Cir. 2022) ...................................................... 20, 21, 22

## CODES

Tex. Code Crim. Proc. art. 20A.202(a) ............................................................. 20

Tex. Code Crim. Proc. art. 20A.051 ................................................................. 20

Tex. Code. Crim. Proc. art. 21.02(2) ................................................................ 22

Tex. Penal Code § 38.15(d) ............................................................................. 16

## OTHER AUTHORITIES

Petition for Writ of Certiorari,
  *Gonzalez v. Trevino*, Case No. 22-1025, 2023 WL 3075683 (Apr. 20, 2023) ............ 23

**INTRODUCTION AND SUMMARY OF THE ARGUMENT IN REPLY**

Plaintiff Pulliam, a citizen journalist with a reputation for pointed criticism of local law enforcement, is entitled to partial summary judgment on liability as to all Defendants. **Part I**: There are no disputed material facts because the key events were captured on video. Defendants cannot manufacture factual disputes by putting their subjective gloss on objective video evidence. **Part II:** Sheriff Fagan, Detective Hartfield, and the County violated Pulliam's constitutional rights when, without provocation, they ejected him under threat of arrest from the July 2021 press conference. Defendants do not even cite a free-speech case, much less satisfy their affirmative First Amendment burdens. **Part III:** Sergeant Rollins violated Pulliam's constitutional rights when Rollins arrested Pulliam in December 2021. Defendants ignore the most significant fact: Rollins ordered three people to go across the street; two were mental-health caseworkers who explained to Rollins that they should be able to remain on scene; after Pulliam saw Rollins change his mind about the caseworkers, he asked if he could stay, too. Instead of answering, Rollins arrested him for asking that simple question. Because the arrest was objectively unreasonable and without probable cause, Rollins violated Pulliam's clearly established First Amendment rights by arresting him in retaliation for protected speech. The County is also liable for the retaliatory arrest as Rollins was carrying out FBCSO's policy of excluding and retaliating against Pulliam.

Pulliam respectfully asks the Court to hold Sheriff Fagan, Detective Hartfield, and Sergeant Rollins individually liable and without qualified immunity; to hold the County

1

liable under the *Monell* doctrine; for entry of declaratory and injunctive relief against all parties; and to schedule further proceedings on the question of damages.

## ARGUMENT IN REPLY

### I.   There is no genuine fact dispute: The videos speak for themselves.

There is no fact dispute because each incident—the July 2021 press conference and December 2021 arrest—was captured on crystal-clear video. "[W]e assign greater weight, even at the summary judgment stage, to the video recording taken at the scene." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)) (cleaned up); *Scott v. Harris*, 550 U.S. 372, 381 (2007) ("[Courts] view[] the facts in the light depicted by the videotape."). A court "need not rely on [a party's] description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape." *Carnaby*, 636 F.3d at 187.

Defendants do not, because they cannot, dispute the objective facts shown in the videos. Stuck with that damning evidence, they try to manufacture a dispute by offering self-serving, after-the-fact testimony about their subjective motivations. And they do so without contesting what the videos plainly depict. The Sheriff, for example, does not deny that he threatened to arrest Pulliam or made an express speaker-based distinction by ejecting him from the press conference because he was, in the Sheriff's eyes, "not media." Instead, the Sheriff declares that he ordered "Hartfield [to] separate[] Plaintiff from the other participants in the news conference because of [Plaintiff's] inappropriate interactions that morning." Resp. at 5. Likewise for Rollins and the welfare check. Rollins does not deny that he arrested Pulliam for asking if Pulliam still had to go across the street after

2

Rollins changed his mind about requiring two other civilians to do so. Instead, Rollins states that he had a good reason—never disclosed on scene—for letting the other two civilians stay: They "were part of the response to the armed subject." Resp. at 8.

These subjective motivations do not create genuine disputes about what happened. The standard for qualified immunity "is entirely objective[,]" and "subjective beliefs about the [action] are irrelevant." *Melear v. Spears*, 862 F.2d 1177, 1182–83 (5th Cir. 1989) (citation omitted); *see also Hayes v. Jones County*, 633 F. Supp. 3d 806, 814 (S.D. Miss. 2022) ("An officer's entitlement to qualified immunity depends not on his subjective beliefs but rather on the objective question[.]"). "Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact[.]" *Sanchez v. Oliver*, 995 F.3d 461, 473 (5th Cir. 2021) (quoting *Brown v. Bolin*, 500 F. App'x 309, 312 (5th Cir. 2012)). The standard for *Monell* liability is also objective: "[T]o establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)).

"There is no genuine fact dispute if the record, taken as a whole, could not lead a rational trier-of-fact to find for the non-moving party." *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013). This case is ripe for summary judgment because the record—taken as a whole and with the videos at the center—does not contain a genuine dispute about any material fact. Therefore, for the reasons explained in Pulliam's summary-judgment motion and as further developed below, he is entitled to partial summary judgment on liability.

3

## II.     Pulliam is entitled to summary judgment on his press conference claims.

### A. Sheriff Fagan and Hartfield do not even try to satisfy any First Amendment burden or explain why Pulliam's rights were not clearly established.

It is impossible to overstate the magnitude of Plaintiff Pulliam's First Amendment interests at the press conference. From whatever angle one views it, his free-speech rights were at their maximum that day. **Traditional public forum**: "[M]embers of the public retain strong free speech rights when they venture into public streets and parks." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). **Freedom of journalists from arbitrary arrest**: "[I]t should be obvious to any reasonable police officer that locking up a journalist for asking a question violates the First Amendment." *Gonzalez v. Trevino*, 42 F.4th 487, 494 (5th Cir. 2022) (quoting *Villarreal v. City of Laredo*, 17 F.4th 532, 541 (5th Cir. 2021)), *cert. granted*, No. 22-1025, 2023 WL 6780371 (U.S. Oct. 13, 2023). **Citizen journalists**: "We conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist[.]" *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017). **Freedom from speaker-based discrimination**: ("[S]peaker-based [distinctions] demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994). **Freedom from hostility to viewpoint**: "[V]iewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001).

Given these immense free-speech interests, Sheriff Fagan and Detective Hartfield face heightened First Amendment scrutiny. To the extent their restrictions on Pulliam's speech were speaker- or content-based, they needed to satisfy strict scrutiny by showing that relocating Pulliam was "narrowly tailored to serve compelling [government] interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Or, if ejecting him was a content-neutral burden on Pulliam's right to record the police (which it was not), the Sheriff and Hartfield at least needed to prove that their actions were a "reasonable time, place, and manner restriction[]." *Turner*, 848 F.3d at 688. To do that, the Sheriff and Hartfield needed to establish "that the filming *itself* [wa]s interfering or about to interfere, with [their] duties." *Gericke v. Begin*, 753 F.3d 1, 8 (1st. Cir. 2014). No matter what standard of heightened First Amendment scrutiny applies, Defendants' restrictions on Pulliam's speech are presumptively unconstitutional, and Defendants squarely "bear[] the burden of proving the constitutionality of [their] actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) (collecting cases).

Sheriff Fagan and Detective Hartfield completely default on their affirmative First Amendment burdens in defending their removal of Pulliam from where the traditional media was located at the press conference. And complete default is no exaggeration. They do not make any legal argument that their actions were constitutionally permissible. In fact, *they do not cite a single First Amendment case*, not in their synopsis of qualified-immunity doctrine and not in their discussion of why qualified immunity attaches to their actions at the press conference. *See* Resp. at 1–3 (cases summarizing QI rules), 4–5 (asserting QI for Fagan and Hartfield). The cases they cite—all but one of which are in the qualified-

5

immunity synopsis—are a hodgepodge of fact-patterns about excessive force, murder, football coaches getting fired, racial discrimination in contracts, etc. And each random case is cited for a generic proposition, such as "a plaintiff must allege facts demonstrating that a governmental actor violated clearly established rights." *See, e.g.*, Resp. at 3 (citing *Salas v. Carpenter*, 980 F.2d 299 (5th Cir. 1992) (analyzing a hostage's death at the hands of her abductor)). The Sheriff and Hartfield do not engage with Pulliam's detailed First Amendment analysis, do not acknowledge that they bear an affirmative burden under the First Amendment, do not analogize the record to any other case (much less a First Amendment case), and do not explain why applicable free-speech decisions afford qualified immunity here.

Inexplicably, Sheriff Fagan and Detective Hartfield seem to think that the First Amendment problem just disappears—and their affirmative burdens along with it—if they offer their take on what they did and why:

- "Plaintiff was not 'excluded' from the press conference, he was merely directed to be a short distance away." Resp. at 5.
- The reason was "[an] earlier physical altercation [with the decedent's family] and negative interactions that Pulliam had with others that morning." Resp. at 4.
- "Plaintiff was expressly told that he could record video and audio at the press conference." Resp. at 5.
- "Plaintiff never told anyone from the Sheriff's Office that he could not adequately record audio and visual from where he was told to stand." Resp. at 5.

The problem here is not a standard summary-judgment issue of whether the nonmoving party has raised a material fact dispute. The problem is more fundamental: Sheriff Fagan and Hartfield think that offering their subjective gloss on events *relieves them of any obligation to provide authorities and analysis for their apparent belief that*

*they win this case*. Fagan and Hartfield expect the Court just to accept their conclusion: "[T]here is at least a genuine issue of material fact whether the Sheriff and Dep [sic] Hartfield separated Plaintiff from the other participants in the news conference because of his inappropriate interactions that morning[.]" Resp. at 5.

But why is that factual dispute material? Why would the Sheriff's secret motivation trump the one he stated aloud in the video? Based on what case? And how do these supposedly disputed facts, if they cut in the Sheriff's and Hartfield's favor, justify their actions under their affirmative First Amendment burdens? What are the "compelling interests" for strict scrutiny? Or, at least, what are the "substantial interests" for intermediate scrutiny? And what of tailoring? How was moving Plaintiff 80–100 feet away either "the least restrictive means" necessary to achieve the (unidentified) compelling interest, or at least a reasonably tailored means for intermediate scrutiny? Why didn't Sheriff Fagan and Hartfield have an obligation to try a less-speech-restrictive option, such as warning Pulliam or waiting until he was disruptive before removing him? Why, when interacting with Pulliam, could the Sheriff threaten arrest as a first resort? Defendants do not address, much less answer, any of these questions.

To avoid summary judgment, the nonmovant must "articulate the precise manner in which the submitted or identified evidence supports his or her claim." *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 273 (5th Cir. 2009) (quoting *Smith ex rel. Est. of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004)). Sheriff Fagan and Hartfield have not done that, and their "stray reference to a fact—with no explanation of its import—fails to defeat a

summary judgment motion." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019).

**B. None of the supposedly "disputed facts" preclude summary judgment against the Sheriff and Hartfield.**

As noted in Part I, a nonmovant cannot manufacture a fact dispute at the summary-judgment stage by putting their own subjective gloss on objective video. And, as noted directly above, the Sheriff and Hartfield do not even attempt to provide objective evidence to carry their affirmative First Amendment burden. The Court can and should rule for Pulliam on those grounds alone. But, to the extent the Court wants reassurance about the implications of the supposedly disputed facts that Sheriff Fagan and Hartfield identify, those facts don't matter.

*i. Saying that Plaintiff Pulliam wasn't excluded changes nothing.*

The Sheriff and Detective Hartfield assert that "Plaintiff was not 'excluded' from the press conference, he was merely directed to be a short distance away." Resp. at 5. This is not so much a disputed fact as a reframing of what happened to minimize the egregiousness of their actions (which the Court can see for itself on the video). Setting aside that Defendants' description is a preposterous one—much like a judge saying "I'm not sending you to prison, I'm giving you an all-expenses-paid vacation to Alcatraz Island"—the nomenclature does not alter the First Amendment analysis. The Sheriff and Hartfield must still justify, under heightened First Amendment scrutiny, why they "directed" a non-disruptive journalist "to be a short distance away" on pain of arrest because he is "not media." After all, "an individual's exercise of her First Amendment right

to film police activity carried out in public . . . necessarily remains unfettered unless and until a reasonable restriction is imposed." *Gericke*, 753 F.3d at 8. Speaker-based discrimination is not reasonable. Plaintiff was not being disruptive, so moving him was not a reasonable time, place, and manner restriction. In short, the question is not what characterization the Sheriff and Hartfield can give their actions, but whether the actions themselves can be justified under heightened First Amendment scrutiny. Sheriff Fagan and Hartfield cannot satisfy that scrutiny, and, perhaps understanding that, do not even try.

### ii. The Sheriff's secret reasons for his actions are immaterial.

The Sheriff and Detective Hartfield do not acknowledge in their response that the Sheriff threatened to arrest Pulliam or that the Sheriff's stated reason for kicking him out was that Pulliam was not "local media." They just pretend that neither of those things happened even though they are the key factual bases for Pulliam's claims. Instead, the Sheriff avers that his true motivation was a secret: "[An] earlier physical altercation [with the decedent's family] and negative interactions that Pulliam had with others that morning." Resp. at 4. But this secret motivation does not extricate the Sheriff and Hartfield from the First Amendment box—it makes their predicament worse.

**Altercation with family**: First, the family was not present at the press conference, so no reasonable jury could believe that Sheriff Fagan moved Pulliam 80–100 feet away from the press conference to "protect" a family that was there.[1] Second, the family initiated

---

[1] Pl.'s Ex. 2 (Fagan Dep. Tr.) 83:6–13. Indeed, FBCSO officers closed the Park and designated a media area at the front of the Park at least in part to separate the media from the deceased's family. Pl.'s Ex. 2 (Fagan Dep. Tr.) 69:25–70:16; Pl.'s Ex. 6 (July 12th Video) 0:00–0:32; Pl.'s Ex. 1 (Pulliam Decl.) ¶30.

the confrontation based on a misunderstanding of what Pulliam was filming.[2] He was filming Park personnel, not them.[3] Pulliam forgave them and holds no grudges because they were under the terrible stress of learning that a loved one had died tragically.[4] In short, even if Sheriff Fagan and Detective Hartfield had tried to carry their burden under heightened First Amendment scrutiny, this purported concern about the family does not justify their actions.

**Negative interactions with others**: This vague assertion appears to refer to a chain of hearsay leading to the Sheriff in which a local TV journalist may have said to someone that she did not consider Pulliam "professional."[5] Even if true, and there is no evidence it is, that would not alter the outcome. The Sheriff and Hartfield would still have to justify, under heightened First Amendment scrutiny, why a "negative interaction" somewhere else would justify kicking a quiet, non-disruptive journalist out of the press conference. In fact, as Pulliam pointed out in his summary-judgment motion (another thing the Sheriff and Hartfield ignore), the Sheriff's duty ran in the opposite direction. Mot. at 12. To the extent traditional news media like local TV reporters do not like Pulliam, his style, or his content, the Sheriff must protect Pulliam. "Speech cannot be . . . punished or banned, simply because it might offend a hostile mob." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). The government cannot "tak[e] the right to speak from some and

---

[2] Pl.'s Ex. 1 (Pulliam Decl.) ¶¶24–29.
[3] *Id.* ¶¶24–25.
[4] *Id.* ¶¶26–27.
[5] Pl.'s Ex. 2 (Fagan Dep. Tr.) 84:15–86:22, 146:20–148:2.

giv[e] it to others" based on professionalism, popularity, or any other form of approval. *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010). There are no "preferred speakers." *Id.*

> ### iii. The fact that Pulliam was told "he could record video and audio at the press conference" is immaterial.

The Sheriff and Detective Hartfield make another irrelevant distinction when they point out that Hartfield told Pulliam, after relocating him, that he could continue to record. This is not a disputed fact. Hartfield said it on the video. But this argument willfully ignores the First Amendment problem. The problem is not that the Sheriff and Hartfield made Pulliam shut off his camera. The problem is that the Sheriff ejected a non-disruptive journalist from a press conference under threat of arrest based on his status as a disfavored speaker, and then had him marched 80-100 feet away by two burly police officers. This offends the First Amendment in various ways: the threat of arrest, the speaker-based distinction, the hostility towards and humiliation of Pulliam, his inability to participate and film effectively, and the subsequent chilling of his speech. Sure, the First Amendment violation could have been worse—the police could have smashed his camera, they could have beaten him up, they could have chased him away completely. But the fact that the violation could have been worse does not mean that there was no violation. And it certainly does not relieve Sheriff Fagan and Hartfield of their affirmative First Amendment burdens.

> ### iv. Pulliam does not have to push back after being threatened with arrest.

Ultimately, the Sheriff and Hartfield blame Pulliam: "Plaintiff never told anyone from the Sheriff's Office that he could not adequately record audio and visual from where

11

he was told to stand." Resp. at 5. In their view, after being threatened with arrest and escorted 80–100 feet away, Pulliam was supposed to point out that he could not see, hear, or participate in the press conference. But Pulliam obviously could not have asked to come closer because the Sheriff had just threatened him with arrest "if he don't get back."[6] And, as the video shows, Hartfield and the other officer turned their backs on Pulliam and walked away in silence after relocating him.[7] They ignore Pulliam's follow-up questions about where he could stand.[8] And, as also depicted in the video, Hartfield positioned himself halfway between Pulliam and the press conference.[9] The video, not Defendants' self-serving narrative, controls. Sheriff Fagan and Hartfield sent a clear message: get back, stay put, and shut up. Under these circumstances, blaming Pulliam for his inability to participate and record the press conference does not even pass the laugh test, much less any standard of heightened First Amendment scrutiny.

### C. The County is liable for the First Amendment violations at the press conference.

In his summary-judgment motion, Pulliam explained that the County is liable under the *Monell* doctrine because the Sheriff and Hartfield were acting on the basis of official County policy. *See generally* Mot. at 14–15. "Two policies promulgated by an official policymaker—one written and one unwritten—caused the violation of Pulliam's constitutional rights." *Id.* at 14. The written policy is General Order #08-03, titled "Media

---

[6] Pl.'s Ex. 6 (July 12th Video) 15:45–16:01; Pl.'s Ex. 1 (Pulliam Decl.) ¶¶38–39.
[7] Pl.'s Ex. 6 (July 12th Video) 17:00–17:45; Pl.'s Ex. 1 (Pulliam Decl.) ¶¶41–44.
[8] *Id.*
[9] *Id.*

Relations," which, on its face, makes the same distinction the Sheriff did in the video between "media" and "not media."[10] Detective Hartfield testified in his deposition that he understood Pulliam to be "social media," not "media" as government by General Order #08-03—and that FBCSO officers are presumed to know and follow such orders.[11]

The unwritten policy was the Sheriff's on-the-spot decision to threaten Pulliam with arrest and eject him from the press conference because he was "not media." The Sheriff's decision was official policy because "in Texas, the county sheriff is the county's final policymaker in the area of law enforcement[.]" *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996). And, under the *Monell* doctrine, a municipality can be liable for a "single unconstitutional action . . . if undertaken by the municipal official or entity possessing 'final policymaking authority' for the action in question." *Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016).

The County does not argue that the Sheriff's on-the-spot decision to eject Pulliam from the press conference was not official policy. *See* Resp. at 6. Thus, if the Court finds, as it should, that the Sheriff is individually liable to Pulliam for violating his rights, then the County is necessarily liable too because the Sheriff and the County are one and the same.

As to the written policy, the County does not dispute that General Order #08-03 makes a facial distinction between media and non-media for County policy on interacting

---

[10] Pl.'s Ex. 14 (General Orders #08-03) at 1, 6, 11; Pl.'s Ex. 15 (General Orders #05-04) at 1, 4; Pl.'s Ex. 2 (Fagan Dep. Tr.) 36:1–41:1.
[11] Pl.'s Ex. 19 (Hartfield Dep. Tr.) 20:12–21:18, 24:12–27:15.

with the media. The County does not dispute that General Order #08-03 borrows the definition of "social media" from General Order #05-04, which restricts employee use of social media. The County does not dispute that the Sheriff's distinction at the press conference between local TV media and Pulliam, a citizen journalist who uses social-media platforms like YouTube, is the exact distinction that General Order #08-03 makes. The County simply argues that General Order #05-04 (the employee social-media policy) does not apply to Plaintiff because he "does not allege that he is an employee of the Sheriff's Office." Resp. at 7. True, but irrelevant. What matters is that General Order #08-03, which is indisputably relevant as the County's written policy for interacting with the media, makes a speaker-based distinction on its face by expressly borrowing the definition from the employee social-media policy in General Order #05-04.[12, 13]

## III. Pulliam is entitled to summary judgment on his retaliatory arrest claims.

### A. Plaintiff's retaliatory arrest claim is not about the failure to arrest the mental-health workers from Texana or the other deputies on scene.

Sergeant Rollins and the County fundamentally misunderstand Pulliam's retaliatory arrest claim. Their response erroneously frames Plaintiff's claim this way: "Plaintiff argues that, because Sgt. Rollins did not arrest two Texana caseworkers on scene, that Plaintiff was singled out for retaliatory arrest." Resp. at 8. Rollins and the County declare that allowing the Texana civilians to remain on scene made sense because they "were part of

---

[12] Pl.'s Ex. 14 (General Orders #08-03) at 1, 6, 11; Pl.'s Ex. 15 (General Orders #05-04) at 1, 4.

[13] Plaintiff also has a live equal-protection claim. *See* Mot. at 14. If the Court determines, as it should, that Fagan, Hartfield, and the County violated Pulliam's First Amendment rights by making a speaker-based distinction between him and the local TV news crews, then that also violates the Equal Protection clause. *Id.* Defendants do not address Pulliam's equal-protection claim in their response.

the response to the armed subject." *Id.* They chide Plaintiff for suggesting that the Texana caseworkers should have been arrested: "Plaintiff would as effectively argue that Rollins' failure to arrest the other deputies on scene evidences a retaliatory animus toward Plaintiff." *Id.*

The fact that Rollins and the County portray Pulliam's claim as suggesting that Rollins could have arrested his fellow officers is a clue that they don't get it. Or that they're willfully setting up a strawman, not responding to Pulliam's actual claim. To be absolutely clear, Plaintiff is <u>NOT</u> arguing that:

- Rollins could not have ordered Plaintiff to go across the street after answering Plaintiff's question about why he had to go across the street but not the Texana workers;
- Rollins should have arrested the Texana workers for explaining who they were; or
- Rollins should have arrested his fellow officers.

**B. The claim is that Rollins arrested Pulliam for asking Rollins to clarify whether Pulliam still had to go across the street after Rollins changed his mind about the Texana workers.**

The first subsection of Pulliam's summary-judgment motion on the arrest claim was titled "Key Fact: Sgt. Rollins arrested Pulliam while Pulliam was asking Rollins to clarify his instructions." Mot. at 18. This is the key fact, and it is vital for the Court to understand it. Rollins and the County ignore it. As depicted on the video from two different angles, **Pulliam was obeying Rollins' order to go across the street until the two civilians (Texana workers) stopped to explain why they should be allowed to stay; Rollins listened and changed his mind, allowing them to stay; Rollins then arrested Pulliam**

15

**for asking if he could stay too**.[14] This key fact is plain as day on the video and hence undisputed for summary-judgment purposes.

With this key fact in mind, the legal question is whether probable cause existed to arrest Plaintiff for interference with official duties. The objective existence of reasonable probable cause to arrest for a crime will ordinarily defeat a retaliatory arrest claim. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (evaluating officers' "conduct under objective standards of reasonableness"). Put simply, then, was it objectively reasonable for Rollins to treat asking a simple question (*can I stay too?*) as probable cause to arrest Pulliam for interference? Again, this is not about whether Rollins has the authority to secure the scene; nor about whether he should have arrested the Texana workers or his fellow officers (obviously not). It is about arresting Plaintiff rather than answering his simple question.

As Pulliam explained in his motion, asking a question is, objectively, not probable cause to arrest someone for the crime of interference. Mot. at 18, 22. As a statutory matter, the Texas penal code expressly states that speech alone is not the crime of interference. Tex. Penal Code § 38.15(d) ("It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only."). And the Fifth Circuit has held that "'merely arguing with police officers about the propriety of their conduct . . . falls within the speech exception to section 38.15' and thus does not constitute probable cause to arrest someone for interference." *Gorsky v. Guajardo*, No. 20-20084, 2023 WL 3690429, at *8 n.16 (5th Cir. May 26, 2023) (quoting *Freeman v. Gore*,

---

[14] Ex. 11 (Pulliam Dashcam) 4:50–5:36; Ex. 9 (SD card footage) 4:12–5:00.

483 F.3d 404, 414 (5th Cir. 2007)). That speech alone cannot constitute the crime of interference is why none of the County's other interference arrests resemble Pulliam's. FBCSO's 58 other arrests for interference from 2020–2023 do not solely involve protected speech.[15] The other arrests involved domestic disputes, intoxicated citizens, threats of imminent violence, and violence against the police.[16]

In this country, we don't arrest citizens or citizen-journalists for asking questions, even argumentative questions. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v Hill*, 482 U.S. 451, 462–63 (1987). "[I]t should be obvious to any reasonable police officer that locking up a journalist for asking a question violates the First Amendment." *Gonzalez*, 42 F.4th at 494 (quoting *Villarreal*, 17 F.4th at 541). Yet that is what Rollins did.

Put simply, it is undisputed on the objective video record that Rollins arrested Plaintiff for asking a question. As a matter of law, there was no probable cause for doing so: not under the plain language of the interference statute, nor under binding Fifth Circuit authority. On this record, the only reasonable inference is that Rollins arrested Pulliam for exercising his free-speech rights—his right to ask a question, his right to say "so you can shoot him" to Rollins earlier in their interaction, and his right to be a citizen journalist who frequently films and criticizes local law enforcement. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[W]hen nonretaliatory grounds are in fact insufficient to provoke the

---

[15] Pl.'s Ex. 17 (Interference Offense Reports).
[16] *Id.*

adverse consequences, . . . that retaliation is subject to recovery as the but-for cause of official action offending the Constitution."). Plaintiff is entitled to summary judgment against Rollins in his individual capacity.

### C. Detective James is wrong about probable cause and the grand jury finding is tainted because it never saw videos of the arrest.

Rollins and the County have no response to the fact that Rollins arrested Pulliam for asking a question and that the arrest, if unsupported by probable cause, violated the Constitution. And, as with the press-conference claim, Defendants make no real *legal* argument that the arrest was constitutional. Defendants do not cite, much less discuss, the plain language of the interference statute. They do not cite or discuss Fifth Circuit decisions about that statute, as Pulliam did, nor apply the undisputed facts to relevant First Amendment retaliatory arrest decisions.

Instead, they hang their entire defense on a naked appeal to the authority of third parties—biased third parties who didn't review all the facts to boot. They note that "Travis James, a detective with the Fort Bend County Sheriff's office who Plaintiff did not sue, believed that Plaintiff committed the crime of interference with public duties." Resp. at 8. In addition, "Plaintiff was indicted by a grand jury for the interference charge." Resp. at 8.

Detective James is not an independent or reliable third party. First, James is Rollins' Sheriff's office colleague. That alone makes him unreasonably biased. Second, that the fix was in against Plaintiff is revealed in James' deposition concession that it was "[m]aybe a little unusual" that a "major crimes detective was investigating this Class B misdemeanor

18

that Justin Pulliam was accused of."[17] Third, James opined that Pulliam probably committed the crime of interference when Pulliam asked Rollins whether he could stay after Rollins changed his mind about the Texana workers:

> For me, in my opinion, in the video, you can see that Sergeant Rollins is talking with the TXANA screeners, and he's having to divert his attention away from talking to them to get kind of a rundown of why they're out there as TXANA screeners, to ask Justin Pulliam to go across the street again. That's kind of when we—in my opinion, when it begins to become interference.[18]

True, Rollins' attention is diverted. But it is diverted by *speech*, by an otherwise complying Pulliam stopping to ask a reasonable question—*can I stay too*? As Pulliam explained in his motion and again above, speech—whether a simple question or even arguing—is not the crime of interference. As the video shows, Rollins is not impeded in doing anything.[19] He is not under fire or otherwise behaving like a man who thinks anyone is in imminent danger.[20] He is simply annoyed with Pulliam, annoyed that Pulliam stopped complying and is asking a perfectly reasonable question.[21] And no doubt annoyed that Pulliam said "why so you can shoot him," when Rollins first told everyone to go across the street. So, instead of responding to Pulliam's question, Rollins crosses a grave constitutional line and arrests a journalist for asking a police officer a question—for

---

[17] Ex. B (James Dep. Tr.) 15:19–23. Pulliam provides a complete copy of Detective James' deposition transcript (Exhibit B) as Pulliam and Defendants both provided only portions of Detective James' deposition with their prior briefing. Pl.'s Ex. 13; Defs.' Ex. 2.
[18] Ex. B (James Dep. Tr.) 52:9–16.
[19] Pl.'s Ex. 11 (Pulliam Dashcam) 4:50–5:36; Pl.'s Ex. 9 (SD card footage) 4:12–5:00.
[20] *Id.*
[21] Pl.'s Ex. 9 (SD card footage) 4:15–5:21.

"making [his] job a lot harder."[22] True enough. It might be that the protected speech of citizens makes Rollins' "job a lot harder." But that is often the point of constitutional rights, including the clearly established First Amendment right to film the police. We impose constitutional obligations on law enforcement—such as respecting free speech, requiring probable cause, or *Miranda* warnings—at the expense of police efficiency because making their jobs "harder" is often essential for liberty.

Not only is James wrong about probable cause, but the grand jury indictment is tainted. *See Wilson v. Stroman*, 33 F.4th 202, 209–12 (5th Cir. 2022) (discussing the "taint exception").[23] A grand jury proceeding is only as trustworthy as the evidence the prosecutor provides. Ordinarily, we do not know what goes on during a grand jury. A grand jury "is a constitutional black box." *United States v. Marcucci*, 299 F.3d 1156, 1172 n.14 (9th Cir. 2002) (Hawkins, J. dissenting). It is a secret proceeding, Tex. Code Crim. Proc. art. 20A.202(a), in which the prosecutor presents evidence to members of the community, *id.* art. 20A.051. Given this secretive, one-sided proceeding, "any prosecutor who wanted to could get a Grand Jury to indict a ham sandwich." *People v. Tiger*, 32 N.Y.3d 91, 117 n.6 (2018) (internal quotation and citation omitted).

But there is one key fact we do know about the grand jury proceeding here—a fact that makes all the difference to its probable-cause determination. **The grand jury never saw the video footage of the arrest—not Pulliam's bodycam, not Pulliam's dashcam,**

---

[22] Pl.'s Ex. 9 (SD card footage) 4:57–5:21.
[23] *Wilson* is a false-arrest case but its reasoning about a tainted grand jury applies here.

**not Deputy Rodriguez' dashcam**. This matters because the absence of probable cause—
that Rollins arrested Pulliam simply for asking a question—is patently obvious only on
Pulliam's bodycam and dashcam videos. The prosecutor necessarily presented to the grand
jury only the one-sided, self-serving narrative of Sheriff's office officers, whether in their
written reports or in live testimony. There was no video of the arrest. The grand jury
proceeding was, therefore, tainted by the absence of the most important piece of
evidence—the unambiguous video. *See Wilson*, 33 F.4th at 211–12 (noting that if an
intermediary, "such as a grand jury, has been misled" by either an "objectively
unreasonable" presentation or "a material false statement or omission[,]" then "the taint
exception will apply").

How do we know that the grand jury never saw the videos before handing down its
indictment (*i.e.*, finding of probable cause) on May 16, 2022?[24] As to Pulliam's bodycam
video, that was seized as part of Pulliam's arrest on December 21, 2021. On March 18,
2022, James placed the USB of the footage from Pulliam's SD card in "the Evidence room
at the Fort Bend County Sheriff's Office."[25] And there the USB stayed until just before
Pulliam's criminal trial in March 2023.[26] The grand jury never saw it. Likewise, James did
not personally review or share the footage from Rodriguez's dash camera with the district

---

[24] Ex. D (Indictment). In discovery, Pulliam asked for everything that Defendants produced or
shared with the Fort Bend County District Attorney's Office or its agents relating to Pulliam's
criminal case, and Defendants produced no records showing that any video evidence was shared
with the district attorney's office before June 3, 2022.

[25] Ex. C (FBSCO Offense Report) at 18. Other evidence, such as Rollins' report and audio
recordings of interviews with the Texana employees, were either part of the comprehensive
FBCSO Offense Report or "uploaded onto the e-file system." *Id.* at 7–8, 18–19.

[26] *Id.* at 6, 27. Rodriguez's dashcam footage was capture his "L3 body mic and dash camera" and
is referenced as "L3." *Id.*

attorney until June 3, 2022.[27] The grand jury never saw that. Unbeknownst to the Sheriff's office, Pulliam also had dashcam video of his own arrest.[28] The grand jury never saw that. **All this means that the grand jury never saw any video evidence—the key evidence— not Pulliam's bodycam, not Pulliam's dashcam, not Rodriguez's dashcam.** That is a hopeless defect in the grand jury proceeding that taints the probable-cause determination. *See Wilson*, 33 F.4th at 212.[29]

Thus, the Court cannot rely on the grand jury's probable-cause finding to conclude that Rollins' arrest of Pulliam was objectively reasonable and hence Pulliam's retaliatory-arrest claim fails. To the contrary, as the video footage shows, Rollins, who testified that he was calm and not making split-second decisions,[30] arrested Pulliam solely for his speech. It was objectively unreasonable to treat a question about where to stand (while exercising the clearly established right to film the police) as probable cause to arrest for interference.[31]

---

[27] *Id.* at 22
[28] Pl.'s Ex. 1 (Pulliam Decl.) ¶¶56, 85; Pl.'s Ex. 11 (Pulliam Dashcam).
[29] There are also problems with the indictment document itself, which is invalid under Texas law. Article 21.02 of the Texas Code of Criminal Procedure outlines the requirements for an indictment. Among other requirements, an indictment must "appear that the same was presented in the district court of the county where the grand jury is in session." Tex. Code. Crim. Proc. art. 21.02(2). Here, the indictment plainly states that it was presented "in the County Court of Fort Bend, Texas." Ex. D (Indictment). This is further evidence that the indictment was tainted by the actions of the County and cannot establish probable cause.
[30] Rollins testified that he was emotionally calm during the interaction with Pulliam, was not making a split-second decision under stress, and that, on reviewing the video 21 months after the incident, he would not change how he handled the situation. Pl.'s Ex. 3 (Rollins Dep. Tr.) at 60:4– 63:10.
[31] Pulliam also preserves an argument that, even if probable cause to arrest Pulliam existed, which it did not, the arrest falls under the exception in *Nieves* for misdemeanor crimes that are rarely enforced. In *Nieves*, the Supreme Court recognized that objective probable cause for arrest should

**D.  The County is liable for the retaliatory arrest.**

Pulliam's summary-judgment motion provides a laundry list of evidence to show that the County has an official unwritten policy of retaliating against and excluding Pulliam. Mot. at 20, 23-25. That evidence includes Pulliam's reputation with the Sheriff's office, efforts to exclude Pulliam under the prior sheriff, Pulliam's exclusion at the press conference, a Facebook post and comments celebrating Pulliam's arrest, the Sheriff's visit to Pulliam in jail after the arrest, the Sheriff's approval of booking Pulliam by ordering "do it by the book," the fact that no one has been disciplined or even counseled following the arrest, and the County's representative testified that nothing about the arrest should have been handled differently.

Defendants completely ignore that evidence—and the other evidence that Pulliam marshals. Defendants simply state that because, in their view, Defendants did not violate

---

not apply in situations where officers typically exercise their discretion not to arrest. 139 S. Ct. at 1727 ("[T]he no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."). The Supreme Court gave the example of jaywalking. If someone engaged in protected speech is arrested for jaywalking when that law is not otherwise normally enforced, "it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.* Pulliam did not initially argue this because Fifth Circuit precedent foreclosed the exception, requiring near identical facts with the comparator. *Gonzalez v. Trevino*, 42 F.4th 487, 492 (5th Cir. 2022). *Gonzalez* specifically rejected the argument that a plaintiff can come under the *Nieves* exception by showing that everyone prosecuted for the crime is *different. Id.* That is the evidence Pulliam has here. Of the 58 other arrests for interference, none of them resemble pure speech. They involve violence and other disorderly behavior. *See* Mot. at 23; *see also* Pl.'s Ex. 17 (Interference Offense Reports). But after Pulliam filed his motion for summary judgment, the Supreme Court granted the petition for review in *Gonzalez*, and the Question Presented is whether comparators need to be factually identical: "Whether the Nieves probable cause exception can be satisfied by objective evidence other than specific examples of arrests that never happened." Petition for Writ of Certiorari, *Gonzalez v. Trevino*, Case No. 22-1025, 2023 WL 3075683 (Apr. 20, 2023); *see also* 2023 WL 6780371 (Oct. 13, 2023) (granting writ). Thus, if the Fifth Circuit rule is replaced, Pulliam preserves the right to argue the new rule.

Pulliam's rights by removing him from the press conference and arresting Pulliam, no unconstitutional policy exists. That logic is correct if the premises are correct—that no one violated Pulliam's rights. But, as Pulliam has established, those premises are wrong. The Sheriff, Hartfield, and Rollins indeed violated his rights at the press conference and at the welfare check. And the County is liable for those violations because official policy— written and unwritten—were driving forces behind the constitutional violations. Beyond vacuous rhetoric, Defendants present no legal argument to the contrary.

## CONCLUSION

Pulliam is entitled to summary judgment on liability. Plaintiff respectfully asks the Court to hold Sheriff Fagan, Detective Hartfield, and Sergeant Rollins individually liable and without qualified immunity; to hold the County liable under the *Monell* doctrine; for entry of declaratory and injunctive relief against all parties; and to schedule further proceedings on the question of damages.

24

Dated: November 3, 2023              Respectfully submitted,

<u>/s/ Christen Mason Hebert</u>
Christen Mason Hebert, Attorney-in-Charge
Texas Bar No. 24099898
Federal ID No. 3844981
Jeffrey Rowes*, of counsel
Texas Bar No. 24104956
**INSTITUTE FOR JUSTICE**
816 Congress Ave., Suite 970
Austin, TX 78701
Tel: (512) 480-5936
Fax: (512) 480-5937
Email: chebert@ij.org
       jrowes@ij.org

*Attorneys for Plaintiff*
*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and served by the CM/ECF system to all counsel of record.

<u>/s/ Christen Mason Hebert</u>
Christen Mason Hebert, Attorney-in-Charge

*Attorney for Plaintiff*

26