# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM,<br><br>      *Plaintiff*,<br><br>v.<br><br>COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity,<br><br>      *Defendants*. | Civil Action No. 4:22-cv-4210 |

## APPENDIX TO PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE(S)**

Exhibit A – Declaration of Christen Mason Hebert in Support of Plaintiff's
Summary-Judgment Reply.................................................................. 3–4

Exhibit B – Full Deposition Transcript of Detective Travis James ............................ 5–79

Exhibit C – FBCSO Offense Report ........................................................ 80–107

Exhibit D – The State of Texas vs Justin Reid Pulliam Indictment ....................... 108–109

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**
*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JUSTIN PULLIAM, | |
| *Plaintiff*, | |
| v. | Civil Action No. 4:22-cv-4210 |
| COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity, | |
| *Defendants*. | |

## <u>DECLARATION OF CHRISTEN MASON HEBERT IN SUPPORT OF PLAINTIFF'S SUMMARY-JUDGMENT REPLY</u>

I, Christen Mason Hebert, declare and state as follows:

1.      I am a citizen of the United States and a resident of Texas. I am over eighteen years of age and competent to make this declaration. I knowingly and voluntarily submit this declaration in support of Plaintiff's Reply in Support of Motion for Partial Summary Judgment based on my personal knowledge of these facts, and I would competently testify to them under oath.

2.      I am an attorney with the Institute for Justice, which represents Plaintiff Justin Pulliam in this action.

3.      Exhibit B to Plaintiff's Reply in Support of Motion for Partial Summary

3

Judgment is a true, correct, and complete copy of the deposition of Detective Travis James.

4.      Exhibit C to Plaintiff's Reply in Support of Motion for Partial Summary Judgment is a true, correct, and complete copy of the FBCSO Offense Report for Case 21-50633.

5.      Exhibit D to Plaintiff's Reply in Support of Motion for Partial Summary Judgment is a true, correct, and complete copy of The State of Texas vs Justin Reid Pulliam Indictment.

I declare under penalty of perjury that the foregoing is true and correct and of my own knowledge.

DATED and SIGNED this 3rd day of November, 2023.

Christen Mason Hebert

# PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT B

```
 1                  UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION
 3   JUSTIN PULLIAM,
 4      Plaintiff,
 5   v.                        Civil Action No. 4:22-cv-4210
 6   COUNTY OF FORT BEND, TEXAS;
     SHERIFF ERIC FAGAN, in his
 7   Individual capacity; OFFICER ROBERT
     HARTFIELD, in his individual capacity;
 8   OFFICER JONATHAN GARCIA, in his
     Individual capacity; OFFICER TAYLOR
 9   ROLLINS, in his individual capacity;
     And OFFICER RICKY RODRIGUEZ, in
10   His individual capacity,
11      Defendants.
12
13                    ORAL DEPOSITION
14                         OF
15              DETECTIVE TRAVIS JAMES
16
              Taken via remote videoconference
17
18
19   August 30, 2023                        9:05 a.m.
20
21
22
23
24
25
```

7

```
 1   APPEARANCES:

 2   FOR PLAINTIFFS (all via Zoom):

 3                       INSTITUTE FOR JUSTICE

                        816 Congress Ave., Suite 960

 4                      Austin, TX  78701

                        By: Christen Mason Hebert

 5                          CHebert@IJ.org

                            Jeff Rowes

 6                          JRowes@IJ.org

 7   FOR DEFENDANTS:

 8                      Kevin Hedges

                        Assistant County Attorney

 9                      Litigation Division

                        401 Jackson Street

10                      3rd Floor

                        Richmond, TX  77469

11                      Kevin.Hedges@FBCtx.gov

12

13   ALSO PRESENT:      Molly Hanis

14   REPORTED BY:       Sarah B. Townsley, CSR, CRR, RPR

15

16

17

18

19

20

21

22

23

24

25
```

Travis James

```
 1                    STIPULATIONS

 2      IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR

 3  THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF DETECTIVE

 4  TRAVIS JAMES WAS TAKEN BEFORE SARAH B. TOWNSLEY, CRR,

 5  CCR, CSR, RPR, CERTIFIED REALTIME REPORTER IN AND FOR

 6  THE STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE

 7  AND IN ACCORDANCE WITH THE FEDERAL RULES OF CIVIL

 8  PROCEDURE AS PROVIDED BY LAW, VIA REMOTE

 9  VIDEOCONFERENCE, ON AUGUST 30, 2023, AT 9:05 A.M.;

10      THE PARTIES HEREBY WAIVE ALL FORMALITIES IN

11  CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE

12  EXCEPTION OF THE SWEARING OF THE WITNESS AND THE

13  REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;

14      THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED

15  TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;

16      COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT

17  AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE

18  ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND

19  THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE

20  TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF

21  MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF

22  THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;

23      SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN

24  ADMINISTERING THE OATH TO THE WITNESS.

25
```

9

Travis James

```
 1                        INDEX

 2   EXAMINATION BY                        PAGE NO.

 3   Mr. Rowes                                 5

 4

 5                       EXHIBITS

 6   NO.    DESCRIPTION                    PAGE NO.

 7   1      deposition notice                 9

 8   2      Affidavit for Search Warrant     21

 9   3      Affidavit for Search Warrant     24

10   4      offense report                  29

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

10

Travis James

```
 1   PROCEEDINGS:

 2                        DETECTIVE TRAVIS JAMES,

 3   having been first duly sworn by the court reporter,

 4   testified on oath as follows:

 5                   COURT REPORTER:   We're on the record at

 6   9:05 a.m.

 7                        [Witness was sworn.]

 8   EXAMINATION BY MR. ROWES:

 9      Q.   Good morning, Detective James.  Would you please

10   state your name and rank with the Fort Bend County

11   Sheriff's Office?

12      A.   My name is Travis James, and I'm a detective

13   with the Fort Bend County Sheriff's Office.

14      Q.   My name is Jeff Rowes.  We met a moment ago, and

15   I'm an attorney with the Institute for Justice.  I

16   represent plaintiff, Justin Pulliam, and, as you might

17   know, he has this lawsuit asserting his First and Fourth

18   Amendment rights concerning an incident at Jones Creek

19   Ranch Park in July 2021, and then the arrest at the

20   Kraft Country Store in December 2021.  The latter is the

21   one you were involved in.  I'm sure you remember.

22      A.   Yes.

23      Q.   Before we get going, I just want to go through a

24   few deposition logistics, especially because this is

25   Zoom.  I'm sure, as a law enforcement officer, you've
```

Travis James

```
 1   testified under oath before; is that right?
 2      A.   Yes, sir.
 3      Q.   Have you ever been deposed, sir?
 4      A.   No, sir.
 5      Q.   So I have no doubt that you understand the
 6   seriousness of your oath, but I'm just going to give my
 7   usual explanation.
 8          You were sworn in a moment ago by the court
 9   reporter, who will produce a transcript of everything
10   that is said; and do you understand that you've given an
11   oath to answer my questions truthfully?
12      A.   Yes, sir.
13      Q.   And do you understand you should treat your oath
14   with the same seriousness you would if you were
15   testifying before a judge?
16      A.   Yes, sir.
17      Q.   It's important that we have a clear record, and
18   so I'm going to ask you to provide clear, verbal
19   answers, rather than just nodding, or shaking your
20   head, or saying "uh-huh" or "uh-uh", since that's
21   difficult to record on the transcript.  Please don't
22   begin answering a question until I've finished asking
23   it, and I won't ask a question until you've finished.
24   A deposition isn't really like a normal conversation,
25   where we're just kind of chatting.  We have to have one
```

12

Travis James

```
1    person talking, and the other person talking.
2          If you don't understand a question, please let me
3    know, and I can ask Sarah to read it back, or I'll try
4    to rephrase it.  There's nothing wrong with saying you
5    don't understand something.
6       A.   Okay.
7       Q.   If a Zoom connection goes haywire or something,
8    or you can't hear me, just let me know, and then we'll
9    make sure we get everything squared away, and let's just
10   kind of be patient with each other if something goes
11   wrong.
12         If you don't know the answer to a question,
13   that's fine.  You can just said "I don't know", but if
14   you do know, you have to provide the answer.
15      A.   Uh-huh.
16      Q.   Mr. Hedges, I know, is present with you,
17   although he's off-screen right now.  He might state an
18   objection after I ask a question.  It doesn't mean the
19   question's bad, or that you don't have to answer it.  It
20   just -- he just wants to preserve an objection to maybe
21   chat with the judge about afterwards.  On the other
22   hand, if he specifically instructs you not to answer a
23   question, then that's fine, and then the lawyers can
24   figure out what to do.
25         It's good to leave a little pause before your
```

Travis James

```
 1   answers, just in case Mr. Hedges wants to slip in an

 2   objection.

 3       A.   Okay.

 4       Q.   We'll -- if you need to take a break, or grab a

 5   drink, or use the restroom, or whatever, just let me

 6   know.  The only thing that I would ask is that, if

 7   there's a question pending, that you answer it before we

 8   go on the break.

 9       A.   Absolutely.

10       Q.   Is there any reason why you can't give your best

11   testimony today?  Like you've had to take medication or

12   something like that?

13       A.   No, sir.

14       Q.   We're going to look at just a couple of

15   documents today, and we're going to look at the video of

16   the arrest from Justin's camera, which I know you've

17   seen before.  I just have a -- specific questions about

18   those documents, and so I'm going to direct us to

19   those, but if you want to read the whole document, or

20   you want to watch the whole video from, like, minute

21   zero to minute six or something, that's fine.  Let me

22   know, and we can go off the record.

23           The other thing is -- Kevin might have

24   mentioned, our depositions have been very friendly and

25   collegial, and I'm going to ask you questions about your
```

14

Travis James

```
 1    investigation, but the vibe of my question is:  I've

 2    never practiced criminal law, and I don't know how

 3    investigations work, so I'm just asking you kind of what

 4    happens.  The vibe of my question isn't, "Well, why

 5    didn't you speak to that person", or, "You should have

 6    spoken to that person", or something.  I just kind of

 7    want to know what happened, and then, you know, later on

 8    after all this is done, Mr. Hedges and the rest of us

 9    can chat with the judge about what it all means.

10       A.   Okay.

11       Q.   All right, so I'd like to jump in and show you

12    -- I'm going to -- sure.

13       A.    Sorry about that.

14       Q.   No problem.  I'm going to show you what I'd like

15    to mark as Exhibit No. 1, which is your deposition

16    notice, and I am going to share my screen to do that.

17                   [Exhibit 1 was marked.]

18    BY MR. ROWES:

19       Q.   Detective James, can you see this document that

20    I've shared?

21       A.   Yes, I can.

22       Q.   Okay.  I'm going to... the title of it is --

23    this is the amended notice of your deposition today.

24    That's okay, do you see a second?  Do you want to jump

25    off the record?
```

15

Travis James

```
1      A.    My apologies.  My allergies are acting up.

2      Q.    Yeah, you know, my son has the same problem, and

3  he had to stay home today because of severe allergies.

4  If you ever need to go off the record or hit the "mute"

5  button, that's fine; but have you seen Exhibit No. 1,

6  the deposition notice for your deposition today?

7      A.    I don't believe so, sir.

8      Q.    Okay.  All right, so this is the notice just

9  saying that you're here -- we've asked you to be here,

10  Mr. Hedges has gotten it, and that's why you're here

11  today.  Do you have any objection to the deposition

12  notice or to your presence today?

13      A.    No, sir, I don't.  Can y'all hear me okay?

14      Q.    Yeah, we can hear you great.  Can you hear me

15  okay?  I should have checked that.

16      A.    Yes, sir.

17      Q.    Did you do anything to prepare for today's

18  deposition today, such as review documents or videos?

19      A.    I reviewed my affidavits, and I spoke with Kevin

20  Hedges.

21      Q.    Okay.  And none of my questions today are asking

22  you to tell me anything you talked about with Mr.

23  Hedges, and so if I ask you stuff, you never have to

24  throw in, "And then Kevin told me this", or, you know,

25  "Kevin said that."  That's all protected.
```

Travis James

```
 1     A.    Okay.

 2     Q.    And did you discuss your deposition with anyone

 3  besides Mr. Hedges?

 4     A.    No, sir.

 5     Q.    And did you bring anything with you today?  Any

 6  notes or anything along those lines?

 7     A.    No, sir.

 8     Q.    All right, before we jump in to any documents, I

 9  just want to get a little bit on your personal

10  background -- not too much, but just to understand the

11  basis for you being the person who was investigating

12  Mr. Pulliam.  So how long have you been with the Fort

13  Bend County Sheriff's Office?

14     A.    Originally, I started with the Fort Bend County

15  Sheriff's Office in December of 2006.  I left in 2015

16  to go to another agency.  I came back in 2017, and have

17  been with them since 2017, so going back five years.

18     Q.    And what agency did you work with in the -- in

19  the in-between period?

20     A.    When I left, I went to the Harris County

21  Constable's Office, Precinct 1.

22     Q.    And when did you become a detective with the

23  sheriff's office?

24     A.    March 20, 2021.

25     Q.    Okay.  By the way, if I say "sheriff's office",
```

Travis James

```
 1   let's just agree I'm referring to the Fort Bend County

 2   Sheriff's Office, okay?

 3       A.   Yes, sir.

 4       Q.   And if I say "sheriff", I'm referring to Sheriff

 5   Fagan.

 6       A.   Yes, sir.

 7       Q.   And, prior to -- prior to becoming a detective

 8   --

 9            COURT REPORTER:      I'm sorry, y'all.

10   Somebody's at my door, and the dog is going to just

11   really go crazy.

12            MR. ROWES:      Okay.

13                 [Off the record.]

14   BY MR. ROWES:

15       Q.   I just want to just clarify something, in case I

16   missed it.  The deposition notice is Exhibit 1.

17       A.   Okay.

18       Q.   And so you -- you mentioned -- I think what I

19   was going to ask you is what -- what was your position

20   with Fort Bend County prior to becoming a detective?

21       A.   I was a deputy on patrol.

22       Q.   So for that period, excluding the time you were

23   a constable, you were a patrol deputy, and then you

24   went and did the exam, or whatever it is to become a

25   detective; is that right?
```

18

Travis James

```
 1    A.   Well, for clarity, from 2006 to 2010, I was a

 2   jailer, and then from 2010 to March '21, I was a patrol

 3   deputy, yes, sir.

 4    Q.   I see.  And did you go to the Fort Bend County

 5   police academy?  I think it's called Gus George.  I

 6   can't quite remember what it's called.

 7    A.   No, sir.

 8    Q.   Where did you attend your training?

 9    A.   I went to Wharton County Junior College, their

10   basic academy.

11    Q.   Are you still a detective in the criminal

12   investigation division's robbery and homicide section?

13    A.   Yes, sir.

14    Q.   And have you been a detective in that section

15   since you started as a detective?

16    A.   Yes, sir.

17    Q.   And is most of your time spent on major crimes

18   like robberies and homicides?

19    A.   I investigate everything from homicides and

20   robberies to misdemeanor assaults, and aggravated

21   assaults and major crimes, such as threats to schools

22   and -- yeah, threats to schools; pretty much, that's it.

23    Q.   How often do you investigate class B

24   misdemeanors, like the one we have here about

25   interfering with public duties?
```

19

```
 1     A.   I wouldn't say very often.

 2     Q.   Okay.  And when you're doing an investigation,

 3  as I said before, basically, my knowledge is, like,

 4  whatever I've seen on TV and in the movies, and I'm

 5  sure, obviously, an investigation is more involved, but

 6  what's the basic approach to investigating?  Like, how

 7  do you decide when you've talked to enough people, that

 8  kind of thing?

 9     A.   My investigations -- I speak from my

10  experience -- I usually start by either reading an

11  offense report or if I've been called out a scene,

12  meeting with the deputy or an officer, figuring out

13  what they did on the scene, figuring out if they've

14  talked to any witnesses, any suspects, victims, and,

15  from there, I'll figure out who do I need to talk to,

16  what evidence do I need to obtain, such as video

17  evidence, crime scene evidence, which is not really

18  here, but stuff like that, and then move forward from

19  there.

20     Q.   And we'll dig into a little bit more detail

21  later, but I know, reading the incident report, that in

22  April of 2022, you presented this case, after your

23  investigation, to the district attorney.  Do you recall

24  that?

25     A.   In April '22?  Yes.
```

Travis James

```
 1    Q.   Yes.  Okay, so is it exclusively detectives who

 2    present their investigations to the district attorney to

 3    proceed, or do patrol deputies also do that?

 4    A.   Patrol deputies can present cases; however, if a

 5    specific patrol deputy takes a report, say, on an

 6    arrest, it will go to a -- I guess an intake deputy, and

 7    they will then file that case.

 8    Q.   I see, so it's not the case -- it's not usually

 9    the situation where the arresting officer is the one who

10    fully completes the investigation and then presents the

11    case?

12    A.   I'm sorry, could you repeat that?

13    Q.   Sure.  Sorry if it's confusing.  What I meant to

14    say is that if a patrol deputy makes an arrest, it's

15    not usually the situation where the arresting officer

16    will then do the complete investigation him or herself,

17    and present it directly to the ADA; is that right?

18    A.   I would say that was -- that is correct.

19    Q.   Okay.  So was there anything unusual fact that a

20    homicide detective -- a major crimes detective was

21    investigating this class B misdemeanor that Justin

22    Pulliam was accused of?

23    A.   Maybe a little unusual.

24    Q.   How did you come to be -- how did you come to be

25    assigned to investigate this?
```

21

Travis James

```
 1      A.   So the call that Justin Pulliam was arrested on,
 2   I originally investigated a subject known as Edwin Kraft
 3   for stalking, and during that call, we had taken, as
 4   evidence, Mr. Pulliam's, I believe, cellphone camera,
 5   body-worn camera, and one of his cameras as evidence.
 6   Unbeknownst to CID, this had been placed into evidence,
 7   and then we were then tasked with figuring out if
 8   probable cause existed to obtain a search warrant for
 9   those items.
10      Q.   I see.  And could you, just for the record, tell
11   me what "CID" means?
12      A.   I'm sorry, criminal investigation division.
13      Q.   And so when you were investigating -- so, in
14   other words, it sounds to me like someone didn't say --
15   did not say, "Detective James, go investigate Justin
16   Pulliam", or is it that someone said, "Detective James,
17   investigate the incident on December 21, 2021, at the
18   Kraft Country Store."
19      A.   It was the incident, yes, sir.
20      Q.   So you were simultaneously investigating Edwin
21   Kraft for any potential crimes he committed that day; is
22   that correct?
23      A.   That investigation was actually completed.
24      Q.   Completed by you or by someone else?
25      A.   By me.
```

22

Travis James

```
 1      Q.    I see.  And so the investigation into Edwin
 2   Kraft was completed before you presented the case about
 3   Justin Pulliam to the ADA?
 4      A.    Correct.
 5      Q.    Okay.  And what did your -- just in broad
 6   strokes.  You don't have to dig into the details, but
 7   what -- what was your presentation to ADA about
 8   potential crimes Mr. Kraft committed that day?
 9      A.    So the complaint was that Mr. Kraft had made
10   threatening... I guess you would call them gestures, had
11   been harassing the employees of a store across the
12   street from the -- what I know to be the Kraft Country
13   Store, and had done so numerous times, and during our
14   investigation, we believed that it fit stalking, so we
15   obtained an arrest warrant for Mr. Kraft for stalking.
16      Q.    And so what about the potential crimes he
17   committed on the day that Justin Pulliam was arrested?
18   For example, you know, he was arrested because,
19   apparently, he had an old rusty rifle that he might have
20   been brandishing.  I don't know all the details.  Did
21   you investigate the specific things Edwin Kraft did that
22   day?
23      A.    No, sir.
24      Q.    Okay.  And did somebody -- do you know, did
25   another detective investigate what Mr. Kraft was doing
```

23

Travis James

```
 1   that day?

 2      A.   Not to my knowledge, no, sir.

 3      Q.   Okay.  So when you were -- when you were

 4   assigned to investigate what occurred at the Kraft

 5   Country Store on December 21, 2021, was your assignment

 6   specifically to investigate the arrest of Justin

 7   Pulliam, or anything else?

 8      A.   My assignment was basically to review the case

 9   where Mr. Pulliam had been arrested to see if probable

10   cause existed for the issuance of the search warrants

11   for his camera and SD cards.

12      Q.   I see.  And then I know that the search warrant

13   was signed, executed, and is it correct to say that

14   there was a phase 2 of your investigation, in which you

15   reviewed the video evidence obtained during the search

16   warrant?

17      A.   Yeah, that's fair to say.

18      Q.   And then after reviewing that, you then

19   presented the case for prosecution on interference with

20   public duties; is that correct?

21      A.   Correct.

22      Q.   In the course of your investigation, both the

23   first phase, where you're obtaining a search warrant,

24   and the second phase, where you were reviewing the

25   evidence that you obtained, what videos did you look at
```

```
 1   or, like -- it could be dash cam videos, it could be

 2   Justin's videos, any video evidence you recall reviewing

 3   at any point.

 4       A.   I reviewed Mr. Pulliam's video once I obtained

 5   it.

 6       Q.   And did you -- I've listened to -- sorry, I've

 7   listened to Deputy Rodriguez's dash cam.  I don't think

 8   he had video of the incident on his dash cam, but there

 9   was a little bit of noise off to the side, and you

10   could kind of hear what was going on.  Did you look at

11   Deputy Rodriguez's dash cam at all?

12       A.   Briefly.

13       Q.   And who was the person who assigned you the

14   Justin Pulliam case in December of 2021?

15       A.   Lieutenant Scott Heinemeyer.

16       Q.   And do you know -- is it just, like, the cases

17   are dished out at random, or did he assign it to you

18   because you had this past history of investigating Edwin

19   Kraft?

20       A.   So, typically, the cases are just out of kind of

21   at random; however, in this instance, he was walking

22   down the hall, I happened to be kind of standing in the

23   hall, and he was looking for somebody to kind of work

24   on this, and when he explained it to me, I said, "Well,

25   I've worked on the Edwin Kraft incident.  I'll go ahead
```

1    take this on, as well."

2        Q.    And I know, in the incident report, you spoke to

3    a couple of people within the sheriff's office, and you

4    spoke to the TXANA people, and we'll get into some of

5    those details, but did you speak with other people that

6    you recall who were neither TXANA nor part of the

7    sheriff's office?

8        A.    No, sir.

9        Q.    Did you try to speak with Justin Pulliam,

10   himself, as part of your investigation?

11       A.    No, sir.

12       Q.    Do you -- would you normally, in the course of

13   investigations, actually try to arrange a talk with the

14   -- the criminal suspect?

15       A.    Yes, sir, I would; however, in this instance, my

16   understanding, when he was arrested, he didn't wish to

17   provide a statement or anything like that, so I was

18   like, okay, if you don't want to give us a statement,

19   fine.

20       Q.    So if Justin had spoken to the sheriff and the

21   other folks who were with him after the arrest indicated

22   a willingness to do so, you might have talked to Mr.

23   Pulliam; is that correct?

24       A.    That is correct, yes, sir.

25       Q.    But you just thought, "Oh, well, he's going to

Travis James

```
1    invoke his right to an attorney", and not talk to you,
2    and so there was no point in doing it in this
3    situation?
4        A.   To my understanding, he had already invoked his
5    right, yes, sir.
6        Q.   Do you recall -- did you send any e-mails or
7    text messages related to the case?
8        A.   E-mails as far as to who?
9        Q.   I don't know, like, to various witnesses, like
10   Sergeant Rollins, trying to set up a meeting, or trying
11   to clarify facts -- just anything that you would have
12   that would have documented the steps you took in your
13   investigation.
14       A.   I did call Deputy Rodriguez and Sergeant
15   Rollins, but no text messages, no e-mails, to my
16   knowledge, from my recollection.
17       Q.   Okay.  So you just spoke to them on the phone to
18   kind of get their side of the story?
19       A.   Correct.
20            MR. ROWES:     Molly, would you please
21   put up Exhibit 2, which is the Affidavit for Search
22   Warrant, 2022 SW 0184, and I'm going to stop my
23   screen-share.
24            [Exhibit 2 was marked.]
25   BY MR. ROWES:
```

27

Travis James

```
1      Q.   Before I jump into the affidavit, Detective

2   James, you mentioned a minute ago that the lieutenant

3   assigned you the Justin Pulliam case.  What did he tell

4   you about it?

5      A.   Lieutenant Heinemeyer basically said:  Hey,

6   Justin Pulliam was arrested.  We apparently took --

7   when I say "we", I'm referring to the sheriff's office

8   -- took, I believe, his cellphone, his body-worn

9   camera, and a camera as evidence, and nothing has been

10  done with it.  We need to figure out if probable cause

11  exists, so that either -- if probable cause doesn't

12  exist, we need to release it, or, if it does exist, we

13  need to get a search warrant to that we can process this

14  evidence, so it doesn't sit in our evidence.

15     Q.   And was there -- given that -- I know you know,

16  because you wrote it down, but Justin was a sort of a

17  known quantity as someone who videotaped different

18  sheriff's office folks and deputies.  Was there any

19  concern expressed to you that this was a sensitive

20  case, or that the sheriff's department wanted you to be

21  particularly careful in your investigation?

22     A.   No.

23     Q.   So it just -- did it have the feel of the

24  run-of-the-mill case?  Your lieutenant gives you an

25  assignment, and you just carry it out?
```

28

Travis James

1      A.    To me, yeah.

2      Q.    All right, let's take a look at the search

3   warrant, and you can -- you can see, Detective James,

4   that under number 1, it describes an SD card under

5   "1A", and then under "1B", it describes another SD

6   video card.  Do you see that?

7      A.    Yes, sir.

8            MR. ROWES:       Molly, can you scroll down

9   to the signature page, please.

10     Q.    Like I say, Detective James, I'll represent to

11  you this is what we got -- this is an accurate copy, but

12  if you want to -- okay, we can stop there.  If you want

13  to stop and, like, read every page, but I'll just ask

14  you have right now, on page 6 of Exhibit 2, is that your

15  signature?

16     A.    Yes, sir.

17     Q.    And is that Judge Becerra's signature and --

18     A.    I'm sorry?

19     Q.    Is that Judge Becerra's signature?

20     A.    Yes, sir.

21     Q.    And so this is the -- this is the affidavit that

22  you presented in support of the search warrant for those

23  video cards on January 14th, 2022; is that correct?

24     A.    Yes, sir.

25     Q.    I'd like to introduce now, Exhibit 3, which is

29

Travis James

 1   the Affidavit for Search Warrant 2022 SW 0180.

 2              MR. ROWES:        Molly, if you could put

 3   that up, please?

 4                   [Exhibit 3 was marked.]

 5   BY MR. ROWES:

 6      Q.   And if you take a look under Section 1

 7   describing the subject of the search here, it's a black

 8   body-worn camera, I think that Justin had on.  Do you

 9   see that?

10      A.   Yes, sir.

11              MR. ROWES:        And, Molly, can you

12   forward to page 6, the signature page, please?

13   BY MR. ROWES:

14      Q.   And is this your signature on page 6 of Exhibit

15   No. 3?

16      A.   Yes, sir.

17      Q.   And that's the -- the judge's signature, and you

18   presented this to the judge on January 14, 2022,

19   correct?

20      A.   Yes, sir.

21      Q.   I've read both of the affidavits in Exhibits 2

22   and 3, and they seem to be the same, except that one is

23   looking for the two memory cards and the other one is

24   looking for the body cam.  Is it correct that they're

25   both essentially identical, except for those -- the

Travis James

1    different evidence that is the subject of the searches?

2       A.    I would say that's correct, yes, sir.

3       Q.    So did you do anything different in preparing

4    the two affidavits?

5       A.    On the SD card affidavit, I researched the -- I

6    believe they -- the camera that the SD cards were

7    inserted in that Deputy Rodriguez removed from to see

8    if there was any internal media or anything like that

9    that would indicate that that particular camera would

10   also have evidence on it, as well.

11      Q.    And did you complete the affidavits at the same

12   time?

13      A.    Basically, I worked on a rough draft of an

14   affidavit for both.  Once the rough draft was

15   completed, I then worked on each individual affidavit

16   and inserted that rough draft in there.

17      Q.    Got it.  Okay, so the -- we've acknowledged that

18   there's a difference between the affidavits, in terms of

19   the specific evidence that they sought in the search

20   warrant, but your testimony about your investigation is

21   the same in both of them, correct?

22      A.    Correct.

23      Q.    So what's true of one affidavit is true for

24   another, then, correct?

25      A.    Correct.

31

Travis James

```
1                MR. ROWES:      You can stop sharing for a

2   moment, Molly -- oh, you have.  I'm sorry.

3   BY MR. ROWES:

4      Q.   So we've already mentioned that the arrest in

5   December of 2021 took place at the Kraft Country Store.

6   You know what I'm talking about when I say "Kraft

7   Country Store", right?

8      A.   Yes, sir.

9      Q.   And I gather from looking at the documents we

10  have, you weren't physically present at the Kraft

11  Country Store on December 21, 2021, to witness the

12  events that happened; is that correct?

13     A.   That is correct, sir.

14     Q.   So your knowledge of what occurred that day is

15  based on the evidence you gathered as part of your

16  investigation, including reviewing the videos and

17  talking to the other officers who were present; is that

18  right?

19     A.   That is correct, and reviewing the offense

20  report, as well.

21     Q.   Right.  We'll talk about the offense report in a

22  second.  How does -- maybe just tell me what is an

23  offense report.

24     A.   My apologies.  An offense report is -- an

25  offense report would be a document that the -- what we
```

Travis James

```
 1   call the primary deputy, which is basically the deputy

 2   who -- in this instance would be Deputy Rodriguez, who

 3   is the deputy that is taking responsibility for the

 4   case, is maybe alleging an offense or what-have you, is

 5   -- he's doing the on-scene investigation.

 6        Once that's complete, if CID comes into the

 7   picture and maybe does follow-up investigations, as

 8   well, and they would complete a supplement under that

 9   offense report.

10   Q.   And do people have to get approval to add

11   something to the offense report, or is it just, if

12   you're working on it and you want to document what

13   you've done, you just go ahead and add it?

14   A.   When you say "approval", what are you talking

15   about?

16   Q.   I'm sorry, like, do you have to go to your

17   supervisor and say, "Hey, I've done something for this

18   case I want to add to the offense report", do you need

19   to get approval of what you add to it before you add it,

20   or is that just something you do on your own discretion?

21   A.   Well, are you referring to patrol instances, in

22   their offense report, or are you referring to, like, a

23   CID, their follow-up --

24   Q.   Sure.  Maybe let's break it down into both.  So

25   if a patrol deputy like -- like Deputy Rodriguez in
```

33

Travis James

```
 1    this case, if he wants to add to the offense report,

 2    does he have to get prior approval of what he wants to

 3    add?

 4        A.   So once he completes his report and what we call

 5    owner-approve it, it goes to the supervisor, who, then

 6    the supervisor approves it.  Our records division then

 7    freezes it.  If he needs to add something in there --

 8    maybe he forgot something or what-have you -- if he

 9    needs to do a records request:  Hey, add this in,

10    what-have you, send it to them.  They then add that in,

11    because the report is frozen.

12        Q.   Got it.  And, in your case as the investigator,

13    what kind of happens with you?

14        A.   So due to the longevity of some of our

15    investigations, a lot of times, we will leave our

16    reports in progress.  What that means is the report is

17    in progress, we're still working the investigation, and

18    we will add on because it's -- due to the time frame,

19    we will add on what we do in those reports, and then

20    once completed, we approve it, our supervisor looks at

21    it, and then the same process; it becomes frozen.

22        Q.   Okay.

23             MR. ROWES:     Molly, would you please

24    put up Exhibit 4?  And I would like to introduce as

25    Exhibit 4 the offense report in this case, which is
```

34

Travis James

1    number 21-50633.

2                    [Exhibit 4 was marked.]

3    BY MR. ROWES:

4        Q.   Can you just take a look at that, Detective

5    James?  Do you -- I realize you haven't had a chance to

6    look at the details, but do you recognize this as an

7    offense report of the Fort Bend County Sheriff's

8    Office?

9        A.   Yes, sir.

10                   MR. ROWES:        And if you just want to go

11   down a little bit, and if you can just stop there.

12       Q.   Can you take a look at where Molly has stopped

13   on page 1 of Exhibit No. 4?  Do you see, Detective

14   James, where it says "Justin Pulliam", and then it lists

15   out various camera equipment?

16       A.   Yes, sir.

17       Q.   And do you recognize this offense report as the

18   offense report for the investigation into Justin

19   Pulliam's arrest for interference with public duties?

20       A.   Yes, sir.

21       Q.   We talked a moment ago about the two phases of

22   your investigation.  The first was obtaining the search

23   warrants on January 14th, and so you would have read

24   the offense report for everything up to January 14th in

25   preparing your affidavits; is that correct?

```
 1      A.    Yes, sir.

 2      Q.    And then, obviously, you didn't actually have

 3   the video from the things you were trying to search, so

 4   that evidence wasn't part of your initial investigation

 5   to acquire the -- to obtain the search warrant; is that

 6   right?

 7      A.    That is correct, yes, sir.

 8            MR. ROWES:      And can you go to pages --

 9   can you go to page 14, Molly, please, of Exhibit No. 4?

10   Can you just scroll down a little bit?  You can stop

11   there.

12   BY MR. ROWES:

13      Q.    Do you see, Detective James, on page 14 of

14   Exhibit No. 4, you have a summary narrative.  Is that

15   something you added to this document on January 6th?

16      A.    That is correct.

17      Q.    And so on or before January 6th when you made

18   this supplement, you had spoken to Deputy Rodriguez and

19   Sergeant Rollins; is that right?

20      A.    Yes, sir.

21      Q.    And had you spoken to -- do you recognize the

22   names "April Leifler", L-E-I-F-L-E-R, and "Lori Rosas",

23   R-O-S-A-S?

24      A.    Yes, sir, I recognize their names.

25      Q.    And are those employees of TXANA, the mental
```

 1   health crisis contractor that the county uses?

 2      A.   Yes, sir.

 3      Q.   And so had you spoken to them by the time you

 4   made this entry on January 6th, or were these just

 5   potential witnesses you were thinking about talking to?

 6      A.   On January 6th -- on or before January 6th, I

 7   had not spoken to them.  I believe I spoke to them in

 8   March of 2022.

 9      Q.   So you're just listing the relevant witnesses

10   here; is that right?

11      A.   Yes, sir.

12      Q.   Okay.  Besides speaking to Sergeant Rollins and

13   Deputy Rodriguez between the time of the arrest and

14   your first January 6th entry, did you take any other

15   actions, that you recall?

16      A.   Other than completing the -- or beginning to

17   work on the affidavits, no.

18          MR. ROWES:       So Molly, can you go to

19   page 16 of Exhibit No. 14 -- or Exhibit No. 4, please?

20   If we take a look at -- can you go down a little bit,

21   please, Molly?

22   BY MR. ROWES:

23      Q.   Do you see on your second entry on this page,

24   Saturday, January 8th, you write, "Based on the reports

25   and the statements made by Deputy Rodriguez and

                                37

Travis James

```
1    Sergeant Rollins, probable cause exists for a search

2    warrant", do you see that?

3        A.   Yes, sir.

4        Q.   And was that statement an accurate reflection of

5    everything you'd done to investigate Justin Pulliam for

6    the offense of interference up to that point?

7        A.   Yes, sir.

8        Q.   And I think we answered this a minute ago, but

9    you didn't take any other actions besides those

10   conversations in reviewing the offense report, right?

11       A.   No, sir.

12       Q.   You wrote that the affidavits -- on Friday,

13   January 14th, at the bottom it says, "On this date and

14   time, I met with ADA Ellisor and the Honorable Judge

15   Becerra" -- oh, I'm sorry, let me back up.  In the

16   previous thing about the search warrant where you say

17   that you believe that there's probable cause, it says

18   "The affidavits were forwarded to ADA Ellisor on January

19   8th."  Who is ADA Ellisor?

20       A.   She is the chief intake prosecutor for the Fort

21   Bend County District Attorney's Office.

22       Q.   So is she the person who gives it the first look

23   and decides whether this is a case that the district

24   attorney's office is likely to prosecute?

25       A.   Are you referring to the search warrants
```

Travis James

```
1    themselves, or just to the entire case?
2        Q.   Well, we can break it down.  Did she review the
3    search warrant, and then say, "I think the proposed
4    search warrant and the probable cause affidavit are
5    sufficient."
6        A.   Yes.
7        Q.   So she's the one who signs off on that --
8        A.   Yes.
9        Q.   And is it the case that an investigator like you
10   might present a search warrant affidavit, as you did
11   here, to ADA Ellisor -- and, by the way, that's spelled
12   E-L-L-I-S-O-R -- in which the intake ADA says:  This
13   isn't good enough.  You need to go and get more
14   evidence.  Does that ever happen?
15       A.   Yes, it has, actually.
16       Q.   Okay.  And when you forwarded this, what was the
17   purpose of forwarding to her?  Was it to get her
18   approval to pursue the search warrant?
19       A.   So when I forwarded -- typically, what we do is,
20   when we complete the affidavit, we forward them to the
21   ADAs, who then review them, maybe they have some
22   comments, maybe they want something added, such as,
23   "Hey, you need to either go get this evidence", or --
24   or maybe they don't necessarily agree with the wording
25   on something; just to kind of help with our affidavits
```

Travis James

1   and make sure that probable cause does exist.

2       Q.   You review it to make sure it's legally

3   sufficient.  They obviously don't want a defective

4   warrant to result in a search for evidence that they

5   then can't use; is that right?

6       A.   That's correct.

7       Q.   Do you have the discretion, as the investigating

8   detective, to conclude that no probable cause exists,

9   and just to kill the case, or how would it work if you

10  decided there wasn't probable cause, and did not -- and

11  did not recommend moving forward?

12      A.   So yes.  For instance, in this case, I believe

13  we took a cellphone as evidence.  I didn't believe

14  probable cause existed for the cellphone, so I decided

15  not to even include it in an affidavit or attempt to get

16  an affidavit, so, yes, we do have some discretion with

17  that.

18      Q.   And did you have to get somebody to sign off on

19  your conclusion that the phone didn't need to be

20  searched?

21      A.   No.

22      Q.   Okay.

23      A.   Do you have a problem if we pause for a second?

24  I need to use the restroom.

25              MR. ROWES:       No problem.  Why don't we

40

Travis James

```
1    take a ten-minute break, and we'll come back around 10

2    o'clock.

3              COURT REPORTER:  Off the record, 9:50.

4                   [Short recess was taken.]

5    BY MR. ROWES:

6       Q.   Detective James, in between when you made your

7    January 8th entry about finishing your initial

8    investigation and forwarding the affidavits to the ADA

9    and the presentation of the search warrant to the

10   judge, did you do any further investigation at that

11   point?

12      A.   No.

13      Q.   When you -- when you spoke to Sergeant Rollins,

14   what was his feeling -- did he convey to you that he

15   felt strongly that the investigation should go forward

16   against Justin Pulliam?

17      A.   I believe, to my recollection, he stated that,

18   you know, Mr. Pulliam did interfere with his duties.  It

19   distracted him from trying to set up the perimeter, but

20   as far as carrying the investigation forward, I don't

21   believe we talked about that.

22      Q.   So it was more like you just spoke about the

23   facts?  You didn't speak about whether, ultimately, a

24   prosecution was a good idea or a bad idea?

25      A.   Not to my recollection, no.
```

41

Travis James

```
1     Q.    When you forwarded the draft affidavits on

2   January 8, 2022 to the ADA, did you make any edits after

3   that in terms of what you presented on January 14th to

4   the judge?

5     A.    I believe ADA Ellisor did forward me some edits

6   she wanted me to complete.  I believe I did make those

7   edits.

8     Q.    And do you recall what the nature of those edits

9   were?

10    A.    I don't, sir.  I'm sorry.

11    Q.    That's okay.  And just based own your

12  recollection, were they sort of major edits, like:

13  Detective James, there's no probable cause here in your

14  first one; or was it more minor-type things to fix?

15    A.    Minor, like, typographical errors --

16    Q.    Okay, so you didn't have a big disagreement with

17  the ADA over the substance of your affidavit --

18    A.    No.

19    Q.    -- is that correct?

20    A.    No.

21    Q.    The one thing I wanted to ask you that I

22  realized during the break that I hadn't before, had you

23  ever investigated interference with public duties prior

24  to this one with Mr. Pulliam?

25    A.    With Mr. Pulliam, no.
```

42

Travis James

1    Q.   And, you know, prior to becoming a detective,

2  had you ever arrested anybody for interference with

3  public duties?

4    A.   I have to think about that one.

5    Q.   I'm sure you've had a lot of people in your

6  past, but just if you recall.

7    A.   I believe so, but I'm not a hundred percent on

8  it.

9    Q.   Is it common -- and we can -- just whatever that

10  means to you, but do people get arrested every day in

11  Fort Bend County for interference with public duties, or

12  is it a rarer charge?

13    A.   I'd say it's more on the rarer side.

14    Q.   Just to clarify, had you -- prior to your

15  investigation of Justin Pulliam for interference, had

16  you investigated anybody else for interference?  Not

17  just Mr. Pulliam.

18    A.   As far as like CID-wise?

19    Q.   Yes.

20    A.   No.

21    Q.   And did you review the statute in the Penal Code

22  for interference while you were preparing the affidavit?

23    A.   Yes.

24        MR. ROWES:      Molly, can we go, please,

25  to Exhibit No. 2, which is search 2022SW0184, and turn

43

Travis James

```
 1    to page 3?  Okay, just -- stop right there.  Molly, you
 2    can stop scrolling.
 3         Q.   Do you see in that second paragraph that begins
 4    "Affiant's belief", and then on line 3, it says you had
 5    conversations with Sergeant Hickey, Sergeant Rollins,
 6    and Deputy Rodriguez.  Can you tell me who Sergeant
 7    Hickey is?
 8         A.   Sergeant Hickey at the time was the sergeant in
 9    charge of the squad.
10         Q.   What was your conversation with him?
11         A.   Just apprising him of the case, letting him knew
12    that Lieutenant Heinemeyer had given it to me, and
13    keeping him abreast of the situation.
14         Q.   I see.  And why would Sergeant Hickey need to be
15    kept abreast of the situation?  Is he your supervisor?
16         A.   Yes, sir.
17         Q.   I see.
18         A.   He was my supervisor at the time.
19         Q.   Got it.  And so Sergeant Hickey -- you weren't
20    talking to Sergeant Hickey to obtain evidence about
21    your investigation?  You were just letting him know
22    that you were doing the investigation?
23         A.   Correct.
24         Q.   Got it.  Did you review -- in preparing your
25    search warrant affidavits, did you review the dash cams
```

Travis James

```
 1    of either Deputy Rodriguez or Deputy Lacy?

 2        A.    I believe I briefly reviewed Deputy Rodriguez's,

 3    but I really couldn't hear anything on it.  I felt like

 4    it had no bearing at the time.

 5        Q.    I listened to the whole thing, too, and you

 6    basically can only hear stuff off to the side.  It's

 7    mostly pointed at Deputy Rodriguez and kind of the house

 8    area.  What about Deputy Lacy?  Do you recall talking to

 9    him at all about the arrest?

10        A.    No, sir.

11        Q.    And did you make a decision not to talk to

12    Deputy Lacy, or did you just not know that he was

13    involved?

14        A.    I can't remember.

15        Q.    And after you prepared your -- your search

16    warrant affidavits, did you have somebody within the

17    sheriff's office review them prior to sending them to

18    the assistant district attorney for her review?

19        A.    No.

20        Q.    So there's -- there's not a lawyer within -- for

21    example, there's not a lawyer within the sheriff's

22    department that you would go to and say, "Is this

23    legally sufficient before I send it out to the ADA?"

24        A.    No.

25        Q.    And if this were -- if this were for a more
```

Travis James

```
 1   serious crime, like bank robbery or homicide, would a

 2   supervisor of yours have reviewed the affidavits for

 3   the search warrant, or is that just your discretion,

 4   you do it, and then work with the ADA?

 5       A.   Typically, what I do is, if I complete an

 6   affidavit, I will forward it to the ADA, and I will let

 7   my supervisor know, as well.

 8       Q.   You're just keeping your supervisor in the loop?

 9   You're not asking your supervisor to review and sign

10   off; is that correct?

11       A.   That is correct.

12       Q.   Do you recall whether you showed the affidavit

13   -- draft affidavit, before presenting it to the judge,

14   to Sergeant Rollins or Deputy Rodriguez?

15       A.   Showing it to them?  No.

16            MR. ROWES:       Can we take a look at page

17   4, Molly, of Exhibit No. 2; and right there at the top.

18       Q.   So do you see, Detective James, where it says

19   "Affiant then read Deputy Rodriguez's report."

20       A.   Uh-huh.

21       Q.   And by "Deputy Rodriguez's report", you're

22   referring to the offense report that we looked at

23   earlier that's Exhibit No. 4, correct?

24       A.   That is correct, yes, sir.

25       Q.   And you know from that report, obviously, that
```

Travis James

```
 1    Deputy Rodriguez was onsite?

 2       A.   Yes, sir.

 3       Q.   And if you look partway down of Exhibit No. 2,

 4    page 4, it says, "Affiant read that Deputy Rodriguez

 5    seized the handheld camera equipment, cellphone, and a

 6    body cam and memory cards."  Do you see that?

 7       A.   Yes, sir.

 8       Q.   Okay.  So, given that Deputy Rodriguez was

 9    personally involved, being physically present at the

10    Kraft Country Store, and that he personally seized

11    evidence that became the subject of the search warrant,

12    why didn't he write the search warrant affidavits?

13       A.   Typically, our patrol deputies don't write

14    search warrant affidavits, evidentiary search warrant

15    affidavits, unless they are doing, like, a DWI with a

16    blood draw search warrant.  Typically we -- as

17    investigators or detectives, that's something we would

18    follow up with to do those search warrant affidavits,

19    since we have more experience in writing these search

20    warrants.

21       Q.   I see.  And when you say that a patrol deputy

22    might do a search warrant for a blood draw, is that

23    because time is really of the essence in that

24    situation?

25       A.   Yes, sir.
```

47

Travis James

```
 1    Q.   But, in this case, you could sort of take a few
 2  weeks to do your investigation of Justin Pulliam,
 3  right?
 4    A.   That is correct.
 5    Q.   So there was nothing unusual about you as a
 6  detective being the one who does the search warrant
 7  affidavits, as opposed to the patrol deputy who was
 8  actually present and did the arrest or processed
 9  evidence, correct?
10    A.   Correct.
11    Q.   Is it normal for you, as a CID detective, to
12  prepare search warrant affidavits for cases that you
13  weren't directly involved in?
14    A.   When you say "not directly involved in" --
15    Q.   Yeah, that was confusing.  I'm sorry.  So is it
16  common for you as a CID detective to be preparing search
17  warrants for suspected criminal activity that you
18  weren't the arresting officer, or involved in the
19  initial encounter with the person who's the suspect?
20    A.   I would say it is common.
21    Q.   Okay.  Since you're -- maybe I should back up,
22  too, and just clarify something.  As a detective,
23  you're not out just kind of patrolling the streets
24  responding to calls that come in to 9-1-1, are you?
25    A.   No.
```

48

Travis James

```
 1      Q.    So if you're out in your car doing something,

 2   you're doing something for a specific investigation you

 3   already have on your plate; is that correct?

 4      A.    That is correct.

 5      Q.    So it wouldn't really make sense that you would

 6   ever be doing the search warrant affidavit -- well,

 7   actually, let me back up.  Sometimes -- would you get

 8   an investigation before the person has been arrested?

 9   Have you ever prepared warrants for the arrest of

10   someone for a crime?

11      A.    Like arrest warrants?

12      Q.    Yes.

13      A.    Yes, I have prepared those.

14      Q.    Okay.  So -- let's say a crime has been

15   committed, a bank has been robbed, but nobody knows who

16   robbed the bank, person gets away.  You conduct an

17   investigation, identify a suspect, and then based on

18   that, you might seek an arrest warrant in that case; is

19   that right?

20      A.    That is correct.

21      Q.    And so would you be -- if you obtained an arrest

22   warrant for someone, would you be the one who actually

23   goes out and arrests him, or would that be someone

24   else's responsibility?

25      A.    That would be someone else's responsibility.
```

Travis James

```
1     Q.    Okay.  And whose -- would that be a patrol

2  deputy who would go ahead and execute the search

3  warrant?

4     A.    The arrest warrant or search warrant?

5     Q.    Sorry, the arrest warrant.

6     A.    That would be our chief of the warrants

7  division.

8     Q.    I see.  Got it.  And based on your

9  understanding, would you say, other than the DWI blood

10  draw situation, it is the policy that patrol deputies do

11  not do search warrant affidavits?

12     A.    I wouldn't call it policy, necessarily.  It's

13  procedure, I would say.

14     Q.    Like a practice?  Like a common practice?

15     A.    Correct.

16     Q.    Let's turn to page 5 of Exhibit No. 2, please,

17  can you take a look at -- towards the bottom of the

18  page where the sentence begins, "Affiant knows that

19  Justin Pulliam"; it's kind of in the middle now.  Do you

20  see that?

21     A.    Yes, sir.

22     Q.    Can you just read that paragraph?  It talks

23  about "Affiant knows that Justin Pulliam, on many

24  occasions, has arrived at the scene"; can you just read

25  that and let me know when you've finished?
```

50

Travis James

```
 1      A.   Do you want me to read it out loud or --

 2      Q.   No.  You can just read it so you understand what

 3   you wrote, just to refresh your memory.

 4      A.   I'm done.

 5      Q.   How did you know that affiant, Justin Pulliam,

 6   has, on many occasions, arrived at the scenes of many

 7   investigations?

 8      A.   When I was on patrol, numerous times he's showed

 9   up to scenes and recorded.  I don't believe I was ever

10   there for one of those, but it was through

11   conversations with other deputies and stuff talking

12   about it.

13      Q.   So you don't recall Justin Pulliam being at any

14   scene you were on; is that correct?

15      A.   That is correct.

16      Q.   Okay.  But you had spoken to fellow officers

17   about Justin Pulliam's presence at investigations; is

18   that right?

19      A.   That's correct.

20      Q.   Had you ever interacted with Justin Pulliam

21   personally before you did the investigation into his

22   arrest in December 2021?

23      A.   I don't believe so, no, sir.

24      Q.   And why did you include in your affidavit that

25   Justin Pulliam is known to show up at police
```

51

Travis James

```
1    investigations and film them and post them to social
2    media?
3        A.   Just to kind of show that there would
4    potentially be evidence on those SD cards.
5        Q.   When you were a patrol deputy and had been
6    chatting with your colleagues about Justin Pulliam,
7    what was the general impression of him that you got
8    based on those conversations?
9        A.   That, you know, he's generally respectful --
10   because I work night shift.  I know that when we showed
11   up, we were respectful to him.  We just asked that he
12   kind of stay back out of the sight of the crime scene,
13   and he would comply.
14       Q.   Have you ever watched any of the videos that
15   Justin has posted to his social media channels, like
16   YouTube, about the Fort Bend County Sheriff's Office?
17       A.   No.
18       Q.   Are you aware that he has those channels?
19       A.   Yes.
20       Q.   Have you ever talked to anybody else in the
21   sheriff's office about those videos?
22       A.   Like, as far as what?
23       Q.   Kind of their content, like, "Oh, Justin posted
24   something the other day, and here's what I think about
25   it."
```

52

 1     A.    Potentially.  I can't recall a specific

 2   conversation, though.

 3     Q.    Thank you.  Molly, could you go back to page 2

 4   of Exhibit No. 2, please, and let's take a look at

 5   Section 3.  Do you see Section 3 on page 3 of Exhibit 2,

 6   there is a paragraph that says, "Affiant" -- meaning you

 7   -- "has reason to believe and does believe that Justin

 8   committed the offense of interference with public

 9   duties."  Do you see that?

10     A.    Yes, sir.

11     Q.    And this is the paragraph where you're stating

12   your professional conclusion that there's probable

13   cause to believe that Justin committed those -- that

14   crime, and, therefore, a search warrant is appropriate

15   because it will reveal evidence, potentially, of that;

16   is that correct?

17     A.    That's correct.

18     Q.    And do you stand by your conclusions today, or

19   do you have reason to believe that you might have made a

20   mistake?

21     A.    I stand by them.

22           MR. ROWES:      Can we just take a quick

23   look at page 3 of Exhibit No. 2, Molly?  I'll tell you

24   where, too.

25     Q.    Can you just take a look at the second-to-last

Travis James

```
 1   paragraph?  And it's actually right at the bottom, the

 2   second-to-last line, which says, "Affiant read that

 3   Sergeant Rollins told Justin Pulliam it was for his,

 4   "Pulliam's) safety."  Do you see that?

 5     A.   Yes.

 6     Q.   And so your understanding was that when Sergeant

 7   Rollins was talking to Justin about safety, Sergeant

 8   Rollins was concerned for Justin's own safety, rather

 9   than Justin wasn't posing a threat to other people; is

10   that right?

11     A.   Yes.

12          MR. ROWES:       And so let's shift gears a

13   little bit to phase 2.  Molly, can you go to page 20 of

14   Exhibit No. 4, please?

15     Q.   And Exhibit No. 4, if you remember, Detective

16   James, was the offense report.

17          MS. HANIS:       What page did you want,

18   Jeff?

19          MR. ROWES:       Page number 20, please.

20   Let's just scroll down a little bit, and I'll tell you

21   -- go ahead and stop right there.

22   BY MR. ROWES:

23     Q.   This is a supplement that you prepared; is that

24   correct, on April 13th?

25     A.   Yes, sir.
```

54

Travis James

```
 1      Q.   And if you take a look at the -- at the
 2   narrative, it says, "On this date, I, Detective Travis
 3   James, presented this case to the Fort Bend County
 4   district attorney's office."  What does it mean that
 5   you "presented" it to the district attorney's office?
 6      A.   So "presented", basically what that means is
 7   I've taken all available evidence that I have known to
 8   me at the time, assembled it into what we call a case
 9   packet, and taken it over to the district attorney's to
10   their intake, and given it to them so that they may
11   begin their work on it.
12      Q.   And when you present it, is your investigation
13   over at this point?
14      A.   Considering I'm in CID, not necessarily.
15      Q.   Okay.  And what does the fact that you're in CID
16   have to do with whether the investigation is over once
17   you present the evidence?
18      A.   So sometimes evidence will come back -- such as
19   DNA evidence, crime scene evidence, that would come
20   back after the case has been presented, potentially, so
21   then you would supplement the case, present that
22   supplement to the district attorney's office as a
23   follow-up.
24      Q.   And so -- but your pre -- when you presented the
25   case to the district attorney on April 13th, you had
```

55

Travis James

1    concluded, based on your investigation, that probable

2    cause existed that a crime had been committed, so

3    you're recommending to the D.A. to move forward; is that

4    correct?

5        A.   I'm not recommending that the D.A. move forward.

6    I'm just presenting the case as it is at that moment.

7        Q.   I see.  And it's the D.A.'s independent judgment

8    about whether to move forward that decides whether the

9    case gets prosecuted; is that right?

10       A.   Correct.

11       Q.   But setting aside the recommendation, when you

12   presented the case on Wednesday, April 13th, you had

13   concluded that probable cause existed that Justin had

14   committed crime, after reviewing all of the evidence,

15   clueing the evidence from his cameras; is that correct?

16       A.   Are you asking my personal beliefs, or --

17       Q.   Yeah.

18       A.   Yes.

19       Q.   Okay.  If you -- if you did an investigation and

20   you believed that probable cause didn't exist, would you

21   say so in your presentation to the D.A.?

22       A.   Yeah.  Yes, sir.

23       Q.   So -- it seems obvious.  Like, if you don't

24   think a crime's been committed, you don't recommend that

25   -- you don't give it to the D.A. and say, "Here's the

56

Travis James

```
 1   evidence"; you would tell them, "I don't think a crime
 2   was committed."
 3       A.   Correct.
 4       Q.   And, obviously, you didn't have just tin's
 5   videos when you did your original search warrant
 6   affidavit because that was the point, but I think we've
 7   established that once you got those, you reviewed those
 8   before you presented the case to the district attorney;
 9   that's correct, right?
10       A.   Correct.
11       Q.   Okay.
12            MR. ROWES:      And actually, Molly, can
13   you just go to page 17 of Exhibit No. 4, please?  You
14   can go ahead and stop there, actually.
15   BY MR. ROWES:
16       Q.   Do you see that you sort of have a time-stamped
17   narrative of the SD card video; do you see that in the
18   middle of the page?
19       A.   Yes, sir.
20       Q.   And is this the narrative that you made based on
21   watching the video from Justin's camera, of the arrest
22   that Sergeant Rollins made?
23       A.   Yes.
24            MR. ROWES:      Molly, can you scroll
25   down to the bottom of this time-stamped narrative of
```

57

Travis James

```
 1   the video?

 2   BY MR. ROWES:

 3       Q.   Just thinking back -- and you can refresh your

 4   memory, if you want, by looking at the -- at the

 5   narrative you created with the timestamps.  Was there a

 6   particular moment in the video where you said:  Okay,

 7   this is where interference occurs?  Did you come to a

 8   specific conclusion about a moment in the video?

 9       A.   For me, in my opinion, in the video, you can see

10   that Sergeant Rollins is talking with the TXANA

11   screeners, and he's having to divert his attention away

12   from talking to them to get kind of a rundown of why

13   they're out there as TXANA screeners, to ask Justin

14   Pulliam to go across the street again.  That's kind of

15   when we -- in my opinion, when it begins to become

16   interference.

17       Q.   Okay.  Well, maybe we'll just take a look at the

18   video, actually, because it's not very long, and you're

19   correct that, like, three-quarters of the video,

20   nothing's happening.  I think you note in your

21   narrative, there's sort of a little bit of conversation

22   at the beginning, then there's a four-minute gap, and

23   then the interaction between Sergeant Rollins and just

24   tin is probably about a minute long, and so maybe we

25   can just look at that, and I'll just kind of get your
```

58

Travis James

```
1    view, because one of the things I'm trying to figure

2    out in the case is pinning down when lawful behavior

3    ends and interference begins.

4              MR. ROWES:      Can you go to -- can you

5    just go ahead and go to 4:18 on the video?  Kevin's seen

6    this video a million times, but you're welcome -- if

7    you'd like me to play it or you want to take a break to

8    watch the whole thing, that's fine.  I'm just going to

9    start the video where Sergeant Rollins comes in.  Is

10   that okay, or do you want me to watch the whole thing?

11      A.   No, I'm fine.

12             MR. ROWES:      Okay, so can you play

13   from about where you are, Molly, to timestamp 4:30?

14   Actually, go back to about 4:15 and then play to 4:30.

15             THE WITNESS:     Is there audio for y'all?

16             MR. ROWES:      Yeah, I can't hear it.

17   Can you hear it, Molly?

18             MS. HEBERT:      This is Christie, and I

19   can't hear it.  My guess is the Internet lag is the

20   issue.  We might have to individually watch it on our

21   computers.

22             MS. HANIS:      I figured it out.  Hold

23   on.  Let me see if this works.

24             MR. ROWES:      Okay, I can hear it now.

25   So let's go back, Molly, to around 4:15, please, and
```

59

1    then just play to 4:30.

2                    [Video was played.]

3    BY MR. ROWES:

4        Q.   So could you hear that video okay --

5        A.   Yes.

6        Q.   -- Detective James -- okay, so we just saw

7    Sergeant Rollins roll up and, as you noted in your

8    narrative, it's actually hard to see in the video, but

9    he says, "You guys go across the street."  He's talking

10   to everybody who's on the scene, correct?

11       A.   Correct.

12       Q.   And when I say "everybody who's on the scene",

13   I'm talking about the two TXANA employees, who we can

14   identify in a moment, but I'm sure you remember there

15   were two TXANA employees there in addition to Justin,

16   right?

17       A.   Correct.

18       Q.   And then Justin says, you know, Sergeant Rollins

19   asks him to go across the street, Justin says, "Why?  So

20   you can shoot 'em?"  Sergeant Rollins says, "What's

21   wrong with you man?"  Sergeant Rollins asks him to go

22   across the street, and Justin says, "What's wrong with

23   you?"  Do you believe interference with public duties

24   had occurred in this initial interaction?

25       A.   No.

Travis James

```
 1     Q.   Okay.  So just -- I don't personally want to say
 2  that my client's behavior was a little insulting or
 3  disparaging towards Sergeant Rollins, but I could
 4  understand that if someone else thought that.  Is it,
 5  based on your understanding of the interference statute,
 6  is being insulting towards the police interference with
 7  their duties?
 8     A.   Speech is not an interference.
 9     Q.   Okay.  And the police officers are expected,
10  based on their professionalism, not to respond to
11  insulting provocations; is that right?
12     A.   When you say "respond", are you --
13     Q.   I guess I meant they're not supposed to just act
14  out of anger?  They're supposed to maintain their
15  professional calm, even in a volatile situation; is that
16  right?
17     A.   That's correct.
18     Q.   Okay.
19          MR. ROWES:   Can we -- can you just back up
20  to about 4:20, Molly, and then -- let's just -- the
21  thing I want to watch is after Sergeant Rollins says to
22  Justin, "Please go across the street", Justin turns
23  around and starts to walk there, so can you play up
24  again till about, like, 4:35, Molly?
25                    [Video was played.]
```

61

Travis James

```
 1   BY MR. ROWES:

 2      Q.   We can stop there.  So you saw, Detective James,

 3   that after Sergeant Rollins has this initial

 4   interaction, he says, "Go across the street", Justin

 5   turns around and starts walking towards the street.  Did

 6   you see that?

 7      A.   Yes, sir.

 8      Q.   And so would you agree that at that point, he's

 9   in compliance -- in that particular moment, he's turned

10   around and walking towards the street?

11      A.   Correct.

12      Q.   Okay.  And then the -- civilian female says,

13   "Sir, we're with TXANA."  Did you hear that?

14      A.   Yes, sir.

15      Q.   And can you tell me who TXANA is, just so we

16   have it on the record?

17      A.   TXANA is a mental health, I guess, institution,

18   that the county uses to assist with our -- I guess our

19   individuals that we may run across in our duties who

20   have mental health issues, may be going through a

21   mental health professional crisis that need help, that

22   law enforcement may not have the tools or the ability to

23   help.

24      Q.   Right, and it might be, in some cases, just

25   having a law enforcement is kind of inherently
```

62

Travis James

```
1    escalates the situation, maybe, if you have a civilian
2    mental health worker, that sort of helps diffuse it; is
3    that right?
4        A.   Potentially, yes.
5        Q.   Potentially?  Yeah.  Okay, and so when Justin
6    turns around and starts walking away, at that point,
7    Sergeant Rollins has still ordered all three people
8    across the street, right?
9        A.   Correct.
10       Q.   And then the TXANA person -- actually, Molly,
11   why don't we play from about 4:25 to 4:40, and we can
12   see the TXANA employees start talking to Sergeant
13   Rollins, and then Justin starts to turn around with his
14   camera.
15                   [Video was played.]
16       Q.   Okay, so, at this point in the video, Justin is
17   walking backwards now, because he wants to document the
18   conversation with TXANA, apparently, and you saw that
19   the TXANA civilians were talking to Sergeant Rollins,
20   correct?
21       A.   Yes.
22       Q.   And did you -- did you hear -- so they announce
23   that they're from TXANA and was the purpose of that,
24   based on your personal judgment, that they were trying
25   to explain to Sergeant Rollins why their presence might
```

63

Travis James

```
 1   be permissible, and they shouldn't go across the

 2   street?

 3       A.   Yes.

 4       Q.   Did the TXANA employees commit interference when

 5   they explained to Sergeant Rollins why they didn't

 6   think that they should have to go across the street?

 7       A.   No.

 8       Q.   And then Sergeant Rollins, in fact, rescinded

 9   his order to go across the street with respect to them,

10   right?  They were allowed to stay?

11       A.   Correct.

12       Q.   And we discussed earlier, but we didn't get into

13   it.  You mentioned that, at some point in your

14   investigation between January 14th when the search

15   warrants went in, and April 13th when you presented the

16   case to the ADA, you spoke to the TXANA employees; is

17   that right?

18       A.   Yes, sir.

19       Q.   Did you speak to both of them, or just one?

20       A.   Both of them.

21       Q.   Okay.  And you know, just kind of in broad brush

22   strokes, kind of what was the gist of what they told

23   you?

24       A.   So, from my understanding, they were called to

25   the residence of Edwin Kraft, who was experiencing
```

64

Travis James

```
 1   homicidal, suicidal ideations, and they had been called

 2   out and they had contacted us to assist.

 3       Q.   And so after you spoke to them, you didn't think

 4   that it was unjustified for Sergeant Rollins to let

 5   them stay, right?  That seemed like a good decision?

 6       A.   Correct.

 7       Q.   Yeah.  And we can watch the video again, if you

 8   need to clarify, but at the point in which the TXANA

 9   employees start talking to Sergeant Rollins, Sergeant

10   Rollins hasn't told anybody the reason why they have to

11   go across the street, correct?

12       A.   No.

13       Q.   He's just said "go across the street."  He

14   hasn't said, "Go across the street because", right?

15       A.   Correct.

16            MR. ROWES:       Let's watch from 4:35 to

17   4:42, please, Molly.

18                    [Video was played.]

19       Q.   And this is the point where Sergeant Rollins

20   notices that Justin hasn't really started going to

21   across the street anymore and has kind of stopped,

22   right?

23       A.   Correct.

24            MR. ROWES:       And can you play it all

25   the way to the five-minute mark, Molly?
```

65

Travis James

```
 1    Q.   You can stop it, Molly.  So after -- so after

 2   Sergeant Rollins orders Justin to go across the street,

 3   he says, "Well, hold on.  If it's not for safety", and

 4   so Justin is the first person who brings up safety in

 5   this discussion, correct?

 6    A.   Correct.

 7    Q.   And after Sergeant Rollins says "across the

 8   street", Justin asks, "everyone, or just me", correct?

 9    A.   Correct.

10    Q.   Do you think that, at this point, is Justin

11   committing the crime of interference with public

12   duties?

13    A.   Yes.

14    Q.   And why is it that he's going so now?

15    A.   So, as Sergeant Rollins is kind of getting the

16   rundown -- I call it the rundown -- the update about

17   what is going on with TXANA, he's having to divert his

18   attention to Mr. Pulliam to tell him, hey, continue

19   across the street, and then some back-and-forth

20   happens, which is delaying and interfering with

21   Sergeant Rollins getting that update, maybe moving the

22   TXANA individuals out of where they are so that he can

23   speak with them on-scene, so that he can start getting

24   that situation under control.  He's having to divert

25   his attention from that to Mr. Pulliam.
```

66

Travis James

```
1    Q.   So I -- I kind of get that.  The one -- the one

2    follow-up I kind of want to ask is, maybe, if Sergeant

3    Rollins didn't pull the trigger a little bit too early

4    in arresting him, because, from Justin's point of view,

5    the TXANA employees had made an appeal to Sergeant

6    Rollins, Sergeant Rollins just changed his mind about

7    them, and then Justin is asking, well, does everyone

8    have to go across the street for safety?  I mean, why

9    isn't, at this point, Justin is just trying to clarify

10   and kind of plead his case to see if he can stay, too?

11   In other words, why didn't it become interference then,

12   and not just Justin is asking Sergeant Rollins of

13   Sergeant Rollins is willing to change his mind?

14   A.   So you're asking why does it become interference

15   then?

16   Q.   Yeah, I mean, looking at it -- let's say we look

17   at it from Justin's perspective, and he sees the TXANA

18   people have been ordered to go across the street, then

19   they talk to Sergeant Rollins, and he changes his mind,

20   and so then Justin asks Sergeant Rollins, wait a

21   minute, do I have to go?  Is it everybody, or is it

22   just me?  Looking at it from Justin's perspective, why

23   isn't this just him trying to clarify the situation the

24   same way the TXANA people clarified the situation, and,

25   since Sergeant Rollins just changed his mind, maybe
```

67

Travis James

```
 1   Justin thinks Sergeant Rollins will change his mind
 2   again with respect to him, Justin.
 3       A.   Okay.  So your question is -- I'm just trying to
 4   understand --
 5       Q.   Yeah, I guess what I mean to say is that, like,
 6   the TXANA women talked to Sergeant Rollins, Sergeant
 7   Rollins changed his mind, and so Justin sees that, and
 8   he thinks well, I want to talk to Sergeant Rollins a
 9   little bit more to see if he'll change his mind about
10   me, so I'm trying to figure out, if it wasn't
11   interference for the TXANA personnel to get Sergeant
12   Rollins to change his mind, why did it become
13   interference for Justin to talk to Sergeant Rollins to
14   see if he'd change his mind?
15       A.   Based off of my experience, I believe it became
16   interference with Justin due to the fact that Justin
17   was not directly involved in the case, meaning he
18   wasn't the reportee like the TXANA workers were, or he
19   wasn't Mr. Kraft's mother, Frances, who has direct
20   knowledge of Mr. Kraft.  The TXANA workers have direct
21   knowledge of Mr. Kraft, and they are the reportees.
22   They're the ones calling us out there.  That's my
23   understanding.
24       Q.   But do you think that -- so I think that's
25   arguable and could be justifiable.  I guess what I'm
```

68

Travis James

```
 1   thinking is, since Justin may not have understood or
 2   known that, why couldn't Sergeant Rollins have just
 3   explained, "Well, there's a reason they get to stay.
 4   They're involved, here, but you're just documenting it,
 5   so you need to go across the street and we're going to
 6   take steps ensure the safety of the TXANA people",
 7   something like that?
 8       A.   In laymen's terms, when you have a subject who's
 9   barricaded in a residence, who is going through
10   homicidal, suicidal ideations, those are very dangerous
11   situations, and the more time you spend out in the
12   open, the more time you're at risk.  Does that make
13   sense?
14       Q.   It does.  I understand what you mean.  Did the
15   TXANA employees, when you spoke to them, talk about
16   where Sergeant Rollins relocated them, or when they got
17   relocated to a safe area?
18       A.   I believe they were relocated shortly after
19   Mr. Pulliam was arrested, and they were relocated
20   behind a Tahoe that was out of view of the residence of
21   Mr. Kraft.
22       Q.   So since the search warrant affidavits don't
23   mention the TXANA employees, is that because you just
24   hadn't spoken to them yet, or is there a reason why
25   they weren't included in the search warrant affidavits?
```

69

Travis James

```
 1      A.   So when I reviewed the video, I saw that they
 2  were directly involved, and one of them said, "Hey, you
 3  can't film my client."  It's a public place, but
 4  whatever, so, at that point, my opinion was they needed
 5  to be interviewed for potential exculpatory evidence,
 6  along those lines.
 7      Q.   Right.  So I -- I asked a -- you answered the
 8  question I asked, but I didn't ask the question I meant
 9  to ask.  So my question is:  When you did the search
10  warrant affidavits for Judge Becerra on January 14th,
11  the TXANA screeners -- you hadn't seen the video yet,
12  and the TXANA screeners were not included in your -- in
13  your discussion of the facts for the search warrants in
14  January.  Did you know the TXANA people were involved
15  at that point, and you just chose not to include them,
16  or kind of -- when did you figure out the TXANA people
17  were actually involved?
18      A.   I knew they were on-scene.  I didn't realize
19  their level of involvement until the video.
20      Q.   I see.  And so you didn't feel like it was
21  necessary, leading up to the January 14th search warrant
22  affidavits, to talk to them first --
23      A.   Correct.
24      Q.   -- before doing the search warrants -- okay.
25  One thing -- I'm curious whether you've heard about it,
```

Travis James

```
1    actually, and we didn't ask the other officers about

2    this, but it occurs to me, I've heard of -- a criminal

3    defense attorney told me that interference with public

4    duties is also known among criminal defense lawyers,

5    and maybe among the police, as "contempt of cop."  Have

6    you ever heard that expression, "contempt of cop"

7    before?

8        A.   Yes.

9        Q.   And what does that mean to you, or, like, when

10   you hear "contempt of cop", what do you think that that

11   means?

12       A.   It means that -- to me, that law enforcement has

13   become upset at somebody who maybe is doing something

14   or saying something to law enforcement that is upsetting

15   to them, and they will take them to jail.

16       Q.   I see.  And did you consider the possibility

17   that there was the kind of contempt of cop dynamic

18   going on, because Justin had said that insulting

19   phrase, "So you can shoot him", that kind of thing?

20   Had you considered that possibility in investigating

21   this?

22       A.   Yes.

23       Q.   And how -- so, obviously, you moved ahead and

24   made the presentation that you did to the ADA.  How did

25   you conclude that this was not maybe a contempt of cop
```

Travis James

```
 1   situation, but was, in fact, a legitimate arrest for

 2   interference?

 3        A.   Just based off my -- I've known Sergeant Rollins

 4   for years.  I also know that his interaction with

 5   individuals is usually very calm and professional, just

 6   like I am.

 7        Q.   And, for the record, I know he's Lieutenant

 8   Rollins now.  I'm just using "Sergeant Rollins" because

 9   it seems easiest because that's what it says in all the

10   documents about the case.

11        A.   Correct.

12             MR. ROWES:   Can we go, Molly, please, to

13   Exhibit No. 4, and that's the offense report, on page

14   10.

15        Q.   We're almost finished, by the way.  You can take

16   a break at any time you want, but we're almost finished

17   so maybe we can just, like, push through.  I'll take a

18   break in a few minutes when I'm finished talking about

19   this, and decide if I'm actually finished.

20             MR. ROWES:        Can you just move it up a

21   little bit, Molly?  I'm sorry, the -- move it -- so not

22   the Fort Bend County -- get rid of the Fort Bend County

23   Sheriff stuff so we can see more of the -- there we go.

24        Q.   I was just hoping you could walk through some

25   things, here, that I don't completely understand, since
```

Travis James

```
 1   it's kind of unfamiliar.

 2       A.   Sure.

 3       Q.   What is this page, page 10 of Exhibit No. 4,

 4   documenting?

 5       A.   Looks like it's documenting that our records, a

 6   clerk attached the case presentation slip.

 7       Q.   Got it.  Is that who Lynda Lynette Flory is, the

 8   records keeper?

 9       A.   Yes, one of them.

10       Q.   One of them, okay.  And what is the next line

11   down where it says, "Assignment", and it says

12   "IAD/RECORDS/ALARMDETAIL", etcetera.  Can you tell me

13   what that means?

14       A.   That would be just their -- to my understanding,

15   that would just be, like, their general overall

16   assignment in the sheriff's office.

17       Q.   And if you look at the bottom, it says,

18   "Approving officer", and then it has the ID of the

19   officer, I presume DXE004 is someone -- and is this

20   someone who would have reviewed this entry before it was

21   actually posted to the offense report?

22       A.   Yes.

23       Q.   And down towards the bottom, it says, "LNordt."

24   Is that a person?

25       A.   I believe so, yes.
```

73

Travis James

```
 1      Q.    Okay.  It's someone in the records department?

 2      A.    Possibly.  I don't know.

 3      Q.    Speaking in terms of your various additions to

 4   the offense reports, were each of those reviewed by your

 5   supervisor before they were posted?

 6      A.    My various supplements?

 7      Q.    Yes.  Your personal ones.

 8      A.    Yes.

 9      Q.    And did you get any feedback to change things,

10   beyond just sort of typos and a little bit --

11      A.    No.

12      Q.    Okay.  So, basically, when you did your offense

13   reports, they were signed off on as written?

14      A.    Correct.

15            MR. ROWES:   Could you just go to page 11,

16   Molly?

17      Q.    If you could look at page 11 in the "Narrative"

18   section, it looks like you had a conversation with

19   Deputy Guajardo, G-U-A-J-A-R-D-O; is that correct?

20      A.    Correct.

21      Q.    How did you contact Deputy Guajardo?

22      A.    By phone.

23      Q.    Why did you contact Deputy Guajardo?

24      A.    Because I saw that she was on the call slip, and

25   there was no supplement report generated by her.
```

74

Travis James

1    Q.    And what did she tell you, generally?

2    A.    That she had just been dispatched out there to

3    assist TXANA as a crisis intervention officer.

4    Q.    And so she had special training and skills for

5    dealing with people who might be in a mental health

6    crisis; is that right?

7    A.    Correct.

8    Q.    And did you learn anything new about the arrest

9    of Justin Pulliam that day that you didn't already know

10   based on your conversations with Deputy Guajardo?

11   A.    No.

12   Q.    In the process of doing your investigation into

13   the interference charge, did you talk to anybody else

14   within the sheriff's office to try to understand the

15   crime of interference better?

16   A.    No.

17   Q.    Did you talk to anybody who had previously

18   arrested someone for interference, to get their take?

19   A.    No.

20   Q.    Did you discuss this case at all with the

21   sheriff?

22   A.    With the sheriff?  No.

23   Q.    Did you discuss it with anyone higher up the

24   chain of command besides your immediate supervisor?

25   A.    No.

Travis James

```
 1      Q.    When you presented the case to the ADA, did the
 2   ADA contact you again and ask you to engage in some
 3   follow-up investigation?
 4      A.    Not that I recall.
 5      Q.    Well, other than -- because I think once I
 6   presented it, we were still waiting on the body camera
 7   video.
 8      Q.    Okay.  Do you present all of the cases you
 9   investigate to the ADA, or are there some cases where
10   you don't present anything to the ADA?
11      A.    There are some cases I don't present.
12      Q.    So if it's just -- you might investigate
13   something, you conclude that, clearly, no crime has been
14   committed by the -- there might have been a crime
15   committed, but it's not a crime committed by this
16   particular suspect, and then you just won't even
17   proceed to the steps of notifying the ADA; is that
18   right?
19      A.    Correct.
20      Q.    Do you have to get sign-off from anybody above
21   you if you decide not to present an investigation to
22   the ADA because you think that there isn't enough
23   evidence?
24      A.    No.
25      Q.    And do you just make your decision based about
```

76

 1   whether to present or not, I guess, just based on

 2   whether your investigation determines whether there's

 3   evidence to show that a crime was committed?

 4      A.   Are you referring to, like, probable cause --

 5      Q.   Yeah, just in general, yeah.  Like if you're

 6   going to -- so like if you're willing to take the step

 7   to presenting it to the ADA, that's based on your

 8   assessment of the evidence that a crime has at least

 9   probably been committed; is that right?

10      A.   Correct.

11           MR. ROWES:      I don't think I have

12   anymore questions.  I'd like to ask to take a break for

13   about ten minutes.  Could we come back at 11:05, and I

14   can just consult with my colleagues, and then we'll see

15   if Kevin has anymore questions and we might be done.

16           MR. HEDGES:     Very good.

17           COURT REPORTER:  Off the record, 10:54.

18           MR. ROWES:      Detective James, I don't

19   have any further questions for you.  I'd like to thank

20   for coming out today and for answering my questions with

21   candor and respect.  I really appreciate that.  I'll

22   pass the witness to you, Kevin, if you have any

23   questions.

24           MR. HEDGES:     We don't have any

25   questions at this time.  I think we're done.

Travis James

```
 1                MR. ROWES:      And you'll read and sign,

 2   I presume?

 3                MR. HEDGES:     Yes, and we do want a

 4   copy.

 5                MR. ROWES:      All right, thank you,

 6   everybody, appreciate it.

 7                [Deposition was concluded 11:00 a.m.]

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

78

Travis James

```
 1                    REPORTER CERTIFICATION

 2          ORAL DEPOSITION of TRAVIS JAMES, taken on August

 3   30, 2023.

 4     I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify

 5   to the following:

 6     That the witness, TRAVIS JAMES, was duly sworn by me,

 7   and that the transcript of the deposition is a true

 8   record of the testimony given by the witness;

 9     That examination and signature of the witness to the

10   deposition transcript was reserved by the witness at the

11   time of the deposition;

12     I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties in the

14   action in which this proceeding was taken, and, further,

15   that I am not financially or otherwise interested in the

16   outcome of this action.

17     Certified by me on this 19th day of September, 2023.

18

19   _____

20          Sarah B. Townsley CRR CCR CSR RPR

21          Certified Realtime Reporter

22          TX CSR #5746; LA CCR #92016; RPR 814558

23

24

25
```

79

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT C

# FORT BEND COUNTY SHERIFF

**21-50633**

Reported Date
**12/21/2021**
Rpt/Incident Typ
**INTDUTIES**
Member#
**RODRIGUEZ,RICKY M**

Supplement No
**ORIG**

1410 WILLIAMS WAY BLVD

Phone
**281-342-6116**
Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No | |
|---|---|---|---|---|---|---|---|
| FORT BEND COUNTY SHERIFF | | 21-50633 | ORIG | 12/21/2021 | 09:28 | 213550380 | |

| Status | Rpt/Incident Typ |
|---|---|
| Arrest | Interfer with Duties of Peace Officer |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| 22134 FM 762 | | | | | | | | DAMON |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| 77430 | 723R | 9 | 9 | 12/21/2021 | 09:24 | 12/21/2021 | 11:39 | 22P14 |

| Member# | | Assignment | | Entered By |
|---|---|---|---|---|
| RMR002/RODRIGUEZ,RICKY M | | PATROL DEPUTY DAY SHIFT | | RMR002 |

| Assignment | RMS Transfer | Prop Trans Stat | Property? | Approving Officer |
|---|---|---|---|---|
| PATROL DEPUTY DAY SHIFT | Successful | Successful | Property | SXG004 |

| Approval Date | Approval Time |
|---|---|
| 12/27/2021 | 09:27:22 |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | INTDUTIES | INTERFER WITH DUTIES | |

| NIBRS | | | | | Seq # | IBRS |
|---|---|---|---|---|---|---|
| 1 90ZCN | 88 | | 07 | | 1 | 90Z |

| Attempted/Completed | Used | Bias | Location Type | # Premises | Method of Entry | Criminal Activity | Weapon/Force |
|---|---|---|---|---|---|---|---|
| C | N | 88 | 07 | | | | |

| Cargo Theft? |
|---|
| |

## Person Summary

| Invl | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| ARR | 1 | I | PULLIAM,JUSTIN | 1614093 |

| Race | Sex | DOB |
|---|---|---|
| W | M | 11/21/1989 |

## Property Summary

| Involvement | Description |
|---|---|
| EVD | Article: CAMERA EQUIPMENT/PHOTOS CAMERA PANASO S1 PANASONIC S1 |
| Serial No | Value |

| Involvement | Description |
|---|---|
| EVD | Article: CAMERA EQUIPMENT/PHOTOS PARTS    LENS/FILTER |
| Serial No | Value |

| Involvement | Description |
|---|---|
| EVD | Article: CAMERA EQUIPMENT/PHOTOS PARTS CAMPRO   CAMPRO BAODY CAM |
| Serial No | Value |

| Involvement | Description |
|---|---|
| EVD | Article: CAMERA EQUIPMENT/PHOTOS PARTS WISE    WISE XD MEMORY CARD |
| Serial No | Value |

| Involvement | Description |
|---|---|
| EVD | Article: CAMERA EQUIPMENT/PHOTOS PARTS LEXAR   LEXAR SD MEMORY CARD |
| Serial No | Value |

| Report Officer | | Printed At |
|---|---|---|
| RMR002/RODRIGUEZ,RICKY M | **EXHIBIT** | 06/08/2023 12:00 |
| Page 1 of 6 | 4 | |

FBC001336

# FORT BEND COUNTY SHERIFF

## Property Summary

| Involvement | Description |
|---|---|
| EVD | Article: CAMERA EQUIPMENT/PHOTOS PARTS RHODE   RHODE MICROPHONE |
| Serial No | Value |

| Involvement | Description |
|---|---|
| EVD | Article: CAMERA EQUIPMENT/PHOTOS PARTS   CAMERA BATTERY |
| Serial No | Value |

| Involvement | Description |
|---|---|
| EVD | Article: CAMERA EQUIPMENT/PHOTOS PARTS   PHONE HOLDER/ADAPTER |
| Serial No | Value |

| Involvement | Description |
|---|---|
| EVD | Article: OFFICE EQUIPMENT CELLPH APPLE   APPLE IPHONE |
| Serial No | Value |

## Summary Narrative

During a investigation, Justin Pulliam was found interfering with public duties and arrested.

| Report Officer | Printed At |
|---|---|
| RMR002/RODRIGUEZ,RICKY M | 06/08/2023 12:00 |
| Page 2 of 6 | |

FBC001337

# FORT BEND COUNTY SHERIFF

## Arrested person 1: PULLIAM, JUSTIN

| Involvement | Invl No | Type |
|---|---|---|
| Arrested person | 1 | Individual |

| Name | | | MNI | Race | Sex |
|---|---|---|---|---|---|
| PULLIAM, JUSTIN | | | 1614093 | White | Male |

| DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|
| | 32 | Not of Hispanic origin | No | 5'08" | 230# | Red or Auburn | Blue |

| OFN_INVL | PRN | NIBRS | | |
|---|---|---|---|---|
| 1 | 1105672 | 32 R | N | |

| Vic/Ofnd Age | Residence | Sexual Assault? |
|---|---|---|
| 32 | Resident | No |

| Type | Address |
|---|---|
| Home | 8919 JAPONICA DR |

| City | State | ZIP Code | Date |
|---|---|---|---|
| ROSENBERG | TEXAS | 77469 | 12/21/2021 |

| Type | ID No | OLS |
|---|---|---|
| OPERATOR LICENSE | 23240591 | TEXAS |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (979)246-4545 | 12/21/2021 |

| Type | Email |
|---|---|
| Home | |

| Involvement | Arrest Type | Arrest Date | Arrest Time | Booking No | Book Date | Book Time |
|---|---|---|---|---|---|---|
| Arrested | Arrested | 12/21/2021 | 11:09:00 | 21-10328 | 12/21/2021 | 11:39:00 |

| Status | Dispo |
|---|---|
| NORMAL BOOKING | MISDEMEANOR-17 YOA and older |

| Arrest Location | City |
|---|---|
| 22134 FM 762 | DAMON |

| Rep Dist | Beat | Physical Condition |
|---|---|---|
| 723R | 9 | NORMAL AND HEALTHY |

| NIBRS |
|---|
| N01 |

| Multi-Arrests | Armed With |
|---|---|
| Not applicable | Unarmed |

| Charge | Level | Charge Literal |
|---|---|---|
| 73991084 | MB | INTERFER W/PUBLIC DU |

## Property

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 1 | Evidence | 12/21/2021 | Yes | No | 210004180 | 1 | 1 |

| Description | Typ |
|---|---|
| PANASONIC S1 | Article |

| Cat | Article | Brand | Model |
|---|---|---|---|
| CAMERA EQUIPMENT/PHOTOS | Camera | PANASO | S1 |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Photographic, Optical equipment | A Room | 12/21/2021 | 17:00 |

| RMS Transfer | Control |
|---|---|
| Successful | RMR002 1221211825 |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM, JUSTIN | W | M |

| DOB |
|---|
| |

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 2 | Evidence | 12/21/2021 | Yes | No | 210004180 | 2 | 1 |

| Description | Typ |
|---|---|
| LENS/FILTER | Article |

| Cat | Article |
|---|---|
| CAMERA EQUIPMENT/PHOTOS | Camera Parts and accessories |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Photographic, Optical equipment | A Room | 12/21/2021 | 17:01 |

| RMS Transfer | Control |
|---|---|
| Successful | RMR002 1221211825 |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM, JUSTIN | W | M |

| DOB |
|---|
| |

| Report Officer | Printed At |
|---|---|
| RMR002/RODRIGUEZ, RICKY M | 06/08/2023 12:00 |

Page 3 of 6

FBC001338

# FORT BEND COUNTY SHERIFF

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 3 | Evidence | 12/21/2021 | Yes | No | 210004180 | 3 | 1 |

| Description | | | | Typ | |
|---|---|---|---|---|---|
| CAMPRO BAODY CAM | | | | Article | |

| Cat | Article | Brand |
|---|---|---|
| CAMERA EQUIPMENT/PHOTOS | Camera Parts and accessories | CAMPRO |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Photographic, Optical equipment | A Room | 12/21/2021 | 17:02 |

| RMS Transfer | Control | | |
|---|---|---|---|
| Successful | RMR002    1221211825 | | |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM,JUSTIN | W | M |

| DOB | |
|---|---|
| | |

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 4 | Evidence | 12/21/2021 | Yes | No | 210004180 | 4 | 1 |

| Description | | | | Typ | |
|---|---|---|---|---|---|
| WISE XD MEMORY CARD | | | | Article | |

| Cat | Article | Brand |
|---|---|---|
| CAMERA EQUIPMENT/PHOTOS | Camera Parts and accessories | WISE |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Photographic, Optical equipment | A Room | 12/21/2021 | 17:03 |

| RMS Transfer | Control | | |
|---|---|---|---|
| Successful | RMR002    1221211825 | | |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM,JUSTIN | W | M |

| DOB | |
|---|---|
| | |

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 5 | Evidence | 12/21/2021 | Yes | No | 210004180 | 5 | 1 |

| Description | | | | Typ | |
|---|---|---|---|---|---|
| LEXAR SD MEMORY CARD | | | | Article | |

| Cat | Article | Brand |
|---|---|---|
| CAMERA EQUIPMENT/PHOTOS | Camera Parts and accessories | LEXAR |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Photographic, Optical equipment | A Room | 12/21/2021 | 17:04 |

| RMS Transfer | Control | | |
|---|---|---|---|
| Successful | RMR002    1221211825 | | |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM,JUSTIN | W | M |

| DOB | |
|---|---|
| | |

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 6 | Evidence | 12/21/2021 | Yes | No | 210004180 | 6 | 1 |

| Description | | | | Typ | |
|---|---|---|---|---|---|
| RHODE MICROPHONE | | | | Article | |

| Cat | Article | Brand |
|---|---|---|
| CAMERA EQUIPMENT/PHOTOS | Camera Parts and accessories | RHODE |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Photographic, Optical equipment | A Room | 12/21/2021 | 17:04 |

| RMS Transfer | Control | | |
|---|---|---|---|
| Successful | RMR002    1221211825 | | |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM,JUSTIN | W | M |

| DOB | |
|---|---|
| | |

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 7 | Evidence | 12/21/2021 | Yes | No | 210004180 | 7 | 1 |

| Description | | | | Typ | |
|---|---|---|---|---|---|
| CAMERA BATTERY | | | | Article | |

| Cat | Article | |
|---|---|---|
| CAMERA EQUIPMENT/PHOTOS | Camera Parts and accessories | |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Photographic, Optical equipment | A Room | 12/21/2021 | 17:05 |

| RMS Transfer | Control | | |
|---|---|---|---|
| Successful | RMR002    1221211825 | | |

| Report Officer | Printed At |
|---|---|
| RMR002/RODRIGUEZ,RICKY M | 06/08/2023 12:00 |

Page 4 of 6

FBC001339

# FORT BEND COUNTY SHERIFF

| Link | Involvement | Invl No | Name | | Race | Sex |
|---|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM, JUSTIN | | W | M |

DOB

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 8 | Evidence | 12/21/2021 | Yes | No | 210004180 | 8 | 1 |

| Description | | Typ |
|---|---|---|
| PHONE HOLDER/ADAPTER | | Article |

| Cat | Article |
|---|---|
| CAMERA EQUIPMENT/PHOTOS | Camera Parts and accessories |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Photographic, Optical equipment | A Room | 12/21/2021 | 17:05 |

| RMS Transfer | Control |
|---|---|
| Successful | RMR002    1221211825 |

| Link | Involvement | Invl No | Name | | Race | Sex |
|---|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM, JUSTIN | | W | M |

DOB

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | # Pieces |
|---|---|---|---|---|---|---|---|
| 9 | Evidence | 12/21/2021 | Yes | No | 210004180 | 9 | 1 |

| Description | | Typ |
|---|---|---|
| APPLE IPHONE | | Article |

| Cat | Article | Brand | Article Color |
|---|---|---|---|
| OFFICE EQUIPMENT | Cell Phone,pagers,PDA's | APPLE | Black |

| IBRS Type | Storage Building | Entered Date | Entered Time |
|---|---|---|---|
| Portable Electronic communications | A Room | 12/21/2021 | 17:06 |

| RMS Transfer | Control |
|---|---|
| Successful | RMR002    1221211825 |

| Link | Involvement | Invl No | Name | | Race | Sex |
|---|---|---|---|---|---|---|
| OWN | ARR | 1 | PULLIAM, JUSTIN | | W | M |

DOB

## Modus Operandi

| Physical Evidence | Premise Type | Crime Code(s) |
|---|---|---|
| VIDEO TAPE | BUSINESS OTHER | OFFENSES AGAINST PUBLIC ADMIN – OTHER |

## Narrative

Introduction:

On December 21, 2021 at about 0930 hours, I, Deputy R. Rodriguez #1423 was dispatched to 22134 FM 1462, Damon, Fort Bend County, Texas in reference to a Check Welfare.

Deputy M. Lacey (24P10) and I were dispatched to this call for service regarding a subject by the name of Edwin Kraft (21-50632). The service call was placed by Texana staff who stated that Edwin Kraft was having homicidal thoughts and had recently locked his mother out of the house. Deputy Lacey made location prior to me and observed Edwin Kraft come out of the residence while he was speaking to Edwin Kraft's mother. Deputy Lacey believed that Edwin Kraft went back in the house. Edwin Kraft is known to abuse drugs and has been arrested on stalking and possession charges in the past. Edwin Kraft has also been known to threaten civilians and had recently threatened to shoot Law Enforcement. Edwin Kraft has also been known to always be in possession of firearms.

While Deputy Lacey and I were creating a perimeter around the residence and keeping cover, a maroon pickup truck pulled in front of the residence that is connected to the old Kraft County Store. A male subject that would later be identified Justin Pulliam (DOB:        ), got out of the truck with multiple cameras and began filming. Justin Pulliam moved closer to the residence and gave him a command to stay back while I attempted to get closer to the residence. Shortly after, Sgt Rollins (22S7) arrived on location. I observed Sgt Rollins begin speaking with Justin Pulliam, but could not hear everything said. I heard Sgt Rollins tell Justin Pulliam that he needed to leave the location for safety reasons and Justin Pulliam began to argue with him. After refusing to leave, Sgt Rollins placed Justin Pulliam in handcuffs and placed him in the backseat of my marked patrol car. (See Sgt supplement). Justin Pulliam was placed in custody for Interfering with Public Duties and later transported to the Fort Bend County Jail without incident.

| Report Officer | Printed At |
|---|---|
| RMR002/RODRIGUEZ,RICKY M | 06/08/2023 12:00 |

Page 5 of 6

FBC001340

# FORT BEND COUNTY SHERIFF

## Narrative

The camera equipment and cell phone that Justin Pulliam was using to record was seized as evidence and later booked into the Fort Bend County Evidence Department in Richmond. The property was photographed prior to booking in (see property list). While booking Justin Pulliam in, I did not locate any identification or vehicle keys on his person. I asked Justin Pulliam about his vehicle that he drove to the location in, but he would not answer and responded that he pleads the Fifth Amendment. I asked Justin Pulliam if he wanted us to release the vehicle to someone or tow it. Justin Pulliam did not respond. The vehicle was possibly later picked up by Justin Pulliam's friends, after Deputy Mendoza confirmed it was no longer at the original location.

Scene Summary:

22134 FM 1462 is a previous place of business that was commonly known as the Kraft Country Store. The business is shut down and there is a manufacture home located on the southwest side of the store.

Crime Scene Search:

During the investigation I used my L3 body mic and dash camera. The video was uploaded to the Richmond L3 server and case number added.

I took photos using my county issued camera and downloaded them to the e-files tab of this report.

Evidence seized from Justin Pulliam was booked into the Richmond Evidence Department locker A-28.

Attachments:

None

Audio: Yes (L3)
Video: Yes (L3)
Photos: No

# FORT BEND COUNTY SHERIFF

## 21-50633

Reported Date
12/22/2021
Rpt/Incident Typ
INTDUTIES
Member#
ROLLINS,TAYLOR

Supplement No
0001

1410 WILLIAMS WAY BLVD

Phone
281-342-6116
Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| FORT BEND COUNTY SHERIFF | | 21-50633 | 0001 | 12/22/2021 | 06:41 | 213550380 |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| Arrest | Interfer with Duties of Peace Officer | | | | | |

| Location | | | | | | | City |
|---|---|---|---|---|---|---|---|
| 22134 FM 762 | | | | | | | DAMON |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| 77430 | 723R | 9 | 9 | 12/21/2021 | 09:24 | 12/21/2021 | 11:39 | 22P14 |

| Member# | | Assignment | | | Entered By |
|---|---|---|---|---|---|
| TXR003/ROLLINS,TAYLOR | | PATROL SERGEANT DAY SHIFT | | | TXR003 |

| Assignment | RMS Transfer | Prop Trans Stat | Approving Officer |
|---|---|---|---|
| PATROL SERGEANT DAY SHIFT | Successful | Successful | TXR003 |

| Approval Date | Approval Time |
|---|---|
| 12/27/2021 | 06:22:25 |

## Summary Narrative

## Modus Operandi

Crime Code(s)
OFFENSES AGAINST PUBLIC ADMIN - OTHER

## Narrative

21-50633
December 21, 2021
Sergeant T. Rollins #786
Supplement #1

On December 21, 2021 I, Sergeant T. Rollins, was dispatched to 22134 FM 762. Edwin Kraft's mother called in stating her son was Homicidal, Suicidal, and Psychotic. She stated she slept in her car all night because she was afraid for her life. Edwin Kraft locked her out of the house and would not communicate with her. Edwin Kraft was having hallucinations and saying there were people in the walls and ceiling trying to get him.

For the last few weeks, we have had several reports of Edwin Kraft walking around with either a firearm, machete, or a baseball bat threatening the public. We also had an active warrant for his arrest for Stalking. Edwin Kraft is known to use Methamphetamines, and last year tried to set a church on fire. On many occasions he has made direct threats to shoot Law Enforcement Officers.

Due to Edwin Kraft's mental state, and the reports of him being armed with a weapon, and his past violent history, we treated the call like a barricaded person and set up a perimeter around the house.

Upon my arrival, 2 Deputies were setup on the front and backside of the residence behind cover and concealment. I noticed a male subject standing in the direct line of fire in front of the residence, video recording with a body worn camera and a handheld camera. There were 3 females close to him as well. I immediately told all of them to quickly move across the street. The females identified themselves as Edwin Kraft's mother and 2 Mental Health Screeners from Texana. I wanted to utilize them to help make contact with Edwin Kraft so I moved them to a safe location behind our vehicle and behind a gas station next door. I told the male subject video

| Report Officer | Printed At |
|---|---|
| TXR003/ROLLINS,TAYLOR | 06/08/2023 12:00 |

Page 1 of 2

FBC001342

# FORT BEND COUNTY SHERIFF

**Narrative**

recording, later identified as Justin Pulliam, he needed to move across the street. Justin Pulliam looked at me and said, "Why? So ya'll can shoot him?" I asked him what was wrong with him. I again told him to move across the street because he couldn't stand there due to it being directly in front of the residence where Edwin Kraft was barricaded with a weapon. He began to walk in that direction, then stopped and said, "you didn't say it was for my safety". I told Justin Pulliam it was in fact for his safety. I again told him to move across the street and said I wasn't going to say it again. I told Justin Pulliam he had 5 seconds to start moving and he just stood there. By him staying in that area it put him and myself in danger. I began to count down from 5 down to 1, and Justin did not move. I placed Justin Pulliam in custody for Interference with Public Duties. I placed him inside a marked Tahoe, then had the Tahoe moved to a safer location.

Edwin Kraft was later found in a field behind his house armed with a rifle. Edwin Kraft had no regard for anyone's safety and pointed the rifle at Deputies. He was taken into custody for Aggravated Assault on a Peace Officer, Interfering, and Stalking (Warrant).

END OF SUPPLEMENT

| Report Officer | Printed At |
|---|---|
| TXR003/ROLLINS,TAYLOR | 06/08/2023 12:00 |
| Page 2 of 2 | |

FBC001343

# FORT BEND COUNTY SHERIFF



## 21-50633

**Supplement No**
0002

Reported Date
**01/07/2022**
Rpt/Incident Typ
**INTDUTIES**
Member#
**ARRIAGA,JENNIFER LYNN**

Phone
**281-342-6116**
Fax

1410 WILLIAMS WAY BLVD

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **FORT BEND COUNTY SHERIFF** | | **21-50633** | **0002** | **01/07/2022** | **10:31** | **213550380** |

| Status | Rpt/Incident Typ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Arrest** | **Interfer with Duties of Peace Officer** | | | | | | | |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| **22134 FM 762** | | | | | | | | **DAMON** |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| **77430** | **723R** | **9** | **9** | **12/21/2021** | **09:24** | **12/21/2021** | **11:39** | **22P14** |

| Member# | | | Assignment | Entered By |
|---|---|---|---|---|
| **JLA002/ARRIAGA,JENNIFER LYNN** | | | **ID INVESTIGATOR** | **JLA002** |

| Assignment | RMS Transfer | Prop Trans Stat | Property? | Approving Officer |
|---|---|---|---|---|
| **ID INVESTIGATOR** | **Successful** | **Successful** | **None** | **RNA001** |

| Approval Date | Approval Time |
|---|---|
| **01/10/2022** | **08:31:59** |

## Modus Operandi

Crime Code(s)
**OFFENSES AGAINST PUBLIC ADMIN - OTHER**

## Narrative

Property Release Supplement
Case Number 21-50633
Deputy J Garza #4347

On 1/7/2022 at approximately10:15, I, Deputy Garza, was contacted by records, Justin Pulliam, was in the records lobby to pick up property. Lt. Heinemeyer has approved that the property could be released to Justin Pulliam. I released the following property to Justin Pulliam.

| 210004180 | 1 | PANASONIC S1 |
|---|---|---|
| 210004180 | 2 | LENS/FILTER |
| 210004180 | 6 | RHODE MICROPHONE |
| 210004180 | 7 | CAMERA BATTERY |
| 210004180 | 8 | PHONE HOLDER/ADAPTER |

Justin Pulliam signed the property receipt form. I uploaded the signed property receipt form and a copy of his ID into the e-files.

Supplement concluded by Deputy J Garza #4347
Supervisor Sgt. R Ayoub

| Report Officer | Printed At |
|---|---|
| **JLA002/ARRIAGA,JENNIFER LYNN** | **06/08/2023 12:00** |
| Page 1 of 1 | |

FBC001344

# FORT BEND COUNTY SHERIFF



## 21-50633

1410 WILLIAMS WAY BLVD

Supplement No
0003

Reported Date
01/11/2022

Rpt/Incident Typ
INTDUTIES

Member#
FLORY, LINDA LYNETTE

Phone
281-342-6116

Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| FORT BEND COUNTY SHERIFF | | 21-50633 | 0003 | 01/11/2022 | 15:49 | 213550380 |

| Status | Rpt/Incident Typ |
|---|---|
| Arrest | Interfer with Duties of Peace Officer |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| 22134 FM 762 | | | | | | | | DAMON |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| 77430 | 723R | 9 | 9 | 12/21/2021 | 09:24 | 12/21/2021 | 11:39 | 22P14 |

| Member# |
|---|
| LLF003/FLORY,LINDA LYNETTE |

| Assignment | | Entered By |
|---|---|---|
| ID/RECORDS/ALARM DETAIL CLERK DAY SHIFT | | LLF003 |

| Assignment | RMS Transfer | Prop Trans Stat |
|---|---|---|
| ID/RECORDS/ALARM DETAIL CLERK DAY SHIFT | Successful | Successful |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| DXE004 | 01/13/2022 | 13:56:05 |

## Modus Operandi

| Crime Code(s) |
|---|
| OFFENSES AGAINST PUBLIC ADMIN - OTHER |

## Narrative

Supplement Generated for Attachment Purposes

Case Presentation

LNordt
Records

| Report Officer | Printed At |
|---|---|
| LLF003/FLORY,LINDA LYNETTE | 06/08/2023 12:00 |

| Page 1 of 1 | |
|---|---|

FBC001345

# FORT BEND COUNTY SHERIFF

## 21-50633

Reported Date
**12/21/2021**
Rpt/Incident Typ
**INTDUTIES**
Member#
**GUAJARDO,MICHELLE**

1410 WILLIAMS WAY BLVD

Supplement No
**0004**

Phone
**281-342-6116**
Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **FORT BEND COUNTY SHERIFF** | | **21-50633** | **0004** | **12/21/2021** | **10:03** | **213550380** |

| Status | Rpt/Incident Typ |
|---|---|
| **Arrest** | **Interfer with Duties of Peace Officer** |

| Location | City |
|---|---|
| **22134 FM 762** | **DAMON** |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| **77430** | **723R** | **9** | **9** | **12/21/2021** | **09:30** | **12/21/2021** | **13:33** | **22P14** |

| Member# | | Assignment | | | Entered By |
|---|---|---|---|---|---|
| **MXG001/GUAJARDO,MICHELLE** | | **CRISIS INTERVENTION TEAM** | | | **MXG001** |

| Assignment | RMS Transfer | Prop Trans Stat | Property? | Approving Officer |
|---|---|---|---|---|
| **CRISIS INTERVENTION TEAM** | **Successful** | **Successful** | **None** | **MFT001** |

| Approval Date | Approval Time |
|---|---|
| **01/19/2022** | **17:09:58** |

## Summary Narrative

SUPPLEMENT:

## Modus Operandi

Crime Code(s)
**OFFENSES AGAINST PUBLIC ADMIN - OTHER**

## Narrative

On January 18, 2022 I, CIT M. Guajardo #4340 was contacted by Detective T. James to write a supplement on this case in reference to any involvement I had with Justin Pulliam.

On December 21, 2021 at around 0930 hours I, CIT Deputy M. Guajardo #467 was dispatched to 22134 FM 762 to a CIT Check Welfare. Upon my arrival I, CIT Deputy M. Guajardo observed Sgt. Taylor placing handcuffs on a white male and placing him in a marked patrol car. The male was late identified as Justin Pulliam. I, CIT Deputy M. Guajardo had not interaction with Justin Pulliam.


**ATTACHMENTS:**

None

AUDIO: N

VIDEO: N

PICS: N

| Report Officer | Printed At |
|---|---|
| **MXG001/GUAJARDO,MICHELLE** | **06/08/2023 12:00** |
| **Page 1 of 1** | |

FBC001346

# FORT BEND COUNTY SHERIFF

## 21-50633

Reported Date
**03/18/2022**

Rpt/Incident Typ
**INTDUTIES**

Member#
**CLARK,JACK D JR**

Supplement No
**0005**

1410 WILLIAMS WAY BLVD

Phone
**281-342-6116**

Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| FORT BEND COUNTY SHERIFF | | 21-50633 | 0005 | 03/18/2022 | 13:52 | 213550380 |

| Status | Rpt/Incident Typ | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| Arrest | Interfer with Duties of Peace Officer | | | | | | | |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| 22134 FM 762 | | | | | | | | DAMON |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| 77430 | 723R | 9 | 9 | 12/21/2021 | 09:24 | 12/21/2021 | 11:39 | 22P14 |

| Member# | | | Assignment | Entered By |
|---|---|---|---|---|
| JDC003/CLARK,JACK D JR | | | ID INVESTIGATOR | JDC003 |

| Assignment | RMS Transfer | Prop Trans Stat | Approving Officer | Approval Date |
|---|---|---|---|---|
| ID INVESTIGATOR | Successful | Successful | RNA001 | 03/23/2022 |

| Approval Time |
|---|
| 08:41:52 |

## Summary Narrative

Supplement
Case #21-50633
03/18/2022

## Property

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Evidence | 03/18/2022 | Yes | No | 220000966 | 1 | | |

| Description | | Typ | Cat |
|---|---|---|---|
| 16 GB USB from GHRCFL "video from GHR016552" | | Article | COMPUTERS |

| Article | IBRS Type | Entered Date | Entered Time |
|---|---|---|---|
| Parts and Accessories | Computer hardware, software | 03/18/2022 | 13:52 |

| RMS Transfer | Control | |
|---|---|---|
| Successful | JDC003 | 0318221357 |

## Modus Operandi

| Crime Code(s) |
|---|
| OFFENSES AGAINST PUBLIC ADMIN - OTHER |

## Narrative

Supplement
Case #21-50633
Inv. J. Clark
03/18/2022

On Friday March 18, 2022, at about 1300 hours, I, Inv. J. Clark, transported evidence from the Greater Houston Regional Computer Forensics Laboratory to the Fort Sheriff's Office.  The following item was submitted to evidence:

1) 16 GB Sandisk USB labelled "This device contains extracted video from GHR016552 for Investigator".

The item was released to the Evidence Custodian.
The Chain of Custody form was copied into E-File and the original forwarded to Records

| Report Officer | Printed At |
|---|---|
| JDC003/CLARK,JACK D JR | 06/08/2023 12:00 |

| Page 1 of 2 | |
|---|---|

FBC001347

# FORT BEND COUNTY SHERIFF

**Narrative**

End Supplement
Supervisor Sgt. Ayoub

FBC001348

# FORT BEND COUNTY SHERIFF

## 21-50633

Reported Date
**03/20/2022**
Rpt/Incident Typ
**INTDUTIES**
Member#
**JAMES,TRAVIS A**

Supplement No
**0006**

1410 WILLIAMS WAY BLVD

Phone
**281-342-6116**
Fax

## Administrative Information

| Agency | | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| FORT BEND COUNTY SHERIFF | | | 21-50633 | 0006 | 03/20/2022 | 20:04 | 213550380 |

| Status | Rpt/Incident Typ |
|---|---|
| Arrest | Interfer with Duties of Peace Officer |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| 22134 FM 762 | | | | | | | | DAMON |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| 77430 | 723R | 9 | 9 | 12/21/2021 | 09:24 | 12/21/2021 | 11:39 | 5D29 |

| Member# |
|---|
| TAJ001/JAMES,TRAVIS A |

| Assignment | Entered By |
|---|---|
| CID INVESTIGATOR – Crimes Against Persons | TAJ001 |

| Assignment | RMS Transfer |
|---|---|
| CID INVESTIGATOR – Crimes Against Persons | Supplement Transfer Complete |

| Prop Trans Stat | Property? | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|---|
| Successful | None | APH002 | 03/31/2022 | 20:38:23 |

## Summary Narrative

Detective Travis James #3009
FBCSO Case #21-50633/Interference with Public Duties
22134 FM 762, Damon, Fort Bend County
Thursday January 06, 2022
Supplement #6

## Witness 1: LEIFLER,APRIL

| Involvement | Invl No | Type | Name | | | | | |
|---|---|---|---|---|---|---|---|---|
| Witness | 1 | Individual | LEIFLER,APRIL | | | | | |

| MNI | Race | Sex | DOB | Age | Ethnicity | | Juvenile? | Height |
|---|---|---|---|---|---|---|---|---|
| 1479196 | White | Female | ███ | 36 | Not of Hispanic origin | | No | 5'02" |

| Weight | Hair Color | Eye Color | RMS Transfer | PRN |
|---|---|---|---|---|
| 200# | Brown | Brown | Successful | 1126304 |

| Type | Address |
|---|---|
| Work/Business | 4910 AIRPORT AVENUE |

| City | State | ZIP Code | Date |
|---|---|---|---|
| RICHMOND | TEXAS | 77471 | 03/20/2022 |

| Type | ID No | OLS |
|---|---|---|
| OPERATOR LICENSE | 19696644 | TEXAS |

| Phone Type | Phone No | Date |
|---|---|---|
| Work/Business | (346)762-0268 | 03/20/2022 |

## Witness 2: ROSAS,LORI

| Involvement | Invl No | Type | Name | | | | |
|---|---|---|---|---|---|---|---|
| Witness | 2 | Individual | ROSAS,LORI | | | | |

| MNI | Race | Sex | DOB | Age | Juvenile? | RMS Transfer | PRN |
|---|---|---|---|---|---|---|---|
| 1667704 | White | Female | ███ | 34 | No | Successful | 1126305 |

| Type | Address |
|---|---|
| Work/Business | 4910 AIRPORT AVENUE |

| City | State | ZIP Code | Date |
|---|---|---|---|
| RICHMOND | TEXAS | 77471 | 03/20/2022 |

| Report Officer | Printed At |
|---|---|
| TAJ001/JAMES,TRAVIS A | 06/08/2023 12:00 |

Page 1 of 6

FBC001349

# FORT BEND COUNTY SHERIFF

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (832) 945-0813 | 03/20/2022 |

## Modus Operandi

| Crime Code(s) |
|---|
| OFFENSES AGAINST PUBLIC ADMIN - OTHER |

## Narrative

**Detective Travis James #3009**
**FBCSO Case #21-50633/Interference with Public Duties**
**22134 FM 762, Damon, Fort Bend County**
**Thursday January 06, 2022**
**Supplement #6**

**(Case Assigned)**

On this date, I Detective Travis James #3009, employed by the Fort Bend County Sheriff's Office, Criminal Investigation, was assigned this case for follow up.

I read the report completed by **Deputy Ricky Rodriguez, with the Fort Bend County Sheriff's Office, Patrol Division.**

I read that on Tuesday December 21, 2022 at about 0930 hours that Deputy Ricky Rodriguez was dispatched to 22134 FM 762, Damon, Fort Bend County in reference to a Check Welfare involving a subject known to me as **Edwin Kraft.**

I read that Texana was on location and requesting the Sheriff's Office assistance, due to Edwin Kraft having homicidal thought.

*Note: Edwin Kraft has history of possession of firearms, threatening to shoot law enforcement and harassing behavior.*

Deputy Rodriguez states that he was attempting to set a perimeter at the front of the residence, where Edwin Kraft was last seen located and observed a maroon pickup truck pull up and stop in front of the residence connected to the Kraft Country Store.

*Note: This residence is believed to be the same residence Edwin Kraft was last seen located in.*

Deputy Rodriguez states that he observed **case suspect, Justin Pulliam**, to exit the vehicle with multiple cameras. Deputy Rodriguez states in his report that Justin Pulliam was observed to move closer to the scene location he was attempting to secure, and he ordered Justin Pulliam to stay back.

Deputy Rodriguez states that he observed Sergeant Taylor Rollins, with the Fort Bend County Sheriff's Office, Patrol Division, arrive on scene shortly afterwards.

I read that Deputy Rodriguez heard Sergeant Rollins to request Justin Pulliam to leave the location for safety reasons. I read that Deputy Rodriguez heard Justin Pulliam to argue with Sergeant Rollins, at which point Deputy Rodriguez observed Sergeant Rollins to place Justin Pulliam into custody.

I read that Justin Pulliam was arrested for Interference with Public Duties (MB).

I read that Deputy Rodriguez placed Justin Pulliam's handheld camera, two (2) SD cards, and a Campro body camera into the Fort Bend County Sheriff's Office Evidence.

*For complete details refer to original report completed by Deputy Rodriguez.*

I read the supplemental report completed by Sergeant Rollins, and read that he was dispatched to the above location in reference to Edwin Kraft. I read that Sergeant Rollins was advised that Edwin Kraft's mother had called in reference to him locking her out of the residence. Furthermore, I read that Sergeant Rollins was advised that Edwin Kraft was homicidal, suicidal, and psychotic.

| Report Officer | Printed At |
|---|---|
| TAJ001/JAMES,TRAVIS A | 06/08/2023 12:00 |

Page 2 of 6

FBC001350

# FORT BEND COUNTY SHERIFF

**Narrative**

I read that Sergeant Rollins was aware of history with Edwin Kraft being armed with weapons such as firearms and machetes. Sergeant Rollins was also aware that Edwin Kraft had an active arrest warrant for Stalking as well.

*Note: Refer to FBCSO Case #21-47345 for details of the Stalking case.*

I read that Sergeant Rollins decided to treat the situation as a barricaded subject, meaning that a perimeter would be set up and that Deputies would attempt to contact Edwin Kraft via other means such as through telephone or public address.

Sergeant Rollins notes that upon his arrival he observed a Deputy Rodriguez set up at the front of the residence, and a second Deputy set up at the back of the residence. Sergeant Rollins further states in his report, that he observed a subject later identified as Justin Pulliam to be standing in direct line of fire of the residence wearing a body worn camera and carrying a camera. Sergeant Rollins also observed three (3) females standing in front of the residence in the line of fire as well.

Sergeant Rollins advised that he ordered the females, as well as Justin Pulliam, across the street (which I know to be a good distance away and offset from the line of fire of the residence) for safety.

Sergeant Rollins states in his report that one of the females identified herself as Edwin Kraft's mother, and the other two (2) females identified themselves as employees of Texana (a mental health institution). Sergeant Rollins states that he intended to use them to assist in having Edwin Kraft safely exit the residence, and repositioned them to hard cover behind a Tahoe (which I know to provide cover as the engine block, and interior police cages, seats, and rear metal storage box equipped in all FBCSO Tahoe's would provide adequate cover).

During this time, Sergeant Rollins states that he requested Justin Pulliam to move across the street, at which point Justin Pulliam stated "why so you can kill him?". Sergeant Rollins states that he then ordered Justin Pulliam across the street again.

Sergeant Rollins stated in his report that he observed Justin Pulliam to begin to move across the street, however after a few steps Justin Pulliam turned around and stated "you didn't say it was for my safety", and Sergeant Rollins states that at this point he advised it was for Justin Puliam's safety.

Sergeant Rollins states in his report that he again ordered Justin Pulliam across the street to safety, and stated to Justin Pulliam that he had five (5) seconds to comply.

Sergeant Rollins states that Justin Pulliam refused to comply and that he placed Justin Pulliam into custody for interference with public duties.

Sergeant Rollins later elaborated that Edwin Kraft was later safely detained, while in possession of a rifle which he pointed at Deputies.

*For complete details refer to Sergeant Rollins Supplement Report.*

### Search Warrant Affidavit
### Saturday January 08, 2022 at 1423 hours

Based on the reports, and the statements made by Deputy Rodriguez and Sergeant Rollins, I believe probable cause existed for an affidavit for a search warrant to be completed in reference to the SD Cards and Body Worn Camera.

The affidavits were forwarded to ADA Laurel Ellisor on January 08, 2022 at about 1423 hours.

### Search Warrant Affidavit
### Friday January 14, 2022 at 1030 hours

On this date, and time, I met with ADA Ellisor, and the Honorable Judge Becerra of the 434th District Court of Fort

| Report Officer | Printed At |
|---|---|
| TAJ001/JAMES,TRAVIS A | 06/08/2023 12:00 |
| Page 3 of 6 | |

FBC001351

# FORT BEND COUNTY SHERIFF

## Narrative

Bend County.

The search warrants were presented to Judge Becerra, and he signed them on this date, and time. I observed the warrants to be numbered as follows:
-Campro Body Camera Warrant #1SW011422JCB
-SD Camera Cards Warrant #2SW011422JCB

*Note: refer to attached Search Warrant Affidavits*

### Execution of Search Warrants
### Friday January 14, 2022 at about 1100 hours

The warrants were executed on the same date, via a preview. At the time of the preview I observed one SD cards to possibly not contain evidence. However, the Campro Body Camera was not able to be previewed, due to not having an adapter. Furthermore, the second SD card was not able to be previewed due to also not having an acceptable adapter to connect it to a computer.

At this time, the SD Cards and Campro Body Camera will be sent to the Greater Houston RCFL for forensic download.

*Refer to attached evidentiary request for service.*

### SD Card Video
### Friday March 18, 2022 at 1320 hours

On this date, and time, I received from CSU Investigator Jack Clark a USB Memory card, which he advised was a working copy, of the video he was able to retrieve from the SD Cards of the incident.

I reviewed the video, and observed that it the total length of the video is 6:06:56 long.

At 00:00:00 the starts with the filmmaker walking up to the Kraft Country Store. In the back ground of the video is a white residence, which is known to me be the residence of Edwin and Frances Kraft.

At 00:00:05 the filmmaker is confronted by a Frances Kraft, who asks who he is. In the back ground I can heard Deputy Rodriguez to state "you need to stay back" but it is unknown who he is talking too.

At 00:00:10 the filmmaker identifies himself as a journalist, indicating that the filmmaker is Justin Pulliam. Furthermore, he states that he films the police and is familiar with Edwin Kraft's case.

At 00:00:40 Deputy Rodriguez is observed to walk across the camera field of vision and it is noted that he advised Justin Pulliam to stay back "over there".

*Note: during this time I can clearly see the residence that Edwin Kraft is known to reside in. Furthermore, it should be noted that Edwin Kraft's white Ford F150 is in front of the residence.*

Between 00:00:41 and 00:04:14 nothing of significance is noted in the video.

At 00:04:15 Sergeant Rollins can be heard to ask "I need you *guys* to go across the street" indicating more than one person.

At 00:04:20 Justin Pulliam is heard to ask "Across the street" and Sergeant Rollins confirms "yes across the street" Justin Pulliam is heard to state "why so you can shoot him". At no point during this time is Justin Pulliam observed to make movements to comply.

At 00:04:26 Sergeant Rollins is heard to reply to Justin Pulliam's statement with "what's wrong with you man". Justin Pulliam asks Sergeant Rollins "what's wrong with you" and at this point Sergeant Rollins asks Justin Pulliam to go across the street again.

| Report Officer | Printed At |
|---|---|
| TAJ001/JAMES,TRAVIS A | 06/08/2023 12:00 |

Page 4 of 6

FBC001352

# FORT BEND COUNTY SHERIFF

**Narrative**

At 00:04:30 Justin Pulliam is observed to begin going across the street by moving towards his vehicle.

At 00:04:31-32 Two (2) presumed Texana screeners are observed to walk up to Sergeant Rollins and identify themselves as such.

At 00:04:34 Justin Pulliam is observed to turn and continue walking backwards.

At 00:04:38-45 Justin Pulliam advises if it's not for safety then he does not have to leave.  At which point, Sergeant Rollins (who at this point is talking with Texana) stated that it was for his safety.

At 00:04:50 one of the Texana representatives states that Justin Pulliam could not film her client (indicating Edwin Kraft).

At 00:04:56 Sergeant Rollins again asks Justin Pulliam across the street.  Justin Pulliam is heard to refuse at which point Sergeant Rollins begins counting down from five (5).

At 00:04:58 Sergeant Rollins approaches Justin Pulliam and places him into custody.

Nothing else was noted for the rest of the video.

*A copy of the video will be saved as evidence, and placed into the Evidence room at the Fort Bend County Sheriff's Office.*

**Campro Body Camera**

As to the status of the Campro Body Camera, I was advised by Investigator Clark that the camera was password protected.  To protect the data on the camera he advised that it would be sent to the FBI labs for evaluation.

**Interview with April Lefler**
**Wednesday March 23, 2022 at 1613 hours**

On this date, and time, I contacted April Lefler with Texana Crisis Center.

She advised that she was at the location on the date of the offense to assist in screen Edwin Kraft.  While doing so she observed a subject to be filming (Justin Pulliam) five feet away from her.

April Lefler advised that she heard a "Sergeant" (referring to Sergeant Rollins) to tell Justin Pulliam, as well as her and her coworker Lori Rosas to go across the street for safety purposes.

I asked April Lefler where exactly they were positioned and she advised that they were positioned in front a white trailer home connected to the Kraft Country Store.

April Lefler advised that after she identified herself and Lori Rosas as Texana screener's she and Lori Rosas were moved off to the side out of view of the trailer home.

*Note: This residence is believed to Edwin Kraft's residence.*

April Lefler states she heard Justin Pulliam to become argumentative and combative Sergeant Rollins, before he was arrested.

*For complete details refer to audio recording, which was uploaded onto the e-file system.*

**Attempt to contact Lori Rosas**
**Wednesday March 23, 2022 at 1712 hours**

On this date, and time, I attempted to contact Lori Rosas.

I received no answer and left voicemail.

| Report Officer | Printed At |
| --- | --- |
| TAJ001/JAMES,TRAVIS A | 06/08/2023 12:00 |
| Page 5 of 6 | |

FBC001353

# FORT BEND COUNTY SHERIFF

**Narrative**

**Interview with Lori Rosas**
**Friday March 25, 2022 at 1414 hours**

On this date, and time, I contacted Lori Rosas, and interviewed her via telephone.

Lori Rosas identified herself as a Texana Screener, and stated that she was at the location of 22134 FM 762, Damon, on the date of the offense.

She advises that she was called to the residence to screen Edwin Kraft with April Leifer, and upon their arrival they observed an unknown subject (Justin Pulliam) to be filming.

Lori Rosas states that she, along with April Leifer, and the subject filming were requested to move across the street by an unknown (to her) Deputy with the Fort Bend County Sheriff's Office. Lori Rosas states that she and April Leifer identified themselves to the Deputy, and were moved to an area out of the way.

Lori Rosas states that she feels that they were moved for safety reason.

However, prior to this she heard the Deputy to ask Justin Pulliam at least three separate times to move across the street, and heard that the Deputy even gave Justin Pulliam to the count of three to move.

*For complete details refer to audio recording, which was uploaded onto the e-file system.*


**Case Disposition**

At this time, the case will forwarded, with this updated information, to the Fort Bend County District Attorney's Office for charging of Justin Pulliam for the offense of Interference with Public Duties (MB).

A supplement will follow as I am still awaiting the data from the Body Camera.

**Attachments**

Copy of Search Warrants
Copy of SD Card Video



**End Supplement**
**Detective Travis James #3009**
**Sergeant A. Hickey**

| Report Officer | Printed At |
|---|---|
| TAJ001/JAMES,TRAVIS A | 06/08/2023 12:00 |

Page 6 of 6

FBC001354

# FORT BEND COUNTY SHERIFF



## 21-50633
Reported Date
**04/14/2022**
Rpt/Incident Typ
**INTDUTIES**
Member#
**JAMES,TRAVIS A**

Supplement No
**0007**

1410 WILLIAMS WAY BLVD

Phone
**281-342-6116**
Fax

---

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| FORT BEND COUNTY SHERIFF | | 21-50633 | 0007 | 04/14/2022 | 09:52 | 213550380 |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| Arrest | Interfer with Duties of Peace Officer | | | | | |

| Location | | | | | | City |
|---|---|---|---|---|---|---|
| 22134 FM 762 | | | | | | DAMON |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| 77430 | 723R | 9 | 9 | 12/21/2021 | 09:24 | 12/21/2021 | 11:39 | 5D29 |

| Member# |
|---|
| TAJ001/JAMES,TRAVIS A |

| Assignment | Entered By |
|---|---|
| CID INVESTIGATOR - Crimes Against Persons | TAJ001 |

| Assignment | RMS Transfer | Prop Trans Stat | Property? |
|---|---|---|---|
| CID INVESTIGATOR - Crimes Against Persons | Successful | Successful | None |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| APH002 | 04/18/2022 | 14:43:44 |

## Modus Operandi

| Crime Code(s) |
|---|
| OFFENSES AGAINST PUBLIC ADMIN - OTHER |

## Narrative

**Detective Travis James #3009**
**FBCSO Case # 21-50633/Interference with Public Duties**
**22134 FM 762, Damon, Fort Bend County**
**Supplement #06**
**Wednesday April 13, 2022**

On this date, I Detective Travis James #3009, employed by the Fort Bend County Sheriff's Office, Criminal Investigation Division, presented this case to the Fort Bend County District Attorney's Office.

I generated this supplement for attachment of the FBCDA Case Presentation Receipt, via E-File.

**End of Supplement**
**Detective Travis James #3009**
**Sergeant A. Hickey**

---

| Report Officer | Printed At |
|---|---|
| TAJ001/JAMES,TRAVIS A | 06/08/2023 12:00 |

FBC001355

# FORT BEND COUNTY SHERIFF



**21-50633**

Reported Date
**06/09/2022**
Rpt/Incident Typ
**INTDUTIES**
Member#
**FLORY,LINDA LYNETTE**

Supplement No
**0008**

1410 WILLIAMS WAY BLVD

Phone
**281-342-6116**
Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **FORT BEND COUNTY SHERIFF** | | **21-50633** | **0008** | **06/09/2022** | **16:47** | **213550380** |

| Status | Rpt/Incident Typ |
|---|---|
| **Arrest** | **Interfer with Duties of Peace Officer** |

| Location | City |
|---|---|
| **22134 FM 762** | **DAMON** |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| **77430** | **723R** | **9** | **9** | **12/21/2021** | **09:24** | **12/21/2021** | **11:39** | **22P14** |

| Member# |
|---|
| **LLF003/FLORY,LINDA LYNETTE** |

| Assignment | Entered By |
|---|---|
| **ID/RECORDS/ALARM DETAIL CLERK DAY SHIFT** | **LLF003** |

| Assignment | RMS Transfer | Prop Trans Stat |
|---|---|---|
| **ID/RECORDS/ALARM DETAIL CLERK DAY SHIFT** | **Successful** | **Successful** |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| **DXE004** | **11/22/2022** | **18:46:27** |

## Modus Operandi

| Crime Code(s) |
|---|
| **OFFENSES AGAINST PUBLIC ADMIN - OTHER** |

## Narrative

Supplement Generated for Attachment Purposes

Court Docket

LNordt
Records

FBC001356

# FORT BEND COUNTY SHERIFF



**21-50633**

Reported Date
**06/14/2022**

Rpt/Incident Typ
**INTDUTIES**

Member#
**JAMES,TRAVIS A**

Supplement No
**0009**

1410 WILLIAMS WAY BLVD

Phone
**281-342-6116**

Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **FORT BEND COUNTY SHERIFF** | | **21-50633** | **0009** | **06/14/2022** | **15:05** | **213550380** |

| Status | Rpt/Incident Typ |
|---|---|
| **Arrest** | **Interfer with Duties of Peace Officer** |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| **22134 FM 762** | | | | | | | | **DAMON** |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| **77430** | **723R** | **9** | **9** | **12/21/2021** | **09:24** | **12/21/2021** | **11:39** | **5D29** |

| Member# |
|---|
| **TAJ001/JAMES,TRAVIS A** |

| Assignment | Entered By |
|---|---|
| **CID INVESTIGATOR - Crimes Against Persons** | **TAJ001** |

| Assignment | RMS Transfer | Prop Trans Stat | Property? |
|---|---|---|---|
| **CID INVESTIGATOR - Crimes Against Persons** | **Successful** | **Successful** | **None** |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| **APH002** | **06/30/2022** | **21:55:37** |

## Summary Narrative

**Detective Travis James #3009**
**FBCSO Case # 21-50633/Interference with Public Duties**
**22134 FM 762, Damon, Fort Bend County**
**Supplement #09**
**Friday June 03, 2022**

## Modus Operandi

Crime Code(s)
**OFFENSES AGAINST PUBLIC ADMIN - OTHER**

## Narrative

**Detective Travis James #3009**
**FBCSO Case # 21-50633/Interference with Public Duties**
**22134 FM 762, Damon, Fort Bend County**
**Supplement #09**
**Friday June 03, 2022**

On this date, I Detective Travis James #3009, employed by the Fort Bend County Sheriff's Office, Criminal Investigation Division, received L3 video from Deputy David Craven.

I later supplemented this case, and submitted the L3 video to the Fort Bend County District Attorney's Office. I

**End of Supplement**
**Detective Travis James #3009**
**Sergeant A. Hickey**

| Report Officer | Printed At |
|---|---|
| **TAJ001/JAMES,TRAVIS A** | **06/08/2023 12:00** |

| Page 1 of 1 | |

FBC001357

# FORT BEND COUNTY SHERIFF



## 21-50633

Reported Date
**06/30/2022**
Rpt/Incident Typ
**INTDUTIES**
Member#
**FINK,MARY E**

Supplement No
**0010**

Phone
**281-342-6116**
Fax

1410 WILLIAMS WAY BLVD

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **FORT BEND COUNTY SHERIFF** | | **21-50633** | **0010** | **06/30/2022** | **15:38** | **213550380** |

| Status | Rpt/Incident Typ | | | | | | |
|---|---|---|---|---|---|---|---|
| **Arrest** | **Interfer with Duties of Peace Officer** | | | | | | |

| Location | | | | | | | City |
|---|---|---|---|---|---|---|---|
| **22134 FM 762** | | | | | | | **DAMON** |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| **77430** | **723R** | **9** | **9** | **12/21/2021** | **09:24** | **12/21/2021** | **11:39** | **22P14** |

| Member# |
|---|
| **MEF003/FINK,MARY E** |

| Assignment | Entered By |
|---|---|
| **ID/RECORDS/ALARM DETAIL CLERK DAY SHIFT** | **MEF003** |

| Assignment | RMS Transfer | Prop Trans Stat | Property? |
|---|---|---|---|
| **ID/RECORDS/ALARM DETAIL CLERK DAY SHIFT** | **Successful** | **Successful** | **None** |

| Approving Officer | Approval Date | Approval Time |
|---|---|---|
| **DXE004** | **11/22/2022** | **18:46:38** |

## Summary Narrative

Supplement generated for attachment purposes.

-DA's additional info request

M. Fink
Records

## Modus Operandi

| Crime Code(s) |
|---|
| **OFFENSES AGAINST PUBLIC ADMIN - OTHER** |

| Report Officer | Printed At |
|---|---|
| **MEF003/FINK,MARY E** | **06/08/2023 12:00** |
| **Page 1 of 1** | |

FBC001358

# FORT BEND COUNTY SHERIFF



**21-50633**

Reported Date
**03/15/2023**

Rpt/Incident Typ
**INTDUTIES**

Member#
**CLARK,JACK D JR**

1410 WILLIAMS WAY BLVD

Supplement No
**0011**

Phone
**281-342-6116**
Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **FORT BEND COUNTY SHERIFF** | | **21-50633** | **0011** | **03/15/2023** | **14:31** | **213550380** |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| **Arrest** | **Interfer with Duties of Peace Officer** | | | | | |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| **22134 FM 762** | | | | | | | | **DAMON** |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| **77430** | **723R** | **9** | **9** | **12/21/2021** | **09:24** | **12/21/2021** | **11:39** | **22P14** |

| Member# | | | Assignment | Entered By | |
|---|---|---|---|---|---|
| **JDC003/CLARK,JACK D JR** | | | **ID INVESTIGATOR** | **JDC003** | |

| Assignment | RMS Transfer | Prop Trans Stat | Approving Officer | Approval Date | |
|---|---|---|---|---|---|
| **ID INVESTIGATOR** | **Successful** | **Successful** | **RNA001** | **03/23/2023** | |

| Approval Time | |
|---|---|
| **08:58:34** | |

## Summary Narrative

Supplement
Case #21-50633
Inv. J. Clark
01/18/2022

## Modus Operandi

Crime Code(s)
**OFFENSES AGAINST PUBLIC ADMIN - OTHER**

## Narrative

Supplement
Case #21-50633
Inv. J. Clark
01/18/2022

On Tuesday January 18, 2022, at about 1150 hours, I, Inv. J. Clark, transported the following items to the Greater Houston RCFL for processing:

1) Lexar SD Card (Tag 210004180 Item 5)
2) Wise Memory card (Tag 210004180 Item 4)
3) Campro body camera (Tag 210004180 Item 3)

The items were released to RCFL personnel.

Chain of Custody was uploaded into E-File and original forwarded to evidence.

End Supplement
Supervisor
Sgt. R. Ayoub

| Report Officer | Printed At |
|---|---|
| **JDC003/CLARK,JACK D JR** | **06/08/2023 12:00** |
| **Page 1 of 1** | |

FBC001359

# FORT BEND COUNTY SHERIFF

## 21-50633

Reported Date
**03/15/2023**
Rpt/Incident Typ
**INTDUTIES**
Member#
**CLARK,JACK D JR**

Supplement No
**0012**

1410 WILLIAMS WAY BLVD

Phone
**281-342-6116**
Fax

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| FORT BEND COUNTY SHERIFF | | 21-50633 | 0012 | 03/15/2023 | 14:36 | 213550380 |

| Status | Rpt/Incident Typ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Arrest | Interfer with Duties of Peace Officer | | | | | | | |

| Location | | | | | | | | City |
|---|---|---|---|---|---|---|---|---|
| 22134 FM 762 | | | | | | | | DAMON |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| 77430 | 723R | 9 | 9 | 12/21/2021 | 09:24 | 12/21/2021 | 11:39 | 22P14 |

| Member# | | Assignment | Entered By |
|---|---|---|---|
| JDC003/CLARK,JACK D JR | | ID INVESTIGATOR | JDC003 |

| Assignment | RMS Transfer | Prop Trans Stat | Approving Officer | Approval Date |
|---|---|---|---|---|
| ID INVESTIGATOR | Successful | Successful | RNA001 | 03/23/2023 |

| Approval Time | | | | |
|---|---|---|---|---|
| 08:59:57 | | | | |

## Summary Narrative

Supplement
Case #21-50633
Inv. J. Clark
03/15/2023

## Property

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | |
|---|---|---|---|---|---|---|---|
| 1 | Evidence | 03/15/2023 | Yes | No | 230000945 | 1 | |

| Description | | | Typ |
|---|---|---|---|
| USB with results of all evidence from RCFL | | | Article |

| Cat | Article | IBRS Type | Entered Date | Entered Time | RMS Transfer |
|---|---|---|---|---|---|
| OTHER/MISCELLANEOUS | OTHER/MISCELLANEOUS | Other | 03/15/2023 | 14:41 | Successful |

| Control | | | | | |
|---|---|---|---|---|---|
| JDC003   0315231442 | | | | | |

| Prop # | Involvement | Invl Date | In Custody? | Security | Tag No | Item No | |
|---|---|---|---|---|---|---|---|
| 2 | Evidence | 03/15/2023 | Yes | No | 230000945 | 2 | |

| Description | | | Typ |
|---|---|---|---|
| Archive tape of results and files from RCFL | | | Article |

| Cat | Article | IBRS Type | Entered Date | Entered Time | RMS Transfer |
|---|---|---|---|---|---|
| OTHER/MISCELLANEOUS | OTHER/MISCELLANEOUS | Other | 03/15/2023 | 14:41 | Successful |

| Control | | | | | |
|---|---|---|---|---|---|
| JDC003   0315231442 | | | | | |

## Modus Operandi

| Crime Code(s) |
|---|
| OFFENSES AGAINST PUBLIC ADMIN - OTHER |

## Narrative

Supplement
Case #21-50633
Inv. J. Clark
03/15/2023

On Wednesday March 15, 2023, at about 1320 hours, I, Inv. J. Clark, transported the following items from the

| Report Officer | Printed At |
|---|---|
| JDC003/CLARK,JACK D JR | 06/08/2023 12:00 |

Page 1 of 2

FBC001360

# FORT BEND COUNTY SHERIFF

**Narrative**

Greater Houston RCFL to the Fort Bend County Sheriff's Office:

1) Lexar SD Card (Tag 210004180 Item 5)
2) Wise Memory card (Tag 210004180 Item 4)
3) Campro body camera (Tag 210004180 Item 3)

New property from RCFL:

1) USB with results from all submitted evidence.
2) Archive tape of results and files of submitted evidence.

A copy of the Report of Examination from GHRCFL was also transported.

The items were released to the Evidence Custodian.

Chain of Custody was uploaded into E-File and original forwarded to evidence. The Report of Examination was uploaded into E-File and the original forwarded to evidence.

End Supplement
Supervisor
Sgt. R. Ayoub

# FORT BEND COUNTY SHERIFF



## 21-50633

Supplement No
**0013**

Reported Date
**03/17/2023**

Rpt/Incident Typ
**INTDUTIES**

Member#
**ENRIQUEZ,DAISY**

Phone
**281-342-6116**

Fax

1410 WILLIAMS WAY BLVD

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|
| **FORT BEND COUNTY SHERIFF** | | **21-50633** | **0013** | **03/17/2023** | **10:47** | **213550380** |

| Status | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|
| **Arrest** | **Interfer with Duties of Peace Officer** | | | | | |

| Location | | | | | | City |
|---|---|---|---|---|---|---|
| **22134 FM 762** | | | | | | **DAMON** |

| ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|---|
| **77430** | **723R** | **9** | **9** | **12/21/2021** | **09:24** | **12/21/2021** | **11:39** | **22P14** |

| Member# | | Assignment | Entered By |
|---|---|---|---|
| **DXE003/ENRIQUEZ,DAISY** | | **ID INVESTIGATOR** | **DXE003** |

| Assignment | RMS Transfer | Prop Trans Stat | Property? | Approving Officer |
|---|---|---|---|---|
| **ID INVESTIGATOR** | **Successful** | **Successful** | **None** | **RNA001** |

| Approval Date | Approval Time |
|---|---|
| **03/23/2023** | **09:01:52** |

## Summary Narrative

**Property Released to Detective Supplement**

## Modus Operandi

| Physical Evidence | Crime Code(s) |
|---|---|
| **Documents** | **OFFENSES AGAINST PUBLIC ADMIN - OTHER** |

## Narrative

**Property Released to Detective Supplement**
**Case Number 21-50633**
**Deputy Daisy Enriquez #4140**

On 3/17/2023 at approximately10:45AM, I, Deputy Daisy Enriquez, released the following property to Investigator Kreusel.

230000945 1 Article: OTHER/MISCELLANEOUS  MISC  USB with results of all evidence from RCFL

Investigator Kreusel signed the property receipt form. I uploaded the signed evidence/property release form into the e-files.

**-End of Supplement-**
**Deputy Daisy Enriquez #4140**
**Supervisor Sgt. R Ayoub**

| Report Officer | Printed At |
|---|---|
| **DXE003/ENRIQUEZ,DAISY** | **06/08/2023 12:00** |
| **Page 1 of 1** | |

FBC001362

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
*Pulliam v. County of Fort Bend, Texas, et al.*
Case No. 4:22-cv-4210

# EXHIBIT D

QC: 5/18/22 AE

# THE STATE OF TEXAS

### VS

# JUSTIN REID PULLIAM

Laurel Ellisor
38.15(b)
73991084

22-DCR-099536
INDI          1
Indictment
6512202

| D.O.B.: ████████ | CONTROL NO: 22-000112 |
|---|---|
| CHARGE: INTERFER W/PUBLIC DUTIES/ MB | ARREST DATE: 12/21/2021 |
| CASE NO: 22-DCR-099534 | OFFENSE DATE: December 21, 2021 |
| COUNTY COURT AT LAW NO: 434th | AGENCY/AGENCY #: FORT BEND COUNTY SHERIFF'S OFFICE/ 210050633 |
| BAIL AMOUNT: $500.00 | PRIOR CASE #: |
| RELATED CASES: | CO-DEF: |

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

The duly organized Grand Jury of Fort Bend County, Texas, presents in the County Court of Fort Bend County, Texas, that in Fort Bend County, Texas, **JUSTIN REID PULLIAM**, hereafter styled the Defendant, heretofore on or about **December 21, 2021**, did then and there, while Sergeant Taylor Rollins, a peace officer, was performing a duty or exercising authority imposed or granted by law, to-wit: securing a scene and/or setting up a perimeter, with criminal negligence, interrupt, disrupt, impede, or interfere with the said Sergeant Taylor Rollins by failing to move across the street and/or by failing to follow Sergeant Taylor Rollins instructions to move.

AGAINST THE PEACE AND DIGNITY OF THE STATE.

FILED

2022 MAY 16  PM 5: 54

_Beverly McGrew Walker_
CLERK DISTRICT COURT
FORT BEND CO., TX

FOREMAN OF THE GRAND JURY

INDICTMENT   (ORIGINAL/DA)

Copy to County Clerk