United States District Court
Southern District of Texas
**ENTERED**
September 05, 2024
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JUSTIN PULLIAM, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:22-cv-04210 |
| | § | |
| FORT BEND COUNTY, TEXAS, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Justin Pulliam ("Pulliam") is a journalist who records law enforcement activities and frequently criticizes law enforcement officers. This criticism is lodged directly at law enforcement officers and through personal commentary in his videos. Pulliam publishes his work on Facebook and on his YouTube channel, "Corruption Report." He brings this civil rights case against Fort Bend County and certain members of the Fort Bend County Sheriff's Office ("FBCSO").

Pending before me is Pulliam's Motion for Partial Summary Judgment. Dkt. 61. Pulliam asserts that his constitutional rights were violated on two occasions. First, Pulliam argues his First and Fourteenth Amendment rights were violated when Fort Bend County Sheriff Eric Fagan ("Fagan") ordered Pulliam's removal from a July 2021 press conference. Second, Pulliam argues his First Amendment rights were violated during a separate incident in December 2021 during which a FBCSO sergeant arrested him for interference with public duties.

For the reasons discussed below, I recommend Pulliam's motion be **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Pulliam captured the July 2021 and December 2021 incidents on video.

A.      JULY 2021 PRESS CONFERENCE

On July 12, 2021, the FBCSO closed Jones Creek Ranch Park to the public after a corpse was discovered. Pulliam had been filming FBCSO activity in the park before the decision to close the park was announced. After being told the FBCSO had closed the park, Pulliam complained to the FBCSO officer who announced the decision, and to Fagan directly. The FBCSO officer told Pulliam to go to the park entrance where a press conference would be held. Fagan then told Pulliam that if Pulliam did not go to the park entrance within five minutes, he would be arrested. Pulliam again protested, but eventually walked to his truck and drove to the park entrance where reporters were gathered. Pulliam parked his truck about 10 parking spaces away from where the reporters had parked their cars.

About five minutes later, Fagan arrived at the press conference in a golf cart. Pulliam then walked toward the press conference. As Pulliam approached, Fagan told FBCSO Detective Robert Hartfield ("Hartfield") to remove Pulliam from the area of the press conference. Fagan pointed at Pulliam and told Hartfield: "If he don't do it, arrest him, 'cause he is not part of the local media, so he have to go back." Dkt. 61-6 at 15:50–15:57. Fagan's instruction was in-line with the FBCSO media relations policy, which specifically excludes social-media journalism from its definition of "media." *See* Dkt. 61-14 at 12 ("Media" is defined as "[p]ersons associated with television, print, electronic, or radio news programs/services and related entertainment enterprises. For purposes of this General Order this term does not generally include social media (this is defined and governed under General Order 05-04).").[1]

Hartfield then told Pulliam: "Mr. Pulliam, uh, you are not, uh, media, so at the sheriff's request, can you step back this way with us please?" *Id.* at 16:28–16:35.

---

[1] General Order 05-04 defines social media as "[o]nline sources that allow people to communicate and share information such as photographs, text, video, multimedia files and related items via online or cellular network platforms. In this General Order this also includes social networking platforms including but not limited to facebook, twitter, youtube, blogs . . . ." Dkt. 61-15 at 2.

Hartfield and Jonathan Garcia ("Garcia")—an officer from the Fort Bend County Constable's Office—escorted Pulliam back to his truck. When they reached Pulliam's truck—about 80 feet away, well beyond earshot of the press conference—Hartfield told Pulliam: "Mr. Pulliam, it would be greatly appreciated if you'd just stick right here. You're more than happy to film from right here. If you just stay back here that'd be great, okay, sir? Alright? I appreciate you." *Id.* at 17:03–17:12. Pulliam responded: "You're a joke. You're a joke, man. So I can be right here?" *Id.* at 17:12–17:16. Hartfield and Garcia walked back toward the press conference without responding to Pulliam's question. Pulliam, standing alone, then told his viewers watching live: "Well, I guess that's what I get for parking my truck too far back." *Id.* at 18:24–18:28.

**B.   DECEMBER 2021 ARREST**

On December 21, 2021, Pulliam arrived at a property where FBCSO personnel had responded to a welfare check. Both the FBCSO and Pulliam knew that the man who lived at the property had a mental illness, used a firearm, and had been the subject of FBCSO responses before. Upon arrival, the subject's mother confronted Pulliam. Pulliam told her he was there to ensure the FBCSO would not harm her son, and obtained her permission to film the events. FBCSO Officer Ricky Rodriguez ("Rodriguez") walked by, pointed in Pulliam's direction, and told him: "Sir, you need to stay back over there." Dkt. 61-9 at 0:38–0:41.

About four minutes later, FBCSO Sergeant Taylor Rollins ("Rollins") approached Pulliam, and the following interaction ensued:

> **Rollins:** Can you move across the street please?
> **Pulliam:** *Across* the street?
> **Rollins:** Yes, across the street.
> **Pulliam:** So you can shoot him?
> **Rollins:** [pauses] What's wrong with you, man?
> **Pulliam:** What's wrong with *you*?
> **Rollins:** Please go across the street, thank you.

[Two people arrive and tell Rollins they are social workers, and Rollins begins speaking with them. Pulliam stands several feet behind them.]

**Rollins:** [pointing at Pulliam] Across the street.

**Pulliam:** Well hold on, if it's not for safety, I already have permission from the land—I already have [the subject's mother's] permission to stay.

**Social worker:** [to Pulliam] Sir, you cannot film my client...

**Pulliam:** So is everyone leaving or just me?

**Rollins:** Across the street.

**Pulliam:** Everyone or just me?

**Rollins:** Five, four, three...

**Pulliam:** Oh, you're going to be like that? [starts slowly walking backwards]

**Rollins:** Two, one. Come here. Turn around. Thank you. I asked you twice. Three or four times. You're interfering with my job. You're making my job a lot harder than it needs to be.

*Id.* at 4:18–5:15 (emphasis added). Rollins handcuffed Pulliam, arrested him for interference with public duties,[2] and walked him to an FBCSO vehicle.

## C.   PROCEDURAL HISTORY

Pulliam filed this lawsuit on December 5, 2022. The live complaint includes the following claims: (1) free speech violation arising from the July 2021 press conference against Fagan, Hartfield, Garcia, and Fort Bend County; (2) equal protection violation arising from the July 2021 press conference against Fagan, Hartfield, Garcia, and Fort Bend County; (3) free speech violation arising from the December 2021 arrest against Fagan, Rollins, Rodriguez, and Fort Bend County; (4) First Amendment retaliation arising from the December 2021 arrest against Fagan, Rollins, Rodriguez, and Fort Bend County; and (5) Fourth Amendment violation against Fort Bend County. Pulliam also seeks injunctive relief,

---

[2] "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." TEX. PENAL CODE § 38.15(a)(1).

declaratory relief, and damages. On June 29, 2023, Judge David Hittner dismissed Pulliam's Fourth Amendment claim at the pleading stage. On September 14, 2023, Judge Hittner granted Pulliam's unopposed motion to dismiss the claims against Garcia and Rodriguez.[3]

Pulliam has moved for partial summary judgment on three claims: (1) violation of free speech arising from the July 2021 press conference against Fagan, Hartfield, and Fort Bend County; (2) equal protection violation arising from the July 2021 press conference against Fagan, Hartfield, and Fort Bend County; and (3) First Amendment retaliation arising from the December 2021 arrest against Rollins and Fort Bend County. Neither party has moved for summary judgment on Pulliam's violation of free speech claims arising from the December 2021 arrest, or Pulliam's retaliation claim against Fagan.

## LEGAL STANDARDS

### A.  SUMMARY JUDGMENT

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine issue of material fact exists when there is evidence sufficient for a rational trier of fact to find for the non-moving party." *Schnell v. State Farm Lloyds*, 98 F.4th 150, 156 (5th Cir. 2024) (quotation omitted).

"The movant has the burden of showing that there is no genuine issue of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant makes such a showing, "the burden shifts to the non-movant to produce evidence of the existence of such an issue for trial." *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015) (quotation omitted). The nonmoving party "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment." *Id.* (quotation omitted). I "may not . . . evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes." *Matter*

---

[3] Judge Hittner recused himself from this case on October 5, 2023. *See* Dkt. 59.

*of Green*, 968 F.3d 516, 520 (5th Cir. 2020) (quotation omitted). Rather, I "view all facts, and the inferences to be drawn from them, in the light most favorable to the nonmovant." *Brandon*, 808 F.3d at 269 (quotation omitted).

I "assign greater weight, even at the summary judgment stage, to the video recording taken at the scene." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (cleaned up). I "need not rely on [a party]'s description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.'" *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

## B.    42 U.S.C. § 1983

Section 1983 provides, in relevant part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation omitted).

To establish § 1983 liability against an individual officer, a plaintiff must show (1) "a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). Local governing bodies, however, are not liable under § 1983 based solely on the actions of their employees. *See Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010). A plaintiff may prevail against a local governing body only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). Establishing municipal liability under § 1983 requires a

plaintiff to identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Valle*, 613 F.3d at 541–42 (quotation omitted).

## C.   QUALIFIED IMMUNITY

Government officials sued in their individual capacity under § 1983 are entitled to assert the defense of qualified immunity, which is "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016). It is a judicially created doctrine designed to avoid "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The doctrine arises from "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties." *Id.* (cleaned up).

To overcome a defendant's assertion of qualified immunity, a plaintiff must demonstrate facts showing: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). "These steps may be considered in either order." *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018).

The first prong of the qualified immunity inquiry asks whether the facts "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a plaintiff's allegations, viewed favorably, do not establish a constitutional violation, no further inquiry is necessary. *See id.*

The second prong of the qualified immunity inquiry "asks whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotation omitted). Governmental actors are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). "[T]he salient question . . . is whether the state of the law" at the time of the incident provided the defendants "fair warning that their alleged [conduct] was unconstitutional." *Id.* at 741. A plaintiff bears a heavy burden on this prong because a right is clearly established only if relevant precedent "ha[s] placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

## ANALYSIS

**A.    JULY 2021 PRESS CONFERENCE: FREE SPEECH VIOLATION AGAINST FAGAN, HARTFIELD, AND FORT BEND COUNTY**

Pulliam brings a free speech violation claim against Fagan, Hartfield, and Fort Bend County stemming from the July 2021 press conference.

At the outset, I must address the threshold issue of whether the activities undertaken by Pulliam—a citizen who posts opinion-laden news coverage of law enforcement on social media channels—are protected by the First Amendment. The answer is, unequivocally, yes. "Freedom of the press is a fundamental personal right which is not confined to newspapers and periodicals. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (cleaned up). The media landscape has rapidly changed since *Branzburg*. The law has not. Nearly four decades after *Branzburg*, the Supreme Court stated:

> We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers. With the advent of the Internet and the decline of print and broadcast media, moreover, the line between media and others who wish to comment on political and social issues becomes far more blurred.

*Citizens United v. FEC*, 558 U.S. 310, 352 (2010). "In short, social media users . . . engage in a wide array of protected First Amendment activity." *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017).

### 1.   *Fagan*

Because Pulliam must overcome the affirmative defense of qualified immunity, Pulliam must demonstrate facts showing: "(1) that [Fagan] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 755 (quoting *Harlow*, 457 U.S. at 818).

### a.   **Violation of a Constitutional Right**

Pulliam contends he had a First Amendment right to attend the press conference, and that Fagan violated Pulliam's right to free speech when Fagan had Pulliam removed from the press conference on a speaker-based distinction between "media" and "not media." Dkt. 61 at 15. While within earshot of Pulliam, Fagan told Hartfield: "If [Pulliam] don't move, arrest him, 'cause he is not part of the local media, so he have to go back." Dkt. 61-6 at 15:50–15:57. While escorting Pulliam about 80 feet away (the length of 10 parking spots) from the press conference, Hartfield told Pulliam: "Step back this way with us please" because "you are not, uh, media." *Id.* at 16:30–16:35.

In other words, Pulliam argues that Fagan removed him from the press conference because he is a social-media journalist operating on YouTube and Facebook, as opposed to a journalist working for a traditional news outlet, such as a newspaper or television station. That distinction, Pulliam says, is improper. Pulliam is correct.

"[L]aws favoring some speakers over others demand strict scrutiny when the . . . speaker preference reflects a content preference. Thus, a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based." *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015) (quotation omitted). It is well-established that "restrictions

distinguishing among different speakers, allowing speech by some but not others," are "[p]rohibited" under the First Amendment. *Citizens United*, 558 U.S. at 340.

> Speech restrictions based on the identity of the speaker are all too often simply a means to control content.
>
> Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.

*Id.* at 340–41.

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quotations omitted). "To survive strict scrutiny . . . a State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve that asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992). "If a less restrictive alternative would serve the Government's purpose, the [Government] must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). The Supreme Court has "emphasized that it is the rare case in which the State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (quotation omitted).

Fagan's decision to exclude Pulliam from the press conference was based on Fagan's belief that Pulliam was "not part of the local media" (Dkt. 61-6 at 15:50–15:57), which reflects a content preference. Thus, Fagan faces the high hurdle of overcoming strict scrutiny. Fagan must show that his removal of Pulliam from the press conference "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quotations omitted).

To survive strict scrutiny review, Fagan first argues that "[Pulliam] was not 'excluded' from the press conference, he was merely directed to be a short distance away." Dkt. 62 at 8. Fagan testified that he wanted Pulliam only "[f]ar enough away that he wouldn't be interfering with the other news media, but not so far away where he couldn't see it or film it." Dkt. 61-2 at 82. Fagan also testified that if Pulliam had asked questions from 80 feet away, Fagan would have shouted answers back to Pulliam. *See id.* at 91. This argument misses the point. Even if reasonable minds could disagree as to whether Pulliam was removed from the press conference or simply moved back, Pulliam was unquestionably treated differently from other members of the media. Such speaker-based discrimination must pass strict scrutiny review.

Fagan next argues he removed Pulliam because of an earlier incident at Jones Creek Ranch Park between Pulliam and the victim's ex-husband. Details are light, but the record indicates that earlier that day, while Pulliam filmed mowers in the park, the ex-husband approached Pulliam. The ex-husband told Pulliam "to get the camera out of his face," Dkt. 61-1 at 7, grabbed Pulliam's cellphone out of his hand, and threw it on the ground. Pulliam did not engage with the ex-husband, press charges, or publish any video of the incident. Fagan testified about the incident:

> I was told that [Pulliam had] just apparently gotten into a[n] altercation with one of the family members, and one of the family members wanted to attack Justin Pulliam, and, in fact, I was told that one of the family members slapped the camera, or phone, or something out of Justin Pulliam['s] hand, and they had to physically restrain the two apart, so I wanted him away from them.

Dkt. 61-2 at 70.

This justification fails strict scrutiny for two reasons. First, Fagan did not raise this justification until this litigation commenced. The video conclusively establishes that the only justification spoken aloud at the time concerned Fagan's belief that Pulliam was not part of the local media. *See* Dkt. 61-6 at 15:50–15:57. "Government justifications for interfering with First Amendment rights must be

genuine, not hypothesized or invented *post hoc* in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (cleaned up). Justifications for such interference must also be communicated to the affected person. *See id.* ("But [defendant] never raised concerns along these lines in its contemporaneous correspondence with [plaintiff]."). Fagan never communicated concerns about the prior incident between Pulliam and the victim's ex-husband until after Pulliam sued Fagan to vindicate Pulliam's constitutional rights. Thus, I will not give this *post hoc* justification any credence.

Second, the incident with the ex-husband is unrelated to the press conference and the infringement of Pulliam's First Amendment rights. A restriction on speech "is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (quotation omitted). Fagan testified that he wanted the press conference to occur away from the victim's family. As a result, the FBCSO placed the family a "[c]ouple of blocks" away from the press conference. Dkt. 61-2 at 71. The idea that Fagan removed Pulliam 80 feet away from the press conference to protect the victim's family—who were themselves blocks away from the press conference—defies logic. In fact, Fagan and the FBCSO employee *told Pulliam to go to the park entrance for the press conference*. As such, Fagan's intrusion upon Pulliam's First Amendment rights was not narrowly tailored.

Fagan's final justification—again, raised only in the context of this litigation and not disclosed to Pulliam on the day of the press conference—is that other journalists told Fagan that they have generally had negative interactions with Pulliam. Fagan testified that other journalists told him "that he's not a part of the media, he's making it difficult for us, he's embarrassing us, he won't—they said something about he won't listen. He's fussing and stuff; exactly what they said, I don't remember." *Id.* at 87. Fagan agreed that "the general gist of the media's complaint was that he wasn't media and he wasn't acting very professional." *Id.* This justification for removing Pulliam from the press conference is so vague that

Fagan admits he does not know the details behind it. "Narrow tailoring requires that the regulation be the least restrictive means available to the government." *Denton v. City of El Paso*, 861 F. App'x 836, 839 (5th Cir. 2021). As Pulliam points out, Fagan could have warned Pulliam that any disruption or annoyance that Pulliam caused other reporters during the press conference would result in removal. Again, Fagan cannot satisfy the high standard of strict scrutiny.

But the analysis does not end there. Fagan argues that summary judgment should not be granted in Pulliam's favor because Fagan is entitled to qualified immunity. Although I find that Fagan violated Pulliam's First Amendment rights, for Pulliam to prevail, I must also find that Fagan violated clearly established law.

### b.   Clearly Established Law

That Fagan's actions violated Pulliam's First Amendment rights was established by the Supreme Court decades ago: "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972). "Freedom of the press is a fundamental personal right which is not confined to newspapers and periodicals." *Branzburg*, 408 U.S. at 704 (quotation omitted). "Where a government restricts the speech of a private person, the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edison Co. of N.Y., Inc. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 530, 540 (1980).

The First Amendment also protects Pulliam's right to simply listen and observe the press conference. "The First Amendment protects the right to hear as well as to speak," so that which "silences a willing speaker . . . also works a constitutional injury against the hearer." *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1211 (5th Cir. 1982); *see also Va. State Bd. of Pharm. v. Va. Citizen Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the

protection afforded is to the communication, to its source and recipients both."). There is no question that Fagan violated clearly established law.

Courts have forcefully held that restricting information from one reporter, when that same information is given to other reporters at the same event, is prohibited by the First Amendment. *See Sherill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977) ("[A]rbitrary or content-based criteria for press pass issuance are prohibited under the first amendment. . . . [T]he first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons. Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." (cleaned up)); *United Tchrs. of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1375 (S.D. Fla. 2002) ("Defendants must demonstrate a compelling interest to support their policy of classifying Plaintiffs as 'particular-profession media' and excluding them on this basis."); *Borreca v. Fasi*, 369 F. Supp. 906, 909 (D. Haw. 1974) (The "right of access [to news] includes a right of access to the public galleries, the press rooms, and the press conferences dealing with government. . . . The foregoing seems obvious and elementary in the light of our political and juridical history."); *Consumers Union of U.S., Inc. v. Periodical Correspondents' Assoc.*, 365 F. Supp. 18, 25–26 (D.D.C. 1973) ("While it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news, the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of newsgathering presents a wholly different situation. Access to news, if unreasonably or arbitrarily denied . . ., constitutes a direct limitation upon the content of the news." (cleaned up)), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975).

In this case, the video speaks for itself. Pulliam walked up to the press conference as directed by an FBCSO employee. Before the press conference even

began, Fagan ordered Pulliam's removal without offering a justification that survives strict scrutiny. As such, Fagan is not entitled to qualified immunity. A trial as to Fagan's liability on this claim is unnecessary. A jury should determine only the quantum of damages that Fagan owes to Pulliam.

### 2.    *Hartfield*

For the reasons discussed above as to Fagan, Hartfield violated Pulliam's First Amendment rights by removing Pulliam from the press conference. Hartfield, however, was simply following orders from Fagan. This raises the question of whether a reasonable officer would have thought that complying with a superior's order constituted violation of a clearly established right.

In *Heaney v. Roberts*, 846 F.3d 795 (5th Cir. 2017), a Louisiana parish councilman ordered a citizen's removal from a council meeting after a testy back-and-forth with the citizen during a public comment period. The citizen sued the councilman and the deputy who physically removed the citizen from the meeting. The Fifth Circuit affirmed the district court's finding that the deputy was entitled to qualified immunity. Here, as in *Heaney*, "[Hartfield] had no reason to believe that he was violating [Pulliam]'s First Amendment rights by following [Fagan]'s order. . . . [Hartfield] was not required to cross-examine and second-guess [Fagan] regarding First Amendment motives before acting." *Id.* at 804 (quotation omitted).

Although Hartfield has not moved for summary judgment, he vaguely argues in his response that he is entitled to qualified immunity. Thus, I recommend the court *sua sponte* find that Hartfield is entitled to qualified immunity and dismiss him from this case. *See Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770–71 (5th Cir. 2000) ("[A] district court may grant summary judgment *sua sponte*, so long as the losing party has ten days notice to come forward with all of its evidence in opposition to summary judgment." (quotation omitted)). Pulliam has 14 days to object to this Memorandum and Recommendation and explain why summary judgment should not be awarded to Hartfield on this claim. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2).

### 3.    Fort Bend County

To hold Fort Bend County liable for the violation of his First Amendment rights, Pulliam must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Valle*, 613 F.3d at 541–42 (quotation omitted). These three elements "are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

#### a.    Official Policy and Final Policymaker

In this case, I may examine the first two elements of municipal liability—an official policy and a final policymaker—together.

"[E]ven a single decision may constitute municipal policy in rare circumstances when the official . . . possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim." *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019) (quotations omitted). "When the policymakers are the violators, no further proof of municipal policy or custom is required." *Anderson v. City of McComb*, 539 F. App'x 385, 388 n.2 (5th Cir. 2013); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983."). "[T]his 'single incident exception' is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." *Valle*, 613 F.3d at 542.

"In Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 448 (5th Cir. 2019) (cleaned up). Fagan, as sheriff, is a final policymaker for § 1983 purposes. As such, the first two elements of municipal liability are satisfied.

### b.   Moving Force

The final prong of municipal liability "requires a plaintiff to prove 'moving force' causation." *Valle*, 613 F.3d at 542. For this prong, Pulliam "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Pulliam "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411.

Fagan had Pulliam removed from the press conference because, in Fagan's eyes, Pulliam is "not media." *See* Dkt. 61-6 at 15:50–15:57. Fagan followed the letter of the FBCSO media relations policy—*that he approved*—when he had removed Pulliam from the press conference. The policy specifically excludes social-media journalism from its definition of "media." *See* Dkt. 61-14 at 12 ("[M]edia" is defined as "[p]ersons associated with television, print, electronic, or radio news programs/services and related entertainment enterprises. For purposes of this General Order this term does not generally include social media."). Yet, Pulliam has the same First Amendment rights as journalists who work for more traditional outlets, such as newspapers or television stations. *See Citizens United*, 558 U.S. at 352. Because the FBCSO policy excludes social media journalists from its definition of "media" and the policy's protections, an improper distinction sits at the heart of the policy.

Remarkably, the County argues:

> [Fagan]'s actions in moving Pulliam a short distance away from
> members of the media is unrelated to the exercise of [Pulliam]'s First
> Amendment rights. It was instead based on [Pulliam]'s conduct
> earlier that day getting into physical and verbal altercations with the
> members of the victim's family and members of the media.

Dkt. 62 at 9. This is unpersuasive. As discussed, the victim's family was stationed blocks away from the press conference, so Pulliam would not have encountered the victim's family at the press conference. Moreover, these justifications were not communicated to Pulliam and were only raised in response to this litigation. Fort Bend County cannot raise a *post hoc* justification for violating Pulliam's First Amendment rights. *See Kennedy*, 597 U.S. at 543 n.8.

As such, Pulliam's motion for partial summary judgment should be granted as to his free speech violation claim against Fort Bend County arising from the July 2021 press conference. Trial should proceed on this claim to determine only the amount of damages that Fort Bend County owes to Pulliam.

\* \* \*

In sum, I recommend Pulliam's motion for partial summary judgment be granted as to his free speech violation claims against Fagan and Fort Bend County arising from the July 2021 press conference. I recommend Pulliam's claim against Hartfield be dismissed *sua sponte* because Hartfield is entitled to qualified immunity. Pulliam may explain in his objections to this recommendation why summary judgment should not be granted in favor of Hartfield.

**B.   JULY 2021 PRESS CONFERENCE: EQUAL PROTECTION CLAIM AGAINST FAGAN, HARTFIELD, AND FORT BEND COUNTY**

Next, Pulliam brings equal protection claims against Fagan, Hartfield, and Fort Bend County arising from the July 2021 press conference.

"Generally, to establish a Fourteenth Amendment equal protection claim [Pulliam] must prove that similarly situated individuals were treated differently." *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021) (cleaned up). "'Similarly situated' means 'in all relevant aspects alike.'" *Golden Glow Tanning Salon, Inc. v. City of Columbus*, 52 F.4th 974, 978 (5th Cir. 2022) (quoting *Tex. Ent. Ass'n*, 10

F.4th at 513). "Once that threshold showing is made, the court determines the appropriate level of scrutiny for . . . review." *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 468 (5th Cir. 2021).

Pulliam argues he is similarly situated to the other reporters standing at the press conference. Defendants fail to address Pulliam's equal protection claims in their response to Pulliam's motion for partial summary judgment.

"There is no precise formula to determine whether an individual is similarly situated to comparators." *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012) (cleaned up). Generally, "comparators must be *prima facie* identical in all relevant aspects." *Id.* at 233–34. "[T]he inquiry is case-specific and requires [courts] to consider the full variety of factors that an objectively reasonable decisionmaker would have found relevant in making the challenged decision." *Id.* at 234. Here, there is no question Pulliam is similarly situated to the other journalists who were present at the press conference. Both Pulliam and the other journalists were trying to collect information about the body found in the park and the ensuing investigation. Each of the journalists, including Pulliam, were told to gather at that specific place—near the entrance of the park—for the press conference. Each of them attended for the purpose of gathering and reporting information. Thus, when considering all relevant factors, I find Pulliam is similarly situated to the other journalists present at the press conference.

Having made this finding, I must now determine the appropriate level of scrutiny. *See Golden Glow*, 52 F.4th at 979. If the "classification impermissibly interferes with the exercise of a fundamental right," strict scrutiny applies. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). The Supreme Court "has characterized the freedom of speech and that of the press as fundamental personal rights and liberties. The phrase is not an empty one and was not lightly used." *Schneider v. State of N.J., Town of Irvington*, 308 U.S. 147, 150 (1939). Because this case involves the fundamental rights inherent to the First Amendment, strict scrutiny applies. "Under strict scrutiny, the government must adopt the least

restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

For the same reasons discussed above regarding Pulliam's free speech violation claim arising from the July 2021 press conference, Pulliam's motion for partial summary judgment should be granted as to his equal protection claims against Fagan and Fort Bend County. Fagan and Fort Bend County "can fare no better under the Equal Protection Clause than under the First Amendment itself." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 55 n.4 (1986); *see also Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 780 (9th Cir. 2014) ("Where plaintiffs allege violations of the Equal Protection Clause relating to expressive conduct, we employ 'essentially the same' analysis as we would in a case alleging only content or viewpoint discrimination under the First Amendment." (quoting *Barr v. Lafon*, 538 F.3d 554, 575 (6th Cir. 2008))). A jury determines only the amount of damages that Fagan and Fort Bend County owe Pulliam.

## C. DECEMBER 2021 ARREST: FIRST AMENDMENT RETALIATION CLAIM AGAINST ROLLINS AND FORT BEND COUNTY

For Pulliam to prevail on his First Amendment retaliation claim against Rollins and Fort Bend County arising out of his December 2021 arrest, he must prove: "(1) [he was] engaged in constitutionally protected activity, (2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [his] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). "[A] 'plaintiff pressing a retaliatory arrest claim' based on speech protected by the First Amendment generally 'must plead and prove the absence of probable cause for the arrest.'" *Grisham v. Valenciano*, 93 F.4th 903, 909 (5th Cir. 2024) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019)). There is one exception to this rule: A plaintiff need not establish the absence of probable cause if the arrest

is a "circumstance[] where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 587 U.S. at 406.

Pulliam first argues that Rollins did not have probable cause to arrest him for interference with public duties. "Although the probable cause inquiry is an objective one, it must nevertheless be conducted in light of the actual facts known to the officer at the time of the arrest." *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). Further, Rollins "is entitled to qualified immunity even if he did not have probable cause to arrest a suspect, if a reasonable person in his position would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Voss v. Goode*, 954 F.3d 234, 239 (5th Cir. 2020).

Rollins testified about the reason he arrested Pulliam: "Because now [Pulliam is] making me turn[] my attention and he's arguing. Now he's instigating an arguing match with me, taking all my attention away from scene security of the scene, and now I'm having to deal with him, delaying everything and putting everybody's safety in jeopardy." Dkt. 61-3 at 55–56. Rollins went on:

> It's everything in between that pointed to me that he was there to interrupt, to cause a scene, to make my job more difficult, to pull me away from the safety, securing the scene and making everybody as safe as possible as I could, and I didn't have time for that, and it was clear to me what his intentions were.

*Id.* at 56.

It is unclear who else was present at the scene—a fact that bears on the veracity of Rollins's claim to have needed Pulliam across the street for scene security purposes. Before the interaction, Rodriguez told Pulliam to stay at the spot where Pulliam spoke with the subject's mother, before Rodriguez assumed a position closer to the subject's believed location. *See* Dkt. 61-9 at 0:35–4:18. It is

unclear where the subject's mother, or any other people nearby, were located during this period. Such facts are relevant to any probable cause determination.

"[M]erely arguing with police officers about the propriety of their conduct . . . falls within the speech exception to [the interference with public duties statute]' and thus does not constitute probable cause to arrest someone for interference." *Gorsky v. Guajardo*, No. 20-20084, 2023 WL 3690429, at *8 n.16 (5th Cir. 2023) (quoting *Freeman*, 483 F.3d at 414). Cases where courts find probable cause for interference-with-public-duties arrests usually involve some sort of physical obstruction by the arrestee. *See Gorsky*, 2023 WL 3690429, at *9 (collecting cases where courts found that officers had probable cause to arrest for interference with public duties "where the interference consisted of physical obstruction or commands to act in a way that interfered with instructions made with legal authority"); *see also Freeman*, 483 F.3d at 414 (noting that arguing with officers is not an offense under § 38.15, "yelling and screaming . . . alone does not take [an arrestee's] conduct out of the realm of speech," and finding a lack of probable cause where "there is nothing to indicate that [the arrestee's] conduct involved anything other than speech or that she physically obstructed the deputies in any way"). Here, Pulliam did not physically obstruct Rollins from carrying out his job, nor did Pulliam instruct anyone else to obstruct Rollins. If Rollins needed Pulliam to stand across the street for scene security purposes, a jury should weigh in on the veracity of that explanation.

Pulliam argues alternatively that even if Rollins did have probable cause to arrest Pulliam, the *Nieves* exception applies. "To fall within the exception, [Pulliam] must produce evidence to prove that his arrest occurred" in a circumstance "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Gonzalez v. Trevino*, 144 S. Ct. 1663, 1667 (2024) (quotation omitted). "The only express limit [the Supreme Court] placed on the sort of evidence a plaintiff may present for that purpose is that it must be objective in order to avoid 'the significant problems that would arise from

reviewing police conduct under a purely subjective standard.'" *Id.* (quoting *Nieves*, 587 U.S. at 407).

The Supreme Court issued *Gonzalez* after Pulliam filed the instant motion and his reply brief. *Gonzalez* invalidated Fifth Circuit law which had stated that, in order to fall within the *Nieves* exception, a plaintiff "had to provide very specific comparator evidence—that is, examples of identifiable people who [acted] in the same way [the plaintiff] did but were not arrested." *Gonzalez*, 144 S. Ct. at 1667. The Supreme Court said the Fifth Circuit's previous "demand for virtually identical and identifiable comparators goes too far." *Id.*

In his reply, Pulliam noted that the Supreme Court could invalidate the Fifth Circuit's specific-comparator-evidence requirement in the upcoming *Gonzalez* opinion. *See* Dkt. 64 at 28–29 n.31. Pulliam was proven correct. Although Pulliam "preserve[d] the right to argue the new rule," *id.*, he has not requested a new round of briefing on the issue in the months since *Gonzalez* was issued. That Defendants have not had a chance to brief this issue mandates denial of Pulliam's motion for partial summary judgment on this claim.

## CONCLUSION

I recommend Pulliam's motion for partial summary judgment be **GRANTED** as to Fagan and Fort Bend County's liability on Pulliam's free speech and equal protection violation claims arising from the July 2021 press conference. A jury trial on these claims should address only damages.

I recommend Pulliam's free speech violation claim against Hartfield be **DISMISSED** *sua sponte* because Hartfield is entitled to qualified immunity. Pulliam may raise in his objections to this Memorandum and Recommendation any reasons why his claim against Hartfield should not be dismissed.

Finally, I recommend Pulliam's motion for partial summary judgment as to his First Amendment retaliation claims against Rollins and Fort Bend County be **DENIED**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this ___5ᴹ___ day of September 2024.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE