**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JUSTIN PULLIAM | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO.: 4:22-CV-4210 |
| | § | |
| | § | |
| FORT BEND COUNTY, TEXAS, ET. | § | |
| AL., | § | |

**APPENDICES TO
DEFENDANTS' MOTION TO EXCLUDE
UNDISCLOSED EVIDENCE AND DAMAGES
AND
OBJECTIONS TO PLAINTIFF'S PROPOSED TRIAL EXHIBITS**

**Appendix 1:** Appendix of Evidence.

> **Exhibit 1:** Plaintiff's final Initial Disclosures.
>
> **Exhibit 2:** June 24, 2025 e-mail from Plaintiff's counsel to Defendants' counsel producing copies of exhibits and exhibit list.
>
> **Exhibit 3:** June 26, 2025 e-mail from Plaintiff's counsel to Defendants' counsel providing reasons for the failure to disclose.
>
> **Exhibit 4:** Declaration of Kevin T. Hedges.

**Appendix 2:** Plaintiff's Proposed Trial Exhibits.

> **Index:** Plaintiff's proposed trial exhibit list.
>
> **PX-04:** Purported photo of vantage point across the street.
>
> **PX-10:** YouTube video published on (May 5, 2022).
>
> **PX-13:** Summary of PX-12.
>
> **PX-14:** E-mail.
>
> **PX-17:** Video of Oct. 2, 2023 FBCSO interaction.
>
> **PX-18:** Video of Oct. 15, 2024 FBCSO interaction.

**PX-19:**     Video of Apr. 13, 2020 HCCO Pct. 5 interaction.

**PX-21:**     Oct. 18, 2023 letter from AG.

**PX-22:**     Nov. 17, 2022 Pulliam letter to Sheriff Fagan.

**PX-23:**     Mar. 17, 2023 J. Buechmann E-mail.

**PX-24:**     DA Middleton's purported text messages.

**PX-25:**     Aug. 28, 2024 letter from AG.

**PX-26:**     Aug. 28, 2024 letter from AG.

**PX-27:**     Total damages summary.

**PX-28:**     Purported social media posts.

**PX-29:**     Purported news article.

**PX-30:**     Pulliam background report.

**PX-31:**     Jan. 10, 2023 letter from DPS.

**PX-32:**     Receipts.

**PX-33:**     Receipts.

**PX-34:**     Checks purportedly made to criminal defense lawyer.

**PX-35:**     Summary of criminal case expenses.

**PX-36:**     YouTube analytics for Pulliam video.

**PX-37:**     Chart of "all police events filmed per month."

**PX-38:**     Summary of YouTube data.

**PX-39:**     Summary of YouTube data.

**PX-40:**     Summary of YouTube data.

**PX-41:**     Summary of "business damages to YouTube platform revenue."

**PX-42:**     Chart of YouTube data.

**PX-43:**     Summary of YouTube data.

**PX-44**      Summary of YouTube data.

**PX-45**     Summary of YouTube data.

**PX-48**     30(b)(6) deposition transcript.

**PX-49**     Sheriff Fagan deposition transcript.

**PX-50**     Photo.

**PX-52**     Dec. 21, 2021 video with subtitles

# Appendix 1

Appendix of Evidence

# Exhibit 1

Plaintiff's final Initial Disclosures

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM, | |
| *Plaintiff*, | |
| v. | Civil Action No.4:22-cv-4210 |
| COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity, | |
| *Defendants*. | |

## PLAINTIFF'S AMENDED RULE 26 INITIAL DISCLOSURES

In accordance with Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff Justin Pulliam serves these Amended Initial Disclosures to Defendants. These disclosures are based on information that is currently known to Plaintiff and may not be conclusive. Investigation is continuing. Plaintiff reserves the right to supplement and/or amend any of these disclosures. Plaintiff also reserves the right

1

to seek discovery from any person identified by Defendants in their disclosures and responses to written discovery.

1.    **Individuals likely to have discoverable information that Plaintiff may use to support his claim:**

a.    *Justin Pulliam*. Justin has information about both his exclusion from the July 2021 press conference and his December 2021 arrest, as well as other allegations in the complaint. He can be contacted through undersigned counsel.

b.    

c.    *Defendants Fort Bend County and Eric Fagan*. These defendants have information about both the July 2021 press conference incident and the December 2021 arrest, as well as the secondhand allegations in the search warrant affidavits and other allegations in the complaint. They also have information about the County's practices, customs, and policies pertaining to the County's treatment of Justin. They may be contacted through Defendants' counsel.

2

    **d.** ***Defendants Robert Hartfield and Jonathan Garcia.*** These defendants may have information about the July 2021 press conference incident, as well as other allegations in the complaint. They may be contacted through Defendants' counsel.

    **e.** ***Defendants Taylor Rollins and Ricky Rodriguez.*** These defendants may have information about the December 2021 arrest incident, as well as the secondhand allegations in the search warrant affidavits and other allegations in the complaint. They may be contacted through Defendants' counsel.

    **f.** ***Chief Deputy Mattie Provost.*** Ms. Provost may have information about the December 2021 arrest incident, as well as other allegations in the complaint. Her contact information is unknown, but she is a current employee of defendants Fort Bend County and Sheriff Eric Fagan.

    **g.** ***Texana workers on the scene of the December 2021 incident.*** These individuals may have information about the December 2021 arrest incident, as well as other allegations in the complaint. Names and contact information of the two Texana workers:





h. *Reporters on the scene of the July 2021 press conference incident.*
These individuals may have information about the July 2021 press conference incident, as well as other allegations in the complaint. Names and contact information of two of the reporters:



i. *Fort Bend County Sheriff's Office Detective Travis James.* James may have information about the secondhand information in the search warrant affidavits, as well as other allegations in the complaint. His contact information is currently unknown, but he is a current employee of defendants Fort Bend County and Sheriff Eric Fagan.

2.    **Documents, electronically stored information, and tangible things in Plaintiff's possession, custody, or control that Plaintiff may use to support her claim:**

Plaintiff may use digital documents, including video files, in his custody pertaining to both the July 2021 and December 2021 incidents. Plaintiff may use digital documents in his possession pertaining to his prosecution. Plaintiff may also use digital documents, including video files, pertaining to defendant Fort Bend County's pattern or practice of treating him differently from other journalists.

3.    **Computation of each category of damages claimed by the disclosing party:**

Plaintiff seeks damages in the amount of $1,957.19 for his currently confiscated recording equipment; $500 in bail payments; expenses related to his ongoing criminal prosecution (which are currently accruing and cannot be computed at this time); damages for his unlawful arrest and incarceration, including mental suffering as a result of his arrest and ongoing prosecution (currently accruing); and losses to his YouTube and other monetized social media channels (currently accruing). In the event Plaintiff is successful in this action, he also intends to seek costs, including attorneys' fees, from Defendants. These costs are also currently accruing and therefore cannot be computed at this time.

**4.    Any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment:**

Not applicable.

Dated: August 24, 2023                    Respectfully submitted,

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge
Texas Bar No. 24099898
Federal ID No. 3844981
Jeffrey Rowes*, of counsel
Texas Bar No. 24104956
Institute for Justice
816 Congress Ave., Suite 960
Austin, TX 78701
Tel: (512) 480-5936
Fax: (512) 480-5937
Email: chebert@ij.org
          jrowes@ij.org

Joshua House*, of counsel
California Bar No. 284856
Institute for Justice
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: jhouse@ij.org

*Attorneys for Plaintiff*
*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2023, a true and correct copy of the foregoing Plaintiff's Amended Rule 26 Initial Disclosures was served via e-mail on the following counsel of record:

Kevin Hedges, Attorney-in-Charge
Texas Bar No. 09370100
Federal ID No. 9939
Fort Bend County Attorney's Office
401 Jackson Street, 3rd Floor
Richmond, Texas 77469
Tel.: (281) 341-4555
Fax: (281) 341-4557
Kevin.Hedges@fbctx.gov

*Attorney-in-Charge for Defendants*

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge

*Attorney for Plaintiff*

# Exhibit 2

June 24, 2025 E-mail

| | |
|---|---|
| **From:** | Christie Hebert |
| **To:** | Krueger, Rolf; Hedges, Kevin |
| **Cc:** | Svatek, Amy; Jeff Rowes; Michael Peña; Kendall Morton; Elina Pavlukhina |
| **Subject:** | Pulliam v. Fort Bend County et al.: Pretrial Filings and Exhibits |
| **Date:** | Tuesday, June 24, 2025 2:33:01 PM |
| **Attachments:** | (2025.06.24) Joint Exhibit List DRAFT.docx |
| | (2025.06.24) Pl."s Exhibit List.docx |
| | Joint Pretrial Order revised 6.24.25_clean.docx |
| | Joint Pretrial Order revised 6.24.25_redlined.docx |

Rolf and Kevin,

Attached you will find the following:

1. **Draft Joint Exhibit List:** We attempted to identify exhibits from both Plaintiff's and Defendants' exhibit lists that the parties would likely agree to jointly admit. In the version attached, we made notes identifying corresponding exhibits that Defendants previously provided or other information we thought important. These notes are for opposing counsel only. We intend to remove the notes column before filing. Please let us know if you agree to the proposed joint exhibit list or if you have suggested changes.

2. **Plaintiff's Exhibit List**

3. **Revised Draft of the Joint Pretrial Order:** We sought to reconcile Plaintiff's and Defendants' drafts with revisions to Plaintiff's draft. I have provided both a redlined copy and a clean copy of the revised draft. If you have additional changes, please redline the clean copy (**clean** in title) to avoid version and formatting issues.

Here are links to the corresponding categories of exhibits:

- **Proposed Joint Exhibits:**
  https://www.dropbox.com/scl/fo/jq9eophr5evkkz4pxsf7b/AE8XHUX9FHHVF8Y4c1aojO4?rlkey=wy5d48a2ef1xtixxzvrnaa2u9&st=2752pjbb&dl=0

- **Plaintiff's Exhibits:**
  https://www.dropbox.com/scl/fo/lnp3y567oqhv5p1ye54d5/AA7oO2OM64Mp08Fe2KTsl_8?rlkey=swtihfib2ap56immah5aeehrg&st=bpsdr30z&dl=0

Finally, two additional notes:

- We noticed that Defendants indicated in their draft of the joint pretrial order that Detective James may be unavailable for trial due to the impending birth of a child. Can you please provide more information? What is the likelihood that Detective James will be unavailable to testify at trial? If Detective James is unavailable for trial, Plaintiff intends to admit excerpts of his deposition testimony where needed and may seek a continuance of the trial to obtain his live testimony. We hope that isn't required, but we reserve the right to take all necessary steps to obtain the testimony we need.

- ███████████████████████████████████████████████
  ███████████████████████████████████████████████
  ████████████████

Please feel free to reach out with any questions, and our team is happy to do a call if needed. In particular, we are open to discussing objections to our exhibits to see what we can resolve ahead of time to minimize the number of evidentiary issues we have to put before the Court.

Best,
Christie

 **CAUTION:** This email originated from **outside** of the organization. '<u>chebert@ij.org</u>' **Do not click** links, open attachments, or respond unless you recognize the sender and know the content is safe. Please forward suspicious emails to the **IT Service Desk.**

# Exhibit 3

June 26, 2025 E-mail

| From: | Christie Hebert |
|---|---|
| To: | Krueger, Rolf |
| Cc: | Hedges, Kevin; Svatek, Amy; Jeff Rowes; Michael Peña; Kendall Morton; Elina Pavlukhina |
| Subject: | RE: Question Regarding Exhibits |
| Date: | Thursday, June 26, 2025 11:20:00 AM |

Good morning Rolf,

Thanks for getting back to us. I'll keep an eye out for your revisions to the Joint Pretrial Order. It would be great if we can get that squared away before the weekend.

For the Plaintiff's exhibits that you identified, we did not produce them during discovery because Defendants did not make any requests for production at any point as I mentioned in my email on May 31, 2025. Pulliam had an affirmative duty to disclose these specific documents under Rule 26(a)(3) for pretrial disclosures, as ordered by Judge Hanks. That said,

- PX 5 consists of photos that were exhibits at Plaintiff's criminal trial and therefore were available to the County.
- PX 8 is a Facebook post that was provided via email as a courtesy to Kevin Hedges and Amy Svatek on 8/15/23 following Mr. Hedges' informal request at Pulliam's deposition. It was also included with Plaintiff's summary-judgment motion as Exhibit 12.
- PX 12 consists of arrest reports that Defendants produced in response to Pulliam's RFP 12 but that Defendants failed to Bates label.
- PX 13 is a summary of PX 12.
- PX 14 is an email from FBCSO that was produced in response to an open-record request by Plaintiff. Defendants should have produced this email in discovery, but they failed to do so.
- PX 16 was an exhibit at Sheriff Fagan's deposition, a copy of which was provided with Sheriff Fagan's deposition transcript.
- PX 21- 26 concern Plaintiff's open-records requests made to the County. These documents are within the County's possession. Indeed, PX 23 and 24 are the County's responses. At least a portion of PX24 should have been produced in response to Plaintiff's RFP 4, but Defendants failed to produce it.

I hope that answers your questions.

For Defendants' Exhibits:

- DX 15 isn't a 911 call. It seems to be a call from the Texana employee to the FBCSO's main phone line. This also appears to be responsive to Pulliam's RFP #3, but it doesn't seem to have been produced in discovery. We'll object to this unless there is a reason you think it's admissible.
- DX 20 wasn't produced in discovery but is responsive to Pulliam's RFP #15. We'll object to this unless there is a reason you think it's admissible.
- DX 43 is the entirety of Plaintiff's deposition. Plaintiff will be available to testify. We'll

object to this unless there is a reason you think it's admissible.

- For DX 17, 50-57, can you please provide the Bates-labeled versions that Defendants claim were produced in discovery? These documents are dated 6/4/2025.

Best,
Christie

**From:** Krueger, Rolf <Rolf.Krueger@fortbendcountytx.gov>
**Sent:** Thursday, June 26, 2025 8:16 AM
**To:** Christie Hebert <chebert@ij.org>
**Cc:** Hedges, Kevin <Kevin.Hedges@fortbendcountytx.gov>; Svatek, Amy
████████████████████████; Jeff Rowes <jrowes@ij.org>; Michael Peña <mpena@ij.org>;
██████████████████████████
**Subject:** Question Regarding Exhibits

Christie:

Hope all is well.  We're still working though proposed changes to the Joint Pretrial Order and analyzing your client's proposed exhibits.  We hope to have something to y'all soon.  I do have a few questions though.

**Exhibits**

Could you please identify the bates numbers, and the dates the documents were produced, for the following exhibits:

- PX 04
- PX 05
- PX 08
- PX 12
- PX 13
- PX 14
- PX 16
- PX 19
- PX 21 – 45 (or the data that supports these summaries)
- PX 50

I'm admittedly still catching up with this file, so I'm likely missing it.

**Det. Travis James**

Det. James' wife is due on July 24th.  I don't anticipate that there will be a problem with his availability but want to make sure y'all are aware of the potential issue.

Thanks,



**Rolf F. Krueger**
Assistant County Attorney
Fort Bend County Attorney's Office
301 Jackson Street, 5th Floor
Richmond, Texas 77469
Direct: (832) 471-1171
Fax: (281) 341-4557
*rolf.krueger@fortbendcountytx.gov*

**+++++CONFIDENTIALITY NOTICE+++++**
The information in this email may be confidential and/or privileged.  This email is intended to be reviewed by only the individual or organization named above.  If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited.  If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.  Thank you in advance for your assistance.

**Disclaimer, Email Does Not Constitute a Binding Agreement.** This email does not constitute an agreement to conduct transactions by electronic means and does not create any legally binding contract or enforceable obligation in the absence of a fully signed written contract.

**CAUTION:** This email originated from **outside** of the organization. '*chebert@ij.org*' **Do not click** links, open attachments, or respond unless you recognize the sender and know the content is safe. Please forward suspicious emails to the **IT Service Desk.**

# Exhibit 4

Declaration of Kevin T. Hedges

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JUSTIN PULLIAM | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO.: 4:22-CV-4210 |
| | § | |
| | § | |
| FORT BEND COUNTY, TEXAS, ET. | § | |
| AL., | § | |

**DECLARATION OF KEVIN T. HEDGES**

I, Kevin T. Hedges, do hereby declare and state as follows:

"My name is Kevin T. Hedges.  I am over twenty-one (21) years of age, of sound mind, and capable of making this Declaration.  The facts stated in this Declaration are within my personal knowledge and are true and correct:

1.      Exhibit 1 to this Motion is a true and correct copy of Plaintiff's Amended Rule 26 Initial Disclosures served on August 24, 2023.

2.      Exhibit 2 to this Motion is a true and correct copy of an e-mail sent from Ms. Christie Hebert on June 24, 2025.

3.      Exhibit 3 to this Motion is a true and correct copy of an e-mail sent from Ms. Christie Hebert on June 26, 2025.

My name is Kevin T. Hedges.  I declare under the penalty of perjury that the foregoing is true and correct to the best of my ability.

Executed in Fort Bend County, State of Texas on the 30th day of June, 2025.

*/s/ Kevin T. Hedges*
Kevin T. Hedges

# Appendix 2

Plaintiff's Proposed Trial Exhibits

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

JUSTIN PULLIAM,

    *Plaintiff,*

v.

COUNTY OF FORT BEND, TEXAS;
SHERIFF ERIC FAGAN, in his
individual capacity; OFFICER ROBERT
HARTFIELD, in his individual capacity;
OFFICER JONATHAN GARCIA, in his
individual capacity; OFFICER TAYLOR
ROLLINS, in his individual capacity;
and OFFICER RICKY RODRIGUEZ, in
his individual capacity,

    *Defendants.*

Civil Action No. 4:22-cv-4210

### PLAINTIFF'S EXHIBIT LIST

| No. | Description | Offer | Obj. | Admit | Date |
|-----|-------------|-------|------|-------|------|
| PX 1 | Photo of Kraft Property with Rodriguez Notes | | | | |
| PX 2 | Photo of Kraft Property with Tractor Trailer | | | | |
| PX 3 | Photo of Kraft Property | | | | |
| PX 4 | Photo of Vantage Point from Across the Street | | | | |
| PX 5 | Kraft Property Photos, February 14, 2023 | | | | |
| PX 6 | Probable Cause Affidavit, Sergeant Taylor Rollins, December 21, 2021 | | | | |

| No. | Description | Offer | Obj. | Admit | Date |
|---|---|---|---|---|---|
| PX 7 | Jail Video, December 21, 2021 | | | | |
| PX 8 | FBCSO Officer Cardenas Facebook Post | | | | |
| PX 9 | Criminal Case Warrant Info Sheet and Presentation Packet, January 4, 2022 | | | | |
| PX 10 | Corruption Report Video, May 5, 2022 | | | | |
| PX 11 | Criminal Case Presentation Sheet, April 13, 2022 | | | | |
| PX 12 | Fort Bend County Interference with Public Duties Arrests 2020-2022, Redacted Offense Reports | | | | |
| PX 13 | Fort Bend County Interference with Public Duties Arrests 2020-2022, Summaries | | | | |
| PX 14 | Pulliam Email with Fwd, January 12, 2021 | | | | |
| PX 15 | Video of Press Conference, July 12, 2021 | | | | |
| PX 16 | Sheriff Eric Fagan's Campaign Video | | | | |
| PX 17 | Video of October 2, 2023 Interaction with FBSCO | | | | |
| PX 18 | Video of October 15, 2024 Interaction with FBSCO | | | | |
| PX 19 | Video of April 3, 2020 Interaction with HCCO | | | | |
| PX 20 | Pulliam Arrest Sync Video, December 21, 2021 | | | | |
| PX 21 | AG Determination Letter Fort Bend County SO (Fagan Middleton Communications), October 18, 2023 | | | | |

| No. | Description | Offer | Obj. | Admit | Date |
|---|---|---|---|---|---|
| PX 22 | Pulliam Open Records Request (Fagan Middleton Communications), November 17, 2022 | | | | |
| PX 23 | Fort Bend County SO Open Records Response (Fagan Middleton Communications), March 17, 2023 | | | | |
| PX 24 | Fagan Middleton Text Conversations | | | | |
| PX 25 | AG Determination Letter Fort Bend County SO (Command Staff Emails), August 28, 2024 | | | | |
| PX 26 | AG Determination Letter Fort Bend County SO (Pulliam Docs), August 28, 2024 | | | | |
| PX 27 | Total Damages Summary | | | | |
| PX 28 | Anti-Pulliam Social Media Posts | | | | |
| PX 29 | Grand Jury Indicts Local YouTube Activist, Fort Bend Herald | | | | |
| PX 30 | Truthfinder Report on Justin Pulliam | | | | |
| PX 31 | Letter Suspending License to Carry a Handgun, January 10, 2023 | | | | |
| PX 32 | Safety and Data Security Expense Receipts and Records | | | | |
| PX 33 | Equipment Replacement Expense Receipts and Records | | | | |
| PX 34 | Criminal Case Expense Receipts and Records | | | | |
| PX 35 | Summary of Expenses Related to December 21, 2021 Arrest | | | | |
| PX 36 | Corruption Report Video YouTube Lifetime Revenue Example | | | | |

| No. | Description | Offer | Obj. | Admit | Date |
|---|---|---|---|---|---|
| PX 37 | Charts of Police Events Filmed 2021-2025 | | | | |
| PX 38 | Corruption Report Videos, YouTube Raw Data Download | | | | |
| PX 39 | Corruption Report Uploads, YouTube Data Formatted List | | | | |
| PX 40 | Corruption Report Excluded Videos, YouTube Data Formatted List | | | | |
| PX 41 | Business Damages to YouTube Platform Revenue | | | | |
| PX 42 | Justin Pulliam Live Revenue Per Month Graph | | | | |
| PX 43 | Justin Pulliam Live Revenue, YouTube Raw Data Download | | | | |
| PX 44 | Corruption Report Livestreams, YouTube Data Formatted List | | | | |
| PX 45 | Livestreams Revenue, YouTube Data Summary | | | | |
| PX 46 | Defendant Fort Bend County's Response to Plaintiff's First Set of Requests for Admission, July 28, 2023 | | | | |
| PX 47 | Defendant Eric Fagen's Response to Plaintiff's First Set of Requests for Admission, July 28, 2023 | | | | |
| PX 48 | Transcript of the 30(b)(6) Deposition of Fort Bend County, August 29, 2023 | | | | |
| PX 49 | Transcript of the Deposition of Sheriff Eric Fagan, August 9, 2023 | | | | |
| PX 50 | Photo of Pulliam Filming, October 15, 2024 | | | | |

| No. | Prior No. | Description | Offer | Obj. | Admit | Date |
|-----|-----------|-------------|-------|------|-------|------|
| PX 51 | JX 1 | Video from Pulliam Dashcam, December 21, 2021 | | | | |
| PX 52 | JX 2 | Video from Handheld Camera with Subtitles, December 21, 2021 | | | | |
| PX 53 | JX 3 | Video from Deputy Rodriguez's Dashcam, December 21, 2021 | | | | |
| PX 54 | JX 4 | Offense Report, December 21, 2021 | | | | |
| PX 55 | New | Call Slip, December 21, 2021[1] | | | | |
| PX 56 | JX 6 | Call Slip, December 21, 2021 (Partially Redacted, Open Records) | | | | |
| PX 57 | JX 7 | Call Slip, December 21, 2021 | | | | |
| PX 58 | JX 8 | Grand Jury Indictment, May 16, 2022 | | | | |
| PX 59 | JX 9 | Grand Jury Indictment, August 10, 2022 | | | | |
| PX 60 | JX 12 | Notice of Resetting Arraignment, March 15, 2022 | | | | |
| PX 61 | JX 13 | Notice of Resetting Arraignment, May 4, 2022 | | | | |
| PX 62 | JX 14 | Records for Transfer of Criminal Case | | | | |
| PX 63 | JX 15 | Dismissal of Criminal Case, May 15, 2024 | | | | |
| PX 64 | JX 16 | Detective Travis James Search Warrant Affidavit A, January 14, 2022 | | | | |

---

[1] FBC1131-34.

| PX 65 | JX 17 | Detective Travis James Search Warrant Affidavit B, January 14, 2022 | | | | |
|---|---|---|---|---|---|---|
| PX 66 | JX 18 | Texas Penal Code Section 38.1 | | | | |
| PX 67 | JX 20 | FBCSO General Order #05-04 Social Media and Related Communications, Jun. 1, 2017 | | | | |
| PX 68 | JX 21 | FBCSO General Order #05-04 Social Media and Related Communications, Oct. 1, 2021 | | | | |
| PX 69 | JX 22 | FBCSO General Order #08-03 Public Information and Media Relations, Jun. 1, 2017 | | | | |
| PX 70 | JX 23 | FBCSO General Order #08-03 Public Information and Media Relations, Oct. 1, 2021 | | | | |
| PX 71 | JX 24 | FBCSO General Order #08-03 Public Information and Media Relations, Dec. 29, 2022 | | | | |

Dated: June 27, 2025.                    Respectfully submitted,

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge
Texas Bar No. 24099898
Federal ID No. 3844981

Jeffrey Rowes*, of counsel
Texas Bar No. 24104956

Michael Peña*, of counsel
Texas Bar No. 24131580

INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org
jrowes@ij.org
mpena@ij.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

6

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2025, a true and correct copy of the foregoing document was served upon all counsel of record.

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge

*Attorney for Plaintiff*

**PX-04**



**PX-08**







# PX-10

(Video Will be Hand delivered)

**PX-13**

**Fort Bend County Interference with Public Duties Arrests 2020-2022, Summaries**

**Disposition**

| Outcome | Number of Arrests | Percent of Arrests |
|---|---|---|
| Not Filed, Rejected, or No Record | 18 | 60% |
| Dismissed | 8 | 27% |
| Pending | 1 | 3% |
| Plea (Guilty/No Contest) | 3 | 10% |
| Trial | 0 | 0% |
| **Total** | **30** | |

**Charging Instrument**

| Charging Instrument | Number of Charges | Percent of Charges |
|---|---|---|
| Information | 12 | 100% |
| Grand Jury Indictment | 0 | 0% |
| **Total** | **12** | |

**Incident Call Type**

| Call Type | Number of Calls | Percent of Calls |
|---|---|---|
| Abuse of 911 | 2 | 7% |
| Assault | 1 | 3% |
| Civil Matter | 1 | 3% |
| Deadly Conduct Investigation | 1 | 3% |
| Domestic Disturbance or Violence | 20 | 67% |
| Traffic | 5 | 17% |
| Welfare Check | 0 | 0% |
| **Total** | **30** | |

**Alleged Conduct, Summarized**

| Conduct | Number of Arrests | Percent of Arrests |
|---|---|---|
| Aggressive Behavior | 1 | 3% |
| Assault Officer with Physical Obstruction | 5 | 17% |
| Invaded a Crime Scene | 1 | 3% |
| Lied to Police | 2 | 7% |
| Physical Obstruction | 20 | 67% |
| Trespassing | 1 | 3% |
| **Total** | **30** | |

**Suspect Category**

| Category | Number of Arrests | Percent of Arrests |
|---|---|---|
| Involved Party or Family Member | 29 | 97% |
| Bystander | 1 | 3% |
| Journalist | 0 | 0% |
| **Total** | **30** | |

**Fort Bend County Interference with Public Duties Arrests 2020-2022**

**Offense Details**

| Report Number | Bates Pages | Suspect Name | Offense Date | Is Bystander? | Is Journalist? | Conduct |
|---|---|---|---|---|---|---|
| | Incident Type | | Offense Summary | | | |
| 1 | 1-11 | ▓▓▓ | 2/12/2020 | No | No | Physical Obstruction |
| | Traffic | | Traffic stop. Driver failed to stop where instructed by deputy. Odor of marijuana (marijuana contraband later found). Driver repeatedly verbally & physically refused to exit vehicle; physically resisted removal from car and restraint, "started fighting" deputy. Passively resisted placement into patrol vehicle; tried to keep door open with her feet. | | | |
| 2 | 12-21 | ▓▓▓ | 3/5/2020 | No | No | Assault Officer, Physical Obstruction |
| | Assault | | Suspect caused disturbance inside gas station. Suspect "continued to yell and walk away from" deputies who were trying to investigate. Suspect then approached deputies "in an aggressive manor," hit deputy in the face, and physically resisted officers. Officers tased suspect to gain compliance. | | | |
| 3 | 22-29 | ▓▓▓ | 3/18/2020 | No | No | Aggressive Behavior |
| | Domestic Disturbance or Violence | | Mom wanted her adult son to leave her residence after he drove her car and returned home without the vehicle. When deputies attempted to interview the subject, he "abruptly became irate and angry" and took "an aggressive stance" towards deputies with "with both fists closed and clinched tight." Subject was shouting and screaming, stating "I Ain't afraid of no bullet," and "kicked his mattress in the direction of" deputies. Later, subject "began to scream" and "forcibly kick" the patrol vehicle door. | | | |
| 4 | 30-40 | ▓▓▓ | 5/23/2020 | No | No | Physical Obstruction |
| | Traffic | | Suspect parked his car in the middle of the road to intentionally block more than half of the roadway. Deputy called for a tow truck. Suspect entered his vehicle. Suspect repeatedly refused to exit his vehicle, physically resisted and was "pulling away" from deputy as deputy was telling the suspect "over and over again to exit the vehicle." Then, "for an unknown and unexpected reason," the suspect "lept out of the vehicle landing on his back." The suspect "had both of his legs under the vehicle" and "wouldn't move." Suspect refused to provide identifying details. Once the tow truck arrived, the suspect "moved around to where he was in front of his vehicle, blocking the path of the tow truck." | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 41-56 ▉ | 7/31/2020 | No | No | Physical Obstruction |
| 5 | Domestic Disturbance or Violence | Wife locked intoxicated husband outside for safety of family; husband threatened to shoot them (loaded handgun in plain view in his nearby vehicle). Suspect "kicked in the front door." Deputy attempted to separate parties for safety by having the suspect step outside; however, suspect was "veering towards" the family "in an aggressive manner" and "ignoring all commands." Suspect physically resisted officer, pushed/pulled away while being detained, and actively resisted arrest. Suspect "pushed towards" deputy, "causing him to fall onto" deputy on the ground. Suspect "attempted to get back up," "continued pulling his arms away," and tucked his hand under his body. The suspect "made multiple attempts to prevent" the deputy from escorting him to the patrol vehicle by "actively pushing against" deputy. | | | |
| | 57-65 ▉ | 8/2/2020 | No | No | Assault Officer, Physical Obstruction |
| 6 | Domestic Disturbance or Violence | Intoxicated suspect's husband "blacked out" after she "hit [the husband] with a drinking glass." When deputies arrived, the husband was "lying on the ground unresponsive." Suspect "was very confrontational." Suspect "walked in front of [deputy] and stated [deputy] was not taking any photographs of the scene." Suspect, using "her right open hand," struck the digital camera out of the deputy's hand, which caused the camera "to strike the concrete ground." Suspect "began to actively resist arrest," "tensed her body," and "attempted to pull her body away." Suspect "refused to comply" with commands to place her hand behind her back. | | | |
| | 66-75 ▉ | 9/14/2020 | No | No | Lied to Police |
| 7 | Domestic Disturbance or Violence | Suspect sent ex-girlfriend "alarming and annoying messages stating he was going to shoot her and kill her." Suspect "wanted to fight" new boyfriend and was in the parking lot. While deputies were on-scene investigating, an associated individual started running, lifted his shirt, and "he reached in to his waistband and pulled out a black handgun." Deputy asked suspect "if he knew who the subject was that was running from the police." Suspect immediately stated and "continued to say that he came to the apartment complex alone and he did not know the subject that was running." Eventually, suspect admitted that the other individual was his brother and "came with me to help me fight… incase the fight got out of hand." | | | |
| | 76-83 ▉ | 9/26/2020 | No | No | Physical Obstruction |
| 8 | Domestic Disturbance or Violence | Suspect was "actively yelling and arguing" with her daughter. Deputies "made multiple attempts to have Joy Guyton either exit the residence or go to another room to deescalate the situation" so they could investigate. Suspect "continually refused and further continued engaging in a verbal altercation." Suspect "continually interfered" with deputies "by moving her person to block deputies and yelling," which prevented deputies from obtaining a statement from the other party. Suspect "refused to identify herself" and "closed and locked the door." | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 84-97 | ▮▮▮▮ | 10/10/2020 | No | No | Physical Obstruction |
| 9 | Domestic Disturbance or Violence | | Suspect interfered with 911 call, stating victim "would not call the cops," and then "took her phone from her and hung it up" while victim was speaking with dispatch. When deputies arrived, the intoxicated suspect "refused multiple commands to exit the apartment and became belligerent with Deputies, balling up his fists." Suspect "began walking away from" deputy, "refusing commands." Suspect grabbed victim's young child and placed her between himself and deputies. When deputies grabbed suspect, he began "flexing his muscles, balling his hands, and pulling away." Suspect "continued to actively resist Deputies." | | | |
| | 98-111 | ▮▮▮▮ | 10/11/2020 | No | No | Physical Obstruction |
| 10 | Domestic Disturbance or Violence | | Suspect's girlfriend was arrested and officers were attempting to secure her in the back seat of patrol vehicle. Suspect placed himself between arrested person and officers. After deputies requested suspect "to move out of the way in order to place Myah Reale into custody," suspect "grabbed the rear seat… and the parting wall" of the patrol vehicle. Several deputies "attempted to pull Lawrence Nemecek from between us and Myah Reale with negative results." Suspect refused to move and advised deputies he was "not going to remove his arm from its position." Suspect was "gripping the back-seat caging" and a deputy "pried his fingers from the caging." Suspect "continued to resist." | | | |
| | 112-116 | ▮▮▮▮ | 1/1/2021 | No | No | Physical Obstruction |
| 11 | Domestic Disturbance or Violence | | Suspect "refused to allow Deputies… access to the residence" during an assault family violence investigation. Suspect "released two pit bull dogs and shut the iron gate to the residence and refused to put the dogs up." Suspect "refused to contact his brother inside the residence who is a suspect in the family violence assault that occurred at the scene." Suspect "refused to contact the home owner (his father) and became uncooperative." | | | |
| | 117-133 | ▮▮▮▮ | 1/29/2021 | No | No | Physical Obstruction |
| 12 | Domestic Disturbance or Violence | | A dispute occurred during a custody exchange. While being interviewed by Crisis Intervention Team deputies, in the back seat of the county vehicle, the juvenile "stated she needed her inhaler." Suspect (the juvenile's father) refused to obtain the juvenile's inhaler, responding with, "No, I will bring her inside to it." Suspect "approached the driver side door" and "reached for the passenger door." Despite orders "not to open the door," suspect "opened the door," "grabbed hold of [juvenile]," and "removed her from the backseat of the patrol vehicle." Suspect was "irate and profane," causing juvenile to "become inconsolable and escalated [her] mental state." Suspect "took [juvenile] back inside the residence." EMS arrived and suspect "refused treatment on his daughter's behalf." Suspect "attempted to slam the door shut" on a deputy and "continued to push it closed." | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 134-154 | ▮▮▮ | 2/16/2021 | No | No | Physical Obstruction |
| 13 | Abuse of 911 | | Deputies attempted to detain suspect's wife (Jennifer Robinson). Suspect walked towards deputy and placed himself between Jennifer Robinson and deputies. Suspect "continued to place himself between" Robinson and deputies, "hold[ing] his arms straight with open hands, extending his arms towards [deputy] and physically keeping [deputy] from Jennifer Robinson." Suspect was ordered "multiple times to move and step out of the way" but continued to state, "leave her alone." Suspect "placed his hands on [deputy's] chest area." Suspect was given "multiple chances to remove himself." When deputy grabbed suspect to place him into custody, suspect "continued to physically tense his body and pull away." Suspect was brought to the ground, "place[d] his hands underneath his body" and refused multiple orders to give deputies his hands. |
| | 134-154 | ▮▮▮ | 2/16/2021 | No | No | Physical Obstruction |
| 14 | Abuse of 911 | | Suspect made repeated abusive calls to 911. Suspect was ordered to come to deputies to be placed in custody. Suspect "refused [deputy's] commands and began to walk backwards away." Suspect's husband (Davin Smith) then interfered with suspect's arrest, so deputies attempted to bring him into custody. Suspect moved to the "immediate area" where deputies were attempting to arrest suspect's husband (laying on the ground). Deputy "verbally commanded [suspect] to move away… with negative results." Suspect stood at the head area of her husband, "interfering with [deputy's] ability" to assist placing him into custody. Suspect "place[ed] her hand on the back of" a deputy. |
| | 155-165 | ▮▮▮ | 2/28/2021 | No | No | Physical Obstruction |
| 15 | Traffic | | Intoxicated suspect was investigated for DWI. Deputies obtained a search warrant for the seizure of blood from suspect. Suspect "physically refused to allow the taking of physical evidence/specimen, possibly with intent to impair our investigation, and had to be restrained for the execution of the Warrant." |
| | 166-178 | ▮▮▮ | 3/13/2021 | No | No | Lied to Police |
| 16 | Domestic Disturbance or Violence | | Suspect's wife called 911 for medical assistance. When EMS and deputies arrived, intoxicated suspect "advised nobody at the residence had called for Emergency Medical Services." Subject "stated he did not need medical assistance nor was there anyone on location who did." Suspect's wife was later found "in an upstairs bedroom with a large amount of dried blood in her hair and running down her neck." Deputies observed suspect's wife to have multiple injuries, including a laceration in her hair. Suspect "had blood on his right shorts leg that did not appear to be his." Suspect repeatedly "stated he would refuse to provide a statement." |

| | 179-199 | ▮▮▮ | 6/7/2021 | No | No | Assault Officer, Physical Obstruction |
|---|---|---|---|---|---|---|
| **17** | Domestic Disturbance or Violence | | Deputy was attempting to arrest suspect's boyfriend, who was resisting. Suspect approached deputy and began to yell at deputy. Deputy "advised Emily Stewart to back away or she would be placed in custody for Interfering with Public Duties, to which Emily Stewart stated 'I don't care, arrest me'." Suspect once again "approached [deputy] and crouched down, continuing to yell." Suspect was given multiple orders to "back away." Suspect "stood up and struck [deputy] in the right side of [his] face (cheek area) using a closed fist." Deputies observed "redness" and "slight swelling" to the right cheek of the injured deputy. | | | |
| | 200-208 | ▮▮▮ | 6/13/2021 | No | No | Physical Obstruction |
| **18** | Domestic Disturbance or Violence | | Suspect's girlfriend "stated Dylan Hill pushed her and began hitting her, striking her in the face." Suspect's girlfriend wanted suspect to leave her apartment. Suspect repeatedly "refused to identify himself" to deputies. Suspect "continued to walk away from [deputy]" and "refused to provide any information regarding the altercation that occurred." Deputy observed subject's girlfriend "to have a red mark in the corner of her left eye, consistent with being struck in the face." After being placed in handcuffs and escorted to patrol vehicle, suspect "began to passively resist." | | | |
| | 209-215 | ▮▮ | 8/2/2021 | Yes | No | Invaded a Crime Scene |
| **19** | Deadly Conduct Investigation | | Investigating deputies "marked crime scene by putting up crime scene tape, enclosing the immediate area around the scene where the shooting occurred." Suspect "crossed the line and wouldn't go back behind the tape." Suspect was "ordered on numerous occasions" to "go back behind the police line." Suspect "was advised that he needed to step behind the police tape or he would go to jail for interfering with a crime scene." Suspect "continued to express that he wasn't going to leave." Suspect "briefly resisted" arrest and then began hitting the patrol vehicle window "with enough force that the top of the door frame could be seen separating from the body of the vehicle." | | | |
| | 216-228 | ▮▮▮ | 8/22/2021 | No | No | Trespassing |
| **20** | Domestic Disturbance or Violence | | Suspect "barged into the residence" of his ex-girlfriend and when doing so, "he shoved her to the left side of the entryway with his right arm causing her to feel pain on her left shoulder." Ex-girlfriend "desired a criminal trespass warning to be issued." Deputies advised suspect "he was going to be issued a Criminal Trespass warning to which he refused to sign." Suspect "became argumentative, stating he should not be issued a criminal trespass warning." Suspect "was given ample time and was given opportunities to leave." Suspect "did not want to comply with [deputies'] commands." Suspect was arrested due to "refusing to leave the residence." | | | |

| | 229-242 | ▮ | 10/6/2021 | No | No | Physical Obstruction |
|---|---|---|---|---|---|---|
| 21 | Traffic | | During a traffic stop, deputy observed "smoking coming out of the front windows" and "the odor of burnt marihuana." Suspect "became argumentative." Instead of providing insurance policy information, suspect "became upset and made the font smaller" on the phone. Deputy ordered suspect out of the vehicle due to "defensive and aggressive behavior." Suspect "would not walk past the back of his vehicle" and was detained in handcuffs. Suspect refused to let go of his keys and "began to argue and gripped harder onto the keys" as deputy "attempted to pry the keys from his hand." Deputy escorted suspect to back seat of patrol vehicle "due to his non-compliant behavior." Suspect "fell to the ground" and "wrapped his legs around the back passenger side tire." Additional officers arrived and suspect "continued to argue and pull himself away and lay on the ground." Suspect continued to deny deputies' requests to provide his car key but eventually "removed the car key from his anus to provide it to [deputies]." | | | |
| 22 | 243-251 | ▮ | 10/18/2021 | No | No | Physical Obstruction |
| | Domestic Disturbance or Violence | | Suspect's mom called 911 and reported that suspect "IS BEING ABUSIVE TO HER AND HER DAUGHTER" and then disconnected. Suspect refused multiple commands to get up from the couch and leave residence. Deputy "explained that if he did not comply with a lawful order then he could be arrested for interference with public duties." Suspect was "advised to exit the residence." Suspect "refused to exit and took a step away from the front door." Deputy "attempted to escort him from the residence" and suspect "tensed his muscles in an aggressive manner and pulled away from attempting to walk back towards the living room." Suspect "continued to passively resist" and "continued to physically attempt to place his hands under his stomach/waist area." Deputy instructed suspect to "stop resisting," but suspect "continued to pull his arms away." | | | |
| 23 | 252-265 | ▮ | 10/23/2021 | No | No | Physical Obstruction |
| | Domestic Disturbance or Violence | | Juvenile reported via 911 that "HER AUNT AND BF ARE FIGHTING" and then hung up. When deputies arrived, a family member advised deputies that suspect was "choking" victim and "smashed her face on the ground." Suspect and victim were "still inside the residence." Deputy "began to knock and announce to [victim] and Jose Vega to open the door." Deputy "observed what appeared to be blood on [victim's] lip/mouth area appearing that she had been assaulted." Suspect "refused to open the front door" and "began stating they were not going to open the door." Deputies forced entry into residence. Suspect "stated nothing happened." | | | |

| | 266-278 | ▮▮▮ | 11/24/2021 | No | No | Physical Obstruction |
|---|---|---|---|---|---|---|
| **24** | Traffic | | Intoxicated suspect on a dirt bike "crashed into the front of [a] truck." Suspect "attempted to flee the scene by trying to start the dirt bike again" and witness "grabbed the handle bars of the bike and guided it to the side of the road so Rafael would not hurt himself or someone else." Witness stated "Rafael started to come at him multiple times because he was trying to hold his bike." Deputy observed suspect to have "red glossy eyes and slurred speech" and "was swaying while standing." During the investigation, suspect "got on his dirt bike and attempted to kick start it multiple times." Deputy grabbed suspect, who "tensed up and attempted to pull his right hand to his chest to break loose of [deputy's] grip." Suspect "started to roll over on his back and not comply with [deputy's] lawful orders of placing his hands behind his back." A "Search Warrant for blood was executed" but the nurse "had to stop the blood draw, due to Rafael Barreto moving, and flexing his arm." | | | |
| | 279-287 | ▮▮▮ | 12/20/2021 | No | No | Physical Obstruction |
| **25** | Domestic Disturbance or Violence | | Suspect "aggressively came at" her husband and "threw things at him." Suspect called 911 and reported that her husband "wanted in the house, but she locked him out." Suspect "appeared to be hostile and aggressive" when talking to deputies. Deputy "placed [his] right foot inside the door, preventing in from being closed" and "instructed Latisha to not close the door." Suspect "refused to listen." Deputies "repeatedly lawfully instructed Latisha Brown to clear the doorway" but suspect "again refused to follow the lawful order and physically stood in the doorway." Suspect "swung the door back and forth, as if she wanted to slam it on [deputy's] foot." Suspect "slammed the door in [deputy's] face" and "stood in the door way." Suspect "refused to identify herself twice." | | | |
| | 288-306 | ▮▮▮ | 1/24/2022 | No | No | Physical Obstruction |
| **26** | Domestic Disturbance or Violence | | Suspect was having a mental health crisis and sprayed his mother "with an unknown chemical substance to the facial area multiple times." Victim "locked herself in her bedroom" and suspect "attempted get inside the bedroom." While deputy was interviewing victim, suspect "walked downstairs and out through the garage door." Deputy "attempted to stop" suspect. Suspect "continued walking on foot" despite deputy giving suspect "a verbal command to stop." Suspect "did not comply with [deputy's] verbal command and continued walking." Backup units were called since suspect "was not stopping." "Defendant actively impeded the investigation by walking away from the scene." Suspect "evaded detention by fleeing on foot." Deputies eventually "caught up" to suspect and brought him "to the ground to safely detain him." Suspect "passively resisting restraint by locking his arms in front of his chest" and "a brief struggle" occurred. "It took six Deputies to get Kenneth Meadows in handcuffs." | | | |

| | 307-315 | ▮▮▮▮▮ | 3/14/2022 | No | No | Assault Officer, Physical Obstruction |
|---|---|---|---|---|---|---|
| 27 | Domestic Disturbance or Violence | | During "an Assault Family Violence Investigation," deputy closed the front door of the residence "in order to speak with [reporting party] in private to conduct the investigation." Suspect then opened the door and "stood at the door frame of the residence." Suspect refused to go inside and close the door. Suspect stated "do what you have to do because I am standing right here." Deputy "observed [suspect] to be getting close to [reporting party]" and suspect was "preventing [deputy] from conducting an investigation." Deputy attempted to detain suspect but suspect "began pulling away from [deputy] and was walking backward into the residence." Suspect "grabbed [deputy] by putting both of his hands inside [deputy's] bullet proof vest and push[ed] [deputy] into a wall." While being escorted outside, suspect was "continuing to pull away" from deputy, which led to both tripping over a step and they "proceeded to fall down to the ground." Deputy "detected the strong odor of an alcoholic beverage and marijuana emitting from" suspect. | | | |
| 28 | 316-323 | ▮▮▮▮▮ | 3/25/2022 | No | No | Assault Officer, Physical Obstruction |
| | Domestic Disturbance or Violence | | Deputies were investing a family violence (869) assault relating to the "highly intoxicated" suspect and her father. While a deputy was taking photos of the scene, suspect "shoved [deputy] stating [deputy] could not search her closet." Suspect "kept interfering with the investigation by trying to incite a physical altercation." Suspect would "run down the stairs in an aggressive manner" towards her father while deputies were interviewing him. Suspect "continued to run down the stairs starting a verbal altercation… after being told multiple times to stay upstairs." After "hindering [deputy] from conducting his investigation," suspect was placed in custody.  Suspect was ordered "several times to walk down the stairs, and she refused." Suspect then "threw her legs in the air" and had to be carried by her legs and upper body "to get her down the stairs safely." Once at the jail, suspect "refused to exit the vehicle and was being belligerent due to her intoxicated state." | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 29 | 324-338 ████ | | 5/18/2022 | No | No | Physical Obstruction |
| | Domestic Disturbance or Violence | | Suspect "choked" his children's mother and was "following her around." Deputy placed himself between the two parties "to prevent any escalation." Suspect "reach[ed] into his front pocket a fourth time" after being instructed to "keep his hand out of his pockets." Suspect "continued to refuse [deputy's] orders as he continuously reached into his front right pocket." As deputy "grabbed ahold" suspect's right wrist, suspect "began to resist [deputy] and pull away." Suspect "refused to place his right arm behind his back as [deputy] had instructed him to do." Suspect "continued to resist [deputy's] efforts to detain him and instead lit a cigarette." Suspect "stated he would not be going into [deputy's] vehicle." Suspect "resisted all attempts to place him into mechanical restraints" and was finally restrained with the assistance of two additional deputies. | | | |
| 30 | 339-346 ████ | | 6/3/2022 | No | No | Physical Obstruction |
| | Civil Matter | | Deputies "arrived to execute and complete the eviction" of suspect from his mother's home. Deputy made "entry known by calling the suspect's name." Suspect was instructed to "to exit the room." Suspect "briefly exited the room and went right back inside." Suspect "was ordered several times to get up out of the bed" but "refused." Suspect "attempted to cover himself with sheets." Suspect "was told this was his last chance to get up willingly or he would be removed forcefully." "Suspect stated that he wasn't leaving." "As deputies approached subject he turned over on his stomach and placed his hands under his body actively resisting." A "brief struggle ensued." | | | |

**Offense Disposition**

| Report Number | Interference Charges | Interference Disposition | Other Charges | Other Charges Disposition |
|---|---|---|---|---|
| 1 | No record of criminal case | No record of criminal case | | |
| 2 | Charged by Information 3/31/2020 | Dismissed 1/11/2022 | | |
| 3 | No record of criminal case | No record of criminal case | | |
| 4 | Charged by Information 8/25/2020 | Dismissed 3/5/2021 | Obstruct Highway, Information 8/25/2020 | Dismissed 3/12/2021 |
| 5 | Charged by Information 8/28/2020 | Dismissed 5/26/2022 | Terroristic Threat, Information 8/28/2020 | Resisting Arrest Rejected 8/24/2020; Terroristic Threat Dismissed 5/26/2022 |
| 6 | Charged by Information 11/24/2020 | No Contest Plea 10/26/2021 ($500 fine; 1 day time served) | | |
| 7 | No record of criminal case | No record of criminal case | | |
| 8 | No record of criminal case | No record of criminal case | | |
| 9 | No record of criminal case for interfering | No record of criminal case for interfering | Interfering with 911, Information 12/4/2020 | Interference with 911 Pending Case |
| 10 | Charged by Information 10/28/2020 | Pending Case 20-CCR-218826 | | |
| 11 | No; case closed by CID | No record of criminal case | | |
| 12 | No record of criminal case | No record of criminal case | | |
| 13 | Charged by Information 3/23/2021 | Dismissed 10/25/2021 | | |
| 14 | Rejected 3/25/2021 | Rejected 3/25/2021 | Abuse of 911, Information 3/25/2021 | Convicted of abuse of 911, 9/16/2022 |
| 15 | No record of criminal case for interfering | No record of criminal case | DWI 3rd, Indictment 4/19/2021 | DWI 3rd, Guilty Plea 5/19/2022 |
| 16 | Charged by Information 4/13/2021 | Dismissed 1/12/2022 | | |
| 17 | No record of criminal case | No record of criminal case | | |
| 18 | No record of criminal case for interfering | No record of criminal case | Failure to ID, Information 7/13/2021 | Class C Obstruction of Justice, Guilty Plea 6/21/2022 |
| 19 | Charged by Information 6/10/2022 | Guilty plea 5/9/2023 | | |
| 20 | No record of charges filed for interfering. | No record of charges filed for interfering. | Trespass charge by information on 8/31/2021 | Trespass charge dismissed 7/15/2022 |
| 21 | Charged by Information 2/28/2022 | No contest plea 9/27/2022 (2 days time served) | 3 associated charges rejected | |

| | | | | |
|---|---|---|---|---|
| 22 | Interference charge rejected 1/4/2022 | Interference charge rejected | Resist Arrest, Information 1/4/2022 | Associated resisting charge dismissed 12/6/2022 |
| 23 | Interference charge rejected 12/16/2021 | Interference charge rejected | Family violence charge rejected 12/16/2021 | Family violence charge rejected |
| 24 | Charged by Information 4/20/2022 | Interference charge dismissed 12/13/2022 | DWI 2nd, Information 4/20/2022 | Guilty plea to DWI 12/13/2022 |
| 25 | No record of criminal case | No record of criminal case | | |
| 26 | Charged by Information 3/23/2022 | Dismissed 8/30/2022 | Evading Arrest, Information 3/14/2022 | Evading charged dismissed 8/30/2022 |
| 27 | No record of criminal case | No record of criminal case | | |
| 28 | No record of criminal case | No record of criminal case | | |
| 29 | No record of criminal case | No record of criminal case | | |
| 30 | Charged by Information 8/17/2022 | Dismissed 5/9/2023 | | |

**PX-14**

| | |
|---|---|
| **From:** | Provost, Mattie |
| **To:** | FBCSOPIO |
| **Subject:** | RE: Press Release/Advisory/Blotter Distribution Lists |
| **Date:** | Tuesday, January 12, 2021 4:27:00 PM |

Ok, thank you.  Great response.

**From:** FBCSOPIO <FBCSOPIO@fortbendcountytx.gov>
**Sent:** Tuesday, January 12, 2021 3:47 PM
**To:** Provost, Mattie ███████████████████████
**Subject:** Fw: Press Release/Advisory/Blotter Distribution Lists

For your records, this was the original response:

**From:** FBCSOPIO ██████████████████████
**Sent:** Tuesday, January 12, 2021 1:07 PM
**To:** Justin Pulliam ████████████████
**Subject:** Re: Press Release/Advisory/Blotter Distribution Lists

Mr. Pulliam,
According to FBCSO PIO policy, only accredited media outlets can be added to the list you're requesting to be added to. Press conferences are not open to the public and require an invitation from our office.
However, we do offer press releases, advisories and other information to the community through several different outlets including:
Facebook
Twitter
Nextdoor
LinkedIn

For specific public information requests, you can email ███████████████████████

**From:** Justin Pulliam ██████████████████
**Sent:** Tuesday, January 12, 2021 10:57 AM
**To:** FBCSOPIO███████████████████████ Reyes, Jessica
████████████████████████
**Subject:** Press Release/Advisory/Blotter Distribution Lists

Dear Ms. Reyes:

Please add the following contact information to the sheriff's office media lists:

Justin Pulliam

████████████████

I appreciate your assistance.

Sincerely,

Justin Pulliam

| | |
|---|---|
| **CAUTION:** | This email originated from **outside** of the organization ████████████ **Do not click** links, open attachments, or respond unless you recognize the sender and know the content is safe. Please forward suspicious emails to the **IT Service Desk.** |

# PX-17

(Video Will be Hand delivered)

# PX-18

(Video Will be Hand delivered)

# PX-19

(Video Will be Hand delivered)

**PX-21**



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

Criminal Prosecutions Division
OFFICE: (512) 463-3038
FAX: (512) 370-9942

October 18, 2023

Justin Reid Pulliam

██████████████████

██████████████████

   Re: PIA Complaint Against Fort Bend County Sheriff's Office (Fagan-Middleton
      Communications)

Mr. Pulliam:

The Texas Office of the Attorney General ("OAG") is in receipt of a complaint filed by you
against the Fort Bend County Sheriff's Office ("FBCSO") for violation(s) of the Public
Information Act ("PIA"). As required by Government Code section 552.3215, our office
must determine whether the alleged violation(s) were committed, determine whether
action will be brought under the PIA, and notify the complainant in writing of our
determinations. In addition, should the Attorney General elect to not bring an action
pursuant to section 552.3215 of the PIA we are required to provide a statement giving
you the basis for such a determination.

<u>Background</u>

Based on the information you provided, it appears that the following timeline outlines
the relevant events concerning your request:

11/17/2022 You made a request for information to the FBCSO for all communications
      between Sheriff Fagan and Fort Bend County District Attorney Brian
      Middleton for a specified period of time.

12/21/2022 The District Attorney provided email communications responsive to a
      separate request for the same information to the District Attorney.

2/9/2022  You submitted a complaint to the Fort Bend County District Attorney
      under 552.3215.

3/17/2022  You received a portion of the requested information from the FBCSO in the
      form of text messages with what appeared to be only one side of the
      conversations.

10/12/2023     The county notifies this office that no emails were located at the Sheriff's Office, that the text messages released are complete, and the attachments cannot be opened.

<u>Analysis</u>

A governmental body is required to promptly produce public information after a request for information is made.  Section 552.221(a).  If a governmental body intends to seek a ruling from this office to determine if any exception(s) to disclosure apply, it must do so no later than the 10th business day after receiving the request.  Section 552.301(b).  The FBCSO did not produce the responsive documents in this case until March 17, 2023, and after the 10th business day after receiving your request.  Because no records were produced promptly after the request was made and no request for ruling was made for any records, it appears the FBCSO violated the PIA and should have produced all documents not confidential by law no later than December 5, 2022.

The OAG has limited civil enforcement jurisdiction to address violations of the PIA. That jurisdiction is provided in sections 552.321 and 552.3215. These provisions allow for the OAG to seek judicial compliance with the PIA in civil court to compel the release of public information (552.321 – mandamus; 552.3215 – declaratory judgment and injunctive relief). These remedies serve to provide the OAG with a means of ensuring that requestors are provided public information when appropriate under the PIA.  As noted, it now appears that all responsive documents in the possession of the FBCSO have been produced.[1]  Therefore, the remedial procedures found in the enforcement provisions of the PIA are now unnecessary and despite the apparent violation of the PIA, no enforcement action will be taken pursuant to section 552.3215.

This determination is subject to revision upon receipt of new, relevant, and persuasive information.

Respectfully,

*/s/Kent S. Richardson*
Deputy Division Chief
Criminal Prosecutions Division

---

[1] The OAG will accept all statements from the public information officer of the county as true unless evidence clearly indicates a contrary conclusion.

**PX-22**



# Justin Reid Pulliam

November 17, 2022

The Honorable Eric Fagan
Sheriff of Fort Bend County
1840 Richmond Parkway
Richmond, Texas 77469

**Re: Public Information Request—Sheriff Communications**

Dear Sheriff Fagan and/or Agent of the Officer for Public Information:

This written request is application for access to public information. I request an electronic copy of the following information:

**All communications sent or received by Eric Fagan to/from District Attorney Brian Middleton during the time period from January 1, 2021 to November 17, 2022. Communications include, but are not limited to, emails (including attachments), text messages, multimedia messages, social app messages, Facebook messages, electronic messaging applications, facsimile, memoranda, electronic communications, written communications, voice messages, voicemail, phone calls, and any other method utilized for communicating.**

Since the disclosure of this information is primarily in the interest of the general public, I request a waiver of all fees. The acceptable format to receive the requested information is native electronic format or electronic PDF.

I am not an agent of another. I look forward to the prompt receipt of the requested information. Please send all written correspondence relating to this request by email to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Please feel free to contact me by phone at ▮▮▮▮▮▮▮▮ with any questions. My mailing address is ▮▮▮▮▮▮▮▮▮▮▮▮▮

Sincerely,

*Justin Pulliam*

Justin Pulliam

RECEIVED
BY _____
NOV 1 7 2022
FORT BEND COUNTY SHERIFF'S
OFFICE RECORDS
3:51 pm

1 JB 11/18/22

**PX-23**

## Justin Pulliam

| | |
|---|---|
| **From:** | Buechmann, Johanna ███████████████████████████ |
| **Sent:** | Friday, March 17, 2023 4:30 PM |
| **To:** | ████████████ |
| **Cc:** | Lary, LaNetra; LaForge, Mark; Degollado, Sandra; Elizondo, Debra; Burger, James; Abbasi, Nasir |
| **Subject:** | Public Information Request 111722 |
| **Attachments:** | ORR Justin Pulliam 111722.pdf; TEXT MESS_Redacted.pdf |
| | |
| **Importance:** | High |

Good Afternoon Justin,

This agency received the attached Public Information Request on November 17, 2022 for all communications sent or received by Eric Fagan to/from District Attorney Brian Middleton during the time period from January 1, 2021 to November 17, 2022.  Please see the attached text messages for this request.

Sincerely,

*Johanna Buechmann*
*Records Supervisor*



****CONFIDENTIALITY NOTICE****

**This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.  If you have received this email in error, please notify the sender.  This message contains confidential information of the Fort Bend County Sheriff's Office and is intended only for the individual(s) named for a law enforcement purpose.  If you are not the named addressee, you should not disseminate, distribute or copy this email.  Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system.  If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.**

**PX-24**

**10:52**

**New iMessage**        **Cancel**

**To: DA Brian Middleton**

Please let me know when your command staff is available for a training. It will take about 4 hours to cover everything needed. We would prefer to do it at Patton Hall (Academy). We will need a few days notice to properly prepare and schedule speakers

Jan 20, 2021 at 1:38 PM

Reminder that we have our weekly zoom meeting in youth programs at 2 pm. FBISD is joining call today

Jan 21, 2021 at 11:26 AM

Are you coming to the chief's luncheon? Your audience awaits your arrival

     iMessage    

10:54

**New iMessage**     Cancel

To: DA Brian Middleton

Jan 21, 2021 at 11:26 AM

Are you coming to the chief's luncheon? Your audience awaits your arrival

Jan 22, 2021 at 12:38 PM

Dr Jacquelyn Minter Director, FBC Health & Human Services

▮▮▮▮▮▮▮▮▮▮▮

Yes sir. Praise God to the fullest!!

Jan 26, 2021 at 7:37 PM

I sent you an email regarding execution of a mental health warrant. I usually deal with Jerome Ellis on CIT matters. Just need to meet to discuss

    iMessage   

**10:56**

**New iMessage**          Cancel

To: **DA Brian Middleton**

 **imagejpeg_0525.jpg**
JPEG Image · 124 KB

 **imagejpeg_2527.jpg**
JPEG Image · 171 KB

 **imagejpeg_1526.jpg**
JPEG Image · 164 KB

Long email. Sending part of it just so  you see the gist of it

Jan 28, 2021 at 10:46 AM
Feb 3, 2021 at 9:24 AM

Do you have a preferred time on Wednesday or Thursday next week to meet with FBI ASAC?

Feb 3, 2021 at 11:24 AM

  iMessage 

**10:57**

## New iMessage                    Cancel

To: DA Brian Middleton

Jan 28, 2021 at 10:46 AM
Feb 3, 2021 at 9:24 AM

Do you have a preferred time on Wednesday or Thursday next week to meet with FBI ASAC?

Feb 3, 2021 at 11:24 AM

I need to respond to FBI. Let me know your response to my last text

Feb 9, 2021 at 11:13 AM

February 27th at Hightower High School.

Yes that second injection kicked me in the butt for 2 days. I was fine on the 4th day.

Feb 9, 2021 at 10:46 PM

    iMessage  

**10:57**

**New iMessage**          Cancel

To: **DA Brian Middleton**

Feb 9, 2021 at 10:46 PM

Can you request your Warrants Division (April or Maggie) give priority to the Roger Kurian and Matthew John cases to activate the warrants tomorrow morning? The district clerks office have them ready for 9 am pickup tomorrow.

It is a high profile fraud case involving cares act fraud

Feb 10, 2021 at 8:05 AM

Great! The text was sent late last night so tomorrow is today. To clarify warrants will be ready for pick up this morning at 9 am.

Thank you!!

Feb 10, 2021 at 10:43 AM

 

iMessage 

**10:58**

**New iMessage**          **Cancel**

To: **DA Brian Middleton**

Feb 10, 2021 at 10:43 AM

 **Resized_IMG_25 021.jpg**
JPEG Image · 164 KB

 **Resized_IMG_24 991.jpg**
JPEG Image · 170 KB

Feb 10, 2021 at 3:52 PM

There is more. Too much to send but FBI is going to put them on watch list

Reggie Robinson, director of probation, needs to speak to you before NAACP meeting this evening.   Reggie Robinson

Feb 11, 2021 at 3:52 PM

           iMessage          

**10:58**

**New iMessage**          Cancel

To: DA Brian Middleton

Feb 11, 2021 at 3:52 PM

Chief Investigator Ed Gordon needs card access to the "elected parking lot" behind the courthouse. They are doing operations coming in and out with AR's need to be more discreet using back entrance. Can you give the command to courthouse detail to grant him card access to back door and gate?

Feb 11, 2021 at 7:54 PM

Suggestion: you will never have enough CIT officers. If you are looking to add new positions mid budget year, consider CIT. No one in good conscience would oppose it. Would be perceived as progressive as well. Will prevent excessive

  iMessage

Page 8

**11:00**

**New iMessage**                    Cancel

To: DA Brian Middleton

Feb 17, 2021 at 2:25 PM

I need to shave and get dressed. Give me about 30 minutes and I will let you know when I get into my car to head that way

Heading to courthouse now

Heading to courthouse now

Here

At the back gate where you said

Feb 23, 2021 at 5:31 PM

https://fbindependent.com/fort-bend-county-launches-expose-excellence-youth-program-p14646-1.htm

Mar 5, 2021 at 12:21 PM

  iMessage 

**11:01**

**New iMessage**    Cancel

To: **DA Brian Middleton**

 **Resized_202103
05_121232.jpg**
JPEG Image · 700 KB

 **Resized_202103
05_121209.jpg**
JPEG Image · 568 KB

**Resized_202103
05_121126.jpg**
JPEG Image · 525 KB

Mar 10, 2021 at 2:27 PM

You dont have anyone on
the youth program call.
Missing important
presentation.

Mar 11, 2021 at 7:28 PM

If you want to jump on carl
david Evan's zoom, I can
show you the quiet room. I
just did it. Took longer than

  iMessage 



**11:01**

**Kahlenberg, Michael**    now
Re: GL Incident Reported by
Jesse Zamaripa...

To: DA Brian Middleton



**Resized_2021031
1_193342.jpg**
JPEG Image · 680 KB

Mar 11, 2021 at 9:38 PM

Proud of you Eric!!! I was
exhausted tonight. Wish I
would have said it on stage.
Didnt know I was going to
speak. Was caught off
guard. Will make it up at the
next event

Mar 24, 2021 at 9:30 PM

Stand by

Trying to find it. She was his
former legal assistant.



**IMG_043710011.j
pg**
JPEG Image · 125 KB

  iMessage 



**New iMessage**                    Cancel

To: DA Brian Middleton

IMG_043710011.jpg
JPEG Image · 125 KB

IMG_043511.jpg
JPEG Image · 38 KB

IMG_039311.jpg
JPEG Image · 54 KB

Can't find her name. Think her name was Maribel Olivares Orozco.



Resized_Screensho1.jpg
JPEG Image · 265 KB

From Wilvin

Mar 26, 2021 at 3:50 PM



iMessage

**11:03**

**New iMessage**          Cancel

To: DA Brian Middleton

Mar 26, 2021 at 3:50 PM

The appropriate response to media inquires about Bankston should be cannot comment on an open pending investigation.

Apr 6, 2021 at 9:04 AM

FYI: just noticed thatThey are not going order on list.

Apr 6, 2021 at 9:36 PM

Still here waiting to be heard on HB2077.

Glad you came out. Very significant that you came. Very rare and important for a sheriff to show up

Apr 20, 2021 at 4:30 PM

  iMessage 





**11:04**

**New iMessage**          Cancel

To: **DA Brian Middleton**

6 pm to 11 pm at sugar land Marriott Gala flyer is attached

May 5, 2021 at 3:20 PM

Let me know either way. Need to submit names

May 18, 2021 at 9:02 AM

 **Resized_2021051 8_085808.jpg**
JPEG Image · 634 KB

FBCSO not present at Gang training at my office

Ok. Understood.

I will tell them to repeat it for your group. Important information being discussed on legal strategy

  iMessage 

11:05

**New iMessage**     Cancel

To: DA Brian Middleton

Understood. I wish I had spell check on my text messages.

Jun 3, 2021 at 10:58 AM

Deputy Pailes just raised a concern on our Webex about jail credit on municipal charges. He indicated that each city is different but law requires a minimum credit. Need to make sure cities are adhering. Failure to follow jail credit law is a possible criminal civil rights violation. Not going to raise it on webex but will have civil rights team to call pailes to determine if any city is in violation. To be clear this would a violation by cities not FBCSO

 

iMessage

**11:05**

**New iMessage**          Cancel

To: DA Brian Middleton

Jun 3, 2021 at 3:19 PM

Also, need to solve that double murder that occurred in Fresno last winter. Would like to know status of investigation and develop strategy to solve case using crimestoppers etc

Jun 3, 2021 at 6:15 PM

Ask Big 6 for a logo. Also remind them they will need a permit from Mo City

We can solve that Fresno case. We just need to sit down and plot it out. Go fencing information and Crimestoppers will go a long way. Investigators need a push. It will mean a lot to the community.




iMessage

**11:06**

## New iMessage          Cancel

To: DA Brian Middleton

We can solve that Fresno case. We just need to sit down and plot it out. Go fencing information and Crimestoppers will go a long way. Investigators need a push. It will mean a lot to the community.

Email it to me so I can update the flyer.

Jul 1, 2021 at 11:21 AM

Yes.

I have a meeting right afterwards otherwise I would do it elsewhere

Jul 7, 2021 at 2:09 PM

No

No meeting today

  iMessage 

**11:07**

## New iMessage                Cancel

To: DA Brian Middleton

Yes, sir. Thanks for everything!

Sep 9, 2021 at 6:27 PM

ARRESTS MADE IN FRESNO In response to an uptick in violent crime in Fresno, Texas, the Fort Bend County Sheriff's Office arrested 25 people on July 28, July 29, and August 26, 2021. Authorities seized 10 gun... >

This post is way to premature and needs come down as it is jeopardizing the operation which is still ongoing.

US Marshals Office gave us instructions not to do any press releases without their approval. Moreover, it is way too much information.

  iMessage 

**11:08**

**New iMessage**                    Cancel

To: DA Brian Middleton

US Marshals Office gave us instructions not to do any press releases without their approval. Moreover, it is way too much information. Potential liability if any information is incorrect.

Call me when you are free

Sep 10, 2021 at 4:26 PM

Ok. I will ask Wes for his availability and let you know.

Yes, it has been a busy short week.

Sep 14, 2021 at 6:58 AM

I closed my office until 10 am. If no power by 10, office will remain closed.

  iMessage 

**11:08**

## New iMessage                    Cancel

To: **DA Brian Middleton**

Yes. Thanks. Wishing you the same.

Sep 24, 2021 at 3:00 PM

Called you back

Sep 24, 2021 at 5:58 PM

We are here. Crowd gathering. Will meet inside house at heights creek drive and heights knoll court.

Sep 26, 2021 at 11:16 AM

I agree. We also showed them a united front. They expect us to be dysfunctional and incompetent. It is important that we prioritize this case to send a message that we are capable and effective in fighting crime. Maybe

iMessage

**11:09**

**New iMessage**          Cancel

To: DA Brian Middleton

I agree. We also showed them a united front. They expect us to be dysfunctional and incompetent. It is important that we prioritize this case to send a message that we are capable and effective in fighting crime. Maybe consider parking an unmanned unit in the neighborhood for a few nights. It would make them feel safer and discourage criminals. I am wondering if the white car was a ███████ mad at someone's kid.

Sep 29, 2021 at 2:04 PM

Wow! Glad no officers injured.

No Zoom today. New employee is still getting

      iMessage     

**11:09**

**New iMessage**     Cancel

To: DA Brian Middleton

No Zoom today. New employee is still getting things together. Expose kids are going to Baseball game at Skeeters tomorrow evening if you want to go, let me know. Deacon Jones provided the tickets.

Also, headed to Manhattan for a conference. Flying out this evening. Be back Friday night.

Oct 4, 2021 at 8:49 AM

Reggie Robinson

Oct 5, 2021 at 1:57 PM

 Resized_IMG_27 551.jpg

  iMessage 

**11:10**

## New iMessage          Cancel

To: DA Brian Middleton

I agree. We also showed them a united front. They expect us to be dysfunctional and incompetent. It is important that we prioritize this case to send a message that we are capable and effective in fighting crime. Maybe consider parking an unmanned unit in the neighborhood for a few nights. It would make them feel safer and discourage criminals. I am wondering if the white car was a juvenile mad at someone's kid.

Sep 29, 2021 at 2:04 PM

Wow! Glad no officers injured.

No Zoom today. New employee is still getting

iMessage



**New iMessage**          Cancel

To: **DA Brian Middleton**

No Zoom today. New employee is still getting things together. Expose kids are going to Baseball game at Skeeters tomorrow evening if you want to go, let me know. Deacon Jones provided the tickets.

Also, headed to Manhattan for a conference. Flying out this evening. Be back Friday night.

Oct 4, 2021 at 8:49 AM

Reggie Robinson



Oct 5, 2021 at 1:57 PM



Resized_IMG_27
551.jpg

iMessage



**New iMessage**                    Cancel

To: DA Brian Middleton

 **Resized_IMG_27
551.jpg**
JPEG Image · 221 KB

Liz Abraham has a huge
party every year. Is it on
your list for tonight?

Oct 5, 2021 at 4:51 PM

Outside your main entrance

Dec 23, 2021 at 6:42 AM

https://www.google.com/
amp/s/
www.houstonchronicle.com
/politics/texas/amp/
Alleging-racial-profiling-in-
Fort-Bend-drug-
unit-16723568.php

You will need an expert to
explain/defend the task
force. It is absolutely

iMessage

  

**11:12**

**New iMessage**          Cancel

To: DA Brian Middleton

You will need an expert to explain/defend the task force. It is absolutely necessary at this point. This is urgent.

Dec 27, 2021 at 9:43 AM

Sorry I missed seeing you and the new uniform.

Dec 29, 2021 at 12:48 PM

I spoke to Ed Sturdivant this morning about funds needed to hire Del Carmen. Going to speak with Bridgette after the Council of Judges meeting (meeting now). But I need you to request to put the item on next week's commissioners court agenda as a closed session ███████ matter. Deadline

   iMessage  



**New iMessage**     Cancel

To: **DA Brian Middleton**

I spoke to Ed Sturdivant this morning  about funds needed to hire Del Carmen. Going to speak with Bridgette after the Council of Judges meeting (meeting now). But I
need you to request to put the item  on next week's commissioners court agenda as a closed session ███████ matter. Deadline is today at 2 pm. I will help make the calls to get the votes for passage. I do not expect any opposition. ██

████████████

Bridgette is the only one that can put it on closed session. So speak with her.

Jan 28, 2022 at 1:11 PM

      iMessage     

**11:12**

## New iMessage          Cancel

To: DA Brian Middleton

Jan 28, 2022 at 1:11 PM

They need access to jury assembly room at 10 am

Feb 7, 2022 at 2:28 PM

Need to launch election integrity task force. Need to get on a Zoom  with Bridgette before Friday

Feb 8, 2022 at 10:30 AM

That's up to you. Short distance for me.

We will need your deputies to enter the polling locations for routine welfare checks since the law changed as to who can enter 2 without probable cause.

Feb 8, 2022 at 5:02 PM

iMessage

**11:13**

**New iMessage**          Cancel

To: DA Brian Middleton

Feb 8, 2022 at 5:02 PM

FYI: at your office to meet with Rodney and Crimestoppers.  Access Card still not working at front door

Mubashir Chaudhry is front door of FBCSO admin trying to get into meeting

Feb 8, 2022 at 6:45 PM

Just had heated conversation with crime stoppers board. I think I handled it. Seems that They don't trust us to keep ███████ information secret. I was direct in response. Backed up Rodney. Mubashir is on the board but he arrived late.

    iMessage   

**New iMessage**                    Cancel

To: DA Brian Middleton

Feb 12, 2022 at 6:04 PM

My wife is still getting ready. I probably won't arrive until 7 pm. I rsvp'd for you, Jackie, and a deputy (wasn't sure if it would be kizzee). We should be at table 38

Feb 16, 2022 at 3:16 PM

Our offices are already plugged into this group. You participated in our Hate Crimes Forum. Kim Milstead is our liaison from CRS.

Sharad is a friend and lives in Fort bend. He is a federal prosecutor.

Those flyers were also spread in Missouri City.

iMessage

**11:14**

**New iMessage**          Cancel

To: **DA Brian Middleton**

it was on the news a while ago.  We have done a lot with the Feds. Feds have a lot of rules regarding media releases. COVID slowed down progress. But you are a part of the plans already

Feb 16, 2022 at 6:02 PM

Ok.

Feb 17, 2022 at 8:21 AM

That's clear. Thanks

We need to monitor social media. Suspects may have created a video for intimidation tactics.

Doubt they went out there without some kind of audience. Too much effort

  iMessage 



**New iMessage**          Cancel

To: **DA Brian Middleton**

Feb 24, 2022 at 7:33 PM

**Got it**

**Ok. Thanks**

Fri, Apr 29 at 9:34 AM

 **IMG_3817.jpg**
JPEG Image · 191 KB

Tue, May 17 at 9:58 AM

**Grand jury approved charges against Justin Pulliam yesterday on charges filed by Rosenberg Police Department. So be on the lookout. He will likely be recording everywhere and protesting**

Wed, Jun 15 at 9:50 AM

  iMessage 



**New iMessage**        Cancel

To: DA Brian Middleton

Wed, Jun 15 at 9:50 AM

**IMG_8303.jpg**
JPEG Image · 716 KB

Parking lot war. Can you send a deputy

Resolved it

Wed, Jun 22 at 4:17 PM

Yes will send in separate text.

**Navroz Pr.x-vcard**
156 bytes

Sorry, Was on the phone when you called.

Wed, Jul 13 at 8:47 AM

   iMessage 

**11:15**

**New iMessage**    Cancel

To: DA Brian Middleton

Wed, Jul 13 at 8:47 AM

Thanks!! Unfortunately, Crime is picking up in Fresno.

█████████ was followed home last Saturday. My neighbor was outside at the time. May have prevented a robbery because car sped off

Thanks! Much appreciated

Let me look at a map and I can tell you

I trying to get block numbers now, but I would say all the business parking lots from Walmart (9929 Highway 6) to Exxon (at teal run blvd and 6) and the area in Teal Run Meadows

  iMessage 



**New iMessage**                    Cancel

To: DA Brian Middleton

I trying to get block numbers now, but I would say all the business parking lots from Walmart (9929 Highway 6) to Exxon (at teal run blvd and 6) and the area in Teal Run Meadows (between teal bend blvd and south post oak). I am going to ask my intake division as well for hot spots

Also Winfield Lakes Neighborhood

Wed, Aug 3 at 10:09 AM

Details: GM—Brian Solis—determinate sentence capital murder (convenient store) paroled by Sherman a couple of months ago cut off his monitor last night. Marshal's contacted Demaris and we're on it. She

   iMessage 



**New iMessage**                    Cancel

To: DA Brian Middleton

Details: GM—Brian Solis— determinate sentence capital murder (convenient store) paroled by Sherman a couple of months ago cut off his monitor last night. Marshal's contacted Demaris and we're on it. She is reviewing our file now.

Sat, Jan 21 at 7:25 PM

**Death Row Information**
tdcj.texas.gov 

Bad reception. But tried to call you back

With Easton and Healey

Tue, Jan 24 at 2:14 PM

The section that needs to be amended is Article 18B.001(4) which defines

    iMessage   

**11:17**

**New iMessage**              Cancel

To: **DA Brian Middleton**

The section that needs to be amended is Article 18B.001(4) which defines "Designated law enforcement or agency" ... sheriff's department of a county with a population of 3.3 million or more

of the Texas Code of Criminal Procedure

Thank you so much



iMessage



To: **DA Brian Middleton**



Sat, Jan 28 at 11:46 AM

Told the community to send letters to Grady to get funding for more patrol deputies. They were complaining about

  

**11:17**

## New iMessage                    Cancel

To: DA Brian Middleton



Sat, Jan 28 at 11:46 AM

Told the community to send letters to Grady to get funding for more patrol deputies. They were complaining about decreased law enforcement visibility. All MUD 23 HOAs will make the demand

Thank you. The commissioners need to put more money in yours and mine offices so we can attract D.A's and deputies to help us protect our county

Delivered

Yep, and I already called Grady to let him know what I said to the group

iMessage

**PX-25**



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

Criminal Prosecutions Division
OFFICE: (512) 463-3038
FAX: (512) 370-9942

August 28, 2024

Justin Reid Pulliam

███████████ ██████

██████████████

      Re:    PIA Complaint Against Fort Bend County Sheriff's Office and County
               Attorney (FBCSO Command Staff Emails)

Mr. Pulliam:

The Texas Office of the Attorney General ("OAG") is in receipt of a complaint filed by you
against the Fort Bend County Sheriff's Office ("FBCSO") and Fort Bend County Attorney
("FBCA") for violation(s) of the Public Information Act ("PIA"). As required by
Government Code section 552.3215, our office must determine whether the alleged
violation(s) were committed, determine whether action will be brought under the PIA,
and notify the complainant in writing of our determinations. In addition, should the
Attorney General elect to not bring an action pursuant to section 552.3215 of the PIA we
are required to provide a statement giving you the basis for such a determination.

<u>Background</u>

Based on the information you provided, it appears that the following timeline outlines
the relevant events concerning your request:

1/7/2022      You made a request for information to the FBCSO for emails between
               certain command staff during a particular period.

1/19/2022    You modified your request.

1/26/2022    The county (through the IT department) provided you with a cost estimate
               for the compilation of responsive documents.

2/9/2022      You modified your request a second time.

2/10/22       The county (through the IT department) provided you with a cost estimate
               for the compilation of responsive documents for the modified request.

2/11/2022    You paid the required deposit and notified the county of your payment via email.

2/10/2023    You submitted a complaint to the Fort Bend County District Attorney under 552.3215.

11/8/2023    The county released the first batch of documents responsive to your request through its file share service. Redactions made pursuant to 552.137 (personal email addresses of member of public).

11/17/23    The county released the second and third batch of documents responsive to your request through its file share service. Redactions made pursuant to 552.137 (personal email addresses of member of public).

11/20/23    The county released the fourth batch of documents responsive to your request through its file share service. Redactions made pursuant to 552.137 (personal email addresses of member of public).

12/1/23    The county released the fifth batch of documents responsive to your request through its file share service. Redactions made pursuant to 552.136 (access device numbers) and 552.137 (personal email addresses of member of public).

12/11/23    The county released the sixth batch of documents responsive to your request through its file share service. Redactions made pursuant to 552.117 (personal contact information of peace officer) and 552.137 (personal email addresses of member of public).

12/19/23    The county released the seventh batch of documents responsive to your request through its file share service. Redactions made pursuant to 552.137 (personal email addresses of member of public).

1/4/24    The county released the eighth batch of documents responsive to your request through its file share service. Redactions made pursuant to 552.137 (personal email addresses of member of public).

1/19/24    The county released the ninth batch of documents responsive to your request through its file share service. Redactions made pursuant to 552.137 (personal email addresses of member of public).

2/1/24    The county released the tenth, eleventh, twelfth and thirteenth batches of documents responsive to your request through its file share service. Redactions made pursuant to 552.130 (license plate information) and 552.137 (personal email addresses of member of public).

3/28/24    The county released the first and second batch of email attachments

responsive to your request.

4/1/24      The county released batch three, four, five and six of email attachments responsive to your request.

6/12/24      County confirms that it has completed the release of all information responsive to your request.

8/28/24      County completes a supplemental release of records with certain email addresses unredacted.[1]

<u>Analysis</u>

A governmental body is required to promptly produce public information after a request for information is made. Section 552.221(a). If a governmental body intends to seek a ruling from this office to determine if any exception(s) to disclosure apply, it must do so no later than the 10th business day after receiving the request. Section 552.301(b). Therefore, based on the date of your request, the FBCSO should have promptly produced any documents it did not intend to seek a ruling upon promptly and needed to request a ruling by February 25, 2022, for any remaining information. Because no records were produced promptly after the request was made and no request for ruling was made for any records, it appears the FBCSO violated the PIA and should have produced all documents not confidential by law no later than the 10th business day after the payment for the deposit was made.

The FBCSO redacted many of the responsive documents pursuant to various sections of the PIA. The specific information that was redacted pursuant to 552.1175 (personal information of law enforcement) and 552.137 (email addresses of member of public). The personal information of law enforcement can be withheld without a ruling from this office and email addresses can also be withheld based on the prior decision of this office. ORD 684 (2009). Therefore, it appears that the redactions of the types of information noted were properly made.[2]

The OAG has limited civil enforcement jurisdiction to address violations of the PIA. That jurisdiction is provided in sections 552.321 and 552.3215. These provisions allow for the OAG to seek judicial compliance with the PIA in civil court to compel the release of public information (552.321 – mandamus; 552.3215 – declaratory judgment and injunctive relief). These remedies serve to provide the OAG with a means of ensuring that requestors are provided public information when appropriate under the PIA. As noted, it now appears that all responsive documents in the possession of the FBCSO have been released. Therefore, the remedial procedures found in the enforcement provisions of the PIA are now unnecessary and despite the apparent violations of the PIA, no enforcement action will be taken pursuant to

---

[1] The county has confirmed that all information responsive to your request has now been released subject to any mandatory redaction for confidentiality.

[2] The county was notified that it appeared that certain personal email addresses may have been redacted when they should not have been under the PIA. The county later agreed that certain personal email addresses that were redacted should not have been, and a supplemental release of documents was made with those addresses unredacted.

section 552.3215.

This determination is subject to revision upon receipt of new, relevant, and persuasive information.

Respectfully,

_/s/Kent S. Richardson_
Deputy Division Chief
Criminal Prosecutions Division

encl:  Complaint

**PX-26**



**KEN PAXTON**

ATTORNEY GENERAL OF TEXAS

Criminal Prosecutions Division
OFFICE: (512) 463-3038
FAX: (512) 370-9942

August 28, 2024

Justin Reid Pulliam

████████████ ████████
████████████████████

      Re:    PIA Complaint Against Fort Bend County Sheriff's Office (FBCSO Records
               Relating to Pulliam)

Mr. Pulliam:

The Texas Office of the Attorney General ("OAG") is in receipt of a complaint filed by you
against the Fort Bend County Sheriff's Office ("FBCSO") for violation(s) of the Public
Information Act ("PIA"). As required by Government Code section 552.3215, our office
must determine whether the alleged violation(s) were committed, determine whether
action will be brought under the PIA, and notify the complainant in writing of our
determinations. In addition, should the Attorney General elect to not bring an action
pursuant to section 552.3215 of the PIA we are required to provide a statement giving
you the basis for such a determination.

<u>Background</u>

Based on the information you provided, it appears that the following timeline outlines
the relevant events concerning your request:

1/28/2022     You made a request for information to the FBCSO for all emails and other
             documents relating to Justin Pulliam.

2/4/2022      The county (through the IT department) provided you with a cost estimate
             for the compilation of responsive documents.

2/9/2022      You modified your request.

2/9/2022      The county acknowledged receipt of the modified request.

2/10/2022    The county (through the IT department) provided you with a cost estimate
             for the compilation of responsive documents for the modified request.

| 2/11/2022 | You paid the required deposit and notified the county of your payment via email. |
|---|---|
| 2/23/2022 | The county responded that there were no documents other than emails found after conducting a search which were voluminous and would require time to review for exceptions and/or confidentiality. |
| 2/8/2023 | You submitted a complaint to the Fort Bend County District Attorney under 552.3215. |
| 2/7/2024 | The county released the first batch of documents responsive to your request through its file share service consisting of emails. |
| 3/28/2024 | The county released a second and third batch of documents responsive to your request through its file share service consisting of email attachments. |
| 4/1/2024 | The county released a fourth through ninth batch of documents responsive to your request through its file share service consisting of emails. |
| 5/20/2024 | The county released a tenth through thirteenth batch of documents responsive to your request through its file share service consisting of emails. |
| 5/28/2024 | The county released a fourteenth batch of documents responsive to your request on a flash drive consisting of email attachments. |
| 6/6/2024 | The county released a fifteenth batch of documents responsive to your request by email consisting of email attachments. |
| 6/11/2024 | The county released a sixteenth batch of documents responsive to your request by email consisting of email attachments.[1] |

<u>Analysis</u>

A governmental body is required to promptly produce public information after a request for information is made. Section 552.221(a). If a governmental body intends to seek a ruling from this office to determine if any exception(s) to disclosure apply, it must do so no later than the 10th business day after receiving the request. Section 552.301(b). Therefore, based on the date of your request, the FBCSO should have promptly produced any documents it did not intend to seek a ruling upon promptly and needed to request a ruling by February 25, 2022, for any remainder. Because no records were produced promptly after the request was

---

[1] The county has confirmed that all information responsive to your request has now been released subject to any mandatory redaction for confidentiality.

made and no request for ruling was made for any records, it appears the FBCSO violated the PIA and should have produced all documents not confidential by law no later than the 10th day after the payment for the deposit was made.

The OAG has limited civil enforcement jurisdiction to address violations of the PIA. That jurisdiction is provided in sections 552.321 and 552.3215. These provisions allow for the OAG to seek judicial compliance with the PIA in civil court to compel the release of public information (552.321 – mandamus; 552.3215 – declaratory judgment and injunctive relief). These remedies serve to provide the OAG with a means of ensuring that requestors are provided public information when appropriate under the PIA.   As noted, it now appears that all responsive documents in the possession of the FBCSO have been produced.   Therefore, the remedial procedures found in the enforcement provisions of the PIA are now unnecessary and despite the apparent violations of the PIA, no enforcement action will be taken pursuant to section 552.3215.

This determination is subject to revision upon receipt of new, relevant, and persuasive information.


Respectfully,

*/s/Kent S. Richardson*
Deputy Division Chief
Criminal Prosecutions Division


encl:   Complaint

**PX-27**

## Total Damages Summary

| Total Damages Summary | |
|---|---:|
| Lost Profits | $163,113.00 |
| Equipment Replacement Expenses | $1,444.35 |
| Criminal Case Expenses | $22,730.91 |
| Reputation, Humiliation, and Mental Anguish (Press Conference) | $30,000.00 |
| Reputation, Humiliation, and Mental Anguish (Kraft Scene Exclusion + Arrest) | $55,000.00 |
| **Total** | **$272,288.26** |

## Component Parts

| 1.  Press Conference Damages Summary | |
|---|---:|
| Lost Profits | $98,227.79 |
| Reputation, Humiliation, and Mental Anguish | $30,000.00 |
| **Subtotal** | **$128,227.79** |

| 2.  Kraft Scene Exclusion + Arrest Damages Summary | |
|---|---:|
| Lost Profits | $64,885.21 |
| Equipment Replacement Expenses | $1,444.35 |
| Criminal Case Expenses | $22,730.91 |
| Reputation, Humiliation, and Mental Anguish | $55,000.00 |
| **Subtotal** | **$144,060.47** |

**PX-28**

**18:22**

◀ Gmail



Q Search **Nextdoor**

↑ New Posts

Good morning 🙏 🌅 a little bit of humor 😜

😂😊❤️ 18          😮 **Wow**     💬     ↱

---

**Joseph Mayfield**
Summer Park · 1h                    · · ·

### Grand jury indicts local YouTube activist

A Fort Bend County man who videos local police and sheriff's deputies for his YouTube channel has been indicted on one count of interferring with public duties.

Justin Reid Pulliam was arrested on Dec. 21, 2021 after he allegedly failed to move away from a crime scene as ordered. According to the indictment, handed down this month, Pulliam failed to follow Fort

Bend County Sheriff's Sgt. Taylor Rollins' instructions to move as Rollins was attempting to secure a crime scene or setting up a perimeter around a crime scene on Dec. 21, 2021. Pulliam's bond was set at $500.

Pulliam posts videos of law enforcement personnel on his YouTube channel when he believes they are violating laws or people's rights.

Our own Justin made the news.

😮❤️😊 8          ♡ **Like**     💬 **2**     ↱

---



**How Life Unfolds**
Sponsored                           · · ·

**Do you know what belongs in the recycling bin?**

Paper and paper-based packaging are among the most recycled materials in the U.S. And while local g... See more



🏠            ⊙            ⊕            🏷            🔔
**Home**    Discover      Post      For Sale   Notifications

6:27



# General



**Joseph Mayfield**
Summer Park · 1h

···

## indicts local YouTu

| | |
|---|---|
| vho videos local police | Bend County Sheriff's |
| YouTube channel has | tions to move as Rolli |
| interferring with pub- | a crime scene or setti |
| | crime scene on Dec. 21 |
| rested on Dec. 21, 2021 | at $500. |
| ve away from a crime | Pulliam posts video |
| the indictment, hand- | nel on his YouTube ch |
| failed to follow Fort | are violating laws or pe |

Our own Justin made the news.

Posted in **General** to **Anyone**

  8 Neighbors     Like    

 **Kevin Tran** 🎗 · River's Run    ···
Well. This should help his subscriber count.

1h 😄 1        Like    Reply    Share

 **Jessica Carbajal** · Walnut Creek    ···

41m        Like    Reply    Share

     Comment

◀ Gmail

‹ **General**

Interesting. Thank you for sharing!

31m +1 1                    Like    Reply    Share

**David T.** · Bonbrook Plantation                ···

**Jerry** maybe they're upset that they now have to use the "crime scene tape" which has been collecting dust for many years in the trunk. Taping off the scene is very expensive and requires unnecessary wasted work hours; **Justin**...See more

10m +1 😮 2              **Wow**    Reply    Share

**Joseph Mayfield** · Summer Park  Author         ···

He claims he did nothing wrong and they just arrested him for no reason, yet the DA and the grand jury found enough evidence to charge him. That usually doesn't happen unless you've actually done something wrong, don't get me wrong there are exceptions but in this case I doubt it.

4m                          Like    Reply    Share

**Jerry V.** · Reserve at Brazos Town Center       ···

That's true **David**. I'm sure if they had put up tape that Justin would not have crossed it. I am looking forward to them returning Justin's property so we can see what really happened rather than making our opinions off of a popularity contest.  See more

4m +1 1                    Like    Reply    Share

**Justin Pulliam** · Bonbrook Plantation           ···

**Jerry** there was no tape. It happened in less than 45 seconds. There was no effort to secure anything other than messing with me. He came up to me. I was nowhere near an officer prior to that.

Now                         Like    Reply    Share

📷  📍   Comment

🏠          ⊘           ➕          🏷          🔔¹
Home    Discover     Post     For Sale    Notifications

‹ **General**

corrupt law enforcement, and corrupt corporations. "I can't recollect", "the situation is still fluid", "the investigation is still ong… See more

2h 😄 1    Like   Reply   Share

↪ See 1 previous reply

**JoAnn McMinn** · Travis    ⋯

**David** , ditto what Jerry said. In addition, there are good reason for some of the comments you scorn——it would be detrimental to the case, you shouldn't reveal all, they really are still investigating and interviewing p…See more

51m    Like   Reply   Share

**John Smith** · Walnut Creek    ⋯

Horrible! How dare the justice system make people face the consequences of their own actions?

1h (edited) ❤️😢 2    Like   Reply   Share

**Justin Pulliam** · Bonbrook Plantation    ⋯

https://youtu.be/RuCIMdL3mxo

55m 😊❤️ 2    Like   Reply   Share

**Jerry V.** · Reserve at Brazos Town Center    ⋯

Don't forget to like, subscribe and ring that bell 🔔

22m 🟢+1 1    Like   Reply   Share

**David T.** · Bonbrook Plantation    ⋯

I have to say **Jerry** that was a very interesting video and makes me want to wonder what Fort Bend Sheriff department has to hide 🤔

17m ❤️+1 2    Like   Reply   Share

**D  Del C.** · Sunrise Meadow    ⋯

Justin Pulliam? You mean Justin Theway?

5m 😄 1    Like   Reply   Share

📷 📍  Comment

🏠 Home    ⊙ Discover    ⊕ Post    🏷 For Sale    🔔 Notifications

2:24

### Kelsey Brynn
Bonbrook Plantation · 3d · 🌐

**JoAnn McMinn** · Travis

**Monica** , probably, but unlike people who support his agenda, many of us want gullible people to be aware of his shenanigans.

5h ❤️ 2     Like    Reply    Share

**Kirk G.** · Rosemeadow

Elections have consequences. Fort Bend corruption is just getting started. The cover ups are extensive and Ft Bend leadership isn't gonna let anyone expose it. Enjoy!

2h +1 1     Like    Reply    Share

**Mike M.** · Bridlewood Estates

**Kirk G.** No worries - Justin and Jerry are on the case(s)!

20m ❤️😆 2     Like    Reply    Share

**Chad Sparks** · Cottonwood

Someone with a camera and a YouTube account is not a legitimate journalist. Try again.

1h ❤️+1😮 7     Like    Reply    Share

**Jerry V.** · Reserve at Brazos Town Center

A lot of the cops don't mind Justin there and they are very cordial with one another, almost friendly.

31m 😮 1     Like    Reply    Share

📷 📍 Comment

Home    Discover    Post    For Sale    Notifications



**Fort Bend County Police Happenings**
22h · 🌐

···


⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️⚠️


👏👏👏👏 Great Job Fort Bend Jury 👏👏👏👏

Good Job Sgt Rollins with the Fort Bend County Sheriff's Office. This should have happen along time ago.



## Grand jury indicts local YouTube activist

A Fort Bend County man who videos local police and sheriff's deputies for his YouTube channel has been indicted on one count of interferring with public duties.

Justin Reid Pulliam was arrested on Dec. 21, 2021 after he allegedly failed to move away from a crime scene as ordered. According to the indictment, handed down this month, Pulliam failed to follow Fort

Bend County Sheriff's Sgt. Taylor Rollins' instructions to move as Rollins was attempting to secure a crime scene or setting up a perimeter around a crime scene on Dec. 21, 2021. Pulliam's bond was set at $500.

Pulliam posts videos of law enforcement personnel on his YouTube channel when he believes they are violating laws or people's rights.

---

👍 Like   💬 Comment   ↪ Share

 79

**9 Shares**

**Most relevant** ⌄


**Adrian L Gomez**
Justin Pulliam

46m   Like   Reply

Write a reply...


**Kyle Griffith**
If you search him on face page, his picture looks like he still lives at home and is into some strange furry conventions

 Write a comment...    

23:18

### General

**JoAnn McMinn** · Travis
I've seen this guy and one of his buddies in action. The buddy tries to stir up trouble and get a reaction while this guy films.

4h                    Like    Reply    Share

**Rachelle Smith** · River's Run
And I've seen the cops be jerks to Justin just because they dont want to be filmed.

33m                    Like    Reply    Share

**David T.** · Bonbrook Plantation
A regular 👮 - - 👮 celebrity, I'm going to ask for his autograph 📖✍️

1h  ❤️ 1               Like    Reply    Share

**Jerry V.** · Reserve at Brazos Town Center
I've met Justin in person. He's a real nice guy.

56m  😮 1             Like    Reply    Share

**JoAnn McMinn** · Travis
**Jerry** , you are joking, right?

36m                    Like    Reply    Share

**Ray Leon** · Walnut Creek
**JoAnn** He is. Don't listen to that nonsense.

29m                    Like    Reply    Share

**Jerry V.** · Reserve at Brazos Town Center
**JoAnn** No. I'm being serious. I met Justin one day on Reading Rd as he was helping someone who had just been in an auto accid... See more

29m                    Like    Reply    Share

**Ray Leon** · Walnut Creek
Justin deserves every charge he gets. He goes out looking for it, so I'm happy they oblige him.

     Comment

**Justin Pulliam**

Bonbrook Plantation • 18 Oct 22 • 🌐

•••

Brave Rosenberg Officer Vela spent the afternoon in Summer Lakes pulling over female residents driving nice minivans and the like. I applaud RPD for keeping us safe from hardened soccer moms while also padding the racial discrimination data.





 25

 Like      97 Comments      Share



**Donna Schmitz** · Walnut Creek · 1y
Yeah,,,, I'm not sure I believe this. Sounds like someone wants to stir the pot and cause trouble

Like    Reply    Share    💜 +1  5

**Billy S.** · Summer Lakes · 1y    •••
Donna I agree. I told my kids if they ever see this man when they are playing outside run and shout at the top of their lungs- Stranger danger.

Like    Reply    Share    💜 +1  4

**Donna Schmitz** · Walnut Creek · 1y    •••
@Billy ok lol now I'm invested... is that a real mug shot.... of the man that is criticizing the police?

Like    Reply    Share    ❤ 2

**Jimmy D.** · Rose Ranch · 1y    •••
@Donna yup

Like    Reply    Share    ❤ 2

**Kamand Khadivian** · Riverpark · 1y    •••
@Jimmy wtffff

Like    Reply    Share

**Donna Schmitz** · Walnut Creek · 1y    •••
@Jimmy wow well this just confirms my original thoughts....

Like    Reply    Share    ❤ 1

**Justin Pulliam**  Author · Bonbrook Plantation · 1y    •••
Donna what are your original thoughts? I've been in handcuffs once in my entire life, and that was for filming the police. I've never been pulled over while driving. What do you have to say about me?

Like    Reply    Share

**Jimmy D.** · Rose Ranch · 1y    •••
@Donna interfering with public duties

Like    Reply    Share

**Donna Schmitz** · Walnut Creek · 1y    •••
@Justin excuse me but isn't this post about the GROSS capabilities of the local police? Now you want it to be about you. Do not try and come for me I didn't post the mug shot. You have no clue where I was going with my comment.  Maybe just maybe I was going to defend you...

Like    Reply    Share

**Jerry V.** · Reserve at Brazos Town Center · 1y    •••
Plenty of people have mugshots from being arrested for very minor charges or for no real reason at all.

Wow    Reply    Share    😮 1

**Justin Pulliam**  Author · Bonbrook Plantation · 1y    •••
Donna I am eagerly awaiting it no matter the point of view. I don't want this to be about me, but some come out of the gate attacking the photographer instead of arguing on point. I did not intend to come across confrontational regarding your comment.

Like    Reply    Share    ❤ 1

**Carol Luckie Maluski** · Bridlewood Estates · 1y    •••
Donna Schmitz I can't believe the admins left it up.  This dude is obviously trying to publicly harass and shame this officer.....😡

Like    Reply    Share

**Donna Schmitz** · Walnut Creek · 1y    •••
@Carol bingo

Like    Reply    Share

Like    Reply    Share

 **Kamand Khadivian** • Riverpark • 1y                          •••

Wow guess he is quiet now that he has his mug shot on blast hahaH

Like    **Reply    Share**                                     1

 **Justin Pulliam**  Author  • Bonbrook Plantation • 1y        •••

**Kamand** that's the public's mugshot. It's public information. But the
intent for posting it is nasty and also against the rules of this app. I will
not report your hateful speech or stifle you in any way, however.

Like    **Reply    Share**                                     2

 **Jimmy D.** • Rose Ranch • 1y                               •••

**@Justin** kind of like your post intent?

Like    **Reply    Share**                                     3

 **Billy S.** • Summer Lakes • Edited 1y                      •••

**Justin** as a resident of summer lakes, I am just saying that you are not
welcome in the neighborhood but your presence is legally allowed.
With that said, I am not comfortable with my children around as you
would potentially be a catalyst with whomever you are interacting with
to put my children in danger. So yes, I will continue to tell them if they
see you in the neighborhood to run and scream for their own safety. It's
not hate speech. (edited)

Like    **Reply    Share**                                     1

 **Justin Pulliam**  Author  • Bonbrook Plantation • 1y       •••

**Billy** who made you the neighborhood spokesman?

Like    **Reply    Share**                                     1

 **Kamand Khadivian** • Riverpark • 1y                       •••

**@Justin** my soee h isn't hTeful but ok

Like    **Reply    Share**



**RadioReference**.com
Your Complete Reference Source

Scanners, Software and Accessories at Great Prices
RadioReference recommends
SCANNER MASTER

RadioReference ▾ | **Forums** | What's new ▾ | Classifieds ▾ | Media ▾ | Database | Register | Log in | 🔍

New posts    Search forums

Forums › Scanners, Receivers and Related Equipment Forums › **General Scanning Discussion** ›

## Digital Frequency Search Internet Site

👤 Chillybilly · 🕔 Apr 4, 2024

| 1 | 2 | 3 | Next ▸ |

---

**C**

**Chillybilly**
Member

Premium Subscriber

Joined:        Oct 28, 2012
Messages:              46
Location:        Western PA

Apr 4, 2024                                                    ⇗ #1

I use the site Digital Frequency Search to monitor license frequencies on DSDPlus Fastlane. I get an error connection notice when trying to use it. I was wondering if this was happening to anyone else or just on my computer.

🔵 wtp

---

**dave3825**
★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

Premium Subscriber

Joined:        Feb 17, 2003
Messages:          9,149
Location:
             Suffolk County NY

Apr 4, 2024                                                    ⇗ #2

> Chillybilly said: ⊕
>
> I use the site Digital Frequency Search to monitor license frequencies on DSDPlus Fastlane. I get an error connection notice when trying to use it.

Since the Digital Frequency Search site and DSDPlus have nothing to do with each other, other than creating DSDPLus formated files, do you mean you get a connection error when trying to start DSDPlus and FMPx?

How many dongles are you using and what files are you clicking to start DSDPlus?

---

**KevinC**
The big K

Super Moderator

Joined:        Jan 7, 2001
Messages:        12,915
Location:
           I'm everywhere Focker!

Apr 4, 2024                                                    ⇗ #3

I think he means the DFS site as I can't connect to it. Maybe Justin is in jail again?

😈 ecps92

---

**Whiskey3JMC**
Airwave
surfer...Cowabunga!

Premium Subscriber

Joined:        Jul 16, 2006
Messages:          8,471
Location:        Philly burbs us

Apr 4, 2024                                                    ⇗ #4

Server issue on their end



**dave3825**
Premium Subscriber
Joined: Feb 17, 2003
Messages: 9,149
Location: Suffolk County NY

Apr 4, 2024    #5

> KevinC said: ⊕
>
> jail again?

Again? Got a link to the first time?

**KevinC**
The big K
Super Moderator
Joined: Jan 7, 2001
Messages: 12,915
Location: I'm everywhere Focker!

Apr 4, 2024    #6

> dave3825 said: ⊕
>
> Again? Got a link to the first time?

justin pulliam arrest - Google Search

**dave3825**
Premium Subscriber
Joined: Feb 17, 2003
Messages: 9,149
Location: Suffolk County NY

Apr 4, 2024    #7

> KevinC said: ⊕
>
> justin pulliam arrest - Google Search

Oh, thought he did something wrong. Many people like him bringing attention across the country to the right to record in public. It's really sad that many pd tell people its not legal when it is.

@Chillybilly try reaching out to him here via PM or on his youtube channel.

**KevinC**
The big K
Super Moderator
Joined: Jan 7, 2001
Messages: 12,915
Location: I'm everywhere Focker!

Apr 4, 2024    #8

> dave3825 said: ⊕
>
> Oh, thought he did something wrong. Many people like him bringing attention across the country to the right to record in public. It's really sad that many pd tell people its not legal when it is.
>
> @Chillybilly try reaching out to him here via PM or on his youtube channel.

He hasn't visited RR in 4 years, so I doubt a PM would do any good.

**nowires**
Member
Joined: Sep 4, 2017
Messages: 129

Apr 7, 2024    #9

Digital Frequency Search still down.

**PDXh0b0**

Apr 9, 2024    #10

Looks like the pork slipped off the bun on 03/22

Active Member
**Premium Subscriber**
Joined:       Mar 31, 2020
Messages:              824
Location:     Woodland, WA

---

**F**

**Facsimile**
Member
**Premium Subscriber**
Joined:       Apr 8, 2023
Messages:               91

Apr 9, 2024                                                                                    #11

Is there a way to search by emission on the FCC database while this site is down?

---

**W**

**Wilrobnson**
Rock or Something
Joined:       Jun 19, 2002
Messages:            1,170
Location:     Object-oriented

Apr 10, 2024                                                                                   #12

Not that I've ever found, but why? That's no guarantee what's actually being used.

> 🔵 ecps92

---

**Whiskey3JMC**
Airwave
surfer...Cowabunga!
**Premium Subscriber**
Joined:       Jul 16, 2006
Messages:            8,471
Location:     Philly burbs us

Apr 10, 2024                                                                                   #13

> Facsimile said: ⊕
>
> Is there a way to search by emission on the FCC database while this site is down?

MAPRAD.IO | Radiocomms Register Search Tool
Online app for searching the ACMA Register of Radiocommunications Licences (RRL)
maprad.io

"Emission" is one of the items in the drop down menus in the advanced search query. But as mentioned before just because the emission appears on the license doesn't guarantee its use



---

**N**

**nowires**
Member
Joined:       Sep 4, 2017
Messages:              129

Apr 28, 2024                                                                                   #14

Looks like dfs is back on.

---

**BinaryMode**
Blondie Once Said To Call
Her But Never Answered
Joined:       Jul 3, 2023
Messages:            1,059

Apr 29, 2024                                                                                   #15

Is this the website being refereed to? Digital Frequency Search

**PX-29**

**Class of 2022 GRADUATION**
Special Section **INSIDE TODAY!**

**THURSDAY,** MAY 26, 2022

# Fort Bend Herald
### AND TEXAS COASTER

VOLUME 130, NUMBER 63          www.fbherald.com          ROSENBERG-RICHMOND, TEXAS          75¢ RACK/64¢ DELIVERED

---

## HIGH SCHOOL FOOTBALL



Fulshear football star becomes a U.S. citizen; see **Sports**

### Good Afternoon!

**Memorial Day ceremony**
The Fulshear-Simonton Lions Club, the Brazos River Rotary Club, the Texian Exchange Club, and the Fulshear-Katy Area Chamber of Commerce will be hosting a Memorial Day Observance on Monday, May 30, at the Irene Stern Community Center in Fulshear at 6920 Katy-Fulshear Road at 11 a.m. All area residents are invited to attend. Following the program, a flag-folding ceremony will be held outside the community center.

**Freedom Festival**
The city of Needville will host its annual Freedom Festival on Sunday, July 3, at Harvest Park between noon and 11 p.m. Vendor information and questions, call City Hall at 979-793-4251. KG Williams band and M&M Playboys Czech Polka Band will provide live music. Activities include car show, mutton bustin' competition, pet show, bike decorating parade, kids games, lawnmower races and cornhole tournament, and fireworks.

**Memorial Day**
The city of Richmond government offices will be closed for Memorial Day, which is recognized as an employee holiday. Call 281-342-5456 for more information.

**Memorial Day**
VFW Post 3903 in Rosenberg will host a Memorial Day ceremony at 11 a.m., Monday, May 30, at the post, located at 1903 First St. The public is invited.

**Teen police academy**
The Rosenberg Police Department will host a teen citizen police academy June 27-July 1 for teens age 14-18. Register at Rosenbergpolice.com

### Fort Bend Journal

**Great graduations!**
Really enjoyed attending all five LCISD graduations this past week, although I do admit it has left me a little run down. Hopefully, I will get plenty of rest this weekend.
— SRW

### Around the Bend

Jenny George of Fulshear proud to earn his Master of Business Administration degree from Belhaven University this month...

### Obituaries

René Rosenbush Lamb, 75

See page 2A

### Today's Scripture

*Do not repay anyone evil for evil.*
Romans 12:17

---

## MAY 24, 2022 RUN-OFF ELECTION

# Kitzman defeats Stephenson in House District 85 run-off

## Governor's last-second endorsement helps former Waller County commissioner beat 3-term incumbent

**BY SCOTT REESE WILLEY**
swilley@fbherald.com



**Stan Kitzman**     **Phil Stephenson**

Gov. Greg Abbott's last-minute endorsement of Stan Kitzman apparently helped the former Waller County commissioner defeat three-term incumbent Phil Stephenson in Tuesday's Republican runoff election.

Kitzman will face Democrat Larry E. Baggett in the November General Election.

Districtwide, Kitzman drew 58% of the votes cast, or 8,134. Stephenson earned 42% of 5,891.

In Fort Bend County Stephenson earned 58% of the votes cast, or 528 votes to Kitzman's 41.25%, or 372 votes.

The newly redrawn House district includes Waller, Austin, Fayette, Colorado, Wharton counties and a small part of Fort Bend County.

Campaign appearances with the governor prior to the email seemed to indicate he had Abbott's support, according to Stephenson, who added he had been unable to reach anyone in the governor's office to make it official.

"We had a screw-up here," Stephenson, R-Wharton, told the El Campo Leader-News, owned by Hartman News.

"He endorsed me last time and (my) consultant (Todd Gallaher) screwed that up ... it shouldn't have gotten out like that."

More than 20,000 addresses in District 85 received an email seeming to indicate the governor had endorsed Stephenson for the May 24, 2022 GOP run-off.

"I do apologize and you can damn sure say it," Stephenson said, adding he would be sending a formal apology to the governor.

SEE KITZMAN, PAGE 2A

---

# Tibbs, Rash, McCoy get Dems' OK

**BY SCOTT REESE WILLEY**
swilley@fbherald.com

Democrats voted on Tuesday to advance Albert Tibbs, Dexter McCoy and Sonia Rash to the November general election where they will face Republican challengers.

Tibbs defeated Quiasr Q. Imam in the race for county treasurer in Tuesday's Democratic Primary runoff election. Tibbs garnered 50.69% of the votes cast, or 9,826. Imam drew 49.91% or 8,985 votes.

Tibbs will face incumbent county treasurer Bill Rickert in November.

In the race for Precinct 4 Commissioner, Dexter L. McCoy earned 60.67% of the votes cast, or 3,220. Neeta Sane drew 39.33% or 2,087.

McCoy will face Republican Roy Aguilar in the November general election.

In the race for Justice of the Peace

SEE DEMOCRATS, PAGE 2A

---



**Needville High School commencement**

*Needville School Board President Chris Janicek presents Class of 2022 graduate Gavin Danehaus with his diploma. More photos, page 12A.*

---

# Local officials react to Uvalde mass shooting

**BY NICK IRENE**
nirene@fbherald.com

Local officials lend their condolences to the 21 victims of Tuesday's mass shooting in Uvalde at Robb Elementary School that left 19 children and two teachers dead and at least 17 people injured.

U.S. Representative Troy Nehls did not release an official statement but put emphasis on mental health and increasing police officers in schools as opposed to gun reform laws.

"We need to make mental health a priority in this country, otherwise despicable attacks on our children like the elementary school shooting in Uvalde will only continue," Nehls said in a Twitter post.

Nehls has not been in favor of gun reform laws as he voted no on bills that would've required background checks for all gun sales and increased the waiting period for federal background checks for firearms on March 11, 2021.

County Judge KP George did not express any position but offered thoughts and prayers to the victims.

"Words can not express the heartbreaking and shocking nature of the event that occurred today," George said. "Our children go to school to learn in a caring and safe environment. The horrific actions of this single individual, once again, serve as a reminder, that even in our efforts to keep our schools safe, there are those who wish to inflict harm on the most vulnerable amongst us, our children."

Fort Bend ISD Superintendent Christie Whitbeck also issued a letter to students and staff following the tragedy.

"We want to assure you that the safety of our students, teachers and staff is always our top priority," Whitbeck said. "And while no one can ever guarantee that nothing tragic will ever occur in any setting, we hope you will be able to take comfort in knowing our dedicated police department and robust safety measures are in place and are there ready to protect and serve every student and staff member in Fort Bend ISD. Just last night district leaders were engaged in a previously-planned workshop focused on future goals, which included additional safety measures. This is an ongoing priority to seek best practices to keep our children and staff safe."

State Senator for District 18 Lois Kolkhorst also issued condolences.

"Words are inadequate and time will never heal the wounds of this senseless act. Only God can," Kolkhorst said. "We pray for the grieving parents, family, friends and the entire community of Uvalde. Darkness and evil is ever-present in this world. That is what we must fight."

State Representative for House District 26 Jacey Jetton sympathized with those affected as a young parent.

"As a parent of young children, we trust our children will come home from school safely each and every day," Jetton said. "The tragic, heinous act of one mentally ill individual has tragically ended the lives of 14 children."

State Representative for House District 28 Gary Gates tagged school districts to offer armed officers throughout their campuses after offering prayers to the victims.

"Demand your school district have an armed police officer at every campus, every that children are present," Gates said.

State Representative for House District 85 Phil Stephenson was in disbelief over Tuesday's actions.

"I cannot understand the evil that resides in the heart and soul of someone who would attack children and fellow human beings in such a cowardly and craven manner," Stephenson said. "I pray that God will comfort the Uvalde community, especially those who lost loved ones today."

The First State Bank of Uvalde has opened a Robb School Memorial Fund for the families of Robb Elementary.

Donations can be made at any First State Bank locations, by check or via Zelle.

Checks must be mailed out to 200 E. Nopal St., Uvalde, TX 78801. Electronic donations must be donated to robbschoolmemorialfund@gmail.com.

---

# Beto O'Rourke interrupts governor's Uvalde briefing

UVALDE, Texas (AP) — Surrounded by fellow Republicans on a high school stage, Gov. Greg Abbott was wrapping up his opening remarks about the killing of school children and teachers in Uvalde, Texas, when Beto O'Rourke strode-forward from his seat in the audience.

"Gov. Abbott, I have something to say," the Democrat challenging Abbott for governor this fall said Wednesday, pointing a finger at his rival. "The time to stop the next shooting is right now, and you are doing nothing."

A mix of boos and cheers rose up from the crowd as the former congressman and 2020 presidential candidate briefly spoke, then was escorted from the room. Sen. Ted Cruz, standing beside Abbott, shook his head and said "sit down!" while one woman in the crowd chanted, "Let him speak."

Uvalde Mayor Don McLaughlin yelled that O'Rourke was a "sick son of a bitch." Some people cried.

And with that, the briefing transformed into an argument similar to the one happening in many corners of America after yet another school shooting that inflicted a shocking death toll — 19 children and two teachers.

---

# Grand jury indicts local YouTube activist

A Fort Bend County man who videos local police and sheriff's deputies for his YouTube channel has been indicted on one count of interfering with public duties.

Justin Reid Pulliam was arrested on Dec. 21, 2021 after he allegedly failed to move away from a crime scene as ordered. According to the indictment, handed down this month, Pulliam failed to follow Fort Bend County Sheriff's Sgt. Taylor Rollins' instructions to move as Rollins was attempting to secure a crime scene or setting up a perimeter around a crime scene on Dec. 21, 2021. Pulliam's bond was set at $500.

Pulliam posts videos of law enforcement personnel on his YouTube channel when he believes they are violating laws or people's rights.

---



6    THURSDAY, MAY 26, 2022    **NEWS**    FORT BEND HERALD

## Indictments

A Fort Bend County grand jury returned indictments against 13 individuals for a variety of felony offenses.

Indictments are not an indication of guilt, only that the grand jury believed a jury of the defendant's peers should determine if a crime had been committed.

Due to space limitations, here is a partial list of those individuals indicted, the charges and the punishments they face, along with the date of the alleged offense and judge assigned to hear their cases, are:

■ Terry Leon Spurs, burglary of a habitation, a second-degree felony, March 15, 2022, Judge J. Christian Becerra.

■ Krystina Renee Moncada, possession of a controlled substance, penalty group 2, less than 1 gram, a state-jail felony, March 17, 2022, Judge J. Christian Becerra.

■ Adrian Angel Garcia, accident involving serious bodily injury, a second-degree felony, March 17, 2022, Judge J. Christian Becerra.

■ Julian Dario Requena, intox-

ication assault causing serious bodily injury to a peace officer of a judge, a second-degree felony, March 20, 2022, Judge Frank J. Fraley.

■ Julian Dario Requena, intoxication assault with a vehicle causing serious bodily injury, a second-degree felony, March 20, 2022, Judge Frank J. Fraley.

■ Trevon Lamar Foye, aggravated assault with a deadly weapon, March 27, 2021, a second-degree felony, Judge Frank J. Fraley.

■ Trevon Lamar Foye, aggravated assault with a deadly weapon, March 27, 2021, a second-degree felony, Judge Frank J. Fraley.

■ Ever Armando Lopez, driving while intoxicated third offense or more, a third-degree felony, April 11, 2022, Judge O'Neil Williams.

■ Wendy Lizeth Galvez, obstruction or retaliation, April 11, 2022, Judge J. Christian Becerra.

■ Larry Lee Hawkins, possession of a prohibited substance or item inside a correctional facility, April 20, 2022, Judge J. Christian Becerra.

■ Larry Lee Hawkins, possession of a controlled substance, penalty group 1/18, less than 1 gram, a state-jail felony, April 20, 2022, Judge J. Christian Becerra.

■ Bonnie Leneil Williams, aggravated assault with a deadly weapon, a second-degree felony, April 10, 2021, Judge Robert L. Rolnick.

■ Deandre Dwight Murphy, aggravated assault with a deadly weapon, April 25, 2022, Judge Tameka Carter.

■ Faith Elaine Evans, driving while intoxicated, third offense or more, a third-degree felony, April 30, 2022, Judge O'Neil Williams.

■ Trenton Cordell Jackson, evading arrest/detention with a vehicle, a state-jail felony, May 3, 2022, Judge O'Neil Williams.

■ Trenton Cordell Jackson, attempting to take a weapon from an officer, a third-degree felony, May 3, 2022, Judge O'Neil Williams.

■ Justin Reid Pulliam, interfering with public duties, a third-degree felony, Dec. 21, 2021, Judge J. Christian Becerra.

**ROSENBERG POLICE REPORT**

Rosenberg police responded to 142 calls for assistance, traffic violators, property checks, silent alarms, stray and wild animals, noise complaints, people with weapons, deceased persons, suspicious people, civil matters, threats, assaults, road hazards, disturbances, accidents/ crashes, assisting other agencies, etc., Monday, May 23, and made three arrests.

**Dispatch calls that resulted in offense reports being filed by the responding officer:**
- 2:25 a.m., welfare check, 700 block of Blume Rd.
- 8:25 a.m., adult protective services.
- 9:10 a.m., CPS referral
- 9:46 a.m., suspicious act, 1200 block of Miles St.
- 10:02 a.m., auto theft, 1000 block of Lindsey Dr.
- 11:34 a.m., burglary, 5000 block of Sierra Ridge Dr.
- 2:33 p.m., theft, 900 block of Village Court Ln.
- 3:08 p.m., criminal mischief, 24000 block of Commercial Dr. (Home Depot)
- 5:16 p.m., traffic stop, Summer Lake Pass Ln and Summer Crescent Dr.

**Arrests made Monday, May 23**
- 10:44 a.m., male, 40, of Rosenberg, five outstanding warrants.
- 6:43 p.m., male, 25, of Rosenberg, evading arrest/detention with a vehicle.
- 6:54 p.m., female, 50, of Rosenberg, outstanding warrant (issued by another community/law enforcement agency).

Rosenberg police responded to 174 calls on Tuesday, May 24, and made three arrests.

**Dispatch calls that resulted in offense reports being filed by the responding officer:**
- 12:14 a.m., assault, 28300 block of U.S. 59 (La Quinta).
- 2:22 a.m., suspicious act, 7th St. and Ave. Q.
- 6:26 a.m., SWAT requested, 1200 block of Preston St.
- 8:18 a.m., assist other agency, 1200 block of Seventh St.
- 12:02 p.m., assault in progress, 5500 block of Reading Rd.
- 12:27 p.m., fraud reported, 800 block of Ave. I (Ice House).
- 1:16 p.m., traffic stop, 5300 block of Ave. I.

- 1:40 p.m., disturbance, 4700 block of SH 36 South. (Harbinger).
- 2:10 p.m., theft, 3200 block of First St.
- 3:05 p.m., theft, 3900 block of Teby Blvd.
- 4:00 p.m., pedestrian questioned, 28300 block of U.S. 59 (Oyo Hotel).
- 6:41 p.m., auto theft, 1300 block of Ellis Grove Ln.
- 6:58 p.m., traffic stop, Ave. H and Miles St.
- 9:03 p.m., disturbance, 1100 block of First St. (Hartz Chicken).

- 11:37 p.m., auto theft in progress, 7100 block of Reading Rd.

**Arrests made Tuesday, May 24**
- 1:17 a.m., female, 17, of Rosenberg, assault.
- 4:08 p.m., female, 44, of Rosenberg, four outstanding warrants (issued by other community/law enforcement agency).
- 4:15 a.m., male, 34 of Rosenberg, evading arrest/detention with a previous conviction of a similar offense; possession of a controlled substance, penalty group 2, between 4 grams and 400 grams; and criminal trespass.
- 9:44 p.m., male, 52, of Rosenberg, public intoxication.

# Classifieds
## 281-342-4474

**Fort Bend Herald**
and Texas Coaster
Since 1892



**100 Cars**

MEMORIAL DAY SALE

FINNEGAN IS PROUD TO HONOR AND REMEMBER OUR HEROIC VETERANS ALL MONTH LONG.

STOP IN TO ENJOY THE BEST PRICING ON THE HOTTEST VEHICLES ON THE ROAD!

THE 2021 DODGE CHARGER SXT $27,988
THE 2021 JEEP GRAND CHEROKEE LAREDO $32,988
THE 2022 WAGONEER SERIES II STARTING AT $69,988
THE 2022 JEEP GRAND CHEROKEE LONE STAR EDITION $36,788
2022 RAM 1500 BIG HORN CREW CAB 4X4 $7,000 OFF

281-342-9318 • FINNEGANCHRYSLERJEEPDODGE.COM
26433 SW. FWY, ROSENBERG, TX 77471

Finnegan AUTO GROUP    Jeep



**100 Cars**

FINNEGAN IS PROUD TO HONOR AND REMEMBER OUR HEROIC VETERANS.

MEMORIAL DAY SALE ALL MONTH LONG

WE ARE OFFERING THE BEST PRICING ON YOUR FAVORITE VEHICLES ALL MONTH LONG STOP IN FOR A TEST DRIVE TODAY!

THE NEW 2022 CHEVROLET SILVERADO 1500 LT CREW CAB $42,988
THE NEW 2022 CHEVROLET EQUINOX $38,988
THE NEW 2022 CHEVROLET TRAX $22,988
2022 BUICK ENCORE PREFERRED $24,788
2022 GMC SIERRA 1500 BASE LIMITED 4X4 $5,000 OFF

FIND NEW ROADS    Chevrolet    Buick    GMC

Shop Online 24 Hours a Day at FinneganChevrolet.com
26529 SW Freeway, Rosenberg, TX 77471 • 281-342-4200

Finnegan AUTO GROUP

Want to make your Classified **Stand Out** From the Rest?

**Tractor For Sale $500**
call 281-555-5555

**Sofa and Chair $50**
call 281-555-5555

Call Today About One of Our Attention Grabbers!
281-342-4474

**405 Office Help**

# OFFICE POSITION

Full-time position in Rosenberg focusing on

*Receivables/Reception*

Job duties also include:
Data Entry & Cash Handling & Assisting in other departments.
Customer Service, Computer & Telephone Skills Are A Must.
Office experience is a plus.
Company Benefits/401K

**If interested, e-mail your resume to ar@fbherald.com**

**100 Cars**

1926 T Bucket Body
with custom frame
$4,500. Work in high nolor environment & cant take calls, please text: 281-469-7685

**300 Special Services**

GARAGE SALE
7822 Summerdale Dr., Richmond - 77469
Fri. & Sat. 7:00am-?
Furniture, Living Rm, Bedroom, Dining Rm, Home Accessories, Clothes, Shoes, Etc...

★★★★★
KEN'S PAINTING & SHEETROCK REPAIR
Interior Or Exterior. Pressure Washing. Res/Com. 47 Yrs. Exp.
(832)435-9917

**410 General Help**

GLOBAL PRODUCT MANAGER
(Beasley, TX).
Translate customer input, market needs & tech trends to create winning strategies & products. Build relationships w/ customers & channel partners. Manage the product life cycle to create growth & deliver profitability. Utilize market research techniques to gain customer insights that will drive enhancements & innovate products & svcs. Drive product plans, benefits & results to internal & external audiences. Contribute to the development of the global strategic marketing plan, focused on strategic shifts. Analyze, eval & make recommendation about supply & demand factors with North America. Reqs: Bach's in Chem Engrg, or foreign equiv. & 2 yrs of exp in managerial position. Mail resumes to HR, Finorid LLC, 8115 Loop 540 Beasley, TX 77417

**410 General Help**

S.P.J.S.T. NURSING Home-Needville
Accepting Applications
PCT Housekeeper
Apply in person M-F between 8:00a & 4:30p
8611 Main St.
Needville, TX 77461

Maintenance/Make Ready Position
Must have Experience. E-mail Resume to:
ashleeskamagrin@gmail.com
Or Apply In Person
1136 Radio Lane, Rosenberg
No phone calls please

Holiday Cleaners
now hiring for the following positions:
Front Counter, Shirt Pressers, Dry Clean Pressers & Silk Finish Pressers. For more info please call 281-341-9066

LOOKING FOR A Technician who knows how to operate & repair an Indian machinery for a water plant facility (blowing machine, tilling machine, label machine & packing machine) Also looking for a Bilingual Secretary (Spanish-English) with basic office knowledge. Please contact Jose G. 979-417-5332

**425 Medical**

S.P.J.S.T. NURSING Home-Needville
NOW HIRING WEEKEND RN
Apply in person M-F between 8:00a & 4:30p
8611 Main St.
Needville, TX 77461

S.P.J.S.T. NURSING Home-Needville
NOW HIRING WEEKEND RN
Apply in person M-F between 9:00a & 4:30p
8611 Main St.
Needville, TX 77461

FIND A pot of gold or save a pot of gold with the classifieds. Call 342-4474 To Place Your Ad.

**600 Misc. For Sale**

Cemetery Plots & Marker for Sale
2 Cemetery plots in prime location at Greenlawn Memorial Park Section 38, Lots 3&4½, Spaces 2/8. Companion marker with vase 32x11 Bronze & 44x14 Granite Twilight Rose Design $14,000 (Transfer Costs Included) Call (832) 389-1984

CEMETERY LOTS FOR SALE
at Davis Greenlawn
Lot 24, Sec K
5, 7 & 9 and 2 & 4
Call 979-482-0861

Space Crypt "For Sale"
Row 83 #16 @ Davis-Greenlawn Funeral Chapel & Cemetery, Rosenberg, TX $14,000 obo Contact: Whitney Woodard (501)691-3773

**605 Garage Sales**

HUGE GARAGE & PLANT SALE: 5964 Railroad St., Wallis 6/2, 6/3 & 6/4: 8am-?

**705 Unfurnished Apartment**

KINGS ARMS APARTMENTS
will be open for the HUD waiting list for 2 Bdrms Tues., April 5th - Fri., April 29th by appointment only

WILLIAMSBURG APARTMENTS

LB6 RADIO LANE
• 2 Bedrooms
• Carports
• Walk-In Closets
• Dressing Vanities
For more information call
281-232-2070
If no answer
281-342-4603

DO YOUR shopping in the Classifieds!

SUBSCRIBE TODAY!

**PX-30**



Background Report

# Justin Reid Pulliam

Link to Report

Report Created

Jun 22, 2025

truthfinder.com/dashboard



































**PX-31**



# TEXAS DEPARTMENT OF PUBLIC SAFETY
**Box 4087 MSC 0245 • AUSTIN, TEXAS 78773-0245**
**Regulatory Services Division**
**www.dps.texas.gov**
**512-424-7293**

January 10, 2023

Justin Reid Pulliam

████████████

████████████

Re:      Suspension of License to Carry a Handgun #████████

Dear Mr. Pulliam:

It has come to the Department's attention that cause exists for the suspension of your license to carry a handgun. Suspension of your license is based on the presence of a pending Class B misdemeanor charge in County Court at Law #3, Fort Bend County, Texas (Cause No. 21-CCR-225419) for Interfer with Public Duties filed on August 10, 2022.

Under Government Code Section 411.187(a)(1), a license is subject to suspension if the license holder has been charged with the commission of a Class A or Class B misdemeanor or an offense under Section 42.01, Penal Code (Disorderly Conduct), or of a felony under an information or indictment. Your pending Class B misdemeanor charge causes your license to be suspended until the disposition of the charge. If the charge is dismissed or you receive an acquittal, your license will be restored. If you receive a conviction, or an order of deferred adjudication your license will be revoked.

Please be advised that in order to renew a handgun license, under Government Code Section 411.185(e) a license holder must meet all the eligibility requirements stated in Government Code Section 411.172. Therefore, if your license expires while the above charge is pending, you will not be eligible to renew the license and any renewal application you submit while the above charge is pending must be denied. Under Government Code Section 411.174(a)(6) a renewal application fee is non-refundable.

Government Code Section 411.187(b) requires the surrender of your license to the Department not later than the tenth day after you receive this notice unless you request a hearing. If you have not already surrendered your handgun license, please mail it to:

      Texas Department of Public Safety
      Handgun Licensing Bureau MSC-0245
      ATTN: REVOCATIONS/SUSPENSIONS
      P.O. Box 4087
      Austin, Texas 78773-0245

Justin Reid Pulliam
January 10, 2023
Page 2


Government Code Section 411.180 provides information regarding your appeal rights. Specifically, Section 411.180(a) states that your request for a hearing must be in writing and received by the Department no later than thirty (30) days after you receive this notice. If you request a hearing, the request must be mailed to the Department at the following address:

> Texas Department of Public Safety
> ATTN: RLS-Legal Staff MSC-0246
> P.O. Box 4087
> Austin, Texas 78773-0246

Handgun Licensing
Regulatory Services Division

DL:ltc
Enclosures: GC §411.180, GC §411.187

**PX-32**



## Final Details for Order #113-3224679-6308236

Print this page for your records.

**Order Placed:** December 30, 2021
**Amazon.com order number:** 113-3224679-6308236
**Order Total:** $294.50

## Shipped on December 31, 2021

| Items Ordered | Price |
|---|---|
| 2 of: *CammPro I826 1296P HD Police Body Camera,128G Memory,Waterproof Body Worn Camera,Premium Portable Body Camera with Audio Recording Wearable,Night Vision,GPS for Law Enforcement*<br>Sold by: Amazon.com Services LLC | $138.59 |

Condition: New

**Shipping Address:**
Justin Pulliam



**Shipping Speed:**
FREE Prime Delivery

## Payment information

**Payment Method:**
Visa | Last digits: ▮▮▮

**Billing address**
Justin Pulliam

| | |
|---|---|
| Item(s) Subtotal: | $277.18 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $277.18 |
| Estimated tax to be collected: | $17.32 |
| | ----- |
| **Grand Total:** | **$294.50** |

**Credit Card transactions**

Visa ending in ▮▮▮ December 31, 2021: $294.50

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2022, Amazon.com, Inc. or its affiliates

 Gmail

## Order Confirmation #222733757-001

1 message

**OfficeDepotOrders@officedepot.com** <OfficeDepotOrders@officedepot.com>          Wed, Jan 19, 2022 at 9:01 AM
Reply-To: OfficeDepotOrders@officedepot.com
To: ██████████████████



## Hi Justin,

Your order is in. We're working to get it packed up and out the door. Expect a shipping confirmation in your inbox soon.

**View Order Details**

## Shipment 1 of 1

**Order #:** 222733757-001

**Status:** In Process

| | | |
|---|---|---|
| | **Synology DiskStation DS1621xs+ - Intel Xeon D-1527 2.20 GHz - 6 x HDD Supported - 0 x HDD Installed - 6 x SSD Supported - 0 x SSD Installed - Clustering Supported - 8 GB RAM** | **$1,634.29** |
| | Item #7445149 Unit Price: $1,634.29/each Qty Ordered: 1 | |

| Subtotal: | $1634.29 |
| Delivery Fee: | $0.00 |
| Tax: | $134.83 |
| **Order Total** | **$1769.12** |

## Questions? We're here to help.

Visit our Help Center
Start a self-service return
Chat or Text with us

## Download our App for Exclusive Offers



©2022 Office Depot, LLC. All rights reserved. 6600 North Military Trail, Boca Raton, FL 33496

This sale is subject to the terms of use that govern this website. We reserve the right to cancel or limit any order that is made contrary to any applicable offer, discount, promotion or coupon. Please be advised that prices vary based upon the order and delivery location(s) and the applicable retail store location .

Office Depot has paid the CA Electronic Waste Recycling fee on your behalf for all online and telephone purchases made in or to CA.

For compliance with select California laws and for financial reporting purposes, all sales shipped to California and Texas customers are made by eDepot, LLC, a wholly-owned subsidiary of Office Depot, Inc, and are F.O.B. destination point.

Manage Preferences | Privacy Policy

 

**Order #27369 confirmed**
1 message

**ServerPartDeals.com** <support@serverpartdeals.com>                    Wed, Jan 19, 2022 at 9:04 AM
To:

# ServerPartDeals.com                                    ORDER #27369

## Thank you for your purchase!

Hi Justin, we're getting your order ready to be shipped. We will notify you when it has been sent.

Click here to download Invoice in PDF Format

View your order    or Visit our store

## Order summary

  **Seagate 16TB Exos X16 ST16000NM001G 7200 RPM SATA 6Gb/s 512e/4Kn 256MB 3.5" Enterprise Hard Drive × 3**                    **$929.97**

| | |
|---|---|
| Subtotal | **$929.97** |
| Shipping | **$0.00** |
| Taxes | **$0.00** |
| Total | **$929.97 USD** |

## Customer information

Shipping address



Billing address

Shipping method
FedEx® - 2nd Day

Payment method
Paypal — **$929.97**

If you have any questions, reply to this email or contact us at
support@serverpartdeals.com



## Order #U1051536 confirmed
1 message

**Ubiquiti Inc.** <no-reply@shopifyemail.com>                    Sun, Jan 23, 2022 at 6:59 PM
Reply-To: "Ubiquiti Inc." <store@ui.com>
To:

VISIT STORE

# Thank you for your purchase!

### VIEW YOUR ORDER

Hi Justin, we're getting your order ready to be shipped. We will notify you when it
has been sent.

ORDER SUMMARY

| | | |
|---|---|---|
| UniFi LTE × 1 | | $199.00 |

| | |
|---|---|
| Subtotal | **$199.00** |
| Shipping | **$0.00** |
| TX STATE TAX | **$12.44** |

| | |
|---|---|
| Total | **$211.44 USD** |

CUSTOMER INFORMATION

**Shipping address**



**Billing address**

**Shipping method**

Free 2-day Shipping

**Payment method**

**VISA** ▇▇▇▇▇▇ — **$211.44**

If you have any questions, reply to this email or contact us at store@ui.com

Order created at 2022-01-23 17:58



## Your B&H Order #1079617327 Is Confirmed. Thank You!

1 message

**B&H Photo Customer Service** <ord-status@bhphotovideo.com>          Sat, Jan 29, 2022 at 5:34 PM
To:



Order Confirmation

## Thank You For Your Order

We'll email you with tracking information when your items ship.

### Order # 1079617327



**Ship To**
Justin Pulliam

**Bill To**
Justin Pulliam

**Paid With**
$782.43

 $75.00

ⓘ  Signature may be required upon delivery

**Expedited Delivery**   **Estimated Delivery: Wed Feb 2**

**Ubiquiti Networks UniFi XG 6-Port 802.3bt PoE++**
**Enterprise Network Switch** UBUSXG6POE                  $579.99
In Stock   **QTY**: 1   **Price**: $579.99

 **Ubiquiti Networks UniFi USW Flex Mini 5-Port**
**Gigabit Managed Switch** UBUSWFLEXMNI                   $29.00
In Stock   **QTY**: 1   **Price**: $29.00

**Ubiquiti Networks UniFi Switch Flex 5-Port**
**Managed Gigabit PoE Network Switch** UBUSWFLEX         $198.00
In Stock   **QTY**: 2   **Price**: $99.00

---

|         |          |
|---------|----------|
| Subtotal | $806.99 |
| Shipping | $0.00   |
| Tax      | $50.44  |

# Total                                    $857.43

All orders are subject to approval by our Verification Department. We will notify you by phone or email should your order be delayed for any reason.

| MODIFY / CANCEL ORDER | You may modify or change your order before your item has been packed. |

Check Order Status          Hours of Operation          Return Policy

Customer Service: 800.221.5743 or cs@bhphoto.com

Was this email helpful? emailcomments@bhphoto.com

CONNECT WITH US:

        

GET THE APP:

 

# Receipt



**Invoice number**  ACA9C29B-0003
**Receipt number**  2304-9196
**Date paid**  February 28, 2022
**Payment method**  ▉▉▉▉▉▉

**Ubiquiti Labs, LLC**                          **Bill to**
685 3rd Avenue                                  ▉▉▉▉▉▉▉▉▉▉
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on February 28, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 457,427,607 | | |
| **First 1073741824**<br>Jan 31 – Feb 28, 2022 | 457,427,607 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Jan 31 – Feb 28, 2022 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

# Synology®

**INVOICE**

C2 Operations (America) Inc. 30 N GOULD ST STE 1051 SHERIDAN WY 82801

Tel: +1 (307) 429-2263

**Billed To**

**Kelsey Pulliam**

| **Purchase Date** |
|---|
| 01-03-2022 |

**Invoice Number**

98E10CA3-0002

**Total Amount**

## $350.27

| NO. | Description | Usage | Amount |
|---|---|---|---|
| 1 | supplementary fee (01-03-2022 ~ 01-03-2023 GMT) | | $0.32 |
| 2 | C2 Storage - Subscription: Advanced (01-03-2022 ~ 01-03-2023 GMT) | 5 TB | $349.95 |

| | | |
|---|---|---|
| | Subtotal | $350.27 |
| | Total | $350.27 |

# Receipt

**Invoice number**   ACA9C29B-0004
**Receipt number**   2524-1551
**Date paid**        March 31, 2022
**Payment method**   ███████

**Ubiquiti Labs, LLC**                          **Bill to**
685 3rd Avenue                                  ██████████████
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on March 31, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 106,942,842 | | |
| **First 1073741824**<br>Feb 28 – Mar 31, 2022 | 106,942,842 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Feb 28 – Mar 31, 2022 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt

**Invoice number**   ACA9C29B-0005
**Receipt number**   2571-7681
**Date paid**          April 30, 2022
**Payment method**   ████████

**Ubiquiti Labs, LLC**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
████████████

## $15.00 paid on April 30, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 41,814,301 | | |
| **First 1073741824**<br>Mar 31 – Apr 30, 2022 | 41,814,301 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Mar 31 – Apr 30, 2022 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

# Receipt

Invoice number    **ACA9C29B-0006**
Receipt number    **2995-5468**
Date paid          May 31, 2022
Payment method    

**Ubiquiti Labs, LLC**                          **Bill to**
685 3rd Avenue                                  
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on May 31, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 2,809,772 | | |
| **First 1073741824**<br>Apr 30 – May 31, 2022 | 2,809,772 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Apr 30 – May 31, 2022 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

# Receipt

| | |
|---|---|
| **Invoice number** | ACA9C29B-0007 |
| **Receipt number** | 2257-0808 |
| **Date paid** | June 30, 2022 |
| **Payment method** |  |

**Ubiquiti Labs, LLC**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**


## $15.00 paid on June 30, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 2,696,450 | | |
| **First 1073741824**<br>May 31 – Jun 30, 2022 | 2,696,450 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>May 31 – Jun 30, 2022 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt



**Invoice number**  ACA9C29B-0008
**Receipt number**  2342-3959
**Date paid**  July 31, 2022
**Payment method**  ███████

**Ubiquiti Labs, LLC**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
████████████

## $15.00 paid on July 31, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 3,202,294 | | |
| **First 1073741824**<br>Jun 30 – Jul 31, 2022 | 3,202,294 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Jun 30 – Jul 31, 2022 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

# Receipt

**Invoice number**   **ACA9C29B-0009**
**Receipt number**   2123-2547
**Date paid**   August 31, 2022
**Payment method**   ▇▇▇▇

**Ubiquiti Labs, LLC**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
▇▇▇▇▇▇▇▇

## $15.00 paid on August 31, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 15,829,004 | | |
| **First 1073741824**<br>Jul 31 – Aug 31, 2022 | 15,829,004 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Jul 31 – Aug 31, 2022 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

 Gmail

**Your Helm order has been confirmed!**
1 message

**Helm** <support@thehelm.com>                                         Tue, Sep 20, 2022 at 12:18 PM



ORDER #4712

## Thank you for your order!

Congratulations on taking this step toward taking back your privacy! We've received your order for a Helm Personal Server and we're working to get it shipped as soon as possible. Once your Helm ships, you'll receive an additional email with specific tracking information.

If you have any questions, don't hesitate to get in touch!

Your order is estimated to ship in 6-8 weeks.

View your order

## Order summary

    **Helm Personal Server V2 × 1**
1TB                                                            **$449.00**

    **Helm Subscription × 1**
128GB                                                          ~~$99.00~~
🏷 PREORDER2022 (-$50.00)                                       **$49.00**

| | |
|---|---|
| Subtotal | **$498.00** |
| Shipping | **$15.00** |

| | |
|---|---|
| Total | **$513.00 USD** |

You saved $50.00

## Customer information

**Shipping address**
Justin Pulliam
███████████
███████████
██████

**Billing address**
Justin Pulliam
███████████
███████████
████████

**Shipping method**
Standard shipping

**Payment method**
 Payment method

If you have any questions, reply to this email or contact us at support@thehelm.com

# Receipt



**Invoice number**  ACA9C29B-0010
**Receipt number**  2172-1862
**Date paid**  September 30, 2022
**Payment method**  ▮▮▮▮▮

**Ubiquiti Labs, LLC**                                    **Bill to**
685 3rd Avenue                                           ▮▮▮▮▮▮▮▮
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on September 30, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 656,386,578 | | |
| **First 1073741824**<br>Aug 31 – Sep 30, 2022 | 656,386,578 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Aug 31 – Sep 30, 2022 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

# Receipt

**Invoice number**  ACA9C29B-0011
**Receipt number**  2412-5114
**Date paid**  October 31, 2022
**Payment method**  

**Ubiquiti Labs, LLC**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**

## $15.00 paid on October 31, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 2,920,411 | | |
| **First 1073741824** <br> Sep 30 – Oct 31, 2022 | 2,920,411 | $0.00 | $0.00 |
| **Flat fee for first 1073741824** <br> Sep 30 – Oct 31, 2022 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt

**Invoice number**   **ACA9C29B-0012**
**Receipt number**   2289-9566
**Date paid**   November 30, 2022
**Payment method**   ███████

**Ubiquiti Labs, LLC**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
███████████████

## $15.00 paid on November 30, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 2,254,629 | | |
| **First 1073741824**<br>Oct 31 – Nov 30, 2022 | 2,254,629 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Oct 31 – Nov 30, 2022 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

# Receipt



**Invoice number**   ACA9C29B-0013
**Receipt number**   2078-7402
**Date paid**   December 31, 2022
**Payment method**   <span>████</span>

**Ubiquiti Labs, LLC**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
<span>████████</span>

## $15.00 paid on December 31, 2022

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 1,201,429 | | |
| **First 1073741824**<br>Nov 30 – Dec 31, 2022 | 1,201,429 | $0.00 | $0.00 |
| **Flat fee for first 1073741824**<br>Nov 30 – Dec 31, 2022 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt

**Invoice number**  ACA9C29B-0014
**Receipt number**  2853-5079
**Date paid**  January 31, 2023
**Payment method**  

**Ubiquiti Inc.**                                      **Bill to**
685 3rd Avenue                                        
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on January 31, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 762,796 | | |
| First 1073741824<br>Dec 31, 2022 – Jan 31, 2023 | 762,796 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Dec 31, 2022 – Jan 31, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt



**Invoice number**  ACA9C29B-0015
**Receipt number**  2226-1597
**Date paid**  February 28, 2023
**Payment method**  ▮▮▮▮▮▮

**Ubiquiti Inc.**                                          **Bill to**
685 3rd Avenue                                          ▮▮▮▮▮▮▮▮▮▮▮▮
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on February 28, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 1,085,339 | | |
| First 1073741824<br>Jan 31 – Feb 28, 2023 | 1,085,339 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Jan 31 – Feb 28, 2023 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

# Synology®

# Invoice

C2 Operations (America) Inc.

30 N GOULD ST STE 1051 SHERIDAN WY 82801, USA

Tel: +1 307 429-2263

**Billed To**

**Purchase Date**

01-03-2023

**Kelsey Pulliam**

**Invoice Number**

98E10CA3-0003

**Total Amount**

**$349.95**

| NO. | Description | Usage | Amount |
|-----|-------------|-------|--------|
| 1 | C2 Storage - Subscription: Advanced (01-03-2023 ~ 01-03-2024 GMT) | 5 TB | $349.95 |

|  | Subtotal | $349.95 |
|--|----------|---------|
|  | Total | $349.95 |

# Receipt



**Invoice number**  ACA9C29B-0016
**Receipt number**  2339-2311
**Date paid**  March 31, 2023
**Payment method**  ▮▮▮▮▮

**Ubiquiti Inc.**                                   **Bill to**
685 3rd Avenue                                   ▮▮▮▮▮▮▮▮▮
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on March 31, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 584,553 | | |
| First 1073741824<br>Feb 28 – Mar 31, 2023 | 584,553 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Feb 28 – Mar 31, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt



**Invoice number**  ACA9C29B-0017
**Receipt number**  2923-3817
**Date paid**  April 30, 2023
**Payment method**  

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**

## $15.00 paid on April 30, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 667,754 | | |
| First 1073741824<br>Mar 31 – Apr 30, 2023 | 667,754 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Mar 31 – Apr 30, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt



**Invoice number**  ACA9C29B-0018
**Receipt number**  2404-6517
**Date paid**  May 31, 2023
**Payment method**  ▇▇▇▇▇

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
▇▇▇▇▇▇▇▇▇▇

## $15.00 paid on May 31, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 1,272,886 | | |
| First 1073741824<br>Apr 30 – May 31, 2023 | 1,272,886 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Apr 30 – May 31, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt



**Invoice number**   ACA9C29B-0019
**Receipt number**   2054-3948
**Date paid**         June 30, 2023
**Payment method**   

**Ubiquiti Inc.**                                    **Bill to**
685 3rd Avenue                                      ███████████████
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on June 30, 2023

| Description | Qty | Unit price | Amount |
| --- | --- | --- | --- |
| ULTE (per Byte) | 1 | | |
| First 1073741824<br>May 31 – Jun 30, 2023 | 1 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>May 31 – Jun 30, 2023 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

# Receipt



**Invoice number**  ACA9C29B-0020
**Receipt number**  2088-4979
**Date paid**        July 31, 2023
**Payment method**  ▮▮▮▮

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
▮▮▮▮▮▮▮▮▮

## $15.00 paid on July 31, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 1 | | |
| First 1073741824<br>Jun 30 – Jul 31, 2023 | 1 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Jun 30 – Jul 31, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt



| | |
|---|---|
| **Invoice number** | ACA9C29B-0021 |
| **Receipt number** | 2841-7029 |
| **Date paid** | August 31, 2023 |
| **Payment method** |  |

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**

▉▉▉▉▉▉▉▉▉▉▉▉

## $15.00 paid on August 31, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 1 | | |
| First 1073741824<br>Jul 31 – Aug 31, 2023 | 1 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Jul 31 – Aug 31, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt



**Invoice number**   ACA9C29B-0022
**Receipt number**   2167-4229
**Date paid**   September 30, 2023
**Payment method**   ███████

**Ubiquiti Inc.**                                             **Bill to**
685 3rd Avenue                                         ████████████
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

## $15.00 paid on September 30, 2023

| Description | Qty | Unit price | Amount |
| --- | --- | --- | --- |
| ULTE (per Byte) | 1 | | |
| First 1073741824<br>Aug 31 – Sep 30, 2023 | 1 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Aug 31 – Sep 30, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt

**Invoice number**   **ACA9C29B-0023**
**Receipt number**   2931-1125
**Date paid**        October 31, 2023
**Payment method**   

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**


## $15.00 paid on October 31, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 1 | | |
| First 1073741824<br>Sep 30 – Oct 31, 2023 | 1 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Sep 30 – Oct 31, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |



### Final Details for Order #111-1466308-9577824

Print this page for your records.

**Order Placed:** November 28, 2023
**Amazon.com order number:** 111-1466308-9577824
**Order Total:** $155.11

---

#### Shipped on November 29, 2023

| Items Ordered | Price |
|---|---|
| 1 of: *CammPro 1440P Police Body Camera,128G Memory,Waterproof Body Worn Camera,Premium Portable Body Camera with Audio Recording Wearable,Night Vision,GPS for Law Enforcement (I826 Pro 128G)* | $165.99 |

Sold by: Mofang Store (seller profile)
Supplied by: Mofang Store (seller profile)

Condition: New

**Shipping Address:**
Justin Pulliam
███████████
████████████████
█████████

**Shipping Speed:**
FREE Prime Delivery

---

#### Payment information

**Payment Method:**
Mastercard ████████

**Billing address**
Justin Pulliam
██████████
███████████

**Credit Card transactions**

| | | |
|---|---|---|
| Item(s) Subtotal: | | $165.99 |
| Shipping & Handling: | | $0.00 |
| Your Coupon Savings: | | -$20.00 |
| | | ----- |
| Total before tax: | | $145.99 |
| Estimated tax to be collected: | | $9.12 |
| | | ----- |
| **Grand Total:** | | **$155.11** |
| MasterCard ████████ | November 29, 2023: | $155.11 |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2025, Amazon.com, Inc. or its affiliates



Back to top

amazon   🌐 English ⇕   🇺🇸 United States   Help

Conditions of Use  Privacy Notice  Consumer Health Data Privacy Disclosure  Your Ads Privacy Choices ✔×
© 1996-2025, Amazon.com, Inc. or its affiliates

# Receipt

**Invoice number**  ACA9C29B-0024
**Receipt number**  2679-8767
**Date paid**  November 30, 2023
**Payment method**  ███████

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
████████████████

## $15.00 paid on November 30, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) | 1 | | |
| First 1073741824<br>Oct 31 – Nov 30, 2023 | 1 | $0.00 | $0.00 |
| Flat fee for first 1073741824<br>Oct 31 – Nov 30, 2023 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Receipt

**Invoice number**    ACA9C29B-0025
**Receipt number**    2878-3414
**Date paid**    December 31, 2023
**Payment method**    ▮▮▮▮▮▮

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
+1 646-780-7958
subscriptions@ui.com

**Bill to**
▮▮▮▮▮▮▮▮▮▮▮▮

## $15.00 paid on December 31, 2023

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte)<br>Nov 30 – Dec 31, 2023 | 1 | | $15.00 |
| First 1073741824 | 1 | $0.00 | $0.00 |
| Flat fee for first 1073741824 | 0 | | $15.00 |

| | | |
|---|---|---|
| Subtotal | | $15.00 |
| Total | | $15.00 |
| **Amount paid** | | **$15.00** |

# Receipt



**Invoice number**  ACA9C29B-0026
**Receipt number**  2487-2992
**Date paid**  January 31, 2024
**Payment method**  ▮▮▮▮▮▮

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
subscriptions@ui.com

**Bill to**
▮▮▮▮▮▮▮▮▮▮▮

## $15.00 paid on January 31, 2024

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte)<br>Dec 31, 2023 – Jan 31, 2024 | 1,815,806 | | $15.00 |
| First 1073741824 | 1,815,806 | $0.00 | $0.00 |
| Flat fee for first 1073741824 | 0 | | $15.00 |

| | | |
|---|---|---|
| Subtotal | | $15.00 |
| Total | | $15.00 |
| **Amount paid** | | **$15.00** |

# Receipt

| | |
|---|---|
| **Invoice number** | ACA9C29B-0027 |
| **Receipt number** | 2995-1489 |
| **Date paid** | February 29, 2024 |
| **Payment method** | ███████ |

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
subscriptions@ui.com

**Bill to**
████████████████

## $15.00 paid on February 29, 2024

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte)<br>Jan 31 – Feb 29, 2024 | 18,760,529 | | $15.00 |
| First 1073741824 | 18,760,529 | $0.00 | $0.00 |
| Flat fee for first 1073741824 | 0 | | $15.00 |
| | | Subtotal | $15.00 |
| | | Total | $15.00 |
| | | **Amount paid** | **$15.00** |

# Synology®

**Invoice**

C2 Operations (America) Inc.

30 N GOULD ST STE 1051 SHERIDAN WY 82801, USA

Tel: +1 307 429-2263

**Billed To**

███████████████

**Kelsey Pulliam**

███████████████

██

**Purchase Date**

01-03-2024

**Invoice Number**

98E10CA3-0004

**Total Amount**

**$349.95**

| NO. | Description | Usage | Amount |
|-----|-------------|-------|--------|
| 1 | C2 Storage - Subscription: Advanced (01-03-2024 ~ 01-03-2025 GMT) | 5 TB | $349.95 |
| | | Subtotal | $349.95 |
| | | Total | $349.95 |

# Receipt



| | |
|---|---|
| **Invoice number** | **ACA9C29B-0028** |
| Receipt number | 2337-9969 |
| Date paid | March 31, 2024 |
| Payment method | ▇▇▇▇▇ |

**Ubiquiti Inc.**
685 3rd Avenue
27th Floor
New York, New York 10017
United States
subscriptions@ui.com

**Bill to**
▇▇▇▇▇▇▇▇▇▇

## $15.00 paid on March 31, 2024

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| ULTE (per Byte) Feb 29 – Mar 31, 2024 | 2,591,594 | | $15.00 |
| First 1073741824 | 2,591,594 | $0.00 | $0.00 |
| Flat fee for first 1073741824 | 0 | | $15.00 |
| | Subtotal | | $15.00 |
| | Total | | $15.00 |
| | **Amount paid** | | **$15.00** |

**PX-33**



## Final Details for Order #113-3224679-6308236

Print this page for your records.

**Order Placed:** December 30, 2021
**Amazon.com order number:** 113-3224679-6308236
**Order Total:** $294.50

### Shipped on December 31, 2021

| Items Ordered | Price |
| --- | --- |
| 2 of: *CammPro I826 1296P HD Police Body Camera,128G Memory,Waterproof Body Worn Camera,Premium Portable Body Camera with Audio Recording Wearable,Night Vision,GPS for Law Enforcement* <br> Sold by: Amazon.com Services LLC <br><br> Condition: New | $138.59 |

**Shipping Address:**
Justin Pulliam



**Shipping Speed:**
FREE Prime Delivery

### Payment information

**Payment Method:**
Visa | Last digits: ███

**Billing address**
Justin Pulliam
███████

| | |
| --- | --- |
| Item(s) Subtotal: | $277.18 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $277.18 |
| Estimated tax to be collected: | $17.32 |
| | ----- |
| **Grand Total:** | **$294.50** |

**Credit Card transactions**     Visa ending in ███ December 31, 2021: $294.50

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2022, Amazon.com, Inc. or its affiliates



## Final Details for Order #112-6224143-9597026
### Print this page for your records.

**Order Placed:** January 8, 2022
**Amazon.com order number:** 112-6224143-9597026
**Order Total:** $77.55

## Shipped on January 9, 2022

| Items Ordered | Price |
|---|---|
| 1 of: *Lexar Professional 1667x 256GB SDXC UHS-II Card, Up To 250MB/s Read, for Professional Photographer, Videographer, Enthusiast (LSD256CBNA1667)* <br> Sold by: Amazon.com Services LLC | $72.99 |

Condition: New

**Shipping Address:**
Justin Pulliam


**Shipping Speed:**
Same-Day Delivery

## Payment information

**Payment Method:**
Visa | Last digits: ▮▮▮

**Billing address**
Justin Pulliam
▮▮▮▮▮▮

| | |
|---|---|
| Item(s) Subtotal: | $72.99 |
| Shipping & Handling: | $2.99 |
| Free Shipping: | -$2.99 |
| | ----- |
| Total before tax: | $72.99 |
| Estimated tax to be collected: | $4.56 |
| | ----- |
| **Grand Total:** | **$77.55** |

**Credit Card transactions**          Visa ending in ▮▮▮ January 9, 2022: $77.55

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2022, Amazon.com, Inc. or its affiliates



## Final Details for Order #112-5172017-3848233

Print this page for your records.

**Order Placed:** January 8, 2022
**Amazon.com order number:** 112-5172017-3848233
**Order Total: $15.13**

# Shipped on January 9, 2022

| Items Ordered | Price |
|---|---|
| 1 of: *Spigen Tempered Glass Screen Protector [Glas.tR EZ Fit] designed for iPhone 12 (2020) / iPhone 12 Pro (2020) [Case Friendly] - 2 Pack*<br>Sold by: Spigen Inc (seller profile) \| Product question? Ask Seller | $14.99 |

Condition: New

**Shipping Address:**
Justin Pulliam



**Shipping Speed:**
FREE Prime Delivery

# Payment information

**Payment Method:**
Visa | Last digits:

**Billing address**
Justin Pulliam

| | |
|---|---|
| Item(s) Subtotal: | $14.99 |
| Shipping & Handling: | $0.00 |
| Your Coupon Savings: | -$0.75 |
| | ----- |
| Total before tax: | $14.24 |
| Estimated tax to be collected: | $0.89 |
| | ----- |
| **Grand Total:** | **$15.13** |

**Credit Card transactions**          Visa ending in ▮▮ : January 9, 2022: $15.13

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2022, Amazon.com, Inc. or its affiliates

 **Gmail**

**Justin Pulliam** ████████████

---

## You submitted an order in the amount of $896.31 USD to Apple Inc

---

**service@paypal.com** <service@paypal.com>                    Sun, Jan 9, 2022 at 12:31 AM
To: Justin Pulliam ████████████

Hello, Justin Pulliam



# Thanks for your order at Apple Inc. Money won't leave your account until Apple Inc processes your order.

Thanks for using PayPal. To see the full transaction details, log in to your PayPal account. Keep in mind, it may take a few moments for this transaction to appear.

**Transaction ID**                         **Transaction date**
O-97D322415M455924K                        Jan 9, 2022 00:30:54 CST

**Merchant**                               **Instructions to merchant**
Apple Inc                                  You haven't entered any instructions.

| Description | Unit price | Qty | Amount |
|---|---|---|---|
| iPhone 12 128GB Black Item# MGHC3LL/A | $779.00 USD | 1 | $779.00 USD |
| iPhone 12 \| 12 Pro Silicone Case with MagSafe - Black Item# MHL73ZM/A | $49.00 USD | 1 | $49.00 USD |

|  | |
|---|---|
| **Subtotal** | $828.00 USD |
| Tax | $68.31 USD |
| **Total** | $896.31 USD |

Payment sent from ███████████

The final payment amount may change when the merchant completes the order.

## Issues with this transaction?

You have 180 days from the date of the transaction to open a dispute in the Resolution Center.



Help & Contact | Security | Apps

   

PayPal is committed to preventing fraudulent emails. Emails from PayPal will always contain your full name. Learn to identify phishing

Please don't reply to this email. To get in touch with us, click **Help & Contact**.

PayPal Customer Service can be reached at 888-221-1161.

Not sure why you received this email? Learn more

Copyright © 1999-2022 PayPal, Inc. All rights reserved. PayPal is located at 2211 N. First St., San Jose, CA 95131.

PayPal RT000064:en_US(en-US):1.4.0:5e241ccefba38



**420 Ninth Avenue, New York, NY 10001 • Fax: 212.239.7770**

   

| PHOTO | 1-212 444-6600 1-800 947-9950 | DIGITAL PHOTO | 1-212 444-6700 1-800 947-9978 | VIDEO | 1-212 444-5000 1-800 947-9910 | PRO AUDIO | 1-212 444-5070 1-800 947-1183 |

**To Inquire About Your Order** *Tel: 212.239.7765 - 800.221.5743 • Fax: 212.239.7549 - 800.947.2215*

*The Professional's Source* ━━━ **www.bhphotovideo.com** ━━━



**Order No.:** 891931045
**Reference No.:** 1080207093

Bill To: **JUSTIN PULLIAM**
**JUSTIN PULLIAM**



Ship To: **JUSTIN PULLIAM**



Bill Phone: ▉

Ship Phone: ▉

| Invoice Date | Terms | Order No: | Order Date | PO NUMBER | Customer Code | Ship Via |
|---|---|---|---|---|---|---|
| 02/17/22 | | 891931045 | 02/17/22 | | B425573 | MULTIPLE |

| Qty Ord | Qty Ship | Qty Bko | Item Description | SKU#/MFR# | Item Price | Amount |
|---|---|---|---|---|---|---|
| 1 | 1 | | B+W- 77MM CLEAR #007 (MRC-BASIC) FILTER<br>Salesperson Code:   WB | BWCB77<br>(66-1101261) | $86.95 | $86.95 |
| 1 | 1 | | PROGRADE 256GB MCRSDXC UHS-II CRD W/ADP-V60<br>Salesperson Code:   WB | PRMSD256GBP2<br>(PGMSD256GBP2BH) | $199.99 | $199.99 |
| 1 | 1 | | PROGRADE PGD USB 3.1 GEN 2 DUAL-SLOT CARD R<br>Salesperson Code:   WB | PRPMICROSDAN<br>(PGRWMICROSDANA) | $79.99 | $79.99 |
| 1 | 1 | | LEXAR LEXAR PRO CF EXPRESS 256GB RB<br>Salesperson Code:   WB<br>Regular Price: $399.99<br>Instant Savings: -$110.00  Exp. 02/27/22<br>Your Final Price: $289.99 | LECFE256GB<br>(LCFX10-256CRBNA) | $289.99 | $289.99 |
| 1 | 1 | | PANASONIC DMW-BLJ31 BATTERY PACK F/S1/S1R<br>Salesperson Code:   WB<br><br>PLEASE NOTE: ---------------------------------------------------------<br>***PLEASE NOTE OUR UPCOMING HOLIDAY SCHEDULE***<br>We will be closed from Friday April 15th<br>through Saturday April 23rd | PADMWBLJ31<br>(DMW-BLJ31B) | $87.99 | $87.99 |

BNL_invoice-REPRINT

Continued on Next Page ...



**420 Ninth Avenue, New York, NY 10001 • Fax: 212.239.7770**



To Inquire About Your Order  *Tel:* 212.239.7765 - 800.221.5743 • *Fax:* 212.239.7549 - 800.947.2215

*The Professional's Source* — **www.bhphotovideo.com** —



**Order No.:** 891931045
**Reference No.:** 1080207093

Bill To: **JUSTIN PULLIAM**

Ship To: **JUSTIN PULLIAM**

Bill Phone: **(903)815-1314**

Ship Phone: **(903)815-1314**

| Invoice Date | Terms | Order No: | Order Date | PO NUMBER | Customer Code | Ship Via |
|---|---|---|---|---|---|---|
| 02/17/22 | | 891931045 | 02/17/22 | | B425573 | MULTIPLE |

| Qty Ord | Qty Ship | Qty Bko | Item Description | SKU#/MFR# | Item Price | Amount |
|---|---|---|---|---|---|---|
| | | | *and will reopen on Sunday April 24th at 10:00am* | | | |
| | | | ************************************************* | | | |

| Payment Type | Card/Check Number | Amount | Sub-Total: | $744.91 |
|---|---|---|---|---|
| VISA CARD | | 791.47 | | |
| | | | Tax: | $46.56 |
| | | | Total Order: | $791.47 |
| | | | Total Payment: | $791.47 |
| | | | Balance: | USD $.00 |

BNL_invoice-REPRINT

**PX-34**

CapitalOne

## Check #310 Cashed

| | |
|---|---|
| **Check Number:** | ▮ |
| **Amount:** | $2,000.00 |
| **Date Posted:** | December 23, 2021 |
| **Account:** | ▮ |



| DATE | | DESCRIPTION | CATEGORY | AMOUNT | BALANCE |
|---|---|---|---|---|---|
| Oct 19 | $ | Overnight Courier Check Charge for payment to Coby DuBose | Overnight Courier Check Charge | -$20.00 | $23,954.30 |
| | | Appears on statement as: *Overnight Courier Check Charge for payment to Coby DuBose* | | | |
| Oct 19 | $ | Coby DuBose | Check payment | -$2,687.50 | $23,974.30 |
| | | Appears on statement as: *Cashier's Check Payment to Coby DuBose* | | | |

| Dec 14 | $ | Overnight Courier Check Charge for payment to Coby DuBose | Overnight Courier Check Charge | -$20.00 |

**Appears on statement as:** *Overnight Courier Check Charge for payment to Coby DuBose*

| Dec 14 | $ | Coby DuBose | Check payment | -$2,500.00 |

**Appears on statement as:** *Cashier's Check Payment to Coby DuBose*

**OFFICIAL RECEIPT**

**OFFICE OF
BEVERLEY McGREW WALKER
DISTRICT CLERK
FORT BEND COUNTY
1422 EUGENE HEIMANN CIRCLE
RICHMOND, TEXAS 77469**

Payor
Justin Reid Pulliam

Receipt No.
**2023-01522-DCLK**

Transaction Date
01/13/2023

| Description | Amount Paid |
|---|---|
| Miscellaneous Payment | |

| | | |
|---|---|---|
| | Plain Copies - Criminal | 19.00 |
| | Plain Copies - Criminal (Misc) | 19.00 |
| | **SUBTOTAL** | **19.00** |

**PAYMENT TOTAL** | **19.00**

| | |
|---|---|
| Credit Card (Ref #06596Q) Tendered | 19.00 |
| Total Tendered | **19.00** |
| Change | 0.00 |

PO Box 452 Guy TX 77444/ 21DCR097297/ 23DCR102181/21 DCR098018/ Various Documents

| 01/13/2023 | Cashier gulafs | Audit |
|---|---|---|
| 02:56 PM | Station DCR04 | 8333288 |

**OFFICIAL RECEIPT**

Charge, Case

**ACI** PAYMENTS, INC.

| Home | Payment Center | Help | Official Extras | | En Español |

**My Account**

**Log In** (Optional)

Log in for expedited access to our enhanced payment services.

E-mail Address:

Password:

Submit

Sign Up / Forgot Password?

▸ Pay Now
▸ View History
▸ Schedule Payments
▸ Verify Payments
▸ Schedule Reminders
▸ My Account Dashboard
▸ E-Wallet
▸ My Bills

## Make A Payment

Select Service > Enter Amount > Accept Terms > Provide Details > Confirm Details > **Digital Receipt**

**Fort Bend County District Clerk, TX**

**Civil Filing Fees and Court Costs**

### Your payment has been completed successfully.

| **Confirmation Number:** | 06596Q |
| **Payment Date:** | **Friday, January 13, 2023** |
| **Payment Time:** | **12:55PM PT** |

Print Confirmation

• Please print or write down your payment confirmation number for your records.
• Do not use your browser's "Back" button. Instead, navigate using the buttons below.

**Payer Information**

| Name: | Justin R Pulliam |
| Street Address: | |

Daytime Phone Number:
E-mail Address:
Last Six digits of Cause Number:

If there are only 5 digits remaining in your Cause Number, please enter a zero in front of the Cause Number.

**Payment Option**

Card Type:
Card Number:
Card Verification Number:

**Payment Information**

| Payment Type: | Civil Filing Fees and Court Costs |
| Payment Amount: | $19.00 |
| Convenience Fee: | $3.95 |
| Total Payment: | $22.95 |

Select what you would like to do next:

◉ Based on your zip code, there are other agencies in your area that can be *paid on time, on your time, every time*. Select this option to view them.

○ Make another payment to Fort Bend County District Clerk - Civil Filing Fees and Court Costs

○ Make another Payment

○ Exit. For security and privacy reasons, your session data will be cleared out.

Continue ▸

This page supports 128-bit SSL encryption as verified by DigiCert.

CapitalOne

## Check #316 Cashed

**Check Number:**

**Date Posted:**     February 14, 2023

**Account:**





## Final Details for Order #113-0674677-6725053
### Print this page for your records.

**Order Placed:** March 22, 2023
**Amazon.com order number:** 113-0674677-6725053
**Order Total: $161.29**

## Shipped on March 22, 2023

| Items Ordered | Price |
|---|---|
| 1 of: *OWC Mercury Pro 16X Blu-ray, 16X DVD, 48X CD Read/Write Solution*<br>Sold by: OWC (Other World Computing) (seller profile)<br>Supplied by: Other | $149.00 |

Condition: New

**Shipping Address:**
Coby DuBose

**Shipping Speed:**
FREE Prime Delivery

## Payment information

**Payment Method:**
Amazon.com Visa | Last digits:

**Billing address**
Justin Pulliam

| | |
|---|---|
| Item(s) Subtotal: | $149.00 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $149.00 |
| Estimated tax to be collected: | $12.29 |
| | ----- |
| **Grand Total:** | **$161.29** |

**Credit Card transactions**

Visa ending in     : March 22, 2023: $161.29

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

.com

## Final Details for Order #113-8069044-7164267
Print this page for your records.

**Order Placed:** March 22, 2023
**Amazon.com order number:** 113-8069044-7164267
**Order Total: $107.17**

## Shipped on March 23, 2023

| Items Ordered | Price |
|---|---|
| 1 of: *USB Flash Drive Case Memory Card Case SD SDXC SDHC Card Holder Organizer Thumb Drive Case USB Drives Storage Case for Sandisk/Samsung/SamData/Inland /PNY/Netac/JBOS (Case Only with Label and Strap)*<br>Sold by: JBOS (seller profile)<br>Supplied by: Other | $14.95 |

Condition: New

| | |
|---|---|
| 1 of: *PNY 32GB Turbo Attaché 3 USB 3.0 Flash Drive, 10-Pack*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $39.99 |

Condition: New

**Shipping Address:**
Justin Pulliam



**Shipping Speed:**
FREE Prime Delivery

## Shipped on March 23, 2023

| Items Ordered | Price |
|---|---|
| 4 of: *Transcend 16GB JetFlash 790 USB 3.1 Flash Drive (TS16GJF790K) Black*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $5.99 |

Condition: New

| | |
|---|---|
| 2 of: *Samsung BAR Plus 64GB - 300MB/s USB 3.1 Flash Drive Titan Gray (MUF-64BE4/AM)*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $10.99 |

Condition: New

**Shipping Address:**
Justin Pulliam



**Shipping Speed:**
FREE Prime Delivery

# Payment information

**Payment Method:**
Amazon.com Visa | Last digits: ██████

**Billing address**
Justin Pulliam
██████████████████

**Credit Card transactions**

| | |
|---|---|
| Item(s) Subtotal: | $100.88 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $100.88 |
| Estimated tax to be collected: | $6.29 |
| | ----- |
| **Grand Total:** | **$107.17** |

Visa ending in ██████ March 23, 2023: $107.17

To view the status of your order, return to <u>Order Summary</u>.

<u>Conditions of Use</u> | <u>Privacy Notice</u> © 1996-2023, Amazon.com, Inc. or its affiliates



## Final Details for Order #113-5318613-9528264

Print this page for your records.

**Order Placed:** March 23, 2023
**Amazon.com order number:** 113-5318613-9528264
**Order Total: $65.42**

## Shipped on March 24, 2023

| Items Ordered | Price |
|---|---|
| 1 of: *Samsung BAR Plus 64GB - 300MB/s USB 3.1 Flash Drive Titan Gray (MUF-64BE4/AM)*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other<br><br>Condition: New | $10.99 |
| 1 of: *SAMSUNG BAR Plus 3.1 USB Flash Drive, 128GB, 400MB/s, Rugged Metal Casing, Storage Expansion for Photos, Videos, Music, Files, MUF-128BE4/AM, Titan Grey*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other<br><br>Condition: New | $14.99 |
| 1 of: *Black n' Red Notebook, Hardcover, Premium Optik Paper, Scribzee App Compatible, Environmentally Friendly, Durable Spiral Binding, 11" x 8-1/2", 70 Double-Sided Ruled Sheets, Pack of 3 (400123488)*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other<br><br>Condition: New | $35.59 |

**Shipping Address:**
Justin Pulliam



**Shipping Speed:**
Rush Shipping

## Payment information

**Payment Method:**
Amazon.com Visa | Last digits: ▮▮

**Billing address**
Justin Pulliam

| | |
|---|---|
| Item(s) Subtotal: | $61.57 |
| Shipping & Handling: | $2.99 |
| Free Shipping: | -$2.99 |
| | ----- |
| Total before tax: | $61.57 |
| Estimated tax to be collected: | $3.85 |
| | ----- |
| **Grand Total:** | **$65.42** |

**Credit Card transactions**    Visa ending in ▮▮ : March 24, 2023: $65.42

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

1 of 1



## Final Details for Order #113-7658797-6545027
Print this page for your records.

**Order Placed:** March 23, 2023
**Amazon.com order number:** 113-7658797-6545027
**Order Total: $84.98**

## Shipped on March 24, 2023

| Items Ordered | Price |
|---|---|
| 2 of: *PNY 32GB Turbo Attaché 3 USB 3.0 Flash Drive, 10-Pack*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other | $39.99 |

Condition: New

**Shipping Address:**
Justin Pulliam



**Shipping Speed:**
FREE Prime Delivery

## Payment information

**Payment Method:**
Amazon.com Visa | Last digits: ⬛

**Billing address**
Justin Pulliam
⬛⬛⬛6701

| | |
|---|---|
| Item(s) Subtotal: | $79.98 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $79.98 |
| Estimated tax to be collected: | $5.00 |
| | ----- |
| **Grand Total:** | **$84.98** |

**Credit Card transactions**     Visa ending in ⬛ March 24, 2023: $84.98

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates



# Final Details for Order #113-2969710-6453810

Print this page for your records.

**Order Placed:** March 23, 2023
**Amazon.com order number:** 113-2969710-6453810
**Order Total: $61.60**

## Shipped on March 24, 2023

| Items Ordered | Price |
|---|---|
| 2 of: *Samsung BAR Plus 256GB - 400MB/s USB 3.1 Flash Drive Titan Gray (MUF-256BE4/AM)*<br>Sold by: Amazon.com Services LLC<br>Supplied by: Other<br><br>Condition: New | $28.99 |

**Shipping Address:**
Justin Pulliam

**Shipping Speed:**
FREE Prime Delivery

## Payment information

**Payment Method:**
Amazon.com Visa | Last digits:

**Billing address**
Justin Pulliam

| | |
|---|---|
| Item(s) Subtotal: | $57.98 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $57.98 |
| Estimated tax to be collected: | $3.62 |
| | ----- |
| **Grand Total:** | **$61.60** |

**Credit Card transactions**

Visa ending in ▮▮▮▮ March 24, 2023: $61.60

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2023, Amazon.com, Inc. or its affiliates

CapitalOne

## Check #318 Cashed

**Check Number:**
**Date Posted:**       March 27, 2023
**Account:**



**Coby DuBose**

███████████████

███████████████
████████████

# INVOICE

INVOICE #082
DATE: 12/14/2022

**TO:**
Justin Pulliam

**COMMENTS OR SPECIAL INSTRUCTIONS:**
<u>Fort Bend County Criminal Case – Interference w/ Public
Duties</u>

| PROJECT | WORK DESCRIPTION | HOURS |
|---------|-----------------|-------|
| Pulliam | Evidentiary Review | 1.25 hours |
| Pulliam | Correspondence/Communication w/ civil lawyers | .25 hours |
| Pulliam | Research/Drafting for Motion to Quash | 6.25 hours |
| Pulliam | Court date: 11/15 – driving and court time | 2 hours |
| Pulliam | Subpoena preparation for Fagan/Provost | .25 hours |
| Pulliam | Meeting w/ client and wife (comp/gratis) | 2.5 hours (comp) |

Total Expenses: N/A

**Hourly Rate: $250/hr**

**Legal Fees Accrued Since Last Invoice: 10 hours ($2,500)**

**Amount Due: $2,500**

**PX-35**

# Summary of Expenses Related to
# December 21, 2021 Arrest

### As of April 12, 2024

## Replacement Equipment

Purchases of equipment to replace what was seized by FBCSO:

| Date | Item | Notes | Amount |
|------|------|-------|--------|
| 12/30/2021 | Body Camera | | $147.25 |
| 1/8/2022 | Lexar SD Card | | $77.55 |
| 1/8/2022 | iPhone Screen Protector | | $15.13 |
| 1/9/2022 | iPhone and iPhone Case | Due to my financial situation, I bought a cheaper iPhone, which was inadequate for live streaming | $896.31 |
| 2/17/2022 | Lexar CF Express 256GB Card | | $308.11 |
| | | **Subtotal** | **$1,444.35** |

## Arrest and Criminal Prosecution

These are payments to defense counsel, expenses related to trial, or other expenses due to the arrest. This does not include travel (e.g., multiple trips to Houston) or compensation for time.

| Date | Description | Notes | Amount |
|------|-------------|-------|--------|
| 12/23/2021 | Criminal Defense Retainer | DuBose Defense | $2,000.00 |
| 10/19/2022 | Criminal Defense Legal Fees | DuBose Defense | $2,687.50 |
| 10/19/2022 | Bank fee for above payment | | $20.00 |
| 12/14/2022 | Criminal Defense Legal Fees | DuBose Defense | $2,500.00 |
| 12/14/2022 | Bank fee for above payment | | $20.00 |
| 1/13/2023 | FBC District Clerk (Records) | | $19.00 |
| 1/13/2023 | FBC District Clerk (Fee) | | $3.95 |
| 2/14/2023 | Criminal Defense Legal Fees | DuBose Defense | $5,000.00 |
| 3/22/2023 | External DVD Drive | To view discovery | $161.29 |
| 3/22/2023 | USB Drives | Organize exhibits | $107.17 |
| 3/23/2023 | USB Drives, Notebooks | Organize exhibits, notes during trial | $65.42 |
| 3/23/2023 | USB Drives | Organize exhibits | $84.98 |
| 3/23/2023 | USB Drives | Organize exhibits | $61.60 |
| 3/24/2023 | Criminal Defense Legal Fees | DuBose Defense | $10,000.00 |
| | | **Subtotal** | **$22,730.91** |

**Safety and Data Security Expenses**

After the arrest and seizure of my property, I (1) upgraded my computer system to protect and backup files from my reporting and my personal life in case other hardware was seized and (2) purchased backup equipment so I could continue reporting following a seizure:

| Date | Description | Notes | Amount |
|------|-------------|-------|--------|
| 12/30/2021 | Body Camera | To have BWC in each truck | $147.25 |
| 1/19/2022 | Synology DS1621xs+ Personal Server | Personal backup server | $1,769.12 |
| 1/19/2022 | 3x 16TB HDDs for Personal Server | | $929.97 |
| 1/23/2022 | Ubiquiti UniFi LTE Failover | Redundant internet for home network/ security cameras | $211.44 |
| 1/29/2022 | Power over Ethernet Network Equip | Upgrade network so all security cameras would have battery backup | $857.43 |
| 2/28/2022 | LTE Failover Data | | $15.00 |
| 3/1/2022 | Personal Data Cloud Backup 1/yr | Cloud backup for personal files | $350.27 |
| 3/31/2022 | LTE Failover Data | | $15.00 |
| 4/30/2022 | LTE Failover Data | | $15.00 |
| 5/31/2022 | LTE Failover Data | | $15.00 |
| 6/30/2022 | LTE Failover Data | | $15.00 |
| 7/31/2022 | LTE Failover Data | | $15.00 |
| 8/31/2022 | LTE Failover Data | | $15.00 |
| 9/20/2022 | Personal Email Server + Subscription | Home based email server with encryption | $513.00 |
| 9/30/2022 | LTE Failover Data | | $15.00 |
| 10/31/2022 | LTE Failover Data | | $15.00 |
| 11/30/2022 | LTE Failover Data | | $15.00 |
| 12/31/2022 | LTE Failover Data | | $15.00 |
| 1/31/2023 | LTE Failover Data | | $15.00 |
| 2/28/2023 | LTE Failover Data | | $15.00 |
| 3/1/2023 | Personal Data Cloud Backup 1/yr | | $349.95 |
| 3/31/2023 | LTE Failover Data | | $15.00 |
| 4/30/2023 | LTE Failover Data | | $15.00 |
| 5/31/2023 | LTE Failover Data | | $15.00 |
| 6/30/2023 | LTE Failover Data | | $15.00 |
| 7/31/2023 | LTE Failover Data | | $15.00 |
| 8/31/2023 | LTE Failover Data | | $15.00 |
| 9/30/2023 | LTE Failover Data | | $15.00 |
| 10/31/2023 | LTE Failover Data | | $15.00 |
| 11/28/2023 | CammPro 1440P Bodycam | New version eliminates exploit that was used by police to access my bodycam video | $155.11 |

2

| | | | |
|---|---|---|---|
| 11/30/2023 | LTE Failover Data | | $15.00 |
| 12/31/2023 | LTE Failover Data | | $15.00 |
| 1/31/2024 | LTE Failover Data | | $15.00 |
| 2/29/2024 | LTE Failover Data | | $15.00 |
| 3/1/2024 | Personal Data Cloud Backup 1/yr | | $349.95 |
| 3/31/2024 | LTE Failover Data | | $15.00 |
| | | **Subtotal** | **$6,023.49** |

**PX-36**

Corruption Report Video YouTube Lifetime Revenue Example

**2021 Revenue: $760.81**

November 29, 2021 to December 31, 2021



**Lifetime Revenue: $1,819.79**

November 29, 2021 to May 8, 2025



**PX-37**



**All Police Events Filmed per Month**

**Frequency of All Police Events Filmed**

| Time Period | Average Per Week |
|---|---|
| 1/1/2021 to 7/12/2021 | 9.0 |
| 7/13/2021 to 12/21/2021 | 2.2 |
| 12/22/2021 to 2/28/2025 | 1.8 |



**Fort Bend County Sheriff's Office Events Filmed per Month**

**Frequency of Fort Bend County Sheriff's Office Events Filmed**

| Time Period | Average Per Week |
|---|---|
| 1/1/2021 to 7/12/2021 | 3.1 |
| 7/13/2021 to 12/21/2021 | 0.6 |
| 12/22/2021 to 2/28/2025 | 0.2 |

**PX-38**

Corruption Report Videos
YouTube Raw Data Download

| Content | Video title | Video publish time | Duration | Returning viewers | Hours streamed | Views | Watch time (hours) | Subscribers | Estimated revenue (USD) | Impressions | Impressions click-through rate (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | | | | 0 | 38.3588 | 25078311 | 2597242.86 | 98929 | 93242.313 | 166396227 | 7.13 |
| Vwt-lHx_nSY | **Auditors Win** Police Coverup FAIL, Lies Caught on Camera | 24-May-23 | 2438 | | | 1708744 | 317318.185 | 8089 | 11545.36 | 14587124 | 6.79 |
| 4VJ3A1AV4Xg | **Auditors WIN** Police Screw Up so BAD, they INSTANTLY Settle (Leon Valley) | 24-Jan-24 | 1383 | | | 1530297 | 208607.606 | 8119 | 6896.928 | 15074922 | 7.16 |
| Jv21Vcn2xPU | Bait? Trap? Setup? @NewsNowHouston's First Amendment Audit Tactics Revealed \| Missouri City, TX | 24-Jan-20 | 1384 | | | 453983 | 80755.4843 | 2936 | 2518.81 | 7488564 | 3.32 |
| 135xJcNjqY8 | Am I Guilty? WATCH COP LIE in Court (Dash Cam Shows Truth) | 10-Dec-24 | 3689 | | | 270785 | 71624.321 | 1473 | 2260.749 | 2698639 | 6.7 |
| I3ng4-G00kU | â€œWeâ€™re humanâ€ Police Arrest Deaf, Blind Woman during Breakup | 3-May-23 | 1613 | | | 739159 | 64620.2187 | 2570 | 2145.823 | 4432553 | 10.91 |
| A2sUm6IGWCg | AUDITORS WIN: Attorney General Determined Sheriff BROKE THE LAW \| Harris County Sheriff Texas | 5-Mar-20 | 1388 | | | 349228 | 61127.3397 | 2739 | 2153.092 | 4523811 | 4.34 |
| wtDp6jasXJs | Arrested for NOT TALKING. Did the Cops Screw Up? | 4-Feb-25 | 2522 | | | 363496 | 59078.2462 | 3889 | 1828.265 | 2663391 | 8.63 |
| EEk_B6a0Z8U | ðŸ¥ðŸ¥ðŸ¥ Corrupt Police Chief BUSTED: Lying Sheriff STRIPPED of License, Office | 29-Nov-21 | 3420 | | | 243915 | 55831.7807 | 1763 | 1818.725 | 1990412 | 7.86 |
| 4hLcqZbpOh0 | **Auditors Win** Corrupt Police Retaliate, LIES Caught on Camera | 11-Jan-24 | 3037 | | | 326401 | 51997.0678 | 1636 | 1275.461 | 2014045 | 10.02 |
| En7uoOsq-jw | Cop has a MELTDOWN after we BUST him Breaking the Law | 15-May-23 | 837 | | | 506128 | 41831.7367 | 1518 | 1794.205 | 3297528 | 9.99 |
| K0Qi2Y-GtWg | Tyrant Cops STEAL Cameras, HIDE Video (The next Leon Valley?!) | 13-Jan-22 | 1693 | | | 254148 | 39495.3219 | 1785 | 420.553 | 2560510 | 5.42 |
| HsrL8PlOkeE | BlueLeaks: LEAKED FBI FILES Reveal Police War Against YouTubers, 1st Amendment Auditors | 1-Jul-20 | 1683 | | | 224893 | 38220.4667 | 1779 | 437.1 | 2445680 | 5.58 |
| PzO0_koX19k | Making government employees do workâ€¦ | 22-Jan-22 | 29 | | | 4486790 | 35355.074 | 6726 | 1.23 | 539040 | 13.15 |
| Q15VIFETSMs | "You're Detained" A Guide on How to Talk to the Police (with Police Reports) | 5-Dec-22 | 797 | | | 298887 | 33332.7969 | 1036 | 1412.486 | 2956404 | 6.47 |
| WW24F6TsdWg | Police Terrorize, Draw Weapons on Women and Baby | 11-Dec-22 | 1062 | | | 287551 | 27534.2342 | 806 | 904.482 | 1660134 | 12.25 |
| rJK8sXmIMbM | Cops MESS UP Big Time, will they PAY?! Judge Rules on Qualified Immunity | 26-Feb-24 | 1523 | | | 251386 | 26789.4369 | 1087 | 994.914 | 1766503 | 8.9 |
| nKCR-bM_ksE | Police Call Citizens "Clowns," Trespass Freeman \| VIA Transit San Antonio Texas | 21-Jan-19 | 1533 | | | 150074 | 26293.5096 | 840 | 158.995 | 2273082 | 3.38 |
| osS7BkzT6-E | Lying Police BUSTED: Illegal COVERUP in Leon Valley (856 Day FOIA Battle) | 9-Nov-21 | 2502 | | | 120015 | 26207.5793 | 516 | 973.416 | 1315551 | 6.26 |
| br-kn2B2q5c | SHOCKING CALL led to @NewsNowHouston Arrest \| Jersey Village Police | 4-Feb-21 | 1415 | | | 167610 | 25098.1061 | 1127 | 981.762 | 1489150 | 6.2 |
| rl_z_RUNc_l | **Auditors Win** Lying Sheriff OWNED by Federal Judge | 25-Sep-24 | 1528 | | | 204363 | 23161.3903 | 1538 | 1095.117 | 1692378 | 7.81 |
| 30f36ijD30A | â€œMore to the storyâ€ MURDER Charges Filed on Officer in Tuttle Drug Raid Case \| Houston Texas Police | 25-Aug-19 | 1709 | | | 108089 | 20699.605 | 932 | 90.52 | 1197288 | 4.92 |
| vHEilqKsMAc | Officer Retaliates Against Journalist Getting Public Information About Tuttle Murder \| Houston Texas | 19-Aug-19 | 1074 | | | 160194 | 20553.4937 | 2744 | 514.291 | 1574621 | 5.41 |
| xSF6X7sO8EQ | Police LIES Caught on Camera, BUSTED by Civil Rights Lawyer | 12-Feb-24 | 1649 | | | 140570 | 19820.1517 | 292 | 659.733 | 1034956 | 9.09 |
| _zqlCmClZkg | Scared ðŸ˜¨ðŸ˜° Tyrant COPS FLEE FROM PUBLIC \| Olmos Park Police OWNED \| Arrest Warrant for Auditor | 13-Mar-20 | 1161 | | | 137183 | 19155.0873 | 564 | 579.513 | 1138170 | 6.21 |

## Corruption Report Video Revenue

| ID | Title | Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Gwl_MMhFOw4 | POLICE CHIEF FIRED: Attorney General Orders City to RELEASE Secret Emails \| Pasadena, Texas | 28-Jul-19 | 962 | 152561 | 19020.1387 | 1278 | 196.929 | 1177353 | 6.27 |
| HlRZRmAAgT4 | The WORST COPS \| Rosenberg, Texas | 20-May-20 | 1584 | 109313 | 18887.7494 | 655 | 629.623 | 1143473 | 5.35 |
| megSfVezwz0 | Tyrant Chief DEFEATED for Good? | 3-Nov-21 | 3172 | 71781 | 18166.4622 | 288 | 644.817 | 945944 | 5.22 |
| 6cNNt3svkTs | **AUDITORS WIN** Chief Joe Salvaggio FIRED \| Leon Valley, TX | 6-Mar-21 | 1258 | 156041 | 18045.0356 | 413 | 799.699 | 869529 | 10.8 |
| 6-G1Ubw-cBE | SECRETS EXPOSED: Tyrant Magers threatens Liberty Activist James Freeman \| Bowie Texas Police | 10-Dec-18 | 1944 | 94460 | 18034.1746 | 295 | 250.737 | 986212 | 5.36 |
| eRMrW-1_Qqc | What are the POLICE HIDING? Olmos Park EXTREME Open Records Cost Games | 6-Mar-20 | 1568 | 84393 | 15679.159 | 275 | 318.362 | 782339 | 5.51 |
| p98zis8-tg8 | ðŸ˜² ARREST Report Released. Is it a POLICE COVERUP ðŸ˜¨?!? | 18-Jan-22 | 1117 | 109565 | 15176.2171 | 512 | 530.916 | 905910 | 7.76 |
| P6slZJNzKf4 | ARRESTED After Asking Tyrant Cop for Name & Badge Number \| VIA Transit Police San Antonio | 24-Jan-19 | 1647 | 85007 | 14625.7074 | 396 | 118.06 | 740348 | 5.74 |
| zx3V14DBU78 | Leon Valley Chief Salvaggio *Full* Testimony in Federal Court | 14-Nov-18 | 11908 | 37398 | 14286.4949 | 170 | 88.505 | 389888 | 5 |
| H-9UJN25KfA | Police Arrest Local Journalist to Hide â€œLethal Coverageâ€ (Full Arrest Video) | 19-Dec-22 | 484 | 246122 | 13516.8745 | 811 | 808.915 | 1110602 | 16.46 |
| t6MjudxhEc0 | WARRANTS ISSUED: Leon Valley Tyrants Investigated by Attorney General | 28-Apr-22 | 2434 | 75811 | 12928.223 | 221 | 458.345 | 575920 | 9.25 |
| b5Gy-pvYC4w | I BEAT THE COPS ðŸ˜ŸðŸ˜´ðŸ˜´ðŸ˜ŸðŸ˜¥ Failed ID Attempt on â€œHIPAA Violationâ€ Call \| Baytown, Texas Police | 15-Jun-20 | 1835 | 72038 | 12537.3966 | 299 | 361.292 | 615044 | 7.04 |
| gkBuRrxVUHg | Democracy BANNED!! Leon Valley Facing New Lawsuit Over Recall Election | 26-Jan-20 | 808 | 99014 | 12393.5909 | 926 | 253.004 | 999512 | 4.97 |
| BagJ8XvycpQ | WTF?! Youâ€™ll NEVER BELIEVE why Police Arrested this Veteran | 31-Jan-20 | 1347 | 98838 | 12222.3083 | 434 | 204.144 | 1173562 | 4.1 |
| vNtngDtpsFc | **Extreme Retaliation** Police Deptâ€™s Illegal Scheme LEAKED | 26-Aug-24 | 1150 | 157755 | 11985.0336 | 1069 | 561.08 | 1081487 | 8.41 |
| ZZsr68mlDaA | Saved by Copwatcher? DPS Trooper Gives Warning on James Freemanâ€™s Stop \| Multicam Audit Rockwall, TX | 25-Jul-19 | 710 | 127019 | 10985.0889 | 239 | 337.393 | 720443 | 10.64 |
| KXR_fRK3O-c | ðŸ˜¨å TYRANT ALERTåå ðŸ˜¨ Attacked, Arrested for Filming Crash \| Lake Jackson, TX | 5-Mar-22 | 2350 | 61109 | 10980.8842 | 253 | 384.199 | 490743 | 6.92 |
| 3dqmKCz4gl0 | Police Supporters get UGLY \| Lake Jackson, Texas with @BCScann | 7-Jun-20 | 1819 | 57906 | 10870.7604 | 166 | 205.13 | 549035 | 5.58 |
| ElYriN-epfA | LEAKED â€œCity Hall is being Call Swarmedâ€ Police Tried to HIDE These Secret Emails \| Missouri City TX | 21-Oct-19 | 623 | 135656 | 10498.7368 | 1443 | 404.745 | 672529 | 10.3 |
| MkzTRy3tFHA | WHO IS LEAVING?! Leon Valley Tyrant Resigning (Breaking Update) | 1-Feb-20 | 1229 | 78173 | 10241.78 | 267 | 212.962 | 743283 | 5.57 |
| qf0_6ZZVQSA | Chief Salvaggio FIRED?! Council Calls NO CONFIDENCE Vote \| Leon Valley, Texas | 19-Jan-21 | 1219 | 80541 | 10004.4957 | 210 | 393.112 | 608779 | 6.59 |
| AoYoH1yAjB8 | Who Raided Tuttle?! ðŸ˜ŸðŸ˜¡ Houston Cops Under Investigation for 7815 Harding St | 28-Jan-20 | 813 | 85714 | 9770.6102 | 657 | 114.53 | 1117812 | 4.14 |
| mZrEW_X1_V8 | Chief Salvaggio â€œCHOKED ME OUTâ€ **New PD Video** Leon Valley, Texas | 7-Sep-20 | 1313 | 75786 | 9719.9425 | 212 | 380.867 | 604116 | 6.15 |
| -uh1KwmBBII | STUPID POLICE STOPS + Iâ€™m â€œAggressiveâ€ Cop Complains \| Clute, TX | 2-Feb-21 | 1464 | 62912 | 9557.602 | 198 | 331.666 | 548484 | 6.21 |
| LhlsQRJaZng | City Council BANS CAMERAS, PUBLIC COMMENTS \| Leon Valley, TX | 8-Mar-21 | 2619 | 43894 | 9145.214 | 78 | 316.641 | 491714 | 5.82 |

## Corruption Report Video Revenue

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| K6nJDDDXagk | Official Oppression? Salvaggio Retaliating Against Councilor \| Leon Valley, Texas | 21-Jul-20 | 2123 | 45442 | 8844.3249 | 169 | 221.956 | 538899 | 4.5 |
| HyH2WNHAzIE | Police Chief: A Threat? NO! Itâ€™s a PROMISE!!! \| Leon Valley, Texas Police (Joe Salvaggio) | 21-May-20 | 933 | 76718 | 8810.1556 | 136 | 271.021 | 568485 | 8.29 |
| On4ZVkcLdYo | *Update* Leon Valley Arrest Warrant + Police Report | 11-Jun-20 | 2144 | 58047 | 8491.2907 | 78 | 203.393 | 500502 | 6.53 |
| rlgJrq0XsSI | "I'll Whack Your Ass" INSANE City Council Meeting \| Leon Valley, TX | 22-Oct-20 | 2106 | 62573 | 8458.9676 | 273 | 420.148 | 455344 | 6.02 |
| ZYg57h-DCkk | Leon Valley Lawsuit Update: FEDERAL COURT TESTIMONEY \| Bradshaw v. Salvaggio | 31-Oct-20 | 7543 | 31832 | 8403.4409 | 51 | 313.382 | 359883 | 4.71 |
| xzIf4NF3GLo | @TXSHEEPDOG72 CASE DISMISSED!!! This is what happened at Leon Valley City Hall | 9-Dec-19 | 823 | 78141 | 8256.9245 | 500 | 364.345 | 538690 | 8.27 |
| hmafiiAQQqo | Grandma ILLEGALLY ARRESTED for ID REFUSAL (Tyrant Cops Retaliate) | 22-Nov-21 | 1930 | 46220 | 8156.3802 | 82 | 307.097 | 439048 | 6.36 |
| E5EoMKNEFs8 | Police Chief FILES ASSAULT CHARGES on City Councilor **Tyrant Alert** \| Leon Valley, TX | 11-Feb-21 | 1763 | 46807 | 8128.321 | 81 | 249.515 | 380896 | 6.65 |
| YLLt0uz6aro | â€œKeep it Positive!â€ Leon Valley BANS SPEECH Critical of Joe Salvaggioâ€™s Political Establishment | 11-Feb-20 | 1100 | 57228 | 8011.5129 | 117 | 122.891 | 384574 | 7.76 |
| ChCMnZF7t-w | Tyrants Retaliate! DETAINED for Bonding Out ARRESTED YouTuber (Cop Wants Video $$$) | 4-Jan-22 | 1216 | 63733 | 7972.5759 | 270 | 266.243 | 425361 | 8.45 |
| 2Vc6unlUcJ0 | *Tyrant Alert* Chief Joe Salvaggio ARRESTS Elderly Man at Council Meeting \| Leon Valley, Texas | 5-Jun-20 | 1469 | 59806 | 7960.9787 | 91 | 100.416 | 486938 | 7.13 |
| doGlVzKbLG8 | *Tyrant Alert* FALSE ARREST of Black YouTuber @NEWSNOWOMAHACOPBLOCK \| Tomball, Texas Police | 22-Feb-21 | 2093 | 42092 | 7563.0947 | 198 | 221.485 | 349773 | 6.72 |
| SnCK2-qVYb8 | James Freeman CHARGED! Rude Government Workers Show Off | 17-Jan-21 | 901 | 62999 | 7335.7586 | 214 | 281.137 | 384272 | 8.28 |
| tOHqLceaD-U | COVER UP BUSTED! Corrupt Cop Fails to ID \| Harris County Pct 6 visits Fort Bend Texas | 24-Aug-20 | 1694 | 44266 | 7254.0525 | 95 | 280.161 | 404671 | 5.72 |
| 7LK6CLj9TrU | LAWSUIT FILED \| Press Conference with @InstituteForJustice Attorneys | 7-Dec-22 | 755 | 116817 | 7160.1474 | 623 | 442.421 | 785248 | 8.63 |
| nR-WyCIEgjg | Police REFUSE to Investigate Cop who ASSAULTED Journalist | 2-Feb-21 | 638 | 72100 | 7032.2175 | 149 | 198.305 | 660208 | 5.72 |
| cEQsFOi_hFk | Justin Pulliam Nailed LYING Chief Salvaggio \| Leon Valley, Texas | 14-Sep-20 | 1106 | 55064 | 6826.8805 | 76 | 443.672 | 480529 | 6.64 |
| vSy34V64sqQ | Leon Valley (BREAKING): Salvaggioâ€™s â€œTeamâ€ KICKING OUT the Mayor today?!? | 13-Apr-20 | 1171 | 58343 | 6811.4074 | 96 | 162.223 | 422360 | 8.47 |
| r_TxT89j44M | Call the Police! PLEASE HURRY… Heâ€™s Interviewing the Mayor | 3-Dec-24 | 3048 | 36520 | 6807.0368 | 97 | 219.333 | 305521 | 7.63 |
| OMrFPg67ICQ | Blue Line Protection? Cops Deny Criminal Report Against Deputies-Lake Jackson TX @BCScann | 21-Jan-20 | 864 | 61670 | 6638.8258 | 578 | 114.671 | 489789 | 7.06 |
| UOhX4P1yFa0 | Blackmore EJECTED + Police UNION THREATENS Leon Valley Council | 13-Jan-21 | 1518 | 46669 | 6595.8705 | 85 | 254.5 | 417528 | 5.83 |
| pRxEwMCq-pY | Brianna, Hide! Rookie GIRL COP DRIVES into DITCH \| Harris Constable Pct 5 | 23-May-20 | 1350 | 58115 | 6585.5616 | 180 | 265.582 | 401114 | 8.2 |
| EDkUQd1riqE | Police BAN Videos, Charges FILED Against YouTubers | 30-Jan-24 | 638 | 94455 | 6526.0758 | 910 | 213.09 | 557520 | 11.88 |
| Lfgja1vfreE | â€œMy Heroes Betrayed Meâ€ Police Coverup Exposed | 8-Jan-24 | 1494 | 60881 | 6480.8175 | 190 | 149.866 | 388270 | 10.07 |
| vcymmBOLOKc | CORRUPTION REPORT | 4-Nov-21 | 1836 | 39545 | 6476.5054 | 125 | 300.703 | 369718 | 7.76 |
| MJsFXhe5eQs | **IA Report Exclusive** Tyrant Cops Punished \| Lake Jackson, TX | 27-Mar-22 | 1411 | 52128 | 6460.8761 | 160 | 296.773 | 416164 | 7.68 |
| TPONzASLcps | **$20,000+ LOST** Cruel and Unusual Prosecution | 30-Mar-23 | 1732 | 90326 | 6266.1504 | 122 | 256.974 | 467319 | 9.44 |

Corruption Report Video Revenue

| ID | Title | Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7tc_JO6h9iI | "IMMEDIATE RESIGNATION" of Leon Valley Official + NEW LAWSUIT Threatened | 27-Feb-21 | 1975 | | 33885 | 6136.4322 | 27 | 275.138 | 234018 | 8.15 |
| a6OpLWEY4a4 | From Family Dispute, Lies to DPS Attack Helicopter: Houston Police Murder Victims of Bogus Drug Raid | 27-Mar-19 | 1294 | | 42949 | 6126.3329 | 103 | 73.706 | 504075 | 4.55 |
| OzDmWQw2D5k | Chief Salvaggio: "Auditors are Shaping your Mind" + Did Change Leon Valley FAIL?! | 21-Jan-21 | 1225 | | 44704 | 5919.7293 | 42 | 259.302 | 430546 | 5.63 |
| LTusfNGUaoA | NEW! Ousting Leon Valley TYRANTS: 1,600 signatures marched to City Hall for Recall Election | 19-Nov-19 | 872 | | 71951 | 5877.9785 | 314 | 171.863 | 434027 | 8.46 |
| Ka7QOYZ2PJs | UPDATE: Fort Bend Sheriff Fagan Political Arrest of Justin Pulliam | 22-Dec-21 | 5980 | | 28060 | 5711.213 | 68 | 745.547 | 187905 | 9.56 |
| SqY-7eiK9vs | Bad Cop Support Rally (Crashing the Party) | 13-Sep-22 | 986 | | 68183 | 5661.8218 | 347 | 317.049 | 363233 | 13.94 |
| fxFiYiKaBS8 | EXCLUSIVE! See the Police Reports, Warrant for Fort Worth COP WHO MURDERED woman inside her home | 17-Oct-19 | 1484 | | 41642 | 5654.5237 | 172 | 31.737 | 349342 | 6.53 |
| Op7A-Le2NeY | Cops "Dick" Around and Find Out... (Sister Threatened with Arrest) | 26-May-23 | 1054 | | 71908 | 5543.9617 | 180 | 327.663 | 399849 | 11.07 |
| EdY1kMrbxAQ | Black Site Jails: Rosenberg & Fort Bend HIDING Innocent Americans | 9-Jan-21 | 2441 | | 30293 | 5525.2558 | 79 | 166.675 | 295129 | 4.3 |
| zLGkRnnyEhA | Uvalde 2.0†"Scared Cops HIDE, Refuse to Engage Active Incident | 27-Feb-24 | 517 | | 120010 | 5282.4878 | 294 | 202.421 | 631914 | 11.44 |
| skyrItJTYis | Corrupt Clerk BUSTED for Jury Tampering ⚖ï¿½–ï¿½½ (10+ years) | 23-Feb-22 | 2334 | | 29121 | 5152.2757 | 51 | 166.705 | 272297 | 6.26 |
| 91d1INvZIDQ | The Craziest Secretary | 28-Aug-19 | 930 | | 40311 | 5132.9669 | 112 | 133.621 | 329115 | 6.19 |
| mFD3Y5dkx_Y | What was POLICE CHIEF Salvaggio TEXTING?! 📱ï¿½ï¿½²  Leon Valley, Texas | 22-Sep-20 | 1121 | | 33774 | 5071.7069 | 61 | 241.875 | 300898 | 5.67 |
| lmQdo1Ddkao | 3 Cops Detain Mom, BAN "Different" Speech (1st Amendment Nullified) | 16-Jan-24 | 1003 | | 56245 | 5055.0288 | 108 | 140.789 | 337310 | 11.27 |
| mSxlbzkw4KI | Police Chief Salvaggio **LIES UNDER OATH** in Leon Valley, Texas | 20-Oct-20 | 1536 | | 28049 | 5002.7149 | 81 | 237.207 | 270826 | 5.86 |
| sGEaL6K_8tY | Chief will ARREST City Council for "Public Humiliation" of Cops | Leon Valley, TX | 27-Sep-20 | 1206 | | 39464 | 4953.6085 | 50 | 272.317 | 310935 | 6.78 |
| z5ts3HNfNJk | Snowflake Calls Police on Grandma for Handing Out 2A Fliers, DPS Targets Activist | Lake Jackson TX | 8-Aug-19 | 1272 | | 42044 | 4943.9036 | 147 | 34.84 | 801884 | 2.9 |
| 4wFxg_Y6ECY | "I hope she GOES TO JAIL" | Leon Valley Residents SLAM Corrupt Officials | 26-Aug-20 | 964 | | 41170 | 4923.5531 | 28 | 197.244 | 319661 | 7.04 |
| hxSxpykCMCY | Why I'm Quitting | 17-Jan-24 | 2023 | | 50853 | 4888.1221 | 189 | 190.338 | 264913 | 12.39 |
| xGKDTeysEVk | Deputy STUCK with FOIA REQUEST for Sheriff's TEXT MESSAGES | Fort Bend Sheriff Troy Nehls | 15-Mar-20 | 618 | | 59377 | 4728.2448 | 143 | 200.93 | 361122 | 9.12 |
| NXZ1Qc6KiLM | ARRESTED! What happens when you go to JAIL? (Police Bodycam) | 12-Sep-22 | 996 | | 52234 | 4602.8845 | 113 | 238.482 | 388406 | 9.54 |
| 4VXR6ip3vBs | POLICE STATION STAKEOUT 📸📹😱: Will Sheriff Troy Nehls HIDE 😤 from One Tough Voter? | 16-Jun-20 | 1174 | | 39462 | 4492.1631 | 88 | 164.72 | 312938 | 7.08 |
| T1lY5x0fus8 | Boyd PD CALLS & BODYCAM: Best Open Carry Stop in Texas, Snowflake Callers Meltdown | 5-Dec-18 | 1047 | | 41645 | 4444.2753 | 122 | 24.167 | 255593 | 7.33 |
| -Xaw9YcDCXc | 😡😤†😤¨, Alcocer RAGE QUITS Council Meeting | Leon Valley, Texas | 27-Oct-20 | 1130 | | 32659 | 4437.2387 | 15 | 286.018 | 223917 | 8.18 |
| p-DIDCX1SJs | Agitator Salvaggio WAGING WAR on Free Speech & Press | Leon Valley, TX | 3-Aug-20 | 1390 | | 33160 | 4423.7781 | 83 | 79.222 | 309113 | 5.5 |
| a4iCggMaYvE | DENIED: Secretary Blocks Access to IA Report-Rosenberg TX Open Records Audit | 19-Jul-19 | 1242 | | 30526 | 4396.5845 | 154 | 134.069 | 234732 | 6.22 |

## Corruption Report Video Revenue

| ID | Title | Date | Views | Revenue | Col1 | Col2 | Col3 | Col4 |
|---|---|---|---|---|---|---|---|---|
| 8FliZW3wL0Q | **Auditor Arrested** "You CANNOT Film Government Buildings" \| Palmetto Bay, Florida | 27-Jan-21 | 1417 | 34420 | 4394.0921 | 61 | 193.388 | 236174 | 7.73 |
| OI4w9HkA-h8 | (SNOWFLAKES) How to SKIP THE LINE at the DMV Drivers License Office + Real ID Requirements Texas DPS | 28-Feb-20 | 1157 | 32309 | 4284.7931 | 67 | 107.905 | 340313 | 5.37 |
| z7XOyB8yXKY | **BREAKING** Federal Lawsuit Announcement + Arrest Video Released @InstituteForJustice | 6-Dec-22 | 232 | 119643 | 4257.3658 | 518 | 299.905 | 579512 | 15.42 |
| e8ZUF200leY | We lied, let us hide, do not hold us accountable \| Houston Police Chief Acevedo Press Conference | 17-Feb-19 | 2081 | 42881 | 4240.1649 | 119 | 53.211 | 285907 | 8.43 |
| n8IXQ7e4pos | Police Tackle Teen for Declining EMS \| Sugar Land, Texas | 23-Mar-22 | 1238 | 39220 | 4173.0909 | 83 | 220.672 | 232672 | 10.14 |
| fWV7ZXmeBCY | Police COVERUP Leads to SWAT STANDOFF \| Harris County Pct 1 Constable | 25-Jun-21 | 1635 | 25046 | 4120.0063 | 106 | 220.373 | 298553 | 5.7 |
| 3wDSA8NpRLs | MAKE 'EM PAY \| Vlog #3 | 9-Sep-22 | 933 | 57781 | 4111.52 | 162 | 279.444 | 268820 | 15.29 |
| I7G0qqNX91Y | Police Chief VOTED OUT | 31-Oct-21 | 779 | 40340 | 4076.3379 | 91 | 217.936 | 347394 | 8.3 |
| SSIl59giPwg | Leon Valley Council Debates ðŸ"ðŸ¼â€",â€ðŸ· POLICE REFORM + ðŸ"¥ Case Update | 28-Jun-20 | 1147 | 32385 | 4042.1008 | 28 | 143.104 | 202730 | 8.53 |
| WUM7Hxe8OAA | ðŸ"¯ Lyinâ€™ Houston Cop Gerald GOINES ARRESTED George FLOYD ðŸ"ðŸ¿â€šï¸,ðŸ"¥ | 18-Jun-20 | 875 | 39943 | 4030.8766 | 120 | 159.418 | 226794 | 8.47 |
| 7ydK4mcxoDE | Chief Salvaggio LIED to STEAL CARS in Leon Valley, Texas | 17-Aug-20 | 1043 | 31523 | 3951.1924 | 52 | 165.442 | 277244 | 6.25 |
| XwGjFDdf02I | Leon Valley CENSORS Me but lets TROLL ATTACK | 6-Jun-20 | 1372 | 28190 | 3899.0287 | 31 | 67.913 | 232555 | 6.46 |
| x6iHQFFoz5o | **Leaked FBI Bulletin** Cops claim Auditing is â€œTerrorismâ€ | 20-Feb-24 | 1110 | 37824 | 3892.1574 | 209 | 138.232 | 276929 | 8.62 |
| TY5COmjKqfA | â€œGet out of My Faceâ€ Police Chief MELTDOWN (ft. Real Karen) | 19-Dec-21 | 1112 | 31925 | 3786.4033 | 46 | 193.947 | 258503 | 8.33 |
| 2OMe4Q76-y4 | EPIC COURT HEARING + Tomball TYRANTS LAUGH about Arrest \| @NEWSNOWOMAHACOPBLOCK Update | 25-Feb-21 | 1457 | 33727 | 3771.304 | 66 | 187.565 | 272239 | 7.25 |
| 1Yy1mugSigU | Kuenstler COMPLAINT: Auditors, Council â€œRetaliatedâ€ & â€œCalled me Namesâ€ \| Leon Valley, TX | 27-Jan-22 | 2762 | 21252 | 3739.4652 | 32 | 132 | 218686 | 5.65 |
| DQeE9lZqo-w | This is REALLY BAD: Chief Salvaggioâ€™s October SURPRISE + Bradshaw Interview \| Leon Valley, TX | 2-Nov-20 | 1287 | 28222 | 3656.2988 | 48 | 174.431 | 258291 | 6.14 |
| 6TH6_u3riBg | Did they STOP me? ðŸ"¤â€¦ï¸,ðŸ··â€â€(Police Political Oppression) | 5-Dec-21 | 2867 | 17836 | 3645.4298 | 7 | 239.769 | 210321 | 5.37 |
| jcxJokiVY7c | POLITICAL CORRUPTION: Leon Valley Chief, Manager Interfere in Elections \| Outed by Will Bradshaw | 6-Sep-20 | 1120 | 26592 | 3623.7152 | 10 | 136.321 | 254923 | 5.25 |
| hX4VjDKvdq0 | EJECTED for Exposing **POLICE VOTER FRAUD** in Leon Valley, TX | 21-Sep-20 | 877 | 33579 | 3617.5174 | 35 | 207.119 | 232980 | 7.19 |
| wb7OKvjJ-wl | Just 1 Beer? HUGE POLICE RESPONSE for Filming DWI Investigation \| Brazoria County, Texas | 23-Aug-20 | 2309 | 21004 | 3582.4003 | 33 | 143.874 | 178776 | 5.88 |
| sdGIAYlKTuw | *Auditor Girls Arrested* for WALKING â€œILLEGALLYâ€ @CarolinainFortWorth @AcuraAmanda | 15-Mar-21 | 1665 | 23290 | 3464.5057 | 17 | 153.628 | 216109 | 7.24 |
| YxQPlVOj1tg | BLASTING TYRANTS at Leon Valley Council Meeting (Bodycam) | 14-Aug-20 | 916 | 33778 | 3435.9904 | 30 | 147.645 | 267624 | 7.48 |
| jIA5GHuLFHk | Bossy Girls: COPS BLOCK FILMING \| Angleton, TX \| First Amendment Audit | 7-Apr-21 | 1383 | 26645 | 3406.2497 | 46 | 157.183 | 237211 | 7.36 |
| IQ45vYAAXmg | Police! Stop! Do NOT Help People! | 27-Sep-23 | 1280 | 39717 | 3404.7372 | 80 | 133.426 | 243671 | 10.83 |
| VPG4sgSKD6U | Will VOTERS CHANGE Leon Valley today? Or is Tyrant Joe Salvaggio here to Stay? | 3-May-20 | 1156 | 24308 | 3391.7305 | 22 | 96.595 | 229644 | 5.68 |

## Corruption Report Video Revenue

| ID | Title | Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| aFMuzCQ759I | **Tyrant Alert** RETALIATORY ARREST by Angleton Police of AUDITOR @BCScann John Gray | 22-Jan-21 | 773 | | 38522 | 3363.7885 | 161 | 173.806 | 220318 | 9.05 |
| 0BM0dFExgKE | **FELONY ARREST** Auditor Talks to the Police, then Gets RAIDED | 23-Mar-24 | 7374 | 2.047 | 19345 | 3354.5432 | 19 | 87.376 | 100631 | 11.16 |
| 32Ma2Qb19iU | Saved by Cop Watcher?! DWI Case DISMISSED | 5-Nov-21 | 837 | | 31986 | 3305.6832 | 88 | 280.393 | 306219 | 7.58 |
| cUV3r_NchU0 | EXPOSED!! Fake 1st Amendment Auditor "Freedom" Rally \| La Porte, Texas | 7-May-21 | 1801 | | 20494 | 3295.3064 | 35 | 152.662 | 216368 | 6.49 |
| uow4Vb4-vlM | "Extortion" Chief Salvaggio Submits Resignation "Agreement" \| Leon Valley, TX | 12-Feb-21 | 1690 | | 29521 | 3291.3379 | 17 | 158.364 | 199131 | 7.75 |
| lPH6AP3_Ztg | NEW CITY to DESTROY ðŸ˜¨ Joe Salvaggio & Kelly Kuenstler Hired In... | 5-Sep-21 | 2102 | | 26148 | 3225.6907 | 32 | 200.267 | 210321 | 8.4 |
| TRctR2bbXaU | FLASHLIGHT FRAUDITORS EXPOSED + Trolls Crash Cop Watch \| La Porte, TX (Part 2) | 27-Jun-21 | 2101 | | 16269 | 3185.1289 | 10 | 137.596 | 153975 | 6.66 |
| KuHWyxBUhsY | Am I the A-HOLE? Brave Deputy Avocado SCARED of Justin \| Fort Bend County Sheriff | 1-Mar-21 | 1618 | | 22419 | 3137.3437 | 8 | 137.782 | 153767 | 7.68 |
| jTeES1zpGJ8 | Secret Police â€œKeep us SAFEâ€ from FREEDOM (Document Dump) | 21-Jan-22 | 6403 | | 14473 | 3074.7706 | 51 | 102.941 | 174908 | 5.09 |
| CtHeIOgWUgg | â€œI KNOW THE LAWâ€: You Wonâ€™t Believe the Open Records Games in Stafford Texas | 3-May-19 | 1348 | | 20324 | 3052.6266 | 117 | 30.044 | 258949 | 4.25 |
| XFkQdQ_aTlo | â€œDO NOT FILMâ€ Police Still Afraid of Cameras \| Missouri City, TX | 3-Mar-21 | 1698 | | 21733 | 3031.6786 | 22 | 143.473 | 159642 | 7.66 |
| 8xkHc4AJ_dw | Evan Bohl: "COUNCIL WAS BOUGHT"; Police Chief Complains (Leon Valley Replay) | 8-Nov-21 | 8697 | | 11013 | 3026.1195 | 5 | 62.207 | 176381 | 4.02 |
| i-weGqEsQrY | FOOT-CHASE: You WONâ€™T BELIEVE Who the Police Caught! ðŸ˜®ðŸ˜® | 4-May-21 | 749 | | 31120 | 2995.1481 | 47 | 178.422 | 252925 | 8.59 |
| xi-vFrJa7Zs | I Tear Apart Salvaggioâ€™s Attack on Bradshaw + Meeting Update | 15-Sep-20 | 1447 | | 19894 | 2960.2929 | 5 | 128.091 | 164460 | 6.46 |
| -GrxAF1EQy8 | NEW! Houston Police Still Stonewalling, Delaying Info on Bogus Drug Raid Murders | 13-Jun-19 | 799 | | 32315 | 2953.9747 | 333 | 62.727 | 264756 | 6.71 |
| D0k6rdu3oH0 | City Manager RESIGNS in Leon Valley + Open Records Complaint How-to | 11-Nov-21 | 13313 | | 11511 | 2935.1813 | 2 | 88.864 | 182601 | 4.12 |
| ZSow55g_2qM | Leon Valley Police **SHOOT** Driver (BREAKING) | 5-Oct-20 | 843 | | 27240 | 2870.4224 | 29 | 90.72 | 162970 | 8.41 |
| qrSDsWSo0-E | Police Supporter THREATENS CITY OFFICIAL Will Bradshaw at Leon Valley Council Meeting | 18-Aug-20 | 872 | | 25270 | 2847.4222 | 24 | 102.604 | 200270 | 6.87 |
| 9HUUBackXkk | This Could END Journalism in USA \| Villarreal v. Laredo (En Banc Arguments) | 26-Jan-23 | 4219 | | 17685 | 2821.9885 | 11 | 100.45 | 177750 | 6.68 |
| ubJQJuEhaEw | Document Dump Friday: Politicizing the Police (Leon Valley, TX) | 4-Dec-21 | 5922 | | 11693 | 2814.6451 | 12 | 212.221 | 142518 | 4.86 |
| XhWzfzpcL0c | ðŸ‘ðŸ˜ˆâ€¢ï¸_ðŸ¤¬ Leon Valley Police PROTECT VILE AGITATOR Blackmore | 21-Aug-20 | 887 | | 27232 | 2797.4147 | 36 | 113.505 | 199618 | 6.99 |
| 8_SBpAGAR0U | Tyrant Cop *OBSTRUCTS* Journalist at Vehicle Search \| Rosenberg, TX | 7-Feb-21 | 1255 | | 24828 | 2789.8011 | 28 | 172.616 | 219002 | 6.26 |
| eMkWtgkh73c | POLICE FLIP OUT o\| BEST VIEW \| Leon Valley, TX | 5-Nov-20 | 508 | | 40090 | 2782.7484 | 55 | 242.392 | 282768 | 7.59 |
| xvtccU5Fuak | Exclusive: Police Chief Joe Salvaggio's DEMAND LETTER | 19-Jan-21 | 664 | | 28982 | 2755.875 | 24 | 124.124 | 207698 | 7.68 |
| G7nMbatYIJ8 | I SUED the Police. This is how it went. | 10-Apr-24 | 579 | | 39086 | 2722.7245 | 96 | 119.42 | 283678 | 9.42 |
| UDrkXYDGHyQ | **Tyrant Alert** Auditor ARRESTED after RETALIATORY COPS Run License Plates \| @roguenationaudits | 22-Sep-21 | 1034 | | 23922 | 2714.0425 | 127 | 176.589 | 180050 | 8.41 |
| mUXPy3ysXV0 | **Lawsuit Filed** End Bogus Search Warrants | 14-Feb-23 | 703 | | 34898 | 2707.8002 | 62 | 137.865 | 238682 | 10.06 |
| AUgxsS1L1Rk | I QUIT! â€œDictatorâ€ City Managerâ€™s CRY LETTER (Leon Valley) | 17-Nov-21 | 2212 | | 16102 | 2691.108 | 9 | 135.211 | 145081 | 7.08 |

## Corruption Report Video Revenue

| ID | Title | Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| P2uvNA648BU | KICKED OUT for Filing Complaint at Troy Nehls' Sheriffâ€™s Office \| Fort Bend County, Texas | 5-Jul-20 | 945 | | 24999 | 2661.4381 | 23 | 104.703 | 204148 | 6.79 |
| wuZqZCn6xEk | Police Scared of Cameras? (3 Audit Fails) | 6-Nov-21 | 1647 | | 19162 | 2652.4112 | 43 | 117.561 | 215669 | 5.59 |
| IA-Mu8o8Ah8 | *SECRET CAMERA* Rosenberg Police ILLEGALLY STOP Hispanic Pedestrian, Glovebox Audit FAIL | 23-Sep-21 | 1048 | | 22616 | 2643.3196 | 68 | 165.522 | 185626 | 8.46 |
| AlHJZ1nduo8 | Salvaggio will RESIGN for HUGE PAYOUT, NO YOUTUBE \| Exclusive Demand Letter | 24-Feb-21 | 1141 | | 20765 | 2601.1037 | 15 | 114.415 | 150764 | 7.47 |
| zfpoGuqa7l4 | 1st Amendment Audit FAIL, LYING COP Tries to HIDE Kangaroo Court | 21-Oct-20 | 1115 | | 25608 | 2562.0977 | 96 | 143.736 | 236559 | 6.07 |
| SZNYl5af4BM | This Request INSTANTLY Triggered the Police (ID Refusal) | 18-Nov-24 | 802 | | 34151 | 2537.4689 | 70 | 117.182 | 255282 | 8.41 |
| gdNeSUc4Qdg | "Out of Control" City DEFIES Attorney General Mandate \| Vlog 2 | 8-Sep-22 | 1333 | | 24470 | 2530.8062 | 48 | 127.602 | 178537 | 10.19 |
| eOFROanrjIc | **CAPITAL FELONY** Dallas Police Officer Arrested, Remains Employed | 5-Mar-21 | 1138 | | 26212 | 2525.4206 | 60 | 126.252 | 167091 | 7.9 |
| MswR7d4Sj0s | SCARED COPS Send EMERGENCY BACKUP for 1st Amendment Auditor \| Stafford, Texas | 1-Apr-21 | 1615 | | 19593 | 2493.3469 | 32 | 136.114 | 160045 | 8.08 |
| CSp02Yw7z6Q | *Action Alert* Leon Valley Records Corruption ($423 Fee) | 2-Nov-21 | 5734 | | 12490 | 2417.137 | -1 | 78.451 | 137640 | 5.75 |
| pJBAwLgJVrA | Am I GOING TO JAIL Again? (1st Amendment Nullified) | 4-Mar-24 | 1222 | | 23234 | 2407.1334 | 36 | 83.698 | 187311 | 8.03 |
| Zjt2UxFBmxA | Should Police Replace Doctors? | 25-Jul-23 | 3122 | | 14401 | 2405.1719 | 6 | 69.806 | 112072 | 8.25 |
| 213P7EXfRHQ | SEND BACKUP! They're filming where they can HEAR and SEE \| Harris County Constable Pct 5 | 12-May-20 | 612 | | 29522 | 2380.3514 | 56 | 103.795 | 193249 | 8.79 |
| HHnbf2QpDTE | Contempt of Cop Arrest? \| Lake Jackson, Texas Police (Part 2) | 3-Jan-22 | 6199 | | 11467 | 2375.7965 | 12 | 122.369 | 152889 | 4.58 |
| OEkHVchD514 | *Tyrant Alert* Midland Police ARREST Attorney during Copwatch \| @Texas2AAttorney | 6-Nov-22 | 623 | | 35565 | 2328.9341 | 80 | 103.244 | 263998 | 9.21 |
| kuMJ5U2dK1A | **TYRANT ALERT** Freeport TX Cops Arrest DEAF, Legally BLIND Ex-Girlfriend | 3-May-23 | 9088 | 2.5228 | 12897 | 2319.3811 | 70 | 180.473 | 115788 | 6.28 |
| IqfR9JybtiU | TYRANT Cops SHAKEDOWN Pedestrians (Rosenberg Police) | 12-Nov-21 | 781 | | 23929 | 2282.7236 | 51 | 133.823 | 264805 | 6.25 |
| GdQoEnP9B74 | Journalist Arrested for Filming Police (Dash Cam) | 21-Dec-23 | 6907 | 1.9342 | 17007 | 2270.1082 | 24 | 164.296 | 102504 | 9.95 |
| eHDTPApdxk0 | "They've Been SCREWED" How Corruption DESTROYS Small-Town America | 15-Mar-23 | 1364 | | 22668 | 2250.1141 | 34 | 103.158 | 189131 | 8.1 |
| St_niF-ZHmA | â€œTransparentâ€?!? Lake Jackson ILLEGALLY Charges Me, HIDES Bodycam | 15-Mar-22 | 2567 | | 15671 | 2222.4663 | 9 | 247.368 | 124292 | 7.39 |
| yQePCJPFHjg | TOO CLOSE FOR COMFORT + Who paid for illegal signs? Leon Valley, TX | 30-Oct-20 | 731 | | 24919 | 2174.9814 | 128 | 176.961 | 213610 | 6.24 |
| GD22pvlASaI | GIRL PLAYS POLICE GAMES: What happens on a DWI Traffic Stop? | 23-Sep-20 | 1885 | | 17646 | 2134.8145 | 8 | 130.942 | 153202 | 5.99 |
| XdoaDdLO8RA | Leon Valley LAWSUIT FILED: Will the judge STOP Salvaggio?! | 5-Oct-20 | 574 | | 25309 | 2116.0714 | 25 | 450.864 | 180837 | 7.56 |
| ycz-93t_iCg | Police Report COVERUP. Did Mayor Riley Break the Law? | 1-Mar-22 | 1893 | | 12166 | 2109.5929 | 18 | 91.206 | 140203 | 5.26 |
| bbNq6xkYjpE | Leon Valley: The Blue Lyin' Sanctuary City \| Police Chief Joe Salvaggio | 6-Jul-20 | 1463 | | 15350 | 2088.0572 | 3 | 46.005 | 175584 | 4.81 |
| ZMc-cFseR7g | This couldâ€™ve ended badlyâ€¦ | 21-Feb-24 | 43 | | 176253 | 2062.704 | 258 | 31.891 | 167723 | 8.32 |
| 823hlpGwLSg | ðŸ˜-ðŸ˜â€¦ï¸ Feelings Police ILLEGALLY STOP Upstanding Citizen | 29-Oct-21 | 505 | | 31264 | 2044.9744 | 135 | 160.114 | 202587 | 10.85 |

## Corruption Report Video Revenue

| ID | Title | Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| qfM3tGAlvZ0 | ðŸ"¥Exclusive BodycamðŸ"¥ Lyinâ€™ Cop FIRED Over THIS \| Lake Jackson, TX | 30-Mar-22 | 770 | | 20168 | 2038.2921 | 42 | 118.528 | 105727 | 10.89 |
| _ZLKbcFXgOU | Felony Filming? ðŸ"¡ Cops Took My Bodycam (Again) \| Vlog #1 | 19-Aug-22 | 1281 | | 17932 | 2037.3365 | 35 | 96.267 | 148984 | 8.31 |
| nO6OV-FKM2o | "Never Talk to the Police" @NewsNowHouston's Top First Amendment Audit Tips | 30-Jan-20 | 742 | | 21785 | 2020.3516 | 58 | 37.134 | 227498 | 5.08 |
| EZNWtp61ylc | Auditors "cause anarchy" \| Justin Pulliam Police Report \| Friday Document Dump | 5-Feb-22 | 6207 | | 8304 | 2019.7038 | -8 | 257.622 | 70603 | 7 |
| i70yMmWBgS4 | BREAKING: Lake Jackson Officer Resigns, Avoids Discipline | 9-Mar-22 | 3504 | | 14666 | 2008.0064 | 20 | 305.475 | 108951 | 8.58 |
| DSY9s1NiE-k | Trample 1st Amend. Rights + New Manager?! | 24-Dec-21 | 10787 | | 6697 | 2000.0525 | -1 | 42.296 | 162358 | 2.47 |
| ZgAyDGyCIGo | â€œStop Interferingâ€ Cop Does A Dumb \| Sugar Land, TX | 6-Jul-21 | 1140 | | 15926 | 1985.0182 | 20 | 103.298 | 134342 | 8.2 |
| 4y0WyL7wVcQ | Should I go to PRISON for this? Cop Watch Truth Revealed \| Vlog #6 | 9-Dec-22 | 992 | | 25829 | 1970.599 | 53 | 102.298 | 187048 | 8.53 |
| 79dj62mMxJw | La Porte Open Records Complaint (Filing with Public) | 21-Apr-21 | 1076 | | 13610 | 1942.8763 | 16 | 113.022 | 138102 | 6.6 |
| _NPgSyezJlc | **WEAPONS DRAWN** Arrested for Fearing Cops | 19-Jan-24 | 978 | | 13843 | 1915.9703 | 45 | 64.057 | 167618 | 9.71 |
| McpCB83yvXA | Donâ€™t Film the VIA Transit Police: A History of Abuse Pt 1 \| San Antonio Texas | 20-Jan-19 | 428 | | 25197 | 1884.444 | 101 | 17.632 | 144964 | 8.82 |
| QsUWwJkttlc | Do You Smell That?! SUSPICIOUS COP REFUSES SEARCH (Flip Script with @JamesFreeman1) | 9-Nov-21 | 483 | | 31046 | 1883.9793 | 71 | 113.459 | 202781 | 10.72 |
| MesIN5r_7-4 | Leon Valley to CENSOR SPEECH \| @TXSHEEPDOG72 & @BCScann at City Council | 28-Mar-17 | 1886 | | 12632 | 1881.4467 | -1 | 87.814 | 121141 | 6.98 |
| amzG6UVoNyY | *TYRANT ALERT* Teen held with NO BAIL \| Lake Jackson, Texas Police | 2-Jan-22 | 4924 | | 9030 | 1844.3715 | 7 | 58.244 | 100288 | 5.08 |
| lBo3x13vP5E | Robbery & Homicide is Investigating Me ðŸ¨¨ | 11-Feb-23 | 915 | | 19622 | 1843.59 | 33 | 37.124 | 154868 | 8.15 |
| uvLNRIty-bQ | He was ARRESTED last time we did this | 7-Mar-23 | 1827 | 0.5064 | 16795 | 1819.0521 | 25 | 41.638 | 113834 | 10.36 |
| p-o3K9RYj3s | Police Unions Slam Texas Bill to END BAD GYPSY COPS | 23-Apr-21 | 1411 | | 15405 | 1818.7005 | 10 | 122.332 | 268044 | 3.68 |
| 4FeBcGRRd8U | Secret Police ðŸ'¤ðŸ"¨ + How-to First Amendment Audit + Equipment I use \| Missouri City, Texas | 14-Feb-20 | 1052 | | 15941 | 1812.3672 | 16 | 38.588 | 154279 | 5.38 |
| YsQGlm6p6Cc | The Dumbest Cops Everâ€¦ Caught on Camera | 20-Dec-23 | 988 | | 24774 | 1786.0691 | 76 | 79.332 | 141852 | 11.62 |
| W7PzXd69NJo | Cops Tackle Congressman | 16-Aug-23 | 404 | | 36143 | 1764.6122 | 29 | 68.504 | 202641 | 11.9 |
| EtmnlOEGxYQ | Sheriff Torments Journalistâ€™s Family and Friends (Arrest Series) | 4-Dec-22 | 484 | | 28962 | 1715.8059 | 41 | 86.42 | 172532 | 10.57 |
| uBY77vl1fYl | Will this TYRANT Cop KILL the Rabbits? (City Council) | 29-Nov-22 | 1495 | | 20599 | 1667.5268 | 21 | 59.228 | 152154 | 8.61 |
| gEP3YyfBlbl | AUDITOR BEHIND BARS: Mystery Olmos Park Pocket Warrant Revealed | 22-Apr-20 | 532 | | 26499 | 1631.319 | 81 | 44.423 | 132571 | 13.17 |
| KljFMtlNYBg | â€œThis is BULL$#*!â€ Was it an ILLEGAL SEARCH & SEIZURE?! | 10-May-21 | 1587 | | 15050 | 1617.4087 | 13 | 103.459 | 157506 | 6.02 |
| uOngqUyS52k | ATTACKED by POLICE SUPPORTER | 29-Jun-21 | 871 | | 14134 | 1611.7981 | 19 | 87.16 | 104797 | 9.08 |
| J6rYQ6h3-_s | Evan Bohl: "The Choice to Lead" \| Leon Valley City Council | 21-Oct-21 | 11741 | | 5086 | 1591.2698 | -12 | 427.465 | 91190 | 3.15 |
| Fu5MIHtj3gc | (Preview) LEAKED BODYCAM from Leon Valley City Hall @TXSHEEPDOG72 30.06 Complaint | 7-Dec-19 | 152 | | 52649 | 1586.9471 | 334 | 73.409 | 204583 | 12.4 |
| edPHal2DSEg | City Officials ATTACK Pastor, BLOCK Church \| Leon Valley, TX | 29-Dec-21 | 1883 | | 9264 | 1556.6022 | 4 | 67.011 | 124064 | 4.46 |
| 7tQx7jwci8U | Felony Charge! ðŸ"°ðŸ"¸ Jack Miller @TXSHEEPDOG72 Charge + Bond Update \| Olmos Park TX Tyrant Valenciano | 7-Feb-20 | 302 | | 35369 | 1550.2891 | 43 | 51.202 | 195280 | 9.77 |

# Corruption Report Video Revenue

| ID | Title | Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Eu9YHUTqlHE | WTF!! Arrested after Calling 911 for Medical Emergency (Rosenberg, TX) | 19-Nov-21 | 854 | | 14526 | 1523.2043 | 18 | 98.432 | 139026 | 6.79 |
| 5B8UR6yF7qQ | Leon Valley Updates: Salvaggio's Suit, Chicken Council, Punk Perales | 25-Nov-21 | 4284 | | 7714 | 1517.7806 | 0 | 87.087 | 104053 | 4.41 |
| IUft2947Apk | Epic! @JamesFreeman1 OWNS COP Tyrant (Must See) | 3-Feb-20 | 230 | | 40595 | 1516.4204 | 178 | 75.12 | 346296 | 6.33 |
| p8Ns6WnWhK4 | I CUSS & YELL at 911 Police Dispatch, Says Rockwall Sheriffâ€™s Office f/ @CarolinainFortWorth | 23-Dec-19 | 647 | | 16209 | 1516.0602 | 19 | 48.031 | 102924 | 8.31 |
| OtKCPvkhpnE | Leon Valley Coffee with Mayor (Blackmore Explodes) | 23-Oct-21 | 6721 | | 8796 | 1507.5066 | -13 | 52.55 | 93766 | 6.12 |
| nVfRLgD8iYl | Blue Lyin': How the Police Protect their Pals (False Arrest Update) | 4-May-23 | 396 | | 32054 | 1504.2072 | 68 | 63.91 | 233026 | 8.73 |
| c3ZHu6NnUzo | "Harassment," "Cronyism," "Hypocrisy"â€"What is Freeport HIDING?!? | 20-Oct-22 | 1641 | | 16419 | 1493.2309 | 9 | 73.205 | 129172 | 9.07 |
| w_ZPK1Hjquc | Should the PUBLIC wear Body Cameras? | 15-Aug-20 | 492 | | 23705 | 1481.4155 | 103 | 80.324 | 209013 | 7.42 |
| fbZeG9XLOgQ | ðŸ˜â€šâ€‘_ðŸ¥ How to Violate the Law without Punishment | 7-Mar-22 | 1326 | | 10996 | 1437.9223 | 8 | 55.768 | 122959 | 5.13 |
| -dUFyQSS-xM | Run or Hide? | 24-May-22 | 60 | | 122073 | 1422.7625 | 258 | 0.228 | 88074 | 3.95 |
| AXB6Z4amO74 | â€œYou Look Goodâ€ CUTE COP FLASHLIGHT FLIRTS | Fort Bend Sheriff | 4-Mar-21 | 805 | | 17169 | 1398.9059 | 20 | 85.266 | 117286 | 7.57 |
| drpmnAYWChw | Hypocrite Tyrant BANS My Video, HIDES From Public (Crybaby Councilor) | 21-Apr-22 | 1817 | | 10085 | 1388.3095 | -3 | 66.923 | 93177 | 7.14 |
| gmRbEQGf6sY | â€œYouâ€™re Suspiciousâ€ Police Chief PULLS CAMERA on Reporter | 5-Dec-24 | 938 | | 18403 | 1317.7829 | 37 | 62.797 | 139688 | 8.59 |
| 5so4FhgS-ol | Trample Rights?! Cops Please Karen Snowflakes | 14-Nov-21 | 999 | | 11753 | 1287.8619 | 5 | 68.893 | 146559 | 5.08 |
| edDIN09SOIl | Officer Goines in Custody on Double Murder Charges | Live from Houston, Texas | 23-Aug-19 | 776 | | 13900 | 1241.1178 | 82 | 5.477 | 96694 | 7.54 |
| bokMB4EnGwk | Leon Valley Tyrant Session Streamed Live | 19-Jun-22 | 31518 | | 5999 | 1233.283 | -4 | 34.857 | 105991 | 4.17 |
| N9NLabl7JQo | **Tyrant Alert** Did Police JUST KILL a 1A Auditor?! | 23-Jun-24 | 177 | | 45356 | 1226.7585 | 176 | 84.053 | 258838 | 12.78 |
| TUy5lC-5qBs | Are You a "STUPID Keyboard Warrior"?! Traitors BAN Speech, Transparency | 2-May-22 | 1379 | | 10182 | 1220.6265 | 0 | 53.878 | 106221 | 6.68 |
| ebU3kPsY_sY | NEW INFO: Details about Ft Worth Cop Aaron Dean who Murdered Atatiana Jefferson on a â€œWelfare Checkâ€ | 14-Oct-19 | 437 | | 19855 | 1207.7219 | 77 | 30.961 | 145460 | 7.01 |
| mMax6i4Ds1s | 3 Cs of Corruption: Control, Cronyism, Contracts (Rough Draft, Live) | 14-Mar-23 | 5027 | 1.3952 | 6626 | 1205.4596 | 13 | 228.319 | 91026 | 4.66 |
| sMg3u5Hz7Gc | (Preview) Sheriff Eric Fagan LOSES IT | Fort Bend County, TX | 12-Jul-21 | 265 | | 24208 | 1169.8824 | 33 | 127.947 | 124852 | 11.66 |
| b5qecEGR09Q | â€œAccidents Happenâ€ Chief Crashes Fire Truck | Missouri City, TX | 23-Jun-21 | 1932 | | 8415 | 1143.4206 | 6 | 58.001 | 93028 | 5.17 |
| 6PhLFgGeZWk | â€œTheyâ€™ll see your infoâ€ â€" PD Flips the Script on Open Records Audit | Lake Jackson Texas | 11-Aug-19 | 602 | | 16743 | 1139.9034 | 59 | 51.662 | 154534 | 6.21 |
| _aZMYM74Cbs | The BEST COPS | Rosenberg, Texas | 19-Sep-23 | 2237 | | 9696 | 1139.0182 | 2 | 51.926 | 79294 | 8.05 |
| _Lj7HDRKKDk | Private Police: $279,688 Reasons to Violate YOUR Rights (Document Dump) | 19-Dec-21 | 3659 | | 5500 | 1112.9615 | -3 | 66.111 | 79787 | 3.7 |
| 6zipQYi3K8E | Justin Pulliam Released from JAIL | Vlog #4 | 11-Sep-22 | 362 | | 23373 | 1095.6923 | 49 | 59.741 | 140297 | 12.02 |
| Fwps09ipVjo | Corrupt Clerk DEFEATED. Real Journalism = Real Change | 4-Mar-22 | 527 | | 18637 | 1087.5465 | 21 | 102.919 | 104354 | 11.75 |
| 3Ua9zIhIfQk | EMERGENCY ALERT - Leon Valley Arrested John Gray | 4-Feb-20 | 264 | | 29547 | 1077.1542 | 55 | 39.898 | 150761 | 8.78 |
| PjASOYFj3LA | Did the POLICE SLAM HIM? DWI Arrest | San Antonio, Texas | 5-Sep-20 | 854 | | 11839 | 1027.1725 | 8 | 47.585 | 86009 | 5.75 |

Corruption Report Video Revenue

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| y4DGGvb5eo0 | â€œDonâ€™t LEAK INFO to Publicâ€ This Attorney is Defending Officer Goines, Charged with Tuttle Murders | 28-Aug-19 | 265 | | 22401 | 1023.9356 | 85 | 33.106 | 119026 | 10.6 |
| RuCIMdL3mxo | â€œLocal Journalistâ€ Arrestedð¥¹ Did the Sheriff Win? (Case Update) | 5-May-22 | 612 | | 13601 | 1020.2375 | 17 | 64.757 | 115924 | 8.51 |
| rO8J1w8LsrE | ð¥¹ð¥¹â€¦ The OUTRAGEOUS Things BAD Cops Say | 12-Feb-23 | 486 | | 16536 | 1002.0618 | 38 | 36.888 | 133924 | 8.08 |
| P3LOYbchnQY | Is Texas a Nanny State? | 31-Jan-22 | 679 | | 10362 | 989.5464 | 7 | 61.243 | 111510 | 5.75 |
| dY6oL2PUdRI | Tyrant Cop BLINDS Journalist with SPOTLIGHT \| Lake Jackson, TX with @BCScann | 30-Mar-21 | 1044 | | 9820 | 981.1694 | 1 | 69.999 | 112727 | 5.53 |
| MEq7NDaXNlk | (Update) Houston Cops Take Down Auditor | 7-Jun-22 | 1019 | | 11017 | 977.9361 | 3 | 50.15 | 75870 | 9.87 |
| Bldu6aFjmZQ | â€œAuditorâ€ ASSAULTED by Speeding Cop (Reaction Video) | 4-Nov-22 | 563 | | 17876 | 962.5708 | 28 | 38.566 | 128673 | 9.47 |
| UcL1VOfxUKs | Power Trippinâ€™ Cop Say WHAT?!? | 13-Aug-22 | 11 | | 245301 | 948.3495 | 144 | 0.571 | 81937 | 6.92 |
| _VE91pRuzMM | Will Chief Joe Salvaggio become City Manager Today? Leon Valley, TX | 3-Dec-20 | 580 | | 12136 | 937.6834 | 7 | 96.202 | 106855 | 6.41 |
| h7YUJMQYY0o | MASS ARREST ** Tyrant Alert ** Police Attack Auditors for Sidewalk Chalk \| Rockwall County, TX | 6-Dec-19 | 233 | | 24507 | 932.4794 | 79 | 39.061 | 163710 | 7.66 |
| cmTGdbSShSw | Political Retaliation: Is Justin FINISHED?! | 28-Mar-23 | 388 | | 20339 | 927.3953 | 34 | 128.04 | 139363 | 9.35 |
| U1fbEOMfqWk | **Guilty** 1A Auditor CONVICTED \| Whatâ€™s the Sentence? | 30-Apr-22 | 1051 | | 9836 | 870.3011 | -3 | 48.725 | 60966 | 11.35 |
| XlK_WtZ6sbc | Lake Jackson Arrest--Full Video | 8-Mar-22 | 188 | | 29937 | 860.3231 | 79 | 97.366 | 197266 | 8.4 |
| 41D3StvAYNA | â€œNo Commentâ€ Will Cops ARREST a POLICE CHIEF?? Friendswood Coverup | 2-Mar-21 | 302 | | 16872 | 852.2609 | 13 | 62.381 | 92465 | 9.9 |
| 5R85lPVdsn0 | Blue Alert Info: Cop Shot, Sheriff hopes suspect is â€œleakingâ€ | 18-Aug-21 | 1410 | | 7817 | 849.6626 | -2 | 44.594 | 67481 | 7.1 |
| CTNHyP3nt3g | Police Games Challenge (6 Cops) | 2-Nov-21 | 1032 | | 7869 | 820.8111 | 13 | 42.848 | 89361 | 5.59 |
| a2IXJ7n5PfE | Deadly Drug Raid Police Shootout Search Warrant \| Houston Texas Police | 5-Feb-19 | 1047 | | 7434 | 817.9943 | 48 | 3.912 | 88056 | 4.64 |
| NoPVs1d6vYg | BAN Copwatchers with this First Amendment Loophole | 12-Dec-23 | 587 | | 15713 | 811.7118 | 14 | 41.924 | 102467 | 9.89 |
| lX_-arxlRjY | Are ALL â€œFirst Amendment Auditorsâ€ FRAUDS?!? | 16-Aug-21 | 490 | | 10602 | 795.7823 | -16 | 650.827 | 67690 | 9.67 |
| 6etHyl-XMac | Leon Valley VICTORY: CLV Candidates SWEEP ELECTION (Again) | 6-May-21 | 294 | | 15332 | 769.4196 | 8 | 64.387 | 117594 | 9.27 |
| AUfMMewJKs0 | "We Take Away Your Rights" \| Vlog 5: Rosenberg Copwatch | 9-Oct-22 | 1286 | | 8030 | 750.452 | 7 | 36.506 | 81234 | 6.83 |
| dorlGIN2aVQ | **AGITATOR UPDATE** Leon Valley Establishment Trolls Attack | 18-Sep-20 | 269 | | 13957 | 742.4514 | -2 | 50.491 | 78082 | 8.71 |
| 1NC2ORimlD0 | DIRTY POLITICS: Texas House Speaker Dennis Bonnen Trashing Constitutional Carry | 1-May-19 | 1267 | | 5834 | 724.9945 | 31 | 13.16 | 71026 | 3.66 |
| 4cM-rE8-7Zc | Change Leon Valley? Or Ban More Speech? | 8-May-22 | 844 | | 7794 | 721.7568 | -5 | 44.146 | 95809 | 5.66 |
| -m-Xu1k7Ops | Fort Bend Lie Center | 8-Mar-23 | 3817 | 1.0626 | 4466 | 720.4354 | -2 | 19.64 | 56609 | 4.98 |
| 0DGcQzl9gho | Did this Cop just Ruin his career? | 14-Dec-23 | 481 | | 14066 | 711.1474 | 54 | 40.47 | 73206 | 11.96 |
| qu6XX22Cyjk | Open Records How-To: 8 Steps to Request Government Records | 4-Jul-19 | 750 | | 10374 | 700.2367 | 146 | 48.304 | 107138 | 5.7 |
| m3Q1-9iMnds | Classified Records Leaked?! Leon Valley Bodycam Cover Up | 6-Apr-22 | 828 | | 8717 | 687.0016 | 5 | 37.234 | 36428 | 14.41 |
| _IPN6J8xRo4 | Frauditors Admit itâ€™s ALL ABOUT THE MONEY | 18-Oct-21 | 581 | | 9127 | 684.7279 | -11 | 119.69 | 53687 | 10.85 |
| Y0gBu2Lwi9M | FIGHTING WORDS? Disorderly Tyrant Police Chief Taunts â€œAuditorâ€ & Refuses to ID \| Royse City, Texas | 6-Sep-19 | 322 | | 14110 | 679.4525 | 46 | 18.684 | 57716 | 11.43 |

## Corruption Report Video Revenue

| ID | Title | Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| anv_68R37Vk | {Bodycam} Police Beat, Strap Down Veteran for Filming in Public \| Tucson, AZ \| Tuc Police Suck | 3-Dec-19 | 227 | | 20712 | 666.9428 | 33 | 36.844 | 96451 | 11.83 |
| _kUdc4SB0cQ | Rosenberg Police COVERUP: Kidnapped Baby NOT SAVED | 3-Nov-22 | 5502 | 1.5339 | 4010 | 661.485 | -1 | 21.334 | 49392 | 5.1 |
| xeTxsgLIuCU | INSTANT TAKEDOWN: Woman Arrested for Filming Cops **CFW Bodycam** | 27-Jun-24 | 481 | | 13150 | 654.9161 | 12 | 28.215 | 100500 | 8.65 |
| DWP35DzoiY4 | ðŸŒ½ **Sneak Peak** Fight Tyrant Police + Corrupt Government with Justin Pulliam in 2020 | 20-Jan-20 | 510 | | 7156 | 647.4421 | 72 | 16.519 | 33467 | 10.33 |
| VKP305OYYnE | CITIZEN PULLS OVER COP: Who was cited? | 1-May-20 | 304 | | 11706 | 633.633 | -1 | 25.45 | 76148 | 7.82 |
| Hx8gCqXC8pA | Local Government Club Meeting \| Brazoria County | 17-Mar-22 | 5494 | | 4614 | 608.1794 | -3 | 96.785 | 75410 | 3.19 |
| ROcnmUgW2ug | (Bodycam) Brandon White Free on Bond for Polk County Retaliatory Charges | 10-Mar-22 | 703 | | 10118 | 603.3881 | 5 | 42.484 | 94292 | 6.41 |
| 5h_adB3dzt8 | Fort Bend District Attorney | 13-Jun-22 | 1788 | | 4005 | 594.7555 | 2 | 19.612 | 57107 | 4.62 |
| 4TiH8EdEO7w | Chief Salvaggio Harassing Leon Valley Residents, Political Opposition | 21-Jul-20 | 198 | | 16752 | 594.7518 | 10 | 54.789 | 95302 | 9.81 |
| CRJbHNQ5vg8 | Truth | 16-May-20 | 480 | | 9479 | 590.1873 | -5 | 23.281 | 68360 | 7.15 |
| dxYuCvtpl1Q | Do you see the crime? | 18-Aug-22 | 39 | | 63719 | 567.9775 | 66 | 1.911 | 73042 | 7.72 |
| uTFdPz_zMzl | ðŸ˜¨*Emergency Alert*ðŸ˜¨ Fort Worth Police KIDNAP 1st Amendment Auditor | 8-Apr-22 | 503 | | 8820 | 557.2884 | 2 | 27.024 | 83745 | 6.7 |
| yf9Wticsixk | Detained in Cop's CROSSHAIRS over a Noise Complaint | 6-Sep-24 | 1345 | 0.3657 | 25046 | 553.6811 | 70 | 29.527 | 44493 | 7.83 |
| 6Td9TYutlQU | Leon Valley Activism Plan (Live) | 16-Jun-22 | 4857 | | 3477 | 542.7489 | -8 | 19.255 | 53415 | 4.14 |
| RUE5U4wgXRl | ALERT! Rosenberg, Texas Gang Stalkers Targeting Me | 13-Dec-20 | 143 | | 20265 | 542.1356 | 86 | 45.154 | 165843 | 6.54 |
| z9kU3uP_Ax0 | Preview: Did Manager Payout VIOLATE Texas Law? (Video Banned) | 21-Dec-21 | 482 | | 7939 | 535.5703 | 4 | 46.114 | 81648 | 5.92 |
| zhsyCwzCLaY | Cop Shoots Woman for ACTION & ADVENTURE | 12-Feb-20 | 122 | | 20450 | 523.8088 | 55 | 27.294 | 101813 | 9.62 |
| i_-Qs3r4muw | Woman Claims Police Killed Her Family | 8-Sep-20 | 353 | | 10951 | 522.0113 | -1 | 28.487 | 72708 | 7.01 |
| 1GM3rcHsMWU | Houston National Security Function | 2-Jan-25 | 1774 | 0.4974 | 4925 | 507.7246 | 0 | 17.437 | 43477 | 6.95 |
| U8TGjjTl4Uw | Bailing out Brandon Whiteâ€"Livingston | 9-Mar-22 | 2545 | | 5985 | 499.6568 | 1 | 26.167 | 56924 | 5.11 |
| _LsDNL6oR1o | **Police Bodycam** Arrested for Filming & Pointing | 2-Apr-22 | 500 | | 8705 | 492.4468 | -3 | 28.881 | 78925 | 6.55 |
| 2WbVUO9OhPo | YOU Helped Accomplish THIS in 2020 (Replaced a Government âˆ") | 24-Dec-20 | 384 | | 7712 | 488.8582 | 2 | 41.15 | 63877 | 5.79 |
| Vyfet5UXeKQ | Weâ€™re Here to Marchâ€"Black Lives Matter Police Protest \| Houston, Texas | 30-May-20 | 363 | | 9044 | 487.3443 | 5 | 8.388 | 67842 | 6.01 |
| h2cUsX5wges | Will the police stop retaliating? | 16-Dec-23 | 652 | | 6687 | 455.0949 | 2 | 19.908 | 58358 | 8.2 |
| _tmu4zu5lQY | *NEW SITE* Driver Lost the Rosenberg Police (until this happened) | 17-Jul-21 | 538 | | 6609 | 442.1038 | -13 | 28.075 | 77079 | 5.29 |
| 1C4vKvA-QqU | BMV Suspect "Traps himself," ID Refusal Audit | 16-Dec-23 | 2192 | 0.6047 | 4839 | 437.0048 | 0 | 14.609 | 42536 | 8.14 |
| JUvR-rx-osU | Thousands March for George Floyd, Justice in Houston on June 2, 2020 [Raw Video, Entire Parade] | 3-Jun-20 | 3641 | | 3600 | 430.9225 | -5 | 5.685 | 64800 | 2.35 |
| gqGvKFiPWdc | Auditing the Auditors Ep 1: Parking Enforcement f/ James Freeman, TXSHEEPDOG72, SouthSide Slakr210 | 11-Mar-19 | 285 | | 9935 | 423.1921 | 36 | 15.152 | 83782 | 6.05 |
| L3vxTyU9zwl | @GoodCitizenNews01 Arrested, at Houston Jail | 6-Jun-22 | 1469 | | 4361 | 422.0912 | 5 | 15.847 | 37830 | 7.3 |
| 90i04JPU1nU | Is Texas a Nanny State?! | 4-Feb-22 | 29 | | 47367 | 412.5241 | 74 | 0.394 | 48780 | 5.34 |
| KJJFV48ckxl | "Deer Park PD Lied" News Now Houston Statement from Court | 5-Mar-19 | 81 | | 22762 | 412.1216 | 39 | 27.496 | 88338 | 13.93 |
| AumIQE0RTcg | **NO BODYCAMS** Sugar Land Thugs Raid Rosenberg Home (Recorded Live) | 8-Nov-24 | 4304 | 1.2463 | 3729 | 412.028 | 0 | 12.603 | 29340 | 7.74 |
| f_b6MWBAfQ0 | Back the blue OR ELSEâ€¦! .@BCScann Full vid: https://youtu.be/oKlwHCLq-7A | 1-Apr-24 | 60 | | 30836 | 395.5083 | 22 | 6.023 | 61005 | 5.97 |

## Corruption Report Video Revenue

| ID | Title | Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 7GHw4pbwmGQ | INSANE! Government Official Attacks Reporter News Now Patrick Roth for Filming | 1-Jul-19 | 1042 | | 6680 | 388.6105 | 15 | 9.463 | 51010 | 7.22 |
| 40lq6tV-Aq0 | "I don't answer questions" Harris County District Attorney Hiding Tuttle Murder Information | 14-Jun-19 | 329 | | 7634 | 386.8774 | 12 | 10.663 | 81278 | 5.32 |
| aPUNFzRISd4 | END Police Militarization! Call Senators @ 202-224-3121 | 2-Jul-20 | 603 | | 4950 | 386.807 | -4 | 20.553 | 56821 | 4.39 |
| e09JeJ4fO2M | â€œDeputyâ€ Hibbs, Badge 1380 \| Fort Bend County Sheriffâ€™s Office | 14-Jun-20 | 179 | | 13865 | 385.9535 | 15 | 29.197 | 90127 | 8.42 |
| Jc662AwSDkQ | Backroom Meeting with Freeport City Manager (Raw Bodycam) | 21-Nov-23 | 1668 | | 3973 | 383.3813 | 0 | 15.704 | 37500 | 5.33 |
| 6b7KDkhkD_U | Missouri City Hunger Strike | 7-Jul-22 | 7690 | | 2121 | 382.3668 | -2 | 124.058 | 21570 | 6.41 |
| x9_fClwMO6s | Contraband Found? Suspicious Vehicle Search | 5-Oct-22 | 740 | | 5402 | 381.7961 | -4 | 23.067 | 49408 | 7.45 |
| eE4qC-3ypdg | A Copwatcher Saved My Night | 1-Jul-22 | 548 | | 6372 | 381.1744 | 11 | 23.332 | 60276 | 7.38 |
| tCjOFZ168J0 | Anti-Camera Cop Wants to Subpoena Video \| Brazoria County Sheriffâ€™s Office | 17-Mar-22 | 453 | | 7170 | 380.4933 | 2 | 23.042 | 72305 | 5.98 |
| rN1sBhxQ50U | SCHOOL SAFETY Supervisor Arrested for SHOOTING | 10-Feb-25 | 316 | | 10138 | 377.6373 | 34 | 21.458 | 63993 | 8.78 |
| oFGEOtQikLc | Bad Cop Fallacy | 9-Dec-24 | 1321 | 0.3601 | 5593 | 375.8688 | 3 | 36.758 | 41010 | 7.85 |
| zxiVdpUsFzg | Open Records: Will Police Harass Me Again? | 12-Jul-22 | 4558 | | 2428 | 371.6154 | -5 | 8.464 | 23012 | 7.22 |
| -CpnMNQnj_0 | (Live) Betting on a Beating - The BAD COP Problem | 14-Feb-25 | 5065 | 1.4022 | 2309 | 347.0873 | -1 | 35.196 | 24318 | 4.94 |
| zJji8vw2bBI | BAD Cop vs. Good Cops \| Traffic Stop Tyrant Games | 11-Aug-21 | 487 | | 5453 | 344.0855 | -6 | 23.624 | 55434 | 5.94 |
| JNmLeI-Y6D8 | Stopped for WHAT?!? | 18-Aug-22 | 24 | | 63018 | 343.1131 | 34 | 0.296 | 47202 | 4.21 |
| 0hgUHGAmnUQ | **Preview** Leon Valley Trolls Harassing Justin Pulliam | 15-Sep-20 | 106 | | 14039 | 342.8701 | 0 | 26.122 | 96111 | 7.24 |
| v3WBIGzOcls | â€œSubject Crashed Outâ€ Police PURSUIT Leads to CRASH \| Richwood, Texas | 5-Apr-21 | 666 | | 4744 | 338.9199 | 0 | 24.245 | 66695 | 3.91 |
| ymO4hoTLdH4 | Shut Down | 8-Aug-24 | 2610 | 0.72 | 3749 | 330.3784 | 0 | 12.211 | 30074 | 7.17 |
| esy09AhlvBA | Filing Open Records on POLICE SHAKEDOWN + Model City Employee | 7-Jul-22 | 1200 | | 4327 | 329.2348 | -1 | 17.634 | 59247 | 5.07 |
| 3qiK8tXVjsU | Officer Involved Shooting | | 11112 | 3.0877 | 2986 | 326.5788 | 10 | 40.766 | 29223 | 6.54 |
| VMFgzx6tsWs | Open Records Harassment August 16, 2019 Houston, Texas | | 826 | | 2764 | 292.0724 | 356 | 3.349 | 560 | 8.04 |
| fiR2jD_DR1c | â€œThey were in the council chambers recordingâ€ Auditing News Now Patrick \| Missouri City Part 1 | 2-Apr-19 | 589 | | 4683 | 290.9873 | 8 | 9.404 | 36648 | 6.68 |
| vtFrpuuhRqg | "****ing Pig", "Keep Recording" Rosenberg COP WATCH | 31-Aug-21 | 197 | | 8471 | 287.4792 | -1 | 44.803 | 60953 | 9.11 |
| 5dpqXhLbA_w | Missouri City Police Dept | 13-Jun-22 | 810 | | 3765 | 284.6829 | -6 | 14.493 | 40245 | 6.4 |
| u09mst5CTyY | BREAKING: James Freeman Almost Hit By Deputies \| Pinal County Sheriff | 6-Jan-19 | 174 | | 8405 | 276.7969 | 33 | 0.083 | 82738 | 6.86 |
| Rh6haxU2Wk4 | Will BAD COPS take my complaint? | 24-Aug-22 | 218 | | 7206 | 270.0438 | 2 | 22.519 | 50853 | 9.78 |
| YeFcvDPcv24 | When you ðŸˆ ðŸˆâ€â"¸ : | 1-Mar-24 | 40 | | 26427 | 269.12 | 20 | 5.122 | 54569 | 6.1 |
| 9oSgx4y2Evc | Just Filming Rosenberg PD to Keep People FREE | 13-Jul-22 | 1037 | | 4544 | 255.8364 | -5 | 12.935 | 51370 | 6.15 |
| YcmZKVWzFl4 | Arson? Home of Jailed SCHOOL SAFETY OFFICER Burns | 15-Feb-25 | 2215 | 1.0857 | 3272 | 249.7937 | 3 | 20.038 | 29164 | 6.44 |
| EOJSWVcTneY | On the Fence about BIG Gov't? Do YOU need CRAZY people RULING YOU? | 27-Mar-21 | 317 | | 4862 | 248.6035 | 0 | 16.25 | 48859 | 5.56 |
| 8buATIUVYm4 | Houston Hiding History \| Join the Police Reform & Accountability Effort | 5-Mar-19 | 186 | | 7122 | 248.3187 | 50 | 11.407 | 37998 | 9.45 |
| jgwKAZD2-K8 | Government Breaking the Law | 11-Apr-19 | 3800 | | 1739 | 242.6834 | -4 | 2.224 | 18338 | 3.97 |
| 8-_VMaq9yFU | Will I go to JAIL??? #firstamendmentaudits #cops | 23-Apr-24 | 57 | | 17884 | 234.5344 | 21 | 3.586 | 62052 | 7.21 |
| 53598tsfAUg | Major Crash FBCSO Rosenberg | 26-Feb-21 | 1422 | | 2124 | 233.3497 | -4 | 7.495 | 14712 | 4.26 |
| 69Wij09P3PY | Rosenberg SWAT Raid Prep | 31-Aug-22 | 7888 | | 1081 | 233.2171 | 1 | 14.823 | 17448 | 3.47 |
| JhrJSxA1fGQ | BREAKING: News Now Houston Bond Set | 2-Mar-19 | 181 | | 7570 | 231.6772 | 99 | 6.062 | 57007 | 5.63 |

## Corruption Report Video Revenue

| ID | Title | Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| kqY2PvpRUUk | COPS ARREST FOR FREE SPEECH: Take the Police Protest Challenge! | 19-May-19 | 260 | | 5596 | 229.4167 | 13 | 0 | 42810 | 6.51 |
| ylew7wZv_Xg | VIA San Antonio | 18-Mar-19 | 3806 | | 1800 | 222.1808 | 6 | 20.174 | 24806 | 3.35 |
| njdMwO8XnuU | And I didnâ€™t play any gamesâ€¦ | 6-Jan-24 | 58 | | 19523 | 214.2438 | 18 | 3.309 | 72090 | 7.91 |
| 9H2u1OcMFoI | Free Speech Criminal @BCScann Released from Jail | 5-May-21 | 118 | | 8815 | 201.3779 | 6 | 24.186 | 73925 | 7.85 |
| qwXgSg5xXxo | Political Prisoner Brandon White Released from Jail-- Livingston, TX | 9-Mar-22 | 153 | | 7922 | 201.3691 | 2 | 18.694 | 69097 | 7.41 |
| 6PHGwLm-IZU | Alamo | 18-Mar-19 | 4581 | | 1311 | 195.4613 | -6 | 1.603 | 20689 | 2.5 |
| gLmR4Xrii8U | What to do if Arrested | 15-Oct-24 | 60 | | 10820 | 178.5726 | 9 | 2.903 | 23551 | 6.29 |
| Emwvnpz4iO4 | Sandy found out the hard way | 14-Jan-24 | 50 | | 14367 | 167.1086 | 15 | 2.512 | 58443 | 5.99 |
| uaz78KJFXCk | Deadly Drug Raid Update: Houston Police Department Asks AG to Conceal Information | 14-Feb-19 | 288 | | 3497 | 154.9468 | 39 | 0.548 | 26792 | 5.64 |
| zm1ZVP8giwo | $1,147.27 Records Fees, Government THUGS | 31-Mar-22 | 2945 | | 1684 | 154.6493 | 1 | 76.211 | 12990 | 6.44 |
| QX5FHStEFb4 | Do YouTubers have 1st Amendment press rights? I sued the sheriff and found out. | 26-Sep-24 | 56 | | 10699 | 153.4562 | 3 | 2.937 | 60957 | 7.12 |
| DA6b0y7UfA | BODYCAM: Bowie Texas Police Officer Magers stops activist James Freeman | 6-Dec-18 | 948 | | 2575 | 146.9595 | 14 | 0.426 | 32096 | 4.22 |
| jB46U7lFnkA | â€¡ TASER DEPLOYED â€¡ | 6-Aug-22 | 54 | | 10710 | 144.733 | 9 | 1.026 | 59754 | 4.36 |
| j1uK8_gy5fU | Suspicious Activity by House IS THE COPS | 13-Jan-25 | 58 | | 8905 | 141.921 | 16 | 1.965 | 26088 | 7.49 |
| UqAb_zay7es | See a cop, film a cop. | 23-Jan-22 | 16 | | 38198 | 140.9618 | 20 | 0.171 | 83745 | 5.8 |
| q_Goclhdxyg | Rosenberg Police Arrest Alleged Bank Robber (Live Replay) | 27-Oct-21 | 483 | | 2949 | 137.348 | -5 | 13.871 | 36300 | 4.17 |
| jXPwBycjgnE | Fort Bend Major Event: School Safety Supervisor Detained | | 5075 | 1.4083 | 5884 | 136.0294 | 9 | 5.465 | 12714 | 6.4 |
| ebcjSzi2Wr8 | â€œBehave, Behaveâ€ YEP That Really Happened: 5 Hilarious Police Radio Calls You Canâ€™t Help But Laugh | 14-Mar-19 | 141 | | 4961 | 131.0711 | -1 | 7.936 | 39105 | 6.65 |
| AxOpFir-QQ8 | Stand-off Pursuit Police | 11-Oct-21 | 4370 | | 1243 | 130.8538 | -10 | 4.611 | 14968 | 3.7 |
| Lf18Hv7-cLg | LIVE in the FIELD: Out at the PD | 3-May-19 | 1237 | | 1481 | 127.5146 | 1 | 2.202 | 19069 | 3.5 |
| 5t2Tuenyljc | Crime Scene on Scene | | 8941 | 2.4813 | 7657 | 123.7726 | 24 | 1.227 | 10130 | 5.19 |
| W4mLmgFe08 | â€œYou can ZOOM IN all you Wantâ€ Filming Cones | Sheriff Faganâ€™s â€œTransparencyâ€ | 6-Feb-25 | 317 | | 4023 | 123.4695 | 2 | 8.279 | 28207 | 7.09 |
| BydOIbvQYwo | Dispatcher Protects Lying Cop #firstamendmentaudit #cops | 26-Nov-24 | 59 | | 9156 | 122.9257 | 7 | 2.492 | 20288 | 6.28 |
| h8UfOVd7jR4 | Not Arrested | 17-Nov-22 | 2353 | 0.6732 | 1440 | 119.1334 | 2 | 2.616 | 9165 | 6.57 |
| Euwh8kY2oqY | Justin Pulliam Live | 9-Feb-25 | 1549 | 0.4288 | 1622 | 118.7183 | 1 | 5.706 | 12974 | 7.37 |
| UhVoerh_ur4 | Open Records: Will Police Harass Me Again? | | 2834 | | 1040 | 118.541 | -17 | 12.311 | 10081 | 6.85 |
| 7VMPA_nXo0Y | Police HATE When You Do This | 8-Sep-24 | 33 | | 12911 | 117.4735 | 11 | 3.612 | 23291 | 6.67 |
| bA1dr4-4okk | 7815 Full Warrant | 25-Feb-19 | 206 | | 4158 | 117.417 | 21 | 3.656 | 47446 | 4.44 |
| 5HqlMUj2PcA | Rosenberg Police Arrive to Issue CTW | 12-Nov-21 | 1370 | | 1707 | 117.3853 | -5 | 0.479 | 13347 | 8.43 |
| U82kL7KTztA | Eagle Lake, Texas Corruption | 14-Mar-23 | 656 | 0.1785 | 1916 | 116.4189 | 3 | 4.9 | 14433 | 8.03 |
| v44ZB45qzCw | (Coming Soon) How do police stifle legal, 1st Amendment activity? | 26-Jun-20 | 85 | | 6692 | 116.0226 | 16 | 16.798 | 53002 | 6.51 |
| QBujednKNP0 | (Preview) What is the Fort Bend County Sheriff Hiding? | 10-Jun-20 | 78 | | 6581 | 115.6116 | -6 | 12.788 | 60096 | 5.24 |
| xz4MEoTH9w0 | â€œDelete it All or Iâ€™ll Arrest Youâ€ Selena Saves News Now Patrick Roth Again | St Louis County Tyrant | 21-Jul-19 | 92 | | 6280 | 112.7699 | 4 | 6.261 | 33024 | 9.92 |
| AUxXxOE9rvc | Rosenberg Freeing Prisoners | 13-Dec-22 | 918 | 0.2505 | 1457 | 111.6925 | 1 | 3.255 | 8260 | 10.36 |
| a3y3wURzys4 | Police Playing Open Records Games | 19-Nov-24 | 27 | | 12677 | 110.2774 | 15 | 3.689 | 16404 | 6.15 |
| 3B7DZxgANjs | When Cops say â€œyou can videoâ€ #gaslighting #firstamendmentaudit | 20-Nov-24 | 30 | | 12675 | 107.9417 | 13 | 3.809 | 15150 | 5.72 |

## Corruption Report Video Revenue

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| vPBYwykzg5M | Rosenberg Freeing Prisoner Pt 2 | 13-Dec-22 | 2055 | 0.5695 | 858 | 107.8298 | 2 | 12.078 | 6452 | 7.81 |
| tbAnP2NcOGk | When your Social Credit Score gets too low in TEXAS, cops throw you in JAIL. | 27-Aug-24 | 35 | | 11124 | 102.3467 | 15 | 2.777 | 32469 | 7.24 |
| llgio8EsEDo | The BEST Leon Valley Video ðŸ¤ ðŸ¤ ðŸ'ªâ€ï¸ ðŸ'º (me: ðŸˆ ðŸˆ ðŸ'£) | 20-Jun-20 | 24 | | 15369 | 101.8074 | -7 | 2.438 | 73553 | 11.43 |
| O9GcoGDyUvY | Above the Law | 3-Oct-23 | 37 | | 10965 | 99.1285 | 12 | 1.71 | 21443 | 4.22 |
| TqWHnLDAx4g | Is it still a â€free countryâ€ if walking in a CRIME?! #cops #constitution #firstamendmentaudits | 22-Apr-24 | 35 | | 11847 | 96.6225 | 11 | 2.378 | 37901 | 4.77 |
| ASPdEDdkaUs | LEAKED CALL: Troll tattles on activist James Freeman | Bowie Texas Police | 11-Dec-18 | 214 | | 3069 | 94.4331 | 4 | 1.098 | 31456 | 4.98 |
| ng8N6u-35pY | Man ESCAPES from POLICE Carâ€"Cop FAILS Reverse Lock Watch Audit | 2-Aug-21 | 77 | | 4899 | 85.5956 | -11 | 15.481 | 47268 | 5.93 |
| Byx1V7H5Kxg | Cops Harass me for Filming Cops | 17-Nov-22 | 2030 | 0.5818 | 907 | 84.5848 | -6 | 0.213 | 7686 | 6.7 |
| 3i5S1ZR-QaE | Field training on how to be a TYRANT | 23-Dec-23 | 52 | | 7683 | 81.3534 | 13 | 1.344 | 24450 | 4.22 |
| pBCX2Vl1SgA | Does my Next Sheriff have a record? | 5-Nov-24 | 130 | | 3878 | 80.2402 | -3 | 23.476 | 20223 | 8.22 |
| ZlQMBWA3ymo | Not Clever Enough | 22-Apr-22 | 25 | | 10976 | 79.128 | 3 | 0.239 | 51933 | 5.81 |
| wtfPy1sP9SI | Heroic bravery | 3-Jan-24 | 19 | | 11758 | 73.3617 | 7 | 2.037 | 18400 | 2.65 |
| Ik0A2wsGF9o | â€œWe need more policeâ€ understaffed? Lol ðŸ˜ | 31-Dec-23 | 59 | | 7372 | 71.932 | 2 | 1.296 | 35975 | 4.86 |
| -3P-z70pQOw | When you complain about the policeâ€¦ | 15-Dec-23 | 30 | | 9821 | 71.0969 | 28 | 1.694 | 21808 | 3.63 |
| yXT4Dl-jVAl | Eye Approaching: Hurricane Beryl | 9-Jul-24 | 2325 | 1.251 | 1254 | 70.4508 | -7 | 3.776 | 25099 | 2.53 |
| 2MazZ9hTgC8 | Oh no! Cops are coming. | 17-Oct-24 | 49 | | 7108 | 70.142 | 9 | 1.855 | 26192 | 5.72 |
| rRt-zASOLUU | Can you see the eye? | 9-Jul-24 | 1625 | 0.4494 | 1903 | 66.3622 | -11 | 4.748 | 23047 | 4.33 |
| 7t1fKmUltN0 | Police â€œPatrollingâ€ to â€œKeep Us Safeâ€ | 16-Oct-24 | 60 | | 5712 | 64.5871 | 5 | 1.542 | 21911 | 6.18 |
| 6dq_LXpzkul | Karen Calls Cops #firstamendmentaudit | 6-Dec-24 | 27 | | 7146 | 62.6898 | 8 | 1.97 | 12120 | 3.45 |
| toELlosZVbs | Fort Bend Scene | | 4255 | 1.1801 | 2971 | 62.4572 | 16 | 0.922 | 8367 | 6.27 |
| M6-8MNy5qJM | POLICE BODYCAM (Miller): Bowie Police abuse Liberty Activist James Freeman | 10-Dec-18 | 1159 | | 805 | 52.9822 | 1 | 0.122 | 18920 | 2.33 |
| O7qPmBPMVkA | ðŸ'®â€ï¸ HATE ðŸ—", : Are 1st Amendment Protections Outdated? | 8-Nov-24 | 13 | | 11098 | 52.0639 | 4 | 3.303 | 13634 | 5.68 |
| NCpEWYEeeVs | STOP Filming Cops #firstamendmentaudit #cops | 13-Dec-24 | 16 | | 9170 | 48.2122 | 8 | 2.519 | 12951 | 6.6 |
| iA0TMfJdp-w | Officer Involved Shooting Suspect Home Burns | | 1265 | 0.35 | 797 | 45.6567 | -1 | 3.878 | 3094 | 7.79 |
| q0kJ9vMuo8E | (D) Voters Left Before Voting for Sheriff Fagan ðŸ˜, ðŸ˜, | 6-Nov-24 | 289 | | 1283 | 44.6188 | -3 | 2.184 | 19580 | 4.68 |
| n-_kiRdNFmc | â€œCAN I GET SOME IDâ€ ***Subscribe to Justin Pulliam IRL Live & Audits*** | 7-May-19 | 102 | | 2376 | 41.8509 | 5 | 2.689 | 20912 | 5.46 |
| 9BKp_I9sbOE | Vote NO to Fort Bend Tyrants! | 7-Nov-23 | 121 | | 1987 | 39.1309 | -2 | 6.316 | 26812 | 4.3 |
| aepU_thyF3g | The Final Day of Free Speech?! | 5-Nov-24 | 128 | | 2130 | 39.1006 | -15 | 4.04 | 10013 | 5.83 |
| xlOyDsN1Qks | LIVE: Go Vote!!! | 4-May-19 | 1001 | | 625 | 38.4938 | -4 | 0.679 | 17810 | 1.27 |
| 7om3hfs7Mrs | News Now Wong #firstamendmentaudit | 9-Dec-24 | 34 | | 4279 | 36.4311 | 2 | 1.161 | 12147 | 4.08 |
| NGniZgr0b7Y | Jail Injuries | 6-Jun-22 | 120 | | 1910 | 36.3677 | 0 | 18.523 | 23498 | 4.14 |
| _ecRDQo0-cA | Southerland Springs: Defund the Police? | 16-Jan-23 | 45 | | 3698 | 36.2724 | -1 | 0.04 | 23130 | 5.33 |
| 8JnEBkFpKYg | (Preview) Police Chief Wong | New 1A Auditor | 7-Nov-24 | 40 | | 4052 | 35.1639 | 1 | 6.213 | 29244 | 8.15 |
| ln9hhligmaA | Brandon White to be Released from Polk County Jail | | 803 | | 380 | 27.0427 | 0 | 5.308 | 2689 | 7.92 |
| _VcnpU_ujwY | POLICE BODYCAM: Bowie Police Officer Stone #318 cleans up after Magers #316 | 10-Dec-18 | 547 | | 1017 | 26.9755 | 2 | 0.256 | 13388 | 3.94 |
| 2kqDsW7zTh0 | I'm SORRY. I was wrong. Statement on NNH. | 2-Mar-19 | | | 2387 | 25.2918 | -2 | 1.475 | 2722 | 26.23 |
| 2Si97wQW9mw | NEW CHANNEL: Justin Pulliam IRL Live -- Go Sub!!! Link Below in Desc | 22-Mar-19 | 178 | | 1451 | 21.2377 | -10 | | 17335 | 3.75 |
| 6--zE2BG8mk | 50/50 Race, Every Ballot Matters. Fort Bend Sheriff | 6-Nov-24 | 110 | 0.0683 | 1237 | 20.8597 | -6 | 3.092 | 18765 | 2.95 |
| UdvikwOkDqE | Justin Pulliam Live | 5-Nov-24 | 910 | 0.2516 | 364 | 19.0138 | -3 | 2.044 | 1502 | 11.45 |

# Corruption Report Video Revenue

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BQx1namY_-s | "He fired shots at us" Radio Traffic of Intense Dallas Police Chase | 25-Apr-18 | 617 | | 375 | 18.327 | 0 | 0.125 | 8630 | 2.7 |
| gBgtOjhimes | Montague sheriff deputy call floods Bowie Police Department | 10-Dec-18 | 51 | | 1521 | 18.0674 | 5 | 0.61 | 19959 | 4 |
| canw6UK_42A | Got Tape? | 4-Dec-24 | 12 | | 3096 | 16.303 | 2 | 0.829 | 10545 | 3.82 |
| cNkb5n1a8vM | There's no reason to film the cops yourself… | 21-Feb-25 | 6 | | 2706 | 14.9377 | 2 | 0.654 | 5150 | 6.54 |
| _7ikeLNcp4U | Ranger Texas Dog Bodycam (Members Only) | | 3302 | | 46 | 9.9299 | 0 | 0.101 | 3484 | 0.92 |
| 4OYgga_r5kY | Free USA Flags for Memorial Day events | 11-May-19 | 153 | | 423 | 8.0375 | -6 | 0.102 | 5213 | 2.53 |
| p0pThUG9Vd4 | 🇺🇸 | 16-Feb-25 | 60 | | 938 | 7.8569 | 0 | 0.225 | 7509 | 3.57 |
| 4xvRwc29y9M | *SECRET CAMERA* Rosenberg Police ILLEGALLY STOP Hispanic Pedestrian, Glovebox Audit FAIL | | 1051 | | 45 | 7.5812 | 0 | 0.453 | 558 | 3.58 |
| TRVphiOaAX8 | [PRIVATE] Jones Creek Park 7/12/2021 All Cameras | | 7649 | | 34 | 5.1939 | 0 | | 0 | |
| Xxcv6YZaNT4 | Banned from Press Conference | Fort Bend Retaliation (Sync Video) | | 1813 | | 67 | 4.6829 | 0 | 0.243 | 1 | 0 |
| a7mbj3DX4Mk | *CONFIDENTIAL* Fort Bend Sheriff Discrimination against Justin Pulliam | | 1101 | | 77 | 4.0308 | 0 | | 0 | |
| 7rFJgDGIoHg | HCSO BLUE TEAM--Ribbe BWC | | 3433 | | 27 | 3.5506 | 1 | | 42607 | 0.02 |
| xHg52tXZrvU | Across the Tracks, Putting 4 Rosenberg PD Units Back in Service | | 285 | | 62 | 3.159 | 1 | | 2483 | 1.81 |
| kuV3fcT2Cv4 | Rosenberg Bogus Felony Stop (Raw Bodycam for Members) | | 640 | | 45 | 2.9429 | -2 | 0.073 | 5623 | 0.59 |
| Po7ZVCRQHM8 | Arrested for Filming Police | Fort Bend Retaliation (Sync Video) | | 390 | | 48 | 2.4658 | 0 | 0.415 | 0 | |
| TMtqu3mbZz0 | Texas DPS Trooper Shaw Speeding (Raw Dashcam) | | 270 | | 54 | 2.0151 | 7 | | 13716 | 0.16 |
| sjCJQNfPJAY | Snowflake Speaker: Texas House Leader Dennis Bonnen Trashing Constitutional Carry | | 1224 | | 17 | 1.9416 | 0 | 0.038 | 0 | |
| gN-AQtNIh_4 | Calling the boss + Get ready for new exclusive content | 19-Jan-19 | 20 | | 288 | 1.568 | -2 | 0 | 1613 | 5.39 |
| uOr1tHvxn8M | Patreon Intro Video | | 268 | | 42 | 1.5399 | 0 | 0 | 23 | 0 |
| 6Pg3nbVIABY | Leon Valley Chalk Arrest | Breton BWC | | 830 | | 23 | 1.1916 | 12 | | 45141 | 0.02 |
| hAt9ihd9pXg | I can't take pictures? | 14-Dec-23 | 6 | 0.0106 | 671 | 1.1345 | -2 | 0.087 | 1617 | 5.13 |
| 8jGoSmEfdJk | Missouri City Rough Draft | | 2247 | | 6 | 1.0045 | 0 | | 14 | 35.71 |
| nflLN2jK_YI | Is Salvaggio a Cop? | | 3172 | | 2 | 0.8241 | 0 | 0.011 | 4 | 0 |
| JFEgCjh3h5w | Trooper Shaw Bodycam | | 253 | | 20 | 0.7373 | 12 | | 47761 | 0.03 |
| ZubKw3QU8RY | Cruel and Unusual Prosecution | | 1851 | | 5 | 0.7329 | 0 | 0.031 | 0 | |
| I4sGBX8pR14 | The Prosecutor Dropped My Case!!! | | 159 | | 23 | 0.6694 | 12 | | 21560 | 0.04 |
| PWix7wqmVdk | **Auditing Banned** Did I "Interfere with K9"? | | 570 | | 9 | 0.6584 | 0 | 0.016 | 132 | 2.27 |
| 8D57IWmHYls | Leon Valley Chalk Arrest | Gonzalez BWC | | 846 | | 12 | 0.632 | 4 | | 34214 | 0.02 |
| PZs7D4PArQs | FBCSO Deputy Erick Becker Real **Attorney-Client Communication** | | 2306 | | 2 | 0.6286 | 0 | | 0 | |
| WDB-D0LviYY | Justin Pulliam Live | | 2167 | | 4 | 0.5493 | 0 | 0.014 | 295 | 0.34 |
| AXaMV4MOXek | *Confidential* Rosenberg Anti-Accountability Arrests | | 1036 | | 5 | 0.384 | 0 | | 0 | |
| YZSCM7gNIrA | Attempted Censorship | Fort Bend District Clerk | | 58 | | 26 | 0.324 | 3 | 3.493 | 29690 | 0.03 |
| rBBoMnk5JXU | *CONFIDENTIAL* Leon Valley Texas Viewpoint Discrimination | | 1947 | | 9 | 0.3089 | 0 | | 0 | |
| wE1uEqIFQCY | Amazon Delivery! | | 9 | | 90 | 0.2832 | 0 | 0.003 | 0 | |
| nDDAx6EsT8Y | SLPD Draft | | 950 | | 2 | 0.2631 | 0 | | 0 | |
| R8k9b-MQ420 | Justin Pulliam Live | | 136 | 0.0303 | 14 | 0.2469 | 1 | | 18657 | 0.03 |
| a7ui_PNdsYQ | FBCSO at House | | 219 | | 9 | 0.2344 | 0 | 0 | 9 | 0 |
| DzO3oADrF5Q | Wes Wittig Fort Bend DA Executive Attorney | | 1194 | | 4 | 0.2074 | 0 | 0.004 | 0 | |
| 3VI-vOKgzRA | Fagan Interview January 11, 2021 | | 660 | | 3 | 0.1904 | 0 | | 0 | |

## Corruption Report Video Revenue

| ID | Title | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| nZpTxla8eo0 | Beating the Cops with NNH | | 62 | | 15 | 0.1773 | -1 | 0.001 | 1367 | 0.88 |
| 5RgTGhlDxWM | Lowry Interview | | 1125 | | 4 | 0.1691 | 0 | | 0 | |
| hNKQom-5ZfI | Stand with me Against Corruption | | 218 | | 5 | 0.1493 | 0 | | 0 | |
| WBQPZMLvwVw | Indictment is a "Security Blanket" (to be honest) | | 445 | | 5 | 0.1182 | 0 | 0 | 0 | |
| EzGW4olD_Ws | Temp | | 640 | | 1 | 0.115 | 0 | | 0 | |
| fxN5RuUwZE0 | FBCSO Property Dept May 22, 2024 | | 257 | | 4 | 0.1126 | 0 | | 0 | |
| pGgm8ixMmaM | R | | 281 | | 3 | 0.1058 | 0 | 0 | 0 | |
| xocgvKhVE60 | FBC County Attorney Office Open Records | | 296 | | 2 | 0.0843 | 0 | | 0 | |
| lu9Zlmy7MIQ | FBCSO Harassment at Home | | 130 | | 4 | 0.0724 | 0 | | 0 | |
| _ibO5S7EgHg | News Now Wong | | 978 | | 2 | 0.068 | 0 | 0.002 | 0 | |
| d5ZIALYaSLo | Why didnâ€™t the chicken cross the road | | 27 | | 9 | 0.0581 | 0 | | 0 | |
| Iw6E67ANAw8 | CopWatch | | 188 | | 3 | 0.0574 | 0 | | 0 | |
| CguKY6qjzUs | Elandon Roberts Clips | | 141 | | 2 | 0.0461 | 0 | | 0 | |
| MZuW5pELlIc | Justin Pulliam Live | | 2420 | 0.6701 | 2 | 0.0377 | 0 | | 0 | |
| 0RIJ2moUWk0 | Any | | 115 | | 4 | 0.0373 | 0 | 0 | 0 | |
| cEVzxAl6Fso | (Preview) Justice? Or Political Retaliation? | | 56 | | 3 | 0.0357 | 0 | | 4908 | 0.02 |
| ffNrrl_vrOc | Meeting Mattie Provost, 1st Day in Office, 1/4/2021 | | 320 | | 2 | 0.0328 | 0 | | 0 | |
| p9po7T5FuGE | 12/21/21 Bond Office Games | | 148 | | 1 | 0.0243 | 0 | | 0 | |
| WIREjQ53xhQ | Niagara Falls | 10-Apr-12 | 47 | | 2 | 0.023 | 0 | 0.006 | 4 | 25 |
| l-DIU4vlxV0 | News Now Wong | | 978 | | 2 | 0.0228 | 0 | | 0 | |
| PkkK7r1-D00 | Pickup Rollover Willis | | 84 | | 3 | 0.0214 | 0 | | 4 | 0 |
| 8J0IJE2Bo7Y | Campus "Free" Speech -- Texas Senate Committee on State Affairs | | 10968 | | 3 | 0.0153 | 0 | 0.028 | 21 | 0 |
| fkraXiqSRdk | Deputy Doxxing Me at Home | | 18 | | 1 | 0.0094 | 0 | | 0 | |
| eSTscd7vYU0 | Rule 8(k) complaint filed against Montgomery County Republican Party Chairman, Sept 27, 2018 | | 5772 | | 2 | 0.0058 | 0 | | 5 | 0 |
| _gGVftQoZ3E | Justin Pulliam Live | | 1485 | | 2 | 0.0057 | 0 | | 0 | |
| R5TFnIpIHM8 | Jim busts a tail light | | 301 | | 1 | 0.0057 | 0 | | 4 | 0 |
| IVooqc1XXOE | 2021-01-12 FBCSO PIO Phone Call | | 152 | | 1 | 0.0055 | 0 | | 0 | |
| yefw5UVZCJA | Justin Pulliam Live | | 273 | 0.0722 | 2 | 0.0044 | 0 | | 0 | |
| 7rIOFLAuVak | 2/14/2021 FBCSO with Turner | | 326 | | 1 | 0.0036 | 0 | | 0 | |
| rG6T_eHCGVE | Justin Pulliam Live | | 970 | | 1 | 0.0034 | 0 | | 0 | |
| woVSlTnS6AQ | Justin Pulliam Live | | 835 | 0.2302 | 1 | 0.0027 | 0 | | 0 | |
| VHKLLssW65E | Justin Pulliam Live | | 1690 | 0.4671 | 1 | 0.0026 | 0 | | 0 | |
| jlv7vxRfgJc | Justin Pulliam Live | | 5308 | | 1 | 0.0023 | 0 | | 0 | |
| POVdE5CqYaA | FBCSO Bond Refund Discrimination | | 3245 | | 1 | 0.002 | 0 | | 0 | |
| YZadHIZI_Iw | Justin Pulliam Live | | 115 | 0.0303 | 1 | 0.0019 | 0 | | 0 | |
| l-LaGnBcgvg | 2023-08-11 Part 2 | | 4326 | | 1 | 0.0018 | 0 | 0 | 0 | |
| B0pRVvvfYdU | Justin Pulliam Live | | 287 | 0.0763 | 1 | 0.0014 | 0 | | 0 | |
| ExWKHqCTK4o | 12/21/2021 Backup Camera Raw Video | | 292 | | 2 | 0.0013 | 0 | 0.005 | 0 | |
| PusV4pb6j18 | Justin Pulliam Live | | 670 | 0.1847 | 1 | 0.0011 | 0 | | 0 | |
| hWCpoCryq8A | Justin Pulliam Live | | 2174 | 0.6058 | 1 | 0.001 | 0 | | 0 | |
| La3fWtMnvU4 | Justin Pulliam Live | | 1275 | 0.3521 | 1 | 0.001 | 0 | | 0 | |
| 0C3zab49AXM | Justin Pulliam Live | | 549 | 0.1481 | 2 | 0.0009 | 0 | | 0 | |
| uTqH_bl0qtl | Justin Pulliam Live | | 628 | 0.1705 | 1 | 0.0008 | 0 | | 0 | |
| nug8v_NzIZ4 | Justin Pulliam Live | | 1370 | 0.3793 | 1 | 0.0006 | 0 | | 0 | |

**PX-39**

**Corruption Report Uploads**
**YouTube Data Formatted List**

Long-Form Video Uploads 1/1/2020 to 2/28/2025

| Publish Date | Video Title | Views | Revenue |
|---|---|---|---|
| 1/20/2020 | 😇 **Sneak Peak** Fight Tyrant Police + Corrupt Government with Justin Pulliam in 2020 | 7,156 | $16.519 |
| 1/21/2020 | Blue Line Protection? Cops Deny Criminal Report Against Deputies- Lake Jackson TX @BCScann | 61,670 | $114.671 |
| 1/24/2020 | Bait? Trap? Setup? @NewsNowHouston's First Amendment Audit Tactics Revealed | Missouri City, TX | 453,983 | $2,518.810 |
| 1/26/2020 | Democracy BANNED!! Leon Valley Facing New Lawsuit Over Recall Election | 99,014 | $253.004 |
| 1/28/2020 | Who Raided Tuttle?! 🚗 🏢 🏠 Houston Cops Under Investigation for 7815 Harding St | 85,714 | $114.530 |
| 1/30/2020 | "Never Talk to the Police" @NewsNowHouston's Top First Amendment Audit Tips | 21,785 | $37.134 |
| 1/31/2020 | WTF?! You'll NEVER BELIEVE why Police Arrested this Veteran | 98,838 | $204.144 |
| 2/1/2020 | WHO IS LEAVING?! Leon Valley Tyrant Resigning (Breaking Update) | 78,173 | $212.962 |
| 2/2/2020 | Police REFUSE to Investigate Cop who ASSAULTED Journalist | 72,100 | $198.305 |
| 2/3/2020 | Epic! @JamesFreeman1 OWNS COP Tyrant (Must See) | 40,595 | $75.120 |
| 2/4/2020 | EMERGENCY ALERT - Leon Valley Arrested John Gray | 29,547 | $39.898 |
| 2/7/2020 | Felony Charge! 💰 💰 Jack Miller @TXSHEEPDOG72 Charge + Bond Update | Olmos Park TX Tyrant Valenciano | 35,369 | $51.202 |
| 2/7/2020 | "You'll know when I hurt you" Bully Police Chief's War on 1st & 2nd Amendment | Olmos Park TX | 18,371 | $3.105 |
| 2/11/2020 | "Keep it Positive!" Leon Valley BANS SPEECH Critical of Joe Salvaggio's Political Establishment | 57,228 | $122.891 |
| 2/12/2020 | Cop Shoots Woman for ACTION & ADVENTURE | 20,450 | $27.294 |
| 2/14/2020 | Secret Police 👀📷 + How-to First Amendment Audit + Equipment I use | Missouri City, Texas | 15,941 | $38.588 |
| 2/24/2020 | Salvaggio's New Organized Crime Charges | Leon Valley Update | Ban Social Media | 47,305 | $38.782 |
| 2/28/2020 | (SNOWFLAKES) How to SKIP THE LINE at the DMV Drivers License Office + Real ID Requirements Texas DPS | 32,309 | $107.905 |
| 3/5/2020 | AUDITORS WIN: Attorney General Determined Sheriff BROKE THE LAW | Harris County Sheriff Texas | 349,228 | $2,153.092 |
| 3/6/2020 | What are the POLICE HIDING? Olmos Park EXTREME Open Records Cost Games | 84,393 | $318.362 |
| 3/13/2020 | Scared 😨 🏃 Tyrant COPS FLEE FROM PUBLIC | Olmos Park Police OWNED | Arrest Warrant for Auditor | 137,183 | $579.513 |

| | | | |
|---|---|---|---|
| 3/15/2020 | Deputy STUCK with FOIA REQUEST for Sheriff's TEXT MESSAGES \| Fort Bend Sheriff Troy Nehls | 59,377 | $200.930 |
| 4/13/2020 | Leon Valley (BREAKING): Salvaggio's "Team" KICKING OUT the Mayor today?!? | 58,343 | $162.223 |
| 4/22/2020 | AUDITOR BEHIND BARS: Mystery Olmos Park Pocket Warrant Revealed | 26,499 | $44.423 |
| 5/1/2020 | CITIZEN PULLS OVER COP: Who was cited? | 11,706 | $25.450 |
| 5/3/2020 | Will VOTERS CHANGE Leon Valley today? Or is Tyrant Joe Salvaggio here to Stay? | 24,308 | $96.595 |
| 5/8/2020 | "TURN OFF your Camera and STOP RECORDING Government" \| Fort Bend County Texas District Attorney | 32,166 | $120.716 |
| 5/10/2020 | Entitled Cops: DOUBLE PAY & Double Standards \| Fort Bend County, Texas | 17,973 | $65.603 |
| 5/12/2020 | SEND BACKUP! They're filming where they can HEAR and SEE \| Harris County Constable Pct 5 | 29,522 | $103.795 |
| 5/16/2020 | Truth | 9,479 | $23.281 |
| 5/18/2020 | The Thin Blue Line | 87,401 | $391.578 |
| 5/20/2020 | The WORST COPS \| Rosenberg, Texas | 109,313 | $629.623 |
| 5/21/2020 | Police Chief: A Threat? NO! It's a PROMISE!!! \| Leon Valley, Texas Police (Joe Salvaggio) | 76,718 | $271.021 |
| 5/23/2020 | Brianna, Hide! Rookie GIRL COP DRIVES into DITCH \| Harris Constable Pct 5 | 58,115 | $265.582 |
| 5/30/2020 | We're Here to March—Black Lives Matter Police Protest \| Houston, Texas | 9,044 | $8.388 |
| 6/2/2020 | Houston Police AGGRESSIVE, FALSE ARREST of Witness "I'm trying to go home" | 12,433 | $3.653 |
| 6/3/2020 | Thousands March for George Floyd, Justice in Houston on June 2, 2020 [Raw Video, Entire Parade] | 3,600 | $5.685 |
| 6/5/2020 | *Tyrant Alert* Chief Joe Salvaggio ARRESTS Elderly Man at Council Meeting \| Leon Valley, Texas | 59,806 | $100.416 |
| 6/6/2020 | Leon Valley CENSORS Me but lets TROLL ATTACK | 28,190 | $67.913 |
| 6/7/2020 | Police Supporters get UGLY \| Lake Jackson, Texas with @BCScann | 57,906 | $205.130 |
| 6/11/2020 | *Update* Leon Valley Arrest Warrant + Police Report | 58,047 | $203.393 |
| 6/13/2020 | Police TACKLE Girl & ARREST Her \| Houston, Texas | 13,573 | $1.363 |
| 6/14/2020 | "Deputy" Hibbs, Badge 1380 \| Fort Bend County Sheriff's Office | 13,865 | $29.197 |
| 6/15/2020 | I BEAT THE COPS ♿ 💯 🤓 🏃 🏃 Failed ID Attempt on "HIPAA Violation" Call \| Baytown, Texas Police | 72,038 | $361.292 |
| 6/16/2020 | POLICE STATION STAKEOUT 😳 📸 🏃 : Will Sheriff Troy Nehls HIDE 🙈 from One Tough Voter? | 39,462 | $164.720 |
| 6/18/2020 | 🤡 Lyin' Houston Cop Gerald GOINES ARRESTED George FLOYD 🏃 👋 | 39,943 | $159.418 |
| 6/28/2020 | Leon Valley Council Debates 🏃 ♂️🔧 POLICE REFORM + 💥 Case Update | 32,385 | $143.104 |

| Date | Title | Views | Revenue |
|---|---|---|---|
| 7/1/2020 | BlueLeaks: LEAKED FBI FILES Reveal Police War Against YouTubers, 1st Amendment Auditors | 224,893 | $437.100 |
| 7/2/2020 | END Police Militarization! Call Senators @ 202-224-3121 | 4,950 | $20.553 |
| 7/4/2020 | IGNORE the GOV?!? The Truth about the Mask Order | 9,981 | $37.599 |
| 7/5/2020 | KICKED OUT for Filing Complaint at Troy Nehls' Sheriff's Office | Fort Bend County, Texas | 24,999 | $104.703 |
| 7/6/2020 | Leon Valley: The Blue Lyin' Sanctuary City | Police Chief Joe Salvaggio | 15,350 | $46.005 |
| 7/16/2020 | @TXSHEEPDOG72 ATTACKED while Covering ELECTION CORRUPTION in Texas | 14,938 | $69.234 |
| 7/21/2020 | Chief Salvaggio Harassing Leon Valley Residents, Political Opposition | 16,752 | $54.789 |
| 7/21/2020 | Official Oppression? Salvaggio Retaliating Against Councilor | Leon Valley, Texas | 45,442 | $221.956 |
| 8/3/2020 | Agitator Salvaggio WAGING WAR on Free Speech & Press | Leon Valley, TX | 33,160 | $79.222 |
| 8/14/2020 | BLASTING TYRANTS at Leon Valley Council Meeting (Bodycam) | 33,778 | $147.645 |
| 8/15/2020 | Should the PUBLIC wear Body Cameras? | 23,705 | $80.324 |
| 8/17/2020 | Chief Salvaggio LIED to STEAL CARS in Leon Valley, Texas | 31,523 | $165.442 |
| 8/18/2020 | Police Supporter THREATENS CITY OFFICIAL Will Bradshaw at Leon Valley Council Meeting | 25,270 | $102.604 |
| 8/21/2020 | 👮 🚨 👮 Leon Valley Police PROTECT VILE AGITATOR Blackmore | 27,232 | $113.505 |
| 8/23/2020 | Just 1 Beer? HUGE POLICE RESPONSE for Filming DWI Investigation | Brazoria County, Texas | 21,004 | $143.874 |
| 8/24/2020 | COVER UP BUSTED! Corrupt Cop Fails to ID | Harris County Pct 6 visits Fort Bend Texas | 44,266 | $280.161 |
| 8/26/2020 | "I hope she GOES TO JAIL" | Leon Valley Residents SLAM Corrupt Officials | 41,170 | $197.244 |
| 8/30/2020 | 🚨 👮 👮 Did these COPS PLANT EVIDENCE?! You make the call! | 25,644 | $7.393 |
| 9/5/2020 | Did the POLICE SLAM HIM? DWI Arrest | San Antonio, Texas | 11,839 | $47.585 |
| 9/6/2020 | POLITICAL CORRUPTION: Leon Valley Chief, Manager Interfere in Elections | Outed by Will Bradshaw | 26,592 | $136.321 |
| 9/7/2020 | Chief Salvaggio "CHOKED ME OUT" **New PD Video** Leon Valley, Texas | 75,786 | $380.867 |
| 9/8/2020 | Woman Claims Police Killed Her Family | 10,951 | $28.487 |
| 9/12/2020 | **POLICE BUSTED** Secret "Intelligence" Bulletins Illegally Target YouTubers, 1st Amendment Auditors | 61,738 | $22.113 |
| 9/14/2020 | Justin Pulliam Nailed LYING Chief Salvaggio | Leon Valley, Texas | 55,064 | $443.672 |
| 9/15/2020 | I Tear Apart Salvaggio's Attack on Bradshaw + Meeting Update | 19,894 | $128.091 |
| 9/18/2020 | **AGITATOR UPDATE** Leon Valley Establishment Trolls Attack | 13,957 | $50.491 |
| 9/21/2020 | EJECTED for Exposing **POLICE VOTER FRAUD** in Leon Valley, TX | 33,579 | $207.119 |
| 9/22/2020 | What was POLICE CHIEF Salvaggio TEXTING?! 🚨 📱 Leon Valley, Texas | 33,774 | $241.875 |
| 9/23/2020 | GIRL PLAYS POLICE GAMES: What happens on a DWI Traffic Stop? | 17,646 | $130.942 |

| Date | Title | Views | Amount |
|---|---|---|---|
| 9/27/2020 | Chief will ARREST City Council for "Public Humiliation" of Cops \| Leon Valley, TX | 39,464 | $272.317 |
| 10/5/2020 | Leon Valley LAWSUIT FILED: Will the judge STOP Salvaggio?! | 25,309 | $450.864 |
| 10/5/2020 | Leon Valley Police **SHOOT** Driver (BREAKING) | 27,240 | $90.720 |
| 10/20/2020 | Police Chief Salvaggio **LIES UNDER OATH** in Leon Valley, Texas | 28,049 | $237.207 |
| 10/21/2020 | 1st Amendment Audit FAIL, LYING COP Tries to HIDE Kangaroo Court | 25,608 | $143.736 |
| 10/22/2020 | "I'll Whack Your Ass" INSANE City Council Meeting \| Leon Valley, TX | 62,573 | $420.148 |
| 10/25/2020 | Who Won?! HUGE Leon Valley Lawsuit Updates, @James Freeman Case | 38,711 | $18.026 |
| 10/27/2020 | 🐝 😄 😄 Alcocer RAGE QUITS Council Meeting \| Leon Valley, Texas | 32,659 | $286.018 |
| 10/29/2020 | Councilor FACING TRIAL for OFFENDING MASK 😨 😁 Leon Valley, TX | 16,890 | $159.257 |
| 10/30/2020 | TOO CLOSE FOR COMFORT + Who paid for illegal signs? Leon Valley, TX | 24,919 | $176.961 |
| 10/31/2020 | Leon Valley Lawsuit Update: FEDERAL COURT TESTIMONEY \| Bradshaw v. Salvaggio | 31,832 | $313.382 |
| 11/2/2020 | This is REALLY BAD: Chief Salvaggio's October SURPRISE + Bradshaw Interview \| Leon Valley, TX | 28,222 | $174.431 |
| 11/5/2020 | POLICE FLIP OUT o\| BEST VIEW \| Leon Valley, TX | 40,090 | $242.392 |
| 12/3/2020 | Will Chief Joe Salvaggio become City Manager Today? Leon Valley, TX | 12,136 | $96.202 |
| 12/13/2020 | ALERT! Rosenberg, Texas Gang Stalkers Targeting Me | 20,265 | $45.154 |
| 12/24/2020 | YOU Helped Accomplish THIS in 2020 (Replaced a Government ✔) | 7,712 | $41.150 |
| 1/9/2021 | Black Site Jails: Rosenberg & Fort Bend HIDING Innocent Americans | 30,293 | $166.675 |
| 1/10/2021 | Trump Supporter UNLAWFULLY ARRESTED by Police \| Full Bodycam (Demonetized) | 28,767 | $8.662 |
| 1/12/2021 | (Epic Plot Twist) JAILER ARRESTED, POLICE HIDE: Will Sheriff Fagan Talk?! | 36,190 | $136.340 |
| 1/13/2021 | Blackmore EJECTED + Police UNION THREATENS Leon Valley Council | 46,669 | $254.500 |
| 1/17/2021 | James Freeman CHARGED! Rude Government Workers Show Off | 62,999 | $281.137 |
| 1/19/2021 | Exclusive: Police Chief Joe Salvaggio's DEMAND LETTER | 28,982 | $124.124 |
| 1/19/2021 | Chief Salvaggio FIRED?! Council Calls NO CONFIDENCE Vote \| Leon Valley, Texas | 80,541 | $393.112 |
| 1/21/2021 | Chief Salvaggio: "Auditors are Shaping your Mind" + Did Change Leon Valley FAIL?! | 44,704 | $259.302 |
| 1/22/2021 | **Tyrant Alert** RETALIATORY ARREST by Angleton Police of AUDITOR @BCScann John Gray | 38,522 | $173.806 |

| | | | |
|---|---|---|---|
| 1/27/2021 | **Auditor Arrested** "You CANNOT Film Government Buildings" \| Palmetto Bay, Florida | 34,420 | $193.388 |
| 2/2/2021 | STUPID POLICE STOPS + I'm "Aggressive" Cop Complains \| Clute, TX | 62,912 | $331.666 |
| 2/4/2021 | SHOCKING CALL led to @NewsNowHouston Arrest \| Jersey Village Police | 167,610 | $981.762 |
| 2/7/2021 | Tyrant Cop *OBSTRUCTS* Journalist at Vehicle Search \| Rosenberg, TX | 24,828 | $172.616 |
| 2/11/2021 | Police Chief FILES ASSAULT CHARGES on City Councilor **Tyrant Alert** Leon Valley, TX | 46,807 | $249.515 |
| 2/12/2021 | "Extortion" Chief Salvaggio Submits Resignation "Agreement" \| Leon Valley, TX | 29,521 | $158.364 |
| 2/22/2021 | *Tyrant Alert* FALSE ARREST of Black YouTuber @NEWSNOWOMAHACOPBLOCK \| Tomball, Texas Police | 42,092 | $221.485 |
| 2/24/2021 | Salvaggio will RESIGN for HUGE PAYOUT, NO YOUTUBE \| Exclusive Demand Letter | 20,765 | $114.415 |
| 2/25/2021 | EPIC COURT HEARING + Tomball TYRANTS LAUGH about Arrest \| @NEWSNOWOMAHACOPBLOCK Update | 33,727 | $187.565 |
| 2/27/2021 | "IMMEDIATE RESIGNATION" of Leon Valley Official + NEW LAWSUIT Threatened | 33,885 | $275.138 |
| 3/1/2021 | Am I the A-HOLE? Brave Deputy Avocado SCARED of Justin \| Fort Bend County Sheriff | 22,419 | $137.782 |
| 3/2/2021 | "No Comment" Will Cops ARREST a POLICE CHIEF?? Friendswood Coverup | 16,872 | $62.381 |
| 3/3/2021 | "DO NOT FILM" Police Still Afraid of Cameras \| Missouri City, TX | 21,733 | $143.473 |
| 3/4/2021 | "You Look Good" CUTE COP FLASHLIGHT FLIRTS \| Fort Bend Sheriff | 17,169 | $85.266 |
| 3/5/2021 | **CAPITAL FELONY** Dallas Police Officer Arrested, Remains Employed | 26,212 | $126.252 |
| 3/6/2021 | **AUDITORS WIN** Chief Joe Salvaggio FIRED \| Leon Valley, TX | 156,041 | $799.699 |
| 3/8/2021 | City Council BANS CAMERAS, PUBLIC COMMENTS \| Leon Valley, TX | 43,894 | $316.641 |
| 3/13/2021 | Leon Valley Mask Challenge! Tyrants STILL Breaking the Law 😦 | 22,122 | $147.111 |
| 3/15/2021 | *Auditor Girls Arrested* for WALKING "ILLEGALLY" @CarolinainFortWorth @AcuraAmanda | 23,290 | $153.628 |
| 3/27/2021 | On the Fence about BIG Gov't? Do YOU need CRAZY people RULING YOU? | 4,862 | $16.250 |
| 3/28/2021 | Leon Valley to CENSOR SPEECH \| @TXSHEEPDOG72 & @BCScann at City Council | 12,632 | $87.814 |
| 3/30/2021 | Tyrant Cop BLINDS Journalist with SPOTLIGHT \| Lake Jackson, TX with @BCScann | 9,820 | $69.999 |
| 4/1/2021 | SCARED COPS Send EMERGENCY BACKUP for 1st Amendment Auditor \| Stafford, Texas | 19,593 | $136.114 |
| 4/5/2021 | "Subject Crashed Out" Police PURSUIT Leads to CRASH \| Richwood, Texas | 4,744 | $24.245 |
| 4/7/2021 | Bossy Girls: COPS BLOCK FILMING \| Angleton, TX \| First Amendment Audit | 26,645 | $157.183 |

| 4/8/2021 | **Action Alert** Bill to BLOCK FILMING of POLICE in Texas House Committee TODAY | 9,307 | $36.113 |
|---|---|---|---|
| 4/21/2021 | La Porte Open Records Complaint (Filing with Public) | 13,610 | $113.022 |
| 4/23/2021 | Police Unions Slam Texas Bill to END BAD GYPSY COPS | 15,405 | $122.332 |
| 4/24/2021 | Police SHOOT Black Man IN THE BACK, Killing Him \| Rosenberg, Texas | 17,314 | $2.652 |
| 5/4/2021 | FOOT-CHASE: You WON'T BELIEVE Who the Police Caught! 😵 😵 | 31,120 | $178.422 |
| 5/6/2021 | Leon Valley VICTORY: CLV Candidates SWEEP ELECTION (Again) | 15,332 | $64.387 |
| 5/7/2021 | EXPOSED!! Fake 1st Amendment Auditor "Freedom" Rally \| La Porte, Texas | 20,494 | $152.662 |
| 5/10/2021 | "This is BULL$#*!" Was it an ILLEGAL SEARCH & SEIZURE?! | 15,050 | $103.459 |
| 6/23/2021 | "Accidents Happen" Chief Crashes Fire Truck \| Missouri City, TX | 8,415 | $58.001 |
| 6/25/2021 | Police COVERUP Leads to SWAT STANDOFF \| Harris County Pct 1 Constable | 25,046 | $220.373 |
| 6/27/2021 | FLASHLIGHT FRAUDITORS EXPOSED + Trolls Crash Cop Watch \| La Porte, TX (Part 2) | 16,269 | $137.596 |
| 6/29/2021 | ATTACKED by POLICE SUPPORTER | 14,134 | $87.160 |
| 7/6/2021 | "Stop Interfering" Cop Does A Dumb \| Sugar Land, TX | 15,926 | $103.298 |
| 7/12/2021 | (Preview) Sheriff Eric Fagan LOSES IT \| Fort Bend County, TX | 24,208 | $127.947 |
| 7/17/2021 | *NEW SITE* Driver Lost the Rosenberg Police (until this happened) | 6,609 | $28.075 |
| 7/31/2021 | ARE WE SAFER NOW?! Cop Tries to HIDE Tyrannical Stop & Seizure | 6,732 | $42.543 |
| 8/11/2021 | BAD Cop vs. Good Cops \| Traffic Stop Tyrant Games | 5,453 | $23.624 |
| 8/16/2021 | Are ALL "First Amendment Auditors" FRAUDS?!? | 10,602 | $650.827 |
| 8/18/2021 | Blue Alert Info: Cop Shot, Sheriff hopes suspect is "leaking" | 7,817 | $44.594 |
| 8/31/2021 | "****ing Pig", "Keep Recording" Rosenberg COP WATCH | 8,471 | $44.803 |
| 9/5/2021 | NEW CITY to DESTROY 😵 Joe Salvaggio & Kelly Kuenstler Hired In... | 26,148 | $200.267 |
| 9/22/2021 | **Tyrant Alert** Auditor ARRESTED after RETALIATORY COPS Run License Plates \| @roguenationaudits | 23,922 | $176.589 |
| 9/23/2021 | *SECRET CAMERA* Rosenberg Police ILLEGALLY STOP Hispanic Pedestrian, Glovebox Audit FAIL | 22,616 | $165.522 |
| 10/18/2021 | Frauditors Admit it's ALL ABOUT THE MONEY | 9,127 | $119.690 |
| 10/29/2021 | 🔇 🏛 Feelings Police ILLEGALLY STOP Upstanding Citizen | 31,264 | $160.114 |
| 10/31/2021 | Police Chief VOTED OUT | 40,340 | $217.936 |
| 11/2/2021 | Police Games Challenge (6 Cops) | 7,869 | $42.848 |
| 11/3/2021 | Tyrant Chief DEFEATED for Good? | 71,781 | $644.817 |
| 11/4/2021 | CORRUPTION REPORT | 39,545 | $300.703 |
| 11/5/2021 | Saved by Cop Watcher?! DWI Case DISMISSED | 31,986 | $280.393 |
| 11/6/2021 | Police Scared of Cameras? (3 Audit Fails) | 19,162 | $117.561 |

| 11/9/2021 | Do You Smell That?! SUSPICIOUS COP REFUSES SEARCH (Flip Script with @JamesFreeman1) | 31,046 | $113.459 |
|---|---|---|---|
| 11/9/2021 | Lying Police BUSTED: Illegal COVERUP in Leon Valley (856 Day FOIA Battle) | 120,015 | $973.416 |
| 11/12/2021 | TYRANT Cops SHAKEDOWN Pedestrians (Rosenberg Police) | 23,929 | $133.823 |
| 11/14/2021 | Trample Rights?! Cops Please Karen Snowflakes | 11,753 | $68.893 |
| 11/17/2021 | I QUIT! "Dictator" City Manager's CRY LETTER (Leon Valley) | 16,102 | $135.211 |
| 11/19/2021 | WTF!! Arrested after Calling 911 for Medical Emergency (Rosenberg, TX) | 14,526 | $98.432 |
| 11/22/2021 | Grandma ILLEGALLY ARRESTED for ID REFUSAL (Tyrant Cops Retaliate) | 46,220 | $307.097 |
| 11/29/2021 | ✹ ✹ ✹ Corrupt Police Chief BUSTED: Lying Sheriff STRIPPED of License, Office | 243,915 | $1,818.725 |
| 12/5/2021 | Did they STOP me? 🚨 ⬤ ❓ (Police Political Oppression) | 17,836 | $239.769 |
| 12/19/2021 | "Get Out of My Face" Police Chief MELTDOWN (ft. Real Karen) | 31,925 | $193.947 |
| 12/21/2021 | Preview: Did Manager Payout VIOLATE Texas Law? (Video Banned) | 7,939 | $46.114 |
| 12/29/2021 | City Officials ATTACK Pastor, BLOCK Church | Leon Valley, TX | 9,264 | $67.011 |
| 1/4/2022 | Tyrants Retaliate! DETAINED for Bonding Out ARRESTED YouTuber (Cop Wants Video $$$) | 63,733 | $266.243 |
| 1/13/2022 | Tyrant Cops STEAL Cameras, HIDE Video (The next Leon Valley?!) | 254,148 | $420.553 |
| 1/18/2022 | 🐸 ARREST Report Released. Is it a POLICE COVERUP 😵 ?!? | 109,565 | $530.916 |
| 1/27/2022 | Kuenstler COMPLAINT: Auditors, Council "Retaliated" & "Called me Names" | Leon Valley, TX | 21,252 | $132.000 |
| 1/31/2022 | Is Texas a Nanny State? | 10,362 | $61.243 |
| 2/23/2022 | Corrupt Clerk BUSTED for Jury Tampering ✖ ⚖ 🧑‍⚖️ (10+ years) | 29,121 | $166.705 |
| 3/1/2022 | Police Report COVERUP. Did Mayor Riley Break the Law? | 12,166 | $91.206 |
| 3/4/2022 | Corrupt Clerk DEFEATED. Real Journalism = Real Change | 18,637 | $102.919 |
| 3/5/2022 | ⚰ ⚠TYRANT ALERT⚠ ⚰ Attacked, Arrested for Filming Crash | Lake Jackson, TX | 61,109 | $384.199 |
| 3/7/2022 | 👮 ☁ How to Violate the Law without Punishment | 10,996 | $55.768 |
| 3/8/2022 | Lake Jackson Arrest--Full Video | 29,937 | $97.366 |
| 3/9/2022 | Political Prisoner Brandon White Released from Jail--Livingston, TX | 7,922 | $18.694 |
| 3/10/2022 | (Bodycam) Brandon White Free on Bond for Polk County Retaliatory Charges | 10,118 | $42.484 |
| 3/23/2022 | Police Tackle Teen for Declining EMS | Sugar Land, Texas | 39,220 | $220.672 |
| 3/27/2022 | **IA Report Exclusive** Tyrant Cops Punished | Lake Jackson, TX | 52,128 | $296.773 |

| Date | Title | Views | Amount |
|---|---|---|---|
| 3/30/2022 | 🩸 Exclusive Bodycam 🩸 Lyin' Cop FIRED Over THIS \| Lake Jackson, TX | 20,168 | $118.528 |
| 4/2/2022 | **Police Bodycam** Arrested for Filming & Pointing | 8,705 | $28.881 |
| 4/6/2022 | Classified Records Leaked?! Leon Valley Bodycam Cover Up | 8,717 | $37.234 |
| 4/8/2022 | ⚰️ *Emergency Alert* ⚰️ Fort Worth Police KIDNAP 1st Amendment Auditor | 8,820 | $27.024 |
| 4/21/2022 | Hypocrite Tyrant BANS My Video, HIDES From Public (Crybaby Councilor) | 10,085 | $66.923 |
| 4/28/2022 | WARRANTS ISSUED: Leon Valley Tyrants Investigated by Attorney General | 75,811 | $458.345 |
| 4/30/2022 | **Guilty** 1A Auditor CONVICTED \| What's the Sentence? | 9,836 | $48.725 |
| 5/2/2022 | Are You a "STUPID Keyboard Warrior"?! Traitors BAN Speech, Transparency | 10,182 | $53.878 |
| 5/5/2022 | "Local Journalist" Arrested �§ : Did the Sheriff Win? (Case Update) | 13,601 | $64.757 |
| 5/8/2022 | Change Leon Valley? Or Ban More Speech? | 7,794 | $44.146 |
| 6/7/2022 | (Update) Houston Cops Take Down Auditor | 11,017 | $50.150 |
| 7/1/2022 | A Copwatcher Saved My Night | 6,372 | $23.332 |
| 8/19/2022 | Felony Filming? 😡 Cops Took My Bodycam (Again) \| Vlog #1 | 17,932 | $96.267 |
| 8/24/2022 | Will BAD COPS take my complaint? | 7,206 | $22.519 |
| 9/8/2022 | "Out of Control" City DEFIES Attorney General Mandate \| Vlog 2 | 24,470 | $127.602 |
| 9/9/2022 | MAKE 'EM PAY \| Vlog #3 | 57,781 | $279.444 |
| 9/11/2022 | Justin Pulliam Released from JAIL \| Vlog #4 | 23,373 | $59.741 |
| 9/12/2022 | ARRESTED! What happens when you go to JAIL? (Police Bodycam) | 52,234 | $238.482 |
| 9/13/2022 | Bad Cop Support Rally (Crashing the Party) | 68,183 | $317.049 |
| 10/5/2022 | Contraband Found? Suspicious Vehicle Search | 5,402 | $23.067 |
| 10/9/2022 | "We Take Away Your Rights" \| Vlog 5: Rosenberg Copwatch | 8,030 | $36.506 |
| 10/20/2022 | "Harassment," "Cronyism," "Hypocrisy"—What is Freeport HIDING?!? | 16,419 | $73.205 |
| 11/4/2022 | "Auditor" ASSAULTED by Speeding Cop (Reaction Video) | 17,876 | $38.566 |
| 11/6/2022 | *Tyrant Alert* Midland Police ARREST Attorney during Copwatch \| @Texas2AAttorney | 35,565 | $103.244 |
| 11/29/2022 | Will this TYRANT Cop KILL the Rabbits? (City Council) | 20,599 | $59.228 |
| 12/4/2022 | Sheriff Torments Journalist's Family and Friends (Arrest Series) | 28,962 | $86.420 |
| 12/5/2022 | "You're Detained" A Guide on How to Talk to the Police (with Police Reports) | 298,887 | $1,412.486 |
| 12/6/2022 | **BREAKING** Federal Lawsuit Announcement + Arrest Video Released @InstituteForJustice | 119,643 | $299.905 |
| 12/7/2022 | LAWSUIT FILED \| Press Conference with @InstituteForJustice Attorneys | 116,817 | $442.421 |
| 12/9/2022 | Should I go to PRISON for this? Cop Watch Truth Revealed \| Vlog #6 | 25,829 | $102.298 |
| 12/11/2022 | Police Terrorize, Draw Weapons on Women and Baby | 287,551 | $904.482 |

| Date | Title | Views | Revenue |
|---|---|---|---|
| 12/19/2022 | Police Arrest Local Journalist to Hide "Lethal Coverage" (Full Arrest Video) | 246,122 | $808.915 |
| 1/26/2023 | This Could END Journalism in USA | Villarreal v. Laredo (En Banc Arguments) | 17,685 | $100.450 |
| 2/11/2023 | Robbery & Homicide is Investigating Me 😨 | 19,622 | $37.124 |
| 2/12/2023 | 👁 ⚰ The OUTRAGEOUS Things BAD Cops Say | 16,536 | $36.888 |
| 2/14/2023 | **Lawsuit Filed** End Bogus Search Warrants | 34,898 | $137.865 |
| 3/15/2023 | "They've Been SCREWED" How Corruption DESTROYS Small-Town America | 22,668 | $103.158 |
| 3/28/2023 | Political Retaliation: Is Justin FINISHED?! | 20,339 | $128.040 |
| 3/30/2023 | **$20,000+ LOST** Cruel and Unusual Prosecution | 90,326 | $256.974 |
| 5/3/2023 | "We're human" Police Arrest Deaf, Blind Woman during Breakup | 739,159 | $2,145.823 |
| 5/4/2023 | Blue Lyin': How the Police Protect their Pals (False Arrest Update) | 32,054 | $63.910 |
| 5/15/2023 | Cop has a MELTDOWN after we BUST him Breaking the Law | 506,128 | $1,794.205 |
| 5/24/2023 | **Auditors Win** Police Coverup FAIL, Lies Caught on Camera | 1,708,744 | $11,545.360 |
| 5/26/2023 | Cops "Dick" Around and Find Out... (Sister Threatened with Arrest) | 71,908 | $327.663 |
| 7/25/2023 | Should Police Replace Doctors? | 14,401 | $69.806 |
| 8/16/2023 | Cops Tackle Congressman | 36,143 | $68.504 |
| 9/19/2023 | The BEST COPS | Rosenberg, Texas | 9,696 | $51.926 |
| 9/27/2023 | Police! Stop! Do NOT Help People! | 39,717 | $133.426 |
| 11/7/2023 | Vote NO to Fort Bend Tyrants! | 1,987 | $6.316 |
| 11/21/2023 | Backroom Meeting with Freeport City Manager (Raw Bodycam) | 3,973 | $15.704 |
| 12/12/2023 | BAN Copwatchers with this First Amendment Loophole | 15,713 | $41.924 |
| 12/14/2023 | Did this Cop just Ruin his career? | 14,066 | $40.470 |
| 12/16/2023 | Will the police stop retaliating? | 6,687 | $19.908 |
| 12/20/2023 | The Dumbest Cops Ever… Caught on Camera | 24,774 | $79.332 |
| 1/8/2024 | "My Heroes Betrayed Me" Police Coverup Exposed | 60,881 | $149.866 |
| 1/11/2024 | **Auditors Win** Corrupt Police Retaliate, LIES Caught on Camera | 326,401 | $1,275.461 |
| 1/16/2024 | 3 Cops Detain Mom, BAN "Different" Speech (1st Amendment Nullified) | 56,245 | $140.789 |
| 1/17/2024 | Why I'm Quitting | 50,853 | $190.338 |
| 1/19/2024 | **WEAPONS DRAWN** Arrested for Fearing Cops | 23,846 | $64.057 |
| 1/24/2024 | **Auditors WIN** Police Screw Up so BAD, they INSTANTLY Settle (Leon Valley) | 1,530,297 | $6,896.928 |
| 1/30/2024 | Police BAN Videos, Charges FILED Against YouTubers | 94,455 | $213.090 |
| 2/12/2024 | Police LIES Caught on Camera, BUSTED by Civil Rights Lawyer | 140,570 | $659.733 |
| 2/20/2024 | **Leaked FBI Bulletin** Cops claim Auditing is "Terrorism" | 37,824 | $138.232 |

| Date | Title | | |
|---|---|---|---|
| 2/26/2024 | Cops MESS UP Big Time, will they PAY?! Judge Rules on Qualified Immunity | 251,386 | $994.914 |
| 2/27/2024 | Uvalde 2.0—Scared Cops HIDE, Refuse to Engage Active Incident | 120,010 | $202.421 |
| 3/4/2024 | Am I GOING TO JAIL Again? (1st Amendment Nullified) | 23,234 | $83.698 |
| 4/10/2024 | I SUED the Police. This is how it went. | 39,086 | $119.420 |
| 6/23/2024 | **Tyrant Alert** Did Police JUST KILL a 1A Auditor?! | 45,356 | $84.053 |
| 6/27/2024 | INSTANT TAKEDOWN: Woman Arrested for Filming Cops **CFW Bodycam** | 13,150 | $28.215 |
| 8/26/2024 | **Extreme Retaliation** Police Dept's Illegal Scheme LEAKED | 157,755 | $561.080 |
| 9/25/2024 | **Auditors Win** Lying Sheriff OWNED by Federal Judge | 204,363 | $1,095.117 |
| 11/6/2024 | (D) Voters Left Before Voting for Sheriff Fagan 😂 😂 | 1,283 | $2.184 |
| 11/18/2024 | This Request INSTANTLY Triggered the Police (ID Refusal) | 34,151 | $117.182 |
| 12/3/2024 | Call the Police! PLEASE HURRY… He's Interviewing the Mayor | 36,520 | $219.333 |
| 12/5/2024 | "You're Suspicious" Police Chief PULLS CAMERA on Reporter | 18,403 | $62.797 |
| 12/10/2024 | Am I Guilty? WATCH COP LIE in Court (Dash Cam Shows Truth) | 270,785 | $2,260.749 |
| 2/4/2025 | Arrested for NOT TALKING. Did the Cops Screw Up? | 363,496 | $1,828.265 |
| 2/6/2025 | "You can ZOOM IN all you Want" Filming Cones | Sheriff Fagan's "Transparency" | 4,023 | $8.279 |
| 2/10/2025 | SCHOOL SAFETY Supervisor Arrested for SHOOTING | 10,138 | $21.458 |

**PX-40**

**Corruption Report Excluded Videos**
**YouTube Data Formatted List**

Per-Video Data Excluded from Calculations

**Excluded: Videos Prior to 2020**

*The analysis consists of videos published from January 1, 2020 to February 28, 2025.*

| Publish Date | Video Title | Duration | Views | Watch Time | Estimated Revenue |
|---|---|---|---|---|---|
| 4/10/2012 | Niagara Falls | 47 | 2 | 0.023 | 0.006 |
| 4/25/2018 | "He fired shots at us" Radio Traffic of Intense Dallas Police Chase | 617 | 375 | 18.327 | 0.125 |
| 11/14/2018 | Leon Valley Chief Salvaggio *Full* Testimony in Federal Court | 11908 | 37398 | 14286.49 | 88.505 |
| 12/5/2018 | Boyd PD CALLS & BODYCAM: Best Open Carry Stop in Texas, Snowflake Callers Meltdown | 1047 | 41645 | 4444.275 | 24.167 |
| 12/6/2018 | BODYCAM: Bowie Texas Police Officer Magers stops activist James Freeman | 948 | 2575 | 146.9595 | 0.426 |
| 12/10/2018 | SECRETS EXPOSED: Tyrant Magers threatens Liberty Activist James Freeman | Bowie Texas Police | 1944 | 94460 | 18034.17 | 250.737 |
| 12/10/2018 | POLICE BODYCAM (Miller): Bowie Police abuse Liberty Activist James Freeman | 1159 | 805 | 52.9822 | 0.122 |
| 12/10/2018 | POLICE BODYCAM: Bowie Police Officer Stone #318 cleans up after Magers #316 | 547 | 1017 | 26.9755 | 0.256 |
| 12/10/2018 | Montague sheriff deputy call floods Bowie Police Department | 51 | 1521 | 18.0674 | 0.61 |
| 12/11/2018 | LEAKED CALL: Troll tattles on activist James Freeman | Bowie Texas Police | 214 | 3069 | 94.4331 | 1.098 |
| 1/6/2019 | BREAKING: James Freeman Almost Hit By Deputies | Pinal County Sheriff | 174 | 8405 | 276.7969 | 0.083 |
| 1/19/2019 | Calling the boss + Get ready for new exclusive content | 20 | 288 | 1.568 | 0 |
| 1/20/2019 | Don't Film the VIA Transit Police: A History of Abuse Pt 1 | San Antonio Texas | 428 | 25197 | 1884.444 | 17.632 |
| 1/21/2019 | Police Call Citizens "Clowns," Trespass Freeman | VIA Transit San Antonio Texas | 1533 | 150074 | 26293.51 | 158.995 |
| 1/24/2019 | ARRESTED After Asking Tyrant Cop for Name & Badge Number | VIA Transit Police San Antonio | 1647 | 85007 | 14625.71 | 118.06 |
| 2/5/2019 | Deadly Drug Raid Police Shootout Search Warrant | Houston Texas Police | 1047 | 7434 | 817.9943 | 3.912 |
| 2/14/2019 | Deadly Drug Raid Update: Houston Police Department Asks AG to Conceal Information | 288 | 3497 | 154.9468 | 0.548 |
| 2/17/2019 | We lied, let us hide, do not hold us accountable | Houston Police Chief Acevedo Press Conference | 2081 | 42881 | 4240.165 | 53.211 |
| 2/25/2019 | 7815 Full Warrant | 206 | 4158 | 117.417 | 3.656 |
| 3/2/2019 | BREAKING: News Now Houston Bond Set | 181 | 7570 | 231.6772 | 6.062 |
| 3/2/2019 | I'm SORRY. I was wrong. Statement on NNH. | 39 | 2387 | 25.2918 | 1.475 |
| 3/5/2019 | Houston Hiding History | Join the Police Reform & Accountability Effort | 186 | 7122 | 248.3187 | 11.407 |
| 3/5/2019 | "Deer Park PD Lied" News Now Houston Statement from Court | 81 | 22762 | 412.1216 | 27.496 |

| 3/11/2019 | Auditing the Auditors Ep 1: Parking Enforcement f/ James Freeman, TXSHEEPDOG72, SouthSide Slakr210 | 285 | 9935 | 423.1921 | 15.152 |
| 3/14/2019 | â€œBehave, Behaveâ€ YEP That Really Happened: 5 Hilarious Police Radio Calls You Canâ€™t Help But Laugh | 141 | 4961 | 131.0711 | 7.936 |
| 3/18/2019 | Alamo | 4581 | 1311 | 195.4613 | 1.603 |
| 3/18/2019 | VIA San Antonio | 3806 | 1800 | 222.1808 | 20.174 |
| 3/22/2019 | NEW CHANNEL: Justin Pulliam IRL Live -- Go Sub!!! Link Below in Desc | 178 | 1451 | 21.2377 | |
| 3/27/2019 | From Family Dispute, Lies to DPS Attack Helicopter: Houston Police Murder Victims of Bogus Drug Raid | 1294 | 42949 | 6126.333 | 73.706 |
| 4/2/2019 | â€œThey were in the council chambers recordingâ€ Auditing News Now Patrick | Missouri City Part 1 | 589 | 4683 | 290.9873 | 9.404 |
| 4/11/2019 | Government Breaking the Law | 3800 | 1739 | 242.6834 | 2.224 |
| 5/1/2019 | DIRTY POLITICS: Texas House Speaker Dennis Bonnen Trashing Constitutional Carry | 1267 | 5834 | 724.9945 | 13.16 |
| 5/3/2019 | â€œI KNOW THE LAWâ€: You Wonâ€™t Believe the Open Records Games in Stafford Texas | 1348 | 20324 | 3052.627 | 30.044 |
| 5/3/2019 | LIVE in the FIELD: Out at the PD | 1237 | 1481 | 127.5146 | 2.202 |
| 5/4/2019 | LIVE: Go Vote!!! | 1001 | 625 | 38.4938 | 0.679 |
| 5/7/2019 | â€œCAN I GET SOME IDâ€ ***Subscribe to Justin Pulliam IRL Live & Audits*** | 102 | 2376 | 41.8509 | 2.689 |
| 5/11/2019 | Free USA Flags for Memorial Day events | 153 | 423 | 8.0375 | 0.102 |
| 5/19/2019 | COPS ARREST FOR FREE SPEECH: Take the Police Protest Challenge! | 260 | 5596 | 229.4167 | 0 |
| 6/13/2019 | NEW! Houston Police Still Stonewalling, Delaying Info on Bogus Drug Raid Murders | 799 | 32315 | 2953.975 | 62.727 |
| 6/14/2019 | "I don't answer questions" Harris County District Attorney Hiding Tuttle Murder Information | 329 | 7634 | 386.8774 | 10.663 |
| 7/1/2019 | INSANE! Government Official Attacks Reporter News Now Patrick Roth for Filming | 1042 | 6680 | 388.6105 | 9.463 |
| 7/4/2019 | Open Records How-To: 8 Steps to Request Government Records | 750 | 10374 | 700.2367 | 48.304 |
| 7/19/2019 | DENIED: Secretary Blocks Access to IA Report-Rosenberg TX Open Records Audit | 1242 | 30526 | 4396.585 | 134.069 |
| 7/21/2019 | â€œDelete it All or Iâ€™ll Arrest Youâ€â€œSelena Saves News Now Patrick Roth Again | St Louis County Tyrant | 92 | 6280 | 112.7699 | 6.261 |
| 7/25/2019 | Saved by Copwatcher? DPS Trooper Gives Warning on James Freemanâ€™s Stop | Multicam Audit Rockwall, TX | 710 | 127019 | 10985.09 | 337.393 |
| 7/28/2019 | POLICE CHIEF FIRED: Attorney General Orders City to RELEASE Secret Emails | Pasadena, Texas | 962 | 152561 | 19020.14 | 196.929 |
| 8/8/2019 | Snowflake Calls Police on Grandma for Handing Out 2A Fliers, DPS Targets Activist | Lake Jackson TX | 1272 | 42044 | 4943.904 | 34.84 |

| 8/11/2019 | "They'll see your info" – PD Flips the Script on Open Records Audit \| Lake Jackson Texas | 602 | 16743 | 1139.903 | 51.662 |
|---|---|---|---|---|---|
| 8/19/2019 | Officer Retaliates Against Journalist Getting Public Information About Tuttle Murder \| Houston Texas | 1074 | 160194 | 20553.49 | 514.291 |
| 8/23/2019 | Officer Goines in Custody on Double Murder Charges \| Live from Houston, Texas | 776 | 13900 | 1241.118 | 5.477 |
| 8/25/2019 | "More to the story" MURDER Charges Filed on Officer in Tuttle Drug Raid Case \| Houston Texas Police | 1709 | 108089 | 20699.61 | 90.52 |
| 8/28/2019 | The Craziest Secretary | 930 | 40311 | 5132.967 | 133.621 |
| 8/28/2019 | "Don't LEAK INFO to Public" This Attorney is Defending Officer Goines, Charged with Tuttle Murders | 265 | 22401 | 1023.936 | 33.106 |
| 9/6/2019 | FIGHTING WORDS? Disorderly Tyrant Police Chief Taunts "Auditor" & Refuses to ID \| Royse City, Texas | 322 | 14110 | 679.4525 | 18.684 |
| 10/14/2019 | NEW INFO: Details about Ft Worth Cop Aaron Dean who Murdered Atatiana Jefferson on a "Welfare Check" | 437 | 19855 | 1207.722 | 30.961 |
| 10/17/2019 | EXCLUSIVE! See the Police Reports, Warrant for Fort Worth COP WHO MURDERED woman inside her home | 1484 | 41642 | 5654.524 | 31.737 |
| 10/21/2019 | LEAKED "City Hall is being Call Swarmed" Police Tried to HIDE These Secret Emails \| Missouri City TX | 623 | 135656 | 10498.74 | 404.745 |
| 11/19/2019 | NEW! Ousting Leon Valley TYRANTS: 1,600 signatures marched to City Hall for Recall Election | 872 | 71951 | 5877.979 | 171.863 |
| 12/3/2019 | {Bodycam} Police Beat, Strap Down Veteran for Filming in Public \| Tucson, AZ \| Tuc Police Suck | 227 | 20712 | 666.9428 | 36.844 |
| 12/6/2019 | MASS ARREST ** Tyrant Alert ** Police Attack Auditors for Sidewalk Chalk \| Rockwall County, TX | 233 | 24507 | 932.4794 | 39.061 |
| 12/7/2019 | (Preview) LEAKED BODYCAM from Leon Valley City Hall @TXSHEEPDOG72 30.06 Complaint | 152 | 52649 | 1586.947 | 73.409 |
| 12/9/2019 | @TXSHEEPDOG72 CASE DISMISSED!!! This is what happened at Leon Valley City Hall | 823 | 78141 | 8256.925 | 364.345 |
| 12/23/2019 | I CUSS & YELL at 911 Police Dispatch, Says Rockwall Sheriff's Office f/ @CarolinainFortWorth | 647 | 16209 | 1516.06 | 48.031 |

**Excluded: Shorts and Videos with Duration Under 2 Minutes**

*The analysis considers long-form videos. YouTube Shorts are a newer type of content that are monetized differently and involve a quicker production process (often a remake of a portion of a long-form video). I removed videos less than two minutes. However, recently, YouTube expanded to Shorts duration to three minutes, so two recent Shorts were excluded, even though they were longer than two minutes.*

| Publish Date | Video Title | Duration | Views | Watch Time | Estimated Revenue |
|---|---|---|---|---|---|
| 2/21/2025 | There's no reason to film the cops yourself… | 6 | 2706 | 14.9377 | $0.654 |
| 12/14/2023 | I can't take pictures? | 6 | 671 | 1.1345 | $0.087 |
| | Amazon Delivery! | 9 | 90 | 0.2832 | $0.003 |
| 8/13/2022 | Power Trippin' Cop Say WHAT?!? | 11 | 245301 | 948.3495 | $0.571 |
| 12/4/2024 | Got Tape? | 12 | 3096 | 16.303 | $0.829 |
| 11/8/2024 | 👮‍♂️ I HATE 👮: Are 1st Amendment Protections Outdated? | 13 | 11098 | 52.0639 | $3.303 |
| 12/13/2024 | STOP Filming Cops #firstamendmentaudit #cops | 16 | 9170 | 48.2122 | $2.519 |
| 1/23/2022 | See a cop, film a cop. | 16 | 38198 | 140.9618 | $0.171 |
| | Deputy Doxxing Me at Home | 18 | 1 | 0.0094 | |
| 1/3/2022 | Heroic bravery | 19 | 11758 | 73.3617 | $2.037 |
| 8/18/2022 | Stopped for WHAT?!? | 24 | 63018 | 343.1131 | $0.296 |
| 6/20/2020 | The BEST Leon Valley Video 🤣👮‍♂️😂🤦‍♂️😟🥴 (me: 🤔😂,😜😂😝🤣) | 24 | 15369 | 101.8074 | $2.438 |
| 4/22/2022 | Not Clever Enough | 25 | 10976 | 79.128 | $0.239 |
| 12/6/2024 | Karen Calls Cops #firstamendmentaudit | 27 | 7146 | 62.6898 | $1.970 |
| 11/19/2024 | Police Playing Open Records Games | 27 | 12677 | 110.2774 | $3.689 |
| | Why didn't the chicken cross the road | 27 | 9 | 0.0581 | |
| 2/4/2022 | Is Texas a Nanny State?! | 29 | 47367 | 412.5241 | $0.394 |
| 1/22/2022 | Making government employees do work… | 29 | 4486790 | 35355.07 | $1.230 |
| 11/20/2024 | When Cops say "you can video" #gaslighting #firstamendmentaudit | 30 | 12675 | 107.9417 | $3.809 |
| 12/15/2023 | When you complain about the police… | 30 | 9821 | 71.0969 | $1.694 |
| 9/8/2024 | Police HATE When You Do This | 33 | 12911 | 117.4735 | $3.612 |
| 12/9/2024 | News Now Wong #firstamendmentaudit | 34 | 4279 | 36.4311 | $1.161 |
| 8/27/2024 | When your Social Credit Score gets too low in TEXAS, cops throw you in JAIL. | 35 | 11124 | 102.3467 | $2.777 |
| 4/22/2022 | Is it still a "free country" if walking is a CRIME?! #cops #constitution #firstamendmentaudits | 35 | 11847 | 96.6225 | $2.378 |
| 10/3/2023 | Above the Law | 37 | 10965 | 99.1285 | $1.710 |
| 8/18/2022 | Do you see the crime? | 39 | 63719 | 567.9775 | $1.911 |

| 11/7/2024 | (Preview) Police Chief Wong \| New 1A Auditor | 40 | 4052 | 35.1639 | $6.213 |
| 3/1/2024 | When you 🎥📹️: | 40 | 26427 | 269.12 | $5.122 |
| 2/21/2024 | This couldâ€™ve ended badlyâ€¦ | 43 | 176253 | 2062.704 | $31.891 |
| 1/16/2023 | Southerland Springs: Defund the Police? | 45 | 3698 | 36.2724 | $0.040 |
| 10/17/2024 | Oh no! Cops are coming. | 49 | 7108 | 70.142 | $1.855 |
| 1/14/2024 | Sandy found out the hard way | 50 | 14367 | 167.1086 | $2.512 |
| 12/23/2023 | Field training on how to be a TYRANT | 52 | 7683 | 81.3534 | $1.344 |
| 8/6/2022 | âš¡️ TASER DEPLOYED âš¡️ | 54 | 10710 | 144.733 | $1.026 |
| 9/26/2024 | Do YouTubers have 1st Amendment press rights? I sued the sheriff and found out. | 56 | 10699 | 153.4562 | $2.937 |
| | (Preview) Justice? Or Political Retaliation? | 56 | 3 | 0.0357 | |
| 4/23/2024 | Will I go to JAIL??? #firstamendmentaudits #cops | 57 | 17884 | 234.5344 | $3.586 |
| 1/13/2025 | Suspicious Activity by House IS THE COPS | 58 | 8905 | 141.921 | $1.965 |
| 1/6/2024 | And I didnâ€™t play any gamesâ€¦ | 58 | 19523 | 214.2438 | $3.309 |
| | Attempted Censorship \| Fort Bend District Clerk | 58 | 26 | 0.324 | $3.493 |
| 11/26/2024 | Dispatcher Protects Lying Cop #firstamendmentaudit #cops | 59 | 9156 | 122.9257 | $2.492 |
| 12/31/2023 | â€œWe need more policeâ€ understaffed? Lol 🎥 | 59 | 7372 | 71.932 | $1.296 |
| 2/16/2025 | 🎥¢🎥¢🎥¢ | 60 | 938 | 7.8569 | $0.225 |
| 10/16/2024 | Police â€œPatrollingâ€ to â€œKeep Us Safeâ€ | 60 | 5712 | 64.5871 | $1.542 |
| 10/15/2024 | What to do if Arrested | 60 | 10820 | 178.5726 | $2.903 |
| 4/1/2024 | Back the blue OR ELSEâ€¦. @BCScann Full vid: https://youtu.be/oKIwHCLq-7A | 60 | 30836 | 395.5083 | $6.023 |
| 5/24/2022 | Run or Hide? | 60 | 122073 | 1422.763 | $0.228 |
| | Beating the Cops with NNH | 62 | 15 | 0.1773 | $0.001 |
| 8/2/2021 | Man ESCAPES from POLICE Carâ€"Cop FAILS Reverse Lock Watch Audit | 77 | 4899 | 85.5956 | $15.481 |
| 6/10/2020 | (Preview) What is the Fort Bend County Sheriff Hiding? | 78 | 6581 | 115.6116 | $12.788 |
| | Pickup Rollover Willis | 84 | 3 | 0.0214 | |
| 6/26/2020 | (Coming Soon) How do police stifle legal, 1st Amendment activity? | 85 | 6692 | 116.0226 | $16.798 |
| 9/15/2020 | **Preview** Leon Valley Trolls Harassing Justin Pulliam | 106 | 14039 | 342.8701 | $26.122 |
| 11/6/2024 | 50/50 Race, Every Ballot Matters. Fort Bend Sheriff | 110 | 1237 | 20.8597 | $3.092 |
| | Any | 115 | 4 | 0.0373 | $0.000 |
| | Justin Pulliam Live | 115 | 1 | 0.0019 | |
| 5/5/2021 | Free Speech Criminal @BCScann Released from Jail | 118 | 8815 | 201.3779 | $24.186 |
| 11/5/2024 | The Final Day of Free Speech?! | 128 | 2130 | 39.1006 | $4.040 |
| 11/5/2024 | Does my Next Sheriff have a record? | 130 | 3878 | 80.2402 | $23.476 |

**Excluded: Videos with Less Than 1,000 Views**

*Many of these videos are personal; sent to others as a file sharing mechanism. It also includes livestreams that were recorded as a safety backup and videos not otherwise uploaded for the intention of public viewership.*

| Publish Date | Video Title | Duration | Views | Watch Time | Estimated Revenue |
|---|---|---|---|---|---|
| | **Auditing Banned** Did I â€œInterfere with K9â€? | 570 | 9 | 0.6584 | 0.016 |
| | *CONFIDENTIAL* Fort Bend Sheriff Discrimination against Justin Pulliam | 1101 | 77 | 4.0308 | |
| | *CONFIDENTIAL* Leon Valley Texas Viewpoint Discrimination | 1947 | 9 | 0.3089 | |
| | *Confidential* Rosenberg Anti-Accountability Arrests | 1036 | 5 | 0.384 | |
| | *SECRET CAMERA* Rosenberg Police ILLEGALLY STOP Hispanic Pedestrian, Glovebox Audit FAIL | 1051 | 45 | 7.5812 | 0.453 |
| | [PRIVATE] Jones Creek Park 7/12/2021 All Cameras | 7649 | 34 | 5.1939 | |
| | 12/21/2021 Backup Camera Raw Video | 292 | 2 | 0.0013 | 0.005 |
| | 12/21/21 Bond Office Games | 148 | 1 | 0.0243 | |
| | 2/14/2021 FBCSO with Turner | 326 | 1 | 0.0036 | |
| | 2021-01-12 FBCSO PIO Phone Call | 152 | 1 | 0.0055 | |
| | 2023-08-11 Part 2 | 4326 | 1 | 0.0018 | 0 |
| | Across the Tracks, Putting 4 Rosenberg PD Units Back in Service | 285 | 62 | 3.159 | |
| | Arrested for Filming Police \| Fort Bend Retaliation (Sync Video) | 390 | 48 | 2.4658 | 0.415 |
| | Banned from Press Conference \| Fort Bend Retaliation (Sync Video) | 1813 | 67 | 4.6829 | 0.243 |
| | Brandon White to be Released from Polk County Jail | 803 | 380 | 27.0427 | 5.308 |
| | Campus "Free" Speech -- Texas Senate Committee on State Affairs | 10968 | 3 | 0.0153 | 0.028 |
| 11/17/2022 | Cops Harass me for Filming Cops | 2030 | 907 | 84.5848 | 0.213 |
| | CopWatch | 188 | 3 | 0.0574 | |
| | Cruel and Unusual Prosecution | 1851 | 5 | 0.7329 | 0.031 |
| | Elandon Roberts Clips | 141 | 2 | 0.0461 | |
| | Fagan Interview January 11, 2021 | 660 | 3 | 0.1904 | |
| | FBC County Attorney Office Open Records | 296 | 2 | 0.0843 | |
| | FBCSO at House | 219 | 9 | 0.2344 | 0 |
| | FBCSO Bond Refund Discrimination | 3245 | 1 | 0.002 | |
| | FBCSO Deputy Erick Becker Real **Attorney-Client Communication** | 2306 | 2 | 0.6286 | |
| | FBCSO Harassment at Home | 130 | 4 | 0.0724 | |
| | FBCSO Property Dept May 22, 2024 | 257 | 4 | 0.1126 | |
| | HCSO BLUE TEAM--Ribbe BWC | 3433 | 27 | 3.5506 | |

| | | | | | |
|---|---|---|---|---|---|
| | Indictment is a "Security Blanket" (to be honest) | 445 | 5 | 0.1182 | 0 |
| | Is Salvaggio a Cop? | 3172 | 2 | 0.8241 | 0.011 |
| | Jim busts a tail light | 301 | 1 | 0.0057 | |
| 11/5/2024 | Justin Pulliam Live | 910 | 364 | 19.0138 | 2.044 |
| | Justin Pulliam Live | 136 | 14 | 0.2469 | |
| | Justin Pulliam Live | 2167 | 4 | 0.5493 | 0.014 |
| | Justin Pulliam Live | 2420 | 2 | 0.0377 | |
| | Justin Pulliam Live | 1485 | 2 | 0.0057 | |
| | Justin Pulliam Live | 549 | 2 | 0.0009 | |
| | Justin Pulliam Live | 273 | 2 | 0.0044 | |
| | Justin Pulliam Live | 5308 | 1 | 0.0023 | |
| | Justin Pulliam Live | 2174 | 1 | 0.001 | |
| | Justin Pulliam Live | 1690 | 1 | 0.0026 | |
| | Justin Pulliam Live | 1370 | 1 | 0.0006 | |
| | Justin Pulliam Live | 1275 | 1 | 0.001 | |
| | Justin Pulliam Live | 970 | 1 | 0.0034 | |
| | Justin Pulliam Live | 835 | 1 | 0.0027 | |
| | Justin Pulliam Live | 670 | 1 | 0.0011 | |
| | Justin Pulliam Live | 628 | 1 | 0.0008 | |
| | Justin Pulliam Live | 287 | 1 | 0.0014 | |
| | Leon Valley Chalk Arrest \| Breton BWC | 830 | 23 | 1.1916 | |
| | Leon Valley Chalk Arrest \| Gonzalez BWC | 846 | 12 | 0.632 | |
| | Lowry Interview | 1125 | 4 | 0.1691 | |
| | Meeting Mattie Provost, 1st Day in Office, 1/4/2021 | 320 | 2 | 0.0328 | |
| | Missouri City Rough Draft | 2247 | 6 | 1.0045 | |
| | News Now Wong | 978 | 2 | 0.068 | 0.002 |
| | News Now Wong | 978 | 2 | 0.0228 | |
| | Officer Involved Shooting Suspect Home Burns | 1265 | 797 | 45.6567 | 3.878 |
| | Patreon Intro Video | 268 | 42 | 1.5399 | 0 |
| | R | 281 | 3 | 0.1058 | 0 |
| | Ranger Texas Dog Bodycam (Members Only) | 3302 | 46 | 9.9299 | 0.101 |
| | Rosenberg Bogus Felony Stop (Raw Bodycam for Members) | 640 | 45 | 2.9429 | 0.073 |
| 12/13/2022 | Rosenberg Freeing Prisoner Pt 2 | 2055 | 858 | 107.8298 | 12.078 |
| | Rule 8(k) complaint filed against Montgomery County Republican Party Chairman, Sept 27, 2018 | 5772 | 2 | 0.0058 | |

| | | | | |
|---|---|---|---|---|
| SLPD Draft | 950 | 2 | 0.2631 | |
| Snowflake Speaker: Texas House Leader Dennis Bonnen Trashing Constitutional Carry | 1224 | 17 | 1.9416 | 0.038 |
| Stand with me Against Corruption | 218 | 5 | 0.1493 | |
| Temp | 640 | 1 | 0.115 | |
| Texas DPS Trooper Shaw Speeding (Raw Dashcam) | 270 | 54 | 2.0151 | |
| The Prosecutor Dropped My Case!!! | 159 | 23 | 0.6694 | |
| Trooper Shaw Bodycam | 253 | 20 | 0.7373 | |
| Wes Wittig Fort Bend DA Executive Attorney | 1194 | 4 | 0.2074 | 0.004 |

## Excluded: Unlisted Video

*The following video was "unlisted" and was erroneously shared by another content creator. A public upload of the story was published on 8/19/2019. Also, this video was uploaded prior to 2020.*

| Publish Date | Video Title | Duration | Views | Watch Time | Estimated Revenue |
|---|---|---|---|---|---|
| | Open Records Harassment August 16, 2019 Houston, Texas | 826 | 2764 | 292.0724 | 3.349 |

**PX-41**

**Business Damages to YouTube Platform Revenue**

<u>YouTube Video Uploads</u>

| Time Period Published | Actual Number of Videos | Actual Lifetime Revenue for Videos[1] | Average Lifetime Revenue per Video | Expected Number of Videos | Number of Lost Videos | Lost Upload Revenue |
|---|---|---|---|---|---|---|
| 2020 | 92 | $18,375.20 | $199.73 | | | |
| Jan-Jul 2021 | 50 | $8,725.45 | $174.51 | | | |
| Aug-Dec 2021 | 27 | $7,386.19 | $273.56 | 40 | 13 | $3,556.28 |
| 2022 | 47 | $9,441.51 | $200.88 | 90 | 43 | $8,637.84 |
| 2023 | 22 | $17,204.78 | $782.04 | 90 | 68 | $53,178.72 |
| 2024 | 22 | $15,559.66 | $707.26 | 90 | 68 | $48,093.68 |
| Jan-Feb 2025 | 3 | $1,858.00 | $619.33 | 15 | 12 | $7,431.96 |
| | | | | | | **$120,898.48** |

| Time Period Published | Average Lifetime Revenue per Video | Expected Number of Videos | Number of Lost Videos | Reduction in Uploads | Press Conference Lost Upload Revenue[2] | Arrest Lost Upload Revenue |
|---|---|---|---|---|---|---|
| Aug-Dec 2021 | $273.56 | 40 | 13 | **32.5%** | $3,556.28 | |
| 2022 | $200.88 | 90 | 43 | 47.8% | $5,875.74 | $2,762.10 |
| 2023 | $782.04 | 90 | 68 | 75.6% | $22,874.67 | $30,304.05 |
| 2024 | $707.26 | 90 | 68 | 75.6% | $20,687.36 | $27,406.33 |
| Jan-Feb 2025 | $619.33 | 15 | 12 | 80.0% | $3,019.23 | $4,412.73 |
| | | | | | **$56,013.28** | **$64,885.21** |

---

[1] Video lifetime is the time between the video publish date and February 28, 2025. This column is the total lifetime revenue generated from all videos *published during* the given time period.

[2] Allocation to press conference vs arrest is based upon the percentage reduction in number of uploaded videos (Lost Videos / Expected Videos) realized in the Aug-Dec 2021 time period, which was a 32.5% reduction.

**YouTube Livestreams**

| Time Period | Months in Time Period | Actual Revenue | Revenue Per Month | Expected Revenue Per Month | Lost Revenue Per Month | Lost Livestreams Revenue Per Period |
|---|---|---|---|---|---|---|
| 2020 | 12 | $9,448.39 | $787.37 | | | |
| Jan-Jul 2021 | 7 | $7,994.74 | $1,142.11 | | | |
| Aug-Dec 2021 | 5 | $3,776.90 | $755.38 | $1,142.11 | $386.73 | $1,933.65 |
| 2022 | 12 | $1,907.37 | $158.95 | $1,142.11 | $983.16 | $11,797.92 |
| 2023 | 12 | $827.00 | $68.92 | $1,142.11 | $1,073.19 | $12,878.28 |
| 2024 | 12 | $258.12 | $21.51 | $1,142.11 | $1,120.60 | $13,447.20 |
| Jan-Feb 2025 | 2 | $126.76 | $63.38 | $1,142.11 | $1,078.73 | $2,157.46 |
| | | | | | | **$42,214.51** |

**Summary**

| | Uploads | Livestreams | Total |
|---|---|---|---|
| Attributable to Press Conference: | $56,013.28 | $42,214.51 | $98,227.79 |
| Attributable to Arrest: | $64,885.21 | | $64,885.21 |
| **Total Damages to YouTube Platform Revenue:** | | | **$163,113.00** |

**PX-42**



**PX-43**

# Justin Pulliam Live Revenue
## YouTube Raw Data Download

| Date | Estimated revenue (USD) | Date | Estimated revenue (USD) |
|------|------------------------|------|------------------------|
| 2020-01 | 161.056 | 2023-07 | 19.417 |
| 2020-02 | 713.833 | 2023-08 | 3.813 |
| 2020-03 | 418.562 | 2023-09 | 25.74 |
| 2020-04 | 364.53 | 2023-10 | 11.847 |
| 2020-05 | 803.629 | 2023-11 | 8.577 |
| 2020-06 | 567.17 | 2023-12 | 11.081 |
| 2020-07 | 613.188 | 2024-01 | 2.05 |
| 2020-08 | 1172.924 | 2024-02 | 0.981 |
| 2020-09 | 673.047 | 2024-03 | 5.149 |
| 2020-10 | 1526.677 | 2024-04 | 0.616 |
| 2020-11 | 1501.638 | 2024-05 | 44.892 |
| 2020-12 | 932.132 | 2024-06 | 6.581 |
| 2021-01 | 1209.125 | 2024-07 | 0.871 |
| 2021-02 | 1377.866 | 2024-08 | 0.287 |
| 2021-03 | 1799.738 | 2024-09 | 0.456 |
| 2021-04 | 946.145 | 2024-10 | 9.235 |
| 2021-05 | 1094.728 | 2024-11 | 0 |
| 2021-06 | 846.724 | 2024-12 | 0 |
| 2021-07 | 712.909 | 2025-01 | 0 |
| 2021-08 | 531.414 | 2025-02 | 0 |
| 2021-09 | 609.182 | | |
| 2021-10 | 688.321 | | |
| 2021-11 | 223.283 | | |
| 2021-12 | -157.06 | | |
| 2022-01 | 31.158 | | |
| 2022-02 | 16.442 | | |
| 2022-03 | 62.527 | | |
| 2022-04 | 8.972 | | |
| 2022-05 | 50.233 | | |
| 2022-06 | 12.126 | | |
| 2022-07 | 13.98 | | |
| 2022-08 | 10.612 | | |
| 2022-09 | 19.975 | | |
| 2022-10 | 15.697 | | |
| 2022-11 | 2.539 | | |
| 2022-12 | 6.869 | | |
| 2023-01 | 8.818 | | |
| 2023-02 | 27.496 | | |
| 2023-03 | 41.651 | | |
| 2023-04 | 6.261 | | |
| 2023-05 | 6.879 | | |
| 2023-06 | 1.54 | | |

**PX-44**

**Corruption Report Livestreams**
**YouTube Data Formatted List**

1/1/2020 to 2/28/2025

| Publish Date | Video Title | Views | Estimated Revenue |
|---|---|---|---|
| 2/26/2021 | Major Crash FBCSO Rosenberg | 2,124 | $7.495 |
| 10/11/2021 | Stand-off Pursuit Police | 1,243 | $4.611 |
| 10/21/2021 | Evan Bohl: "The Choice to Lead" \| Leon Valley City Council | 5,086 | $427.465 |
| 10/23/2021 | Leon Valley Coffee with Mayor (Blackmore Explodes) | 8,796 | $52.550 |
| 10/27/2021 | Rosenberg Police Arrest Alleged Bank Robber (Live Replay) | 2,949 | $13.871 |
| 11/2/2021 | *Action Alert* Leon Valley Records Corruption ($423 Fee) | 12,490 | $78.451 |
| 11/8/2021 | Evan Bohl: "COUNCIL WAS BOUGHT"; Police Chief Complains (Leon Valley Replay) | 11,013 | $62.207 |
| 11/11/2021 | City Manager RESIGNS in Leon Valley + Open Records Complaint How-to | 11,511 | $88.864 |
| 11/12/2021 | Rosenberg Police Arrive to Issue CTW | 1,707 | $0.479 |
| 11/25/2021 | Leon Valley Updates: Salvaggio's Suit, Chicken Council, Punk Perales | 7,714 | $87.087 |
| 12/4/2021 | Document Dump Friday: Politicizing the Police (Leon Valley, TX) | 11,693 | $212.221 |
| 12/19/2021 | Private Police: $279,688 Reasons to Violate YOUR Rights (Document Dump) | 5,500 | $66.111 |
| 12/22/2021 | UPDATE: Fort Bend Sheriff Fagan Political Arrest of Justin Pulliam | 28,060 | $745.547 |
| 12/24/2021 | Trample 1st Amend. Rights + New Manager?! | 6,697 | $42.296 |
| 1/2/2022 | *TYRANT ALERT* Teen Held with NO BAIL \| Lake Jackson, Texas Police | 9,030 | $58.244 |
| 1/3/2022 | Contempt of Cop Arrest? \| Lake Jackson, Texas Police (Part 2) | 11,467 | $122.369 |
| 1/21/2022 | Secret Police "Keep us SAFE" from FREEDOM (Document Dump) | 14,473 | $102.941 |
| 2/5/2022 | Auditors "cause anarchy" \| Justin Pulliam Police Report \| Friday Document Dump | 8,304 | $257.622 |
| 3/9/2022 | Bailing out Brandon White—Livingston | 5,985 | $26.167 |
| 3/9/2022 | BREAKING: Lake Jackson Officer Resigns, Avoids Discipline | 14,666 | $305.475 |
| 3/15/2022 | "Transparent"?!? Lake Jackson ILLEGALLY Charges Me, HIDES Bodycam | 15,671 | $247.368 |
| 3/17/2022 | Anti-Camera Cop Wants to Subpoena Video \| Brazoria County Sheriff's Office | 7,170 | $23.042 |
| 3/17/2022 | Local Government Club Meeting \| Brazoria County | 4,614 | $96.785 |
| 3/31/2022 | $1,147.27 Records Fees, Government THUGS | 1,684 | $76.211 |
| 6/6/2022 | Jail Injuries | 1,910 | $18.523 |
| 6/6/2022 | @GoodCitizenNews01 Arrested, at Houston Jail | 4,361 | $15.847 |
| 6/13/2022 | Missouri City Police Dept | 3,765 | $14.493 |
| 6/13/2022 | Fort Bend District Attorney | 4,005 | $19.612 |
| 6/16/2022 | Leon Valley Activism Plan (Live) | 3,477 | $19.255 |

| 6/19/2022 | Leon Valley Tyrant Session Streamed Live | 5,999 | $34.857 |
|---|---|---|---|
| 7/7/2022 | Filing Open Records on POLICE SHAKEDOWN + Model City Employee | 4,327 | $17.634 |
| 7/7/2022 | Missouri City Hunger Strike | 2,121 | $124.058 |
| 7/12/2022 | Open Records: Will Police Harass Me Again? | 2,428 | $8.464 |
| 7/13/2022 | Just Filming Rosenberg PD to Keep People FREE | 4,544 | $12.935 |
| 8/31/2022 | Rosenberg SWAT Raid Prep | 1,081 | $14.823 |
| 8/31/2022 | Open Records: Will Police Harass Me Again? | 1,040 | $12.311 |
| 11/3/2022 | Rosenberg Police COVERUP: Kidnapped Baby NOT SAVED | 4,010 | $21.334 |
| 11/17/2022 | Not Arrested | 1,440 | $2.616 |
| 12/13/2022 | Rosenberg Freeing Prisoners | 1,457 | $3.255 |
| 3/7/2023 | He was ARRESTED last time we did this | 16,795 | $41.638 |
| 3/8/2023 | Fort Bend Lie Center | 4,466 | $19.640 |
| 3/14/2023 | 3 Cs of Corruption: Control, Cronyism, Contracts (Rough Draft, Live) | 6,626 | $228.319 |
| 3/14/2023 | Eagle Lake, Texas Corruption | 1,916 | $4.900 |
| 5/3/2023 | **TYRANT ALERT** Freeport TX Cops Arrest DEAF, Legally BLIND Ex-Girlfriend | 12,897 | $180.473 |
| 12/16/2023 | BMV Suspect "Traps himself," ID Refusal Audit | 4,839 | $14.609 |
| 12/21/2023 | Journalist Arrested for Filming Police (Dash Cam) | 17,007 | $164.296 |
| 3/23/2024 | **FELONY ARREST** Auditor Talks to the Police, then Gets RAIDED | 19,345 | $87.376 |
| 7/9/2024 | Eye Approaching: Hurricane Beryl | 1,254 | $3.776 |
| 7/9/2024 | Can you see the eye? | 1,903 | $4.748 |
| 8/8/2024 | Shut Down | 3,749 | $12.211 |
| 9/6/2024 | Detained in Cop's CROSSHAIRS over a Noise Complaint | 25,046 | $29.527 |
| 11/8/2024 | **NO BODYCAMS** Sugar Land Thugs Raid Rosenberg Home (Recorded Live) | 3,729 | $12.603 |
| 12/9/2024 | Bad Cop Fallacy | 5,593 | $36.758 |
| 1/2/2025 | Houston National Security Function | 4,925 | $17.437 |
| 2/9/2025 | Justin Pulliam Live | 1,622 | $5.706 |
| 2/9/2025 | Officer Involved Shooting | 2,986 | $40.766 |
| 2/9/2025 | Crime Scene on Scene | 7,657 | $1.227 |
| 2/9/2025 | Fort Bend Major Event: School Safety Supervisor Detained | 5,884 | $5.465 |
| 2/9/2025 | Fort Bend Scene | 2,971 | $0.922 |
| 2/14/2025 | (Live) Betting on a Beating - The BAD COP Problem | 2,309 | $35.196 |
| 2/15/2025 | Arson? Home of Jailed SCHOOL SAFETY OFFICER Burns | 3,272 | $20.038 |

**PX-45**

# Livestreams Revenue
## YouTube Data Summary

**Combined YouTube Livestreams Revenue**

| Time Period | Justin Pulliam Live All Revenue | Corruption Report Livestreams Revenue | Combined Livestreams Revenue | Months in Time Period | Combined Average Monthly Revenue |
|---|---|---|---|---|---|
| 2020 | $9,448.39 | $0.00 | $9,448.39 | 12 | $787.37 |
| Jan-Jul 2021 | $7,987.24 | $7.50 | $7,994.74 | 7 | $1,142.11 |
| Aug-Dec 2021 | $1,895.14 | $1,881.76 | $3,776.90 | 5 | $755.38 |
| 2022 | $251.13 | $1,656.24 | $1,907.37 | 12 | $158.95 |
| 2023 | $173.12 | $653.88 | $827.00 | 12 | $68.92 |
| 2024 | $71.12 | $187.00 | $258.12 | 12 | $21.51 |
| Jan-Feb 2025 | $0.00 | $126.76 | $126.76 | 2 | $63.38 |

**Justin Pulliam Live YouTube Channel All Revenue**

*Aggregate revenue data retrieved from YouTube analytics. Includes all YouTube Channel revenue.*

| Time Period | Justin Pulliam Live All Revenue | Months in Time Period | Average Monthly Revenue |
|---|---|---|---|
| 2020 | $9,448.39 | 12 | $787.37 |
| Jan-Jul 2021 | $7,987.24 | 7 | $1,141.03 |
| Aug-Dec 2021 | $1,895.14 | 5 | $379.03 |
| 2022 | $251.13 | 12 | $20.93 |
| 2023 | $173.12 | 12 | $14.43 |
| 2024 | $71.12 | 12 | $5.93 |
| Jan-Feb 2025 | $0.00 | 2 | $0.00 |

**Corruption Report—Justin Pulliam YouTube Channel Livestreams Revenue**

*Summation of per-video revenue for individual livestreams.*

| Time Period | Corruption Report Livestreams Revenue | Months in Time Period | Average Monthly Livestreams Revenue |
|---|---|---|---|
| 2020 | $0.00 | 12 | $0.00 |
| Jan-Jul 2021 | $7.50 | 7 | $1.07 |
| Aug-Dec 2021 | $1,881.76 | 5 | $376.35 |
| 2022 | $1,656.24 | 12 | $138.02 |
| 2023 | $653.88 | 12 | $54.49 |
| 2024 | $187.00 | 12 | $15.58 |
| Jan-Feb 2025 | $126.76 | 2 | $63.38 |

**PX-48**

```
 1                UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3   JUSTIN PULLIAM,

 4     Plaintiff,

 5   v.                    Civil Action No. 4:22-cv-4210

 6   COUNTY OF FORT BEND, TEXAS;
     SHERIFF ERIC FAGAN, in his
 7   Individual capacity; OFFICER ROBERT
     HARTFIELD, in his individual capacity;
 8   OFFICER JONATHAN GARCIA, in his
     Individual capacity; OFFICER TAYLOR
 9   ROLLINS, in his individual capacity;
     And OFFICER RICKY RODRIGUEZ, in
10   His individual capacity,

11     Defendants.

12

13                    ORAL DEPOSITION

14                         OF

15        COUNTY OF FORT BEND SHERIFF'S DEPARTMENT

16              THROUGH ITS REPRESENTATIVE

17                 SHERIFF ERIC FAGAN

18
               Taken via remote videoconference
19

20   August 29, 2023                      9:06 a.m.

21

22

23

24

25
```

Sheriff Eric Fagan

```
 1    APPEARANCES (all via remote):

 2    FOR PLAINTIFFS:

 3                        INSTITUTE FOR JUSTICE
                          816 Congress Ave., Suite 960
 4                        Austin, TX  78701
                          By: Christen Mason Hebert
 5                            CHebert@IJ.org
                              Jeff Rowes
 6                            JRowes@IJ.org

 7    FOR DEFENDANTS:

 8                        Kevin Hedges
                          Assistant County Attorney
 9                        Litigation Division
                          401 Jackson Street
10                        3rd Floor
                          Richmond, TX  77469
11                        Kevin.Hedges@FBCtx.gov

12

13    ALSO PRESENT:       Molly Hanis

14    REPORTED BY:        Sarah B. Townsley, CSR, CRR, RPR

15

16

17

18

19

20

21

22

23

24

25
```

1                          STIPULATIONS

2        IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR

3    THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF SHERIFF

4    ERIC FAGAN WAS TAKEN BEFORE SARAH B. TOWNSLEY, CRR, CCR,

5    CSR, RPR, CERTIFIED REALTIME REPORTER IN AND FOR THE

6    STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE AND IN

7    ACCORDANCE WITH THE FEDERAL RULES OF CIVIL PROCEDURE AS

8    PROVIDED BY LAW, VIA REMOTE VIDEOCONFERENCE, ON AUGUST

9    29, 2023, AT 9:06 A.M.;

10       THE PARTIES HEREBY WAIVE ALL FORMALITIES IN

11   CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE

12   EXCEPTION OF THE SWEARING OF THE WITNESS AND THE

13   REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;

14       THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED

15   TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;

16       COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT

17   AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE

18   ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND

19   THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE

20   TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF

21   MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF

22   THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;

23       SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN

24   ADMINISTERING THE OATH TO THE WITNESS.

25

Sheriff Eric Fagan

```
 1                        INDEX

 2   EXAMINATION BY                      PAGE NO.

 3   Ms. Hebert                             5

 4   Mr. Hedges                           113

 5   Ms. Hebert                           113

 6

 7                      EXHIBITS

 8   NO.   DESCRIPTION                   PAGE NO.

 9   1     topic list from deposition notice    11

10   2     discovery responses               16

11   3     call slip                         76

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sheriff Eric Fagan

```
 1   PROCEEDINGS:

 2                         ERIC FAGAN,

 3   having been first duly sworn by the court reporter,

 4   testified on oath as follows:

 5               COURT REPORTER:   We are on the record.

 6   It's 9:06 a.m.

 7                    [Witness was sworn.]

 8   EXAMINATION BY MS. HEBERT:

 9     Q.   Good morning, Sheriff.  As you know, my name is

10   Christie Hebert.  We met previously, and before we

11   start, I'm going to go through a couple of things.  I

12   know that you previously testified in this case, so a

13   lot of these things will sound familiar to you, but I

14   need to state them on the record, nevertheless; do you

15   understand?

16     A.   Yes.

17     Q.   Okay.  As you know, my colleague, Jeff Rowes, is

18   joining us today, as is my colleague, Molly Hanis, and

19   then, in the room with you, you have your attorney, the

20   county's attorney, Mr. Kevin Hedges.  Is anybody else in

21   the room with you today?

22     A.   No.

23     Q.   And then we also have the lovely Sarah as our

24   court reporter today, who's been with us before.  Just

25   wanted to introduce Sarah, and she will write down
```

```
 1   everything that's said during this deposition, unless

 2   she's instructed otherwise, just as a heads-up.

 3   Because you're here today, you're just generally

 4   waiving any objections to deficiencies in your

 5   deposition notice, and you're generally waiving any

 6   objections to the lovely Sarah's qualifications as the

 7   court reporter to record today.

 8        We'll start with opening questions.  Can you

 9   state your name for the record, please?

10   A.   Eric Wayne Fagan.

11   Q.   And, as you previously testified, you are the

12   sheriff of Fort Bend County; is that correct?

13   A.   Yes.

14   Q.   And you are here today testifying on behalf of

15   Fort Bend County; is that correct?

16   A.   Yes.

17   Q.   And you previously testified under oath in this

18   case?

19   A.   Yes.

20   Q.   And before we kind of go on, I'll go over the

21   general housekeeping matters for a deposition.  You

22   understand, that today, like you previously testified,

23   that you are under oath today, and that's the same as if

24   you were in court testifying before a judge?

25   A.   Yes.
```

Sheriff Eric C Fagan

1    Q.    And that means that you swore to tell the truth?

2    A.    Yes.

3    Q.    And, as a reminder, it's important that we need

4    to have a clear record.  That means I need to ask clear

5    questions, and you need to provide clear answers, and,

6    generally, that means don't shake your head or say

7    "uh-uh" or "uh-huh", because those responses --

8    especially via Zoom -- are difficult for Sarah to

9    capture.  Do you understand that?

10   A.    Yes.

11   Q.    And if you don't understand a question or

12   something that I'm asking, please let me know.  I will

13   either ask Sarah, the court reporter, to read back the

14   question, or I will attempt to rephrase.  And, again,

15   like last time, let's try to avoid interrupting each

16   other.  I'll try and finish my question, and I'll try

17   to avoid interrupting you when you're answering.

18   Finally, you can generally assume that I'm not asking

19   you anything about what your attorney, Mr. Hedges, told

20   you, or any conversations that you had with Mr. Hedges.

21        Your attorney, Mr. Hedges, may state an objection

22   after I ask a question, and this doesn't mean that I've

23   asked a bad question.  It just means that Mr. Hedges is

24   preserving his right to make an objection before a judge

25   at a later date to a specific answer or question, and

Sheriff Eric Fagan

```
1    so, in general, you just continue to answer the

2    question after Mr. Hedges' objection, unless he

3    specifically directs you not to answer.

4         We're taking this deposition via Zoom, so if I

5    cut out or freeze, please let me know as soon as

6    possible, and I know that we can all have technical

7    difficulties via Zoom, despite our familiarity in the

8    post-pandemic era, but let's try to agree to be patient

9    with each other if technology issues pop up; is that

10   okay, Sheriff?

11        A.   Yes.

12        Q.   And, like last time, if you need a break, need

13   to use the restroom, need to get a drink, that's fine.

14   Just let me know, and I'd ask you to try to finish

15   answering a question before taking a break.  Is that all

16   right?

17        A.   Yes.

18        Q.   Is there any reason why you are not able to give

19   your fullest and best testimony today, such as you're

20   taking impairing medicine or something else?

21        A.   No.

22        Q.   And do you have -- do you understand how you'll

23   access the exhibits that I plan to use today?

24             MR. HEDGES:     What we've done,

25   Christie, is we've downloaded those locally to this
```

Sheriff Eric Fagan

```
 1   computer, so I think I can switch screens and play

 2   them.

 3                MS. HEBERT:      Okay, so you have the

 4   videos if we need those, and then Molly just shared the

 5   link for exhibits as they get marked, as we introduce

 6   them, so you'll be able to open that folder, Kevin.

 7                MR. HEDGES:      In the chat?

 8                MS. HANIS:       I can always share my

 9   screen if that's easier.

10   BY MS. HEBERT:

11      Q.   She sent it in the chat, so you guys have your

12   ability to -- she can also share her screen as we go.

13                MR. HEDGES:      Okay, well, hopefully,

14   we'll be able to figure that out.

15   BY MS. HEBERT:

16      Q.   Okay.  If we have unclarity about what document

17   that I'm referring to, or need to sort that out, feel

18   free to just stop me, and we'll make sure that we're all

19   looking at the same place and the same document, in

20   whatever form we need to.  And, just like your

21   deposition previously, Sheriff, you have the right to

22   read the document in its entirety.  We're not trying to

23   trick you, here, but some documents obviously include

24   material that we're not asking you about today, so I've

25   tried to highlight or identify the particular portions
```

1    of a document that might be relevant, but it is your

2    right to review the entirety of the document with Mr.

3    Hedges.  Do you understand that?

4        A.   Yes.

5        Q.   And, similarly, we are going to look at some

6    video clips today.  To save time, I have identified

7    relevant portions of those video clips, but, again, you

8    have the right to review the entirety of those video

9    clips with Mr. Hedges.  To be clear, we're not trying

10   to trick you, or we're not cutting out a specific

11   portion, or trying to make you look bad.  Instead,

12   we're just trying to focus on the specific portions of

13   the video that are relative for our conversation today.

14   Do you understand?

15       A.   Yes.

16       Q.   There's a couple things that I just want to make

17   sure we're clear about on shorthand.  If I say "the

18   county", can we agree that I'm referring to Fort Bend

19   County?

20       A.   Yes.

21       Q.   And if I say "the sheriff's office", can we

22   agree that I'm referring to the Fort Bend County

23   Sheriff's Office?

24       A.   Yes.

25       Q.   And if I say "the sheriff", can we agree that I

1    am saying the sheriff of Fort Bend County?

2       A.    Yes.

3       Q.    I want to talk about your deposition notice.

4            MS. HEBERT:      Molly, would you mind

5    bringing up Exhibit A and marking that as Exhibit 1?

6                 [Exhibit 1 was marked.]

7    BY MS. HEBERT:

8       Q.    Molly, would you mind just scrolling over this

9    document so the sheriff can see the entirety of it?

10           MR. HEDGES:      Are you sharing your

11   screen?

12           MS. HEBERT:      She is.

13           MR. HEDGES:      Okay, I'm in the actual

14   exhibit, so hold on.

15           MS. HEBERT:      I was just trying to make

16   it easier for all of us; that way, you can see what I'm

17   seeing.

18           MR. HEDGES:      All right, so I think we're

19   good now.

20           MS. HEBERT:      So, Molly, would you mind

21   scrolling again just a little bit so the sheriff can

22   see all of the pages?

23           Page 2 and page 3, page 4, and page 5.  Let's go

24   back to page 1, Molly.

25   BY MS. HEBERT:

Sheriff Eric Fagan

```
 1      Q.   Sheriff, have you seen this document before?

 2      A.   Yes.

 3      Q.   And I'll represent to you that this is the

 4  notice of deposition for the County of Fort Bend.  Do

 5  you understand that?

 6      A.   Yes.

 7           MS. HEBERT:    And, Molly, let's go to

 8  page 2; and page 3.

 9  BY MS. HEBERT:

10      Q.   Sheriff, have you seen this topic list before?

11      A.   Yes.

12      Q.   And you understand that, today, you are here to

13  testify on the county's behalf as the representative of

14  Fort Bend County?

15      A.   Yes.

16      Q.   And that means that the county has designated

17  you as its representative; do you understand?

18      A.   Yes.

19      Q.   And I know that testifying on behalf of an

20  entity -- specifically here, the county -- can make

21  things a little bit awkward, especially when I ask

22  questions about the sheriff, but, because you are

23  answering on the county's behalf, I need to kind of

24  phrase the questions specifically to ask about the

25  county's answers, so, although you are the sheriff, I
```

Sheriff Eric Fagan

```
 1   might be asking some third-person questions about the
 2   sheriff.  Do you understand?
 3        A.   Yes.
 4        Q.   Okay.  Did you do anything to prepare for this
 5   deposition, other than speak to Mr. Hedges?
 6        A.   No.
 7        Q.   Did you speak to anybody else at the county?
 8        A.   No.
 9        Q.   Did you review any particular documents?
10        A.   My own deposition last night.  I read over it
11   and made corrections.
12        Q.   Sure.  Anything else?
13        A.   No.
14        Q.   And did you watch any videos in preparation for
15   this deposition?
16        A.   No.
17        Q.   Okay.
18             MS. HEBERT:     Kevin, I think this is a
19   great time to stipulate on the record, and what I have
20   is that the county is willing and agrees to stipulate
21   that Sheriff Fagan's answers in his deposition can serve
22   as the county's answers to the same questions that were
23   posed to the sheriff.
24             MR. HEDGES:     Yes, that's correct, and
25   just to specify that his deposition was taken on August
```

1    9th of 2023.  We agree to that.

2              MS. HEBERT:     Thank you.  At this time,

3    I think it would be helpful for us all to take a

4    fifteen-minute break, and I will review the questions

5    that I -- I'm planning to ask the sheriff and make sure

6    that we're trying to be as efficient as possible.  So

7    fifteen minutes from now... let's come back at 9:35.

8              MR. HEDGES:     Perfect.

9              MS. HEBERT:     Okay.  Talk to you soon.

10             COURT REPORTER:  Off the record, 9:18.

11                  [Short recess was taken.]

12             COURT REPORTER:  We're back on the record

13   at 9:37 a.m.

14   BY MS. HEBERT:

15   Q.   Thank you, Sheriff, for the brief break for us

16   to revise kind of what we're going to ask you today.

17   I'll start with a few basic questions.  How many peace

18   officers does the county employ?

19   A.   Well, when you ask that question, I'll have to

20   put in the constables, as well, so I couldn't give you

21   an exact number, but I would say over a thousand; well

22   over -- close to 2,000.  I have 800 employees at my

23   agency, and different constables' office have their

24   employees.  I couldn't give you an exact number.

25   Q.   That's okay.  And so just let me rephrase to

Sheriff Eric Fagan

```
 1    make sure that I am understanding.  You would say the

 2    sheriff's office has approximately 800 employees; is

 3    that correct?

 4         A.   Yes.

 5              MR. HEDGES:      Peace officers.

 6         A.   You're talking about peace officers, correct?

 7         Q.   I wasn't sure.  I wasn't clear.  So the

 8    sheriff's office has approximately 800 peace officers?

 9         A.   Certified officers, not including civilian

10    employees.

11         Q.   Okay, thank you.  And then the constable's

12    office, which is separate from the sheriff's office --

13         A.   Yes.

14         Q.   -- they have another number, and you're not

15    exactly sure of the amount that the constable's office

16    has?

17         A.   Yes.  I don't remember.  I have no idea the

18    numbers they have.

19         Q.   I understand, but both categories of officers

20    are technically employed by the county?

21         A.   Yes.

22         Q.   Okay.  And about how many or what percentage of

23    the 800 peace officers employed by the sheriff's office

24    will go on patrol?

25         A.   On patrol is my second-largest.  I'll say
```

1   anywhere between 575 to 600.

2       Q.   So anywhere from 75 officers to --

3       A.   475 -- I said 5 -- 475.

4       Q.   So let me make sure that we have a clear record

5   on that.  Anywhere from 475 to 700 of the officers of

6   the -- of the peace officers of the sheriff's office go

7   on patrol?

8       A.   About 475 go on patrol.  I have peace officers

9   that works inside the jail, as well, so they don't go

10  on patrol, and I have peace officers who are

11  investigators, so they don't go on patrol.

12      Q.   So approximately 475 peace officers from the

13  sheriff's office patrol?

14      A.   Yes.  If you give me two minutes, I can call and

15  get the exact number, if that's what you want.

16      Q.   No, that's okay.  475, approximately, is fine.

17  About how many people live in Fort Bend County, based on

18  the county's estimates?

19      A.   I'll say close to over nine hundred thousand.

20  We're close to -- 885 thousand, close to nine hundred

21  thousand individuals from the last census.

22      Q.   Okay.  Thank you.  That was helpful.  We can

23  skip a lot of this.  Before we continue, just so Molly

24  has advance notice, Molly, would you mind bringing up

25  Exhibit I?  "I", as in "ice cream."

```
 1                    [Exhibit 2 presented.]

 2  BY MS. HEBERT:

 3     Q.   Before we continue, I'd like to talk about the

 4  county's responses to request for admissions, which

 5  we're going to label as Exhibit 2.

 6              MS. HEBERT:     And, Molly, would you mind

 7  scrolling through the pdf of this document just so that

 8  the sheriff can see all the pages?  We're on page 2,

 9  page 3, page 4, page 5, page 6, page 7, page 8, page 9,

10  page 10, page 11, page 12, page 13, page 14, page 15,

11  page 16, page 17, and I believe that's all the pages.

12  Can you scroll back to the top, Molly, the first page?

13  BY MS. HEBERT:

14     Q.   Sheriff, have you seen this exhibit before?

15     A.   Yes.

16     Q.   Did you, on behalf of the county, review the

17  answers to Exhibit 2 to make sure the answers are

18  correct?

19     A.   Yes.

20     Q.   And did anyone besides Mr. Hedges help you

21  answer these questions?

22     A.   No.

23     Q.   And, to be explicit, you, on behalf of the

24  county, answered the questions in Exhibit 2?

25     A.   Yes.
```

Sheriff Eric Fagan

1    Q.    In preparing the responses to the questions in

2    Exhibit 2, did you review the -- the video of July

3    12th, 2021, that is referenced in the questions as part

4    of providing the county's response?

5    A.    Yes.

6    Q.    And did you review any footage of the events of

7    December 21, 2021, relating to Justin Pulliam's arrest

8    in answering the questions that are part of Exhibit 2?

9    A.    Yes.  I'd like to qualify those answers.  I

10   watched the videos before I answered the questions, but

11   when I watched the videos, I had no idea the questions

12   were coming, so I did watch them -- if you understand

13   what I mean.

14   Q.    I do.  So let me just break that down.  When you

15   say "watch the videos", can you tell me which videos

16   you're referring to?

17   A.    At Jones Creek; that -- that video, I watched

18   that one, and then the one with Justin Pulliam was

19   arrested at the standoff at the home.

20   Q.    Okay.  And how did you access those videos?  Did

21   you access those videos as linked in plaintiff's

22   complaint?

23   A.    The first time I did it from my office -- my

24   officers, on their body cam, and then the next time I

25   watched them was from the complaint.

Sheriff Eric Fagan

1    Q.   When you say "officer's body cam", I understand
2    that the officers did not have body cameras in December
3    21, 2021, so --
4    A.   Correct.  So the vehicle.  Thank you for
5    correcting me.  It's the vehicle.
6    Q.   Okay, so what I understand you to be saying is
7    that you reviewed the dash camera footage from Deputy
8    Ricky Rodriguez; is that fair?
9    A.   Yes.
10   Q.   And you reviewed the footage from Justin
11   Pulliam's body camera; is that also accurate?
12   A.   Yes.
13   Q.   Okay.  And then later, you --
14   A.   Well, I take that -- if that's the video that
15   Mr. Hedges had that he showed me, I'm assuming it came
16   from Justin Pulliam.
17   Q.   I can't answer what Mr. Hedges showed you, so I
18   guess I'm asking you about what videos you reviewed
19   before the complaint, and you just explained that you
20   reviewed the footage from -- Deputy Rodriguez's dash
21   camera footage.
22   A.   Yes.
23   Q.   Was there any other footage of the December 21,
24   2021 events that you reviewed before the complaint?
25   A.   No.

Sheriff Eric Fagan

1    Q.   And then after the complaint, did you review the

2    footage that Justin Pulliam linked in the complaint from

3    December 21, 2021?

4    A.   Yes.

5    Q.   I'd like to return to the topic of the county's

6    policies on press conferences.  Generally, sheriff, how

7    does the sheriff's office announce that it is holding a

8    press conference?

9    A.   My PIO would reach out to the media outlets to

10   come for the press conference.

11   Q.   And how does your PIO -- how does the county's

12   PIO reach out to the media?

13   A.   I guess by e-mail or call.

14   Q.   And is there an e-mail list that the sheriff's

15   office then uses to announce press conferences?

16   A.   I wouldn't know.  My PIO would have to answer

17   that question.  I wouldn't know that.  I'm sure they do

18   have a e-mail link, but I never had to use it.

19   Q.   Okay, and who is on the list of folks who get

20   the e-mail?

21   A.   I wouldn't know that, either.  Like I said, my

22   PIO handles that, but I'm sure it's the local news media

23   outlets.

24   Q.   Okay, and how does someone get added to the list

25   that the sheriff's office maintains for press

Sheriff Eric Fagan

```
 1    conferences?

 2       A.   I couldn't answer that question, either.  Well,

 3    I don't know.

 4       Q.   A press conference is planned in advance, if

 5    it's going to be, let's say, held onsite at the

 6    sheriff's office, where does the sheriff's office hold

 7    the press conference?

 8       A.   Either in my media room or my bunker room.

 9       Q.   What was that second one?

10       A.   Bunker room.

11       Q.   Bunker room.

12       A.   Just a big room.  We just call it a bunker.

13    It's not a bunker.  It's a big room.

14       Q.   Okay.  That sounded pretty intense, but thank

15    you for clarifying.  Who gets to attend a press

16    conference?

17       A.   People from the news media outlets that the PIOs

18    invited.

19       Q.   And if your average Joe heard about the press

20    conference, would he or she be able to walk in and

21    attend?

22       A.   No.

23       Q.   Okay.  Is there typically someone at the door

24    who's checking IDs?

25       A.   Yes, because the press conferences are behind
```

Sheriff Eric Fagan

```
1   the secured area.  You have to have a access code to

2   get there.

3       Q.   You need to have a what?  What was that?

4       A.   A access card to get there.

5       Q.   And tell me about an access card.

6       A.   It's just a ID card that has -- you scan at the

7   door, and it'll allow you in, because it's behind a

8   secured area.

9       Q.   And how does a member of the media get an access

10  code -- or access card, excuse me?

11      A.   My deputy at the front desk, after they sign in,

12  she will scan them in.

13      Q.   Okay, so let me make sure I understand that.  If

14  someone from a Houston TV channel comes to a press

15  conference because they were allegedly invited by a PIO

16  officer, they walk in the door; is that right?

17      A.   Yes.

18      Q.   They sign in with the deputy at a front desk; is

19  that right?

20      A.   Yes.

21      Q.   And then the deputy at the front desk hands them

22  an access card --

23      A.   No.

24      Q.   -- is that right?

25      A.   No.  The deputy at the front desk then walks
```

```
 1    them over to the door, uses his or her scan card to scan

 2    the door and let them in.

 3         Q.   Okay, so the press person, the media -- the

 4    member of the media does not receive an access card him

 5    or her self?

 6         A.   Correct.

 7         Q.   Okay, so the deputy lets the media person in,

 8    and then the media person proceeds to whatever room

 9    you've designated as the location for the press

10    conference?

11         A.   Yes.

12         Q.   When the media person is signing in with the

13    deputy at the front desk, is that when the media

14    person's ID is checked?

15         A.   By the deputy, yes.

16         Q.   Okay, and what kind of identification does the

17    deputy check?

18         A.   They'll see the call letters of the television

19    or the media outlet, and it asks for ID.

20         Q.   Okay, so what kind of identification does the

21    sheriff's office accept?

22         A.   For media?

23         Q.   Yes.

24         A.   The ID and, like I said, the camera has the call

25    letters.
```

Sheriff Eric Fagan

```
 1      Q.    Okay.  So when you say "ID", do you mean

 2   someone's driver license?

 3      A.    No.  Their ID card from the news station, but

 4   when people do come in, we do look at the driver's

 5   license, as well, too.

 6      Q.    Okay, so, to summarize, the deputy at the front

 7   door asks for their -- their ID from their employer,

 8   and potentially the driver's license?

 9      A.    Yes.

10      Q.    Anything else?

11      A.    No.

12      Q.    Okay, and how does the sheriff's office make

13   sure that the media identification that someone is

14   providing at the front door is authentic?

15      A.    Actually, just take their word for it.  Like,

16   they come in with a camera man and all that, so they

17   just take their word.  We don't vet them at the door.

18   That would be too time-consuming.

19      Q.    Sure.  Is there any vetting process that occurs

20   before a member of the media comes to the door?

21      A.    If the PIO contacted them, that would be the

22   only way they would know about it.

23      Q.    Okay.  Let me revisit that, then.  So the PIO

24   contacting folks and inviting them to press

25   conferences, how does the PIO decide who to send
```

Sheriff Eric Fagan

```
 1   invitations to?
 2      A.   It's the PIO's discretion.  They handle that.  I
 3   hired them for that purpose.  It's not a media person,
 4   so that's why I hired people to do that, so that
 5   question would have to go to the media person.  The
 6   PIOs, public information officers, that's their job who
 7   to pick and not to pick if it's -- I can't -- I don't
 8   know how they do it.
 9      Q.   But the sheriff supervises the PIO; is that
10   correct?
11      A.   Yes.  I delegate a person to supervise the PIOs,
12   yes.
13      Q.   I'd like to talk about the sheriff's office's
14   policy for behavior that warrants removing someone from
15   a press conference.  I expect that the sheriff's office
16   has a policy on removing people who are acting violent
17   or, perhaps, threatening violence; is that a correct
18   statement?
19      A.   No, we don't have a policy.  We'll just act if
20   someone does it.  I don't have a policy for media people
21   on removal.
22      Q.   You may not have -- the county might not have a
23   written policy, or the sheriff's office might not have
24   a written policy, but would it be fair to say that that
25   is an informal or unwritten policy that if someone were
```

1    threatening violence at a press conference or was being

2    violent at a press conference, they would be removed?

3        A.   Yes.

4        Q.   What other types of behavior warrant removing a

5    person from a press conference?

6        A.   Being disruptive.

7        Q.   And what does "disruptive" mean to the sheriff's

8    office?

9        A.   As far as my standards, interrupting the press

10   conference, not allowing other people to speak, things

11   of that nature.  Using vulgarity, things like that.

12       Q.   Under the sheriff's office policy, if someone is

13   being disruptive at a press conference, does the

14   sheriff's office require an officer to give a warning

15   to that person before removing them from the press

16   conference?

17       A.   It depends on the severity of the disruption.

18   In some cases, you can give a warning.  In other cases,

19   you might to act right away.

20       Q.   But it depends on the severity of the

21   disruption?

22       A.   Yes.

23       Q.   I'd like to get some clarification about the

24   training that the sheriff's office provides its

25   officers.  Does the training -- does the sheriff's

Sheriff Eric Fagan

```
1    office provide any training to its officers that

2    specifically focuses on the policies of the sheriff's

3    office?

4        A.   The sheriff's office -- we have general orders,

5    in that when a person get hired, they're told that they

6    have to read over those general orders and policies.

7    Do we have a class for general orders and policies?

8    No.  It's the officer's duty to read over those general

9    orders and policies.

10       Q.   Sure.  So let me make sure I understand what

11   you're saying.  When a peace officer is hired, he or she

12   is expected to read the general orders and whatever

13   other written documents that the sheriff's office

14   delivers as policies, but other than that, there's no

15   specific training the sheriff's office provides on its

16   orders and policies?

17       A.   No.

18       Q.   Okay.  So you previously talked about in-service

19   training in your deposition?

20       A.   Yes.

21       Q.   Can you -- can the county clarify what it means

22   by a in-service training for the sheriff's office?

23       A.   By state law, officers have to take a certain

24   number of hours each year to keep their licenses

25   active.  It's called TCOLE hours, the state of Texas,
```

1    that they have to take.  These courses vary in topics.

2    Like legal updates; we have to have legal updates.

3    That's every year you have to do that.  Diversity

4    training; that's every year.  Now, because of mental

5    illness, we have mental illness training.  Like I said,

6    it varies.

7        Q.    So when you -- when you are referring to -- or

8    the county is referring to in-service training, the

9    county is referring to training -- TCOLE training that

10   officers are attending?

11       A.    Yes.

12       Q.    And I understand that "TCOLE" stands for the

13   Texas Commission on Law Enforcement, and that,

14   generally, TCOLE sets kind of the minimum standards for

15   what it means to be a peace officer, and then verifies

16   for provides the requirements for -- the continuing

17   education requirements for maintaining your peace

18   officer license; is that a good summary?

19       A.    Yes.

20       Q.    And how does the sheriff's office verify that

21   its officers are satisfying TCOLE's continuing

22   education requirements?

23       A.    We have a list that the academy staff keeps of

24   every officer's TCOLE hours, and the state notifies

25   each law enforcement agency if someone's in jeopardy of

Sheriff Eric Fagan

```
 1   not completing their hours within that time period.
 2       Q.   Okay, thank you.  And I understand that the
 3   TCOLE training is kind of general training that is
 4   consistent across the state of Texas; is that fairly
 5   accurate?
 6       A.   Yes.
 7       Q.   So any of the TCOLE training would not be
 8   specific to the sheriff's office; is that correct?
 9       A.   Yes.
10       Q.   Does the sheriff's office provide its officers
11   with a list of training topics that they are required
12   to take from TCOLE separate from the state's
13   requirements?
14       A.   Yes.
15       Q.   And what's on the sheriff's office list of
16   training that an officer must take that is -- that is
17   separate from the -- the states?
18       A.   Training that I feel or someone on my command
19   staff feel that it's important for the officer to take.
20   Like mental illness, they're taking more classes on
21   mental -- more than what the state requires because
22   that's something I think is important for them to take.
23   I had a situation about domestic violence here in Fort
24   Bend, so I'm taking some other courses on how to handle
25   family violence situations, so it could be courses that
```

 1    I myself feel they need to take or someone on the

 2    command staff think that our officers need more

 3    training on, we can require them to take these classes.

 4        Q.   Okay, I understand.  So how is that -- how is

 5    the training requirement that you -- you identify, how

 6    is that communicated to other officers, to the rest of

 7    the sheriff's office officers?

 8        A.   We send out a e-mail blast through our web --

 9    through our e-mail at the sheriff's office that just

10    goes to our employees.

11        Q.   So when the sheriff's office identifies a

12    training that its officers need to have that's in

13    addition to the state requirements, there will be an

14    e-mail blast saying everybody needs to take X training

15    by a certain date?

16        A.   Yes.

17        Q.   What happens if someone fails to take the

18    required training?

19        A.   The TCOLE training or the training that --

20        Q.   The training that the sheriff's office mandates

21    that they take.

22        A.   They could be reprimanded.

23        Q.   Okay.

24        A.   Anywhere from an oral reprimand, written

25    reprimand to days off.

Sheriff Eric Fagan

```
 1    Q.    Okay.  I'll ask more questions about that in a
 2  minute.  Let's circle back to that in a minute, but how
 3  does -- we talked a little bit about you identifying or
 4  a command officer identifying a deficiency in officer
 5  training but, how, generally, does the sheriff's office
 6  go about evaluating the adequacy of the training that
 7  is provided to its officers as a whole?  Is there any
 8  kind of process?
 9    A.    Some classes, they have to take tests, and they
10  have to have, like, a minimum score in that class to
11  say that they successfully took the class, but it
12  varies.  Some classes don't have tests, so it varies.
13    Q.    Okay, so let me make sure I understand that.  So
14  the way that you, as the sheriff, and the way the
15  county, through the sheriff's office and any of its
16  command staff identifies inadequacy in officer training
17  is if officers score a certain range on a test?
18    A.    In some classes, yes, like I said, but some
19  classes don't have tests that they're in.
20    Q.    Okay.  I think we might be getting our wires
21  crossed a little bit.  You previously said that when
22  the sheriff's office identifies an additional training
23  above and beyond the TCOLE requirements that its
24  officers need, the sheriff's office will send out an
25  e-mail blast saying, hey, officers, you need to take X
```

Sheriff Eric Fagan

1    training by a certain date.  How does the sheriff's

2    office identify those kinds of courses that its officers

3    need or are missing?

4        A.    Like I said before, it's a class that I feel

5    that I want them to take, get more instruction on.

6    They're still TCOLE classes, but I want them to get

7    more instructions on them.  Like the mental illness;

8    they might have several classes on mental illness, and

9    TCOLE said they need eight hours.  Well, I want them to

10   take 16 hours, so they need to take another course in

11   that -- I'm just using that as an example.

12       Q.    Sure.

13       A.    They're still TCOLE classes, but they're extra

14   in that particular area that we want them to take.

15       Q.    Sure.  So the sheriff, based on his discretion,

16   identifies a particular class, or a command officer

17   identifies a particular class or a particular number of

18   credits in their discretion that they want the rest of

19   the sheriff's officers to take.  Is that a fair

20   summary?

21       A.    Yes.

22       Q.    Okay.  Is there any other process for evaluating

23   whether sheriff's office officers need additional

24   training?

25       A.    Yes.  By the supervisors in the field watching

Sheriff Eric Fagan

1    them -- watching body cameras, looking at a certain

2    body camera video, and we see certain things, so we

3    assess that they need more training in certain areas.

4        Q.   Okay, so let me just make sure I understand

5    that.  Particular supervisors will watch body camera

6    videos and identify areas of need for a particular

7    officer, and then -- and then instruct that particular

8    officer to get additional training?  Is that a fair

9    understanding of what you just said?

10       A.   That's one of the ways.  I said that the -- the

11   supervisors in the field may see a officer deficient in

12   some area, and may think they need more training and

13   also the body camera, as well.

14       Q.   Okay, and before body cameras, presumably, it

15   would just be based on a supervisor's field observation

16   of an officer; is that correct?

17       A.   Yes, and the dash cam.

18       Q.   Okay.  That's fair.  I understand.  So there's

19   kind of two categories, as I'm understanding your

20   testimony, or the county's testimony today.  There's

21   the category of the sheriff's office identifies a

22   particular training based on the sheriff's discretion,

23   or a command officer's discretion, and then issues an

24   e-mail blast telling officers they need to take this

25   particular course, and then, additionally, supervisors

Sheriff Eric Fagan

 1   may identify a particular training for a particular

 2   officer based on field performance, whether viewed in

 3   the field or via body camera.  Are those the two ways

 4   that training -- additional training is identified as

 5   needed?

 6       A.   Yes.  Pretty much, yes.

 7       Q.   Okay.  And the officers themselves can

 8   voluntarily take extra classes if they want?

 9       Q.   Sure.  Of course.  Let me just check my notes,

10   here.

11         I want to just ask a couple of questions about

12   discipline in general.  So, speaking generally, what

13   are the forms of discipline that the sheriff's office

14   can give when an officer makes a mistake?

15       A.   It can vary all the way from oral reprimand, to

16   a written reprimand, to days off, all the way up to

17   termination.

18       Q.   When you say "days off", can you explain that to

19   me?

20       A.   Not days off.  One, two, three days off with no

21   pay.

22       Q.   Kind of like a suspension, then?

23       A.   Yes.

24       Q.   Okay.  So, to continue on to something like an

25   oral reprimand, a written reprimand, some kind of

Sheriff Eric Fagan

```
1    suspension, there might be a couple of other actions,
2    and kind of the end result is some kind of termination?
3       A.   Yes.
4       Q.   And when -- let's start at the beginning.  When
5    there is an oral reprimand, is there a written record
6    of that?  So let's say, to explain what I mean, let's
7    say a supervisor makes an oral reprimand of a deputy.
8    Would the supervisor write up that oral reprimand at
9    all?
10      A.   It'll be documented that he had a oral
11   reprimand, yes.
12      Q.   Okay, so every form of the action, from an oral
13   reprimand to, obviously, termination would be written
14   down somewhere in some form?
15      A.   Yes.  It will be documented, yes.
16      Q.   Okay.  And how does a supervisor decide what
17   level of reprimand or what level of discipline to use
18   for a particular officer's mistake?
19      A.   For minor infractions, it's the supervisor's
20   discretion.  When it's something major, it has to go
21   through IAD.
22      Q.   What is IED?
23      A.   IAD.
24      Q.   Oh, internal affairs department?
25      A.   Internal affairs division, yes.
```

Sheriff Eric Fagan

1    Q.    Okay, and what kinds of things are minor enough

2    that it's just within the supervisor's discretion?

3    A.    A officer missed a training period.  A officer's

4    maybe came in late to work two or three times and you

5    need to talk to them, things like that.  That's minor

6    infraction.  A officer not completing a report; a minor

7    infraction, but they do it over and over again, then it

8    escalates to, like I said, the continuum -- oral,

9    written, and things like that, but it's the supervisor's

10   discretion.

11   Q.    And what kinds of things would you expect, or

12   would the county expect would be immediately referred to

13   the internal affairs department?

14   A.    Excessive force, any actions of excessive force,

15   unjustifiable rudeness -- depends on the -- depends on

16   the type of rule like that, we would look to.

17   Dereliction of duty; a lot of things it could be.

18   Q.    Sure.  So if someone, a citizen, made a

19   complaint to the sheriff's office that an officer was

20   incredibly rude, would that go to the internal affairs

21   department?

22   A.    Yes.  The supervisor would immediately look at

23   the body cam -- the body cam, and, also, I started

24   something here when I became sheriff.  It's called

25   mediation.  Sometimes we mediate the offense if a

Sheriff Eric Fagan

```
1    offense was rude to -- a citizen felt like they were

2    rude, we can mediate it.

3        Q.   And what does "mediate it" mean?

4        A.   Mediation.  You go before a mediator, you have a

5    third non-biased person in the room with them, a

6    certified mediator, where the officers sit down with

7    the citizen, and they discuss the issue that the

8    complaint is on, and they try to work it out there,

9    and, by mediate -- mediating it, it doesn't have to go

10   to IAD, and this citizen feel like they have a part of

11   it and the officers also feel like a part of it.

12   That's something new that I started when I became

13   sheriff.  Mediation.  I should have said that.  We don't

14   always go to IED and that's a part of the -- we have

15   mediation.

16       Q.   I understand.

17            Okay, I'm going to switch topics and discuss the

18   sheriff's office response to just calls and incidents

19   and policies on that.  In general, can you tell me

20   about how the sheriff's office classifies, calls and

21   responses?  And, to clarify what I mean, there, for

22   example, I'm thinking about the Department of Homeland

23   Security and how they have their various color

24   classifications of threats and how security folks need

25   to respond to a particular threat level.  Does the
```

```
 1    sheriff's office have a system for classifying, let's
 2    say, the priority of calls that come in?
 3        A.   Yes.  Code 1, 2, and 3.
 4        Q.   And can you explain what the codes 1, 2, and 3
 5    mean?
 6        A.   Code 3 is not that serious.  Code 2 is a little
 7    serious.  Code 1 is very serious.
 8        Q.   So there are three levels, 1 being the worst and
 9    3 being not serious at all?
10        A.   Not that it's not serious at all.  Just get
11    there when time permit you to get there.  Code 2, more
12    expedient to get there.  Code 1, you immediately head
13    that way.
14        Q.   How is that code communicated to officers in the
15    field?
16        A.   They learn the different codes in the academy
17    before they get to the field, and then when they get
18    with the trainer, they go over it again.  They also get
19    trained -- they just don't go straight to the car.
20    They have to have a trainer, and they go over the codes
21    with them to explain the importance of it, things like
22    that.
23        Q.   So officers on patrol are familiar with the
24    codes, to be fair?
25        A.   Yes.
```

Sheriff Eric Fagan

```
1      Q.    And then for a particular call, how does the

2   classification work?  What's the system?

3      A.    I'm not really sure --

4      Q.    Sure.  How does a call get a priority level?

5      A.    Oh, it depends on the severity of the call.

6   Dispatch decides what type of code is it.  If a weapon

7   is involved, if there's a mental patient involved, if

8   someone committed a -- say they're going to harm

9   themselves.  It varies.  Could be a illness; it just

10  varies.

11     Q.    So would it be fair to say, then, that dispatch

12  assigns the priority number based on the facts that are

13  called in?

14     A.    Yes, and then when the officer get there, he

15  could upgrade it.  He or she could upgrade the call if

16  seen necessary.

17     Q.    Okay, so let me understand that.  Like, if it's

18  level 3, the lowest-priority call, the officer on-scene

19  can say, no, really, it's a level 2 --

20     A.    Yes.

21     Q.    -- and upgrade the -- okay.

22     A.    Yes.

23     Q.    And how -- how are the priority codes -- the

24  priority numbers -- is that the right way to phrase

25  that?  Priority numbers?  How are they communicated to
```

Sheriff Eric Fagan

1   officers for a particular call?  So how would an

2   officer know what calls are number 1, for example?

3       A.   It can either go through the radio by mic, or it

4   can be typed to a -- teletyped to them on the MDT, the

5   computer in their car.

6       Q.   MDT, can you explain what that stands for, for

7   me?

8       A.   Mobile data terminal.

9       Q.   And that's just the computer that officers have

10  in their vehicle?

11      A.   Yes.

12      Q.   So we talked through a couple of prior

13  scenarios, just so I can understand the priority

14  system.  If there was, a -- let's say a car accident

15  where no one was injured, but were parked on the side

16  of the road, what priority level or what number would

17  the sheriff's office assign to that type of call?

18      A.   No injuries, just a minor accident, side of the

19  road be a code 3, minor.  It would be a low-priority

20  call.

21      Q.   And what about a general welfare check?

22      A.   We do welfare checks.  It depends on the type of

23  welfare check.  If it's something that we on a regular

24  basis -- because people can call in to ask us to do

25  welfare checks on their loved ones.  That's a code 1.

Sheriff Eric Fagan

1    When they have time, they'll go by there.  If we get

2    called in for a welfare check, because someone called

3    in and said, "I haven't heard from my mother in two or

4    three days, and she's known to be sickly.  We want to

5    check on her", that probably will code a code 2 call.

6    We'll try to call and see if we can contact, then we'll

7    send a unit over.  If we know that someone's hurt or

8    they said that someone's hurt, that will be a code 1.

9    We know we need to get emergency people out there right

10   away.

11       Q.   Let me just make sure I understand, because I

12   think you might have misspoke there, a little bit.  The

13   first scenario that you just walked through where

14   someone just, like, generically calls in asking for a

15   welfare check, that would be the lowest priority of 3;

16   is that correct?

17       A.   No.  The first one I was saying, we have a -- a

18   program here --

19       Q.   Sure.

20       A.   -- where people can sign up and ask us to check

21   on their loved ones.  It's called -- we just check on

22   them.  We check on them periodically, and we'll go by

23   and check on them, because they ask us, would you mind

24   checking on my mother, she lives alone, things like

25   that, so that's a low priority.  It's not low priority,

 1    because that's your loved one, but, to us, we'll go to

 2    check on them when -- like, you don't have any calls

 3    holding, you'll go check on that house to make sure

 4    she's all right; or he.

 5        Q.    I understand.  And it's not that it -- it would

 6    be classified as a number 3, not because it's not a low

 7    priority.  It's just, relative to the other calls that

 8    come in, it's when you have time --

 9        A.    Yes.

10        Q.    Okay.

11        A.    Yes.

12        Q.    And I understand that we just talked about the

13    ways that the sheriff's office classifies the priority

14    levels of a -- of a -- of a call, but is there a way

15    that the sheriff's office classifies -- separate from

16    the priority level, is there a way that the sheriff's

17    office classifies the type of response that might be

18    needed?  So here's kind of what I'm thinking, here.  Is

19    there a way that the sheriff's office communicates to

20    its officers that you need to be in your S.W.A.T. gear,

21    for example, when responding to this call, even though,

22    you know, you wouldn't necessarily need to be in your

23    S.W.A.T. gear for every priority one call?

24        A.    Yes.

25        Q.    And can you tell me about that system?

 1    A.   If you get there -- get the call that there's a

 2  barricaded person, or if there's a possible hostage

 3  situation, something like that, we know to send out

 4  S.W.A.T., more than just one unit, because of the

 5  safety of the officers and the safety of the public, so

 6  you know you want to -- you know, the S.W.A.T., like

 7  you said, bring S.W.A.T. out there, not just one unit.

 8    Q.   And how would dispatch, I think -- I believe it

 9  would be dispatch.  How would dispatch communicate that

10  need?

11    A.   The same way -- by radio or over the radio, or

12  Teletype.  Most likely, in these type of situations it's

13  going to be the radio, because you make sure that they

14  have -- got the message, and also using the MDT, as

15  well.

16    Q.   Okay.  So let me break that down a little bit,

17  then.  If dispatch wants to be sure that its officers

18  -- that the sheriff's office officers generally got a

19  particular message, the dispatcher will put it on the

20  radio?

21    A.   Put it on the radio, yes.

22    Q.   But if something is maybe conveyed in text via

23  the MDT system, there's not necessarily the presumption

24  that an officer's going to know it?

25    A.   No, it is a presumption, because they're ordered

Sheriff Eric Fagan

1    to watch the MDT, as well.  It's just -- how can I put

2    it?  They send it over -- something like a S.W.A.T.

3    situation, they're going to send it over the mic, but

4    they're also going to send it through MDT, as well.

5    It's presumed all officers at all time to monitor their

6    MDTs and monitor the radio, so it's presumed that they

7    receive the message, regardless.  This is just a extra

8    step that we do.

9        Q.   I understand.  Thank you.  And thank you for

10   your patience with me as I understand the -- learn the

11   acronyms, too.

12       A.   Not a problem.

13       Q.   I'd like to talk a little bit about the crisis

14   intervention team, and I understand that the sheriff's

15   office has a particular team called the crisis

16   intervention team, and that is a specialized unit

17   within the sheriff's office; is that fair?

18       A.   Yes.

19       Q.   And can you tell me under what umbrella of the

20   sheriff's office, under what part of the organization

21   the crisis intervention team falls?

22       A.   Under the chief.  I take that one very

23   seriously.  I personally made that up under my chief

24   deputy.  I placed them under her.

25       Q.   The crisis intervention team is directly

Sheriff Eric Fagan

```
 1   supervised by the sheriff's office chief deputy?

 2       A.   Yes.

 3       Q.   Okay.  And I understand from the crisis

 4   intervention team's website that there's approximately

 5   15 sheriff's officers who are devoted to the crisis

 6   intervention team.  Is my understanding correct?

 7       A.   Yes, 16 with the lieutenant that's over, so when

 8   you count him, it's 16, but 15, yes.

 9       Q.   Sure.  I understand that the crisis intervention

10   team works pretty closely with different healthcare

11   providers, such as the focus from TXANA; is that

12   correct.

13       A.   Yes.

14       Q.   And are TXANA employees classified as part of

15   the sheriff's office?

16       A.   No.

17       Q.   And are, to your knowledge, and to the county's

18   knowledge, are TXANA employees peace officers?

19       A.   No.

20       Q.   What types of calls are classified as crisis

21   intervention calls?

22       A.   When someone's in mental crisis, someone with

23   mental illness, these types of calls, calls where we

24   know a personal with mental illness is there.  We want

25   to send someone specially-trained to deal with these
```

Sheriff Eric Fagan

1   individuals, to deescalate it.  In the past, in law

2   enforcement, we didn't really understand mental

3   illness, and some people got harmed -- the officer or

4   the individual got harmed because we didn't have the

5   knowledge of mental illness.  The CIT people are

6   specialty-trained to recognize mental illness, so we

7   have them there, and we have TXANA there because

8   they're even more trained.  That's their job, to know

9   mental illness, so, sometimes, we want to -- we want

10  TXANA to be there with us; licensed counselors and

11  things like that to be with us to help better -- help

12  better serve the public with mental illness.

13      Q.   I understand, and that makes a lot of sense to

14  me.  What is the typical -- and I think you were

15  talking about this a little bit, but I want to kind of

16  make it explicit.  What is the typical response for a

17  crisis intervention call?  Does that mean that, when

18  there's a crisis intervention call, when someone, for

19  example, calls in and says there might be someone with a

20  mental health need, does that mean only a crisis

21  intervention team member responds to that call?

22      A.   No.  If they're available.  If they're

23  available.  Mental illness is vast, and sometimes when

24  we have a call for mental illness, a CIT, the other CIT

25  officers, all fifteen, they might be at other -- other

Sheriff Eric Fagan

1    calls and they're not booked.  Well, I can't ignore that

2    call, so we have to send a officer out there that's not

3    a CIT officer, but we do our best to try to send a CIT

4    person to a mental illness when we can, but does it

5    happen all the time?  No, and I'm sorry -- because I

6    don't have all of them trained -- all CIT-trained

7    officers.  I wish I did, but I don't.

8        Q.   Sure.  So does the CIT -- if there is a CIT

9    officer available, and that officer can respond, is

10   that the -- that officer the only person who goes to

11   the call, or do other deputies also go to the call?

12   What's the ideal response to a crisis intervention call

13   for service?

14       A.   A call for service for a mentally ill --

15   possibly a mental -- person in crisis, we send an

16   available CIT person out there.  That CIT -- he or she

17   see that they need more help, they can call for backup

18   either from a regular officer or another CIT officer to

19   come out there.

20       Q.   Okay, so let me make sure that I understand

21   that.  If there is a CIT person available, he or she

22   goes out by themselves and just kind of does an

23   assessment of what's going on, and he or she will then

24   radio for backup to see if additional deputies are

25   needed.  Is that a fair summary of the ideal response?

1    A.   Yes, if the CIT deputies feel like they need

2  more help, they can request for more help, yes.

3    Q.   And when a call for service comes in where

4  there's someone in crisis, would the dispatch

5  specifically contact CIT team members or -- go ahead.

6    A.   Sorry.  They will bump to see if a CIT unit is

7  available.

8    Q.   What does that mean, I'm sorry?

9    A.   I'm sorry, they would radio to see if a CIT

10  person is available.  "Bump" mean -- I apologize,

11  they'll radio to see if a CIT unit is available.

12    Q.   So the dispatcher would radio out something

13  like:  Any CIT folks available to respond to a call of a

14  -- someone who might have bipolar disorder, and if they

15  said yes, the dispatcher would send whatever team

16  members said they were available; is that fair?

17    A.   Yes.

18    Q.   And if there were no CIT members available, what

19  would happen?

20    A.   A regular unit would go.

21    Q.   A regular unit would go?

22    A.   Yes.

23    Q.   But that conversation would be reflected on the

24  dispatch log or the radio; is that fair?

25    A.   Yes.

Sheriff Eric Fagan

1    Q.    Okay.

2    A.    Yes.

3    Q.    How does TXANA usually get informed of a

4    potential crisis intervention call?  What's the process

5    for getting them out there?

6    A.    We actually have TXANA people inside our

7    dispatch, as well.  They listen for the calls, or if

8    it's a call where a person is having a weapon or

9    harming someone, it's kind of a high level.  We

10    probably want to take a TXANA person with us to help

11    bring the person down.

12    Q.    So does that mean that there are TXANA people at

13    the sheriff's office every day?

14    A.    In our dispatch.  We have a grant that pays --

15    pays them.  I don't know if the grant ran out yet or

16    not.  I hope they're still there.

17    Q.    Okay.  So the county believes that there are

18    TXANA employees in the dispatch center?

19    A.    Yes.

20    Q.    Okay.  And what about TXANA employees who might

21    ride along, or come with a -- an officer who's

22    responding to a call?  Where do those TXANA employees

23    come from?

24    A.    From TXANA.  Both.  I'm not saying all TXANA's

25    in my dispatch.  I said we have some in dispatch, and we

1    do have some that ride along with us, as well.

2        Q.   Okay.  So let me make sure I understand that.

3    So if the sheriff's office determines that a TXANA

4    employee is needed, will they pick up -- will an

5    officer pick up someone from the dispatcher center?

6        A.   No.

7        Q.   Okay, so the dispatched TXANA focus just stay in

8    dispatch?

9        A.   Yes.  Now, if they ever have picked up someone

10   from dispatch, I don't know.  They may have --

11       Q.   Sure.

12       A.   But I don't believe they have, but I don't know.

13       Q.   That's okay.  You're just testifying about the

14   county -- on behalf of the county and the county's

15   policy.  So, generally, it's not the county's policy

16   that a deputy or another officer should go pick someone

17   up from dispatch to use as a TXANA person?

18       A.   Yes.

19       Q.   And so when an officer determines that they need

20   a TXANA person to come out to a call, does the officer

21   then call the TXANA center and then go pick someone up

22   and drive out to the call?  Is that a fair understanding

23   of what happens?

24       A.   Yes, but, like I said, some TXANA people ride

25   along with our CIT, so some of them may be already

Sheriff Eric Fagan

1    there.  If someone is not there, yes, they can request

2    for TXANA person to come.

3        Q.   Okay.  So let me make sure I understand that.

4    There are TXANA people who go out on patrol with the

5    crisis intervention team members; is that right?

6        A.   Yes.  On some occasions, yes.

7        Q.   And --

8        A.   That's not every day -- I wish it was every day,

9    but it's not a everyday thing.

10       Q.   So how often does that usually happen, then?

11       A.   I don't know.  I couldn't answer that question.

12       Q.   Okay.  Other than -- I might come back to the

13   TXANA piece in a minute, but other than members of the

14   crisis intervention team, do sheriff's officers receive

15   specialized training on crisis intervention calls?

16       A.   Yes.

17       Q.   And can you tell me about that specialized

18   training?

19       A.   It's the T -- well, I'm saying TCOLE.  It's also

20   requested also requested a meet-up (unintelligible) to

21   come to my office to give a class.  We can request

22   people to come over from the mental health side to come

23   and give courses on things like that to all the

24   deputies, but, like I said, CIT take special training

25   they constantly take -- like, say my officers have to

Sheriff Eric Fagan

```
1    take 16 hours of mental health.  Well, TXANA -- I'm

2    sorry, not TXANA -- my CIT people would probably take

3    24 hours of courses.  They usually take way more mental

4    health courses than what my regular -- a regular deputy

5    does.

6       Q.   I understand.  I understand.

7            MR. HEDGES:     Christie, I just got a

8    notice that my battery's running low, and I think I'm

9    plugged in, so I'm going to be rooting around under the

10   table for a second.

11           MS. HEBERT:     Let's take a brief break.

12   I've got to use the restroom, anyway.  Why don't you

13   get that sorted out, and let's come back at, say,

14   10:45.

15           MR. HEDGES:     Okay.  We'll be here.

16           COURT REPORTER:  Off the record, 10:32.

17              [Short recess was taken.]

18           COURT REPORTER:  Back on the record at

19   10:44 a.m.

20           MS. HEBERT:     Kevin, we asked the

21   sheriff, on behalf of the county, a bunch of questions

22   about the list for press conferences, and who gets

23   contacted, who's on the list for notification about

24   press conferences, and, essentially, how the PIO

25   officer decides who gets notified of a press
```

 1    conference.  One of the topics you might recall from

 2    the deposition notice is the sheriff's office practices,

 3    generally, with press conferences, and I know that the

 4    sheriff's been designated as the county's

 5    representative, and he's testified that he doesn't know

 6    this information.  Given that it's like 10:45, I wanted

 7    to suggest that perhaps the sheriff could either call

 8    the PIO officer and get that information and,

 9    therefore, be able to testify about it now, or e-mail

10    the PIO officer, and then be able to read the e-mail

11    into the record as his testimony.  What are your

12    thoughts on doing that now, Kevin?

13                MR. HEDGES:     I think that's fine.

14    It's -- it's not lunchtime, so someone ought to be

15    available.

16                MS. HEBERT:     Right.  That's why I

17    brought it up now rather than waiting till lunchtime or

18    the afternoon.

19                MR. HEDGES:     Okay, well, the sheriff's

20    making the call right now.

21                MS. HEBERT:     Sure.  Sheriff, do you

22    want to take a break to make that call, or do you want

23    to just make it here?

24                THE WITNESS:    I can make it here.

25                MR. ROWES:     We can go off the record

Sheriff Eric Fagan

```
 1   while the sheriff makes the call.

 2              COURT REPORTER:  Off the record, 10:46.

 3                   [Off the record.]

 4              COURT REPORTER:  Back on the record at

 5   10:52.

 6   BY MS. HEBERT:

 7      Q.   Sheriff, I understand that you have collected

 8   additional information from your PIO officer on the

 9   sheriff's office's practices for press conferences; is

10   that correct?

11      A.   Yes.

12      Q.   And with whom did you speak to collect that

13   information?

14      A.   Michelle, Domenico -- Damonico -- I cant

15   pronounce her last name.

16      Q.   Michelle Domenico, we'll call her for lack of a

17   better pronunciation; and she's part of the public

18   information office?

19      A.   Yes.

20      Q.   And as I understand it, Ms. Domenico testified

21   that the PIO office maintains a list of folks that the

22   sheriff's office will invite to press conference; is

23   that contact?

24      A.   Yes.

25      Q.   And the PIO office will e-mail that list when
```

Sheriff Eric Fagan

1   the sheriff's office is holding a press conference in

2   advance; is that correct?

3       A.   Yes.

4       Q.   And the PIO office decides who is on that list;

5   is that correct?  They assemble the list?

6       A.   Yes.

7       Q.   And, as I understand it, the folks who are on

8   the PIO office's press conference list get added in one

9   of two ways.  First, they get added if they ask to get

10  added, and then the PIO office confirms that they

11  should be on the list, and then the second way is if

12  the PIO office asks the media person the -- if the

13  office directly asks the media person if they want to

14  be on the list, and the media person says yes.  Are

15  those the two ways that the folks get added to the PIO

16  office's list?

17      A.   Yes, from what I understood, yes.

18      Q.   And if I understood Ms. Domenico's information,

19  the PIO office assesses whether a particular person who

20  wants to be on the list is credible or not credible; is

21  that a fair assessment?

22      A.   Yes.  From what I understood, she said she

23  researched the social media to see if they have a media

24  presence, yes.

25      Q.   And so, as I understand it, Ms. Domenico said

1    that she has not come into contact with any person that

2    didn't have an online media presence with a media

3    outlet that she was familiar with; is that correct?

4        A.   Yes.

5        Q.   And that, if she has any questions about whether

6    a particular person should be on a list or not, on if

7    -- if Ms. Domenico -- let me clarify that and start

8    over.  If Ms. Domenico has any questions about whether a

9    person should be on the PIO office's press conference

10   list, she will speak to her direct supervisor for

11   clarification; is that correct?

12       A.   Yes.

13       Q.   And to summarize, the sheriff's office creates

14   and maintains the list of who gets invited to press

15   conferences; is that fair?

16       A.   Yes.

17       Q.   Okay.  I think that's all that I'm going to ask

18   about the press conferences for now.  If something else

19   comes up, we can revisit the topic.  I want to talk a

20   little bit about what we were talking about with --

21   with the TXANA folks.  We were talking -- before Kevin

22   had a battery issue, we were talking about the TXANA

23   folks who go along with the sheriff's office officers

24   on service calls.  Who determines when a TXANA employee

25   needs to attend a call with a CIT team member or another

Sheriff Eric Fagan

```
 1    deputy?

 2       A.    The field supervisor.

 3       Q.    So a call comes in, and a field supervisor makes

 4    the decision of whether we need -- they need a TXANA

 5    person or not?

 6       A.    Yes.

 7       Q.    And who would be a field supervisor?  Would that

 8    be a sergeant who was on patrol?

 9       A.    Sergeant or lieutenant.

10       Q.    Okay.  And I understand from your deposition as

11    the sheriff, that TXANA folks sometimes train with Fort

12    Bend County sheriff's officers; is that correct?

13       A.    Yes.  When I say "trained", I don't mean they're

14    out there in the field with us or anything like that.

15    We sit down to discuss scenarios and things like that;

16    what you should do when certain things happen.  They're

17    not at my academy, or running routes and stuff like that

18    with us, no.

19       Q.    So they're not, like, in a field where they're,

20    you know, practicing certain things where the sheriff's

21    office?  It's more of a meeting?

22       A.    Yeah, across the table sitting down and talking,

23    yes.

24       Q.    Sure.  That's helpful, thank you.  And,

25    presumably, TXANA has all sorts of employees, just like
```

1    the sheriff's office does.  You know, accounting

2    people, HR, maybe administrative assistants.  Can you

3    help me understand what type of TXANA employees will go

4    on call with the sheriff's office?  Is there a specific

5    category?

6       A.   Mental health counselors; people in mental

7    health.  Those are the people we deal with with TXANA.

8    If they deal with anyone else other than that, I

9    wouldn't know about it.

10      Q.   Sure.  So some kind of mental -- mental

11   health-specific -- to the county's knowledge, do the

12   folks -- the TXANA employees who do ride-alongs or come

13   on particular calls with the sheriff's office, do they

14   have to have any particular training or certification?

15      A.   Yes.

16      Q.   Can you tell me about that?

17      A.   That would be verified through TXANA.  It would

18   be a certified counselor, someone like that; certified

19   counselor in mental health.

20      Q.   But the sheriff's office itself doesn't do any

21   independent verification of the qualifications of TXANA

22   employees?

23      A.   No.  We trust -- I'm sorry, we trust TXANA to do

24   that.

25      Q.   Sure.  And do does the sheriff's office itself

1    do any independent training of folks who ride along

2    with the sheriff's office?  So, for instance, "This is

3    how you need to proceed on -- on a call", and, "Here's

4    what you're doing wrong, here", that kind of training?

5        A.    After the incident, I'm pretty sure they discuss

6    what we can do better, what could be done better, things

7    like that, yes.

8        Q.    Okay.  So, as I understand your answer, there's

9    no advanced training for a TXANA employee who's

10   accompanying a sheriff's office officer, but there

11   might be some kind of after-action review?

12       A.    Yes.  When we say "advanced", I'm pretty sure

13   that they talked to them -- the field people do talk to

14   them.  S.W.A.T. do talk to them.  I'm not there

15   personally to say that they do or don't do, but I'm

16   pretty sure that they do before a situation to take

17   place, I'm pretty sure they have a plan of action of

18   what they want them to do in their roles -- what their

19   roles would be.

20       Q.    Okay, so let me make sure that I understand

21   that.  In general, is -- these meetings that you talked

22   about about how the sheriff's office and TXANA

23   structures its relationships.  Is that one of the forms

24   of communication that's going on?

25       A.    Yes.

1    Q.   Okay.  And then before a specific call, officers

2    will have conversations with the TXANA employees of

3    saying something along the lines of:  This is the call

4    that we're responding to, here's what we want you to do,

5    here's how this is going to go.  Is that fair?

6    A.   Yes.  Plan of action, yes.

7    Q.   Yeah, a plan of action for that particular call?

8    A.   Yes.

9    Q.   And then after the call, the TXANA and the

10   sheriff's office officers may review how the call went

11   and discuss how things can go better in the future?

12   A.   Yes.

13   Q.   Is that a fair summary of kind of the

14   relationship, in terms of training or how a call should

15   go between TXANA and the sheriff's office?

16   A.   Yes.

17   Q.   Okay.  That's helpful, thank you.  And for a

18   welfare check, how would the sheriff's office expect,

19   generally speaking, TXANA to conduct him or herself

20   during a welfare check?

21   A.   For a TXANA to go to a welfare check, it have to

22   be a certain criteria.  They don't go on every welfare

23   check.  There's no reason for them to go to every

24   welfare check, so if a TXANA person is going with

25   someone on a welfare check, certain criterias must have

Sheriff Eric Fagan

1    taken place for them to call for a TXANA person to come

2    with them.  Like, a welfare check that a person is

3    planning on harming themselves, or a person has a -- a

4    weapon and things like that might have a TXANA person to

5    go out there.  If a person's barricaded, known to be

6    mentally ill, might have a TXANA person to go -- to go

7    out there to try to talk to the person from a safe

8    distance, counsel them.  They'll be more trained on how

9    to handle that person; better equipped, I should say, on

10   how to handle that person without anyone getting hurt or

11   harmed.

12        Q.    Okay.  Thanks.  Let me summarize and make sure

13   that I have all of that.  So the kinds of criteria for

14   situations where a TXANA employee would be asked to

15   accompany an officer, those types of situations include

16   where someone threatened to harm themselves, maybe has

17   a weapon, barricaded him or herself -- and/or has a

18   known mental illness.  Am I summarizing that correctly?

19        A.    Yes.  TXANA would be called.  On the barricade

20   one, we probably would add S.W.A.T., as well.

21        Q.    Can you explain to me what barricade means?  How

22   do you identify whether someone's barricaded something?

23        A.    When we say "barricaded", we mean that the

24   person is locked into a room or some type of structure

25   that he has blocked off where we can't reach him or

Sheriff Eric Fagan

1    her, or the -- and the person has a weapon, a weapon

2    that could harm someone on the outside or on the inside

3    that's being barricaded.  We can't reach them, and they

4    -- and it's blocked -- the entranceway is blocked in

5    some fashion by a locked door or some type of debris.

6        Q.   Okay, so there's specific criteria for

7    barricading, which you just outlined, and to determine

8    whether someone has barricaded him or herself in, an

9    officer would try to enter, and then would see that they

10   couldn't enter; is that fair?

11       A.   Or you'll scan the area.  We're talking about

12   things that have to take place in seconds.  Not

13   minutes.

14       Q.   Sure.

15       A.   They have to evaluate real quick to see if that

16   person is barricaded or not.  We'll ask them -- the

17   person to come to the door.  We'll ask the person by

18   loudspeaker to come to the door.  We'll ask if the door

19   was checked.  We'll go up with a -- a shield, a

20   ballistic shield sometimes to check the door to see if

21   it's locked or something like that, so it's things that

22   we have to do very quickly to see if we need to call

23   S.W.A.T. out, or it could be the call that we got that a

24   person say my loved one is barricade -- we'll take their

25   word for it.  We're not going to take a -- we're going

1    to take their word for it, and we'll assume that that

2    person is barricaded, and we're going to treat that as a

3    barricaded situation.

4        Q.   Sure, and if there was a barricaded situation,

5    that would be -- I can't remember the acronym you told

6    me.  I want to say the MDT --

7        A.   You got it.  You got it.  Yes.

8        Q.   Okay.  So if someone were barricaded, that would

9    be relayed and confirmed via the radio and the MDT

10   system?

11       A.   Yes.

12       Q.   Okay.  A couple of other questions about the

13   TXANA and the relationship -- the relationship of the

14   sheriff's office with the TXANA folks.  At a welfare

15   check or another call, are there specific

16   responsibilities or actions that the sheriff's office

17   would generally expect a TXANA employee to take?

18       A.   Well, we're not the specialists in the mental

19   part of it, so we follow their lead, but we make -- they

20   have to make sure that they have to stay as safe as

21   possible, and to also stay away from application

22   actions, let us do our job, but we take the lead on how

23   to do escalate.  If they say, look, give me more time to

24   talk with the person.  We're dealing with a mental

25   person, it -- like, say -- y'all picked on my friend

Sheriff Eric Fagan

```
 1    Hedges all the time.  I'm going to pick on your people

 2    now.  Say we have to go to Molly's house, and she's

 3    mentally ill with a weapon, and then we go to Sarah's

 4    house.  Well, she's not mentally ill, but she has

 5    barricaded herself in.  It might take us five hours to

 6    deal with Sarah, whereas it might take us anywhere from

 7    16 to 18 hours with Molly because of the mental

 8    illness.  We'll take more time and caution with those.

 9         Q.   I understand.  And I appreciate the example.  So

10    it would be fair to say that the TXANA folks from the

11    sheriff's office perspective are the experts on the

12    mental health side in your consulting with the experts;

13    is that fair?

14         A.   Yes.

15         Q.   And would it be fair to say that the sheriff's

16    office officers -- the deputies, lieutenants,

17    sergeants, you name it -- they're the experts on safety,

18    and TXANA folks should listen to the officers on issues

19    of safety?

20         A.   Yes.

21         Q.   That's fair.  I would like to talk about the

22    sheriff's office's policy on filming the police.  Does

23    the sheriff's office have a formal written policy on

24    citizens filming the police and how its officers should

25    interact with those citizens?
```

Sheriff Eric Fagan

```
 1      A.   I don't know if we have a formal policy.  I
 2  think we have a GO.  I don't read them all off, because
 3  I have a lot of things to do.  I would think they do.
 4  I've told them a citizen has the right to film.  There's
 5  no problem with a citizen's filming, as long as they're
 6  a safe distance.  I always say that.
 7      Q.   Okay, let me make sure I break that down, then.
 8  As you sit here today testifying on behalf of the
 9  county, you are not sure if there is a formal written
10  policy that the sheriff's office has for how all
11  officers should interact with citizens filming police?
12      A.   We have a GO about media relations.  I'm not
13  sure if it covers that, but, like I said, officers
14  should know -- if there's legal updates we have every
15  year, they address that, so there is a policy that
16  officers should know that citizens have every right to
17  film -- I mean, First Amendment right.  They have a
18  right to -- if it's out in the public, you can't stop
19  someone from filming, but maintain a safe distance.
20      Q.   Sorry, I missed that last bit.
21      A.   As long as it's in a safe distance and not
22  interfering with police actions.
23      Q.   I got it.  So you referenced the media relations
24  order, and I know that we've already stipulated that
25  your testimony -- your previous testimony also counts
```

 1  for the sheriff's office, and we've looked at that

 2  general order on media relations and the various

 3  versions of that GO previously, so we can kind of put

 4  that one to the side, but you talked a little bit about

 5  a legal update.  Can you tell me more information about

 6  the legal update?

 7     A.   Every year, we have a legal update.  When

 8  legislation comes to do the -- like, the 85th

 9  legislation, they have new laws and things like that.

10  Well, we have to have a legal update where all officers

11  are required to have -- to go over that legal update.

12     Q.   Sure.  And so that legal update comes from

13  TCOLE?  It's a state-mandated legal update; is that

14  fair?

15     A.   It come from the legislation.  TCOLE require us

16  to do it, but the -- the actual law come from the

17  legislation.

18     Q.   Sure.  That makes total sense; but the TCOLE

19  training is summarizing the legislation from that --

20     A.   Yes.

21     Q.   -- year's legislature?

22     A.   Yes.

23     Q.   And you mentioned that you have told your

24  officers that they should let someone film police

25  activity, so long as that person is doing so from a safe

Sheriff Eric Fagan

1    distance; is that correct --

2        A.    Yes, and not interfering with police actions.

3        Q.    And can you tell me how you've told your

4    officers that?  How did that get communicated to -- of

5    the eight-hundred-some-odd peace officers that you have

6    under your authority?

7        A.    From my command staff to their -- to the

8    supervisors, from the supervisors to the officers.  I

9    tell my command staff, who tell the captain, who tell

10   their lieutenant, who tell the sergeants, and it get

11   down to the men and women in the field.

12       Q.    Okay.  Sure, I understand.  And can you tell me

13   more about the sheriff's office's policy?  I know you

14   talked a little bit about the fact that folks are

15   supposed to be able to film, so long as they're at a

16   safe distance and not interfering with what's going on.

17   How does an officer determine what a safe distance is?

18       A.    That's the officer's discretion on that scene.

19   That's that officer's discretion.

20       Q.    And is that discretion ever evaluated?  How does

21   -- how does the sheriff's office determine whether its

22   officers are abusing that discretion in its decision to

23   determine where folks filming police should be located?

24       A.    If the person that was-- in a scenario where a

25   person was told to stop or to get back too far, anything

Sheriff Eric Fagan

```
 1    like that, they would have to make a complaint and then
 2    we'll hear about it and we'll investigate it, or we
 3    catch it on a body camera.  If we saw something on body
 4    camera we didn't think was right, we'll investigate it.
 5        Q.   So those are the two ways that an abuse of
 6    discretion might be flagged --
 7        A.   Yes.
 8        Q.   -- complaint or body camera, so before body
 9    camera, it would just be complaint?
10        A.   Correct.  Yes.
11        Q.   Thank you.  And then you talked a little bit
12    about interfering with police activity.  How would an
13    officer evaluate if filming was interfering with police
14    activity?
15        A.   It could be many ways.  It could be where
16    someone's -- let's say they had a barricaded area, and
17    we had a barricaded person with a high-powered rifle,
18    and we tell the person, "look, you need to get back.
19    You need to get back", and they're in the line of fire.
20    Well, my officer would have to turn their back.  Him or
21    her would have to turn their back to have that person
22    to move if they wouldn't do it verbally.  Now, you're
23    interfering, now you're causing my officers in danger,
24    you're endangering your life, as well as the officer's
25    life.
```

Sheriff Eric Fagan

1    Q.    Sure.  Under the sheriff's office policy, when

2    can an officer essentially prevent or prohibit someone

3    from filming?  What are the categories of situations

4    when an officer from the sheriff's office should prevent

5    or prohibit someone from filming?

6    A.    Well, like the scenario I just gave you, it's

7    not -- it's not necessarily preventing them from

8    filming, but if you arrest that person, they can't film

9    anymore.

10    Q.    Sure.

11    A.    So I don't -- if you understand what I'm saying,

12    it's not that we're stopping that person from filming.

13    We're arresting that person because they were

14    interfering, so once we make that arrest, he or she

15    can't film anymore.

16    Q.    Of course.  Under sheriff's office policy, does

17    an officer have a duty to state their justification

18    before arresting someone for -- while they were

19    filming, if possible?  So, unless there's, I don't

20    know, a scenario where it makes it not feasible to give

21    a warning, is an officer required to give a warning

22    before arresting that person who was filming?

23    A.    If it's -- if time permits, yes.  Like you said,

24    depends on the situation.  Is it a requirement?  No.

25    It's not a requirement.

Sheriff Eric Fagan

1    Q.    So there's no requirement, but is it recommended

2  by the sheriff's office that, if time permits, you warn

3  a person that's filming:  Hey, look, you're not safe,

4  orb or, hey, look you're in the way.  If feasible?

5    A.    Yes, if feasible, yes.

6    Q.    But that's not a requirement.  That's just the

7  sheriff's office recommendation?

8    A.    Yes.

9    Q.    And, again, that recommendation is probably

10  conveyed down the chain of command to folks in the

11  field; is that fair?

12    A.    Yes.

13    Q.    Does a sheriff's officer generally have a duty

14  to inform their supervisor of their justification before

15  arresting someone who's filming police, if it's

16  feasible?

17    A.    No.

18    Q.    So there's no kind of obligation or

19  recommendation that an officer run it up the flag pole

20  before arresting someone who's filming?

21    A.    No.

22    Q.    Does an officer -- a sheriff's officer have a

23  duty to inform him or her supervisor that they arrested

24  someone who was filming police after the arrest, as

25  soon as possible?  So, immediately after the arrest,

1    let your supervisor know:  Hey, I arrested someone.

2    They were filming, but this is why I arrested them.  If

3    feasible.

4        A.    It's not a policy, no.

5        Q.    Does the sheriff's office have a policy on the

6    responsibilities of the supervisor when a citizen is

7    arrested while filming police?  And by that, I mean, if

8    it's feasible, if it's tactically feasible or possible,

9    does the supervisor have any kind of responsibility to

10   interact with the person filming police, maybe warn

11   that citizen that their actions, if continued, may arise

12   to the level of an offense?

13       A.    If a supervisor is on the scene -- if that

14   supervisor's there on the scene, yes.  I'm not really

15   understanding your question.  You mean if a person

16   making an arrest of a person they felt was interfering

17   when they were filming and they make the arrest, if a

18   supervisor wasn't on that scene, is that officer

19   obligated to go tell the supervisor later:  Look, I

20   arrested someone.  He was filming, and these are the

21   reasons why.  Is that what you're asking me, or are you

22   asking me, every time they make an arrest, they have to

23   inform the supervisor of it?

24       Q.    I had asked -- this is kind of a separate

25   question from what I'm asking now, but I had asked you

1    previously if a subordinate officer had any obligation

2    to immediately notify their supervisor after they

3    arrested someone for -- while that someone had been

4    filming, of their justifications for the arrest, and

5    you had answered no.  Do you -- do you want to change

6    that?

7        A.    No.

8        Q.    Okay.  And then, now, I was kind of asking you

9    about any unique responsibilities of a supervisor him

10   or herself.  So if a supervisor is on-scene, does that

11   supervisor have any obligation or duty to interact with

12   someone who was filming police.  For example, if the

13   citizen who was filming, if their actions, if

14   continued, would rise to the level of some kind of

15   offense, would the supervisor have a duty to inform

16   that citizen:  Hey, stop what you're doing, or it's

17   going to rise to the level of offense?  If tactically

18   feasible.

19       A.    If tactically feasible.  Yes, I would agree with

20   that.  Yes.

21       Q.    And how does the sheriff's office ensure that

22   its officers are correctly carrying out this policy

23   that's been conveyed via the chain of command?

24       A.    By the field supervisor's observation, and by

25   body cameras.  And by complaints.

1    Q.    Sure.  I'm writing that down, too.  Thanks.  And

2    before body cameras, it would be just observations and

3    complaints; is that fair?

4    A.    And dash cams.

5    Q.    Yes, and dash cams, okay.  Does the county keep

6    any information about where field officers have

7    observed the sheriff's officers not following this

8    policy?  So we just talked a little bit about the four

9    ways that the sheriff's office uses to check whether

10   its officers are complying with the policy on filming

11   the police, and I'm asking about the first category,

12   observations by field officers.  Does the county have

13   any examples or knowledge about specific observations

14   of its officers failing to comply with the county's

15   policy on filming the police?

16   A.    Not that I know of.

17   Q.    Sure.  And does the sheriff's office have any

18   knowledge of any instances where body camera footage,

19   for instance, showed that its officers were not

20   complying with the policy on filming the police?

21   A.    Not that I know of.

22   Q.    And does the county have any complaints about

23   its sheriff's officers not complying with the policy on

24   filming the police?

25   A.    Yes.

Sheriff Eric Fagan

1    Q.    And can you tell me about those complaints?

2    A.    I only know of one; Justin Pulliam's.

3    Q.    Okay.  And does the sheriff's office have any

4  dash camera footage of sheriff's office officers not

5  complying with the policy on filming the police?

6    A.    No.  And I should make a correction.  We also

7  receive calls about -- complaints about not allowing

8  people filming from out of state, and we get

9  threatening calls about things like -- I don't know who

10  these people are.  It's just out of state numbers,

11  calls, and e-mails, and stuff like that, so, yeah, we've

12  got numerous -- this all happened after the Pulliam

13  incident.

14    Q.    So other than the Pulliam -- the facts

15  surrounding Justin Pulliam's arrest, the sheriff's

16  office and the county has never received a complaint

17  about its officers restricting the rights of citizens to

18  film the police?

19    A.    Since I've been sheriff, no, I -- can't say

20  never, because I wasn't sheriff before 2021, so --

21    Q.    Sure.

22    A.    -- since I've been here, that 's the only one

23  that I can recollect, is Pulliam's.

24    Q.    Bear with me, because we've covered a lot of

25  this already, so I'm just going through my list.

Sheriff Eric Fagan

```
 1              I'd like to jump quickly, Sheriff, to the events
 2    at Jones Creek Ranch Park on July 12, 2021.  We already
 3    previously talked about the events in the park and just
 4    outside of the park in your prior deposition, but, to
 5    make things easier today, if I say "Jones Creek", can
 6    we generally agree that I'm referring to Jones Creek
 7    Ranch Park, and if I'm referring specifically to the
 8    creek, I will let you know?
 9        A.   Yes.
10        Q.   So in your prior testimony, we talked a lot
11    about the video footage and we reviewed the video
12    footage of the press conference, and your comments to
13    Detective Hartfield and Detective Hartfield's comments
14    to Justin Pulliam, and what happened with Justin
15    Pulliam, but as you sit here today testifying on behalf
16    of the county, is there anything that should have been
17    done differently concerning the sheriff's office
18    interaction with Mr. Pulliam on July 12, 2021?
19        A.   No.
20        Q.   Okay.  I'd like to talk about the events on
21    December 21st, 2021, and you're aware that a sheriff's
22    officer arrested Justin Pulliam for interference with
23    public duties on that date, correct?
24        A.   Yes.
25        Q.   And I understand on -- on December 21, 2021,
```

1    that sheriff's officers were dispatched to the

2    residence of Edwin Kraft and his mother, Frances Kraft;

3    is that correct?

4        A.    Yes.

5        Q.    And I'd like to take a look at a document

6    concerning that event.

7                MS. HEBERT:  Molly, will you bring up

8    Exhibit O and mark that as Exhibit 3?

9                [Exhibit 3 was marked.]

10    BY MS. HEBERT:

11        Q.    Now, Sheriff, I'll represent that Exhibit 3 is a

12    document received by plaintiff, Justin Pulliam, in

13    response to an open records request to the sheriff's

14    office.  Can you have tell me what this document is?

15        A.    A call slip.

16        Q.    So when I say "call slip", I'll refer to this

17    type of document; is that fair?

18        A.    Yes.

19        Q.    And is a call slip created for every call that

20    the sheriff's office receives?

21        A.    Yes.

22        Q.    And what's the purpose of the call slip?

23        A.    It shows you the time the call went in, and

24    different radio traffic that went on during that call.

25        Q.    Can we start at the top of this document and

Sheriff Eric C. Fagan

1    just kind of work our way down, so that I understand

2    what it's saying?  At the very top, it says a police --

3    and it's a little bit obscured by the "you are viewing

4    Molly Hanis screen", but it says, "Police event", and

5    then there's a pound sign and a number -- just leave it

6    there, Molly, on page 1.

7         At the very top of this page that says, "Police

8    event", there's a pound sign and then a number.  Can you

9    tell me, does a number get assigned to every call?  Is

10   that -- is that correct?

11   A.    Yes.

12   Q.    And then the next line says "Detail history for

13   police event."  The detail history, is there -- is that

14   the automatic -- what's generated for this police event

15   for a call slip; is that fair?

16   A.    Yes.

17   Q.    And I see that the date listed in this line,

18   "Detailed history for police event number", is as of

19   1/3/2022.  Why is the date on this document about two

20   weeks after the event?  Can you explain that to me?

21   A.    It probably generated the form at that time when

22   they requested it.  That's the time that they printed it

23   out; the date --

24   Q.    Okay, so that's -- that's telling you when the

25   document was generated, when it's pulled off the

1    system?

2       A.   Yes.

3       Q.   And what does, "Output for SCP001" mean?

4       A.   I assume it's coming from a certain computer.

5    I'm not really sure about that one.

6       Q.   That's fine, so as far as the county is aware,

7    it's some kind of indicator, maybe, that it's coming

8    from a particular computer or a particular officer, or

9    something along those lines?

10      A.   Yes.

11      Q.   Can we go to the next line, "Priority 3, types",

12   and it looks like "assault" -- a dash, and "assault" to

13   me.  Let's break that down.  What does "priority 3"

14   mean?

15      A.   Type of call, the urgency.

16      Q.   Okay, so this is what we talked about earlier

17   with the, like, numeric classification system of 1, 2,

18   3?

19      A.   Yes.

20      Q.   And then "type" what does that mean?

21      A.   Type of call.  Is it an assault call?  Is it a

22   accident?  It's just the title of the call.  What

23   offense or what -- why are we going to that location?

24   The reason we're at that location.

25      Q.   Sure, and "ASLT-assault", do you know what that

Sheriff Eric Fagan

1    means?

2        A.    Abbreviation for assault.

3        Q.    So abbreviation for assault and dash "assault",

4    does that mean anything in particular, versus just a

5    regular assault?

6        A.    No.  Doesn't mean -- just abbreviation.

7        Q.    Sure.  And bear with me.  I understand, like,

8    the next lines are about location, then there's a -- a

9    box that starts with the line that says "created", and

10   then a timestamp and other things.  Can you walk me

11   through what this box generally shows?

12       A.    "Created" is when the time the call came in,

13   when created, and then the next line, "entered", it was

14   entered by the dispatcher at that time, and then

15   "dispatch", that's when they radioed it to a unit, and

16   "en route", the unit that accepted the call gave them

17   the time they were en route, gave a control number at

18   that time.  Then "outcome", if the -- the time it was

19   completed, if a report was made, then it -- it was

20   completed with a report or an arrest, then "closed",

21   they closed it at that time.

22       Q.    Okay, thanks for that clearer summary.  I want

23   to just ask a couple of follow-up questions.  You said

24   the "en route" line indicates when the first officer was

25   en route to the scene; is that fair?

1    A.    Yes.

2    Q.    And then "on scene", does that mean that's the

3    time when the first officer was on the scene; is that

4    correct?

5    A.    Arrival time, yes.

6    Q.    And what does the line for "control" mean?

7    A.    That line is where the officer or officers feel

8    like they're taking action.  What's going on at the

9    scene?  They're doing something.  They're in action

10   right then.

11   Q.    Okay.  So would "control" mean that the

12   situation is under control at that time?  Is that a

13   fair --

14   A.    Yes.  They took some type of action, and they

15   have it handle -- well, not really handled, but under

16   control.

17   Q.    Okay, so the -- the line "control" and a

18   timestamp means, at this time, the officers radioed or

19   confirmed that the situation was under control; is that

20   correct?

21   A.    Yes.

22   Q.    Okay.  I think I understand all of that box,

23   then.  I want to go down to the next line that says "IC

24   unit prime."  Can you explain to me what that means?

25   A.    Oh.  The unit number of the officer.

Sheriff Eric Fagan

```
1     Q.   Oh, okay.  I see it.  So "IC unit prime" and the
2  primary responder is that next unit of 24P10?
3     A.   Yes.
4     Q.   And what does "dispo ARPF" mean?
5     A.   The secondary unit, and then the -- the district
6  and beat that the call came from.
7     Q.   No, I think --
8     A.   I'm sorry, that's the dispatcher.  I'm sorry.
9  That's the dispatcher -- radio pat 2, radio 2 from the
10  dispatcher.
11     Q.   So wait.  To the "DISPO ARPF", is that the
12  dispatcher's initials, then?
13     A.   Yeah -- "pat 2" is radio 2.  That could be the
14  dispatcher's initials, but "pat 2" mean radio 2.
15  That's where the dispatcher is sitting at in dispatch.
16     Q.   I'm going to try something here.  Bear with me.
17  I just -- I want to be clear.  I'm going to draw an
18  arrow to the thing that I'm referring to.  Can you see
19  that?
20     A.   Yes.
21     Q.   "DISPO ARPF"; I'm specifically asking about
22  that.  What does that mean?
23     A.   I think that's the initials for the actual
24  dispatcher.
25     Q.   Okay.  I just wanted to make sure I understand.
```

Sheriff Eric Fagan

1    Thank you.  That's helpful.  I think I understand,

2    generally, the rest.  The agency is the sheriff's

3    office, that's correct?

4        A.   Yes.

5        Q.   Okay, and then the others would be the location

6    of -- that the officers were going to, and the dispatch

7    area.  The case numbers, I think that's

8    self-explanatory, and the next line -- I want to

9    continue to the line after that.  It starts with

10   "9/24/19, CST", and then there's a bunch of numbers

11   following that in the left column.  Do these indicate

12   the timestamp of various events?

13       A.   It has the location --

14       Q.   So I'm asking generally, and I'm going to -- I

15   don't know how to undo -- we're experimenting here

16   together, Sheriff.  This column here, are these the time

17   stamps --

18       A.   Yes.

19       Q.   -- and by "here", I'm referring to the numbers

20   on the very left-hand side of the page.  Are these the

21   timestamps for the actions that are taken on the rest of

22   the columns going right?

23       A.   Yes.

24       Q.   Okay.  And then I want to talk about the first

25   one, which is this one that starts with "9/24 /19 CST"

1    --

2       A.   Okay.

3       Q.   -- and that one says "create."  What is that

4    talking about?

5       A.   This is the location.  It gives the location,

6    what -- the location, the name, phone number.  It's just

7    the descriptors of the location.

8       Q.   And then I see that it says "Type description:

9    Check on welfare" -- that was a terrible zero -- circle.

10   My apologies, Sheriff.  I see where it says,

11   "Type/description:  Check on welfare."  You see where my

12   indicator is?

13      A.   Yes.

14      Q.   What does that mean?

15      A.   Just the type of call.  Is it welfare check,

16   possible -- just giving details of the call, why we

17   were there.  The location and the type of call, why we

18   were there; and then we go down further, they explain

19   it.

20      Q.   Okay, it seems like that type description is

21   different from the type that we talked about before with

22   assault; is that -- is that accurate?

23      A.   Yes.  And that could happen.

24      Q.   Tell me about that.

25      A.   Okay.  It -- on this call, the mother had called

1  in for her son that was in mental crisis.  He had a

2  weapon; that brought in an assault.  It was still a

3  welfare check, checking on his wellness and to try to

4  bring him down, so it can be an assault and a welfare

5  check all at the same time.

6      Q.   Okay, so let me make sure that I understand what

7  you're saying there.  Initially, this call was

8  classified as a check on welfare, and then it later got

9  changed to a type assault based on the subsequent

10  events; is that fair?

11      A.   It all happened at the same time.  You never --

12  it was assault at the very -- because he had a weapon

13  and threatening, and it's a welfare check because we

14  know he's mentally ill, so it's -- it happens at the

15  same time.  It could be two things at one time.

16      Q.   Okay.  So wouldn't, then, the -- okay, so it

17  could -- well, then why wouldn't it list up at the top,

18  "Type:  Welfare check", comma, "assault"?

19      A.   Because we don't do it that way.  It's just more

20  detailed.

21      Q.   Sure.  And I guess, then, one of the questions I

22  have -- Molly, can you go -- we'll come back to this

23  page.  Molly, can you scroll down to the next page,

24  please?  Oops.  I've got to take all these marks off.

25  Hold on, Sheriff.  Apparently, they stay on the thing.

Sheriff Eric Fagan

1          Molly, can you go to the next page, please?

2          Okay, Sheriff, I'm going to highlight a section.

3     It starts down here at 11:09:09, and can you explain to

4     me what this entry means?

5     A.    "Type:  Check, assault.  Description:  Check

6     welfare, assault."  What we talked about earlier.

7     Q.    It seems like, to me, based on this indicator,

8     that the type was changed from a check to assault and

9     then the type description was changed from check on

10    welfare to assault.  Is that fair?

11    A.    When you're saying "changed" --

12    Q.    And it says "11:09:09", and the next line says

13    "change."

14    A.    Yes.

15    Q.    So is it fair for me to say that, at 11:09:09,

16    type of call was changed from a welfare check to

17    assault --

18    A.    Yes.

19    Q.    -- and the type description was changed from

20    "check on welfare" to "assault"?

21    A.    Yes.

22    Q.    Okay.  That's all.  I just wanted to make sure I

23    was reading this document correctly.

24          Molly, can you go back to the first page?

25          Sheriff, I want to go back to this first entry

1    here.  We already talked about priority 3, but can you

2    tell me what this "Response:  Standard" means?

3        A.   Standard response?  I'll get there as soon as

4    possible, when time permits.

5        Q.   Okay.

6        A.   Well, I shouldn't say when time permits.  En

7    route; get there as soon as possible.

8        Q.   Okay.  And then I want to look at the next

9    entry.  It looks like at 9:28:08, someone entered a

10   comment.  Who would -- where would this comment come

11   from?

12       A.   I would think -- it could either come from the

13   dispatcher or from the MDT from the officer.

14       Q.   Okay.  So we're not really sure who put the

15   comment in, but there's some kind of comment here?

16       A.   Yes.

17       Q.   And then at 9:28, same timestamp, the next line

18   below, and there's two timestamps.  It says "subject."

19   I think that this seems pretty apparent to indicate

20   that there's two subjects, potentially, at the

21   property, and their names, date of births, and ages; is

22   that fair?

23       A.   Yes.

24       Q.   The next line starts with "09:28:08", and there

25   is a -- after that time stamp there's a dash, "NPREMS."

Sheriff Eric Fagan

1    What does that mean?

2       A.   I don't see -- would you --

3       Q.   Yeah, sure, I'll circle it.  What does this

4    indicate?

5       A.   No more.  No more comments.

6       Q.   No, no.  This one.  Let me see if I can make it

7    clearer.  Hold on.  I'll do it in red.  This "NPREMS"

8    thing right there.

9       A.   Not really sure.

10      Q.   Okay.  Let's go to 9:28:26 where it says "no

11   more" right there.  What does that mean?

12      A.   No more comments at this time.

13      Q.   Okay.  So if I -- if I were to conclude that all

14   of the stuff before "no more", that's the preliminary

15   information coming from the dispatch, for lack of a

16   better descriptor?

17      A.   Yes.

18      Q.   Okay.  And then at 9:30:16, this line here, I'll

19   try to highlight it -- what's going on on that line?

20      A.   The operator -- where you have it highlighted is

21   from dispatch.  Just the dispatcher's name.

22      Q.   Okay, and then what is this -- what's going on

23   with Officer Rodriguez here?  Is it -- is this number

24   indicating -- this "22P14", does that mean Officer

25   Rodriguez?

Sheriff Eric Fagan

```
 1     A.    His radio number.

 2     Q.    Okay, so 22P14 -- am I saying that right?

 3     A.    Yes.  I think "24 Paul" -- I can't see it --

 4     Q.    Yeah, sure.  So I'll say -- we can zoom in

 5   there, Molly, a little bit, I think.  Well, if we

 6   can't, we can't.  Thank you.  And I'm going to take

 7   these marks off and see if that helps.

 8     A.    Yes, 22 Paul 14 Rodriguez.

 9     Q.    So 22 Paul 14, whenever we see that, that means

10   Officer Rodriguez; is that fair?

11     A.    Yes.

12     Q.    And I guess that means that 22P10, does that

13   mean Officer Lacy?

14     A.    Yes.

15     Q.    And so at 9:30:16, is the dispatcher indicating

16   that these two officers are responding to the call?

17     A.    Yes.

18     Q.    Okay.  I want to talk about these entries with

19   "backer."  9:30:24, there's two indicators, two

20   timestamps that say "backer."  I'm circling that there.

21   What does "backer" mean?

22     A.    I'm assuming this is the dispatcher.  Not really

23   sure.

24     Q.    So something about "backer."  And it looks like

25   this Officer Guajardo was, maybe, dispatched; is that
```

1    fair?

2        A.    Yes.

3        Q.    And then is -- maybe Officer Rosalyn Jenkins was

4    dispatched?

5        A.    Yes.

6        Q.    And then it looks like Officer Rollins was

7    dispatched.

8        A.    Yes.  Oh, backup units.  Backer.

9        Q.    At 9:30:24, these were the backup units

10   dispatched?

11       A.    Yes.

12       Q.    So at 9:32:42, there was this message relayed.

13   What does this mean?

14       A.    On-scene.

15       Q.    Okay, so 9:32:42, 24 Paul 10, which was --

16   Officer Lacy was on-scene; is that what that means?

17       A.    Yes.

18       Q.    And then the next time entry, 09:36:15, says,

19   "LOGM."  What does "LOGM" mean.  Do you see where I'm

20   referring to --

21       A.    Yes, I'm reading the message to the side,

22   because it states what's going on.

23       Q.    Sure.  And I guess that gets to the point, this

24   is a lot of text, here, so I'm curious, like, how the

25   officer who's responding to the scene has the time to

1    type all this up, and so I'm just curious.  What is

2    this, where does it come from, how does the officer do

3    it?

4        A.   Well, other officers are on the scenes.  While

5    one person is doing something, they might go back and

6    type in, so it varies.  That's why you have different

7    radio numbers, sometimes, on a call slip.

8        Q.   Well, it looks like, though, only Officer Lacy

9    was on-scene this time, and it looks like the 24 Paul

10   10, which is Officer Lacy, this looks like the message

11   is coming from him -- or her --

12       A.   Him.

13       Q.   -- or her, okay.  This message is coming from

14   him, but then there's a giant message number, and

15   message type text.  Can you -- do you know what this is

16   about?

17       A.   No.

18       Q.   Okay.  Let's skip to the next page.  I'm going

19   to try to clear my markers off.  Go back.  Sorry,

20   Sheriff.  I didn't mean to cut you off.

21       A.   That's all right.  I was reading, and it looked

22   like prior convict -- prior things that happened with

23   this location, because it said, "intoxication",

24   "includes stalking" -- just a prior history.

25       Q.   So how -- how would this be generated?  How did

1    this information come to be?  And how did it end up in

2    this report?  I'm not trying to catch anybody, here.

3    I'm just trying to understand what this thing is --

4       A.   No --

5                    [Reporter warning.]

6    BY MS. HEBERT:

7       Q.   We're overlapping each other too much, so we'll

8    try to stop interrupting each other as much.  Just as a

9    reminder, a deposition can always be a natural

10   conversation.

11        So this entry at 9:36:15 that says "LOGM", how

12   does this information get here?

13      A.   They probably ran -- ran the subject -- and that

14   takes seconds -- out of a computer and got prior

15   history, or trying to get a warrant, and it's coming

16   from the 434th Court, Judge Becerra -- I was just

17   reading it, then I saw what it was.  Got height and

18   weight descriptors of the suspect, and things like that.

19      Q.   Okay, so would it be --

20      A.   And that's --

21      Q.   No.  Go ahead.  I didn't mean to cut you off.

22      A.   I was just going to say that could be a quick

23   check.  You can ask the dispatcher to do it and --

24   you're talking seconds.

25      Q.   Okay, so it would be fair to say, at 9:36:15,

1    Officer Lacy ran Edwin Kraft through the system, and

2    this is what came back?

3        A.   Yes.

4        Q.   Okay.  Molly, would you scroll down to the next

5    page?  And look at -- I want to start with the

6    timestamp that says "9:49:02", and I'm going to circle

7    that, just to help identify it, and it says, "OK", and

8    then it says 24 Paul 10, which I understand to be

9    Officer Lacy, and then there's a comment, "Standing by

10   for another unit.  Have P14 stop it up."  Did I read

11   that correctly?

12       A.   Yeah, I think they meant to say "step it up."

13       Q.   Oh, okay.  So "have P14", which I understand to

14   be Officer Rodriguez, step it up?  Like, get there

15   sooner?

16       A.   Yes.

17       Q.   So at 9:49:02, what does "okay" mean?

18       A.   I think it's from the MDT, coming from the

19   officer on the mic.

20       Q.   Right, and so, I mean, you see "MISC", "MISC",

21   "MISC", and then you see, "OK" at 9:42:02.  What does

22   "OK" mean, compared to "MISC", which I assume stands for

23   "miscellaneous"?

24       A.   I'm thinking it's either the MDT or by mic.  We

25   can call dispatch and find out real quick.

Sheriff Eric Fagan

```
 1    Q.   Sure.

 2              MS. HEBERT:        Sarah, why don't we take a

 3    brief moment off the record while the sheriff founds out

 4    this information.

 5              COURT REPORTER:  Off the record, 11:50.

 6              [Off the record.]

 7              COURT REPORTER:  Back on the record at

 8    11:58.

 9    BY MS. HEBERT:

10    Q.   Okay, Sheriff, so we were just talking about

11    9:49:02, and the message right next to that is "OK."

12    Can you tell me what that means?

13    A.   They checked on the officer to see if the

14    officer was okay.

15    Q.   And then the officer relayed that they were

16    okay?  That's what that means?

17    A.   Yes.

18    Q.   Okay.  So just to make sure we've got a clear

19    record, because we were stepping on each other little

20    there -- sorry, Sarah.  Don't be mad -- at 9:49:02, the

21    dispatcher was checking on the officer and the officer

22    relayed that they were okay and that they were on

23    standby, essentially?

24    A.   Yes.

25    Q.   Okay.  I want to look at the next line.  I'm
```

Sheriff Eric Fagan

1   going to try to remove the annotation.  At 9:42 --

2   9:49:42.  I'm going to circle that annotation.  At

3   9:49:42, there's a indicator of miscellaneous, and it

4   looks like 24 Paul 10, which we understand to be Officer

5   Lacy, commented subject -- which -- "SUBJ", which I

6   assume means "subject", "at back of residence with

7   baseball bat."  Am I reading that correctly?

8       A.   Yes.

9       Q.   And does that mean that Officer Lacy radioed

10  that the subject, which I assume was Edwin Kraft, was at

11  the back of the residence with a baseball bat?

12      A.   Yes.

13      Q.   Okay.  And then I want to look at the next

14  entry, which is 9:50:16, and then it says "MISC", and

15  then we see 24 Paul 10, which we understand to be

16  Officer Lacy, and then, "Comment:  Parties separated -

17  mom outside with me- SUBJ inside the residence."  Did I

18  read that correctly?

19      A.   Yes.

20      Q.   And I understand that to be saying, based on

21  your prior testimony, that at 9:50:16, Officer Lacy

22  radioed that the parties were separated.  The mom, Mrs.

23  Kraft, was outside with Officer Lacy, and the subject,

24  Edwin Kraft, was inside the residence; am I reading that

25  correctly?

Sheriff Eric Fagan

1    A.    Yes.

2    Q.    If you want to look at the next line, which

3    starts at "9:55:23, miscellaneous", and then I'm going

4    to read that.  24 Paul 10, "Comment:  Keeping an eye on

5    the door from a distance until SUPV make LOC."  Did I

6    read that correct?

7    A.    Yes.

8    Q.    Correctly.  And based on your prior testimony, I

9    understand that at 9:55:23, Officer Lacy, 24 Paul 10,

10   radioed that he was keeping an eye on the door from a

11   distance until something happened.  Can you explain to

12   me what "SUPV make LOC" means?

13   A.    Until the supervise make the location.

14   Q.    Okay, so based on this entry, Officer Lacy was

15   standing outside the door from a distance until a

16   supervisor arrived; is that fair?

17   A.    Yes.

18   Q.    And then the next line has "09:55:29, on-scene",

19   which I think you already testified this means

20   on-scene -- 22 Paul 14, "comment:  Out."  Did I read

21   that correctly?

22   A.    Yes.

23   Q.    And what does "comment:  Out" mean?

24   A.    Arrival.

25   Q.    Okay, so at 9:55:29, this means that 22 Paul 14,

1    which you previously testified is Officer Rodriguez,

2    arrived on the scene; is that accurate?

3        A.    Yes.   They use the term "out."   I didn't use

4    that when I was on the street.   "I used AR", but he used

5    "out."

6        Q.    And you understand that means "arrived"?

7        A.    Yes.

8        Q.    This next line, it says, "9:55:42,

9    miscellaneous", the 24 Paul 10, "Comment:  W/M BLK over

10   BLU."  Did I read that correctly?

11       A.    Yes.

12       Q.    And based on your prior testimony, I understand

13   this to mean that Officer Lacy made some kind of

14   comment over the radio.  Can you tell me what the

15   comment was?

16       A.    White male, black over blue clothing.   I'm

17   thinking descriptors.

18       Q.    Okay, so in this point -- at this time, Officer

19   Lacy was describing Edwin Kraft; is that fair?

20       A.    I would -- I would think so, yes.

21       Q.    The next line, 10:00:16, we see, "OK" again, and

22   then we see 22 Paul 14, 22 Paul 10.  Did I read that

23   correctly?

24       A.    Yes.

25       Q.    And based on your prior testimony, I would

1    understand this line to indicate that the dispatcher

2    checked on the two deputies in the field, and they

3    radio back -- they radioed back that they were okay?

4        A.    Yes.

5        Q.    The next line, 10:00:42 miscellaneous, 22 Paul

6    14 comment "Justin Pulliam, journalist on-scene", did I

7    read that correctly?

8        A.    Yes.

9        Q.    Based on what we talked about already today, I

10   would understand this to be saying that at 10:00:42,

11   Officer Rodriguez radioed that Justin Pulliam -- which I

12   think is a typo or a misspelling of Justin Pulliam, was

13   on-scene as a journalist; is that correct?

14       A.    Yes.

15       Q.    Okay, and then I'm going to look at the next

16   line, which I'm going to circle.  10:01:41, on-scene

17   22S7, comment:  Out."  Did I read that correctly?

18       A.    Yes.

19       Q.    And at this time, some other officer is on the

20   scene; is that what this is indicating?

21       A.    Yes.

22       Q.    And I can't remember who this one was.  Molly,

23   can we go back to the first page, please?  Let's --

24   22S7, does that refer to Taylor Rollins?

25       A.    Yes.

1    Q.    So left's go back to page 2, Molly.

2         At 10:01:41, "On-scene 22S7.  Comment:  Out."

3    Does that mean that officer Rollins had arrived?

4    A.    Yes.

5    Q.    And then at 10:03:05, "On-scene 2M7", does that

6    mean whoever that officer, I think that was the officer

7    Guajardo -- Guajardo that we looked at previously; is

8    that correct?

9    A.    Yes.

10   Q.    And then I want to look at this 10:16:40.  There

11   was a radio -- at 10:16:40, we see the message, "OK 22

12   Paul 14, 2M7, 22S7, and 24 Paul 10"; is that correct?

13   Did I read that correctly?

14   A.    Yes.

15   Q.    And does this mean all the -- the dispatcher --

16   the dispatcher checked on all the officers on-scene, and

17   they radioed back that they were okay?

18   A.    Yes.

19   Q.    I think we can skip a lot of this next couple of

20   entries.  Let's look down -- Molly, could you scroll

21   down just a little?

22        I want to look at 10:39:56, and I'm going to

23   circle that.  I'm going to read that.  10:39:56, "Misc

24   2M7, Comment:  Mom said he left the house", and then

25   there's some numbers, "down there screaming."  Did I

Sheriff Eric Fagan

1    read that correctly?

2        A.    Yes.

3        Q.    And does this mean that the mom, Frances Kraft,

4    relayed to some officer -- I assume 2M7 -- that Edwin

5    Kraft was no longer in the house?

6        A.    Yes.

7        Q.    Okay, I want to look at the next line of

8    10:42:25, and this says, "Miscellaneous:  24 Paul 10.

9    Comment:  Subject on foot headed out.  Poss have a

10   weapon.  Set up perimeter."  Did I read that correctly?

11       A.    Yes.

12       Q.    And does that mean at 10:42:25, Officer Lacy

13   radioed a message to the dispatch and to the other

14   officers; is that correct?

15       A.    Yes.

16       Q.    And, as I understand Officer Lacy's comment

17   that's memorialized here, he was saying that the

18   subject, Edwin Kraft, was on foot; is that a correct

19   understanding of this writing?

20       A.    Yes.

21       Q.    And that Edwin Kraft was headed out, and we

22   don't know exactly what "headed out" means, but it says

23   "headed out."

24       A.    Yes.

25       Q.    And "poss have a weapon", does that mean that

Sheriff Eric Fagan

```
 1    Officer Lacy at that time thought that Edwin Kraft

 2    possibly had a weapon?

 3        A.    Yes.

 4        Q.    And when Officer Lacy said, "set up perimeter",

 5    was Officer Lacy instructing other officers to set up a

 6    perimeter?

 7        A.    Yes.

 8        Q.    I want to look at the next line of 10:42:31, and

 9    it looks like this comment came shortly after -- seconds

10    after the last comment.  The line says, "10:42:31, MISC

11    24 Paul 10.  Comment:  May be a long gun."  Did I read

12    that correctly?

13        A.    Yes.

14        Q.    And, as I understand it, based on your prior

15    testimony about this document, this line is saying that

16    at 10:42:31, Officer Lacy radioed that the weapon that

17    Edwin Kraft may have might be a long gun; is that

18    accurate?

19        A.    Yes.

20        Q.    Let's skip down to 10:46:33.  This one right

21    here, Sheriff.  It's easy to get lost in these numbers.

22    Do you see where I'm indicating 10:46:33?

23        A.    Yes.

24        Q.    I'm going to read this line.  "10:46:33, MISC,

25    22 Paul 14.  Comment:  Call mother ADVD her to leave LOC
```

1    with screeners."  Did I read that correctly?

2        A.    Yes.

3        Q.    And, as I understand this line, Sheriff, this

4    line is memorializing the fact that at 10:46:33,

5    Officer Rodriguez radioed that someone needed to call

6    the mother, Frances Kraft, and advise her to leave the

7    location with some screeners.  Is that correct?

8        A.    Yes.

9        Q.    And would the screeners refer to TXANA

10   employees?

11       A.    I would assume so.

12                  [Off-the-record discussion.]

13              MR. HEDGES:      I'm back, Christie.  Thank

14   you for the break.

15   BY MS. HEBERT:

16       Q.    Sure.  So I want to look at the -- another line,

17   which is 10:49:07.  Can you see where I'm circling?

18       A.    Yes.

19       Q.    And I'm going to read that line.  "10:49:07,

20   MISC.  Comment:  CT ADVD mother to leave LOC."  Did I

21   read that correctly?

22       A.    Yes.

23       Q.    And, as I understand it, some comment was

24   entered that CT advised mother to leave location.  Is

25   that understanding correct?

Sheriff Eric Fagan

```
 1    A.   Yes.

 2    Q.   Does this doesn't -- this line doesn't have the

 3  radio number or indicator for officer.  Why is that?

 4  AND I guess the next question is what does "CT" mean, so

 5  maybe that answers the question, but help me unpack this

 6  line.

 7    A.   I'm thinking "CT" probably the TXANA person, but

 8  let me -- can I make a quick call?

 9    Q.   Sure.

10              [Off the record.]

11    A.   "CT" stands for "call taken"; the dispatcher.

12    Q.   Okay, so the dispatcher advised the mother to

13  lever location; is that accurate?

14    A.   Yes.  They're confirming that she was advised to

15  leave.

16    Q.   Okay.  That's fine.  That's helpful.  Thank you.

17  I would not have -- I would not have bet that.

18       Let's go down to 10:53:09, and I will circle

19  that.  "10:53:09, MISC 22S7.  Comment:  1X detained at

20  10:53."  Did I read that correctly?

21    A.   Yes.

22    Q.   What does this line mean?

23    A.   One subject was detained.

24    Q.   At 10:53?

25    A.   Yes.
```

Sheriff Eric Fagan

1    Q.   And then let's look at 10:55:40.  That's the

2    next page.  10:55:40, I'm going to circle that one.

3    That was a terrible circle.  I'm just going to circle

4    the time, because that's safer.  At 10:55:40, "Clear

5    5D11.  Comment:  Clear at 10:54."  Did I read that

6    correctly?

7    A.   Yes.

8    Q.   And, as I understand this line, whoever the

9    officer was 5D11 -- that's probably in the call log

10   somewhere -- was radioing that everything was all clear

11   at 10:54.  Is that accurate?

12   A.    That he cleared the scene; that he left the

13   scene.

14   Q.   Okay.  So this means at 10:55:40, 5D11 left the

15   scene?

16   A.   Yes.

17   Q.   Okay.  That's helpful.  Thank you.  We can --

18   thank you, Sheriff, for helping me understand what a

19   call slip is and how that works.  I want to talk about a

20   couple more things, first of which after Justin

21   Pulliam's arrest on December 21st, 2021.  Other than

22   Detective Travis James, who at the sheriff's office

23   reviewed the footage of events on December 21, 2021?

24   A.   On the day of the arrest.

25   Q.   Yeah, so just to be clear, I know that you

Sheriff Eric Fagan

1    previously testified that you reviewed Officer

2    Rodriguez's dash camera, and then subsequently reviewed

3    the footage from the complaint, so I'm asking you who

4    else in the sheriff's office besides yourself and

5    Detective Travis James reviewed the footage?

6        A.    My chief.

7        Q.    And who would your chief be?  Would that be

8    Chief Deputy Provost?

9        A.    Yes.  Chief Deputy Matty Provost.

10       Q.    Okay.  Anyone else?

11       A.    I would believe the captain of patrol.  Captain

12   Mike Fisher.

13       Q.    Okay.  So you have Detective Travis James

14   reviewed the footage, yourself, Chief Deputy Provost,

15   and the person in charge of the patrol; is that

16   correct?

17       A.    Yes, and the -- the head -- Major Burger.  So

18   myself, Chief Provost, Major Burger, Captain Fisher.

19       Q.    Okay.  Thank you for helping me clarify.  And

20   was any sheriff's officer disciplined for their role in

21   Justin Pulliam's arrest?

22       A.    No.

23       Q.    Was there any -- we talked a little bit earlier

24   today about oral reprimand.  Was there any oral

25   reprimand?

1    A.    No.

2    Q.    Was there any conversation among anybody about,

3    hey, you could have handled X, Y, or Z better?

4    A.    No.

5    Q.    And, as you sit here today testifying on the

6    county's behalf, is there anything that should have been

7    done differently on December 21, 2021?

8    A.    No.

9    Q.    Couple more questions.  I want to talk a little

10    bit about the investigation of Justin Pulliam for the

11    offense of interference with public duties.  I

12    understand that detective James investigated Justin

13    Pulliam for the offense.  How did Detective James come

14    to be tasked with investigating Justin Pulliam for the

15    offense?

16    A.    He was assigned to it by his supervisor.

17    Q.    Okay, and is that the ordinary course of how

18    someone get tasked with investigating an offense?

19    A.    Yes.  It -- it'd be assigned, yes.

20    Q.    So the supervisor of some division hands out

21    assignments of what the detectives should be

22    investigating; is that fair?

23    A.    Yes.

24    Q.    And is it typical for the sheriff's office to

25    assign a detective to investigate interference with

Sheriff Eric Fagan

1   public duties?

2       A.   It depends, yes.  It depends on the situation.

3       Q.   And what does it depend on?

4       A.   Well, all arrests are investigated by either the

5   officer or, if it needs to be further investigated,

6   we'll assign it to an investigator, depending on the

7   situation.

8       Q.   So every arrest that a sheriff's officer makes

9   is investigated?

10      A.   Yes, by that officer, or by a supervisor, and,

11  if needed, by an investigator.

12      Q.   Okay, so how does the sheriff's office determine

13  if an investigator is needed?

14      A.    If it's a situation that garners media

15  attention.  If it's a situation that have multiple

16  suspects, or multiple injuries, or if it's a major

17  crime.

18      Q.   Okay, I want to break that down.  What's a

19  situation that garners media attention?

20      A.   Multiple -- multiple injuries, multiple

21  suspects, something that can cause injury or death;

22  something like that.

23      Q.   Okay, so those are the types --

24      A.   Basically, injury or death -- I'm sorry, I

25  should have said major injuries or death.

Sheriff Eric Fagan

1    Q.   No, that's okay.  So those are the types of

2    situations where an investigator would be assigned -- a

3    detective would be assigned to investigate what

4    happened?

5    A.   Yes.

6    Q.   And who reviewed Detective James' findings or

7    report from the investigation of Justin Pulliam?

8    A.   Supervisor of the investigator's division.

9    Would have to be that supervisor.

10   Q.   And so if the supervisor -- in general, if a

11   supervisor reviews a detective's report, would the

12   supervisor tell the detective:  Hey, this report has

13   certain deficiencies, and you should go back and look

14   again?

15   A.   Yes.

16   Q.   But if the supervisor approved the report, what

17   would happen next?

18   A.   It'd just go forward, be filed --

19   Q.   What is --

20   A.   It gets filed.  Our report will be filed in the

21   computer.  It'll go as the officer wrote it.  If there

22   was no corrections need to be made or anything like

23   that, it'll just go into our system, or cloud, however

24   they say it.

25   Q.   I get you.  So, how -- how does a -- a report --

Sheriff Eric Fagan

```
 1    a detective's report that goes into the system, like it
 2    gets finalized, gets done, how does that get transferred
 3    to the district attorney's officers?
 4        A.    We send the charges over.
 5        Q.    And does the sheriff's office always send the
 6    charges over to the district attorney's office?
 7        A.    Yes.
 8        Q.    So it's a matter of course that every time an
 9    offense investigation is completed, the report gets sent
10    to the district attorney's office?
11        A.    Yes.
12        Q.    Is there ever a situation where the sheriff's
13    office decides not to send the investigation results
14    along to the district attorney's office?
15        A.    If charges are going to be filed, we send them
16    over all the time.
17        Q.    I understand that, but, like, what if -- if it's
18    not sure if charges are going to be filed.  How does
19    that -- I guess what I'm saying is separate and apart
20    from the district attorney's decision to charge someone
21    or not, there's got to be some communication between the
22    sheriff's office and the district attorney's office
23    saying, hey, here's the offenses that you need to pay
24    attention to.  How does that work?
25        A.    It's -- it's different in Fort Bend.  In
```

1    Houston, we have to call the D.A. to see if they'll

2    accept charges.  Here in Fort Bend, we don't do that.

3    The officer's discretion is to make that arrest, and

4    then after writing the report, they send the charges

5    over, then the D.A. can either say he or she's going to

6    accept the charges or not accept the charges.  If the

7    D.A. decides not to accept the charges, we have to

8    release that individual.

9        Q.   Okay, so that's helpful, thank you.  Let me

10   break that down.  So every time someone is arrested in

11   Fort Bend County, the officer who did the arresting

12   writes a report, and there may be an investigation if

13   it's a serious crime with multiple suspects or serious

14   injuries, and then every time those reports and

15   findings get sent to the district attorney's office,

16   and then the district attorney's office decides what to

17   do from there?

18       A.   Yes.

19       Q.   Okay.  Thank you.  I'd like to talk a little bit

20   about search warrants.  Does the sheriff's office have a

21   policy on who the appropriate officer is to request a

22   particular search warrant?

23       A.   No.  We -- I shouldn't have said no.  The

24   detectives do the search warrants.  Each detective can

25   do the search warrant.  It varies from detective to

Sheriff Eric Fagan

1    detective, what division it's in.  Not just one person

2    does it.

3        Q.   So, in general, patrol officers don't request

4    search warrants?

5        A.   Correct.

6        Q.   Detectives request -- detectives in the

7    sheriff's office for Fort Bend County are the ones who

8    are responsible for requesting search warrants?

9        A.   Yes.

10       Q.   Does the sheriff's office generally require a

11   detective to have firsthand knowledge to request a

12   search warrant?

13       A.   I'm not sure of your question.  Firsthand

14   knowledge of the case?

15       Q.   Yes.

16       A.   No.

17       Q.   Does the sheriff's office have a policy on the

18   requirements for an affidavit to request a search

19   warrant?

20       A.   Yes.

21       Q.   And what is that policy?

22       A.   If the officers are being truthful at the time,

23   making their -- making their affidavit, that, to the

24   best of the knowledge, they're giving a true and

25   accurate statement.

1    Q.    Sure.  And is there any rule about relying on

2    the statements of other officers in the affidavit for a

3    search warrant?  Is it permissible to rely on the

4    statements of other officers for a search warrant?

5    A.    Yes.

6    Q.    So a detective who's seeking to complete an

7    affidavit to get a search warrant can rely on the

8    statements of other officers?

9    A.    Yes.

10    Q.    Can -- can a detective who's seeking to write an

11    affidavit to get a search warrant rely solely on the

12    statements of other officers?

13    A.    In some situations, yes.

14    Q.    In what kind of situations?

15    A.    If the officers were the only person there at

16    the time.  The officer's the same as the detectives.

17    They're obligated to be truthful and accurate as

18    possible when giving statements, as well.  It could be

19    a situation that there's no complainant there, or

20    someone -- you know, other than just the officer.

21    Q.    Sure.  And so I guess that naturally leads me to

22    the next question of if there's only one officer who

23    witnessed or was in the field and understands what's

24    going on, why wouldn't that officer who has the direct

25    knowledge and direct information be the one to complete

Sheriff Eric Fagan

1    the affidavit?

2        A.    That officer's responsibility is to write the

3    offense report.  They write the offense report and get

4    sent over to that investigative agency.

5        Q.    And then whoever's investigating writes the

6    affidavit based on the report; is that correct?

7        A.    Yes.

8        Q.    Okay.  Why don't we take a brief break, and I'll

9    just check my notes to make sure I don't have anything

10   else, and, hopefully, we'll be done from there.

11              COURT REPORTER:  Off the record, 12:30.

12                   [Short recess was taken.]

13              COURT REPORTER:  Back on the record,

14   12:33.

15   BY MS. HEBERT:

16       Q.    Sheriff, thank you for your candor, and your

17   patience with me today.  I don't have any other

18   questions at this time.  I pass the witness.  Kevin, do

19   you have anything you want to discuss?

20              MR. HEDGES:     There was one thing that I

21   think we need to clarify.  Molly, could you please put

22   up Exhibit 3 for me?  We're going to look at the very

23   first page at the very top.  Thank you for making it

24   bigger.  You've got young eyes.  I don't.  This is a lot

25   easier for me to read.  Thank you.

Sheriff Eric Fagan

1    EXAMINATION BY MR. HEDGES:

2       Q.   Sheriff, when you called your office to find out

3    what "OK" meant to response to questions, did you also

4    ask what -- in this top box here, what "control" means?

5       A.   Yes.

6       Q.   All right, I think earlier, you mentioned that

7    you thought it meant when the officer had the scene

8    under control.  Is that what you were told when you

9    inquired?

10      A.   No.

11      Q.   Tell us what "control" means.

12      A.   Megan said that it was officer onsite.

13      Q.   So the officer was controlled to be onsite?

14      A.   Yes.

15      Q.   That's all I've got.  I pass the witness.

16           MS. HEBERT:     Sure.  Thanks, Kevin.

17   FURTHER EXAMINATION BY MS. HEBERT:

18      Q.   I don't think I entirely understand what that

19   means, Sheriff, so I'm going to just ask a couple of

20   follow-up questions.  I understand the line before

21   "criminal" in Exhibit 3 to be saying on scene, and

22   that's when an officer is on-scene at the location; is

23   that fair?

24      A.   Yes.

25      Q.   Okay, so then control, what -- what does

Sheriff Eric Fagan

1    "control" mean based on the additional clarification you

2    received --

3        A.    Pretty much the same thing.  They were on-scene

4    and okay.  On-scene.  Pretty much the same thing.

5        Q.    So --

6        A.    But --

7        Q.    Go ahead.  I don't mean to interrupt you.

8        A.    No, I was going to say I'm going to call her

9    again.  That'll just take two seconds.

10       Q.    Sure, because there's two different timestamps,

11   so I'm just unclear, to I'm trying to understand.

12   That's it.

13                   [Off the record.]

14       A.    "Control" is the same as "OK."  I'm sorry.  Are

15   y'all ready?

16       Q.    Sure.  We've stayed on the record, so continue.

17       A.    "Control" means the same as "OK."

18       Q.    Okay, it seems like there's -- there's these

19   different numbers, then, in the columns, and I'm just

20   trying to understand who's communicating this at times.

21   I'm going to just circle these.  We've got these

22   numbers here (indicating).  What's going on in this

23   column?

24       A.    CT11, CT... I don't know if that's the

25   dispatcher's number or what.

```
 1                [Off-the-record discussion.]

 2     A.    That's the dispatcher's workstation.

 3     Q.    Okay.  So "DW07" means "dispatcher workstation."

 4  What does "S321" mean?

 5     A.    The S stands for what?

 6                [Off-the-record discussion.]

 7     A.    That's the deputy's MDT number.

 8     Q.    Okay.  So at 12:21:09, 32, 42, this was likely

 9  Officer Lacy arriving on scene?

10     A.    Yes.

11     Q.    And then we've got this "12/21 control",

12  "12/21/2021", and "09:49:02", this is the dispatcher

13  indicating that everything is controlled on-scene is

14  okay; is that fair?

15     A.    Yes.  The same as okay.  Just checking.  Yes.

16     Q.    I understand.  Thank you for clarifying that.

17           Pass the witness, Kevin, if there's anything else

18  you want to clean up.

19                MR. HEDGES:     No, we have nothing

20  further.

21                MS. HEBERT:     Thank you sheriff for your

22  time today.

23                THE WITNESS:    Thank you.

24                COURT REPORTER:  Off the record 12:39.  All

25  right, guys, thanks.
```

Sheriff Eric Fagan

```
1    MR. HEDGES:      And we do want a copy.

2    COURT REPORTER:   Okay, thanks a lot, guys.

3    [Deposition was concluded.]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  REPORTER CERTIFICATION

 2      ORAL DEPOSITION of ERIC FAGAN, taken on August 29,

 3   2023.

 4      I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify

 5   to the following:

 6      That the witness, ERIC FAGAN, was duly sworn by me,

 7   and that the transcript of the deposition is a true

 8   record of the testimony given by the witness;

 9      That examination and signature of the witness to the

10   deposition transcript was reserved by the witness at the

11   time of the deposition;

12      I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties in the

14   action in which this proceeding was taken, and, further,

15   that I am not financially or otherwise interested in the

16   outcome of this action.

17      Certified by me on this 13th day of September, 2023.

18

19              _____

20              Sarah B. Townsley CRR CCR CSR RPR

21              Certified Realtime Reporter

22              TX CSR #5746; LA CCR #92016; RPR 814558

23

24

25
```

**PX-49**

1                  UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION

3   JUSTIN PULLIAM,

4      Plaintiff,

5   v.                      Civil Action No. 4:22-cv-4210

6   COUNTY OF FORT BEND, TEXAS;
    SHERIFF ERIC FAGAN, in his
7   Individual capacity; OFFICER ROBERT
    HARTFIELD, in his individual capacity;
8   OFFICER JONATHAN GARCIA, in his
    Individual capacity; OFFICER TAYLOR
9   ROLLINS, in his individual capacity;
    And OFFICER RICKY RODRIGUEZ, in
10  His individual capacity,
    Defendants

11

12

                      ORAL DEPOSITION
13
                           OF
14
                  SHERIFF ERIC FAGAN
15

16              Taken at the Offices of
             Fort Bend County Attorney
17        401 Jackson St., 3rd Floor Conference
                    Richmond, Texas
18

19  August 9, 2023                      9:03 a.m.

20

21

22

23

24

25

Sheriff Eric Fagan

```
 1    APPEARANCES:

 2    FOR PLAINTIFFS:

 3                         INSTITUTE FOR JUSTICE
                           816 Congress Ave., Suite 960
 4                         Austin, TX  78701
                           By: Christen Mason Hebert
 5                             CHebert@IJ.org
                               Jeff Rowes
 6                             JRowes@IJ.org

 7    FOR DEFENDANTS:

 8                         Kevin Hedges
                           Assistant County Attorney
 9                         Litigation Division
                           401 Jackson Street
10                         3rd Floor
                           Richmond, TX  77469
11                         Kevin.Hedges@FBCtx.gov

12

13    ALSO PRESENT:       Molly Hanis

14    REPORTED BY:        Sarah B. Townsley, CSR, CRR, RPR

15

16

17

18

19

20

21

22

23

24

25
```

Sheriff Eric Fagan

```
 1                        STIPULATIONS

 2      IT IS HEREBY STIPULATED BY AND BETWEEN COUNSEL FOR

 3   THE PARTIES HEREIN THAT THE ORAL DEPOSITION OF SHERIFF

 4   ERIC FAGAN WAS TAKEN BEFORE SARAH B. TOWNSLEY, CRR, CCR,

 5   CSR, RPR, CERTIFIED REALTIME REPORTER IN AND FOR THE

 6   STATES OF TEXAS AND LOUISIANA, PURSUANT TO NOTICE AND IN

 7   ACCORDANCE WITH THE FEDERAL RULES OF CIVIL PROCEDURE AS

 8   PROVIDED BY LAW, AT THE COUNTY ATTORNEY'S OFFICE, 401

 9   JACKSON STREET, 3RD FLOOR, RICHMOND, TEXAS, ON AUGUST 9,

10   2023, AT 9:03 A.M.;

11      THE PARTIES HEREBY WAIVE ALL FORMALITIES IN

12   CONNECTION WITH THE TAKING OF THE DEPOSITION, WITH THE

13   EXCEPTION OF THE SWEARING OF THE WITNESS AND THE

14   REDUCTION OF THE QUESTIONS AND ANSWERS TO TYPEWRITING;

15      THE RIGHT OF THE WITNESS TO READ AND SIGN A COMPLETED

16   TRANSCRIPT OF TESTIMONY IS SPECIFICALLY RESERVED;

17      COUNSEL FOR ALL PARTIES RESERVE ALL OBJECTIONS EXCEPT

18   AS TO THE FORM OF THE QUESTION AND RESPONSIVENESS OF THE

19   ANSWER AT THE TIME OF TAKING OF SAID DEPOSITION, AND

20   THEY ALSO RESERVE THE RIGHT TO MAKE OBJECTIONS AT THE

21   TIME THAT TAKING OF SAID DEPOSITION OF ANY PART THEREOF

22   MAY BE OFFERED INTO EVIDENCE, WITH THE SAME RIGHTS AS IF

23   THE TESTIMONY HAD BEEN GIVEN IN OPEN COURT;

24      SARAH B. TOWNSLEY, CCR, CSR, RPR, OFFICIATED IN

25   ADMINISTERING THE OATH TO THE WITNESS.
```

```
 1                          INDEX

 2  EXAMINATION BY                          PAGE NO.

 3  Mrs. Hebert                                5

 4  Mr. Hedges                               148

 5  Mrs. Hebert                              149

 6

 7                        EXHIBITS

 8  NO.    DESCRIPTION                       PAGE NO.

 9  1      deposition notice                   9

10  2      video footage                      18

11  3      org chart                          21

12  4      RFA responses                      23

13  5      video footage                      26

14  6      FBC001401 - 08                     33

15  7      FBC001399 - 403                    34

16  8      FBC001394 - 1398                   35

17  9      FBC001412 - 1414                   38

18  10     FBC001409 - 1411                   39

19  11     RFP responses                      43

20  12     RFA responses                      46

21  13     video footage                      53

22  14     screen shot                        56

23  15     FBC001385 - 1390                  102

24  16     GO #09-03                         103

25
```

Sheriff Eric Fagan

```
 1   PROCEEDINGS:

 2                   SHERIFF ERIC FAGAN,

 3   having been first duly sworn by the court reporter,

 4   testified on oath as follows:

 5                   COURT REPORTER:   We're on the record at

 6   9:03 a.m.

 7                   [Witness was sworn.]

 8   EXAMINATION BY MS. HEBERT:

 9      Q.   Good morning, Sheriff Fagan.

10      A.   Good morning.

11      Q.   I'm Christy Hebert.  We just introduced

12   ourselves, and, as you know, I represent the plaintiff,

13   Justin Pulliam.

14        The court reporter, Sarah, just swore you in.

15   Just to kind of refresh -- this is Jeff Rowes.  You

16   just met him, and this is my paralegal Molly Hanis.

17   Your attorney, Kevin Hedges, is here today.  Thanks for

18   being with us, Kevin.

19                   MR. HEDGES:      Sure.

20      Q.   So we'll just kind of do the usual stipulations.

21   By being here, you're waiving any objections to your

22   notice of deposition, and you're waiving any objections

23   to Sarah's qualifications.  Sarah's a great court

24   reporter.  I just met her, you know, but -- by putting

25   this on the record, we're waiving any objections to
```

```
 1    Sarah's qualifications.

 2       A.    I like court reporters.  My wife is a court

 3    reporter.

 4       Q.    So then you know all about court reporters and

 5    all the things they see on their day-to-day basis, I'm

 6    sure.

 7          So will you state your full name for the record?

 8    I know you already did, but --

 9       A.    Eric Wayne Fagan.

10       Q.    Eric Wayne Fagan.  So, Wayne; you kind of have a

11    Bruce Wayne connection?

12       A.    No.

13       Q.    Just checking.  Before we go on, I'd like to go

14    over a couple of housekeeping matters, to make things

15    easier on us today.  Have you ever testified under oath

16    before?

17       A.    Yes.

18       Q.    Have you ever taken a deposition before?

19       A.    Yes.

20       Q.    So you understand that, today, you're under

21    oath, the same as if you were in a courtroom testifying

22    before a judge?

23       A.    Yes.

24       Q.    And that means you swore to tell the truth?

25       A.    Yes.
```

1    Q.   Great.  We'll go over a couple things for the

2    record.  It's important to have a clear record.  That

3    means I need to ask clear questions, and you need to

4    provide clear verbal answers.  So that means,

5    obviously, don't shake your head -- "yes" or "no", and

6    no "uh-huh" or "uh-uh."  Say for the record in the

7    future -- and if you slip up and start shaking your

8    head, or say "uh-huh" or "uh-uh", I'll try to ask you

9    to say "yes" or "no."  If you don't understand a

10   question, please let me know, and I'll either ask Sarah

11   to read it back, or I'll try to rephrase it; and then,

12   similarly, try not to begin answering a question before

13   I've finished asking it, and I will try not to

14   interrupt you when you're answering something.  So

15   we'll try not to interrupt each other.

16        And then, finally, I think it's generally safe

17   to assume that I'm not asking you any questions about

18   what you've talked about with Mr. Hedges, that we are

19   not going to try to ask any questions about

20   attorney-client communications, so you can just assume

21   that, and I'll try to, like, distinguish that anytime I

22   ask about who you talked to or something like that.  If

23   you do not know the answer to a question, you can say

24   "I don't know", but if you do know the answer to the

25   question, you are required to provide that answer.  Mr.

1   Hedges, who, obviously, you're familiar with, and who

2   represents the county, he may state an objection after I

3   ask the question, but that doesn't necessarily mean that

4   I asked a bad question.  It just means that Mr. Hedges

5   is trying to preserve the right to later object to the

6   question because it doesn't follow the rules of

7   evidence.  Do you understand all that?

8       A.   Yes.

9       Q.   If you would like to take a break or need to get

10  a drink or use the restroom, that's fine.  Please let

11  either of us know, either Mr. Hedges or myself, and we

12  will try to take a break.  I only ask that you finish

13  answering the question before you take a break, so in

14  between questions is when we would really look to take

15  a break.  Is there any reason that you couldn't give

16  your fullest or best testimony today, such as you're

17  taking an impairing medication or something along those

18  lines?

19      A.   No.

20      Q.   We're going to look at some documents today.

21  You have the right to read and understand everything

22  that's in the document, and I don't want to rush you

23  through them, so please let me know if I'm asking you a

24  question before you're ready.  We're also going to look

25  at some video clips today.  To save time, I've

1    identified relevant timestamps or portions of the

2    video, and we'll go to those particular time stamps, but

3    it is your right to watch the video in its entirety with

4    Mr. Hedges at any particular time.  Some videos are

5    longer than others.  I'm not trying to trick you, here.

6    Rather than just watching every video every time I ask a

7    question.  I'm looking to focus on particular parts,

8    but, again, if you need to see more of the video,

9    please let us know.  Do you have any other questions

10   before we continue?

11       A.   No.

12       Q.   Do you understand all of that?

13       A.   Yes.

14       Q.   I'm going to start by looking at your deposition

15   notice for today.  We're going to mark that as Exhibit

16   1.

17                    [Exhibit 1 was marked.]

18   BY MS. HEBERT:

19       Q.   Have you seen this notice before?

20       A.   Yes.

21       Q.   Did you do anything to prepare for today's

22   deposition, other than talking to Mr. Hedges?

23       A.   No.

24       Q.   Did you review any documents?

25       A.   No.

```
1    Q.    Okay.  Did you discuss this deposition with

2    anybody besides Mr. Hedges?

3    A.    No.

4    Q.    Did you bring any documents with you to the

5    deposition, other than your newspaper?

6    A.    No.  Just the newspaper.

7    Q.    And did you watch any videos in preparation for

8    this deposition?

9    A.    Yes.

10    Q.    What videos did you watch?

11    A.    The one at the park.  I saw that video.

12    Q.    Okay, and how did you watch that video?

13    A.    On my computer.

14    Q.    Did you -- did Mr. Hedges send you a link, or

15    did you access the link from somewhere else?

16    A.    His computer.

17            MR. HEDGES:    We watched it together.  I

18    said my computer.  I meant his computer.

19    BY MS. HEBERT:

20    Q.    So Mr. Hedges accessed the link for you and you

21    watched it?

22    A.    Yes.

23    Q.    Okay.  Thank you.  We're going to talk a lot

24    about Fort Bend County Sheriff's Office today.  When I

25    -- to short-cut that, rather than say "Fort Bend County
```

1    Sheriff's Office" every time, can we agree that every

2    time I say "the sheriff's office, I'm referring to Fort

3    Bend County Sheriff's Office?

4        A.    Yes.

5        Q.    And anytime I say "the sheriff", can we agree

6    that I'm going to be referring to you or your position

7    as the sheriff of Fort Bend County Sheriff's Office?

8        A.    Yes.

9        Q.    Thank you.  All right, so just to get some

10   background stuff out of the way, before you became the

11   sheriff, what did you do?

12       A.    I was a Houston police officer.

13       Q.    And what was your role as a Houston police

14   officer?

15       A.    I worked on the mayor's protection security

16   detail with my last position.

17       Q.    So you had other positions with the Houston

18   Police Department?

19       A.    You want to know all of them?

20       Q.    Just give me a general list.

21       A.    I worked at the patrol station southeast for

22   Mykawa.  From Mykawa, working there -- from there, I

23   worked in IAD.  I worked in --

24       Q.    Wait, wait.  What's IED?

25       A.    IAD; internal affairs.  From there, I worked

Sheriff Eric Fagan

```
 1    mediations.  From there, I went to the mayor's

 2    protection detail.  From there, I went to Chief

 3    Flanders' office, and, from there, I retired.

 4       Q.   So you retired from the Houston Police

 5    Department?

 6       A.   Yes.

 7       Q.   And it sounds like you had a long career at the

 8    Houston Police Department.  How long were you there?

 9       A.   35 years.

10       Q.   Wow.  Any other agencies besides the Houston

11    Police Department, before you were sheriff?

12       A.   I worked at the marshal's office, but the

13    marshal got taken in by the Houston Police Department.

14       Q.   The United States Marshal's Office?

15       A.   No.  City marshal.

16       Q.   How long were you with the city marshal's --

17       A.   I think it was four years before they got taken

18    in.

19       Q.   Four years?

20       A.   Uh-huh; four to five years before they got taken

21    in.

22       Q.   Four to five; not 45?

23       A.   No, four to five.

24       Q.   And you were elected sheriff in 2020?

25       A.   Yes.
```

Sheriff Eric Fagan

```
 1     Q.   And before that, did you work with the Fort Bend

 2   County Sheriff's Office at all?

 3     A.   No.

 4     Q.   So this was your first position?

 5     A.   Yes.  I've worked for Harris County Sheriff's

 6   Department.  I forgot about that; for a year.

 7     Q.   When did you work for the Harris County

 8   Sheriff's Department?

 9     A.   It was the time Captain Whitmire was mayor.  I

10   went for a year and then I came back.

11     Q.   Came back to?

12     A.   Houston Police Department.

13     Q.   Okay, so let me just summarize the order.  You

14   worked for the rangers --

15     A.   City marshal.

16     Q.   City marshal.  So you worked for the city

17   marshal, they got absorbed into the Houston Police

18   Department --

19     A.   Police department.

20     Q.   You took a hiatus year to work for the Harris

21   County Sheriff's Office, and then you came back to the

22   Houston Police Department?

23     A.   Correct.

24     Q.   And, all in all, that was, let's say -- 39 years

25   of law enforcement before you became sheriff?
```

1    A.    Yes.

2    Q.    And what are the main responsibilities of being

3  sheriff?

4    A.    I have to make policies for the department, the

5  county jail, which is one of the largest

6  responsibilities.  Patrol, investigations, Raven,

7  everything.

8    Q.    Raven?  What is that?

9    A.    Helicopter.  I'm sorry.  Helicopter.

10    Q.    That's okay.  I'm new to the law enforcement

11  world, so I might ask you a bunch of questions that

12  probably seem basic as I get an understanding.  Thank

13  you for explaining it.  And what made you decide to run

14  for sheriff?

15    A.    I lived in Fort Bend County for 31 years while I

16  worked in Houston.  At the time I decided to run, the

17  former sheriff made a statement that there was no human

18  trafficking here in Fort Bend, and there was no gang

19  problem here in Fort Bend, and so I decided to run.

20    Q.    To fix some of those problems?

21    A.    Yes.

22    Q.    And when did you take office as sheriff?

23    A.    January of 2020.

24    Q.    So you took office January of 2020?

25    A.    (Witness nods head.)

1    Q.   But you ran -- did you run -- you ran for office

2    in 2020?

3    A.   Yes.

4    Q.   So you would have taken --

5    A.   January 2021, yes.

6    Q.   So you took office in January of 2021?

7    A.   Yes.  I'm sorry.

8    Q.   That's okay.  And, as taking office as sheriff

9    -- in taking office as sheriff, was part of that taking

10   office you taking an oath of office?

11   A.   Yes, I had to take a oath.

12   Q.   And was part of the oath swearing that you would

13   preserve the Constitution of the United States?

14   A.   Yes.

15   Q.   And are you seeking re-election?

16   A.   Yes.

17   Q.   Is your term four years?

18   A.   Yes.

19   Q.   And so you're looking for another four years?

20   A.   Yes.

21   Q.   Is it like a pie-eating contest, where you get

22   more pie?

23   A.   No.

24   Q.   I want to talk a little bit about your campaign

25   before you became sheriff.  Was securing body cameras

Sheriff Eric Fagan

1    for front-line sheriff's officers part of your campaign

2    in 2020?

3        A.    Yes.

4        Q.    Can you tell me about that?  Why did you want

5    body cameras for officers?

6        A.    To be more transparent, not only for the

7    security and for the safety of my officers.  Body

8    cameras works both ways for the citizens and the

9    officers, because a lot of officers get a lot of

10   complaints, and they'll say the officer did something,

11   then you can look at the body camera and see what

12   actually happened, or vice versa.  An officer might say

13   he did or didn't do something, and body cameras, we can

14   see what actually happened.

15       Q.    So it kind of provides impartial evidence to

16   protect both the officer and civilians --

17       A.    The citizen, yes.

18       Q.    Thank you.  And I understand that you fulfilled

19   that campaign promise; is that correct?

20       A.    Yes.

21       Q.    When did you obtain body cameras for the

22   officers?

23       A.    I don't remember the exact date, but I want to

24   say it was in February or March.  I don't know the

25   exact date.  I can --

1     Q.   Of what year?

2     A.   2021.

3     Q.   2021.  So --

4          MR. HEDGES:     Wouldn't it have been

5     after the budget, though?

6     A.   Yeah, after the budget.  I just don't remember

7     the exact date.

8          MR. HEDGES:     Our fiscal year is October

9     to October, so I suspect that it was actually 2022 if

10    you got them approved in your budget for '21.

11          THE WITNESS:    Yeah.

12    BY MS. HEBERT:

13    Q.   So you got body cameras for your officers

14    sometime in 2022; is that correct?

15    A.   I think we've had them, I want to say, at least

16    ten months.

17    Q.   So at least ten months, so counting back ten

18    months sometime in 2022 from today?

19    A.   Uh-huh.

20    Q.   Before then, did you have no body cameras at all

21    for the sheriff's officers?

22    A.   Before I became sheriff, I couldn't -- they

23    didn't have it.  As far as I know, they didn't have it.

24    When I came here, they didn't have it.

25    Q.   Thanks.  And let's watch a short clip from your

Sheriff Eric Fagan

```
 1   campaign before you were sheriff.  Molly, I think you

 2   were starting to play it a little bit earlier.

 3              MS. HEBERT:      We'll mark this exhibit as

 4   Exhibit 2, Sarah.

 5                   [Exhibit 2 was identified.]

 6   BY MS. HEBERT:

 7     Q.   So I'm going to show you this video.  It's a

 8   relatively short video clip, so we'll just watch the

 9   entire thing.

10                   [Clip was played.]

11   BY MS. HEBERT:

12     Q.   Do you recall giving that interview?

13     A.   Yes.

14     Q.   Would it be fair to say that interview was from

15   sometime in 2020?

16     A.   Probably 2019.

17     Q.   2019?  Well, it'd be after the George Floyd

18   events which were in 2020 --

19     A.   Yeah.  Okay.

20     Q.   So would it be fair to say that's sometime in

21   2020?

22     A.   Yes.

23     Q.   And you, in the film, you said something along

24   the lines of you believe that most officers are good.

25   I would agree with that.  Do you still believe that
```

Sheriff Eric Fagan

```
 1   today?

 2       A.   Yes.

 3       Q.   And in the -- this footage of an interview, you

 4   stated that it's not against the law to film an

 5   officer.  You have every right to film; is that

 6   accurate?

 7       A.   Yes.

 8       Q.   And so before you became sheriff in 2021, you

 9   knew that citizens had the right to film the police?

10       A.   Yes.

11       Q.   And you knew that the right to film the police

12   was protected by the first amendment?

13       A.   Yes.

14       Q.   And you also stated in the footage that you have

15   the right to be a certain distance away.  What did you

16   mean by that?

17       A.   A safe distance away.

18       Q.   And how did you come up with that rule?

19       A.   I didn't come up with the rule.  It's just a

20   safe distance; what the officer feels is a safe

21   distance.

22       Q.   Okay, and what is a safe distance away?

23       A.   Depends on what the situation is, what's a safe

24   distance; a safe distance would be 50 feet, 40 feet, a

25   hundred feet, 200 feet.  Whatever that officer feels is
```

 1    a safe distance in that situation; depends on what the

 2    situation is.

 3       Q.   Okay.  And you talked about a Baytown example,

 4    where people were filming the police from a hundred

 5    feet away, and you said that the officers walked over

 6    to them, "them" being the folks who were filming -- and

 7    said, "Stop videoing.  You in my crime scene", and the

 8    officers were absolutely wrong.  Why were those

 9    officers wrong?

10       A.   They had already, from what I can remember of

11    the Baytown is that -- I want to say a gas station,

12    store, something like that, they had made the arrest

13    and, from what I can remember, the officers went away

14    from the -- after they had that guy covered, went away

15    from them and then went over to the person that was

16    filming.

17       Q.   Okay.  So should the officers not have left the

18    person who was in handcuffs, then?

19       A.   I'm saying that they had finished the arrest.

20    It was over with, so there was no reason for them to go

21    over to the guy that was filming.

22       Q.   Oh, I understand.  You advised kind of the

23    viewers of the interview that we just watched to tell

24    an officer who tries to stop them from filming that

25    they should tell the officer -- and I'm going to quote

1    -- "they have every right to record"; is that accurate?

2        A.    Yes.

3        Q.    And it seems like a natural variation on that

4    statement would be if an officer sees someone filming

5    and orders that person to leave, but does not order

6    anyone else, any other civilians to leave a situation,

7    that you should also tell that officer you have every

8    right to record; is that fair?

9        A.    Yes.

10       Q.    So I want to look at another exhibit.  I'd like

11   to look at what's going to be marked Exhibit 3.

12                    [Exhibit 3 was marked.]

13   BY MS. HEBERT:

14       Q.    When you're done reviewing, just let me know.

15       A.    Okay.

16       Q.    Do you recognize this document?

17       A.    Yes.  Command chart.

18       Q.    Excuse me?

19       A.    Command chart.

20       Q.    So it's a command chart of the sheriff's office?

21       A.    Yes.

22       Q.    And does it show the organization of the

23   sheriff's office?

24       A.    Yes.

25       Q.    And it looks like you're at the top, Sheriff

Sheriff Eric Fagan

```
 1    Eric Fagan; is that correct?

 2        A.    Yes.

 3        Q.    And that means you're in charge of a lot of

 4    people.  Is that difficult?

 5        A.    Is it difficult?

 6        Q.    Uh-huh.

 7        A.    Yes.

 8        Q.    And it looks like you're in charge of the

 9    operations bureau and the administration bureau; is that

10    correct?

11        A.    Correct, yes.

12        Q.    And there is no one above you; is that fair?

13        A.    Yes.

14        Q.    So does that mean, when you give orders,

15    everybody underneath this chain has to follow what you

16    say?

17        A.    Yes.

18        Q.    Even if some of these folks below you are

19    supervisors themselves?

20        A.    Yes.

21        Q.    And does that mean you have the authority to

22    override other officers' orders?

23        A.    Yes.

24        Q.    I'd like to walk through a couple of specifics

25    on this chart.  In supervising the operations half of
```

1    the chart, do you supervise both the field operations,

2    the investigations command, and the detention command?

3        A.    Yes.

4        Q.    And then the administration side, do you see --

5    oversee the grants, the public information office, the

6    human resources, professional development and support

7    services?

8        A.    I have to clarify this.  I have people that I

9    delegate to do it, but I have the final say-so.

10       Q.    Sure.  That's helpful.

11       A.    Okay.

12       Q.    And so you oversee all the -- and, just to look

13   at a specific one, you oversee the public information

14   office, even though you might be supervising folks in

15   that office?

16       A.    I don't personally supervise.  I have people

17   delegated, but I have the final say, yes.

18       Q.    Thank you.  Before we continue, do you have any

19   supervisors?  Who do you report to?

20       A.    I don't report to anyone.  I'm the sheriff.

21       Q.    Okay.  And before we continue, I want to kind of

22   look at your -- your responses to some of our requests

23   previously.  I'm going to hand you another Exhibit that

24   we're going to mark Exhibit 4.

25                    [Exhibit 4 was marked.]

```
 1   BY MS. HEBERT:

 2       Q.   Let me know when you have a chance to look at

 3   it.

 4              MR. HEDGES:      This was 4, Christy?

 5              MS. HEBERT:      Yes.

 6              MR. HEDGES:      And the org chart was 3?

 7       A.   Yes, sir.

 8       Q.   It took you a few minutes to review that

 9   exhibit, correct?

10       A.   Yeah, I've read it.

11       Q.   Have you seen this exhibit before?

12       A.   Yes.

13       Q.   Did you review the answers to this document

14   before you produced them to our side to make sure the

15   answers were correct?

16       A.   Yes.

17       Q.   And did you do anything to prepare your

18   responses to that document, other than talk to Mr.

19   Hedges?

20       A.   No.

21       Q.   And did you review the July 12, 2021, press

22   conference video as part of answering those questions?

23       A.   I don't know what video you're talking about.

24   Press conference?

25       Q.   Sure.  The video from Jones Creek Ranch Park?
```

1    A.   Oh, yes.  Watched it today.

2    Q.   Did you review that video in answering these

3    questions?

4    A.   No.

5    Q.   Okay.  And did you review videos of Justin

6    Pulliam's arrest from December 21, 2021, in answering

7    those questions?

8    A.   No.

9    Q.   Okay.  I think you can move that to the side for

10   now, and we'll come back to that exhibit later.

11        I want to talk to you a little bit about Justin

12   Pulliam.  You already admitted that you knew him before

13   July 2021.  When did you meet Justin Pulliam?

14   A.   The very first time I met Justin Pulliam, he was

15   in the parking lotting lot of the sheriff's office

16   filming me as I was parking my car -- trying to park to

17   get in, and deputies was stopping him from filming me,

18   so I told him to stop, I got out the car, told Justin

19   to wait till I park the car, come into the office.  If

20   you want to talk to me, come in, sit down and talk with

21   me.

22   Q.   That's fair.  And do you remember about when

23   that was?  Would January 11, 2021, sound familiar?

24   A.   Yes.

25   Q.   Okay.  And how would you describe Justin Pulliam

1    to someone who was looking to pick him out of the

2    crowd?

3        A.    Red-headed, about 5'6", a little chubby, white

4    male.

5        Q.    Okay.  We're going to look at some video of, I

6    think, that interaction.  I'm going to mark that as

7    Exhibit 5.

8                    MS. HEBERT:      Molly, would you mind

9    pulling that up?

10                   [Exhibit 5 was marked.]

11                   [Video clip was viewed.]

12   BY MS. HEBERT:

13       Q.    Thank you for watching that.  So this video was

14   probably shortly after you took office?

15       A.    Yes.

16       Q.    In January of 2021?

17       A.    I don't remember the date.

18       Q.    And as we watch on this video, Justin asked you

19   about getting body cameras for your officers; is that

20   correct?

21       A.    Yes.

22       Q.    And you said that was one of the goals, correct?

23       A.    That we were working on it.

24       Q.    Yeah.  And, as we saw on that video, did Justin

25   Pulliam tell you he wanted to be at press conferences?

```
 1      A.    Yes.

 2      Q.    And, as we watched this video, you said you

 3   weren't the PIO -- which I believe stands for "public

 4   information officer" --

 5      A.    Yes.

 6      Q.    So you said that you weren't the PIO?

 7      A.    Yes.

 8      Q.    But you said a little bit earlier that you

 9   supervise the PIO.

10      A.    Correct.

11      Q.    And you said that you weren't afraid to speak to

12   anybody, correct?

13      A.    Yes.

14      Q.    And did you say that -- to Justin Pulliam that

15   if he wanted to speak to you, just you directly, fine?

16      A.    Told him to contact the PIO; I believe that's

17   what I said.

18      Q.    We can watch it again.  Did you say to Justin

19   Pulliam that if he wanted to speak to you directly,

20   fine, you can do it directly?

21      A.    If i said that, okay.

22      Q.    We'll cue that up, Molly.  I think it's towards

23   the end of the video.

24                    [Video clip played.]

25   BY MS. HEBERT:
```

Sheriff Eric Fagan

1    Q.    When you said to Justin Pulliam if he wanted to

2    speak to you, "fine" -- to quote you directly -- is what

3    you said?

4    A.    Yes.

5    Q.    I know it might be a little bit difficult to

6    separate your thoughts on Justin Pulliam from now,

7    versus then, but do you have any memory of what your

8    perception was of Justin Pulliam back in the beginning

9    of 2021?

10    A.    Same perception.

11    Q.    And that is?

12    A.    Redhead, white male.

13    Q.    No, not physically.  Just, like, perception of

14    his attitude, or his personality, any of like that, or

15    his reporting?

16    A.    I don't think about Justin Pulliam one way or

17    the other, no.

18    Q.    Are you familiar today with Justin Pulliam's

19    YouTube channel called "Corruption Report"?

20    A.    Yes.  I've seen some.

21    Q.    Okay.  And you've watched some of the videos

22    from Justin's YouTube channel?

23    A.    Saw two of them, matter of fact, yes.

24    Q.    And what were those two videos about?  Do you

25    remember?

```
 1    A.   One when he was in my jail, this guy that was

 2    following me, and then the other one was -- I forgot

 3    what the other one's about, but I know I saw two of them

 4    and after that, I quit watching.

 5    Q.   Sure.  Do you remember when you watched those

 6    videos?

 7    A.   No.

 8    Q.   Was it before today?

 9    A.   Yes.

10    Q.   Was it before 2022?

11    A.   Yes.

12    Q.   Was it before mid-2021?

13    A.   Don't know.

14    Q.   And have you ever seen Justin Pulliam at a

15    police incident other than the incident at Jones Creek

16    Ranch Park in 2021?

17    A.   No.

18    Q.   And, in your experience, when you took office in

19    2021, was Justin Pulliam generally known to the

20    sheriff's office, to folks working in the sheriff's

21    office?

22    A.   That's when I found out about it, when I became

23    sheriff, but the people at the sheriff's office knew

24    about him.

25    Q.   And what did you learn from people at the
```

1    sheriff's office about Justin Pulliam?

2    A.    People warned me about him, saying that he -- he

3    likes to come film people and try to catch people

4    off-guard, try to upset people, things like that.

5    Q.    Did Justin Pulliam have a reputation of being

6    violent?

7    A.    Not that I know of, no.

8    Q.    Did he have any reputation of physically

9    attacking any officers?

10    A.    Not that I know of, no.

11    Q.    Did Justin Pulliam have a reputation of yelling

12    at officers or telling people at the scene of a incident

13    that they should lie or run away?

14    A.    No.

15    Q.    Okay.  And did Justin Pulliam have any

16    reputation for physically altering evidence or changing

17    a scene?

18    A.    No.

19    Q.    And how has your perception -- you can say that

20    you don't really have a change of perception, but how

21    has your perception of Justin Pulliam changed from when

22    you first met him in the beginning of 2021 to today?

23    A.    It hasn't changed.

24    Q.    Okay.  Before we get into the specifics of

25    looking at some of your general orders, can you tell me

Sheriff Eric Fagan

```
 1   what a general order of the sheriff's office is?

 2       A.   Rules and policies that officers must follow.

 3       Q.   And when you take office as the sheriff -- or

 4   took office as the sheriff, do you review all of the --

 5   kind of the policies and the general orders?

 6       A.   I go over them.

 7       Q.   Okay.  And are there general orders on topics

 8   other than public information and media relations and

 9   social media that we might look at today?

10       A.   That you -- I don't know what you're going to

11   look at today, so I can't answer that.

12       Q.   Sure.  I guess the broader question is:  What's

13   the scope of things that general orders are on?

14       A.   I'm not understanding your question.

15       Q.   That's okay.  What kind of topics do general

16   orders cover?

17       A.   They cover a broad range of topics.

18       Q.   Okay.  Give me some examples.

19       A.   Use of force, driving, officer safety, proper

20   procedures, jail; just a whole range of things.

21       Q.   Okay, so trying to kind of cover most of the

22   topics that a front-line law enforcement officer, or

23   even supervisors, might have to interact with or deal

24   with on a day-to-day basis?

25       A.   Okay.
```

```
 1      Q.    Is that fair?

 2      A.    Yes.

 3      Q.    Are sheriff's employees expected to be aware of

 4   general orders?

 5      A.    Yes.

 6      Q.    So do you presume that officers have knowledge

 7   or know about kind of the substance of general orders?

 8      A.    Yes.

 9      Q.    And can you, as the sheriff, order a general

10   order to be altered or changed?

11      A.    Yes.

12      Q.    Have you ever done that?

13      A.    Yes.

14      Q.    And what was the context?  Do you remember?

15      A.    No.

16      Q.    And how are general orders distributed to

17   sheriff's office personnel?

18      A.    Through our e-mail.

19      Q.    And is there any training that officers receive

20   to make sure that their behavior is consistent with a

21   general order?

22      A.    I don't know if you call it training for the

23   general orders, but officers take in-service training --

24   have to take in-service training.  They don't take

25   training over the general orders.  They're expected to
```

Sheriff Eric Fagan

1    read the general orders.

2        Q.    Okay.  And in-service training, does that come

3    from your office?

4        A.    Comes from TCOLE.

5        Q.    So the State of Texas law enforcement --

6        A.    Yes.

7        Q.    -- training is where they get their training?

8        A.    Yes.

9        Q.    And does the sheriff's office ever recommend

10   certain TCOLE courses?

11       A.    Yes.

12       Q.    All right, I'm going to hand you an exhibit that

13   we're going to mark Exhibit 6.

14                  [Exhibit 6 was marked.]

15   BY MS. HEBERT:

16       Q.    Would you mind reviewing this document, and then

17   when you've had a chance to look it over, just let me

18   know.

19       A.    Okay.

20       Q.    So it looks like the date on the top of this

21   general order is 2017 -- a date in 2017; is that

22   correct?

23       A.    Yes.

24       Q.    And what's the title of this general order?

25       A.    "Public Information & Media Relations."

1    Q.   And have you seen this general order before?

2    A.   Yes.

3    Q.   And you're familiar with it?

4    A.   Yes.

5    Q.   And I understand 2017 was before you became

6    sheriff --

7    A.   Correct.

8    Q.   -- so you inherited, for lack of a better word,

9    this general order?

10   A.   Uh-huh.

11   Q.   And if I refer to this as the 2017 media

12   relations order, you'll know what I'm talking about?

13   A.   (Witness nods head.)

14   Q.   I'd like to look at another exhibit, and I'm

15   going to mark that Exhibit 7.  Keep this 2017 order.  We

16   might come back to that.

17                  [Exhibit 7 was marked.]

18   BY MS. HEBERT:

19   Q.   And is the title of this document the same as

20   Exhibit 6; "Public Information & Media Relations"?

21   A.   Yes.

22   Q.   What's the date at the top of this?

23   A.   10/1/2021.

24   Q.   Okay, so this would be after you took office as

25   sheriff?

```
 1      A.   Yes.

 2      Q.   Was this order approved by you?

 3      A.   Yes.

 4      Q.   And I'll look at, kind of one more order and

 5   we're going to mark this as Exhibit 8.

 6                  [Exhibit 8 was marked.]

 7   BY MS. HEBERT:

 8      Q.   Let me know when you're done.

 9      A.   Okay.

10      Q.   Are you familiar with this document, Exhibit 8?

11      A.   Yes.

12      Q.   And is the top -- the title of this document

13   also "Public Information & Media Relations"?

14      A.   Yes.

15      Q.   And what's the date on this?

16      A.   12/29/2022.

17      Q.   And this order replaced the document that was

18   marked as Exhibit 7; is that correct?

19      A.   Yes.

20      Q.   So I can refer to this as "the 2022 media

21   relations order" --

22      A.   Yes.

23      Q.   -- and you'll understand?  And I can refer to

24   Exhibit 7 as "the 2021 media relations order"?

25      A.   Yes.
```

Sheriff Eric Fagan

```
 1    Q.   So let's go back to the 2017 media relations

 2   order, and I think that's Exhibit 6.

 3    A.   Yes.

 4    Q.   Would you please look at the first page?  Kind

 5   of halfway down, looks like there's a "Definitions"

 6   section, and there's a definition of "media."  Do you

 7   see where I'm talking about?

 8    A.   Yes.

 9    Q.   And I'm going to read that.  "Media:  Persons

10   associated with television, print, electronic, or radio

11   news programs/services and related entertainment

12   enterprises.  For the purposes of this general order,

13   this term does not generally include social media", and

14   then there's parentheses.  "This is defined and

15   governed under General Order 0504", and close

16   parentheses.  Did I read that correctly?

17    A.   Yes.

18    Q.   And would you agree that this definition makes a

19   distinction between traditional media, such as

20   television, print and radio, and social media, on the

21   other hand?

22    A.   Yes.

23    Q.   And would you agree that, under this definition,

24   social media is excluded from the definition of

25   "media"?
```

1    A.    Yes.

2    Q.    Okay.  And would you agree that this 2017 social

3    -- or media relations order, so this -- I'll say that

4    again.  Would you agree that this 2017 media relations

5    order references the general order 0504 for social

6    media?

7    A.    Yes.

8    Q.    Let's go to the 2021 media relations order,

9    which was Exhibit 7.  Did the definition of "media"

10   change at all from the 2017 order to the order that you

11   approved in 2021?

12   A.    No.

13   Q.    Thank you.  And let's kind of ask the same

14   question for the order for 2022, which is Exhibit 8.

15   Did the definition of "media" change at all from 2017,

16   to 2021, to 2022?

17   A.    No.

18   Q.    So in all three orders, the definition of

19   "media" is the same?

20   A.    Yes.

21   Q.    And all three orders reference this general

22   order 0504 for the definition of "social media"?

23   A.    Yes.

24   Q.    Let's look at that, how social media's defined.

25   Let's go to Exhibit -- what's going to be marked Exhibit

1    9.

2                    [Exhibit 9 was marked.]

3    BY MS. HEBERT:

4       Q.    Would you review this document and let me know

5    when you're done?

6                    MR. HEDGES:      So this is 9, right?

7                    MS. HEBERT:      Yes, sir.

8       A.    Okay.

9       Q.    Are you familiar with this general order?

10      A.    No, not really.  No.

11      Q.    Why is that?

12      A.    I probably read it, but I don't remember it.

13      Q.    Okay, so you probably read it in your course of

14   being sheriff; you just don't remember as you sit here

15   today?

16      A.    Yes.

17      Q.    Okay.  Can we agree that this is the 0504 order

18   that is referenced in the media relations orders that we

19   just looked at?

20      A.    No.

21      Q.    Okay.  Does this order, at the top say "0504"?

22      A.    Yes.

23      Q.    And let's go back to Exhibit 8.  And in the

24   definition of "media", you see that parentheses, "This

25   is defined and governed under General Order 0504"?

 1    A.   Yes.

 2    Q.   And then let's flip back to Exhibit 9.  Is this

 3    General Order 0504?

 4    A.   Yes.  I misunderstood you.  I thought you meant

 5    it was parenthesized there, and I was like, no it's

 6    not.

 7    Q.   No, I understand.  You're fine.  I probably

 8    asked a bad question.  Is "social media" defined in

 9    Exhibit 9, the General Order 0504?

10    A.   Yes.

11    Q.   And I'm going to read that definition, and you

12    tell me if I get it correctly.  "Social media:  Online

13    sources that allow people to communicate and share

14    information, such as photographs, texts, video,

15    multimedia files, and related items via online or

16    cellular network platforms.  In this general order,

17    this also includes social networking platforms, but not

18    limited to Facebook, Twitter, YouTube, blogs..."; is

19    that correct?

20    A.   Yes, that's what it reads, yes.

21    Q.   And would someone who uses a YouTube channel

22    fall  under the definition of "social media"?

23    A.   For the person who wrote this, yes.

24    Q.   Thank you.  And let's look at Exhibit 10.

25         MS. HEBERT:    Molly, would you mind handing

```
 1   the Sheriff Exhibit 10?

 2                   [Exhibit 10 was marked.]

 3   BY MS. HEBERT:

 4      Q.   Would you mind reviewing this document, Sheriff,

 5   and letting me know when you're done?

 6      A.   Uh-huh.  Okay.

 7      Q.   From the 2017 version that we looked at in

 8   Exhibit 9 to this version in Exhibit 10, are you

 9   familiar with Exhibit 10?

10      A.   Yes.

11      Q.   Is this the same order that we just looked at

12   for Exhibit 9, just updated to 2021?

13      A.   Yes.

14      Q.   And that's 0504; is that correct?

15      A.   Yes.

16      Q.   Would you look at the definition of "social

17   media" on this order?

18      A.   Yes.

19      Q.   And can you tell me if the definition of "social

20   media" has changed at all from 2017 to 2021?

21      A.   No.

22      Q.   And this order was issued while you've been

23   sheriff, correct?

24      A.   Yes.

25      Q.   Did you approve this order?
```

1    A.    Yes.

2    Q.    Now, looking at all five of the general orders

3   together that we just talked about, is it accurate to

4   say that, from 2017 to today, someone who films for a

5   YouTube channel does not fall under the definition of

6   "media" as defined by the sheriff's office?

7    A.    Yes.

8    Q.    Okay.  Let's continue for a few minutes, and

9   then we'll take a break if that's okay with you.

10    A.    Yes.

11    Q.    I want to talk a little bit about your press

12   conference experience.  I understand you took office in

13   2021, and that you had over 39 years of law enforcement

14   experience before becoming sheriff.  Did you have

15   experience with press conferences before you became

16   sheriff?

17    A.    Yes.

18    Q.    And can you estimate how many press conferences

19   you've done in 39 years, or participated in, or

20   attended?

21    A.    A lot.

22    Q.    Over a hundred?

23    A.    Yes.

24    Q.    Over two hundred?

25    A.    I don't know.

Sheriff Eric Fagan

```
 1     Q.    So, ideally, somewhere between a hundred and two

 2   hundred, maybe?

 3     A.    Maybe.

 4     Q.    Okay.  And for those press conferences, did law

 5   enforcement require the people to -- attending the

 6   press conference to provide their credentials?

 7     A.    Yes.

 8     Q.    And what do those credentials look like?

 9     A.    They had them around their neck.  They had the

10   station letters and, like, "Channel 13", "Channel 2",

11   whatever station they're from.

12     Q.    And does every press person have their

13   credentials around their neck?

14     A.    Yes.

15     Q.    So every press person you've ever interacted

16   with in 39 years of law enforcement has been wearing

17   their credentials around their neck?

18     A.    I don't know.

19     Q.    In your experience, do you recall anyone being

20   excluded from a press conference because they weren't

21   media?

22     A.    Yes.

23     Q.    Do you recall anyone being excluded from a press

24   conference because they used social media?

25     A.    No.
```

1    Q.    And after becoming sheriff, approximately how

2    many press conferences would you say you've attended or

3    participated in?

4    A.    I don't know; fifty, sixty.  I don't know; a

5    lot.

6    Q.    That's fine.  And does the sheriff's office have

7    a -- as you sit here today, does the sheriff's office

8    have a policy of asking for media credentials for

9    someone to attend a press conference?

10    A.    I don't ask, and, like I said, they wear them

11    around their neck, and I see it.

12    Q.    So you don't have a formal policy of asking to

13    see media credentials at press conferences?

14    A.    No.

15    Q.    I'd like to look at what I'm going to mark as

16    Exhibit 11.

17                    [Exhibit 11 was marked.]

18    BY MS. HEBERT:

19    Q.    And when you have a second to review that, let

20    me know when you're finished.

21    A.    Okay.

22    Q.    Okay, and I'll represent to you that these are

23    the county's -- Fort Bend County's responses to our

24    requests for admissions.  Have you seen this document

25    before?

Sheriff Eric Fagan

```
 1                 MR. HEDGES:      I think these are

 2    production.

 3    BY MS. HEBERT:

 4      Q.   Excuse me.  Request for production.  You're

 5    right.  They are why don't we take a break right now,

 6    then?  Do you mind?

 7      A.   No.

 8                 MS. HEBERT:      Let's take a brief

 9    intermission.  Sarah, would ten minutes, fifteen minutes

10    work for you?

11                 COURT REPORTER:   That's fine.

12                 MS. HEBERT:      We'll take a break for

13    fifteen minutes.

14                 COURT REPORTER:   Off the record at 9:58.

15                    [Short recess was taken.]

16                 COURT REPORTER:   We're back on the record

17    10:13.

18    BY MS. HEBERT:

19      Q.   Before we get to this lovely exhibit that Amy

20    has printed for us, let's go back a little bit.  We were

21    talking about your press conference experience,

22    Sheriff.

23      A.   Okay.

24      Q.   And you talked a little bit about being on the

25    mayor's security detail, and you had experience with
```

Sheriff Eric Fagan

```
 1    kicking folks out of press conferences; is that

 2    correct?

 3        A.    Uh-huh.

 4        Q.    Can you tell me a little bit about who gets

 5    kicked out of a press conference, based on your

 6    experience on the mayor's security detail?

 7        A.    On the security detail, a individual who was

 8    disruptive -- not a media person, but a disruptive

 9    person, something like that, we might have to escort

10    out.

11        Q.    And what does a disruptive person look like?

12        A.    Someone yelling and screaming during a press

13    conference, someone who's trying to rush up on the stand

14    where the mayor is, something like that.

15        Q.    And would you, when someone was yelling and

16    screaming, would you give that person a warning to

17    stop?

18        A.    Yes.

19        Q.    And then if they did not comply with that

20    warning, would you remove them?

21        A.    Yes.

22        Q.    And is there any difference between an indoor

23    press conference versus an outdoor press conference?

24    It would seem like to me that maybe an indoor press

25    conference is where maybe there was something taking
```

1    place at the mayor's office, and there would be a

2    couple of differences; for instance, there might not be

3    enough space, or that there were going to be security

4    concerns that you have to vet people beforehand.  So

5    would it be fair to say there's a difference between

6    indoor and outdoor press conferences?

7        A.    Yes.

8        Q.    And do you have different security concerns for

9    indoor press conferences?

10       A.    Yes.

11       Q.    And different space concerns for outdoor press

12   conferences?

13       A.    Yes.

14       Q.    And outdoor press conferences may or may not

15   have space constraints?

16       A.    Depending on the situation.

17       Q.    Okay.  Let's turn to what is being marked as

18   Exhibit 12.

19                    [Exhibit 12 was marked.]

20   BY MS. HEBERT:

21       Q.    This is the exhibit that I meant to introduce

22   earlier when we talked about Exhibit 11, so if you

23   wouldn't mind reviewing, Sheriff, Exhibit 12, and let me

24   know when you've had a chance to review this exhibit.  I

25   won't ask you about all of it.

Sheriff Eric Fagan

```
1     A.   Do I need to read all of it?

2     Q.   I won't ask you about all of it, but we can --

3     A.   If I need to read all of it, I will, but if I

4   don't need to read all of it, I won't.

5     Q.   Sure.  How about this general question:  Are you

6   familiar with this document?

7     A.   Yes.

8     Q.   And how are you familiar with this document?

9     A.   I answered the questions.

10    Q.   Okay.  Let's go to No. 7, which I believe is on

11  page 4; so the bottom of page 4.

12         And I'll read this so it's clear on the record.

13  "Admit that on July 12, 2021, FBCSO had no policy of

14  asking for media credentials and restricting press

15  conferences to those with media credentials before

16  making statements intended for pubic dissemination."

17  And the response there was "deny."  So has -- a

18  follow-up question:  Has the sheriff's office changed

19  its policy on media credentials since July 12, 2021?

20    A.   No.

21    Q.   So earlier today, you testified that the

22  sheriff's office does not have a policy for asking folks

23  attending press conferences for media credentials.  In

24  light of that conversation, would you change your answer

25  to Request for Admission No. 7?
```

1    A.    No.  I can clarify what I mean by that.  Like,

2  when I was telling -- most people from the press, when I

3  see them, they have credentials around their neck, so I

4  never needed to ask for it.

5    Q.    Okay, but this request for admission is talking

6  about asking.  So did the sheriff's office have a policy

7  of asking for credentials?

8    A.    No.

9    Q.    When you do see media credentials around

10  someone's neck, how do you evaluate their authenticity?

11    A.    They being with a camera person that has

12  credentials, as well, and the credentials, like I said,

13  has the letters of the -- KHOU or -- I'm just thinking

14  off the top of my head, the letters and channel number.

15    Q.    So you look to see if someone has credentials

16  around their neck and if they're with a camera person?

17    A.    Yes.

18    Q.    Anything else?

19    A.    No.

20    Q.    Okay.  Since becoming sheriff, do you recall any

21  press conference other than the events at Jones Creek

22  Ranch Park on January -- July 12, 2021?  Other than

23  that press conference, do you recall any press

24  conference since becoming sheriff, where someone was

25  asked to leave or excluded?

Sheriff Eric Fagan

```
 1    A.    No.

 2    Q.    In the course of your 39-year career as law

 3   enforcement, have you seen members of the media --

 4   traditional media or otherwise -- push the boundaries

 5   of what's news by reporting on, maybe, personal or

 6   sensitive issues?

 7    A.    I'm not understanding the question.

 8    Q.    Sure.  For example, have you seen members of the

 9   media show up at some event that might be insensitive

10   for them to report -- for instance, a funeral or where

11   there was a victim?

12    A.    Yes.

13    Q.    And, in your experience, after such -- I'll call

14   this less-than-courteous behavior, were those members of

15   the media excluded from press conferences?

16    A.    You asked first showing up.  I don't think

17   that's discourteous, just showing up.

18    Q.    Sure.  So maybe my question was less than

19   artful.  If someone was being disrespectful at a press

20   conference in general, would they be excluded from

21   future press conferences?

22    A.    If they -- if they were being disrespectful

23   where it would cause an incident to happen, yes.

24    Q.    Okay, so if a member of the media disrupts a

25   press conference today, you would expect to exclude
```

Sheriff Eric Fagan

```
 1   them from future press conferences?
 2      A.   No.  It -- every situation -- how can I put
 3   this?  It depends on what happened at that situation.
 4   I can't exclude somebody because they did something one
 5   day, and I'm going to expect them to do the same thing
 6   the next day.  I won't do that, no.
 7      Q.   Okay, sure.  And let's say a member of the media
 8   tried to question a victim who was obviously distraught,
 9   and an officer said no, no, no, you need to get back to
10   this victim, and then you were holding a press
11   conference later that day.  Would you exclude that
12   member of the media?
13      A.   It depends.
14      Q.   Okay.
15      A.   Because -- if someone -- it depends on the
16   situation.  If it's a act of violence or something like
17   that's going to happen, yes, I'm going to exclude them,
18   but asking a question, no.
19      Q.   Okay.  So based on what I think your answer is,
20   it -- if the media person posed a threat of violence,
21   you would exclude them?
22      A.    If the family member pose a threat of violence
23   towards the media person or vice versa, I'm going to
24   separate them.
25      Q.   You'd separate them, okay.  And regardless of
```

Sheriff Eric Fagan

 1   kind of the justification, have you ever, other than

 2   the events on July 21st, 2021, ever moved a media

 3   person away from a press conference to a distance other

 4   than the press conference?

 5               MR. HEDGES:     I think you misspoke about

 6   the date, Christy.

 7               MS. HEBERT:     I'll rephrase.  Thanks.

 8   BY MS. HEBERT:

 9   Q.   Other than July 12, 2021, the day of the Jones

10   Creek Ranch press conference, other than that day, have

11   you ever moved a media person or a person attending a

12   press conference to some physical distance away from the

13   press conference?

14   A.   Never had to, no.

15   Q.   And I'd like to kind of get into the specific

16   events of July 12th, 2021, at Jones Creek Ranch Park,

17   and I'm sure you remember that, on that day, a vehicle

18   was discovered submerged in the water, and,

19   unfortunately, someone was discovered deceased in that

20   vehicle.  Do you remember that?

21   A.   Yes.

22   Q.   And I'd like to walk you through some of your

23   admissions on that day.  You previously -- and this is

24   Exhibit 4.  We can look at No. 4.

25               So we're looking at Exhibit 4, which is your

1    response to request for admissions.  I'm going to look

2    at page 3, number 4, and in this request for admission,

3    your response was you admitted that you closed the park

4    in connection with an investigation, and then number 7,

5    which is page 4, you admitted that there were certain

6    people who remained after in the park, and that there

7    were other individuals in the park previously who were

8    recording, press folks who were recording; is that

9    correct?

10    A.    Yes.

11    Q.    Let's go back to your admission number 8 which

12    is also on page 4, and I'm going to read this one.

13    "Admit that on July 12, 2021, you did not ask any person

14    either in or outside of Jones Creek Ranch Park for

15    documentation to prove his or her identity as a member

16    of the media."  Your response was, "Admitted.  Media

17    that was there displayed their credentials, so that I

18    did not need to ask to see their credentials."  Is that

19    accurate?

20    A.    Yes.

21    Q.    And what did you mean by "the media displayed

22    their credentials"?

23    A.    They had a lanyard around their neck.

24    Q.    Let's look at some footage from the press

25    conference that day, and we're going to mark this

Sheriff Eric Fagan

```
 1   footage as Exhibit 13.

 2                 [Exhibit 13 was marked.]

 3   Q.    And I'll represent to you that this footage was

 4   taken by my client, Justin Pulliam, on July 12, 2021,

 5   using various cameras.  You'll see how the four panels

 6   put together.  You might be familiar with kind of some

 7   of the footage that you reviewed with your attorney,

 8   Mr. Hedges, and some of it's from a cellphone, a body

 9   camera, a higher-resolution camera that he had on a

10   tripod, and a dash camera.  Molly, would you pull that

11   up and we'll watch from timestamp 3:28 to 4:29.

12                 [Clip was played.]

13   Q.    Thank you, Molly.  Were there four other people

14   in this clip of the footage other than Justin Pulliam?

15   A.    Yes.

16   Q.    And did you allow all these four folks to remain

17   in this area for the press conference that happens after

18   this?

19   A.    I don't remember.

20   Q.    Let me rephrase this.  Did you have any of those

21   four escorted away from the press conference?

22   A.    No.

23   Q.    And after reviewing this footage, can you tell

24   me where the media credentials of these folks were

25   displaying were located?
```

1    A.   If you go back to when I first arrived at the

2    park, I believe they had the cameraman with them, and

3    they had the credentials on them.  This was after they

4    found the body, so maybe I'm assuming that they had to

5    -- because I'm used to seeing it around the necks, but

6    I'm -- they had the credentials earlier.  That's what

7    I'm thinking.  I may be wrong.  If I am, I was wrong.

8    Q.   Okay, so your testimony is you're not sure if

9    they were displaying their credentials.  They may have

10   displayed them earlier --

11   A.   I think they would -- yes.

12   Q.   But there are no credentials in this footage we

13   see here?

14   A.   No.

15   Q.   Okay.  And if we review other footage, we might

16   see the credentials?

17   A.   Yes.

18   Q.   But at this press conference -- or at this media

19   area, to be more precise, that the sheriff's office had

20   designated, none of those four folks were displaying

21   credentials?

22   A.   Correct.

23   Q.   Let's go back to your RFAs, which are Exhibit 4,

24   and we'll look at page 5, and we'll go down to number 9

25   just at the top.  I don't think I need to read this,

Sheriff Eric Fagan

```
 1    but you admitted that there were two news crews present

 2    in the parking lot outside of the Jones Creek Ranch

 3    Park on July 12, 2021; is that correct?

 4        A.   Yes.

 5        Q.   And were these four folks that we just watched

 6    in the video clip with this timestamp ending at 4:29,

 7    the two news crews, you admitted were present in the

 8    parking lot?

 9        A.   I believe so, yes.

10        Q.   Have you ever ordered members of a TV news crew

11    to be ex -- to leave a press conference?

12        A.   No.

13        Q.   Let's skip to another portion of the video.

14             MS. HEBERT:     Molly, would you minute

15    cuing up timestamp 6:26 to 6:34?

16    BY MS. HEBERT:

17        Q.   And, Sheriff, I know there's four panels, so it

18    might be helpful, most clear to pay attention to the

19    panel in the upper left corner.

20             [Clip was played.]

21        Q.   Did you see what looked like a golf cart or a

22    Gator pull up to the media area?

23        A.   Yes.

24        Q.   Were you in that golf cart?

25        A.   Yes.
```

1      Q.    And who was with you?

2      A.    One of my deputies.

3      Q.    Would it be accurate to say Detective Hartfield,

4    is his title?

5      A.    Okay.

6      Q.    Well, we can look at the footage, but you're

7    familiar with Detective Hartfield?

8      A.    Yes.

9      Q.    How tall would you estimate Detective Hartfield

10    is?

11      A.    5'9", 5'10".

12      Q.    And how much would you estimate Detective

13    Hartfield weighs?

14      A.    Never thought about it.  I don't know.  I just

15    need to see the video, I guess, then.

16      Q.    Sure.

17            MS. HEBERT:    Let's play a little

18    bit further ahead, Molly, from 6:53 to 6:58.  We might

19    have to go back, but we'll look at that.

20            [Clip was played.]

21      Q.    All right, it's a little hard to see, but in the

22    bottom left corner, is that Detective Hartfield?

23      A.    Yes.

24      Q.    And, refreshing your memory, would you estimate

25    how much he might weigh?  Over two hundred pounds?

Sheriff Eric Fagan

```
 1     A.    I'll say about 210, 215.

 2     Q.    That's fair; and where were you and Detective

 3  Hartfield coming from?

 4     A.    Inside the park.

 5     Q.    Inside Jones --

 6     A.    -- Ranch Park.

 7     Q.    And where, exactly, inside the park?

 8     A.    I don't remember.

 9     Q.    Were you by the creek where the car was

10  discovered?

11     A.    Yeah, I was there earlier, but where we left

12  from exactly then, I don't know.

13     Q.    Sure.  How far would you estimate the creek was

14  from the front of this -- from the parking lot in the

15  front of this park?

16     A.    A hundred yards?  I don't know.

17     Q.    It would be fair to say it's some distance away,

18  that you had to take a Gator?

19     A.    Yes.

20     Q.    And what did you and Detective Hartfield discuss

21  on the way over on your ride in the Gator?

22     A.    Don't know.

23     Q.    Did you say anything about Justin Pulliam?

24     A.    Probably did, yes.

25     Q.    Do you remember the gist of what you had said?
```

1    A.    Yes.  Probably told them if he was there, keep

2    him away from the rest of the media.

3    Q.    Did you give Detective Hartfield a reason why?

4    A.    I don't remember, but my reason was that the

5    media was complaining about him earlier.

6    Q.    When you arrived at this media area, who was

7    there?

8    A.    Myself, the deputy, my PIO officer, Jacqueline

9    Preston, Justin Pulliam, and those -- and the other

10    media people.

11    Q.    So when you said Jacqueline Preston, is that

12    your PIO officer?

13    A.    Yes.

14    Q.    Okay.  Just making sure.  So we are paused --

15    Molly, can you show the timestamp?  We're paused at

16    7:01, and in the bottom left corner --

17                MS. HEBERT:      Molly, can you move your

18    mouse off --

19    BY MS. HEBERT:

20    Q.    In the bottom left corner that woman with a

21    light blew shirt --

22    A.    Yes.

23    Q.    -- is she your PIO officer?

24    A.    Yes.

25    Q.    And what was she doing there?

```
 1     A.   Just there; any media outlet, my PI director

 2  comes out.

 3     Q.   Do you recall if she spoke at the press

 4  conference?

 5     A.   No, I don't recall.

 6     Q.   Let's go back and 7:53 to 7:05 a little bit and

 7  we'll look specifically at the --

 8             MR. HEDGES:     Say that again.  What

 9  timestamp?

10             MS. HEBERT:     Sure.  6:53 to 7:05.

11             MR. HEDGES:     Thank you.

12  BY MS. HEBERT:

13     Q.   And, Sheriff, if you wouldn't mind focusing on

14  the top right-hand panel.

15                  [Clip was played.]

16     Q.   And what was Justin Pulliam doing in this clip

17  of the footage?

18     A.   Walking up to the rest of the media.

19     Q.   And did he set down a camera on a tripod?

20     A.   Yes.

21     Q.   Did Justin Pulliam say anything to you?

22     A.   No.

23     Q.   Did Justin Pulliam say anything at all?

24     A.   Not that I can remember, no.

25     Q.   And did you say anything to him?
```

```
 1      A.   No.

 2      Q.   All right, let's return to Exhibit 4 again and

 3  look at your responses to the request for admission.

 4  We'll go to page 5, with number 10; and would you mind

 5  reading that?  I don't think I'm going to read it out

 6  loud.

 7      A.   You want me to read it out loud, or just read it

 8  --

 9      Q.   No, just read it.

10      A.   Okay.

11      Q.   And you said -- your response was, "I admit that

12  I said words to that effect."  Let's watch the same

13  portion of the video that we just watched, 6:53 to 7:05,

14  and we may need to crank up the volume a little here,

15  because I know you hear Justin's feet walking, but let's

16  listen for what you said, and I think the best panel is

17  the bottom left panel.

18                      [Video clip played.]

19  BY MS. HEBERT:

20      Q.   Okay, now having reviewed the relevant portion

21  of the video, did you say to Detective Hartfield, "If

22  you don't do it, arrest him, because he's not part of

23  the local media, so he has to go back", with "he" and

24  "him" referring to Justin Pulliam?

25      A.   Yes.
```

1    Q.    And why did you say that Justin Pulliam was not

2    a part of the local media?

3    A.    Like I said -- oh, why did I say he's not part

4    of the local media?

5    Q.    Yeah.

6    A.    Because he's not.

7    Q.    Okay.  By saying, "If he don't do it, arrest

8    him", were you authorizing Detective Hartfield to

9    arrest Justin Pulliam if he did not move away from the

10   mead?

11   A.    No.

12   Q.    So if Justin had said, "No, I'm not moving

13   back", would you have expected Detective Hartfield to

14   arrest him?

15   A.    No.

16   Q.    Okay.  Would you have -- so you wouldn't have

17   ordered Detective Hartfield to order -- you wouldn't

18   have ordered Detective Hartfield to arrest Justin

19   Pulliam if he refused?

20   A.    No.  You're forgetting what I'm answering

21   earlier.  Justin Pulliam had got into it with the media

22   earlier that day, and with the family that day.  I

23   wanted to make sure the confrontation wouldn't happen.

24   If Justin Pulliam would have stayed there and erupted

25   again with the media or have conversation, then I would

1    expect him to be arrested.

2        Q.    Okay.  Let me just write that down.

3             So when you said to Detective Hartfield, "If he

4    don't do it, arrest him", you were referring to moving

5    back, correct?

6        A.    Yes.

7        Q.    So you were saying:  If he don't do it, if he

8    don't move back, arrest him, to Detective Hartfield?

9    That's what you're saying?

10       A.    What I meant by, like I said earlier, Justin had

11   got into it with --

12       Q.    I don't think you're answering.  Listen to the

13   question.  When you said, "If he don't do it", you were

14   referring to move back, correct?

15       A.    Yes.

16       Q.    And you were telling Detective Hartfield that if

17   he don't do it, if he don't move back, arrest him?

18       A.    Yes.

19       Q.    And do you -- an arrest is a pretty serious

20   thing, correct?

21       A.    Yes.

22       Q.    And the threat of arrest is a pretty serious

23   thing?

24       A.    Yes.

25       Q.    Do you normally go around telling your officers

1    to arrest someone if they don't do something and not

2    actually mean it?

3        A.   No.

4        Q.   So when you tell someone if you give -- when you

5    give an order to arrest an individual, you would expect

6    your officer to arrest that individual?

7        A.   Yes.

8        Q.   And if Justin Pulliam had said, "I have the

9    right to record the police", like you recommended in the

10   2020 interview, would you have expected Hartfield to

11   arrest him?

12       A.   Just for recording, no.

13       Q.   But for refusing to step back?

14       A.   Yes.

15       Q.   Let's go back to Exhibit 4, your responses to

16   the RFAs, specifically number 10 on page 5 that we

17   already looked at.  Now I want to look at the second

18   half of your response.  You said, "Admit that I also

19   said that plaintiff had five minutes to leave the

20   taped-off investigation area."  Had Justin Pulliam

21   crossed any police tape that day?

22       A.   We put up police tape.  Yes.

23       Q.   So he'd crossed police tape --

24       A.   No.  We put up police tape.  He was in the area

25   already.

1    Q.    Okay, so let me make sure I understand that.

2    The sheriff's office put up police tape.  Did Justin

3    ever cross that police tape in a way that was entering

4    the area that he was not supposed to be in?

5    A.    No.

6    Q.    So he never entered an area after it had been

7    set off?

8    A.    No.

9    Q.    And, ultimately, even if, you know, he expressed

10    some reluctance or some criticism, did Justin Pulliam

11    leave the area that you told him to leave, the

12    taped-off investigation area?

13    A.    Yes.

14    Q.    And your answer here was that, "I also said that

15    plaintiff had five minutes to leave."  Did you give

16    anyone else a five-minute time frame to leave the

17    investigation area?

18    A.    Didn't have to.

19    Q.    And what do you mean by that?

20    A.    I didn't need to.  No one else would -- gave me

21    a reason to give that order to.  Just him.

22    Q.    Okay.  Let's look at number 7.  I Exhibit 7?

23    A.    Page 7 or the response to the --

24    Q.    Number 7, page 4.  On the same exhibit, which is

25    Exhibit 4.  I'm going to read this.  "Admit that on July

Sheriff Eric Fagan

1    12, 2021, as seen beginning at 1:20 on July 12, 2021,

2    video footage, you told Lieutenant Simmons that after

3    five minutes --

4              MR. HEDGES:      This is different than

5    what I've got.

6        A.   Yeah.  I'm not seeing it.  You said page 4 --

7        Q.   I'm reading the wrong one.  You're right.  Page

8    4, number 7.  I was reading number 5, excuse me.  Admit

9    that -- I'm going to read this again.  Request number

10   7, page 4, "Admit that on July 12, 2021, as seen

11   beginning at 1:56 on July 12, 2021, video footage, you

12   allowed individuals other than plaintiff Justin Pulliam

13   to continue recording the activities of FBCSO officers

14   in Jones Creek Ranch Park while personally escorting

15   Justin out of the park."  Your response was, "Admitted

16   that certain employees of the district attorney and

17   sheriff's office may have continued to film after the

18   park was closed.  Otherwise, deny.  Admitted, however

19   that not all people at the park, including those

20   filming, were able to leave at exactly the same time."

21   Did I read that correctly?

22       A.   Uh-huh.

23       Q.   Were there people who were filming the taped-off

24   investigation area after Justin Pulliam was told to

25   leave?

```
 1      A.    Yes.

 2      Q.    I'm going to use an exhibit -- I think this is

 3   No. 14 that we are on now.

 4            MS. HEBERT:      Molly; would you mind

 5   handing the Sheriff what is marked as Exhibit 14.

 6            [Exhibit 14 was marked.]

 7            MS. HEBERT:      And, Sheriff, would you

 8   mind reviewing this.

 9      A.    Uh-huh.  Yes.

10      Q.    Is this you in the picture?  It looks like

11   you're there four times -- or three time, given the

12   panel --

13      A.    Yes.

14      Q.    And it looks like you're looking at your watch;

15   is that correct?

16      A.    Yes.

17      Q.    Is this the point where you were telling

18   plaintiff, Justin Pulliam, to leave the park within five

19   minutes?

20      A.    Yes.  Not leave the park, leave that area.

21      Q.    Thank you.  So this is the time that you were

22   telling Justin Pulliam to leave that area within five

23   minutes?

24      A.    Yes.

25      Q.    And it looks like there are some people behind
```

Sheriff Eric Fagan

1   you in that photo.  What are those people doing?

2      A.    Filming.

3      Q.    And are these, looks like maybe three people

4   employees of the district attorney?

5      A.    Don't know.

6      Q.    Are these people employees of the sheriff's

7   office?

8      A.    Dolly is.  Dolly Simon, the one in front of me.

9      Q.    What about the three folks behind you?

10     A.    I don't know who they are.  Look like a

11  cameraman and look like a female.  That's all I can see.

12     Q.    And what's the female wearing?

13     A.    Pants.

14     Q.    What color?

15     A.    Black or blue.

16     Q.    And the shirt?

17     A.    Don't know; green.  I don't know.

18     Q.    Some kind of dark color; is that fair?

19     A.    Yes.

20     Q.    And what is the cameraman wearing?

21     A.    Plaid shirt.

22     Q.    And just behind the cameraman, can you see a

23  little bit of pink over his shoulder?

24     A.    No.

25     Q.    You don't see any pink there?

```
 1     A.   No.

 2          MS. HEBERT:      Molly, would you mind

 3   going to Exhibit 13, and going to timestamp 4:29.

 4          MR. HEDGES:      4:39?

 5          MS. HEBERT:      29.

 6          MR. HEDGES:      Thank you.

 7          MS. HEBERT:      Sure.

 8   BY MS. HEBERT:

 9     Q.   And looking at both the still shot of what's at

10   timestamp 4:29 of Exhibit 13 --

11          MS. HANIS:       4:31?

12     Q.   Okay, now, looking at the still shot of what's

13   at timestamp 4:31 of Exhibit 13, and comparing that with

14   what's at Exhibit 14, is that the same gentleman in the

15   plaid shirt?

16     A.   I believe so.

17     Q.   And is that the same woman in the dark outfit,

18   for lack of a better descriptor, leaning against the

19   vehicle there?

20     A.   I believe so.

21     Q.   So -- and you testified earlier that these four

22   folks shown at 4:29 and now 4:31 were the two news crews

23   that you admitted were present?

24     A.   Yes.

25     Q.   And so you would say that you believe that the
```

Sheriff Eric Fagan

1    folks standing behind you in Exhibit 14 are news or TV

2    crews?

3         A.    Yes.

4         Q.    Thank you.  I'd like to just follow up and ask

5    why did you tell Lieutenant Simmons or Simons -- is it

6    "Simmons" or "Simons"?

7         A.    Simons.

8         Q.    Why did you tell Lieutenant Simons to arrest

9    Justin Pulliam if he did not leave the park within five

10   minutes?

11        A.    He'd just had -- when I got there, I was told

12   that he'd just apparently gotten into a altercation with

13   one of the family members, and one of the family members

14   wanted to attack Justin Pulliam, and, in fact, I was

15   told that one of the family members slapped the camera,

16   or phone, or something out of Justin Pulliam hand, and

17   they had to physically restrain the two apart, so I

18   wanted him away from them.

19        Q.    Okay.  And is that one of the reasons you asked

20   the press, media folks, to leave the park?

21        A.    No.

22        Q.    Why did you ask the press and media folks to

23   leave the park?

24        A.    I never asked anyone to leave the park.

25        Q.    Okay.  To go to the designated media area.  Is

1  that one of the reasons you asked the media to go to the

2  designated media area at the other end of the parking

3  lot?

4      A.   That was after the car came up and the body was

5  found.  I told him I would speak to him over there,

6  because I didn't want to speak to him over there by the

7  family.

8      Q.   So you wanted to speak to the press and media

9  away from the family?

10     A.   Yes.

11     Q.   So you designated a media area at the parking

12 lot?

13     A.   Yes.

14     Q.   And how far away from the family was the

15 designated media area?

16     A.   It was far.

17     Q.   Okay.  A mile?

18     A.   No.  It wasn't a mile, no.  Couple of blocks.

19     Q.   Couple of blocks away, okay.  Let's go back to

20 your RFAs, which are Exhibit 4.

21     A.   Exhibit 4?

22     Q.   Yes, sir.  And let's turn to page 6, and let's

23 look at number 13.  I'll just read your response, here,

24 rather than the whole admission, but if you wouldn't

25 mind just reviewing the question.  "Admit that I

Sheriff Eric Fagan

1    ordered Deputy Hartfield to move plaintiff a short

2    distance away, based on plaintiff's conduct earlier that

3    day.  I deny that the reason was so that plaintiff could

4    not participate in the news conference."  Did I read

5    that correctly?

6        A.    Yes.

7        Q.    And what did you mean by "based on plaintiff's

8    conduct earlier that day"?

9        A.    Getting in a altercation with the family

10   members, and getting in a altercation with the rest of

11   the news media.

12       Q.    Okay.  And although you're talking about an

13   altercation with the family and an altercation with the

14   news media, the only reason that you provided Detective

15   Hartfield why he needed to move Justin Pulliam back

16   from the press conference was because Justin was not

17   media, correct?

18       A.    You said that's the only reason I told

19   Hartfield?

20       Q.    Yes.

21       A.    Maybe.  I don't know.  I could have told him

22   about the altercation.  He's the one that told me about

23   the altercation.

24       Q.    He's the one that told you about the

25   altercation?

1    A.    Yeah.  That happened before I got there.

2    Q.    Sure.  So let me just kind of break all of that

3    down.  At some point when you arrived at Jones Creek

4    Ranch Park, Deputy/Detective Hartfield -- he was kind of

5    in a deputy capacity, right?

6    A.    Yes.

7    Q.    So, at some point when you arrived at Jones

8    Creek Ranch Park, Deputy Hartfield told you there had

9    been an altercation?

10    A.    I don't know which deputy told me that.  Could

11    have been Hartfield or Simons.  One of my deputies told

12    me --

13    Q.    Okay, so some deputy told you there had been an

14    altercation, you didn't witness said altercation

15    between Justin Pulliam and the family, personally?

16    A.    Correct, yes.

17    Q.    And when you gave Deputy Hartfield the order to

18    move Justin back, the only reason you gave him that

19    order, at the time, was because Justin was not media,

20    correct?

21    A.    No.

22    Q.    You gave another explanation?

23    A.    The reason I did it was because of the

24    altercation earlier.  I didn't have to explain that to

25    my deputy why I wanted that all taking place.  That was

1    my reasoning.

2      Q.   Okay, let's look at request for admission number

3    11, and that is on page number 5.  Let's read that.

4    "Admit that on July 12, 2021, as seen beginning at 15:50

5    on July 12, 2021, video footage, you did not identify

6    any reason for instructing FBCSO officer Robert

7    Hartfield to move plaintiff Justin Pulliam back from the

8    designated media area, other than plaintiff Pulliam is

9    not part of the local media, and you responded, "Admit."

10          So, to confirm, you didn't tell Deputy Hartfield

11   that he needed to move Justin away from the media area

12   based on Justin's behavior that day?

13     A.   Yes.

14     Q.   I don't think that answer was particularly

15   clear, so let's -- let me rephrase that.  You did not

16   tell Detective Hartfield that he needed to move Justin

17   away from the media area based on Justin's behavior

18   earlier that day?

19     A.   Yes.  I don't know what you want me to answer.

20   I did tell him to move back.  Yes, I did.

21     Q.   Okay, and when did that conversation occur?

22     A.   It wasn't a conversation.  I told him to move

23   him back.

24     Q.   Okay.  I understand that you may have had this

25   other justification for moving plaintiff Pulliam back,

Sheriff Eric Fagan

1    but I'm specifically asking what you told Detective

2    Hartfield, and when you gave Detective Hartfield the

3    order to move Justin Pulliam back, you did not say,

4    verbalize, "move Justin back because of his behavior

5    earlier today"?

6        A.    No.

7        Q.    You did not make a verbal statement to Detective

8    Hartfield that he needed -- that Detective Hartfield

9    needed to move Justin Pulliam back because Justin had

10   done something?

11       A.    I don't think so, no.

12       Q.    Did you tell anyone else that Justin's behavior

13   had been problematic so that you needed to remove him

14   from the media area?

15       A.    I was told that his behavior was problematic.

16   His -- that the altercation had taken place, so I

17   already knew that, so that's why.

18       Q.    Okay, so you didn't tell anybody, "We need to

19   remove Justin from the media area because of an

20   altercation"?

21       A.    No.

22       Q.    Okay.  And are you aware that Detective

23   Hartfield relayed your explanation almost word-for-word

24   to Justin himself in moving Justin back from the media

25   area?

Sheriff Eric Fagan

```
 1      A.    He could have.

 2      Q.    Okay.  Let's look at the relevant portion of the

 3   video.

 4            MS. HEBERT:      Molly, would you go to

 5   7:28, and we'll watch until 7:44.

 6      Q.    And, Sheriff, I think the bottom left panel is

 7   probably the best one to look at?

 8                 [Clip was played.]

 9   BY MS. HEBERT:

10      Q.    Detective Hartfield didn't say anything about

11   Justin Pulliam's behavior earlier in the day, did he?

12      A.    What are you asking me?

13      Q.    So, in ordering Justin to step back from the

14   media area, did Detective Hartfield say anything about

15   Justin Pulliam's behavior earlier in the day?

16      A.    I don't know if he was the one that told me

17   about the altercation, if that's what you're asking.  He

18   could have.  I don't know.

19      Q.    Sure, sure.  That's not what I'm asking.  I'm

20   not asking about your conversation with Detective

21   Hartfield.  I'm asking about the conversation that we

22   just saw from 7:28 to 7:44.  It's not really a

23   conversation.  It's just the order that Detective

24   Hartfield gave, so, to rephrase, I'm asking you about

25   the order that Detective Hartfield gave to Justin
```

Sheriff Eric Fagan

1    Pulliam and that order occurred from 7:28 to 7:44.  In

2    giving that order to Justin Pulliam to step back, did

3    Detective Hartfield say anything about Justin's

4    behavior earlier in the day?

5        A.   When you say "earlier in the day", that's the

6    whole day before that --

7        Q.   Yeah.

8        A.   -- so if he's the one that told me about the

9    altercation, then yes.  I don't remember who told me

10   about the altercation.

11       Q.   I understand that.

12       A.   So I can't answer that question a hundred

13   percent honestly.  I don't remember.

14       Q.   Yeah, and I'm not asking about what Detective

15   Hartfield said to you.  I'm asking about this

16   conversation right here between Detective Hartfield and

17   Justin Pulliam, so let me ask the question --

18       A.   What's confusing me, you keep putting "earlier

19   that day."  Well, earlier that day is that whole day,

20   so if he said something about that altercation, then

21   yes, he did.  If he -- so I can't answer that a hundred

22   percent.

23       Q.   Sure.  I'm going to look at your response to

24   request for admission number 13 that we just looked at,

25   and your response was "Admit that I ordered Deputy

1    Hartfield to move plaintiff a short distance away, based

2    on plaintiff's conduct earlier that day."

3    A.    Yes.

4    Q.    I'm using your language.

5    A.    Yes.

6         MS. HEBERT:    And, Molly, would you mind

7    cuing up 7:28 to 7:44 again.

8              [Clip was played.]

9    BY MS. HEBERT:

10   Q.    So the only reason that Detective Hartfield said

11   to Justin Pulliam for the reason he was escorting

12   Justin Pulliam back from the media area was because

13   Justin was not media; "at the sheriff's request, could

14   you step back this way"?

15   A.    Yes, that's what he said, yes.

16   Q.    And that's the only thing that Detective

17   Hartfield said to Justin Pulliam in that moment?

18   A.    In that moment, yes.

19   Q.    Okay, so Detective Hartfield didn't say anything

20   like, "Justin, you've been disruptive.  Please step

21   back", correct?

22   A.    No.

23   Q.    Detective Hartfield didn't say anything like,

24   "You've been rude to the family of the deceased.  Please

25   step back"?

1     A.    No.

2     Q.    At any point on July 12, 2021, did Justin

3  Pulliam refuse to follow orders issued by sheriff's

4  office personnel, that you know of?

5     A.    No.

6     Q.    Had Justin Pulliam made any threats that he was

7  going to attack you or other people --

8     A.    No.

9     Q.    -- that you know of.

10     A.    No.

11     Q.    I'm sorry, I stepped on you a little bit, there.

12  Had Justin Pulliam made any threats that he was going to

13  attack you?

14     A.    No.

15     Q.    Had Justin Pulliam made any threats that he was

16  going to attack anyone else?

17     A.    No.

18     Q.    Sometimes we think back to what happened in the

19  past, and we, like, come up with other reasons why that

20  action made sense at the time.  So, is that kind of

21  what happened here?  After the dust settled and you had

22  time to think about it, it made sense to ask Justin to

23  leave based on his behavior earlier in the day, even

24  though you didn't say it at the time?

25     A.    It made sense to me then.

```
1    Q.    Okay, it made sense to you at the time.  So

2   other than the interactions with the family that we've

3   talked about a little bit, and some kind of altercation

4   with other members of the media, and then the third

5   item of Justin not being media, was there any other

6   reason that you ordered Detective Hartfield to escort

7   Justin Pulliam back from the media area?

8    A.    No.

9    Q.    So just those three, kind of, reasons?

10   A.    Yes.

11   Q.    So, to confirm, your testimony under oath is

12  that on July 12, 2021, you had a secret reason -- the

13  media altercation and the family altercation, for your

14  order to move Justin Pulliam back from the media area

15  that  you didn't tell Detective Hartfield in giving him

16  the direct order, and that wasn't used to explain to

17  Justin Pulliam why he needed to leave the media area?

18            MR. HEDGES:    Object to the form.  It's

19  argumentative.

20   A.    It was not a secret.

21   Q.    Okay.

22   A.    That was my reason, but it wasn't a secret.

23   Q.    But you didn't tell anybody else?

24   A.    I didn't tell -- I was told about the situation,

25  so Hartfield knew about it already.  I'm just saying I
```

1    don't know if it was Hartfield that told me about it or

2    not, so if he's the one that told me about it, then he

3    knew.

4        Q.    But you didn't explain your rationale to anybody

5    about why you were excluding Justin from the media

6    area?

7        A.    No.

8        Q.    Let's watch another portion of the video,

9    timestamp 7:44 to 8:53.

10                    [Clip was played.]

11       Q.    Did Detective Hartfield and Deputy Garcia escort

12   Justin Pulliam away from where you were going to hold

13   the press conference?

14       A.    Yes.

15       Q.    And Justin estimated there that he was ten

16   parking spots back from where you were going to hold

17   the press conference.  Was that about accurate, give or

18   take?

19       A.    I believe, yes.

20       Q.    And what if Detective Hartfield had only moved

21   Justin Pulliam back two feet from the press conference

22   area?  Would that have been far enough for your order?

23       A.    Yes.  I didn't tell him how far back to move

24   him; just move him back.

25       Q.    Okay, so if he had moved Justin Pulliam two feet

1    back from where he'd set up his tripod, that would have

2    complied with your order?

3        A.    Moving back, yes, it would have complied.  I'm

4    not going to say I'd be satisfied with it, though, but

5    yeah, it would have complied.

6        Q.    It would have complied with, maybe, the

7    technical words of your order, but not the spirit of

8    your order?

9        A.    Correct.

10       Q.    And in the spirit of your order, where did you

11   want Detective Hartfield to move Justin Pulliam?

12       A.    Far enough away that he wouldn't be interfering

13   with the other news media, but not so far away where he

14   couldn't see it or film it.

15       Q.    Okay.  That's fair.  We are paused on timestamp

16   8:54, and would you mind looking at the two panels on

17   the left; and you see the man in the black shirt

18   standing kind of closest to Justin Pulliam?  Is that

19   Detective Hartfield?

20       A.    I believe so.

21       Q.    And did you see -- if we need to go back, we can

22   go back a little bit.  Is that where Detective

23   Hartfield walked after escorting Justin Pulliam back?

24       A.    I'm looking at it now, yes.

25            MS. HEBERT:    Let 's go back just a

Sheriff Eric Fagan

```
1    couple of seconds, Molly, just so we can follow

2    Detective Hartfield's path.

3                    [Clip was played.]

4    Q.   And now we're paused on 8:44, which is a little

5    bit earlier, but did you see Detective Hartfield walk

6    from where he had escorted Justin Pulliam to this point

7    where he's standing?

8    A.   Yes.

9    Q.   And is Detective Hartfield standing in between

10   the media area and Justin Pulliam?

11   A.   Yes.

12   Q.   Let's go back to your RFAs, and that is Exhibit

13   4; and we're going to look at number 13 and look at the

14   second half of your response to number 13.

15        You said, "I deny that the reason was so that

16   plaintiff could not participate in the news

17   conference."  And you have the same sentence in response

18   to request for admission number 14 at the end.  I deny

19   the reason that Deputy Garcia walked with plaintiff was

20   so that plaintiff could not participate in the news

21   conference, and you have a similar for the next page,

22   number 16.  "I deny the reason was so that plaintiff

23   could not participate in the news conference."  Can you

24   explain your reason for having Justin Pulliam moved

25   away from the press conference if the purpose wasn't to
```

1    prevent Justin from participating in the press

2    conference?

3        A.    Earlier, when I stated he had a confrontation

4    with the news media and the family before.  The same

5    reason.

6        Q.    Sure.  And when you arrived at the media area,

7    you had identified four folks who were news media

8    present in the parking lot.  Was any member of the

9    deceased's family present in the parking lot?

10       A.    No.

11       Q.    Were any of the family members near the parking

12   lot?

13       A.    No.  Not that I know of, no.

14       Q.    Sure.  So then why was moving Justin further

15   back from the press conference respectful to the

16   members of the deceased's family?

17       A.    I didn't say that.  I said because of the

18   confrontation he had with the media.

19       Q.    With the media?

20       A.    With the media.

21       Q.    Okay, so you moved Justin back just because of

22   the confrontation that he had had with the media?

23       A.    Yes.

24       Q.    And tell me a little bit more about this

25   confrontation with members of the media.

Sheriff Eric Fagan

```
 1      A.   I wasn't there when the confrontation happened.

 2   I was told by members of the media.

 3      Q.   Who on the media told you about this

 4   confrontation?

 5      A.   One of the females.

 6      Q.   And which -- can you tell me which female it

 7   was?

 8      A.   No.

 9      Q.   Okay.  Let's go to 7:15, Molly, on Exhibit 13 in

10   the video.

11               MR. HEDGES:     7:15?

12               MS. HEBERT:     Yes.

13               MR. HEDGES:      Thank you.

14   BY MS. HEBERT:

15      Q.   So there are two -- in this video clip, there

16   are two women who introduced themselves as members of

17   the media.  There's the one in pink and then the one

18   we'd looked at previously, which was in dark clothing.

19   Do you remember which one of the ladies told you that

20   they had had an altercation with Justin?

21      A.   No.

22      Q.   And it looks like both of these women introduced

23   themselves.  Did you recall meeting them before?

24      A.   Yes.

25      Q.   Can you tell me about that?
```

```
 1      A.    It was at the park when I first got there

 2   earlier.

 3      Q.    Okay, so you had had some kind of interaction

 4   with them at the park earlier?

 5      A.    Yes.

 6      Q.    And, just for the record, you didn't ask either

 7   of these two ladies for their credentials?

 8      A.    No.  I don't think I did, no.

 9      Q.    And you were telling me a little bit about one

10   of these ladies saying to you that they had some kind of

11   negative interaction with Justin Pulliam.

12      A.    Yes.

13      Q.    Can you tell me kind of what you remember about

14   that conversation, the substance of it?

15      A.    No.

16      Q.    Do you remember where that conversation

17   occurred?

18      A.    At the park.

19      Q.    Where at the park?

20      A.    By the creek.

21      Q.    Okay, so somewhere by the creek, one of these

22   ladies spoke to you about Justin Pulliam?

23      A.    Yes.

24      Q.    And you can't remember the substance of that

25   conversation?
```

```
1    A.    Some type of altercation.  It was -- they was

2    telling me about the -- they also told me about the

3    altercation with the family, and that he's not a part

4    of the media, he's making it difficult for us, he's

5    embarrassing us, he won't -- they said something about

6    he won't listen.  He's fussing and stuff; exactly what

7    they said, I don't remember.

8    Q.    That's okay, but you've given me the general

9    gist --

10    A.    Yes.

11    Q.    -- which is fine.  If -- and it seems like the

12    general gist of the media's complaint was that he

13    wasn't media and he wasn't acting very professional; is

14    that fair?

15    A.    Yes.

16    Q.    So why didn't you give Justin Pulliam a warning

17    of, look, Justin, you need to be professional and

18    courteous, here, and hold your comments to the end, or

19    not speak to the other media members, before ordering

20    Detective Hartfield to escort Justin away from the press

21    conference?

22    A.    He's not my employee.

23    Q.    Okay.  Earlier today, we talked a little bit

24    about press conferences before you were sheriff, and

25    you mentioned that if someone was going to be -- was
```

Sheriff Eric Fagan

```
 1   being really disruptive -- was yelling, or screaming,
 2   or threatening the press conference, you would give
 3   them a warning before you escorted them out of the
 4   press conference.  Why wouldn't you give the same kind
 5   of warning here?  "Justin don't disrupt the press
 6   conference."
 7      A.   Because those are the rules I had to follow as a
 8   officer with the Houston Police Department, was the
 9   orders that I was given.
10      Q.   So they're not your kind of rules today?
11      A.   No.
12      Q.   So, today, as we sit here, do you have a general
13   rule that if someone shouts something in a press
14   conference, you're going to remove them immediately?
15      A.   Depends on the situation.
16      Q.   What does it depend on?
17      A.   Violence, act of violence.
18      Q.   Okay.  And Justin hadn't threatened you at all
19   --
20      A.   No.
21      Q.   -- before you removed him?
22      A.   No.  Never said that, no.
23      Q.   And, to your knowledge, had Justin threatened
24   any members of the media?
25      A.   No.
```

Sheriff Eric Fagan

```
 1      Q.    And the complaint that you received from one of

 2  the members of the media, did that member of the media

 3  say anything about Justin potentially being violent?

 4      A.    No.

 5      Q.    You admitted previously that you made statements

 6  at this press conference on July 12, 2021, outside of

 7  -- at the front of Jones Creek Ranch Park; is that

 8  correct?

 9      A.    Yes.

10      Q.    And, for clarification, why did you give the

11  statement in this press conference, rather than your

12  PIO?

13      A.    Can --

14      Q.    Sure.  Why did you lead the press conference,

15  rather than your public information officer?

16      A.    Because I was there.

17      Q.    Because you were there.  So if you're onsite,

18  you're going to give the press conference, rather than

19  the PIO?

20      A.    Correct.

21      Q.    And that's typical?

22      A.    Yes.

23      Q.    At the July 12th press conference, were the

24  reporters there, the four reporters we've previously

25  identified, able to ask you questions?
```

```
 1      A.   Yes.

 2      Q.   And was Justin Pulliam able to ask you questions

 3   at all during this press conference?

 4      A.   If he wanted to.

 5      Q.   Were you able to hear Justin Pulliam said from

 6   where he had been moved --

 7      A.   Yes.

 8      Q.   -- at the part of the parking lot?

 9      A.   Yes.

10      Q.   What did you recall Justin Pulliam saying?

11      A.   Nothing.

12      Q.   So he didn't say anything?  You were able to

13   hear him?

14      A.   Yes.

15      Q.   So your position is that Justin asked -- if

16   Justin asked a question, you would have heard him from

17   where he was standing?

18      A.   Yes.  And I even told Justin, after this, if he

19   wanted to speak to me, he could.

20      Q.   And when was that?

21      A.   When they -- earlier, because I'm the one that

22   told him where we were going to.

23      Q.   Yes, okay, so before the press conference, you

24   told Justin that you were all going to the designated

25   media area?
```

1    A.   Yes.

2    Q.   And then at the press conference, you did not

3    speak to Justin Pulliam directly?

4    A.   No.

5    Q.   And if Justin had asked a question from where he

6    was located, approximately ten parking spaces back from

7    where you were, you would have answered it?

8    A.   Yes.

9    Q.   And so, to make sure he was being heard, would

10   you have shouted the answer to your question down to him

11   at the end of the parking lot?

12   A.   Yes.  If I had to, yes.

13   Q.   So it is your position that you believe that

14   Justin Pulliam could have fully participated, just like

15   all the other members of the media, from where he was

16   located?

17   A.   Yes.

18   Q.   Let's watch another portion of the video.

19        MS. HEBERT:     Molly, would you mind

20   cuffing up Exhibit 13, 8:53 to 9:06.

21                    [Clip was played.]

22   BY MS. HEBERT:

23   Q.   From this portion that we watched, can you tell

24   if you had started the press conference yet?

25   A.   Can I tell?

1    Q.    Yes.

2    A.    No.

3          MS. HEBERT:        Let's watch an earlier

4    portion of the video, 7:15 to -- we already watched

5    this.  We'll skip this.  Let's skip to another portion

6    of the video, of Exhibit 13.  Let's start at timestamp

7    15:17, Molly, so we'll skip to Exhibit 13, timestamp

8    15:17, and we'll watch to the end of the video, 15:59.

9    Q.    And, Sheriff, I think that the top left panel

10   might be the best to look at.

11   BY MS. HEBERT:

12   Q.    On the video clip that we just watched, can you

13   hear what you said at the end of the press conference?

14   A.    No.

15   Q.    And it looks like you got in a golf cart, or the

16   Gator, for lack of a better descriptor, with Detective

17   Hartfield, and drove off.  Is that what happened at the

18   end?

19   A.    Yes.

20   Q.    And where did you guys go?

21   A.    Probably back to my car.

22   Q.    Did you discuss Justin Pulliam with Detective

23   Hartfield on that drive back away from the press

24   conference?

25   A.    I don't recall.

Sheriff Eric Fagan

```
1     Q.    Did you say anything like, "Man, that Justin

2    Pulliam's a real jerk."

3     A.    Don't recall.

4     Q.    Sure.  After the press conference, did you

5    create any kind of written document, such as an incident

6    report or an e-mail, saying that you had to remove

7    Justin Pulliam from the press conference?

8     A.    Don't remember doing that.

9     Q.    Okay.  What about a formal text -- or a

10   less-formal document, like a text message.  Did you have

11   to text anyone and say, "Hey, just heads up:  I asked

12   that Justin Pulliam be escorted away from the press

13   conference."

14    A.    Don't remember doing that.

15    Q.    That's okay.  And after the press conference,

16   was there any sort of investigation about your decision

17   to move Justin Pulliam away from the press conference?

18    A.    Not to my knowledge, no.

19    Q.    And I think that's probably a good time for a

20   break.

21                MR. ROWES:      A lunch break.

22                MS. HEBERT:      Yeah, let's take a lunch

23   break.  What time is it now?

24                MR. HEDGES:      11:26.

25                MS. HEBERT:      So how about like 12:45,
```

```
 1   for come-back.  Give everybody enough time to get

 2   lunch.

 3   [Lunch recess was taken from 11:26 a.m. till 12:43 p.m.]

 4           COURT REPORTER:     Back on the record,

 5   12:43.

 6   BY MS. HEBERT:

 7       Q.   Okay, we are coming back from lunch.  I'm

 8   probably going to take the snooze button and go through

 9   some of the policies, so bear with me as we kind of go

10   through some of the paperwork this afternoon.  Kind of a

11   general question:  Earlier, we talked a little bit

12   about TCOLE.  Can you explain to me what "TCOLE" stands

13   for?

14       A.   Texas Law Enforcement -- gosh, you would have

15   asked me that.

16       Q.   Sorry.  I'm not trying to put you on the spot.

17           MR. HEDGES:     Texas Commission on Legal

18   -- Texas Commission on Law Enforcement.

19   BY MS. HEBERT:

20       Q.   So Texas Commission on Law Enforcement.  So,

21   "TCOLE" stands for "Texas Commission on Law

22   Enforcement", okay.  And does the sheriff's office do

23   any independent training?  Do you guys provide training

24   to your office?

25       A.   We have an academy.
```

1    Q.    You have a Fort Bend County Sheriff's Office

2    academy?

3    A.    Uh-huh.

4    Q.    And is that for before you become an officer?

5    A.    It's an academy -- many agencies.  We have

6    Richmond, Sugar Land -- anybody who want to be a police

7    officer, they have go through an academy, and that's a

8    State-certified academy, but it's under my office.

9    Q.    All right, so it's a precursor to becoming an

10    officer, the academy?

11    A.    Yes.

12    Q.    And not all of the folks who go to your

13    sheriff's office academy become officers at Fort Bend

14    County?

15    A.    No.

16    Q.    They go --

17    A.    Yeah.

18    Q.    -- all sorts of places?

19    A.    Yes.

20    Q.    Other than the academy, so putting the academy

21    as a precursor to becoming an officer aside, does the

22    sheriff's office host or hold independent training?

23    A.    Yes.  States mandate that officers have to have

24    at least 40 hours, and we do all of that.

25    Q.    Okay, so you do more than 40 hours; and the

Sheriff Eric Fagan

1    sheriff's office provides its own training sessions?

2    A.    Yes, but they have to be TCOLE-approved.  I just

3    can't just give a training session just to be giving a

4    training session.  It wouldn't count for nothing.  Have

5    to be TCOLE approved.

6    Q.    Right.  So they have to be TCOLE so the officers

7    get credit, presumably?

8    A.    Right.  Correct.

9    Q.    And do you -- do you develop those -- does the

10   sheriff's office develop those trainings independently

11   an then go get TCOLE approval?

12   A.    Some classes are independently made, but the

13   class courses have to be approved by TCOLE.

14   Q.    And some courses, I would guess --

15   A.    Come straight from the --

16   Q.    -- (interruption) straight from TCOLE --

17   A.    Correct.

18   Q.    And does the sheriff's office, if it's not going

19   to provide a training directly, recommend certain

20   trainings from TCOLE.  For example, to just clarify what

21   I mean, you say to Detective Hartfield, "Detective

22   Hartfield:  We want you to take X, Y, and Z courses this

23   year."

24   A.    Yes, you can do that.

25   Q.    And you, independently as the sheriff, might say

Sheriff Eric Fagan

1    to an officer, hey, I attended this training.  It was

2    really good.  You should attend it?

3        A.   Yes, I can do that.

4        Q.   Are officers with the sheriff's office trained

5    by the sheriff's office on how to interact with members

6    of the media?

7        A.   I didn't understand the question.  Does -- TCOLE

8    approved the class that they have to take; media

9    relations.

10       Q.   So let me just unpack that and make sure I

11   understand what you're saying.  There's a TCOLE class

12   that the sheriff's office recommends -- requires

13   officers to take that is media relations?

14       A.   Yeah.  I don't recommend it.  It's required by

15   TCOLE.

16       Q.   So there is a class that TCOLE requires all

17   officers across the state of Texas, called "media

18   relations", that they have to take?

19       A.   I don't know what it's called, but I know you

20   have to take a class on media.

21       Q.   I mean, the specific title is -- we can let that

22   go.  There's some class that the State of Texas

23   requires every officer to take that has to do with

24   media?

25       A.   Yes.

1    Q.    And have you taken that class?

2    A.    Yes.

3    Q.    And you would presume that all of your -- your

4    officers have taken that class?

5    A.    Yes.

6    Q.    And would that class be on their training record

7    from TCOLE, then?

8    A.    Yes.

9    Q.    So if an officer took some kind of media class,

10   it would be on whatever training record TCOLE provides

11   officers?

12   A.    Yes.

13   Q.    Do you know what the main takeaways are of the

14   training for officers on interacting with media?

15   A.    No.

16   Q.    Do you know if -- are your sheriff's officers

17   trained on how to balance concerns like safety with

18   First Amendment rights?

19   A.    Yes.

20   Q.    What does that training look like?  What are the

21   main takeaways of that?

22   A.    When you go through the academy, you have the

23   course.

24   Q.    And what does that course teach the officers to

25   do?

Sheriff Eric Fagan

```
 1      A.   To protect people's freedom of speech, and
 2   things like that.  That's something I had when I was --
 3   when I went through the academy.  You're talking
 4   something over forty years ago.  I don't remember the
 5   class.  I know I had it --
 6      Q.   That's okay.  I don't remember what I had for
 7   breakfast, so it's -- I entirely understand that you
 8   don't remember something that you did forty years ago.
 9   So today's sheriff's academy in Fort Bend County -- the
10   academy that you guys run today, is there a training
11   that y'all provide today that includes some kind of
12   media relations aspect?
13      A.   I'm sure it is.  I don't teach at the academy,
14   but I know there's a course that they have to go through
15   that, yes.
16      Q.   So if there was an officer who's looking -- or a
17   person who's looking to become an officer today through
18   the Fort Bend County Sheriff's Office training program,
19   the academy, they would receive some kind of training
20   from your office saying:  Hey, this is how you deal with
21   media.
22      A.   I'm sure -- yes.
23      Q.   Based on your kind of long experience, you know,
24   30-plus years of being a law enforcement officer, how do
25   free speech rights differ for members of the media
```

Sheriff Eric Fagan

1    versus, like, your average citizen?

2    A.   Well, on, like -- I'm not really sure of the

3    question you're asking me.  I mean, everyone has the

4    freedom of speech.  It doesn't differ, but if you mean

5    access, well, you have that different.  Media can come

6    into places where a average citizen can't come in.

7    Q.   Okay, so if I'm understanding your statement

8    correctly, freedom of speech is the same for everybody,

9    but there's a difference in access?

10   A.   Yes.

11   Q.   And how do you -- how does the sheriff's office

12   control that access?  How do you determine who gets to

13   have access to the information as a media -- as a member

14   of the media?

15   A.   Well, I'm not sure what you're asking me.  Like,

16   do I pick and choose what media come in?

17   Q.   Yeah, I guess -- we just talked about that

18   there's a difference in access to information based on

19   those folks who are media, versus your Average Joe on

20   the street, and I was just wondering how you kind of

21   determine that.  How you determine what access, like,

22   your average person on the street gets, versus someone

23   who's part of the media.

24   A.   I'm not sure -- like, when I first became

25   sheriff, I had a press conference where I had all the

Sheriff Eric Fagan

1    law enforcement agencies come talk about school safety

2    -- active shooters and school safety.  I invited all the

3    media to come.  At that meeting, people from all

4    different newspaper outlets, radio, TV, Justin Pulliam,

5    was there at that meeting, so everyone had access.  No

6    citizen -- I didn't see a person -- like, my next-door

7    neighbor or somebody like that.  No, they couldn't have

8    came in, but anybody can come in.  Like I said, even

9    Justin Pulliam came to that.  I didn't stop him then.

10   Q.   Okay, so, just to be clear, if your next-door

11   neighbor had said, "Hey, Sheriff Fagan, I want to come

12   to this school shooting press conference", he could

13   have come?

14   A.   No.

15   Q.   It was exclusive to people who were part of the

16   media?

17   A.   Yes, because it was going into a secure place in

18   my office; my media room.

19   Q.   And someone like Justin Pulliam or someone else

20   who was, like, filming for their YouTube channel, how

21   did you check to determine they were media to come into

22   your office?

23   A.   Like, when I first got here, people told me

24   about Justin Pulliam here at the sheriff's -- they had a

25   negative opinion about him.  I didn't know the guy.

Sheriff Eric Fagan

1   Never met him before in my life, so it didn't really

2   affect me one way or the other.  I told them let him in.

3   I didn't have a problem with it.

4       Q.   Okay, thanks.

5            We talked a little bit about the right to film

6   the police previously?  How are folks from the

7   sheriff's office trained on folks who are filming the

8   police, generally?

9       A.   They're told that people have the right to film.

10  It's not my -- you have the course -- in the academy

11  class, you have that course.

12      Q.   And do you recall -- the answer to this might be

13  no.  Are there any materials that are provided -- you

14  know, sometimes I go to trainings -- law, education

15  trainings, and they give us, like, a PowerPoint, and

16  then you have the PowerPoint to review, or there's a

17  PowerPoint that, you know -- if I call them up and say,

18  "Hey, there's a PowerPoint you can send me later", are

19  there any materials that are part of this training for

20  training officers on how to film the police, or how to

21  interact with people filming the police, to be more

22  precise?

23      A.   I wouldn't know.  I mean, there's information

24  they have to take.  Whoever teaches the class will have

25  to answer that question.  I don't know.

Sheriff Eric Fagan

```
 1     Q.   Okay, so there could be, you know, PowerPoint

 2    presentation or worksheets, or whatever, that someone

 3    who teaches the class on media relations, or how to

 4    interact with the public that say when you film the

 5    police, you should do -- or when someone's filming the

 6    police, you should do X, Y, and Z?

 7     A.   Yes.

 8     Q.   I'd like to look -- let's look at what should be

 9    marked as Exhibit 15.

10                    [Exhibit 15 was marked.]

11    BY MS. HEBERT:

12     Q.   And, Sheriff, would you mind reviewing this

13    document and letting me know when you're ready?

14     A.   Okay.

15     Q.   What is this document?

16     A.   It's a general order on arrests and

17    investigatory stops.

18     Q.   And was this order issued during your tenure as

19    sheriff?

20     A.   Yes.

21     Q.   Did you review it?

22     A.   Yes.

23     Q.   I want to look at the section titled "Core

24    Principles", and there's four core principles listed

25    here.  The first is "Sanctity of human life."  The
```

Sheriff Eric Fagan

1    second is, "De-escalation"; the third is "Procedural

2    Justice"; and the fourth is "Fair and Impartial Policy."

3    Did I get those right?

4        A.   Yes.

5        Q.   And would you say that these four principles

6    were something that -- are something that you, as the

7    sheriff, stand behind, generally?

8        A.   Yes.

9        Q.   So when you took office in 2021, these were four

10   principles that you would say were policy of the

11   sheriff's office?

12       A.   Yes.

13       Q.   So even though the date on this general order

14   looks like it's February 2022, you would say these core

15   principles predated this general order?

16       A.   Yes.

17       Q.   Let's look at what I'm going to mark Exhibit 16.

18                    [Exhibit 16 was marked.]

19                MS. HEBERT:      That would be, Molly, from

20   our index, P.

21                    [Exhibit 16 was marked.]

22   BY MR. HEBERT:

23       Q.   While Molly's getting that, sheriff, would you

24   mind looking at Exhibit 15 at the top?  The order from

25   2022 says, "Replaces or modifies GO #09-03, dated

1   8/15/2015."  Did I read that correctly?

2      A.   Yes.

3      Q.   Let's look at Exhibit 16; and what is this?

4      A.   Traffic enforcement.

5      Q.   And is this a general order?

6      A.   Yes.

7      Q.   What's the date on this general order?

8      A.   August 15, 2017.

9      Q.   And what's the number?

10     A.   GO 09-03.

11     Q.   So is this general order that is at Exhibit 16

12  the order that Exhibit 15 -- 09-10 -- was replacing?

13     A.   Yes.

14     Q.   And this 2017 order looks like it just governed

15  traffic enforcement; is that correct?

16     A.   Yes.

17     Q.   And the 2022 order looks like it was the title

18  is "Arrests & Investigatory Stops."  Am I reading that

19  right?

20     A.   Yes.

21     Q.   So before the 2022 order was issued, did the

22  sheriff's office have a general order that governed

23  arrests?

24     A.   Before the 2022?

25     Q.   Yeah.

1    A.    Yes.  I'm sure they did, yes.

2    Q.    So is there probably out there a written general

3    order on arrests that would have been governing 2017?

4    A.    I would think so, yes.

5    Q.    And even if there wasn't a general order out

6    there on arrests, would you say that the sheriff's

7    office had a policy on arrests --

8    A.    Yes.

9    Q.    -- in 2017?

10    A.    Yes.

11    Q.    Okay.  I want to walk through Exhibit 15, so you

12    can put Exhibit 16 away.  I don't think we're going to

13    look at that again.  Let's go back to those four core

14    principles, and one of those core principles is

15    "de-escalation."  I'm going to read that principle.

16    "All FBCSO employees shall use de-escalation techniques

17    and tactics to reduce any threats or gain compliance to

18    lawful commands without the use of force or with the

19    lowest possible" -- "with the lowest level of force

20    possible."  Did I read that correctly?

21    A.    Yes.

22    Q.    Sorry.  I messed up a little bit, there.  What

23    does de-escalation look like?

24    A.    Trying to calm a situation down.

25    Q.    Okay.  And, so as part of de-escalation, would

Sheriff Eric Fagan

```
1   you expect that an officer's going to try to defuse the
2   situation as much as possible?
3       A.   Correct.
4       Q.   And maybe -- does that -- does defusing a
5   situation mean that maybe if the stakes are low -- not
6   a high-stakes crisis situation, but if the stakes are
7   low, you can give someone a warning as, like, the first
8   step, before arresting them, for example?
9       A.   Yes.
10      Q.   And if there was an order, you might give them a
11  warning to comply with the order before taking a more
12  severe action?
13      A.   You try to do it in a continuum.  You know,
14  steps.
15      Q.   So talk to me a little bit about the continuum.
16  Keep in mind that I'm not familiar with the law
17  enforcement arena.
18      A.   That's the officer's discretion.  That's an
19  individual officer, what I might do or another officer
20  might not do, so I can only tell you from my viewpoint
21  what I would do, because everybody thinks differently.
22      Q.   Of course, yeah.  And so what might be, like,
23  step A on your continuum might be, like, step A.2 on Joe
24  Officer B's continuum, right?
25      A.   My continuum is verbal -- just verbal; second,
```

Sheriff Eric Fagan

1    hands on; step three, arrest.

2        Q.   And is that continuum consistent with your

3    training and experience?

4        A.   Yes.

5        Q.   And do you know if your officers are trained to

6    kind of follow that continuum?

7        A.   To de-escalate, yes.

8        Q.   To try to use verbal first?

9        A.   Yes.

10       Q.   Followed by some kind of hands-on, maybe

11   escorting, maybe putting your hands literally on

12   someone?  Is that kind of the second step, as I

13   understand?

14       A.   Uh-huh.

15       Q.   You're going to have to say yes --

16       A.   I'm sorry, yes.

17       Q.   And then third step might be, kind of, arrest or

18   citation?

19       A.   Yes, and then it's all the way up.

20       Q.   Right.  Proactively, how do you ensure that your

21   officers are carrying out the de-escalation policy?

22       A.   Watching the body cameras.

23       Q.   So do you, like, spot-check the body cameras to

24   just see how -- like, how things are going?

25       A.   Yes, I have someone that does that, and then if

Sheriff Eric Fagan

```
 1   something goes wrong, they bring it to my attention.

 2      Q.   So is that review of body camera footage

 3   independent of a complaint being made?

 4      A.   Yes.

 5      Q.   So you're already looking at the body camera

 6   footage before someone ever, you know --

 7      A.   In some cases, yes.

 8      Q.   I mean, obviously, you can't review hundreds of

 9   hours of body camera footage every day.  That would be

10   incredible and require a number of resources.

11      A.   That's impossible.

12      Q.   Right.  You're spot-checking?

13      A.   Yes.

14      Q.   Okay.  Let's go back to the core principles

15   again, and I want to look at that Procedural Justice

16   piece, and this is, again, in Exhibit 15.  I'm going to

17   read the Procedural Justice section.  "Procedural

18   justice is defined as the fairness of processes used by

19   those in positions of authority to reach specific

20   outcomes or decisions.  Procedural justice is based

21   upon four central principles -- treating people with

22   dignity and respect, giving citizens a voice during

23   encounters, being neutral in decision-making, and

24   conveying trustworthy motives.  I want to ask about

25   giving citizens a voice during encounters.  What do you
```

Sheriff Eric Fagan

```
 1   mean by that?

 2      A.   Hear what they have to say.

 3      Q.   So does that mean a citizen can voice a

 4   complaint about an order, for example?

 5      A.   Yes.  They have a right to ask a question, yes.

 6      Q.   So not only can they voice a complaint; they can

 7   also ask a question?

 8      A.   Yes.

 9      Q.   And can a citizen assert a right in response to

10   a police order?  So here's an example:  Let's say, you

11   know, Mr. Hedges is walking down the street and an

12   officer comes at him from nowhere and says, "Mr. Hedges,

13   can I search your backpack?"  Mr. Hedges says, "No.  I

14   have the right to refuse to search."  Can a citizen like

15   Mr. Hedges do that?

16      A.   Yes.

17      Q.   Would Mr. Hedges or any other citizen have

18   committed an offense by asserting that right?

19      A.   No.

20      Q.   How are sheriff's officers trained to give voice

21   to citizens during an encounter?

22      A.   Their academy class.

23      Q.   And what, like -- rather than just the mechanism

24   of training, what's the methodology?  What are the

25   officers instructed to do?
```

Sheriff Eric Fagan

```
 1    A.    Follow the law.

 2    Q.    I understand that, but when -- how are the

 3   officers trained so that they can give voice to

 4   citizens during encounters?

 5    A.    That's the de-escalation.  You're going back to

 6   de-escalation.

 7    Q.    Okay.  Has the sheriff's office ever disciplined

 8   some of its officers or any of its officers for failing

 9   to de-escalate a situation?

10    A.    Yes.

11    Q.    What did that look like?

12    A.    It varies.

13    Q.    Okay.  Tell me more.  What is the range of

14   discipline --

15    A.    Termination.

16    Q.    Okay.  To, maybe, a counseling session, like:

17   Joe, you've really got to handle the situation better.

18    A.    Yeah, oral or written, all the way up to

19   termination.

20    Q.    Okay.  The other parts of procedural justice --

21   treating people with dignity and respect, being in

22   control of decision-making, conveying trustworthy

23   motives -- can you discuss in broad stakes how you

24   expect officers to achieve those things?

25    A.    Just treat people with respect.  I tell my
```

1    officers when I speak to them, you want to treat people

2    the way you treat your mother, your brother, your

3    sister, like that.

4        Q.    So kind of in achieving these core principles,

5    you would expect your officers to talk to citizens,

6    have citizens talk to them, engage in conversation?

7        A.    Yes.

8        Q.    I want to talk about active scenes with

9    potential shooters.  In general, when a sheriff's

10   officer arrives on a -- at an incident or a scene with a

11   potential shooter, what should be the officer's first

12   steps?

13       A.    Safety.

14       Q.    Tell me about that.  How do they ensure safety?

15       A.    Take cover, get positioned, make sure there's no

16   one in the line of fire.

17       Q.    So the first step would be take cover, get in

18   position; and then the second would be check to make

19   sure no one's in the line of fire?

20       A.    Yes.

21       Q.    And then what would you expect the officer to

22   do?

23       A.    To conduct the investigation.

24       Q.    Okay.  And then, you know, radio what's kind of

25   going on on the ground, when it was safe to do so?

1    A.    What resources do they need?  Is this person a

2   CIT?  Is this person someone that needs mental help, or

3   is it just someone that we need to get S.W.A.T. out

4   there?  So it varies.

5    Q.    Okay, and I don't want to put words in your

6   mouth, but let me summarize.  The first step is to take

7   cover and make sure your position is safe; the second

8   stuff is kind of line of fire, make sure other people

9   are safe; and then the third step is to do

10  investigation and/or radio or other resources or give

11  updates?

12    A.    As needed.

13    Q.    As needed; is that accurate?

14    A.    Yes.

15    Q.    If an officer saw that there were civilians near

16  a potential shooter, what should the officer do?

17    A.    Get that citizen away from them.

18    Q.    Okay.  If the officer allowed civilians to just

19  stay in the same place, does that mean that the officer

20  concluded that that same place, that original location,

21  was safe?

22    A.    When you say "allowed" --

23    Q.    So, yeah, the first question, we talked about if

24  an officer saw civilians kind of in the line of fire, he

25  or she would move those civilians?

Sheriff Eric Fagan

```
1     A.   Yes.

2     Q.   And then, presumably, the kind of converse of

3   that is if the officer allows someone just to stay

4   where they were, that means the officer concluded those

5   civilians were as safe, as far as he or she could tell?

6     A.   Yes.

7     Q.   Would there ever be a situation where an officer

8   said:  Generally, we've got to get people out of the

9   line of fire, but I'm going to leave these particular

10  people -- these exceptions in the line of fire, this --

11  maybe they can provide a special service.

12    A.   Yes.

13    Q.   And tell me more about that.

14    A.   When I said CIT, we have where we have people

15  from Texana to come out for individuals that we deem to

16  have a mental issue.  They help to de-escalate, so

17  they'll be in the area.  Still want to keep them out of

18  the line of fire, as well, but they may be closer than

19  what a regular civilian would be.

20    Q.   I understand.  So when someone -- what does

21  "CIT" stand for?

22    A.   "Critical incident training."

23    Q.   So if someone of critical incident -- for a

24  critical incident, and you have a Texana employee you

25  still want to move them out of the line of fire, but
```

Sheriff Eric Fagan

1    they may be able to be closer to the incident --

2        A.    Yeah.   Than a regular citizen, yes.

3        Q.    Would the officer warn the mental health

4    professional or Texana to stay behind cover?

5        A.    Yes.   I would think so, yes.

6        Q.    And is there any written policy on, you know,

7    Texana or CIT professionals that the sheriff's office

8    has?

9        A.    Any written policy on how to --

10       Q.    I understand that that question was a little

11   unclear.   We talked a little bit about how CIT folks,

12   or Texana, or mental health folks might get a special

13   exception to stay closer to the scene.   Is there a

14   policy anywhere that says effectively that?

15       A.    I don't think so, but they train with us.

16       Q.    They train with you.

17       A.    Go through training, yes.

18       Q.    So tell me what that training looks like.

19       A.    Just -- we do scenarios on active shooters and

20   things like that, so we do training on what to do, how

21   to respond.

22       Q.    Okay.   And the Texana employees participate in

23   said training?

24       A.    Yes.

25       Q.    Do they ever participate in role-playing?

1    A.    Yes.

2    Q.    If there was an -- if there was an active

3  shooter potential situation, would the officer ever

4  explain the risks of remaining onsite to someone like a

5  Texana or CIT worker?

6    A.    They should know that.

7    Q.    And what would the officer do to make sure those

8  folks were protected?  Would the officer stay with

9  them?

10    A.    Yeah, they would be on the scene with them, yes.

11    Q.    Not only be on the scene with them, but let's

12  say there's an active or potentially active shooter.

13  Is it protocol for an officer to remain with the CIT

14  employee or CIT professional?

15    A.    Yes.

16    Q.    When dealing with a potential shooter situation,

17  do officers wear special vests?

18    A.    Yes.

19    Q.    And front-line officers, on a daily basis, they

20  wear some kind of body armor?

21    A.    Yes.

22    Q.    A special vest -- what's the right term for

23  that?

24    A.    "Vest."

25    Q.    So, on a daily basis, officers are wearing a

Sheriff Eric Fagan

1    special vest, a bulletproof vest?

2    A.    I don't like the term "bulletproof", because all

3    of them are not bulletproof.

4    Q.    Right, so I was trying to find the right term.

5    Let's say a safety vest.

6              MR. HEDGES:    Maybe ballistic vest.

7              THE WITNESS:    Yes.

8    BY MS. HEBERT:

9    Q.    And the idea behind a ballistic vest is to try

10   to keep the officer safe if they get shot?

11   A.    With certain weapons.

12   Q.    With certain weapons, that they're going to be

13   protected?

14   A.    Yes.

15   Q.    At least more protected than if they weren't

16   wearing said vest?

17   A.    Yes.

18   Q.    And when dealing with a potential shooter

19   situation, would you expect the officer to try to keep

20   they were eyes on where the shooter might be?

21   A.    Yes.

22   Q.    When would it be appropriate for an officer to

23   turn their back on where a potential shooter might be?

24   A.    If they're trying to protect someone else --

25   themselves or someone else, something like that.

Sheriff Eric Fagan

```
 1   That's rare, but other than that, you keep your eye --
 2      Q.   Okay, so let me make sure I understand.  So
 3   other than when an officer -- and this would be
 4   incredibly rare -- is trying to use his or her body to
 5   literally shield someone from bullets --
 6      A.   Yes.
 7      Q.   -- an officer should not be turning his back to
 8   a potential shooter?
 9      A.   Yes.
10      Q.   If an officer had to arrest someone on a scene
11   with a potential shooter, how would the officer ensure
12   that he and the arrestee stayed safe?
13      A.   Arrest that person and take them away from the
14   scene.
15      Q.   Okay.  And what if that wasn't feasible?  What
16   if you couldn't take the arrestee away from the scene,
17   given the reality on the ground?
18      A.   Then we call -- radio in for some help to have
19   that person removed.
20      Q.   Okay.  How are you doing?  Do you need a break?
21      A.   I'm good.  Just came back from lunch.
22      Q.   Let's talk a little bit about offenses under
23   Texas law, and we'll get to the offense that Justin
24   Pulliam was arrested for in a little bit, but under
25   Texas law, is it generally an offense to fail to comply
```

1    with a police order?

2        A.    Yes.

3        Q.    And do you know what offense that is?

4        A.    Not off the top of my head, no, I can't read the

5    law, but I know it's a law.

6        Q.    So generally, if you don't do what the police

7    say, you're committing offense?

8        A.    In certain situations, yes.

9        Q.    Okay.  And what kind of situations?

10       A.    Like we was just talking about; a active shooter

11   in there.

12       Q.    A potential shooter.  So if you didn't

13   immediately comply with a police order in an active

14   shooter event, you would be committing an offense?

15       A.    Yes.

16       Q.    What about when you have, like, a less critical

17   incident?  Let's say, you know -- we'll go back to Mr.

18   Hedges' example.

19              MR. HEDGES:    Why do I always have to be

20   the criminal?

21   BY MS. HEBERT:

22       Q.    Well, you're not the criminal.  That's why

23   you're so great.  Mr. Hedges is walking down the

24   street, and the officer orders Mr. Hedges to cross the

25   street.  If Mr. Hedges failed to do that, would he be

Sheriff Eric Fagan

1    committing an offense?

2        A.    No.

3        Q.    And is it an offense to question a police

4    officer order?

5        A.    No.

6        Q.    Is it an offense to ask for clarification for a

7    police officer order?

8        A.    No.

9        Q.    What is your understanding of the offense of

10   interference with public duties?  And, by that, I mean

11   what kinds of conduct is interference with public

12   duties?

13       A.    Hindering the officer from doing his legal duty,

14   hindering the officers from making arrests.

15       Q.    So there's a lot of things that could,

16   presumably, hinder an officer from doing his duty or

17   making an arrest.  You know, if you were hungry, and you

18   were doing your duty, and I had a pizza, I mean, that

19   might distract you from doing your duty and making an

20   arrest, no?

21       A.    No.

22       Q.    You wouldn't be distracted based on this

23   awesome-smelling pizza that I had?

24       A.    No.

25       Q.    All right.  Presumably, if I started shouting at

Sheriff Eric Fagan

```
1    you, "Hey, Sheriff Fagan, come get this awesome pizza",

2    as you were trying to make an arrest, would that

3    distract you?

4         A.   No.

5         Q.   If I --

6         A.   Hunger is a bad example.  No.

7         Q.   Okay, so hunger doesn't work.  But if I decided

8    to, like, you know, chuck the pizza at you.

9         A.   Yes.

10        Q.   Okay.  If I decided to say -- you know, protest

11   the fact that you had shut down all the pizza shops in

12   town, and I kind of walked into the middle of where you

13   were making an arrest, would that be interference with

14   your duties?

15        A.   If you walk in between me and my subject -- yes.

16        Q.   So, kind of to summarize, something more than

17   being present for -- you know, enticing you with pizza

18   is needed to commit the offense of interference with

19   public duties?

20        A.   Yes.

21        Q.   Any idea on how to really articulate what that

22   "something more" is?

23        A.   It depends on the situation and the type of

24   arrest you're going to do.

25        Q.   Okay.  Would the person who, you know, is
```

Sheriff Eric Fagan

```
 1   potentially committing this offense, what would their

 2   mental state have to be?

 3       A.   What you --

 4       Q.   Would they have to have any -- would they have

 5   to have the specific purpose of interfering with your

 6   duty?

 7       A.   No.

 8       Q.   So just by the fact that they did something that

 9   interfered with your carrying out of the arrest or the

10   duty, that means that they are liable for the offense?

11       A.   Yes.  After being warned and it continuing, yes.

12       Q.   So you would have to warn them first?

13       A.   Would I have to?  No.  I don't have to, but will

14   I?  Yes.

15       Q.   Okay, so there is no requirement to say, "Hey,

16   Christy, stop throwing pizza at me"?

17       A.   No.

18       Q.   So you could just arrest me for throwing pizza

19   at you?

20       A.   Yeah.  If you hit me with it, yeah.

21       Q.   Well, I'm not a very good shot, so probably not.

22   But if I decided I was protesting the arrest, or, you

23   know, you shutting down pizza shops, would you have to

24   give me a warning?

25       A.   For?
```

Sheriff Eric Fagan

1    Q.    Before I, you know, was going to be arrested for

2    the interference with your duties; if I was being

3    obnoxious or getting in your way?

4    A.    It would be a warning.

5    Q.    Okay, so if I was potentially getting in your

6    way, you would have to give me a warning to make sure

7    that I knew?

8    A.    Yes, I'll give you a warning.  That's the

9    deescalation part of it, yes.  I would give you a

10   warning.

11   Q.    Okay.  To your knowledge, is there any specific

12   training that a sheriff's office gives officers on the

13   offense of public interference with duties?

14   A.    The de-escalation.

15   Q.    Okay, so you would classify the de-escalation

16   as, like, the training?

17   A.    Yes.

18   Q.    When is a countdown supposed to be used?  What's

19   a -- how is a countdown used?

20   A.    It's officer discretion.  There's no such thing

21   as a countdown that we're trained on.  That's a

22   discretion -- I use that when the situation merit it, so

23   if it's a dangerous situation, I'm not going to wait

24   that long.  If it's not that dangerous, you might get

25   more time.  If it's something I think needs to be

Sheriff Eric Fagan

1    expedited, then I'll probably give a countdown.

2       Q.   Okay, so let me make sure I understand, then.

3    You personally, as the sheriff and the law enforcement

4    officer that you are -- many years, you've been on the

5    force -- you personally have used countdowns as a

6    tactic?

7       A.   Yes.

8       Q.   And are officers trained to use countdowns?  Is

9    that, like, a technique that they train officers --

10      A.   That's a tactic.  I don't know if they're

11   trained, but that's a technique that I use.  In law

12   enforcement -- I don't know if I'm getting off your

13   question, but --

14      Q.   No, you're fine.

15      A.   In law enforcement, you're trained in a lot of

16   different things, so you take some things and put in

17   your toolbox.  Other things, you don't.  Like, no, I'm

18   not going to use that, I'm going to use this.  So I

19   don't know where I learned -- I know I got that in the

20   class, some training, so that's something that I use.

21   Now, I have some officers that use it, as well, too,

22   but if you're saying that countdown, is it TCOLE, I

23   never saw it as TCOLE training, no.

24      Q.   And you wouldn't know if the sheriff's office

25   specifically has given trainings on countdowns?

1    A.    No.

2    Q.    And you talked a little bit about, you know --

3    let me rephrase that.  You talked a little about when

4    you personally would use a countdown, and you said that

5    you would use a countdown when it wasn't, like, a

6    critical, immediate situation?

7    A.    Uh-huh.

8    Q.    Was that correct?

9    A.    Yes.

10    Q.    And you wouldn't use a countdown if complying

11    with a police order or doing a certain action was, like,

12    mission critical for that moment?

13    A.    Yes.

14    Q.    And then when you do use a countdown, you

15    provide some kind of warning; is that right?

16    A.    Yes.

17    Q.    You would say something like I tell my two-year

18    old; "If you don't pick up your toys in five seconds,

19    you're going to have no dessert.  Five, four, three,

20    two, one"; is that correct?

21    A.    Yes.  It's a de-escalation technique.

22    Q.    Okay.  And this is what happens with my two-year

23    old:  If I just start randomly counting, he thinks it's

24    super-fun to count with me, and -- he's not really

25    great at number 3, so it goes "1, 2, 1, 2", a lot and

1    then "1, 2, 1, 2", and won't get to 3.  If you were to

2    use the countdown technique without warning someone

3    what's going to happen at the countdown, that wouldn't

4    be very effective; is that correct?

5        A.   No, it's really effective.  I look at my watch

6    instead of -- that's a technique.

7        Q.   Okay, so you look at your watch.  Do you ever

8    tell the person when you're looking at your watch and

9    counting down, "Look, dude.  You're going to do what I

10   say", or, "If you don't leave the area", or, "If you

11   don't X, Y, or Z" --

12       A.   No.  I say, "You have five minutes", and I'll do

13   that.

14       Q.   And you don't tell them what the consequence of

15   five minutes might be?

16       A.   Beforehand, if you don't leave, you'll get

17   arrested in five minutes.  I'm not even really looking

18   at the watch.  I'm just looking down at the watch.

19       Q.   Okay.  So the implication --

20       A.   Yes.

21       Q.   -- if I'm understanding you, is anytime you're

22   looking at your watch or counting down, if you don't do

23   whatever I said you're going to do beforehand, you're

24   going to be arrested?

25       A.   Yes.

Sheriff Eric Fagan

```
 1      Q.    Okay.  I'd like to talk a little bit about
 2   welfare checks.  I understand what was going on with
 3   Edwin Kraft on December 2021 -- December 21, 2021 --
 4   there's a lot of "2s" and "1s" -- was kind of a welfare
 5   check performed out in the public.  What is a welfare
 6   check?
 7      A.    Checking on the person's wellbeing and mental
 8   health, or their physical health.
 9      Q.    And does the sheriff's office have written
10   policies on welfare checks performed out in the world?
11      A.    I'm not sure what you --
12      Q.    Yeah, so does the sheriff's office have any kind
13   of written policy of:  This is the procedure for
14   performing a welfare check on someone who's, you know,
15   at their house or --
16      A.    If we're talking about that situation, we knew
17   he was a person in crisis, so, yeah, we have a certain
18   way we handle that.
19      Q.    So you have a policy on how you handle someone
20   in crisis?
21      A.    Yes.
22      Q.    And if they weren't someone in crisis -- let's
23   say my mom calls your office and says go check this
24   college kid's apartment, or something like that, do you
25   have a policy for that kind of welfare check, too?
```

```
 1      A.    Yes.

 2      Q.    Is that written down somewhere?

 3      A.    Yes.

 4      Q.    Would it be, like, a general order on welfare

 5    checks?

 6      A.    Just probably a SOP.

 7      Q.    What does that stand for?

 8      A.    "Standard operating procedure"; so -- because

 9    you still have to follow the law.  If your mother called

10    to go check on this college student, knock on the door,

11    don't get a answer, I don't have a warrant to get into

12    that house.  I have to have a reason.  Like, say, I see

13    flies on the windows or something like that.  I'll call

14    the D.A. and get a warrant to go in.

15      Q.    And, generally, how do welfare checks come

16    about?  Seems like it might be someone calling in.  Is

17    --

18      A.    A loved one usually calls because of someone.

19      Q.    Okay, that's the typical way it surfaces?

20      A.    Yes.

21      Q.    And then what's the procedure for a welfare

22    check?  What's the first step?

23      A.    Get a unit out there first, try to get all the

24    information that we can, find out if this person's in

25    crisis or not, or find out if they have some type of
```

Sheriff Eric Fagan

1   medical emergency, try to find out why you need the

2   welfare check, trying to figure out what we're doing

3   there.

4       Q.   And then, you know, before body cams in 2022

5   were a part of your sheriff's office, was there a way

6   that welfare checks were recorded?

7       A.   I wouldn't know.  I didn't work here there --

8   before this.

9       Q.   Well, you worked at the sheriff's office --

10      A.   Before the body cameras --

11      Q.   -- in 2021, you were there?

12      A.   Yeah.

13      Q.   So how were welfare checks recorded in 2021?

14      A.   By offense reports.

15      Q.   Okay, and did officers have dash cameras in

16  2021?

17      A.   Yes.

18      Q.   Did every officer have a dash camera?

19      A.   I believe so.  Patrol.

20      Q.   Every patrol officer?

21      A.   Yes.

22      Q.   And what's the difference -- how do you

23  distinguish between patrol versus non-patrol?

24      A.   I have people who work in the jail, dispatchers,

25  investigators.

Sheriff Eric Fagan

1    Q.    Okay, so anybody who's not out in a police

2    cruiser driving around is not patrol -- it would be

3    anybody who's in a police cruiser driving around,

4    regardless of what rank, they are going to have a dash

5    camera?

6    A.    No.  There's certain ones that have dash camera.

7    People in patrol, the sergeants in patrol.  Some

8    lieutenants, I mean, won't have one.  We don't have a

9    unlimited budget, so I have to be --

10   Q.    Judicious?

11   A.    Yeah.

12   Q.    Okay.  So, you know, deputies probably have

13   them?

14   A.    Yes.

15   Q.    Sergeants probably have them?

16   A.    Yes.

17   Q.    After a welfare check is completed, how is that

18   documented?  Just an offense report?

19   A.    Offense report, yes.

20   Q.    And what -- would the conclusion of that

21   incident was -- would be written down in that offense

22   report?

23   A.    Yes, unless if it was one that had a mental

24   health person there, it would be two reports; a offense

25   report and a report from Texana.

Sheriff Eric Fagan

1       Q.    And anytime there's, like, a person in mental

2   crisis, would you expect that there would be some kind

3   of mental health professional with an officer?

4       A.    We try to get a mental health professional with

5   us, yes.  Not all the time, but we try to.

6       Q.    So if you have enough notice -- I mean,

7   obviously, if an officer interacts with someone who's

8   having a nervous breakdown on the street, they're not

9   going to have a mental health officer --

10      A.    Right.

11      Q.    But if there's enough notice, you're going to

12  try to call someone with specialized mental health

13  training?

14      A.    Yes.

15      Q.    What about welfare checks done in the jail?  Now

16  do those come about?

17      A.    Well, they have to check on inmates on every

18  hour, so they're always having welfare checks, and then

19  if it's someone that's in a mental crisis if we have

20  them in a certain room, they'll check every thirty

21  minutes; suicide watch, every fifteen minutes.

22      Q.    So within the jail itself, the employees of the

23  jail are doing checks --

24      A.    Called rounds.

25      Q.    Rounds.

Sheriff Eric Fagan

1       A.    Yes.

2       Q.    They're doing rounds at regular intervals?

3       A.    Yes.

4       Q.    What does that kind of welfare round look like

5    in the jail?

6       A.    They're looking -- physically looking to see if

7    a person's all right.

8       Q.    And do they, like, have a clipboard or write

9    down every time, or -- like, "Inmate 1, fine"; Inmate 2,

10   fine" --

11      A.    No.

12      Q.    They just kind of --

13      A.    It has a secure -- I forgot what the name of

14   this computer thing.  It has a little thing on the -- on

15   the cell, and we look in to see about -- you scan it and

16   it writes things down for you.

17      Q.    That's pretty cool.  All right, so maybe I'm a

18   little antiquated, here, but, you know, everybody has a

19   QR code on their jail that you scan to make sure they're

20   -- so, you know, when they're doing their rounds, they

21   scan all the people to, like, mark that they've checked

22   on them?

23      A.    Yes.

24      Q.    And if someone were in a mental health crisis,

25   but the jail professional -- what's the right word

Sheriff Eric Fagan

```
 1   there?  "Jailer"?

 2       A.   Uh-huh.  You can say "jail employee", yes.

 3       Q.   A jail employee determines that no treatment is

 4   necessary, you would expect that to kind of be written

 5   down or indicated in their, like, QR code log?

 6       A.   Uh-huh.  Yes.

 7       Q.   And if a welfare check was prompted by some kind

 8   of, let's say medical concern, someone was having heart

 9   palpitations.  Would you expect some kind of medical

10   professional to be involved?

11       A.   Yes.

12       Q.   So if someone was complaining or had a medical

13   condition, you would have a doctor or a nurse check

14   them?

15       A.   Yes.

16       Q.   Not just a conventional jail employee?

17       A.   Yes.

18       Q.   Do you have an estimate for how many people get

19   arrested in Fort Bend County on a daily basis?

20       A.   No.

21       Q.   Do you guys have records on, maybe, how many

22   people get arrested on a monthly basis?

23       A.   Yes, I'm sure we do.

24       Q.   Without having to, like, look at the specific

25   records, could you give me an estimate on what that
```

Sheriff Eric Fagan

```
 1    looks like?

 2       A.   I don't look at that estimate.  I never have.  I

 3    look at the number in my jail each and every day.  Like

 4    today, I know I have 803, and 107 of them are females;

 5    so I'll look at that.

 6       Q.   Is that, you think, typical of a day at the

 7    sheriff's office?  800 inmates?

 8       A.   803 today.

 9       Q.   803; so you know that really well?

10       A.   Yeah, I look at it every day.

11       Q.   And is that a typical amount, 803 folks in the

12    jail?

13       A.   It varies.

14       Q.   What's the kind of range?

15       A.   When I first got here, it usually ranged from

16    675 to 700, and now it's -- for the last two months,

17    it's been averaging 800 to 803, to 806; 800 to 803, 806;

18    806 is the highest so far.

19       Q.   So you've been kind of having more folks in the

20    jail lately?

21       A.   Yeah.  More people are moving to Fort Bend.

22       Q.   Yeah, it's a growing area.  And each time

23    someone is arrested by a sheriff's officer, do they

24    bring that arrestee to the Fort Bend County Jail?

25       A.   Yes.
```

Sheriff Eric Fagan

1    Q.   So you wouldn't, like, arrest someone and then

2    let them go?

3    A.   That has happened, yes.

4    Q.   Okay, so you would arrest someone and then say:

5    Eh, we're not bringing this person into the jail?

6    A.   Yeah, if that person's ill or something like

7    that, we may have to take them to the hospital or

8    something like that.  Well, they'll still be under

9    arrest, but we have to take them to the hospital or

10   something like that.

11   Q.   Okay, so other than, like, taking someone who's

12   ill or in, like, a condition, to the hospital, do you

13   ever just arrest someone and say, "Nah, sorry, go ahead.

14   Go home."

15   A.   I don't arrest people.  No.

16   Q.   Do you know if your officers do?

17   A.   No.  I don't know that.

18   Q.   Do you personally perform welfare checks on

19   every person who's in the Fort Bend County jail?

20   A.   On every person?  No.  I have done it several

21   times.

22   Q.   Okay.  So how many times a day would you say you

23   check on someone in the jail?

24   A.   I've done it five times since I've been sheriff.

25   Q.   Okay, so five times since you've been sheriff,

Sheriff Eric Fagan

```
 1   you've checked on someone in the jail?

 2      A.   Yes.

 3      Q.   And can you tell me about those five times?

 4      A.   Once, a mother called me worried about her son,

 5   and I went over and checked on him and then called her

 6   back.  One, I had a autistic young man that was

 7   arrested.  The parents were in the -- in the bonding

 8   area when I walked through and I saw the lady crying,

 9   and I asked what was wrong, and she said her autistic

10   son was arrested, so I went back in the jail to check

11   on the autistic son.  I stayed with that young man

12   until they got through with the bonding.  I made sure

13   they didn't place him into a cell, because he didn't

14   understand.  He was autistic, and so I stayed with him

15   until they got through, and brought him back out to the

16   parents.  That was the second time.  Third time I went

17   in, the mother had called and said her son wrote and

18   said he was going to commit suicide.  I went in to go

19   check on that individual; and the fifth time was -- I

20   figure you're going to ask me questions about that --

21   was Pulliam.

22      Q.   So you had the mother of the autistic, the

23   potential suicide; what was the fourth time?

24      A.   Another suicide.

25      Q.   And then the fifth time was Pulliam?
```

Sheriff Eric Fagan

```
 1     A.    Pulliam.

 2     Q.    So how do you decide who warrants a personal

 3   welfare check from the sheriff?

 4     A.    Some parents -- I'm like that.  I'm a parent, so

 5   I'll do it.  On Pulliam, I knew that he had a bad

 6   relationship with the sheriff's office.  I went over

 7   there so people could see me with him so he would be

 8   treated fairly and nobody would -- I'm not saying

 9   nobody was going to do anything to him, but I wanted

10   them to know that I had eyes on him, so that's why I

11   went.  Or that's what warrant me to go over there.

12     Q.    I understand.  And I'm just asking generally

13   now -- walk me through the process of, like, performing

14   a welfare check at the jail.  What's the first step you

15   take when you're going to go over there?

16     A.    You're talking about when I go do a wel --

17     Q.    Yes, sir.

18     A.    I ask where this inmate is, I ask for that

19   inmate, find out where they are, and I just go look.

20     Q.    Okay.  And after you complete a welfare check

21   for the other four examples that you talked about, do

22   you write anything up?

23     A.    No.

24     Q.    Any documentation at all?

25     A.    No.
```

Sheriff Eric Fagan

```
 1      Q.    Nothing to say, like, "I checked on this woman's

 2   son and he was fine."

 3      A.    No.

 4      Q.    And if, in any situation where you did a welfare

 5   check, you determined that treatment was necessary, you

 6   would call for that treatment --

 7      A.    Yes.

 8      Q.    -- or document that you were going to get the

 9   treatment?

10      A.    Yes.

11      Q.    And are there cameras in the jail?

12      A.    Yes.

13      Q.    So there would be footage of you kind of when

14   you come in and out of the jail?

15      A.    Yes.

16      Q.    And would there -- are all areas of the jail

17   covered by cameras?

18      A.    No.

19      Q.    What areas are?

20      A.    By law, you can't video where people are taking

21   showers at.  You can't video certain areas where --

22   where it's not -- where anyone is going to take

23   showers, you can't be --

24      Q.    Be indecent.

25      A.    Yeah.  Indecent; you can't do things like that.
```

1    Q.    So other than where people are going to be

2    indecent, would you estimate that there are cameras in

3    the rest of the jail?

4    A.    Yes, but there are some spots that we don't

5    catch everything.  There's some blind spots.  We don't

6    let them know about it, but we have blind spots.

7    Q.    So there are some bind spots, but there's no

8    cameras capturing it?

9    A.    Yes.

10   Q.    And you would know where those blind spots are?

11   A.    I don't know every one, no.

12   Q.    You know some of them?

13   A.    Yes.

14   Q.    I want to talk a little bit about that

15   interaction you mentioned with Justin Pulliam in the

16   jail on December 21, 2021, and that was the date that

17   Justin Pulliam was arrested for that offense of

18   interference with public duties.  Let's start by going

19   back to Exhibit 4, which are your RFAs, and I would

20   like to turn to page 7, number 19.

21        We've already kind of talked about this.  You

22   admitted that you visited Justin Pulliam in the jail.

23   Chief Deputy Matty C. Provost was with you, and another

24   individual.  Can you tell me who that other individual

25   was?

Sheriff Eric Fagan

```
1     A.   I think it was -- I'm not really sure.  I think

2  it was Wong, but I might be wrong.

3     Q.   Who --

4     A.   Assistant Chief Wong.

5     Q.   And can you tell me what Assistant Chief Wong's

6  first name is?

7     A.   Norman.

8     Q.   Norman.  Okay.

9     A.   But, like I said, I might be wrong about that.

10     Q.   Okay.  And how did you learn that Justin Pulliam

11  had been arrested?

12     A.   They notified me.

13     Q.   Do they notify you every time someone's

14  arrested?

15     A.   No.

16     Q.   So Justin Pulliam's arrest was a special case?

17     A.   Yes.

18     Q.   Okay, and who notified you?

19     A.   Someone over at the jail.

20     Q.   And what did they say?

21     A.   "Justin Pulliam is in our jail."

22     Q.   And what was your reaction?

23     A.   "Okay"; and I went over.

24     Q.   And your office and the Fort Bend County Jail

25  are not in the same building, correct?
```

```
 1    A.    No.

 2    Q.    So you had to walk outside and then go to the

 3    jail?

 4    A.    Yes.

 5    Q.    And where was Justin Pulliam in the jail when

 6    you first saw him?

 7    A.    In booking.

 8    Q.    In booking; and did you check in with Justin in

 9    booking?

10    A.    What you mean, "check in"?

11    Q.    So you were doing a welfare check with Justin

12    Pulliam?

13    A.    Yes.

14    Q.    By going to booking, did you try to talk to

15    Justin in booking?

16    A.    I asked where Justin was, and they pulled Justin

17    out to me.

18    Q.    Where did they pull him out to?

19    A.    They pulled him from wherever he was in booking,

20    into a room where I was.

21    Q.    So you were -- in summary, you told some other

22    employee to go get Justin Pulliam?

23    A.    Uh-huh.

24    Q.    They fetched and brought Justin Pulliam to you

25    in a room?
```

Sheriff Eric Fagan

```
 1      A.    Yes.

 2      Q.    Okay.  Is the room that you were in -- what's

 3   the room that you were in?

 4      A.    Just a office.

 5      Q.    Some kind of office space?

 6      A.    Yes.  I believe it was the sergeant's office.

 7      Q.    And is that room, the sergeant's office, did it

 8   have a -- a video camera?

 9      A.    On the outside.

10      Q.    On the outside, but not inside the office?

11      A.    Not inside the office; that I know of.

12      Q.    Sure.  Not that you know of.  Let's look at

13   number 20, which I think is on page 8.  So, again, this

14   is Exhibit 4, number 20, page 8.

15          Now, this request for admissions asks about the

16   conversation.  You denied that a conversation happened.

17   Your response, to be precise, is "Denied.  Plaintiff

18   said nothing.  There was no conversation."  Did you say

19   anything to Justin Pulliam?

20      A.    Yes.

21      Q.    And what did you say?

22      A.    "Justin, are you all right", and, "Why are you

23   arrested?"

24      Q.    And what did he say?

25      A.    Nothing.
```

Sheriff Eric Fagan

```
 1      Q.   Did he ask to speak to his attorney?

 2      A.   No.

 3      Q.   Did you continue to ask Justin any questions?

 4      A.   No.

 5      Q.   So just asked Justin one question?

 6      A.   No, that's not true.  I asked Justin, "Are you

 7   all right?  Do you know why you're here?"  He didn't

 8   say anything.  I said, "Justin, are you all right?"  He

 9   said nothing, and that was the end.  So I asked that

10   twice.

11      Q.   Did Chief Deputy Provost ask Justin any

12   questions?

13      A.   I think she did.

14      Q.   Do you recall what she asked?

15      A.   No.

16      Q.   And then the other individual, who we're going

17   to classify as Wong, for lack of a better descriptor,

18   did he ask Justin any questions?

19      A.   No.

20      Q.   Did you ask Justin any kind of health-related

21   questions?

22      A.   "Are you all right?"

23      Q.   And did you determine that Justin looked okay?

24      A.   Yes.

25      Q.   Did you evaluate Justin for any, maybe, suicidal
```

Sheriff Eric Fagan

1  ideation?

2      A.   Did I evaluate him?  No.

3      Q.   Did you -- when Justin refused to talk to you,

4  did you say something like, "Fine.  We'll do it the

5  regular and normal way."

6      A.   No.  I just said, "Do it by the book."  I made

7  that statement.  "Do it by the book."

8      Q.   And what does "by the book" mean?

9      A.   Treat him fairly, like everyone else in the

10 jail.  Like I said, I knew that the people at the

11 sheriff's office didn't like Justin Pulliam.  That's

12 before I got there, and I don't know the guy from

13 anyone else.  I just wanted to make sure he was treated

14 fairly.  That's why I went over there.  If the sheriff

15 goes over to see a inmate, that inmate is not going to

16 be jacked with.  So that's the reason.

17     Q.   Got it, but if a sheriff doesn't necessarily go

18 over to see an inmate, they might mess around with him a

19 little?

20     A.   No.  No, I'm just making sure that nobody would.

21     Q.   Okay.  What happened after you met with Justin

22 Pulliam?  Did you go back to your office?

23     A.   Yes.

24     Q.   Did Chief Deputy Provost accompany you?

25     A.   Yes.

1    Q.   And Mr. Wong?

2    A.   I believe that was him, yes.

3    Q.   And did you guys discuss what happened?

4    A.   No.

5    Q.   Did you discuss Justin Pulliam at all?

6    A.   No -- cameraman -- I assume it was one of his

7    cameramen -- was asking him questions.

8    Q.   So there was some cameraman somewhere who was

9    asking questions as you were leaving?

10   A.   Yes.

11   Q.   And what did you say?

12   A.   Nothing.  I kept walking, and he kept asking

13   questions, and I turned and answered the questions, and

14   he made the statement, "Oh, now you're going to hit me?"

15   I smiled, turned back around and -- I laughed because I

16   was like, "You stopped me, and I turned and now you're

17   saying I'm attacking?"  So I turned back around and kept

18   walking.

19   Q.   Okay.  Did you send any follow-up e-mails or

20   text messages after you visited the jail?

21   A.   I was done.

22   Q.   I think now is a great time for a break before

23   we talk about anything else.  We're relatively close to

24   being done, so let's take a brief intermission.

25             COURT REPORTER:   Off the record, 1:47.

Sheriff Eric Fagan

```
 1                    [Off the record.]

 2                    COURT REPORTER:   Back on the record,

 3     1:57.

 4     By MS. HEBERT:

 5        Q.    I have a couple of questions about the December

 6     21, 2021, arrest of Justin Pulliam.  Other than

 7     Detective Travis James, who investigated Justin for

 8     that offense -- putting that aside, did anyone in the

 9     sheriff's office, or yourself personally, investigate

10     the decision to move Justin away from the press

11     conference in July?

12        A.    No.

13        Q.    And did anyone investigate the decision to

14     arrest Justin, other than Detective Travis James?

15        A.    No.

16        Q.    There was no internal investigation?

17        A.    No.

18        Q.    Was anybody disciplined for actions dealing with

19     the December of 2021 arrest?  To be more precise, was

20     anybody disciplined or counseled after Justin Pulliam

21     was arrested?

22        A.    No.

23        Q.    Related to that arrest.

24        A.    No.

25        Q.    We talked a little bit about welfare checks, and
```

Sheriff Eric Fagan

```
 1   folks in CIT and crisis, and we talked a little bit

 2   about Texana employees, and you indicated that, when

 3   there's some kind of incident -- a mental health

 4   incident, there will be the offense or incident report,

 5   and some kind of Texana report.  Does the Texana report

 6   get shared with the sheriff's office?

 7       A.   If we request it.

 8       Q.   So the sheriff's office has the right to request

 9   the Texana report?

10       A.   Yes.

11       Q.   Okay, I just have a couple more questions to

12   clean up about the July 2021 press conference.  You're

13   aware that, following the July 2021 press conference,

14   the discovery of someone's remains in the creek was

15   reported by several news outlets?

16       A.   Yes.

17       Q.   And are you aware that Justin Pulliam did not

18   have any footage of the press conference?

19       A.   No.

20       Q.   When the -- earlier, we talked about when one of

21   the media people complained to you about Justin

22   Pulliam, when they made that complaint, did the media

23   person say they were in fear for their life?

24       A.   No.

25       Q.   Did they say anything like they were being
```

1    threatened by Justin?

2        A.    No.

3        Q.    Did the media person say anything like Justin

4    was being physically inappropriate?

5        A.    They said that he's escalating the situation.

6        Q.    With the media people?

7        A.    The term was "escalating the situation."  I'm

8    assuming they were meaning about -- I don't know if it

9    was a brother or what relation he was to the deceased.

10        Q.    Okay, so the only really -- the complaint was

11    Justin did something with the family of the deceased?

12        A.    Yes.

13        Q.    So it was not a complaint that Justin did

14    something inappropriate to the media person him or her

15    self?

16        A.    They were just saying that he was being

17    unprofessional and making it bad because he was

18    escalating the situation with the family, from I can

19    remember.

20        Q.    Okay, so, as far as you can remember, there was

21    one incident with the family, and you heard about that

22    incident from --

23        A.    One of my deputies.

24        Q.    One of your deputies and the media person?

25        A.    Yes.

Sheriff Eric Fagan

```
 1      Q.    And that was it?

 2      A.    That was it.

 3            MS. HEBERT:       We don't have any other

 4   questions at this time.  Pass the witness.

 5   EXAMINATION BY MR. HEDGES:

 6      Q.    Sheriff, I know you've got something fairly

 7   emergent to do this afternoon, but there is one thing I

 8   wanted to follow-up on.  Right before we took our last

 9   break, you mentioned that people from the sheriff's

10   office didn't necessarily like Mr. Pulliam.  Tell us

11   about the time frame you're talking about there.

12      A.    The prior administration that, when Nehls was

13   sheriff here, they wouldn't allow him -- they said he

14   was a troublemaker and things like that.  That was one

15   of the reasons why I allowed him in that video right

16   there to come into the office, and told him he can come

17   -- if he wanted to speak to me, just call and make an

18   appointment to speak with me, and that's the reason I

19   let him come into that -- when I had all the law

20   enforcement come in.  I don't know him from anyone.  I

21   never met the guy, so nothing personal to me, no.  No

22   big deal to me.

23      Q.    All right, well that's all I wanted to clear up,

24   and like I said, I know you've got someplace you need to

25   be.
```

Sheriff Eric Fagan

```
 1    FURTHER EXAMINATION BY MS. HEBERT:

 2        Q.   Just kind of one quick -- or two quick questions

 3    about that.  When you said "that video", I just want to

 4    clarify for the record you were referring to Exhibit 5,

 5    the video from 2021 where you were having a

 6    conversation with Justin Pulliam?

 7        A.   In my coat and my mask.

 8        Q.   Yes.  And it said "Eric Fagan" on the mask?

 9        A.   "Sheriff Fagan", yes.

10        Q.   "Sheriff Fagan" on the mask.

11        A.   Okay.

12        Q.   You're referring to the video that's Exhibit

13    5 --

14        A.   Yes.

15        Q.   -- when you say "that video"; I just wanted to

16    clean that up for the record.

17        A.   Yes.

18        Q.   And when you were answering Mr. Hedges'

19    questions about folks who didn't like Justin Pulliam,

20    and that was the prior administration, when you took

21    office, did you clean house?  Were most of the people

22    fired?

23        A.   No.

24        Q.   Did most of the people stay on?

25        A.   Yes.
```

1    Q.    Did anyone leave?

2    A.    Yes.

3    Q.    Who left?

4    A.    Mackerel, Barfield... I don't remember all the

5    names, but a few left.

6    Q.    A few left, and then you filled their positions

7    with new people?

8    A.    Yes.

9    Q.    But the majority of folks under the prior

10   administration are the same folks working for you

11   today?

12   A.    Yes.  I'm talk -- my command staff.  Now, the

13   deputies and all, all of them are still there from the

14   prior administration.  I would have to fire 800 people.

15   I wouldn't do that.

16   Q.    Sure.  And after you were sworn in as sheriff,

17   did you issue any statements with regard to Justin

18   Pulliam of -- to the nature of:  Please provide Justin

19   Pulliam access, or please be nice to Justin Pulliam.

20   A.    No.  I just told them that the sheriff's office,

21   nobody's denied to come into this office.  When they

22   told me that, it didn't make sense to me.  What if he

23   come in to file a complaint, and you're saying he can't

24   -- just -- even if I don't like you, I'm not going to

25   tell you you can't come into the sheriff's office.  To

Sheriff Eric Fagan

1   me, that's ridiculous; so that's the only thing I did.

2       Q.   Sure.  That's the only thing you did?

3       A.   Yes.

4       Q.   Okay.  I don't have any other questions.  Pass

5   the witness, in case there's anything else you want to

6   talk about.

7                  MR. HEDGES:       No.  Thank you.

8                  COURT REPORTER:   Okay, read and sign and

9   copies.

10                 MR. HEDGES:       Yes, please.

11                 COURT REPORTER:   You want me to handle both

12  the copy and read and sign through you?

13                 MR. HEDGES:       Yes.

14                 COURT REPORTER:   We're off the record 2:04

15  p.m.

16                 [Deposition was concluded.]

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER CERTIFICATION

 2      ORAL DEPOSITION of ERIC FAGAN, taken on August 9,

 3  2023.

 4      I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify to

 5  the following:

 6      That the witness, ERIC FAGAN, was duly sworn by me,

 7  and that the transcript of the deposition is a true

 8  record of the testimony given by the witness;

 9      That examination and signature of the witness to the

10  deposition transcript was reserved by the witness at the

11  time of the deposition;

12      I further certify that I am neither counsel for,

13  related to, nor employed by any of the parties in the

14  action in which this proceeding was taken, and, further,

15  that I am not financially or otherwise interested in the

16  outcome of this action.

17      Certified by me on this 23rd day of August, 2023.

18

19                   _____

20                   Sarah B. Townsley CRR CCR CSR RPR

21                   Certified Realtime Reporter

22                   TX CSR #5746; LA CCR #92016; RPR 814558

23

24

25
```

**PX-50**



# PX-52

(Video Will be Hand delivered)