IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUSTIN PULLIAM | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO.: 4:22-CV-4210 |
| | § | |
| | § | |
| FORT BEND COUNTY, TEXAS, ET. | § | |
| AL., | § | |

**DEFENDANTS' MEMORANDUM OF LAW**

To the Honorable Court:

Pursuant to Local Rul 9.B.3.c, Defendants submit this Memorandum of Law addressing: (i) the *prima facie* elements of each cause of action and defense asserted, (ii) the legal definitions, (iii) components of damages, and (iv) methods of calculation of damages.

**THE JULY 12, 2021 PRESS CONFERENCE**

On July 12, 2021, Fort Bend County Sheriff Eric Fagan ("Sheriff Fagan") order Plaintiff to stand approximately 80-feet away from an approximate nine-minute-long press conference.[1] United States Magistrate Judge Andrew Edison found that this action violated Plaintiff's rights under the First and Fourteenth Amendments.[2] Judge Edison's recommendation was adopted by this Court on September 24, 2024.[3]

Accordingly, the only issue that remains to be adjudicated in connection with Plaintiff's First and Fourteenth Amendment claims that allegedly occurred on July 12, 2021 is the amount of damages, if any, Plaintiff is owed.

---

[1] Memorandum and Recommendation (ECF No. 77 filed on Sep. 5, 2024) at 2-3.

[2] *See id*. at 8-18.

[3] *See* Order Adopting Memorandum and Recommendation (ECF No. 81 filed on Sep. 24, 2024).

## COMPONENTS OF DAMAGES

Plaintiff seeks recovery of compensatory, nominal, and punitive damages for alleged violations of his rights under the First and Fourteenth Amendment on July 12, 2021. Plaintiff also seeks injunctive and declaratory relief.

**Component 1:    Compensatory Damages**

Compensatory damages are a type of monetary award granted in a civil lawsuit to compensate a plaintiff for actual losses or injuries suffered as a result of the defendant's wrongful conduct. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). The primary goal of compensatory damages is to restore the injured party to the position they would have been had the harm not occurred. *See id*.

For claims brought pursuant to Section 1983, compensatory damages include both pecuniary and non-pecuniary damages. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Pecuniary damages cover out-of-pocket expenses such as lost earnings and loss of earning capacity. *See id*. Non-pecuniary damages include compensation for emotional distress, mental anguish, personal humiliation, and impairment of reputation. *See id*. But, emotional distress and other intangible injuries require specific proof, often in the form of corroborating testimony from third parties. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 416-17 (5th Cir. 1998). Indeed, as the Fifth Circuit explained nearly 30-years ago.

> We start with the premise that, in this circuit, compensatory damages for emotional distress and other forms of intangible injury will not be presumed from mere violation of constitutional or statutory rights. (citations omitted). Specific individualized proof is necessary, and testimony from the plaintiff alone is not ordinarily sufficient. (citations omitted). Compensatory damages may be awarded only if the plaintiff submits proof of actual injury, often in the form of psychological or medical evidence, or other corroborating testimony from a third party. (citations omitted).

*See id*.

Compensatory damages must be reasonable in amount and calculated to make the plaintiff whole, without allowing the plaintiff to realize a profit from the damages sustained. *See id*. Indeed, compensatory damages cannot be based on the abstract value or importance of constitutional rights. *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 467 (5th Cir. 2000). Instead, the damages must be grounded in determinations of the plaintiff's actual losses. *See id*.

To be entitled to an award of compensatory damages, a plaintiff must prove, by a preponderance of the evidence, three specific elements. <u>First</u>, they suffered actual harm or loss as a result of the defendant's conduct. <u>Second</u>, establish a causal link between the defendant's wrongful act and the damages claimed. <u>Third</u>, provide sufficient evidence to support the amount of damages sought using documentation, expert testimony, or other admissible evidence. *See generally id*.

**Component 2:    Nominal Damages**

Nominal damages are a symbolic sum of money awarded to a plaintiff when a legal wrong has occurred but no actual, quantifiable harm resulted from the violation. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 290 (2021). Nominal damages are available in Section 1983 cases when a plaintiff proves a violation of their constitutional rights but cannot demonstrate actual injury. *See id*.

While nominal damages are typically a small sum, courts have discretion in determining the exact amount. *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1015 (5th Cir. 2003). Historically, nominal damages have been awarded in amounts ranging from one dollar to higher sums deemed insignificant in the context of the case. *See e.g., id*. The Fifth Circuit, for example, has upheld awards of $100 as nominal damages in civil rights cases, recognizing that the amount should reflect the symbolic nature of the award rather than its economic value. *See e.g., id*.

**Component 3:    Punitive Damages**

Punitive damages – also known as exemplary damages – are a type of monetary award in a civil lawsuit **not** intended to compensate plaintiff for a loss, but rather to:

- Punish the defendant for especially wrongful, malicious, or reckless conduct; and

- Deter the defendant and others from engaging in similar conduct in the future.

*Heaney v. Roberts*, 846 F.3d 795, 803 (5th Cir. 2017).

Punitive damages are available in Section 1983 cases when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the constitutional rights of others.  *See id.*  Courts consider several facts to ensure the award is not grossly excessive or arbitrary, including:

- The degree of reprehensibility of the defendant's misconduct.

- The disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award.

- The difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

The Due Process Clause of the Fourteenth Amendment imposes procedural and substantive limitations on punitive damages awards.  *Jones v. Wells Fargo Home Mortg., Inc.*, 489 B.R. 645, 652 (E.D. La. 2013).  Punitive damages must not be grossly excessive or arbitrary.  *See id.*  Moreover, punitive damages are not awarded as a matter of right, even if the defendant's conduct meets the required standard.  *See id.*  The decision to award punitive damages is left to the discretion of the finder of fact and is reviewed on appeal with great deference. *See id.*  This means, even if a plaintiff makes a showing justifying an award of punitive damages, the court may still choose not to award them.  *See id.*

**Component 4:     Injunctive Relief**

Injunctive relief is a court-issued order that prohibits or commands a party to act or refrain from acting in a certain way.  *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 766 (5th Cir. 2011).

But, as this Court explained in 2020: "[T]he Fifth Circuit has clearly held that injunctive and declaratory relief are not available to remedy a past harm."  *Johnson v. Stephens*, No. CV 4:17-3578, 2020 WL 12442431, at *2 (S.D. Tex. Oct. 30, 2020) (Hanks, G.) (citing *Stringer v. Whitley*, 942 F.3d 715, 720-21 (5th Cir. 2019); *see also Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001); *see also Pagoaga-Castro v. Pierson*, 790 F. App'x 652 (5th Cir. 2020).  Instead, a Plaintiff must demonstrate a continuing injury or a threatened future injury.  *Stringer v. Whitley*, 942 F.3d 715, 720-21 (5th Cir. 2019).  That continued or threatened future injury must be: (i) potentially suffered by the plaintiff, not someone else, (ii) concrete and particularized, not abstract; and (iii) actual or imminent, not conjectural or hypothetical.  *Id*.

**Component 5:     Declaratory Relief**

Declaratory relief is a judgment by a court that defines the legal rights, duties, or obligations of the parties involved in a dispute.  *DTND Sierra Investments LLC v. Bank of New York Mellon Tr. Co., N.A.*, 958 F. Supp. 2d 738, 753 (W.D. Tex. 2013).  To be entitled to declaratory relief, a plaintiff must prove: (i) an actual controversy exists, (ii) the court's declaration would resolve the uncertainty or dispute, and (iii) the issue is ripe for judicial determination.  *See* 28 U.S.C. § 2201.

But, federal courts possess "substantial discretion in deciding whether to declare the rights of litigants" under the Declaratory Judgment Act.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  This discretion is guided by the utility of the judgment in clarifying and settling the legal relations at issue.  *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 523 (5th Cir.

2016).  For that reason, "[c]ourts in the Fifth Circuit ... regularly reject claims for declaratory [relief] that seek nothing more than resolution of issues already stated in the lawsuit."  *Nextera Energy Mktg. LLC v. Shell Energy N. Am. (US) LP*, 2023 WL 2541964, at *3 (S.D. Tex. Mar. 16, 2023) (Eskridge, C.).

**METHODS OF CALCULATION OF DAMAGES**

<u>First</u>, Sheriff Fagan and Fort Bend County were never provided any computation or supporting documentation in connection with Plaintiff's claim for compensatory damages until 14-days before trial, in violation of Rule 26(a)(1)(A)(iii).  Fed. R. Civ. P. 26(a)(1)(A)(iii).

<u>Second</u>, Sheriff Fagan and Fort Bend County anticipate that no credible evidence will be presented of evil motive or intent, nor any evidence of reckless or callous indifference to the constitutional rights of Plaintiff or others.  This means, Plaintiff will only be able to prove entitlement to the recovery of nominal damages.

<u>Third</u>, Plaintiff is not entitled to any injunctive relief given that there will be no credible evidence presented of a continuing injury or a threatened future injury.

<u>Finally</u>, Plaintiff is not entitled to declaratory relief since Plaintiff's requested declaration seeks nothing more than resolution of issues already stated in the lawsuit.

**THE DECEMBER 21, 2021 ARREST**

On December 21, 2021, Edwin Kraft – an armed mentally ill man with a long history of methamphetamine use and violence – purportedly barricaded himself in a trailer home located behind the now closed Kraft Gas Station.

Following a call initiated by mental health professionals, the Fort Bend County Sheriff's Office was dispatched to the scene.  Dep. Ricky Rodriguez and Dep. Matthew Lacy were the first to arrive.  Upon arrival, both deputies took cover and waited for their supervisor – Lt. Taylor

Rollins – to arrive. While the deputies waited, mental health professionals from Texana[4] reached the location to assist with de-escalation efforts. Thereafter, Plaintiff appeared and began video recording. Lt. Rollins arrived minutes later.

Almost immediately upon arrival – understanding the volatility of the situation – Lt. Rollins ordered Plaintiff to relocate across the street. Also, before he realized who they were, Lt. Rollins ordered the mental health professionals to relocate across the street. The mental health professionals, however, informed Lt. Rollins that they were there in a professional capacity to defuse the explosive situation. Apparently believing he was being excluded from the scene for his video recording, Plaintiff refused to relocate across the street. Indeed, Plaintiff admits:

> In another act of retaliation, in December 2021, Fort Bend County Sheriff's officer [*sic.*] Taylor Rollins arrested [Plaintiff] for filming a heated encounter with a citizen **because [Plaintiff] did not comply** with an [alleged] unconstitutional order to relocate across the street where filming was impossible.[5]

"Because [he] did not comply" with Lt. Rollins' order to relocate across the street, Plaintiff was arrested for violating Section 38.15 of the Texas Penal Code. Plaintiff was then indicted by a duly empaneled grand jury for this charge on May 16, 2022.

The case then proceeded to trial which resulted in a hung jury. Thereafter, the Fort Bend County District Attorney's Office dismissed the case.

### ELEMENTS OF A FIRST AMENDMENT RETALIATION CLAIM

To establish a First Amendment Retaliation Claim, Plaintiff must prove: (i) he engaged in a constitutionally protected activity, (ii) Defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity — *i.e.*,

---

[4] *See* https://www.texanacenter.com/

[5] Pl.'s Orig. Compl. (ECF No. 1 filed on Dec. 5, 2022) ¶ 1 (emphasis added); *see also* Pl.'s 1st Am. Compl. (ECF No. 33 filed on Feb. 12, 2023) ¶ 1.

curtailment, and (iii) Defendants' actions were substantially motivated against Plaintiff's exercise of the constitutionally protected activity. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

### DEFENSES: LT. TAYLOR ROLLINS

Lt. Rollins anticipates asserting four defenses in response to Plaintiff's First Amendment retaliation claims. First, probable cause existed to arrest Plaintiff for violating Section 38.15 of the Texas Penal Code. Second, the Independent Intermediary Doctrine shields Lt. Rollins from liability. Third, there is no evidence that Plaintiff's arrest was motivated against his recording of police activity. Fourth, Lt. Rollins is protected by qualified immunity.

**Defense 1:        Probable Cause**

"The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019). Probable cause for an arrest exists when "the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was committing, an offense." *Benfer v. City of Baytown, Tex.*, 120 F.4th 1272, 1281 (5th Cir. 2024), cert. denied, 145 S. Ct. 1313 (2025) (citing *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996)).

Under Section 38.15 of the Texas Penal Code, a person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law. Tex. Pen. Code § 38.15(a)(1).

### Disobeying a peace officer's lawful order
### establishes probable cause for an arrest under Section 38.15

Texas courts have long held failure to comply with an officer's order at a crime scene provides the officer with adequate "facts and circumstances … sufficient for a reasonable person

to conclude that the suspect had committed, or was committing" the offense of interfering with duties of a public servant. *Benfer*, 120 F.4th at 1281. For example:

- *Duncantell v. State*, 230 S.W.3d 835, 842 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (Affirming a conviction, beyond a reasonable doubt, that petitioner violated Section 38.15 by repeatedly disregarding officers' orders to stand away from crime scene.).

- *Key v. State*, 88 S.W.3d 672, 676 (Tex. App.—Tyler 2002, pet. ref'd) (Concluding that defendant "engaged in conduct other than speech in refusing to obey directives of" a police officer to remain on the sidewalk, which the officer "believed was necessary to prevent [defendant] from assaulting" another individual.).

- *Mata v. State*, No. 02-23-00110-CR, 2023 WL 8643023, at *5 (Tex. App.—Fort Worth Dec. 14, 2023, pet. ref'd) ("Refusing to leave the scene when instructed to do so and distracting an officer from performing his duty constitutes interference under Section 38.15.").

- *Lovett v. State*, 523 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. ref'd) (Finding evidence was sufficient to support a conviction, beyond a reasonable doubt, under Section 38.15 when a defendant failed to disarm after being ordered to do so by a police officer — despite the fact that it was undisputed the defendant was carrying the firearm lawfully.).

- *Barnes v. State*, 206 S.W.3d 601, 602 (Tex. Crim. App. 2006) (Finding, during a traffic stop, three acts committed by appellant were sufficient to support a conviction, beyond a reasonable doubt, under Section 38.15 — (i) moving her vehicle forward, despite being told not to do so, (ii) disregarding the officer's safety commands by removing hands from view, and (iii) shouting "run" to her child.).

- *Yarbrough v. State*, 429 S.W.3d 118, 123 (Tex. App.—Amarillo 2014, no pet.) (Finding evidence was sufficient to support a conviction, beyond a reasonable doubt, under Section 38.15 when defendant was found to have: (i) refused to exit his vehicle when requested to do so by the officer, (ii) refused to give the keys to his vehicle to the officer, (iii) refused to sit in the patrol car, and (iv) refused to place his hands behind his back.).

Likewise, in *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 657 (5th Cir. 2004), the Fifth Circuit held a defendant's failure to comply with an officer's order at a crime scene establishes probable cause for an arrest under Section 38.15. Since *Haggerty*, the Fifth Circuit has followed this precedent in a string of cases, most notably in:

- *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (Holding a failure to comply with an officer's order to move a truck established probable cause to arrest under Section 38.15.).

- *Buehler v. Dear*, 27 F.4th 969, 992 (5th Cir. 2022) ("We have held, based on caselaw from Texas courts interpreting the relevant provisions, that conduct extremely similar to that in which [Plaintiff] engaged – that is, ***refusing to obey a police officers' repeated and unambiguous warnings to step back*** so as not to interfere with officers' official duties – establishes probable cause to arrest for a violation of Texas Penal Code § 38.15(a)(1).") (emphasis added).

- *Johnson v. City of San Antonio*, No. 22-50196, 2023 WL 3019686, at *9 (5th Cir. Apr. 20, 2023) (Failure to "follow orders" of a peace officer provides probable cause to arrest under 38.15).

- *Traylor v. Yorka*, No. 22-10783, 2024 WL 209444, at *4 (5th Cir. Jan. 19, 2024), cert. denied, 144 S. Ct. 2580, 219 L. Ed. 2d 1239 (2024) (Affirming dismissal of unlawful arrest claim under Section 38.15 when defendant failed to leave a bar despite being instructed to do so by a police officer.).

- *Bailey v. Ramos*, 125 F.4th 667, 678 (5th Cir. 2025) (Officer entitled to qualified immunity in connection with plaintiff's unlawful arrest claim when plaintiff hesitated in complying with an officer's instruction to move back.).

Several district courts throughout the state have also followed *Haggerty* in a number of proceedings — many eerily similar to the matter at hand.  For example:

- *Hunter v. City of Electra, Tex.*, No. CIV.A. 7:03-CV-153-R, 2006 WL 1814150, at *5 (N.D. Tex. June 29, 2006) (Buchmeyer, J.) (Finding probable cause existed for an arrest under 38.15 when the Plaintiff failed to leave scene of crime, despite being ordered to do so, and interfered with defendant officer's negotiations of a man in distress.).

- *Cadena v. Ray*, No. 5:15-CV-552-DAE, 2016 WL 6330438, at *4 (W.D. Tex. Oct. 27, 2016), aff'd, 728 Fed. Appx. 293 (5th Cir. 2018) (Ezra, D.) ("In this case, there is no genuine dispute of material fact that probable cause existed to arrest Cadena for interfering with official police duties. The cell phone video clearly establishes that Officer Garcia told Cadena that his continued presence in the area was agitating his wife, and thus interfering with the officers' exercise of their authority to arrest her…. Cadena starts to leave, but instead comes back and approaches Officer Rodriguez").

- *Cruz v. Delgado*, No. CV H-16-3568, 2017 WL 11503868, at *5 (S.D. Tex. Dec. 7, 2017) (Werlein, E.) ("Texas courts and the Fifth Circuit have recognized that the conduct of refusing to obey an officer's order is distinct from the accompanying verbal refusal and may provide a basis for liability under § 38.15 (citations omitted)…. Thus, it appears that Delgado likely had probable cause to arrest Plaintiff for violating § 38.15 based on his physical noncompliance with Delgado's order.").

- *Zinter v. Salvaggio*, 610 F. Supp. 3d 919, 936 (W.D. Tex. 2022) (Lamberth, R.) (Failure to "stand across the street right not" provided officer probable cause to arrest Plaintiff under Section 38.15.).

- *Ordonez v. Gonzalez*, No. EP-23-CV-99-KC, 2024 WL 1250181, at *7 (W.D. Tex. Mar. 25, 2024) (Cardone, K.) (Failing to "back up" as instructed provided officer with probable cause to arrest plaintiff for violating Section 38.15 — despite the fact that Plaintiff was filing the police, a constitutionally protected activity.).

### Plaintiff admits he failed to comply with
### Lt. Rollins' order to relocate across the street

In this case, Plaintiff ***admits*** he was arrested under Section 38.15 for failing to relocate across the street after being ordered to do so by Lt. Rollins.[6]

Accordingly, based on Plaintiff's admissions, testimony, and the above-cited precedent, it is clear Lt. Rollins had probable cause to arrest Plaintiff for violating Section 38.15.  He is entitled to qualified immunity.

### Plaintiff acknowledges that
### Lt. Rollins' order to relocate across the street was lawful

"Recording police activity is protected by the First Amendment, subject only to reasonable time, place, and manner restrictions."  *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017).  A reasonable restriction recognized by nearly every court faced with the issue is a peace officer's right to "perform his official duties without undue interference so as to protect the officer and everyone in the vicinity."  *Buehler v. City of Austin/Austin Police Dep't*, No. A-13-CV-1100 ML, 2014 WL 12776539, at *6 (W.D. Tex. July 24, 2014) (Lane, M.).  This principle is often illustrated when peace officers restrict recording of a crime scene to ensure safety or preserve evidence.

---

[6] *Id.*

For example, the Fifth Circuit found an arrest of a citizen journalist under Section 38.15 was lawful when he failed to "stay back" from a crime scene after being ordered to do so by a peace offer — even though the citizen journalist was recording police activity. *Bailey*, 125 F.4th at 685. Likewise, a prohibition on recording was found to be acceptable when a "[Citizen journalist] impeded the officers' efforts to secure [an accident] scene and restore public order." *Cobarobio v. Midland Cnty., Tex.*, No. MO:13-CV-00111-RAJ, 2015 WL 13608102, at *12 (W.D. Tex. Jan. 7, 2015), aff'd, 695 Fed. Appx. 88 (5th Cir. 2017). Finally, the Fifth Circuit found an arrest of a citizen journalist was lawful because, "based on caselaw from Texas courts interpreting the relevant provisions, that conduct extremely similar to that in which [the citizen journalist] engaged – that is, ***refusing to obey a police officers' repeated and unambiguous warnings to step back*** so as not to interfere with officers' official duties – establishes probable cause to arrest for a violation of Texas Penal Code § 38.15(a)(1)." *Buehler*, 27 F.4th at 992.

Plaintiff even seemingly admits ensuing safety at a crime scene is a reasonable restriction on a citizen journalist's right to record police activity:

> Q: So, if you think it's safe and the police officer doesn't think it's safe, who decides?
>
> **A: Well, the police officer.**[7]

Accordingly, based on the above-cited precedent, Plaintiff's argument that Lt. Rollins' order was unconstitutional is simply meritless.

**Defense 2:        The Independent Intermediary Doctrine**

"[I]f facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party…." *See McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017) (quoting

---

[7] Ex. 1 at 35:7-16.

*Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009)).  But, "the chain of causation remains intact if 'it can be shown that the deliberations of that intermediary were in some way tainted by the actions of the defendant….'"  *See Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010) (quoting *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)).

In this case, it is undisputed that Plaintiff was indicted by a duly empaneled grand jury for violations of Section 38.15.  And, there is no evidence that the "deliberations of [the grand jury] were in some way tainted by the actions of [Lt. Rollins]."  *See id*.

**Defense 3:**        **No evidence of retaliatory intent**

To establish a First Amendment retaliation claim, a plaintiff must prove that the defendant's actions were substantially motivated against Plaintiff's exercise of the constitutionally protected activity.  *Keenan*, 290 F.3d at 258.  In this case, there is no evidence that Lt. Rollins' arrested Plaintiff in retaliation for recording police activity.  He instead arrested Plaintiff for failing to comply with his reasonable, lawful, and justified order.

**Defense 4:**        **Qualified Immunity**

Qualified immunity protects government officials – like Lt. Rollins – sued in their individual capacities "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-part framework to determine if a plaintiff has overcome a qualified immunity defense.  <u>First</u>, the court asks whether, taken in the light most favorable to the injured party, "the facts alleged show the officer's conduct violated a constitutional right."  *Id*. at 201.  <u>Second</u>, the court considers whether the allegedly violated right was "clearly established."  *Id*. at 201.  When deciding whether the constitutional right was clearly established, the court asks whether the law so clearly and

unambiguously prohibited the conduct such that a reasonable official would understand that what they were doing violated the law — *i.e.*, "fair warning." *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013).  "Answering in the affirmative requires the court to be able to point to controlling authority – or a robust consensus of persuasive authority – that defines the contours of the right in question with a high degree of particularity.  This requirement establishes a high bar." *Id.*

Thus, to overcome the qualified immunity of government officials – like Lt. Rollins – a plaintiff must prove: (i) a constitutional violation, (ii) of a right clearly established at the time the violation occurred, and that (iii) the defendant actually engaged in conduct that violated the clearly established right.  *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001).  Plaintiff will not be able to overcome Lt. Rollins' qualified immunity.

### DEFENSES: FORT BEND COUNTY

Fort Bend County intends on asserting four defenses in response to Plaintiff's First Amendment retaliation claim.

First, Fort Bend County cannot be liable for a constitutional violation that did not occur.

Second, even if a constitutional violation did occur, no official county policy, widespread custom, or longstanding practice exists in connection with arresting individuals for recording police activity.

Third, there is no evidence that a county policy, custom, or practice was adopted, approved, or knowingly acquiesced by a Fort Bend County final policymaker.

Fourth, there is no evidence that a county policy, custom, or practice was a moving force that cause the alleged retaliatory arrest.

**Defense 1:          No County liability given that Lt. Rollins is entitled to qualified immunity**

Every *Monell* claim requires an underlying constitutional violation.  *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017).  Here, as established above, Lt. Rollins did not commit any constitutional violation.[8]  Accordingly, no *Monell* liability is warranted.

**Defense 2:          No official policy, widespread custom, or longstanding practice.**

There will be no evidence of an official Fort Bend County policy, widespread custom, or longstanding practice exists in connection with arresting, or retaliating against, individuals who record police activity.  *See generally Groden v. City of Dallas,* 826 F.3d 280, 282 (5th Cir. 2016).  Plaintiff's *Monell* claim fails.

**Defense 3:          No evidence that a policy, custom, or practice was adopted, approved, or knowingly acquiesced by a final policymaker of Fort Bend County**

An official policy or custom is usually established through a formal directive officially adopted and promulgated by a policymaker.  *Pena v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018).  When an official policy is not so explicit, the "persistent, widespread practice of city officials or employees … so common and well settled as to constitute a custom that fairly represents municipal policy" will suffice.  *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 69 (5th Cir. 2010) (quoting *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984), modified on reh'g on other grounds, 739 F.2d 993 (5th Cir. 1984)).  To show a practice is "so persistent and widespread as to practically have the force of law," a plaintiff must prove the existence of "actions that have occurred for so long with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct."  *Jackson v. Valdez*, 852 F. App'x 129, 135 (5th Cir. 2021), cert. denied, 142 S. Ct. 863 (2022).

---

[8] *See supra* at 8-14.

Here, there will be no evidence of (i) a Fort Bend County policy related to making arrests, or retaliating against, individuals who record police activity or (ii) a persistent and widespread practice of arresting, or retaliating against, individuals who record police activity.

**Defense 4:**      **No evidence that a policy, custom, or practice was a moving force that caused the alleged retaliatory arrest**

For a policy or custom to be the moving force behind the constitutional violation, a plaintiff must show either (i) that the policy itself was unconstitutional or (ii) that it was adopted with deliberate indifference to the known or obvious fact that a specific constitutional violation would follow. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 219 (5th Cir. 2019).

Under the deliberate indifference framework, a party must prove there is a causal link between the policy and their harm and that the defendant had the requisite degree of culpability. *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  Culpability, in this context, is a complete disregard of "the risk that a violation of a particular constitutional ... right [would] follow the decision." *Id*. at 411.  As for the policy requirement, a party may point to a formal declaration, an informal custom, or, sometimes, a "single decision."  *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000).  But, the "single decision" exception is "extremely narrow" and only applies in "rare circumstances." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010); *Webb*, 925 F.3d at 214 n.51.  To warrant application, the constitutional harm in question must have been the "plainly obvious" consequence of the actor's single decision.  *See Brown*, 219 F.3d at 461.  In practice, that means the decision must have been made despite a very "high degree of predictability concerning the consequences of the challenged decision." *Id*. at 460.  That's a "stringent standard" which requires "unmistakable culpability and clearly connected causation." *Id*. at 461.

There will be no evidence that a Fort Bend County policy (i) was unconstitutional or (ii) or was adopted with deliberate indifference.

### METHODS OF CALCULATION OF DAMAGES

Given that Plaintiff was not arrested in retaliation for recording police activity, no damages should be awarded.

### CONCLUSION

Wherefore, Defendants pray that this Joint Memorandum of Law provides the Court with guidance on the anticipated issues likely to arise at trial.

Respectfully submitted,

Bridgette Smith-Lawson
Fort Bend County Attorney

By: */s/ Kevin T. Hedges*
      Kevin T. Hedges
      Attorney-in-Charge
      State Bar No. 09370100
      Federal ID No. 9939
      *kevin.hedges@fortbendcountytx.gov*
      Rolf F. Krueger
      State Bar No. 24080990
      Federal ID No. 3041756
      *rolf.krueger@fortbendcountytx.gov*
      Fort Bend County Attorney's Office
      401 Jackson Street, 3rd Floor
      Richmond, Texas 77469
      (281) 341-4555
      (281) 341-4557 (Fax)

ATTORNEYS FOR DEFENDANTS
FORT BEND COUNTY, TEXAS, SHERIFF
ERIC FAGAN, AND LIEUTENANT TAYLOR
ROLLINS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on the parties and counsel identified on the attached service list by electronic service on this the 1st day of July, 2025.

*/s/ Kevin T. Hedges*
Kevin T. Hedges

## SERVICE LIST

Christen M. Hebert
Jeffrey T. Rowes
Michael Pena
Institute for Justice
816 Congress Avenue, Suite 970
Austin, Texas 78701
*chebert@ij.org*
*jrowes@ij.org*
*mpena@ij.org*

# Exhibit 1

CINDIBENCHREPORTING.COM

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
                          )
JUSTIN PULLIAM            )
                          )
VS.                       )   CAUSE NO. 4:22-CV-04210
                          )
COUNTY OF FORT BEND,      )
TEXAS; SHERIFF ERIC FAGAN,)
IN HIS INDIVIDUAL         )
CAPACITY; OFFICER ROBERT  )
HARTFIELD, IN HIS         )
INDIVIDUAL CAPACITY;      )
OFFICER JONATHAN GARCIA,  )
IN HIS INDIVIDUAL         )
CAPACITY; OFFICER TAYLOR  )
ROBBINS, IN HIS INDIVIDUAL)
CAPACITY; AND OFFICER     )
RICKY RODRIGUEZ,          )
IN HIS INDIVIDUAL CAPACITY)
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

JUSTIN PULLIAM

AUGUST 11, 2023

VOLUME 1 OF 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF JUSTIN
PULLIAM, produced as a witness at the instance of
the Defendants and duly sworn, was taken in the
above-styled and numbered cause on August 11, 2023,
from 12:57 p.m. to 4:23 p.m. before Karen Romeo
Rothman, Certified Shorthand Reporter in and for the
State of Texas, reported by computerized stenotype
machine wherein all parties were present at 401
Jackson, Richmond, Texas, pursuant to the Federal
Rules of Civil Procedure and the provisions state on
the record or attached hereto.

2

1                    APPEARANCES

2    FOR PLAINTIFF:

3    Mr. Jeffrey T. Rowes
     Texas Bar No.
4    The Institute for Justice
     901 N. Glebe Road, Suite 900
5    Arlington, VA  22203
     Telephone:  703.682.9320
6    Email:  jrowes@ij.org

7    Ms. Christie Hebert
     Texas Bar No. 24104956
8    The Institute for Justice
     806 Congress Avenue, Suite 960
9    Austin, TX  78701
     Telephone:  512.480.5936
10   Email:  chebert@ij.org

11   FOR THE DEFENDANTS:

12   Mr. Kevin Hedges
     Texas Bar No. 0937000
13   Assistant Fort Bend County Attorney
     401 Jackson Street, 3rd Floor
14   Richmond, TX  77469
     Telephone:  281.341.4555
15   Email:  kevin.Hedges@co.fortbend.tx.gov

16        Also Present:  Ms. Nina Liddi, VWA Video
                         Ms. Molly Hanis

17

18

19

20

21

22

23

24

25

CINDIBENCHREPORTING.COM

3

1                              INDEX

2   JUSTIN PULLIAM                     AUGUST 11, 2023

3                                      PAGE

4   Examination by Mr. Hedges ...............    4

5   Examination by Mr. Rowes ................   53

6   Continued Examination by Mr. Hedges ......   54

7   Further Examination by Mr. Rowes.........  129

8   Signature Page ...........................  133

9   Court Reporter's Certificate .............  134

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

35

1      Q   All right.  I'm a little bit fuzzy

2   still -- and it's probably my fault, not yours --

3   about who gets to decide when a scene is safe.

4      A   Uh-huh.

5      Q   Who's the ultimate decision maker there on

6   the scene?

7      A   I -- one of the police officers, maybe

8   Sgt. Rollins.

9      Q   Okay.  But not you?

10      A   I think that I can independently.  If I

11  make that determination, I don't have to wait on

12  someone.  But then also the police officers can make

13  that determination and it apply to people, too.

14      Q   So, if you think it's safe and the police

15  officer doesn't think it's safe, who decides?

16      A   Well, the police officer.

17      Q   All right.  So, tell me a little bit about

18  your background and education and training.

19      A   Uh-huh.  I went to college at Texas A & M

20  University.

21      Q   Gig 'em.

22      A   Gig 'em.  And I got involved in student

23  journalism there.

24      Q   What was your major?

25      A   Animal science.

CINDIBENCHREPORTING.COM

132

1                          CHANGES AND SIGNATURE

2          PAGE   LINE    CHANGE                    REASON

3          _____

4          _____

5          _____

6          _____

7          _____

8          _____

9          _____

10         _____

11         _____

12         _____

13         _____

14         _____

15         _____

16         _____

17         _____

18         _____

19         _____

20         _____

21         _____

22         _____

23         _____

24         _____

25

133

1        I declare under penalty of perjury that the

2   foregoing is true and correct.

3                                    _____

4                        JUSTIN PULLIAM

5        SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned

6   authority, by the witness, JUSTIN PULLIAM, on this, the

7   _____ day of _____, 2023.

8

9                        _____
                         NOTARY PUBLIC IN AND FOR
10                       THE STATE OF

11  My Commission expires:  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

134

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3                              )
     JUSTIN PULLIAM             )
 4                              )
     VS.                        )  CAUSE NO. 4:22-CV-04210
 5                              )
     COUNTY OF FORT BEND,       )
 6   TEXAS; SHERIFF ERIC FAGAN,)
     IN HIS INDIVIDUAL          )
 7   CAPACITY; OFFICER ROBERT   )
     HARTFIELD, IN HIS          )
 8   INDIVIDUAL CAPACITY;       )
     OFFICER JONATHAN GARCIA,   )
 9   IN HIS INDIVIDUAL          )
     CAPACITY; OFFICER TAYLOR   )
10   ROBBINS, IN HIS INDIVIDUAL)
     CAPACITY; AND OFFICER      )
11   RICKY RODRIGUEZ,           )
     IN HIS INDIVIDUAL CAPACITY)

12

13   ********************************************************

14           REPORTER'S CERTIFICATION OF THE

15         ORAL AND VIDEOTAPED DEPOSITION OF

16                    JUSTIN PULLIAM

17                   August 11, 2023

18   ********************************************************

19      I, Karen Romeo Rothman, Certified Shorthand

20   Reporter in and for the State of Texas, hereby

21   certify to the following:

22      That the witness, JUSTIN PULLIAM, was duly

23   sworn by the officer and that the transcript of the

24   oral deposition is a true record of the testimony

25   given by the witness;
```

CINDIBENCHREPORTING.COM

135

1        I further certify that, pursuant to FRCP Rule

2    30(f)(i), that the signature of the deponent:

3        _____ Was requested by the deponent or a party

4    before the completion of the deposition and that the

5    signature is to be before any notary public and returned

6    within 30 days from the date of receipt of the

7    transcript.  If returned, the attached Changes and

8    Signature Page contains any changes and the reasons

9    therefor;

10        _____ Was not requested by the deponent or a

11    party before the completion of the deposition.

12        I further certify that I am neither counsel

13    for, related to, nor employed by any of the parties

14    or attorneys in the action in which this proceeding

15    was taken, and further that I am not financially or

16    otherwise interested in the outcome of the action.

17        Certified to by me on this, the ____ day of

18    _____, 2023.

19

20                    _____
                      Karen Romeo Rothman, CSR, CRR
21                    Texas CSR 1510
                      Expiration:  02/28/25
22                    CINDI BENCH REPORTING
                      10701 Corporate Drive, Ste. 172
23                    Stafford, Texas  77477
                      281.565.8222 Fax:  281.565.8220
24                    Firm Registration No. 56

25

CINDIBENCHREPORTING.COM

136

1    COUNTY OF FORT BEND  )

2    STATE OF TEXAS        )

3         I hereby certify that the witness was notified on
      _____; that the witness had 30 days (or _____
4    days by agreement of counsel) after being notified by
     the officer that the transcript is available for review
5    by the witness, and if there are changes in the form or
     substance to be made, then the witness shall signa
6    statement reciting such changes and the reasons given by
     the witness for making them;

7
          That the witness' signature was/was not returned as
8    of _____.

9         That a copy of this certificate was served on all
     parties and/or the witness shown here in on
10   _____;

11        That the original deposition was delivered to

12   _____;

13        I further certify that I am neither attorney or
     counsel for, related to, nor employed by any parties to
14   the action in which this testimony is taken and,
     further, that I am not a relative or employee of any
15   counsel employed by the parties hereto or financially
     interested in the action.

16

17        SUBSCRIBED AND SWORN TO under my hand and seal of

18   office on this, the _____ day of _____,

19   2023.

20                         _____
                           Karen Romeo Rothman, CSR, CRR
21                         Texas CSR 1510
                           Expiration:  2/28/25
22                         CINDI BENCH REPORTING
                           10701 Corporate Drive, #172
23                         Stafford, TX  77477
                           281.565.8222
24                         Firm Registration No. 56

25

# *Bailey v. Ramos*

125 F.4th 667 (5th Cir. 2025)

125 F.4th 667
United States Court of Appeals, Fifth Circuit.

David BAILEY, Plaintiff—Appellee,
v.
Oscar RAMOS, Defendant—Appellant.

No. 23-50185
|
FILED January 10, 2025

**Synopsis**

**Background:** Arrestee brought § 1983 action against police officer and city, alleging unlawful seizure and arrest, excessive force, malicious prosecution, violation of right to record the police, and First Amendment retaliation arising from incident in which arrestee was charged with interfering with duties of a public servant stemming from arrestee's conduct while filming police officers responding to an assault. The United States District Court for the Western District of Texas, Xavier Rodriguez, J., 657 F.Supp.3d 927, denied officer's motion for summary judgment based on qualified immunity. Officer appealed.

**Holdings:** The Court of Appeals, Willett, Circuit Judge, held that:

[1] officer could have reasonably, even if mistakenly, believed that he had probable cause for arrest for Texas offense of interference with a public duty, and therefore officer was entitled to qualified immunity on arrestee's unlawful-arrest claim;

[2] even if takedown procedure employed by officer amounted to excessive force, unlawfulness of officer's conduct was not clearly established, and therefore officer was entitled to qualified immunity on arrestee's excessive-force claim;

[3] officer's use of leg maneuver to cause handcuffed arrestee, who was standing against a wall, to slide to ground and become seated on ground was not objectively unreasonable and thus not excessive force; and

[4] there was no evidence that officer had subjective retaliatory motive for arrest, nor that any such motive was the but-for cause of decision to arrest, precluding First Amendment retaliation claim.

Reversed and remanded with instructions.

Elrod, Chief Judge, concurred in part, dissented in part, and filed opinion.

**Procedural Posture(s):** Interlocutory Appeal; Motion for Summary Judgment.

West Headnotes (36)

**[1]    Federal Courts** ⬩ Summary judgment

Ordinarily, Court of Appeals reviews the district court's denial of summary judgment de novo, applying the same standard as the district court.

**[2]**   **Civil Rights** 🔑 Government
Agencies and Officers

**Civil Rights** 🔑 Good faith and
reasonableness; knowledge and
clarity of law; motive and intent, in
general

**Civil Rights** 🔑 Defenses;
immunity and good faith

Once a defendant asserts qualified
immunity in a § 1983 action,
the plaintiff bears the burden of
negating it by showing that (1)
the official violated a statutory or
constitutional right and (2) the right
was clearly established at the time of
the challenged conduct. 42 U.S.C.A.
§ 1983.

1 Case that cites this headnote

**[3]**   **Civil Rights** 🔑 Good faith and
reasonableness; knowledge and
clarity of law; motive and intent, in
general

Although a § 1983 plaintiff seeking
to negate qualified immunity need
not identify a case directly on point
in order to show the law was clearly
established, he or she must point to
authority at a sufficiently high level
of specificity to put a reasonable
official on notice that his conduct is
definitively unlawful. 42 U.S.C.A. §
1983.

1 Case that cites this headnote

**[4]**   **Federal Courts** 🔑 Immunity

In a § 1983 action, Court of Appeals
reviews summary judgment based on
qualified immunity de novo, but only
to extent that it turns on issue of law.
42 U.S.C.A. § 1983.

**[5]**   **Federal Courts** 🔑 As to immunity

District court's finding that a
genuine factual dispute exists is
a factual determination that Court
of Appeals is prohibited from
reviewing in an interlocutory appeal
from denial of summary judgment
based on qualified immunity in a
§ 1983 action; however, the district
court's determination that a particular
dispute is material is a reviewable
legal determination. 42 U.S.C.A. §
1983.

**[6]**   **Summary Judgment** 🔑 Immunity

On a motion for summary judgment
based on qualified immunity in a §
1983 action, where video evidence
is available, court is required to
view the facts in light depicted
by videotape; however, inasmuch as
that video evidence is inconclusive,
the ordinary summary judgment
standard applies. 42 U.S.C.A. §
1983.

1 Case that cites this headnote

**[7]**   **Search, Seizure, and
Arrest** 🔑 Necessity in general

A warrantless arrest must be based on probable cause. U.S. Const. Amend. 4.

**[8]    Search, Seizure, and Arrest** 🔑 **What constitutes probable cause in general**

Probable cause to arrest exists when totality of facts and circumstances within police officer's knowledge at moment of arrest are sufficient for reasonable person to conclude that suspect had committed or was committing offense. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[9]    Search, Seizure, and Arrest** 🔑 **What constitutes probable cause in general**

Adjudication of probable cause for arrest is an objective test: courts must look to the totality of the circumstances and decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, demonstrate a probability or substantial chance of criminal activity. U.S. Const. Amend. 4.

**[10]    Civil Rights** 🔑 **Arrest and detention**

If there was probable cause for arrest for any of the charges made, then an arrest was supported by probable

cause, and an arrestee's claim for false arrest fails. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[11]    Civil Rights** 🔑 **Defenses; immunity and good faith**

**Summary Judgment** 🔑 **Immunity**

Genuine dispute of material fact existed as to whether police officer had probable cause to arrest bystander for Texas offense of assault by offensive conduct, as could preclude summary judgment based on qualified immunity from bystander's § 1983 unlawful-arrest claim following arrest during incident in which bystander, while filming officer's response to an assault, allegedly swatted officer and clenched hand into a fist as though he were preparing to fight officer. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 22.01(a)(3).

**[12]    Obstructing Justice** 🔑 **Interfering with Performance of Official Duties**

Under Texas law, for an action to constitute "interference" with public duties of peace officer, as could constitute offense of interference with public duties, the action must consist of more than just speech alone. Tex. Penal Code Ann. § 38.15(a)(1).

**[13]  Civil Rights** 🔑 **Sheriffs, police, and other peace officers**

Police officers who reasonably but mistakenly conclude that probable cause for arrest is present are entitled to qualified immunity in a § 1983 action for unlawful arrest; there must not even arguably be probable cause for the arrest for the immunity to be lost, and thus this is a significant hurdle for plaintiff to clear in order to defeat qualified immunity. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[14]  Civil Rights** 🔑 **Sheriffs, police, and other peace officers**

Police officer could have reasonably, even if mistakenly, believed that he had probable cause to arrest bystander for Texas offense of interference with a public duty, and therefore officer was entitled to qualified immunity from bystander's unlawful-arrest claim under § 1983 following arrest during incident in which bystander, while filming officer's response to an assault, allegedly failed to comply with officer's instructions to stand back from active crime scene, even if bystander was in fact attempting to comply with instruction to stand back, where bystander hesitated in complying, bystander had made obscene gesture at officer shortly before instruction to stand back,

bystander was cursing at officer, and individual with bystander had approached officer while openly carrying a gun. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

1 Case that cites this headnote

**[15]  Search, Seizure, and Arrest** 🔑 **Exceptions in general; warrantless searches in general**

In absence of warrant, search is reasonable only if it falls within specific exception to warrant requirement. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[16]  Federal Courts** 🔑 **Summary judgment**

Arrestee's argument before district court that officer "use[d] more physical force than necessary to effectuate the arrest" was broad enough to allow arrestee to raise argument that officer used excessive force, and thus was not entitled to qualified immunity from arrestee's excessive-force claim under § 1983, through specific conduct of sweeping arrestee's legs out from under him to bring him to the ground, in arrestee's response to officer's appeal of denial of summary judgment based on qualified immunity for excessive-force claims arising from several different takedown actions of officer

during arrest; language in argument to district court covered force used to keep control of arrestee in the minutes after he was placed in handcuffs. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[17]    Civil Rights** 🔑 Arrest and detention

A § 1983 plaintiff's excessive-force claim is separate and distinct from an unlawful-arrest claim, and court must therefore analyze the excessive-force claim without regard to whether the arrest itself was justified. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[18]    Civil Rights** 🔑 Use of force in general

In a § 1983 action for excessive force, an officer's use of force is excessive under the Fourth Amendment if the plaintiff can show: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[19]    Search, Seizure, and Arrest** 🔑 Reasonableness in general; objective or subjective test

To assess reasonableness of force used by police officer, court considers three factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, (3) and whether he is actively resisting arrest or attempting to evade arrest by flight. U.S. Const. Amend. 4.

**[20]    Search, Seizure, and Arrest** 🔑 Reasonableness in general; objective or subjective test

Reasonableness of particular use of force by police officer must be judged from perspective of reasonable officer on scene, rather than with 20/20 vision of hindsight. U.S. Const. Amend. 4.

**[21]    Search, Seizure, and Arrest** 🔑 Reasonableness in general; objective or subjective test

Not every push or shove by police officer, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment prohibition on excessive force. U.S. Const. Amend. 4.

**[22]  Search, Seizure, and Arrest** 👈 Reasonableness in general; objective or subjective test

Fourth Amendment requirement that force used by police officer be reasonable is not a requirement to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection. U.S. Const. Amend. 4.

**[23]  Civil Rights** 👈 Assault and battery; personal injury and use of force

As long as a plaintiff asserting a § 1983 claim for excessive force has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[24]  Civil Rights** 👈 Defenses; immunity and good faith

**Summary Judgment** 👈 Immunity

Genuine disputes of material fact existed as to whether arrestee posed immediate threat to safety of others and whether force used by police officer when he pushed arrestee and brought him to the ground was reasonable, as could preclude summary judgment based on qualified immunity in arrestee's § 1983 action for excessive force arising from arrest for Texas offense of interference with public duties while arrestee was attempting to film officer's response at scene of an assault, during which arrestee allegedly engaged in physical contact with officer in moments preceding use of force. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

**[25]  Civil Rights** 👈 Sheriffs, police, and other peace officers

Even if takedown procedure employed by police officer during arrest of bystander for Texas offense of interference with public duties, allegedly consisting of shoving arrestee, pulling off arrestee's shirt, and pushing arrestee to ground to handcuff him, amounted to excessive force, unlawfulness of officer's conduct was not clearly established, and thus officer was entitled to qualified immunity in arrestee's § 1983 action asserting excessive force; unlike in relevant precedent, bystander had been given an order with which to comply, namely to stand back, and level of force used was far less than that in case in which force and been found excessive. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

1 Case that cites this headnote

2 Cases that cite this headnote

**[26]    Search, Seizure, and Arrest** 👈 **Particular cases in general**

Police officer's use of leg maneuver to cause handcuffed arrestee, who was standing against wall, to slide to ground and become seated on ground was not objectively unreasonable, and thus did not amount to excessive force, in violation of Fourth Amendment, where arrestee was not complying with officers' lawful orders to sit down. U.S. Const. Amend. 4.

**[27]    Search, Seizure, and Arrest** 👈 **Reasonableness in general; objective or subjective test**

Once a suspect has been handcuffed and subdued, and is no longer resisting, a police officer's use of force is excessive. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[28]    Search, Seizure, and Arrest** 👈 **Reasonableness in general; objective or subjective test**

Use of force against handcuffed suspect is not excessive if suspect is resisting by ignoring lawful commands. U.S. Const. Amend. 4.

**[29]    Summary Judgment** 👈 **First Amendment in general**

To survive summary judgment on a First Amendment retaliation claim under § 1983, plaintiff must show there is at least a genuine dispute of material fact that (1) he was engaged in constitutionally protected activity; (2) the defendant's actions caused plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[30]    Constitutional Law** 👈 **Retaliation in general**

A First Amendment retaliation claim against a police officer based on an arrest is only available when non-retaliatory grounds are in fact insufficient to provoke the arrest, meaning that the officer's subjective motivation must be the but-for cause of the adverse action against the plaintiff. U.S. Const. Amend. 1.

2 Cases that cite this headnote

**[31]    Constitutional Law** 👈 **Retaliation**

For an injury to constitute one that would chill a person of ordinary firmness from continuing to engage in that activity, as would be required to support First Amendment retaliation claim, the effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights, it need not be great in order to be actionable. U.S. Const. Amend. 1.

1 Case that cites this headnote

**[32]   Constitutional Law** 🔑 Interaction with public safety officials

**Search, Seizure, and Arrest** 🔑 Retaliatory or discriminatory arrest

Alleged injuries which arrestee suffered as a result of police officer's use of force during the arrest were sufficient to chill a person of ordinary firmness from continuing to engage in activity at issue, as could support arrestee's First Amendment retaliation claim in his § 1983 action against officer arising from arrest for Texas offense of interference with public duties, which arrest occurred while arrestee was filming officer's response at scene of an assault, where arrestee alleged that he suffered abrasions to his wrist and knee, acute neck pain, and a concussion. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

**[33]   Summary Judgment** 🔑 First Amendment in general

At summary judgment stage of First Amendment retaliation action under § 1983, plaintiff cannot rely on allegations but rather must produce specific support for his claim that defendant had an unconstitutional motive. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[34]   Civil Rights** 🔑 Weight and Sufficiency of Evidence

First Amendment retaliation claim under § 1983 does not require plaintiff to produce direct evidence of defendant's unconstitutional motive; circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[35]   Constitutional Law** 🔑 Interaction with public safety officials

**Search, Seizure, and Arrest** 🔑 Retaliatory or discriminatory arrest

There was no evidence that police officer had a subjective retaliatory motive when he arrested bystander for Texas offense of interference with public duties, nor that any such motive was the but-for cause of officer's decision to arrest

bystander, precluding bystander's First Amendment retaliation claim under § 1983 arising from incident in which bystander was arrested while filming officer's response at scene of an assault, after bystander allegedly failed to comply with officer's commands to stand back. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

[36]    **Constitutional Law** 🗝 Arrest

In a First Amendment retaliation claim under § 1983 arising from an arrest while arrestee was engaging in speech, the fact that arrestee was arrested when otherwise similarly situated individuals not engaged in the same sort of speech were not arrested is good evidence in favor of arrestee as to whether police officer acted with unconstitutional motive. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**\*672** Appeal from the United States District Court for the Western District of Texas, USDC No. 5:20-CV-466

**Attorneys and Law Firms**

Brandon Grable (argued), Grable Grimshaw, P.L.L.C., San Antonio, TX, for Plaintiff—Appellee.

Mark Kosanovich, Fitzpatrick & Kosanovich, P.C., San Antonio, TX, Laura Flores Macom (argued), Langley & Banack, Incorporated, San Antonio, TX, for Defendant—Appellant.

Before Elrod, Chief Judge, and Willett and Duncan, Circuit Judges.

**Opinion**

Don R. Willett, Circuit Judge:

David Bailey and his friends went to downtown San Antonio to "film the police." With cameras rolling, they approached Officers Oscar Ramos and Christopher Dech, who were guarding an ambulance. An altercation ensued, and Bailey was arrested for interfering with the duties of a public servant. He brought various constitutional claims against the City of San Antonio and Officers Ramos and Dech, though this appeal concerns just the claims against Ramos: unlawful arrest, unlawful seizure, First Amendment retaliation, and excessive force. Ramos moved for summary judgment based on qualified immunity, the district court denied it, and Ramos appealed. We REVERSE the denial of summary judgment and REMAND with instructions to grant summary judgment in favor of Ramos and to dismiss Bailey's claims.

I

On April 28, 2018, David Bailey and three friends went to downtown San Antonio "to film the police." Angered by the recent arrest of a friend, they planned for one member of the group to "kind of, be the jerk" to the police officer, and Bailey **\*673** would "film them"

and "go up and be the ... nice citizen, and say, 'Hey, just leave the – leave the cop alone. Let him do his job.' " But once the officer expressed thanks, Bailey would tell the officer, "I'm here because of what you-all [sic] did to Mike Thompson, and I'm, like Well—well, f*** you."

San Antonio Police Officers Oscar Ramos and Christopher Dech were on bike patrol in downtown San Antonio. They responded to an assault at a bar, and while paramedics administered treatment to the victim inside an ambulance, the officers positioned themselves outside to keep people away. The officers didn't know yet who assaulted the victim, so they were also using the area to interview witnesses.

Bailey and his group were filming and immediately hostile when they first approached Ramos and Dech. Bailey gave the officers the middle finger and said "f*** off" as he walked away. After this initial interaction, most of the group wandered away, and Dech went back to the bar, leaving Ramos alone. One of Bailey's friends, Jack Miller, then walked up to Ramos while openly carrying a gun. Miller asked Ramos, "What are you shaking your f***ing head at?" Ramos asked him to watch his language and to back up. Miller repeatedly asked where he should stand. At first, Ramos told him to "back up" and "go over there," motioning with his hand to move backwards. At that point, Dech returned from the bar to stand beside Ramos in front of the ambulance. Body camera footage shows that Officer Dech instructed Bailey and Miller to "just listen" and that the area was an active crime scene while Bailey and Miller continued to shout over him. Video footage clearly shows

Bailey filming this interaction. Meanwhile, Miller continued to ask, "[W]here would you like us to stand?" Dech responded, "[S]tand back behind that line," and pointed to a line in the sidewalk. Miller immediately turned away and walked back, motioning to the group to follow and saying, "[A]lright, let's go, move." Bailey, however, did not immediately comply. Video footage shows him come to a complete stop and turn to face Ramos, while still standing in front of the line.

The parties dispute what happened next. Ramos says that he lightly touched Bailey's shoulder to guide him toward the line. When Bailey stopped moving, Ramos put his arm up again to Bailey's chest, and Bailey responded by "swatting Officer Ramos' arm away, striking him, and causing him to stagger." Then Ramos says that he saw Bailey drop his left hand and clench it into a fist. Because of Bailey's conduct and these "signs of aggression," Ramos asserts he "was in fear of an impending assault." In response, Ramos placed both hands on Bailey's chest and pushed him. He then grabbed Bailey by his upper body and forced him to the ground. Bailey, however, denies swatting Ramos or clenching his fist and alleges that Ramos "pushed [him] back twice before tackling him to the ground, kneeling on him, and then handcuffing him." The video evidence also shows that Bailey yelled "hands off!" in response to the contact with Ramos before he was tackled to the ground.

Dech handcuffed Bailey once Ramos had him on the ground. The officers lifted Bailey into a standing position and placed him up against a nearby wall. There, Bailey repeatedly yelled expletives at Ramos and Dech while they

asked him to calm down and sit down. Bailey screamed at both officers that he would "dial up my wife to own your ass" and told Dech that he would "lock you up with this little piece of sh*t," referring to Ramos. Bailey was moving about and stepped toward the officers. The officers guided him back against the wall **\*674** with their hands while telling him repeatedly to sit down. Bailey did not comply and responded, "[W]hat, are you going to go hands on again?" Ramos then used some type of leg maneuver to bring Bailey to a seat on the ground.

Bailey was charged with interfering with the duties of a public servant. The charge was later dismissed by the prosecutor's office for lack of evidence.

Bailey sued Ramos and Dech [1] and the City of San Antonio under 42 U.S.C. § 1983, alleging unlawful seizure and arrest, excessive force, malicious prosecution, violation of his right to record the police, and First Amendment retaliation. Bailey also brought municipal-liability claims against the City. All three parties moved for summary judgment, with Ramos arguing he was entitled to qualified immunity. The district court (1) dismissed all of Bailey's claims against the City; (2) dismissed Bailey's right-to-record claim because Bailey had conceded it; (3) granted qualified immunity for the malicious prosecution claim; and (4) denied qualified immunity and summary judgment for the unlawful arrest, unlawful seizure, First Amendment retaliation, and excessive force claims because genuine disputes of material fact existed. [2]

## II

**[1]** "Ordinarily, we would review the district court's denial of summary judgment *de novo*, applying the same standard as the district court." [3] That standard requires us to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [4]

**[2]**    **[3]** Because this is an interlocutory appeal of a denial of qualified immunity, we "alter[ ] the usual summary judgment burden of proof." [5] Once a defendant asserts qualified immunity, the plaintiff bears the burden [6] of negating it by showing that (1) the official violated a statutory or constitutional right and (2) the right was " 'clearly established' at the time of the challenged conduct." [7] "Although the plaintiff need not identify 'a case *directly* on point' in order to" show the law was clearly established, "he or she must point to 'authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.' " [8]

**[4]**    **[5]** We review summary judgment based on qualified immunity de novo, but only "to the extent that it turns on an issue **\*675** of law." [9] "This means that the district court's finding that a *genuine* factual dispute exists is a factual determination that this court is prohibited from reviewing in this interlocutory appeal." [10] However, "the district court's determination that a particular dispute is *material* is a reviewable legal determination." [11]

**[6]**  There's one further wrinkle. Where video evidence is available, there is an "exception to the materiality/genuineness rule cited above." [12] "[W]e are required to 'view the facts in the light depicted by the videotape.' " [13] The Supreme Court instructed in *Scott v. Harris* that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." [14] Thus, "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." [15] "Inasmuch as that video evidence is inconclusive, however, the ordinary summary judgment standard applies." [16]

### III

**[7]**  **[8]**  **[9]**  The Fourth Amendment governs Bailey's claim for unlawful arrest. "A warrantless arrest must be based on 'probable cause.' Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." [17] "[T]he adjudication of probable cause is an objective test: [C]ourts must look to the totality of the circumstances and decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer demonstrate a probability or substantial chance of criminal activity." [18]

**[10]**  "If there was probable cause for any of the charges made ... then the arrest was supported by probable cause, and the claim for false arrest fails." [19]  Bailey contends that Ramos lacked probable cause to arrest him. Ramos counters that he had probable cause to arrest Bailey for (1) assault by offensive conduct under Texas Penal Code § 22.01(a)(3) and (2) interference **\*676** with public duties under Texas Penal Code § 38.15.

### A

We start with assault.

**[11]**  Under the Texas Penal Code, a person commits assault if he or she "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." [20] The district court denied qualified immunity to Ramos because it concluded that there was a genuine dispute of material fact as to the nature of the contact between Ramos and Bailey before Ramos took Bailey to the ground.

"[T]he district court's finding that a *genuine* factual dispute exists" about the contact between Bailey and Ramos "is a factual determination that this court is prohibited from reviewing in this interlocutory appeal." [21] The *Scott v. Harris* exception that allows us to draw our own conclusions from the video evidence does not alter our review here because the video does not "blatantly" contradict either Ramos's or Bailey's stories about the nature

of the contact between them.[22] Even though there were many recording devices at the scene, none of the video evidence clearly shows whether Bailey swatted Ramos or clenched his hand into a fist as though he was preparing to fight. These factual disputes are material because Bailey's conduct and the contact between him and Ramos are part of the "facts and circumstances within the officer's knowledge" that are relevant to whether there was probable cause.[23] Accordingly, because we cannot conclude as a matter of law that Ramos had probable cause to arrest Bailey for assault, we turn to the next charge: interference with public duties.

## B

[12] Under the Texas Penal Code, a person commits the offense of interference with public duties "if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with ... a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law."[24] To constitute interference, the action must consist of more than just speech alone.[25] But "Texas courts have found that failure to comply with an officer's instructions ... violates Texas Penal Code § 38.15 and is not protected speech. Specifically, several courts have affirmed convictions of defendants who failed to comply with an officer's instruction to move away from a crime scene."[26]

The district court assessed each of the instances in which Ramos says Bailey refused to comply with his orders and concluded: **\*677** (1) when

Ramos said "go over there," he was speaking to Miller, not Bailey; (2) when Ramos gestured with a hand motion to move backwards, it was not "explicit"; and (3) the order from Dech to stand behind the line was directed at Miller, and Bailey "immediately step[ped] back to look around ... in order to locate the line," and "it is not clear that [Bailey] even had an opportunity to fully comply with the order, given that Ramos lunged at [Bailey] approximately one second after Dech's instructions." The district court held that there were genuine factual disputes "as to whether [Bailey] was complying with the officers' instructions in the moments before Ramos lunged at him" and as to "the nature of the contact between [Bailey] and Ramos." Because of these disputed facts, the district court held that it could not "conclude as a matter of law that Ramos had probable cause to arrest [Bailey]."

[13] However, the Supreme Court instructs that police officers who "reasonably but mistakenly conclude that probable cause is present" are entitled to qualified immunity.[27] There must "not even arguably be probable cause for the ... arrest for the immunity to be lost."[28] A plaintiff must clear this "significant hurdle" in order to defeat qualified immunity.[29]

[14] The district court did not address whether Ramos could have reasonably, although mistakenly, believed that he had probable cause.[30] Assuming that Ramos lacked probable cause, we must still ask whether Ramos "could have reasonably thought his actions were lawful," even if he was mistaken.[31]

Officers told Bailey and Miller multiple times that this was an active crime scene and they should stand back. Despite being told to "just listen," Bailey continued to shout over the officers. Bailey and Miller were both standing close to the officers when Dech instructed that they should "stand back behind that line." Bailey himself was filming the interaction. Miller immediately turned away to comply with the instruction, moving before Dech finished his sentence. Within two more seconds, Miller was motioning to the group to follow and saying, "alright, let's go, move." But Bailey did not move at the same time as Miller. Bailey briefly stepped back and looked backwards, but he came to a complete stop and turned back toward Ramos while still in front of the line. Within two to three seconds of Miller's instruction, Ramos pushed Bailey backwards. Bailey responded by swatting Ramos's arm away.

The district court found that Bailey "immediately step[ped] back and look[ed] around ... in order to locate the line to which Dech was referring" and that Ramos's **\*678** assertion that Bailey "failed to move" in response to Dech's orders was "contradicted by the video." The videos confirm that Bailey moved his right foot backwards and that he looked around and then backwards. But it is unclear whether (1) Bailey was reflexively stepping back and looking back in response to Ramos touching his shoulder to guide him backwards, given that Bailey immediately said "hands off" after that contact, or (2) Bailey was stepping back to locate the line, as the district court found.

Regardless, when Bailey continued to talk over the officers' commands, did not start moving at the same time as Miller, and turned back toward Ramos, an officer in Ramos's position could have reasonably thought that Bailey was not complying with the order to move behind the line and thus that there was probable cause to believe that Bailey was interfering with a public duty. [32]

Our court has held as much in similar circumstances. For example, in *Haggerty v. Texas Southern University*, we held that an officer mistakenly but reasonably believed that an action constituted interference with a public duty where the officer warned the individual to not interfere, the individual was within relative proximity of the crime scene, and the individual stepped forward. [33] We said that a reasonable officer in that situation "could have believed that the situation was tense and dangerous," and so a reasonable officer could also have believed that the failure to follow the instruction was interfering with his duties. [34] Likewise, in *Eisenbach v. Zatzkin*, we held that an officer mistakenly but reasonably believed that there was probable cause to arrest for interference with a public duty where the officer warned the plaintiff to leave the area of his investigation, but the plaintiff, believing the investigation was over, approached the area. [35] The plaintiff's approaching the crime scene, which was contrary to the officer's instruction, was sufficient for a reasonable officer to conclude that the plaintiff was interfering with a public duty. [36]

Similarly here, when Bailey didn't immediately move away with Miller, Ramos could

reasonably have believed that Bailey, like the plaintiffs in *Haggerty* and *Eisenbach*, was ignoring officer instructions to stay away from the crime scene. Even if Bailey was complying with those instructions, Ramos, like the officers in *Haggerty* and *Eisenbach*, could have reasonably but mistakenly believed that Bailey's hesitation was contrary to his instructions and interfered with a public duty. This is especially so, given that Bailey had given the officers the middle finger and was cursing at them, and Miller had approached them while openly carrying a gun, giving Ramos reason to believe "the situation was tense and dangerous." [37]

Because we conclude that Ramos could have reasonably, even if mistakenly, believed that he had probable cause to arrest Bailey for interference with a public duty, he is entitled to qualified immunity as to the unlawful arrest claim. [38]

IV

We next address whether Ramos is entitled to qualified immunity as to the unlawful seizure claim.

 **\*679**  **[15]**  Ramos seized Bailey's cell phone and belongings incident to his arrest. Bailey asserts that these items were seized without a warrant or probable cause in violation of the Fourth Amendment. Under the Fourth Amendment, people have a right to be free from "unreasonable searches and seizures." [39] "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the

warrant requirement." [40] A warrantless search incident to a lawful arrest is one of the oldest and most widely used exceptions to the warrant requirement. [41] Bailey's unlawful seizure claim rises and falls with his unlawful arrest claim because the exception would not apply if the arrest were deemed unlawful. Because Ramos is entitled to qualified immunity for Bailey's unlawful arrest claim, he is entitled to qualified immunity for Bailey's unlawful seizure claim.

V

We now turn to whether Ramos is entitled to qualified immunity as to the excessive force claims. Bailey contends that Ramos used excessive force when he: (1) pushed Bailey; (2) grabbed Bailey's shirt and pulled it over his head to slam him to the ground; (3) knelt on Bailey's neck and shoulder; (4) pulled Bailey up by the handcuffs; and (5) swept Bailey's legs out from under him to bring him to the ground.

The district court held that Ramos was entitled to qualified immunity to the extent Bailey's claims were premised on Ramos briefly placing his knee on Bailey's back to effectuate the arrest and lifting Bailey by the handcuffs because neither of these acts violated a clearly established right. It otherwise held that factual disputes precluding summary judgment existed as to whether the other uses of force were objectively unreasonable under the Fourth Amendment. Ramos appealed the denial of summary judgment. Because Bailey did not cross-appeal the limited grant of summary judgment, we do not review the district court's grant of summary judgment for the excessive force claims based on Ramos's placing his knee

on Bailey's back or picking him up by the handcuffs.

**[16]** Ramos contends that Bailey raised the fact of his leg sweep for the first time in his response to Ramos's summary-judgment motion and that it should therefore not be considered. [42] The district court disagreed, noting that Bailey's complaint, which generally alleged that "Defendants use[d] more physical force than necessary to effectuate the arrest," was broad enough to cover the leg sweep.

We agree. The complaint's reference to physical force used to "effectuate the arrest" is broad enough to cover force used to keep control of Bailey in the minutes after he was placed in handcuffs. We also note that Ramos was on notice about the leg sweep long before discovery closed, as one of Bailey's experts specifically identified it in his report. Accordingly, we review whether Ramos is entitled to qualified immunity on Bailey's excessive force claims regarding both the leg sweep and the other takedown procedures.

**[17]  [18]  [19]  [20]  [21]  [22]** Bailey's "excessive force claim is separate and distinct from [his] unlawful **\*680** arrest claim, and we must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." [43] An officer's use of force is excessive under the Fourth Amendment if the plaintiff can show: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." [44] "The second and third elements collapse into a single

objective-reasonableness inquiry." [45] To assess reasonableness, we consider three factors that the Supreme Court outlined in *Graham v. Connor*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." [46] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." [47] " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." [48] "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.' " [49]

**[23]** Bailey has met the injury requirement for an excessive force claim. He provided evidence of "abrasion to his wrist and knee, acute neck pain, and a concussion." He also "testified that he still experiences pain in his neck, shoulder, and spine and needs occasional cortisone shots." "[A]s long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." [50] Thus, we need only consider whether Ramos's use of force was objectively reasonable under the *Graham* factors.

A

**[24]** We start with the force used during the takedown procedure, when Ramos pushed Bailey and brought him to the ground. The district court denied summary judgment for this use of force because it held that there were genuine disputes of material fact as to the nature of the contact between Ramos and Bailey in the moments preceding the use of force.

Turning to the *Graham* factors to assess the reasonableness of the takedown procedure, first, the offense Bailey was being arrested for—interference with public duties—is "a minor offense" under Texas **\*681** law. [51] Second, Ramos does not argue that Bailey was actively resisting arrest or attempting to evade arrest by flight. But whether Bailey posed "an immediate threat to the safety of the officers or others" [52] can only be determined once the factual disputes as to the nature of the contact between Ramos and Bailey have been resolved. We cannot review the "district court's finding that a *genuine* factual dispute exists" about the nature of the contact between Bailey and Ramos unless the video evidence blatantly contradicts the story either Ramos or Bailey presents. [53] As we discussed above, none of the video evidence clearly shows the nature of the contact between Bailey and Ramos. Because the nature of the contact is relevant to whether Bailey posed an immediate threat to the safety of others and to the reasonableness of the force used, we agree with the district court and the dissent that these disputes of fact are material.

**[25]** But even if there is a genuine and material fact dispute as to whether the takedown procedure did amount to excessive force, Ramos is still entitled to qualified immunity because the unlawfulness of his conduct was not clearly established at the time it occurred. [54]

Bailey, for his part, submits that the unlawfulness of Ramos's takedown procedure was clearly established, pointing to our 2012 decision in *Newman v. Guedry*. [55] In *Newman*, the defendant-officers severely beat and tased a passenger of a stopped car, precipitated only by the passenger's suggestion that one of the officer's hands "remained on [his] crotch for an uncomfortable length of time" during the pat-down search. [56] There was, moreover, no evidence that the passenger failed to comply with any lawful order before officers hit him thirteen times with a baton, tased him three times, and dragged him to the sidewalk with taser barbs in his skin and his shorts around his ankles. [57] We accordingly held that the officers' force was objectively unreasonable under *Graham* and violated the passenger's clearly established constitutional right to be free from such force. [58]

We agree with Ramos that our decision in *Newman* is not sufficiently analogous to have put him on notice that his conduct was unlawful. Most notably, unlike in *Newman*, Bailey was given an order with which to comply, thus rendering the circumstances preceding Ramos's use of force materially different. And the level of force the officers used in *Newman* far exceeded the force that Ramos used here. [59]

**\*682** *Newman* is not this court's only relevant precedent. [60] However, further review of our caselaw shows that it was not

clearly established in April 2018 that Ramos's takedown procedures were unlawful.

Just weeks before Bailey's arrest, we denied qualified immunity and observed in *Sam v. Richard* that "it was clearly established ... that pushing, kneeing, and slapping a suspect who is neither fleeing nor resisting is excessive." [61] However, the use of force in *Richard* is distinguishable in that it was used *after* the plaintiff was lying face down on the ground, with his hands on the back of his head. [62] Under *Richard*, an officer isn't entitled to qualified immunity if takedown procedures are used *after* the officer has gained control of the suspect. But that isn't the case here, where Bailey wasn't yet handcuffed, and Ramos used force to gain control of Bailey under the reasonable belief that Bailey was disregarding his orders. Moreover, the force used in *Richard*—slapping the suspect across the face and kneeing him while he was face down on the ground with his hands on the back of his head [63] —was more severe and less appropriate than the shove, pulling of Bailey's shirt, and push to the ground that Ramos used here to gain control of and handcuff Bailey. [64]

Similarly, in *Bush v. Strain*, a decade earlier, we held that it was clearly established that officers could not "forcibly slam[ ]" a "handcuffed and subdued" individual's face "into a nearby vehicle" when the individual "was not resisting arrest or attempting to flee." [65] But, again, that is not the case here. True, Ramos doesn't contest that, like the suspect in *Bush*, Bailey wasn't resisting arrest. But we have "frequently held" that takedown procedures like pushing a suspect and bringing him to the ground are

lawful ways to gain control of and arrest a suspect before he has been handcuffed and subdued. [66] *Bush* does not clearly establish that use of takedown procedures is unlawful when law enforcement hasn't yet gained control of the suspect. So, even if Bailey wasn't resisting arrest, as determined above, a reasonable officer could have believed he was refusing to **\*683** follow instructions and thus needed to be subdued using such measures.

The dissent also points to *Trammell v. Fruge*, [67] *Joseph v. Bartlett*, [68] and *Darden v. City of Fort Worth* [69] as showing that Ramos's conduct was a clearly established violation of Bailey's constitutional rights at the time of the arrest. But analogy to these cases suffers the same flaws as analogies to *Richard* and *Bush*— the officers were not "acting under similar circumstances" as Ramos, so the cases cannot have put him on notice that his actions were unconstitutional. [70]

For example, in contrast to the plaintiffs in those cases, Bailey was not yet subdued when officers exerted the alleged excessive force. In *Darden*, we denied qualified immunity where video evidence showed that officers exerted force *after* the plaintiff was kneeling with his hands in the air and following officer instructions, all while bystanders were shouting to the officers that the plaintiff couldn't breathe. [71] Likewise, in *Joseph*, the officers exerted force *after* the plaintiff was already lying on the ground in the fetal position, obviously subdued. [72] By contrast, although Bailey was not actively resisting arrest, he had not given officers an obvious indication that he was subdued, such as kneeling with his

hands in the air or lying in the fetal position. Instead, he was on his feet, shouting over officer instructions, and obstructing an active crime scene. Bailey hasn't pointed to any case saying that officers may not use some force to subdue an arrestee in this situation.

These cases are also distinguishable in the *amount* of force officers used. We have held that "the degree of force an officer can reasonably employ is *reduced* when an arrestee is not actively resisting." [73] But none of these cases suggest that Ramos's use of force— putting his hands to Bailey's chest, pulling his shirt, and pushing him to the ground—was more force than reasonably necessary to subdue Bailey under the circumstances. Ramos's force was far milder than the officers in *Darden*, who "threw [plaintiff] to the ground, tased him twice, choked him, punched and kicked him in the face, pushed him into a face-down position, pressed his face into the ground, and pulled his hands behind his back to handcuff him." [74] And Ramos's actions were less violent than the officers' actions in *Trammell*, which consisted of grabbing plaintiff's arms, executing knee strikes and a headlock, and tackling him. [75] Ramos also acted far more proportionally than the officers in *Joseph*, who held the plaintiff's body down and tased him for 11 seconds, struck him with a baton at least twice, tased him again, then kicked and punched him multiple times. [76] These much more extreme cases thus do not clearly establish that Ramos "should have known that he could not use that amount of force on an individual who was not resisting arrest." [77] By contrast, even taking the facts in the light most favorable to Bailey, Ramos **\*684** pushed Bailey, shoved him to

the ground, then stopped the force immediately after Bailey was handcuffed. Bailey cannot point to any case saying that this amount of force was not reasonably necessary to subdue Bailey under the circumstances. We thus cannot say that Ramos's actions were "plainly in conflict with our caselaw at the time of the alleged misconduct." [78]

Bailey has thus failed to meet his burden to show that it was clearly established at the time of his arrest that Ramos's takedown maneuver was an unlawful use of force. Accordingly, Ramos is entitled to qualified immunity on this claim.

## B

**[26]** We turn now to whether Ramos used excessive force when he swept Bailey's legs out from under him.

**[27]** **[28]** The district court denied summary judgment for this use of force, holding that Ramos used a leg sweep on a "subdued suspect who had not resisted arrest," violating Bailey's clearly established rights. Our caselaw has "clearly established ... that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's use of force is excessive." [79] But use of force against a handcuffed suspect is not excessive if the suspect is resisting by ignoring lawful commands. [80]

Video evidence clearly shows that, after Bailey was handcuffed, he was placed standing up against a wall. There, he repeatedly yelled

expletives at Dech and Ramos. Both officers told Bailey to "sit down" and "kneel down," to which Bailey defiantly responded, "[W]hat, are you going to go hands on again?" The officers responded by maneuvering Bailey so that his back was against the wall. Ramos then used some type of leg maneuver to seat him on the ground. Bailey slid with his back along the wall to the ground, with Dech's hand on his chest guiding him down. Because the video evidence shows that Bailey was not complying with the officers' lawful orders to sit down, Ramos's responsive use of force was not objectively unreasonable under the Fourth Amendment. [81]

Because the video evidence is clear that bringing Bailey to a seat with a leg sweep was not an objectively unreasonable use of force, Ramos is entitled to qualified immunity.

## VI

 **[29]**   **[30]**  Finally, we turn to Bailey's First Amendment retaliation claim. To survive summary judgment, Bailey must show there is at least a genuine dispute of material fact that "(1) [he was] engaged in constitutionally protected activity, (2) the defendant['s] actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant['s] **\*685** adverse actions were substantially motivated against the plaintiff['s] exercise of constitutionally protected conduct." [82]  A retaliation claim is only available "when non-retaliatory grounds are in fact insufficient to provoke" the arrest, meaning that the officer's subjective motivation

must be the but-for cause of the adverse action against the plaintiff. [83]

The district court denied summary judgment on this claim.

The parties do not dispute that Bailey satisfies the first prong. And for good reason: In *Turner v. Lieutenant Driver*, [84]  we held that the right to film police under the First Amendment is clearly established, "subject only to time, place, and manner restrictions." [85]

 **[31]**   **[32]**  The second prong requires an injury that would "chill a person of ordinary firmness from continuing to engage in that activity." [86]  "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights, it need not be great in order to be actionable." [87]  Bailey contends that "arresting and injuring [him], while seizing his belongings, would chill a person of ordinary firmness ...." We agree that the injuries Bailey suffered as a result of the use of force during his arrest meet this standard.

 **[33]**   **[34]**   **[35]**  As to the third prong, "[a]t the summary judgment stage, [Bailey] cannot rely on allegations; he must produce specific support for his claim" that Ramos had an "unconstitutional motive." [88]  We do not require plaintiffs to produce direct evidence. "Circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent. Also, direct evidence of an improper motive is usually difficult, if not impossible, to obtain. Thus, requiring direct evidence of an improper motive would

effectively insulate from suit public officials who deny an improper motive ....”[89]

**[36]** Looking to circumstantial evidence, Bailey points out that Ramos did not pay attention to or arrest any of the people walking through the area who were not recording. True, the fact that “he was arrested when otherwise similarly situated individuals not engaged in the same sort of speech had not been” would be good evidence in his favor.[90] But the video evidence blatantly contradicts Bailey's characterization of events. None of the passersby walking through the crime scene were “similarly situated” to Bailey. Apart from those whom the officers were interviewing as witnesses, no one stopped and lingered in close proximity to the ambulance. Bailey was the only person who appeared to disregard police orders to stay back from the crime scene. Indeed, video shows other individuals recording the interaction, and those individuals were not arrested.

Bailey hasn't pointed to any other evidence that would show that Ramos had a **\*686** subjective retaliatory motive, much less that any such motive was the but-for cause of Ramos's decision to arrest him. Video evidence blatantly disputes his only argument. As a result, no dispute of material fact exists, and Ramos is entitled to judgment as a matter of law on Bailey's First Amendment retaliatory arrest claim.

## VII

We REVERSE the denial of summary judgment and REMAND with instructions to grant summary judgment in favor of Ramos and to dismiss Bailey's claims.

Jennifer Walker Elrod, Chief Judge, concurring in part and dissenting in part:

I agree with the majority opinion as to all of Bailey's claims except for the excessive-force claim based on Ramos pushing Bailey, grabbing him around the upper neck and back, and taking him to the ground. In my view, there are genuine disputes of material fact that preclude summary judgment on that excessive-force claim and require us to dismiss that portion of the appeal for lack of jurisdiction. I believe that the majority opinion errs because it does not view these factual disputes in the light most favorable to Bailey.

## I

In an interlocutory appeal of a denial of qualified immunity, when the district court determines that there is a genuine factual dispute and that dispute is material, under our long-standing precedent in *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) (en banc), we must dismiss the appeal for lack of jurisdiction. *See id.* at 346–47.

Here, the district court concluded that there were genuine disputes of fact as to whether Bailey was complying with Officer Ramos's and Officer Dech's instructions to stand behind a line in the sidewalk. The district court reviewed the video footage and stated that Bailey and his friend Miller “both appear to immediately step back and look around them

in order to locate the line to which Dech was referring." It observed that "it is not clear that [Bailey] even had an opportunity to fully comply with the order, given that Ramos lunged at [Bailey] approximately one second after Dech's instructions." The district court determined that Bailey "appear[ed] to initially comply with the order to move behind the line."

The district court also determined that there were genuine factual disputes regarding the contact between Bailey and Ramos. It noted that there was conflicting testimony about Bailey allegedly "swatting" Ramos and concluded that "[b]ecause the video footage does not offer a clear view of the nature of [Bailey's] contact with Ramos, a jury would need to rely on credibility determinations and weigh the evidence to resolve the question." In the district court's view, "taking the facts in the light most favorable to [Bailey], a jury could conclude that Ramos's use of force was objectively unreasonable in light of clearly established law at the time of the incident."

Here, the video evidence does not blatantly contradict either Bailey's or Ramos's version of the facts—as the majority opinion itself acknowledges. Accordingly, we cannot and should not review the genuineness of those factual disputes. *See Kinney*, 367 F.3d at 346–47; *Curran v. Aleshire*, 800 F.3d 656, 663–64 (5th Cir. 2015) (noting that the *Scott v. Harris* exception to the materiality/genuineness rule applies only if the plaintiff's story is "blatantly contradicted" by the video evidence).

Further, the district court correctly determined that these factual disputes are material to the determination of whether Ramos's use of force

was excessive, and **\*687** the majority opinion again agrees. Thus, in this case, "we do not second-guess the district court's determination that there are genuine disputes of material fact" in the qualified-immunity context, and summary judgment is improper. *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 331, 346 (5th Cir. 2020); *see also Roque v. Harvel*, 993 F.3d 325, 339 (5th Cir. 2021); *Kokesh v. Curlee*, 14 F.4th 382, 409 (5th Cir. 2021) (Willett, J., dissenting) ("[B]ecause there are genuine disputes of material fact ..., the conclusion is apparent: [the defendant] is not entitled to summary judgment on this claim."). I would accordingly dismiss the appeal as to Bailey's excessive-force claim based on the takedown for lack of jurisdiction. *See Kinney*, 367 F.3d at 347.

II

These factual disputes are also material to the analysis of whether Bailey's rights were clearly established under our precedent. I believe that the majority opinion errs because it fails to view the factual disputes in the light most favorable to Bailey when conducting that analysis. "[T]o overcome qualified immunity, *the plaintiff's version* of th[e] disputed facts must also constitute a violation of clearly established law." *Joseph*, 981 F.3d at 330 (emphasis added).

When viewing the facts in the light most favorable to Bailey, Ramos's takedown of Bailey could have violated clearly established law. Although officers may use some physical force to effectuate an arrest, they must also consider "the relationship between the need and

the amount of force used." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). The majority opinion asserts that Ramos could have reasonably believed that Bailey was not complying with orders and that Ramos's use of force was thus necessary to gain control of Bailey. However, Bailey's compliance is in dispute, and "[w]e have no more ability to review these factual disputes as to clearly established law than we did as to the constitutional merits—which is to say, none." *Joseph*, 981 F.3d at 337. Further, disobeying orders generally does not constitute active resistance. *See id.* at 339; *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017). "Our case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018); *see also id.* at 730 (determining that the video evidence did not resolve the factual dispute over whether the plaintiff complied with commands or resisted arrest); *Trammell*, 868 F.3d at 341 (concluding that there was a factual dispute as to whether the plaintiff was actively resisting arrest by refusing to comply with orders and pulling his arm away from officers). If Bailey was not dangerous, was not disobeying orders, and was not resisting arrest, a jury could find that a reasonable officer would know that the amount of force used to subdue Bailey was excessive.

For example, in *Trammell v. Fruge*, we held that the law in 2013 "clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp."

868 F.3d at 343. There, the officers grabbed the plaintiff's arms, used a knee strike, put him in a headlock, and "pulled [him] to the ground." *Id.* at 337. We described this force as "tackling [the plaintiff] to the ground" and determined that such force was excessive even when used before the officers had "subdue[d] and handcuff[ed] him." *Id.* at 337–38, 342. Our caselaw also **\*688** clearly establishes that "violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force." *See Darden*, 880 F.3d at 732–33. Finally, in *Sam v. Richard*, 887 F.3d 710 (5th Cir. 2018), we also determined that the force used before handcuffing the suspect was excessive because the suspect was compliant. *See id.* at 712. In sum, if Bailey did not pose an immediate threat and was compliant—questions on which there are open factual disputes and on which we must make all inferences in Bailey's favor—it is clearly established that Ramos was not justified in resorting to using the takedown maneuver. *See Trammell*, 868 F.3d at 342 ("[T]he quickness with which the officers resorted to tackling [the plaintiff] to the ground militates against a finding of reasonableness.").

As we have previously observed:

> [A] jury could ultimately determine that the suspect was in fact resisting arrest or disobeying commands. And under those alternative facts, the officers' force may have been reasonable under the Fourth Amendment and reasonable under the clearly

established law. Yet, a genuine dispute of material fact existed, meaning that a jury could also find facts demonstrating the opposite. Therefore, the officers were not entitled to qualified immunity at the summary-judgment stage.

*Joseph*, 981 F.3d at 342 (footnotes omitted) (citing *Darden*, 880 F.3d at 731–32). I would thus hold that Bailey has overcome qualified immunity at this stage on his excessive-force claim based on Ramos's takedown.

III

Simply put, the interlocutory appeal of the excessive-force claim based on Ramos's takedown maneuver should have been dismissed for lack of jurisdiction. *See Kinney,* 367 F.3d at 347. Genuine disputes of material fact preclude our jurisdiction over the appeal of this claim and make granting qualified immunity at the summary-judgment stage improper. When the facts are properly viewed in the light most favorable to Bailey, a reasonable jury could find that Ramos's use of force in these circumstances violated clearly established law. I respectfully dissent in part.

**All Citations**

125 F.4th 667

---

### Footnotes

1    The parties later stipulated to dismiss the claims against Dech.

2    The district court partially granted summary judgment on the excessive force claims to the extent that the claims were based on Ramos briefly placing his knee on Bailey's back while he was being handcuffed and Ramos pulling up Bailey by the handcuffs to a standing position. Bailey does not challenge that holding on appeal.

3    *Kinney v. Weaver*, 367 F.3d 337, 347–48 (5th Cir. 2004) (en banc) (citing *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001)) (emphasis removed).

4    FED. R. CIV. P. 56(a).

5    *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

6    *Id.* ("The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." (citation omitted)).

7    *Perniciaro v. Lea*, 901 F.3d 241, 255 (5th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see also Brown*, 623 F.3d at 253.

8    *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022) (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

9    *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 331–32 (5th Cir. 2020) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

10   *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010).

11   *Id.*

12   *Curran v. Aleshire*, 800 F.3d 656, 663 (5th Cir. 2015).

13   *Boyd v. McNamara*, 74 F.4th 662, 665 (5th Cir. 2023) (quoting *Salazar v. Molina*, 37 F.4th 278, 280 (5th Cir. 2022) (alteration omitted)).

14   550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

15   *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

16   *Boyd*, 74 F.4th at 666 (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021)).

17   *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) (per curiam). *See also Brown v. Lyford*, 243 F.3d 185, 191 (5th Cir. 2001) ("[I]f a reasonable officer could have concluded that there was probable cause upon the facts then available to him, qualified immunity will apply." (quoting *Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021) (cleaned up))).

18   *Reitz v. Woods*, 85 F.4th 780, 790 (5th Cir. 2023) (quoting *Terwilliger*, 4 F.4th at 282).

19   *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995).

20   TEX. PENAL CODE § 22.01(a)(3).

21   *See Good*, 601 F.3d at 397.

22   *See* 550 U.S. at 380–81, 127 S.Ct. 1769.

23 *Reitz*, 85 F.4th at 790 (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009)).

24 TEX. PENAL CODE § 38.15(a)(1).

25 *Id.* § 38.15(d). "Texas courts have recognized that merely arguing with police officers ... falls within the speech exception to section 38.15." *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007); *see also Carney v. State*, 31 S.W.3d 392, 398 (Tex. App.—Austin 2000, no pet.) (reversing conviction where no evidence that defendant touched officers or physically obstructed their entry into home).

26 *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (citing *Duncantell v. State*, 230 S.W.3d 835, 842 (Tex. App.—Hous. [14th Dist.] 2007, pet. ref'd); *Key v. State*, 88 S.W.3d 672, 676 (Tex. App.—Tyler 2002, pet. ref'd)).

27 *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). *See also Reitz*, 85 F.4th at 792 (alteration adopted) (quoting *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994)). " '[T]he objective reasonableness of the defendant officers' conduct goes to the question of whether [the plaintiff's] constitutional right [against being arrested absent probable cause] was violated, not the question of whether that right was clearly established under these particular circumstances.' This inquiry does not aim to 'add[ ] a standalone 'objective reasonableness' element to the Supreme Court's two-pronged test for qualified immunity.' " *Id.* (quoting *Baker v. Coburn*, 68 F.4th 240, 251 n.10 (5th Cir. 2023)).

28 *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 657 (5th Cir. 2004) (quoting *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001)).

29 *Id.*

30 *See Lyford*, 243 F.3d at 190.

31 *Reitz*, 85 F.4th at 792; *see also Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003).

32 *See Childers*, 848 F.3d at 415.

33 391 F.3d at 657.

34 *Id.*

35 728 F. App'x 307, 311 (5th Cir. 2018).

36 *Id.*

37 *Haggerty*, 391 F.3d at 657.

38    *Reitz*, 85 F.4th at 792.

39    U.S. CONST. amend. IV.

40    *Riley v. California*, 573 U.S. 373, 382, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).

41    *Id.*

42    *U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012) ("[A] plaintiff may not raise a new claim for the first time at the summary-judgment stage.").

43    *See Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007).

44    *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

45    *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018).

46    *Deville*, 567 F.3d at 167 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

47    *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

48    *Id.* at 396, 109 S.Ct. 1865 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

49    *Heien v. North Carolina*, 574 U.S. 54, 60–61, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

50    *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (internal quotation marks and citation omitted).

51    *Buehler*, 27 F.4th at 983 (quoting *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018)).

52    *Deville*, 567 F.3d at 167 (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

53    *See Good*, 601 F.3d at 397; *Scott*, 550 U.S. at 380–81, 127 S.Ct. 1769.

54    *See Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013). *Cf. Kokesh v. Curlee*, 14 F.4th 382, 409 (5th Cir. 2021) (Willett, J., dissenting) (arguing that officer was not entitled to summary judgment on qualified immunity where there were genuine disputes of material fact *and* plaintiff's constitutional rights were clearly established at the time of the arrest).

55  703 F.3d 757 (5th Cir. 2012).

56  *Id.* at 760.

57  *Id.* at 760–63.

58  *Id.* at 763–64.

59  The dissent suggests that we fail to view the evidence in the light most favorable to Bailey. However, considering the clear video evidence and the facts in Bailey's favor, Ramos's force consisted of placing an arm to Bailey's chest, placing both hands on Bailey's chest and pushing him, pulling Bailey's shirt, and grabbing Bailey's upper body and pushing him to the ground. None of these actions rise to the level of violence exhibited in *Newman* or in the other cases we distinguish below.

60  The only case Bailey cited in his reply brief is *Newman.* To be sure, we have recited many times that "[t]he plaintiff has the burden to point out clearly established law." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021). But we have never understood this burden to mean that we are artificially boxed in by only those cases cited in the plaintiff's brief. Indeed, as we recently observed in a qualified-immunity case, "this court is not restricted to analyzing the issues properly presented by the parties only on the authorities cited by the parties." *Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th Cir. 2022). The Supreme Court has similarly held that "[a] court engaging in review of a qualified-immunity judgment should ... use its full knowledge of its own and other relevant precedents." *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (alterations and internal quotation marks omitted). Nevertheless, our review of the caselaw shows that it was not clearly established at the time of Bailey's arrest that Ramos's takedown procedures were unlawful.

61  887 F.3d 710, 714 (5th Cir. 2018).

62  *Id.*

63  *Id.*

64  *See Buehler*, 27 F.4th at 987 (distinguishing *Richard* and finding qualified immunity because *Richard* "involved more severe and less appropriate uses of force" than used by the *Buehler* officers).

65  513 F.3d 492, 502 (5th Cir. 2008).

66  *Buehler*, 27 F.4th at 988 n.67. Though *Buehler* was decided after Bailey's arrest, several of the cases it cites were decided prior to Bailey's arrest in 2018.

67   868 F.3d 332 (5th Cir. 2017).

68   981 F.3d 319.

69   880 F.3d 722 (5th Cir. 2018).

70   *See Joseph*, 981 F.3d at 337 (citing *D.C. v. Wesby*, 583 U.S. 48, 64, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) (cleaned up)).

71   *Darden*, 880 F.3d at 725, 730–33.

72   *Joseph*, 981 F.3d at 340.

73   *Darden*, 880 F.3d at 733 (emphasis added).

74   *Id.* at 725.

75   *Trammell*, 868 F.3d at 337–38.

76   *Joseph*, 981 F.3d at 326–27.

77   *Darden*, 880 F.3d at 731–32.

78   *Id.* at 733.

79   *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015).

80   *See Pratt v. Harris County*, 822 F.3d 174, 178 (5th Cir. 2016) (finding use of force is not excessive against handcuffed suspect who is verbally and physically resisting).

81   *See Buehler*, 27 F.4th at 988 n.67 (collecting cases showing instances in which bringing suspect to the ground was neither excessive force nor unreasonable); *Childers*, 848 F.3d at 415 (holding that plaintiff's conduct moved beyond speech when he failed to follow the deputy's instruction to move his truck); *Deville*, 567 F.3d at 167 ("Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance.").

82   *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

83   *See Degenhardt v. Bintliff*, 117 F.4th 747, 758 (5th Cir. 2024).

84   848 F.3d 678 (5th Cir. 2017).

85   *Id.* at 688.

86   *Keenan*, 290 F.3d at 258.

87  *McLin v. Ard*, 866 F.3d 682, 697 (5th Cir. 2017) (quoting *Keenan*, 290 F.3d at 258).

88  *See Tompkins v. Vickers*, 26 F.3d 603, 608 (5th Cir. 1994).

89  *Id.* at 609.

90  *Gonzalez v. Trevino*, 602 U.S. 653, 144 S.Ct. 1663, 1665, 219 L.Ed.2d 332 (2024) (citing *Nieves v. Bartlett*, 587 U.S. 391, 402, 139 S.Ct. 1715, 204 L.Ed.2d 1 (2019)).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# *Childers v. Iglesias,*

848 F.3d 412  (5th Cir. 2017)

848 F.3d 412
United States Court of Appeals, Fifth Circuit.

Randy CHILDERS, Plaintiff–Appellant,
v.
Ed IGLESIAS; Anne Hollis,
Defendants–Appellees.

No. 16–10442
|
Filed February 9, 2017

**Synopsis**
**Background:** Arrestee brought § 1983 action in state court against sheriff's deputies for unlawful arrest arising out of his arrest after he failed to comply with deputy's request to move his truck. Deputies removed case to federal court. The United States District Court for the Northern District of Texas, Reed O'Connor, J., 2016 WL 1714888, granted deputies' motion to dismiss. Arrestee appealed.

**[Holding:]** The Court of Appeals, Edward C. Prado, Circuit Judge, held that a reasonable officer in deputies' position could have believed that there was a fair possibility that arrestee violated Texas statute prohibiting interference with a police officer's official duties.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (7)

**[1]** **Federal Courts** 🔑 Pleading
**Federal Courts** 🔑 Dismissal for failure to state a claim

The Court of Appeals reviews de novo a district court's dismissal for failure to state a claim, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff. Fed. R. Civ. P. 12(b)(6).

6 Cases that cite this headnote

**[2]** **Federal Civil Procedure** 🔑 Insufficiency in general

If a complaint has not set forth enough facts to state a claim to relief that is plausible on its face, it must be dismissed. Fed. R. Civ. P. 12(b)(6).

5 Cases that cite this headnote

**[3]** **Civil Rights** 🔑 Arrest, search, and detention

To survive a motion to dismiss a § 1983 action for false arrest, the plaintiff must allege facts that show the defendants lacked probable cause to arrest him. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[4]**    **Search, Seizure, and Arrest** 🖝 What constitutes probable cause in general

Probable cause to arrest exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. U.S. Const. Amend. 4.

18 Cases that cite this headnote

**[5]**    **Civil Rights** 🖝 Sheriffs, police, and other peace officers

Police officers are entitled to qualified immunity from a § 1983 action for false arrest if a reasonable officer in their position could have believed that, in light of the totality of the facts and circumstances of which they were aware, there was a fair probability that the arrestee committed an offense. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

10 Cases that cite this headnote

**[6]**    **Civil Rights** 🖝 Sheriffs, police, and other peace officers

A reasonable officer in the position of sheriff's deputies, who arrested arrestee for failure to comply with their instructions to move his truck, could have believed that there was a fair possibility that arrestee violated Texas statute prohibiting interference with a police officer's official duties, and thus deputies were entitled to qualified immunity in arrestee's § 1983 action against them for false arrest, where there was no question that arrestee had failed to comply with deputies' instruction, and Texas courts had found in the past that failure to comply with an officer's instructions under similar circumstances violated statute prohibiting interference with officer's official duties and that such failure to comply was not protected speech. U.S. Const. Amends. 1, 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15.

25 Cases that cite this headnote

**[7]**    **Federal Civil Procedure** 🖝 Matters deemed admitted; acceptance as true of allegations in complaint

On a motion to dismiss, the court must assume that the plaintiff's allegations are correct.

**\*413**  Appeal from the United States District Court for the Northern District of Texas, Reed Charles O'Connor, U.S. District Judge

**Attorneys and Law Firms**

Franklin W. Cram, Mansfield, TX, for Plaintiff–Appellant.

Stephen Robert Marsh, David Klosterboer & Associates, Richardson, TX, for Defendants–Appellees.

Before PRADO, HIGGINSON, and COSTA, Circuit Judges.

**Opinion**

EDWARD C. PRADO, Circuit Judge:

Plaintiff–Appellant Randy Childers brought suit against Defendants–Appellees Ed Iglesias and Anne Hollis for unlawful arrest under 42 U.S.C. § 1983. The district court granted the Defendants' motion to dismiss on the ground that Childers failed to allege a constitutional violation. For the reasons stated below, we AFFIRM.

# I. BACKGROUND

Childers owns a ranch in Parker County, Texas. On September 15, 2013, Childers went to his ranch to evict an individual whom he was allowing to stay there. After he arrived, he requested assistance from the Parker County Sheriff's Office. When Hollis and Iglesias, who are Parker County Deputy Sheriffs, arrived, Childers's truck was parked in front of the gate to the ranch. The Defendants parked their car in front of Childers's truck. Childers alleges that he was intending to leave the ranch at that point, but that the Defendants' parked car prevented him from leaving.

Childers then attempted to explain the situation to Hollis. While Childers was speaking with Hollis, Iglesias asked Childers to move his truck. Childers did not immediately comply; instead he "attempted to complete his explanation." Iglesias then placed Childers under arrest for interfering with the officers' duties. Childers alleges that the Defendants could have driven around his truck, and that Hollis agreed; Iglesias, however, did not believe he could drive around the truck.

Although the district attorney eventually dismissed the charge, Childers was held in jail for over twenty-four hours and incurred legal fees as a result of his arrest. Childers subsequently brought suit in state court under 42 U.S.C. § 1983, claiming that the Defendants arrested him without probable cause in violation of the Fourth Amendment. After removing the case to federal court, the Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The Defendants asserted qualified immunity and argued that Childers's allegations do not support a constitutional violation. The district court agreed and granted the Defendants' motion to dismiss. This appeal followed.

# II. DISCUSSION

**A. Standard of Review and Applicable Law**

 **[1]**  **[2]** We review de novo a district court's dismissal under Rule 12(b)(6), "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Hines v. Alldredge*, 783 F.3d 197, 201 (5th Cir.) (quoting *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009)), *cert. denied*, —— U.S. ——, 136 S.Ct. 534, 193 L.Ed.2d 426 (2015). "If the complaint has not set forth 'enough facts to state a claim to relief that is plausible on its

face,' it must be dismissed." *Id.*  **\*414** (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

 **[3]**    **[4]**    **[5]**   To survive a motion to dismiss, Childers must allege facts that show the Defendants lacked probable cause to arrest him. *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001). "Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.' " *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655–56 (5th Cir. 2004) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001)). Moreover, the Defendants are "entitled to qualified immunity if a reasonable officer in [their] position could have believed that, in light of the totality of the facts and circumstances of which [they were] aware, there was a fair probability" that Childers committed an offense—namely, interfering with a police officer's official duties. *Id.* at 656; *see also* Tex. Penal Code § 38.15 ("A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with ... a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law.").

## B. Analysis

 **[6]**  Childers principally argues that he did nothing to interfere with the Defendants' official duties. [1]  Although Childers concedes that he did not move his truck when Deputy Iglesias requested he do so, he contends that the Defendants could have driven around his

truck or simply walked past it to enter the ranch. Childers also argues that he merely attempted to explain the situation to the Defendants, which he suggests was protected speech under the First Amendment. *See City of Hous. v. Hill*, 482 U.S. 451, 462–63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (recognizing "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest").

Childers cites *Carney v. State*, 31 S.W.3d 392, 396 (Tex. App.—Austin 2000, no pet.), in support of his argument that he did not interfere with the Defendants' official duties. In *Carney*, the Texas Court of Appeals reversed a conviction under Texas Penal Code § 38.15 on the ground that the defendant's interference "consisted of speech only," which is a complete defense to a conviction under that statute. 31 S.W.3d at 395. Carney was trying to prevent police officers from entering his house to execute a search warrant. *Id.* at 397. The court found that the defendant did not physically block the officers from entering the house; he merely argued with the officers, thereby delaying their entry. *Id.* at 398. The court held that mere argument was insufficient to support a conviction under Texas Penal Code § 38.15. *Id.*

 **[7]**  The district court found that Childers's case is factually distinguishable from *Carney* because Childers's truck blocked the Defendants' entry to the property. Specifically, the district court inferred that because "Childers admits that the police were blocking his ability to exit the property, ... it follows that the officer's passage was also obstructed." This was improper fact-finding; on a motion to dismiss, we must assume that the plaintiff's

allegations are correct. *See Hines*, 783 F.3d at 201.

 **\*415** Even assuming that Childers's truck was not blocking the Defendants' entry, however, *Carney* is distinguishable based on the fact that Childers failed to move his truck when Deputy Iglesias instructed him to do so. This instruction was made within the scope of the official duty Deputy Iglesias was performing: trying to access the ranch through the gate that was indisputably located behind Childers's truck. Moreover, this instruction concerned the moving of Childers's truck rather than the content of his speech.[2] Thus, Childers did more than just argue with police officers; he failed to comply with an officer's instruction, made within the scope of the officer's official duty and pertaining to physical conduct rather than speech.

Texas courts have found that failure to comply with an officer's instructions under similar circumstances violates Texas Penal Code § 38.15 and is not protected speech. Specifically, several courts have affirmed convictions of defendants who failed to comply with an officer's instruction to move away from a crime scene.[3] *See Duncantell v. State,* 230 S.W.3d 835, 842 (Tex. App.—Hous. [14th Dist.] 2007, pet. ref'd) (finding that defendant violated Texas Penal Code § 38.15 by repeatedly disregarding officers' orders to stand away from crime scene); *Key v. State,*

88 S.W.3d 672, 676 (Tex. App.—Tyler 2002, pet. ref'd) (concluding that defendant "engaged in conduct other than speech in refusing to obey the directives of" a police officer to remain on the sidewalk, which the officer "believed was necessary to prevent [defendant] from assaulting" another individual). Likewise, this Court has held that failure to comply with a police officer's instruction to stand back is not protected speech and gives the officer probable cause to arrest under Texas Penal Code § 38.15. *See Haggerty*, 391 F.3d at 657 ("[W]hile Haggerty's relevant actions included speech, a reasonable officer could have believed that they were not *limited* to speech: Haggerty stepped forward toward [an officer] after having previously been warned to not interfere and was within relative proximity (10 to 15 feet away)."). Based on this precedent, a reasonable officer could have believed that there was a fair probability that Childers violated Texas Penal Code § 38.15 by failing to comply with Iglesias's instruction to move the truck.

### III. CONCLUSION

For the foregoing reasons, the district court's order of dismissal is AFFIRMED.

### All Citations

848 F.3d 412

---

## Footnotes

1    Childers neither alleges in his complaint nor argues on appeal that the Defendants were not performing duties authorized by law. Indeed, Childers himself requested police assistance at the ranch. Childers also neither alleges nor argues that he lacked the criminal negligence required by Texas Penal Code § 38.15.

2    Although Childers argues, correctly, that his attempt to explain the situation to the Defendants was protected speech, *see Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007), he does not argue that his refusal to move his truck was itself expressive conduct that might be protected by the First Amendment.

3    In an unpublished case, a Texas appellate court has extended this principle to failure to comply with an officer's instruction to move a tent. *Momentoff v. State*, No. 02–12–00335–CR, 2013 WL 5967107, at *7 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (holding that defendant's "act of standing in his tent and refusing to allow the officer to remove it did not constitute 'speech only' ").

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# *Buhler v. Dear*

27 F.4th 969 (5th Cir. 2025)

27 F.4th 969
United States Court of Appeals, Fifth Circuit.

Antonio BUEHLER, Plaintiff
—Appellee Cross-Appellant,

v.

Randy DEAR, in his individual and
official capacities, Aljoe Garibay, in
his individual and official capacities;
Wesley Devries, in his individual and
official capacities; Monika McCoy, in
her individual and official capacities,
Defendants—Appellants Cross-Appellees,
City of Austin, Quint Sebek, in his
individual and official capacities; John
Leo Coffey, in his individual and official
capacities; Ryan Adams, in his individual
and official capacities; Allen Hicks, in
his individual and official capacities; Reginald
Parker, in his individual and official
capacities, Defendants—Cross-Appellees.

No. 20-50822
|
FILED March 3, 2022

**Synopsis**
**Background:** Arrestee, who was arrested for
misdemeanor interference with performance of
official duties and resisting arrest, brought §
1983 action against city and police officers,
alleging false arrest and excessive force in
violation of the Fourth Amendment and
retaliation for the exercise of his First
Amendment right to film the police. The
United States District Court for the Western
District of Texas, David A. Ezra, Senior
District Judge, granted in part defendants'
motion to dismiss for failure to state a
claim, dismissing arrestee's municipal-liability,

bystander-liability, and First Amendment
claims, and, 2020 WL 5793008, granted
summary judgment to arresting officers
on false-arrest claim, but denied summary
judgment on excessive-force claim, and denied
arrestee's motion for reconsideration and
officers' motion to alter or amend judgment.
Officers filed interlocutory appeal, and arrestee
cross-appealed.

**Holdings:** The Court of Appeals, Willett,
Circuit Judge, held that:

[1] alleged injuries to arrestee satisfied
requirement of "some injury" necessary to state
claim for excessive force;

[2] limited extent of arrestee's injuries
supported determination that use of force was
not unreasonable under Fourth Amendment;

[3] factor of severity of offense supported
finding that use of force was unreasonable;

[4] conduct of officer who held arrestees' legs
was not excessive force;

[5] conduct of officers who took arrestee to
ground was not excessive force;

[6] alleged inaccuracies in officer's affidavit did
not taint arrest warrant, and thus taint exception
to independent-intermediary doctrine did not
apply;

[7] officers had probable cause to arrest for
interference with peace officers' official duties;
and

[8] arrestee did not have clearly established First Amendment right to videotape officers, thus entitling officers to qualified immunity on First-Amendment retaliation claim.

Affirmed in part, reversed and rendered in part.

**Procedural Posture(s):** Interlocutory Appeal; Motion to Dismiss for Failure to State a Claim; Motion for Summary Judgment.

West Headnotes (61)

[1] **Federal Courts** 👈 Failure to mention or inadequacy of treatment of error in appellate briefs

Arrestee abandoned any issue relating to district court's dismissal of claim that detective violated constitution by inadequately investigating circumstances of his arrest, which he asserted was effected without probable cause and with excessive force, on appeal of grant of motion to dismiss for failure to state a claim in § 1983 action, where none of arrestee's appellate briefing challenged or even mentioned dismissal of detective as defendant. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

[2] **Federal Courts** 👈 As to immunity

Notwithstanding general rule that only final judgments are immediately appealable, denial of summary judgment on qualified

immunity grounds is immediately appealable under collateral order doctrine.

2 Cases that cite this headnote

[3] **Federal Courts** 👈 Pleading
**Federal Courts** 👈 Summary judgment

Court of Appeals reviews dismissals for failure to state a claim and for summary judgment de novo. Fed. R. Civ. P. 12(b)(6), 56(a).

[4] **Federal Civil Procedure** 👈 Insufficiency in general
**Federal Civil Procedure** 👈 Matters deemed admitted; acceptance as true of allegations in complaint

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

[5] **Federal Courts** 👈 Immunity

On interlocutory appeal from order denying qualified immunity on summary judgment, Court of Appeals reviews de novo district court's legal determinations as to materiality of factual disputes, but lacks jurisdiction to review its

determinations that factual disputes are genuine.

2 Cases that cite this headnote

[6] **Federal Courts** Summary judgment

Although Court of Appeals reviews evidence in light most favorable to nonmoving party on appeal from district court's disposition of summary judgment motion, the Court assigns greater weight, even at summary judgment stage, to facts evident from video recordings taken at the scene; the Court is not required to accept factual allegations that are blatantly contradicted by such evidence, but instead views the facts in the light depicted by the videotape.

9 Cases that cite this headnote

[7] **Civil Rights** Government Agencies and Officers

**Civil Rights** Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To deny qualified immunity at the summary judgment stage, a district court must answer "yes" to two questions; if the court finds that the alleged conduct amounts to a constitutional violation, then it must also determine whether the right was clearly established at the time of the conduct.

7 Cases that cite this headnote

[8] **Federal Courts** Altering, amending, modifying, or vacating judgment or order; proceedings after judgment

Court of Appeals generally reviews a decision on a motion to alter or amend judgment for abuse of discretion, except to the extent that the decision was based on a question of law, in which case the standard of review is de novo.

[9] **Search, Seizure, and Arrest** Reasonableness in general; objective or subjective test

Fourth Amendment prohibits police from using more force than is reasonably necessary to effect arrest. U.S. Const. Amend. 4.

3 Cases that cite this headnote

[10] **Search, Seizure, and Arrest** Use of Force During Arrests

Right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. U.S. Const. Amend. 4.

**[11]**   **Search, Seizure, and Arrest** ⚷ Application of Fourth Amendment and state equivalents

**Search, Seizure, and Arrest** ⚷ Reasonableness in general; objective or subjective test

Plaintiff arguing that public official has used excessive force in violation of Fourth Amendment in making an arrest must show: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. U.S. Const. Amend. 4.

22 Cases that cite this headnote

**[12]**   **Search, Seizure, and Arrest** ⚷ Reasonableness in general; objective or subjective test

Test of reasonableness under Fourth Amendment in using force in making an arrest is not capable of mechanical application, but instead requires careful attention to each case's facts. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[13]**   **Search, Seizure, and Arrest** ⚷ Reasonableness in general; objective or subjective test

Among the considerations that inform the need for force in making an arrest are: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting or attempting to evade arrest. U.S. Const. Amend. 4.

9 Cases that cite this headnote

**[14]**   **Search, Seizure, and Arrest** ⚷ Reasonableness in general; objective or subjective test

Touchstone of court's inquiry in whether a public official used excessive force in effecting an arrest is simply the reasonableness of the force employed. U.S. Const. Amend. 4.

5 Cases that cite this headnote

**[15]**   **Search, Seizure, and Arrest** ⚷ Reasonableness in general; objective or subjective test

To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of officials in using force during an arrest, giving them fair leeway for enforcing the law in the community's protection. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[16]**   **Search, Seizure, and Arrest** ⚷ Application of Fourth Amendment and state equivalents

Not every push or shove by a public official during an arrest, even if it may later seem unnecessary in peace

of judge's chambers, violates Fourth Amendment. U.S. Const. Amend. 4.

2 Cases that cite this headnote

[17]   **Civil Rights**  Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

"Qualified immunity" shields public officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.

10 Cases that cite this headnote

[18]   **Civil Rights**  Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Plaintiff has the burden of showing that the unlawfulness of the defendant's conduct was clearly established at the time it occurred to overcome qualified immunity.

5 Cases that cite this headnote

[19]   **Civil Rights**  Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Although the plaintiff need not identify a case directly on point in order to show the unlawfulness of

the defendant's conduct was clearly established at the time it occurred, as required to overcome qualified immunity, he or she must point to authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.

3 Cases that cite this headnote

[20]   **Civil Rights**  Sheriffs, police, and other peace officers

Qualified immunity analysis in excessive force case involves two distinct reasonableness inquiries: one is whether officer's use of force was objectively reasonable in light of Fourth Amendment standards; the other is whether right was clearly established such that reasonable officer would know that particular level of force used was excessive. U.S. Const. Amend. 4.

12 Cases that cite this headnote

[21]   **Civil Rights**  Government Agencies and Officers
       **Civil Rights**  Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Court of Appeals is free to decide which of the two prongs of the qualified immunity analysis to address first, namely, whether there was a violation of a constitutional

right, and whether the right at issue
was clearly established.

6 Cases that cite this headnote

[22]   **Civil Rights** ☞ Government
Agencies and Officers
**Civil Rights** ☞ Good faith and
reasonableness; knowledge and
clarity of law; motive and intent, in
general

Although the Court of Appeals
may "leapfrog" the first prong
of qualified immunity analysis,
asking whether there was violation
of a constitutional right, and
resolve cases solely on the basis
that defendants' conduct—even if
unlawful—did not violate clearly
established law, it is better to address
both steps in order to provide clarity
and guidance for officers and courts.

6 Cases that cite this headnote

[23]   **Search, Seizure, and
Arrest** ☞ Reasonableness in
general; objective or subjective test

For a plaintiff to state a claim for
excessive use of force in violation
of the Fourth Amendment, the
plaintiff's asserted injury must be
more than de minimis. U.S. Const.
Amend. 4.

15 Cases that cite this headnote

[24]   **Search, Seizure, and
Arrest** ☞ Use of Force During
Arrests

Alleged injuries to arrestee of
abrasions to his face, bruises
to his head, and self-reported
mental trauma, while minor, satisfied
requirement of "some injury"
necessary to state claim for excessive
force against arresting officers, in
violation of Fourth Amendment, in §
1983 action. U.S. Const. Amend. 4;
42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[25]   **Search, Seizure, and
Arrest** ☞ Use of Force

Amount of injury necessary to satisfy
requirement of "some injury," as
required to state claim for excessive
force, is directly related to amount
of force that is constitutionally
permissible under circumstances; as
long as plaintiff has suffered some
injury, even relatively insignificant
injuries and purely psychological
injuries will prove cognizable when
resulting from officer's unreasonably
excessive force. U.S. Const. Amend.
4.

18 Cases that cite this headnote

[26]   **Search, Seizure, and
Arrest** ☞ Use of Force

As long as a plaintiff has
suffered some injury, even relatively

insignificant injuries and purely psychological injuries will prove cognizable under the Fourth Amendment when resulting from an officer's unreasonably excessive force. U.S. Const. Amend. 4.

11 Cases that cite this headnote

**[27]** **Search, Seizure, and Arrest** 🔑 Particular cases in general

Limited extent of arrestee's injuries supported determination that police officers' use of force in taking arrestee to the ground was reasonable and not excessive force; photographs taken of arrestee's face immediately after the incident revealed that any lacerations he suffered were so minor as to be essentially invisible, security camera footage of arrestee's booking at county jail showed him moving around comfortably with no signs of physical injury or mental distress, and arrestee admitted that he did not physically suffer anything beyond bruising and pain for which he did not seek any medical attention while in jail or day of release. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[28]** **Search, Seizure, and Arrest** 🔑 Reasonableness in general; objective or subjective test

On an excessive-force claim, a reviewing court should consider the seriousness of the alleged injuries in determining whether the officer's conduct in effecting an arrest was objectively reasonable under the Fourth Amendment. U.S. Const. Amend. 4.

**[29]** **Federal Courts** 🔑 Matters or evidence considered

Where district court does not set out factual basis underlying its legal determinations related to claim of qualified immunity, Court of Appeals, even in interlocutory appeal, may review record to determine what facts district court assumed.

1 Case that cites this headnote

**[30]** **Search, Seizure, and Arrest** 🔑 Particular cases in general

Arrestee's self-reported mental suffering was entitled to little weight, in determining whether police officers' use of force in taking arrestee to the ground and holding him there during time it took to handcuff him was reasonable under Fourth Amendment and not excessive force, where arrestee spent fewer than 45 seconds on the ground while officers handcuffed him. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[31]** **Search, Seizure, and Arrest** 🔑 Physical contact; chokehold

Factor of severity of offense supported finding that force used by four police officers in taking arrestee to the ground, resulting in abrasions to his face and bruises to his head, was unreasonable under the Fourth Amendment, where arrestee was bring arrested for interfering with peace officers' official duties under Texas law, which was minor offense. U.S. Const. Amend. 4; Tex. Penal Code Ann. § 38.15(a)(1).

1 Case that cites this headnote

**[32]** **Civil Rights** 🔑 Arrest and detention

Excessive-force and false-arrest claims are separate and distinct, such that an excessive force claim must be analyzed without regard to whether the arrest itself was justified. U.S. Const. Amend. 4.

3 Cases that cite this headnote

**[33]** **Civil Rights** 🔑 Sheriffs, police, and other peace officers

In considering whether officer is entitled to qualified immunity, the court must measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts. U.S. Const. Amend. 4.

4 Cases that cite this headnote

**[34]** **Search, Seizure, and Arrest** 🔑 Physical contact; chokehold

Officers could reasonably have believed that arrestee was resisting arrest by turning to walk away rather than complying with their orders, and by lurching forward when officer grabbed his wrists from behind in effort to restrain him, as factor in supporting determination that force used when officers took arrestee to ground, resulting in abrasions to his face and bruises to his head, was reasonable under Fourth Amendment and not excessive force; after officer told arrestee to turn around and informed him that he was under arrest, arrestee turned his back on officers and began to walk away, and, while arrestee's jerking motion was probably attempt to hand off device with which he had been recording police, officers likely thought sudden motion was effort to break free. U.S. Const. Amend. 4; Tex. Penal Code Ann. § 38.03(a).

1 Case that cites this headnote

**[35]** **Search, Seizure, and Arrest** 🔑 Reasonableness in general; objective or subjective test

Reasonableness of a particular use of force by an officer in making an arrest must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[36]** **Search, Seizure, and Arrest** ⟜ Physical contact; chokehold

Force used by arresting officers involved measured and ascending responses to arrestee's noncompliance, as would support determination that officers' use of force when they took arrestee to ground, resulting in abrasions to his face and bruises to his head, was reasonable under Fourth Amendment and not excessive force; prior to arrest, arrestee had relentlessly followed officers around for hours, disobeying their repeated and unambiguous commands that he step back at least an arm's length away so as not to block officers' field of vision. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[37]** **Search, Seizure, and Arrest** ⟜ Reasonableness in general; objective or subjective test

One consideration bearing upon the reasonableness of an arresting officer's use of force is whether it involved measured and ascending responses to a suspect's

noncompliance. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[38]** **Search, Seizure, and Arrest** ⟜ Physical contact; chokehold

**Search, Seizure, and Arrest** ⟜ Handcuffs

Conduct of police officer, who placed her knee on arrestee's legs to hold them still while he was handcuffed during arrest undertaken by multiple officers, did not constitute excessive force in violation of the Fourth Amendment, since any contribution by officer to arrestee's injuries, namely, abrasions to his face, bruises to his head, and self-reported mental trauma, was de minimis. U.S. Const. Amend. 4.

**[39]** **Civil Rights** ⟜ Sheriffs, police, and other peace officers

Where excessive-force claims are brought against multiple officers in connection with a single arrest, a reviewing court must analyze the officers' actions separately in determining whether they are entitled to qualified immunity. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[40]** **Search, Seizure, and Arrest** 👉 Physical contact; chokehold

**Search, Seizure, and Arrest** 👉 Handcuffs

Conduct of police officers, who took arrestee to the ground and held him there face-down for as long as it took to handcuff him, resulting in abrasions to his face and abrasions to his face, did not constitute excessive force in violation of the Fourth Amendment; while arrestee was being arrested for interference with peace officers' official duties, which was not serious offense, and he did not pose obvious danger to officers or passersby, arrestee's conduct in turning to walk away and making jerking motion amounted to mild resistance to arrest, officers used gradually ascending means of attempting to gain control of situation before resorting to force, and arrestee's injuries were minimal. U.S. Const. Amend. 4; Tex. Penal Code Ann. §§ 38.03(a), 38.15(a)(1).

**[41]** **Civil Rights** 👉 Sheriffs, police, and other peace officers

The extent of an injury is an element of an excessive force claim that must be clearly established in the qualified immunity analysis. U.S. Const. Amend. 4.

4 Cases that cite this headnote

**[42]** **Civil Rights** 👉 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

In determining what constitutes clearly established law for qualified immunity purposes, Court of Appeals first looks to Supreme Court precedent and then to its own, but if there is no directly controlling authority, the Court of Appeals may rely on decisions from other circuits to extent they have reached consensus on issue.

**[43]** **Civil Rights** 👉 Arrest and detention

Bystander liability under § 1983 arises only where the plaintiff can allege and prove another officer's use of excessive force in making an arrest. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[44]** **Civil Rights** 👉 Governmental Ordinance, Policy, Practice, or Custom

**Conspiracy** 👉 Existence of independent claim; necessity of and relationship to underlying right or violation

Conspiracy and municipal-liability claims under § 1983 both require the plaintiff to point to an underlying

violation of his or her constitutional rights. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

---

**[45] Civil Rights** 🔑 **Arrest and detention**

"Independent intermediary doctrine" holds that if facts supporting an arrest are placed before an independent intermediary such as a magistrate, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party, even if the warrant application was sought and granted after the arrest took place. U.S. Const. Amend. 4.

2 Cases that cite this headnote

---

**[46] Civil Rights** 🔑 **Arrest and detention**

Under the "taint" exception to the independent-intermediary doctrine, arrest warrants do not insulate arresting officers from false-arrest liability if their own false and misleading affidavits tainted the magistrate's deliberations. U.S. Const. Amend. 4.

2 Cases that cite this headnote

---

**[47] Federal Courts** 🔑 **Summary judgment**

**Summary Judgment** 🔑 **Response or Other Opposition**

Party opposing summary judgment motion must inform trial judge

of reasons, legal or factual, why summary judgment should not be entered; if it does not do so, it cannot raise such reasons on appeal.

---

**[48] Federal Courts** 🔑 **Summary judgment**

It is not enough to merely mention or allude to a legal theory in order to raise an argument in opposition to summary judgment, as required for the issue to be considered on appeal; rather, a party must press its claims, which entails clearly identifying a theory as a proposed basis for deciding the case.

---

**[49] Search, Seizure, and Arrest** 🔑 **Necessity in general**

A false-arrest claim does not cast its primary focus on the validity of each individual charge; if there was probable cause for any of the charges, then the arrest was supported by probable cause, and the claim for false arrest fails. U.S. Const. Amend. 4.

5 Cases that cite this headnote

---

**[50] Federal Courts** 🔑 **Mode and sufficiency of presentation**

Court of Appeals will typically not consider an issue or a new argument raised for the first time in a motion for reconsideration in the district court.

**[51]   Federal Courts** 🗝 Summary
judgment

Arrestee forfeited opportunity to
rely on alleged inaccuracies in
police officer's affidavits supporting
magistrate's approval of arrest
warrants as basis for application
of "taint" exception to independent-
intermediary doctrine, on appeal
of grant of summary judgment in
favor of officers on false-arrest
claims, where arrestee did not raise
those alleged inaccuracies to district
court's attention. U.S. Const. Amend.
4.

**[52]   Civil Rights** 🗝 Arrest and
detention

Alleged misrepresentations in
police officer's affidavit supporting
issuance of arrest warrant for
resisting arrest under Texas law,
including that officer falsely claimed
that arrestee tried to put his arm
underneath himself while being
held face-down during arrest, did
not taint arrest warrant, and thus
did not support application of
"taint" exception to independent-
intermediary doctrine insulating
officers from false arrest claim,
where affidavit's claims to which
arrestee objected either were
substantially accurate, were not
material to magistrate's findings of
probable cause, or were merely

different interpretations of events on
which there was plainly room to
disagree. U.S. Const. Amend. 4; Tex.
Penal Code Ann. § 38.03(a).

3 Cases that cite this headnote

**[53]   Civil Rights** 🗝 Arrest and
detention

An affiant's presentation of one
plausible version of disputed facts to
the magistrate judge does not taint
the resulting warrant, for purposes
of the "taint" exception to the
independent-intermediary doctrine
that would insulate officers from
false-arrest claim.

3 Cases that cite this headnote

**[54]   Search, Seizure, and
Arrest** 🗝 Obstructing justice,
bribery, and perjury

Police officers had probable cause to
arrest suspect, who was videotaping
officers, for interfering with peace
officers' official duties under Texas
law, where suspect refused to obey
officers' repeated and unambiguous
warnings to step back to at least
an arm's length away so as not to
interfere with officers' official duties
by blocking their field of vision. U.S.
Const. Amend. 4; Tex. Penal Code
Ann. § 38.15(a)(1).

3 Cases that cite this headnote

[55]  **Civil Rights**  🔑  Sheriffs, police, and other peace officers

Arrestee did not have clearly established right under First Amendment to publicly film police at time of his arrest for interfering with peace officers' official duties, and thus officers were entitled to qualified immunity as to arrestee's First Amendment retaliation claim in § 1983 action. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[56]  **Constitutional Law**  🔑  Interaction with public safety officials

First Amendment guarantees, subject to reasonable limitations, a right to publicly film police. U.S. Const. Amend. 1.

2 Cases that cite this headnote

[57]  **Civil Rights**  🔑  Governmental Ordinance, Policy, Practice, or Custom

A policy, practice, or custom claim under § 1983 against a municipality cannot proceed unless the plaintiff has suffered an underlying constitutional violation. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[58]  **Civil Rights**  🔑  Municipalities and counties and their officers

Municipalities are not entitled to qualified immunity from a § 1983 claim. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[59]  **Civil Rights**  🔑  Municipalities and counties and their officers

A municipality may still be liable under § 1983 if a plaintiff states a claim against an official but the official is protected by qualified immunity. 42 U.S.C.A. § 1983.

[60]  **Federal Courts**  🔑  Theory and Grounds of Decision of Lower Court

Court of Appeals may affirm a district court's dismissal for failure to state a claim on any grounds supported by the record. Fed. R. Civ. P. 12(b)(6).

1 Case that cites this headnote

[61]  **Constitutional Law**  🔑  Arrest

A plaintiff pressing a First Amendment retaliatory arrest claim must plead and prove the absence of probable cause for the arrest, though an exception exists when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been. U.S. Const. Amends. 1, 4.

4 Cases that cite this headnote

**\*976** Appeal from the United States District Court for the Western District of Texas, USDC 1:17-CV-724, David A. Ezra, U.S. District Judge

**Attorneys and Law Firms**

Daphne L. Silverman, Silverman Law Group, Austin, TX, for Plaintiff—Appellee Cross-Appellant.

Amanda Garrett Taylor, Butler Snow, L.L.P., Ridgeland, MS, Marshall Ayres Bowen, Butler Snow, L.L.P., Austin, TX, for Defendants—Appellants Cross-Appellees.

Before Clement, Southwick, and Willett, Circuit Judges.

**Opinion**

Don R. Willett, Circuit Judge:

This appeal concerns the line between filming the police, which is legal, and hindering the police, which is not. Without question, video footage plays a major role in exposing incidents of police brutality. The ubiquity of smartphone cameras has made eyewitnesses of us all; as smartphones proliferate, so do recordings of police interactions (some commendable, others condemnable). The rub is figuring out when filming veers from documenting to interfering. For example, how far away should a citizen-videographer be so as not to get in the way? How close is "too close" such that the filming, however well-intentioned, becomes hazardous, diverting officers' attention and impeding their ability to perform their duties in fast-moving, highly charged situations?

In the wee hours of August 2, 2015, Antonio Buehler, a police-accountability activist, was arrested on crowded Sixth Street in downtown Austin while "cop watching" (video-recording police activity). Buehler insists he was just filming; the officers insist he was interfering. In short, Buehler and the officers had repeated verbal confrontations about how close to them he was permitted to stand while recording. The bickering escalated, with Buehler ultimately arrested for misdemeanor interference with performance of official duties. Four Austin police officers took Buehler to the ground and handcuffed him, with Buehler suffering minor bruises and lesions as a result.

Buehler brought various constitutional claims against the City of Austin and nine officers of the Austin Police Department. Buehler alleged false arrest and excessive force in violation of the Fourth Amendment and retaliation for the exercise of his First Amendment right to film the police. The district court ruled mostly for the Defendants, but not fully. It dismissed **\*977** Buehler's municipal-liability and First Amendment claims and granted summary judgment to the individual Defendants on Buehler's false-arrest claim, while denying summary judgment on his excessive-force claim. Defendants filed this interlocutory appeal of the partial denial of their summary judgment motion, and Buehler cross-appealed the district court's unfavorable rulings of all but his excessive-force claim.

We hold that none of the officers involved in Buehler's arrest used excessive force in violation of the Fourth Amendment. We also conclude that summary judgment for the officers on Buehler's false-arrest claim was proper; the officers were entitled to qualified immunity on Buehler's First Amendment claim; and Buehler's bystander- and municipal-liability claims fail for lack of an underlying constitutional violation. Accordingly, we REVERSE the district court's denial of summary judgment as to Buehler's excessive-force claim and AFFIRM the district court in all other respects.

I

Cross-Appellant Antonio Buehler leads the Peaceful Streets Project (PSP), a watchdog organization with the stated mission of holding police accountable for official misconduct. In the early morning hours of August 2, 2015, Buehler and several other PSP members were cop watching in downtown Austin. Buehler regularly filmed the Austin police, and many officers were familiar with him. In footage taken by Buehler, Officer Randy Dear can be seen talking to a passerby while Buehler films the encounter. Afterwards, Dear turns away, at which point Buehler shouts at Dear to get his attention and then begins arguing with Dear about the extent of Buehler's right to film the police. Buehler repeatedly interrupts Dear's answers to questions, and Dear tries several times to walk away while Buehler follows with his camera. Towards the end of the clip, Buehler can be heard saying, "I'm going after Dear. F***ing pigs. I hate pigs."

Other footage shows that, as of around 1:30 a.m., Buehler was standing next to a group of police officers standing in the middle of Sixth Street. Buehler is positioned extremely close to (though not physically touching) Officer Dear, and the two can be heard arguing contentiously from time to time. Officers Garibay and DeVries also can be seen arguing with Buehler about whether he was maintaining a sufficient distance while filming. In footage taken by Buehler, Dear can be seen turning to Buehler and telling him, "just going to let y'all know, the next time we go to a disturbance and y'all get in the way .... The next time you're interfering, you're going to be arrested." As he walks away from Buehler, Dear then adds, "You've been warned, sir." Buehler follows him briefly before pointing his camera at the other officers and asking several times, "What does that mean? Can you explain that?" Officer Sebek responds, "arm's length, please. Arm's length, please." Footage taken from another angle shows that Buehler continued to stand closer to the officers than an arm's length away (certainly no more than two feet, and probably no more than one).

After nearly two minutes pass with little movement by the officers or Buehler, Dear turns to Buehler to give further orders, telling Buehler, "you're interfering with my space here so I can monitor the crowd," and, "I'm going to ask you one more time." Buehler then takes several steps and pivots such that he is directly facing Dear, but standing about the same distance away. A few seconds later, Dear tells Buehler, "Go ahead and turn around, sir. Go ahead and turn around," and "You're under arrest." While Dear is giving **\*978** these orders, Buehler begins taking steps backward

away from the officers, even as Dear is walking forward towards Buehler. Buehler then turns his back on the officers and takes one or two additional steps away from them. Officer Garibay grabs Buehler's wrists from behind in an attempt to restrain him. Footage of the incident taken at ground level appears to show Buehler taking another step after being grabbed, lurching forward as Garibay attempts to make the arrest, though aerial ("x") footage taken by an APD camera suggests that Buehler's sudden motion was most likely an attempt to throw the device with which he was filming to someone else so as to preserve his footage. At that point, Dear, Garibay, and DeVries take Buehler to the ground and hold him in a prone position while placing him in handcuffs. Officer McCoy also ran to assist after Buehler was taken down, holding Buehler's legs still while the other officers carry out the arrest. Buehler remained on the ground for between 40 and 45 seconds.

Afterwards, the officers took him to the Travis County jail and booked him for misdemeanor interference with official duties and resisting arrest. Buehler claims to have suffered mental pain, bruises on his tricep and head, and abrasions to his face as a result of the arrest (though any facial injuries he suffered were apparently not serious enough to be visible in photographs of him taken soon after the incident).

\* \* \*

**[1]**  In August 2017, Buehler sued the City of Austin and nine APD officers (Dear, Garibay, DeVries, McCoy, Sebek, Coffey, Adam, Hicks, and Parker[1]) under 42 U.S.C. § 1983, alleging

false arrest and excessive force in violation of the Fourth Amendment, and retaliation for exercise of his First Amendment right to film police. Buehler also brought municipal-liability claims against the City and bystander-liability claims against the officers not directly involved in his arrest. Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The district court granted Defendants' motion in part, holding that they were entitled to qualified immunity on the First Amendment claim; and that Buehler had failed to state claims for either bystander- or municipal-liability, or for excessive force against Defendants Coffey, Sebek, Hicks, or Adam. But the district court denied Defendants' 12(b)(6) motion as to Buehler's false-arrest and excessive-force claims against the four officers who participated in his arrest (Dear, Garibay, DeVries, and McCoy, hereinafter "Officers").[2]

**[2]**  The arresting Officers subsequently moved for summary judgment on Buehler's remaining claims. The district court granted the Officers' motion as to the false-arrest claim but held that Buehler had established a genuine dispute of material fact as to whether they were entitled to qualified immunity on the excessive-force claim, thus precluding summary judgment.[3] The district court subsequently **\*979** denied both Buehler's motion for reconsideration and the Officers' motion to alter or amend judgment. The Officers then filed this interlocutory appeal of the denial of summary judgment on the excessive-force claim, and the district court granted Buehler's request for certification of partial final judgment so that he could cross-appeal that court's judgment in all other respects.[4]

## II

**[3]**   **[4]** The standards of review governing Buehler's cross-appealed claims are straightforward. He appeals the dismissals of his First Amendment and municipal-liability claims, as well as the grant of summary judgment to Defendants on his false-arrest claim. We review both de novo.[5] "To survive a [12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[6] And a motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."[7]

**[5]** A different standard, however, governs the Officers' interlocutory appeal. On interlocutory appeal from an order denying qualified immunity, we review de novo the district court's legal determinations as to the materiality of factual disputes, but lack jurisdiction to review its determinations that factual disputes are "genuine."[8] The distinction between permissible "materiality" review and impermissible "genuineness" review can be hazy in practice, but in this case, the parties agree that the facts are not in question. The issue presented by the Officers' interlocutory appeal is simply "whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment."[9]

**[6]** It is also noteworthy for purposes of appellate review that the record here includes extensive video evidence of Buehler's arrest and the events leading up to it from several different angles. "Although we review evidence in the light most favorable to the nonmoving party" on appeal from a district court's disposition of a summary-judgment motion, "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene."[10] "[W]e are not required to accept factual allegations that are 'blatantly contradicted' " by such evidence.[11] Instead, we "view[ ] the facts in **\*980** the light depicted by the videotape."[12]

## A

**[7]**   **[8]** We begin by considering the question presented by the Officers' interlocutory appeal—namely, whether Dear, Garibay, DeVries, and McCoy (the four APD officers involved in Buehler's arrest) were entitled to summary judgment on his excessive-force claim. The Officers moved for summary judgment on the ground that their use of force in arresting Buehler did not violate the Fourth Amendment or, in the alternative, that they were at least entitled to qualified immunity on this issue. The district court denied the motion, finding that genuine disputes of material fact existed as to whether the Officers had used excessive force or were protected by qualified immunity. As we explain below, we disagree.[13]

**[9]**   **[10]** *Governing Law.* The Fourth Amendment prohibits police from using more

force than is reasonably necessary to effect an arrest. [14] As one American court admonished 180 years ago, "[a] person having authority to arrest another must do it peaceably, and with as little violence as the case will admit of.... [I]f resisted he may use force sufficient to effect his purpose; but if no resistance be offered or attempt at escape, he has no right rudely and with violence, to seize and collar his prisoner." [15] Nevertheless, it is hornbook law that "the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat **\*981** thereof to effect it." [16]

[11] [12] [13] [14] [15] [16] A plaintiff arguing that a public official has used excessive force in violation of the Fourth Amendment thus "must show: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." [17] " 'The test of reasonableness under the Fourth Amendment is not capable of ... mechanical application,' " but instead "requires careful attention" to each case's facts. [18] Among the "considerations that inform the need for force: [are] (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting ... or attempting to evade arrest." [19] Still, at the end of the day, the touchstone of our inquiry is simply the reasonableness of the force employed. " 'To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of ... officials, giving them " 'fair leeway for enforcing the law in the community's protection.' " ' "

" [20] " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." [21]

[17] [18] [19] [20] In addition, even if the Officers violated the Fourth Amendment, Buehler's claims against them cannot proceed unless he overcomes qualified immunity, which shields officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." [22] The plaintiff has the burden of showing that the unlawfulness of the defendant's conduct was clearly established at the time it occurred. [23] Although the plaintiff need not identify "a case *directly* on point" in order to make such a showing, he or she must point to "authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." [24] "[T]he qualified immunity analysis in an excessive force case" such as this one "involves two distinct reasonableness inquiries. One is whether the officer's use of force was objectively reasonable in light of Fourth Amendment standards. The other is whether the right was clearly established such that a reasonable officer would know that the particular level of force used was excessive." [25]

[21] [22] The Supreme Court formerly "mandated a two-step sequence" for resolving **\*982** qualified immunity claims: "First, a court [had to] decide whether the facts ... alleged ... make out a violation of a constitutional right. Second, if the plaintiff ...

satisfied this first step, the court [had to] decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." [26] Today, however, "[c]ourts of appeal are free to decide which of the two prongs of the qualified immunity analysis to address first." [27] Moreover, although we now may also "leapfrog" the first prong and resolve cases solely on the basis that defendants' conduct—even if unlawful—did not violate clearly established law, "we think it better to address both steps in order to provide clarity and guidance for officers and courts." [28]

\* \* \*

**[23]** *Application.* The Officers first argue that Buehler's excessive-force theory fails as a matter of law because his injuries were too minor. It is true that, "[t]o state a claim for excessive use of force, the plaintiff's asserted injury must be more than *de minimis.*" [29] We have tossed out an excessive-force allegation where, for example, "the most substantial injury claimed by [the arrestee] [wa]s that she suffered bruising on her wrists and arms because the handcuffs were applied too tightly," reasoning that "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force." [30]

**[24]**  **[25]**  **[26]** Nevertheless, the injury requirement is a sliding scale, not a hard cutoff. "[T]he amount of injury necessary to satisfy [the] requirement of 'some injury' ... is directly related to the amount of force that is constitutionally permissible under the circumstances." [31]  "[A]s long as a plaintiff

has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." [32] Here, Buehler suffered abrasions to his face, as well as bruises on his tricep and head, as a result of the arrest. He also alleges that the incident caused him mental trauma. We therefore conclude that Buehler's injuries, while minor, are not so minor that his excessive-force claim necessarily fails as a matter of law.

**[27]**  **[28]**  **[29]** Still, a reviewing court "should ... consider the seriousness of the alleged injuries in determining whether the officer's conduct was objectively reasonable." [33] The district court determined that Buehler had produced enough evidence that "a reasonable jury could conclude that [he] had suffered an injury as a result of his arrest." [34] As for the *extent* of the alleged bruises, abrasions, and mental pain, the district court remarked only that Buehler's "injuries appear relatively minor" and "are **\*983** the type that the Fifth Circuit has held to be *de minimis.*" [35] We agree. By consulting the largely undisputed evidence in the record that relates to this issue, [36] we conclude that Buehler's injuries are properly characterized as "minor" for purposes of excessive-force analysis. Photographs taken of Buehler's face immediately after the incident reveal that any lacerations he suffered were so minor as to be essentially invisible. The security camera footage of Buehler's booking at the Travis County Jail show him moving around comfortably with no signs of physical injury or mental distress. What is more, Buehler

admitted in his deposition that he did not physically suffer "anything beyond ... bruising and pain," for which he did not seek medical attention while in jail or the day he was released (and apparently was never prescribed any treatment except "self-care" and "ibuprofen or something"). The limited extent of Buehler's injuries tends to support the Officers' argument that they acted reasonably.

[30]  Moreover, we believe Buehler's self-reported mental suffering is entitled to relatively little weight in our Fourth Amendment reasonableness analysis, given that we have noted in another case that "any non-physical injury [the plaintiff-arrestee] may have suffered due to the time spent handcuffed lasted at most 20 seconds and was therefore *de minimis*," and thus supported the ultimate conclusion that the arresting officer's use of force in that case did not violate the Fourth Amendment. [37]  That reasoning applies with almost as much force here, as Buehler spent fewer than 45 seconds on the ground while the Officers handcuffed him. Indeed, we have rejected similar attempts by excessive-force plaintiffs to parlay their minimal injuries into more serious ones by tacking on allegations of psychological suffering. [38]

[31]   [32]  The Officers and Buehler further dispute whether interfering with officers' public duties is a "severe" offense. [39]  But we have already spoken to this issue in a precedential case—holding that, for excessive-force analysis purposes, "interference with public duties" under Texas law is "a minor offense." [40]  This consideration favors

Buehler's position for purposes of the Fourth Amendment reasonableness inquiry.

[33]   [34]  The Officers and Buehler also disagree as to whether Buehler's actions can be characterized as resisting arrest. According to Garibay's affidavit, when Dear told Buehler to turn around and that he was under arrest, Buehler "turned around" and began "walking away." Buehler, **\*984** on the other hand, asserts that he was merely turning around in preparation for his arrest, in accordance with Dear's orders. Footage of the incident, consistent with Garibay's description, depicts Buehler taking several steps backwards away from officers immediately after Dear tells Buehler to turn around and informs him that he is under arrest. Buehler turns his back on the Officers and begins to walk away. Based on the video evidence, we conclude that, at the very least, the Officers could reasonably have believed that Buehler was turning to walk away rather than complying with their orders. We "must measure the force used under the facts as a reasonable officer *would perceive them*, not necessarily against the historical facts." [41]  And we have acknowledged that, as the Officers in this case duly point out, a "suspect [who] ... back[s] away from the arresting officers" is "actively resist[ing] arrest"—albeit mildly. [42]

[35]  The Officers further contend that when Garibay grabbed Buehler's wrists from behind in an effort to restrain him, Buehler lurched forward in an attempt to get away—a maneuver the Officers characterize as another form of resistance by Buehler. Again, the street-level video tends to support this account. And "[t]he great weight of Texas authority indicates that pulling out of an officer's grasp is sufficient

to constitute resisting arrest" for purposes of Texas Penal Code § 38.03(a)[43]—and, it stands to reason, for purposes of excessive-force analysis. While the HALO footage tends to suggest (and the district court apparently believed[44]) that Buehler's jerking motion was probably an attempt to hand off his recording device, the Officers likely thought at the time that Buehler's sudden motion was an effort to break free of Garibay's grasp. And once again, the " 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[45]

[36]    [37] Finally, yet another consideration bearing upon the reasonableness of an arresting officer's use of force is whether "it involved 'measured and ascending responses' to a [suspect's] noncompliance."[46] We held in one case, for instance, that arresting officers' use of force to subdue a suspect did not violate the Fourth Amendment, emphasizing that "the Officers spoke calmly to [the suspect] for several minutes despite his attempt to interfere with his wife's arrest and his erratic behavior throughout the interaction. Furthermore, [the suspect] not only disobeyed **985 the Officers' order to submit to arrest, he had disobeyed their prior order to leave the [hotel] lobby" where these events were taking place.[47] This reasoning lends support to the Officers' position in this case. While Buehler's conduct leading to his arrest was perhaps not as "erratic," he relentlessly followed around officers for hours, disobeying their repeated and unambiguous commands that he step back at least arm's length away so as not to block the Officers' field of vision. We believe their conduct in dealing with Buehler can accurately be described as "measured and ascending."

[38]    [39] Based on these considerations, we are quite certain at the outset that at least Officer McCoy is entitled to summary judgment on the excessive-force claim. Where such claims are brought against multiple officers in connection with a single arrest, a reviewing court of course "must analyze the officers' actions separately."[48] And in our view, it is beyond reasonable debate that McCoy did not violate the Fourth Amendment, let alone "clearly established" Fourth Amendment caselaw. She explains in her affidavit that, consistent with what footage of the arrest appears to show, she merely placed her knee on Buehler's legs to hold them still while he was handcuffed, (or, in his words, "grabbed one of my legs") and, as he admits, did not "cause [him] any injury."

Precedent confirms the commonsense notion that McCoy, in so doing, did not violate the Fourth Amendment. We held, in an arrestee's similar excessive-force suit against the two officers who arrested her, that the officer who threw her to the ground and injured her spine was not entitled to summary judgment, but the other officer (who restrained the arrestee once she was on the ground) *was* so entitled: "the reasonable cause of [the plaintiff's spinal] injury is [the first officer's] body-slam and not [the second officer's] assistance in holding [the plaintiff] on the ground. [The plaintiff's] other injuries, including the abrasions and bruises, bloody urine, and high blood pressure and heart rate, which may have been caused by [the second officer's] actions, are ... *de minimis*."[49] So too with McCoy's actions here.[50]

 **[40]**  As for the other three arresting Officers
(Dear, Garibay, and DeVries), the excessive-
force analysis is slightly closer. On the one
hand, working in Buehler's favor is the fact
he was not being arrested for a "serious"
offense, nor did he pose an obvious danger
to the Officers or to passersby. On the other
hand, however, the Officers rightly point out
that Buehler's conduct amounted to active
resistance to arrest, that they used gradually
ascending means of attempting to gain control
of the situation before resorting to  **\*986**  force,
and that Buehler's injuries were extremely
minor. We think the balance tips in the Officers'
favor. Still, in an abundance of caution, we turn
to caselaw for further guidance as to whether
the Officers' use of force was reasonable. On
that score, Buehler directs our attention to
several of our decisions that supposedly clearly
establish that the use of force in this case
violated the Fourth Amendment. We examine
each in turn.

First, Buehler cites a case where we held that
"a reasonable jury could find that [an arrestee's]
pulling his arms away from the officers, along
with the other circumstances of [his] arrest,
did not justify the officers' decision to tackle
[him] to the ground." [51] The use of force in
that case, however, was far more extreme than
the force used against Buehler. [52] Buehler also
cites a decision in which we held that an
arresting officer violated the clearly established
law governing excessive force when he "rushed
towards [a suspect] and administered a blow
to [his] upper back or neck," and then "took
[the suspect] to the ground" to handcuff him,
even though the suspect engaged in no "active
resistance or an attempt to flee" during the
whole encounter. [53] The suspect visited the

hospital later that day for treatment, where he
was diagnosed with fairly serious injuries [54] —
certainly more serious than those sustained by
Buehler in this case. Buehler similarly points
to a case where we held that arresting officers
were not entitled to qualified immunity from
the excessive-force claim of an arrestee who
"suffered a broken shoulder as a result of
being tackled" by the officers, "from whom
he was not fleeing." [55] Once again, however,
a closer look at the facts reveals that the
injuries sustained by this unfortunate suspect
were orders of magnitude greater than those
suffered by Buehler as a result of his arrest. [56]

 **[41]**  In our view, the forced used in each of
these cases was far more egregious than that
used by the Officers in arresting Buehler—
who actively resisted (albeit mildly) and whose
injuries were far less severe. Since "[t]he extent
of an injury is an element of an excessive
force claim that must be clearly established
in ... the qualified immunity analysis," [57] we
disagree with Buehler that these decisions
would have put the Officers on notice that
the comparatively negligible injury suffered by
Buehler during his arrest rendered the force
used to carry out that arrest unconstitutional.

With that said, some of the cases Buehler
cites involved facts closer to those here. First,
he cites *Ramirez v. Martinez*, where we held
that it "was objectively unreasonable" for
"several officers [to] force[ ] [a misdemeanor
arrestee] to the ground" and  **\*987**  tase him
twice (including once after he was already
handcuffed), resulting in burns—particularly
given the absence of "resistance on [the
arrestee's] part," except for "pulling his arm

out of [an officer's] grasp." [58]   Still, this was an appreciably more severe use of force than what was employed by the Officers who arrested Buehler (which did not involve a taser [59]); the arrestee in *Ramirez* alleged, and the Officer-Defendants in that case did not contest, that he " 'sustained numerous injuries to his body, including, but not limited to, contusions and abrasions to his body, and burn marks from the taser probes.' " [60]   Further, our reasoning in *Ramirez* focused on the fact that the forceful arrest measures in question were employed "*after* [the] arrestee ha[d] been restrained and handcuffed," [61] whereas here the Officers took Buehler to the ground and held him there face-down for only as long as it took to handcuff him. It therefore seems quite a stretch to say that *Ramirez* alone "clearly established" that the lesser degree of force used by the Officers in arresting Buehler violated the Fourth Amendment.

Similarly, Buehler points to our decision in *Sam v. Richard*, where we held that an arresting officer's "use of force was objectively unreasonable at the summary judgment stage. Although [the suspect] initially ran, ... he was lying face down on the ground with his hands on his head when [the officer] kneed him in the hip and pushed him against a patrol car." [62]   Even though the suspect's injuries were mild (though still marginally more serious than Buehler's), [63] we concluded in that case that "[s]uch a use of force on a compliant suspect is excessive and unreasonable," and also "it was clearly established ... that pushing, kneeing, and slapping a suspect who is neither fleeing nor resisting is excessive." [64]   To be sure, *Sam* lends some support to Buehler's argument, yet we

think the decision is ultimately distinguishable. The Officers here did not "knee" or "slap" Buehler at all, let alone while he was already face down on the ground. They only brought him to the ground in response to movements by Buehler that the Officers reasonably believed to be resistance to arrest.

In our view, of the five cases relied upon by Buehler and discussed above, only *Ramirez* and *Sam* are similar enough to this case to lend any support to his claim that the Officers (or at least Dear, DeVries, and Garibay) violated clearly established law, and still *Ramirez* and *Sam* involved more severe and less appropriate uses of force than that used by the Officers here. [65]

**\*988**   **[42]**   On the other hand, there is ample circuit authority supporting the Officers' position that their use of force did not violate the Fourth Amendment, or at least not clearly established Fourth Amendment law. [66]   We have frequently held that officers were either constitutionally justified or entitled to qualified immunity for taking suspects to the ground in response to forms of physical resistance similar to those in which Buehler engaged. [67] Likewise, a survey of our sister circuits' precedent on this issue turns up "[m]any decisions [that] hold that there is no clearly established rule forbidding a clean takedown [of a suspect] to end mild resistance." [68]   To be sure, arrestees in some of the cases to which we have referred were suspected of more serious crimes than Buehler's. But other such cases either involved petty crimes or were apparently decided without regard to the severity of the suspected offenses, [69] suggesting that this

consideration ought not affect the outcome **\*989** here. And as we have previously noted in response to an excessive-force plaintiff's emphasis on "the minor nature of the crime that [a suspect] had allegedly committed," "neither the Supreme Court nor this Court has ever held that *all* of the *Graham* factors must be present for an officer's actions to be reasonable." [70]

Ultimately, we conclude that the Officers stayed not only within the bounds of "clearly established law," but also within those of the Fourth Amendment. Looking beyond our circuit, there is a wealth of appellate cases where comparable force by arresting officers under similar circumstances was held not violative of the Fourth Amendment. In case after case, courts upheld officers' use of takedowns to gain control of suspects who had disregarded lawful police orders or mildly resisted arrest, even when arrestees were suspected of minor offenses and the force employed appeared greater than necessary in retrospect—at least when officers' tactics caused arrestees only minimal injuries. [71] Considering this decisional authority, as well as the totality of the factors discussed thus far in our excessive-force analysis, we conclude that none of the four Officers involved in arresting Buehler (Officers Dear, Garibay, DeVries, and McCoy) used excessive force in violation of the Fourth Amendment. The district court thus erred in denying their motion for summary judgment on the excessive-force claims.

[43]   [44] Accordingly, Buehler's bystander-liability claims against the other individual Defendants (Officers Sebek, Coffey, Adam, and Hicks) necessarily fail, since "[b]ystander liability arises only where the plaintiff can allege and prove another officer's use of excessive force." [72] For similar reasons, Buehler's conspiracy and municipal-liability claims also fail insofar as they relate to excessive force, given that both theories likewise require the plaintiff to point to an underlying violation of his or her constitutional rights. [73]

B

We now consider the issues raised by Buehler's cross-appeal, beginning with his argument that the district court erred in **\*990** entering summary judgment for the Officers on his false-arrest claims.

[45] Buehler asserts false-arrest claims against Officers Dear, Garibay, DeVries, and McCoy, alleging that they lacked probable cause to arrest him for either interfering with peace officers' official duties in violation of Texas Penal Code § 38.15(a)(1) [74] or resisting arrest in violation of § 38.03(a). [75] The Officers argue in response that, because they subsequently obtained arrest warrants signed by a magistrate, they are shielded from liability by the independent intermediary doctrine—which holds that "if facts supporting an arrest are placed before an independent intermediary such as a magistrate ..., the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party," [76] even if the warrant application was sought and granted after the arrest took place. [77] This doctrine is derived from the time-honored rule that "a constable ... cannot be held liable" for acts authorized by a "warrant ... regular on its

face, and ... issued by a magistrate having jurisdiction over the subject matter"—which "affords a full justification for all acts done by [the officer] in its lawful execution."[78] The district court sided with the Officers and granted their motion for summary judgment on Buehler's false-arrest claims. We agree.

Buehler challenges the district court's rejection of his false-arrest claims on several grounds. First, he argues that the independent-intermediary doctrine should be rejected as inconsistent with the Fourth Amendment. But we have "consistently applied the doctrine in published opinions"[79] and are bound by those holdings.[80] Buehler attempts to sidestep our precedent, suggesting that those cases' underpinnings were called into doubt by the Supreme Court's 1986 decision in *Malley v. Briggs*.[81] There, in a footnote, the Court "conceded that the appellant police officer's argument that he could not have proximately caused a defendant's unlawful arrest by filing an affidavit unsupported by probable cause was not before it on appeal," but nonetheless suggested in dicta "that it would not have been receptive to this contention."[82] The problem for Buehler, however, is that we have reaffirmed the independent-intermediary doctrine in multiple precedential cases in the 36 years since *Malley*, repeatedly rejecting litigants' arguments that we should "disregard firmly ensconced **\*991** circuit precedent in favor of ... a cursory analysis of *Malley*'s dicta."[83] And just as we are bound by our precedent recognizing the independent-intermediary doctrine, so too are we bound by our precedent holding that the doctrine survived *Malley*.

**[46]  [47]  [48]  [49]  [50]  [51]** Second, Buehler argues that, even if we adhere to the independent-intermediary doctrine, his false-arrest claims are still viable because the Officers' conduct in arresting him fell within the doctrine's "taint" exception. Under that rule, "arrest warrants do not insulate" arresting officers from false-arrest liability if their own "false and misleading affidavits tainted the magistrate's deliberations."[84] Buehler argues that Officer Garibay's affidavits, which formed the basis for the magistrate's approval of both warrants, were tainted by materially false statements. But, with one inconsequential exception,[85] Buehler did not bring these supposed inaccuracies to the district court's attention. He has therefore forfeited the opportunity to rely on them on appeal.[86] "It is a well settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, *legal or factual*, why summary judgment should not be entered. If it does not do so, ... it cannot raise such reasons on appeal."[87] "It is not enough to merely mention or allude to a legal theory in order to raise an argument. Rather, a party must press its claims, which entails clearly identifying a theory as a proposed basis for deciding the case."[88]

**[52]  [53]** Moreover, even if Buehler's supposed examples of misrepresentations in Garibay's affidavit were properly presented for our consideration, they would not affect our conclusion, for none are inaccuracies of a sort that would taint the arrest warrant. All of the affidavit's claims to which Buehler objects either were substantially **\*992** accurate, were "not material to the [magistrate's] findings of

probable cause," or were merely "different interpretations" of events on which "[t]here [wa]s plainly room to disagree." [89] And an affiant's presentation of one plausible "version of ... disputed facts to the magistrate judge" does not taint the resulting warrant. [90]

[54] Indeed, even were we to discard the independent-intermediary doctrine, or to accept Buehler's argument that the arrest warrant was tainted by false statements in Garibay's affidavit, the result would simply be that we would decide ourselves whether Buehler's arrest for interference with official duties was supported by probable cause. It obviously was. We have held, based on caselaw from Texas courts interpreting the relevant provision, that conduct extremely similar to that in which Buehler was engaged—that is, refusing to obey police officers' repeated and unambiguous warnings to step back so as not to interfere with officers' official duties—establishes probable cause to arrest for a violation of Texas Penal Code § 38.15(a)(1). [91]

For these reasons, we conclude that the district court properly entered summary judgment for Defendants Dear, Garibay, DeVries, and McCoy on Buehler's false-arrest claim. And as with Buehler's claim against the City relating to its excessive-force policies, his false-arrest claim against the City, fails for lack of an underlying constitutional violation, since "a municipality cannot be liable '[i]f a person has suffered no constitutional injury at the hands of the individual police officer.' " [92]

## C

[55] We now turn to Buehler's First Amendment claim against the individual Defendants. Buehler asserts that the officers arrested him in retaliation for filming the officers in a public setting, an activity protected by the First Amendment's freedom-of-speech guarantee. The district court, relying on our 2017 decision in *Turner v. Lieutenant Driver*, [93] held that the officers were entitled to qualified immunity from Buehler's retaliation claim, since it was not clearly established at the time of his arrest in August 2015 that the right to publicly film police was protected by the First Amendment.

[56] The district court properly dismissed Buehler's First Amendment retaliation claim. Buehler is correct that the First Amendment guarantees, subject to reasonable limitations, a right to publicly film police. We are bound, however, by our holding in *Turner* (a published opinion) that the First Amendment right to film police was not clearly established in this circuit as of September 2015. [94] And it follows *a fortiori* from *Turner*'s holding that neither was such a right clearly established a month earlier. Buehler's First **\*993** Amendment claims against the Officers thus cannot proceed.

## D

Finally, we consider Buehler's municipal-liability claims against the City of Austin. Buehler alleged that the City was liable under § 1983 because (1) the APD's policy

governing police treatment of citizens filming officers in public violated such citizens' rights under the First Amendment, and (2) the City failed to train or discipline officers who used excessive force in conducting arrests. The district court dismissed both of Buehler's theories of municipal liability for failure to state claims. First, the district court reasoned that because the First Amendment right to film police was not clearly established as of August 2015, the claim against the City based on its policies governing filming of police could not proceed. The district court also rejected Buehler's failure-to-train and failure-to-discipline theory as insufficiently supported by factual allegations. [95] We agree with the district court, albeit for different reasons, that Buehler failed to state claims against the City under either theory.

 **[57]** For one, as we have already explained, Buehler's claims against the City fail at the outset insofar as they are based on APD policies or practices relating to use of force in carrying out arrests. A "policy, practice, or custom claim[ ]" against a municipality cannot proceed unless the plaintiff has suffered "an underlying constitutional violation," [96] and the force used in effectuating Buehler's arrest did not violate the Constitution.

 **[58]    [59]** That leaves only Buehler's First Amendment claim against the City. The district court dismissed this claim based on its conclusion that the right to film police was not clearly established as of August 2015. The district court's reasoning appears to have rested on the incorrect assumption that municipalities are entitled to qualified immunity. They are not. [97] And of course our conclusion above

that the individual Defendants are entitled to qualified immunity on Buehler's First Amendment claim does not dispose of his corresponding claim against the City, since "a municipality may [still] be liable if a plaintiff states a claim against an official but the official is protected by qualified immunity." [98]

 **[60]    [61]** Nevertheless, we "may affirm a district court's Rule 12(b)(6) dismissal on any grounds ... supported by the record," [99] and here there is an obvious alternate ground on which to affirm dismissal of Buehler's First Amendment claim against the City. Such a claim, just to reiterate, cannot succeed unless the harm he claims to have suffered as a result of the City's policies or practices (his August 2, 2015 arrest) violated the First Amendment. It did not. As the Supreme Court recently held, a "plaintiff pressing a [First Amendment] retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." [100] (An exception exists "when a plaintiff presents objective evidence that he was arrested when otherwise **\*994** similarly situated individuals not engaged in the same sort of protected speech had not been," [101] but Buehler points to no such evidence. [102]) And as we have already explained in affirming summary judgment for Defendants on Buehler's false-arrest claims, the arresting Officers had probable cause to arrest Buehler for interference with official duties. The arrest therefore did not violate his First Amendment rights, and his municipal-liability claim premised on the contrary notion necessarily fails.

### III

Buehler followed the Officer-Defendants for hours that night for purposes of filming them, as is his right. But in the minutes leading up to his arrest, Buehler had positioned himself less than arms' length away from the group of officers, obstructing their view and performance of their duties—and disregarding their warnings of his conduct's unlawfulness. The Officers then informed Buehler he was under arrest, at which point he turned and began walking away (or so a reasonable officer would have believed). When the Officers reached for his wrists, he suddenly lurched forward. Reasonably believing him to be resisting, the Officers brought him to the ground, where they held him for fewer than 45 seconds—only as long as it took to handcuff him. He suffered only bruises and lesions so minor they cannot be seen in mugshots taken minutes afterwards. Perhaps it was not strictly necessary for the Officers to take Buehler down to effect the arrest. But the seizure, even if imperfect, was not unreasonable.

Summing up: None of the Officers involved in Buehler's arrest used excessive force in violation of the Fourth Amendment; summary judgment for the Officers on Buehler's false-arrest claim was proper; the Officers were entitled to qualified immunity on his First Amendment claim; and Buehler's bystander- and municipal-liability claims, as well as his conspiracy claim, fail for lack of an underlying constitutional violation. We therefore REVERSE the district court's denial of Defendants' summary-judgment motion as to Buehler's excessive-force claim and RENDER judgment for Defendants on that claim. [103] We AFFIRM the district court's judgment in all other respects.

### All Citations

27 F.4th 969

---

## Footnotes

1   For reasons it did not make clear, the district court dismissed Buehler's claims against Parker, who was not present when Buehler was arrested but, according to Buehler, violated the Constitution by inadequately investigating the arrest. None of Buehler's appellate briefing challenges or even mentions the dismissal of Parker as a defendant. The issue has thus been abandoned, *see Akuna Matata Investments, Ltd. v. Tex. Nom Ltd. P'ship*, 814 F.3d 277, 282 n.6 (5th Cir. 2016), and we do not consider it.

2   *See Buehler v. City of Austin*, No. 1:17-CV-724-LY, 2018 WL 4225046 (W.D. Tex. Sept. 5, 2018).

3   *See* No. 1:17-CV-724-DAE, 2020 WL 5793008 (W.D. Tex. Mar. 27, 2020).

4    We have jurisdiction over the Officers' appeal because, notwithstanding the general rule that only final judgments are immediately appealable, a denial of summary judgment on qualified-immunity grounds is immediately appealable under the collateral-order doctrine. *See* *Mitchell v. Forsyth*, 472 U.S. 511, 524–30, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Similarly, we have jurisdiction over Buehler's cross-appeal under 28 U.S.C. § 1291 because the district court granted Buehler's request for certification of partial final judgment so that he could cross-appeal the court's disposition of his other claims. *See* FED. R. CIV. P. 54(b).

5    *Magee v. Reed*, 912 F.3d 820, 822 (5th Cir. 2019).

6    *Id.* (quoting *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017)).

7    FED. R. CIV. P. 56(a).

8    *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015).

9    *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004).

10    *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

11    *Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

12    *Id.* (quoting *Scott*, 550 U.S. at 381, 127 S.Ct. 1769).

13    The district court, after "f[inding] that there is a genuine issue of material fact as to whether" the Officers' use of force violated the Fourth Amendment, concluded that it "need not conduct a full analysis as to whether the right was clearly established or not." *Buehler v. Dear*, 2020 WL 5793008, at *11 n.5 (W.D. Tex. Mar. 27, 2020). We agree with the Officers that this is an incorrect statement of the law. "To deny qualified immunity at the summary judgment stage, [a] district court must answer 'yes' to *two* questions." *McDonald v. McClelland*, 779 F. App'x 222, 225 (5th Cir. 2019) (per curiam). If the court finds that "the alleged conduct amounts to a constitutional violation," then it must also determine "whether the right was clearly established at the time of the conduct." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir. 2009). Here, since the district court's opinion erroneously skipped the second inquiry, we perhaps could remand for the district court to consider the clearly-established-law question in the first instance. That was how we disposed of a case involving an interlocutory appeal of a denial of summary judgment where the district court erroneously "failed to address [the second] half of the qualified-immunity inquiry." *McDonald*, 779 F. App'x at 225.

In this case, however, we believe that remand is unnecessary. After the Officers pointed out the district court's mistake of law in their motion to alter or amend judgment, the district court addressed the second step of the qualified-immunity analysis in its order denying that motion. And the Officers have appealed both the original denial of summary judgment *and* its denial of their motion to alter or amend judgment. We "generally review[s] a decision on [such] a motion to ... for abuse of discretion," except "[t]o the extent" that the decision was based on "a question of law," in which case "the standard of review is *de novo.*" *Pioneer Nat. Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Loc. 4-487*, 328 F.3d 818, 820 (5th Cir. 2003). Here, the district court apparently denied the Officers' motion to alter or amend judgment on the purely legal ground that the unconstitutional conduct in which they allegedly engaged violated clearly established law. We therefore are satisfied that both steps of the qualified-immunity inquiry are properly presented for our de novo review.

14    *Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020).

15    *State v. Mahon*, 3 Del. 568, 569 (1842); *accord Golden v. State*, 1 S.C. 292, 302 (1870).

16    *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Fulton v. Staats*, 41 N.Y. 498, 499 (1869) (Officers may "use as much force as [i]s necessary to make the arrest.").

17    *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005).

18    *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

19    *Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020).

20    *Heien v. North Carolina*, 574 U.S. 54, 60–61, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

21    *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

22    *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

23    *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015).

24    *Id.*

25    *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013).

26   *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

27   *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam).

28   *Joseph v. Bartlett*, 981 F.3d 319, 331 (5th Cir. 2020).

29   *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007).

30   *Id.* at 417.

31   *Ikerd v. Blair*, 101 F.3d 430, 434–35 (5th Cir. 1996).

32   *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (quoting *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013)).

33   *Harper v. Harris Cty.*, 21 F.3d 597, 601 (5th Cir. 1994); *accord Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009).

34   2020 WL 5793008, at *9.

35   *Id.*

36   "[W]here a district court does not set out the factual basis underlying its legal determinations related to a claim of qualified immunity, the court of appeals"—even in an interlocutory appeal such as this one—may "review the record to determine what facts the district court assumed." *Beltran v. City of El Paso*, 367 F.3d 299, 302 (5th Cir. 2004).

37   *Johnson v. Hollins*, 716 F. App'x 248, 254 (5th Cir. 2017).

38   *See Tarver*, 410 F.3d at 752; *Mesa v. Prejean*, 543 F.3d 264, 272–73 (5th Cir. 2008); *Brooks v. City of W. Point*, 639 F. App'x 986, 990 (5th Cir. 2016).

39   Buehler also attempts to bolster his excessive force-claim by arguing that "no crime [was] taking place" when he was arrested. This argument fails to appreciate that excessive-force and false-arrest claims are "separate and distinct," such that an "excessive force claim" must be "analyze[d] ... without regard to whether the arrest itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007).

40   *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018).

41   *Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016).

42   *Cadena v. Ray*, 728 F. App'x 293, 296 (5th Cir. 2018) (per curiam) (cleaned up) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)).

43   *Ramirez v. Martinez*, 716 F.3d 369, 376 (5th Cir. 2013).

44    The district court described the relevant chain of events as follows: "The video footage shows [the Officers] each physically restraining Plaintiff mere moments after Dear instructed Plaintiff to turn around and stated to Plaintiff that he was under arrest. Plaintiff turned around and took maybe a step or two away from Dear, yet certainly does not appear to be resisting or evading arrest. He appears to be mostly focused on passing his camera to someone else." 2020 WL 5793008, at *11. We do not take issue with the district court's literal description of the events depicted in the video; rather, we disagree with the district court's "assess[ment] [of] the legal significance" of those events. *Kinney*, 367 F.3d at 348.

45    *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

46    *Poole*, 691 F.3d at 629 (quoting *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (per curiam) (unpublished)).

47    *Cadena*, 728 F. App'x at 296.

48    *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018).

49    *Westfall v. Luna*, 903 F.3d 534, 549–50 (5th Cir. 2018).

50    The district court, despite conceding "that it is a close[ ] call whether Plaintiff has an excessive force claim against McCoy, particularly considering here that he does not allege any injury to his knees or legs," reasoned that her "physical restraint ... contributed to [Buehler's] overall injuries and certainly to his alleged psychological injuries." 2020 WL 5793008, at *9. We do not know what led the district court to conclude that McCoy "contributed to [Buehler's] overall injuries," a finding that is contradicted by the evidence. But even if the district court's remark to that effect is a factual "genuineness" holding that we may not second-guess on interlocutory appeal, we are still confident based on the record that any "contribut[ion]" by McCoy to Buehler's injuries was *de minimis* as a matter of law.

51    *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017).

52    The force in that case included repeated strikes to the arrestee's arms, thighs, and ribs, and resulted in him suffering " 'mildly displaced right L1, L2, and L3 transverse process fractures' " that required him to "use[ ] a wheelchair while at home." *Id.* at 338.

53    *Hanks v. Rogers*, 853 F.3d 738, 743, 746, 745 (5th Cir. 2017).

54    He had suffered "contusions, acute strains, and bruised ribs" and "received two prescriptions for pain medication and a form releasing him from work for two days." *Id.*

55    *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000).

56    The arrestee in that case "spent 8 days in the hospital, at a cost of almost $32,000. He needed a plate and screws inserted into his shoulder," "missed a year of work," and was "likely [to] need his entire shoulder replaced in the future." *Id.* at 734.

57    *Flores v. City of Palacios*, 381 F.3d 391, 400 n.7 (5th Cir. 2004).

58    716 F.3d 369, 378 (5th Cir. 2013).

59    This is a meaningful distinction. As we have observed in the past, the use of "a taser can cause death or serious injury." *Pena v. City of Rio Grande City*, 816 F. App'x 966, 972 n.8 (5th Cir. 2020).

60    716 F.3d at 377.

61    *Id.* at 378 (emphasis added).

62    887 F.3d 710, 714 (5th Cir. 2018).

63    The force used against the arrestee in *Sam* "cause[d] him to bleed on the scene and 'left a scab.' ... [O]ne of [his] friends stated in deposition that, after the incident, [the arrestee] 'looked like he got hit' and 'his face was a little red and bruised.' Finally, according to medical records generated from a medical appointment about six weeks after the incident, [he] complained of lingering pain in his left hip." *Id.* at 712–13.

64    *Id.* at 714.

65    Moreover, because *Sam* was decided long after Buehler's arrest, the case plays a limited role in a qualified-immunity inquiry, which turns on whether the unlawfulness of a defendant's conduct was clearly established *at the time it occurred. Harlow*, 457 U.S. at 818, 102 S.Ct. 2727.

66    "In determining what constitutes clearly established law," we first look to "Supreme Court precedent and then to our own," but "[i]f there is no directly controlling authority," we "may rely on decisions from other circuits to the extent" they have reached a consensus on an issue. *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018). We have similarly consulted other circuits' caselaw in determining whether arresting officers' uses of force violated the Fourth Amendment. *See Sam*, 887 F.3d at 714 n.2.

67    *See Griggs v. Brewer*, 841 F.3d 308, 314 (5th Cir. 2016) (holding that arresting officers did not violate clearly established law by using " 'takedown' maneuver" against arrestee because "under the totality of the circumstances—that is, a late-

night traffic stop involving a clearly drunk and obstinate individual, lurching to the side and stating 'no, no,' *in the act* of being handcuffed, immediately following the command to 'put your hands behind your back'—[the arrestee's] actions ... amount to resistance to arrest"); *Priest v. Grazier*, 860 F. App'x 343, 347 (5th Cir. 2021) (holding that arresting officers "did not violate clearly established law by forcing [arrestee] to the ground to handcuff him" after arrestee failed to "comply with their repeated instructions to roll down his window, open his door, [or] get out of his car."); *Ibarra v. Harris Cty.*, 243 F. App'x 830, 835 (5th Cir. 2007) (similar); *Tennyson v. Villarreal*, 801 F. App'x 295, 296 (5th Cir. 2020) (per curiam) (similar, though unclear whether holding in defendant officers' favor was based on qualified immunity or lack of Fourth-Amendment violation); *Mathews v. Davidson*, 674 F. App'x 394, 396 (5th Cir. 2017) (per curiam) (finding similar use of force did not violate Fourth Amendment); *Cadena*, 728 F. App'x at 296 (same); *cf. Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (similar use of force by officers did not violate Fourth Amendment; arrestee's resistance was greater than Buehler's, but at the same time his injuries due to officers' use of force were more serious than Buehler's); *Robles v. Ciarletta*, 797 F. App'x 821, 827–28 (5th Cir. 2019) (per curiam) (holding that, although assault suspect "only passively resisted" arrest, arresting officer did not violate clearly established law by putting suspect's "arm[ ] behind [his] back, press[ing] him against a fence," and bringing him "to the ground where [the officer] put [him] in handcuffs"); *Fontenot v. Cormier*, 56 F.3d 669, 675 (5th Cir. 1995) (holding that arresting officer's use of force did not violate Fourth Amendment by tackling arrestee in a manner that caused "no significant injury"—although that suspect, unlike Buehler, had a "history of violence").

68    *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019); *see Kelsay v. Ernst*, 933 F.3d 975 (8th Cir. 2019) (en banc) (officer entitled to qualified immunity for a bear-hug takedown when an agitated suspect walked away from the officer for the second time); *Hedgpeth v. Rahim*, 893 F.3d 802 (D.C. Cir. 2018) (same for an arm takedown and knee to the leg of suspect who had pulled his hands away as officer attempted to handcuff him).

69    *See Griggs*, 841 F.3d at 314; *Priest*, 860 F. App'x at 347; *Cadena*, 728 F. App'x at 296; *Poole*, 691 F.3d at 628–29; *see also Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003); *Schliewe v. Toro*, 138 F. App'x 715, 722 (6th Cir. 2005); *Horn v. Barron*, 720 F. App'x 557, 565 (11th Cir. 2018); *Kelsay*, 933 F.3d at 980; *Hedgpeth*, 893 F.3d at 809–10.

70    *Rockwell v. Brown*, 664 F.3d 985, 992 (5th Cir. 2011).

71    *See, e.g.*, *Charles v. Johnson*, 18 F.4th 686, 700 (11th Cir. 2021); *Horn v. Barron*, 720 F. App'x 557, 564, 565 (11th Cir. 2018); *Ehlers v. City of Rapid City*, 846 F.3d

1002, 1011 (8th Cir. 2017); *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003); *Griffin v. Hardrick*, 604 F.3d 949, 954–55 (6th Cir. 2010); *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001); *Gomez v. City of Whittier*, 211 F. App'x 573, 576 (9th Cir. 2006); *Bozung v. Rawson*, 439 F. App'x 513, 520–21 (6th Cir. 2011); *Kohorst v. Smith*, 968 F.3d 871, 877 (8th Cir. 2020); *Earnest v. Genesee County*, 841 F. App'x 957, 960–61 (6th Cir. 2021); *see also Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013); *Schliewe v. Toro*, 138 F. App'x 715, 722 (6th Cir. 2005).

72   *Windham v. Harris County*, 875 F.3d 229, 243 n.19 (5th Cir. 2017) (quoting *Kitchen v. Dallas County*, 759 F.3d 468, 481 (5th Cir. 2014)).

73   *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013); *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) ("[A] conspiracy claim is not actionable without an actual violation of section 1983.") (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990)). It is not entirely clear whether Buehler's complaint set forth a conspiracy-based theory of liability. The complaint does not use that term, though it makes scattered allegations that, in substance, amount to conspiracy claims, and Buehler's briefing on appeal repeatedly accuses Defendants of conspiracy. We need not decide whether Buehler has adequately raised a conspiracy claim, however, since any such claim obviously fails anyway for the reasons explained in the text to which this footnote is appended.

74   That section provides, "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law."

75   That section provides, "A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or transportation of the actor or another by using force against the peace officer or another."

76   *Taylor v. Gregg*, 36 F.3d 453, 456 (5th Cir. 1994), *overruled on other grounds*, *Castellano v. Fragozo*, 352 F.3d 939, 949 (5th Cir. 2003) (en banc).

77   *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 554 (5th Cir. 2016).

78   *Clarke v. May*, 68 Mass. 410, 413 (1854).

79   *Buehler*, 824 F.3d at 554.

80    *See Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001) ("one panel of this Court may not overrule another").

81    475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

82    *Murray v. Earle*, 405 F.3d 278, 291 (5th Cir. 2005) (citing 475 U.S. at 345 n.7, 106 S.Ct. 1092).

83    *Id.* at 292.

84    *McLin v. Ard*, 866 F.3d 682, 691 (5th Cir. 2017).

85    Buehler's filings in the district court identified just "one specific fact ... in support of his ["taint"] argument," which was his allegation that "Garibay falsely claimed that [Buehler] tried to put his arm underneath himself" while being held face-down during his arrest. 2020 WL 5793008, at *7. Buehler's contention that Garibay misrepresented what occurred during the arrest, even if true, would at best be relevant to the validity of the resisting-arrest charge, but "certainly ... not ... [to that of] the Interference with Public Duties warrant." *Id.* That dooms Buehler's attempt at a false-arrest claim, which "does not cast its primary focus on the validity of each individual charge .... If there was probable cause for any of the charges ... then the *arrest* was supported by probable cause, and the claim for false arrest fails." *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995).

86    Buehler attempts to dodge the forfeiture problem by contending that, "Although the district court incorrectly stated that [he] provided only 'one specific fact' " to support his "taint" argument, "Buehler attempted to correct this mistake by filing a Motion for Reconsideration," which included other purported examples of misrepresentations in Garibay's affidavit. But this does not help Buehler one whit, since "[t]his court will typically not consider an issue or a new argument raised for the first time in a motion for reconsideration in the district court," *U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 425 (5th Cir. 2014), especially given that Buehler has offered no explanation for why he did not set forth the other allegations supporting his "taint" argument at an earlier stage of the district-court proceedings.

87    *Savers Fed. Sav. & Loan Ass'n v. Reetz*, 888 F.2d 1497, 1501 (5th Cir. 1989) (emphasis added) (quoting *Liberles v. Cook Cty.*, 709 F.2d 1122, 1126 (7th Cir. 1983)).

88    *U.S. Bank Nat. Ass'n*, 761 F.3d at 425 (cleaned up) (quoting *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010)).

89    *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 556 (5th Cir. 2016).

90    *Anderson v. City of McComb*, 539 F. App'x 385, 387 (5th Cir. 2013).

91    *See, e.g.*, *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (citing cases); *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 657 (5th Cir. 2004); *see also Holt v. State*, No. 05-08-00134-CR, 2009 WL 311451, at *2 (Tex. App. Feb. 10, 2009).

92    *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam)).

93    848 F.3d 678 (5th Cir. 2017).

94    *Id.* at 686.

95    2018 WL 4225046, at *7–8.

96    *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013).

97    *See Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

98    *Bustos*, 599 F.3d 458, 467 n.50.

99    *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).

100   *Nieves v. Bartlett*, —— U.S. ——, 139 S. Ct. 1715, 1724, 204 L.Ed.2d 1 (2019).

101   *Id.* at 1727.

102   Buehler cites several purported examples of other passersby who the Officers permitted to "get close" without arresting them shortly before Buehler was arrested. None of these individuals, however, continued to stand within arms' length of the Officers for a prolonged period after being ordered to stand back, as Buehler did. We therefore do not consider these individuals "similarly situated," *id.*, and so the Officers' failure to arrest them does not raise suspicion that Buehler's contemporaneous arrest was made in retaliation for his filming of the Officers.

103   "[W]hen the Rule 56 standard has been met, [a] reviewing court may direct the entry of summary judgment .... The appellate court either can include the order as part of its opinion or remand the case with directions To Enter a Summary Judgment." 10A CHARLES ALAN WRIGHT ET AL., FED. PRAC. & PROC. CIV. § 2716 (April 2021 update). Here, we opt for the former path. Defendants have specifically requested rendition, and we see no need for a remand given that nothing remains to be done in this case other than entry of judgment—which we can do ourselves. Our cases reversing denials of summary-judgment motions have sometimes remanded for entry of judgment, sometimes rendered judgment outright, and sometimes merely

reversed without specifying further procedural steps. *Compare Keller v. Fleming, 952 F.3d 216, 227 (5th Cir. 2020)* (rendering), *with Tucker, 998 F.3d at 185* (remanding), *and Joseph, 981 F.3d at 346* (reversing without elaboration).

---

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# *Eisenbach v. Zatzkin,*

728 Fed. App. 307 (5th Cir. 2018)

728 Fed.Appx. 307
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure
32.1 generally governing citation of
judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of
App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

Theodore EISENBACH,
Plaintiff-Appellant,
v.
Mark ZATZKIN; I. Guzman,
Defendants-Appellees.

No. 16-20748
|
Filed April 10, 2018

**Synopsis**
**Background:** Arrestee brought action against
police officers for malicious prosecution and
under 42 U.S.C. § 1983 for violations of his
First and Fourth Amendment rights after he was
arrested for interference with public duties. The
United States District Court for the Southern
District of Texas entered summary judgment in
favor of police officers. Arrestee appealed.

**Holdings:** The United States Court of Appeals
held that:

[1] officer had qualified immunity from
arrestee's First and Fourth Amendment claims,
and

[2] officer had qualified immunity from
arrestee's malicious prosecution claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion
for Summary Judgment.

West Headnotes (2)

[1] **Civil Rights** 👉 Sheriffs, police,
and other peace officers

Police officer was reasonable in
concluding that he had probable
cause to arrest for interference
with public duties, and, thus,
he had qualified immunity from
arrestee's claim under § 1983 for
violations of his First and Fourth
Amendment rights, where officer
had instructed arrestee to leave the
area of officer's investigation of
motor vehicle accident, and arrestee
approached driver while officer was
completing paperwork. U.S. Const.
Amend. 4; 42 U.S.C.A. § 1983; Tex.
Penal Code Ann. § 38.15(a)(1).

6 Cases that cite this headnote

[2] **Malicious Prosecution** 👉 Persons
liable

Police officer was reasonable in
concluding that he had probable
cause to arrest arrestee for
interference with public duties, and,
thus, he had qualified immunity from
arrestee's malicious prosecution

claim, where officer had instructed arrestee to leave the area of officer's investigation of motor vehicle accident, and arrestee approached driver while officer was completing paperwork. U.S. Const. Amend. 4.

6 Cases that cite this headnote

**\*308** Appeal from the United States District Court for the Southern District of Texas, USDC No. 4:15-CV-1685

### Attorneys and Law Firms

Randall Lee Kallinen, Esq., Law Office of Randall L. Kallinen, P.L.L.C., Houston, TX, Susan J. Contreras, Lader Contreras, P.L.L.C., Cypress, TX, for Plaintiff-Appellant

Heidi J. Gumienny, Steven Dan Selbe, Senior Counsels, Gordon & Rees, L.L.P., Houston, TX, for Defendants-Appellees

Before JOLLY, DENNIS, and ELROD, Circuit Judges.

### Opinion

PER CURIAM: [*]

This lawsuit resulted from a confrontation between Theodore Eisenbach and Mark Zatzkin, a police officer, at the apartment complex where they both lived. That encounter ended with Eisenbach's arrest for Interference with Public Duties under section 38.15 of the Texas Penal Code. The charges were ultimately dismissed, and Eisenbach filed suit. He alleged malicious prosecution under Texas

law and deprivation of his constitutional rights under 42 U.S.C. § 1983. The district court entered summary judgment in Zatzkin's favor on all claims, holding that Zatzkin was entitled to qualified immunity. We AFFIRM that judgment.

### I

Eisenbach and Zatzkin were both residents at the same apartment complex. [1] Zatzkin was a police officer for the City of Jersey Village and served as a courtesy officer at the complex. Eisenbach was the business manager for an international chemical producer and was waiting for a delivery of chemical samples on the day of the incident in question.

**\*309** On his way into the apartment complex, the driver delivering the chemical samples to Eisenbach bumped into a pole near the entry gate to the complex with his delivery truck, causing minor damage. The driver continued into the complex and met Eisenbach outside of Eisenbach's apartment. Meanwhile, Zatzkin's wife told Zatzkin that a truck had hit the pole at the entrance of the complex. Zatzkin left his apartment to see if he could locate the driver and get the driver's license plate number.

Soon thereafter, Zatzkin found the driver conversing with Eisenbach, who had not yet received his package. Zatzkin was not in uniform, but he identified himself as an officer when prompted by Eisenbach. Eisenbach started to explain the situation to Zatzkin, who asked Eisenbach to "leave the area." Eisenbach then went to stand with some of the apartment complex's staff, who had gathered

nearby. Zatzkin spoke to the driver, checked his identification, and then "moved away from the driver" to the other side of the truck. To Eisenbach, Zatzkin appeared to be filling out some paperwork. After Zatzkin moved to the other side of the truck, the driver began to take Eisenbach's package out of the truck. Eisenbach took this to mean that Zatzkin's investigation had ended, and he walked toward the driver to sign for his package.

Zatzkin then returned to where Eisenbach and the driver were standing, and, according to Eisenbach, began to shout at the driver. Eisenbach asked Zatzkin "if the constant screaming was necessary" and asked for his badge number. Zatzkin then told Eisenbach that he was under arrest. Another officer, Irvin Guzman, subsequently arrived at the scene and arrested Eisenbach for Interference with Public Duties in violation of Texas Penal Code section 38.15. Guzman transferred Eisenbach to the Harris County jail. Eisenbach spent thirty-three hours in jail, during which he was assaulted and injured by another inmate. He spent $5,000 on a lawyer and was required to make a number of appearances in court as a result of the case brought against him. Ultimately, the charges against him were dismissed for insufficient evidence.

Eisenbach sued Zatzkin and Guzman under 42 U.S.C. § 1983, alleging violations of his First and Fourth Amendment rights. He also alleged malicious prosecution under Texas law, invoking the district court's supplemental jurisdiction. Zatzkin and Guzman filed a joint motion for summary judgment, arguing that they were entitled to qualified immunity. In his opposition to that motion, Eisenbach stated that he no longer wished to pursue his claims against Guzman. [2] After a hearing, the district court, presumably understanding Eisenbach to have waived his claims against Guzman, granted summary judgment in Zatzkin's favor. Eisenbach timely appealed, asserting that genuine disputes of material fact remain on each of his claims.

## II

"This court reviews de novo the district court's resolution of legal issues on a motion **\*310** for summary judgment on the basis of qualified immunity." *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017) (quoting *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016) ). A court must enter summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* This means that a party cannot survive summary judgment with just "a scintilla of evidence" in its favor. *Id.* at 252, 106 S.Ct. 2505. Although we view the evidence in the light most favorable to the non-movant, the non-movant must "come forward with specific facts indicating a genuine issue for trial" and cannot merely rely on the allegations in the complaint. *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001).

Eisenbach v. Zatzkin, 728 Fed.Appx. 307 (2018)

"A qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Hanks*, 853 F.3d at 744 (citation omitted) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) ). A law is clearly established if every reasonable officer would know that his or her conduct was unlawful. *See Kinney v. Weaver*, 367 F.3d 337, 349–50 (5th Cir. 2004) (en banc).

### III

**[1]** Eisenbach contends that Zatzkin violated his rights under the Fourth Amendment by arresting him without probable cause. "The right to be free from arrest without probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994). "Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.' " *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655–56 (5th Cir. 2004) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001) ). Even if the officer's conclusion was mistaken, he is still entitled to qualified immunity so long as the conclusion was reasonable. *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). The question before us is, therefore, whether a reasonable officer could have concluded that there was probable cause to arrest Eisenbach

for interference with the duties of a peace officer.

Eisenbach was arrested for Interference with Public Duties under section 38.15 of the Texas Penal Code. Section 38.15 provides: "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with ... a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." TEX. PENAL CODE § 38.15(a)(1). However, "[i]t is a defense ... that the interruption, disruption, impediment, or interference alleged consisted of speech only." *Id.* § 38.15(d).

Eisenbach argues that there is a genuine dispute of material fact as to whether Zatzkin had completed his investigation when Eisenbach approached the driver, that his actions did not rise to the level of criminal negligence, and that his actions were limited to speech only. Zatzkin responds that Eisenbach's admission that he approached the driver and continued to try to speak with him after Zatzkin had instructed Eisenbach to leave the area establishes **\*311** that he had probable cause to arrest Eisenbach. Zatzkin further argues that Eisenbach's subjective belief that Zatzkin had concluded his investigation is immaterial to the question of whether a reasonable officer could have concluded that there was probable cause to arrest Eisenbach.

Zatzkin is correct that disobeying the instruction of a police officer who is performing official duties may be sufficient to establish probable cause for an arrest under section 38.15, at least where the instruction pertains

to the arrestee's conduct, as opposed to his or her speech. *See, e.g.*, *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (officer entitled to qualified immunity where arrestee "did more than just argue with police officers; he failed to comply with an officer's instruction, made within the scope of the officer's official duty and pertaining to physical conduct rather than speech"). But Eisenbach's position is not merely that he subjectively believed that Zatzkin had concluded the investigation before Eisenbach approached the driver; instead, he maintains that Zatzkin had in fact concluded the investigation and that his return to the area therefore did not violate Zatzkin's instruction.

We conclude, however, that record evidence does not establish a genuine dispute as to whether, for purposes of qualified immunity, a reasonable officer could have concluded that Zatzkin's investigation was ongoing. According to Eisenbach, Zatzkin was talking to the driver and then moved away to the other side of the truck, where he appeared to be filling out paperwork. Thus, based on Eisenbach's version of events, Zatzkin had not left the scene and was still engaged in duties relating to his investigation of the driver when Eisenbach returned to the driver. In declarations by Eisenbach and the driver, both men asserted that Eisenbach approached only after Zatzkin was "done speaking with" the driver. However, those statements are conclusory and provide no concrete facts from which it could be inferred that every reasonable officer in Zatzkin's position would conclude that the investigation had ended.

Because Eisenbach's argument that his actions did not amount to criminal negligence rests on his assertion that he complied with Zatzkin's instruction by returning to the truck only after the investigation was complete, it is similarly unavailing. As to Eisenbach's contention that his actions were limited to speech, a reasonable officer could have believed that, in approaching the delivery truck, contrary to Zatzkin's instruction, Eisenbach's actions went beyond the realm of speech. *See, e.g.*, *Childers*, 848 F.3d at 415; *Haggerty*, 391 F.3d at 657 (reasonable officer could have believed that arrestee's actions were not limited to speech where the arrestee "stepped forward toward [the officer] after having previously been warned to not interfere and was within relative proximity").

Thus, on the record before us, Zatzkin was reasonable in concluding that he had probable cause to arrest Eisenbach, and Eisenbach has therefore failed to raise a genuine fact issue that precludes summary judgment against him on his Fourth Amendment claim. This conclusion is also fatal to Eisenbach's First Amendment claim. *See Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (probable cause to believe an arrestee has committed a crime precludes "any argument that the arrestee's speech as opposed to her criminal conduct was the motivation for her arrest").

 **[2]** Zatzkin is entitled to immunity from Eisenbach's malicious-prosecution claim as well. Under Texas law, "official immunity" is a defense to malicious-prosecution claims. *Crostley v. Lamar Cty.*, 717 F.3d 410, 424 (5th Cir. 2013) (citing **\*312** *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994) ). "Texas law of official immunity is substantially the same as federal qualified

immunity." *Id.* (quoting *Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997) ). Because Zatzkin reasonably believed that he had probable cause to arrest Eisenbach, he is entitled to official immunity on Eisenbach's malicious-prosecution claim. *See id.* (holding that official immunity barred malicious-prosecution claim because officers "were not objectively unreasonable in believing that probable cause existed").

**IV**

For these reasons, we AFFIRM the district court's summary judgment dismissal of Eisenbach's claims.

**All Citations**

728 Fed.Appx. 307

---

## Footnotes

\*　Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1　We view the evidence in the light most favorable to Eisenbach, the party opposing summary judgment. *See Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017).

2　It is unclear whether Eisenbach intends to revive his claims against Guzman on appeal. Eisenbach's brief rarely mentions Guzman outside of section headings, though he also asks us to reverse the district court's grant of summary judgment in favor of Zatzkin and Guzman. On appeal, Zatzkin and Guzman argue that Eisenbach abandoned his claims against Guzman. Eisenbach did not respond to this argument in his reply. In any event, we conclude that he has abandoned any claim against Guzman through his clear and unequivocal representations to the district court. *See Hosp. House, Inc. v. Gilbert*, 298 F.3d 424, 434 n.12 (5th Cir. 2002) (plaintiffs abandoned any § 1983 claim "by their clear representations to the district court that they were not alleging any violations of federal rights").

---

**End of Document**　　　　　　　　　© 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Haggerty v. Tex. S. Univ.,*

391 F.3d 653 (5th Cir. 2004)

391 F.3d 653
United States Court of Appeals, Fifth Circuit.

Michael HAGGERTY, Plaintiff–Appellee,
v.
TEXAS SOUTHERN
UNIVERSITY; et al., Defendants,
W. Williams, Individually and in
His Capacity as a Texas Southern
University Campus Police
Officer, Defendant–Appellant.

No. 03–20411
|
Nov. 18, 2004.

**Synopsis**

**Background:** Arrestee brought § 1983 claims and state law claims against arresting officer for false arrest/false imprisonment, and malicious prosecution. The United States District Court for the Southern District of Texas, Ewing Werlein, Jr., J., denied officer's motion for summary judgment based on based on qualified and official immunity, and officer appealed.

**Holdings:** The Court of Appeals, Garwood, Circuit Judge, held that:

[1] a reasonable officer in arresting officer's position could have believed with fair probability that arrestee, who stepped forward toward officer after having previously been warned to not interfere with officer's handling of potentially tense and dangerous situation and who was within relative proximity of officer, had interfered with officer's duties in violation of Texas law, and

[2] § 1983 claim could not be based on malicious prosecution.

Affirmed in part and reversed in part.

DeMoss, Circuit Judge, filed opinion dissenting in part.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (8)

**[1]    Federal Courts  ☞ As to immunity**

Denial of summary judgment on the ground of qualified immunity is immediately appealable to the extent that the question on appeal is whether the undisputed facts amount to a violation of clearly established law. 42 U.S.C.A. § 1983.

52 Cases that cite this headnote

**[2]    Federal Courts  ☞ Immunity**

Court reviews *de novo* the denial of summary judgment predicated on qualified immunity. 42 U.S.C.A. § 1983.

50 Cases that cite this headnote

**[3]    Civil Rights  ☞ Arrest and detention**

To prevail on his § 1983 false arrest/ false imprisonment claim, arrestee must show that officer did not have

probable cause to arrest him. 42 U.S.C.A. § 1983.

294 Cases that cite this headnote

[4]  **Civil Rights**  ⚷ Sheriffs, police, and other peace officers

Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to qualified immunity from liability on § 1983 false arrest/false imprisonment claim. 42 U.S.C.A. § 1983.

257 Cases that cite this headnote

[5]  **Civil Rights**  ⚷ Sheriffs, police, and other peace officers

**False Imprisonment**  ⚷ Persons Liable

**Municipal, County, and Local Government**  ⚷ Police, law enforcement, and public safety

**Public Employment**  ⚷ Law enforcement personnel

Arresting officer was entitled to qualified immunity from arrestee's false arrest/false imprisonment claim under § 1983 and official immunity on arrestee's false arrest/false imprisonment claim under Texas law; a reasonable officer in arresting officer's position could have believed with fair probability that arrestee, who stepped forward toward officer after having previously been warned to not interfere with officer's handling of potentially tense and

dangerous situation and who was within relative proximity of officer, had interfered with officer's duties in violation of Texas law. 42 U.S.C.A. § 1983; V.T.C.A., Penal Code § 38.15(a)(1).

164 Cases that cite this headnote

[6]  **Civil Rights**  ⚷ Malicious prosecution and false imprisonment; mental health commitments

Malicious prosecution standing alone is no violation of the United States Constitution, and to proceed under § 1983 such a claim must rest upon a denial of rights secured under federal and not state law. 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

[7]  **Federal Courts**  ⚷ Failure to mention or inadequacy of treatment of error in appellate briefs

Issue not argued in brief was waived on appeal.

[8]  **Public Employment**  ⚷ In general; official immunity

Texas law of official immunity is substantially the same as federal qualified immunity law. 42 U.S.C.A. § 1983.

49 Cases that cite this headnote

**Attorneys and Law Firms**

**\*654** U. Lawrence Bozé (argued), Houston, TX, for Haggerty.

Russ Harris (argued), Austin, TX, for Williams.

Appeal from the United States District Court for the Southern District of Texas.

Before GARWOOD, WIENER and DeMOSS, Circuit Judges.

**Opinion**

GARWOOD, Circuit Judge:

Defendant-appellant Willie Williams, a Texas Southern University Police Officer, appeals the partial denial of his motion for summary judgment based on qualified immunity. We affirm in part and reverse in part.

Plaintiff-appellee Michael Haggerty brought several claims for damages against Williams in his individual capacity based on 42 U.S.C. § 1983 and Texas law.[1] **\*655** Williams sought summary judgment based on qualified immunity respecting Haggerty's section 1983 claims and based on official immunity respecting Haggerty's state law claims. The district court denied summary judgment on Haggerty's claims under section 1983 for false arrest/false imprisonment, excessive force, and malicious prosecution and on Haggerty's claims under state law for false imprisonment and malicious prosecution.[2]

**Discussion**

*I. Jurisdiction over this Appeal*

**[1]** "Denial of summary judgment on the ground of qualified immunity is immediately appealable to the extent that the question on appeal is whether the undisputed facts amount to a violation of clearly established law." *Kelly v. Foti,* 77 F.3d 819, 821 (5th Cir.1996).

*II. Qualified Immunity and Claims Under § 1983*

**[2]** We review *de novo* the denial of summary judgment predicated on qualified immunity. *Beltran v. City of El Paso,* 367 F.3d 299, 302 (5th Cir.2004). In an interlocutory appeal in which the defendant asserts qualified immunity, to the extent that the district court found that genuine factual disputes exist, we accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true. *Id.*

We use a two-step approach to analyze qualified immunity claims. *Price v. Roark,* 256 F.3d 364, 369 (5th Cir.2001). First, we "consider whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right." *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)). If the plaintiff's allegations could make out a constitutional violation, we then "ask whether the right was clearly established—that is, whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Id.* (quoting *Saucier,* 121 S.Ct. at 2156). "If,

upon viewing the evidence in the light most favorable to the [plaintiff], reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Southard v. Tex. Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir.1997). This inquiry is an objective one, not dependant on the particular officer's subjective beliefs. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987).

### A. False Arrest/False Imprisonment Under Section 1983

**[3]   [4]**   To ultimately prevail on his section 1983 false arrest/false imprisonment claim, Haggerty must show that Williams did not have probable cause to arrest him. *See Brown v. Lyford,* 243 F.3d 185, 189 (5th Cir.2001) ("The 'constitutional torts' of false arrest ... and false imprisonment ... require a showing of no probable cause."). Probable cause exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable **\*656** person to conclude that the suspect had committed or was committing an offense." *Glenn v. City of Tyler,* 242 F.3d 307, 313 (5th Cir.2001) (internal quotation and citation omitted). Therefore, Williams is entitled to qualified immunity if a reasonable officer in his position could have believed that, in light of the totality of the facts and circumstances of which Williams was aware, there was a fair probability that Haggerty had committed or was committing an offense. *See id.; see also United States v. Watson,* 273 F.3d 599, 602 (5th Cir.2001) (explaining that probable cause's "fair probability" requires more than a bare suspicion but less than a preponderance of evidence). "Even law enforcement officials

who reasonably but *mistakenly* conclude that probable cause is present are entitled to immunity." *Mendenhall v. Riser,* 213 F.3d 226, 230 (5th Cir.2000) (emphasis added) (internal quotation and citation omitted); *see also Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987) ("... it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials —like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable"). In sum, Haggerty "must clear a significant hurdle to defeat [William's] qualified immunity." *Brown,* 243 F.3d at 190. "[T]here must not even arguably be probable cause for the ... arrest for immunity to be lost." *Id.* (internal quotation and citation omitted).

Haggerty was arrested for interference with the duties of a public servant. *See* TEX. PENAL CODE ANN. § 38.15(a)(1) (2004). "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with ... a peace officer while the peace officer is performing a duty...." *Id.* However, "it is a defense" that the alleged "interruption, disruption, impediment or interference" "consisted of speech only." § 38.15(d).

**[5]**   Viewing the facts in the light most favorable to Haggerty and based on the totality of the circumstances within Williams's knowledge, a reasonable officer in Williams's position could have believed with "fair probability" that Haggerty had interfered with his duties. Haggerty claimed in his affidavit that

on July 27, 2000 Kendrick Randolph, a student from Haggerty's group who allegedly had just been attacked (by eight males, according to Haggerty's response to the motion for summary judgment) in the cafeteria of Texas Southern University (TSU), "was out of control and was trying to fight all those that had jumped on him." When Haggerty went outside, he saw Williams handcuffing Randolph; he told Williams not to handcuff Randolph and that he was Randolph's teacher.[3] Haggerty acknowledges that Williams told him to "step back or get away and if [he] didn't [he] would be put under arrest."[4] Haggerty claims to have stepped back without touching Williams.

Williams then took Randolph back into the TSU student center. Randolph saw some of the individuals who had attacked him and began pulling away from Williams to again combat those individuals. When Haggerty went back into the student center, he saw Williams slam Randolph into a wall. Haggerty claims that he then "took **\*657** a few steps forward, but never got closer than 10–15 feet to ... Williams" and said "don't do that, don't slam that boy into the wall" and "don't manhandle that juvenile."[5] Haggerty states that he was not cursing, but "was speaking up loudly." He also observed "many young children and others seeing [what] was going on." Williams then said something that Haggerty cannot recall, and "the next thing I (Haggerty) recall" is several other officers (not Williams) tackled Haggerty.

Thus, viewing the totality of circumstances in the light most favorable to Haggerty, but from the perspective of a reasonable officer in Williams's position, we have: police called because Haggerty concluded he and TSU staff could not handle the matter (see note 6, *infra*), an out-of-control victim/witness/suspect (Randolph) who was occupying Williams's efforts and attention, a nearby group of some eight alleged attackers, an approaching person in relative proximity to Williams (Haggerty)— who had previously been told to "step back" and that he would be arrested if he did not— speaking loudly and telling Williams to stop, and a gathering crowd. A reasonable officer in Williams's position could have believed that the situation was tense and dangerous, Haggerty's actions were serving to stir up the potentially explosive situation,[6] and there was a fair probability that Haggerty's actions constituted interference with his duties.

Further, while Haggerty's relevant actions included speech, a reasonable officer could have believed that they were not *limited* to speech: Haggerty stepped forward toward Williams after having previously been warned to not interfere and was within relative proximity (10 to 15 feet away). Under the circumstances, it is not unreasonable that an officer could have believed that this constituted more than "speech *only*" and that the statutory defense of section 38.15(d) was not established. As "law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity," *Mendenhall,* 213 F.3d at 230 (internal quotations and citations omitted), it is not determinative that Haggerty's interruption, disruption, impediment or interference could ultimately be determined to have been by speech *only* and that Williams's probable cause judgment may have been wrong. *Cf. Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2159– 60, 150 L.Ed.2d 272 (2001). We conclude

that **\*658** Williams is entitled to qualified immunity from Haggerty's false arrest/false imprisonment claim under section 1983.

### B. Malicious Prosecution Under *Section 1983*

**[6]**   Subsequent to the district court's denial of Williams's summary judgment, and to when the briefs in this appeal were filed, we held that " 'malicious prosecution' standing alone is no violation of the United States Constitution, and that to proceed under 42 U.S.C. § 1983 such a claim must rest upon a denial of rights secured under federal and not state law." *Castellano v. Fragozo,* 352 F.3d 939, 942 (5th Cir.2003) (en banc). Thus, we order that Haggerty's 1983 section malicious prosecution claim be dismissed.

### C. Excessive Force Claim Under *Section 1983*

**[7]**   Williams briefly argues that he is entitled to *official immunity* on a *state law* excessive force claim. However, the record does not indicate that Haggerty brought a *state law* excessive force claim, and the district court made no ruling on such a claim. [7] The district court did hold that Haggerty's *section 1983* excessive force claim could proceed; but because Williams has not argued that issue in his brief, [8] it is waived on appeal. *See United States v. Mullin,* 178 F.3d 334, 340 n. 1 (5th Cir.1999).

### III. Official Immunity and Claims Under State Law

As with the section 1983 false arrest/false imprisonment claim, the resolution of

Haggerty's remaining state law claims, false imprisonment and malicious prosecution, turns on whether a reasonable officer in Williams's position could have reasonably believed he had probable cause to order the arrest of Haggerty. *See Villegas v. Griffin Industries,* 975 S.W.2d 745, 754 (Tex.App.—Corpus Christi 1998, pet. denied) (stating that whether the imprisonment was without authority of law "depends on whether the officers had probable cause to effect an arrest"); *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517 (Tex.1997) (listing "absence of probable cause for the proceeding" as an element of malicious prosecution).

**[8]**   "Texas law of official immunity is substantially the same as federal qualified immunity law." *Wren v. Towe,* 130 F.3d 1154, 1160 (5th Cir.1997). We therefore reverse the denial of summary judgment based on official immunity from Haggerty's remaining state law claims for the same reasons that we reverse the denial of summary judgment on the section 1983 false arrest/false imprisonment claim.

### Conclusion

For the reasons stated herein, we AFFIRM the denial of summary judgment with respect to the section 1983 excessive force claim and REVERSE the denial of summary judgment with respect to the section 1983 false arrest/false imprisonment and the state law false imprisonment and malicious prosecution claims. We also order that Haggerty's section 1983 malicious prosecution claim be dismissed.

AFFIRMED in part; REVERSED in part.

DeMOSS, Circuit Judge, dissenting in part:

Insofar as the majority's opinion reverses the district court's denial of qualified **\*659** immunity on the § 1983 claims of false imprisonment or false arrest, I respectfully dissent. On these particular facts, a Texas statute, section 38.15 of the Penal Code, provides both the offense for which Officer Williams arrested Haggerty, TEX. PEN.CODE § 38.15(a)(1), and a defense when the interfering conduct is merely speech, *id.* § 38.15(d).

The majority correctly states that Haggerty must, to prevail on these claims, demonstrate that Williams lacked probable cause to arrest him under section 38.15. *See Brown,* 243 F.3d at 189. On this record and because of the peculiar nature of the explicit mere speech defense found in section 38.15(d), I cannot agree that Officer Williams had probable cause to arrest Haggerty. A reasonable officer in Williams's position would have been familiar with and trained in the application of section 38.15, which in its original form in 1989 included the "mere speech" defense. Act effective Sept. 1, 1989, 71st Leg., R.S., ch. 1162, § 1, 1989 Tex. Sess. Law Serv. 4780. The law, as to what constituted interference with a police officer and the existence of the speech only defense, was in place and well established at the time of Haggerty's arrest. Any reasonable police officer would know of and recognize his obligations to abide by the language of the statutory provision, including the obligation to refrain from arresting one whose objections are expressed merely by speech.

In *Carney v. State,* 31 S.W.3d 392, 397 (Tex.App.—Austin 2000, no pet.), the Texas court of appeals reversed a jury's conviction under section 38.15. There, although the defendant argued with the officers, delayed their entrance into his home, and lied to them, the Texas court held that the speech only defense of § 38.15(d) applied and that "a rational trier of fact could not have found, beyond reasonable doubt, the essential element of interference." *Id.* at 398.

In resolving that Williams is entitled to qualified immunity, the majority relies upon factors other than Haggerty's own conduct (e.g., an out-of-control victim occupying Williams's attention, a nearby group of students and teachers, some allegedly involved in an attack, and a crowd). This resolution is in tension with the treatment of section 38.15 in *Carney,* where the Texas court did not look to surrounding factors, but instead limited its review to whether the defendant's conduct alone included more than speech. Although *Carney* was decided after the incident leading to this appeal, the opinion suggests that Texas limits its analysis of the applicability of the mere speech defense to the individual's conduct alone. The only fact offered by Williams in support of the arrest in the criminal information was the allegation that Haggerty grabbed Williams. Because of this limited language, in combination with the evidence adduced by Haggerty, the primary fact question is whether Haggerty grabbed or attempted to grab Officer Williams.

The majority determines that this factual dispute is immaterial to the legal question of qualified immunity in this case. I disagree,

based upon the record and my view that Texas's statute requires consideration of whether the mere speech defense applied. The question must be resolved in the light most favorable to Haggerty. *See Price,* 256 F.3d at 369. Therefore, we must assume that Haggerty never touched nor attempted to touch the officer and his only interfering conduct was speech. Based upon this view of the record and Texas's treatment of the mere speech defense in *Carney,* I cannot say that any reasonable officer would find probable cause to arrest Haggerty under section 38.15.

**\*660**  For these reasons, I would affirm the district court's denial of summary judgment on the § 1983 false arrest or false imprisonment claims and permit Haggerty to develop facts further, even if Officer Williams were ultimately entitled to qualified immunity on a more developed showing. In all other aspects of the majority's opinion, I concur.

**All Citations**

391 F.3d 653

---

## Footnotes

1    Haggerty's petition does not clearly define his claims. His claims consisted of violations of 42 U.S.C. § 1983 and false imprisonment, malicious prosecution, and assault and battery, but Haggerty did not define his § 1983 claims in detail or clearly differentiate between his § 1983 and state law claims. For instance, in Haggerty's response to Williams's motion for summary judgment, Haggerty recounted the allegations in his petition, declaring that Williams had "purposely deprived [Haggerty] of his rights ... afforded by the 4th, 5th and 14th Amendments to the United States Constitution and the Texas Constitution, in violation of 42 U.S.C. § 1983, and that such conduct toward [Haggerty] constituted false imprisonment, malicious prosecution and assault and battery"; however, Haggerty did not specifically state whether any (or which) of these claims were based on state law.

In ruling on Williams's motion for summary judgment, the district court divided the claims between § 1983 claims (false arrest/false imprisonment, excessive force, and malicious prosecution), and state law claims (assault and battery, state constitutional claims, false imprisonment, and malicious prosecution). At oral argument before this court, the parties agreed with the district court's categorization of Haggerty's claims.

2    The district court initially granted summary judgment on Haggerty's § 1983 excessive force claim and his state law assault and battery and constitutional tort

claims. Later on rehearing, however, the district court reinstated the 1983 excessive force claim.

3    Haggerty alleged in his petition that he "rushed outside" and told Williams not put Randolph in handcuffs.

4    Haggerty alleged in his petition that Williams advised him to "stay away" and that he would be arrested if he interfered.

5    Haggerty alleged in his petition that when he saw Williams slam Randolph against the wall, "he stepped forward and stated loudly 'stop, stop don't do that, that's wrong!' "

6    Haggerty claims that the situation was not potentially violent *because* "this was a college campus not [t]he back streets of Third Ward and there were youth participants, educators, TSU staff and employees looking in shock at what was going on." This claim by Haggerty from *his point of view,* however, is not controlling to our qualified immunity analysis in that it does not determine what a reasonable officer *in Williams's position* might have believed. Indeed, Haggerty's affidavit states respecting the original cafeteria confrontation "I along with other PIP staff tried our best to stop it. When I realized we couldn't stop it I told Texas Southern Cafeteria staff to call the Texas Southern police department for help...." A bystander witness, another adult leader of the student group, made a statement (which was submitted by Haggerty in his response to Williams' motion for summary judgment) in which she described the situation as: "confusion," a "crowd rush[ing] to the center of the scene and every body ... pushing and shubbing [sic]," a "wild heard [herd] of students," and "the crowd was too wild." In light of the undisputed facts—fighting, an extremely agitated person (Randolph), loud speaking, a crowd—an officer in Williams's position could reasonably have perceived the presence of "many young children and others" observing—as described by *Haggerty*—in the same way that this witness did.

7    At oral argument, both parties acknowledged that Haggerty did not bring a *state law* excessive force claim, but only a § 1983 excessive force claim.

8    In his statement of the issues, Williams does not list anything with respect to an excessive force claim, under § 1983 *or* state law.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# *Johnson v. City of San Antonio*

No. 22-50196, 2023 WL 3019686 (5th Cir. Apr. 20, 2023)

2023 WL 3019686
Only the Westlaw citation
is currently available.
United States Court of Appeals, Fifth Circuit.

April JOHNSON, an individual and
as next friend of A.N.E.R., a minor;
A.N.E.R., a minor child, an individual,
Plaintiffs—Appellants/Cross-Appellees,
v.
The CITY OF SAN ANTONIO; Daniel
Groce, Officer, Badge #1182, individually
and in his official capacity; Does 1
Through 25, Defendants—Appellees,
Gary Tuli, Officer, Badge #517,
individually and in his official capacity;
Jessica Osoria, Officer, Badge #1422,
individually and in her official capacity,
Defendants—Appellees/Cross-Appellants.

No. 22-50196
|
FILED April 20, 2023

Appeal from the United States District Court
for the Western District of Texas, USDC No.
5:19-CV-733

**Attorneys and Law Firms**

Artessia K. House, Esq., Tess House Law,
P.L.L.C., San Antonio, TX, for Plaintiffs—
Appellants/Cross-Appellees.

Shawn Kevin Fitzpatrick, Fitzpatrick &
Kosanovich, P.C., San Antonio, TX, Michael
J. Urbis, City Attorney's Office, San Antonio,
TX, for Defendant—Appellee City of San
Antonio.

Charles Straith Frigerio, Trial Attorney,
Law Offices of Charles S. Frigerio, P.C.,
San Antonio, TX, for Defendants—Appellee/
Cross-Appellant Gary Tuli.

Clarissa M. Rodriguez, Patrick C. Bernal, Esq.,
Denton, Navarro, Rocha, Bernal & Zech, P.C.,
San Antonio, TX, for Jessica Osoria, Daniel
Groce.

Before Wiener, Stewart,[*] and Engelhardt,
Circuit Judges.

**Opinion**

Per Curiam:[**]

**\*1** In 2017, A'Mynae Roberts attended her
friend's quinceañera and found herself in the
back of a police car, in disheveled clothes
and handcuffed, for the alleged assault of a
police officer. She asserted various § 1983 and
state-law claims against three officers, Officer
Tuli, Officer Osoria, and Officer Groce,[1] and
the City of San Antonio (the "City").[2] She
appeals the district court's grant of summary
judgment in favor of the City and the court's
dismissal of her state-law claims. Officer Tuli
and Officer Osoria appeal the district court's
denial of their summary-judgment motions. For
the reasons set forth below, we DISMISS in part
and REVERSE in part.

## I. Facts & Procedural History

On May 20, 2017, Officer Tuli, Officer Groce,
Officer Osoria, and approximately six other
officers of the San Antonio Police Department

("SAPD") responded to an assault in progress between partygoers outside of a quinceañera. Upon arrival, they met a large, angry crowd of about fifty to sixty people. People were yelling at one another, and fights, brawls, and arguments broke out between different groups in multiple areas. Roberts (then 14 years old) and her mother, April Johnson, were part of the crowd and allegedly engaged in the fighting. Despite there being only eight or nine officers present (including Officers Tuli, Groce, and Osoria), the officers attempted to control the unruly crowd and separate fighting individuals. At some point amidst the chaos, Officer Tuli told Johnson to "shut up" in an "aggressive way." What happened next is disputed.

 **\*2**  According to Roberts, she yelled to Officer Tuli, "don't talk to her like that!" and "made a gesture toward Officer Tuli" with her finger. Then Officer Tuli punched her in the face. The punch caused her to spin around and lose her balance. As a result, her strapless dress fell, exposing her breasts. She was handcuffed, placed in the back of an SAPD car, and taken to jail. She was charged with assaulting a police officer. Roberts states that she never hit Officer Tuli, made any movements with her arms in his proximity, or – as he says she did – called him a "white mother fucker."

According to Officer Tuli, Roberts yelled at him and attempted to instigate a fight. He described Roberts as "being loud," "not following orders," and "an obvious threat based on her demeanor." After Officer Tuli allegedly commanded Roberts to back away, Roberts moved closer to him, which provoked Officer Tuli to "lightly push[ ] her back." Then, Roberts allegedly balled up her fists, took a bladed stance, struck the left side of Officer Tuli's face with her right fist, and called him a "white mother fucker." After being hit, Officer Tuli says that he punched Roberts in the face with a closed fist and pulled her arms behind her back. Despite Roberts' continued fighting, pulling away, and struggling, Officer Tuli says that he and Officer Osoria effected the arrest and placed her in the police car.

According to Officer Osoria, Roberts was "definitely hostile." Roberts was allegedly not listening to lawful orders, was interfering with police duties, and was being loud. She then took a "fighter stance," says Officer Osoria, "charged towards [Officer Tuli]," and struck him on the left side of his face with a right closed fist. Officer Tuli then allegedly struck Roberts with a closed fist and attempted to arrest her. Officer Osoria's police report states that Roberts was uncooperative, disobeyed lawful orders, and refused to place her hands behind her back. Officer Osoria assisted Officer Tuli in the arrest by grabbing Roberts' arm, pulling it behind her back, and securing her up against a nearby vehicle. Because Roberts allegedly "caused a struggle" while the officers detained her, her top fell down and exposed her breasts. Officer Osoria says she attempted to cover Roberts by fixing Roberts' top, but was not able to do so because of Roberts' continuous struggling and failure to cooperate. Officer Osoria then allegedly walked Roberts over to a police vehicle and, once Roberts stopped struggling, deemed it was "safe" for her to adjust her top, which Officer Osoria did for Roberts in the back of the car. Afterwards, Officer Osoria reported that Officer Tuli complained of pain and minor swelling to his face.

This suit followed. Against Officer Tuli, Roberts brought claims for excessive force, assault and battery, and unlawful arrest and false imprisonment, all under § 1983; and state-law claims of intentional infliction of emotional distress and defamation. Against Officer Groce and Officer Osoria, Roberts brought claims for unlawful arrest and false imprisonment under § 1983 and state-law claims of intentional infliction of emotional distress and defamation. Against the City, Roberts brought claims for unlawful arrest and false imprisonment, intentional infliction of emotional distress, and negligent hiring, supervision, training, and retention. All parties moved for summary judgment.

Citing genuine issues of material fact, the district court denied Robert's motion for summary judgment, granted the City's cross-motion for summary judgment, and granted in part and denied in part Officer Tuli's and Officers Groce and Osoria's cross-motions for summary judgment. The district court dismissed all state-law claims and all claims against Officer Groce and the City. The court then "terminated" Officer Groce and the City as parties to the suit as a result of its granting their respective motions for summary judgment. Following the district court's disposition of those motions, these claims remained: (1) an excessive force claim brought under 1983 against Officer Tuli; (2) unlawful-arrest and false-imprisonment claims brought under § 1983 against Officer Tuli; and (3) unlawful-arrest and false-imprisonment claims brought under § 1983 against Officer Osoria.

**\*3** Roberts timely appealed the district court's: (1) grant of summary judgment in favor of the City; and (2) dismissal of her state-law claims. Officer Tuli and Officer Osoria timely appealed the district court's denial of their summary-judgment motions premised on qualified immunity.

## II. Roberts' appeal:

### A. The grant of summary judgment in favor of the City:

Roberts challenges the dismissal of her claims against the City. But our jurisdiction over Roberts' appeal of the district court's grant of the City's summary-judgment motion is suspect. "It is axiomatic that parties may not stipulate appellate jurisdiction. We are obliged, *sua sponte* if necessary, to examine the basis for our jurisdiction." *Borne v. A & P Boat Rentals No. 4, Inc.*, 755 F.2d 1131, 1133 (5th Cir. 1985) (citations omitted). "Under 28 U.S.C. § 1291, courts of appeals may review only 'final decisions' of the district courts." *Williams v. Seidenbach*, 958 F.3d 341, 343 (5th Cir. 2020) (en banc). "[I]n a suit against multiple defendants, there is no final decision as to one defendant until there is a final decision as to all defendants." *Williams*, 948 F.3d at 343 (citing FED. R. CIV. P. 54(b) (absent an order to the contrary, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties")). But, "[w]hen an action involves multiple parties or claims, an order dismissing some of the claims is

final for appellate purposes only if the district court (1) has made an express determination that there is no just reason for delay and an express direction for the entry of judgment, *see* Fed. R. Civ. P. 54(b), or (2) certifies the case for immediate appeal pursuant to 28 U.S.C. § 1292(b)." *Castille v. City of League City, Texas*, No. 21-40202, 2022 WL 175545, at *1 (5th Cir. Jan. 18, 2022) (per curiam) (unpublished). [3]

 **\*4** Here, the district court's order on the motions for summary judgment did not dispose of Roberts' § 1983 claims against Officer Tuli and Officer Osoria. Thus, it adjudicated fewer than all of the claims of all of the parties. Nothing in the order or the record reflects an intent by the district judge to enter a partial final judgment. In fact, the order simply provides:

> All state law claims are DISMISSED and the § 1983 claims against Officer Groce and the City are DISMISSED. The Court orders Officer Groce and the City of San Antonio be TERMINATED as parties to this suit.

> IT IS SO ORDERED.

From this, the City correctly argues that we lack jurisdiction over the claims asserted against it because "[t]here is no clear, unmistakable declaration of appealability in the district court's order granting summary judgment to the City." Neither Rule 54(b) [4] nor § 1292(b) [5] supplies jurisdiction for the appeal of the district court's grant of the City's summary-judgment motion.

Examining Rule 54(b) first, there is no indication that the district court unmistakably directed a final judgment as to the City. "If the language in the order appealed from, either independently or together with related portions of the record referred to in the order, reflects the district court's unmistakable intent to enter a partial final judgment under Rule 54(b), nothing else is required to make the order appealable." *Kelly*, 908 F.2d at 1220. As the City points out, "unmistakable intent" is noticeably absent from the bare-bones language of the order granting its motion for summary judgment. Moreover, there is no record evidence that the district court ever certified its order dismissing the claims against the City as a "final" judgment under Rule 54(b). To that end, there is no record evidence that Roberts ever moved for entry of judgment under Rule 54(b) as to the order granting the City's summary-judgment motion. *See Kelly*, 908 F.2d at 1220. When, as here, there is neither an express determination that there is no just reason for delay and an express direction for the entry of judgment, nor any indication in the record that the parties sought such certification, there is no Rule 54(b) final judgment. Accordingly, we lack authority to adjudicate this appeal under Rule 54(b).

 **\*5** Examining § 1292(b) next, there is no indication that the district court declared § 1292(b)'s specific statutory dictates to certify the order's immediate appeal. Absent from the district court's ruling is any statement that the order involves a controlling question of law contemplated by the statute. And no party argues that such a question exists in this case. Noticeably absent, too, is any indication that an immediate appeal would materially advance the case's termination. Because the district court never certified the judgment dismissing the claims against the City as appealable under §

1292(b), we lack authority to adjudicate this appeal under the statute.

Without any indication from the district court's order or the record that Rule 54(b) or § 1292(b) permits an appeal, we lack jurisdiction. Roberts' appeal as to the district court's grant of the City's summary judgment motion is dismissed.

### B. Dismissal of Roberts' state-law claims:

Roberts challenges the dismissal of her state-law claims against Officer Tuli and Officer Osoria. [6] Roberts does not explain why we have jurisdiction over the dismissed state-law claims. Rather, she merely asserts that the district court's dismissal of such claims was in error. But our jurisdiction over the state-law clams is also suspect. And "[t]his [C]ourt has a continuing obligation to assure itself of its own jurisdiction, *sua sponte* if necessary." *United States v. Pedroza-Rocha*, 933 F.3d 490, 493 (5th Cir. 2019) (citing *Bass v. Denney*, 171 F.3d 1016, 1021 (5th Cir. 1999)).

Separate from its qualified-immunity analysis, the district court dismissed all state-law claims against the officers – assault, battery, intentional infliction of emotional distress ("IIED"), and defamation – as barred under the Texas Tort Claims Act ("TTCA"). Roberts states that this was in error, but does not elaborate. She does not argue, or make reference to, pendent appellate jurisdiction. And she fails to contend that the orders on the state-law claims are inextricably intertwined with those on the qualified immunity issues or that conjunctive review is necessary to ensure

meaningful review. Therefore, we decline to exercise jurisdiction and we dismiss the appeal as to the state-law claims for want of jurisdiction.

### III. Officers Osoria's and Tuli's cross appeals:

Officers Osoria and Tuli both challenge the district court's denial of their summary-judgment motions on qualified-immunity grounds. When claims are brought against multiple officers in connection with a single arrest, we "must analyze the officers' actions separately." *Buehler v. Dear*, 27 F.4th 969, 985 (5th Cir. 2022) (quoting *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018)). We first address the claims as they relate to Officer Osoria, then as they relate to Officer Tuli.

### A. Jurisdiction & standard of review:

"Qualified immunity shields public officials sued in their individual capacities from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kokesh v. Curlee*, 14 F.4th 382, 391 (5th Cir. 2021) (cleaned up). This appeal is taken under the collateral order doctrine, which permits denial of a motion for summary judgment on the basis of qualified immunity to be appealed immediately as a final decision under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985). "A qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense,

Case 4:22-cv-04210   Document 106   Filed on 07/01/25 in TXSD   Page 129 of 182

Johnson v. City of San Antonio, Not Reported in Fed. Rptr. (2023)

the burden shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Solis v. Serrett*, 31 F.4th 975, 980 (5th Cir. 2022) (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)). On an immunity-based interlocutory appeal of a denial of summary judgment, "we do not apply the standard of Rule 56 but instead consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004); *see also Kokesh*, 14 F.4th at 39 (same).

 **\*6** Appellate review of an interlocutory appeal is limited. *Solis*, 31 F.4th at 980. Namely, "[d]istrict court orders denying summary judgment on the basis of qualified immunity are immediately appealable and reviewed *de novo only if* they are predicated on conclusions of law and not genuine issues of material fact." *Kokesh*, 14 F.4th at 390 (emphasis added); *see also Winfrey v. Pikett*, 872 F.3d 640, 643 (5th Cir. 2017) ("The district court's denial of summary judgment is immediately appealable 'to the extent it turns on an issue of law.' ") (quoting *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010)). "[W]e cannot review a district court's conclusions that a genuine issue of fact exists concerning whether a defendant engaged in certain conduct." *Walsh v. Hodge*, 975 F.3d 475, 481 (5th Cir. 2020). In short, when the district court has held that there is a genuine dispute of material fact, "we have jurisdiction to review the materiality of any factual disputes, but not their genuineness." *Escobar v. Montee*, 895

F.3d 387, 393 (5th Cir. 2018) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (internal quotation omitted)). [7] Accordingly, "[t]his Court is essentially reviewing the district court's decision that a 'certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law.' " *Kokesh*, 14 F.4th at 391 (quoting *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc)). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.* (quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)).

### B. The defense of qualified immunity, generally:

To overcome the defense of qualified immunity, Roberts must satisfy a two-pronged test. First, Roberts must show that "the official violated a statutory or constitutional right." Second, Roberts must show that "the right was 'clearly established' at the time of the challenged conduct." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)). "Although a case *directly* on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Id.* at 265 (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)). Thus, "a clearly established right is one that is sufficiently clear that every reasonable official would have

understood that what he is doing violates that right." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

**\*7** "Because the plaintiff is the non-moving party, we construe all facts and inferences in the light most favorable to the plaintiff." *Id.* at 261. Thus, "on interlocutory appeal the public official must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal." *Gonzales v. Dallas County*, 249 F.3d 406, 411 (5th Cir. 2001). It is noteworthy that this record on appeal includes eight videos from four different angles, slowed down to varying degrees. " 'Although we review evidence in the light most favorable to the nonmoving party' on appeal from a district court's disposition of a summary-judgment motion, 'we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.' " *Buehler*, 27 F.4th at 979 (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).[8] But that assignment only occurs when the plaintiff's version of events is so "blatantly contradicted" by the video on appeal that "no reasonable jury" could believe her. *Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). As explained below, for the most part, the videos do, in fact, blatantly contradict Roberts' version of events. Accordingly, we view the evidence in the light depicted by the videotape and otherwise in the light most favorable to Roberts.

## C. Officer Osoria's appeal of the district court's partial denial of her summary judgment motion.

Officer Osoria challenges the district court's determination that she is not entitled to qualified immunity with respect to the claims of unlawful arrest and false imprisonment. To defeat Officer Osoria's qualified immunity defense, Roberts must first show that Officer Osoria violated a statutory or constitutional right. Then, Roberts must show that the right was clearly established at the time of the challenged conduct. *See Melton*, 875 F.3d at 261. We conclude that she is qualifiedly immune.

### i. Officer Osoria did not violate a statutory or constitutional right.

As a general matter, "[t]he right to be free from arrest without probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994). "An arrest is unlawful unless it is supported by probable cause." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (citing *Hinshaw v. Doffer*, 785 F.2d 1260, 1266 (5th Cir. 1986)). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.* (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996)) (emphasis in original).[9] "To determine whether probable cause existed for

an arrest, the court examines the events leading up to the arrest, and then decides whether these historical facts, viewed from the standpoint of a reasonable police officer, amount to probable cause." *Loftin v. City of Prentiss, Mississippi*, 33 F.4th 774, 780 (5th Cir. 2022) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)) (internal quotation marks and alterations omitted).

The standard for analyzing probable cause is whether, under the totality of the circumstances, there is a "fair probability" that a crime occurred. *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999) (quoting *United States v. Antone*, 753 F.2d 1301, 1304 (5th Cir. 1985)). "The requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark." *Id.* at 269 (quoting *Antone*, 753 F.2d at 1304). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see also Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

**\*8** To succeed on her unlawful arrest and false imprisonment claims, Roberts must show that there was "not even arguably ... probable cause" for her arrest. *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001) (internal quotation marks and citation omitted). "This probable cause may be for *any* crime and is not limited to the crime that the officers subjectively considered at the time they perform an arrest." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 392 (5th Cir. 2017) (citing *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009))

(emphasis added). "An officer may conduct a warrantless arrest based on probable cause that an individual has committed even a minor offense, including misdemeanors." *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). [10] And "[t]he police may take reasonable actions under the circumstances to ensure their own safety, as well as the safety of the public, during an encounter with a suspect." *Turner v. Lieutenant Driver*, 848 F.3d 678, 694 (5th Cir. 2017) (quoting *United States v. Abdo*, 733 F.3d 562, 565 (5th Cir. 2013)). In sum, Officer Osoria is entitled to qualified immunity if a reasonable officer in her position could have believed that, in light of the totality of the facts and circumstances of which she was aware, there was a fair probability that Roberts had committed or was committing an offense. *See Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656 (5th Cir. 2004).

We begin by reviewing the events leading up to the arrest. Roberts states that while she was standing at the scene, she yelled at Officer Tuli, "don't talk to her like that!" In her deposition testimony, Roberts testified that when she made a finger gesture at Officer Tuli, her "hand did not extend out," her "arm did not extend out," and her gesture was not close to his face. The complaint alleges that, after she made the finger gesture, "[t]he next thing [Roberts] remember[ed] was Officer Tuli punching [her]." According to the complaint, Roberts felt like she was being "swung around" by the cops. And then she was handcuffed and ultimately arrested for an assault on a peace officer. [11]

Johnson v. City of San Antonio, Not Reported in Fed. Rptr. (2023)

Case 4:22-cv-04210    Document 106    Filed on 07/01/25 in TXSD    Page 132 of 182

The video footage tells a different story – enough to "blatantly contradict" a significant portion of Roberts' version of events so that we can assign greater weight to the facts evident from the video recordings.[12] *See Ramirez*, 716 F.3d at 374. Officer Hillman's body camera sets the scene: a crowd of people jostling, fighting with, and yelling at one another. Shortly before Roberts interacted with Officer Tuli, Officer Cavazos's body camera reveals that Roberts quickly approached Officer Osoria out of the crowd; jerked her body and extended her arm towards Officer Osoria's head; yelled, "Don't touch me bitch! Don't fucking touch me!"; refused to back up after Officer Osoria directed her to; repeatedly approached Officer Osoria directly despite being directed to "back up"; and ultimately had to be restrained by an individual not in police uniform. The video from Officer Carrasco's body camera shows the interaction with Officer Tuli. Contrary to Roberts' version of events, the video does not show Roberts merely standing still, but rather shows her aggressively stepping in the direction of the area from which Officer Tuli comes into the video frame. It also shows Roberts fully extending her arm at an angle between 45 and 90 degrees. And it corroborates her yelling, "Don't talk to her like that." It then shows Officer Tuli approaching Roberts, the two struggling, and both Officer Tuli's arms and Roberts' arms flailing[13] about. Moreover, and importantly, footage from Officer Cavazos's body camera shows that, at the moment Roberts extended her arm and yelled, she was in close proximity to Officer Tuli – so close that he was able to make contact with her within a split second.

**\*9** Officer Osoria stated in her deposition testimony that she saw the events with Officer Tuli unfold firsthand. She argues that she had probable cause to arrest Roberts because she observed Roberts: (1) assaulting Officer Tuli; (2) not following orders; (3) interfering with officer duties; (4) resisting arrest; and (5) scuffling with officers. Viewing the evidence in the light depicted by the videotape but otherwise in the light most favorable to Roberts, at the moment of the arrest, a reasonable officer in Officer Osoria's position could have believed with "fair probability" that Roberts had assaulted Officer Tuli, was not following orders, and interfered with police duties. *See Haggerty*, 391 F.3d at 657 (concluding that probable cause existed when "[a] reasonable officer in [the officer's] position could have believed that the situation was tense and dangerous, [the plaintiff's] actions were serving to stir up the potentially explosive situation, and there was a fair probability that [the plaintiff's] actions constituted interference with his duties"). When Officer Osoria and others were attempting to control a combative crowd, and when Roberts interfered with that objective, did not follow directives, and yelled and flailed her arm in close proximity to the officers, a reasonable officer in Officer Osoria's position could agree that, under the totality of the circumstances, there was something more than a "bare suspicion" that a crime of some sort occurred at the time of her arrest. *See Garcia*, 179 F.3d at 269.

Roberts has not undermined Officer Osoria's reasonable belief that there was probable cause to support an arrest. Instead, she relies on conclusory statements like, "the conduct of Officer Jessica Osoria ... when considering the

true facts in this case, fall so far out of bounds of normal policing that [she] simply cannot be entitled to [q]ualified immunity." Roberts then states, "there remain genuine material disputed fact[s] that preclude[ ] the entry of summary judgment," yet fails to explain which facts are material. She contends that Officer Osoria "possessed no information that ... Roberts committed any crime." But Roberts misunderstands the probable-cause inquiry. [14] "[P]robable cause 'is not a high bar.' " *Loftin*, 33 F.4th at 780 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). And after a review of the videos, it cannot be said that there was "*not even arguably*" probable cause for the arrest based on *any* crime here. *See Brown*, 243 F.3d at 190 (emphasis added). Viewed from the standpoint of a reasonable police officer, the facts of this case support probable cause such that no constitutional violation occurred.

### ii. Even had Officer Osoria violated a statutory or constitutional right, the right was not clearly established at the time of the challenged conduct.

Even if Officer Osoria were mistaken with regard to there being probable cause, "law enforcement officials who reasonably but *mistakenly* conclude that probable cause is present are entitled to immunity." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (emphasis added). So, if an officer arrests someone without probable cause, qualified immunity will immunize the officer from suit unless that "officer had fair notice that her conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). This is the second step of the qualified-immunity

inquiry. *See Melton*, 875 F.3d at 261 (observing that the plaintiff must show that "the right was 'clearly established' at the time of the challenged conduct"). "Fair notice requires clearly established law." *Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020). "The onus is on the plaintiff to show that the law is so clearly established that 'every reasonable official' in the defendant-official's shoes would know not to engage in the complained-of conduct." *Loftin*, 33 F.4th at 781 (citing *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018)).

To show that the right was "clearly established," Roberts must "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment" by arresting someone without probable cause. *Loftin*, 33 F.4th at 781 (citing *Wesby*, 138 S. Ct. at 590) (alteration omitted). But Roberts does not even attempt to identify a case in which a court found that an officer violated the Fourth Amendment in similar circumstances. "It is not enough to invoke the general principle that the Fourth Amendment prohibits a warrantless arrest without probable cause." *Loftin*, 33 F.4th at 781-82 (citing *Wesby*, 138 S. Ct. at 590). The onus is on the plaintiff to "provide some controlling precedent that squarely governs the specific facts at issue." *Craig v. Martin*, 49 F.4th 404, 419 (5th Cir. 2022) (citation and internal quotation marks omitted). Roberts has not carried her burden. Accordingly, Officer Osoria is entitled to qualified immunity even if probable cause were wanting.

### D. Officer Tuli appeals the district court's partial denial of his summary-judgment motion.

**\*10** For the unlawful-arrest, false-imprisonment, and excessive-force claims, Roberts must first show that Officer Tuli violated a statutory or constitutional right. Then, Roberts must show that the right was clearly established at the time of the challenged conduct. *See Melton,* 875 F.3d at 261. We first address Roberts' claims for unlawful arrest and false imprisonment. Then we address Roberts' claim for excessive force. We conclude that Officer Tuli is qualifiedly immune.

### i. Unlawful arrest and false imprisonment:

### a. Officer Tuli did not violate a statutory or constitutional right.

Like Officer Osoria, Officer Tuli is correct that there was probable cause to arrest Roberts. Officer Tuli argues that Roberts could have been charged with a number of offenses, including: (1) assault on a public servant (Officer Tuli), Tex. Penal Code § 22.02; (2) assault on a public servant (Officer Osoria), Tex. Penal Code § 22.02; (3) attempted assault on Officer Tuli, Tex. Penal Code § 22.02; (4) attempted assault on Officer Osoria, Tex. Penal Code § 22.02; (5) interference with public duties, Tex. Penal Code § 38.15(a)(1); and (6) disorderly conduct; Tex. Penal Code § 42.01. For the same reasons stated above, a reasonable officer in Officer Tuli's position would agree that, under the totality of the circumstances when the officers were attempting to control an unruly, disobedient, combative crowd and Roberts interfered with that objective, did not follow directives, and yelled and flailed her arm in close proximity to the officer's person, and then continued to flail her arms upon contact, there was something more than a "bare suspicion" that a crime of some sort occurred at the time of her arrest. *See Garcia,* 179 F.3d at 269. Roberts has not undermined Officer Tuli's reasonable belief that there was probable cause to support an arrest. And her conclusory statements that "there was no probable cause to arrest" are insufficient.

### b. Even had Officer Tuli violated a statutory or constitutional right, the right was not clearly established at the time of the challenged conduct.

Roberts does not even attempt to identify a case in which a court found that an officer violated the Fourth Amendment in similar circumstances. As noted, "[i]t is not enough to invoke the general principle that the Fourth Amendment prohibits a warrantless arrest without probable cause." *Loftin,* 33 F.4th 781-82 (citing *Wesby,* 138 S. Ct. at 590). Roberts has not carried her burden. Accordingly, Officer Tuli, like Officer Osoria, would be entitled to qualified immunity even if probable cause were lacking.

### ii. Excessive force:

### a. Officer Tuli did not violate a statutory or constitutional right.

"The constitutional provision governing the claims against [Officer Tuli] is the Fourth Amendment, which protects the right to be free from excessive force during a seizure." *Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020). Whether a use of force is excessive and therefore a constitutional violation depends on whether there was "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "Claims of excessive force are fact-intensive; whether the force used was 'clearly excessive' and 'clearly unreasonable' depends on 'the facts and circumstances of each particular case.' " *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Graham*, 490 U.S. at 396).

### 1. Injury:

 **\*11** We first consider Roberts' injury. According to Roberts, it is "undisputed" that she suffered an injury. She contends that she was taken to the hospital and diagnosed with a concussion and brain injuries. At this juncture, for purposes of his motion, Officer Tuli does not challenge that Roberts suffered a sufficient injury.

### 2. Clearly excessive and clearly unreasonable:

Next, we consider the amount of force used and the reasonableness of resorting to such force. Courts generally consider these factors together, as "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.' " *Deville*, 567 F.3d at 167 (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). We apply the *Graham*[15] factors to determine whether the force used is "excessive" or "unreasonable." *Deville*, 567 F.3d at 167 (citing *Graham*, 490 U.S. at 396). These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" with the recognition that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97 (citation omitted). "The test of reasonableness under the Fourth Amendment is not capable of ... mechanical application," but instead "requires careful attention" to

Case 4:22-cv-04210   Document 106   Filed on 07/01/25 in TXSD   Page 136 of 182

Johnson v. City of San Antonio, Not Reported in Fed. Rptr. (2023)

each case's facts. *Id.* at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)) (alteration and internal quotation marks omitted). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of ... officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, (1949)) (internal quotation marks omitted). "[A]t the end of the day, the touchstone of our inquiry is simply the reasonableness of the force employed." *Buehler*, 27 F.4th at 981.

### i. The severity of the crime at issue here weighs in favor of Officer Tuli.

This first factor weighs in favor of Officer Tuli. Roberts was charged with assaulting a police officer. Roberts, however, argues that because she "committed no crime, ... there was no crime at issue." Officer Tuli argues that assault of an officer is a severe crime, especially when considering the circumstances of the "riot" they encountered. We agree.

### ii. Whether Roberts posed an immediate threat to the safety of the officers or others weighs in favor of Officer Tuli.

This second factor also weighs in favor of Officer Tuli. Roberts states that she did not pose an immediate threat to the safety of Officer Tuli or others and references the fact that she "was only a child at the time,"[16] "very small compared to Officer Tuli," and

unarmed. But Officer Tuli contends that "Roberts was a violent[,] combative suspect who threw a punch at Officer Osoria and punched Officer Tuli during the melee in question." The video footage shows Roberts quickly walking through the group of people fighting, whereupon she: (1) jerks and flails her arm multiple times in close proximity to Officer Osoria; (2) shouts "Don't touch me bitch! Don't fucking touch me!" at Officer Osoria as a nonuniformed person attempts to restrain her; (3) refuses to obey Officer Osoria's commands to back up; and (4) shouts at and flails her arm in close proximity to Officer Tuli. It is not unreasonable to think that Roberts posed an immediate threat, despite being a fourteen year old (a fact not known to Officer Tuli or any other SAPD officer at the time), especially considering the extensive fisticuffs breaking out amongst the large, angry crowd that surrounded and outnumbered the officers, and Roberts' mad, confrontational behavior.

### iii. Whether Roberts was resisting arrest weighs in favor of Officer Tuli.

**\*12** This third factor also weighs in favor of Officer Tuli. And this factor is the most "salient." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022). Although Roberts summarily concludes that she did not resist arrest, the footage makes clear that, after Officer Tuli made physical contact with Roberts, a struggle ensued and arms flailed. A plaintiff's struggling against an officer upon contact can reasonably be viewed as a form of resistance. *Solis*, 31 F.4th at 983. Jerking motions, too, can be reasonably seen as an attempt to break free of an officer's grasp. And "the great weight

Case 4:22-cv-04210    Document 106    Filed on 07/01/25 in TXSD    Page 137 of 182

Johnson v. City of San Antonio, Not Reported in Fed. Rptr. (2023)

of Texas authority indicates that pulling out of an officer's grasp is sufficient to constitute resisting arrest" under Texas law. *Ramirez v. Martinez*, 716 F.3d 369, 376 (5th Cir. 2013). Accordingly, it was reasonable for Officer Tuli to perceive Roberts as actively resisting arrest.

### iv. The speed with which Officer Tuli resorted to force does not weigh in favor of or against Officer Tuli.

Although not listed as a *Graham* factor, this court also considers the speed with which the officer resorts to force. *See, e.g., Trammell*, 868 F.3d at 342 ("[T]he quickness with which the officers resorted to tackling Trammel [sic] to the ground militates against a finding of reasonableness."). "That is because 'an officer must use force with measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance.' " *Solis*, 31 F.4th at 983 (quoting *Joseph*, 981 F.3d at 332-33).

While Roberts does not describe any "measured and ascending actions" taken by Officer Tuli, she does not expressly claim that none were taken. Officer Tuli, on the other hand, testified that he: (1) told Roberts to back away, whereupon she closed distance on him; and (2) pushed her back slightly, after which she took a bladed stance, balled her fist up, and struck him in the face with a closed fist. At this stage in the proceedings, however, this court views the evidence in the light depicted by the videos and otherwise in the light most favorable to Roberts. The videos do not clearly show whether measured and ascending actions occurred. And Roberts neither claims nor refutes that such actions

occurred. Thus, without any evidence that measured and ascending actions did or did not occur, this factor neither weighs in favor nor against Officer Tuli.

Taking these considerations together, Officer Tuli's actions were not so objectively unreasonable as to violate Roberts' constitutional rights. As previously noted, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham, 490 U.S. at 396*. "[O]ur focus is on the officers' reasonable perception of the events at issue, as they happened, *without* the aid of hindsight, multiple viewing angles, slow motion, or the ability to pause, rewind, and zoom." *Tucker*, 998 F.3d at 176. Against the backdrop of a chaotic and angry crowd, it was reasonable of Officer Tuli to believe that some degree of force would be necessary to subdue Roberts, considering her: (1) vocal and physical interjections (*i.e.*, her shouting and repeatedly approaching the officers after being told to back up); (2) comments and tone towards both officers (*i.e.*, her yelling, "Don't touch me bitch! Don't fucking touch me!" while a nonuniformed individual attempted to restrain her and "Don't talk to her like that"); and (3) flailing of arms in close proximity to officers. Thus, Officer Tuli did not violate Roberts' constitutional right to be free from excessive force.

### b. Even had Officer Tuli violated a statutory or constitutional right, the

**right was not clearly established at
the time of the challenged conduct.**

**\*13** Even assuming Roberts could show
that Officer Tuli committed a constitutional
violation, Officer Tuli is nonetheless entitled
to qualified immunity under the second prong
of the qualified-immunity analysis. As stated
above in Section I(C)(1)(b), analysis of the
second prong requires that we determine
whether Officer Tuli's use of force "violated
clearly established statutory or constitutional
rights of which a reasonable officer would
have known." *Craig*, 49 F.4th at 417 (quoting
*Bush v. Strain*, 513 F.3d 492, 500 (5th Cir.
2008)) (internal quotation marks and alteration
omitted). "In excessive-force cases, 'police
officers are entitled to qualified immunity
unless existing precedent *squarely governs* the
specific facts at issue.' " *Garcia v. Blevins*,
957 F.3d 596, 600-01 (5th Cir. 2020) (quoting
*Morrow v. Meachum*, 917 F.3d 870, 876 (5th
Cir. 2019)) (emphasis in original).

As with the unlawful-arrest and false-
imprisonment claims, Roberts has failed
to provide controlling precedent – or any
precedent at all – showing that Officer Tuli's
particular conduct violated a clearly established
right. "Although the plaintiffs need not point
to a factually identical case to demonstrate that
the law is clearly established, they nonetheless
must provide *some* controlling precedent that
'squarely governs the specific facts at issue.'
" *Craig*, 49 F.4th at 419 (quoting *Morrow
v. Meachum*, 917 F.3d 870, 876 (5th Cir.
2019)) (emphasis added). But Roberts has not
provided such precedent here and thus fails
to show that the law clearly established that
Officer Tuli's particular conduct was unlawful
at the time of the incident. Moreover, this

court's "qualified immunity jurisprudence is
filled with cases recognizing the need for
officers to use reasonable force to subdue
and handcuff suspects who strike them or
are otherwise resisting." *Curran v. Aleshire*,
800 F.3d 656, 661 (5th Cir. 2015). And the
videos show Roberts' arms flailing about in
close proximity to Officer Tuli's person, which
an officer could reasonably interpret as an
assault or attempt to strike. So, Roberts has not
overcome Officer Tuli's qualified-immunity
defense. The district court must be reversed.

**E. The officers are qualifiedly immune.**

Roberts cannot overcome the facts that Officer
Osoria and Officer Tuli are qualifiedly immune
from the unlawful-arrest, false-imprisonment,
and excessive-force claims. While the officers
acted reasonably, "[q]ualified immunity gives
government officials breathing room to make
reasonable but mistaken judgments about open
legal questions." *Ashcroft v. al-Kidd*, 563 U.S.
731, 743 (2011). "It likewise 'shields an
officer from suit when the officer makes a
decision that, even if constitutionally deficient,
reasonably misapprehends the law governing
the circumstances the officer confronted.' "
*Kokesh*, 14 F.4th at 392-93 (quoting *Brosseau v.
Haugen*, 543 U.S. 194, 198 (2004)) (alterations
omitted). "When properly applied, it protects
all but the plainly incompetent or those who
knowingly violate the law." *al-Kidd*, 563 U.S.
at 743 (internal quotation marks and citation
omitted). And qualified immunity "is justified
unless no reasonable officer could have acted
as [the defendant officer] did here, or every
reasonable officer faced with the same facts
would not have [acted as the defendant officer

Case 4:22-cv-04210   Document 106   Filed on 07/01/25 in TXSD   Page 139 of 182

Johnson v. City of San Antonio, Not Reported in Fed. Rptr. (2023)

did].” *Kokesh*, 14 F.4th at 393 (quoting *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019)) (alterations in original).

Based on the summary judgment record before us, Roberts has failed to show that no reasonable officer could have acted as Officer Tuli and Officer Osoria did here, when: (1) the officers were trying to control a large, boisterous, and angry crowd; (2) the officers were outnumbered; and (3) Roberts repeatedly approached Officer Osoria after being told to back up, approached Officer Tuli while performing police duties, yelled, “Don't touch me bitch! Don't fucking touch me!” while a nonuniformed individual attempted to restrain her and “Don't talk to her like that,” and jerked her body and flailed her arms in close proximity to the officers. Under the circumstances, the officers were not “plainly incompetent” and there is no evidence that they knowingly violated the law. The district court, then, was wrong to deny Officer Tuli and Officer Osoria qualified immunity.

## IV. Conclusion

**\*14** In sum, we lack jurisdiction to review the district court's grant of summary judgment in favor of the City and its disposition of the state law claims. So we DISMISS the appeal as it relates to these issues. Moreover, the district court erred in denying qualified immunity to Officer Tuli and Officer Osoria. So we REVERSE as to the qualified immunity issues, and remand for further proceedings consistent with this opinion.

## All Citations

Not Reported in Fed. Rptr., 2023 WL 3019686

---

## Footnotes

\*      Judge Stewart concurs in the judgment only.

\*\*     This opinion is not designated for publication. See 5th Cir. R. 47.5.

1      Officer Groce and Officer Osoria jointly moved for summary judgment. Upon finding that there was no direct interaction between Roberts and Officer Groce and that there was no evidence indicating Officer Groce played any role in either effecting or witnessing Roberts' arrest, the district court granted summary judgment in favor of Officer Groce, but not Officer Osoria. In her appellate-court briefing, Roberts briefs the district court's “reversible errors as to officer Daniel Groce.” But, according to her notice of appeal, Roberts did not appeal the district court's order granting in part and denying in part Officer Groce and Officer Osoria's joint motion for summary judgment. Rather, Roberts appealed “the Order Granting the City of San Antonio's Motion for Summary Judgment” and “the Order dismissing the Texas Tort Claims.” Roberts argues: “[t]o the extent that Officer[ ] Daniel Groce and Officer[ ] Jessica

Johnson v. City of San Antonio, Not Reported in Fed. Rptr. (2023)

Case 4:22-cv-04210    Document 106    Filed on 07/01/25 in TXSD    Page 140 of 182

Osoria acted in concert with Officer Gary Tuli in the manufacturing of the 'False Report', the District Court erred by unwittingly ignoring the genuine disputed issue of material fact which precludes the entry of Summary Judgment in favor of Officer Dani[e]l Groce." This is the extent of briefing dedicated to her claims against Officer Groce. Assuming that Roberts appealed the district court's disposition of her state-law claims asserted against Officer Groce, her failure to properly brief the claims results in forfeiture of her argument. *See United States v. Scroggins*, 599 F.3d 433, 446-47 (5th Cir. 2010) ("It is not enough to merely mention or allude to a legal theory. ... We have often said that a party must 'press' its claims.") (citations omitted). In any event, as explained below, we lack jurisdiction to review the state-law claims.

2    At oral argument, Roberts' attorney confirmed that Roberts is the only plaintiff in the action.

3    *See also Askanase v. Livingwell, Inc.*, 981 F.2d 807, 809-10 (5th Cir. 1993) ("Federal appellate courts have jurisdiction over appeals only from (1) a final decision under 28 U.S.C. § 1291; (2) a decision that is deemed final due to jurisprudential exception or that has been properly certified as final pursuant to FED. R. CIV. P. 54(b); and (3) interlocutory orders that fall into specific classes, 28 U.S.C. § 1292(a), or that have been properly certified for appeal by the district court, 28 U.S.C. § 1292(b)."). As discussed below, the appeal of the district court's grant of the City's motion for summary judgment was not a final decision, was not certified as final pursuant to Rule 54(b), did not fall into one of the specific classes delineated by § 1292(a) – which governs (1) interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court; (2) interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property; and (3) interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed – and was not certified for appeal under § 1292(b).

4    Rule 54(b) provides:

When an action presents more than one claim for relief ... or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all

Johnson v. City of San Antonio, Not Reported in Fed. Rptr. (2023)

Case 4:22-cv-04210   Document 106   Filed on 07/01/25 in TXSD   Page 141 of 182

the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

5   Section 1292(b) provides:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

6   Although Roberts devotes argument to the district court's alleged error dismissing the tort claims asserted against Officer Tuli, it is unclear where she properly argues the same for Officer Osoria. She merely provides a one-sentence statement that the court's finding as to Officer Osoiria was in error. We assume, *arguendo*, that Roberts properly briefed the issue as to Officer Osoria, although there is a colorable waiver issue here.

7   "A fact is '*material*' if it '*might affect* the outcome of the suit under the governing law.' " *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Id.* "We review the materiality of fact issues *de novo*." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc).

The district court found multiple facts in dispute, including whether: (1) Roberts ever yelled at Officer Tuli; (2) Roberts punched Officer Tuli in the face; (3) Officer Tuli struck Roberts once or multiple times; and (4) Roberts posed an immediate threat to the safety of the officers or others. The district court reviewed the police body camera videos and determined that, although they showed that Roberts' arms were moving, it is unclear whether she made contract with Officer Tuli's face. As a result, the court concluded that: (1) "there is a genuine issue of material fact as to whether Roberts assaulted Officer Tuli"; and (2) Roberts punching Officer Tuli "is determinative of whether Roberts committed any crime." When the district court identifies a factual dispute, we may evaluate whether it is material (*i.e.*, its legal significance). *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 331 (5th Cir. 2020). "If a factual

dispute must be resolved to make the qualified immunity determination, that fact issue is material and we lack jurisdiction over the appeal." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). The district court was wrong to characterize the factual dispute as to whether Roberts punched Officer Tuli as material. Whether Roberts actually hit Officer Tuli is not dispositive, as a battery is not necessary to constitute assault. As explained below, Roberts' behavior – even excluding the alleged punch – was enough to constitute probable cause to arrest. Whether Roberts did, in fact, hit Officer Tuli is not a fact issue that must be resolved to determine whether Officer Tuli and Officer Osoria are qualifiedly immune.

8    In other words, "[a] court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape." *Carnaby*, 636 F.3d at 187 (internal quotation marks and citation omitted).

9    *See also Brown v. Lynch*, 524 F. App'x 69, 74 (5th Cir. 2013) (per curiam) (unpublished) ("Determining whether [the plaintiff] was arrested without probable cause requires that we trace the progression of events to locate the constitutionally significant point at which the stop escalated to an arrest....").

10    *See also Chiles v. Hempstead*, 426 F. App'x 310, 311 (5th Cir. 2011) (per curiam) (unpublished) (citing *Lockett v. New Orleans City*, 607 F.3d 992, 998 (5th Cir. 2010)) ("An officer has the right to arrest even for a very minor offense if the offense is committed in her presence.").

11    The parties do not identify the statute that Roberts allegedly violated.

12    The district court's impression of the footage is consistent with the following description. To the district court, it was clear that body camera footage showed that Roberts "walked in the direction of where officer Tuli was standing, quickly moved her arms, and yelled something at Officer Tuli."

13    It is unclear whether Officer Tuli's and Roberts' arms flailing is a result of losing balance or throwing punches.

14    Although Roberts contends that she committed no crime, "evidence that the arrestee was innocent of the crime is not necessarily dispositive of whether the officer had probable cause to conduct the arrest because 'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " *Deville*, 567 F.3d at 165 (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)).

15    *Graham v. Connor*, 490 U.S. 386 (1989).

Case 4:22-cv-04210    Document 106    Filed on 07/01/25 in TXSD    Page 143 of 182

Johnson v. City of San Antonio, Not Reported in Fed. Rptr. (2023)

16    At oral argument, Roberts' counsel repeatedly emphasized that Roberts was a minor at the time of the incident. That the plaintiff is a minor has not stopped this court from finding that an officer is qualifiedly immune. *See, e.g., E.A.F.F. v. Gonzalez, 600 F. App'x 205, 215 (5th Cir. 2015)* (unpublished) (per curiam) (granting qualified immunity to police officers where case involved minor teenagers' excessive-force claims); *Wyatt v. Fletcher, 718 F.3d 496, 504 (5th Cir. 2013)* (granting qualified immunity to high school coaches where case involved minor child); *Wooley v. City of Baton Rouge, 211 F.3d 913, 923 (5th Cir. 2000)* (granting qualified immunity to officers where case involved seven-month-old child); *Petta v. Rivera, 143 F.3d 895, 914 (5th Cir. 1998)* (granting qualified immunity to police officer where case involved a three and seven year old).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    20

# *Traylor v. Yorka*

No. 22-10783, 3034 WL 209444 (5th Cir. Jan. 19, 2024)

Case 4:22-cv-04210    Document 106    Filed on 07/01/25 in TXSD    Page 145 of 182

Traylor v. Yorka, Not Reported in Fed. Rptr. (2024)

2024 WL 209444
Only the Westlaw citation
is currently available.
United States Court of Appeals, Fifth Circuit.

Marcus TRAYLOR, Plaintiff
—Appellant/Cross-Appellee,
v.
Gideon YORKA, Defendant
—Appellee/Cross-Appellant.

No. 22-10783
|
FILED January 19, 2024

Appeal from the United States District Court
for the Northern District of Texas, USDC No.
3:21-CV-406

**Attorneys and Law Firms**

Niles Stefan Illich, James Painter Roberts,
Attorney, Scott H. Palmer, P.C., Addison, TX,
for Plaintiff—Appellant/Cross-Appellee.

John Cheves Ligon, Nicholas Dane Palmer,
Attorney, James Bickford Pinson, Assistant
City Attorney, City Attorney's Office,
Dallas, TX, for Defendant—Appellee/Cross-
Appellant.

Before Richman, Chief Judge, and Haynes and
Duncan, Circuit Judges.

**Opinion**

Per Curiam: [*]

 **\*1**  Following an altercation in a Dallas bar,
Officer Gideon Yorka struck Marcus Traylor in
the face and placed him under arrest. Traylor

subsequently brought claims under 42 U.S.C.
§ 1983 for excessive force, unlawful arrest,
and fabrication of evidence. The district court
granted qualified immunity to Yorka on the
excessive force and unlawful arrest claims but
denied qualified immunity on the fabrication-
of-evidence claim. For the reasons set forth
below, we AFFIRM in part and REVERSE in
part.

**I. Background**

On the evening of February 16, 2020, Marcus
Traylor and three of his friends attended
Clutch Bar and Restaurant ("Clutch") in Dallas,
Texas. [1] That night, Dallas Police Department
("DPD") Officer Gideon Yorka and another
DPD officer were working private security at
Clutch. The officers were off duty but wearing
their full DPD uniforms.

At the bar, Traylor's group ordered "bottle
service," which included one bottle of
champagne and two bottles of hard alcohol.
Traylor consumed "two or three glasses" of
champagne over the course of an hour. At
some point, Clutch security asked the group
to leave because Traylor's friend had fallen
asleep. When Traylor lingered to pay his
tab, a Clutch bouncer grabbed him from
behind and brought him to the ground. Yorka
was outside during this altercation. However,
Clutch security informed him that there had
been a fight inside and sought his assistance.
Yorka and his colleague then entered the bar to
break up the commotion, where Yorka observed
Traylor with a bloodied mouth being restrained
on the floor by Clutch security. Yorka picked
Traylor up by the arm and escorted him out of

Traylor v. Yorka, Not Reported in Fed. Rptr. (2024)

Case 4:22-cv-04210    Document 106    Filed on 07/01/25 in TXSD    Page 146 of 182

the bar. During this encounter, Yorka detected the smell of alcohol on Traylor's breath.

The parties' versions of the events outside of the bar vary significantly. According to Traylor, he cooperated as Yorka escorted him past a crowd outside of the bar and shoved him into the street. Yorka instructed Traylor to leave, but Traylor told Yorka that his wallet and belongings were still inside Clutch. Yorka, however, remained adamant that Traylor leave immediately. Traylor then walked towards the curb to find assistance from a security guard or another person to help get his wallet. As Traylor approached the curb, Yorka struck him in the face, causing him to fall to the ground.

According to Yorka, Traylor was uncooperative as he escorted him outside of the bar. Traylor repeatedly tried to turn around to go back inside, but Yorka was able to regain control and shove Traylor into the street. Once released, Traylor again tried to go back to the bar, saying "this sh** is not over; this motherf***er started it." Yorka again pushed Traylor away towards the street. When Traylor continued to make his way back towards the bar, Yorka pushed him a second time. Traylor then used his forearm to shove Yorka in the chest and neck area, creating separation between the two. When Traylor again approached Yorka, Yorka punched him.

 **\*2** A bystander recorded a portion of the relevant events. The video shows a crowded scene both inside and outside of the bar. The camera then pans to the left and shows Traylor in a white hoodie standing in the street. Yorka is standing a few feet away facing Traylor. Traylor leans forward and walks in Yorka's

direction. Yorka then punches Traylor in the face, and Traylor falls to the ground. The interaction lasts only a few seconds before the video cuts to the officers helping Yorka and an ambulance arriving.

The parties agree on the events after Yorka struck Traylor. An ambulance took Traylor to the hospital. Traylor was then arrested and charged with felony assault against a peace officer. The jail supervisor, however, rejected the charge and reduced it to a class C misdemeanor for offensive contact. Officers issued Traylor a citation and released him that night. The misdemeanor was later dismissed.

On February 25, 2021, Traylor filed this suit against Yorka pursuant to 42 U.S.C. § 1983. Traylor alleges that Yorka (1) used excessive force in violation of the Fourth Amendment, (2) unlawfully arrested him in violation of the Fourth Amendment, and (3) fabricated evidence of assault in violation of Traylor's Fourteenth Amendment substantive due process right. Upon Yorka's motion for summary judgment, the district court granted qualified immunity to Yorka on the excessive force and unlawful arrest claims. However, the district court denied qualified immunity on Traylor's fabrication-of-evidence claim. Both parties timely appealed.

## II. Jurisdiction and Standard of Review

The district court properly exercised jurisdiction over Traylor's federal law claims pursuant to 28 U.S.C. § 1331. As to Traylor's excessive force and unlawful arrest claims, we have jurisdiction over the district court's partial

Traylor v. Yorka, Not Reported in Fed. Rptr. (2024)

Case 4:22-cv-04210    Document 106    Filed on 07/01/25 in TXSD    Page 147 of 182

final judgment entered pursuant to Federal Rule of Civil Procedure 54(b). 28 U.S.C. § 1291; *see also Briargrove Shopping Ctr. Joint Venture v. Pilgrim Enters.*, 170 F.3d 536, 538–39 (5th Cir. 1999). As to Traylor's substantive due process claim, we have jurisdiction to immediately review the district court's denial of qualified immunity. *Jason v. Tanner*, 938 F.3d 191, 194 (5th Cir. 2019).

We review a district court's entry of summary judgment based on qualified immunity de novo. *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016). In conducting this review, we must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009) (per curiam). Summary judgment is proper where there are no genuine issues of material fact, and the movant is entitled to prevail as a matter of law. *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (citing FED. R. CIV. P. 56(a)).

In qualified immunity cases on interlocutory appeal, we consider only "the scope of clearly established law and the objective reasonableness of the defendant's acts." *Jason*, 938 F.3d at 194 (internal quotation marks and citation omitted). We "can review the *materiality* of any factual disputes, but not their *genuineness*." *Id.* (quotation omitted). [2]

### III. Discussion

Traylor raises two issues on appeal: (1) whether Yorka was entitled to qualified immunity on the excessive force claim; and (2) whether Yorka was entitled to qualified immunity on the unlawful arrest claim. On cross appeal, Yorka raises an additional issue of whether he was entitled to qualified immunity on the fabrication-of-evidence claim. We address each issue in turn.

### A. Excessive Force

**\*3** Under 42 U.S.C. § 1983, private citizens may sue public officials for violations of their constitutional rights. However, "[q]ualified immunity shields from liability 'all but the plainly incompetent or those who knowingly violate the law.' " *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To determine whether qualified immunity bars a § 1983 claim, we ask (1) whether "the official's conduct violated a constitutional right," and (2) "whether the right was clearly established." *Cunningham v. Castloo*, 983 F.3d 185, 190–91 (5th Cir. 2020) (internal quotation marks and citation omitted). Here, Traylor's claim fails at the first inquiry because Yorka's use of force did not violate Traylor's Fourth Amendment right.

To prevail on a Fourth Amendment excessive force claim, a plaintiff must show that he "suffer[ed] an injury that result[ed] directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020). The district court did not address whether Traylor suffered an injury, but undisputed evidence shows that he suffered a broken wrist from falling after Yorka's punch. Thus, the only remaining issue is whether Yorka's use of force was "objectively unreasonable." *See Graham v. Connor*, 490 U.S. 386, 397 (1989). We look to several factors

Traylor v. Yorka, Not Reported in Fed. Rptr. (2024)

Case 4:22-cv-04210    Document 106    Filed on 07/01/25 in TXSD    Page 148 of 182

for this inquiry, including "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Joseph*, 981 F.3d at 332 (citing *Graham*, 490 U.S. at 396). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018) (quotation omitted).

Construing all factual disputes in Traylor's favor, Yorka's use of force was not objectively unreasonable. Even under Traylor's version of events, Yorka could have reasonably believed Traylor posed a threat. Clutch security had just informed Yorka that Traylor had been in a fight, and Yorka observed Traylor bloodied on the floor with a strong scent of alcohol. *See Escobar v. Montee*, 895 F.3d 387, 394–95 (5th Cir. 2018) (considering that an officer had been warned plaintiff was a threat). Most importantly, the video shows Traylor moving quickly towards Yorka. Even accepting Traylor's version as true, and therefore interpreting his actions as walking towards a third party to ask about retrieving his wallet, the video still supports Yorka's perception of a threat, which is the key question in such a quick and messy situation. Indeed, Traylor leans forward then walks in Yorka's direction. Given Traylor's insistence on retrieving his wallet and the information Yorka received about the fight, Yorka could have reasonably interpreted Traylor's steps as a "charge" towards him. Further, the video shows that only a couple of seconds spanned between Traylor's steps towards Yorka and Yorka's strike. The tense environment and need for a split-second decision indicate that Yorka's use of force was not unreasonable. *See Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). In looking back, it is always easy to think of other things that could have been done differently. Yet, although Yorka's escalation to a strike to the face "may not have been as restrained as we would like to expect from model police conduct ... qualified immunity 'protect[s] officers from the sometimes hazy border between excessive and acceptable force' " in the moment. *Griggs*, 841 F.3d at 315 (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

**\*4** Traylor argues that the district court erred by determining Yorka acted reasonably based on Yorka's version of events. Traylor claims that, under his version, Yorka would have had no reason to doubt that he was merely attempting to retrieve his wallet. But Traylor disregards that reasonability "must be judged from the perspective of a reasonable officer on the scene." *Darden*, 880 F.3d at 729 (quotation omitted). Although Traylor did submit evidence that his intent was to speak to a third party, he has not produced evidence showing that this intent manifested in any outward action. *See Cloud v. Stone*, 993 F.3d 379, 386 (5th Cir. 2021) ("[W]e measure excessive force by the objective circumstances, not by the subjective intentions of the arrestee."). Even interpreting the video in Traylor's favor, it clearly shows him, at the

very least, quickly approaching Yorka. Thus, the factual dispute of whether Traylor intended to charge at Yorka or speak to a third party is immaterial.

Because of the tense situation and Yorka's need to make a split-second decision, Yorka's use of force did not violate Traylor's Fourth Amendment right. Accordingly, we affirm the district court's dismissal of Traylor's excessive force claim.

### B. Unlawful Arrest

The Fourth Amendment bars unreasonable seizures of both property and people. *California v. Hodari*, 499 U.S. 621, 624 (1991). A seizure is reasonable if it is based on probable cause. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 208 (5th Cir. 2009). Therefore, to defeat qualified immunity on an unlawful arrest claim, a plaintiff must prove (1) probable cause did not exist, and (2) the defendant-official was "objectively unreasonable in believing there was probable cause for the arrest." *Bey v. Prator*, 53 F.4th 854, 858 (5th Cir. 2022) (per curiam) (internal quotation marks and citation omitted), *cert. denied*, 143 S. Ct. 1783 (2023).

Here, the district court found that Yorka had probable cause to arrest Traylor for interference with a police officer's performance of public duties in violation of Texas Penal Code § 38.15. Traylor argues that the district court erred by treating § 38.15 as a strict liability provision because the statute instead requires a showing of criminal negligence. But Traylor provides no authority requiring a showing of criminal negligence for arrest on suspected violation of § 38.15. Indeed, our precedent has not imposed such a requirement. *See, e.g.,*

*Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656–57 (5th Cir. 2004) (holding that officer had probable cause for arrest under § 38.15 after plaintiff ignored warnings not to intervene and instead stepped forward towards the officer); *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (affirming probable cause for arrest under § 38.15 where the plaintiff failed to follow an officer's order to move his truck).

Further, uncontested evidence shows that Traylor failed to comply with Yorka's numerous orders to leave. This instruction was made in Yorka's duty to maintain the peace at Clutch, as even an off-duty officer has a duty "to preserve the peace within the officer's jurisdiction." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 466 (5th Cir. 2010) (quoting TEX. CODE CRIM. PROC. art. 2.13(a)). Thus, Yorka had probable cause to arrest Traylor for interfering with the performance of his public duties. *See Buehler v. Dear*, 27 F.4th 969, 992 (5th Cir. 2022) ("[R]efusing to obey police officers' repeated and unambiguous warnings to step back so as not to interfere with officers' official duties ... establishes probable cause to arrest for a violation of Texas Penal Code § 38.15(a)(1)."). Accordingly, we affirm the district court's dismissal of Traylor's unlawful arrest claim.

### C. Fabrication of Evidence

In *Cole v. Carson*, we recognized a substantive due process right "not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person." 802 F.3d 752, 771 (5th Cir. 2015).[3] Here, Traylor claims that Yorka fabricated evidence of assault by making a false statement that

Case 4:22-cv-04210   Document 106   Filed on 07/01/25 in TXSD   Page 150 of 182

Traylor v. Yorka, Not Reported in Fed. Rptr. (2024)

Traylor pushed him. The district court denied qualified immunity because it concluded this case is similar to *Cole* and Traylor raised a fact issue as to whether Yorka's statement was fabricated. However, as discussed above, Traylor must establish both a violation of his constitutional right and that this right was clearly established. *See Cunningham*, 983 F.3d at 190–91. We may limit our analysis to the "clearly established" prong if it resolves the qualified immunity issue. *See Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009). Because *Cole* did not clearly establish Traylor's right as relevant here, we conclude that Yorka is entitled to qualified immunity.

**\*5** A § 1983 plaintiff bears a heavy burden of establishing that an officer violated clearly established law. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). "A right is clearly established only if relevant precedent 'ha[s] placed the ... constitutional question beyond debate.' " *Id.* (alterations in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) ("A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." (internal quotation marks and citation omitted)). Traylor relies solely on *Cole*, in which we established a Fourteenth Amendment substantive due process claim for fabrication of evidence. But we may not define clearly established law with such a high level of generality. *See al-Kidd*, 563 U.S. at 742. Instead, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.' " *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742). Thus,

*Cole* can establish Traylor's right only if the facts there "squarely govern[ ]" the specific facts at issue here. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quotation omitted). We conclude that they do not.

In *Cole*, three officers pursued the plaintiff and subsequently opened fire. 802 F.3d at 755–56. After the shooting, the officers had time to confer before giving their statements, and they ultimately claimed that the plaintiff was given a prior warning and pointed his gun towards one of the officers. *Id.* at 756. Indeed, *Cole* involved allegations of a conspiracy and the calculated fabrication of evidence to justify a shooting.[4] *See id.* This false evidence led to a felony charge for aggravated assault on a public servant, which in turn caused significant reputational injuries and legal expenses.[5] *Id.* at 756, 766.

The facts of *Cole* are distinguishable from those presented here. This case involves a quick and chaotic incident in which the parties have different versions of events. Traylor has not shown that Yorka had the time or deliberation to fabricate evidence of assault. Further, Traylor did not face the extreme consequences as those of the plaintiff in *Cole*. Indeed, Traylor's charge was reduced to a misdemeanor the same night of the incident. Given this significant divergence of facts, *Cole* did not clearly establish that "every reasonable official" in Yorka's position would have understood that his conduct violated Traylor's Fourteenth Amendment right. *See Mullenix*, 577 U.S. at 11 (quotation omitted). Yorka is thus entitled to qualified immunity on Traylor's fabrication-of-evidence claim.

Traylor v. Yorka, Not Reported in Fed. Rptr. (2024)

Case 4:22-cv-04210   Document 106   Filed on 07/01/25 in TXSD   Page 151 of 182

### IV. Conclusion

For the reasons set forth above, we AFFIRM the district court's order granting qualified immunity to Yorka on the excessive force and unlawful arrest claims. However, we REVERSE the district court's order as to the fabrication-of-evidence claim and REMAND for entry of summary judgement in favor of Yorka.

### All Citations

Not Reported in Fed. Rptr., 2024 WL 209444

---

## Footnotes

\*  This opinion is not designated for publication. See 5th Cir. R. 47.5.

1   Because this is an appeal from a summary judgment order, we discuss the following facts in the light most favorable to the nonmovant, Traylor. *See Deville v. Marcantel, 567 F.3d 156, 163–64 (5th Cir. 2009)* (per curiam). However, we note factual discrepancies where relevant.

2   Because the district court entered final judgment on the excessive force and unlawful arrest claims, these limitations apply only to the fabrication-of-evidence claim.

3   *Cole* has a complex procedural history. The Supreme Court vacated *Cole* and remanded for reconsideration in light of its holding in *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam). *Hunter v. Cole*, 580 U.S. 994, 994 (2016) (mem.). On remand, we reinstated the *Cole* opinion regarding the due process fabrication-of-evidence claim because *Mullenix* did not concern that issue. *See Cole v. Carson*, 905 F.3d 334, 347 (5th Cir. 2018) ("*Cole II*"). *Cole II* was subsequently vacated when we granted rehearing en banc. *Cole v. Carson*, 915 F.3d 378 (5th Cir. 2019). However, the en banc court held that *Cole's* fabrication-of-evidence claim remained viable. *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019), *as revised* (Aug. 21, 2019).

4   Unlike this case, we addressed the fabrication-of-evidence claim in *Cole* at the motion-to-dismiss stage. 802 F.3d at 755.

5   The charge was dismissed several months after the incident, and after the plaintiff incurred substantial legal fees to confront the charge. *Cole*, 802 F.3d at 755.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Turner v. Lieutenant Driver*

848 F.3d 678 (5th Cir. 2017)

848 F.3d 678
United States Court of Appeals, Fifth Circuit.

Phillip TURNER, Plaintiff-Appellant
v.
LIEUTENANT DRIVER, in his individual
capacity; Officer Grinalds, Badge Number
3825, in his individual capacity; Officer
Dyess, Badge Number 2586, in his
individual capacity, Defendants-Appellees

No. 16-10312
|
February 16, 2017

**Synopsis**
**Background:** Detainee brought § 1983 action
against two police officers who detained him
after he refused to identify himself, alleging
violations of his First and Fourth Amendment
rights. The United States District Court for the
Northern District of Texas, John McBryde, J.,
2016 WL 722154, dismissed action. Detainee
appealed.

**Holdings:** The Court of Appeals, Wiener,
Circuit Judge, held that:

[1] detainee did not have a clearly established
right to videotape police activity;

[2] as a matter of apparent first impression,
recording of police activity is protected by the
First Amendment, subject only to reasonable
time, place, and manner restrictions;

[3] officers were entitled to qualified immunity
from suspect's § 1983 action against them

alleging initial questioning of him violated
his Fourth Amendment right to be free from
detention absent reasonable suspicion;

[4] handcuffing of detainee and placing him in
back of patrol car constituted an arrest;

[5] officers were not entitled to qualified
immunity from detainee's § 1983 claim that
officers arrested him without probable cause;
and

[6] allegations were insufficient to support
allegation that supervisory officer violated
detainee's Fourth Amendment rights.

Affirmed in part and reversed and remanded in
part.

Edith Brown Clement, Circuit Judge, wrote
opinion dissenting in part.

**Procedural Posture(s):** On Appeal; Motion to
Dismiss; Motion to Dismiss for Failure to State
a Claim.

West Headnotes (41)

**[1]** **Federal Courts** ⚬ Immunity

The Court of Appeals reviews a
district court's grant of a motion to
dismiss based on qualified immunity
de novo.

6 Cases that cite this headnote

**[2]**  **Federal Civil Procedure** ⬤ Construction of pleadings

**Federal Civil Procedure** ⬤ Matters deemed admitted;  acceptance as true of allegations in complaint

On a motion to dismiss, courts accept all well-pleaded facts as true and view them in the light most favorable to the non-movant.

7 Cases that cite this headnote

**[3]**  **Federal Civil Procedure** ⬤ Insufficiency in general

**Federal Civil Procedure** ⬤ Matters deemed admitted;  acceptance as true of allegations in complaint

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

13 Cases that cite this headnote

**[4]**  **Federal Civil Procedure** ⬤ Insufficiency in general

On a motion to dismiss for failure to state a claim, a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

9 Cases that cite this headnote

**[5]**  **Federal Civil Procedure** ⬤ Insufficiency in general

Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice to survive a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

9 Cases that cite this headnote

**[6]**  **Federal Civil Procedure** ⬤ Insufficiency in general

Although a complaint does not need detailed factual allegations, the allegations must be enough to raise a right to relief above the speculative level to survive a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

12 Cases that cite this headnote

**[7]**  **Federal Civil Procedure** ⬤ Insufficiency in general

Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss for

failure to state a claim. Fed. R. Civ. P. 12(b)(6).

9 Cases that cite this headnote

**[8]    Civil Rights** 🔑 Nature and elements of civil actions

To state a claim under § 1983, a plaintiff must first show a violation of the constitution or of federal law, and then show that the violation was committed by someone acting under color of state law. 42 U.S.C.A. § 1983.

23 Cases that cite this headnote

**[9]    Public Employment** 🔑 Qualified immunity

The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal.

3 Cases that cite this headnote

**[10]    Public Employment** 🔑 Privilege or immunity in general

When a defendant raises a qualified immunity defense, the plaintiff has the burden of demonstrating the inapplicability of that defense.

7 Cases that cite this headnote

**[11]    Civil Rights** 🔑 Government Agencies and Officers

**Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To meet the burden of demonstrating the inapplicability of the qualified immunity defense, the plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.

34 Cases that cite this headnote

**[12]    Civil Rights** 🔑 Government Agencies and Officers

The Court of Appeals has the discretion to decide which prong of the qualified immunity analysis to address first.

**[13]    Civil Rights** 🔑 Sheriffs, police, and other peace officers

Detainee did not have a clearly established right to videotape police activity, and thus police officers were entitled to qualified immunity from detainee's § 1983 action against them alleging his detention by officers, after he refused to identify himself when questioned by officers while videotaping activity at police station, violated his First Amendment rights. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

24 Cases that cite this headnote

**[14]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

For a right to be clearly established, as required for a plaintiff to demonstrate the inapplicability of the qualified immunity defense, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

34 Cases that cite this headnote

**[15]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

A right must already be clearly established at the time of the challenged conduct to meet the "clearly established" prong of the qualified immunity analysis.

14 Cases that cite this headnote

**[16]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

When considering whether a defendant is entitled to qualified immunity, the court must ask whether the law so clearly and unambiguously prohibited his conduct that every reasonable

official would understand that what he is doing violates the law.

15 Cases that cite this headnote

**[17]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

For purpose of qualified immunity analysis, to answer the question of whether a right is clearly established in the affirmative, the court must be able to point to controlling authority, or a robust consensus of persuasive authority, that defines the contours of the right in question with a high degree of particularity.

10 Cases that cite this headnote

**[18]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be "clearly established," for purpose of qualified immunity analysis; this is true even when the circuit split developed after the events in question.

3 Cases that cite this headnote

**[19]    Constitutional Law** 🔑 **Interaction with public safety officials**

Recording police activity is protected by the First Amendment, subject only to reasonable time, place, and manner restrictions. U.S. Const. Amend. 1.

78 Cases that cite this headnote

[20]   **Constitutional Law** 🖝 Freedom of Speech, Expression, and Press

**Constitutional Law** 🖝 Press in General

The First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw. U.S. Const. Amend. 1.

10 Cases that cite this headnote

[21]   **Constitutional Law** 🖝 Press in General

News-gathering is entitled to First Amendment protection, for without some protection for seeking out the news, freedom of the press could be eviscerated, even though this right is not absolute. U.S. Const. Amend. 1.

11 Cases that cite this headnote

[22]   **Constitutional Law** 🖝 Interaction with public safety officials

When police departments or officers adopt time, place, and manner restrictions on the First Amendment right to record police activity,

those restrictions must be narrowly tailored to serve a significant governmental interest; however, to be constitutionally permissible, a time, place, and manner restriction need not be the least restrictive or least intrusive means of serving the government's interests. U.S. Const. Amend. 1.

47 Cases that cite this headnote

[23]   **Civil Rights** 🖝 Sheriffs, police, and other peace officers

Police officers' initial questioning of suspect who was videotaping police station was not objectively unreasonable in light of clearly established law, and thus officers were entitled to qualified immunity from suspect's § 1983 action against them alleging the questioning violated his Fourth Amendment right to be free from detention absent reasonable suspicion; suspect's filming in front of police station potentially threatened security procedures at a location where order was paramount, and an objectively reasonable person in officers' position could have suspected that suspect was casing the station for an attack, stalking an officer, or otherwise preparing for criminal activity. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[24] Search, Seizure, and Arrest** 🗝 Necessity of reasonable or articulable suspicion

The police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. U.S. Const. Amend. 4.

8 Cases that cite this headnote

**[25] Search, Seizure, and Arrest** 🗝 After-acquired information

To determine whether a police officer had reasonable suspicion to stop and detain a person for investigative purposes, courts consider only the information available to the officers at the time of the decision to stop a person. U.S. Const. Amend. 4.

9 Cases that cite this headnote

**[26] Civil Rights** 🗝 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

For purposes of qualified immunity analysis, whether a right was clearly established at the time the defendant acted requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident.

4 Cases that cite this headnote

**[27] Civil Rights** 🗝 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To determine whether a right was clearly established at the time a defendant acted, for purpose of defendant's qualified immunity defense, courts must ask whether the law so clearly and unambiguously prohibited his conduct that every reasonable official would understand that what he is doing violates the law.

31 Cases that cite this headnote

**[28] Evidence** 🗝 Common knowledge

Specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy may be judicially noticed.

5 Cases that cite this headnote

**[29] Search, Seizure, and Arrest** 🗝 Place or Time

For purposes of reasonable suspicion, it is appropriate for the police to take into account the location of the suspicious conduct and the degree of the potential danger being investigated; what is not suspicious in one location may be highly suspicious in another. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[30] Search, Seizure, and Arrest** 🔑 **Particular cases in general**

A reasonable person in detainee's position would have understood police officers' actions in handcuffing him and placing him in patrol car to constitute a restraint on his freedom of movement to the degree to which the law associates with a formal arrest, and thus detainee's detention following his refusal to identify himself when officers questioned him while he videotaped police station constituted an arrest, not merely an investigative stop, for purpose of determining whether officers' actions violated clearly established law, precluding them from entitlement to qualified immunity from detainee's § 1983 action for violation of his Fourth Amendment rights; officers were not taking investigative steps to determine detainee's identity or what threat he might have posed while they detained him, and there was nothing to suggest detainee posed a threat, such as possessing a weapon or using his hands in a threatening way, that required such restraint. U.S. Const. Amend. 4.

5 Cases that cite this headnote

**[31] Search, Seizure, and Arrest** 🔑 **Subjective or objective test; reasonable person; intent**

A seizure rises to the level of an arrest only if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. U.S. Const. Amend. 4.

12 Cases that cite this headnote

**[32] Search, Seizure, and Arrest** 🔑 **Subjective or objective test; reasonable person; intent**

For purposes of determining whether a seizure rises to the level of an arrest based on a reasonable person's understanding of the situation, the "reasonable person" is one who is neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances. U.S. Const. Amend. 4.

3 Cases that cite this headnote

**[33] Search, Seizure, and Arrest** 🔑 **Investigatory Stop Distinguished**

When determining whether an investigative stop amounts to an arrest, the relevant inquiry is always one of reasonableness under the circumstances, which must be

considered on a case-by-case basis.
U.S. Const. Amend. 4.

4 Cases that cite this headnote

**[34]** **Search, Seizure, and Arrest** 🔑 **Transition from stop to arrest in general**

Using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect, whether singly or in combination, do not automatically convert an investigatory detention into an arrest requiring probable cause. U.S. Const. Amend. 4.

13 Cases that cite this headnote

**[35]** **Search, Seizure, and Arrest** 🔑 **Duration**

An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. U.S. Const. Amend. 4.

5 Cases that cite this headnote

**[36]** **Search, Seizure, and Arrest** 🔑 **Duration**

There is no rigid time limitation on investigative stops, but in assessing whether a detention is too long in duration to be justified as an investigatory stop, courts consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to

confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. U.S. Const. Amend. 4.

7 Cases that cite this headnote

**[37]** **Search, Seizure, and Arrest** 🔑 **Totality of circumstances in general**

**Search, Seizure, and Arrest** 🔑 **Reasonable or prudent person**

Probable cause to support an warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. U.S. Const. Amend. 4.

16 Cases that cite this headnote

**[38]** **Search, Seizure, and Arrest** 🔑 **Officer safety in general**

The police may take reasonable actions under the circumstances to ensure their own safety, as well as the safety of the public, during an encounter with a suspect. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[39]** **Civil Rights** 🔑 **Sheriffs, police, and other peace officers**

No objectively reasonable person in police officers' position could have believed that there was probable cause to arrest detainee after he refused to identify himself when officers questioned him while he videotaped police station, in light of clearly established Fourth Amendment law, and thus officers were not entitled to qualified immunity from detainee's § 1983 claim that officers arrested him without probable cause; detainee did not make any threats against officers, did not attempt to flee, and did not take any aggressive actions, and police could not arrest an individual solely for refusing to provide identification. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

[40]   **Civil Rights** 🔑 Criminal law enforcement; prisons

Detainee's allegation that supervisory police officer continued the unlawful seizure and arrest of detainee after he arrived on scene where other officers had arrested detainee was insufficient to support allegation that supervisory officer violated detainee's Fourth Amendment rights, as required to defeat supervisory officer's claim of qualified immunity from detainee's § 1983 action, absent allegation that supervisory officer was personally involved in detainee's arrest or that supervisory officer unreasonably

prolonged detainee's arrest. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[41]   **Civil Rights** 🔑 Vicarious liability and respondeat superior in general; supervisory liability in general

Supervisory officials are not liable under § 1983 for the actions of subordinates on any theory of vicarious liability. 42 U.S.C.A. § 1983.

52 Cases that cite this headnote

**\*682**  Appeal from the United States District Court for the Northern District of Texas

**Attorneys and Law Firms**

Kervyn Bryce Altaffer, Jr., Esq., Lunbing Chen, Altaffer & Chen, P.L.L.C., Dallas, TX, Meagan Elizabeth Hassan, Demond & Hassan, P.L.L.C., Houston, TX, for Plaintiff-Appellant.

Luis Alfredo Galindo, Fort Worth, TX, for Defendant-Appellee LIEUTENANT DRIVER.

**\*683** Kenneth E. East, Esq., Foster & East, North Richland Hills, TX, for Defendant-Appellee OFFICER GRINALDS.

Dee Lee Thomas, Jr., Law Office of D. Lee Thomas, Fort Worth, TX, for Defendant-Appellee OFFICER DYESS.

Before WIENER, CLEMENT, and HIGGINSON, Circuit Judges.

**Opinion**

WIENER, Circuit Judge:

Plaintiff-Appellant Phillip Turner was video recording a Fort Worth police station from a public sidewalk across the street when Defendants-Appellees Officers Grinalds and Dyess approached him and asked him for identification. Turner refused to identify himself, and the officers ultimately handcuffed him and placed him in the back of a patrol car. The officers' supervisor, Defendant-Appellee Lieutenant Driver, arrived on scene and, after Driver checked with Grinalds and Dyess and talked with Turner, the officers released Turner. He filed suit against all three officers and the City of Fort Worth under 42 U.S.C. § 1983, alleging violations of his First and Fourth Amendment rights. Each officer filed a motion to dismiss, insisting that he was entitled to qualified immunity on Turner's claims. The district court granted the officers' motions, concluding that they were entitled to qualified immunity on all of Turner's claims against them. Turner timely appealed. We affirm in part and reverse and remand in part.

I.

FACTS AND PROCEEDINGS

A. Facts [1]
In September 2015, Turner videotaped the Fort Worth Police Station from a public sidewalk across the street from the station. He was unarmed. While videotaping, Turner observed Fort Worth Police Officers Grinalds and Dyess pull up in a patrol car in front of the station, get out, and approach him.

Grinalds asked Turner, "How's it going, man? Got your ID with you?" Turner continued videotaping, and Grinalds repeatedly asked Turner if he had any identification. Turner asked the officers whether he was being detained, and Grinalds responded that Turner was being detained for investigation and that the officers were concerned about who was walking around with a video camera. Turner asked for which crime he was being detained, and Grinalds replied, "I didn't say you committed a crime." Grinalds elaborated, "We have the right and authority to know who's walking around our facilities."

Grinalds again asked for Turner's identification, and Turner asked Grinalds, "What happens if I don't ID myself?" Grinalds replied, "We'll cross that bridge when we come to it." Grinalds continued to request Turner's identification, which Turner refused to provide. Grinalds and Dyess then "suddenly and without warning" handcuffed Turner and took his video camera from him, and Grinalds said, "This is what happens when you don't ID yourself."

Turner requested to see a supervisor. Grinalds continued to ask for Turner's ID and told him that he would be fingerprinted so the officers could learn his identity. The officers placed the handcuffed Turner in the back of their patrol car and "left him there to sweat for a while with the windows rolled up." Turner alleges that no air was getting to the back seat and that he **\*684**

banged on the door so the officers would roll down the windows.

Lieutenant Driver approached Grinalds and Dyess, and they "seemingly ignored Mr. Turner." The three officers then rolled down the windows of the patrol car and found Turner lying down in the back seat. Lieutenant Driver identified himself as the commander. Driver asked Turner what he was doing, and Turner explained that he was taking pictures from the sidewalk across the street. Driver asked Turner for his ID, and Turner told the lieutenant that he did not have to identify himself because he had not been lawfully arrested and that he chose not to provide his identification. Driver responded, "You're right."

Driver walked away and talked with the officers, then returned to the patrol car and talked with Turner. Turner said, "You guys need to let me go because I haven't done anything wrong." Driver again walked away from the car, talked on the phone, and spoke further with the officers. They returned to the car and took Turner out of the back seat. Driver "lectur[ed]" Turner, and the officers finally released him and returned his camera to him.

B. Proceedings
In October 2015, Turner filed suit in the Northern District of Texas against Driver, Grinalds, and Dyess (collectively, "defendants") in their individual capacities. Each officer filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Turner filed an amended complaint in January 2016, adding the City of Fort Worth as a defendant. [2] Turner brought claims under 42 U.S.C. § 1983 against all defendants, alleging that they violated his First, Fourth, and Fourteenth Amendment rights. [3] Turner sought compensatory damages, punitive damages, attorneys fees and costs, and declaratory judgment that the defendants had violated his constitutional rights.

The three officers filed motions to dismiss Turner's amended complaint. The district court granted the motions to dismiss on the basis of qualified immunity. The court reasoned that Turner failed to meet his burden of showing that the defendants were not entitled to qualified immunity because he failed to show that their actions violated any of his clearly established statutory or constitutional rights or that their actions were objectively unreasonable. [4] Turner timely appealed.

II.

STANDARD OF REVIEW

[1]   [2]   [3]   [4]   [5]   [6]   [7] We review a district court's grant of a motion to dismiss based on qualified immunity de novo. [5] We accept all well-pleaded facts as true and view them in the light most favorable to the non-movant. [6] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[7] "A **\*685** claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." [8] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." [9] Although a complaint "does not need detailed factual allegations," the "allegations must be enough to raise a right to relief above the speculative level." [10] "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." [11]

### III.

### ANALYSIS

[8] [9] [10] [11] [12] "To state a claim under 42 U.S.C. § 1983, a plaintiff must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law." [12] "The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." [13] When a defendant raises a qualified immunity defense, the plaintiff has the burden of demonstrating the inapplicability of that defense. [14] To meet this burden, the plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." [15] Like the district court, we have the discretion to decide which prong of the qualified immunity analysis to address first. [16]

### A. First Amendment

[13] The district court concluded that the defendants were entitled to qualified immunity on Turner's First Amendment claim because he failed to demonstrate that the defendants' actions violated a clearly established right or that their actions were objectively unreasonable. In particular, the district court ruled that a First Amendment right to video record police activity was not clearly established. The district court's analysis rested on the second, "clearly established," prong, so we begin there.

### 1. Whether the Right Was Clearly Established in September 2015

[14] [15] [16] [17] [18] For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." [17] Thus, the right must already be clearly established "at the time of the challenged conduct." [18] When considering whether a defendant is entitled to **\*686** qualified immunity, the court "must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].' " [19] "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." [20] "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established. This

is true even when the circuit split developed *after* the events in question." [21] As the Supreme Court has explained, "[i]f judges ... disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." [22]

At the time in question, neither the Supreme Court nor this court had determined whether First Amendment protection extends to the recording or filming of police. [23] Although Turner insists, as some district courts in this circuit have concluded, that First Amendment protection extends to the video recording of police activity in light of general First Amendment principles, [24] the Supreme Court has "repeatedly" instructed courts "not to define clearly established law at a high level of generality": "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." [25] Thus, Turner's reliance on decisions that "clarified that [First Amendment] protections ... extend[ ] to gathering information" does not demonstrate whether the specific act at issue here—video recording the police or a police station—was clearly established. [26]

The district court stated that circuit courts "are split as to whether or not there is a clearly established First Amendment right to record the public activities of police." **\*687** The circuit courts are not split, however, on whether the right exists. The First and Eleventh Circuits have held that the First Amendment protects the rights of individuals to videotape police

officers performing their duties. [27] In *American Civil Liberties Union v. Alvarez*, the Seventh Circuit explained that the First Amendment protects the audio recording of the police and concluded that an Illinois wiretapping statute, which criminalized the audio recording of police officers, merited heightened First Amendment scrutiny because of its burdens on First Amendment rights. [28] No circuit has held that the First Amendment protection does *not* extend to the video recording of police activity, although several circuit courts have explained that the law in their respective circuits is not clearly established while refraining from determining whether there is a First Amendment right to record the police. [29]

We cannot say, however, that "existing precedent ... placed the ...constitutional question *beyond debate*" when Turner recorded the police station. [30] Neither does it seem that the law "so clearly and unambiguously prohibited [the officers'] conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " [31] In light of the absence of controlling authority and the dearth of even persuasive authority, there was no clearly established First Amendment right to record the police at the time of Turner's activities. All three officers are entitled to qualified immunity on Turner's First Amendment claim.

### 2. Whether the Right Is Clearly Established Henceforth

**[19]** Although the right was not clearly established at the time of Turner's activities, whether such a right exists and is protected by

the First Amendment presents a separate and distinct question.[32] Because **\*688** the issue continues to arise in the qualified immunity context,[33] we now proceed to determine it for the future. We conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions.

**[20]** **[21]** The First Amendment protects freedom of speech and freedom of the press.[34] But "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."[35] News-gathering, for example, "is entitled to first amendment protection, for 'without some protection for seeking out the news, freedom of the press could be eviscerated,' "[36] even though this right is not absolute.[37] The Supreme Court has also recognized a First Amendment right to "receive information and ideas,"[38] and there is "an undoubted right to gather news from any source by means within the law."[39] Furthermore, the Supreme Court has long recognized that the First Amendment protects film.[40] A corollary to this **\*689** principle is that the First Amendment protects the act of making film, as "there is no fixed First Amendment line between the act of creating speech and the speech itself."[41] Indeed, the Supreme Court has never "drawn a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded. Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation."[42]

In addition to the First Amendment's protection of the broader right to film, the principles underlying the First Amendment support the particular right to film the police. "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs."[43] To be sure, "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."[44] Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy. Filming the police also frequently helps officers; for example, a citizen's recording might corroborate a probable cause finding or might even exonerate an officer charged with wrongdoing. As one court explained:

> Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting "the free discussion of governmental affairs." Moreover, as the [Supreme] Court has noted, "[f]reedom of expression has particular significance with respect to government because '[i]t is here

that the state has a special incentive to repress opposition and often wields a more effective power of suppression.' " This is particularly true of law enforcement officials, who are granted substantial discretion that may be misused to deprive individuals of their liberties. Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government **690 more generally. [45]

Protecting the right to film the police promotes First Amendment principles.

[22] We agree with every circuit that has ruled on this question: Each has concluded that the First Amendment protects the right to record the police. [46] As the First Circuit explained, "[t]he filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within [basic First Amendment] principles." [47] This right, however, "is not without limitations." [48] Like all speech, [49] filming the police "may be subject to reasonable time, place, and manner restrictions." [50] In this case, however, we need not decide which specific time, place, and manner restrictions would be reasonable. [51] Nonetheless, we note that when police departments or officers adopt time, place, and manner restrictions, those restrictions must be "narrowly tailored to serve a significant governmental interest." [52] That said, to be constitutionally permissible, a time, place, and manner restriction "need not be the least

restrictive or least intrusive means of serving the government's interests." [53]

**B. Fourth Amendment**

Turner also insists that he has asserted plausible claims under § 1983, to which the defendants are not immune, *viz.*, that the officers violated his Fourth Amendment rights to be free from (1) detention absent reasonable suspicion and (2) warrantless arrest absent probable cause. Because Lieutenant Driver did not arrive on scene until Officers Grinalds and Dyess had already handcuffed Turner and placed him in the back of the patrol car, we first analyze whether Grinalds and Dyess are entitled to qualified immunity on Turner's Fourth Amendment claims.

**1. Officers Grinalds and Dyess**

**a. Detention**

[23] [24] [25] Turner alleges that Grinalds and Dyess's initial questioning of him violated his Fourth Amendment right to be free from detention absent reasonable suspicion. "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'...." [54] The Supreme **691 Court has "said repeatedly that [when determining whether officers had reasonable suspicion, courts] must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." [55] Courts "consider only the 'information available to the

officer[s] at the time of the decision to stop a person.' " [56]

**[26]** **[27]** Even if we assume *arguendo* that Grinalds and Dyess violated Turner's Fourth Amendments rights by detaining him without reasonable suspicion, we cannot say that this detention was objectively unreasonable in light of clearly established law. [57] An individual's right to be free from detention absent reasonable suspicion was clearly established well before the actions giving rise to this case. [58] "But this general claim—that a seizure under the Fourth Amendment must be based on reasonable suspicion—is precisely the type of 'general proposition' that the Supreme Court has rejected." [59] Whether a right was clearly established at the time the defendant acted "requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." [60] Courts "must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " [61]

**[28]** **[29]** "The Fourth Amendment is concerned with ensuring that the scope of a given detention is reasonable under the totality of the circumstances." [62] Turner alleges that, when Grinalds and Dyess approached him, he was videotaping the police station while walking on the sidewalk across the street during midday. Nothing in the amended complaint suggests that Turner was videotaping an arrest, a traffic stop, or any other action or activity being performed by the police in the course of their duties. On the contrary, Turner's complaint states that he was filming

only **\*692** "the routine activities at the Fort Worth Police Department building." On appeal, Grinalds and Dyess reference several attacks on police officers and police stations, including those in Dallas and Austin, and the resulting increase of security at police stations. [63] "[I]t [is] appropriate for the police to take into account the location of the suspicious conduct and the degree of the potential danger being investigated. What is not suspicious in one location may be highly suspicious in another." [64] Turner's filming in front of the police station "potentially threatened security procedures at a location where order was paramount." [65] An objectively reasonable person in Grinalds's or Dyess's position could have suspected that Turner was casing the station for an attack, stalking an officer, or otherwise preparing for criminal activity, and thus could have found Turner's filming of the "routine activities" of the station sufficiently suspicious to warrant questioning and a brief detention. The officers' detention of Turner under these circumstances was not "plainly incompetent" or a knowing violation of the law. [66]

We cannot say that, when viewed in light of the totality of the circumstances, Grinalds and Dyess's initial questioning or detention of Turner, before he was handcuffed, was objectively unreasonable in light of clearly established law. Accordingly, Grinalds and Dyess are entitled to qualified immunity on Turner's claim that they violated his Fourth Amendment right to be free from detention absent reasonable suspicion. [67]

### b. Arrest

**[30] [31] [32] [33] [34] [35]** Turner also contends that the officers violated his Fourth Amendment right to be free from unlawful arrest. The parties dispute whether Turner's detention amounted to an arrest. "A seizure rises to the level of an arrest only if 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal **\*693** arrest.' " [68] The "reasonable person" is one who is "neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." [69] When determining whether an investigative stop amounts to an arrest, "[t]he relevant inquiry is always one of reasonableness under the circumstances," which must be considered on a case-by-case basis. [70] "[U]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination— do not automatically convert an investigatory detention into an arrest requiring probable cause." [71] But, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." [72]

**[36]** Turner alleges that he was handcuffed and placed in the back of the patrol car, where the officers left him "for a while." There is "no rigid time limitation" on investigative stops, but "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." [73] Although Turner has not alleged the length of time that he was detained in the back seat of the patrol car, Grinalds's and Dyess's actions—handcuffing Turner and placing him in the patrol car—were disproportionate to any potential threat that Turner posed or to the investigative needs of the officers. [74] Based **\*694** on the allegations of Turner's complaint, the officers were not taking investigative steps to determine who he was (aside from repeatedly asking him for identification) or what threat he might have posed. Neither does anything in the amended complaint suggest that Turner had a weapon, was using his hands in a threatening way, or otherwise posed a threat that required such restraint. The officers' handcuffing Turner and placing him in the patrol car, as alleged in the amended complaint, were not reasonable under the circumstances. [75] We conclude that a reasonable person in Turner's position would have understood the officers' actions "to constitute a restraint on [Turner's] freedom of movement of the degree which the law associates with formal arrest." [76]

**[37] [38]** When a police detention amounts to a warrantless arrest, as Turner has alleged it did here, the arrest must be accompanied by probable cause. [77] "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had

committed or was committing an offense." [78] "The police may take reasonable actions under the circumstances to ensure their own safety, as well as the safety of the public, during an encounter with a suspect." [79]

**[39]** Based on the allegations of Turner's amended complaint, the officers lacked probable cause to arrest him, and the officers do not dispute this. [80] Turner "did not make any threats" against the officers, "did not [attempt] to leave or flee," and "did not take any aggressive actions." The only potential reason the officers gave Turner for arresting him that can be gleaned from the amended complaint is Turner's failure to identify himself: He alleges that, after he was handcuffed, Grinalds told him "[t]his is what **\*695** happens when you don't ID yourself." But the police cannot arrest an individual solely for refusing to provide identification. [81] We are satisfied that Turner has alleged a violation of his Fourth Amendment right to be free from unlawful arrest. [82]

The Fourth Amendment right to be free from arrest without probable cause was clearly established at the time of Turner's alleged arrest. [83] None of the defendants contends that any of them had probable cause to arrest Turner or that an arrest would have been objectively reasonable in light of clearly established law. [84] We are satisfied that no objectively reasonable person in these officers' position could have believed that there was probable cause to arrest Turner under the circumstances alleged in the amended complaint. Grinalds and Dyess are therefore not entitled to qualified immunity at this stage of the litigation on Turner's Fourth

Amendment claim that the officers violated his right to be free from warrantless arrest absent probable cause. [85]

2. Lieutenant Driver

**[40]** Turner insists that Driver violated his Fourth Amendment rights by "continuing the unlawful seizure and subsequent handcuffing and arrest and keeping Turner locked in the back of the police car after Driver arrived on the scene."

**[41]** Supervisory officials are not liable under § 1983 for the actions of subordinates on any theory of vicarious liability. [86] Accordingly, Driver is not liable for the actions of Grinalds and Dyess before he arrived on the scene. We thus must determine whether Turner has alleged a separate violation of his constitutional rights by Driver after he arrived and whether Driver's actions were objectively reasonable when viewed in the light of clearly established law.

To be liable under § 1983, Driver must have been personally involved in the alleged constitutional deprivation or have engaged in wrongful conduct that is causally **\*696** connected to the constitutional violation. [87] Personal involvement of supervising personnel generally includes giving a "command, signal, or any other form of direction to the officers that prompted" the detention or arrest. [88] According to Turner's allegations, he was already in handcuffs and in the back seat of the patrol car when Driver arrived on scene. Turner asserts that Driver talked with Grinalds and Dyess and then approached Turner to determine what had transpired.

The allegations of the amended complaint indicate that Driver investigated the situation immediately upon arrival by consulting with Grinalds and Dyess and talking with Turner, and then promptly released Turner. Turner has failed to allege any personal involvement in his arrest or any conduct on Driver's part that indicates he unreasonably prolonged Turner's detention or arrest. The facts alleged in Turner's amended complaint demonstrate that Driver "diligently pursued a means of investigation that was likely to confirm or dispel [the officers'] suspicions quickly."[89] Turner has failed to allege that Driver violated Turner's Fourth Amendment rights to be free from detention absent reasonable suspicion and from unlawful arrest. Even if Turner had sufficiently alleged a constitutional violation, Driver acted objectively reasonably in light of the circumstances—namely, by apprising himself of the situation and acting accordingly. Driver is therefore entitled to qualified immunity on Turner's Fourth Amendment claims.

IV.

CONCLUSION

We affirm the district court's grant of qualified immunity to Grinalds, Dyess, and Driver on Turner's First Amendment claim and on his Fourth Amendment claim for unlawful detention. With respect to Turner's Fourth Amendment claim for unlawful arrest, we affirm the district court's grant of qualified immunity as to Driver, but we reverse as to Grinalds and Dyess and remand for further proceedings on that claim.

AFFIRMED in part; REVERSED and REMANDED in part.

EDITH BROWN CLEMENT, Circuit Judge, dissenting as to Parts III.A.2 & III.B.1.b:

I respectfully dissent from the majority's dicta purporting to clearly establish a First Amendment right to film the police and from the majority's reversal of the district court's grant of qualified immunity to Officers Grinalds and Dyess regarding Turner's unlawful arrest claim.

The Supreme Court has repeatedly held that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *See, e.g.*, *Mullenix v. Luna*, ––– U.S. ––––, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). The Supreme Court recently "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high **\*697** level of generality.' " *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

I

The majority asserts, unconnected to the particular facts and unnecessary to the

disposition of this case, that "a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions." The majority derives this general right to film the police from "First Amendment principles, controlling authority, and persuasive precedent." But the Supreme Court has repeatedly reversed attempts to define "clearly established law" at such "a high level of generality." *White*, 137 S.Ct. at 552.

A law is not clearly established unless and until there is "directly controlling authority" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Gonzalez v. Huerta*, 826 F.3d 854, 858 (5th Cir. 2016) (emphasis omitted). To the extent there is any consensus of persuasive authority, those cases focus only on the narrow issue of whether there is a First Amendment right to film the police "carrying out their duties in public." *E.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011). Turner did not allege that he filmed police officers conducting their public duties, but rather that he filmed a police station.

The majority does not determine that the officers here violated Turner's First Amendment rights—perhaps because it would be reasonable for security reasons to restrict individuals from filming police officers entering and leaving a police station. Because the majority does not hold that the officers actually violated the First Amendment, "an officer acting under similar circumstances" in the future will not have violated any clearly established law. *See White*, 137 S.Ct. at 552.

II

The majority reverses the district court's grant of qualified immunity to Officers Grinalds and Dyess regarding Turner's unlawful arrest claim, holding that "it was clearly established that an officer could not prolong an investigative detention without an investigatory purpose." But the majority "fail[s] to identify a case where an officer acting under similar circumstances as [Officers Grinalds and Dyess] was held to have violated the Fourth Amendment." *White*, 137 S.Ct. at 552. Turner alleged only that he was in the police car "a while"—he failed to specify the length of the investigative detention. Perhaps more importantly, Turner clearly alleged that he "asked for a supervisor to come to the scene." Neither Turner nor the majority identify any case clearly establishing that an officer violated the Fourth Amendment when he extended an investigative detention because the detained individual "asked for a supervisor to come to the scene."

Because Turner himself requested a supervisor, a reasonable police officer in that situation could believe that waiting for the supervisor to arrive at the scene did not transform Turner's detention into a de facto arrest. At the very least, Officers Grinalds and Dyess did not act objectively unreasonably in waiting for the requested supervisor— especially because Lieutenant Driver had to come from the Fort Worth Police Station across the street. Accordingly, I respectfully dissent from the majority's **\*698** reversal of the district court's grant of qualified immunity

to Officers Grinalds and Dyess on Turner's unlawful arrest claim.

**All Citations**

848 F.3d 678

---

## Footnotes

1    All facts derive from the plaintiff's amended complaint and, in this posture, are taken as true. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012).

2    Defendant City of Fort Worth did not file a motion to dismiss and is not a party to this appeal.

3    Although Turner alleged in the district court that the defendants violated his Fourteenth Amendment rights, he has not raised an issue on appeal regarding a Fourteenth Amendment claim.

4    The district court's analysis rested entirely on its determination that a First Amendment right to videotape police activity was not clearly established.

5    *Whitley v. Hanna*, 726 F.3d 631, 637 (5th Cir. 2013).

6    *Id.*

7    *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

8    *Id.*

9    *Id.*

10    *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

11    *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (quoting *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)).

12    *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252–53 (5th Cir. 2005).

13    *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).

14    *Atteberry*, 430 F.3d at 253.

15   *Whitley*, 726 F.3d at 638 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)).

16   *Morgan*, 659 F.3d at 371.

17   *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

18   *Lane v. Franks*, ––– U.S. ––––, 134 S.Ct. 2369, 2381, 189 L.Ed.2d 312 (2014) (quoting *al–Kidd*, 563 U.S. at 735, 131 S.Ct. 2074).

19   *Morgan*, 659 F.3d at 371 (alteration in original) (quoting *al–Kidd*, 563 U.S. at 741, 131 S.Ct. 2074).

20   *Id.* at 371–72 (internal quotation marks omitted).

21   *Id.* at 372 (citation omitted).

22   *Wilson v. Layne*, 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *see also Morgan*, 659 F.3d at 372.

23   Even intracircuit decisions in which courts determine that the right to record police activities is clearly established note that there is no controlling authority on this specific issue. *See, e.g.*, *Turner v. City of Round Rock*, No. 15-CV-939-RP, ECF No. 43 (W.D. Tex. May 25, 2016) ("The Fifth Circuit apparently has not explicitly noted a right to film police or outlined the contours of such a right.").

24   *See, e.g., id.*; *Buehler v. City of Austin*, No. 1:13-CV-1100-ML, ECF No. 54 (W.D. Tex. July 24, 2014).

25   *al–Kidd*, 563 U.S. at 742, 131 S.Ct. 2074.

26   Turner relies on cases such as *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. Unit A Jan. 1981), and *In re Express–News Corp.*, 695 F.2d 807 (5th Cir. 1982), to support his assertion that the right to record police is clearly established under Supreme Court and Fifth Circuit precedent. None of the cases on which Turner relies, however, taken individually or collectively, demonstrates such a clearly established right. For example, in *Joseph Burstyn*, the Supreme Court limited its analysis to whether *motion pictures* fall within the scope of the First Amendment. *See Joseph Burstyn*, 343 U.S. at 501–02, 72 S.Ct. 777. *Shillingford* did not involve any First Amendment challenge. *See Shillingford*, 634 F.2d at 264–66. And *In re Express–News* pertained to a news reporter's ability to interview jurors after they serve on a criminal trial. *In re Express–News*, 695 F.2d 807.

27  *See, e.g., Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("Recognizing that it is firmly established that the First Amendment protects 'a range of conduct' surrounding the gathering and dissemination of information, we held [in *Glik v. Cunniffe*] that the Constitution protects the right of individuals to videotape police officers performing their duties in public."); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("The First Amendment issue here is, as the parties frame it, fairly narrow: is there a constitutionally protected right to videotape police carrying out their duties in public? Basic First Amendment principles, along with case law from this and other circuits, answer that question unambiguously in the affirmative."); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir.), *cert. denied*, 531 U.S. 978, 121 S.Ct. 426, 148 L.Ed.2d 435 (2000) (holding that there exists "a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct").

28  *Am. Civil Liberties Union v. Alvarez*, 679 F.3d 583, 595–602 (7th Cir. 2012).

29  *See, e.g., Kelly v. Borough of Carlisle*, 622 F.3d 248, 261–62 (3d Cir. 2010) (holding that a First Amendment right to videotape police officers during traffic stops was not clearly established); *Szymecki v. Houck*, 353 Fed.Appx. 852, 853 (4th Cir. 2009) (per curiam) (noting that a First Amendment right to record police activities on public property was not clearly established); *McCormick v. City of Lawrence, Kan.*, 130 Fed.Appx. 987, 988–89 (10th Cir. 2005) (explaining that it was not clearly established that police violated the First Amendment by destroying recordings of police activity at roadside sobriety checkpoints).

30  *Morgan*, 659 F.3d at 372 (quoting *al–Kidd*, 563 U.S. at 741, 131 S.Ct. 2074).

31  *Id.* at 371 (second alteration in original) (quoting *al–Kidd*, 563 U.S. at 741, 131 S.Ct. 2074).

32  *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

33  *Compare Basler v. Barron*, No. 15–CV–2254, 2016 WL 1672573, at *3 (S.D. Tex. Apr. 27, 2016) ("It is well established that the gathering of information about government affairs or matters of public concern—including recording police activity—is protected by the First Amendment."), *and Buehler v. City of Austin*, 2015 WL 737031, at *9 ("In light of the existing Fifth Circuit precedent and the robust consensus among circuit courts of appeals, the Court concludes that the right to photograph and videotape police officers as they perform their official duties was clearly established at the time of Buehler's arrests."), *aff'd on other grounds*, 824 F.3d 548 (5th Cir. 2016); *Turner*, No. 15-CV-939-RP, ECF No. 43 at *11 ("The Fifth Circuit apparently has not explicitly noted a right to film police or outlined the contours of such a right. However, '[t]he First Amendment protects a private

citizen's right to assemble in a public forum, receive information on a matter of public concern—such as police officers performing their official duties—and to record that information for the purpose of conveying that information.' " (alteration in original) (quoting *Buehler*, 2015 WL 737031, at *7))*, with Cadena v. Ray*, No. 5:15–CV–552–DAE, 2016 WL 6330438, at *3 n.5 (W.D. Tex. Oct. 27, 2016) ("Since Cadena fails to otherwise show the existence of a clearly established right to videotape police operations, he has failed to meet his burden to overcome the assertion of qualified immunity."), *and Gravolet v. Tassin*, No. 08–CV–3646, 2009 WL 1565864, at *3 (E.D. La. June 2, 2009) ("Even assuming that the plaintiff had the 'clearly established right' to videotape Tassin while on duty, that right does not render the stalking statute inapplicable nor does a video camera immunize the plaintiff from such a charge.").

34   U.S. CONST. amend. I.

35   *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

36   *In re Express–News*, 695 F.2d at 808 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)).

37   *See Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928 (5th Cir. 1996).

38   *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (internal quotation marks omitted).

39   *Houchins v. KQED, Inc.*, 438 U.S. 1, 11, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (internal quotation marks omitted).

40   *See e.g.*, *Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959) ("What New York has done, therefore, is to prevent the exhibition of a motion picture because that picture advocates an idea—that adultery under certain circumstances may be proper behavior. Yet the First Amendment's basic guarantee is of freedom to advocate ideas. The State, quite simply, has thus struck at the very heart of constitutionally protected liberty."); *Superior Films, Inc. v. Dep't of Educ. of State of Ohio, Div. of Film Censorship*, 346 U.S. 587, 589, 74 S.Ct. 286, 98 L.Ed. 329 (1954) (Douglas, J., concurring) ("Motion pictures are of course a different medium of expression than the public speech, the radio, the stage, the novel, or the magazine. But the First Amendment draws no distinction between the various methods of communicating ideas."); *Joseph Burstyn*, 343 U.S. at 502, 72 S.Ct. 777 ("[W]e conclude that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments.").

41  *Alvarez*, 679 F.3d at 596 (citing *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010)); *see also id.* at 595 ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording. The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected....").

42  *Anderson*, 621 F.3d at 1061–62.

43  *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966).

44  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (citation omitted).

45  *Glik*, 655 F.3d at 82–83 (citations omitted).

46  *See Alvarez*, 679 F.3d at 595–96; *Glik*, 655 F.3d at 82, 85; *Smith*, 212 F.3d at 1333; *see also Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

47  *Glik*, 655 F.3d at 82.

48  *Id.* at 84.

49  *See, e.g.*, *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 535–36, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (discussing history of time, place, and manner restrictions).

50  *Glik*, 655 F.3d at 84; *see, e.g., Smith*, 212 F.3d at 1333. "Importantly, an individual's exercise of her First Amendment right to film police activity carried out in public ... necessarily remains unfettered unless and until a reasonable restriction is imposed or in place." *Gericke*, 753 F.3d at 8.

51  *See Glik*, 655 F.3d at 84 ("We have no occasion to explore those limitations here, however.").

52  *McCullen v. Coakley*, ––– U.S. ––––, 134 S.Ct. 2518, 2529, 189 L.Ed.2d 502 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

53  *Id.* at 2535 (internal quotation marks omitted).

54  *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This type of stop is also known as a "Terry stop."

55  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

56  *Carroll v. Ellington*, 800 F.3d 154, 171 (5th Cir. 2015) (alteration in original) (quoting *United States v. Silva*, 957 F.2d 157, 160 (5th Cir. 1992)), *cert. denied*, —— U.S. ——, 137 S.Ct. 492, 196 L.Ed.2d 403 (2016).

57  *Gonzalez v. Huerta*, 826 F.3d 854, 857 n.4 (5th Cir. 2016) ("We may proceed directly to the second prong of the qualified immunity analysis without explicitly ruling on the first." (citing *Pearson*, 555 U.S. at 227, 129 S.Ct. 808)), *cert. denied*, —— U.S. ——, 137 S.Ct. 697, 196 L.Ed.2d 529, 2017 WL 69303 (U.S. 2017).

58  *See* U.S. CONST. amend. IV; *Ibarra v. Harris Cty. Tex.*, 243 Fed.Appx. 830, 833 (5th Cir. 2007) (per curiam) ("The law is clearly established that a detention is objectively unreasonable if the police officers lacks reasonable suspicion to believe that the person is engaged in criminal activity...." (citing *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979))).

59  *Gonzalez*, 826 F.3d at 857–58 (citing *al–Kidd*, 563 U.S. 731, 131 S.Ct. 2074); *see Wilson*, 526 U.S. at 615, 119 S.Ct. 1692 ("It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police.... However, ... the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.").

60  *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004).

61  *Morgan*, 659 F.3d at 371 (alteration in original) (quoting *al–Kidd*, 563 U.S. at 741, 131 S.Ct. 2074).

62  *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) (en banc).

63  *See, e.g.,* Jason Hanna and Joe Sutton, *Dallas Police HQ Shooting: Suspect James Boulware Killed During Standoff*, CNN (June 13, 2015), http://www.cnn.com/2015/06/13/us/dallas-police-headquarters-shooting ("A man unleashed a barrage of gunfire on Dallas' police headquarters and planted explosives outside the building early Saturday...."); *Austin Gunman Dead after Downtown Shooting Rampage*, KXAN (Nov. 28, 2014), http://kxan.com/2014/11/28/austin-police-shut-down-city-streets-for-activeshooter-investigation/ ("A gunman opened fire at four different buildings, including [Austin Police Department] headquarters.... An officer about to get off duty saw the suspect near [the police department] HQ and opened fire on the suspect who fell to the ground.").

"Specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy may be judicially noticed." *Weaver v. United States*, 298 F.2d 496, 498 (5th Cir. 1962); *see also United States v. Ramos*, 629 F.3d 60, 66–68 (1st Cir. 2010) (concluding that the officers had reasonable suspicion that criminal activity was afoot under the totality of the circumstances, including that the officers "were particularly alert to the risk of attacks on public transit systems in light of the coordinated terrorist attacks on Madrid commuter rail trains ... less than three months earlier").

64    *Ramos*, 629 F.3d at 66–67.

65    *Mocek v. City of Albuquerque*, 813 F.3d 912, 924 (10th Cir. 2015).

66    *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

67    *See Carroll*, 800 F.3d at 171 (concluding that, because the plaintiffs "have not shown that [the defendant] was objectively unreasonable in light of clearly established law in initially attempting to detain [the deceased] for investigatory questioning," the defendant was entitled to qualified immunity).

68    *Id.* at 170 (quoting *United States v. Corral–Franco*, 848 F.2d 536, 540 (5th Cir. 1988)).

69    *Corral–Franco*, 848 F.2d at 540 (quoting *United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988)).

70    *United States v. Sanders*, 994 F.2d 200, 206–07 (5th Cir. 1993).

71    *Id.* at 206.

72    *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

73    *United States v. Sharpe*, 470 U.S. 675, 685–86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

74    The appellees rely on cases such as *United States v. Bullock*, 632 F.3d 1004 (7th Cir. 2011); *United States v. Maltais*, 403 F.3d 550 (8th Cir. 2005); and *Haynie v. Cty. of Los Angeles*, 339 F.3d 1071 (9th Cir. 2003), to argue that their actions did not amount to a de facto arrest. These out-of-circuit cases, however, are inapposite. In *Bullock*, the defendant was handcuffed and placed in a patrol car for 30 to 45 minutes while the officers executed a search warrant for narcotics. *Bullock*, 632 F.3d at 1009, 1011. The Seventh Circuit found that, "while the facts ... approach the outer

boundaries of a permissible *Terry* stop," the defendant's seizure did not amount to a de facto arrest:

> Given that officers were conducting a search for drugs, it was reasonable to place [the defendant] in handcuffs and in the squad car for their safety while they pursued their investigation.... Drug crimes are associated with dangerous and violent behavior and warrant a higher degree of precaution. Officers could reasonably believe that [the defendant] was potentially dangerous and a flight risk because of his awareness of the search warrant, his association with the residence, and the officers' reasonable suspicion that he was involved in narcotics distribution.

*Id.* at 1016 (citation omitted). Here, there was no suspicion that Turner was involved in a drug-related offense, and nothing in the amended complaint suggests that the officers in this case shared any of the concerns that the officers in *Bullock* had.

In *Maltais*, the Eighth Circuit held that a defendant's detention in the back of a patrol car for 2 hours and 55 minutes was not unreasonable under the circumstances, as the defendant was in a remote and isolated rural area, only 500 yards from the Canadian border, at 1:00 a.m. *Maltais,* 403 F.3d at 557. The court went to lengths to explain that "[t]he officers acted with diligence and pursued the quickest and least intrusive means of investigation reasonably available to confirm or dispel their well-founded suspicions that [the defendant] was engaged in drug trafficking." *Id.* at 558. Indeed, the court expressly stated that "a detention of this length would be unreasonable under different circumstances." *See also Haynie,* 339 F.3d at 1077 (concluding that the handcuffing of the defendant for 16 to 20 minutes did not amount to a de facto arrest because the officer "appropriately restrained [the defendant] only to the extent necessary to complete his investigation into [a] report about men with guns").

75    *See Sanders,* 994 F.2d at 206–07.

76    *Carroll,* 800 F.3d at 170 (internal quotation marks omitted); *see also Massey v. Wharton,* 477 Fed.Appx. 256, 261 (5th Cir. 2012) (per curiam) ("Tonia Massey was handcuffed and put in the back of a police car, she claims, for two-and-a-half to three hours. There is no indication that the police were investigating her for anything. Under these circumstances, any reasonable officer should have known that Tonia Massey's seizure required probable cause, not reasonable suspicion."); *Freeman v. Gore,* 483 F.3d 404, 408–09, 413 (5th Cir. 2007) (finding that "a reasonable person in [the plaintiff's] situation would surely believe that she had been restrained to an extent that normally accompanies a formal arrest" because, the plaintiff alleged, she was threatened with arrest, handcuffed, and placed in the back of the patrol car for

30 to 45 minutes after she refused to let sheriff's deputies search her home without a search warrant).

77  *Freeman*, 483 F.3d at 413.

78  *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (emphasis omitted) (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996)).

79  *United States v. Abdo*, 733 F.3d 562, 565 (5th Cir. 2013).

80  The officers argue only that the detention did not amount to an arrest. Counsel for Driver conceded at oral argument that, if Turner was arrested, the arrest would have been unlawful because the officers lacked probable cause.

81  *Gonzalez*, 826 F.3d at 858 (citing *Brown*, 443 U.S. at 52, 99 S.Ct. 2637 ("[E]ven assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it."); *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 188, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)); *see also* TEX. PENAL CODE § 38.02(a).

82  *Flores*, 381 F.3d at 402 ("An arrest is unlawful unless it is supported by probable cause.").

83  *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009).

84  *See id.* ("[E]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." (internal quotation marks omitted)).

85  We note the limited scope of our holding. We hold only that it was clearly established that an officer could not prolong an investigative detention without an investigatory purpose. Because the amended complaint does not allege that Turner posed any threat to the officers or that Grinalds and Dyess continued investigating while Turner was handcuffed in the back of the police car, Turner has pleaded a Fourth Amendment claim. Of course, at this stage of the proceeding, Grinalds and Dyess have not had the opportunity to explain their actions. As this case progresses, they will have the opportunity to explain why they handcuffed and detained Turner and provide evidence supporting their explanation. The facts that come to light through discovery might demonstrate that Turner's detention did not amount to a de facto arrest or that Grinalds's and Dyess's actions were not objectively unreasonable. Until then, however, qualified immunity is not proper.

86  *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).

87    *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008).

88    *Id.*; *see also Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) ("To show personal involvement, the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." (internal quotation marks omitted)); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) ("A plaintiff may satisfy [the personal involvement] standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance.").

89    *Sharpe*, 470 U.S. at 686, 105 S.Ct. 1568.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   30