# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

JUSTIN PULLIAM,

     *Plaintiff*,

v.

COUNTY OF FORT BEND, TEXAS;
SHERIFF ERIC FAGAN, in his
individual capacity; OFFICER ROBERT
HARTFIELD, in his individual capacity;
OFFICER JONATHAN GARCIA, in his
individual capacity; OFFICER TAYLOR
ROLLINS, in his individual capacity;
and OFFICER RICKY RODRIGUEZ, in
his individual capacity,

     *Defendants*.

Civil Action No. 4:22-cv-4210

## PLAINTIFF JUSTIN PULLIAM'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Justin Pulliam presents proposed findings of fact and conclusions of law based on the evidence expected at trial.

Trial concerns the part of the case that was not resolved by the Court's grant of partial summary judgment to Pulliam on September 24, 2024. Docs. 77, 81. That partial summary judgment found Defendants Fort Bend County and Sheriff Eric Fagan liable to Pulliam for an incident at a press conference on July 12, 2021, but did not find damages or award any relief. Nor did the partial summary judgment determine liability for Pulliam's claims stemming from the events of a December 21, 2021 welfare check.

1

Therefore, these proposed findings of fact and conclusions of law focus on the subjects of trial: (1) liability for claims stemming from the events of December 21, 2021; and (2) the relief warranted for Pulliam's successful claims. Below, Pulliam offers a summary of the Court's prior decision, factual findings, and legal findings in the Court's voice.

## SUMMARY OF PARTIAL GRANT OF SUMMARY JUDGMENT

1.      The Court has already granted summary judgment to Pulliam on his claim that Sheriff Fagan and Fort Bend County violated Pulliam's First Amendment and equal-protection rights for an incident at a press conference on July 12, 2021. Doc. 77 at 8–18. The Court incorporates its prior factual and legal findings into this Order. To summarize—and not to modify or otherwise alter the summary judgment order—the Court found based on the undisputed evidence that Sheriff Fagan excluded Pulliam from the press conference based on hostility to his speech and his status as a social-media journalist. This exclusion violated Pulliam's clearly established rights, and Sheriff Fagan was not entitled to qualified immunity. The County was also jointly liable for these constitutional violations because Pulliam's exclusion was pursuant to official policy in two ways. First, under Texas law and Fifth Circuit precedent, a Sheriff is an official policymaker for the purposes of *Monell* liability and therefore his acts constituted Fort Bend County policy. Second, the written media policies of Fort Bend County Sheriff's Office (FBCSO) made an explicit distinction between traditional and social media, according lesser status to the latter.

**FINDINGS OF FACT**

2.      Pulliam is an independent journalist who films activities of public interest, including police interactions with civilians. Doc. 77 at 1. Pulliam's coverage has primarily focused on local government in the Houston area, including in Fort Bend County, Texas. Pulliam has a YouTube channel called "Corruption Report," which has over 100,000 subscribers and offers over 300 videos. Before the events underlying this case, Pulliam provided his Corruption Report viewers with videos containing long-form reporting and livestreams of police and local government events. Pulliam's long-form video reports incorporated footage of police officers in action with opinion commentary that he filmed at home. His commentary was frequently critical of law enforcement. His videos could get 100,000–500,000 views, and several of his videos have over one million views. Pulliam also has a separate YouTube channel called "Justin Pulliam Live," which is specifically dedicated to live streaming and has over 14,000 subscribers.

3.      Sheriff Fagan is the elected Sheriff of Defendant Fort Bend County and the final policymaker for Fort Bend County's law enforcement activities. He oversees FBCSO.

**I.      Fort Bend County, particularly FBCSO and its officers, has an official policy and custom of intimidating and excluding Pulliam to interfere with his reporting.**

4.      Although FBCSO and Sheriff Fagan have recognized that citizens have a right to record the police, FBCSO classified Pulliam as "not media" and restricted Pulliam's reporting more than other journalists because he used social media to report and because his reporting was critical of FBCSO and its officers.

3

5.     Before the arrest at issue in this lawsuit, Pulliam was never arrested or charged with any crime.

6.     Nevertheless, FBCSO, under Sheriff Fagan's predecessor, barred Pulliam from visiting FBCSO's office and would refuse Pulliam's requests to interview the sheriff.

7.     After Sheriff Fagan took office, Pulliam asked that he be added to FBCSO's media list so he could receive notice about FBCSO's press conferences. FBCSO again refused to add Pulliam to its press conference list and responded with the following statement via email: "According to FBCSO PIO policy, only accredited media outlets can be added to the list you're requesting to be added to. Press conferences are not open to the public and require an invitation from our office."

8.     On July 12, 2021, Sheriff Fagan closed Jones Creek Ranch Park in connection with an investigation involving human remains in a car within a creek. In closing the park, Sheriff Fagan specifically ordered Pulliam's removal. He told another officer that "after five minutes, make, give him proper time to leave, then make the arrest," with "him" referring to Pulliam.[1] Other members of the media did not receive any such threat and were permitted to continue recording at the incident scene for a few minutes after Pulliam was ordered to leave.

9.     Also on July 12, 2021, Sheriff Fagan ordered Pulliam removed from a press conference under threat of arrest even though Pulliam was standing where other members of the media were staged and was silently recording. Specifically, Sheriff Fagan ordered

---

[1] Fagan Resp. Req. Admis. Nos. 4–5.

his subordinate officer that if Pulliam did not "go back" from the press conference, then "arrest him."

10.    Sheriff Fagan had actual knowledge of the policy and custom of hostility toward Pulliam, his journalism, and his speech and approved it. As evidenced by Sheriff Fagan's action on July 12, 2021, Sheriff Fagan even participated in effecting that policy.

11.    The Sheriff's order to remove Pulliam from the press conference and threats of arrest were motivated by the intent to intimidate and exclude Pulliam because of his critical coverage and status as a social media journalist. Alternatively, Sheriff Fagan was recklessly or callously indifferent to Pulliam's First Amendment rights.

12.    FBCSO has not provided its officers or other personnel with any training on how to interact with citizens filming the police or independent, citizen journalists.

## II.    Rollins instigated a conflict with Pulliam and escalated that to an arrest within 60 seconds of arriving at the scene of a welfare check in retaliation for Pulliam's criticism of law enforcement, filming, and on-scene speech.

13.    On December 21, 2021, the Sheriff's Office received a call from Texana, an entity that provides mental health services, requesting a "welfare check" for Edwin Kraft and his mother Frances Kraft at their rural property in Fort Bend County. Edwin was well known to the Sheriff's Office due to previous calls about his mental illness. Edwin was reportedly experiencing a mental health crisis and the Texana worker sought help from the Sheriff's Office.

14.    Deputies Ricky Rodriguez and Matthew Lacy responded to the call at the rural property where Edwin lived with his mother Frances. The Kraft property includes a convenience store and gas station that no longer operate. The building for the store is still

there, as are the gas pumps under a canopy. There is also a mobile home where the Krafts lived.

15.    Although the officers knew that Edwin had serious mental health issues, Rodriguez and Lacy did not perceive the situation at the Kraft property as posing an imminent threat.

16.    The service call for a welfare check at the Kraft property was classified as a priority three call, the lowest priority, in FBCSO's electronic communication system. The call was also classified in the communication system as requiring a "standard" response, which indicated that the call was not for an abnormally dangerous situation. All FBCSO patrol officers are expected to know the information transmitted in FBCSO's electronic communication system and transmitted by radio when arriving at a scene.

17.    Deputy Lacy arrived at the Kraft property first, and he spoke with Frances.

18.    Lacy then radioed that he was standing by, and that Edwin was behind the Kraft residence with a baseball bat. Lacy subsequently radioed that Frances was outside with him and Edwin was inside the residence. Approximately five minutes later, Lacy radioed that he was keeping an eye on the door of the residence from a distance until a supervisor arrived.

19.    Deputy Rodriguez was the second FBCSO officer to arrive at the Kraft property. Rodriguez's patrol vehicle had a dash camera that recorded his arrival and some of the events.

20.    After Rodriguez arrived, Lacy and Rodriguez met directly in front of the Kraft residence and walked around the property in an unhurried manner to formulate a

plan. Lacy and Rodriguez did not have their guns drawn because they didn't perceive any danger and were still trying to figure out where to set up.

21.     Rodriguez and Lacy were waiting for a supervisor to arrive. Edwin had apparently locked himself in the Krafts' house and was not a danger to anyone. Rodriguez monitored the front of the Kraft residence and Lacy went around the back of the Kraft residence.

22.     At the same time, Frances was standing by the gas pumps, which were located at the front of the property, by the street. Lacy and Rodriguez did not tell Frances to move from her location under the gas canopy. Rodriguez did not believe that Frances was in an unsafe location during that period.

23.     While Rodriguez was waiting, he returned to his patrol car twice. The first time he went to fetch his beanie, given the chilly weather. The second time he fetched his body microphone (which allows his dash cam to record what is said). For both of those trips to his patrol car, Rodriguez crossed in front of the Kraft residence.

24.     A few minutes after Rodriguez arrived at the Kraft property, Pulliam arrived. While riding in his truck with his wife, Pulliam had seen Rodriguez driving in the direction of the Kraft property and suspected that the deputy was going to the Kraft residence. Pulliam, too, was familiar with Edwin Kraft and his mental illness. Pulliam had covered police interactions with Kraft before.

25.     Pulliam was worried that a police confrontation with Kraft could result in Kraft being injured or killed. It was and is Pulliam's understanding that a mental-health

crisis sharply increases the odds that a citizen will be injured or killed during a police interaction.

26.     Pulliam's truck had a dash camera that recorded his arrival and some of the events. Upon seeing two FBCSO vehicles at the Kraft property, Pulliam had his wife park their truck along the road on the Kraft property. Pulliam then got out of his truck and began filming FBCSO officers' activities.

27.     Immediately after Pulliam arrived, Rodriguez radioed "local journalist Justin Pulliam's on scene."[2]

28.     Rodriguez radioed that Pulliam was on scene because Pulliam is widely known to FBCSO officers. Officers are aware of his often-critical coverage and Rodriguez wanted to alert his fellow officers that Pulliam was there recording their actions.

29.     The Court finds that a FBCSO officer arriving at the Krafts' property would have known that Pulliam was there.

30.     At about the same time Rodriguez radioed about Pulliam's arrival, Pulliam approached Frances, who was by her car under the gas canopy. Pulliam explained that he was a journalist who films FBCSO officers and wanted to film for Edwin's safety. By this, Pulliam meant that he thought Edwin would be safer if Pulliam recorded the police call. Pulliam believed that if the police officers knew that Pulliam was there and recording, they would be more reluctant to use violence against Edwin. Pulliam also thought it important

---

[2] County Resp. Req. Admis. Nos. 17–18.

to create an independent record of the police call given the stakes for Edwin. Frances agreed that it was okay for Pulliam to film.[3]

31.     Rodriguez told Pulliam "sir, we need you to stay back over there."[4] Rodriguez testified that, through his order, he was instructing Pulliam to stay where he was and not come any closer to the Kraft residence. At no point was Pulliam ever between Rodriguez (or any other officer) and the residence.

32.     Pulliam complied with Rodriguez's order and did not move closer to the Kraft residence.

33.     A few minutes after Rodriguez ordered Pulliam to "stay back," two civilian women arrived and walked over to where Frances was under the gas canopy. One of the women was wearing heels.

34.     Neither Rodriguez nor Lacy ordered Frances, Pulliam, or the two civilian women to leave the scene.

35.     Sergeant Taylor Rollins then arrived at the Kraft property.

36.     When Rollins arrived, the scene was calm and quiet. There was no conflict between anyone. Pulliam was silently and peacefully filming, complying with Rodriguez's request to stay where he was. Pulliam had Frances' permission to be there. Rodriguez and Lacy were not in conflict with any of the civilians present. None of the civilians present were in conflict with each other. Edwin Kraft was nowhere to be seen.

---

[3] County Resp. Req. Admis. No. 21.
[4] County Resp. Req. Admis. Nos. 22, 26.

37.     He immediately got out of his patrol vehicle and started walking toward Pulliam, Frances, and the two civilian women.

38.     Before arriving at the Kraft property, Rollins knew who Pulliam was by reputation. That reputation was negative.

39.     As Rollins pulled into the parking area on the Kraft property, Rollins spotted a red-haired male who was filming with a nice camera. Rollins assumed that the red-haired man was Pulliam.

40.     Based on both the fact that Rodriguez radioed that "local journalist Justin Pulliam's on scene" and that Rollins was familiar with Pulliam by reputation and general appearance, the Court finds that Rollins knew that the man he spotted filming was Pulliam.

41.     When Rollins arrived, the FBCSO officers believed that Edwin was inside the Kraft residence.

42.     The following image provides a visual representation of the approximate locations of cars and individuals when Rollins arrived at the Kraft property:



43.    The orange R indicates which police vehicle was Rodriguez's and thus contained his dash camera. The red X shows where Rodriguez was standing. The green circle shows generally where Pulliam was standing when Rollins arrived and approached him. The blue triangle shows where Frances was standing, and the two blue squares show where the two civilian women were standing. Finally, the black X indicates where Rodriguez believed Lacy was when Rollins arrived.

44.    Rollins exited his vehicle and walked toward Pulliam and said "sir, I need you to go across the street." The order was directed at Pulliam.

45.    Rollins initiated the contact with Pulliam. Rollins did so without taking time to assess the scene or talk to his fellow officers Rodriguez and Lacy. Rollins first act on

scene was to kick Pulliam off the property despite the fact that Pulliam was peaceful and silent while openly engaged in the protected First Amendment activity of filming the police.

46.    Rollins did not give Pulliam a reason for kicking him off the property. He did not ask Pulliam whether that would affect his ability to obtain audio and video. He did not consider alternative locations on the Kraft property. Rollins summarily ejected Pulliam.

47.    Upon seeing the two civilian women behind Pulliam, Rollins expanded his order to go across the street to the women with the statement "I need y'all to go ahead and go across the street."

48.    Rollins and Pulliam then had the following exchange:

    Pulliam: "Across the street?"
    Rollins: "Yes, across the street."
    Pulliam: "So you can shoot him?"
    Rollins: "What's wrong with you, man?"
    Pulliam: "What's wrong with you?"
    Rollins: "Please go across the street, thank you."

49.    Again, after this exchange, Rollins still did not explain why he ordered the civilians to go across the street. He did not consult with Rodriguez or Lacy, who were already on the scene and had not ordered anyone to leave.

50.    Just as he had done with Rodrigez's order to "stay back," Pulliam complied with Rollins' order: After the brief verbal exchange, Pulliam turned around and began to walk away from Rollins toward the street.[5]

---

[5] County Resp. Req. Admis. No. 27.

51.     Unlike Pulliam, the two civilian women did not comply. Instead, the two civilian women approached Rollins and began a conversation with him, asking him to change his mind about ordering them to go across the street.[6] Through the conversation, Rollins learned that the two women were from Texana, the mental health organization that assists FBCSO in interacting with citizens experiencing mental health crises.

52.     Rollins agreed that the Texana employees could remain on the scene. He therefore rescinded his order for the two civilian women to go across the street.[7]

53.     During the conversation with the Texana employees, Rollins stood with his back toward the Kraft residence. At no point during this conversation did Rollins take any physical action or make any gesture indicating he was concerned that shooting might begin at any minute. Rather, Rollins appeared calm and unconcerned with what might have been going on behind him. Rollins' demonstrated lack of concern about danger was consistent with how Rodriguez and Lacy continued to act. No officer on scene was acting like there was any threat coming from the Kraft residence.

54.     In agreeing to allow the Texana employees to stay, Rollins did not tell them they were in danger, he did not ask them to weigh the value of their presence against risks that Edwin posed, he did not ask them to take cover or direct them to stand somewhere specific. He did not place any restrictions on their movement at that moment (or at any point thereafter).

---

[6] County Resp. Req. Admis. No. 29.
[7] County Resp. Req. Admis. No. 30.

55.     As Rollins and the two Texana employees talked, Pulliam turned back around to film Rollins and the women, took several steps backward, and stopped walking. Pulliam did not speak or make any effort to get Rollins' attention, but Rollins interrupted his conversation with the two Texana employees to shout to Pulliam:

> Rollins: [pointing at Pulliam] "Across the street."
> Pulliam: "Well, hold on, if it's not for safety, I already have permission—"
> Rollins: "It is for safety."
> Pulliam: "from the landow—I have her permission to stay."
> Rollins: "It is for safety."
> Pulliam: "So is everyone leaving or just me?"
> Rollins: "Across the street."
> Pulliam: "Everyone or just me?"

56.     Importantly, as the exchange illustrates, Pulliam did not engage with Rollins first. He did not say anything to Rollins. He stood there silently filming well away from where Rollins and the Texana employees were standing. Rollins engaged Pulliam. And Rollins did so when Pulliam was so far away that he had to raise his voice to the point of shouting.

57.     In contrast to his tone and demeanor toward the civilian women, Rollins' tone and demeanor toward Pulliam was hostile and impatient. Rollins' hostility to Pulliam was so palpable that one of the mental health workers felt emboldened to join Rollins in shouting orders at Pulliam, telling him, baselessly, that he could not film "my client," who, again, was nowhere to be seen. In addition to initiating the exchange with Pulliam, this was the first time that Rollins stated his reason for asking anyone to go across the street.

58.     In contrast to his civil and reasonable conversation with the Texana employees, which caused Rollins to change his mind, Rollins refused to speak to Pulliam

14

or answer his questions about why only he had to leave if safety were the justification. Rather than speak calmly with Pulliam as Rollins had with the Texana employees, Rollins started walking toward Pulliam and counting down from five. In response, Pulliam began moving backward in the direction of the street, continuing to film Rollins.[8] When Rollins reached one, he ordered Pulliam to turn around and placed Pulliam under arrest.

59.    At this juncture, the Court makes two important factual findings. First, Rollins' asserted safety justification was simply bogus. Neither he, nor his fellow officers, nor any of the civilians at the scene acted like there was any material danger from Edwin Kraft when Rollins arrested Pulliam. Second, Pulliam did the exact same thing he had just witnessed the mental health workers do: speak to Rollins about why he should change his mind in ordering him across the street.

60.    As Rollins handcuffed Pulliam, Rollins told Pulliam, "You're interfering with my job. You're making my job a lot harder than it needs to be." The Court finds Rollins' statement on video to be untrue. The scene was peaceful until Rollins arrived. Rollins initiated contact with Pulliam and then steadily escalated that into a conflict that resulted in arrest within 60 seconds of Rollins' arrival. If Rollins had simply left Pulliam alone, as his fellow officers had, none of this would have happened. Or, at least, if Rollins had calmly spoken to Pulliam and not fabricated a bogus safety reason for kicking him out, none of this would have happened. If the civilian women were not interfering with Rollins by speaking to him, then neither was Pulliam. It was Rollins' hostility to Pulliam that drove

---

[8] County Resp. Req. Admis. No. 32.

the entire interaction. Rollins was the sole cause of the "interference" he claimed to justify the arrest.

61.     Rollins did not give Pulliam any warning that he would be arrested if he did not immediately leave or if he did not stop talking to Rollins.

62.     At no point before Rollins arrested Pulliam did Pulliam move closer to the Kraft residence after Rodriguez ordered him to "stay back." Pulliam never physically got in the way of the officers while they were responding to the call about Edwin.

63.     While Rollins was arresting Pulliam, the Texana employees remained standing next to the gas canopy, between the Kraft residence and where Rollins was arresting Pulliam—right in the area where Pulliam had been initially standing to film. Frances remained under the gas canopy, by or in her car. Rollins did not order Frances to go across the street at any time.[9] Frances and the two Texana employees did not leave the Kraft property at that time and were not arrested.

64.     Rollins placed Pulliam in the back of Rodriguez's patrol vehicle and confiscated all the recording equipment on Pulliam's person.[10] Rodriguez's dashcam footage shows that while Pulliam sat handcuffed in Rodriguez's patrol vehicle the two Texana employees continued to walk around the Kraft property unaccompanied by any FBCSO officer.

---

[9] County Resp. Req. Admis. No. 38.
[10] County Resp. Req. Admis. No. 47.

65.    Over 20 minutes after Rollins arrested Pulliam and placed Pulliam in the back of Rodriguez's patrol car, Rollins opened the driver side door of Rodriguez's patrol car and turned off the police radio so Pulliam could not listen to the police radio traffic.

66.    Having viewed the video of the arrest and having considered Rollins' testimony, the Court finds that Rollins arrested Pulliam to punish him for asserting his rights rather than silently complying. And it was not simply that Pulliam was talking to Rollins. It was the fact that Pulliam was questioning the legitimacy of Rollins' order in light of Rollins' own decision with respect to the Texana workers. It was the content of Pulliam's speech that triggered Rollins to arrest Pulliam in literally a matter of seconds.

67.    The Court finds that Rollins would not have arrested Pulliam absent a motive to retaliate against Pulliam for his reporting and speech.

68.    The Court finds that Rollins was carrying out Fort Bend County's policy and custom of intimidating and excluding Pulliam to prevent his reporting.

## III.    Any safety concern requiring civilians to leave the Kraft property arose well after Rollins arrested Pulliam.

69.    About 35 minutes after Rollins placed Pulliam under arrest, FBCSO officers learned that Edwin was not inside the Kraft residence and was instead on a neighboring property.

70.    Approximately three minutes after FBCSO officers learned that Edwin was not in the Kraft residence, Lacy radioed that Edwin was "on foot," that he possibly had a weapon, and instructed his fellow officers to set up a perimeter.

71.     Before driving over to Edwin's location, Rodriguez asked Rollins "What do you want me to do with this guy, release him?" with "him" referring to Pulliam. Rollins instructed Rodriguez that Pulliam would be going to jail.

72.     As Rodriguez was preparing to leave the Krafts' property, he commented to Pulliam that "you probably should have left when you had the chance." By that comment, Rodriguez meant that if Pulliam had left, he would not have been arrested for a crime.

73.     When Rodriguez drove away from the Kraft property with Pulliam, the Texana employees were still freely walking around the Kraft property. This underscores the complete absence of any safety justification for excluding and arresting Pulliam.

74.     When FBCSO officers confirmed that Edwin had a gun, Rodriguez returned to the gas station part of the Kraft property and ordered the Texana employees and Frances to leave the property—an order that was given more than 40 minutes after Rollins placed Pulliam in the backseat of Rodriguez's vehicle.

75.     FBCSO officers did not confirm that the Texana employees and Frances left the Kraft property. After Edwin was apprehended, the Texana employees were still freely walking around the Kraft property.

76.     The first time that any FBCSO officer communicated to dispatch that Pulliam was in custody was over an hour after Rollins placed Pulliam in the back seat of Rodriguez's patrol vehicle.[11]

---

[11] County Resp. Req. Admis. No. 45.

IV.    **Sheriff Fagan oversaw and approved Pulliam's booking for the offense of interference with public duties.**

77.    Rodriguez took Pulliam to the Fort Bend County Jail, and someone at the jail notified Sheriff Fagan that Pulliam was there. Sheriff Fagan is not typically notified every time a new inmate enters the jail's custody, especially given that the number of inmates in the jail has ranged from 675 to 806 during Sheriff Fagan's tenure.

78.    Pulliam was singled out for special treatment, further evidence that the County had a specific official policy of dealing with Pulliam differently than others. Sheriff Fagan, Chief Deputy Provost, and Major Castaneda went to the jail to see and question Pulliam.[12] Sheriff Fagan knew that FBCSO employees did not like Pulliam and might mess with him.

79.    At the jail, Sheriff Fagan instructed a jail employee to bring Pulliam to him. Surveillance camera video from the jail shows Sheriff Fagan in a jail hallway as Pulliam, now wearing prisoner's clothing, is brought to him. Fagan directs Pulliam into a room that did not have a video camera. Sheriff Fagan then follows Pulliam. The Sheriff is then followed by the other senior officials, Provost and Castaneda.

80.    In the office, Sheriff Fagan asked Pulliam "are you all right?" two times and asked "do you know why you're here?" Pulliam did not answer Sheriff Fagan's questions, but simply asked that he be provided with an attorney. Sheriff Fagan then stated "do it by the book" and left.

---

[12] County Resp. Req. Admis. Nos. 48–49.

81.     Before Sheriff Fagan questioned Pulliam, Pulliam was not Mirandized or provided with counsel.

82.     After Sheriff Fagan's questioning and Pulliam's refusal to respond, Pulliam was booked for the offense of interference with public duties. In support of that, Rollins submitted a probable cause affidavit, which he signed under oath before a notary.

83.     While Pulliam was at the Fort Bend County jail during the booking process, Pulliam was openly and profanely ridiculed by officers working in the jail.

84.     With assistance from his wife, Pulliam paid the $500 bond and was released from jail. FBCSO held Pulliam in custody for approximately five hours, from the point that Rollins put handcuffs on him until his release from the Fort Bend County jail.[13]

85.     Shortly after Pulliam was released from jail, on December 21, 2021, a FBCSO officer shared Pulliam's mugshot and a news story about his arrest on Facebook. That officer commented that Pulliam had been arrested for "interfering on a scene" and that Pulliam is "a prick who likes to show up on random officers scenes and try's [sic] to entice them to act out." The post received comments disparaging Pulliam from FBCSO officers, other law enforcement officers, and friends and family of officers.

## V.     Fort Bend County and its law-enforcement officers continued its efforts to retaliate against Pulliam after the arrest.

86.     Rodrigez completed a report on Pulliam's arrest. As Rodriguez described the interaction between Rollins and Pulliam that led to Pulliam's arrest in his report, he wrote

---

[13] County Resp. Req. Admis. No. 46.

that he "could not hear everything said" but that "Pulliam began to argue with [Rollins] and Pulliam "refus[ed] to leave[.]"

87.     The Court finds, based on review of the video evidence, that Pulliam never refused to leave the Kraft property, but he did argue with Rollins.

88.     FBCSO assigned Detective Travis James to investigate whether there was probable cause to search Pulliam's seized electronic equipment and whether Pulliam committed the offense of interference with public duties.

89.     James works in the robbery and homicide section of criminal investigations, typically investigating crimes such as homicides, assaults, and threats to schools. It is unusual for him to investigate class B misdemeanors like interference with public duties. Before investigating Pulliam, James had never investigated someone for interference with public duties.

90.     FBCSO ordinarily only opens an investigation if there is a serious crime with multiple suspects or serious injuries.

91.     Typically, situations requiring investigation are assigned to officers at random, but a FBCSO lieutenant sought to directly assign the investigation of Pulliam to an officer. James agreed to take the Pulliam investigation because he had completed investigating Edwin for the crime of stalking employees at a store near the Kraft property. James did not investigate Edwin for any actions he took on December 21, 2021, even though Edwin was arrested for aggravated assault against a public servant, interference with public duties, and possession of narcotics, among other things.

92.     Although James would normally arrange to speak with the suspect about the crime he was investigating, James did not believe that there was any point in talking with Pulliam because James understood that Pulliam had refused to speak with Sheriff Fagan after he was arrested.

93.     James sought search warrants for footage stored on Justin's equipment, namely in memory cards and on a body-worn camera. He completed two affidavits to obtain the search warrants.

94.     On January 14, 2022, with an attorney from the District Attorney, James presented affidavits for two search warrants to Judge Becerra, who presides over the 434th District Court in Fort Bend County. Judge Becerra signed the warrants that same day. James immediately executed the warrants and attempted to view footage on Pulliam's equipment. He was not, however, able to view any footage. He therefore sent Pulliam's memory cards and body-worn camera to the Greater Houston Regional Computer Forensics Laboratory (RCFL).

95.     On March 18, 2022, James reviewed footage obtained from one of Pulliam's SD cards by RCFL via a USB. He then placed that USB in "the Evidence room at Fort Bend County Sheriff's Office." The USB remained in the evidence room until just before Pulliam's criminal trial.

96.     RCFL was not able to retrieve footage from Pulliam's body-worn camera at that time because it was password protected.

97.     On April 13, 2022, James presented the case against Pulliam to the Fort Bend County District Attorney.

98.    James concluded that Pulliam committed the offense of interference when he began a back-and-forth exchange with Rollins after Rollins started speaking with the Texana employees because Pulliam's questions and comments caused Rollins to divert his attention from the conversation with the Texana employees

99.    The District Attorney did not immediately file charges against Pulliam.

100.    On May 5, 2022, Pulliam posted a video on his YouTube channel about his arrest and the lack of formal charges. In that video, he criticized FBCSO and Fort Bend County officials.

101.    On May 16, 2022, the District Attorney obtained a grand jury indictment against Pulliam for the class B misdemeanor of interference with public duties.

102.    In 2022, the District Attorney only sought to indict one other misdemeanor offense than the one allegedly committed by Pulliam.

103.    In 2022, the District Attorney obtained indictments for 98.4% of the charges that it presented to a grand jury.

104.    That indictment claims Pulliam:

> on or about December 21, 2021, did then and there, while Sergeant Taylor Rollins, a peace officer, was performing a duty or exercising authority imposed or granted by law, to-wit: securing a scene and/or setting up a perimeter, with criminal negligence, interrupt, disrupt, impede, or interfere with the said Sergeant Taylor Rollins by failing to move across the street and/or failing to follow Sergeant Taylor Rollins['] instructions to move.

105.    On its face, the indictment indicates that it was "present[ed] in the County Court of Fort Bend County" and lists the "County Court at Law No." as "434th." There is

no County Court at Law No. 434th. The indictment was returned by a grand jury in the 434th district court, over which Judge Becerra presides.

106.    Because the 434th district does not have jurisdiction over a misdemeanor like interference with public duties, Judge Becerra sought to transfer the indictment to Judge Morales' court, County Court at Law No. 1. On June 23, 2022, Judge Becerra signed a transfer order, but Judge Morales refused to accept the transfer. He simply refused to sign the transfer order and provided no explanation.

107.    On July 14, 2022, the paperwork for Pulliam's criminal case (and his criminal case in general) was returned to the 434th District Court. Judge Becerra then again attempted to transfer Pulliam's criminal case to a county court. This time, the Honorable Juli Mathew in County Court at Law No. 3 accepted the transfer order.

108.    Although the Court does not have insight into why Judge Morales refused the transfer, the Court finds that (1) the inaccuracies in the indictment and (2) Judge Morales' refusal to accept the transfer of Pulliam's criminal case underscores the abnormality of Fort Bend County's prosecution of Pulliam.

## VI.    Eventually, the District Attorney's office dismissed the charge against Pulliam, but FBCSO still keeps Pulliam's property and has made no policy changes.

109.    In March 2023, Pulliam was tried before a jury for the offense of interference with public duties. The trial was declared a mistrial because of a hung jury. Five jurors voted to acquit, but one juror voted to convict.

110.    For over a year, Pulliam's criminal case remained pending without any indication whether he would be retried.

111.    On May 14, 2024, the state finally filed a motion to dismiss Pulliam's criminal case with a self-serving statement: "Probable cause exists. State declines to prosecute further."

112.    Pulliam's arrest doesn't resemble any of the 30 other arrests for this offense in 2020–22.

113.    Pulliam's arrest is also different from other interactions that Pulliam himself has had with law enforcement officers over the years while filming them as part of his journalism. Time and again, the police officers, to their credit, engage with Pulliam, explain their reasoning, but do not arrest Pulliam.

114.    The Court finds Pulliam's pattern of failing to immediately comply with a law enforcement officer's order to stand somewhere else, objecting to that order, and arguing with the officer in a pointed and even insulting manner, does not typically trigger an arrest.

115.    FBCSO has not returned some of the property that it seized from Pulliam on December 21, 2021. Specifically, FBCSO still has two memory cards, an iPhone and its accessories, and a body camera. FBCSO has refused to return Pulliam's property unless he signs a form waiving claims against the County.

116.    Sheriff Fagan and other officers in FBCSO leadership reviewed the footage of Pulliam's arrest. No officers were disciplined, orally reprimanded, or counseled for their role in Pulliam's arrest or for their actions at the Kraft property on December 21, 2021.

## VII. Pulliam suffered extensive financial, reputational, and emotional injuries because of Defendants' violation of his constitutional rights.

117.    The press-conference exclusion, the Kraft-property exclusion, the retaliatory arrest, and FBCSO's policy and custom of intimidating and excluding Pulliam to prevent his reporting has substantially chilled Pulliam's reporting. Pulliam reduced both his methods of reporting via video, livestreaming and uploading long-form reports to YouTube. The Court finds that Pulliam has proved actual injury to his reporting business caused by the chilling of his speech.

118.    Before being excluded from the press conference and threatened with arrest by Sheriff Fagan twice on July 12, 2021, Pulliam filmed an average of nine law enforcement events per week with approximately three of those events focusing on the activities of FBCSO officers.

119.    After Pulliam was excluded from the press conference, Pulliam's reporting on police activity dropped significantly. From July 12, 2021, to December 21, 2021, Pulliam filmed an average of 2.2 police events per week and only a handful of incidents involving FBCSO. Pulliam feared arrest and felt that attempts to film FBCSO activities would be futile because he would likely be removed or excluded. Pulliam interpreted Sheriff Fagan's comments at the July 2021 press conference that Pulliam was "not media" to mean that Pulliam was not eligible for constitutional protections afforded to the press, and that Pulliam might be arrested for any effort to cover the news in the County.

120.    When Pulliam was excluded from the July 2021 press conference, Pulliam was humiliated while livestreaming. After July 2021, Pulliam rarely livestreams police or local government activity.

121.    After his December 2021 arrest, Pulliam generally avoids filming FBCSO activity because he fears arrest or other retaliation. Further, Pulliam dramatically reduced his reporting on all local government because of the retaliatory arrest and criminal prosecution.

122.    As an example of how Pulliam's speech has been chilled, Pulliam introduced video evidence showing that on the rare occasion that he filmed FBCSO officers after his arrest—only doing so to provide support to another journalist—Pulliam filmed from inside his car to avoid interacting with FBCSO officers.

123.    **Lost profits from livestreaming are $42,214.51.** Pulliam provided a conservative estimate of how much revenue he lost from the decrease in livestream reporting after the press conference. Pulliam first calculated his actual monthly revenue from livestreaming from January 2020 to February 2025. Pulliam split 2021 into two periods: before the press-conference exclusion, January through July, and the post-press conference period, July through December. Pulliam calculated his average monthly revenue from livestreaming from January through July of 2021 to be $1,142.11. He used that $1,142.11 number as his expected monthly revenue from livestreaming. For August 2021 to February 2025, Pulliam identified the difference between the expected monthly revenue and the actual monthly revenue as lost monthly revenue. Summing up his lost monthly revenue from the press-conference exclusion to February 2025, Pulliam estimated

that he lost $42,214.51 from his reduced livestream reporting following the press-conference exclusion given that his cost per video would have been nothing.

124.   The Court finds a loss of $42,214.51 from the chilling of Pulliam's livestream reporting to be reasonable and nonspeculative.

125.   **Lost profits from video uploads are $120,898.48.** Pulliam also estimated how much revenue he lost from the decrease in long-form video uploads following both the press-conference exclusion and Pulliam's arrest. After reviewing the content he published from January 2020 to July 2021, Pulliam determined that he would have produced and uploaded 90 videos per year if he maintained his previous publishing rate. Pulliam then determined how many long-form video uploads he actually made and published between January 2020 to February 2025 and the total actual lifetime revenue for those videos to arrive at the average lifetime revenue per video for a given period. The average lifetime revenue for a video increased over time as Pulliam's number of subscribers grew and he gained momentum. Taking the difference between his expected 90 videos and the reduced number actually produced due to chilling of his speech, Pulliam estimated the number of lost videos for a given period. The estimated number of lost videos was multiplied by the average lifetime revenue per video and summed to arrive at the lost revenue from the harm to Pulliam's long-form video reporting, $120,898.48. Like for his livestreaming, once uploaded, Pulliam's per-video cost is effectively zero.

126.   The Court finds a loss of $120,898.48 from the chilling of Pulliam's livestream reporting to be reasonable and nonspeculative.

127.    Of the $120,898.48 in lost profits due to lost video uploads, Pulliam attributes $56,013.28 of his lost long-form video upload revenue to the press-conference exclusion and attributes $64,885.21 of his lost long-form video reporting revenue to the retaliatory arrest. The Court finds that attribution to be reasonable and nonspeculative.

**128.    Total lost profits are $163,113.00.** Adding livestream lost profits of **$42,214.51** and lost profits from video uploads of **$120,898.48**, provides a grand total of reasonable and nonspeculative lost profits of **$163,113.00**.

129.    When Pulliam was excluded from the July 2021 press conference, Pulliam was humiliated in front of fellow reporters whom he considers to be important professional colleagues. He was also humiliated in front of a live audience of approximately 350 viewers. Pulliam suffers mental anguish and depression stemming from the violation of his constitutional rights and treatment as "not media" while he attempts to serve his community.

130.    The Court finds that Pulliam suffered at least $30,000 in reputation, humiliation, and mental anguish damages for the press-conference incident.

131.    The retaliatory arrest caused Pulliam at least $55,000 in reputation, humiliation, and mental anguish damages. News of Justin's arrest and, subsequently, news of his indictment was reported in the local newspaper and shared throughout the Fort Bend community via social media. Pulliam was publicly mocked by FBCSO officers via social media following his arrest. Further, Pulliam received numerous comments from viewers that they did not view his reporting as credible following his arrest.

132.    Pulliam's interactions with non-FBCSO law enforcement officers are influenced by his arrest. At least one other officer referenced reading Rollins' offense report in treating Pulliam poorly.

133.    Because Pulliam was charged with a crime, Pulliam lost his license to carry a handgun. Even though the charge against him has been dismissed, Pulliam has not been able to get his handgun license back.

134.    Because Pulliam was indicted by a grand jury through the district court and that criminal charge was then transferred to a county court, Pulliam is incorrectly listed in the Fort Bend County court's criminal records for two criminal cases, one felony and one misdemeanor. Some of Pulliam's background checks show both a felony charge and a misdemeanor charge.

135.    Pulliam also feared continued retaliation from FBCSO officers. To ensure the backup and protection of his electronic files from the potential of other seizures or search warrants, Pulliam spent $6,023.49. That amount is included in the $55,000 figure that would compensate Pulliam for his reputation, humiliation, and mental anguish caused by the retaliatory arrest.

136.    Pulliam spent $1,444.35 replacing equipment seized by FBCSO following the arrest that was either damaged or not returned. That amount is reasonable.

137.    Pulliam incurred reasonable attorneys' fees in the amount of $22,730.91 defending himself in a criminal trial resulting from his arrest. These are separate and apart from any reasonable attorneys' fees to which Pulliam may be entitled under 42 U.S.C.

§ 1988 as a result of this litigation. The Court recognizes that those will be separately decided on motion after final judgment is entered.

138.    Pulliam's total compensatory damages are **$272,288.26.**

## CONCLUSIONS OF LAW

139.    Having reviewed and considered the evidence and the relevant law, the Court concludes, as described in detail below, that Fort Bend County and Rollins are liable for violating Pulliam's First Amendment rights in excluding him from the scene on December 21, 2021, and arresting him when he attempted to protest that exclusion.

140.    The Court previously concluded Sheriff Fagan and Fort Bend County violated Pulliam's First Amendment and equal-protection rights in excluding him from the July 2021 press conference in granting partial summary judgment to Pulliam.

141.    The Court therefore awards Pulliam injunctive and monetary relief for both sets of claims.

## I.    The County has an unconstitutional policy of intimidating and excluding Pulliam, and this was the driving force behind two First Amendment violations.

142.    "To prevail" against Fort Bend County, Pulliam "must show (1) an official policy (or custom), (2) that a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022) (quotation marks omitted). Pulliam meets that burden.

143.    Under *Monell*'s first element, plaintiffs must show that "an official policy or custom existed that led to a constitutional violation." *Id.* Pulliam satisfies both. The Court's

factual findings, set forth at length above and briefly summarized here, establish that the County had a policy and custom of intimidating and excluding Pulliam based on his status as a social-media journalist and his critical coverage of law enforcement.

144.    As this Court already concluded in granting summary judgment for Pulliam on his press-conference exclusion claims, FBCSO has an official policy that "excludes social media journalists from its definition of 'media' and the policy's protections[.]" Doc. 77 at 17. Acting on that policy, Sheriff Fagan—the County's "final policymaker in the area of law enforcement"—"had Pulliam removed from the press conference because, in Fagan's eyes, Pulliam is 'not media.'" *Id.* (citation omitted). That official policy violates the First Amendment, which affords journalists like Pulliam who report via social media the same rights as journalists who work for more traditional outlets, such as newspapers or television stations. *Id.* (citing *Citizens United v. Fed. Elections Comm'n*, 558 U.S. 310, 352 (2010)).

145.    The question at this stage is whether there is a larger policy of hostility and exclusion towards Pulliam beyond what happened at the press conference. The Court finds that there is a policy of hostility and exclusion "so persistent and widespread as to practically have the force of law." *Moore*, 41 F.4th at 509 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). In broad brush strokes, the Court finds that Pulliam was repeatedly and consistently singled out and treated differently based on hostility toward him and his reporting. This hostility and exclusion occurred so often in so many different contexts, and so frequently with the direct participation of Sheriff Fagan, that it was an official

"preexisting de facto policy" as a matter of fact and law. *Milam v. City of San Antonio*, 113 F. App'x 622, 625, 628 (5th Cir. 2004). The following sets of facts establish the policy.

146. **Refusal to treat Pulliam like a journalist:** Prior to Sheriff Fagan assuming office in January 2020, his predecessor Sheriff barred Pulliam from the Fort Bend County Sheriff's Office building. After Sheriff Fagan assumed office, the FBCSO continued to refuse to add Pulliam to the media list for the distribution of press releases and notification of press conferences. As the Court has already determined in the summary judgment decision, the County classified Pulliam as "not media" under its written social media policy and under the Sheriff's own orders at the July press conference in which the Sheriff excluded Pulliam from the press conference.

147. **Threats of arrest and the arrest itself:** Sheriff Fagan's two threats to arrest Pulliam before the press-conference exclusion further demonstrate the existence of the County's policy of excluding and intimidating Pulliam for activity protected by the First Amendment. The Court affords Sheriff Fagan's arrest threats great weight because Sheriff Fagan is the County's law enforcement policymaker. Sheriff Fagan did not threaten any other journalists with arrest at the park, even when those other journalists continued filming after officers closed the park. Sheriff Fagan's actions established—or, alternatively, confirmed the existence of—an official policy of excluding Pulliam and only Pulliam from law enforcement scenes on threat of arrest. Rollins' arrest of Pulliam at the Kraft property solely in response to Pulliam's speech was consistent with the policy of intimidation and exclusion.

148.    **Pursuing prosecution:** The Court finds it anomalous that the Sheriff's office assigned a homicide detective to investigate Pulliam's arrest. Not only was this a far less serious offense that the sort Detective James would ordinarily investigate, the facts surrounding Pulliam's arrest were fundamentally different from other arrests for interference with public duties. The Court finds it exceedingly likely that the Sheriff's office and the district attorney pursued such a dubious prosecution to make an example of Pulliam and deter his future journalism.

149.    **The Sheriff's visit to Pulliam in jail:** The Court also finds it anomalous that the Sheriff and two other high-ranking officials visited the jail to speak with Pulliam personally. The Sheriff claims that he did so for Pulliam's own protection because the latter was apparently so widely despised on account of his reporting. Law enforcement circulated Pulliam's mugshot on social media with scurrilous insults, illustrating the entrenched culture of animus toward Pulliam.

150.    **The absence of any accountability:** No one involved with Pulliam's arrest was counseled or disciplined for anything.

151.    In sum, the evidence shows that the County had both a policy and custom of intimidating and excluding Pulliam based on his status as a social-media journalist and his critical coverage of law enforcement.

152.    Under *Monell*'s second element, Pulliam must prove that Sheriff Fagan actually knew or constructively knew about FBCSO's policy and custom of intimidating and excluding Pulliam. *Moore*, 41 F.4th at 510. Pulliam more than does that. Sheriff Fagan's actions at the park—both threatening Pulliam with arrest and excluding him from

the press conference—confirm that Sheriff Fagan knew there was a policy and custom of excluding and intimidating Pulliam based on his social-media reporting and his criticism of law enforcement. Likewise, Sheriff Fagan approved Rollins' arrest of Pulliam by blessing Pulliam's booking for the offense and allowing the investigation and prosecution of Pulliam to proceed.

153.    Under *Monell*'s third element, Pulliam must prove the policy or custom caused a violation of his constitutional rights, that the policy or custom was the "moving force." *Id.* at 511. As discussed in more detail below, Pulliam establishes that the County's policy and custom of excluding and intimidating him was the moving force for the violation of his First Amendment rights in two distinct ways as reflected in Counts II and III of the First Amended Complaint (ECF 33): First, Rollins violated Pulliam's right to film when Rollins ordered Pulliam to leave the Kraft property without any legitimate safety justification. Second, Rollins violated Pulliam's right to be free from retaliatory arrest when Rollins arrested Pulliam for speech (Count III).

## II.    Count II: Ordering Pulliam to leave the scene and go across the street violated the First Amendment.

154.    Rollins ordered Pulliam to leave the scene at the Kraft property and relocate across the street immediately after arriving at the Kraft property. At that point, Pulliam was filming, as he had been before Rollins arrived. Rollins knew who Pulliam was, knew that Rodriguez had radioed that "local journalist Justin Pulliam's on scene," and could see the obvious fact that Pulliam was filming. The right to film the police had been clearly established in the Fifth Circuit since *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017). Rollins

knew, therefore, that Pulliam was engaged in protected First Amendment activity, but he ordered Pulliam to leave the scene anyway—in the same way that Sheriff Fagan order Pulliam to leave the park and the press conference a few months earlier. Rollins violated Pulliam's First Amendment right to film the police.

**A.    Pulliam has a First Amendment right to record the police.**

155.    The First Amendment represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964).

156.    Pulliam's reporting is fully protected speech. Independent "new media" journalists like Pulliam, who create content for social media, possess the same First Amendment rights as everyone else. *See Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (Freedom of the press is "not confined to newspapers and periodicals" and includes "every sort of publication which affords a vehicle of information and opinion."); *Citizens United*, 558 U.S. at 352 ("With the advent of the Internet . . . , the line between the media and others who wish to comment on political and social issues becomes far more blurred."); *see also Packingham v. North Carolina*, 582 U.S. 98, 105, 107 (2017) (noting that "social media users employ these websites to engage in a wide array of protected First Amendment activity" and describing social media as "the modern public square").

157.    Like everyone else, a citizen journalist has the First Amendment right not to be discriminated against based on disagreement with his or her viewpoint. "[V]iewpoint

discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001).

158.   Pulliam's First Amendment rights as an independent citizen journalist include the right to record the police while they perform their law-enforcement duties. "We conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist[.]" *Turner*, 848 F.3d at 688. "Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." *Id.* at 689.

### B.   Rollins violated Pulliam's First Amendment right to record the police in excluding him from the Kraft property.

159.   The right to record the police in public in the performance of their official duties "is not without limitations." *Turner*, 848 F.3d at 690. When doing so for content-neutral reasons such as public safety, police regulation of filming is "subject to reasonable time, place, and manner restrictions." *Id.* "[T]hose restrictions must be 'narrowly tailored to serve a significant governmental interest.'" *Id.* at 690 (citation omitted). "Importantly, an individual's exercise of her First Amendment right to film police activity carried out in public . . . necessarily remains unfettered unless and until a reasonable restriction is imposed or in place." *Id.* at 690 n.50 (quoting *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014)). In order words, the government bears the burden of satisfying intermediate scrutiny if it restricts the right to film the police. If it can't meet that burden, its restrictions on the right to film are invalid.

160.   Even assuming content neutrality, Defendants have failed to carry their burden under intermediate scrutiny. Defendants assert that the significant government interest was public safety. The Court acknowledges that circumstances of a police call "might justify a safety measure—for example, a command that bystanders disperse—that would incidentally impact an individual's exercise of the First Amendment right to film." *Gericke*, 753 F.3d at 8. But such an order must address "legitimate safety reasons." *Id.*

161.   No legitimate safety reason existed for Rollins to order Pulliam to go across the street or for Rollins to maintain that order for only Pulliam.

162.   Here, even if a safety risk for civilians existed, Rollins did not address that risk for the Texana employees or Frances Kraft. Assuming there is an arguable justification for allowing the Texana workers and Frances to stay on scene because of their relationship with Edwin, one would expect Rollins to have restricted their movement—and enforced those restrictions. But Rollins didn't do that. Frances and the Texana workers wandered around about the property unaccompanied. Rollins' order, to the extent it was predicated on addressing a safety risk, was therefore too underinclusive. Kicking Pulliam off the Kraft property while allowing the other three civilians to move freely about the scene means that Rollins' "safety policy" was not accomplishing its stated goal.

163.   Rollins' order that Pulliam needed to "go across the street" therefore fails intermediate scrutiny, and Pulliam prevails on his claim that Rollins' order requiring him to go across the street violated the First Amendment (Count II of the First Amended Complaint).

164.    Strictly speaking, it isn't necessary for the Court to determine whether Rollins' order to leave the scene was also a content-based restriction on his speech. The fact that the order cannot survive intermediate scrutiny resolves Count II. That said, the Court notes that the trial record strongly supports the conclusion that Rollins ordered Pulliam to leave the scene because of hostility to Pulliam and his coverage of the FBCSO and Rollins only expanded that order to the other civilians to seem evenhanded.

165.    The safety justification is so weak as to be an obvious pretext. That conclusion is reinforced by Rollins' obvious hostility towards and impatience with Pulliam from the very first moment Rollins arrived. This is consistent with the overall County policy towards Pulliam. As explained earlier, the County had a policy of excluding and intimidating Pulliam based on his status as a social-media journalist and his critical coverage of law enforcement. Pursuant to that policy, Sheriff Fagan kicked Pulliam out of the press conference in July 2021 to undermine his ability to cover the press conference.

166.    Ordering Pulliam to go across the street, and therefore undermining Pulliam's ability to cover the scene at the Kraft property, is materially the same as the exclusion from the press conference. Just as the Sheriff kicked Pulliam out within moments of arriving at the park, Rollins kicked Pulliam out within seconds of arriving on scene at the Kraft property. The evidence and testimony support the inference that Rollins wanted to intimidate and exclude Pulliam based on his speaker status and past coverage, and that Rollins was carrying out the County's policy concerning Pulliam.

167.    As a result, the Court concludes Rollins ordered Pulliam to go across the street to restrict Pulliam's speech because of the content of that speech and Pulliam's

identity as the speaker. The Court therefore finds this to be an independent basis for concluding that Pulliam prevails on Count II. *See Citizens United*, 558 U.S. at 340 (confirming that "restrictions distinguishing among different speakers, allowing speech by some but not others," are "[p]rohibited" by the First Amendment).

## III.    Count III: Rollins violated Pulliam's First Amendment rights by arresting him in retaliation for Pulliam's protected speech.

168.    Rollins committed a separate First Amendment violation when he arrested Pulliam when the latter asserted his right not to be kicked out of the scene. Pulliam began complying with Rollins' order to go across and started walking in the direction of the street. But then Rollins reconsidered his decision to exclude the civilian women who turned out to be Texana mental health workers. When Pulliam sought to persuade Rollins to change his mind, Pulliam was engaged in a separate and distinct form of speech. At that point, Pulliam was no longer just recording the scene. His speech took the form of questioning the validity of Rollins' order based on Pulliam's clearly established right to film the police. Pulliam was asking for clarification as to why it was necessary only for him to go across the street. Rollins unconstitutionally arrested Pulliam for that speech.

169.    "[T]he First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). "[G]overnment officials" may not "subject[] an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)).

170.     Nor may the police arrest someone in retaliation for their protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* at 398 (citation omitted).

171.     "For Pulliam to prevail on his First Amendment retaliation claim against Rollins and Fort Bend County arising out of his December 2021 arrest, he must prove: '(1) [he was] engaged in constitutionally protected activity, (2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [his] exercise of constitutionally protected conduct.'" Doc. 77 at 20 (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).

172.     Pulliam satisfies the first element of a retaliation claim. He was engaged in constitutionally protected speech when he questioned the validity of Rollins' insistence that Pulliam still leave even after Rollins allowed the Texana workers to stay. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987). The First Amendment protects the right to use "opprobrious language" when interacting with the police. *Lewis v. City of New Orleans*, 415 U.S. 130, 133 (1974).

173.     Pulliam satisfies the second element. As the discussion of damages reveals, Pulliam spent less time filming the police and did so in different ways in response to being

arrested for asserting his First Amendment right to film. It is well settled that an arrest is sufficient to chill a person of ordinary firmness. *Bailey v. Iles*, 87 F.4th 275, 289 (5th Cir. 2023) ("[T]here is no dispute as to the second element [of the retaliation test], as Bailey's speech was chilled when he deleted his Facebook post in response to the arrest.").

174.    Pulliam also meets the third element of a First Amendment retaliation claim although that analysis is more complicated than the prior two elements. To prevail, "a plaintiff must establish a "causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Nieves*, 587 U.S. at 398 (quotation marks omitted). Specifically, the plaintiff must show that retaliation for speech is "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399.

175.    The challenge in the retaliatory-arrest context is determining whether there was objective probable cause to arrest the speaker for a crime or whether protected speech was the primary reason for the arrest. "[A]s a general rule, a plaintiff bringing a retaliatory-arrest claim must plead and prove the absence of probable cause for the arrest." *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (quotation marks omitted). In his *Gonzalez* concurrence, Justice Alito explained the specific analytic steps for a retaliatory-arrest claim. First, "plaintiffs pressing such claims [must] prove the absence of probable cause as a threshold requirement." *Id.* at 664 (Alito, J., concurring). Second, if a plaintiff proves the absence of probable cause, the "*Mt. Healthy* framework"—the "two-step," burden-shifting framework from *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977)—is triggered. "At the first step [of *Mt. Healthy*], the plaintiff must demonstrate that he engaged

in protected speech and that his speech was a 'substantial' or 'motivating' factor in the defendant's decision to take action against him." *Gonzalez*, 602 U.S. at 662–63 (Alito, J., concurring) (quoting *Mt. Healthy*, 429 U.S. at 287). "Once the plaintiff makes this showing, the burden shifts to the defendant at the second step to show that he would have taken the same adverse action even in the absence of the protected speech." *Id.* at 663. "To carry these burdens, parties operating within the *Mt. Healthy* framework may present a wide range of evidence—both objective and subjective." *Id.*

176.    There are, however, two exceptions to the general rule: the *Lozman* exception and the *Nieves* exception.

177.    Under *Lozman v. City of Riviera Beach*, a plaintiff "need not prove the absence of probable cause" if the plaintiff proves that he was arrested "pursuant to an 'official municipal policy' of intimidation." 585 U.S. 87, 99–101 (2018) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Nieves*, 587 U.S. at 398 (discussing *Lozman*). That's because "the existence and enforcement of an official policy motivated by retaliation separates [plaintiff's] claim from the typical retaliatory arrest claim." *Lozman*, 585 U.S. at 100.

178.    Under *Nieves,* "[t]he existence of probable cause does not defeat a plaintiff's claim if he produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Gonzalez*, 602 U.S. at 655 (quoting *Nieves*, 587 U.S. at 407).

179.    If either the *Lozman* or *Nieves* exception applies, the *Mt. Healthy* framework is triggered. *Lozman*, 585 U.S. at 101; *Nieves*, 587 U.S. at 406–08.

180.    Pulliam claims he wins on his retaliatory-arrest claim regardless of whether the *Lozman* exception, the *Nieves* exception, or the general rule governs this case. The Court agrees. The Court first explains why Pulliam prevails under the *Lozman* exception (Part A). The Court then applies the general rule, finding that Rollins arrested Pulliam without probable cause (Part B). Finally, even if probable cause for the arrest existed, the Court concludes Pulliam satisfies the *Nieves* exception (Part C).

### A.    Pulliam prevails against the County and Rollins under the *Lozman* exception.

181.    Under the *Lozman* exception, Pulliam "need not prove the absence of probable cause" if he proves "a policy motivated by retaliation." 585 U.S. at 100–01.

182.    As discussed above Pulliam already proved that the County had an unconstitutional policy motivated by retaliation. Pulliam therefore proceeds directly to the *Mt. Healthy* framework.

183.    As noted above, the first step in a *Mt. Healthy* analysis requires the plaintiff to prove that his speech was a substantial motivating factor in the adverse action. Pulliam easily satisfies that initial burden no matter the level of granularity at which one considers the facts. As stated in the Court's factual findings above, Rollins arrested Pulliam for asserting his First Amendment right not to be ejected from the scene without a legitimate safety justification. The content of Pulliam's speech triggered Rollins to arrest Pulliam in literally a matter of seconds.

184.    Looking at the record as a whole, Rollins' arrest can be understood as part of the larger policy of intimidating and excluding Pulliam from the scene of law enforcement

activity. Rollins' exclusion of Pulliam followed the exact model the Sheriff himself used in kicking Pulliam out of the press conference. The only difference here is that Rollins pulled the trigger on the arrest, whereas Sheriff Fagan only threatened arrest. And Sheriff Fagan testified that he would have expected his subordinate officer to have arrested Pulliam if Pulliam had not left the press conference. Rollins' decision to arrest is most plausibly viewed as Rollins manifesting his own animus towards Pulliam while simultaneously carrying out the official policy of intimidating and excluding Pulliam. Rollins intended to teach Pulliam a lesson for being a thorn in his side and for being a thorn in the side of law enforcement more generally.

185.    With Pulliam having established that his arrest was substantially motivated by his protected speech, the burden shifts to Defendants to prove that Rollins "would have taken the same adverse action even in the absence of the protected speech." *Gonzalez*, 602 U.S. at 663 (Alito, J., concurring). Defendants have not, and cannot, carry their burden here. Rollins has no permissible explanation for his decision to arrest Pulliam. Rollins' animus towards Pulliam's speech and the County's policy of intimidating and excluding Pulliam motivated the arrest. Those reasons do not pass constitutional muster.

186.    Rollins created the very distraction he complains of. Pulliam was quietly filming the scene. Rodriguez didn't order Pulliam to leave. Lacy didn't order him to leave. Rollins did not take any time to assess the situation. He rolled up in his patrol car, knew Pulliam was on scene because of Rodriguez's comment on the radio, saw Pulliam, and immediately ordered Pulliam to leave. He then expanded that order to include the two other civilians standing behind Pulliam. Rollins did not ask any questions of the civilians or his

fellow officers. Rollins' decision was obviously rash with respect to the Texana workers because he immediately changed his mind when they explained who they were. Rollins then escalated the confrontation with Pulliam, who was complying but stopped to film Rollins' conversation with the Texana employees. Rollins could have ignored Pulliam or reconsidered his decision with respect to Pulliam. Rollins could have taken time to explain himself and clarify his order. Or Rollins could have spoken to his fellow officers to better understand the safety situation. But instead of doing any of that, Rollins needlessly and unconstitutionally arrested Pulliam, which not only distracted Rollins by tying him up with an actual arrest, but imposed responsibilities on his subordinate, Rodriguez, who had to take custody of Pulliam and transport him to jail for booking. None of this would have happened if Rollins hadn't instigated conflict with Pulliam by ordering him to leave before understanding what was going on. And then Rollins exacerbated the situation by letting his own hostility to Pulliam's speech result in a decision to arrest. Rollins cannot cause his own distraction and then assert that he is exonerated by the very distraction he created.

**B.    Rollins violated Pulliam's right against retaliatory arrest when he arrested Pulliam for his protected speech without probable cause.**

187.    Applying the general rule for a retaliatory-arrest claim here, Pulliam must first prove the absence of probable cause. *Gonzalez*, 602 U.S. at 655. If he can do that, he must proceed through the *Mt. Healthy* framework.

188.    Rollins lacked probable cause to arrest Pulliam. Rollins arrested Pulliam for protesting his exclusion from the Kraft property and in furtherance of an unconstitutional policy of intimidation and exclusion.

189.    The Court recaps the facts relevant to the arrest (without intending to modify the above factual findings). Rollins arrived on the scene, ordered Pulliam to go across the street, and Pulliam responded "so you can shoot him?" Pulliam also complied with the order and began moving away from the scene. Rollins did not arrest Pulliam for saying "so you can shoot him," and Rollins testified that that statement was not the crime of interference with public duties.

190.    The facts relevant to the interference arrest occurred over the course of about 20 seconds after Pulliam stopped walking toward the street in compliance with Rollins' order. Pulliam stopped because the two Texana workers stopped to explain to Rollins why they believed they should be allowed to stay on scene. Rollins agreed and let them stay. Rollins then engaged Pulliam, renewing his order to go across the street. Pulliam protested that he should also be allowed to stay on scene if there was not a safety-based reason for excluding him. Although not framed in technical legal language, Pulliam was attempting to assert his First Amendment right: (1) he had a protected right to record the police, (2) the property owner (Frances) had given him permission to be there and film, and (3) ordering him to go across the street was not a reasonable time, place, and manner restriction in the name of safety, as demonstrated by the fact that Rollins allowed two other civilians to stay. Rollins insisted that excluding Pulliam was for safety, notwithstanding that the Texana workers were being allowed to stay, and began to count down while walking toward Pulliam. Rollins then arrested Pulliam.

191.    The Court notes that Pulliam never engaged in anything other than speech. Pulliam never walked towards Rollins or anyone else. Pulliam did not present any physical

danger to anyone, which Rollins confirmed during his testimony. Not only was he well out of reach of everyone, he was burdened by his camera equipment. Although he raised his voice to be heard and was clearly upset at being excluded, Pulliam did not use threatening language. Pulliam made no motion or gesture suggesting he was going to run anywhere, such as back towards the scene. Because Pulliam had been complying with Rollins' order until the Texana women stopped to talk to Rollins, Pulliam was the farthest from the scene when he attempted to engage Rollins in discussion. Pulliam was not physically obstructing Rollins' ability or the ability of anyone else to walk anywhere.

192.    Rollins' entire argument is that he was "distracted" by Pulliam asserting his First Amendment rights for approximately 10–20 seconds. That "distraction," Rollins argues, constituted probable cause to arrest Pulliam for the crime of interference with public duties.

193.    Asserting one's rights under the First Amendment is not interference with public duties. As an initial matter, the Court has already found Rollins' order kicking Pulliam out to be unconstitutional. Regardless of what the elements of the interference statute are, it cannot be a crime to fail to follow an unconstitutional order. In any case, the elements of the offense are codified at Texas Penal Code § 38.15. Specifically, a "person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." *Id.* § 38.15(a)(1).

194.    Speech alone does not constitute the offense of interference with public duties. *Id.* at § 38.15(d) ("It is a defense to prosecution under this section that the

interruption, disruption, impediment, or interference alleged consisted of speech only.").
The Fifth Circuit has held that "'merely arguing with police officers about the propriety of
their conduct . . . falls within the speech exception to section 38.15' and thus does not
constitute probable cause to arrest someone for interference." *Gorsky v. Guajardo*, No. 20-
20084, 2023 WL 3690429, at *8 n.16 (5th Cir. May 26, 2023) (quoting *Freeman v. Gore*,
483 F.3d 404, 414 (5th Cir. 2007)); *see also Carney v. State*, 31 S.W.3d 392, 398 (Tex.
App.—Austin 2000, no pet.) ("Under section 38.15, arguing with the officers does not
constitute an actionable offense. Speech is a statutory defense to the offense charge even if
the end result is 'stalling.'").

195.    In carving out an exception for speech alone, the statute recognizes the
bedrock First Amendment principle that citizens are protected when they speak to the
police, even if that speech is highly critical. "The freedom of individuals verbally to oppose
or challenge police action without thereby risking arrest is one of the principal
characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at
462–63. Citizens may direct "obscene or opprobrious language" toward police officers.
*Lewis*, 415 U.S. at 132.

196.    Interference with public duties must include some act besides speech that
interferes with a police officer *in a criminally negligent way*. The facts must show that the
arrestee willfully refused to abide by instructions from a police officer in a situation where
the arrestee should have been aware of a substantial and unjustifiable risk of interference,
such that it constituted a gross deviation from ordinary care. Tex. Pen. Code § 6.03(d).

197.    *Buehler v. Dear* "concerns the line between filming the police, which is legal, and hindering the police, which is not." 27 F.4th 969, 976 (5th Cir. 2022). There, "Buehler lead[] the Peaceful Streets Project (PSP), a watchdog organization with the stated mission of holding police accountable for official misconduct." *Id.* at 977. "Buehler regularly filmed the Austin police, and many officers were familiar with him." *Id.* In the incident at issue in that case, "Buehler shouts at [the officer] to get his attention and then begins arguing with [the officer]" and "repeatedly interrupts [the officer]'s answers to questions, and [the officer] tries several times to walk away while Buehler follows with his camera." *Id.* Buehler even says "I'm going after [the officer]. F***ing pigs. I hate pigs." *Id.* (asterisks in original). But none of that speech alone resulted in arrest. The probable cause for Buehler's arrest for interference with public duties was his repeated refusal to obey a request to stay at least an arm's length away from the officer. *Id.* ("Buehler continued to stand closer to the officers than an arm's length away (certainly no more than two feet, and probably no more than one").). No one, least of all a police officer, could work with a threatening, profane, argumentative stranger stalking them up and down the street within an arm's length and refusing to step back. *Id.* at 992 (identifying "repeated and unambiguous warnings to step back"). *See also Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (probable cause to arrest for interference because of failure to heed "instruction [that] concerned the moving of [plaintiff]'s truck rather than the content of his speech"). Buehler crossed the line between filming and hindering the police and was therefore properly arrested. *See Buehler*, 27 F.4th at 980–94.

198.    By contrast, D.J. in *Perkins v. Hart* "did not cross the line between filming the police and hindering the police and was engaged in clearly established, constitutionally protected activity on his family's private property." No. 22-30456, 2023 WL 8274477, at *7 (5th Cir. Nov. 30, 2023) (cleaned up). D.J., a minor, recorded the arrest of his mother on his cell phone. While D.J. was recording, an officer "moved directly in front of D.J., blocking his camera's view of [his mother] and [the arresting officer]. *Id.* at *2; *see id.* at *6 (noting the blocking officer admitted that he "intentionally" obstructed D.J.'s view). "While D.J. was clearly close to the arrest scene—the perimeter of which was still being secured by [the blocking officer]—D.J. was not a hazard, was not too close, and did not impede the [officers'] ability to perform their duties." *Id.* at *7.

199.    Like D.J., Pulliam "did not cross the line between filming the police and hindering the police." *Id.* (cleaned up). He was "engaged in a clearly established, constitutionally protected activity" on "private property"—where he had permission to be and record. *Id.* Pulliam "was not a hazard, was not too close, and did not impede [Rollins' or other officers'] ability to perform their duties." *Id.*

200.    Rollins therefore did not have probable cause to arrest Pulliam. As a matter of law, no reasonable police officer could conclude that Pulliam's speech alone about whether safety justified his exclusion from the scene was a "gross deviation from the standard of care that an ordinary person would exercise" under all the circumstances. Tex. Pen. Code § 6.03(d) (defining "criminal negligence").

201.    To the contrary, Pulliam's speech was reasonable. Pulliam was complying with Rollins' order to go across the street. But Pulliam had just seen the two Texana

workers stop to talk to Rollins about why they should be able to stay and Rollins changed his mind. Pulliam was doing the same thing. If their speech to Pulliam wasn't arrestable "interference," then neither was Pulliam's. He was trying to convince Rollins to allow him to stay. Rollins said no. Pulliam persisted. That persistence was protected speech. For the First Amendment right to record the police to mean anything, it must mean that police are not entitled to immediate, reflexive, unquestioning obedience. Asserting your rights is not a crime.

202.    Indeed, Sheriff Fagan had confirmed as much as part of his campaign in the wake of the murder of George Floyd. During a recorded television interview, Sheriff Fagan acknowledged that citizens have the right to film the police and advised citizens to tell any officer who tries to stop them for recording that they have every right to record. Implicit in that advice is the idea that citizens would not be arrested for simply asserting their First Amendment rights. Indeed, it is impossible to imagine that Rollins would have arrested an NBC camera crew or journalist from the Houston Chronicle for asking for a reasonable explanation for being ejected from the Kraft property. Again, this reenforces the idea that Fort Bend had a specific policy of intimidation and exclusion that applied to Pulliam but no one else.

203.    Furthermore, any claim that Pulliam distracted Rollins from his duties fails. Pulliam was present when Rollins arrived. The scene was peaceful. No one was in conflict with anyone. Pulliam was a journalist openly engaged in protected First Amendment activity. Pulliam had the landowner's permission to be there and Deputy Rodriguez's permission to film from where Pulliam was standing. Pulliam was therefore part of the

scene, not something apart from it. Rather than be a "distraction" to be excluded or disposed of, Pulliam was simply someone Rollins had to take into account, just like everyone else. Citizens, particularly ones engaged in constitutionally protected activity, are not an inherent nuisance to officials. None of this, including Rollins' asserted "interference," would have happened if Rollins had not initiated the conflict and escalated it to arrest so quickly without talking to anyone on scene or with Pulliam himself.

204.    In sum, the Court concludes Rollins lacked probable cause to arrest Pulliam. No objectively reasonable officer would think otherwise.

205.    Satisfying this threshold requirement does not mean Pulliam wins. Rather, "if the plaintiff establishes the absence of probable cause, then the *Mt. Healthy* test governs[.]" *Nieves*, 587 U.S. at 404 (quotation marks omitted). But there is no more work to do under the *Mt. Healthy* framework here because the analysis is the same one the Court already went through above in concluding that Pulliam prevailed under the *Lozman* exception: Pulliam's speech was the but-for cause of the arrest.

206.    Pulliam therefore prevails on his retaliatory-arrest claim under the general rule: Rollins lacked probable cause to arrest Pulliam, and retaliation for speech was the but-for cause of the arrest.

**C.    Even if probable cause technically existed, Pulliam's arrest was still retaliatory under the *Nieves* exception.**

207.    Even if probable cause existed, Pulliam would still be able to proceed to the *Mt. Healthy* framework via the exception to the general rule that probable cause defeats a retaliatory arrest claim.

208.    In *Nieves*, the Supreme Court "recognized a narrow exception to the no-probable-cause rule." *Gonzalez*, 602 U.S. at 665 (Alito, J., concurring). "Concerned that some police officers might exploit the arrest power as a means of suppressing disfavored speech, [the Supreme Court] explained that the no-probable-cause requirement may be set aside 'when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Id.* (quoting *Nieves*, 587 U.S. at 407).

209.    For the purposes of getting into the *Nieves* exception, "evidence regarding an officer's state of mind—*e.g.*, evidence of bad blood between the officer and the plaintiff or allegations that the officer harbored animus—does not qualify." *Id.* at 666. Only objective evidence is considered. *Id.*

210.    The question for the *Nieves* exception is whether there is objective evidence that reasonable officers do not arrest for interference with public duties under these circumstances. A plaintiff like Pulliam does not need "virtually identical and identifiable comparators." *Id.* at 658. In other words, he does not need to produce evidence of other people asserting their right to film the police in the same way—at a former gas station during a welfare check on a mentally ill man.

211.    *Gonzalez* illustrates what valid comparator evidence looks like. The plaintiff there, a city council member, alleged that she inadvertently misplaced a petition among her personal papers following a city council meeting, but, at the behest of political rivals, was investigated and arrested under a Texas statute that criminalizes tampering with government records. *Id.* at 655–56. The Supreme Court concluded that Gonzalez's

comparator evidence—a survey of "the past decade's misdemeanor and felony data" for the particular county—supported the conclusion "that the Texas anti-tampering statute had never been used in the county to criminally charge someone for trying to steal a nonbinding or expressive document." *Id.* at 657 (cleaned up). The plaintiff's evidence was therefore permissible *Nieves*-exception evidence.

212.    Here, Pulliam has offered at least three categories of comparators that show, objectively, that reasonable officers do not arrest for interference with public duties under circumstances like those present at the Kraft property that day: (1) the Texana case workers who were not arrested for asking Rollins to change his mind; (2) testimony and video evidence of Pulliam's similar interactions with other officers at other times at other locations in which Pulliam was not arrested for asking officers to clarify their orders; and (3) records of all 30 arrests by the FBCSO in recent years for interference with public duties, all of which involved "plus factors" in addition to speech such as intoxication, violence, physical interference, and disorderly conduct during more pressing situations. The Court will address each category of comparator in turn.

213.    First, the Texana employees provide a compelling comparator. *See Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022); *Reyes v. City of Austin*, No. 1:21-CV-992-RP, 2024 WL 5088385, at *7 (W.D. Tex. Dec. 12, 2024); *Mattingly v. Cal. Dep't of Parks & Rec.*, No. 23-CV-03754-VKD, 2024 WL 4353062, at *12 (N.D. Cal. Sept. 30, 2024). After Rollins ordered Pulliam to go across the street, he included the Texana employees in his second command to "go across the street." Rather than walking away, like Pulliam, the Texana employees approached Rollins to explain that they were case

workers from Texana. Rollins listened, changed his mind, and allowed them to stay. When Pulliam saw Rollins speak with Texana employees, he stopped walking. And when Rollins again ordered Pulliam across the street, he, too, asked to be allowed to stay. Yet, rather than consider that, Rollins interrupted Pulliam and almost immediately arrested him.

214.    To be sure, the Court recognizes that mental health case workers and journalists present different considerations that may justify different treatment in some settings. But, for the purposes of Pulliam's argument that he qualifies for the *Nieves* exception, the fact is that Rollins listened to the Texana employees and changed his mind, but arrested Pulliam simply for asking for the same reconsideration. Rollins' treatment of the Texana employees shows that officers typically don't arrest someone for failing to immediately comply with a police order or for asking the officer to reconsider that order.

215.    Second, Pulliam himself is a relevant comparator. *See Ballentine*, 28 F.4th at 62; *Mattingly*, 2024 WL 4353062, at *12; *Sodaro v. City & Cnty. of Denver*, 753 F. Supp. 3d 1224, 1238–39 (D. Colo. 2024); *Nilsson v. Baker County*, No. 2:19-CV-01250-HL, 2022 WL 17156771, at *8 (D. Or. Nov. 21, 2022), *report and recommendation adopted*, 2022 WL 17170713 (D. Or. Nov. 22, 2022). He presented testimony and video evidence of his interactions with law enforcement at other scenes over the years in which he had been ordered to stand somewhere else. These interactions are often testy and argumentative, and Pulliam sometimes insults officers or uses foul language. Sometimes these interactions occur at night, alongside darkened roadways, at crime scenes, and under circumstances where officers have duties to perform. Yet these interactions follow a discernable pattern. The officer orders Pulliam to go somewhere else, Pulliam demands an

explanation or tries to persuade the officer that an alternative location is better, the two discuss it, and Pulliam moves. The officers, often commendably patient, do not arrest Pulliam. The objective evidence indicates that reasonable officers exercise their discretion not to arrest for interference with public duties when Pulliam asks for an order to be clarified or modified, especially when the discussion will only take even just a matter of seconds.

216.    Third, Pulliam presented police reports of all 30 arrests in Fort Bend County for interference with public duties issued in the roughly three years surrounding his arrest. All those arrests included the sorts of "plus factors" the Court identified earlier, such as physically or violently impeding an officer's movement or engaging in disorderly conduct while being intoxicated. This is materially similar to the evidence at issue in *Gonzalez*. There, Gonzalez argued that she fell under the *Nieves* exception because no other arrest for intentionally removing a government record resembled her allegation of negligently misplacing a government document in her own binder after a city council meeting. *Gonzalez*, 602 U.S. at 658 ("Gonzalez's survey is a permissible type of evidence because the fact that no one has ever been arrested for engaging in a certain kind of conduct— especially when the criminal prohibition is longstanding and the conduct at issue is not novel—makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct in the past."); *see also Briggs v. Yi*, 760 F. Supp. 3d 874, 892–93 (D. Alaska 2024) (finding evidence was "like the evidence offered by the plaintiff in *Gonzalez*" where the plaintiff (1) provided recent history showing that 256 people were arrested in Anchorage for disorderly conduct, (2) asserted that all the other arrests involved "far

greater disturbances in scope and duration" and there were "no instances where a person was arrested for creating noise for a minute or two and then stopped when asked," and (3) noted that in nearly every case the arrestee was given a warning before being arrested).

217.    The Court finds that Pulliam has carried his threshold burden under the *Nieves* exception of demonstrating, with objective evidence of comparators, that officers ordinarily exercise their discretion not to arrest for interference with public duties under circumstances like those in this case.

218.    But comparator evidence is not the only objective evidence showing the *Nieves* exception applies in this case. Pulliam offered additional evidence that reinforces this Court's conclusion that Pulliam's arrest and his subsequent criminal prosecution were retaliatory. Pulliam highlighted the differences in the outcomes of the 30 other arrests: Of the 30 arrests, 26 of the arrests were either dismissed/not prosecuted or have no criminal record whatsoever. Despite all 30 of the arrests concerning more egregious behavior than Pulliam's, only 3 of them resulted in a conviction. And none of those matters went to trial. Only one of the arrests resulted in a grand jury indictment, and that indictment was for a more serious offense of the defendant's third DWI—not interference with public duties. That accounts for 29 out of the 30 arrests; the one remaining is inactive.

219.    The Court also notes that the Section 38.15 offense is a minor one. *See Spiller v. Harris County,* 113 F.4th 573, 576–77 (5th Cir. 2024) (noting that the Section 38.15 offense "is 'minor,' a factor that weighs in favor of finding excessive force." (citing *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018))); *cf. Haywood v. City of El Paso*, No. EP-20-CV-114-KC, 2021 WL 5072029, at *13 (W.D. Tex. Oct. 26, 2021) (suggesting that

"certain types of offenses are so minor that they may not require comparison-based evidence to trigger the exception"). If asking for clarification of Rollins' order constitutes an offense, "it is an offense for which 'probable cause does little to prove or disprove the causal connection between animus and injury.'" *Ballentine*, 28 F.4th at 62 (quoting *Nieves*, 587 U.S. at 407). Further, even if probable cause technically exists, it is debatable. Pulliam's arrest was not a clear case of probable cause, such as the police catching a person illegally chalking on the sidewalk while in the act in *Ballentine*. *See Ballentine*, 28 F.4th at 59.

220.    The Court also finds it relevant that the officers at the scene of the arrest knew Pulliam by name and reputation. *See Reyes*, 2024 WL 5088385, at *7; *Tucson v. City of Seattle*, No. C23-17 MJP, 2024 WL 2133754, at *12 (W.D. Wash. May 10, 2024). And the Defendants deployed an "unusual" or "irregular" arrest procedure, such as (1) Sheriff Fagan's notification and jail visit, (2) Detective James' assignment to the case, and (3) Pulliam's interference charge being brought by grand jury indictment. These irregular events support the conclusion that the *Nieves* exception to the probable cause rule applies here. *See Gonzalez*, 602 U.S. at 676 (Jackson, J., concurring).

221.    Pulliam can therefore proceed to the *Mt. Healthy* framework under the *Nieves* exception. The Court already concluded above that Pulliam prevails under that framework. Thus, under *Nieves* and *Mt. Healthy*, Rollins' arrest of Pulliam was a form of retaliation that violated the First Amendment, regardless of whether, technically, Rollins had probable cause or not to arrest for interference with public duties.

222.    In a last-ditch effort to escape liability for the retaliatory arrest, Defendants claim that the fact that a grand jury indicted Pulliam means they cannot be held liable. Not so. Although the Fifth Circuit has recognized that a grand jury indictment can shield an officer for liability for an arrest without probable cause, the Fifth Circuit has limited that doctrine to false arrest claims—i.e., where a plaintiff brings a claim that an arrest violated the Fourth Amendment. *See Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir. 2022) (confirming that an "intermediary's decision breaks the chain of causation for *false arrest*" (emphasis added)).[14] The idea behind this doctrine is that the decision of an independent intermediary, like a grand jury, "is sufficient to establish probable cause." *Russell v. Altom*, 546 F. App'x 432, 436 (5th Cir. 2013).

223.    But unlike for Fourth Amendment claims, the presence of probable cause is not a death sentence for all First-Amendment claims: "[T]he no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407. That means if a plaintiff satisfies the *Nieves* exception, a grand jury indictment does not matter: "After making the required showing [that the exception applies], the plaintiff's claim may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable

---

[14] Fifth Circuit precedent governs this Court's decision, but the Court notes that the Fifth Circuit's endorsement of the independent intermediary doctrine is arguably inconsistent with the Supreme Court's statements in *Malley v. Briggs* that a "'no causation' rationale" where an officer would not be liable if an independent intermediary, like a judge, issued a warrant, "is inconsistent with our interpretation of § 1983." 475 U.S. 335, 344 n.7 (1986).

cause." *Id.* at 407–08. Indeed, the point of a claim that proceeds under the *Nieves* exception "isn't to guard against officers who *lack* lawful authority to make an arrest." *Id.* at 414 (Gorsuch, J., concurring). "Rather, it's to guard against officers who *abuse* their authority by making an otherwise lawful arrest for an unconstitutional *reason*." *Id.*

224.    Because Pulliam provided objective evidence that entitled him to the *Nieves* exception, the grand jury indictment is irrelevant here. After all, a grand jury considered only whether there was probable cause to believe Pulliam committed the offense of interference; it would not have considered that officers typically do not arrest for conduct like Pulliam's.

225.    And, even if the grand jury indictment somehow matters here, Pulliam provided evidence that the indictment was tainted. "[T]he independent-intermediary doctrine is not absolute." *Loftin v. City of Prentiss*, 33 F.4th 774, 782 (5th Cir. 2022). "[T]his doctrine only applies where all the facts are presented to the grand jury[.]" *Winfrey v. Johnson*, 766 F. App'x 66, 71 (5th Cir. 2019) (quotation marks omitted). It is Defendants' burden to prove that all material information was presented to the grand jury. *Id.* (concluding that defendant failed to prove that omitted material information was presented to the judge); *see also Wilson*, 33 F.4th at 212–13 (concluding that plaintiffs had alleged taint where they claimed officials made misrepresentations to the grand jury and withheld material video evidence).[15] Defendants have not done so here.

---

[15] *See also Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) ("[B]ecause, at best, it is not clear whether 'all the facts [were] presented to the grand jury,' we hold that the independent-intermediary doctrine does not apply." (internal citation omitted)); *Shields v. Twiss*, 389 F.3d 142, 148 (5th Cir. 2004) (holding the plaintiff failed to rebut defendant's

**IV.    Rollins is individually liable and not entitled to qualified immunity.**

226.    Having determined that Rollins violated Pulliam's First Amendment rights, the question then becomes whether Rollins is entitled to qualified immunity.

227.    Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Est. of Davis ex rel. McCully v. City of Noth Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005). A defendant is not entitled to qualified immunity if "prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Bailey v. Iles*, 87 F.4th 275, 283 (5th Cir. 2023) (quotation omitted).

228.    As of December 2021, prior decisions gave reasonable warning that Rollins' exclusion of Pulliam from the Kraft property and his arrest of Pulliam violated constitutional rights. The right to film the police free from retaliatory arrest has been clearly established at least since *Turner v. Driver*. *See* 848 F.3d at 688 ("We conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a

---

testimony that she "presented all relevant information in her possession—both incriminating and exculpatory—to the grand jury."); *Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814, at *5 (5th Cir. Nov. 27, 2023) (holding the plaintiff "sufficiently alleged that the officers deliberately or recklessly omitted relevant information" where the defendants did not "dispute that several pieces of information were absent from the officers' reports and affidavit, [or] provide copies of the warrant or affidavit" to rebut the plaintiff's allegations).

First Amendment right to record the police does exist[.]"). Similarly, it has been clearly established that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech" since at least 2018. *Lozman*, 585 U.S. at 90.

229.    As part of the *Lozman, Nieves,* and *Mt. Healthy* analyses, the Court has found that Rollins intentionally arrested Pulliam to retaliate against Pulliam's speech, and also found that there is no alternate, non-speech justification for the arrest. Indeed, the *Mt. Healthy* framework required Pulliam to prove that Rollins was specifically *motivated* by a desire to suppress and retaliate against Pulliam's protected speech. That resolves the qualified immunity question. It is clearly established that a police officer can never arrest someone to punish them for protected speech, but Rollins did anyway. He is therefore not entitled to qualified immunity.

## V.    The Court awards Pulliam injunctive and monetary relief for the violation of his constitutional rights.

### A.    Pulliam is entitled to permanent injunctive relief.

230.    Pulliam is entitled to permanent injunctive relief because he has shown that (1) "the failure to grant the injunction will result in irreparable injury," (2) that the injury "outweighs any damage that the injunction will cause the opposing party," and (3) "the injunction will not disserve the public interest." *Hill v. Washburne*, 953 F.3d 296, 309 (5th Cir. 2020) (citation omitted).

231.    The Court's final judgment will issue the following injunctive relief to address the violation of Pulliam's constitutional rights and the County policy that caused those violations:

- All Fort Bend County actions that treat reporters using social media differently than reporters using traditional reporting media are hereby permanently enjoined;

- Fort Bend County and FBCSO shall add Pulliam and any other journalists requesting notification of County or FBCSO press conferences to all media lists announcing press events;

- Fort Bend County and FBCSO are hereby permanently enjoined from treating Pulliam differently than other journalists or worse than members of the public;

- Fort Bend County and FBCSO shall fully investigate any report that County personnel, including FBCSO personnel, are treating Pulliam differently than other journalists or worse than members of the public in retaliation for his reporting or his speech and discipline any individuals found to be carrying out such treatment;

- Fort Bend County shall provide all FBCSO personnel with training on the First Amendment's requirements and interacting with members of the media, including those who use social media, within six months of this Court's order;

- FBCSO shall place a document in Taylor Rollins' personnel file stating, "Rollins violated the First Amendment when he arrested a journalist in retaliation for his speech on December 21, 2021.";

- Fort Bend County and FBCSO shall (1) distribute a written statement to all FBCSO personnel and all personnel in the County Attorney's office and (2) post that written statement on FBCSO's website and social media accounts stating the following:

  o   A United States federal court ruled that Fort Bend County and Sheriff Fagan violated Justin Pulliam's constitutional rights, including his rights under the First Amendment, when Sheriff Fagan ordered Pulliam removed from a press conference in July 2021;

  o   That same court ruled that Fort Bend County and FBCSO officer Taylor Rollins violated Justin Pulliam's First Amendment rights when Rollins

excluded Pulliam from the scene of law enforcement activity and arrested Pulliam in retaliation for First Amendment activities on December 21, 2021; and

o   All County personnel—all FBCSO personnel in particular—shall treat Pulliam the same as other journalists, which means:

- Pulliam shall be allowed to stage his reporting at the same locations as other journalists when reporting on scene;

- Pulliam shall be allowed to stage at locations deemed safe for other civilians to remain;

- Pulliam shall be permitted the same access as other journalists to County and FBCSO press events and County communications;

- Pulliam's requests for information from the County and FBCSO, including his open-records requests, shall be treated the same as requests from other journalists and members of the public;

- County personnel, including FBCSO personnel, shall not arrest Pulliam in retaliation for his reporting or his speech; and

- Any report that County personnel, including FBCSO personnel, are treating Pulliam differently than other journalists or worse than the general public in retaliation for his reporting or his speech shall be fully investigated by the County and any individuals found to be carrying out such treatment shall be disciplined accordingly; and

- Fort Bend County shall provide this Court with an advisory confirming the steps that the County has taken to satisfy the above-ordered injunctive relief within one month of the Court's order.

232.   The above-listed injunctive orders are necessary to prevent future constitutional violations, ensure fair treatment, and remedy the past violation of Pulliam's constitutional rights.

**B.     Pulliam is entitled to $272,288.27 in compensatory damages.**

233.    The Court finds that Pulliam is entitled to compensatory damages because "he proved actual injury caused by the denial of his constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Specifically, Pulliam is entitled to damages compensating him for lost profits; the cost of replacing equipment seized by FBCSO; impairment of his reputation, personal humiliation, and mental anguish; and the attorneys' fees he incurred in the criminal proceeding resulting from his retaliatory arrest.

234.    A Section 1983 plaintiff may recover damages for lost profits. *J & B Ent. v. City of Jackson*, 720 F. Supp. 2d 757, 764 (S.D. Miss. 2010) (awarding a Section 1983 plaintiff lost profits resulting from the violation of procedural and substantive due process rights based on Mississippi tort law). Texas law authorizes an award of lost profits where a plaintiff can prove the loss with reasonable certainty. *See Coll. Network, Inc. v. Moore Educ. Publishers, Inc.*, 378 F. App'x 403, 412 (5th Cir. 2010) (applying Texas law).

235.    Pulliam is entitled to lost-profit damages of in the amount of **$42,214.51** for the loss of livestream revenue. Pulliam is entitled to lost-profit damages in the amount of **$120,898.49** for the loss of his video upload revenue.

236.    Pulliam is entitled to total lost-profit damages in the amount of **$163,113. ($42,214.51+$120,898.49)**.

237.    Pulliam is entitled to damages in the amount of **$1,444.35** for the amount he spent to replace the equipment that FBCSO seized following the retaliatory arrest— equipment that FBCSO never returned or, in the case of one item, returned damaged.

238.    Compensatory damages in Section 1983 suits may include not only out-of-pocket loss and other monetary harms, but also such injuries as "impairment of reputation . . . , personal humiliation, and mental anguish and suffering." *Stachura*, 477 U.S. at 307 (citation omitted). To prove a claim for such injuries, there must be a "specific discernable injury to the claimant's emotional state," but "a plaintiff's testimony, standing alone, can support an award of compensatory damages" for mental injuries. *Vadie v. Miss. State Univ.*, 218 F.3d 365, 376–77 (5th Cir. 2000) (citations omitted).

239.    Pulliam is entitled to an award of **$30,000** in reputation, humiliation, and mental anguish damages for the press-conference incident.

240.    Pulliam is entitled to an award of **$55,000** in reputation, humiliation, and mental anguish damages for the retaliatory arrest.

241.    Pulliam is entitled to a total award of **$85,000 ($30,000+$55,000)** in reputation, humiliation, and mental anguish damages.

242.    Section 1983 plaintiffs may also recover attorneys' fees incurred from related criminal proceedings foreseeably resulting from constitutional violations as compensatory damages. *See Castellano v. Fragozo*, 311 F.3d 689, 711 (5th Cir. 2002), *vacated on other grounds*, 352 F.3d 939 (5th Cir. 2003); *Borunda v. Richmond*, 885 F.2d 1384, 1389–90 (9th Cir. 1988); *Kerr v. City of Chicago*, 424 F.2d 1134, 1141 (7th Cir. 1970).

243.    The Court finds that Pulliam's attorneys' fees "arose out of the necessity" of defending against "unwarranted criminal charges" and "were presented to the trier of fact as an item of damage." *Borunda*, 885 F.2d at 1389; *see also Jenkins v. Town of Vardaman, Miss.*, 899 F. Supp. 2d 526, 535 (N.D. Miss. 2012) ("The court finds that plaintiff's First

Amendment retaliation claim is in fundamental conflict with his guilty plea and that, if he were to prevail on that claim in this court, it would necessarily imply the invalidity of his criminal conviction under *Heck* [*v. Humphrey*].". Pulliam is entitled to recover the fees from his criminal action because the expenditures were, "*unquestionably,* a foreseeable result of [D]efendants' actions." *Castellano*, 311 F.3d at 711.

244.    Pulliam is therefore entitled to damages for the costs and fees associated with his prior criminal proceedings related to the arrest totaling **$22,730.91**, and those fees are not excessive or unreasonable under the circumstances.

245.    In sum, the Court awards Pulliam total compensatory damages of **$272,288.26 (lost profits of $163,113+equipment replacement of $1,444.35+reputation, humiliation, and mental anguish of $85,000+criminal attorneys' fees of 22,730.91).**

**C.    The Court awards punitive damages against Sheriff Fagan.**

246.    Pulliam is entitled to punitive damages from Sheriff Fagan in the amount of **$500**.

247.    Sheriff Fagan's order that Pulliam to be removed from the press conference under the threat of arrest has been "shown to be motivated by evil motive or intent[.]" *Smith v. Wade*, 461 U.S. 30, 56 (1983). Alternatively, Sheriff Fagan's order "involve[d] reckless or callous indifference to [Pulliam's] federally protected rights[.]" *Id.*

248.    The Court awards punitive damages against Sheriff Fagan because the Court finds punitive damages of $500 will "punish [Sheriff Fagan] for his outrageous conduct

and to deter him and others like him from similar conduct in the future." *Id.* at 54 (quoting

Restatement (Second) of Torts § 908(1) (1977)).

**D.    Total compensatory and punitive damages are $272,788.26.**

249.    Pulliam is entitled to total damages of **$272,788.26 (compensatory**

**damages of $272,288.26+punitive damages of $500).**

Dated: July 1, 2025                     Respectfully submitted,

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge
Texas Bar No. 24099898
Federal ID No. 3844981

Jeffrey Rowes*, of counsel
Texas Bar No. 24104956

Michael Peña*, of counsel
Texas Bar No. 24131580

INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org
jrowes@ij.org
mpena@ij.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and served by the CM/ECF system to all counsel of record.

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge

*Counsel for Plaintiff*