IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUSTIN PULLIAM | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO.: 4:22-CV-4210 |
| | § | |
| | § | |
| FORT BEND COUNTY, TEXAS, ET. AL., | § | |
| | § | |

## DEFENDANTS' FIRST AMENDED PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

The case was tried in a bench trial before the Court. Plaintiff Justin Pulliam ("Plaintiff") and Defendants Fort Bend County, Texas (the "County"), Fort Bend County Sheriff Eric Fagan ("Sheriff Fagan"), and Fort Bend County Lieutenant Taylor Rollins ("Lt. Rollins") (collectively, "Defendants") appeared by and through their counsel of record. The Court, having carefully considered the evidence admitted at trial, makes the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

### Findings of Fact

1. Plaintiff is an independent journalist who covers local news in the Fort Bend County area and publishes his reporting on social-media platforms.

2. As part of his reporting, Plaintiff sometimes records police activity.

3. Plaintiff initiated this proceeding on December 5, 2022 seeking damages for alleged violations of his constitutional rights on July 12, 2021 and December 21, 2021.

4. On July 12, 2021, Plaintiff traveled to a public park located in Fort Bend County, Texas known as Jones Creek Park.

5. On that day, Plaintiff traveled to Jones Creek Park for the purpose of recording law enforcement's efforts to recover a submerged automobile from Jones Creek which was believed to contain the remains of a recently deceased woman.

6. While recording, Plaintiff interacted with several members of the Fort Bend County Sheriff's Office and the Fort Bend County Fire Marshal's Office.

---

[1] Defendants reserve the right to amend of supplement these proposed findings and conclusions.

7. During these interactions, Plaintiff shouted insults to various Fort Bend County Sheriff's deputies and members of the Fort Bend County Fire Marshal's office.

8. Also while recording, Plaintiff was involved in an altercation with a member of the deceased woman's family which was broken up by members of the Fort Bend County Sheriff's Office.

9. This altercation was captured on audio and video recording that Plaintiff has in his possession but failed to produce.

10. After recording law enforcement's efforts to recover the submerged automobile from Jones Creek for about an hour, the Fort Bend County Sheriff's Office closed the park.

11. The Fort Bend County Sheriff's Office then directed Plaintiff, other members of the media who were present, and everyone else at the park to relocate to the park's entrance where a press conference would be held.

12. Sheriff Fagan told Plaintiff that if he did not go to the park entrance within five-minutes he would be arrested.

13. Plaintiff relocated to the park's entrance as requested and waited for the press conference to begin about 80-feet-away from other members of the press who were also staged at the park's entrance.

14. Sheriff Fagan arrived at the press conference in a golf cart shortly thereafter.

15. Once Sheriff Fagan arrived, Plaintiff then walked towards the area where the other members of the media were staged.

16. As Plaintiff approached, Sheriff Fagan told Fort Bend County Sheriff's deputy Robert Hartfield ("Hartfield") to remove Plaintiff from the area of the press conference where other members of the press were located.

17. Sheriff Fagan told Hartfield: "If he don't do it, arrest him cause he is not part of the local media, so he have to go back."

18. Plaintiff was subsequently escorted approximately 80-feet-away from the press conference by Hartfield where he was allowed to film.

19. The press conference lasted approximately 9-minutes.

20. On Plaintiff's motion, United States Magistrate Judge Andrew Edison recommended that Sheriff Fagan's order for Plaintiff to relocate approximately 80-feet-away from the press conference violated Plaintiff's rights under the First and Fourteenth Amendments.

21. Judge Edison also recommended that Fort Bend County was liable for Sheriff Fagan's order for Plaintiff to relocate approximately 80-feet-away from the press conference.

2

22. Finally, Judge Edison recommended that Hartfield was entitled to qualified immunity in connection with this incident.

23. Judge Edison's recommendation was adopted by this Court on September 24, 2024.

24. As a result of these rulings, the only issue that was tried to the Court was the amount of damages, if any, Sheriff Fagan and Fort Bend County owe Plaintiff as a result of these violations.

25. In connection with the July 12, 2021 press conference incident, Plaintiff sought recovery of: (i) $98,227.79 in purported "lost profits" and (ii) $30,000 in purported reputation, humiliation, and mental anguish.

26. Plaintiff also sought to recover $500.00 in punitive damages from Sheriff Eric Fagan.

27. Prior to trial, however, this Court ruled that Plaintiff was forbidden from seeking recovery of $98,227.79 in lost profits, and evidence related to any alleged "lost profits" was excluded, given he failed to comply with Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure.

28. With respect to reputation, humiliation, and mental anguish damages arising from the July 12, 2021 press conference incident, Plaintiff only presented uncorroborated testimony.

29. Indeed, Plaintiff admitted he never visited a doctor, therapist, counselor, or any other professional in connection with any purported mental anguish as a result of the July 12, 2021 press conference incident.

30. On December 21, 2021, the Fort Bend County Sheriff's Office was dispatched to a scene located at 22934 FM 762, Needville, Texas 77461 (the "Kraft Gas Station").

31. The Kraft Gas Station consists of a shuttered storefront which used to operate as a convenient store, inoperable gas pumps, and a trailer home located behind the now closed convenient store where Mr. Kraft lived.

32. The Fort Bend County Sheriff's Office was dispatched to the scene in response to a call that Edwin Kraft ("Mr. Kraft"):

    a. Was in a psychotic state;

    b. Made homicidal threats to his mother who also lived with him in the trailer home;

    c. Forced his mother to sleep outside the trailer home the night prior because he didn't want to hurt her or kill her; and

    d. Was potentially armed with a machete.

33. Fort Bend County Sheriff's deputies Ricky Rodriguez ("Dep. Rodriguez") and Matthew Lacy ("Dep. Lacy") were the first to arrive at the scene.

34. Prior to arriving at the scene, Mr. Kraft was well known to Dep. Rodriguez.

35. Indeed, Dep. Rodriguez reasonably believed that Mr. Kraft: (i) suffered from schizophrenia and bipolar disorder which often caused him to act erratically, (ii) abused methamphetamine, (iii) made threats of violence, and (iv) had a history of carrying and possessing firearms.

36. Prior to arriving at the scene, Dep. Rodriguez had received department wide warnings (often known as "BOLOS") concerning Mr. Kraft. Specifically, Dep. Rodriguez was warned:

    a. On April 10, 2020 and/or April 17, 2020, Mr. Kraft made threats to kill any law enforcement officer "that tries to arrest him or take him to the hospital." Mr. Kraft on that day was also reported to be experiencing "paranoid delusions" and "believes people/vehicles are following him." Finally, on that day Mr. Kraft also stated "he would start shooting the persons at the intersection that are spying on him." On that day, it was reported that Mr. Kraft was in possession of a 30/30 rifle which was seized on that day.

    b. On October 7, 2021, a little over two-months before December 21, 2021, Mr. Kraft was seen on a family member's property carrying a shotgun.

37. Dep. Rodriguez also responded to a call on September 13, 2020 involving Mr. Kraft. During his response, Mr. Kraft appeared to be going through a psychotic state and reported that individuals were spying on him and trying to kill him with a rifle containing a scope.

38. Given his prior knowledge of Mr. Kraft, Dep. Rodriguez reasonably believed that Mr. Kraft was barricaded inside his trailer home armed with a firearm.

39. Given his prior knowledge, Dep. Rodriguez:

    a. Ordered Ms. Kraft, who was also on scene, to take cover behind the shuttered convenience store which he believed was a safe location; and

    b. Took cover behind an 18-wheeler to avoid being shot while he stood watch over the front entrance of the trailer home.

40. Unbeknownst to Dep. Rodriguez, however, Ms. Kraft did not take cover behind the shuttered convenience store. Instead, she took cover in her automobile which was parked behind the inoperable gas pumps.

41. Dep. Lacy also took cover and stood watch over the back entrance of the trailer home.

42. Plaintiff arrived after Dep. Rodriguez and Dep. Lacy and began recording police activity.

43. Upon arrival, Dep. Rodriguez advised Plaintiff to "stay back over there" (paraphrasing).

4

44. Plaintiff followed Dep. Rodriguez's commands and silently recorded police activity near the inoperable gas pumps.

45. While Plaintiff was recording police activity, two female mental health workers appeared on the scene, approached Ms. Kraft, who was still inside her automobile.

46. Lt. Rollins arrived on the scene shortly thereafter and took command of the scene.

47. Prior to arriving at the scene, Mr. Kraft was well known to Lt. Rollins.

48. Indeed, Dep. Rodriguez reasonably believed that Mr. Kraft: (i) suffered from schizophrenia and bipolar disorder which often caused him to act erratically, (ii) abused methamphetamine, (iii) made threats of violence, and (iv) had a history of carrying and possessing firearms.

49. Prior to arriving at the scene, Lt. Rollins had received department wide warnings (often known as "BOLOS") concerning Mr. Kraft. Specifically, Lt. Rollins was warned:

    a. On April 10, 2020 and/or April 17, 2020, Mr. Kraft made threats to kill any law enforcement officer "that tries to arrest him or take him to the hospital." Mr. Kraft on that day was also reported to be experiencing "paranoid delusions" and "believes people/vehicles are following him." Finally, on that day Mr. Kraft also stated "he would start shooting the persons at the intersection that are spying on him." On that day, it was reported that Mr. Kraft was in possession of a 30/30 rifle which was seized on that day.

    b. On October 7, 2021, a little over two-months before December 21, 2021, Mr. Kraft was seen on a family member's property carrying a shotgun.

50. Immediately upon arrival, Lt. Rollins ordered Plaintiff and the two mental health professionals to relocate across the street. Lt. Rollins, at that time, was unaware that Ms. Kraft was located insider her vehicle near the gas pumps. Lt. Rollins was also unaware that the females were in fact mental health professionals. At the time he gave the order, Lt. Rollins believe the two females were instead citizens simply there to observe.

51. After receiving this order from Lt. Rollins, the following interaction ensued with Plaintiff:

    **Lt. Rollins:** I need *y'all* to go ahead and go across the street please.
    **Plaintiff:** Across the street?
    **Lt. Rollins:** Yes, across the street.
    **Plaintiff:** So you can shoot him?
    **Lt. Rollins:** What's wrong with you, man?
    **Plaintiff:** What's wrong with you?
    **Lt. Rollins:** Please go across the street, thank you.

5

52. After this exchange, Plaintiff began walking towards the street.

53. The mental health professionals, however, informed Lt. Rollins that they were mental health professionals on scene in a professional capacity to assist with de-escalation efforts.

54. Lt. Rollins then began speaking with the mental health professionals about potential next steps to deal with the situation.

55. While Lt. Rollins was speaking with the mental health professionals, Plaintiff stopped walking towards the street. The following interaction then ensued:

    **Lt. Rollins:** Across the street.

    **Plaintiff:** Well, hold on, *if it's not for safety*, I already have permission from the landowner? I have her permission to stay.

    **Lt. Rollins:** *It is for safety, it is for safety*.

    **Plaintiff:** So is everyone leaving or just me?

    **Lt. Rollins:** Across the street.

    **Plaintiff:** Everyone or just me?

56. Lt. Rollins then began to countdown from five in an attempt to warn Plaintiff that he had five seconds to comply with his order or be arrested.

57. Plaintiff, however, admittedly failed to comply with Lt. Rollins' order to relocate across the street.

58. As a result, Plaintiff was arrested for violation Section 38.15 of the Texas Penal Code.

59. Subsequently, on May 16, 2022, Plaintiff was indicted by a duly empaneled grand jury for violating Section 38.15 on December 21, 2021.

60. The case then proceeded to trial which resulted in a hung jury with 5 jurors voting to acquit and 1 juror voting to convict.

61. On May 15, 2024, the Fort Bend County District Attorney dismissed Plaintiff's charges.

62. To the extent any of the foregoing findings of fact are deemed to be conclusions of law, they should be treated as such.

## Conclusions of Law

1. Plaintiff had the burden of proof with respect to his claim for compensatory damages in connection with the July 12, 2021 press conference.

2. Plaintiff failed to prove, by a preponderance of the evidence, that he is entitled to an award of compensatory damages in connection with the July 12, 2021 press conference.

3. Plaintiff had the burden of proof with respect to his claim for punitive damages against Sheriff Fagan in connection with the July 12, 2021 press conference.

4. Plaintiff failed to prove, by a preponderance of the evidence, that he is entitled to an award of punitive damages against Sheriff Fagan in connection with the July 12, 2021 press conference.

5. Plaintiff is entitled to nominal damages in the amount of $1.00 in connection with the July 12, 2021 press conference against Sheriff Fagan and the County.

6. Plaintiff had the burden of proof with respect to his claim for injunctive and declaratory relief in connection with the July 12, 2021 press conference.

7. Plaintiff failed to prove, by a preponderance of the evidence, that he is entitled to injunctive or declaratory relief in connection with the July 12, 2021 press conference.

8. To establish a First Amendment retaliation claim, Plaintiff must prove: (i) he engaged in a constitutionally protected activity, (ii) Defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (iii) Defendants' actions were substantially motivated against Plaintiff's exercise of the constitutionally protected activity. *Keenan v. Tejeda*, 290.

9. Plaintiff had the burden of proof with respect to his claim that Lt. Rollins' order to relocate across the street on December 21, 2021 was made in retaliation for recording police activity.

10. Plaintiff failed to prove, by a preponderance of the evidence, that Lt. Rollins' order to relocate across the street on December 21, 2021 was made in retaliation for recording police activity.

11. Moreover, given that a reasonable person in his position would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law, Lt. Rollins is entitled to qualified immunity in connection with his order for Plaintiff to relocate across the street on December 21, 2021.

12. Plaintiff had the burden of proof with respect to his claim that Lt. Rollins' arrest on December 21, 2021 was made in retaliation for recording police activity.

13. A plaintiff pressing a retaliatory arrest claim must prove the absence of probable cause for the arrest.

14. Probable cause existed to arrest Plaintiff for violating Section 38.15 of the Texas Penal Code on December 21, 2021.

15. Moreover, given that a reasonable person in his position would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law, Lt. Rollins is entitled to qualified immunity in connection with the December 21, 2021 arrest.

16. Plaintiff failed to prove, by a preponderance of the evidence, that Lt. Rollins' arrest on December 21, 2021 was made in retaliation for recording police activity.

17. Plaintiff shall TAKE NOTHING on his claims arising out of the December 21, 2021 incident against any Defendant.

18. To the extent any of the foregoing conclusions are deemed to be findings of fact, they should be treated as such.

Respectfully submitted,

Bridgette Smith-Lawson
Fort Bend County Attorney

By: */s/ Kevin T. Hedges*
    Kevin T. Hedges
    Attorney-in-Charge
    State Bar No. 09370100
    Federal ID No. 9939
    *kevin.hedges@fortbendcountytx.gov*
    Rolf F. Krueger
    State Bar No. 24080990
    Federal ID No. 3041756
    *rolf.krueger@fortbendcountytx.gov*
    Fort Bend County Attorney's Office
    401 Jackson Street, 3rd Floor
    Richmond, Texas 77469
    (281) 341-4555
    (281) 341-4557 (Fax)

ATTORNEYS FOR DEFENDANTS
FORT BEND COUNTY, TEXAS, SHERIFF
ERIC FAGAN, AND LIEUTENANT TAYLOR
ROLLINS

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing instrument was served on the parties and counsel identified on the attached service list by electronic service on this the 7th day of July, 2025.

                                            */s/ Kevin T. Hedges*
                                            Kevin T. Hedges

## SERVICE LIST

Christen M. Hebert
Jeffrey T. Rowes
Michael Pena
Institute for Justice
816 Congress Avenue, Suite 970
Austin, Texas 78701
*chebert@ij.org*
*jrowes@ij.org*
*mpena@ij.org*