IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUSTIN PULLIAM | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO.: 4:22-CV-4210 |
| | § | |
| | § | |
| FORT BEND COUNTY, TEXAS, ET. AL., | § | |
| | § | |

**DEFENDANTS' SECOND AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The case was tried in a bench trial before the Court. Plaintiff Justin Pulliam ("Plaintiff") and Defendants Fort Bend County, Texas (the "County"), Fort Bend County Sheriff Eric Fagan ("Sheriff Fagan"), and Fort Bend County Lieutenant Taylor Rollins ("Lt. Rollins") (collectively, "Defendants") appeared by and through their counsel of record. The Court, having carefully considered the evidence admitted at trial, and any post-trial briefing, makes the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

**Findings of Fact**

1. Plaintiff is an independent journalist who covers local news in the Fort Bend County area and publishes his reporting on social media platforms.

2. As part of his reporting, Plaintiff sometimes records police activity.

3. Plaintiff initiated this proceeding on December 5, 2022 seeking damages and injunctive relief for alleged violations of his constitutional rights on July 12, 2021 and December 21, 2021.

4. On July 12, 2021, Plaintiff traveled to a public park located in Fort Bend County, Texas known as Jones Creek Park.

5. On that day, Plaintiff traveled to Jones Creek Park for the purpose of recording law enforcement's efforts to recover a submerged automobile from Jones Creek which was believed to contain the remains of a recently deceased woman.

6. While recording, Plaintiff interacted with several members of the Fort Bend County Sheriff's Office and the Fort Bend County Fire Marshal's Office.

7. During these interactions, Plaintiff shouted insults to various Fort Bend County Sheriff's deputies and members of the Fort Bend County Fire Marshal's office.

8. Also while recording, Plaintiff was involved in an altercation with a member of the deceased woman's family which was broken up by members of the Fort Bend County Sheriff's Office.

9. Sheriff Fagan was made aware of Plaintiff's interaction with the decedent's family.

10. After recording law enforcement's efforts to recover the submerged automobile from Jones Creek for about an hour, the Fort Bend County Sheriff's Office closed the park.

11. The Fort Bend County Sheriff's Office then directed Plaintiff, other members of the media who were present, and everyone else at the park to relocate to the park's entrance where a press conference would be held.

12. Sheriff Fagan told Plaintiff that if he did not go to the park entrance within five-minutes he would be arrested.

13. Plaintiff relocated to the park's entrance as requested and waited for the press conference to begin about 80-feet-away from other members of the press who were also staged at the park's entrance.

14. Sheriff Fagan arrived at the press conference in a golf cart shortly thereafter.

15. Once Sheriff Fagan arrived, Plaintiff then walked towards the area where the other members of the media were staged.

16. As Plaintiff approached, Sheriff Fagan told Fort Bend County Sheriff's deputy Robert Hartfield to remove Plaintiff from the area of the press conference where other members of the press were located.

17. Sheriff Fagan told Deputy Robert Hartfield: "If he don't do it, arrest him cause he is not part of the local media, so he have to go back."

18. Plaintiff was subsequently escorted approximately 80-feet-away from the press conference by Deputy Robert Hartfield where he was allowed to film.

19. The press conference lasted approximately 9-minutes.

20. On Plaintiff's motion, United States Magistrate Judge Andrew Edison recommended that Sheriff Fagan's order for Plaintiff to relocate approximately 80-feet-away from the press conference violated Plaintiff's rights under the First and Fourteenth Amendments.

21. Judge Edison also recommended that Fort Bend County was liable for Sheriff Fagan's order for Plaintiff to relocate approximately 80-feet-away from the press conference.

22. Finally, Judge Edison recommended that Deputy Robert Hartfield was entitled to qualified immunity in connection with this incident.

23. Judge Edison's recommendation was adopted by this Court on September 24, 2024.

24. As a result of these rulings, the only issue that was tried to the Court was the amount of damages, if any, Sheriff Fagan and Fort Bend County owe Plaintiff as a result of these violations.

25. In connection with the July 12, 2021 incident, Plaintiff sought recovery of: (i) $98,227.79 in purported "lost profits," (ii) $30,000 in purported reputation, humiliation, and mental anguish damages, and (iii) $500 in punitive damages against Sheriff Fagan.

26. With respect to his claim for "lost profits," Plaintiff introduced evidence of "lost revenue" rather than "lost profits."

27. Plaintiff did not offer any testimony, documentary evidence, or expert analysis in connection with overhead expenses or other direct and indirect costs necessary to determine net profitability.

28. Plaintiff did not offer any testimony, documentary evidence, or expert analysis regarding historical profit margins, contribution margins, or any consistent ratio between revenue and profit.

29. The only evidence offered in connection with "lost profits" was generalized, speculative, and lacked foundation in Plaintiff's accounting records or industry standards.

30. The Court finds that Plaintiff's claimed lost profits are too speculative and lack a sufficient evidentiary foundation to support an award.

31. With respect to his claim for reputation and humiliation damages, Plaintiff presented apparent social media posts allegedly made by third parties.

32. Plaintiff failed to call as witnesses the individuals who authored the social media posts, nor did he offer any testimony or evidence verifying the authenticity or context of these posts.

33. Plaintiff failed to present any live testimony from third parties attesting to a diminished view of Plaintiff's character, standing in the community, or reputation following the July 12, 2021 incident.

34. Plaintiff failed to offer any credible evidence demonstrating that his reputation was actually harmed or that he suffered humiliation beyond his own subjective belief.

35. The Court finds, standing alone, the social media posts are insufficient to support a finding of reputational or humiliation damages.

36. With respect to this claim for mental anguish damages, Plaintiff testified that his exclusion from the July 12, 2021 press conference caused him fear and chilled his recoding of police activity.

37. Evidence, however, revealed that since the July 12, 2021 incident, Plaintiff continues to openly record and photograph Fort Bend County Sheriff's deputies including Deputy Ricky Rodriguez, Lieutenant Taylor Rollins, and Sheriff Eric Fagan, contradicting his claim.

38. Deputy Ricky Rodriguez testified that Plaintiff recently recorded police activity during a murder investigation and was allowed to stage with other members of the mainstream media, was granted the same access as other members of the mainstream media, and was otherwise treated identical to other members of the mainstream media.

39. Plaintiff testified that he has never been told by any Fort Bend County Sheriff's deputy that he was not allowed to record police activity or to stop recording police activity at a scene.

40. Plaintiff presented no medical or expert testimony in connection with his claim for mental anguish damages.

41. Plaintiff presented no corroborating testimony in connection with his claim for mental anguish damages.

42. With respect to his claim for punitive damages, Sheriff Fagan testified under oath that his actions on July 12, 2021 were in error and expressed genuine remorse for his actions.

43. Sheriff Fagan further testified that he has taken affirmative steps to ensure that his actions on July 12, 2021 are not repeated by himself and anyone in his department.

44. Sheriff Fagan testified that Plaintiff has been included in the Fort Bend County Sheriff's Office media distribution list.

45. Sheriff Fagan testified he instructed every patrol deputy at roll call to allow the public to record police activity unimpeded so long as the recoding activity does not interfere with the deputy's constitutional duty as peace officers to protect and serve the public. This testimony was corroborated by Deputy Ricky Rodriguez's and Lt. Rollins' testimony.

46. Sheriff Fagan testified that he recognizes Plaintiff, a citizen journalist, as a member of the media and treats him no differently than representatives of traditional mainstream media outlets.

47. Sheriff Fagan's expressions of remorse and commitment to improvement were credible and consistent with his actions since July 12, 2021.

48. There was no evidence presented indicating that Sheriff Fagan has engaged in conduct similar to that on July 12, 2021, nor was there any indication that Sheriff Fagan engaged in past misconduct similar to that on July 12, 2021.

49. There was no evidence presented indicating that any Fort Bend County Sheriff's deputy has engaged in conduct similar to that on July 12, 2021, nor was there any indication that any Fort Bend County Sheriff's deputy engaged in past misconduct similar to that on July 12, 2021.

50. The evidence reflects that Sheriff Fagan's actions were not malicious or undertaken with conscious indifference for the rights of others, and he has taken responsibility for his behavior.

51. The Court finds that the Sheriff Fagan's remorse and corrective measures weigh against an award of punitive damages in this case.

52. On December 21, 2021, the Fort Bend County Sheriff's Office was dispatched to a scene located at 22934 FM 762, Needville, Texas 77461 (the "Kraft Country Store").

53. The Kraft Country Store consists of a shuttered storefront which used to operate as a convenient store, inoperable gas pumps, and a trailer home located behind the now closed convenient store where Mr. Kraft lived.

54. The Fort Bend County Sheriff's Office was dispatched to the scene in response to a call that Edwin Kraft ("Mr. Kraft"):

    a. Was in a psychotic state;

    b. Made homicidal threats to his mother who also lived with him in the trailer home;

    c. Forced his mother to sleep outside the trailer home the night prior because he didn't want to hurt her or kill her; and

    d. Was potentially armed with a machete.

55. Fort Bend County Sheriff's deputy Matthew Lacy was the first to arrive at the scene and, by virtue of that fact, was the scene commander until a supervisor – *i.e.*, Lt. Rollins – arrived.

56. Fort Bend County Sheriff's deputy Ricky Rodriguez was the second deputy to arrive at the scene.

57. Prior to arriving at the scene, Mr. Kraft was well known to Deputy Ricky Rodriguez. By virtue of numerous be-on-the-lookout warnings ("BOLOs") and officer safety warnings. Indeed, Deputy Ricky Rodriguez was advised:

    a. On April 10, 2020, Mr. Kraft "made threats to kill a law enforcement officer," was known to use drugs such as methamphetamine, and "carry firearms with him." Deputy Ricky Rodriguez also received information that Mr. Kraft (i) made statements of being watched and an ex-girlfriend using underground vault to get his money, (ii) made homicidal threats of killing persons he thought were watching him, and (iii) made threats to kill a female who he stated lived across the river in Brazoria County.

 b. On April 27, 2020, Mr. Kraft (i) made verbal threats to shoot and kill the next police officer that tries to arrest him or take him to the hospital, (ii) is "known to be in possession of firearms that he keeps at his residence in Needville, TX and in his vehicle," (iii) is "mentally unstable and known to abuse narcotics." Law enforcement personnel, including deputy Ricky Rodriguez, were also warned to "use extreme caution if [Edwin] Kraft is encountered."

 c. On October 7, 2021, Edwin Kraft had been seen on a family member's property behind the Kraft Country Store carrying a shotgun. Fort Bend County Sheriff's deputies located and detained Edwin Kraft after giving "several orders to put down the shotgun." Deputy Ricky Rodriguez was further warned that Edwin Kraft (i) threatened to shoot and kill any officer who tries to arrest him or take him to a hospital, (ii) suffers from schizophrenia and bipolar disorder, (iii) uses methamphetamine, and (iv) is known to "carry firearms." As a result, a "CAD Flag" was entered for the Kraft Country Store requiring at least two deputies to respond to any call for service at the location.

 d. On November 1, 2021, Mr. Kraft was bonding out of jail and lives in the trailer behind the Kraft County Store.

 e. On November 28, 2021, Mr. Kraft made a verbal threat over the telephone, was again abusing methamphetamine, and behaving abnormally.

58. On September 13, 2020, Deputy Ricky Rodriguez also responded to a call for service at the Kraft County Store and learned that Mr. Kraft:

 a. Was paranoid;

 b. Claimed a male subject across the street had a rifle with a scope and took aim at him;

 c. Claimed helicopters had been flying around and spying on him; and

 d. Slashed the tires of a woman who worked in a gas station across the street.

59. Given his prior knowledge of Mr. Kraft and the Kraft Country Store, Deputy Ricky Rodriguez reasonably believed he faced significant danger on December 21, 2021.

60. Given this prior knowledge, Deputy Ricky Rodriguez ordered Francis Kraft ("Ms. Kraft"), Mr. Kraft's mother who was also on scene, to take cover behind the shuttered convenience store which he believed was a safe location.

61. However, Ms. Kraft did not take cover behind the shuttered convenience store. Instead, she took cover in her automobile which was parked behind the inoperable gas pumps

62. Deputy Ricky Rodriguez then took cover behind a semi-truck and stood watch over front entrance of Mr. Kraft's trailer home.

6

63. Deputy Matthew Lacy took cover on the side of Mr. Kraft's trailer home and stood guard over the back entrance.

64. Plaintiff arrived at the Kraft County Store shortly thereafter and began recording police activity.

65. Upon arrival, Deputy Ricky Rodriguez advised Plaintiff "to stay back over there" (paraphrasing).

66. Plaintiff followed Deputy Ricky Rodriguez's commands and silently recorded police activity near the inoperable gas pumps.

67. While Plaintiff was recording police activity, two female mental health workers appeared on the scene and approached Ms. Kraft who was still inside her automobile.

68. Lt. Rollins arrived on the scene shortly thereafter and assumed command.

69. Prior to arriving at the scene, Mr. Kraft was well known to Lt. Rollins. Indeed, by virtue of numerous BOLOs and officer safety warnings, Lt. Rollins was advised:

    a. On April 10, 2020, Mr. Kraft "made threats to kill a law enforcement officer," was known to use drugs such as methamphetamine, and "carry firearms with him." Deputy Ricky Rodriguez also received information that Mr. Kraft (i) made statements of being watched and an ex-girlfriend using underground vault to get his money, (ii) made homicidal threats of killing persons he thought were watching him, and (iii) made threats to kill a female who he stated lived across the river in Brazoria County.

    b. On April 27, 2020, Mr. Kraft (i) made verbal threats to shoot and kill the next police officer that tries to arrest him or take him to the hospital, (ii) is "known to be in possession of firearms that he keeps at his residence in Needville, TX and in his vehicle," (iii) is "mentally unstable and known to abuse narcotics." Law enforcement personnel, including Lt. Rollins, were also warned to "use extreme caution if [Edwin] Kraft is encountered."

    c. On October 7, 2021, Edwin Kraft had been seen on a family member's property behind the Kraft Country Store carrying a shotgun. Fort Bend County Sheriff's deputies located and detained Edwin Kraft after giving "several orders to put down the shotgun." Deputy Ricky Rodriguez was further warned that Edwin Kraft (i) threatened to shoot and kill any officer who tries to arrest him or take him to a hospital, (ii) suffers from schizophrenia and bipolar disorder, (iii) uses methamphetamine, and (iv) is known to "carry firearms." As a result, a "CAD Flag" was entered for the Kraft Country Store requiring at least two deputies to respond to any call for service at the location.

    d. On November 1, 2021, Mr. Kraft was bonding out of jail and lives in the trailer behind the Kraft County Store.

7

     e.     On November 28, 2021, Mr. Kraft made a verbal threat over the telephone, was again abusing methamphetamine, and behaving abnormally

70. Given his prior knowledge or Mr. Kraft and the Kraft Country Store, Lt. Rollins reasonably believed he faced significant danger on December 21, 2021.

71. Lt. Rollins testified that responded to the December 21, 2021 scene with his emergency lights and sirens activated.

72. The Court understands that activation of emergency lights and sirens is standard practice used by law enforcement officers responding to calls they feel are urgent, potentially dangerous, and/or requiring immediate attention.

73. The Court finds that Lt. Rollins decision to utilize his emergency lights and sirens indicates he assessed the December 21, 2021 situation as high priority and potentially involving a threat to public safety and officer safety, supporting his reasonable belief that he faced significant danger.

74. Immediately upon arrival, Lt. Rollins testified that he believed only three non-law enforcement personnel were on the scene: (i) Plaintiff and (ii) the two-mental health professionals. Rollins testified that he did not know Plaintiff's wife or Ms. Kraft were on scene.

75. Lt. Rollins further testified that, upon arrival, he did not know the two females on scene were in fact mental health professionals. Instead, he believed the females were citizens simply observing the scene.

76. Immediately upon arrival, Lt. Rollins ordered <u>all</u> non-law enforcement personnel that he observed on scene to relocate across the street.

77. The Court finds that Lt. Rollins' order to all bystanders he observed on scene to relocate across the street was issued in the interest of maintaining public safety, preserving the integrity of the scene, and allowing deputies to carry out their duties without obstruction.

78. The order was not specifically directed at Plaintiff because he was a citizen journalist or because he was recording police activity. The order applied to <u>all</u> non-law enforcement personnel uniformly.

79. Plaintiff, a citizen journalist, was treated no differently than other members of the public.

80. No competent, credible, or reliable evidence was presented indicating that Lt. Rollins singled out Plaintiff based on his status as a citizen journalist, his recording police activity, the content of his recordings, or his viewpoint.

81. Lt. Rollins' actions were consistent with standard lawful crowd control measures and did not involve selective enforcement or content-based discrimination.

82. The Court finds that Lt. Rollins' order to relocate across the street was neutral, lawful, and reasonably applied to all bystanders he observed on the scene and was issued in the interest of maintaining public safety, preserving the integrity of the scene, and allowing deputies to carry out their duties without obstruction.

83. After receiving this order from Lt. Rollins, the following interaction ensued with Plaintiff.

    **Lt. Rollins:**   I need y'all to go ahead and go across the street please.
    **Plaintiff:**   Across the street?
    **Lt. Rollins:**   Yes, across the street.
    **Plaintiff:**   So you can shoot him?
    **Lt. Rollins:**   What's wrong with you, man?
    **Plaintiff:**   What's wrong with you?
    **Lt. Rollins:**   Please go across the street, thank you.

84. After this exchange, Plaintiff continued to film and began walking towards the street.

85. The two females who received the same order as Plaintiff, however, informed Lt. Rollins that they were indeed mental health professionals on scene in a professional capacity to assist.

86. Testimony during trial established that the female mental health professionals are specifically trained to engage with individuals experiencing a mental health crisis and are regularly deployed to scenes to support officers in high-stress and volatile situations.

87. Testimony further established that, as part of their training, these professionals are aware of the inherent risks associated with their roles and voluntarily assume those risks as part of their employment.

88. Due to the unpredictable and potentially dangerous nature of the situations they encounter, these mental health professionals train with Fort Bend County Sheriff's deputies and often wear ballistic vests in the field when they are accompanying law enforcement.

89. The Court finds the presence of these professionals on scene during the December 21, 2021 incident was consistent with standard practice for the Fort Bend County Sheriff's Office and their presence was for the purpose de-escalation and improving the chances of a safe outcome.

90. Lt. Rollins then began speaking with the mental health professionals in what he described as a "briefing."

91. While Lt. Rollins was being briefed by the mental health professionals, Plaintiff stopped walking towards the street and continued his recording of police activity. The following interaction then ensued:

|   |   |   |
|---|---|---|
| **Lt. Rollins:** | | Across the street. |
| **Plaintiff:** | | Well, hold on, <u>if it's not for safety</u>, I already have permission from the landowner? I have her permission to stay. |
| **Lt. Rollins:** | | <u>It is for safety</u>, <u>it is for safety</u>. |
| **Plaintiff:** | | So is everyone leaving or just me? |
| **Lt. Rollins:** | | Across the street. |
| **Plaintiff:** | | Everyone or just me? |

92. Lt. Rollins then began to countdown from five in an attempt to warn Plaintiff that he had five seconds to comply with his order or be arrested

93. Plaintiff, however, failed to, at the very least, immediately comply with Lt. Rollins' order to relocate across the street and was arrested for violating Section 38.15 of the Texas Penal Code.

94. A failure to comply with an officer's instructions violates Section 38.15 of the Texas Penal Code and is not protected speech.

95. Failure to immediately comply with an officer's instructions provides a basis for an officer to reasonably believe an individual is violating Section 38.15 of the Texas Penal Code.

96. The Court finds that Lt. Rollins reasonably believed Plaintiff's failure to immediately comply with the relocation order established probable cause to arrest Plaintiff under Section 38.15 of the Texas Penal Code.

97. At trial, Plaintiff failed to show, with strong affirmative evidence, that other individuals who engaged in comparable behavior were typically not arrested.

98. Following Plaintiff's arrest, the matter was presented to a duly empaneled Fort Bend County grand jury for consideration of formal charges under Section 38.15 of the Texas Penal Code.

99. The grand jury returned a true bill, formally indicting Plaintiff for the offense of interfering with duties of a public servant under Section 38.15 of the Texas Penal Code.

100. The Court finds the existence of this indictment supports its conclusion that Lt. Rollins reasonably believed Plaintiff's failure to immediately comply with the relocation order established probable cause to arrest Plaintiff under Section 38.15 of the Texas Penal Code.

101. The case then proceeded to a jury trial in a court of competent jurisdiction where Plaintiff was allowed to present any evidence he wished in his defense.

102. The evidence and charge were submitted to a jury, which was instructed on the legal standard of proof beyond a reasonable doubt.

103. At least one juror though Plaintiff was guilty beyond a reasonable doubt for violating Section 38.15 of the Texas Penal Code on December 21, 2021.

104. The Court finds the existence of at least one juror believing Plaintiff was guilty beyond a reasonable doubt of interfering with duties of a public servant at trial supports its conclusion that Lt. Rollins reasonably believed Plaintiff's failure to immediately comply with the relocation order established probable cause to arrest Plaintiff under Section 38.15 of the Texas Penal Code.

105. To the extent any of the foregoing findings of fact are deemed conclusions of law, they should be treated as such.

## Conclusions of Law

1. In connection with the July 12, 2021 incident, Plaintiff had the burden of proof by a preponderance of the evidence with respect to his claim for: (i) $98,227.79 in purported "lost profits," (ii) $30,000 in purported reputation, humiliation, and mental anguish damages, and (iii) $500 in punitive damages against Sheriff Fagan.

2. "Federal standards govern the determination of damages under the federal civil rights statutes." *Garrick v. City and County of Denver*, 652 F.2d 969, 971 (10th Cir. 1981). Accordingly, damage awards for lost future profits may not be based upon mere speculation. *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 541 (10th Cir. 1987); *K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1160 (10th Cir. 1985).

3. Evidence of lost revenue is not necessarily evidence of lost profits. *See e.g., Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 779-80 (5th Cir. 2017) (noting if a party aims to recover lost profits, it must show its net profits, not gross profits.).

4. At trial, Plaintiff introduced evidence of "lost revenue" rather than "lost profits."

5. Plaintiff did not offer any testimony, documentary evidence, or expert analysis in connection with overhead expenses or other direct and indirect costs necessary to determine net profitability.

6. Plaintiff did not offer any testimony, documentary evidence, or expert analysis regarding historical profit margins, contribution margins, or any consistent ratio between revenue and profit.

7. The only evidence offered in connection with "lost profits" was generalized, speculative, and lacked foundation in Plaintiff's accounting records or industry standards.

8. The Court finds that Plaintiff's claimed lost profits are too speculative and lack a sufficient evidentiary foundation to support an award of lost profits.

9. With respect to his claim for reputation and humiliation damages, Plaintiff presented apparent social media posts allegedly made by third parties.

11

10. Plaintiff failed to call as witnesses the individuals who authored the social media posts, nor did he offer any testimony or evidence verifying the authenticity or context of these posts.

11. Plaintiff failed to present any live testimony from third parties attesting to a diminished view of Plaintiff's character, standing in the community, or reputation following the July 12, 2021 incident.

12. Plaintiff failed to offer any credible evidence demonstrating that his reputation was actually harmed or that he suffered humiliation beyond his own subjective belief.

13. The Court finds, standing alone, the social media posts are insufficient to support a finding of reputational or humiliation damages

14. With respect to this claim for mental anguish damages, Plaintiff testified that his exclusion from the July 12, 2021 press conference caused him fear and chilled his recoding of police activity.

15. Evidence, however, revealed that since the July 12, 2021 incident, Plaintiff continues to openly record and photograph Fort Bend County Sheriff's deputies including Deputy Ricky Rodriguez, Lieutenant Taylor Rollins, and Sheriff Eric Fagan, contradicting his claim.

16. Deputy Ricky Rodriguez testified that Plaintiff recently recorded police activity during a murder investigation and was allowed to stage with other members of the mainstream media, was granted the same access as other members of the mainstream media, and was otherwise treated identical to other members of the mainstream media.

17. Plaintiff testified that he has never been told by any Fort Bend County Sheriff's deputy that he was not allowed to record police activity or to stop recording police activity at a scene.

18. Plaintiff presented no medical or expert testimony in connection with his claim for mental anguish damages.

19. Plaintiff presented no corroborating testimony in connection with his claim for mental anguish damages.

20. Nevertheless, the Court finds that Plaintiff is entitled to recover mental anguish damages from Sheriff Fagan and the County in connection with the July 12, 2021 incident in the amont of FIFTEEN THOUSAND AND NO/100 DOLLARS ($15,000.00).

21. With respect to his claim for punitive damages, Sheriff Fagan testified under oath that his actions on July 12, 2021 were in error and expressed genuine remorse for his actions.

22. Sheriff Fagan further testified that he has taken affirmative steps to ensure that his actions on July 12, 2021 are not repeated by himself and anyone in his department.

23. Sheriff Fagan testified that Plaintiff has been included in the Fort Bend County Sheriff's Office media distribution list.

24. Sheriff Fagan testified he instructed every patrol deputy at roll call to allow the public to record police activity unimpeded so long as the recoding activity does not interfere with the deputy's constitutional duty as peace officers to protect and serve the public. This testimony was corroborated by Deputy Ricky Rodriguez's and Lt. Rollins' testimony.

25. Sheriff Fagan testified that he recognizes Plaintiff, a citizen journalist, as a member of the media and treats him no differently than representatives of traditional mainstream media outlets.

26. Sheriff Fagan's expressions of remorse and commitment to improvement were credible and consistent with his actions since July 12, 2021.

27. There was no evidence presented indicating that Sheriff Fagan has engaged in conduct similar to that on July 12, 2021, nor was there any indication that Sheriff Fagan engaged in past misconduct similar to that on July 12, 2021.

28. There was no evidence presented indicating that any Fort Bend County Sheriff's deputy has engaged in conduct similar to that on July 12, 2021, nor was there any indication that any Fort Bend County Sheriff's deputy engaged in past misconduct similar to that on July 12, 2021.

29. The evidence reflects that Sheriff Fagan's actions were not malicious or undertaken with conscious indifference for the rights of others, and he has taken responsibility for his behavior.

30. The Court finds that the Sheriff Fagan's remorse and corrective measures weigh against an award of punitive damages in this case.

31. "It goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations." *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012). It follows then, "[w]hile an officer surely cannot issue a 'move on' order to a person *because* he is recording, the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs." *Id*. This means, "a command that bystanders disperse — that would incidentally impact an individual's exercise of the First Amendment right to film" is lawful if given for legitimate safety concerns. Gericke v. Begin, 753 F.3d 1, 8 (1st Cir. 2014).

32. On December 21, 2021, immediately upon arrival, Lt. Rollins ordered all non-law enforcement personnel on scene he observed to relocate across the street.

33. The Court finds that Lt. Rollins' order to all bystanders he observed on scene to relocate across the street was issued in the interest of maintaining public safety, preserving the integrity of the scene, and allowing deputies to carry out their duties without obstruction.

34. The order was not specifically directed at Plaintiff because he was a citizen journalist or because he was recording police activity. The order applied to all non-law enforcement personnel uniformly.

35. The Plaintiff, a citizen journalist, was treated no differently than other members of the public.

36. No competent, credible, or reliable evidence was presented indicating that Lt. Rollins singled out Plaintiff based on his status as a citizen journalist, his recording activity, the content of his recordings, or his viewpoint.

37. Lt. Rollins' actions were consistent with standard lawful crowd control measures and did not involve selective enforcement or content-based discrimination.

38. The Court finds that Lt. Rollins' order to relocate across the street was neutral, lawful, and reasonably applied to all bystanders he observed on the scene and was issued in the interest of maintaining public safety, preserving the integrity of the scene, and allowing deputies to carry out their duties without obstruction.

39. Moreover, Lt. Rollins is vested with qualified immunity. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) ("The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal."). Once raised as a defense, the plaintiff has the burden to demonstrate that qualified immunity should be pierced. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). The plaintiff "must show: (i) that the official violated a statutory or constitutional right, and (ii) that the right was clearly established at the time of the challenged conduct." *Morgan*, 659 F.3d at 371 (quotation marks omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

40. Plaintiff failed to overcome the "high hurdle" required to strip Lt. Rollins of his qualified immunity defense given that Plaintiff failed to cite any clearly established authority which stands for the proposition that: (i) a peace officer's order to ***all bystanders*** to relocate for safety concerns is unlawful even though some of those bystanders may be recording police activity or (ii) an individual recording police activity has a right to remain on a scene a peace officer reasonably believes is unsafe.

41. Accordingly, Lt. Rollis is entitled to qualified immunity in connection with Plaintiff's allegation of unlawful arrest on December 21, 2021.

42. Plaintiff shall TAKE NOTHING on his claim that Lt. Rollins order to relocate across the street on December 21, 2021 was unconstitutional.

43. In connection with Plaintiff's retaliatory arrest claim, "there must not even 'arguably' be probable cause [supporting M. Pulliam's] … arrest for [Lt. Rollins' qualified] immunity to be lost." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001) (quoting *Hart v. O'Brien*, 127 F.3d 424, 444 (5th Cir. 1997)) (emphasis added); *see also Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656 (5th Cir. 2004) ("In sum, Haggerty "must clear a significant hurdle to defeat [William's] qualified immunity. (citations omitted). '[T]here must not even arguably be probable cause for the … arrest for the immunity to be lost.'" (citations omitted)).

44. Additionally, the probable cause inquiry is not whether, with the benefit of hindsight, officers have determined that a crime was committed — it is whether a reasonable officer could believe that a crime had been or was being committed at the time of arrest. *Terrell v. Allgrunn*, 114 F.4th 428, 434 (5th Cir. 2024). And qualified immunity applies even more broadly, in instances where police officers "reasonably but mistakenly concluded that probable cause is present." *Bailey v. Ramos*, 125 F.4th 667, 682 (5th Cir. 2025) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

45. "'Texas courts have found that failure to comply with an officer's instructions … violates Texas Penal Code § 38.15 and is not protected speech. Specifically, several courts have affirmed convictions of defendants who failed to comply with an officer's instruction to move away from a crime scene.'" *Bailey,* 125 F.4th at 676 (quoting *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (citing *Duncantell v. State*, 230 S.W.3d 835, 842 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) & *Key v. State*, 88 S.W.3d 672, 676 (Tex. App.—Tyler 2002, pet. ref'd))).

46. Moreover, earlier this year, when a citizen journalist failed to "immediately comply" with an officer's instructions to "stay back" at a crime scene, the Fifth Circuit held the officer was entitled to qualified immunity in connection with an unlawful arrest claim. *Bailey*, 125 F.4th at 678.

47. The Court finds that Lt. Rollins reasonably believed Plaintiff's failure to immediately comply with the relocation order established probable cause to arrest Plaintiff under Section 38.15 of the Texas Penal Code. *See id*.

48. Accordingly, Lt. Rollins is entitled to qualified immunity in connection with Plaintiff's allegation of unlawful arrest on December 21, 2021.

49. "[I]n the context of retaliatory arrest …, to prove causation, a plaintiff generally must show the officer lacked probable cause to make the arrest." *Degenhardt v. Bintliff*, 117 F.4th 747, 758 (5th Cir. 2024). "Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves v. Bartlett*, 587 U.S. 391, 406 (2019).

50. In order to qualify for the so-called "*Nieves* exception," "a plaintiff [must] present[ ] objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id*. "It is important to keep in mind that the *Nieves* exception is extremely narrow and should not be used 'as a crowbar for overturning the core of [the *Nieves* decision] — namely, that the existence of probable cause either always or nearly always precludes a suit [for retaliatory arrest].'" *Rahdar v. City of Friendswood*, No. 3:22-CV-00280, 2025 WL 918539, at *6 (S.D. Tex. Mar. 14, 2025) (Edison, A.), report and recommendation adopted, No. 3:22-CV-280, 2025 WL 1158552 (S.D. Tex. Apr. 21, 2025) (Brown, J.) (quoting *Gonzalez v. Trevino*, 602 U.S. 653, 667 (2024) (Alito, J. concurring)).

51. At trial, Plaintiff failed to show, with strong affirmative evidence, that other individuals who engaged in comparable behavior were typically not arrested.

52. Accordingly, Plaintiff shall TAKE NOTHING on his claim that Lt. Rollins arrest on December 21, 2021 was in retaliation for recording police activity.

53. "The Fifth Circuit has clearly held that injunctive and declaratory relief are not available to remedy a past ham." *Johnson v. Stephens*, No. CV 4:17-3578, 2020 WL 12442431, at *2 (S.D. Tex. Oct. 30, 2020) (Hanks, G.) (citing *Stringer v. Whitley*, 942 F.3d 715, 720-21 (5th Cir. 2019). Instead, a plaintiff must demonstrate a continuing injury or a threatened future injury. *Id*.

54. At trial, evidence established Plaintiff continues to openly record and photograph Fort Bend County Sheriff's deputies including Deputy Ricky Rodriguez, Lieutenant Taylor Rollins, and Sheriff Eric Fagan.

55. Deputy Ricky Rodriguez testified that Plaintiff recently recorded police activity during a murder investigation and was allowed to stage with other members of the mainstream media, was granted the same access as other members of the mainstream media, and was otherwise treated identical to other members of the mainstream media.

56. Plaintiff testified that he has never been told by any Fort Bend County Sheriff's deputy that he was not allowed to record police activity or to stop recording police activity at a scene.

57. Sheriff Fagan also testified that he has taken affirmative steps to ensure that his actions on July 12, 2021 are not repeated by himself and anyone in his department.

58. Sheriff Fagan testified that Plaintiff has been included in the Fort Bend County Sheriff's Office media distribution list.

59. Sheriff Fagan testified he instructed every patrol deputy at roll call to allow the public to record police activity unimpeded so long as the recoding activity does not interfere with the deputy's constitutional duty as peace officers to protect and serve the public. This testimony was corroborated by Deputy Ricky Rodriguez's and Lt. Rollins' testimony.

60. Sheriff Fagan testified that he recognizes Plaintiff, a citizen journalist, as a member of the media and treats him no differently than representatives of traditional mainstream media outlets.

61. Sheriff Fagan's expressions of remorse and commitment to improvement were credible and consistent with his actions since July 12, 2021.

62. There was no evidence presented indicating that Sheriff Fagan has engaged in conduct similar to that on July 12, 2021, nor was there any indication that Sheriff Fagan engaged in past misconduct similar to that on July 12, 2021.

63. There was no evidence presented indicating that any Fort Bend County Sheriff's deputy has engaged in conduct similar to that on July 12, 2021, nor was there any indication that any Fort Bend County Sheriff's deputy engaged in past misconduct similar to that on July 12, 2021.

64. Accordingly, this Court finds that Plaintiff has not proven, by a preponderance of the evidence, a continuing injury or a threatened future injury.

65. Plaintiff's request for injunctive relief is therefore DENIED.

66. To the extent any of the foregoing conclusions of law are deemed findings of fact, they should be treated as such.

    Respectfully submitted,

    Bridgette Smith-Lawson
    Fort Bend County Attorney

    By: */s/ Kevin T. Hedges*
        Kevin T. Hedges
        Attorney-in-Charge
        State Bar No. 09370100
        Federal ID No. 9939
        *kevin.hedges@fortbendcountytx.gov*
        Rolf F. Krueger
        State Bar No. 24080990
        Federal ID No. 3041756
        *rolf.krueger@fortbendcountytx.gov*
        Fort Bend County Attorney's Office
        401 Jackson Street, 3rd Floor
        Richmond, Texas 77469
        (281) 341-4555
        (281) 341-4557 (Fax)

    ATTORNEYS FOR DEFENDANTS
    FORT BEND COUNTY, TEXAS, SHERIFF
    ERIC FAGAN, AND OFFICER TAYLOR
    ROLLINS

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing instrument was served on the parties and counsel identified on the attached service list by electronic service on this the 17th day of July, 2025.

                                              */s/ Kevin T. Hedges*
                                              Kevin T. Hedges

## SERVICE LIST

Christen M. Hebert
Jeffrey T. Rowes
Michael Pena
Institute for Justice
816 Congress Avenue, Suite 970
Austin, Texas 78701
*chebert@ij.org*
*jrowes@ij.org*
*mpena@ij.org*