**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JUSTIN PULLIAM | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO.: 4:22-CV-4210 |
| | § | |
| | § | |
| FORT BEND COUNTY, TEXAS, ET. | § | |
| AL., | § | |

**LT. TAYLOR ROLLINS' POST TRIAL BRIEF
REGARDING HIS ENTITLEMENT TO QUALIFIED IMMUNITY**

"The qualified immunity doctrine, and its clearly established law requirement, prohibits [courts] from 'second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.'" *Dilley v. Domingue*, 118 F.4th 671, 676 (5th Cir. 2024) (citing *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)). "And it prohibits [courts] from second-guessing an officer 'with the 20/20 vision of hindsight.'" *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Despite these directives, however, Plaintiff Justin Pulliam ("Mr. Pulliam") asked the Court to do just that during trial. He argued this Court should strip Lt. Taylor Rollins ("Lt. Rollins") of his qualified immunity defense because his calm demeanor on December 21, 2021 did not suggest he reasonably perceived any danger. The argument, however, requires this Court to ignore the Supreme Court's guidelines that prohibit evaluation of Lt. Rollins' actions "[w]ith the benefit of hindsight and calm deliberation" rather than "from the proper perspective of a reasonable police officer forced to make a split-second decision in response to a rapidly unfolding chain of events that culminated with," in this case, Edwin Kraft being ***safely*** taken into custody despite pointing a rifle at three peace officers. *Ryburn*, 565 U.S. at 477. Viewed from the correct perspective, it is clear Lt. Rollins is entitled to qualified immunity.

## LT. ROLLINS IS VESTED WITH QUALIFIED IMMUNITY

The doctrine of qualified immunity protects government officers – like Lt. Rollins – from civil liability in their individual capacities if their conduct does not violate clearly established federal statutory or constitutional law of which a reasonable person would have known. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) ("The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal.").  Once raised as a defense, the plaintiff has the burden to demonstrate that qualified immunity should be pierced. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).  This inquiry requires a two-prong analysis, in which the court determines: (i) whether the official violated a statutory or constitutional right, and (ii) whether the unlawfulness of the official's conduct was "clearly established" at that time. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

A right is "clearly established" only where pre-existing law "dictate[s], that is truly compel[s] (not just suggest[s] or allow[s] or raise[s] a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in these circumstances." *Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012).  Even if a defendant's conduct violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity unless "***all reasonable officials*** in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights." *Carroll v. Ellington*, 800 F. 3d 154, 169 (5th Cir. 2015) (emphasis added).

The burden is on the plaintiff to demonstrate the inapplicability of the qualified immunity defense. *Id*.  The plaintiff "must show: (i) that the official violated a statutory or constitutional right, and (ii) that the right was clearly established at the time of the challenged conduct." *Morgan*,

659 F.3d at 371 (quotation marks omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

## LT. ROLLINS WAS WARNED ABOUT EDWIN KRAFT AND THE KRAFT COUNTRY STORE PRIOR TO DECEMBER 21, 2021

At trial, evidence established – conclusively – that Lt. Rollins was aware, by virtue of numerous be-on-the-lookout warnings ("BOLOs") and officer safety warnings, that Edwin Kraft: (i) suffered from schizophrenia and bipolar disorder, (ii) used methamphetamine, (iii) was violent and (iv) had access to, and was often in possession of, ***firearms***.[1] Lt. Rollins was also warned any call for service to the Kraft Country Store demanded caution.[2] Specifically, the BOLOs and officer safety warnings advised:

- On **April 10, 2020 (620-days before December 21, 2021)**, Edwin Kraft "made threats to kill a law enforcement officer," was known to use drugs such as methamphetamine, and "***carry firearms with him***."[3]

  Lt. Rollins also received information that Edwin Kraft (i) made statements of ***being watched*** and an ex-girlfriend using underground vault to get his money, (ii) made homicidal threats of killing persons he thought were ***watching him***, and (iii) made threats to kill a female who he stated lived across the river in Brazoria County.[4]

- On **April 27, 2020 (603-days before December 21, 2021)**, Edwin Kraft (i) made verbal threats to shoot and kill the next police officer that tries to arrest him or take him to the hospital, (ii) is "***known to be in possession of firearms that he keeps at his residence in Needville, TX and in his vehicle***," (iii) is "mentally unstable and known to abuse narcotics."[5]

  Law enforcement personnel, including Lt. Rollins, were also warned to "use ***extreme caution*** if [Edwin] Kraft is encountered."[6]

---

[1] *See* DX-49.

[2] *See id*.

[3] *Id*. at FBC001372. (emphasis added).

[4] *Id*.

[5] *Id*. at FBC001375. (emphasis added).

[6] *Id*. (emphasis added).

- On **October 7, 2021 (75-days before December 21, 2021)**, Edwin Kraft had been seen on a family member's property behind the Kraft Country Store carrying a ***shotgun***.[7] Fort Bend County Sheriff's deputies located and detained Edwin Kraft after giving "several orders to put down the ***shotgun***."[8]

  Lt. Rollins was further warned that Edwin Kraft (i) threatened to ***shoot and kill*** any officer who tries to arrest him or take him to a hospital, (ii) suffers from schizophrenia and bipolar disorder, (iii) uses methamphetamine, and (iv) is known to "***carry firearms***."[9]    As a result, a "CAD Flag" was entered for the Kraft Country Store requiring at least two deputies to respond to any call for service at the location.

- On **November 1, 2021 (50-days before December 21, 2021)**, Edwin Kraft was bonding out of jail and lives in the trailer behind the Kraft Country Store.[10]

- On **November 28, 2021 (only 23-days before December 21, 2021)**, Edwin Kraft made a ***verbal threat over the telephone***, was again abusing methamphetamine, and behaving abnormally.[11]

Lt. Rollins had reliable, trustworthy information that he faced significant danger on December 21, 2021.[12]  This information was reinforced by the reports Lt. Rollins received on the morning of December 21, 2021.[13]  Indeed, Lt. Rollins was informed prior to arrival on scene that Edwin Kraft: (i) was in a psychotic state, (ii) made homicidal threats to his mother, (iii) forced his mother to sleep outside the night prior because he "he didn't want to kill her or hurt her," and (iv) was potentially armed with a machete.[14]  No reasonable officer would have – or should have – ignored those risks.

---

[7] *Id*. at FBC001365.

[8] *Id*. (emphasis added).

[9] *Id*. at FBC001366. (emphasis added).

[10] *Id*. at FBC001364.

[11] *Id*. at FBC001363.

[12] *See* DX-49.

[13] *See* DX-16.

[14] *Id*.

### QUALIFIED IMMUNITY SHIELDS LT. ROLLINS
### IN CONNECTION WITH HIS DECEMBER 21, 2021 ORDER

**"I need <u>y'all</u> [not just Mr. Pulliam] to go ahead and go across the street please."** [15]

On December 21, 2021, Lt. Rollins didn't just order Mr. Pulliam, the only individual on scene recording police activity, to relocate across the street for safety concerns — he ordered ***everyone he saw*** to relocate across the street for safety reasons. [16]



This fact is undisputed.

And, because it was directed at everyone and not just Mr. Pulliam, the order was lawful even though Mr. Pulliam happened to be recording police activity.  *See Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012) ("While an officer surely cannot issue a 'move on' order to a person *because* he is recording, the police may order ***bystanders to disperse***

---

[15] PX-52 at 00:04:18. (emphasis added).

[16] *See id*.

for reasons related to public safety and order and other legitimate law enforcement needs.") (emphasis added); *see also Gericke v. Begin,* 753 F.3d 1, 8 (1st Cir. 2014) ("The circumstances of some traffic stops, particularly when the detained individual is armed, might justify a safety measure—for example ***a command that bystanders disperse***—that would incidentally impact an individual's exercise of the First Amendment right to film. ***Such an order, even when directed at a person who is filming, may be appropriate for legitimate safety reasons***.") (emphasis added).

Given that Lt. Rollins order for "y'all" – not just Mr. Pulliam – to relocate across the street was lawful, he is entitled to qualified immunity because no constitutional violation occurred. *Wesby*, 138 S. Ct. at 589. Lt. Rollins' entitlement to qualified immunity is further cemented by the fact that there is no clearly established authority holding that a peace officer's order to ***all bystanders*** to relocate for safety concerns is unlawful even though some of those bystanders may be recording police activity.[17] *Morgan*, 659 F.3d at 371. In fact, there is clearly established authority which holds the opposite.[18] *Alvarez*, 679 F.3d at 607; *Gericke,* 753, F.3d at 8. Moreover, there is no clearly established authority holding that an individual recording police activity has a right to remain on a scene a peace officer reasonably believes is unsafe. *Morgan*, 659 F.3d at 371. Mr. Pulliam even agreed with this principle at trial. Lt. Rollins is, therefore, entitled to qualified immunity in connection with his December 21, 2021 order. *See id*.

---

[17] *See supra* at 5.

[18] *See id*.

### QUALIFIED IMMUNITY SHIELDS LT. ROLLINS
### IN CONNECTION WITH HIS DECEMBER 21, 2021 ARREST

#### "Must 'not even <u>arguably</u> be probable cause
#### for the … arrest for [qualified immunity] to be lost.'"

"[T]here must not even '*arguably*' be probable cause [supporting M. Pulliam's] … arrest for [Lt. Rollins' qualified] immunity to be lost."  *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001) (quoting *Hart v. O'Brien*, 127 F.3d 424, 444 (5th Cir. 1997)) (emphasis added); *see also Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656 (5th Cir. 2004) ("In sum, Haggerty "must clear a significant hurdle to defeat [William's] qualified immunity.  (citations omitted).  '[T]here must not even arguably be probable cause for the … arrest for the immunity to be lost.'" (citations omitted)).

Additionally, the probable cause inquiry is not whether, with the benefit of hindsight, officers have determined that a crime was committed — it is whether a reasonable officer could believe that a crime had been or was being committed at the time of arrest.  *Terrell v. Allgrunn*, 114 F.4th 428, 434 (5th Cir. 2024).   And qualified immunity applies even more broadly, in instances where police officers "reasonably but mistakenly concluded that probable cause is present."  *Bailey v. Ramos*, 125 F.4th 667, 682 (5th Cir. 2025) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

#### Failure to comply with a peace officer's instructions
#### at a scene establishes probable cause under Section 38.15

"'Texas courts have found that failure to comply with an officer's instructions … violates Texas Penal Code § 38.15 and is not protected speech.  Specifically, several courts have affirmed convictions of defendants who failed to comply with an officer's instruction to move away from a crime scene.'"  *Bailey,* 125 F.4th at 676 (quoting *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (citing *Duncantell v. State*, 230 S.W.3d 835, 842 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) & *Key v. State*, 88 S.W.3d 672, 676 (Tex. App.—Tyler 2002, pet. ref'd))).

**Failure to "immediately comply" with an officer's instructions
at a scene establishes entitlement to qualified immunity**

Moreover, earlier this year, when a citizen journalist failed to "immediately comply" with an officer's instructions to "stay back" at a crime scene, the Fifth Circuit held the officer was entitled to qualified immunity in connection with an unlawful arrest claim. *Bailey*, 125 F.4th at 678. The Court explained:

> Similarly, here, when [plaintiff] didn't ***immediately move away*** with Miller, [defendant] could reasonably have believed that [plaintiff], … was ignoring officer instructions to stay away from the crime scene. Even if Bailey was complying with those instructions, [defendant], … could have reasonably but mistakenly believed that [plaintiff's] hesitation was contrary to his instructions and interfered with a public duty.

*Id*. (emphasis added).

**At the very least, Mr. Pulliam did not immediately comply with
Lt. Rollins' instruction to relocate across the street**

At trial, the evidence established, at the very least, Mr. Pulliam did not "immediately comply" with Lt. Rollins' instructions to relocate across the street — like the plaintiff in *Bailey*.[19]



[19] PX-51 at 00:05:17

In fact, Mr. Pulliam explained on the scene: "if [Lt. Rollins' instruction] was not for safety, [he] already had permission form the landowner … to stay[ ]" and did not have to leave.[20] Accordingly, because Mr. Pulliam didn't – at a minimum – immediately comply with Lt. Rollins order to relocate across the street, Lt. Rollins is entitled to qualified immunity in connection with Mr. Pulliam's retaliatory arrest claim.  *See id*.

**Even though Lt. Rollins did not owe him one,<br>he provided Mr. Pulliam an explanation for his order**

Mr. Pulliam seemingly argued at trial that Lt. Rollins was required to explain the reasoning behind his instruction to relocate across the street as a prerequisite for compliance and arrest. There is, however, no clearly established authority which stands for the proposition that a peace officer is required to explain the reasoning behind his instructions to a citizen journalist as a condition precedent for compliance and arrest under Section 38.15.  *Morgan*, 659 F.3d at 371.  Lt. Rollins is therefore entitled to qualified immunity despite this contention.

However, if an explanation was a condition precedent for compliance and arrest, Lt. Rollins provided one to Mr. Pulliam.[21]  Indeed, Lt. Rollins explained to Mr. Pulliam safety was the reason for his instruction to relocate across the street:

| | |
|---|---|
| **Lt. Rollins:** | Across the street. |
| **Mr. Pulliam:** | Well, hold on, ***if its not for safety***, I already have permission from the landowner?   I have her permission to stay. |
| **Lt. Rollins:** | ***It is for safety, it is for safety***.[22] |

---

[20] PX-52 at 00:04:43-00:04:47.

[21] *Id*. at 00:04:41-00:05:00.

[22] *See id*.

## The *Nieves* exception is inapplicable

"[I]n the context of retaliatory arrest …, to prove causation, a plaintiff generally must show the officer lacked probable cause to make the arrest." *Degenhardt v. Bintliff*, 117 F.4th 747, 758 (5th Cir. 2024). "Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves v. Bartlett*, 587 U.S. 391, 406 (2019).

In order to qualify for the so-called "*Nieves* exception," "a plaintiff [must] present[ ] objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id*. "It is important to keep in mind that the *Nieves* exception is extremely narrow and should not be used 'as a crowbar for overturning the core of [the *Nieves* decision] — namely, that the existence of probable cause either always or nearly always precludes a suit [for retaliatory arrest].'" *Rahdar v. City of Friendswood*, No. 3:22-CV-00280, 2025 WL 918539, at *6 (S.D. Tex. Mar. 14, 2025) (Edison, A.), report and recommendation adopted, No. 3:22-CV-280, 2025 WL 1158552 (S.D. Tex. Apr. 21, 2025) (Brown, J.) (quoting *Gonzalez v. Trevino*, 602 U.S. 653, 667 (2024) (Alito, J. concurring)).

At trial, the evidence presented by Mr. Pulliam failed to establish other similarly situated individuals who engaged in the sort of conduct he did on December 21, 2021 typically do not get arrested.[23] Instead, the evidence revealed the opposite — similarly situated individuals engaged in conduct similar to his on December 21, 2021 often do get arrested.[24] For example:

---

[23] *See* PX-12.

[24] *See id*.

- **20-6308 (PX-12 pp. 1-11):** Hailey Ruiz was arrested under Section 38.15 after she refused to exit her vehicle following a traffic stop despite being ordered to do so by a peace officer.[25]

  "[The Officer] then asked [Hailey Ruiz] one last time if she was going to step out of the vehicle and she replied 'No'".[26]

- **20-9666 (PX-12 pp. 12-21):** Motola Gbaja-Biamila was arrested under Section 38.15 when she refused to speak with, and answer, a peace officer's questions and approached him in an aggressive manor.[27]

  "[The Officer] attempted to speak with Motola Gbaja-Biamila several more time to gather information but Morola Gbaja-Biamila refused and walked towards me in an aggressive manor, with her fists balled."[28]

- **20-11478 (PX-12 pp. 22-29):** Kevin Baylor was arrested under Section 38.15 after he refused to get up from his bed and place clothing on so officers could interview him and instead shouted and took an aggressive stance.[29]

  "Kevin Baylor continue[d] to ignore [the Officer] and shout aggressively. [The Officer] then made the decision to detain Kevin Baylor pending investigation."[30]

- **20-19091 (PX-12 pp. 30-40):** Eduardo Bareng was arrested under Section 38.15 when he started his vehicle despite being instructed not to do so, refused to exit his vehicle, and refused to provide information when requested.[31]

  "Eduardo then went to get into the vehicle and I asked him not to start the vehicle but to get out and hand me his driver's license. Eduardo stuck the keys into the ignition and attempted to start the car…. I attempted to get Eduardo out of the vehicle but he refused…. Eduardo only gave me his first name and refused to give any other information until he spoke with a 'Captain.'"[32]

---

[25] *Id*. at 4-5, 10.

[26] *Id*. at 4-5.

[27] *Id*. at 14.

[28] *Id*.

[29] *Id*. at 24-25.

[30] *Id*.

[31] *Id*. at 34.

[32] *Id*.

- **20-27953 (PX-12 pp. 41-56):** Michael White was arrested under Section 38.15 for failing to comply with a peace officer's numerous commands.[33]

  "Michael White still continually refusing to follow instructions…. I gave repeated commands for Michael White to disconnect the call with 9-1-1 and steps towards the driveway (due to the verbal disturbance escalating the situation).  Michael White continued to disregard all instructions, and shifted his body back towards the front door to re-enter the residence, …."[34]

- **20-35341 (PX-12 pp. 76-83):** Joy Guyton was arrested under Section 38.15 after she refused to exit the residence or go to another room to deescalate the situation, refused to identify herself to deputies, refused to complete any Domestic Violence or Request for Non-prosecution documents, and refused to allow deputies to photograph the room.[35]

- **20-37117 (PX-12 pp. 84-97):** Leory Diggs was arrested under Section 38.15 after he "refused multiple commands to exit the apartment and became belligerent with Deputies, balling up his fists."[36]

- **20-37224 (PX-12 pp. 98-111):** Lawrence A. Nemecek was arrested under Section 38.15 after he stood between officers and an arrestee and refused to move out of the way.[37]

- **21-27 (PX-12 pp. 112-116):** Carlos Zepeda was arrested under Section 38.15 when he "refused to contact his brother" and "refused to contact the homeowner … and became uncooperative when asked who's residence it was."[38]

- **21-3569 (PX-12 pp. 117-133):** Noe Ventura was arrested under Section 38.15 when he refused to provide officers with an inhaler and opened the door of a patrol vehicle despite being ordered not to do so.[39]

  "I told Noe Ventura to go get her inhaler from inside however he responded with "No, I will bring her inside to it."  I once more instructed Noe Ventura to go inside and provide her inhaler to me.  Noe Ventura disregarded my request and approached the driver side door off Deputy Green's patrol vehicle and reached for the passenger door. I ordered Noe Ventura not to open the door.  Noe Ventura opened the door to Deputy

---

[33] *Id*. at 46.

[34] *Id*.

[35] *Id*. at 79.

[36] *Id*. at 88.

[37] *Id*. at 104.

[38] *Id*. at 113.

[39] *Id*. at 119.

Green's vehicle, grabbed hold of [victim], and removed her from the backseat of the patrol vehicle."

- **21-6173 (PX-12 pp. 134-154):** Davin Smith arrested under Section 38.15 when he refused to move and step away from a witness a peace officer was attempting to interview.[40]

- **21-22349 (PX-12 pp. 179-199):** Emily Stewart arrested under Section 38.15 when she failed to back away from a suspect.

  "I advised Emily Stewart to back away or she would be placed in custody for Interfering with Public Duties, …. I again advised Emily Stewart to back away, to which she did not."[41]

- **21-23201 (PX-12 pp. 200-208):** Dylan Hill was arrested under Section 38.15 when he, contrary to an officer's instructions "continued to walk away from [officers], …. [R]efused to identify himself. [W]as asked multiple times for his name and date of birth. "[42]

- **21-30427 (PX-12 pp. 209-215):** Devontay Hughes was arrested under Section 38.15 when he failed to "get back behind the police line" despite being ordered to do so.[43]

- **21-33315 (PX-12 pp. 216-228):** Joe Crawford was arrested under Section 38.15 when he "failed to leave the location" despite being instructed to do so.[44]

- **21-39688 (PX-12 pp. 229-242):** Benjamin Sanchez was arrested under Section 38.15 when he failed to exit his vehicle after being told to do so and failing to walk to a safe location.[45]

  "At that time, due to the defensive and aggressive behavior being displayed by Benjamin Sanchez, I ordered Benjamin Sanchez out of the vehicle and requested for an additional unit to make my location. After a brief argument, Benjamin Sanchez got out of the vehicle. Benjamin Sanchez would not walk past the back of his vehicle and due to his aggressive tone and unwillingness to comply with my initial lawful commands to exit the vehicle, I detained him in handcuffs.[46]

---

[40] *Id*. at 141.

[41] *Id*. at 186.

[42] *Id*. at 204, 206.

[43] *Id*. at 211.

[44] *Id*. at 220, 223-24.

[45] *Id*. at 236.

[46] *Id*.

- **21-41374 (PX-12 pp. 243-251):** Arjun Goswami was arrested under Section 38.15 after failing to exit a residence after being instructed to do so.[47]

  "Arjun Goswami was still advised to exit the residence so [the officer] would conduct [his] investigation and interview the parties separately…. Arjun Goswqani was instructed to exit the residence once again, but refused to exit and took a step away from the front door."[48]

- **21-46870 (PX-12 pp. 266-278):** Rafael Baretto was arrested under Section 38.15 after he failed to "comply with [the officer's] lawful orders of placing his hands behind his back."[49]

- **21-50464 (PX-12 pp. 279-287):** Latisha Brown was arrested under Section 38.15 when she closed a door despite being ordered not to, refused to speak with officers, and impeded a family violence investigation.[50]

- **22-3341 (PX-12 pp. 288-306):** Kenneth Bernard Meadows was arrested under Section 38.15 after he failed to stop walking despite being ordered to do so.[51]

- **22-10788 (PX-12 pp. 307-315):** Antwon Seibert was arrested under Section 38.15 when he failed to comply with an officer's commands while investigating a crime.[52]

  "Antwon Seibert stated he had the right to stand at the front door and listen to what Jaquida Stevens had to say in which [the officer] told him no…. [The officer] advised Antwon Seibert to close the door because [the officer] was not talking to him at the moment. Antwon Seibert stated he did not have to close the door because Jaquida Stevens had called the police."[53]

- **22-12502 (PX-12 pp. 316-323):** Cheyenne Sanchez was arrested under Section 38.15 after she "was told multiple times … to go back upstairs and remain there until [the officers] determined where Joel Bouchereau would be going. Cheyenne Sanchez continued to run down the stairs starting a verbal altercation with Catherine Bouchereau after being told multiple times to stay upstairs."[54]

---

[47] *Id*. at 247.

[48] *ID*.

[49] *Id*. at 270.

[50] *Id*. at 282.

[51] *Id*. at 292, 295.

[52] *Id*. at 310.

[53] *Id*.

[54] *Id*. at 318.

- **22-21083 (PX-12 pp. 324-338):** Javaun Warren was arrested under Section 38.15 after he "was given multiple verbal commands to separate from Kayla Collins at which time he refused to follow Deputy Adams' verbal commands."[55]

  "Javaun Patrick Warren's refusal to follow my instructions, which was hindering my investigation, and due to the close proximity of Kayla Alexander Collins I proceeded to … detain him …."[56]

- **22-23853 (PX-12 pp. 339-346):** Jared Michael Collins was arrested after he failed to comply with orders to stand up.[57]

Notably, none of Mr. Pulliam's comparators involve a suspect like Edwin Kraft — a man law enforcement knew (i) suffered from schizophrenia and bipolar disorder, (ii) used methamphetamine, (iii) was violent and (iv) had access to, and was often in possession of, *firearms*.[58]  Because Mr. Pulliam failed to show, with strong affirmative evidence, that other individuals who engaged in comparable behavior were typically not arrested, his December 21, 2021 arrest does not fall within the *Nieves* exception.

## CONCLUSION

Lt. Rollins is far from a "plainly incompetent" peace officer.  Nor is he a peace officer that "knowingly violates the law."  To the contrary, his leadership on December 21, 2021 resulted in the *safe* apprehension of a man who pointed a rifle at three peace officers.  He is entitled to qualified immunity for his heroic actions on December 21, 2021.

---

[55] *Id*. at 328. 335.

[56] *Id*. at 335.

[57] *Id*. at 341.

[58] *See* DX-49.

Respectfully submitted,

Bridgette Smith-Lawson
Fort Bend County Attorney

By: */s/ Kevin T. Hedges*
    Kevin T. Hedges
    Attorney-in-Charge
    State Bar No. 09370100
    Federal ID No. 9939
    *kevin.hedges@fortbendcountytx.gov*
    Rolf F. Krueger
    State Bar No. 24080990
    Federal ID No. 3041756
    *rolf.krueger@fortbendcountytx.gov*
    Fort Bend County Attorney's Office
    401 Jackson Street, 3rd Floor
    Richmond, Texas 77469
    (281) 341-4555
    (281) 341-4557 (Fax)

    ATTORNEYS FOR DEFENDANTS
    FORT BEND COUNTY, TEXAS, SHERIFF
    ERIC FAGAN, AND OFFICER TAYLOR
    ROLLINS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on the parties and counsel identified on the attached service list by electronic service on this the 17th day of July, 2025.

    */s/ Kevin T. Hedges*
    Kevin T. Hedges

## SERVICE LIST

Christen M. Hebert
Jeffrey T. Rowes
Michael Pena
Institute for Justice
816 Congress Avenue, Suite 970
Austin, Texas 78701
*chebert@ij.org*
*jrowes@ij.org*
*mpena@ij.org*

***Am. Civil Liberties Union of Ill. v. Alvarez***

679 F.3d 583 (7th Cir. 2012)

679 F.3d 583
United States Court of
Appeals, Seventh Circuit.

AMERICAN CIVIL LIBERTIES UNION
OF ILLINOIS, Plaintiff–Appellant,

v.

Anita ALVAREZ, Defendant–Appellee.

No. 11–1286
|
Argued Sept. 13, 2011.
|
Decided May 8, 2012.

**Synopsis**

**Background:** Civil liberties organization filed preenforcement action against State's Attorney, asking for declaratory and injunctive relief barring her from enforcing Illinois eavesdropping statute against organization's "police accountability program," which included a plan to openly make audiovisual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders. The organization moved for a preliminary injunction. The United States District Court for the Northern District of Illinois, Suzanne B. Conlon, J., 2011 WL 66030, denied organization's motion to alter judgment dismissing amended complaint, and denied further leave to amend, and organization appealed.

**Holdings:** The Court of Appeals, Sykes, Circuit Judge, held that:

[1] organization had standing, and

[2] organization had a strong likelihood of success on the merits of its First Amendment claim that Illinois eavesdropping statute was unconstitutional as applied to its planned activities.

Reversed and remanded with instructions.

Posner, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

West Headnotes (13)

**[1]    Civil Rights ⚿ Injunction**

Injunctions protecting First Amendment freedoms are always in the public interest. U.S.C.A. Const.Amend. 1.

56 Cases that cite this headnote

**[2]    Federal Civil Procedure ⚿ In general; injury or interest**

Preenforcement challenges are within Article III; existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper because a probability of future injury counts as "injury" for the purpose of standing. U.S.C.A. Const. Art. 3, § 2, cl. 1.

16 Cases that cite this headnote

**[3]  Constitutional Law** 🔑 **Criminal Law**

To satisfy the injury-in-fact requirement for standing in a preenforcement action, plaintiff must show an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and that there exists a credible threat of prosecution thereunder. U.S.C.A. Const. Art. 3, § 2, cl. 1.

27 Cases that cite this headnote

**[4]  Constitutional Law** 🔑 **Receipt of information or ideas; listeners' rights**

When one person has a First Amendment right to speak, others hold a reciprocal right to receive the speech. U.S.C.A. Const.Amend. 1.

9 Cases that cite this headnote

**[5]  Constitutional Law** 🔑 **Criminal Law**

Advocacy organization's allegations were sufficient to establish a credible threat of prosecution, and therefore had standing to raise First Amendment challenge to Illinois eavesdropping statute, which made it a felony to audio record "all or any part of any conversation" unless all parties to the conversation gave their consent; organization, which planned to openly make audiovisual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders, identified many recent prosecutions against individuals who recorded encounters with on-duty police officers, and prosecutor had not foresworn the possibility of prosecuting the organization or its employees and agents if they audio recorded police officers without consent. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 1; S.H.A. 720 ILCS 5/14–2.

34 Cases that cite this headnote

**[6]  Federal Civil Procedure** 🔑 **In general; injury or interest**

In preenforcement suits, injury need not be certain in order to establish standing. U.S.C.A. Const. Art. 3, § 2, cl. 1.

2 Cases that cite this headnote

**[7]  Federal Courts** 🔑 **Telecommunications**

Although advocacy organization had to establish a credible threat of prosecution in order to have standing to raise First Amendment challenge to Illinois eavesdropping statute, *Younger* abstention did not preclude preenforcement challenge. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 1; S.H.A. 720 ILCS 5/14–2(a)(1).

9 Cases that cite this headnote
More cases on this issue

**[8]    Civil Rights** 🔑 Criminal law enforcement; prisons

Advocacy organization, which planned to openly make audiovisual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders, had a strong likelihood of success on the merits of its First Amendment claim that Illinois eavesdropping statute was unconstitutional as applied to its planned activities, and therefore was entitled to preliminary injunction against statute's enforcement; statute interfered with the gathering and dissemination of information about government officials performing their duties in public, and did not serve the important governmental interest of protecting conversational privacy. U.S.C.A. Const.Amend. 1; S.H.A. 720 ILCS 5/14–2(a)(1).

135 Cases that cite this headnote
More cases on this issue

**[9]    Constitutional Law** 🔑 Particular Issues and Applications in General

Audio recording is entitled to First Amendment protection; act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights

as a corollary of the right to disseminate the resulting recording. U.S.C.A. Const.Amend. 1.

91 Cases that cite this headnote

**[10]    Constitutional Law** 🔑 Right to gather information

**Constitutional Law** 🔑 Government information

First Amendment provides at least some degree of protection for gathering news and information, particularly news and information about the affairs of government. U.S.C.A. Const.Amend. 1.

22 Cases that cite this headnote

**[11]    Constitutional Law** 🔑 Content-Based Regulations or Restrictions

Laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based for purposes of First Amendment analysis; a law is not considered "content based" simply because a court must look at the content of an oral or written statement in order to determine whether a rule of law applies. U.S.C.A. Const.Amend. 1.

10 Cases that cite this headnote

**[12]    Constitutional Law** 🔑 Reasonableness; relationship to governmental interest

In commercial-speech cases, government must establish that the statute challenged under First Amendment directly advances a substantial governmental interest and that the measure is drawn to achieve that interest; intermediate scrutiny in such context requires a "fit" between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable, that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served. U.S.C.A. Const.Amend. 1.

6 Cases that cite this headnote

[13] **Constitutional Law** ☞ Property and Events

Under speech-forum doctrine, a regulatory measure may be permissible under First Amendment as a "time, place, or manner" restriction if it is justified without reference to the content of the regulated speech, narrowly tailored to serve a significant governmental interest, and leaves open ample alternative channels for communication of the information. U.S.C.A. Const.Amend. 1.

14 Cases that cite this headnote

**West Codenotes**

**Validity Called into Doubt**
S.H.A. 720 ILCS 5/14–2(a)(1)

**Attorneys and Law Firms**

**\*585** Richard J. O'Brien (argued), Attorney, Sidley Austin LLP, Chicago, IL, for Plaintiff–Appellant.

James C. Pullos (argued), Paul A. Castiglione, Attorneys, Office of the Cook County States Attorney, Chicago, IL, for Defendant–Appellee.

**\*586** Lucy A. Dalglish, Attorney, Reporters Committee for Freedom of the Press, Arlington, VA, for Amicus Curiae.

Before POSNER, SYKES, and HAMILTON, Circuit Judges.

**Opinion**

SYKES, Circuit Judge.

The Illinois eavesdropping statute makes it a felony to audio record "all or any part of any conversation" unless all parties to the conversation give their consent. 720 ILL. COMP. STAT. 5/14–2(a)(1). The statute covers any oral communication regardless of whether the communication was intended to be private. *Id.* 5/14–1(d). The offense is normally a class 4 felony but is elevated to a class 1 felony—with a possible prison term of four to fifteen years—if one of the recorded individuals is performing duties as a law-enforcement officer. *Id.* 5/14–4(b). Illinois does not prohibit taking silent video of police officers performing their duties in public; turning on a microphone, however, triggers class 1 felony punishment.

American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)

40 Media L. Rep. 1721

The question here is whether the First Amendment prevents Illinois prosecutors from enforcing the eavesdropping statute against people who openly record police officers performing their official duties in public. More specifically, the American Civil Liberties Union of Illinois ("ACLU") challenges the statute as applied to the organization's Chicago-area "police accountability program," which includes a plan to openly make audiovisual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders. Concerned that its videographers would be prosecuted under the eavesdropping statute, the ACLU has not yet implemented the program. Instead, it filed this preenforcement action against Anita Alvarez, the Cook County State's Attorney, asking for declaratory and injunctive relief barring her from enforcing the statute on these facts. The ACLU moved for a preliminary injunction.

Faced with so obvious a test case, the district court proceeded with some skepticism. The judge dismissed the complaint for lack of standing, holding that the ACLU had not sufficiently alleged a threat of prosecution. The ACLU tried again, submitting a new complaint addressing the court's concerns. This time, the judge held that the ACLU had cured the original defect but had "not alleged a cognizable First Amendment injury" because the First Amendment does not protect a "right to audio record." The judge denied leave to amend. The ACLU appealed.

We reverse and remand with instructions to allow the amended complaint and enter a preliminary injunction blocking enforcement of the eavesdropping statute as applied to audio recording of the kind alleged here. The Illinois eavesdropping statute restricts a medium of expression commonly used for the preservation and communication of information and ideas, thus triggering First Amendment scrutiny. Illinois has criminalized the nonconsensual recording of most any oral communication, including recordings of public officials doing the public's business in public and regardless of whether the recording is open or surreptitious. Defending the broad sweep of this statute, the State's Attorney relies on the government's interest in protecting conversational privacy, but that interest is not implicated when police officers are performing their duties in public places and engaging in public communications audible to persons who witness the events. Even under the more lenient intermediate standard of scrutiny applicable to content-neutral burdens on speech, this application of the statute very likely flunks. The Illinois eavesdropping statute restricts far more speech than necessary to protect legitimate privacy interests; as **587** applied to the facts alleged here, it likely violates the First Amendment's free-speech and free-press guarantees.

## I. Background

### A. The Illinois Eavesdropping Law

In 1961 the Illinois General Assembly enacted a law making it a crime to use "an eavesdropping device to hear or record all or part of any oral conversation without the consent of any party thereto." 1961 Ill. Laws 1983. The statute defines "eavesdropping device" as "any device capable of being used to hear or record oral conversation." *Id.* (codified

at 720 ILL. COMP. STAT. 5/14–1(a)); *see also* Celia Guzaldo Gamrath, *A Lawyer's Guide to Eavesdropping in Illinois,* 87 ILL. B.J. 362, 363 (1999) (discussing the history of the Illinois eavesdropping law). The legislature later amended the law to require the consent of "all of the parties" to the conversation. Ill. Pub. Act 79–1159 (1976) (codified at 720 ILL. COMP. STAT. 5/14–2(a)(1)).

In *People v. Beardsley,* 115 Ill.2d 47, 104 Ill.Dec. 789, 503 N.E.2d 346, 349–50 (1986), the Illinois Supreme Court adopted a narrow interpretation of the eavesdropping statute, declaring that audio recordings were prohibited only if the circumstances "entitle [the conversing parties] to believe that the conversation is private and cannot be heard by others who are acting in a lawful manner." In other words, recording a conversation was punishable under the eavesdropping statute *only if* the conversing parties had an "expectation of privacy," though the court remarked that the expectations of privacy protected under the statute were not necessarily "coextensive with those imposed on governmental action by the fourth amendment." *Id.*, 104 Ill.Dec. 789, 503 N.E.2d at 351.

Eight years later the state supreme court reaffirmed its *Beardsley* decision in *People v. Herrington,* 163 Ill.2d 507, 206 Ill.Dec. 705, 645 N.E.2d 957 (1994). The court held that "there can be no expectation of privacy by the declarant where the individual recording the conversation is a party to that conversation." *Id.*, 206 Ill.Dec. 705, 645 N.E.2d at 958. Chief Justice Bilandic dissented, arguing that normal privacy expectations include an

assumption that most conversations are not being recorded. *Id.*, 206 Ill.Dec. 705, 645 N.E.2d at 959–60 (Bilandic, C.J., dissenting). He also distinguished *Beardsley* because the parties to the conversation in that case "knew that the defendant had the tape recorder" and therefore "gave their *implied consent* to the recording of their conversation." *Id.*, 206 Ill.Dec. 705, 645 N.E.2d at 960. The defendant in *Herrington,* by contrast, recorded a conversation surreptitiously.

In 1994 the Illinois legislature amended the eavesdropping statute so that it applies to "any oral communication between 2 or more persons regardless of whether one or more of the parties intended their communication to be of a private nature under circumstances justifying that expectation." Ill. Pub. Act 88–677 (1994) (codified at 720 ILL. COMP. STAT. 5/14–1(d)). This amendment effectively overrode the *Beardsley* and *Herrington* decisions. As later interpreted by the Illinois Supreme Court, under the amended statute a party's consent may be "inferred from the surrounding circumstances indicating that the party knowingly agreed to the surveillance." *People v. Ceja,* 204 Ill.2d 332, 273 Ill.Dec. 796, 789 N.E.2d 1228, 1241 (2003). However, express disapproval defeats any inference of consent. *Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145,* 396 Ill.App.3d 960, 336 Ill.Dec. 497, 920 N.E.2d 1087, 1095 (2009).

The eavesdropping statute exempts recordings made by law-enforcement officers **\*588** for law-enforcement purposes; officers have substantial discretion to record a wide variety of police-civilian encounters without the subject's consent. 720 ILL. COMP. STAT.

40 Media L. Rep. 1721

5/14–3(h). These include any "enforcement stop," a broadly defined term that includes "traffic stops," "motorist assists," "pedestrian stops," and "requests for identification." *Id.* Surreptitious law-enforcement intercepts for investigative purposes are governed by different subsections of the statute. *See id.* 5/14–3(g), (g–5), (g–6). The eavesdropping statute also contains an exemption for the media, at least in some circumstances; it exempts any recording made for "broadcast by radio, television, or otherwise" for live or "later broadcasts of any function where the public is in attendance and the conversations are overheard incidental to the main purpose for which such broadcasts are then being made." *Id.* 5/14–3(c).

## B. The ACLU's First Amendment Challenge

The ACLU filed this suit against Alvarez in her official capacity seeking declaratory and injunctive relief under 42 U.S.C. § 1983 barring her from enforcing the eavesdropping statute against audio recording that the organization plans to carry out in connection with its "police accountability program." More specifically, the ACLU intends to implement a "program of promoting police accountability by openly audio recording police officers without their consent when: (1) the officers are performing their public duties; (2) the officers are in public places; (3) the officers are speaking at a volume audible to the unassisted human ear; and (4) the manner of recording is otherwise lawful." The program will include, among other things, audiovisual recording of policing at "expressive activity" events—protests and demonstrations—in public fora in and around the Chicago area. The organization also plans

to make audiovisual recordings of policing at "expressive activities" carried out by its members. The ACLU intends to publish these recordings online and through other forms of electronic media.

The ACLU alleged that its planned audiovisual recording is protected under the First Amendment's speech, press, and petition clauses, but because of a credible fear of prosecution, it has not followed through on its program. The complaint asked for a declaratory judgment holding the eavesdropping statute unconstitutional as applied to the ACLU's planned recording and for a corresponding injunction barring the Cook County State's Attorney from enforcing the statute against the ACLU or its agents who carry out the recording. The ACLU also moved for a preliminary injunction.

The State's Attorney moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the ACLU lacks standing and failed to state a claim of a First Amendment violation. The district court granted the motion on jurisdictional grounds, holding that the complaint did not adequately allege a credible fear of prosecution and that the ACLU therefore lacked standing to sue. The dismissal was without prejudice, however, so the ACLU moved to amend the judgment under Rule 59(e) to allow an amended complaint under Rules 15(a)(2) and 21. The proposed amended complaint addressed the standing defect the court had identified, adding two individual plaintiffs —Colleen Connell, the ACLU's Executive Director, and Allison Carter, the ACLU's Senior Field Manager—and more detail about

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:22-cv-04210 Document 120 Filed 07/17/25 in TXSD Page 25 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

the threat of prosecution. The ACLU renewed its motion for a preliminary injunction.

**\*589** The State's Attorney opposed this second round of motions, and again the district court agreed. The judge held that although the ACLU had "cured the limited standing deficiencies" and now "sufficiently alleg[ed] a threat of prosecution," the proposed amended complaint contained a different standing defect. Relying on *Potts v. City of Lafayette,* 121 F.3d 1106, 1111 (7th Cir.1997), the judge held that "[t]he ACLU has not alleged a cognizable First Amendment injury" because the First Amendment does not protect "a right to audio record." The judge also held that the ACLU had no First Amendment injury because the police officers and civilians who would be recorded were not "willing speakers." The judge viewed the ACLU's claim as "an unprecedented expansion of the First Amendment" and held that granting leave to amend would be futile because "[t]he ACLU has not met its burden of showing standing to assert a First Amendment right or injury." The judge denied the motion to amend and thus declined to address the request for a preliminary injunction. This appeal followed.

## II. Discussion

### A. Rule 59(e), Rule 15(a), and Preliminary–Injunction Standards

This case comes to us from an order denying a Rule 59(e) motion to alter or amend a judgment to allow the filing of an amended complaint under Rule 15(a)(2). We review this ruling for an abuse of discretion. *Sigsworth v. City of Aurora, Ill.,* 487 F.3d 506, 511 (7th

Cir.2007). But "[i]f the district court reached its conclusion because of its interpretation of relevant law, ... then we review that question of law *de novo* because a district court's application of an erroneous view of the law is by definition an abuse of discretion." *Sosebee v. Astrue,* 494 F.3d 583, 586 (7th Cir.2007).

The district court's decision turned on mistaken understandings about the relevant First Amendment doctrine. As we will explain, the ACLU and its employees have standing; they face a credible threat of prosecution under the eavesdropping statute, and their amended complaint plainly alleges a First Amendment injury. Denying leave to amend also had the effect of denying the ACLU's request for preliminary injunctive relief. The ACLU asks that we address that matter here.

"To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago,* 651 F.3d 684, 694 (7th Cir.2011). If the moving party makes this threshold showing, the court "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.*

**[1]** Ordinarily we would remand to allow the district court to weigh the preliminary-injunction factors in the first instance. However, in First Amendment cases, "the likelihood of success on the merits will often be the determinative factor." *Joelner v. Village*

40 Media L. Rep. 1721

*of Washington Park, Ill.,* 378 F.3d 613, 620 (7th Cir.2004). This is because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion), and the "quantification of injury is difficult and damages are therefore not an adequate remedy," *Flower Cab Co. v. Petitte,* 685 F.2d 192, 195 (7th Cir.1982). Moreover, if the moving party establishes a likelihood of success on the merits, the balance of harms **\*590** normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional. *Joelner,* 378 F.3d at 620. Stated differently, "injunctions protecting First Amendment freedoms are always in the public interest."[1] *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir.2006).

The parties have fully briefed the likelihood of success on the merits, which raises only a legal question. In this situation, it makes sense for us to address whether preliminary injunctive relief is warranted. *See Wis. Right to Life State PAC v. Barland,* 664 F.3d 139, 151 (7th Cir.2011) (on appeal from an abstention order, deciding the plaintiff's entitlement to an injunction because it raised a pure legal question under the First Amendment).

We are confronted, then, with a series of legal questions: (1) has the ACLU established standing to sue; (2) does the amended complaint state a claim for a First Amendment violation; and (3) is that claim likely to succeed? The district court stopped after the first inquiry, holding that the ACLU does not have standing to sue because it has no cognizable First Amendment injury. The State's Attorney urges us to affirm this standing determination, though on a different rationale. In the alternative, she maintains that the proposed amended complaint does not state a claim for an actionable First Amendment violation. Standing comes before the merits, of course, *In re Aqua Dots Prods. Liab. Litig.,* 654 F.3d 748, 750 (7th Cir.2011), but as we'll see, in this case there is some overlap, *see Bond v. Utreras,* 585 F.3d 1061, 1073 (7th Cir.2009).

**B. Standing**

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish standing to sue in federal court,

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.,* 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (citing *Friends of Earth, Inc. v. Laidlaw Envtl.*

40 Media L. Rep. 1721

Servs. (TOC), Inc., 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Our review is de novo. Pollack v. U.S. Dep't of Justice, 577 F.3d 736, 739 (7th Cir.2009).

 [2]   [3]   It is well established that "preenforcement challenges ... are within Article III." Brandt v. Village of Winnetka, Ill., 612 F.3d 647, 649 (7th Cir.2010). To satisfy the injury-in-fact requirement in a preenforcement action, the plaintiff must show "an intention to engage in a course of **\*591** conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Stated differently, "[a] person need not risk arrest before bringing a pre-enforcement challenge under the First Amendment...." Schirmer v. Nagode, 621 F.3d 581, 586 (7th Cir.2010) (citing Holder v. Humanitarian Law Project, 561 U.S. 1, 130 S.Ct. 2705, 2717, 177 L.Ed.2d 355 (2010)); see also Ezell, 651 F.3d at 695. The "existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper [under Article III], because a probability of future injury counts as 'injury' for the purpose of standing." Bauer v. Shepard, 620 F.3d 704, 708 (7th Cir.2010); see also Majors v. Abell, 317 F.3d 719, 721 (7th Cir.2003) (A preenforcement plaintiff "need not show that the authorities have threatened to prosecute him" because "the threat is latent in the existence of the statute.").

The district court dismissed the first version of the ACLU's complaint because it did not sufficiently allege a credible threat of prosecution under the eavesdropping statute. The proposed amended complaint added two individual plaintiffs—ACLU employees Connell and Carter—and more details about the threat of prosecution, including information about recent prosecutions under the eavesdropping statute on like facts. That was enough to satisfy the district court on this point; based on the new allegations, the judge found that "[t]he threat of prosecution is credible and imminent." At this point, however, the judge perceived a different standing defect —one related to the merits of the claim. Relying on our decision in Potts, the judge held that the First Amendment does not protect a "right to audio record" and therefore the ACLU had not alleged a constitutional injury. This was a misreading of Potts.

The issue in Potts was whether a police officer may refuse entry to an onlooker at a Ku Klux Klan rally because he wanted to bring a video camera onto the site. 121 F.3d at 1109–12. Past Klan rallies had inspired violence, so the police in Lafayette, Indiana, where the rally was to be held, established a rule banning any object that could be used as a weapon or projectile. John Potts arrived with a small video recorder and was denied entry based on the broad "no weapons" rule. He defied a police officer's order and entered anyway, and was promptly arrested.

Potts then sued the City of Lafayette and two officers alleging First and Fourth Amendment violations. We affirmed the summary judgment in favor of the defendants. Id. at 1114. Addressing the First Amendment claim, we said that "there is nothing in the Constitution which guarantees the right to record a public

American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)

40 Media L. Rep. 1721

event." *Id.* at 1111 (citing *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 610, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (explaining that the Sixth Amendment does not require broadcasting trials to the public); *United States v. Kerley,* 753 F.2d 617, 620–22 (7th Cir.1985) (recognizing that the exclusion of cameras from federal courtrooms is constitutional)). The district court seized on this single sentence from *Potts* and read it for much more than it's worth.

Immediately after this sentence is the following clarifying explanation: "The right to gather information may be limited under certain circumstances.... The proper constitutional measure of the ... 'weapons' ban is whether the restriction constitutes a valid time, place, or manner regulation." *Id.* In other words, as applied to Potts, Lafayette's ban *did* implicate **\*592** free-speech interests under the First Amendment, but it was subject to review under the "time, place, or manner" standard applicable to content-neutral regulations. Our opinion in *Potts* continues on for several more pages, carefully applying that standard and upholding the weapons ban. *Id.* at 1111–12. If *Potts* stood for a categorical proposition that audiovisual recording is wholly unprotected, as the district court seemed to think, none of this analysis would have been necessary.

The court's second reason for rejecting the amended complaint was also off the mark. The judge held that without a "willing speaker," the ACLU had no First Amendment injury. In other words, because the ACLU does not plan to obtain consent from the officers and others whose communications will be recorded, there will be no "willing speakers" and the ACLU has no First Amendment right to receive and record their speech. By conceptualizing the case in this way, the judge seems to have assumed that, at most, only derivative speech rights are at stake.

**[4]** That's an incorrect assumption. The district court's reliance on the "willing speaker" principle gets the doctrine right but its application wrong. It is well established that "[w]hen one person has a right to speak, others hold a 'reciprocal right to receive' the speech." *Ind. Right to Life, Inc. v. Shepard,* 507 F.3d 545, 549 (7th Cir.2007) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 757, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). It's also true that this derivative "right to receive" or "right to listen" principle "presupposes a willing speaker." *Va. State Bd. of Pharmacy,* 425 U.S. at 756, 96 S.Ct. 1817; *see also Shepard,* 507 F.3d at 549 ("a precondition of the right to receive ... is the existence of a willing speaker" (internal quotation marks omitted)); *Bond,* 585 F.3d at 1077. But this is not a third-party "right to receive" case. The ACLU does not claim to be an intended recipient of police (or police-civilian) communications or to have a reciprocal right to receive the officers' speech as a corollary of the officers' right to speak.

**[5]** Any bystander within earshot can hear what police officers say in public places; "receipt" occurs when the speech is uttered in public and at a volume that others can hear. In other words, the officers' speech is "received" at the moment it is heard; the eavesdropping statute obviously does not prohibit this. The ACLU's challenge to the statute implicates a different set of First

Case 4:22-cv-04210   Document 120   Filed 07/17/25 in TXSD   Page 29 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

Amendment principles. The "right to receive" strand of First Amendment doctrine—with its "willing speaker" precondition—has no bearing on the ACLU's standing.

The State's Attorney does not argue otherwise. Instead, she returns to the original standing problem that the district court identified. Alvarez maintains, as she did in the district court, that the ACLU has not alleged a credible threat of prosecution. We disagree. The eavesdropping statute plainly prohibits the ACLU's proposed audio recording; Alvarez acknowledges as much. The recording will be directed at police officers, obviously increasing the likelihood of arrest and prosecution. The statute has not fallen into disuse. To the contrary, the ACLU has identified many recent prosecutions against individuals who recorded encounters with on-duty police officers; three of these were filed by Alvarez's office. [2] Finally, **\*593** Alvarez has not foresworn the possibility of prosecuting the ACLU or its employees and agents if they audio record police officers without consent. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,* 149 F.3d 679, 687 (7th Cir.1998) ("The Supreme Court has instructed us that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will *not* enforce the statute." (citing *Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988))). These allegations are easily sufficient to establish a credible threat of prosecution.

Alvarez's arguments to the contrary are unavailing. She insists that the ACLU's

program is "advocacy under the guise of First Amendment infringement" without any possibility of a "personal and concrete injury." We confess we do not understand the point. The ACLU's status as an advocacy organization hardly defeats its standing. The organization intends to use its employees and agents to audio record on-duty police officers in public places. The ACLU claims a First Amendment right to undertake this recording, but the eavesdropping statute prohibits it from doing so. The ACLU itself, and certainly its employees and agents (Connell, Carter, and others), will face prosecution for violating the statute. *See* 720 ILL. COMP. STAT. 5/14–1(b), (c) (defining "eavesdropper" and the liability of an eavesdropper's "principal"); *see more generally id.* 5/5–4(a)(2) (providing for corporate liability if the "offense is authorized, requested, commanded, or performed, by the board of directors or by a high managerial agent who is acting within the scope of his or her employment in behalf of the corporation"). Nothing more is needed for preenforcement standing.

[6]   The State's Attorney maintains that the injury alleged here is "merely conjectural or hypothetical" because the threat of prosecution will only occur "at some indefinite future time" and "the identities of the parties to the conversations that [the] ACLU and its members want to audio record is wholly unknown." This argument is a nonstarter. It is well established that in preenforcement suits "[i]njury need not be certain." *Brandt,* 612 F.3d at 649. This is not a case in which the threat of prosecution hinges on a highly attenuated claim of speculative future events or unknowable details about the manner in which the statutory

Case 4:22-cv-04210   Document 120   Filed 07/17/25 in TXSD   Page 30 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

violation will be committed or enforced. *Cf., e.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (future injury depended on plaintiff violating an unchallenged law and provoking constitutional violations based on the manner of police enforcement); *Schirmer,* 621 F.3d at 587 (challenged law could not "fairly be read to prohibit" plaintiffs' actions).

It's true that the ACLU does not know precisely when it or its employees would **\*594** face prosecution or which officers would be involved. Preenforcement suits always involve a degree of uncertainty about future events. *See Brandt,* 612 F.3d at 649 ("Any pre-enforcement suit entails some element of chance...."). So long as that uncertainty does not undermine the credible threat of prosecution or the ability of the court to evaluate the merits of the plaintiff's claim in a preenforcement posture, there is no reason to doubt standing. Here, absent officer consent, the eavesdropping statute flatly prohibits the ACLU's planned recording, exposing the organization and its employees to arrest and criminal punishment. The State's Attorney has recently prosecuted similar violations and intends to continue doing so. That's enough to establish a credible threat of prosecution. [3]

**[7]**   Finally, the State's Attorney argues that principles of *Younger* abstention affect the standing inquiry, or alternatively, that *Younger* abstention applies. *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). "*Younger* abstention is appropriate only when there is an action in state court against the federal plaintiff and the state is seeking to enforce the contested law in that proceeding."

*Forty One News, Inc. v. County of Lake,* 491 F.3d 662, 665 (7th Cir.2007). We have suggested in dicta that if a state prosecution "really *were* imminent, then a federal court might well abstain on comity grounds." *520 S. Mich. Ave. Assocs., Ltd. v. Devine,* 433 F.3d 961, 963 (7th Cir.2006). The State's Attorney maintains that because standing requires an imminent injury, *Younger* abstention must apply. By this logic, *Younger* precludes all federal preenforcement challenges to state laws. That's obviously not right. The State's Attorney's argument misunderstands the basis of preenforcement standing, which "depends on the probability of harm, not its temporal proximity." *Id.* at 962. *Younger* abstention does not apply and does not affect the standing inquiry. *See Hoover v. Wagner,* 47 F.3d 845, 848 (7th Cir.1995).

## C. The First Amendment Claim

On the merits the State's Attorney has staked out an extreme position. She contends that openly recording what police officers say while performing their duties in traditional public fora—streets, sidewalks, plazas, and parks—is *wholly unprotected* by the First Amendment. This is an extraordinary argument, and it rests in large part on the same misreading of *Potts* and misapplication of the "willing speaker" **\*595** principle that infected the district court's standing determination. We have already corrected these misunderstandings and need not repeat that analysis here.

For its part the ACLU contends that the eavesdropping statute, as applied to the facts alleged here, is subject to strict scrutiny. Whether strict scrutiny or some more forgiving standard of judicial review applies depends on

Case 4:22-cv-04210   Document 120   Filed 07/17/25 in TXSD   Page 31 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

what kind of First Amendment interest is at stake and how the eavesdropping statute affects that interest.

### 1. *The Eavesdropping Statute Burdens Individual Speech and Press Rights*

**[8]**    Unlike the federal wiretapping statute and the eavesdropping laws of most other states, [4] the gravamen of the Illinois eavesdropping offense is not the secret interception or surreptitious recording of a private communication. Instead, the statute sweeps much more broadly, banning *all* audio recording of *any* oral communication absent consent of the parties regardless of whether the communication is or was intended to be private. The expansive reach of this statute is hard to reconcile with basic speech and press freedoms. For reasons we will explain, the First Amendment limits the extent to which Illinois may restrict audio and audiovisual recording of utterances that occur in public. [5]

Audio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are "included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Burstyn v. Wilson,* 343 U.S. 495, 502, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (holding that movies are a protected form of speech). Laws that restrict the use of expressive media have obvious effects on speech and press rights; the Supreme Court has "voiced particular concern with laws that foreclose an entire medium of expression." *City of Ladue v. Gilleo,* 512 U.S. 43, 55, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (collecting cases); *see also Reno v. ACLU,* 521 U.S. 844, 869–70, 117 S.Ct.

2329, 138 L.Ed.2d 874 (1997) (recognizing that the internet is a "dynamic, multifaceted category of communication" and that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium").

**[9]**    The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording. The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected, as the State's Attorney insists. By way of a simple analogy, banning photography or **\*596** note-taking at a public event would raise serious First Amendment concerns; a law of that sort would obviously affect the right to publish the resulting photograph or disseminate a report derived from the notes. The same is true of a ban on audio and audiovisual recording.

This is a straightforward application of the principle that "[l]aws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC,* 558 U.S. 310, 130 S.Ct. 876, 896, 175 L.Ed.2d 753 (2010). The Illinois eavesdropping statute regulates the use of a medium of expression; the Supreme Court has recognized that "regulation of a medium [of expression] inevitably affects communication itself." *City of Ladue,* 512 U.S. at 48, 114 S.Ct. 2038 (invalidating an ordinance banning residential signs). Put differently, the eavesdropping statute operates at the front end of the speech process by restricting the use of a common, indeed ubiquitous, instrument of

Case 4:22-cv-04210    Document 120    Filed 07/17/25 in TXSD    Page 32 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

communication. Restricting the use of an audio or audiovisual recording device suppresses speech just as effectively as restricting the dissemination of the resulting recording.

As our colleagues in the Ninth Circuit have observed, there is no fixed First Amendment line between the act of creating speech and the speech itself:

> Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation. Thus, we have not drawn a hard line between the essays John Peter Zenger published and the act of setting the type. *Cf. Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575, 582, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (holding that a tax on ink and paper "burdens rights protected by the First Amendment"). The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds. In other words, we have never seriously questioned that the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection.

*Anderson v. City of Hermosa Beach,* 621 F.3d 1051, 1061–62 (9th Cir.2010).

This observation holds true when the expressive medium is mechanical rather than manual. For instance, "[i]f the state were to prohibit the use of projectors without a license, First Amendment coverage would undoubtedly be triggered. This is not because projectors constitute speech acts, but because they are integral to the forms of interaction that comprise the genre of the cinema." Robert Post, *Encryption Source Code and the First Amendment,* 15 BERKELEY TECH. L.J. 713, 717 (2000).

The Supreme Court's campaign-finance cases illustrate how laws of this sort trigger First Amendment scrutiny. The Court held long ago that campaign-finance regulations implicate core First Amendment interests because raising and spending money *facilitates* the resulting political speech. *See Buckley v. Valeo,* 424 U.S. 1, 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (restricting money spent on political communications "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached"); *see also Citizens United,* 130 S.Ct. at 898 (invalidating the federal ban on corporate and union spending for political speech because the **\*597** government may not "repress speech by silencing certain voices at any of the various points in the speech process"); *McConnell v. FEC,* 540 U.S. 93, 252, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (Scalia, J., concurring in part and dissenting in part) ("The right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise."); *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 400, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Breyer, J., concurring) ("[A] decision to contribute money to a campaign is a matter of First Amendment concern—not because money *is* speech (it is not); but because it *enables* speech.").

American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)

40 Media L. Rep. 1721

So too with laws that restrict audio recording. Audio and audiovisual recording are communication technologies, and as such, they enable speech. Criminalizing all nonconsensual audio recording necessarily limits the information that might later be published or broadcast—whether to the general public or to a single family member or friend—and thus burdens First Amendment rights. If, as the State's Attorney would have it, the eavesdropping statute does not implicate the First Amendment *at all,* the State could effectively control or suppress speech by the simple expedient of restricting an early step in the speech process rather than the end result. We have no trouble rejecting that premise. Audio recording is entitled to First Amendment protection.[6]

And here, the First Amendment interests are quite strong. On the factual premises of this case, the eavesdropping statute prohibits nonconsensual audio recording of public officials performing their official duties in public. " '[T]here is practically universal agreement that a major purpose of' the First Amendment 'was to protect the free discussion of governmental affairs'...." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* ––– U.S. ––––, 131 S.Ct. 2806, 2828, 180 L.Ed.2d 664 (2011) (quoting *Buckley,* 424 U.S. at 14, 96 S.Ct. 612). This agreement " 'reflects our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' " *Id.* at 2828–29 (quoting *Buckley,* 424 U.S. at 14, 96 S.Ct. 612, quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Moreover, "the First

Amendment goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). The freedom of speech and press " 'embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.' " *Id.* at 767, 98 S.Ct. 1407 (quoting *Thornhill v. Alabama,* 310 U.S. 88, 101–02, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)).

**[10]** In this regard, the ACLU's challenge to the eavesdropping statute also draws on the principle that the First Amendment provides at least some degree of protection for gathering news and information, particularly news and information about the affairs of government. *See* **\*598** *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). In *Branzburg* a news reporter claimed a First Amendment privilege to refuse to testify before a grand jury about his confidential sources. *Id.* at 667, 92 S.Ct. 2646. The reporter argued that without an implied testimonial privilege, the right "of the press to collect and disseminate news" would be undermined. *Id.* at 698, 92 S.Ct. 2646.

The Court rejected this claim, but before doing so it made the following general observation:

> The heart of the claim is that the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the information [by grand-jury subpoena].

We do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated.

*Id.* at 681, 92 S.Ct. 2646. The Court declined to fashion a special journalists' privilege for essentially two reasons. First, the Court relied on the general principle that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Id.* at 682, 92 S.Ct. 2646. By this the Court meant that "otherwise valid laws serving substantial public interests may be enforced *against the press as against others,* despite the possible burden that may be imposed." *Id.* at 682–83, 92 S.Ct. 2646 (emphasis added). Stated differently, the institutional press " 'has no special immunity from the application of general laws.' " *Id.* at 683, 92 S.Ct. 2646 (quoting *Associated Press v. NLRB,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 81 L.Ed. 953 (1937)). Second, the Court held that the public interest in detecting, punishing, and deterring crime was much stronger than the marginal increase in the flow of news about crime that a journalist's testimonial privilege might provide. *See id.* at 700–01, 92 S.Ct. 2646.

We will return to the point about generally applicable laws in a moment. For now, it is enough to note that the Court did not use that principle to reject the reporter's claim out of hand. Instead, the Court evaluated the State's demand for the reporter's testimony against

the First Amendment interests at stake and held that the public's interest in obtaining " 'every man's evidence' " justified the incidental burden on First Amendment rights. *Id.* at 687, 92 S.Ct. 2646 (quoting *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)). The Court specifically reserved the question whether in a particular case, a subpoena for a reporter's testimony might be a pretext for "[o]fficial harassment of the press," a circumstance that "would pose wholly different issues for resolution under the First Amendment." *Id.* at 707, 92 S.Ct. 2646.

The Supreme Court has not elaborated much on its abstract observation in *Branzburg* that "news gathering is not without its First Amendment protections."[7] *Id.* **\*599** The *Branzburg* opinion itself suggests some caution in relying too heavily on the Court's discussion of a First Amendment right to gather news and information. *See id.* at 703–04, 92 S.Ct. 2646 (noting that an expansive judicially administered right to gather information would "present practical and conceptual difficulties of a high order" and "embark the judiciary on a long and difficult journey" with an "uncertain destination"). Still, the Court's observation that speech and press freedom includes, by implication, "some protection" for gathering information about the affairs of government is consistent with the historical understanding of the First Amendment.

To the founding generation, the liberties of speech and press were intimately connected with popular sovereignty and the right of the people to see, examine, and be informed of their government. For example, in one of the most famous eighteenth-century essays on

the freedom of speech,[8] Whig commentator Thomas Gordon explained:

"That Men ought to speak well of *their Governours* is true, while *their Governours* deserve to be well spoken of; but to do public Mischief, without hearing of it, is only the Prerogative and Felicity of Tyranny: A free People will be shewing that they are *so,* by their Freedom of Speech.

The Administration of Government, is nothing else but the Attendance of the *Trustees of the People* upon the Interest and Affairs of the People: And as it is the Part and Business of the People, for whose Sake alone all public Matters are, or ought to be transacted, to see whether they be well or ill transacted; so it is the Interest, and ought to be the Ambition, of all honest Magistrates, to have their Deeds openly examined, and publicly scann'd."

*Silence Dogood No. 8,* THE NEW–ENGLAND COURANT (Boston), July 9, 1722, *reprinted in* 1 THE PAPERS OF BENJAMIN FRANKLIN 28 **\*600** (Leonard W. Labaree et al. eds., 1959) (quoting *Cato's Letter No. 15* ). Other colonial writers "stressed the necessity and right of the people to be informed of their governors' conduct so as to shape their own judgments on 'Public Matters' and be qualified to choose their representatives." LEONARD W. LEVY, EMERGENCE OF A FREE PRESS 134 (2004). The Virginia General Assembly objected to the infamous Sedition Act of 1798 in part "because it is levelled against that *right of freely examining public characters and measures,* and of free communication among the people thereon."

Virginia Resolutions of 1798, *reprinted in* 17 THE PAPERS OF JAMES MADISON 189–90 (David B. Mattern et al. eds., 1991) (emphasis added). In a subsequent report, James Madison explained that the Sedition Act had "repressed that *information* and communication among the people, which is indispensable to the just exercise of their electoral rights." Virginia Report of 1800, *reprinted in* 17 THE PAPERS OF JAMES MADISON 343 (emphasis added). This understanding prevailed at the time the Fourteenth Amendment was ratified. In his famous 1868 treatise on constitutional law, Thomas Cooley explained that a foremost purpose of the Constitution's guarantee of speech and press liberty is

to secure the[ ] right to a free discussion of public events and public measures, and to *enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them.* To guard against repressive measures by the several departments of government, by means of which persons in power might secure themselves and their favorites from just scrutiny and condemnation, was the general purpose.... The evils to be guarded against were not the

Case 4:22-cv-04210    Document 120    Filed 07/17/25 in TXSD    Page 36 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.

THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 421–22 (1868) (emphasis added); *see also* Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today,* 160 U. PA. L.REV. 459 (2012) (collecting sources from the framing to the modern era); *see generally* AKHIL REED AMAR, THE BILL OF RIGHTS 20–26, 231–45 (1996) (explaining the structural role of speech and press rights based on founding-era and Reconstruction history).

In short, the eavesdropping statute restricts a medium of expression—the use of a common instrument of communication—and thus an integral step in the speech process. As applied here, it interferes with the gathering and dissemination of information about government officials performing their duties in public. Any way you look at it, the eavesdropping statute burdens speech and press rights and is subject to heightened First Amendment scrutiny.

The First Circuit agrees. In *Glik v. Cunniffe,* 655 F.3d 78, 79–81 (1st Cir.2011), the court considered a claim of qualified immunity in a damages suit brought by a bystander who was arrested for using his cell phone to record police officers making an arrest on the Boston Common. The bystander alleged that the officers violated his rights under the First Amendment; the First Circuit rejected the officers' defense of qualified immunity. *Id.* The court framed the issue this way: "[I]s there a constitutionally protected right to videotape **\*601** police carrying out their duties in public?" *Id.* at 82. The court held that "[b]asic First Amendment principles, along with case law from this and other circuits, answer that question unambiguously in the affirmative."[9] *Id.* The court went on to conclude that the right to record the police was clearly established, resting its conclusion primarily on the Supreme Court's observations about the right to gather and disseminate information about government: "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.' " *Id.* (quoting *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966)).[10]

Before moving on, a few words about challenges to generally applicable laws. As we have noted, the Supreme Court's decision in *Branzburg* rested in part on the principle that a generally applicable law will not violate the First Amendment simply because its application has an incidental effect on speech or the press. 408 U.S. at 682, 92 S.Ct. 2646; *see also Cohen v. Cowles Media Co.,* 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) ( "[G]enerally applicable laws do not offend the First Amendment simply because

their enforcement ... has incidental effects on [the] ability to gather and report the news."); *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 707, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) ("[T]he First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books.").

It's important to note that the legal sanction at issue in *Branzburg*—enforcement of a grand-jury subpoena—was not aimed at the exercise of speech or press rights as such. Likewise *Cohen* involved a claim by two newspapers for a special First Amendment immunity from damages liability for breach of a promise to keep a source's identity confidential. As in *Branzburg,* the Court rejected the claim of special press immunity and upheld the damages award against the newspapers. The Court observed that the doctrine of promissory estoppel is generally applicable and the "enforcement of such general laws **\*602** against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Cohen,* 501 U.S. at 670, 111 S.Ct. 2513. *Branzburg* and *Cohen* thus stand for the unremarkable proposition that the press does not enjoy a special constitutional exemption from generally applicable laws.

Similarly, in *Arcara* the Court upheld a court order shutting down an adult bookstore pursuant to a state nuisance statute authorizing the closure of premises where prostitution is ongoing. The Court held that "the First Amendment is not implicated by the enforcement of a public health regulation

of general application against the physical premises in which respondents happen to sell books." 478 U.S. at 707, 106 S.Ct. 3172. The Court noted, however, that it would be a different case if "the 'nonspeech' which drew sanction was intimately related to expressive conduct protected under the First Amendment." *Id.* at 706 n. 3, 106 S.Ct. 3172. Instead, the "nonspeech" that was subject to general public-health regulation in *Arcara*—operating an establishment where prostitution is carried on—"bears absolutely no connection to any expressive activity," notwithstanding that the establishment is also a bookstore. *Id.* at 707 n. 3, 106 S.Ct. 3172.

On the other hand, in *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), the Court applied First Amendment scrutiny to Indiana's public-indecency statute as applied to establishments that offer nude dancing. The Court observed that "nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." *Id.* at 566, 111 S.Ct. 2456. Applying the intermediate standard of review established in *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court upheld Indiana's modest requirement that dancers wear a modicum of clothing ("pasties" and "G-strings") because that requirement served "a substantial government interest in protecting order and morality," *Barnes,* 501 U.S. at 569, 111 S.Ct. 2456, and was "the bare minimum necessary to achieve the State's purpose," *id.* at 572, 111 S.Ct. 2456.

American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

These cases illustrate the point that "enforcement of a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 640, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *see also Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 194 F.3d 505, 521–22 (4th Cir.1999). When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play. On the other hand, when "speech" and "nonspeech" elements are combined, and the "nonspeech" element (e.g., prostitution) triggers the legal sanction, the incidental effect on speech rights will not normally raise First Amendment concerns. *See* Eugene Volokh, *Speech as Conduct, Generally Applicable Laws, Illegal Courses of Conduct, "Situation–Altering Utterances," and the Uncharted Zones,* 90 CORNELL L.REV. 1277, 1278–93 (2005).

The Illinois eavesdropping statute may or may not be a law of general applicability; as we have noted, it contains a number of exemptions. Either way, it should be clear by now that its effect on First Amendment interests is far from incidental. To the contrary, the statute specifically targets a communication technology; the use of an audio recorder— a medium of expression—triggers criminal liability. The law's legal sanction is directly leveled against the expressive element of an expressive **\*603** activity. As such, the statute burdens First Amendment rights directly, not incidentally.

## 2. *Content Based or Content Neutral?*

The ACLU contends that the eavesdropping statute is subject to strict scrutiny because it restricts speech based on its content and discriminates among speakers. The First Amendment "does not countenance government control over the content of messages expressed by private individuals." *Turner,* 512 U.S. at 641, 114 S.Ct. 2445. This is a "bedrock principle" of First Amendment law. *Snyder v. Phelps,* —— U.S. ——, 131 S.Ct. 1207, 1219, 179 L.Ed.2d 172 (2011) (quotation marks omitted). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU,* 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (quotation marks omitted). Laws that restrict speech based on its content are "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens,* 559 U.S. 460, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (quotation marks omitted).

**[11]** Accordingly, regulatory measures "that suppress, disadvantage, or impose differential burdens upon speech because of its content" are subject to strict scrutiny. *Turner,* 512 U.S. at 642, 114 S.Ct. 2445. "In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny ... because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Id.* (citation omitted). Although the line between content-neutral and content-based laws is sometimes hard to draw, "the 'principal inquiry in determining content neutrality ... is whether the government has adopted a

regulation of speech because of [agreement or] disagreement with the message it conveys.' " *Id.* (alterations in original) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Stated differently, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Id.* at 643, 114 S.Ct. 2445.

The eavesdropping statute is content neutral on its face. It does not target any particular message, idea, or subject matter. The ACLU argues that the eavesdropping statute should be treated as a content-based restriction because its enforcement requires an examination of the audio recording to determine whether a violation has occurred. This argument misunderstands the First Amendment requirement of content neutrality. A law is not considered "content based" simply because a court must "look at the content of an oral or written statement in order to determine whether a rule of law applies." *Hill v. Colorado,* 530 U.S. 703, 721, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

The ACLU also argues that the eavesdropping statute discriminates among speakers by allowing "uniformed on-duty police at their discretion and without court approval to make virtually any audio recording of their conversations with civilians, while forbidding civilians from making virtually any audio recording of those same conversations." Here the ACLU relies on the well-established principle that

the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the **\*604** right to use speech to strive to establish worth, standing, and respect for the speaker's voice.

*Citizens United,* 130 S.Ct. at 899. But this kind of content-based discrimination arises when the government discriminates among *private* speakers, not when it facilitates its own speech. For example, a governmental agency that records its own meetings but bars members of the public from doing so has not preferred one class of private speakers over another, although other First Amendment concerns might arise. Here, the exemption for law-enforcement officers is constitutionally insignificant. [11]

The exemption for the media may be another matter, however. As we have noted, the eavesdropping statute exempts live broadcasts or recordings made for later broadcast "by radio, television, or otherwise" of "any function where the public is in attendance and the conversations are overheard incidental to the main purpose for which such broadcasts are then being made." 720 ILL. COMP. STAT. 5/14–3(c). This exemption appears to be aimed at media coverage of public events in which

American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)

40 Media L. Rep. 1721

conversations are captured without consent as an incidental consequence of broadcasting the event itself, or recording it for later broadcast. This exemption for broadcasting may amount to discrimination among private speakers, though perhaps it's broad enough to cover recordings made by individuals as well as the institutional press. *See Turner,* 512 U.S. at 659, 114 S.Ct. 2445 ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns."). We need not decide the effect of this exemption here. The ACLU does not mention it, probably because the recordings at issue in this case are not limited to those that are "incidental" to recording a public event.

In the end, we think it unlikely that strict scrutiny will apply. But there is no need to resolve the matter here. The ACLU's challenge is likely to succeed under any of the less rigorous standards of scrutiny that apply to restrictions on speech. At the very least, the State's Attorney will have to justify this application of the eavesdropping statute under some form of intermediate scrutiny.

### 3. *The Eavesdropping Statute Likely Fails Intermediate Scrutiny*

The Supreme Court uses several variations of intermediate scrutiny in its free-speech cases. When an intermediate standard of review applies in the campaign-finance context—for example, when the Court reviews limits on contributions to candidates—the challenged law must be "closely drawn to serve a sufficiently important interest...." *Ariz. Free Enter. Club,* 131 S.Ct. at 2817 (internal quotation marks omitted); *see also Doe v.*

*Reed,* 561 U.S. 186, 130 S.Ct. 2811, 2818, 177 L.Ed.2d 493 (2010).

**[12]** In commercial-speech cases, the government must establish that the challenged statute "directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell v. IMS Health Inc.,* —— U.S. ——, 131 S.Ct. 2653, 2667–68, 180 L.Ed.2d 544 (2011). Stated differently, intermediate scrutiny in this context requires "a 'fit' between the legislature's ends and the means chosen to accomplish those ends, ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily **\*605** the single best disposition but one whose scope is in proportion to the interest served." *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (citations and internal quotation marks omitted).

**[13]** Under the Court's speech-forum doctrine, a regulatory measure may be permissible as a "time, place, or manner" restriction if it is "'justified without reference to the content of the regulated speech, ... narrowly tailored to serve a significant governmental interest, ... and ... leave[s] open ample alternative channels for communication of the information.'" *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (quoting *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

Though stated in different terms, these intermediate-scrutiny standards share certain essential elements in common. All require (1) content neutrality (content-based regulations are presumptively invalid); (2) an important

American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)

40 Media L. Rep. 1721

public-interest justification for the challenged regulation; and (3) a reasonably close fit between the law's means and its ends. This last requirement means that the burden on First Amendment rights must not be greater than necessary to further the important governmental interest at stake. *See Fox,* 492 U.S. at 480, 109 S.Ct. 3028; *Ward,* 491 U.S. at 799, 109 S.Ct. 2746; *see also O'Brien,* 391 U.S. at 376–77, 88 S.Ct. 1673 (stating an alternative formulation of intermediate scrutiny).

As we have explained, the eavesdropping statute probably satisfies the requirement of content neutrality. As applied here, however, it very likely fails the rest of the test. The State's Attorney defends the law as necessary to protect conversational privacy. This is easily an important governmental interest. *Bartnicki v. Vopper,* 532 U.S. 514, 532, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) ("Privacy of communication is an important interest...."). Indeed, the protection of personal conversational privacy serves First Amendment interests because "fear of public disclosure of private conversations might well have a chilling effect on private speech." *Id.* at 533, 121 S.Ct. 1753.

At common law, actionable invasion of privacy takes several forms: (1) an unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public. RESTATEMENT (SECOND) OF TORTS § 652A; *Wolfe v. Schaefer,* 619 F.3d 782, 784 (7th Cir.2010); *Desnick v. Am. Broad. Cos.,* 44 F.3d 1345, 1353 (7th Cir.1995); *Haynes*

*v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1229 (7th Cir.1993). In Fourth Amendment law, there is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion); *see also* Orin S. Kerr, *Four Models of Fourth Amendment Protection,* 60 STAN. L.REV. 503 (2007) (discussing different understandings of privacy). But surreptitiously accessing the private communications of another by way of trespass or nontrespassory wiretapping or use of an electronic listening device clearly implicates recognized privacy expectations. *See United States v. Jones,* ——U.S. ——, 132 S.Ct. 945, 945–52, 181 L.Ed.2d 911 (2012); *Bartnicki,* 532 U.S. at 526, 121 S.Ct. 1753; *Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

Simply put, these privacy interests are not at issue here. The ACLU wants to openly audio record police officers performing their duties in public places and speaking at a volume audible to bystanders. **\*606** Communications of this sort lack any "reasonable expectation of privacy" for purposes of the Fourth Amendment. *See Katz,* 389 U.S. at 351, 88 S.Ct. 507 ("What a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection."); *id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring) ("[C]onversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable."). Dissemination of these communications would not be actionable in tort. *See* RESTATEMENT (SECOND) OF TORTS §§ 652B, 652D (explaining the

elements of the different invasion-of-privacy torts). [12]

Of course, the First Amendment does not prevent the Illinois General Assembly from enacting greater protection for conversational privacy than the common-law tort remedy provides. Nor is the legislature limited to using the Fourth Amendment "reasonable expectation of privacy" doctrine as a benchmark. But by legislating this broadly— by making it a crime to audio record *any* conversation, even those that are *not* in fact private—the State has severed the link between the eavesdropping statute's means and its end. Rather than attempting to tailor the statutory prohibition to the important goal of protecting personal privacy, Illinois has banned nearly all audio recording without consent of the parties —including audio recording that implicates *no* privacy interests at all.

The ACLU's proposed audio recording will be otherwise lawful—that is, not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them. The State's Attorney concedes that the ACLU's observers may lawfully watch and listen to the officers' public communications, take still photographs, make video recordings with microphones switched off, or take shorthand notes and transcribe the conversations or otherwise reconstruct the dialogue later. The ACLU may post all of this information on the internet or forward it to news outlets, all without violating the Illinois eavesdropping statute. The State's Attorney has not identified a substantial governmental interest that is served

by banning audio recording of these same conversations. We acknowledge the difference in accuracy and immediacy that an audio recording provides as compared to notes or even silent videos or transcripts. But in terms of the *privacy* interests at stake, the difference is not sufficient to justify criminalizing this particular method of preserving and publishing the public communications of these public officials.

The State's Attorney insists that the broad reach of the statute is necessary to "remove[ ] incentives for interception of private conversations and minimize[ ] the harm to persons whose conversations have been illegally intercepted." At the risk of repeating ourselves, this case has nothing to do with private conversations or surreptitious interceptions. We accept Judge Posner's point that "private talk in public places is common." Dissent at 613. But the communications in question here do not fall into this category; they are not conversations that carry privacy expectations even though uttered in public places. **\*607** Moreover, the ACLU plans to record *openly,* thus giving the police and others notice that they are being recorded. [13]

The State's Attorney also argues that the statute endeavors to "[1.] encourage that civilians candidly speak with law enforcement, including those conversations conditioned on confidentiality; [2.] limit opportunities of the general public from gaining access to matters of national and local security; and [3.] reduce the likelihood of provoking persons during officers' mercurial encounters." These interests are not threatened here. Anyone who wishes to speak to police officers in confidence can

American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)

40 Media L. Rep. 1721

do so; private police-civilian communications are outside the scope of this case. Police discussions about matters of national and local security do not take place in public where bystanders are within earshot; the State's Attorney has made no effort to connect this law-enforcement concern to the communications at issue here. It goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations. While an officer surely cannot issue a "move on" order to a person *because* he is recording, the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs. *See, e.g., Colten v. Kentucky,* 407 U.S. 104, 109, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) (rejecting a First Amendment right to congregate on the side of a highway and "observe the issuance of a traffic ticket"). Nothing we have said here immunizes behavior that obstructs or interferes with effective law enforcement or the protection of public safety.

Because the eavesdropping statute is not closely tailored to the government's interest in protecting conversational privacy, we need not decide whether it leaves open adequate alternative channels for this kind of speech (assuming that this factor—an aspect of speech-forum analysis—even applies in this context). *See Saieg v. City of Dearborn,* 641 F.3d 727, 740 (6th Cir.2011) ( "The requirements for a time, place, and manner restriction are conjunctive." (citing *Watchtower Bible & Tract Soc'y v. Village of Stratton,* 536 U.S. 150, 168–69, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002))). We note, however,

that audio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public. Their self-authenticating character makes it highly unlikely that other methods could be considered reasonably adequate substitutes.

Before closing, a brief response to a couple of points in the dissent. Our decision will not, as Judge Posner suggests, "cast[ ] a shadow over the electronic privacy statutes of other states." Dissent at 609. As we have explained, the Illinois statute is a national outlier. *See* Alderman, *Police Privacy in the iPhone Era?, supra* note 4, at 533–45 (collecting state statutes). Most state electronic privacy statutes apply only to *private* conversations; that is, they contain (or are construed to include) an expectation-of-privacy requirement that limits their scope to conversations that carry a reasonable expectation of privacy. Others apply only to wiretapping, and some ban only surreptitious **\*608** recording. *Id.* Indeed, the California statute discussed in the dissent is explicitly limited to "confidential communications," a term specifically defined to exclude the kind of communications at issue here. If the Illinois statute contained a similar limitation, the link to the State's privacy justification would be much stronger.

The dissent also takes us to task for giving insufficient consideration to the privacy interests of civilians who communicate with the police and for failing to grasp the extent to which people "say things in public that they don't expect others around them to be listening to, let alone recording for later broadcasting." Dissent at 613. To

the contrary, we have acknowledged the importance of conversational privacy and heeded the basic distinction drawn in *Katz* that some conversations in public places implicate privacy and others do not. *See Katz,* 389 U.S. at 351, 88 S.Ct. 507. Again, the privacy interests that may justify banning audio recording are not limited to those that the Fourth Amendment secures against governmental intrusion. But the Illinois eavesdropping statute obliterates the distinction between private and nonprivate by criminalizing *all* nonconsensual audio recording *regardless* of whether the communication is private *in any sense.* 720 ILL. COMP. STAT. 5/14–1(d). If protecting privacy is the justification for this law, then the law must be more closely tailored to serve that interest in order to avoid trampling on speech and press rights.

For these reasons, we conclude that the ACLU has a strong likelihood of success on the merits of its First Amendment claim. The Illinois eavesdropping statute restricts an expressive medium used for the preservation and dissemination of information and ideas. On the factual premises of this case, the statute does not serve the important governmental interest of protecting conversational privacy; applying the statute in the circumstances alleged here is likely unconstitutional.

Accordingly, we reverse and remand with the following instructions: The district court shall reopen the case and allow the amended complaint; enter a preliminary injunction enjoining the State's Attorney from applying the Illinois eavesdropping statute against the ACLU and its employees or agents who openly audio record the audible communications of law-enforcement officers (or others whose communications are incidentally captured) when the officers are engaged in their official duties in public places; and conduct such further proceedings as are consistent with this opinion.

REVERSED AND REMANDED WITH INSTRUCTIONS.

POSNER, Circuit Judge, dissenting.
The American Civil Liberties Union appeals from the denial of a preliminary injunction in its suit against the Cook County State's Attorney (that is, the "D.A." of Cook County, Illinois) to invalidate the Illinois Eavesdropping Act as a violation of freedom of speech (more precisely, freedom to publish or otherwise disseminate other people's speech). I would affirm the district court.

The Act criminalizes "knowingly and intentionally us[ing] an eavesdropping device for the purpose of hearing or recording all or any part of any conversation" without "the consent of all of the parties to such conversation." 720 ILCS 5/14–2(a)(1). My colleagues have decided to reverse, and to order the entry of a preliminary injunction against enforcement of the Eavesdropping Act. But why a *preliminary* injunction? The opinion gives no indication of what argument or evidence presented on remand might allow the district court again to uphold the Act.

**\*609** The invalidation of a statute on constitutional grounds should be a rare and solemn judicial act, done with reluctance under compulsion of clear binding precedent

40 Media L. Rep. 1721

or clear constitutional language or—in the absence of those traditional sources of guidance—compelling evidence, or an overwhelming gut feeling, that the statute has intolerable consequences. The law invalidated today is not an outdated one left on the books by legislative inertia, like many of the laws invalidated by the Supreme Court in famous cases such as *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In its present form it dates only from 1994. It is stricter than provisions found in the laws governing electronic eavesdropping in most other states because it requires both parties to consent to a recording of their conversation. Maybe it's too strict in forbidding nonconsensual recording even when done in defense of self or others, as when the participant in a conversation records it in order to create credible evidence of blackmail, threats, other forms of extortion, or other unlawful activity, as in *Glik v. Cunniffe,* 655 F.3d 78 (1st Cir.2011). But that feature of the statute is irrelevant. The ACLU insists on, and the majority opinion endorses, the right to record conversations to which police officers are parties even if *no* party consents to the recording, as long as the officers are performing public duties (as distinct from talking with one another on a private topic) in a public place and speaking loudly enough to be heard by a person who doesn't have special equipment for amplifying sound—in other words, a person standing nearby.

Our ruling casts a shadow over electronic privacy statutes of other states as well, to the extent that they can be interpreted to require the consent of at least one party to a conversation to record it even though the conversation takes place in a public place, if the conversation could nevertheless reasonably be thought private by the parties. The statutes of several states are so open-ended that they could easily be found invalid under the approach taken in the majority opinion. See Alaska Stat. Ann. § 42.20.310; Ark.Code Ann. § 5–60–120; Cal.Penal Code § 632(c); Mich. Comp. Laws Ann. § 750.539c; N.D. Cent.Code Ann. § 12.1–15–02. The California statute is illustrative. It states that "the term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." The words are clear, the meaning is clear, but the *application* is unclear. Should a conversation in a public place, but intended to be private, be thought a "communication that any party desires to be confined to the parties"? It is both intended to be private and remote from a communication made in a "public gathering," a term that from its placement connotes a public meeting of some sort. But what of the exclusion of private communications that the parties "may reasonably expect ... may be overheard or recorded"? That fogs the issue of which private communications are protected. To read the statute literally would exclude all private communications, for any private communication *can* be overheard and recorded, even if it is a conversation in a closed room.

40 Media L. Rep. 1721

A number of state privacy statutes tee off from the statement in *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that "what a person **\*610** knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." See, e.g., Fla. Stat. § 934.02(2); Ohio Rev.Code Ann. § 2933.51(B); Texas Penal Code § 16.02(b)(1), incorporating Tex.Code Crim. P. art. 18.20 § 1(1); cf. 18 U.S.C. § 2510(2). The police in *Katz* had recorded the defendant's phone call, made in a public telephone booth, by secretly fastening a microphone to the booth, and the Court held that the recording violated the Fourth Amendment because the police had no warrant. Suppose the telephone booth had had no door, or that though it had a door the booth was not soundproof and someone standing five feet away could hear the conversation. Or suppose a police officer is talking in a low voice to a crime victim on a crowded sidewalk; there are people within earshot but the conversants reasonably assume that no one is listening, though they notice someone looking at his cell phone and the recorder in the cell phone might be turned on. We can't predict the impact of today's decision on the laws of most other states.

The ACLU particularly wants to record conversations to which a police officer is a party during demonstrations in public places, such as the march protesting the start of the second Iraq war that was before us in *Vodak v. City of Chicago,* 639 F.3d 738 (7th Cir.2011). That is its particular desire, but if its constitutional argument is correct, anyone has a constitutional right to record all such conversations, not just groups like the ACLU, and journalists, because neither the ACLU nor the press has greater First Amendment rights than other members of the public. *Citizens United v. Federal Election Commission,* 558 U.S. 310, 130 S.Ct. 876, 905–06, 175 L.Ed.2d 753 (2010); *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938); see generally Eugene Volokh, "Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today," 160 *U. Pa. L.Rev.* 459 (2012). Nor would the right be limited to political demonstrations; it would extend to all audible police conversations in public places, whether outdoors on sidewalks and in parks or indoors in the lobbies or other public spaces of courthouses and other government buildings.

Judges asked to affirm novel "interpretations" of the First Amendment should be mindful that the constitutional right of free speech, as construed nowadays, is nowhere to be found in the Constitution. The relevant provision of the First Amendment merely forbids Congress to abridge free speech, which as understood in the eighteenth century meant freedom only from censorship (that is, suppressing speech, rather than just punishing the speaker after the fact). A speaker could be prosecuted for seditious libel, for blasphemy, and for much other reprobated speech besides, but in a prosecution he would at least have the protection of trial by jury, which he would not have if hauled before a censorship board; and his speech or writing would not have been suppressed, which is what censorship boards do. Protection against censorship was the only protection that the amendment was understood to create. *Patterson v. Colorado,*

205 U.S. 454, 461–62, 27 S.Ct. 556, 51 L.Ed. 879 (1907) (Holmes, J.); *Blue Canary Corp. v. City of Milwaukee,* 251 F.3d 1121, 1123 (7th Cir.2001); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 23–24 (1998); cf. 4 William Blackstone, *Commentaries on the Laws of England* 150–53 (1769).

The limitation of the amendment to Congress, and thus to *federal* restrictions on **\*611** free speech (the First Amendment does not apply to state action), and to censorship *is* the original understanding. Judges have strayed *so* far from it that further departures should be undertaken with caution. Even today, with the right to free speech expanding in all directions, it remains a partial, a qualified, right. To make it complete would render unconstitutional defamation law, copyright law, trade secret law, and trademark law; tort liability for wiretapping, other electronic eavesdropping, and publicly depicting a person in a "false light"; laws criminalizing the publication of military secrets and the dissemination of child pornography; conspiracy law (thus including much of antitrust law); prohibitions of criminal solicitation, threats and fighting words, securities fraud, and false advertising of quack medical remedies; the regulation of marches, parades, and other demonstrations whatever their objective; limitations on free speech in prisons; laws limiting the televising of judicial proceedings; what little is left of permitted regulation of campaign expenditures; public school disciplining of inflammatory or disruptive student speech; the attorney-client, spousal, and physician-patient privileges in cases in which an attorney or spouse or physician would like to speak but is forbidden by the privilege to do so; laws making medical records confidential; and prohibitions against the public disclosure of jurors' names in cases in which jurors might be harassed. All these legal restrictions of free speech are permitted (some because they may actually increase the amount of speech, a point I'll come back to). The question in this case is whether a state, to protect both privacy and public safety, should be allowed in addition to forbid the recording of conversations between police officers and members of the public in a public place unless both parties to the conversation consent to being recorded for posterity.

A person who is talking with a police officer on duty may be a suspect whom the officer wants to question; he may be a bystander whom the police are shooing away from the scene of a crime or an accident; he may be an injured person seeking help; he may be a crime victim seeking police intervention; he may be asking for directions; he may be arguing with a police officer over a parking ticket; he may be reporting a traffic accident. In many of these encounters the person conversing with the police officer may be very averse to the conversation's being broadcast on the evening news or blogged throughout the world. In some instances such publicity would violate the tort right of privacy, a conventional exception to freedom of speech as I have noted. *Restatement (Second) of Torts* §§ 652A, 652D (1977) ("unreasonable publicity given to [another person's] private life"); *Wolfe v. Schaefer,* 619 F.3d 782, 784 (7th Cir.2010); *Reuber v. Food Chemical News, Inc.,* 925 F.2d 703, 718–19 (4th Cir.1991) (en banc) ("publiciz[ing] private facts in a highly offensive manner about an issue not of public concern"); *Miller v. Motorola, Inc.,* 202 Ill.App.3d 976, 148 Ill.Dec.

Case 4:22-cv-04210   Document 120   Filed 07/17/25 in TXSD   Page 48 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

303, 560 N.E.2d 900 (1990). This body of law is endangered by today's ruling.

Privacy is a social value. And so, of course, is public safety. The constitutional right that the majority creates is likely to impair the ability of police both to extract information relevant to police duties and to communicate effectively with persons whom they speak with in the line of duty. An officer may freeze if he sees a journalist recording a conversation between the officer and a crime suspect, crime victim, or dissatisfied member of the public. He may be concerned when any stranger moves into earshot, or when he sees a recording device (even a cell phone, for modern cell phones are digital audio recorders) **\*612** in the stranger's hand. To distract police during tense encounters with citizens endangers public safety and undermines effective law enforcement.

The majority opinion disclaims any intention of "immuniz[ing] behavior that obstructs or interferes with effective law enforcement." I am not reassured. A fine line separates "mere" recording of a police-citizen encounter (whether friendly or hostile) from obstructing police operations by distracting the officers and upsetting the citizens they are speaking with. Today's ruling may cause state and federal judicial dockets in Illinois to swell because it will unwittingly encourage police officers to shoo away bystanders, on the authority of cases like *Colten v. Kentucky,* 407 U.S. 104, 109–10, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972); cf. *City of Houston v. Hill,* 482 U.S. 451, 462 n. 11, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *King v. Ambs,* 519 F.3d 607, 613–15 (6th Cir.2008), when the officer wants to have a private conversation in a public place.

That the Eavesdropping Act, despite its name, does not punish the bystander who overhears a conversation without recording it does not have the significance that the majority opinion gives it. There is an important difference, well articulated in Justice Harlan's dissent in *United States v. White,* 401 U.S. 745, 787–89, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (footnotes omitted), between human and mechanical eavesdropping:

The impact of the practice of third-party bugging, must, I think, be considered such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society. It goes beyond the impact on privacy occasioned by the ordinary type of "informer" investigation.... The argument of the plurality opinion, to the effect that it is irrelevant whether secrets are revealed by the mere tattletale or the transistor, ignores the differences occasioned by third-party monitoring and recording which insures full and accurate disclosure of all that is said, free of the possibility of error and oversight that inheres in human reporting.

Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse—that liberates daily life. Much off-hand exchange is easily forgotten

and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record. All these values are sacrificed by a rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.

The distinction that Justice Harlan drew between an overheard private conversation recalled from memory and one that is recorded is something everyone feels—and feels more acutely in the electronic age than 41 years ago. Walter Kirn, "Little Brother Is Watching," *New York Times Magazine* (Oct. 17, 2010); William Saletan, "Bugged Naked: Webcams, Sex, and the Death of Privacy," *Slate* (Oct. 1, 2010); William Safire, "To Stop the Eavesdrop," *New York Times* (Dec. 20, 1999). Americans face new challenges to privacy because of the amount of personal information **\*613** stored and publicly accessible online and the ubiquity of recording devices. Lizette Alvarez, "Spring Break Gets Tamer as World Watches Online," *New York Times* (March 16, 2012); Jeffrey Rosen, "The Web Means the End of Forgetting," *New York Times* (July 25, 2010); Jonathan Zittrain, "Privacy 2.0," 2008 *U. Chi. Legal Forum* 65, 81–91. Lacking relevant expertise, lacking evidence, forced back on intuition, judges should hesitate to invalidate legislative attempts to solve these problems.

Police may have no right to privacy in carrying out official duties in public. But the civilians they interact with do. The majority opinion "acknowledge[s] the difference in accuracy and

immediacy that an audio recording provides as compared to notes or even silent videos or transcripts" but says that "in terms of the *privacy* interests at stake, the difference is not sufficient to justify criminalizing this particular method of preserving and publishing the public communications of these public officials" (emphasis in original). The assertion lacks a supporting argument, and by describing the recording as a "method of preserving and publishing the public communications of these public officials" neglects the fact that the recording will publish and preserve what the civilians with whom the police are conversing say, not just what the police say. The further statement that these "are not conversations that carry privacy expectations even though uttered in public places" implies that anything said outdoors is *ipso facto* public. Yet people often say things in public that they don't expect others around them to be listening to, let alone recording for later broadcasting, and we are given no reason to think that this is never the case when someone complains to a police officer, or otherwise speaks with one, "in public" in the sense of being in a place in which there are other people about.

Suppose a police detective meets an informant in a park and they sit down on a park bench to talk. A crime reporter sidles up, sits down next to them, takes out his iPhone, and turns on the recorder. The detective and the informant move to the next park bench to continue their conversation in private. The reporter follows them. Is this what the Constitution privileges?

It is small consolation to be told by the majority that "the ACLU plans to record *openly,* thus giving the police and others notice that they

are being recorded" (emphasis in original). All the ACLU means is that it won't try to hide its recorder from the conversants whom it wants to record, though since the typical recorder nowadays is a cell phone it will be hidden in plain view. A person who doesn't want his conversations to be recorded will have to keep a sharp eye out for anyone nearby holding a cell phone, which in many urban settings is almost everyone. The ubiquity of recording devices will increase security concerns by distracting the police.

There is more on the state's side of this case than privacy of communications and the effectiveness of law enforcement—and the more is the same First Amendment interest that the ACLU says it wants to promote. The majority opinion concedes that "conversational privacy" "serves First Amendment interests," but thinks there can be no conversational privacy when the conversation takes place in a public place; it says that "this case has nothing to do with private conversations." But private talk in public places is common, indeed ubiquitous, because most people spend a lot of their time in public places; because they rely on their anonymity and on the limited memory of others to minimize the risk of publication; because public places are (paradoxically) often more private than **\*614** private places (imagine if detectives could meet with their informants only in police stations); and because eavesdropping on strangers is actually rather uncommon because it is so difficult in most cases to understand a conversation between strangers. "Anyone who's overheard conversations on the street or in a restaurant knows that conversations between strangers are often unintelligible.

There is the public language we employ when talking to strangers and the elliptical private language that we use when talking to people whom we know. Strangers need an interpreter...." *United States v. Curescu,* 674 F.3d 735, 740 (7th Cir.2012).

I disagree with the majority that "anyone who wishes to speak to police officers in confidence can do so," and "police discussions about matters of national and local security do not take place in public where bystanders are within earshot." Forget national security; the people who most need police assistance and who most want their conversations kept private are often the people least able to delay their conversation until they reach a private place. If a person has been shot or raped or mugged or badly injured in a car accident or has witnessed any of these things happening to someone else, and seeks out a police officer for aid, what sense would it make to tell him he's welcome to trot off to the nearest police station for a cozy private conversation, but that otherwise the First Amendment gives passersby the right to memorialize and publish (on Facebook, on Twitter, on YouTube, on a blog) his agonized plea for help? And as in our informant example, many of the persons whom police want to talk to do not want to be seen visiting police stations.

Accuracy is a social value, and a recording of a conversation provides a more accurate record of the conversation than the recollection of the conversants: more accurate, and also more truthful, since a party to a conversation, including a police officer, may lie about what he heard or said. But on the other side of the balance are the inhibiting effect of

nonconsensual recording of conversations on the number and candor of conversations (and hence on values that the First Amendment protects); the baleful effect on privacy; the negative effect on law enforcement; and the litigation likely to be engendered by police officers' shooing away intruders on their private conversations with citizens. These are significant social costs, and the majority opinion offers no basis in fact or history, in theory or practice, in constitutional text or judicial precedent, for weighting them less heavily than the social value of recorded eavesdropping.

**All Citations**

679 F.3d 583, 40 Media L. Rep. 1721

---

## Footnotes

1    The State's Attorney argues that a preliminary injunction is inappropriate here because it would grant the ACLU affirmative relief rather than preserving the status quo. The Supreme Court has long since foreclosed this argument. *See Ashcroft v. ACLU,* 542 U.S. 656, 670–71, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) (finding a preenforcement preliminary injunction appropriate to protect First Amendment rights because "speakers may self-censor rather than risk the perils of trial"); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) ("[P]rior to final judgment there is no established declaratory remedy comparable to a preliminary injunction; unless preliminary relief is available upon a proper showing, plaintiffs in some situations may suffer unnecessary and substantial irreparable harm.").

2    The Cook County prosecutions are *People v. Drew,* No. 10–cr–46 (Cook Cnty., Ill., Cir.Ct.), *People v. Moore,* No. 10–cr–15709 (Cook Cnty., Ill., Cir.Ct.), and *People v. Tate,* No. 11–cr–9515 (Cook Cnty., Ill., Cir.Ct.). We note that the presiding judge in *People v. Drew* recently held that the eavesdropping statute violates substantive due process and dismissed the case. *People v. Drew,* No. 10–cr–46 (Cook Cnty., Ill., Cir.Ct. Mar. 7, 2012). The ACLU identified the following additional prosecutions under the eavesdropping statute for civilian audio recording of law-enforcement officers: *People v. Thompson,* No. 04–cf–1609 (6th Cir., Champaign Cnty., Ill.); *People v. Wight,* No. 05–cf–2454 (17th Cir., Winnebago Cnty., Ill.); *People v. Babarskas,* No. 06–cf–537 (12th Cir., Will Cnty., Ill.); *People v. Allison,* No. 09–cf–50 (2d Cir., Crawford Cnty., Ill.); *People v. Parteet,* No. 10–cf–49 (16th Cir., DeKalb Cnty., Ill.); *People v. Biddle,* No. 10–cf–421 (16th Cir., Kane Cnty., Ill.); *People v. Fitzpatrick,* No. 10–cf–397 (5th Cir., Vermillion Cnty., Ill.); *People v. Lee,* No. 08–

Case 4:22-cv-04210   Document 120   Filed 07/17/25 in TXSD   Page 52 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

cf–1791 (12th Cir., Will Cnty., Ill.); and *People v. Gordon,* No. 10–cf–341 (11th Cir., Livingston Cnty., Ill.).

3    Although the State's Attorney does not raise it, a possible ground for doubting standing might be that *openly* made recordings could fall within the implied-consent doctrine. *See People v. Ceja,* 204 Ill.2d 332, 273 Ill.Dec. 796, 789 N.E.2d 1228, 1241 (2003) (Consent may be "inferred from the surrounding circumstances," including facts showing that "a party knows of ... encroachments on the routine expectation that conversations are private."). Implied consent is a factual issue for trial in a prosecution under the eavesdropping statute. That the ACLU and its employees may face prosecution is injury enough for preenforcement standing, even though they might be able to defend based on implied consent. Moreover, the implied-consent doctrine, and more particularly its potential application in particular cases, is sufficiently ambiguous for the ACLU to have a credible fear of criminal liability. *See, e.g., Williams v. Poulos,* 11 F.3d 271, 281 (1st Cir.1993) ("Implied consent is not ... constructive consent. Rather, implied consent is consent in fact which is inferred from surrounding circumstances indicating that the party *knowingly agreed* to the surveillance." (citations and internal quotation marks omitted)); *see also Schirmer v. Nagode,* 621 F.3d 581, 586 (7th Cir.2010) ("[W]hen an ambiguous statute arguably prohibits certain protected speech, a reasonable fear of prosecution can provide standing for a First Amendment challenge.").

4    As best we can tell, the Illinois statute is the broadest of its kind; no other wiretapping or eavesdropping statute prohibits the open recording of police officers lacking any expectation of privacy. *See* 18 U.S.C. § 2510(2); Jesse Harlan Alderman, *Police Privacy in the iPhone Era?,* 9 FIRST AMEND. L.REV. 487, 533–45 (2011) (collecting state statutes); *cf.* OR.REV.STAT. § 165.540(1)(c), (6)(a) (exempting "unconcealed" recordings at public events but otherwise requiring that "all participants in the conversation are specifically informed that their conversation is being obtained").

5    The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press," U.S. CONST. amend. I, and applies to the States through Section 1 of the Fourteenth Amendment, U.S. CONST. amend. XIV, § 1. *See Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

6    For more on how the First Amendment protects the use of communications technology, see Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today,* 160 U. PA. L.REV. 459 (2012); Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record,* 159 U. PA. L.REV. 335 (2011); Diane Leenheer Zimmerman, *I Spy: The Newsgatherer Under Cover,* 33 U. RICH. L.REV. 1185

Case 4:22-cv-04210 Document 120 Filed 07/17/25 in TXSD Page 53 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

(2000); Rodney A. Smolla, *Privacy and the First Amendment Right to Gather News,* 67 GEO. WASH. L.REV. 1097 (1999).

7    One exception appears to be the Court's caselaw recognizing a limited constitutional "right of access" to certain governmental proceedings. Based in part on the principle that the First Amendment protects a right to gather information about the government, the Court has recognized a qualified right of the press and public to attend certain governmental proceedings, at least where the proceeding "historically has been open to the press and general public," and public access "plays a particularly significant role" in the functioning of the proceeding in question and "the government as a whole." *Globe Newspaper Co. v. Super. Ct. for the Cnty. of Norfolk,* 457 U.S. 596, 605–06, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (holding that a statute mandating closure of criminal trial during testimony of minor sexual-assault victim fails strict scrutiny); *see also Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 8–9, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (recognizing a qualified First Amendment right of the press and public to attend preliminary hearings); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 576–77, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality opinion) (holding that the First Amendment protects the right of the press and public to attend criminal trials); *In re Cont'l Litig.,* 732 F.2d 1302, 1308 (7th Cir.1984) (recognizing a right to attend civil trials); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.,* 652 F.3d 247, 260–61 (2d Cir.2011) (recognizing a right to attend transit-authority meetings); *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 181 (3d Cir.1999) (recognizing a right to attend planning-commission meetings).

This is not, strictly speaking, a claim about the qualified First Amendment right of access to governmental proceedings. Access is assumed here; the ACLU claims a right to audio record events and communications that take place in traditional public fora like streets, sidewalks, plazas, parks, and other open public spaces.

8    *See, e.g.,* BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 36 (1967) (observing that *Cato's Letters,* which included Gordon's essay on the freedom of speech, were "republished entire or in part again and again ... and referred to repeatedly in the pamphlet literature, ... rank[ing] with the treatises of Locke as the most authoritative statement of the nature of political liberty and above Locke as an exposition of the social sources of the threats it faced"); Donald S. Lutz, *The Relative Influence of European Writers on Late Eighteenth–Century American Political Thought,* 78 AM. POL. SCI. REV. 189, 194 (1984).

9    The claimant in *Glik* recorded the arrest because he thought the police were using excessive force. But the court's First Amendment ruling was not limited

Case 4:22-cv-04210   Document 120   Filed 07/17/25 in TXSD   Page 54 of 100
American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

to "defensive" recording to preserve evidence of wrongdoing, as our dissenting colleague suggests. Dissent at 609.

10   On the other hand, the Third Circuit resolved a similar qualified-immunity question differently in *Kelly v. Borough of Carlisle,* 622 F.3d 248 (3d Cir.2010), which involved a First Amendment claim by a plaintiff who was arrested under the Pennsylvania wiretapping statute for recording a police officer during a traffic stop. Although the Third Circuit found some support for a First Amendment right to record police officers performing their duties in public in some situations, *id.* at 260–62, the court held that "there [i]s insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment," *id.* at 262.

The First Circuit's decision in *Glik* aligns with authority from the Eleventh Circuit and with the weight of district-court decisions. *See Smith v. City of Cumming,* 212 F.3d 1332, 1333 (11th Cir.2000) (summarily recognizing "a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"); *see also* Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record,* 159 U. PA. L.REV. 335, 368 n. 113 (2011) (collecting district-court cases).

This case does not, of course, raise a question of qualified immunity; we do not need to take sides in the circuit split in order to decide this case.

11   The ACLU also suggests that the statute's enhanced penalty for recording a police officer, prosecutor, or judge amounts to content-based discrimination. This argument is off point. The ACLU is not seeking an injunction against the penalty enhancement.

12   Nothing we have said here endangers the tort law of privacy, as the dissent suggests. Dissent at 611–12. A tortious invasion of privacy occurs when a person "gives publicity to a matter concerning the private life of another ... *if* the matter publicized is *of a kind* that (a) would be *highly offensive to a reasonable person,* and (b) is *not of legitimate concern to the public.*" RESTATEMENT (SECOND) OF TORTS § 652D (emphasis added). The communications at issue here are not of this kind.

13   We are not suggesting that the First Amendment protects only *open* recording. The distinction between open and concealed recording, however, may make a difference in the intermediate-scrutiny calculus because surreptitious recording brings stronger

American Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583 (2012)
40 Media L. Rep. 1721

privacy interests into play. *See Bartnicki v. Vopper,* 532 U.S. 514, 529, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001).

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# *Gericke v. Begin*

753 F.3d 1 (1st Cir. 2014)

753 F.3d 1
United States Court of Appeals, First Circuit.

Carla GERICKE, Plaintiff, Appellee,
v.
Gregory C. BEGIN, Weare Police Chief,
in his Individual and Official Capacities;
James J. Carney, Lieutenant, Weare
Police Department, in his Individual
and Official Capacities; Joseph Kelley,
Sergeant, Weare Police Department, in
his Individual and Official Capacities;
Brandon Montplaisir, Police Officer, Weare
Police Department, in his Individual and
Official Capacities, Defendants, Appellants,
Weare Police Department,
Town of Weare, Defendants.

No. 12–2326
|
May 23, 2014.

**Synopsis**
**Background:** Plaintiff brought § 1983 action
against police officers, city police department,
and city, claiming that the officers violated
her First Amendment free speech rights when
they arrested and charged her with illegal
wiretapping in retaliation for her videotaping
of a traffic stop. The United States District Court
for the District of New Hampshire, Steven
J. McAuliffe, J., 2012 WL 4893218, denied
officers' motion for qualified immunity. The
officers appealed.

**Holdings:** The Court of Appeals, Lipez, Circuit
Judge, held that:

[1] the plaintiff had a First Amendment right to
film the officer, and

[2] the plaintiff's First Amendment right to film
was clearly established.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (10)

**[1]  Federal Courts**  ⟜ As to immunity
Court of Appeals has interlocutory
appellate jurisdiction over a denial
of summary judgment on qualified
immunity grounds only if the
material facts are undisputed and the
issue on appeal is one of law.

1 Case that cites this headnote

**[2]  Civil Rights**  ⟜ Good faith and
reasonableness;  knowledge and
clarity of law;  motive and intent, in
general
Qualified  immunity  provides
government officials with breathing
room  to  make  reasonable  but
mistaken judgments by shielding
officials from liability for civil
damages for actions that do not
violate clearly established statutory
or constitutional rights of which
a reasonable person would have
known.

5 Cases that cite this headnote

**[3]    Civil Rights** ⚖ **Government Agencies and Officers**

**Civil Rights** ⚖ **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Courts apply a two-prong test in determining whether a defendant is entitled to qualified immunity, asking (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation.

6 Cases that cite this headnote

**[4]    Civil Rights** ⚖ **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Whether a right was clearly established, for purposes of qualified immunity, depends on: (1) the clarity of the law at the time of the alleged violation, and (2) whether, given the facts of the particular case, a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights.

6 Cases that cite this headnote

**[5]    Civil Rights** ⚖ **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

The law may be clearly established, for purposes of qualified immunity, even if there is no case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

2 Cases that cite this headnote

**[6]    Civil Rights** ⚖ **Particular cases and contexts**

Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

11 Cases that cite this headnote

**[7]    Constitutional Law** ⚖ **Retaliation in general**

In a § 1983 claim of retaliatory prosecution for First Amendment activity, a plaintiff must prove that her conduct was constitutionally protected and was a substantial or motivating factor for the retaliatory decision, and that there was no probable cause for the criminal charge. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

19 Cases that cite this headnote

**[8]    Constitutional Law** ⚖ **Interaction with public safety officials**

**Municipal, County, and Local Government** ⬩ Police, Law Enforcement, and Public Safety

A plaintiff had a First Amendment right to film a police officer conducting a traffic stop in a public place, where the plaintiff complied with the officer's orders to move away from the scene and return to her car, and the officer never ordered the plaintiff to stop filming. U.S.C.A. Const.Amend. 1.

25 Cases that cite this headnote

[9]   **Constitutional Law** ⬩ Interaction with public safety officials

An individual's exercise of her First Amendment right to film police activity carried out in public, including a traffic stop, remains unfettered unless and until a reasonable restriction is imposed or in place; such a restriction could take the form of a reasonable, contemporaneous order from a police officer, or a preexisting statute, ordinance, regulation, or other published restriction with a legitimate governmental purpose. U.S.C.A. Const.Amend. 1.

31 Cases that cite this headnote

[10]   **Civil Rights** ⬩ Sheriffs, police, and other peace officers

A reasonable police officer would have understood that charging a plaintiff with illegal wiretapping for attempting to film the officer during a traffic in a public place and in the absence of any order to stop filming violated the plaintiff's First Amendment rights, and thus the plaintiff's right to film the officer was clearly established for purposes of denying summary judgment on the officer's motion seeking qualified immunity, in the plaintiff's § 1983 action against the police officer, police department and city. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*2** Charles P. Bauer, with whom Robert J. Dietel, Gallagher, Callahan & Gartrell, P.C., Corey M. Belobrow, and Maggiotto & Belobrow, PLLC were on brief, for appellants.

Seth J. Hipple, with whom Stephen T. Martin and The Law Offices of Martin & Hipple, PLLC were on brief, for appellee.

Before THOMPSON, SELYA and LIPEZ, Circuit Judges.

**Opinion**

LIPEZ, Circuit Judge.

This case raises an important question about an individual's First Amendment right to film a traffic stop by a police officer. Carla Gericke attempted to film Sergeant Joseph Kelley as he was conducting a late-night traffic stop. Shortly

thereafter, she was arrested and charged with several crimes, including a violation of New Hampshire's wiretapping statute. Gericke was not brought to trial. She subsequently sued the Town of Weare, its police department, and the officers who arrested and charged her, alleging in pertinent part that the wiretapping charge constituted retaliatory prosecution in violation of her First Amendment rights.

In this interlocutory appeal, the defendant-appellant police officers challenge the district court's order denying them qualified immunity on Gericke's First Amendment **\*3** retaliatory prosecution claim. Based on Gericke's version of the facts, we conclude that she was exercising a clearly established First Amendment right when she attempted to film the traffic stop in the absence of a police order to stop filming or leave the area. We therefore affirm.

## I.

 **[1]** We have interlocutory appellate jurisdiction over a denial of summary judgment on qualified immunity grounds only if the material facts are undisputed and the issue on appeal is one of law. *Mlodzinski v. Lewis,* 648 F.3d 24, 27 (1st Cir.2011). As the officers acknowledge, we must accept and analyze Gericke's version of the facts. *See Campos v. Van Ness,* 711 F.3d 243, 245 (1st Cir.2013). We offer for context, only where it is uncontested, Sergeant Kelley's account of events.

On March 24, 2010, at approximately 11:30 p.m. in Weare, Gericke and Tyler Hanslin were caravaning in two cars to Hanslin's house.

Gericke was following Hanslin because she had never been to his house. Gericke had a passenger in her car, as did Hanslin.

On South Stark Highway, Sergeant Kelley pulled his police car behind Gericke's vehicle and activated his emergency lights. Believing that Kelley was pulling her over, Gericke stopped her car on the side of the highway. Hanslin likewise stopped his car in front of Gericke's. Kelley parked his own vehicle between Hanslin's and Gericke's cars. Kelley approached Gericke's car, informed her that it was Hanslin who was being detained, and told her to move her car. Gericke informed Kelley that she was going to pull her car into the adjacent Weare Middle School parking lot to wait for Hanslin. According to Gericke's deposition, Kelley "eventually said that's fine."

As Gericke was moving her car, Kelley approached Hanslin's vehicle. According to Kelley, when he asked Hanslin if he had any weapons, Hanslin disclosed that he was carrying a firearm. Kelley instructed Hanslin to exit the car. [1]

Once Gericke parked in the lot, she got out of her car and approached a fence that, along with a grassy area, separated the lot from the road. Gericke was at least thirty feet from Kelley. Gericke announced to Kelley that she was going to audio-video record him. She pointed a video camera at Kelley and attempted to film him as he was interacting with Hanslin.

Unbeknownst to Kelley, Gericke's camera, despite her attempts, would not record. [2] Kelley ordered Gericke to return to her car, and she immediately complied. From her car, she

continued to point her camera at Kelley even though she knew the camera was not recording. Significantly, under Gericke's account, Kelley never asked her to stop recording, and, once she pulled into the parking lot, he did not order her to leave the area.

Gericke stopped holding up the camera on her own accord and placed it in the center console of her car. Officer Brandon Montplaisir then arrived on the scene. Montplaisir approached Gericke while she was in her car and demanded to know **\*4** where her camera was, but she refused to tell him. He asked for her license and registration. When Gericke did not comply, Montplaisir arrested her for disobeying a police order. Lieutenant James Carney then arrived on the scene, as did several civilians in a car. [3] Gericke was transported to the Weare police station, where the police filed criminal complaints against her for disobeying a police officer, *see* N.H.Rev.Stat. Ann. § 265:4; obstructing a government official, *see id.* § 642:1; and, the charge relevant here— unlawful interception of oral communications, *see id.* § 570–A:2. [4] Gericke's camera was also seized. [5]

A criminal probable cause hearing was scheduled for May 25, 2010. On the day of that hearing, the town prosecutor declined to proceed on the pending charges, including the charge for unlawful interception of oral communications. The prosecutor sent the matter to the Hillsborough County Attorney, who also did not move forward with the charges. [6]

In May 2011, Gericke brought this action under 42 U.S.C. § 1983 and state law against the defendant police officers, the Weare Police Department, and the Town of Weare. In her amended complaint, she alleged, inter alia, that the officers violated her First Amendment rights when they charged her with illegal wiretapping in retaliation for her videotaping of the traffic stop. In May 2012, the officers filed motions for summary judgment, arguing in pertinent part that they were entitled to qualified immunity on Gericke's First Amendment claim because there was no clearly established right to film the traffic stop.

In a thoughtful opinion, the district court ruled that the police lacked probable cause to believe that Gericke had committed illegal wiretapping because "that statute provides that, for a crime to occur, the victim of an intercepted oral communication must have had a reasonable expectation 'that such communication is not subject to interception under circumstances justifying such expectation.' [N.H.Rev.Stat. Ann. § ] 570–A:1, II." *Gericke v. Begin,* No. 11–cv–231–SM, 2012 WL 4893218, at *6 (D.N.H. Oct. 15, 2012). Here, the district court reasoned, "the officers had no reasonable expectation that their public communications during the traffic stop were not subject to interception." *Id.*

The district court denied the officers' motions seeking qualified immunity on the First Amendment retaliation claim stemming from the illegal wiretapping charge, **\*5** ruling that development of the facts was necessary before it could determine whether the officers were entitled to qualified immunity. Relying on our decision in *Glik v. Cunniffe,* 655 F.3d 78

(1st Cir.2011), the district court stated that, under the "broad holding" there, "a reasonable officer should have known that a blanket prohibition on the recording of *all* traffic stops, no matter the circumstances, was not constitutionally permissible." *Gericke,* 2012 WL 4893218, at *7 n. 4. The court noted that "the circumstances faced by the officers in this case were substantially different than those faced by the officers in *Glik.*" *Id.* at *7. Whereas Glik filmed an arrest on the Boston Common, the district court recognized that here the officers faced a potentially dangerous late-night traffic stop involving a firearm, multiple vehicles, and multiple citizens, some of whom, according to Kelley, were confrontational.

However, the district court reasoned that *Glik* "recognized that it is clearly established in this circuit that police officers cannot, consistently with the Constitution, prosecute citizens for violating wiretapping laws when they peacefully record a police officer performing his or her official duties in a public area." *Id.* at *6. By extension, the district court concluded that there was not a clearly established First Amendment right to record in a disruptive manner the public activity of police officers. Because the court held that there was a genuine factual dispute about whether Gericke had been disruptive, the court denied the officers' motions for summary judgment on the retaliatory prosecution claim stemming from the wiretapping charge.

The officers filed this timely interlocutory appeal. If the district court was correct that the qualified immunity question depends on the resolution of disputed issues of fact about whether Gericke had been disruptive, we would

refuse to hear this interlocutory appeal. *See Mlodzinski,* 648 F.3d at 27–28. However, since the officers "accept [Gericke's] version in order to test the immunity issue," we, in turn, accept interlocutory jurisdiction to decide the question on Gericke's "best case," which portrays compliance with all police orders. *See id.* at 28

The issue before us is whether it was clearly established that Gericke was exercising a First Amendment right when she attempted to film Sergeant Kelley during the traffic stop. If she was not exercising a First Amendment right, or, on her facts, a reasonable officer could have concluded that she was not, then the officers are entitled to qualified immunity. Our review is limited to the denial of summary judgment on qualified immunity grounds, *Boyle v. Burke,* 925 F.2d 497, 499 (1st Cir.1991), which we review de novo, *Mlodzinski,* 648 F.3d at 32.

## II.

**[2]    [3]** Qualified immunity provides government officials with "breathing room to make reasonable but mistaken judgments" by shielding officials from liability for civil damages for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Stanton v. Sims,* —— U.S. ——, 134 S.Ct. 3, 4–5, 187 L.Ed.2d 341 (2013) (internal quotation mark omitted). We apply a two-prong test in determining whether a defendant is entitled to qualified immunity. *Glik,* 655 F.3d at 81. We ask "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the

right was clearly established at the time of the defendant's alleged violation." *Id.* (internal quotation marks omitted).

**[4]** **[5]** Whether the right was clearly established depends on "(1) the clarity of **\*6** the law at the time of the alleged ... violation, and (2) whether, given the facts of the particular case, a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." *Id.* (alternation in original) (internal quotation marks omitted). The law may be clearly established even if there is no "case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Stanton,* 134 S.Ct. at 5 (internal quotation marks omitted). Our task is to determine "whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Glik,* 655 F.3d at 81 (internal quotation mark omitted); *see also MacDonald v. Town of Eastham,* 745 F.3d 8, 12 (1st Cir.2014).

On appeal, the officers argue both that there was no First Amendment right to film law enforcement officers during the late-night traffic stop, when Hanslin had a gun and Kelley faced two cars and four individuals, and that, even if such a right existed, it was not clearly established at the time of the traffic stop in this case.

### III.

### A. Retaliatory Prosecution for First Amendment Activity

**[6]** **[7]** Gericke claims that her First Amendment rights were violated because the officers, by filing the charge of illegal wiretapping, retaliated against her for her attempt to film the public traffic stop. It is well established that claims of retaliation for the exercise of First Amendment rights are cognizable under section 1983. *Powell v. Alexander,* 391 F.3d 1, 16 (1st Cir.2004) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). In a section 1983 claim of retaliatory prosecution for First Amendment activity, a plaintiff must prove that her conduct was constitutionally protected and was a " 'substantial' " or " 'motivating' " factor for the retaliatory decision, *Powell,* 391 F.3d at 17 (quoting *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568), and that there was no probable cause for the criminal charge, *Hartman v. Moore,* 547 U.S. 250, 265–66, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006).[7] Retaliation is always reprehensible, and, regardless of whether the underlying activity is constitutionally protected, it is obviously improper for officers to invoke criminal laws for retaliatory purposes. However, the plaintiff's activity must be constitutionally protected in order to bring a section 1983 claim of First Amendment retaliation.[8]

If Gericke was exercising a clearly established First Amendment right, then it **\*7** is in turn clearly established that the police could not retaliate for such activity by charging her with illegal wiretapping without probable cause. Therefore, to determine whether Gericke has a colorable section 1983 claim, we must analyze (1) whether Gericke was exercising a constitutionally protected right to film the

police during the traffic stop, and (2) whether that right was clearly established at the time of the stop.

**B. Was Gericke Exercising a First Amendment Right to Film the Traffic Stop?**

 **[8]**  In *Glik,* the plaintiff filmed several police officers arresting a young man on the Boston Common. *Glik,* 655 F.3d at 79. Recognizing that it is firmly established that the First Amendment protects "a range of conduct" surrounding the gathering and dissemination of information, we held that the Constitution protects the right of individuals to videotape police officers performing their duties in public. *Id.* at 82. Gericke attempted to videotape Sergeant Kelley during the traffic stop of Hanslin. Thus, the threshold question here is whether the occasion of a traffic stop places Gericke's attempted filming outside the constitutionally protected right to film police that we discussed in *Glik.* It does not.

In *Glik,* we explained that gathering information about government officials in a form that can be readily disseminated "serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.' " *Glik,* 655 F.3d at 82 (quoting *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966)). Protecting that right of information gathering "not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally." *Id.* at 82–83 (citations omitted). Those First Amendment principles apply equally to the filming of a traffic stop and the filming of an arrest in a public park. In both instances, the subject of filming is "police carrying out

their duties in public." *Id.* at 82. A traffic stop, no matter the additional circumstances, is inescapably a police duty carried out in public. Hence, a traffic stop does not extinguish an individual's right to film.

This is not to say, however, that an individual's exercise of the right to film a traffic stop cannot be limited. Indeed, *Glik* remarked that "a traffic stop is worlds apart from an arrest on the Boston Common in the circumstances alleged." *Glik,* 655 F.3d at 85. That observation reflected the Supreme Court's acknowledgment in Fourth Amendment cases that traffic stops may be " 'especially fraught with danger to police officers' " and thus justify more invasive police action than would be permitted in other settings. *Arizona v. Johnson,* 555 U.S. 323, 330, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) (quoting *Michigan v. Long,* 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). [9] Reasonable restrictions on the exercise of the right to film may be imposed when the circumstances justify them. *See Glik,* 655 F.3d at 84 (the exercise of the right to film may be subject to reasonable time, place, and manner restrictions); **\*8** *ACLU of Ill. v. Alvarez,* 679 F.3d 583, 607 (7th Cir.2012) (reasonable orders to maintain safety and control, which have incidental effects on an individual's exercise of the First Amendment right to record, may be permissible).

The circumstances of some traffic stops, particularly when the detained individual is armed, might justify a safety measure— for example, a command that bystanders disperse—that would incidentally impact an individual's exercise of the First Amendment right to film. Such an order, even when directed

at a person who is filming, may be appropriate for legitimate safety reasons. However, a police order that is specifically directed at the First Amendment right to film police performing their duties in public may be constitutionally imposed only if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties. *Glik*'s admonition that, "[i]n our society, police officers are expected to endure significant burdens caused by citizens' exercise of their First Amendment rights" will bear upon the reasonableness of any order directed at the First Amendment right to film, whether that order is given during a traffic stop or in some other public setting. *Glik,* 655 F.3d at 84 (citing *City of Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)). We have made clear that "[t]he same restraint demanded of police officers in the face of 'provocative and challenging' speech, must be expected when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces." *Glik,* 655 F.3d at 84 (citations omitted) (quoting *Hill,* 482 U.S. at 461, 107 S.Ct. 2502).

 **[9]**   Importantly, an individual's exercise of her First Amendment right to film police activity carried out in public, including a traffic stop, necessarily remains unfettered unless and until a reasonable restriction is imposed or in place. This conclusion follows inescapably from the nature of the First Amendment right, which does not contemplate self-censorship by the person exercising the right. *See generally Baggett v. Bullitt,* 377 U.S. 360, 372 n. 10, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) ("[T]he conduct proscribed must be defined specifically so that the person or persons

affected remain secure and unrestrained in their rights to engage in activities not encompassed by the [restriction]." (internal quotation mark omitted)); *Herndon v. Lowry,* 301 U.S. 242, 259, 57 S.Ct. 732, 81 L.Ed. 1066 (1937) ("The appellant had a constitutional right to address meetings and organize parties unless in so doing he violated some prohibition of a valid statute."); *Dean v. Byerley,* 354 F.3d 540, 551 (6th Cir.2004) ("Although the government may restrict the [First Amendment] right [to use streets for assembly and communication] through appropriate regulations, that right remains unfettered unless and until the government passes such regulations."). Such a restriction could take the form of a reasonable, contemporaneous order from a police officer, or a preexisting statute, ordinance, regulation, or other published restriction with a legitimate governmental purpose.

Under Gericke's version of the facts, no such restriction was imposed or in place. [10] According to Gericke, she immediately complied with all police orders: she returned to her car with her camera when **\*9** Sergeant Kelley asked her to do so, he never ordered her to stop filming, and once she pulled into the parking lot, he never asked her to leave the scene. Therefore, under Gericke's version of the facts, her right to film remained unfettered, and a jury could supportably find that the officers violated her First Amendment right by filing the wiretapping charge without probable cause in retaliation for her attempted filming.

**C. Was the Right to Film The Traffic Stop Clearly Established?**

**[10]**    In *Glik,* we held that, "though not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space" was clearly established by the time of the underlying events in the case. *Glik,* 655 F.3d at 85. Our observation that the right to film is not unqualified recognized that the right can be limited by reasonable time, place, and manner restrictions. *Id.* at 84. Gericke's attempt to film Sergeant Kelley during the traffic stop was unmistakably an attempt to film a law enforcement officer in the discharge of his duties in a public space. Therefore, as the events in *Glik* occurred well over two years before the events here, Gericke's right to film the traffic stop was clearly established unless it was reasonably restricted.

Under Gericke's account, no order to leave the area or stop filming was given. Hence, we need not analyze whether a reasonable officer could have believed that the circumstances surrounding this traffic stop allowed him to give such an order. That hypothetical scenario involving a possible restriction on the right to film is irrelevant to this interlocutory appeal. In the absence of a reasonable restriction, it is self-evident, based on first principles, that Gericke's First Amendment right to film police carrying out their duties in public remained unfettered. [11] Under Gericke's account, she was permissibly at the site of the police encounter with Hanslin. It would be nonsensical to expect Gericke to refrain from filming when such filming was neither unlawful nor the subject of an officer's order to stop. In the absence of such restrictions, a reasonable police officer necessarily would have understood that

Gericke was exercising a clearly established First Amendment right.

As we explained above, claims of retaliation for the exercise of clearly established First Amendment rights are cognizable under section 1983. *See Powell,* 391 F.3d at 16. Thus, under Gericke's version of the facts, any reasonable officer would have understood that charging Gericke with illegal wiretapping for attempted filming that had not been limited by any order or law violated her First Amendment right to film. [12] " '[T]he contours of [the] right [were] sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right.' " *Ashcroft v. al–Kidd,* —— U.S. ——, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting **\*10** *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Hence, at this stage of the litigation, the officers are not entitled to qualified immunity. [13]

**IV.**

Under Gericke's version of the facts, where there was no police order to stop filming or leave the area, a jury could supportably find that the officers violated her First Amendment right by filing the wiretapping charge against her because of her attempted filming of Sergeant Kelley during the traffic stop. It was clearly established at the time of the stop that the First Amendment right to film police carrying out their duties in public, including a traffic stop, remains unfettered if no reasonable restriction is imposed or in place. Accordingly, we hold that the district court properly denied qualified immunity to the officers on Gericke's

section 1983 claim that the wiretapping charge constituted retaliatory prosecution in violation of the First Amendment.

**Affirmed.**

**All Citations**

753 F.3d 1

## Footnotes

1    Gericke states that Hanslin was properly licensed to possess and carry a pistol, and she asserts that at no point did Sergeant Kelley draw his own weapon.

2    The parties do not treat as relevant the fact that Gericke attempted, but was unable, to record Kelley due to a problem with her video camera. We agree that Gericke's First Amendment right does not depend on whether her attempt to videotape was frustrated by a technical malfunction. There is no dispute that she took out the camera in order to record the traffic stop.

3    In her deposition, Gericke stated that she thought there were three people in the additional civilian car that arrived. She stated that she knew several of the occupants of the car, who she thinks arrived to "take a look and make sure everyone [was] safe."

4    For the purpose of this interlocutory appeal, the parties do not make an issue of the identity of the officer(s) who charged Gericke with illegal wiretapping. Therefore, without specificity, we simply refer to the "police" or the "officers" in describing those who charged Gericke with illegal wiretapping.

5    On November 2, 2010, the police obtained a warrant to search the contents of Gericke's video camera. According to the government, during the search of the video camera, digital video files were discovered but could not be opened. The camera was sent to the New Hampshire State Laboratory, which apparently encountered the same difficulty. Gericke subsequently filed a motion in state court seeking return of her video camera. The motion was granted, and her camera was returned after the government's motion for reconsideration was denied.

6    The officers do not attempt to explain why the prosecution did not proceed, and neither party points to any explanation in the record.

7    In holding that the plaintiff must plead and prove an absence of probable cause for a retaliatory prosecution claim, the Supreme Court observed that "[i]t may be dishonorable to act with an unconstitutional motive and perhaps in some instances

be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman,* 547 U.S. at 260, 126 S.Ct. 1695. The Court reasoned that evidence regarding probable cause "will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation." *Id.* at 261, 126 S.Ct. 1695. On this interlocutory appeal, the officers have not challenged the district court's probable cause ruling. Therefore, we treat the lack of probable cause as a given for the purpose of this appeal.

8    Even if the activity is not constitutionally protected, a state law claim, such as malicious prosecution, might lie if the elements of such a claim are met. Gericke in fact also brought such a malicious prosecution claim, which is not before us on this interlocutory appeal, and the district court ruled that the claim survived the officers' motions for summary judgment.

9    In a traffic stop, for example, officers may insist that passengers exit the vehicle without even a reasonable suspicion that they were engaged in wrongdoing. *Maryland v. Wilson,* 519 U.S. 408, 413–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). A police officer may also request identifying information from passengers in a traffic stop without particularized suspicion that they pose a safety risk or are violating the law, "[s]o long as the request [does] not 'measurably extend the duration of the stop.' " *United States v. Fernandez,* 600 F.3d 56, 57, 62 (1st Cir.2010) (quoting *Johnson,* 555 U.S. at 333, 129 S.Ct. 781).

10    We do not consider whether the wiretapping statute amounted to a reasonable time, place, and manner restriction because the officers have not in any way challenged on appeal the district court's ruling that there was no probable cause for the wiretapping charge.

11    In *Glik,* we recognized that "some constitutional violations are 'self-evident' and do not require particularized case law to substantiate them." *Glik,* 655 F.3d at 85 (citing *Lee v. Gregory,* 363 F.3d 931, 936 (9th Cir.2004)). We specifically observed that the "terseness" of our acknowledgment of a journalist's First Amendment right to film officials in *Iacobucci v. Boulter,* 193 F.3d 14 (1st Cir.1999), "implicitly speaks to the fundamental and virtually self-evident nature of the First Amendment's protections in this area." *Glik,* 655 F.3d at 84–85.

12    As we explained in note 10, *supra,* the officers do not challenge the finding of the district court that there was no probable cause to believe that Gericke had violated the wiretapping statute.

13    Of course, a trial might leave a fact-finder with a different view of whether Sergeant Kelley ordered Gericke to leave the area or stop filming. That view, in turn, might

affect the court's analysis of the availability of qualified immunity to the officers. *See Swain v. Spinney,* 117 F.3d 1, 10 (1st Cir.1997) ("We recognize that the immunity question should be resolved, where possible, in advance of trial. However, disposition of the question on summary judgment is not always possible.... There are ... factual issues, potentially turning on credibility, that must be resolved by the trier of fact. Only after the resolution of these conflicts may the trial court apply the relevant law on objective reasonableness." (citation omitted)).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# *Bailey v. Ramos*

125 F.4th 667 (5th Ci. 2025)

125 F.4th 667
United States Court of Appeals, Fifth Circuit.

David BAILEY, Plaintiff—Appellee,
v.
Oscar RAMOS, Defendant—Appellant.

No. 23-50185
|
FILED January 10, 2025

**Synopsis**

**Background:** Arrestee brought § 1983 action against police officer and city, alleging unlawful seizure and arrest, excessive force, malicious prosecution, violation of right to record the police, and First Amendment retaliation arising from incident in which arrestee was charged with interfering with duties of a public servant stemming from arrestee's conduct while filming police officers responding to an assault. The United States District Court for the Western District of Texas, Xavier Rodriguez, J., 657 F.Supp.3d 927, denied officer's motion for summary judgment based on qualified immunity. Officer appealed.

**Holdings:** The Court of Appeals, Willett, Circuit Judge, held that:

[1] officer could have reasonably, even if mistakenly, believed that he had probable cause for arrest for Texas offense of interference with a public duty, and therefore officer was entitled to qualified immunity on arrestee's unlawful-arrest claim;

[2] even if takedown procedure employed by officer amounted to excessive force, unlawfulness of officer's conduct was not clearly established, and therefore officer was entitled to qualified immunity on arrestee's excessive-force claim;

[3] officer's use of leg maneuver to cause handcuffed arrestee, who was standing against a wall, to slide to ground and become seated on ground was not objectively unreasonable and thus not excessive force; and

[4] there was no evidence that officer had subjective retaliatory motive for arrest, nor that any such motive was the but-for cause of decision to arrest, precluding First Amendment retaliation claim.

Reversed and remanded with instructions.

Elrod, Chief Judge, concurred in part, dissented in part, and filed opinion.

**Procedural Posture(s):** Interlocutory Appeal; Motion for Summary Judgment.

West Headnotes (36)

**[1]    Federal Courts** ⬥ Summary judgment

Ordinarily, Court of Appeals reviews the district court's denial of summary judgment de novo, applying the same standard as the district court.

**[2]   Civil Rights** 🔑 Government
Agencies and Officers

**Civil Rights** 🔑 Good faith and
reasonableness;  knowledge and
clarity of law;  motive and intent, in
general

**Civil Rights** 🔑 Defenses;
immunity and good faith

Once a defendant asserts qualified
immunity in a § 1983 action,
the plaintiff bears the burden of
negating it by showing that (1)
the official violated a statutory or
constitutional right and (2) the right
was clearly established at the time of
the challenged conduct. 42 U.S.C.A.
§ 1983.

1 Case that cites this headnote

**[3]   Civil Rights** 🔑 Good faith and
reasonableness;  knowledge and
clarity of law;  motive and intent, in
general

Although a § 1983 plaintiff seeking
to negate qualified immunity need
not identify a case directly on point
in order to show the law was clearly
established, he or she must point to
authority at a sufficiently high level
of specificity to put a reasonable
official on notice that his conduct is
definitively unlawful. 42 U.S.C.A. §
1983.

1 Case that cites this headnote

**[4]   Federal Courts** 🔑 Immunity

In a § 1983 action, Court of Appeals
reviews summary judgment based on
qualified immunity de novo, but only
to extent that it turns on issue of law.
42 U.S.C.A. § 1983.

**[5]   Federal Courts** 🔑 As to immunity

District court's finding that a
genuine factual dispute exists is
a factual determination that Court
of Appeals is prohibited from
reviewing in an interlocutory appeal
from denial of summary judgment
based on qualified immunity in a
§ 1983 action; however, the district
court's determination that a particular
dispute is material is a reviewable
legal determination. 42 U.S.C.A. §
1983.

**[6]   Summary Judgment** 🔑 Immunity

On a motion for summary judgment
based on qualified immunity in a §
1983 action, where video evidence
is available, court is required to
view the facts in light depicted
by videotape; however, inasmuch as
that video evidence is inconclusive,
the ordinary summary judgment
standard applies. 42 U.S.C.A. §
1983.

1 Case that cites this headnote

**[7]   Search, Seizure, and
Arrest** 🔑 Necessity in general

A warrantless arrest must be based on probable cause. U.S. Const. Amend. 4.

**[8]** **Search, Seizure, and Arrest** What constitutes probable cause in general

Probable cause to arrest exists when totality of facts and circumstances within police officer's knowledge at moment of arrest are sufficient for reasonable person to conclude that suspect had committed or was committing offense. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[9]** **Search, Seizure, and Arrest** What constitutes probable cause in general

Adjudication of probable cause for arrest is an objective test: courts must look to the totality of the circumstances and decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, demonstrate a probability or substantial chance of criminal activity. U.S. Const. Amend. 4.

**[10]** **Civil Rights** Arrest and detention

If there was probable cause for arrest for any of the charges made, then an arrest was supported by probable

cause, and an arrestee's claim for false arrest fails. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[11]** **Civil Rights** Defenses; immunity and good faith

**Summary Judgment** Immunity

Genuine dispute of material fact existed as to whether police officer had probable cause to arrest bystander for Texas offense of assault by offensive conduct, as could preclude summary judgment based on qualified immunity from bystander's § 1983 unlawful-arrest claim following arrest during incident in which bystander, while filming officer's response to an assault, allegedly swatted officer and clenched hand into a fist as though he were preparing to fight officer. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 22.01(a)(3).

**[12]** **Obstructing Justice** Interfering with Performance of Official Duties

Under Texas law, for an action to constitute "interference" with public duties of peace officer, as could constitute offense of interference with public duties, the action must consist of more than just speech alone. Tex. Penal Code Ann. § 38.15(a)(1).

**[13]   Civil Rights** 🔑 **Sheriffs, police, and other peace officers**

Police officers who reasonably but mistakenly conclude that probable cause for arrest is present are entitled to qualified immunity in a § 1983 action for unlawful arrest; there must not even arguably be probable cause for the arrest for the immunity to be lost, and thus this is a significant hurdle for plaintiff to clear in order to defeat qualified immunity. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[14]   Civil Rights** 🔑 **Sheriffs, police, and other peace officers**

Police officer could have reasonably, even if mistakenly, believed that he had probable cause to arrest bystander for Texas offense of interference with a public duty, and therefore officer was entitled to qualified immunity from bystander's unlawful-arrest claim under § 1983 following arrest during incident in which bystander, while filming officer's response to an assault, allegedly failed to comply with officer's instructions to stand back from active crime scene, even if bystander was in fact attempting to comply with instruction to stand back, where bystander hesitated in complying, bystander had made obscene gesture at officer shortly before instruction to stand back,

bystander was cursing at officer, and individual with bystander had approached officer while openly carrying a gun. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

1 Case that cites this headnote

**[15]   Search, Seizure, and Arrest** 🔑 **Exceptions in general; warrantless searches in general**

In absence of warrant, search is reasonable only if it falls within specific exception to warrant requirement. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[16]   Federal Courts** 🔑 **Summary judgment**

Arrestee's argument before district court that officer "use[d] more physical force than necessary to effectuate the arrest" was broad enough to allow arrestee to raise argument that officer used excessive force, and thus was not entitled to qualified immunity from arrestee's excessive-force claim under § 1983, through specific conduct of sweeping arrestee's legs out from under him to bring him to the ground, in arrestee's response to officer's appeal of denial of summary judgment based on qualified immunity for excessive-force claims arising from several different takedown actions of officer

during arrest; language in argument to district court covered force used to keep control of arrestee in the minutes after he was placed in handcuffs. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[17]  **Civil Rights** 🔑 Arrest and detention

A § 1983 plaintiff's excessive-force claim is separate and distinct from an unlawful-arrest claim, and court must therefore analyze the excessive-force claim without regard to whether the arrest itself was justified. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[18]  **Civil Rights** 🔑 Use of force in general

In a § 1983 action for excessive force, an officer's use of force is excessive under the Fourth Amendment if the plaintiff can show: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which is clearly unreasonable. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[19]  **Search, Seizure, and Arrest** 🔑 Reasonableness in general; objective or subjective test

To assess reasonableness of force used by police officer, court considers three factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, (3) and whether he is actively resisting arrest or attempting to evade arrest by flight. U.S. Const. Amend. 4.

[20]  **Search, Seizure, and Arrest** 🔑 Reasonableness in general; objective or subjective test

Reasonableness of particular use of force by police officer must be judged from perspective of reasonable officer on scene, rather than with 20/20 vision of hindsight. U.S. Const. Amend. 4.

[21]  **Search, Seizure, and Arrest** 🔑 Reasonableness in general; objective or subjective test

Not every push or shove by police officer, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment prohibition on excessive force. U.S. Const. Amend. 4.

[22]  **Search, Seizure, and Arrest** 👉 Reasonableness in general; objective or subjective test

Fourth Amendment requirement that force used by police officer be reasonable is not a requirement to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection. U.S. Const. Amend. 4.

[23]  **Civil Rights** 👉 Assault and battery; personal injury and use of force

As long as a plaintiff asserting a § 1983 claim for excessive force has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[24]  **Civil Rights** 👉 Defenses; immunity and good faith

**Summary Judgment** 👉 Immunity

Genuine disputes of material fact existed as to whether arrestee posed immediate threat to safety of others and whether force used by police officer when he pushed arrestee and brought him to the ground was reasonable, as could preclude summary judgment based on qualified immunity in arrestee's § 1983 action for excessive force arising from arrest for Texas offense of interference with public duties while arrestee was attempting to film officer's response at scene of an assault, during which arrestee allegedly engaged in physical contact with officer in moments preceding use of force. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

[25]  **Civil Rights** 👉 Sheriffs, police, and other peace officers

Even if takedown procedure employed by police officer during arrest of bystander for Texas offense of interference with public duties, allegedly consisting of shoving arrestee, pulling off arrestee's shirt, and pushing arrestee to ground to handcuff him, amounted to excessive force, unlawfulness of officer's conduct was not clearly established, and thus officer was entitled to qualified immunity in arrestee's § 1983 action asserting excessive force; unlike in relevant precedent, bystander had been given an order with which to comply, namely to stand back, and level of force used was far less than that in case in which force and been found excessive. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

1 Case that cites this headnote

**[26]   Search, Seizure, and Arrest** 🖝 Particular cases in general

Police officer's use of leg maneuver to cause handcuffed arrestee, who was standing against wall, to slide to ground and become seated on ground was not objectively unreasonable, and thus did not amount to excessive force, in violation of Fourth Amendment, where arrestee was not complying with officers' lawful orders to sit down. U.S. Const. Amend. 4.

**[27]   Search, Seizure, and Arrest** 🖝 Reasonableness in general; objective or subjective test

Once a suspect has been handcuffed and subdued, and is no longer resisting, a police officer's use of force is excessive. U.S. Const. Amend. 4.

1 Case that cites this headnote

**[28]   Search, Seizure, and Arrest** 🖝 Reasonableness in general; objective or subjective test

Use of force against handcuffed suspect is not excessive if suspect is resisting by ignoring lawful commands. U.S. Const. Amend. 4.

**[29]   Summary Judgment** 🖝 First Amendment in general

To survive summary judgment on a First Amendment retaliation claim under § 1983, plaintiff must show there is at least a genuine dispute of material fact that (1) he was engaged in constitutionally protected activity; (2) the defendant's actions caused plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[30]   Constitutional Law** 🖝 Retaliation in general

A First Amendment retaliation claim against a police officer based on an arrest is only available when non-retaliatory grounds are in fact insufficient to provoke the arrest, meaning that the officer's subjective motivation must be the but-for cause of the adverse action against the plaintiff. U.S. Const. Amend. 1.

2 Cases that cite this headnote

**[31]   Constitutional Law** 🖝 Retaliation

For an injury to constitute one that would chill a person of ordinary firmness from continuing to engage in that activity, as would be required to support First Amendment retaliation claim, the effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights, it need not be great in order to be actionable. U.S. Const. Amend. 1.

1 Case that cites this headnote

**[32]** **Constitutional Law** Interaction with public safety officials

**Search, Seizure, and Arrest** Retaliatory or discriminatory arrest

Alleged injuries which arrestee suffered as a result of police officer's use of force during the arrest were sufficient to chill a person of ordinary firmness from continuing to engage in activity at issue, as could support arrestee's First Amendment retaliation claim in his § 1983 action against officer arising from arrest for Texas offense of interference with public duties, which arrest occurred while arrestee was filming officer's response at scene of an assault, where arrestee alleged that he suffered abrasions to his wrist and knee, acute neck pain, and a concussion. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

**[33]** **Summary Judgment** First Amendment in general

At summary judgment stage of First Amendment retaliation action under § 1983, plaintiff cannot rely on allegations but rather must produce specific support for his claim that defendant had an unconstitutional motive. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[34]** **Civil Rights** Weight and Sufficiency of Evidence

First Amendment retaliation claim under § 1983 does not require plaintiff to produce direct evidence of defendant's unconstitutional motive; circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[35]** **Constitutional Law** Interaction with public safety officials

**Search, Seizure, and Arrest** Retaliatory or discriminatory arrest

There was no evidence that police officer had a subjective retaliatory motive when he arrested bystander for Texas offense of interference with public duties, nor that any such motive was the but-for cause of officer's decision to arrest

bystander, precluding bystander's First Amendment retaliation claim under § 1983 arising from incident in which bystander was arrested while filming officer's response at scene of an assault, after bystander allegedly failed to comply with officer's commands to stand back. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983; Tex. Penal Code Ann. § 38.15(a)(1).

[36]   **Constitutional Law** 👉 Arrest

In a First Amendment retaliation claim under § 1983 arising from an arrest while arrestee was engaging in speech, the fact that arrestee was arrested when otherwise similarly situated individuals not engaged in the same sort of speech were not arrested is good evidence in favor of arrestee as to whether police officer acted with unconstitutional motive. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**\*672**  Appeal from the United States District Court for the Western District of Texas, USDC No. 5:20-CV-466

**Attorneys and Law Firms**

Brandon Grable (argued), Grable Grimshaw, P.L.L.C., San Antonio, TX, for Plaintiff—Appellee.

Mark Kosanovich, Fitzpatrick & Kosanovich, P.C., San Antonio, TX, Laura Flores Macom (argued), Langley & Banack, Incorporated, San Antonio, TX, for Defendant—Appellant.

Before Elrod, Chief Judge, and Willett and Duncan, Circuit Judges.

**Opinion**

Don R. Willett, Circuit Judge:

David Bailey and his friends went to downtown San Antonio to "film the police." With cameras rolling, they approached Officers Oscar Ramos and Christopher Dech, who were guarding an ambulance. An altercation ensued, and Bailey was arrested for interfering with the duties of a public servant. He brought various constitutional claims against the City of San Antonio and Officers Ramos and Dech, though this appeal concerns just the claims against Ramos: unlawful arrest, unlawful seizure, First Amendment retaliation, and excessive force. Ramos moved for summary judgment based on qualified immunity, the district court denied it, and Ramos appealed. We REVERSE the denial of summary judgment and REMAND with instructions to grant summary judgment in favor of Ramos and to dismiss Bailey's claims.

I

On April 28, 2018, David Bailey and three friends went to downtown San Antonio "to film the police." Angered by the recent arrest of a friend, they planned for one member of the group to "kind of, be the jerk" to the police officer, and Bailey **\*673** would "film them"

and "go up and be the ... nice citizen, and say, 'Hey, just leave the – leave the cop alone. Let him do his job.' " But once the officer expressed thanks, Bailey would tell the officer, "I'm here because of what you-all [sic] did to Mike Thompson, and I'm, like Well—well, f*** you."

San Antonio Police Officers Oscar Ramos and Christopher Dech were on bike patrol in downtown San Antonio. They responded to an assault at a bar, and while paramedics administered treatment to the victim inside an ambulance, the officers positioned themselves outside to keep people away. The officers didn't know yet who assaulted the victim, so they were also using the area to interview witnesses.

Bailey and his group were filming and immediately hostile when they first approached Ramos and Dech. Bailey gave the officers the middle finger and said "f*** off" as he walked away. After this initial interaction, most of the group wandered away, and Dech went back to the bar, leaving Ramos alone. One of Bailey's friends, Jack Miller, then walked up to Ramos while openly carrying a gun. Miller asked Ramos, "What are you shaking your f***ing head at?" Ramos asked him to watch his language and to back up. Miller repeatedly asked where he should stand. At first, Ramos told him to "back up" and "go over there," motioning with his hand to move backwards. At that point, Dech returned from the bar to stand beside Ramos in front of the ambulance. Body camera footage shows that Officer Dech instructed Bailey and Miller to "just listen" and that the area was an active crime scene while Bailey and Miller continued to shout over him. Video footage clearly shows

Bailey filming this interaction. Meanwhile, Miller continued to ask, "[W]here would you like us to stand?" Dech responded, "[S]tand back behind that line," and pointed to a line in the sidewalk. Miller immediately turned away and walked back, motioning to the group to follow and saying, "[A]lright, let's go, move." Bailey, however, did not immediately comply. Video footage shows him come to a complete stop and turn to face Ramos, while still standing in front of the line.

The parties dispute what happened next. Ramos says that he lightly touched Bailey's shoulder to guide him toward the line. When Bailey stopped moving, Ramos put his arm up again to Bailey's chest, and Bailey responded by "swatting Officer Ramos' arm away, striking him, and causing him to stagger." Then Ramos says that he saw Bailey drop his left hand and clench it into a fist. Because of Bailey's conduct and these "signs of aggression," Ramos asserts he "was in fear of an impending assault." In response, Ramos placed both hands on Bailey's chest and pushed him. He then grabbed Bailey by his upper body and forced him to the ground. Bailey, however, denies swatting Ramos or clenching his fist and alleges that Ramos "pushed [him] back twice before tackling him to the ground, kneeling on him, and then handcuffing him." The video evidence also shows that Bailey yelled "hands off!" in response to the contact with Ramos before he was tackled to the ground.

Dech handcuffed Bailey once Ramos had him on the ground. The officers lifted Bailey into a standing position and placed him up against a nearby wall. There, Bailey repeatedly yelled expletives at Ramos and Dech while they

asked him to calm down and sit down. Bailey screamed at both officers that he would "dial up my wife to own your ass" and told Dech that he would "lock you up with this little piece of sh*t," referring to Ramos. Bailey was moving about and stepped toward the officers. The officers guided him back against the wall **\*674** with their hands while telling him repeatedly to sit down. Bailey did not comply and responded, "[W]hat, are you going to go hands on again?" Ramos then used some type of leg maneuver to bring Bailey to a seat on the ground.

Bailey was charged with interfering with the duties of a public servant. The charge was later dismissed by the prosecutor's office for lack of evidence.

Bailey sued Ramos and Dech [1] and the City of San Antonio under 42 U.S.C. § 1983, alleging unlawful seizure and arrest, excessive force, malicious prosecution, violation of his right to record the police, and First Amendment retaliation. Bailey also brought municipal-liability claims against the City. All three parties moved for summary judgment, with Ramos arguing he was entitled to qualified immunity. The district court (1) dismissed all of Bailey's claims against the City; (2) dismissed Bailey's right-to-record claim because Bailey had conceded it; (3) granted qualified immunity for the malicious prosecution claim; and (4) denied qualified immunity and summary judgment for the unlawful arrest, unlawful seizure, First Amendment retaliation, and excessive force claims because genuine disputes of material fact existed. [2]

## II

**[1]** "Ordinarily, we would review the district court's denial of summary judgment *de novo*, applying the same standard as the district court." [3] That standard requires us to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [4]

**[2]** **[3]** Because this is an interlocutory appeal of a denial of qualified immunity, we "alter[ ] the usual summary judgment burden of proof." [5] Once a defendant asserts qualified immunity, the plaintiff bears the burden [6] of negating it by showing that (1) the official violated a statutory or constitutional right and (2) the right was " 'clearly established' at the time of the challenged conduct." [7] "Although the plaintiff need not identify 'a case *directly* on point' in order to" show the law was clearly established, "he or she must point to 'authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.' " [8]

**[4]** **[5]** We review summary judgment based on qualified immunity de novo, but only "to the extent that it turns on an issue **\*675** of law." [9] "This means that the district court's finding that a *genuine* factual dispute exists is a factual determination that this court is prohibited from reviewing in this interlocutory appeal." [10] However, "the district court's determination that a particular dispute is *material* is a reviewable legal determination." [11]

**[6]**  There's one further wrinkle. Where video evidence is available, there is an "exception to the materiality/genuineness rule cited above." [12]  "[W]e are required to 'view the facts in the light depicted by the videotape.' " [13] The Supreme Court instructed in *Scott v. Harris* that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." [14]  Thus, "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." [15]  "Inasmuch as that video evidence is inconclusive, however, the ordinary summary judgment standard applies." [16]

## III

**[7]   [8]   [9]**  The Fourth Amendment governs Bailey's claim for unlawful arrest.  "A warrantless arrest must be based on 'probable cause.' Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." [17]  "[T]he adjudication of probable cause is an objective test: [C]ourts must look to the totality of the circumstances and decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer demonstrate a probability or substantial chance of criminal activity." [18]

**[10]**  "If there was probable cause for any of the charges made ... then the arrest was supported by probable cause, and the claim for false arrest fails." [19]  Bailey contends that Ramos lacked probable cause to arrest him. Ramos counters that he had probable cause to arrest Bailey for (1) assault by offensive conduct under Texas Penal Code § 22.01(a)(3) and (2) interference **\*676** with public duties under Texas Penal Code § 38.15.

### A

We start with assault.

**[11]**  Under the Texas Penal Code, a person commits assault if he or she "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." [20] The district court denied qualified immunity to Ramos because it concluded that there was a genuine dispute of material fact as to the nature of the contact between Ramos and Bailey before Ramos took Bailey to the ground.

"[T]he district court's finding that a *genuine* factual dispute exists" about the contact between Bailey and Ramos "is a factual determination that this court is prohibited from reviewing in this interlocutory appeal." [21]  The *Scott v. Harris* exception that allows us to draw our own conclusions from the video evidence does not alter our review here because the video does not "blatantly" contradict either Ramos's or Bailey's stories about the nature

of the contact between them.[22] Even though there were many recording devices at the scene, none of the video evidence clearly shows whether Bailey swatted Ramos or clenched his hand into a fist as though he was preparing to fight. These factual disputes are material because Bailey's conduct and the contact between him and Ramos are part of the "facts and circumstances within the officer's knowledge" that are relevant to whether there was probable cause.[23] Accordingly, because we cannot conclude as a matter of law that Ramos had probable cause to arrest Bailey for assault, we turn to the next charge: interference with public duties.

B

**[12]** Under the Texas Penal Code, a person commits the offense of interference with public duties "if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with ... a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law."[24] To constitute interference, the action must consist of more than just speech alone.[25] But "Texas courts have found that failure to comply with an officer's instructions ... violates Texas Penal Code § 38.15 and is not protected speech. Specifically, several courts have affirmed convictions of defendants who failed to comply with an officer's instruction to move away from a crime scene."[26]

The district court assessed each of the instances in which Ramos says Bailey refused to comply with his orders and concluded: **\*677** (1) when

Ramos said "go over there," he was speaking to Miller, not Bailey; (2) when Ramos gestured with a hand motion to move backwards, it was not "explicit"; and (3) the order from Dech to stand behind the line was directed at Miller, and Bailey "immediately step[ped] back to look around ... in order to locate the line," and "it is not clear that [Bailey] even had an opportunity to fully comply with the order, given that Ramos lunged at [Bailey] approximately one second after Dech's instructions." The district court held that there were genuine factual disputes "as to whether [Bailey] was complying with the officers' instructions in the moments before Ramos lunged at him" and as to "the nature of the contact between [Bailey] and Ramos." Because of these disputed facts, the district court held that it could not "conclude as a matter of law that Ramos had probable cause to arrest [Bailey]."

**[13]** However, the Supreme Court instructs that police officers who "reasonably but mistakenly conclude that probable cause is present" are entitled to qualified immunity.[27] There must "not even arguably be probable cause for the ... arrest for the immunity to be lost."[28] A plaintiff must clear this "significant hurdle" in order to defeat qualified immunity.[29]

**[14]** The district court did not address whether Ramos could have reasonably, although mistakenly, believed that he had probable cause.[30] Assuming that Ramos lacked probable cause, we must still ask whether Ramos "could have reasonably thought his actions were lawful," even if he was mistaken.[31]

Officers told Bailey and Miller multiple times that this was an active crime scene and they should stand back. Despite being told to "just listen," Bailey continued to shout over the officers. Bailey and Miller were both standing close to the officers when Dech instructed that they should "stand back behind that line." Bailey himself was filming the interaction. Miller immediately turned away to comply with the instruction, moving before Dech finished his sentence. Within two more seconds, Miller was motioning to the group to follow and saying, "alright, let's go, move." But Bailey did not move at the same time as Miller. Bailey briefly stepped back and looked backwards, but he came to a complete stop and turned back toward Ramos while still in front of the line. Within two to three seconds of Miller's instruction, Ramos pushed Bailey backwards. Bailey responded by swatting Ramos's arm away.

The district court found that Bailey "immediately step[ped] back and look[ed] around ... in order to locate the line to which Dech was referring" and that Ramos's **\*678** assertion that Bailey "failed to move" in response to Dech's orders was "contradicted by the video." The videos confirm that Bailey moved his right foot backwards and that he looked around and then backwards. But it is unclear whether (1) Bailey was reflexively stepping back and looking back in response to Ramos touching his shoulder to guide him backwards, given that Bailey immediately said "hands off" after that contact, or (2) Bailey was stepping back to locate the line, as the district court found.

Regardless, when Bailey continued to talk over the officers' commands, did not start moving at the same time as Miller, and turned back toward Ramos, an officer in Ramos's position could have reasonably thought that Bailey was not complying with the order to move behind the line and thus that there was probable cause to believe that Bailey was interfering with a public duty. [32]

Our court has held as much in similar circumstances. For example, in *Haggerty v. Texas Southern University*, we held that an officer mistakenly but reasonably believed that an action constituted interference with a public duty where the officer warned the individual to not interfere, the individual was within relative proximity of the crime scene, and the individual stepped forward. [33] We said that a reasonable officer in that situation "could have believed that the situation was tense and dangerous," and so a reasonable officer could also have believed that the failure to follow the instruction was interfering with his duties. [34] Likewise, in *Eisenbach v. Zatzkin*, we held that an officer mistakenly but reasonably believed that there was probable cause to arrest for interference with a public duty where the officer warned the plaintiff to leave the area of his investigation, but the plaintiff, believing the investigation was over, approached the area. [35] The plaintiff's approaching the crime scene, which was contrary to the officer's instruction, was sufficient for a reasonable officer to conclude that the plaintiff was interfering with a public duty. [36]

Similarly here, when Bailey didn't immediately move away with Miller, Ramos could

reasonably have believed that Bailey, like the plaintiffs in *Haggerty* and *Eisenbach*, was ignoring officer instructions to stay away from the crime scene. Even if Bailey was complying with those instructions, Ramos, like the officers in *Haggerty* and *Eisenbach*, could have reasonably but mistakenly believed that Bailey's hesitation was contrary to his instructions and interfered with a public duty. This is especially so, given that Bailey had given the officers the middle finger and was cursing at them, and Miller had approached them while openly carrying a gun, giving Ramos reason to believe "the situation was tense and dangerous." [37]

Because we conclude that Ramos could have reasonably, even if mistakenly, believed that he had probable cause to arrest Bailey for interference with a public duty, he is entitled to qualified immunity as to the unlawful arrest claim. [38]

IV

We next address whether Ramos is entitled to qualified immunity as to the unlawful seizure claim.

**\*679** **[15]** Ramos seized Bailey's cell phone and belongings incident to his arrest. Bailey asserts that these items were seized without a warrant or probable cause in violation of the Fourth Amendment. Under the Fourth Amendment, people have a right to be free from "unreasonable searches and seizures." [39] "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the

warrant requirement." [40] A warrantless search incident to a lawful arrest is one of the oldest and most widely used exceptions to the warrant requirement. [41] Bailey's unlawful seizure claim rises and falls with his unlawful arrest claim because the exception would not apply if the arrest were deemed unlawful. Because Ramos is entitled to qualified immunity for Bailey's unlawful arrest claim, he is entitled to qualified immunity for Bailey's unlawful seizure claim.

V

We now turn to whether Ramos is entitled to qualified immunity as to the excessive force claims. Bailey contends that Ramos used excessive force when he: (1) pushed Bailey; (2) grabbed Bailey's shirt and pulled it over his head to slam him to the ground; (3) knelt on Bailey's neck and shoulder; (4) pulled Bailey up by the handcuffs; and (5) swept Bailey's legs out from under him to bring him to the ground.

The district court held that Ramos was entitled to qualified immunity to the extent Bailey's claims were premised on Ramos briefly placing his knee on Bailey's back to effectuate the arrest and lifting Bailey by the handcuffs because neither of these acts violated a clearly established right. It otherwise held that factual disputes precluding summary judgment existed as to whether the other uses of force were objectively unreasonable under the Fourth Amendment. Ramos appealed the denial of summary judgment. Because Bailey did not cross-appeal the limited grant of summary judgment, we do not review the district court's grant of summary judgment for the excessive force claims based on Ramos's placing his knee

on Bailey's back or picking him up by the handcuffs.

 **[16]** Ramos contends that Bailey raised the fact of his leg sweep for the first time in his response to Ramos's summary-judgment motion and that it should therefore not be considered. [42] The district court disagreed, noting that Bailey's complaint, which generally alleged that "Defendants use[d] more physical force than necessary to effectuate the arrest," was broad enough to cover the leg sweep.

We agree. The complaint's reference to physical force used to "effectuate the arrest" is broad enough to cover force used to keep control of Bailey in the minutes after he was placed in handcuffs. We also note that Ramos was on notice about the leg sweep long before discovery closed, as one of Bailey's experts specifically identified it in his report. Accordingly, we review whether Ramos is entitled to qualified immunity on Bailey's excessive force claims regarding both the leg sweep and the other takedown procedures.

 **[17]  [18]  [19]  [20]  [21]  [22]** Bailey's "excessive force claim is separate and distinct from [his] unlawful **\*680** arrest claim, and we must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." [43] An officer's use of force is excessive under the Fourth Amendment if the plaintiff can show: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." [44] "The second and third elements collapse into a single objective-reasonableness inquiry." [45] To assess reasonableness, we consider three factors that the Supreme Court outlined in *Graham v. Connor*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." [46] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." [47] " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." [48] "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.' " [49]

 **[23]** Bailey has met the injury requirement for an excessive force claim. He provided evidence of "abrasion to his wrist and knee, acute neck pain, and a concussion." He also "testified that he still experiences pain in his neck, shoulder, and spine and needs occasional cortisone shots." "[A]s long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." [50] Thus, we need only consider whether Ramos's use of force was objectively reasonable under the *Graham* factors.

A

**[24]** We start with the force used during the takedown procedure, when Ramos pushed Bailey and brought him to the ground. The district court denied summary judgment for this use of force because it held that there were genuine disputes of material fact as to the nature of the contact between Ramos and Bailey in the moments preceding the use of force.

Turning to the *Graham* factors to assess the reasonableness of the takedown procedure, first, the offense Bailey was being arrested for—interference with public duties—is "a minor offense" under Texas **\*681** law. [51] Second, Ramos does not argue that Bailey was actively resisting arrest or attempting to evade arrest by flight. But whether Bailey posed "an immediate threat to the safety of the officers or others" [52] can only be determined once the factual disputes as to the nature of the contact between Ramos and Bailey have been resolved. We cannot review the "district court's finding that a *genuine* factual dispute exists" about the nature of the contact between Bailey and Ramos unless the video evidence blatantly contradicts the story either Ramos or Bailey presents. [53] As we discussed above, none of the video evidence clearly shows the nature of the contact between Bailey and Ramos. Because the nature of the contact is relevant to whether Bailey posed an immediate threat to the safety of others and to the reasonableness of the force used, we agree with the district court and the dissent that these disputes of fact are material.

**[25]** But even if there is a genuine and material fact dispute as to whether the takedown procedure did amount to excessive force, Ramos is still entitled to qualified immunity

because the unlawfulness of his conduct was not clearly established at the time it occurred. [54]

Bailey, for his part, submits that the unlawfulness of Ramos's takedown procedure was clearly established, pointing to our 2012 decision in *Newman v. Guedry*. [55] In *Newman*, the defendant-officers severely beat and tased a passenger of a stopped car, precipitated only by the passenger's suggestion that one of the officer's hands "remained on [his] crotch for an uncomfortable length of time" during the pat-down search. [56] There was, moreover, no evidence that the passenger failed to comply with any lawful order before officers hit him thirteen times with a baton, tased him three times, and dragged him to the sidewalk with taser barbs in his skin and his shorts around his ankles. [57] We accordingly held that the officers' force was objectively unreasonable under *Graham* and violated the passenger's clearly established constitutional right to be free from such force. [58]

We agree with Ramos that our decision in *Newman* is not sufficiently analogous to have put him on notice that his conduct was unlawful. Most notably, unlike in *Newman*, Bailey was given an order with which to comply, thus rendering the circumstances preceding Ramos's use of force materially different. And the level of force the officers used in *Newman* far exceeded the force that Ramos used here. [59]

**\*682** *Newman* is not this court's only relevant precedent. [60] However, further review of our caselaw shows that it was not

clearly established in April 2018 that Ramos's takedown procedures were unlawful.

Just weeks before Bailey's arrest, we denied qualified immunity and observed in *Sam v. Richard* that "it was clearly established ... that pushing, kneeing, and slapping a suspect who is neither fleeing nor resisting is excessive." [61] However, the use of force in *Richard* is distinguishable in that it was used *after* the plaintiff was lying face down on the ground, with his hands on the back of his head. [62] Under *Richard*, an officer isn't entitled to qualified immunity if takedown procedures are used *after* the officer has gained control of the suspect. But that isn't the case here, where Bailey wasn't yet handcuffed, and Ramos used force to gain control of Bailey under the reasonable belief that Bailey was disregarding his orders. Moreover, the force used in *Richard*—slapping the suspect across the face and kneeing him while he was face down on the ground with his hands on the back of his head [63] —was more severe and less appropriate than the shove, pulling of Bailey's shirt, and push to the ground that Ramos used here to gain control of and handcuff Bailey. [64]

Similarly, in *Bush v. Strain*, a decade earlier, we held that it was clearly established that officers could not "forcibly slam[ ]" a "handcuffed and subdued" individual's face "into a nearby vehicle" when the individual "was not resisting arrest or attempting to flee." [65] But, again, that is not the case here. True, Ramos doesn't contest that, like the suspect in *Bush*, Bailey wasn't resisting arrest. But we have "frequently held" that takedown procedures like pushing a suspect and bringing him to the ground are

lawful ways to gain control of and arrest a suspect before he has been handcuffed and subdued. [66] *Bush* does not clearly establish that use of takedown procedures is unlawful when law enforcement hasn't yet gained control of the suspect. So, even if Bailey wasn't resisting arrest, as determined above, a reasonable officer could have believed he was refusing to **\*683** follow instructions and thus needed to be subdued using such measures.

The dissent also points to *Trammell v. Fruge*, [67] *Joseph v. Bartlett*, [68] and *Darden v. City of Fort Worth* [69] as showing that Ramos's conduct was a clearly established violation of Bailey's constitutional rights at the time of the arrest. But analogy to these cases suffers the same flaws as analogies to *Richard* and *Bush*— the officers were not "acting under similar circumstances" as Ramos, so the cases cannot have put him on notice that his actions were unconstitutional. [70]

For example, in contrast to the plaintiffs in those cases, Bailey was not yet subdued when officers exerted the alleged excessive force. In *Darden*, we denied qualified immunity where video evidence showed that officers exerted force *after* the plaintiff was kneeling with his hands in the air and following officer instructions, all while bystanders were shouting to the officers that the plaintiff couldn't breathe. [71] Likewise, in *Joseph*, the officers exerted force *after* the plaintiff was already lying on the ground in the fetal position, obviously subdued. [72] By contrast, although Bailey was not actively resisting arrest, he had not given officers an obvious indication that he was subdued, such as kneeling with his

hands in the air or lying in the fetal position. Instead, he was on his feet, shouting over officer instructions, and obstructing an active crime scene. Bailey hasn't pointed to any case saying that officers may not use some force to subdue an arrestee in this situation.

These cases are also distinguishable in the *amount* of force officers used. We have held that "the degree of force an officer can reasonably employ is *reduced* when an arrestee is not actively resisting." [73] But none of these cases suggest that Ramos's use of force—putting his hands to Bailey's chest, pulling his shirt, and pushing him to the ground—was more force than reasonably necessary to subdue Bailey under the circumstances. Ramos's force was far milder than the officers in *Darden*, who "threw [plaintiff] to the ground, tased him twice, choked him, punched and kicked him in the face, pushed him into a face-down position, pressed his face into the ground, and pulled his hands behind his back to handcuff him." [74] And Ramos's actions were less violent than the officers' actions in *Trammell*, which consisted of grabbing plaintiff's arms, executing knee strikes and a headlock, and tackling him. [75] Ramos also acted far more proportionally than the officers in *Joseph*, who held the plaintiff's body down and tased him for 11 seconds, struck him with a baton at least twice, tased him again, then kicked and punched him multiple times. [76] These much more extreme cases thus do not clearly establish that Ramos "should have known that he could not use that amount of force on an individual who was not resisting arrest." [77] By contrast, even taking the facts in the light most favorable to Bailey, Ramos **\*684** pushed Bailey, shoved him to

the ground, then stopped the force immediately after Bailey was handcuffed. Bailey cannot point to any case saying that this amount of force was not reasonably necessary to subdue Bailey under the circumstances. We thus cannot say that Ramos's actions were "plainly in conflict with our caselaw at the time of the alleged misconduct." [78]

Bailey has thus failed to meet his burden to show that it was clearly established at the time of his arrest that Ramos's takedown maneuver was an unlawful use of force. Accordingly, Ramos is entitled to qualified immunity on this claim.

### B

**[26]** We turn now to whether Ramos used excessive force when he swept Bailey's legs out from under him.

**[27]** **[28]** The district court denied summary judgment for this use of force, holding that Ramos used a leg sweep on a "subdued suspect who had not resisted arrest," violating Bailey's clearly established rights. Our caselaw has "clearly established ... that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's use of force is excessive." [79] But use of force against a handcuffed suspect is not excessive if the suspect is resisting by ignoring lawful commands. [80]

Video evidence clearly shows that, after Bailey was handcuffed, he was placed standing up against a wall. There, he repeatedly yelled

expletives at Dech and Ramos. Both officers told Bailey to "sit down" and "kneel down," to which Bailey defiantly responded, "[W]hat, are you going to go hash on again?" The officers responded by maneuvering Bailey so that his back was against the wall. Ramos then used some type of leg maneuver to seat him on the ground. Bailey slid with his back along the wall to the ground, with Dech's hand on his chest guiding him down. Because the video evidence shows that Bailey was not complying with the officers' lawful orders to sit down, Ramos's responsive use of force was not objectively unreasonable under the Fourth Amendment. [81]

Because the video evidence is clear that bringing Bailey to a seat with a leg sweep was not an objectively unreasonable use of force, Ramos is entitled to qualified immunity.

## VI

**[29]** **[30]** Finally, we turn to Bailey's First Amendment retaliation claim. To survive summary judgment, Bailey must show there is at least a genuine dispute of material fact that "(1) [he was] engaged in constitutionally protected activity, (2) the defendant['s] actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant['s] **\*685** adverse actions were substantially motivated against the plaintiff['s] exercise of constitutionally protected conduct." [82] A retaliation claim is only available "when non-retaliatory grounds are in fact insufficient to provoke" the arrest, meaning that the officer's subjective motivation must be the but-for cause of the adverse action against the plaintiff. [83]

The district court denied summary judgment on this claim.

The parties do not dispute that Bailey satisfies the first prong. And for good reason: In *Turner v. Lieutenant Driver*, [84] we held that the right to film police under the First Amendment is clearly established, "subject only to time, place, and manner restrictions." [85]

**[31]** **[32]** The second prong requires an injury that would "chill a person of ordinary firmness from continuing to engage in that activity." [86] "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights, it need not be great in order to be actionable." [87] Bailey contends that "arresting and injuring [him], while seizing his belongings, would chill a person of ordinary firmness ...." We agree that the injuries Bailey suffered as a result of the use of force during his arrest meet this standard.

**[33]** **[34]** **[35]** As to the third prong, "[a]t the summary judgment stage, [Bailey] cannot rely on allegations; he must produce specific support for his claim" that Ramos had an "unconstitutional motive." [88] We do not require plaintiffs to produce direct evidence. "Circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent. Also, direct evidence of an improper motive is usually difficult, if not impossible, to obtain. Thus, requiring direct evidence of an improper motive would

effectively insulate from suit public officials who deny an improper motive ....” [89]

**[36]** Looking to circumstantial evidence, Bailey points out that Ramos did not pay attention to or arrest any of the people walking through the area who were not recording. True, the fact that “he was arrested when otherwise similarly situated individuals not engaged in the same sort of speech had not been” would be good evidence in his favor. [90] But the video evidence blatantly contradicts Bailey's characterization of events. None of the passersby walking through the crime scene were “similarly situated” to Bailey. Apart from those whom the officers were interviewing as witnesses, no one stopped and lingered in close proximity to the ambulance. Bailey was the only person who appeared to disregard police orders to stay back from the crime scene. Indeed, video shows other individuals recording the interaction, and those individuals were not arrested.

Bailey hasn't pointed to any other evidence that would show that Ramos had a **\*686** subjective retaliatory motive, much less that any such motive was the but-for cause of Ramos's decision to arrest him. Video evidence blatantly disputes his only argument. As a result, no dispute of material fact exists, and Ramos is entitled to judgment as a matter of law on Bailey's First Amendment retaliatory arrest claim.

### VII

We REVERSE the denial of summary judgment and REMAND with instructions to grant summary judgment in favor of Ramos and to dismiss Bailey's claims.

**Jennifer Walker Elrod**, Chief Judge, concurring in part and dissenting in part:

I agree with the majority opinion as to all of Bailey's claims except for the excessive-force claim based on Ramos pushing Bailey, grabbing him around the upper neck and back, and taking him to the ground. In my view, there are genuine disputes of material fact that preclude summary judgment on that excessive-force claim and require us to dismiss that portion of the appeal for lack of jurisdiction. I believe that the majority opinion errs because it does not view these factual disputes in the light most favorable to Bailey.

### I

In an interlocutory appeal of a denial of qualified immunity, when the district court determines that there is a genuine factual dispute and that dispute is material, under our long-standing precedent in *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) (en banc), we must dismiss the appeal for lack of jurisdiction. *See id.* at 346–47.

Here, the district court concluded that there were genuine disputes of fact as to whether Bailey was complying with Officer Ramos's and Officer Dech's instructions to stand behind a line in the sidewalk. The district court reviewed the video footage and stated that Bailey and his friend Miller “both appear to immediately step back and look around them

in order to locate the line to which Dech was referring." It observed that "it is not clear that [Bailey] even had an opportunity to fully comply with the order, given that Ramos lunged at [Bailey] approximately one second after Dech's instructions." The district court determined that Bailey "appear[ed] to initially comply with the order to move behind the line."

The district court also determined that there were genuine factual disputes regarding the contact between Bailey and Ramos. It noted that there was conflicting testimony about Bailey allegedly "swatting" Ramos and concluded that "[b]ecause the video footage does not offer a clear view of the nature of [Bailey's] contact with Ramos, a jury would need to rely on credibility determinations and weigh the evidence to resolve the question." In the district court's view, "taking the facts in the light most favorable to [Bailey], a jury could conclude that Ramos's use of force was objectively unreasonable in light of clearly established law at the time of the incident."

Here, the video evidence does not blatantly contradict either Bailey's or Ramos's version of the facts—as the majority opinion itself acknowledges. Accordingly, we cannot and should not review the genuineness of those factual disputes. *See Kinney*, 367 F.3d at 346–47; *Curran v. Aleshire*, 800 F.3d 656, 663–64 (5th Cir. 2015) (noting that the *Scott v. Harris* exception to the materiality/genuineness rule applies only if the plaintiff's story is "blatantly contradicted" by the video evidence).

Further, the district court correctly determined that these factual disputes are material to the determination of whether Ramos's use of force

was excessive, and **\*687** the majority opinion again agrees. Thus, in this case, "we do not second-guess the district court's determination that there are genuine disputes of material fact" in the qualified-immunity context, and summary judgment is improper. *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 331, 346 (5th Cir. 2020); *see also Roque v. Harvel*, 993 F.3d 325, 339 (5th Cir. 2021); *Kokesh v. Curlee*, 14 F.4th 382, 409 (5th Cir. 2021) (Willett, J., dissenting) ("[B]ecause there are genuine disputes of material fact ..., the conclusion is apparent: [the defendant] is not entitled to summary judgment on this claim."). I would accordingly dismiss the appeal as to Bailey's excessive-force claim based on the takedown for lack of jurisdiction. *See Kinney*, 367 F.3d at 347.

## II

These factual disputes are also material to the analysis of whether Bailey's rights were clearly established under our precedent. I believe that the majority opinion errs because it fails to view the factual disputes in the light most favorable to Bailey when conducting that analysis. "[T]o overcome qualified immunity, *the plaintiff's version* of th[e] disputed facts must also constitute a violation of clearly established law." *Joseph*, 981 F.3d at 330 (emphasis added).

When viewing the facts in the light most favorable to Bailey, Ramos's takedown of Bailey could have violated clearly established law. Although officers may use some physical force to effectuate an arrest, they must also consider "the relationship between the need and

the amount of force used." *Deville v. Marcantel,* 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Gomez v. Chandler,* 163 F.3d 921, 923 (5th Cir. 1999)). The majority opinion asserts that Ramos could have reasonably believed that Bailey was not complying with orders and that Ramos's use of force was thus necessary to gain control of Bailey. However, Bailey's compliance is in dispute, and "[w]e have no more ability to review these factual disputes as to clearly established law than we did as to the constitutional merits—which is to say, none." *Joseph,* 981 F.3d at 337. Further, disobeying orders generally does not constitute active resistance. *See id.* at 339; *Trammell v. Fruge,* 868 F.3d 332, 341 (5th Cir. 2017). "Our case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Darden v. City of Fort Worth,* 880 F.3d 722, 731 (5th Cir. 2018); *see also id.* at 730 (determining that the video evidence did not resolve the factual dispute over whether the plaintiff complied with commands or resisted arrest); *Trammell,* 868 F.3d at 341 (concluding that there was a factual dispute as to whether the plaintiff was actively resisting arrest by refusing to comply with orders and pulling his arm away from officers). If Bailey was not dangerous, was not disobeying orders, and was not resisting arrest, a jury could find that a reasonable officer would know that the amount of force used to subdue Bailey was excessive.

For example, in *Trammell v. Fruge,* we held that the law in 2013 "clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp."

868 F.3d at 343. There, the officers grabbed the plaintiff's arms, used a knee strike, put him in a headlock, and "pulled [him] to the ground." *Id.* at 337. We described this force as "tackling [the plaintiff] to the ground" and determined that such force was excessive even when used before the officers had "subdue[d] and handcuff[ed] him." *Id.* at 337–38, 342. Our caselaw also **\*688** clearly establishes that "violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force." *See Darden,* 880 F.3d at 732–33. Finally, in *Sam v. Richard,* 887 F.3d 710 (5th Cir. 2018), we also determined that the force used before handcuffing the suspect was excessive because the suspect was compliant. *See id.* at 712. In sum, if Bailey did not pose an immediate threat and was compliant—questions on which there are open factual disputes and on which we must make all inferences in Bailey's favor—it is clearly established that Ramos was not justified in resorting to using the takedown maneuver. *See Trammell,* 868 F.3d at 342 ("[T]he quickness with which the officers resorted to tackling [the plaintiff] to the ground militates against a finding of reasonableness.").

As we have previously observed:

> [A] jury could ultimately determine that the suspect was in fact resisting arrest or disobeying commands. And under those alternative facts, the officers' force may have been reasonable under the Fourth Amendment and reasonable under the clearly

established law. Yet, a genuine dispute of material fact existed, meaning that a jury could also find facts demonstrating the opposite. Therefore, the officers were not entitled to qualified immunity at the summary-judgment stage.

*Joseph*, 981 F.3d at 342 (footnotes omitted) (citing *Darden*, 880 F.3d at 731–32). I would thus hold that Bailey has overcome qualified immunity at this stage on his excessive-force claim based on Ramos's takedown.

Simply put, the interlocutory appeal of the excessive-force claim based on Ramos's takedown maneuver should have been dismissed for lack of jurisdiction. *See Kinney,* 367 F.3d at 347. Genuine disputes of material fact preclude our jurisdiction over the appeal of this claim and make granting qualified immunity at the summary-judgment stage improper. When the facts are properly viewed in the light most favorable to Bailey, a reasonable jury could find that Ramos's use of force in these circumstances violated clearly established law. I respectfully dissent in part.

**All Citations**

125 F.4th 667

III

---

## Footnotes

1   The parties later stipulated to dismiss the claims against Dech.

2   The district court partially granted summary judgment on the excessive force claims to the extent that the claims were based on Ramos briefly placing his knee on Bailey's back while he was being handcuffed and Ramos pulling up Bailey by the handcuffs to a standing position. Bailey does not challenge that holding on appeal.

3   *Kinney v. Weaver*, 367 F.3d 337, 347–48 (5th Cir. 2004) (en banc) (citing *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001)) (emphasis removed).

4   FED. R. CIV. P. 56(a).

5   *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

6    *Id.* ("The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor." (citation omitted)).

7    *Perniciaro v. Lea*, 901 F.3d 241, 255 (5th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see also Brown*, 623 F.3d at 253.

8    *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022) (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

9    *Joseph ex rel. Joseph v. Bartlett*, 981 F.3d 319, 331–32 (5th Cir. 2020) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

10   *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010).

11   *Id.*

12   *Curran v. Aleshire*, 800 F.3d 656, 663 (5th Cir. 2015).

13   *Boyd v. McNamara*, 74 F.4th 662, 665 (5th Cir. 2023) (quoting *Salazar v. Molina*, 37 F.4th 278, 280 (5th Cir. 2022) (alteration omitted)).

14   550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

15   *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

16   *Boyd*, 74 F.4th at 666 (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021)).

17   *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) (per curiam). *See also Brown v. Lyford*, 243 F.3d 185, 191 (5th Cir. 2001) ("[I]f a reasonable officer could have concluded that there was probable cause upon the facts then available to him, qualified immunity will apply." (quoting *Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021) (cleaned up))).

18   *Reitz v. Woods*, 85 F.4th 780, 790 (5th Cir. 2023) (quoting *Terwilliger*, 4 F.4th at 282).

19   *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995).

20   TEX. PENAL CODE § 22.01(a)(3).

21   *See Good*, 601 F.3d at 397.

22   *See* 550 U.S. at 380–81, 127 S.Ct. 1769.

23  *Reitz*, 85 F.4th at 790 (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009)).

24  TEX. PENAL CODE § 38.15(a)(1).

25  *Id.* § 38.15(d). "Texas courts have recognized that merely arguing with police officers ... falls within the speech exception to section 38.15." *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007); *see also Carney v. State*, 31 S.W.3d 392, 398 (Tex. App.—Austin 2000, no pet.) (reversing conviction where no evidence that defendant touched officers or physically obstructed their entry into home).

26  *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (citing *Duncantell v. State*, 230 S.W.3d 835, 842 (Tex. App.—Hous. [14th Dist.] 2007, pet. ref'd); *Key v. State*, 88 S.W.3d 672, 676 (Tex. App.—Tyler 2002, pet. ref'd)).

27  *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). *See also Reitz*, 85 F.4th at 792 (alteration adopted) (quoting *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994)). " '[T]he objective reasonableness of the defendant officers' conduct goes to the question of whether [the plaintiff's] constitutional right [against being arrested absent probable cause] was violated, not the question of whether that right was clearly established under these particular circumstances.' This inquiry does not aim to 'add[ ] a standalone 'objective reasonableness' element to the Supreme Court's two-pronged test for qualified immunity.' " *Id.* (quoting *Baker v. Coburn*, 68 F.4th 240, 251 n.10 (5th Cir. 2023)).

28  *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 657 (5th Cir. 2004) (quoting *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001)).

29  *Id.*

30  *See Lyford*, 243 F.3d at 190.

31  *Reitz*, 85 F.4th at 792; *see also Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003).

32  *See Childers*, 848 F.3d at 415.

33  391 F.3d at 657.

34  *Id.*

35  728 F. App'x 307, 311 (5th Cir. 2018).

36  *Id.*

37  *Haggerty*, 391 F.3d at 657.

38    *Reitz*, 85 F.4th at 792.

39    U.S. CONST. amend. IV.

40    *Riley v. California*, 573 U.S. 373, 382, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).

41    *Id.*

42    *U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012) ("[A] plaintiff may not raise a new claim for the first time at the summary-judgment stage.").

43    *See Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007).

44    *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

45    *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018).

46    *Deville*, 567 F.3d at 167 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

47    *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

48    *Id.* at 396, 109 S.Ct. 1865 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

49    *Heien v. North Carolina*, 574 U.S. 54, 60–61, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

50    *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (internal quotation marks and citation omitted).

51    *Buehler*, 27 F.4th at 983 (quoting *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018)).

52    *Deville*, 567 F.3d at 167 (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

53    *See Good*, 601 F.3d at 397; *Scott*, 550 U.S. at 380–81, 127 S.Ct. 1769.

54    *See Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013). *Cf. Kokesh v. Curlee*, 14 F.4th 382, 409 (5th Cir. 2021) (Willett, J., dissenting) (arguing that officer was not entitled to summary judgment on qualified immunity where there were genuine disputes of material fact *and* plaintiff's constitutional rights were clearly established at the time of the arrest).

55    703 F.3d 757 (5th Cir. 2012).

56    *Id.* at 760.

57    *Id.* at 760–63.

58    *Id.* at 763–64.

59    The dissent suggests that we fail to view the evidence in the light most favorable to Bailey. However, considering the clear video evidence and the facts in Bailey's favor, Ramos's force consisted of placing an arm to Bailey's chest, placing both hands on Bailey's chest and pushing him, pulling Bailey's shirt, and grabbing Bailey's upper body and pushing him to the ground. None of these actions rise to the level of violence exhibited in *Newman* or in the other cases we distinguish below.

60    The only case Bailey cited in his reply brief is *Newman.* To be sure, we have recited many times that "[t]he plaintiff has the burden to point out clearly established law." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021). But we have never understood this burden to mean that we are artificially boxed in by only those cases cited in the plaintiff's brief. Indeed, as we recently observed in a qualified-immunity case, "this court is not restricted to analyzing the issues properly presented by the parties only on the authorities cited by the parties." *Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th Cir. 2022). The Supreme Court has similarly held that "[a] court engaging in review of a qualified-immunity judgment should ... use its full knowledge of its own and other relevant precedents." *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (alterations and internal quotation marks omitted). Nevertheless, our review of the caselaw shows that it was not clearly established at the time of Bailey's arrest that Ramos's takedown procedures were unlawful.

61    887 F.3d 710, 714 (5th Cir. 2018).

62    *Id.*

63    *Id.*

64    *See Buehler*, 27 F.4th at 987 (distinguishing *Richard* and finding qualified immunity because *Richard* "involved more severe and less appropriate uses of force" than used by the *Buehler* officers).

65    513 F.3d 492, 502 (5th Cir. 2008).

66    *Buehler*, 27 F.4th at 988 n.67. Though *Buehler* was decided after Bailey's arrest, several of the cases it cites were decided prior to Bailey's arrest in 2018.

67    868 F.3d 332 (5th Cir. 2017).

68    981 F.3d 319.

69    880 F.3d 722 (5th Cir. 2018).

70    *See Joseph*, 981 F.3d at 337 (citing *D.C. v. Wesby*, 583 U.S. 48, 64, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) (cleaned up)).

71    *Darden*, 880 F.3d at 725, 730–33.

72    *Joseph*, 981 F.3d at 340.

73    *Darden*, 880 F.3d at 733 (emphasis added).

74    *Id.* at 725.

75    *Trammell*, 868 F.3d at 337–38.

76    *Joseph*, 981 F.3d at 326–27.

77    *Darden*, 880 F.3d at 731–32.

78    *Id.* at 733.

79    *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015).

80    *See Pratt v. Harris County*, 822 F.3d 174, 178 (5th Cir. 2016) (finding use of force is not excessive against handcuffed suspect who is verbally and physically resisting).

81    *See Buehler*, 27 F.4th at 988 n.67 (collecting cases showing instances in which bringing suspect to the ground was neither excessive force nor unreasonable); *Childers*, 848 F.3d at 415 (holding that plaintiff's conduct moved beyond speech when he failed to follow the deputy's instruction to move his truck); *Deville*, 567 F.3d at 167 ("Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance.").

82    *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

83    *See Degenhardt v. Bintliff*, 117 F.4th 747, 758 (5th Cir. 2024).

84    848 F.3d 678 (5th Cir. 2017).

85    *Id.* at 688.

86    *Keenan*, 290 F.3d at 258.

87    *McLin v. Ard*, 866 F.3d 682, 697 (5th Cir. 2017) (quoting *Keenan*, 290 F.3d at 258).

88    *See Tompkins v. Vickers*, 26 F.3d 603, 608 (5th Cir. 1994).

89    *Id.* at 609.

90    *Gonzalez v. Trevino*, 602 U.S. 653, 144 S.Ct. 1663, 1665, 219 L.Ed.2d 332 (2024) (citing *Nieves v. Bartlett*, 587 U.S. 391, 402, 139 S.Ct. 1715, 204 L.Ed.2d 1 (2019)).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.