UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM, | |
| *Plaintiff*, | |
| v. | Civil Action No. 4:22-cv-4210 |
| COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity, | |
| *Defendants*. | |

## PLAINTIFF JUSTIN PULLIAM'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Justin Pulliam offers these amended proposed findings of fact and conclusions of law based on the evidence presented at trial over July 8–10, 2025.

Trial concerned the part of the case that was not resolved by the Court's grant of partial summary judgment to Pulliam on September 24, 2024. Docs. 77, 81. That partial summary judgment found Defendants Fort Bend County and Sheriff Eric Fagan liable to Pulliam for an incident at a press conference on July 12, 2021, but did not find damages or award any relief. Nor did the partial summary judgment determine liability for Pulliam's claims stemming from the events of a December 21, 2021 welfare check.

1

Therefore, these proposed findings of fact and conclusions of law focus on the subjects of trial: (1) liability for claims stemming from the events of December 21, 2021; and (2) the relief warranted for Pulliam's successful claims. Below, Pulliam offers a summary of the Court's prior decision, factual findings, and legal findings in the Court's voice.

## SUMMARY OF PARTIAL GRANT OF SUMMARY JUDGMENT

1.      The Court has already granted summary judgment to Pulliam on his claims that Sheriff Fagan and Fort Bend County violated his First Amendment and equal-protection rights for an incident at a press conference on July 12, 2021. Doc. 77 at 8–18. The Court incorporates its prior factual and legal findings into this Order. To summarize— and not to modify or otherwise alter the summary judgment order—the Court found, based on the undisputed evidence, that Sheriff Fagan excluded Pulliam from the press conference based on hostility to his speech and his status as a social-media journalist. This exclusion violated Pulliam's clearly established rights, and Sheriff Fagan was not entitled to qualified immunity. The County was also jointly liable for these constitutional violations because Pulliam's exclusion was pursuant to official policy in two ways. First, under Texas law and Fifth Circuit precedent, a Sheriff is an official policymaker for the purposes of *Monell* liability, and therefore, his acts constituted Fort Bend County policy. Second, the written media policies of Fort Bend County Sheriff's Office (FBCSO) made an explicit distinction between traditional and social media, according lesser status to the latter.

## **FINDINGS OF FACT**

2.      Pulliam is an independent journalist who films activities of public interest, including police interactions with civilians. Pulliam's coverage has primarily focused on local government in the Houston area, including in Fort Bend County, Texas. Pulliam has a YouTube channel called "Corruption Report," which has over 100,000 subscribers. Before the events underlying this case, Pulliam regularly provided his Corruption Report viewers with videos containing long-form reporting and livestreams of police and local government events. Pulliam's long-form video reports incorporated footage of police officers in action with opinion commentary that he filmed at home. His commentary was frequently critical of law enforcement. Several of his videos have over one million views.

3.      Sheriff Fagan is the elected Sheriff of Defendant Fort Bend County and the final policymaker for Fort Bend County's law enforcement activities. He oversees FBCSO.

**I.      Fort Bend County, particularly FBCSO and its officers, has an official policy and custom of intimidating and excluding Pulliam to prevent his reporting.**

4.      Although FBCSO and Sheriff Fagan have recognized that citizens have a right to record the police, FBCSO classified Pulliam as "not media" and restricted Pulliam's reporting more than other journalists because he used social media to report and because his reporting was critical of FBCSO and its officers.

5.      Before the arrest at issue in this lawsuit, Pulliam was never arrested or charged with any crime. FBCSO officers testified that Pulliam has never threatened violence against any FBCSO officer, the Sheriff, or anyone else.

6.    Nevertheless, FBCSO, under Sheriff Fagan's predecessor, barred Pulliam from visiting FBCSO's office and would refuse Pulliam's requests to interview the Sheriff.

7.    When Sheriff Fagan took office, FBCSO employees warned him about Pulliam. Sheriff Fagan told FBCSO employees that Pulliam should not be prevented from coming into the Sheriff's office building, but he did not take any other action regarding Pulliam upon assuming office.[1]

8.    After Sheriff Fagan took office, Pulliam asked that he be added to FBCSO's media list so he could receive notice about FBCSO's press conferences. FBCSO again refused to add Pulliam to its press conference list and responded with the following statement via email: "According to FBCSO PIO policy, only accredited media outlets can be added to the list you're requesting to be added to. Press conferences are not open to the public and require an invitation from our office."[2] The Sheriff's hand-picked Chief Deputy, not a holdover from the previous administration, endorsed the refusal to add Pulliam to the press conference list by endorsing the refusal email as a "Great response."[3]

9.    On July 12, 2021, Sheriff Fagan closed Jones Creek Ranch Park in connection with an investigation involving human remains in a car in the creek. In closing the park, Sheriff Fagan ordered another officer that "after five minutes, make, give him proper time to leave, then make the arrest" with "him" referring to Pulliam.[4] Despite the five-minute warning, the Sheriff and a member of the public information office began

---

[1] PX 49 (Fagan Dep.) 150:16–151:3.
[2] PX 14 (Pulliam Email with Fwd, January 12, 2021).
[3] *Id.*
[4] PX 47 (Fagan Resp. Req. Admis.) Nos. 4–5.

4

marching Pulliam away, to the point that Pulliam had to ask them to stay out of his personal space. Other members of the media did not receive any such threat, were permitted to continue recording at the incident scene for a few minutes after Pulliam was ordered to leave, and they were not marched out.

10.    Also on July 12, 2021, Sheriff Fagan ordered Pulliam removed from a press conference under threat of arrest even though Pulliam was standing where other members of the media were staged and was silently recording.[5] Specifically, Sheriff Fagan ordered his subordinate officer that if Pulliam did not "go back" from the press conference, then "arrest him." Pulliam was marched away by two officers. One of those officers stood between Pulliam and the press conference for the entirety of the press conference.

11.    Sheriff Fagan testified that he would have expected his subordinate officer to have arrested Pulliam if Pulliam had not moved away from the press conference.

12.    Sheriff Fagan had actual knowledge of the policy and custom of hostility toward Pulliam, his journalism, and his speech and approved it. As evidenced by Sheriff Fagan's action on July 12, 2021, Sheriff Fagan even participated in effecting that policy.

13.    The Sheriff's order to remove Pulliam from the press conference and threats of arrest were motivated by the intent to intimidate and exclude Pulliam because of his critical coverage and status as a social media journalist. Alternatively, Sheriff Fagan was recklessly or callously indifferent to Pulliam's First Amendment rights. Several key facts support that factual conclusion.

---

[5] PX 15 (Pulliam Video) at 15:50–16:36.

14.     First, as part of Sheriff Fagan's 2020 campaign in the wake of the murder of George Floyd, Sheriff Fagan confirmed in a tv interview that citizens have the right to film the police.[6] He advised citizens to tell any officer who tries to stop them from recording that they have every right to record. As the Sheriff himself recognized, a natural variation on that advice is that if an officer orders a person filming to leave a scene but does not order anyone else to leave, then that citizen should tell the officer that he has every right to record.[7] Nevertheless, as noted, Sheriff Fagan testified that he would have expected his subordinate officer to have arrested Pulliam if he asserted his right to record on the ground that Pulliam "refus[ed] to step back" even if he never actually refused.[8]

15.     Second, Sheriff Fagan had a nearly 40-year law enforcement career before he became Sheriff. Part of that career included participating in or attending over a hundred press conferences. In his considerable experience, no journalist had ever been removed from a press conference because that journalist reported with social media.

16.     Third, Sheriff Fagan had experience kicking people out of press conferences when he worked on the security detail for Houston's mayor. In his prior experience, he would remove a disruptive person—someone "yelling or screaming during a press conference, someone who's trying to rush up on the stand where the mayor is"—only after giving them a warning.[9] When asked why Sheriff Fagan did not give Pulliam a warning before kicking him out of the July 12, 2021 press conference, the Sheriff glibly replied that

---

[6] PX 16 (Fagan Campaign Video) at 0:32–2:20.
[7] PX 49 (Fagan Dep.) 21:3–9.
[8] *Id.* at 63:8–14.
[9] *Id.* at 44:24–45:14.

Pulliam was "not my employee."[10] The Sheriff's actions cannot be explained by any practical need to control a disruptive person. They were the result of his hostility to Pulliam and his speech.

17.    Fourth, on September 24, 2024, this Court entered its Order granting summary judgment to Pulliam on his claims that Sheriff Fagan and Fort Bend County violated his First Amendment and equal-protection rights at the press conference. In the wake of this Court's Order finding the Sheriff directly liable and the County liable under *Monell*, the Sheriff and the County took no action. For six months, they did absolutely nothing. Only when trial in this case was imminent—after this Court continued the April 2025 trial setting on March 24, 2025—did the Sheriff take steps to ensure that Pulliam was treated the same as other journalists. This was not a sincere response to the Court's decision. It was a litigation tactic to undermine Pulliam's claim to injunctive relief.

18.    To the extent the Sheriff took steps immediately before trial, the Sheriff testified that he announced orally at "roll call" to patrol deputies that Pulliam should be allowed to film. The Sheriff's Office also apparently added Pulliam to the media list. Pulliam testified that he received an email for the first time on March 31, 2025. The Sheriff did not circulate any written policy about Pulliam or filming the police. In fact, the most recent Sheriff's Office "General Order" on media policy continues to expressly exclude "social media" from the definition of "media" for the purposes of written policy.[11] This is

---

[10] *Id.* at 86:16–22.
[11] DX 8 (Dec. 29, 2022 Policy 08-03).

the same written policy that was in force when the Sheriff ejected Pulliam from the press conference because he was not "media."[12]

19.     Finally, despite Sheriff Fagan's campaign statements about the importance of the right to film the police and this Court's ruling that Sheriff Fagan violated Pulliam's constitutional rights, FBCSO has not provided its officers or other personnel with any training on how to interact with citizens filming the police or independent, citizen journalists.

**II.     Rollins instigated a conflict with Pulliam and escalated that to an arrest within 60 seconds of arriving at the scene of a welfare check in retaliation for Pulliam's criticism of law enforcement, filming, and on-scene speech.**

20.     On December 21, 2021, the Sheriff's Office received a call from Texana, an entity that provides mental health services, requesting a "welfare check" for Edwin Kraft and his mother Frances Kraft at their rural property in Fort Bend County. Edwin was well known to the Sheriff's Office due to previous calls about his mental illness. Edwin was reportedly experiencing a mental health crisis and had made homicidal threats to Ms. Kraft.

21.     Deputies Ricky Rodriguez and Matthew Lacy responded to the call at the rural Fort Bend County property where Edwin lived with his mother Frances. The Kraft property includes a convenience store and gas station that no longer operate. The building for the store is still there, as are the gas pumps under a canopy. There is also a mobile home where the Krafts lived.

---

[12] DX 6 (Jun. 1, 2017 Policy 08-03).

22.    The service call for a welfare check at the Kraft property was classified as a priority three call, the lowest priority, in FBCSO's electronic communication system.[13] The call was also classified in the communication system as requiring a "standard" response, which means that officers should get there when time permits. As the Sheriff testified, all FBCSO patrol officers are expected to know the information transmitted in FBCSO's electronic communication system and transmitted by radio when arriving at a scene.

23.    Deputy Lacy arrived at the Kraft property first, and he spoke with Ms. Kraft.

24.    Lacy then radioed that he was standing by, and that Edwin was behind the Kraft residence with a baseball bat.[14] Lacy subsequently radioed that Ms. Kraft was outside with him and Edwin was inside the residence. Approximately five minutes later, Lacy radioed that he was keeping an eye on the door of the residence from a distance until a supervisor arrived.

25.    Deputy Rodriguez was the second FBCSO officer to arrive at the Kraft property. Rodriguez's patrol vehicle had a dash camera that recorded his arrival and some of the events. The Kraft property was part of Rodriguez's regular patrol area and he had responded to calls concerning Edwin previously. He knew Kraft best.

26.    After Rodriguez arrived, Lacy and Rodriguez met directly in front of the Kraft residence and walked around the property in an unhurried manner to formulate a

---

[13] PX 55 (Call Slip).
[14] *Id.*

plan.[15] Lacy and Rodriguez did not have their guns drawn because they didn't perceive any danger and were still trying to figure out where to set up.

27.    Rodriguez and Lacy were waiting for a supervisor to arrive. Edwin had apparently locked himself in the Krafts' house and was not a danger to anyone. Rodriguez monitored the front of the Kraft residence, and Lacy went around the back of the Kraft residence.

28.    At the same time, Ms. Kraft was standing by the gas pumps, which were located at the front of the property, by the street. Lacy and Rodriguez did not tell Ms. Kraft to move from her location under the gas canopy. Rodriguez did not believe that she was in an unsafe location during that period.

29.    While Rodriguez was waiting, he returned to his patrol car twice. The first time he went to fetch his hat, given the chilly weather. The second time he fetched his body microphone (which allows his dash cam to record what is said). For both of those trips to his patrol car, Rodriguez crossed in front of the Kraft residence in an unhurried, casual manner.

30.    The video recordings of Rodriguez's and Lacy's actions make clear that the officers did not perceive the situation at the Kraft property as posing an imminent threat, although the officers knew that Edwin had serious mental health issues.

31.    A few minutes after Rodriguez arrived at the Kraft property, Pulliam arrived. While riding in his truck with his wife, Pulliam had seen Rodriguez driving in the direction

---

[15] PX 53 (Rodriguez Dashcam) at 08:42–9:38.

of the Kraft property and suspected that the deputy was going to the Kraft residence. Pulliam, too, was familiar with Edwin Kraft and his mental illness. Pulliam had covered police interactions with Kraft before.

32.     Pulliam was worried that a police confrontation with Kraft could result in Kraft being injured or killed. It was and is Pulliam's understanding that a mental-health crisis sharply increases the odds that a citizen will be injured or killed during a police interaction.

33.     Pulliam had dramatically reduced his coverage of law enforcement activity and FBCSO activity in particular following the Sheriff's threats of arrest and exclusion of Pulliam at the July 12th press conference. Even though he was afraid that he might get arrested or retaliated against in another way, Pulliam decided to go film at the Kraft property because he was deeply concerned about what might happen if he was not there documenting officer actions to promote accountability. At the time, FBCSO officers did not have body cameras.

34.     Pulliam's truck had a dash camera that recorded his arrival and some of the events. Upon seeing two FBCSO vehicles at the Kraft property, Pulliam had his wife park their truck on the Kraft property. As captured on the dashcam, Pulliam instructed his wife to keep the dashcam on him because he was concerned about FBCSO actions toward him. Pulliam then got out of his truck and began filming FBCSO officers' activities with his hand-held camera.[16]

---

[16] PX 51 (Pulliam Dashcam) at 0:16–40.

35.     Immediately after Pulliam arrived, Rodriguez radioed "local journalist Justin Pulliam's on scene."[17]

36.     Rodriguez radioed that Pulliam was on scene because Pulliam is widely known to FBCSO officers. Officers are aware of his often-critical coverage and Rodriguez wanted to alert his fellow officers that Pulliam was there recording their actions.

37.     The Court finds that a FBCSO officer arriving at the Krafts' property would have known that Pulliam was there.

38.     At about the same time Rodriguez radioed about Pulliam's arrival, Pulliam approached Ms. Kraft, who was by her car under the gas canopy. Pulliam explained that he was a journalist who films FBCSO officers and wanted to film for Edwin's safety. By this, Pulliam meant that he thought Edwin would be safer if Pulliam recorded the police call. Pulliam believed that if the police officers knew that Pulliam was there and recording, they would be more reluctant to use violence against Edwin. Pulliam also thought it important to create an independent record of the police call given the stakes for Edwin. Ms. Kraft agreed that it was okay for Pulliam to film.

39.     Notably, Pulliam did not film Ms. Kraft or try to obtain details about her son. This reflects the focus of Pulliam's journalism. Unlike traditional media, which often focus on the people the police are paying attention to, Pulliam focuses his coverage on the police themselves. At the press conference, for example, Pulliam was not there to cover the tragic death of the woman who was found in her car in Jones Creek. He was covering the Sheriff's

---

[17] County Resp. Req. Admis. Nos. 17–18; PX 53 (Rodriguez Dashcam) at 10:25–35.

Office response to her going missing. So too at the Kraft property. He kept his camera trained on law enforcement.

40.     Rodriguez told Pulliam, "Sir, you need to stay back over there." Rodriguez testified that, through his order, he was instructing Pulliam to stay where he was and not come any closer to the Kraft residence. At no point was Pulliam ever between Rodriguez (or any other officer) and the residence.

41.     Pulliam complied with Rodriguez's order and did not move closer to the Kraft residence.

42.     For approximately four minutes, Pulliam stood silently filming Rodriguez waiting in front of the Kraft residence. The property was quiet, and the scene was controlled. There was no conflict between anyone, let alone any conflict caused by Pulliam.

43.     Just over four minutes after Rodriguez ordered Pulliam to "stay back," two civilian women arrived and walked over to where Ms. Kraft was under the gas canopy. One of the women was wearing heels. Pulliam did not interact with or even turn around to film these two women.

44.     Neither Rodriguez nor Lacy ordered Ms. Kraft, Pulliam, or the two civilian women to leave the scene.

45.     Sergeant Taylor Rollins then arrived at the Kraft property.

46.     When Rollins arrived, the scene was calm and quiet. Pulliam was silently and peacefully filming, complying with Rodriguez's request to stay where he was. Pulliam had Ms. Kraft's permission to be there. Rodriguez and Lacy were not in conflict with any of

13

the civilians present. None of the civilians present were in conflict with each other. Edwin Kraft was nowhere to be seen or heard.

47.     Rollins immediately got out of his patrol vehicle and started walking toward Pulliam.

48.     Before arriving at the Kraft property, Rollins knew who Pulliam was by reputation. That reputation was negative.

49.     As Rollins pulled into the parking area on the Kraft property, Rollins spotted a red haired male who was filming with a nice camera. Rollins assumed that the red-haired man was Pulliam.

50.     Based on both the fact that Rodriguez radioed that "local journalist Justin Pulliam's on scene" and that Rollins was familiar with Pulliam by reputation and general appearance, the Court finds that Rollins knew that the man he spotted filming was Pulliam.

51.     When Rollins arrived, the FBCSO officers believed that Edwin was inside the Kraft residence. Rodriguez also testified that he was still in welfare-check mode at that time.

52.     The following image provides a visual representation of the approximate locations of cars and individuals when Rollins arrived at the Kraft property.[18]

---

[18] PX 1 (Overhead Map with Rodriguez Notations).



53.     The orange R indicates which police vehicle was Rodriguez's and thus contained his dash camera. The red X shows where Rodriguez was standing. The green circle shows generally where Pulliam was standing when Rollins arrived and approached him. The blue triangle shows where Ms. Kraft was standing, and the two blue squares show where the two civilian women were standing. Finally, the black X indicates where Rodriguez believed Lacy was when Rollins arrived.

54.     Rollins exited his vehicle and walked toward Pulliam and said "sir, I need you to go across the street." The order was directed at Pulliam and Pulliam alone. Pulliam was the only male in the area.

55.     Rollins initiated the contact with Pulliam. Rollins did so without taking time to assess the scene or talk to his fellow officers Rodriguez and Lacy. Rollins' first act on scene was to kick Pulliam off the property despite the fact that Pulliam was peaceful and silent while openly engaged in the protected First Amendment activity of filming the police. Pulliam testified that if Rollins had not initiated contact with him that he would have simply continued standing silently filming the deputies.

56.     Rollins did not give Pulliam a reason for kicking him off the property. He did not ask Pulliam whether that would affect his ability to obtain audio and video. He did not consider alternative locations on the Kraft property. Rollins summarily ejected Pulliam.

57.     Upon seeing the two civilian women behind Pulliam, Rollins expanded his order to go across the street to the women with the statement "I need y'all to go ahead and go across the street."

58.     Rollins and Pulliam then had the following exchange:

> Pulliam: "Across the street?"
> Rollins: "Yes, across the street."
> Pulliam: "So you can shoot him?"
> Rollins: "What's wrong with you, man?"
> Pulliam: "What's wrong with you?"
> Rollins: "Please go across the street, thank you."

59.     Again, after this exchange, Rollins still did not explain why he ordered the civilians to go across the street. He did not consult with Rodriguez or Lacy, who were already on the scene and had not ordered anyone to leave.

60.     Just as he had done with Rodrigez's order to "stay back," Pulliam complied with Rollins' order. After the brief verbal exchange, Pulliam turned around and began to

walk away from Rollins toward the street. Pulliam was not happy about this, but he felt that the order was evenhanded.

61.    Unlike Pulliam, the two civilian women did not initially comply. Instead, the two civilian women approached Rollins and began a conversation with him, asking him to change his mind about ordering them to go across the street. Through the conversation, Rollins learned that the two women were from Texana, the mental health organization that assists FBCSO in interacting with citizens experiencing mental health crises.

62.    Rollins agreed that the Texana employees could remain on the scene. He therefore rescinded his order for the two civilian women to go across the street.

63.    Rollins testified that the Texana employees did not commit the offense of interference with public duties when they stopped to speak to him.

64.    During the conversation with the Texana employees, Rollins stood with his back toward the Kraft residence. At no point during this conversation did Rollins take any physical action or make any gesture indicating he was concerned that shooting might begin at any minute. Rather, Rollins appeared calm and unconcerned with what might have been going on behind him.

65.    Rollins' demonstrated lack of concern about danger was consistent with how Rodriguez and Lacy continued to act. No officer on scene was acting like there was any threat coming from the Kraft residence.

66.    In agreeing to allow the Texana employees to stay, Rollins did not tell them they were in danger, he did not ask them to weigh the value of their presence against risks that Edwin posed, he did not ask them to take cover or direct them to stand somewhere

specific. He did not place any restrictions on their movement at that moment (or at any point thereafter).

67.     As Rollins and the two Texana employees talked, Pulliam turned back around to film Rollins and the women, took several steps backward, and stopped walking. Pulliam did not speak or make any effort to get Rollins' attention, but Rollins interrupted his conversation with the two Texana employees to shout to Pulliam:

> Rollins: [pointing at Pulliam] "Across the street."
> Pulliam: "Well, hold on, if it's not for safety, I already have permission—"
> Rollins: "It is for safety."
> Pulliam: "from the landow—I have her permission to stay."
> Rollins: "It is for safety."
> Pulliam: "So is everyone leaving or just me?"
> Rollins: "Across the street."
> Pulliam: "Everyone or just me?"

68.     Importantly, as the transcript of the exchange illustrates, Pulliam did not engage with Rollins first. He did not say anything to Rollins. He stood there silently filming well away from where Rollins and the Texana employees were standing. Rollins engaged Pulliam. And Rollins did so when Pulliam was so far away that he had to raise his voice to the point of shouting.[19]

69.     In contrast to his tone and demeanor toward the civilian women, Rollins' tone and demeanor toward Pulliam was hostile and impatient. Rollins' hostility to Pulliam was so palpable that one of the mental health workers felt emboldened to join Rollins in shouting orders at Pulliam, telling him, baselessly, that he could not film "my client," who,

---

[19] PX 51 (Pulliam Dashcam) at 5:14–28; PX 52 (Pulliam Handheld Camera) at 4:39–53.

again, was nowhere to be seen. In addition to initiating the exchange with Pulliam, this was the first time that Rollins stated his reason for asking anyone to go across the street.

70.     In contrast to his civil and reasonable conversation with the Texana employees, which caused Rollins to change his mind, Rollins refused to speak to Pulliam or answer his questions about why only he had to leave if safety were the justification. At this point, Pulliam was the only person being ejected. The order to go across the street was no longer evenhanded. Pulliam felt like he was being singled out again, as he had been at the press conference. He believed it was important to assert his rights.

71.     Rather than speak with Pulliam as Rollins had with the Texana employees, Rollins started walking toward Pulliam and counting down from five. In response, Pulliam began moving backward in the direction of the street, continuing to film Rollins. When Rollins reached one, he ordered Pulliam to turn around and placed Pulliam under arrest. Rollins did not give Pulliam any warning that he would be arrested if he did not immediately leave or if he did not stop talking to Rollins.

72.     The Court does not find Rollins credible in asserting that safety required him first to eject Pulliam from the scene and then arrest Pulliam without warning. Rollins' and the County's defense is built almost entirely on so-called "BOLO" ("be on the lookout") emails about Edwin Kraft and the dangers he presents that the Sheriff's Office had circulated at various times to patrol staff. Rollins' and the County's defense is based on the idea that Rollins had a perception of danger that the Court should credit over how Rollins, Rodriguez, and Lacy acted on scene. The Court declines to do so. The fact that no one, including Rollins, acted as though Edwin Kraft posed any danger on scene when Rollins

arrived through his arrest of Pulliam speaks louder than words. Rollins' actions on scene are consistent with hostility to Pulliam and his speech. They are not consistent with a belief that safety required Rollins to act as harshly and quickly as he did. The Court also notes that the Texana mental health workers, who were specifically assigned to Kraft's case and thus familiar with him, did not act as though Kraft were going to open fire on anyone.

73.    As Rollins handcuffed Pulliam, Rollins told him, "You're interfering with my job. You're making my job a lot harder than it needs to be." The Court finds Rollins' statement that Pulliam was interfering with his job to be untrue. The scene was peaceful until Rollins arrived. Rollins initiated contact with Pulliam and then steadily escalated that into a conflict that resulted in arrest within 60 seconds of Rollins' arrival. If Rollins had simply left Pulliam alone, as his fellow officers had, none of this would have happened. Or, at least, if Rollins had calmly spoken to Pulliam to explain any asserted safety reason, none of this would have happened. If the civilian women were not interfering with Rollins by speaking to him, then neither was Pulliam. It was Rollins' hostility to Pulliam that drove the entire interaction. Rollins was the sole cause of the "interference" he claimed to justify the arrest.

74.    Pulliam believed he was arguing his case to Rollins as the Texana employees had. Pulliam did not believe he was actively defying Rollins. Pulliam testified that he would have complied had Rollins expressly said the discussion was over and that he would arrest Pulliam if he kept trying to talk to him. The Court finds Pulliam's perspective believable. Pulliam had just witnessed Rollins talk to the Texana women and change his mind. Pulliam had just demonstrated to Rollins that he would comply with orders. Pulliam

did not believe, and Rollins gave him no warning expressly or even implicitly, that talking to him would result in arrest.

75.    The Court finds Rollins' statement that Pulliam was making Rollins' "job a lot harder than it needs to be" illuminating. Rollins' statement reveals the true reason that Rollins kicked Pulliam out and arrested him: Rollins wanted Pulliam gone. Pulliam's filming, speech, and demand for an explanation about why only he was being excluded may have made Rollins' job more difficult, but they were not permissible reasons to kick Pulliam off the Kraft property or arrest him.

76.    Rollins testified that he was emotionally calm during the interaction with Pulliam, was not making a split-second decision under stress, and that, on reviewing the video long after the incident, he would not change how he handled the situation. Rollins testified that he did not find Pulliam to be physically threatening toward himself or anyone else.

77.    At no point before Rollins arrested Pulliam did Pulliam move closer to the Kraft residence after Rodriguez ordered him to "stay back." Pulliam never physically got in the way of the officers while they were responding to the call about Edwin.

78.    Rollins only ordered the Texana employees to go across the street after he specifically ordered Pulliam to leave. As Rollins was walking toward Pulliam, he first ordered Pullian to leave with "*Sir*, I need you to go across the street." Rollins only addressed the other civilians *after* ordering Pulliam to leave, thereby expanding his order with "I need *y'all* to go ahead and go across the street." The Court finds that Rollins affirmatively wanted to exclude Pulliam, and further finds that Rollins simply lumped the

civilians standing behind Pulliam, who turned out to be Texana employees, in with Pulliam in ordering "y'all" to go across the street so as to seem evenhanded. Ultimately, the evidence and testimony support the inference that Rollins was carrying out the County's policy of intimidating and excluding Pulliam based on his speaker status and past coverage.

79.    Rollins testified that Pulliam's initial questions about going across the street and "so you can shoot him?" did not constitute the offense of interference with public duties. Rollins also testified that Pulliam's question "what's wrong with you?" was not interference with public duties.

80.    Rollins testified that he concluded that Pulliam committed the offense of interference with public duties when he protested that he had a right to stay and asked whether Rollins' order to go across the street was for safety and applied to everyone or only Pulliam. Again, the Court notes that Pulliam was protesting only because Rollins stopped talking to the Texana employees and engaged with Pulliam.

81.    Rollins also testified that if Pulliam had spoken to him more respectfully, like the Texana workers, then he would have treated him differently—perhaps listening to Pulliam, providing an explanation for his order, or permitting Pulliam to stay. Rollins' testimony highlights how Rollins treated Pulliam differently, with greater hostility, because of his critical speech.

82.    As will be discussed in more detail in the Conclusions of Law, the Court finds that Pulliam did not act with criminal negligence, which is an element of interference with public duties, in asserting a right to stay after Rollins changed his mind about the Texana employees.

83.     That Pulliam was not behaving with criminal negligence is further evident in an interview Sheriff Fagan did with a local news program in running for Sheriff. In context of a discussion about the George Floyd murder, candidate Fagan emphasized that anyone being told not to film should assert that they have a right to do so.[20] In asserting that he be allowed to remain on the Kraft property to film, Pulliam was asserting his right to film. He was doing what candidate Fagan said people should do when law enforcement restricts the right to film.

84.     While Rollins was arresting Pulliam, the Texana employees remained standing next to the gas canopy, between the Kraft residence and where Rollins was arresting Pulliam—right in the area where Pulliam had been initially standing to film.

85.     Rollins placed Pulliam in the back of Rodriguez's patrol vehicle and confiscated all the recording equipment on Pulliam's person. Rodriguez's dashcam footage shows that while Pulliam sat handcuffed in Rodriguez's patrol vehicle the two Texana employees continued to walk around the Kraft property unaccompanied by any FBCSO officer.[21]

86.     Rollins placed Pulliam in Rodriguez's patrol vehicle that was parked right in the supposed line of fire from the residence.[22]

87.     After putting Pulliam in the patrol vehicle, Rollins stood outside fiddling with Pulliam's handheld camera, fully exposed to the residence where, Rollins claimed,

---

[20] PX 16 (Fagan Campaign Video) at 1:48–2:15.
[21] PX 53 (Rodriguez Dashcam) at 16:36–46.
[22] *Id.* at 16:00–30.

Edwin Kraft was supposedly lying in wait to begin shooting. Rollins could then be seen walking around in front of the residence without concern for any shooting.[23]

88.     After Rollins arrested Pulliam, Ms. Kraft remained under the gas canopy, by or in her car. Despite the fact that Ms. Kraft was the subject of Edwin's homicidal threats, Rollins didn't even ask where she was. Rodriguez raised the topic of Ms. Kraft's location several minutes after Pulliam's arrest by asking if Rollins wanted Ms. Kraft to move.[24] Rollins did not order Ms. Kraft to go across the street at any time. Rollins did not even ask about Ms. Kraft at any point. Rollins also did not check other vehicles for civilians. Mrs. Pulliam, for example, was sitting in the driver's seat of the truck the Pulliams arrived in. Rollins walked right past it and even appeared to look at it as he marched Pulliam away in handcuffs.[25]

89.     Ms. Kraft and the two Texana employees did not leave the Kraft property and were not arrested. Nor did Rollins or any other officer restrict the location or movement of Ms. Kraft or the Texana employees on the basis of safety.

90.     About 15 minutes after Rollins arrested Pulliam and placed Pulliam in the back of Rodriguez's patrol car, Rollins ordered Rodriguez to move his patrol car back. Rodriguez did so, moving his patrol car so that it was farther away from the Kraft residence and out of sight of the Kraft residence.

---

[23] *Id.* at 16:58–17:37.
[24] *Id.* at 17:15–37.
[25] PX 51 (Pulliam Dashcam) at 5:53–59.

91.     A few minutes after Rodriguez moved his patrol car out of sight of the Kraft residence, Rollins opened the driver's side door of Rodriguez's patrol car and turned off the police radio so Pulliam could not listen to the police radio traffic.[26] That radio traffic is publicly accessible. There was no reason for Rollins to turn off the patrol car radio except to prevent Pulliam from listening and undermine his ability to cover the Edwin Kraft scene from a journalist's perspective.

92.     To sum up, Rollins testified that he needed Pulliam across the street for security purposes, he was concerned that Edwin might start immediately shooting, and he needed to secure the scene for safety reasons. But based on the totality of the facts as Rollins knew them to be and based on Rollins' own actions, the Court does not find Rollins credible in asserting that he needed Pulliam—and only Pulliam—to immediately go across the street without the opportunity to ask questions.

93.     Rollins did not act as though he or anyone else was in any actual danger. He issued the order to go across the street arbitrarily on arrival when he knew less than anyone else on scene about what was happening. The unreasoned nature of his order is obvious in his failure to ask any civilian who they were or what their purpose was. Because his order was an unreasoned, reflexive assertion of authority, he immediately backtracked after speaking to the Texana employees. And he did so without any consideration of whether letting the Texana employees stay would endanger them personally because, like his fellow officers on scene, he did not in fact perceive any actual danger.

---

[26] PX 53 (Rodriguez Dashcam) at 47:00–20.

94.    The Court likewise finds that no exigent circumstance or other legitimate reason justified Rollins' hair-trigger arrest of Pulliam. The Court does not find Rollins' testimony credible that he could not spare a moment to respond to Pulliam's question without resorting to arrest. Rollins had no problem talking to the Texana employees. Given that Pulliam was in the process of complying and the absence of any safety justification for ordering Pulliam alone to go across the street, Rollins' arrest was not in response to any practical law enforcement need.

95.    Rollins testimony about safety is contradicted by his other testimony about his reasons for arresting Pulliam. Rollins testified that he was concerned that Pulliam "could have been more distracting in the long run" and that having to interact with Pulliam meant that Rollins "put off" calls to other officers and police resources. This testimony indicates that Rollins concluded upon arrival that Pulliam was going to be a problem and that Rollins was, therefore, looking for an opportunity to neutralize him. The first attempt was to order Pulliam away from the scene and the second attempt was the arrest.

96.    Once again, the Court notes that Rollins initiated the conflict with Pulliam by ordering him across the street and then escalated it by renewing that order, refusing to explain himself sensibly, and then arresting him when Pulliam protested that Rollins' order was unjustified. Rollins' actions are far more consistent with an intention to provoke and silence Pulliam than with a concern for safety, Pulliam's or anyone else's. Had Rollins exited his patrol vehicle and ignored Pulliam, none of this would have happened. Furthermore, the act of arresting Pulliam was a far more time-consuming distraction to Rollins (and later to Rodriguez, who took custody of Pulliam) than any short conversation

with Pulliam would have been. Rollins himself created the interference with public duties (his own and Rodriguez's) by needlessly arresting Pulliam.

97.    The Court finds that Rollins treated Pulliam differently than other civilians. Rollins allowed other civilians, who turned to out to be Texana employees, to explain why they should be permitted to remain on the Kraft property. Rollins did not have a legitimate reason to allow some civilians, but not Pulliam, to explain why they could stay at the scene. Rollins was distinguishing among speakers, allowing speech by other civilians but not by Pulliam.

98.    Having viewed the video of the arrest and having considered Rollins' testimony, the Court finds that Rollins arrested Pulliam to punish him for his criticism of FBCSO activities and for asserting his rights rather than silently complying. The fact that Pulliam dared to question Rollins' motive in removing Pulliam from the scene and Rollins' order excluding Pulliam triggered Rollins to arrest Pulliam in literally a matter of seconds.

99.    The Court finds that Rollins would not have arrested Pulliam absent a motive to retaliate against Pulliam for his reporting and speech. In other words, had Pulliam been someone else yet said the same thing, no arrest would have happened.

100.    The Court finds that Rollins was carrying out Fort Bend County's policy and custom of intimidating and excluding Pulliam to prevent his reporting. Indeed, as Sheriff Fagan testified when discussing his order that Pulliam be removed from the July 2021 press conference, Sheriff Fagan expected his subordinate officer to have arrested Pulliam if Pulliam had asserted his right to stay and record on the ground that Pulliam "refus[ed] to

step back."[27] Rollins carried out that expectation only a few months later. When Pulliam protested that he was the only one being kicked off the property and that he had the landowner's permission to stay and film, Rollins arrested him for refusing to comply. Sheriff Fagan's message had been clear: Pulliam could be excluded. If he asserted a right to remain, then arrest him for refusing to follow police orders. Rollins did so.

101.    Thus, although Sheriff Fagan and Rollins recognized that the First Amendment protected the right to film in the abstract, Sheriff Fagan and Rollins paid only lip service to that right. Yes, Pulliam could film the police—but only from a distance that made actually capturing what was said and done impossible. And if Pulliam dared object or insist that he had a right to be in the same spot as everyone else, he would be arrested and experience the full weight of FBCSO's power. That's exactly what happened here.

### III.    Any safety concern requiring civilians to leave the Kraft property arose well after Rollins arrested Pulliam.

102.    About 35 minutes after Rollins placed Pulliam under arrest, FBCSO officers learned that Edwin was not inside the Kraft residence and was instead on a neighboring property.

103.    Approximately three minutes after FBCSO officers learned that Edwin was not in the Kraft residence, Lacy radioed that Edwin was "on foot," that he possibly had a weapon, and instructed his fellow officers to set up a perimeter.

104.    As Rodriguez was preparing to leave the Krafts' property, he commented to Pulliam that "you probably should have left when you had the chance." Pulliam testified

---

[27] PX 49 (Fagan Dep.) 63:8–14.

that he understood Rodriguez's comment to mean that if Pulliam had left, he would not have been arrested for a crime.

105.    When Rodriguez drove away from the Kraft property with Pulliam, the Texana employees were still walking around the Kraft property without an officer escort.[28] This underscores the complete absence of any safety justification for excluding and arresting Pulliam.

106.    When FBCSO officers confirmed that Edwin had a gun, Rodriguez returned to the gas station part of the Kraft property and ordered the Texana employees and Ms. Kraft to go across the street to another gas station—an order that was given more than 40 minutes after Rollins placed Pulliam in the backseat of Rodriguez's vehicle.[29]

107.    FBCSO officers did not confirm that the Texana employees and Ms. Kraft left the Kraft property. After Edwin was apprehended, the Texana employees were still freely walking around the Kraft property. Rodriguez testified that he never saw the Texana women leave.

108.    The first time that any FBCSO officer communicated to dispatch that Pulliam was in custody was over an hour after Rollins placed Pulliam in the back seat of Rodriguez's patrol vehicle.[30]

109.    Immediately before Rodriguez left the Kraft property with Pulliam in the backseat, Rodriguez took off or turned off his dashcam microphone just after officers

[28] PX 53 (Rodriguez Dashcam) at 52:30–52.
[29] *Id.* at 1:00:54–1:01:02.
[30] County Resp. Req. Admis. No. 45.

discussed what offenses they believed Edwin committed. Rodriguez testified that he could not recall why he turned off his body-worn microphone, the same one he specifically returned to his vehicle to retrieve shortly after arriving at the Kraft property. Rodriguez testified that a body-worn microphone can be important for police accountability. The Court finds it likely that Rodriguez prevented his microphone from capturing conversation between the officers about Pulliam and the alleged offense of interference.

## IV.    Sheriff Fagan oversaw and approved Pulliam's booking for the offense of interference with public duties.

110.    Rodriguez took Pulliam to the Fort Bend County Jail, and someone at the jail notified Sheriff Fagan that Pulliam was there. Sheriff Fagan is not typically notified every time a new inmate enters the jail's custody, especially given that the daily average of inmates in the jail has been 750–800 during Sheriff Fagan's tenure.[31]

111.    Pulliam was singled out for special treatment, further evidence that the County had a specific official policy of dealing with Pulliam differently than others. Sheriff Fagan, Chief Deputy Provost, and Major Castaneda went to the jail to see and question Pulliam.[32] Sheriff Fagan testified that he knew that FBCSO employees did not like Pulliam and might "jack with" him.

112.    At the jail, Sheriff Fagan instructed a jail employee to bring Pulliam to him. As surveillance camera footage from the jail shows, Sheriff Fagan directed Pulliam, who was wearing prisoner's clothing, from a jail hallway into a room that did not have a video

---

[31] PX 49 (Fagan Dep.) at 139:10–17, 133:15–18.

[32] PX 46 (County Resp. Req. Admis.) Nos. 48–49.

camera. Sheriff Fagan then followed Pulliam inside. The other senior officials, Provost and Castaneda, also entered the room. Sheriff Fagan testified that he knows where some of the jail's blind spots—places not filmed by a video camera—are located.

113.    In the office, Sheriff Fagan attempted to ask Pulliam questions, including "do you know why you're here?" Pulliam did not answer and simply asked that he be provided with an attorney. Sheriff Fagan then stated, "Do it by the book," and left.

114.    Before Sheriff Fagan questioned Pulliam, Pulliam was not Mirandized or provided with counsel. At the time, he had not yet been booked for an offense.

115.    The Court finds that the questioning of Pulliam in a room out of view from surveillance cameras by Sheriff Fagan who was flanked by two senior officers before Pulliam was Mirandized, provided with counsel, or booked is an extraordinary and telling event. At the very least, the interaction intimidated Pulliam and further chilled his speech. At worse, the interaction suggests that Sheriff Fagan sought to coerce Pulliam into stopping his criticism of FBCSO.

116.    The Court notes that the situation is scarcely better even if the Court credits the Sheriff's testimony that he was there to stop his officers from "jacking with" Pulliam. That testimony shows an awareness of pervasive hostility to Pulliam, so much so that the Sheriff claims to be worried that Pulliam might be in danger from jail staff, not just inmates. Yet the Sheriff did not act consistently with that purported concern. The Sheriff did not inquire into the circumstances of Pulliam's arrest. He made no announcements and issued no written orders to leave Pulliam alone. And, as the Sheriff testified at trial, no officer has been disciplined or even informally counseled for any action concerning Pulliam.

117.    After Sheriff Fagan's questioning and Pulliam's refusal to respond. Pulliam was booked for the offense of interference with public duties. In support of that, Rollins submitted a probable cause affidavit, which he signed under oath before a notary.

118.    Rollins' probable cause affidavit for the arrest contains numerous material falsehoods, all of which cut in Rollins' favor and against Pulliam.[33] Rollins' affidavit depicts a very different interaction from the one Pulliam filmed. Rollins' material falsehoods include the following: (1) Rollins did not tell Pulliam that he could not remain standing where he was "due to [his position] being directly in front of the residence and where Edwin Kraft was barricaded with a weapon"; (2) Rollins did not give Pulliam any kind of warning like "I wasn't going to say it again"; (3) Pulliam did not "just st[an]d there" but took steps backward in the direction of across the street while continuing to film Rollins; (4) Rollins' statement that "Justin did not move"; (5) Rollins' statement that "[b]y him staying in that area it put him and myself in danger"; (6) Rollins' statement that "Justin did not move" after Rollins began a countdown; (7) Rollins' statement that he moved Ms. Kraft to a safe location before interacting with Pulliam (she was not part of this at all); and (8) Rollins' statement that he moved the Texana employees to a safe location before interacting with Pulliam. More generally, the affidavit is presented as a chronological account but presents the interaction with the Texana employees out of order. Every one of these material falsehoods makes Pulliam look worse and the arrest more justifiable. Rollins testified that he knows sworn affidavits are used as evidence to proceed with investigations,

---

[33] PX 6 (Rollins Probable Cause Affidavit).

secure indictments, and pursue criminal prosecution. The Court does not find Rollins' testimony credible that these were innocent errors. The falsehoods collectively demonstrate a deliberate attempt to justify the arrest by depicting the scene as more dangerous that it was and by depicting Pulliam as behaving in a way that his video proved he did not.

119.    Rodriguez's account in the Offense Report also contains material errors that falsely depict Pulliam as interfering with a dangerous scene. Rodriguez wrote that he had to order Pulliam to stay back as Pulliam kept "getting closer." That is false. Rodriguez also wrote that he had to order Pulliam to stay back as Rodriguez was "attempting" to get closer to the residence. That too is false to the extent it portrays Rodriguez as trying to approach the residence while expecting possible gunfire. The videos depict Rodriguez freely walking back and forth to his patrol vehicle, crossing in front of the residence, without any evident concern about gunfire. Rodriguez's account is totally false to the extent it implies that Pulliam was interfering with Rodriguez's movements on scene. Again, except for Mrs. Pulliam in the truck, Pulliam was almost always the civilian farthest from the scene.

120.    While Pulliam was at the Fort Bend County jail during the booking process, Pulliam was openly and profanely ridiculed by officers working in the jail. He was strip searched, which included the inspection of his genitals. An FBSCO staff member also followed Pulliam around with a video camera in an apparent attempt to mock Pulliam's efforts to film police.

121.    With assistance from his wife, Pulliam paid the $500 bond and was released from jail. FBCSO held Pulliam in custody for approximately five hours, from the point that Rollins put handcuffs on him until his release from Fort Bend County Jail.[34]

122.    Shortly after Pulliam was released from jail, on December 21, 2021, a FBCSO officer shared Pulliam's mugshot and a news story about his arrest on Facebook.[35] That officer commented that Pulliam had been arrested for "interfering on a scene" and that Pulliam is "a prick who likes to show up on random officers['] scenes and try's [sic] to entice them to act out." The post received comments disparaging Pulliam from FBCSO officers, other law enforcement officers, and friends and family of officers. A representative comment was "If pedophiles had a 'look.'"

## V.    Fort Bend County and its law-enforcement officers continued their efforts to retaliate against Pulliam after the arrest.

123.    FBCSO assigned Detective Travis James to investigate whether there was probable cause to search Pulliam's seized electronic equipment and whether Pulliam committed the offense of interference with public duties. Assignments are normally made at random but in this case Lieutenant Scott Heinemeyer assigned the investigation to Detective James. Heinemeyer was on scene at the press conference and interacted with Pulliam there right before Sheriff Fagan first threatened to arrest Pulliam. Sheriff Fagan testified that he and Heinemeyer discussed Pulliam's case, including the camera equipment that Rollins seized.

---

[34] County Resp. Req. Admis. No. 46.
[35] PX 8 (Officer Cardenas Facebook Post).

124.     James works in the robbery and homicide section of criminal investigations, typically investigating crimes such as homicides, assaults, and threats to schools. It is unusual for him to investigate class B misdemeanors like interference with public duties. Before investigating Pulliam, James had never investigated someone for interference with public duties.

125.     FBCSO ordinarily only opens an investigation if there is a serious crime with multiple suspects or serious injuries. That is entirely unlike the facts of the Pulliam arrest.

126.     Although James would normally arrange to speak with the suspect about the crime he was investigating, James did not believe that there was any point in talking with Pulliam because James understood that Pulliam had refused to speak with Sheriff Fagan after he was arrested.

127.     James sought search warrants for footage stored on Pulliam's equipment, namely in memory cards and on a body-worn camera. He completed two affidavits to obtain the search warrants.

128.     On January 14, 2022, with an attorney from the District Attorney, James presented affidavits for two search warrants to Judge Becerra, who presides over the 434th District Court in Fort Bend County. Judge Becerra signed the warrants that same day. James immediately executed the warrants and attempted to view footage on Pulliam's equipment. He was not, however, able to view any footage. He therefore sent Pulliam's memory cards and body-worn camera to a forensic laboratory.

129.    In obtaining the search warrant, James relied on the error-riddled writings of Rollins and Rodriguez, including Rollins' probable-cause affidavit. James also spoke to Rollins and Rodriguez.

130.    Detective James was able to obtain video from Pulliam's handheld camera, but not his body-worn camera. The Court notes for clarity that law enforcement never seized Pulliam's truck dashcam so that footage was never available to the investigation.

131.    On March 18, 2022, James made notes in the Offense Report after viewing the handheld camera footage.[36] None of James' notes acknowledge the false statements made by Rollins and Rodriguez in their writings after the arrest.

132.    In his notes, James wrote that, as captured on the footage, Pulliam was "heard to refuse[.]" At trial, James testified that Pulliam never expressly refused to follow Rollins' order and that he only used "heard to refuse" as a figure of speech.

133.    James testified that he relied on Rollins' assessment that Pulliam committed the offense of interference because James has known Rollins for years.

134.    Rollins, Rodriguez, and James testified that they did not testify before the grand jury. The grand jury therefore rested its indictment on the error-riddled statements of Rollins, Rodriguez, and James, including Rollins' probable-cause affidavit. There was no indication that the grand jury was provided with anything more.

---

[36] PX 54 (Offense Report, December 21, 2021) at 17–18.

135.    The Court finds that the grand jury indictment of Pulliam was tainted by the combination of the errors in Rollins' probable-cause affidavit, the errors in Rodriguez's account in the Offense Report, and the error in James' notes.

136.    The Fort Bend County District Attorney did not immediately file charges against Pulliam. The District Attorney twice reset Pulliam's arraignment. The second resetting was executed on May 4, 2022. Pulliam and his criminal attorney could not obtain clarity on whether Pulliam would be officially charged.

137.    On May 5, 2022, Pulliam posted a video on his YouTube channel about his arrest and the lack of formal charges. In that video, he criticized FBCSO and Fort Bend County officials.

138.    A little over a week later, on May 16, 2022, the District Attorney obtained a grand jury indictment against Pulliam for the class B misdemeanor of interference with public duties. The Court finds that the timing of the indictment suggests that the District Attorney sought to indict Pulliam as part of Fort Bend County's effort to retaliate against Pulliam for his reporting and speech.

139.    The Court further finds that the decision to indict Pulliam via a grand jury was highly irregular. In 2022, the District Attorney only sought to indict one other misdemeanor offense than the one allegedly committed by Pulliam—a situation in which a mayor was accused of official misconduct.

140.    The indictment claims Pulliam:

on or about December 21, 2021, did then and there, while Sergeant Taylor Rollins, a peace officer, was performing a duty or exercising authority imposed or granted by law, to-wit: securing a scene and/or

setting up a perimeter, with criminal negligence, interrupt, disrupt, impede, or interfere with the said Sergeant Taylor Rollins by failing to move across the street and/or failing to follow Sergeant Taylor Rollins['] instructions to move.[37]

141.    On its face, the indictment indicates that it was "present[ed] in the County Court of Fort Bend County" and lists the "County Court at Law No." as "434th."[38] There is no County Court at Law No. 434th. The indictment was returned by a grand jury in the 434th district court, over which Judge Becerra presides.

142.    Because the 434th district does not have jurisdiction over a misdemeanor like interference with public duties, Judge Becerra sought to transfer the indictment to Judge Morales' court, County Court at Law No. 1. On June 23, 2022, Judge Becerra signed a transfer order, but Judge Morales refused to accept the transfer.[39] He simply refused to sign the transfer order and provided no explanation.

143.    On July 14, 2022, the paperwork for Pulliam's criminal case (and his criminal case in general) was returned to the 434th District Court. Judge Becerra then again attempted to transfer Pulliam's criminal case to another county court. This time, the Honorable Juli Mathew in County Court at Law No. 3 accepted the transfer order.

144.    Although the Court does not have insight into why Judge Morales refused the transfer, the Court finds that (1) the inaccuracies in the indictment and (2) Judge Morales' refusal to accept the transfer of Pulliam's criminal case underscores the

---

[37] PX 58 (Grand Jury Indictment, May 16, 2022).
[38] *Id.*
[39] PX 62 (Records for Transfer of Criminal Case) at 15.

abnormality of Fort Bend County's prosecution of Pulliam. The criminal procedure applied to Pulliam certainly was not typical.

## VI.    Eventually, the District Attorney's office dismissed the charge against Pulliam, but FBCSO still keeps Pulliam's property and has made no policy changes.

145.    In March 2023, Pulliam was tried before a jury for the offense of interference with public duties. The trial was declared a mistrial because of a hung jury. Five jurors voted to acquit, but one juror voted to convict. For over a year, Pulliam's criminal case remained pending without any indication of whether he would be retried.

146.    Although the criminal charge was eventually dismissed, officer testimony at the criminal trial is relevant here because it was inconsistent with the video footage of the events at the Kraft property. As Rollins admitted during his testimony before this Court, Rollins initially testified at Pulliam's criminal trial that Pulliam committed the offense of interference because he didn't move across the street and didn't follow Rollins' order. Rollins conceded that he only changed his testimony to recognize that Pulliam did move when Pulliam's defense counsel then showed Rollins video from Pulliam's dashcam.

147.    Similarly, Rodriguez also admitted that he testified incorrectly in Pulliam's criminal trial in testifying before this Court. During the criminal trial, Rodriguez initially testified that Pulliam did not get back when Rodriguez ordered him to get back: "He just kept getting closer." While on the stand in this trial, Rodriguez recognized that his criminal trial testimony had been wrong and that he had corrected that testimony after watching Pulliam's dashcam footage on cross-examination by Pulliam's criminal law attorney.

148.    The Court finds that the inconsistencies between Rollins' and Rodriguez's initial testimony during Pulliam's criminal trial and what was captured on video (1) underscores the abnormality of the prosecution of Pulliam based on officer statements plainly contradicted by video footage and (2) supports the inference that FBCSO pursued Pulliam's prosecution in furtherance of its policy and custom of intimidating and excluding Pulliam in retaliation for his reporting and his speech.

149.    Well over a year after Pulliam's criminal trial resulted in a mistrial, on May 14, 2024, the state finally filed a motion to dismiss Pulliam's criminal case with a self-serving statement: "Probable cause exists. State declines to prosecute further." The Court affords no weight to that self-serving statement, which was made while this Court's review of Pulliam's summary-judgment motion was pending.

150.    Pulliam's arrest doesn't resemble any of the 30 other arrests for the offense of interference with public duties in Fort Bend County in 2020–22. Of the 30 other arrests for this offense in 2020–22, Pulliam's arrest was the only one involving a journalist and only one where the arrestee did nothing but engage in protected speech. It was also the only interference arrest indicted and taken to a criminal trial. The other arrests involved violence or threats of violence toward the police, physically obstructing the police, and lying to the police. And the arrestee was often intoxicated, engaged in a heated domestic dispute, or the subject of a traffic stop. Of these 30 other arrests, 26 were dismissed or the prosecutor declined to proceed; three resulted in convictions by plea; one was never resolved.[40]

---

[40] PX 13 (Interference Arrests Summary).

151.    Rollins testified that none of these plus-factors were present in Pulliam's arrest. Pulliam wasn't violent or threatening violence. He wasn't intoxicated or disorderly. He wasn't trespassing. He wasn't lying. He wasn't inside anyone's personal space. He wasn't physically obstructing anyone or any vehicle from moving. All Pulliam did was try to talk to Rollins.

152.    Pulliam's arrest is also different from other interactions that Pulliam himself has had with law enforcement officers over the years while filming them as part of his journalism. Pulliam introduced three videos into evidence as examples of prior interactions with the police. The video examples illustrate how Pulliam's other interactions with police follow a similar pattern. Pulliam (or someone he was with who was also filming) arrives on scene and is asked to stand somewhere. Pulliam objects, often in a pointed, argumentative, and even insulting manner. Pulliam disputes the necessity of moving or objects to the specific location. Yet, time and again, the police officers engage with Pulliam, explain their reasoning, but do not arrest Pulliam.

153.    Two of the examples concerned situations where there was a concern about violence. In one, an FBCSO officer directly referenced his concern that Pulliam might be in the line of fire if a shooting were to occur in explaining why he needed Pulliam to move. In the second, FBCSO officers were stagging a SWAT operation and wanted space. The objective dangers presented in those videos are similar to those that Rollins was dealing with at the Kraft property the day he arrested Pulliam.

154.    The Court finds Pulliam's pattern of objecting to a law enforcement officer's order to stand somewhere else and arguing with the officer in a pointed and even insulting manner does not typically trigger an arrest.

155.    FBCSO has not returned some of the property that it seized from Pulliam on December 21, 2021. Specifically, FBCSO still has two memory cards, an iPhone and its accessories, and a body camera. FBCSO has refused to return Pulliam's property unless he signs a form waiving claims against the County.

156.    Sheriff Fagan and other officers in FBCSO leadership reviewed the footage of Pulliam's arrest. No officers were disciplined, orally reprimanded, or counseled for their role in Pulliam's arrest or for their actions at the Kraft property on December 21, 2021.

157.    On behalf of Fort Bend County, Sheriff Fagan maintains that the events at the Kraft property on December 21 or the arrest of Pulliam should not have been handled any differently.

## VII.    Pulliam suffered extensive financial, reputational, and emotional injuries because of the Defendants' violation of his constitutional rights.

158.    The press-conference exclusion, the Kraft-property exclusion, the retaliatory arrest, and FBCSO's policy and custom of intimidating and excluding Pulliam to prevent his reporting has substantially chilled Pulliam's reporting. Pulliam reduced both his methods of reporting via video, livestreaming and uploading long-form reports to YouTube. The Court finds that Pulliam has proved actual injury to his reporting business

caused by the chilling of his speech. Pulliam's testimony and evidence of damages was unrebutted.[41]

159.    Before being excluded from the press conference and threatened with arrest by Sheriff Fagan twice on July 12, 2021, Pulliam filmed an average of nine law enforcement events per week with approximately three of those events focusing on the activities of FBCSO officers.

160.    After Pulliam was excluded from the press conference, Pulliam's reporting on police activity dropped significantly. From July 12, 2021, to December 21, 2021, Pulliam filmed an average of 2.2 police events per week and only a handful of incidents involving FBCSO. Pulliam feared arrest and felt that attempts to film FBCSO activities would be futile because he would likely be removed or excluded. Pulliam interpreted Sheriff Fagan's comments at the July 2021 press conference that Pulliam was "not media" to mean that Pulliam was not eligible for constitutional protections afforded to the press, and that Pulliam might be arrested for any effort to cover the news in the County.

161.    When Pulliam was excluded from the July 2021 press conference, Pulliam was humiliated while livestreaming. Before the press conference, Pulliam had over 14,000 subscribers to his livestreaming. After July 2021, Pulliam rarely livestreams police or local government activity. In November 2021, Pulliam ended the option for viewers to subscribe to his livestreaming efforts and refunded subscribers the remaining portion of their subscription fee.

---

[41] PX 27, 32–45 (Damages Evidence).

162.    After his December 2021 arrest, Pulliam generally avoids filming FBCSO activity because he fears arrest or other retaliation. Further, Pulliam dramatically reduced his reporting on all local government because of the retaliatory arrest and criminal prosecution.

163.    As an example of how Pulliam's speech has been chilled, Pulliam introduced video evidence showing that on the rare occasion that he filmed FBCSO officers after his arrest—only doing so to provide support to another journalist—Pulliam filmed from inside his car to avoid interacting with FBCSO officers. The Court also notes that one filming incident was in October 2024 and another in March 2025. Both occurred after this Court held that the County and Sheriff Fagan had violated Pulliam's rights and also after Pulliam was represented in his suit. At most, the only inference that can be drawn is that Pulliam felt some protection from the Court and his own counsel, not that he believed that Defendants had altered their practices. To the contrary, as the Court noted earlier, the County and Sheriff Fagan did nothing in response to the Court's summary judgment ruling and have made no written policy changes. Sheriff Fagan made some statements about Pulliam at roll call (and added him to the media list) in spring 2025, but that was in preparation for trial, not due to a sincere change of heart.

164.    Pulliam reviewed his data from YouTube analytics to determine profits lost from his chilled reporting. YouTube pays Pulliam the revenue that he earns from advertisements, viewer gifts and donations, and subscriber fees directly into his account after taking its cut for administration. Pulliam testified that after he produces one or two

videos in a year—which cover his costs—the revenue that he earns from YouTube translates directly into profit.

165. **Lost profits from livestreaming are $42,214.51.** Pulliam provided a conservative estimate of how much revenue he lost from the decrease in livestream reporting after the press conference. Pulliam first calculated his actual monthly revenue from livestreaming from January 2020 to February 2025. Pulliam split 2021 into two periods: before the press-conference exclusion, January through July, and the post-press conference period, July through December. Pulliam calculated his average monthly revenue from livestreaming from January 2021 through July 2021 to be $1,142.11. He used that $1,142.11 number as his expected monthly revenue from livestreaming. For August 2021 to February 2025, Pulliam identified the difference between the expected monthly revenue and the actual monthly revenue as lost monthly revenue. Summing up his lost monthly revenue from the press-conference exclusion to February 2025, Pulliam estimated that he lost $42,214.51 from his reduced livestream reporting following the press-conference exclusion given that his cost per video would have been nothing.

166. The Court finds a loss of $42,214.51 from the chilling of Pulliam's livestream reporting to be reasonable and nonspeculative.

167. **Lost profits from video uploads are $120,898.48.** Pulliam also estimated how much revenue he lost from the decrease in long-form video uploads following both the press-conference exclusion and Pulliam's arrest. After reviewing the content he published from January 2020 to July 2021, Pulliam determined that he would have produced and uploaded 90 videos per year if he maintained his previous publishing rate.

Pulliam then determined how many long-form video uploads he actually made and published between January 2020 to February 2025 and the total actual lifetime revenue for those videos to arrive at the average lifetime revenue per video for a given period. The average lifetime revenue for a video increased over time as Pulliam's number of subscribers grew and he gained momentum. Taking the difference between his expected 90 videos and the reduced number actually produced due to chilling of his speech, Pulliam estimated the number of lost videos for a given period. The estimated number of lost videos was multiplied by the average lifetime revenue per video and summed to arrive at the lost revenue from the harm to Pulliam's long-form video reporting, $120,898.48. Like for his livestreaming, once uploaded, Pulliam's per-video cost is effectively zero.

168.    The Court finds a loss of $120,898.48 from the chilling of Pulliam's livestream reporting to be reasonable and nonspeculative.

169.    Of the $120,898.48 in lost profits due to lost video uploads, Pulliam attributes $56,013.28 of his lost long-form video upload revenue to the press-conference exclusion and attributes $64,885.21 of his lost long-form video reporting revenue to the retaliatory arrest. The Court finds that attribution to be reasonable and nonspeculative.

170.    **Total lost profits are $163,112.99.** Adding livestream lost profits of **$42,214.51** and lost profits from video uploads of **$120,898.48**, provides a grand total of reasonable and nonspeculative lost profits of **$163,112.99**.

171.    When Pulliam was excluded from the July 2021 press conference, Pulliam was humiliated in front of fellow reporters whom he considers to be important professional colleagues. He was also humiliated in front of a live audience. Pulliam suffers mental

anguish and depression stemming from the violation of his constitutional rights and treatment as "not media" while he attempts to serve his community.

172.    The Court finds that Pulliam suffered at least $30,000 in reputation, humiliation, and mental anguish damages for the press-conference incident.

173.    The retaliatory arrest caused Pulliam at least $55,000 in reputation, humiliation, and mental anguish damages. News of Pulliam's arrest and, subsequently, news of his indictment was reported in the local newspaper and shared throughout the Fort Bend community via social media. Pulliam was publicly mocked by FBCSO officers via social media following his arrest. Further, Pulliam received numerous comments from viewers that they did not view his reporting as credible following his arrest.

174.    Because Pulliam was charged with a crime, Pulliam lost his license to carry a handgun. Even though the charge against him has been dismissed, Pulliam has not been able to get his handgun license back.

175.    Because Pulliam was indicted by a grand jury through the district court and that criminal charge was then transferred to a county court, Pulliam is incorrectly listed in the Fort Bend County court's criminal records for two criminal cases, one felony and one misdemeanor. Some of Pulliam's background checks show both a felony charge and a misdemeanor charge.

176.    Pulliam also fears continued retaliation from FBCSO officers. To ensure the backup and protection of his electronic files from the potential of other seizures or search warrants, Pulliam spent $6,023.49. That amount is included in the $55,000 figure that

would compensate Pulliam for his reputation, humiliation, and mental anguish caused by the retaliatory arrest.

177.    Pulliam spent $1,444.35 replacing equipment seized by FBCSO following the arrest that was either damaged or not returned. That amount is reasonable.

178.    Pulliam incurred reasonable attorneys' fees in the amount of $22,730.91 defending himself in a criminal trial resulting from his arrest. These are separate and apart from any reasonable attorneys' fees to which Pulliam may be entitled under 42 U.S.C. § 1988 as a result of this litigation. The Court recognizes that those will be separately decided on motion after final judgment is entered.

179.    Pulliam's total compensatory damages are **$272,288.26.**

180.    Finally, although Pulliam has been added to the FBCSO's press release list and now receives notice of FBCSO press conferences, Pulliam has not attended because he fears exclusion and additional retaliation without the protection of a court order.

## **CONCLUSIONS OF LAW**

1.    Having reviewed and considered the evidence and the relevant law, the Court concludes, as described in detail below, that Fort Bend County and Rollins are liable for violating Pulliam's First Amendment rights in excluding him from the scene on December 21, 2021, and arresting him when he attempted to protest that exclusion.

2.    The Court previously concluded Sheriff Fagan and Fort Bend County violated Pulliam's First Amendment and equal-protection rights in excluding him from the July 2021 press conference in granting partial summary judgment to Pulliam.

3.    The Court therefore awards Pulliam injunctive and monetary relief for both sets of claims.

**I.    The County has an unconstitutional policy of intimidating and excluding Pulliam, and this was the driving force behind two First Amendment violations.**

4.    "To prevail" against Fort Bend County, Pulliam "must show (1) an official policy (or custom), (2) that a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022) (quotation marks omitted). Pulliam meets that burden.

5.    Under *Monell*'s first element, plaintiffs must show that "an official policy or custom existed that led to a constitutional violation." *Id.* Pulliam satisfies both. The Court's factual findings, set forth at length above and briefly summarized here, establish that the County had a policy and custom of intimidating and excluding Pulliam based on his status as a social-media journalist and his critical coverage of law enforcement.

6.    As this Court already concluded in granting summary judgment for Pulliam on his press-conference exclusion claims, FBCSO has an official policy that "excludes social media journalists from its definition of 'media' and the policy's protections[.]" Doc. 77 at 17. Acting on that policy, Sheriff Fagan—the County's "final policymaker in the area of law enforcement"—"had Pulliam removed from the press conference because, in Fagan's eyes, Pulliam is 'not media.'" *Id.* (citation omitted). That official policy violates the First Amendment, which affords journalists like Pulliam who report via social media the same rights as journalists who work for more traditional outlets, such as newspapers or

television stations. *Id.* (citing *Citizens United v. Fed. Elections Comm'n*, 558 U.S. 310, 352 (2010)). That written policy is still in place.[42]

7.      The question at this stage is whether there is a larger policy of intimidation and exclusion concerning Pulliam beyond what happened at the press conference. The Court finds that there is a policy of intimidation and exclusion "so persistent and widespread as to practically have the force of law." *Moore*, 41 F.4th at 509 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). In broad brush strokes, the Court finds that Pulliam was repeatedly and consistently treated worse than other journalists based on hostility toward him and his reporting. Efforts to intimidate and exclude Pulliam occurred so frequently—and with the direct participation of Sheriff Fagan—that intimation and exclusion of Pulliam was an official "preexisting de facto policy" of the County as a matter of fact and law. *Milam v. City of San Antonio*, 113 F. App'x 622, 625, 628 (5th Cir. 2004). Facts demonstrating the existence of such a policy include the following:

8.      **Refusal to treat Pulliam like a journalist:** Prior to Sheriff Fagan assuming office in January 2020, his predecessor Sheriff barred Pulliam from the Fort Bend County Sheriff's Office building and had Pulliam kicked out when he tried to enter. After Sheriff Fagan assumed office, FBCSO, with the approval of Sheriff Fagan's chief deputy, refused to add Pulliam to the media list for the distribution of press releases and notification of press conferences. As the Court has already determined in the summary judgment decision, FBCSO classified Pulliam as "not media" under its written social media policy and under

---

[42] *See also* DX 8 (Dec. 29, 2022 Policy 08-03).

the Sheriff's own orders at the July press conference in which the Sheriff excluded Pulliam from the press conference.

9.    **Threats of arrest and the arrest itself:** Sheriff Fagan's two threats to arrest Pulliam before the press-conference exclusion further demonstrate the existence of the County's policy of intimidating and excluding Pulliam for activity protected by the First Amendment. The Court affords Sheriff Fagan's arrest threats great weight because Sheriff Fagan is the County's law enforcement policymaker and sets the tone for officer interactions. Sheriff Fagan did not threaten any other journalists with arrest at the park, even when those other journalists continued filming after officers closed the park. Sheriff Fagan's actions established—or, alternatively, confirmed the existence of—an official policy of excluding Pulliam and only Pulliam from law enforcement scenes on threat of arrest. Rollins' arrest of Pulliam at the Kraft property solely in response to Pulliam's speech was consistent with the policy of intimidation and exclusion.

10.    **Pursuing prosecution:** The Court finds it anomalous that the Sheriff's office assigned a homicide detective to investigate Pulliam's arrest. Not only was this a far less serious offense than the sort Detective James would ordinarily investigate, the facts surrounding Pulliam's arrest were fundamentally different—less serious and concerning far less egregious conduct—from other arrests for interference with public duties. And, even though video footage contradicted Rollins' and Rodriguez's statements that Pulliam committed the offense of interference, the County rigorously pursued prosecution. With only the error-filled officer statements, the district attorney sought to indict Pulliam via grand jury and brough the case to trial even after one judge refused to accept the case. The

Court finds it exceedingly likely that the Sheriff's office and the district attorney pursued the dubious prosecution to make an example of Pulliam and deter his future journalism.

11.     **The Sheriff's visit to Pulliam in jail:** The Court also finds it anomalous that the Sheriff and two other high-ranking officials visited the jail to speak with Pulliam personally in a room out of sight of surveillance cameras. The Sheriff claims that he did so for Pulliam's own protection because the latter was apparently so widely despised on account of his reporting. Yet, the Sheriff took no other action to ensure that Pulliam was not abused. He made no announcements about the importance of treating Pulliam fairly and did not inquire into the facts of Pulliam's arrest. Instead, when Pulliam refused to speak with the Sheriff—without being Mirandized, without an attorney, without being booked for an offense—the Sheriff authoritatively pronounced, "do it by the book." This interaction has every indication of an official stamp of approval for Pulliam's arrest without concern for whether that arrest was justified.

12.     **Culture of animus:** After Pulliam was released from jail, a FBCSO officer circulated Pulliam's mugshot on social media and indicated laughter. Other FBCSO officers responded with scurrilous insults, illustrating the entrenched culture of animus toward Pulliam. That the Sheriff felt the need to visit Pulliam in jail confirms that he knew just how pervasive this culture of animus was.

13.     **The absence of any accountability:** No one involved with Pulliam's arrest was counseled or disciplined for anything. As Sheriff Fagan testified at trial, it is still the County's position that nothing should have been done differently on December 21, 2021.

Plainly, then, Rollins was acting in accordance with County policy when he excluded Pulliam and arrested him within seconds at the Kraft property.

14.    In sum, the evidence shows that the County had both a policy and custom of intimidating and excluding Pulliam based on his status as a social-media journalist and his critical coverage of law enforcement.

15.    Under *Monell*'s second element, Pulliam must prove that Sheriff Fagan actually knew or constructively knew about FBCSO's policy and custom of intimidating and excluding Pulliam. *Moore*, 41 F.4th at 510. Pulliam more than does that. Sheriff Fagan's actions at the park—both threatening Pulliam with arrest and excluding him from the press conference—confirm that Sheriff Fagan knew there was a policy and custom of excluding and intimidating Pulliam based on his social-media reporting and his criticism of law enforcement. Likewise, Sheriff Fagan approved Rollins' arrest of Pulliam by blessing Pulliam's booking for the offense and allowing the investigation and prosecution of Pulliam to proceed. The Sheriff also confirmed at trial that everything was done properly at the Kraft property. If the Sheriff personally regards everything as done properly and no one was disciplined for anything, even just informally, then the second element of *Monell* liability is established.

16.    Under *Monell*'s third element, Pulliam must prove the policy or custom caused a violation of his constitutional rights, that the policy or custom was the "moving force." *Id.* at 511. As discussed in more detail below, Pulliam establishes that the County's policy and custom of excluding and intimidating him was the moving force for the violation of his First Amendment rights in two distinct ways as reflected in Counts II and III of the

First Amended Complaint (Doc. 33). First, Rollins violated Pulliam's right to film when Rollins ordered Pulliam to leave the Kraft property without any legitimate safety justification. Second, Rollins violated Pulliam's right to be free from retaliatory arrest when Rollins arrested Pulliam for speech (Count III).

## II.    Count II: Ordering Pulliam to leave the scene and go across the street violated the First Amendment.

17.    Rollins ordered Pulliam to leave the scene at the Kraft property and relocate across the street immediately after arriving at the Kraft property. At that point, Pulliam was quietly and peacefully filming, as he had been before Rollins arrived. Rollins knew who Pulliam was, knew that Rodriguez had radioed that "local journalist Justin Pulliam's on scene," and could see the obvious fact that Pulliam was filming. The right to film the police had been clearly established in the Fifth Circuit since *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017). Rollins knew, therefore, that Pulliam was engaged in protected First Amendment activity, but he ordered Pulliam to leave the scene anyway—in the same way that Sheriff Fagan order Pulliam to leave the park and the press conference a few months earlier. Rollins violated Pulliam's First Amendment right to film the police.

### A.    Pulliam has a First Amendment right to record the police.

18.    The First Amendment represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269–70 (1964).

19.    Pulliam's reporting is fully protected speech. Independent "new media" journalists like Pulliam, who create content for social media, possess the same First Amendment rights as everyone else. *See Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (Freedom of the press is "not confined to newspapers and periodicals" and includes "every sort of publication which affords a vehicle of information and opinion"); *Citizens United*, 558 U.S. at 352 ("With the advent of the Internet . . . , the line between the media and others who wish to comment on political and social issues becomes far more blurred.")*; see also Packingham v. North Carolina*, 582 U.S. 98, 105, 107 (2017) (noting that "social media users employ these websites to engage in a wide array of protected First Amendment activity" and describing social media as "the modern public square").

20.    Like everyone else, a citizen journalist has the First Amendment right not to be discriminated against based on disagreement with his or her viewpoint. "[V]iewpoint discrimination is a clearly established violation of the First Amendment in any forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001).

21.    Pulliam's First Amendment rights as an independent citizen journalist include the right to record the police while they perform their law-enforcement duties. "We conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist[.]" *Turner*, 848 F.3d at 688. "Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." *Id.* at 689.

**B.**     **Rollins violated Pulliam's First Amendment right to record the police in excluding him from the Kraft property.**

22.     The right to record the police in public in the performance of their official duties "is not without limitations." *Turner*, 848 F.3d at 690. When doing so for content-neutral reasons such as public safety, police regulation of filming is "subject to reasonable time, place, and manner restrictions." *Id.* "[T]hose restrictions must be 'narrowly tailored to serve a significant governmental interest.'" *Id.* at 690 (citation omitted). "Importantly, an individual's exercise of her First Amendment right to film police activity carried out in public . . . necessarily remains unfettered unless and until a reasonable restriction is imposed or in place." *Id.* at 690 n.50 (quoting *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014)). In other words, the government bears the burden of satisfying intermediate scrutiny if it restricts the right to film the police. If it can't meet that burden, its restrictions on the right to film are invalid.

23.     This affirmative burden on government matters. It is what prevents the right to film from being a hollow right. At trial, Defendants emphasized that, strictly speaking, they did not tell Pulliam he could not film when Sheriff Fagan kicked him out of the press conference or when Rollins kicked him off the Kraft property. The Sheriff testified that he instructed officers at roll call in spring 2025 to let Pulliam film. But it was also the Sheriff's policy, and hence the policy of the County, that Pulliam could be immediately arrested if he did not instantly comply with an order to leave. For the right to film to mean anything, law enforcement must have actual reasons for restricting it. Law enforcement cannot

nullify the right by kicking a journalist out and then claiming that the threat of arrest isn't directed at the speech, only the noncompliance with the order to immediately leave.

24.    Even assuming content neutrality, Defendants have failed to carry their burden under intermediate scrutiny. Defendants assert that the significant government interest was public safety. The Court acknowledges that circumstances of a police call "might justify a safety measure—for example, a command that bystanders disperse—that would incidentally impact an individual's exercise of the First Amendment right to film." *Gericke*, 753 F.3d at 8. But such an order must address "legitimate safety reasons." *Id.*

25.    No legitimate safety reason existed for Rollins to order Pulliam to go across the street or for Rollins to maintain that order for only Pulliam.

26.    Here, even if a safety risk for civilians existed, Rollins did not address that risk for the Texana employees or Ms. Kraft. Assuming there is an arguable justification for allowing the Texana workers and Ms. Kraft to stay on scene because of their relationship with Edwin, one would expect Rollins to have restricted their movement—and enforced those restrictions. But Rollins didn't do that. As video footage shows, the Texana workers wandered around about the property unaccompanied by any officer after Pulliam was arrested. None of the officers on scene acted as though any realistic threat emanated from the Kraft residence. Rollins' order, to the extent it was predicated on addressing a safety risk, was therefore too underinclusive. Kicking Pulliam off the Kraft property while allowing the other three civilians to move freely about the scene means that Rollins' "safety policy" was not accomplishing its stated goal.

27.     Rollins' order that Pulliam needed to "go across the street" therefore fails intermediate scrutiny, and Pulliam prevails on his claim that Rollins' order requiring him to go across the street violated the First Amendment (Count II of the First Amended Complaint).

28.     Strictly speaking, it isn't necessary for the Court to determine whether Rollins' order to leave the scene was also a content-based restriction on his speech. The fact that the order cannot survive intermediate scrutiny resolves Count II. That said, the Court notes that the trial record strongly supports the conclusion that Rollins ordered Pulliam to leave the scene because of hostility to Pulliam and his coverage of FBCSO and Rollins only expanded that order to the other civilians to seem evenhanded.

29.     The safety justification is so weak as to be an obvious pretext. That conclusion is reinforced by Rollins' obvious hostility towards and impatience with Pulliam from the very first moment Rollins arrived. This is consistent with the overall County policy towards Pulliam. As explained earlier, the County had a policy of excluding and intimidating Pulliam based on his status as a social-media journalist and his critical coverage of law enforcement. Pursuant to that policy, Sheriff Fagan kicked Pulliam out of the press conference in July 2021 to undermine his ability to cover the press conference.

30.     Ordering Pulliam to go across the street, and therefore undermining Pulliam's ability to cover the scene at the Kraft property, is materially the same as the exclusion from the press conference. Just as the Sheriff kicked Pulliam out within moments of arriving at the park, Rollins kicked Pulliam out within seconds of arriving on scene at the Kraft property. The evidence and testimony support the inference that Rollins wanted

58

to intimidate and exclude Pulliam based on his speaker status and past coverage, and that Rollins was carrying out the County's policy concerning Pulliam.

31.    As a result, the Court concludes Rollins ordered Pulliam to go across the street to restrict Pulliam's speech because of the content of that speech and Pulliam's identity as the speaker. The Court therefore finds this to be an independent basis for concluding that Pulliam prevails on Count II. *See Citizens United*, 558 U.S. at 340 (confirming that "restrictions distinguishing among different speakers, allowing speech by some but not others," are "[p]rohibited" by the First Amendment).

## III.    Count III: Rollins violated Pulliam's First Amendment rights by arresting him in retaliation for Pulliam's protected speech.

32.    Rollins committed a separate First Amendment violation when he arrested Pulliam when the latter asserted his right not to be kicked out of the scene. Pulliam began complying with Rollins' order to go across and started walking in the direction of the street. But then Rollins reconsidered his decision to exclude the civilian women who turned out to be Texana mental health workers. When Pulliam sought to persuade Rollins to change his mind, Pulliam was engaged in a separate and distinct form of speech. At that point, Pulliam was no longer just recording the scene. His speech took the form of questioning the validity of Rollins' order based on Pulliam's clearly established right to film the police. Pulliam was challenging why it was necessary only for him to go across the street when there was no apparent safety justification for his exclusion. Rollins unconstitutionally arrested Pulliam for that speech.

33.    "[T]he First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). "[G]overnment officials" may not "subject[] an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)).

34.    Nor may the police arrest someone in retaliation for their protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* at 398 (citation omitted).

35.    "For Pulliam to prevail on his First Amendment retaliation claim against Rollins and Fort Bend County arising out of his December 2021 arrest, he must prove: '(1) [he was] engaged in constitutionally protected activity, (2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [his] exercise of constitutionally protected conduct.'" Doc. 77 at 20 (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).

36.    Pulliam satisfies the first element of a retaliation claim. He was engaged in constitutionally protected speech when he questioned the validity of Rollins' insistence that Pulliam still leave even after Rollins allowed the Texana workers to stay. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest

60

is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987). The First Amendment protects the right to use "opprobrious language" when interacting with the police. *Lewis v. City of New Orleans*, 415 U.S. 130, 133 (1974).

37.    Pulliam satisfies the second element. As the discussion of injuries reveals, Pulliam spent less time filming the police and did so in different ways in response to being arrested for asserting his First Amendment right to film. It is well settled that an arrest is sufficient to chill a person of ordinary firmness. *Bailey v. Iles*, 87 F.4th 275, 289 (5th Cir. 2023) ("[T]here is no dispute as to the second element [of the retaliation test], as Bailey's speech was chilled when he deleted his Facebook post in response to the arrest.").

38.    Pulliam also meets the third element of a First Amendment retaliation claim although that analysis is more complicated than the prior two elements because the retaliation here took the form of an arrest. To prevail, a plaintiff must establish a "causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Nieves*, 587 U.S. at 398 (quotation marks omitted). Specifically, the plaintiff must show that retaliation for speech is "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399.

39.    The challenge in the retaliatory-arrest context is determining whether there was objective probable cause to arrest the speaker for a crime or whether protected speech was the primary reason for the arrest. "[A]s a general rule, a plaintiff bringing a retaliatory-arrest claim must plead and prove the absence of probable cause for the arrest." *Gonzalez*

*v. Trevino*, 602 U.S. 653, 655 (2024) (quotation marks omitted). In his *Gonzalez* concurrence, Justice Alito explained the specific analytic steps for a retaliatory-arrest claim. First, "plaintiffs pressing such claims [must] prove the absence of probable cause as a threshold requirement." *Id.* at 664 (Alito, J., concurring). Second, if a plaintiff proves the absence of probable cause, the "*Mt. Healthy* framework"—the "two-step," burden-shifting framework from *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977)—is triggered. "At the first step [of *Mt. Healthy*], the plaintiff must demonstrate that he engaged in protected speech and that his speech was a 'substantial' or 'motivating' factor in the defendant's decision to take action against him." *Gonzalez*, 602 U.S. at 662–63 (Alito, J., concurring) (quoting *Mt. Healthy*, 429 U.S. at 287). "Once the plaintiff makes this showing, the burden shifts to the defendant at the second step to show that he would have taken the same adverse action even in the absence of the protected speech." *Id.* at 663. "To carry these burdens, parties operating within the *Mt. Healthy* framework may present a wide range of evidence—both objective and subjective." *Id.*

40.     There are, however, two exceptions to the general rule that a plaintiff needs to plead and prove an absence of probable cause for an allegedly retaliatory arrest: the *Lozman* exception and the *Nieves* exception.

41.     Under *Lozman v. City of Riviera Beach*, a plaintiff "need not prove the absence of probable cause" if the plaintiff proves that he was arrested "pursuant to an 'official municipal policy' of intimidation." 585 U.S. 87, 99–101 (2018) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Nieves*, 587 U.S. at 398 (discussing *Lozman*). That's because "the existence and enforcement of an official policy

motivated by retaliation separates [plaintiff's] claim from the typical retaliatory arrest claim." *Lozman*, 585 U.S. at 100. Put simply, if the government has it in for someone as a matter of official policy, courts need to look beyond probable cause to be sure that the arrest isn't in fact a pretext for retaliation against speech.

42.     Under *Nieves,* "[t]he existence of probable cause does not defeat a plaintiff's claim if he produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Gonzalez*, 602 U.S. at 655 (quoting *Nieves*, 587 U.S. at 407). In other words, if the police ordinarily ignore technically illegal conduct or ordinarily let someone off with a warning, arresting someone who is also engaged in protected speech may very well be evidence of retaliation against the speech.

43.     If either the *Lozman* or *Nieves* exception applies, the *Mt. Healthy* framework is triggered, even if probable cause technically existed. *Lozman*, 585 U.S. at 101; *Nieves*, 587 U.S. at 406–08.

44.     Pulliam claims he wins on his retaliatory-arrest claim regardless of whether the *Lozman* exception applies, the *Nieves* exception applies, or because there wasn't probable cause to arrest him. The Court agrees. The Court first explains why Pulliam prevails under the *Lozman* exception (Part A). The Court then applies the general rule, finding that Rollins arrested Pulliam without probable cause (Part B). Finally, even if probable cause for the arrest existed, the Court concludes Pulliam satisfies the *Nieves* exception (Part C).

### A.  Pulliam prevails against the County and Rollins under the *Lozman* exception.

45.  Under the *Lozman* exception, Pulliam "need not prove the absence of probable cause" if he proves "a policy motivated by retaliation." 585 U.S. at 100–01.

46.  As discussed above, Pulliam already proved that the County had an unconstitutional policy motivated by retaliation. Pulliam therefore proceeds directly to the *Mt. Healthy* framework.

47.  As Justice Alito recently explained, the first step in a *Mt. Healthy* analysis requires the plaintiff to prove that his speech was a substantial motivating factor in the adverse action. Pulliam easily satisfies that initial burden no matter the level of granularity at which one considers the facts. As stated in the Court's factual findings above, Rollins arrested Pulliam for asserting his First Amendment right not to be ejected from the scene without a legitimate safety justification. The content of Pulliam's speech triggered Rollins to arrest Pulliam in literally a matter of seconds. Rollins' hostility to Pulliam and his speech fit into the larger policy the County had about Pulliam. Indeed, the Sheriff testified that Rollins did what officers were supposed to do when Pulliam protested exclusion even for a few seconds: arrest him.

48.  Looking at the record as a whole, Rollins' decision to arrest can be understood as part of the larger policy of intimidating and excluding Pulliam from the scene of law enforcement activity based on his speaker status and past coverage. Rollins' exclusion of Pulliam followed the exact model the Sheriff himself used in kicking Pulliam out of the press conference. The only difference here is that Rollins pulled the trigger on

the arrest, whereas Sheriff Fagan only threatened arrest. And Sheriff Fagan testified that he would have expected his subordinate officer at the park to have arrested Pulliam if Pulliam had asserted his right to stay and record. Rollins' decision to arrest is most plausibly viewed as Rollins manifesting his own animus towards Pulliam while simultaneously carrying out the official policy of intimidating and excluding Pulliam. Rollins intended to teach Pulliam a lesson for being a thorn in his side and for being a thorn in the side of law enforcement more generally. He arrested Pulliam for asserting his right to stay on the Kraft property and record—just like the Sheriff expected.

49.     With Pulliam having established that his arrest was substantially motivated by his protected speech, the burden shifts to Defendants to prove that Rollins "would have taken the same adverse action even in the absence of the protected speech." *Gonzalez*, 602 U.S. at 663 (Alito, J., concurring). Defendants have not, and cannot, carry their burden here. Rollins has no permissible explanation for his decision to arrest Pulliam. Rollins' animus towards Pulliam's speech and the County's policy of intimidating and excluding Pulliam motivated the arrest. Those reasons do not pass constitutional muster.

50.     Rollins created the very distraction he complains of. Pulliam was quietly filming the scene. Rodriguez didn't order Pulliam to leave. Lacy didn't order him to leave. Rollins did not take any time to assess the situation. He rolled up in his patrol car, knew Pulliam was on scene because of Rodriguez's comment on the radio, saw Pulliam, and immediately ordered Pulliam to leave. He then expanded that order to include the two other civilians standing behind Pulliam. Rollins did not ask any questions of the civilians or his fellow officers. Rollins' decision was obviously rash with respect to the Texana workers

65

because he immediately changed his mind when they explained who they were. Rollins then escalated the confrontation with Pulliam, who was complying but stopped to film Rollins' conversation with the Texana employees and wait his turn to speak. Pulliam wanted to plead his case to Rollins. Rollins could have ignored Pulliam or reconsidered his decision with respect to Pulliam. Rollins could have taken time to explain himself and/or warned Pulliam that the failure to leave immediately would result in arrest. Or Rollins could have spoken to his fellow officers to better understand the safety situation. But instead of doing any of that, Rollins needlessly and unconstitutionally arrested Pulliam, which not only distracted Rollins by tying him up with an actual arrest, but imposed responsibilities on his subordinate, Rodriguez, who had to take custody of Pulliam and transport him to jail for booking. None of this would have happened if Rollins hadn't instigated conflict with Pulliam by ordering him to leave before understanding what was going on. And then Rollins exacerbated the situation by letting his own hostility to Pulliam's speech result in a decision to arrest. Rollins cannot cause his own distraction and then assert that he is exonerated by the very distraction he created.

**B.    Rollins violated Pulliam's right against retaliatory arrest when he arrested Pulliam for his protected speech without probable cause.**

51.    Alternatively, if the Court applies the general rule for a retaliatory-arrest claim, Pulliam must first prove the absence of probable cause. *Gonzalez*, 602 U.S. at 655. If he can do that, he may proceed through the *Mt. Healthy* framework, as just discussed.

52.    Pulliam meets that burden and proceeds to the *Mt. Healthy* framework. Rollins lacked probable cause to arrest Pulliam. Rollins arrested Pulliam for protesting his

exclusion from the Kraft property and in furtherance of an unconstitutional policy of intimidation and exclusion.

53.    The Court recaps the facts relevant to the arrest (without intending to modify the above factual findings). Rollins arrived on the scene, ordered Pulliam to go across the street, and Pulliam responded, "So you can shoot him?" Pulliam also complied with the order and began moving away from the scene. Rollins did not arrest Pulliam for saying "so you can shoot him," and Rollins testified that that statement was not the crime of interference with public duties.

54.    The facts relevant to the interference arrest occurred over the course of about 20 seconds after Pulliam stopped walking toward the street in compliance with Rollins' order. Pulliam stopped because the two Texana workers stopped to explain to Rollins why they believed they should be allowed to stay on scene. Rollins agreed and let them stay. Rollins then engaged Pulliam, renewing his order to go across the street. Pulliam protested that he should also be allowed to stay on scene if there was not a safety-based reason for excluding him. Although not framed in technical legal language, Pulliam was attempting to assert his First Amendment right: (1) he had a protected right to record the police, (2) the property owner (Ms. Kraft) had given him permission to be there and film, and (3) ordering him to go across the street was not a reasonable time, place, and manner restriction in the name of safety, as demonstrated by the fact that Rollins allowed two other civilians to stay. Rollins insisted that excluding Pulliam was for safety, notwithstanding that the Texana workers were being allowed to stay and that no officer was acting as if the situation was

imminently dangerous, and began to count down while walking toward Pulliam. Rollins then arrested Pulliam.

55.     The Court notes that Pulliam never engaged in anything other than speech. Pulliam never walked towards Rollins or anyone else. Pulliam did not present any physical danger to anyone, which Rollins confirmed during his testimony. Not only was Pulliam well out of reach of everyone, he was burdened by his camera equipment. Although he raised his voice to be heard and was clearly upset at being excluded, Pulliam did not use threatening language. Pulliam made no motion or gesture suggesting he was going to run anywhere, such as back towards the scene. Because Pulliam had been complying with Rollins' order until the Texana women stopped to talk to Rollins, Pulliam was the farthest from the scene when he attempted to engage Rollins in discussion. Pulliam was not physically obstructing Rollins' ability or the ability of anyone else to walk anywhere.

56.     Rollins' entire argument is that he was "distracted" by Pulliam asserting his First Amendment rights for approximately 10–20 seconds. That "distraction," Rollins argues, constituted probable cause to arrest Pulliam for the crime of interference with public duties.

57.     Asserting one's rights under the First Amendment is not interference with public duties. As an initial matter, the Court has already found Rollins' order kicking Pulliam out to be unconstitutional. Regardless of what the elements of the interference statute are, it cannot be a crime to fail to follow an unconstitutional order. In any case, the elements of the offense are codified at Texas Penal Code § 38.15. Specifically, a "person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or

otherwise interferes with: a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." *Id.* § 38.15(a)(1).

58.    Speech alone does not constitute the offense of interference with public duties. *Id.* § 38.15(d) ("It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only."). The Fifth Circuit has held that "'merely arguing with police officers about the propriety of their conduct . . . falls within the speech exception to section 38.15' and thus does not constitute probable cause to arrest someone for interference." *Gorsky v. Guajardo*, No. 20-20084, 2023 WL 3690429, at *8 n.16 (5th Cir. May 26, 2023) (quoting *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007)); *see also Carney v. State*, 31 S.W.3d 392, 398 (Tex. App.— Austin 2000, no pet.) ("Under section 38.15, arguing with the officers does not constitute an actionable offense. Speech is a statutory defense to the offense charge even if the end result is 'stalling.'").

59.    In carving out an exception for speech alone, the statute recognizes the bedrock First Amendment principle that citizens are protected when they speak to the police, even if that speech is highly critical. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462–63. Citizens may direct "obscene or opprobrious language" toward police officers. *Lewis*, 415 U.S. at 132.

60.    Interference with public duties must include some act besides speech that interferes with a police officer *in a criminally negligent way*. The facts must show that the

69

arrestee willfully refused to abide by instructions from a police officer in a situation where the arrestee should have been aware of a substantial and unjustifiable risk of interference, such that it constituted a gross deviation from ordinary care. Tex. Pen. Code § 6.03(d) (defining "criminal negligence").

61.     *Buehler v. Dear* "concerns the line between filming the police, which is legal, and hindering the police, which is not." 27 F.4th 969, 976 (5th Cir. 2022). There, "Buehler [led] the Peaceful Streets Project (PSP), a watchdog organization with the stated mission of holding police accountable for official misconduct." *Id.* at 977. "Buehler regularly filmed the Austin police, and many officers were familiar with him." *Id.* In the incident at issue in that case, "Buehler shouts at [the officer] to get his attention and then begins arguing with [the officer]" and "repeatedly interrupts [the officer]'s answers to questions, and [the officer] tries several times to walk away while Buehler follows with his camera." *Id.* Buehler even says "I'm going after [the officer]. F***ing pigs. I hate pigs." *Id.* (asterisks in original). But none of that speech alone resulted in arrest. The probable cause for Buehler's arrest for interference with public duties was his repeated refusal to obey a request to stay at least an arm's length away from the officer. *Id.* ("Buehler continued to stand closer to the officers than an arm's length away (certainly no more than two feet, and probably no more than one)."). No one, least of all a police officer, could work with a threatening, profane, argumentative stranger stalking them up and down the street within an arm's length and refusing to step back. *Id.* at 992 (identifying "repeated and unambiguous warnings to step back"). *See also Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (probable cause to arrest for interference because of failure to heed "instruction

[that] concerned the moving of [plaintiff]'s truck rather than the content of his speech"). Buehler crossed the line between filming and hindering the police and was therefore properly arrested. *See Buehler*, 27 F.4th at 980–94.

62.    By contrast, D.J. in *Perkins v. Hart* "did not cross the line between filming the police and hindering the police and was engaged in clearly established, constitutionally protected activity on his family's private property." No. 22-30456, 2023 WL 8274477, at *7 (5th Cir. Nov. 30, 2023) (cleaned up). D.J., a minor, recorded the arrest of his mother on his cell phone. While D.J. was recording, an officer "moved directly in front of D.J., blocking his camera's view of [his mother] and [the arresting officer]. *Id.* at *2; *see id.* at *6 (noting the blocking officer admitted that he "intentionally" obstructed D.J.'s view). "While D.J. was clearly close to the arrest scene—the perimeter of which was still being secured by [the blocking officer]—D.J. was not a hazard, was not too close, and did not impede the [officers'] ability to perform their duties." *Id.* at *7.

63.    Like D.J., Pulliam "did not cross the line between filming the police and hindering the police." *Id.* (cleaned up). He was "engaged in a clearly established, constitutionally protected activity" on "private property"—where he had permission to be and record. *Id.* Pulliam "was not a hazard, was not too close, and did not impede [Rollins' or other officers'] ability to perform their duties." *Id.*

64.    Rollins therefore did not have probable cause to arrest Pulliam. As a matter of law, no reasonable police officer could conclude that Pulliam's speech alone about whether safety justified his exclusion from the scene was a "gross deviation from the standard of care that an ordinary person would exercise" under all the circumstances. Tex.

Pen. Code § 6.03(d) (defining "criminal negligence"). In short, it was not criminally negligent to want to speak to Rollins as the Texana workers had just done.

65.    To the contrary, Pulliam's speech was reasonable. Pulliam started complying with Rollins' order to go across the street by walking in the direction of the street. But when Pulliam saw the two Texana workers stop to talk to Rollins and Rollins change his mind about their presence on the property, Pulliam stopped walking. When Rollins again ordered Pulliam to go across the street, Pulliam sought to explain why he should be treated the same as the Texana workers. If the Texana workers' speech to Rollins wasn't arrestable "interference," then neither was Pulliam's. Pulliam was trying to convince Rollins to allow him to stay. Rollins said no. Pulliam objected. That objection was protected speech. For the First Amendment right to record the police to mean anything, it must mean that police cannot order a person filming (and only the person filming) to leave and expect immediate, reflexive, unquestioning obedience. Asserting your rights is not a crime.

66.    Indeed, Sheriff Fagan had confirmed as much as part of his campaign in the wake of the murder of George Floyd. During a recorded television interview, Sheriff Fagan acknowledged that citizens have the right to film the police and advised citizens to tell any officer who tries to stop them for recording that they have every right to record. Implicit in that advice is the idea that citizens would not be arrested for simply asserting their First Amendment rights. Indeed, it is impossible to imagine that Rollins would have arrested an NBC camera crew or journalist from the Houston Chronicle for asking for a reasonable explanation for being ejected from the Kraft property. Again, this reenforces the idea that

Fort Bend had a specific policy of intimidation and exclusion that applied to Pulliam but no one else.

67.     Furthermore, any claim that Pulliam distracted Rollins from his duties fails. Pulliam was present when Rollins arrived. The scene was peaceful. No one was in conflict with anyone. Pulliam was a journalist openly engaged in protected First Amendment activity. Pulliam had the landowner's permission to be there and Deputy Rodriguez's permission to film from where Pulliam was standing. Pulliam was therefore part of the scene, not something apart from it. Rather than be a "distraction" to be excluded or disposed of, Pulliam was simply someone Rollins had to take into account, just like everyone else. Citizens, particularly ones engaged in constitutionally protected activity, are not an inherent nuisance to officials. None of this, including Rollins' asserted "interference," would have happened if Rollins had not initiated the conflict and escalated it to arrest so quickly without talking to anyone on scene or with Pulliam himself.

68.     In sum, the Court concludes Rollins lacked probable cause to arrest Pulliam. No objectively reasonable officer would think otherwise.

69.     Defendants claim that the fact that a grand jury indicted Pulliam means they cannot be held liable. The idea behind this doctrine is that the decision of an independent intermediary, like a grand jury, "is sufficient to establish probable cause." *Russell v. Altom*, 546 F. App'x 432, 436 (5th Cir. 2013). Not so. Although the Fifth Circuit has recognized that a grand jury indictment can shield an officer for liability for an arrest without probable cause, the Fifth Circuit has applied that doctrine to Fourth Amendment false arrest claims or First Amendment retaliatory *prosecution* claims. *See Wilson v. Stroman*, 33 F.4th 202,

208 (5th Cir. 2022) (confirming that an "intermediary's decision breaks the chain of causation for *false arrest*" (emphasis added)); *Trevino v. Iden*, 79 F.4th 524, 531 (5th Cir. 2023) (retaliatory prosecution claims have a presumption of regularity, as described in *Hartman v. Moore*, 547 U.S. 250, 263 (2006)).[43] The doctrine does not and should not apply for a retaliatory arrest claim.

70.    In any case, the independent intermediary doctrine does not apply if the intermediary was tainted. Here, the grand jury was the intermediary and Pulliam proved that its proceedings were tainted. Rollins, Rodriguez, and James testified that they did **not** testify before the grand jury. The grand jury relied only on written evidence: Rollins' error-riddled probable-cause affidavit, Rodriguez's similarly error-filled entry in the Offense Report, and Detective James' entry in the Offense Report that failed to identify any of the errors of Rollins and Rodriguez. If the grand jury's evidence is tainted, then so too are its conclusions. "[T]he independent-intermediary doctrine is not absolute." *Loftin v. City of Prentiss*, 33 F.4th 774, 782 (5th Cir. 2022). "[T]his doctrine only applies where all the facts are presented to the grand jury[.]" *Winfrey v. Johnson*, 766 F. App'x 66, 71 (5th Cir. 2019) (quotation marks omitted).

71.    It is Defendants' burden to prove that all material information was presented to the grand jury. *Id.* (concluding that defendant failed to prove that omitted material

---

[43] Fifth Circuit precedent governs this Court's decision, but the Court notes that the Fifth Circuit's endorsement of the independent intermediary doctrine is arguably inconsistent with the Supreme Court's statements in *Malley v. Briggs* that a "'no causation' rationale" where an officer would not be liable if an independent intermediary, like a judge, issued a warrant, "is inconsistent with our interpretation of § 1983." 475 U.S. 335, 344 n.7 (1986).

information was presented to the judge); *see also Wilson*, 33 F.4th at 212–13 (concluding that plaintiffs had alleged taint where they claimed officials made misrepresentations to the grand jury and withheld material video evidence).[44] Defendants have not done so here. To the contrary, this case is on all fours with *Hughes v. Garcia*, in which the Fifth Circuit held that eight material omissions in a probable cause affidavit nullified the neutral magistrate's finding of probable cause. 100 F.4th 611, 623 (5th Cir. 2024). The facts in *Hughes* and its reasoning apply directly to the eight material falsehoods in Rollins' affidavit, which were compounded by the errors in Rodriguez's account. The tainted grand jury indictment cannot save Defendants from the absence of probable cause for Pulliam's arrest.

72.    Satisfying the threshold requirement that probable cause did not exist does not mean Pulliam wins. Rather, "if the plaintiff establishes the absence of probable cause, then the *Mt. Healthy* test governs[.]" *Nieves*, 587 U.S. at 404 (quotation marks omitted). But there is no more work to do under the *Mt. Healthy* framework here because the analysis is the same one the Court already went through above in concluding that Pulliam prevailed under the *Lozman* exception: Pulliam's speech was the but-for cause of the arrest.

---

[44] *See also Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) ("[B]ecause, at best, it is not clear whether 'all the facts [were] presented to the grand jury,' we hold that the independent-intermediary doctrine does not apply." (internal citation omitted)); *Shields v. Twiss*, 389 F.3d 142, 148 (5th Cir. 2004) (holding the plaintiff failed to rebut defendant's testimony that she "presented all relevant information in her possession—both incriminating and exculpatory—to the grand jury."); *Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814, at *5 (5th Cir. Nov. 27, 2023) (holding the plaintiff "sufficiently alleged that the officers deliberately or recklessly omitted relevant information" where the defendants did not "dispute that several pieces of information were absent from the officers' reports and affidavit, [or] provide copies of the warrant or affidavit" to rebut the plaintiff's allegations).

73.     Pulliam therefore prevails on his retaliatory-arrest claim under the general rule: Rollins lacked probable cause to arrest Pulliam, and retaliation for speech was the but-for cause of the arrest.

### C.    Even if probable cause technically existed, Pulliam's arrest was still retaliatory under the *Nieves* exception.

74.     Even if probable cause existed, Pulliam would still be able to proceed to the *Mt. Healthy* framework via the *Nieves* exception to the general rule that probable cause defeats a retaliatory arrest claim.

75.     In *Nieves*, the Supreme Court "recognized a narrow exception to the no-probable-cause rule." *Gonzalez*, 602 U.S. at 665 (Alito, J., concurring). "Concerned that some police officers might exploit the arrest power as a means of suppressing disfavored speech, [the Supreme Court] explained that the no-probable-cause requirement may be set aside 'when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Id.* (quoting *Nieves*, 587 U.S. at 407).[45]

76.     For the purposes of getting into the *Nieves* exception, "evidence regarding an officer's state of mind—*e.g.*, evidence of bad blood between the officer and the plaintiff or allegations that the officer harbored animus—does not qualify." *Id.* at 666. Only objective evidence is considered. *Id.*

---

[45] Because satisfying the *Nieves* exception allows a plaintiff to proceed to the *Mt. Healthy* framework even when probable cause exists, the independent intermediary doctrine plays no role when the *Nieves* exception applies.

77.     The question for the *Nieves* exception is whether there is objective evidence that reasonable officers do not arrest for interference with public duties under these circumstances. A plaintiff like Pulliam does not need "virtually identical and identifiable comparators." *Id.* at 658. In other words, he does not need to produce evidence of other people asserting their right to film the police in the same way—at a former gas station during a welfare check on a mentally ill man.

78.     *Gonzalez* illustrates what valid comparator evidence looks like. The plaintiff there, a city council member, alleged that she inadvertently misplaced a petition among her personal papers following a city council meeting, but, at the behest of political rivals, was investigated and arrested under a Texas statute that criminalizes tampering with government records. *Id.* at 655–56. The Supreme Court concluded that Gonzalez's comparator evidence—a survey of "the past decade's misdemeanor and felony data" for the particular county—supported the conclusion "that the Texas anti-tampering statute had never been used in the county to criminally charge someone for trying to steal a nonbinding or expressive document." *Id.* at 657 (cleaned up). The plaintiff's evidence was therefore permissible *Nieves*-exception evidence.

79.     Here, Pulliam has offered at least three categories of comparators that show, objectively, that reasonable officers do not arrest for interference with public duties under circumstances like those present at the Kraft property that day: (1) the Texana case workers who were not arrested for asking Rollins to change his mind; (2) testimony and video evidence of Pulliam's similar interactions with other officers at other times at other locations in which Pulliam was not arrested for asking officers to clarify their orders; and

(3) records of all 30 arrests by FBCSO in recent years for interference with public duties, all of which involved "plus factors" in addition to speech such as intoxication, violence, physical interference, and disorderly conduct during more pressing situations. The Court will address each category of comparator in turn.

80.    First, the Texana employees provide a compelling comparator. *See Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022); *Reyes v. City of Austin*, No. 1:21-CV-992-RP, 2024 WL 5088385, at *7 (W.D. Tex. Dec. 12, 2024); *Mattingly v. Cal. Dep't of Parks & Rec.*, No. 23-CV-03754-VKD, 2024 WL 4353062, at *12 (N.D. Cal. Sept. 30, 2024). After Rollins ordered Pulliam to go across the street, he included the Texana employees in his second command to "go across the street." Rather than walking away, like Pulliam, the Texana employees approached Rollins to explain that they were case workers from Texana. Rollins listened, changed his mind, and allowed them to stay. When Pulliam saw Rollins speak with Texana employees, he stopped walking. And when Rollins again ordered Pulliam across the street, he, too, asked to be allowed to stay. Yet, rather than consider that, Rollins interrupted Pulliam and almost immediately arrested him.

81.    To be sure, the Court recognizes that mental health case workers and journalists present different considerations that may justify different treatment in some settings. But, for the purposes of Pulliam's argument that he qualifies for the *Nieves* exception, the fact is that Rollins listened to the Texana employees and changed his mind, but arrested Pulliam simply for asking for the same reconsideration. Rollins' treatment of the Texana employees shows that officers typically don't arrest someone for failing to immediately comply with a police order or for asking the officer to reconsider that order.

82.     Second, Pulliam himself is a relevant comparator. *See Ballentine*, 28 F.4th at 62; *Mattingly*, 2024 WL 4353062, at *12; *Sodaro v. City & Cnty. of Denver*, 753 F. Supp. 3d 1224, 1238–39 (D. Colo. 2024); *Nilsson v. Baker County*, No. 2:19-CV-01250-HL, 2022 WL 17156771, at *8 (D. Or. Nov. 21, 2022), *report and recommendation adopted*, 2022 WL 17170713 (D. Or. Nov. 22, 2022). He presented testimony and video evidence of his interactions with law enforcement at other scenes over the years in which he (or someone he was with) had been ordered to stand and film somewhere else. These interactions are often testy and argumentative, and Pulliam sometimes insults officers or uses foul language. Sometimes these interactions occur at night, alongside darkened roadways, at crime scenes, and under circumstances where officers have duties to perform. Yet these interactions follow a discernable pattern. The officer orders Pulliam to go somewhere else, Pulliam demands an explanation or tries to persuade the officer that an alternative location is better, the two discuss it, and Pulliam moves. The officers, often commendably patient, do not arrest Pulliam. The objective evidence indicates that reasonable officers exercise their discretion not to arrest for interference with public duties when Pulliam asks for an order to be clarified or modified, especially when the discussion will only take just a matter of seconds.

83.     Third, Pulliam presented police reports of all 30 arrests in Fort Bend County for interference with public duties issued in the roughly three years surrounding his arrest. All those arrests included the sorts of "plus factors" the Court identified earlier, such as physically or violently impeding an officer's movement or engaging in disorderly conduct while being intoxicated. Rollins testified that Pulliam exhibited none of these plus factors

prior to his arrest. Pulliam's evidence about the other arrests is materially similar to the evidence at issue in *Gonzalez*. There, Gonzalez argued that she fell under the *Nieves* exception because no other arrest for intentionally removing a government record resembled her allegation of negligently misplacing a government document in her own binder after a city council meeting. *Gonzalez*, 602 U.S. at 658 ("Gonzalez's survey is a permissible type of evidence because the fact that no one has ever been arrested for engaging in a certain kind of conduct—especially when the criminal prohibition is longstanding and the conduct at issue is not novel—makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct in the past."); *see also Briggs v. Yi*, 760 F. Supp. 3d 874, 892–93 (D. Alaska 2024) (finding evidence was "like the evidence offered by the plaintiff in *Gonzalez*" where the plaintiff (1) provided recent history showing that 256 people were arrested in Anchorage for disorderly conduct, (2) asserted that all the other arrests involved "far greater disturbances in scope and duration" and there were "no instances where a person was arrested for creating noise for a minute or two and then stopped when asked," and (3) noted that in nearly every case the arrestee was given a warning before being arrested).

84.    The Court finds that Pulliam has carried his threshold burden under the *Nieves* exception of demonstrating, with objective evidence of comparators, that officers ordinarily exercise their discretion not to arrest for interference with public duties under circumstances like those in this case.

85.    But comparator evidence is not the only objective evidence showing the *Nieves* exception applies in this case. Pulliam offered additional evidence that reinforces

this Court's conclusion that Pulliam's arrest and his subsequent criminal prosecution were retaliatory. Pulliam highlighted the differences in the outcomes of the 30 other arrests: Of the 30 arrests, 26 of the arrests were either dismissed/not prosecuted or have no criminal record whatsoever. Despite all 30 of the arrests concerning more egregious behavior than Pulliam's, only three resulted in a conviction. And none of those matters went to trial. None of the interference with public duties offenses were the subject of a grand jury indictment. That accounts for 29 out of the 30 arrests; the one remaining is inactive.

86.    The Court also notes that the Section 38.15 offense is a minor one. *See Spiller v. Harris County,* 113 F.4th 573, 576–77 (5th Cir. 2024) (noting that the Section 38.15 offense "is 'minor,' a factor that weighs in favor of finding excessive force." (citing *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018))); *cf. Haywood v. City of El Paso*, No. EP-20-CV-114-KC, 2021 WL 5072029, at *13 (W.D. Tex. Oct. 26, 2021) (suggesting that "certain types of offenses are so minor that they may not require comparison-based evidence to trigger the exception"). If asking for clarification of Rollins' order constitutes an offense, "it is an offense for which 'probable cause does little to prove or disprove the causal connection between animus and injury.'" *Ballentine*, 28 F.4th at 62 (quoting *Nieves*, 587 U.S. at 407). Further, even if probable cause technically exists, it is debatable. Pulliam's arrest was not a clear case of probable cause, such as the police catching a person illegally chalking on the sidewalk while in the act in *Ballentine*. *See Ballentine*, 28 F.4th at 59.

87.    The Court also finds it relevant that the officers at the scene of the arrest knew Pulliam by name and reputation. *See Reyes*, 2024 WL 5088385, at *7; *Tucson v. City*

*of Seattle*, No. C23-17 MJP, 2024 WL 2133754, at *12 (W.D. Wash. May 10, 2024). And the Defendants deployed an "unusual" or "irregular" post-arrest procedure, such as (1) Sheriff Fagan's notification and jail visit, (2) Detective James' assignment to the case, and (3) Pulliam's interference charge being brought by grand jury indictment. These irregular events support the conclusion that the *Nieves* exception to the probable cause rule applies here. *See Gonzalez*, 602 U.S. at 676 (Jackson, J., concurring).

88.    Pulliam can therefore proceed to the *Mt. Healthy* framework under the *Nieves* exception. The Court already concluded above that Pulliam prevails under that framework. Thus, under *Nieves* and *Mt. Healthy*, Rollins' arrest of Pulliam was a form of retaliation that violated the First Amendment, regardless of whether, technically, Rollins had probable cause or not to arrest for interference with public duties.

## IV.    Rollins is individually liable and not entitled to qualified immunity.

89.    Having determined that Rollins violated Pulliam's First Amendment rights, the question then becomes whether Rollins is entitled to qualified immunity.

90.    Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Est. of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005). A defendant is not entitled to qualified immunity if "prior decisions gave reasonable warning

that the conduct then at issue violated constitutional rights." *Bailey v. Iles*, 87 F.4th 275, 283 (5th Cir. 2023) (quotation omitted).

91.    As of December 2021, prior decisions gave reasonable warning that Rollins' exclusion of Pulliam from the Kraft property and his arrest of Pulliam violated constitutional rights. The right to film the police free from retaliatory arrest has been clearly established at least since *Turner v. Driver*. *See* 848 F.3d at 688 ("We conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist[.]"). Similarly, it has been clearly established that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech" since at least 2018. *Lozman*, 585 U.S. at 90.

92.    As part of the *Lozman, Nieves,* and *Mt. Healthy* analyses, the Court has found that Rollins intentionally arrested Pulliam to retaliate against Pulliam's speech, and also found that there is no alternate, non-speech justification for the arrest. Indeed, the *Mt. Healthy* framework required Pulliam to prove that Rollins was specifically *motivated* by a desire to suppress and retaliate against Pulliam's protected speech. That resolves the qualified immunity question. It is clearly established that a police officer can never arrest someone to punish them for protected speech, but Rollins did anyway. He is therefore not entitled to qualified immunity.

**V.    The Court awards Pulliam injunctive and monetary relief for the violation of his constitutional rights.**

**A.    Pulliam is entitled to permanent injunctive relief.**

93.    Pulliam is entitled to permanent injunctive relief because he has shown that (1) "the failure to grant the injunction will result in irreparable injury," (2) that the injury "outweighs any damage that the injunction will cause the opposing party," and (3) "the injunction will not disserve the public interest." *Hill v. Washburne*, 953 F.3d 296, 309 (5th Cir. 2020) (citation omitted).

94.    Defendants' last-minute efforts to address their unconstitutional treatment of Pulliam when trial appeared imminent do not forestall Pulliam's right to injunctive relief. As the Court noted in its factual findings, Defendants have not changed the written policy classifying reporters using social media as not media. Sheriff Fagan's statements to officers at each shift's roll call and the addition of Pulliam to FBCSO's email list for press releases was not a sincere response to the Court's decision in September 2024. It was a litigation tactic deployed in the spring of 2025 to undermine Pulliam's claim to injunctive relief.

95.    Defendants' limited and half-hearted attempt to stop their unconstitutional treatment of Pulliam on the eve of trial does not bar this Court from granting permanent injunctive relief. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Given the substantial risk that Defendants will continue intimidating and excluding Pulliam based on

his status and critical speech when this Court's gaze is no longer upon them, this Court must act "to enjoin [Defendants] from renewing the practice." *Id.*

96.    The Court's final judgment will issue the following injunctive relief to address the violation of Pulliam's constitutional rights and the County policy that caused those violations:

- Fort Bend County's written policy and its actions treating reporters using social media differently than reporters using traditional reporting media are hereby permanently enjoined;

- Fort Bend County and FBCSO shall add Pulliam and any other journalists requesting notification of County or FBCSO press conferences to all media lists announcing press events;

- Fort Bend County and FBCSO are hereby permanently enjoined from treating Pulliam differently than other journalists or worse than members of the public;

- Fort Bend County and FBCSO shall fully investigate any report that County personnel, including FBCSO personnel, are treating Pulliam differently than other journalists or worse than members of the public in retaliation for his reporting or his speech and discipline any individuals found to be carrying out such treatment;

- Fort Bend County shall provide all FBCSO personnel with training on the First Amendment's requirements and interacting with members of the media, including those who use social media, within six months of this Court's order;

- FBCSO shall place a document in Taylor Rollins' personnel file stating, "Rollins violated the First Amendment when he arrested a journalist in retaliation for his speech on December 21, 2021.";

- Fort Bend County and FBCSO shall (1) distribute a written statement to all FBCSO personnel and all personnel in the County Attorney's office and (2) post that written statement on FBCSO's website and social media accounts stating the following:

  o A United States federal court ruled that Fort Bend County and Sheriff Fagan violated Justin Pulliam's constitutional rights, including his rights

under the First Amendment, when Sheriff Fagan ordered Pulliam removed from a press conference in July 2021 under threat of arrest;

o That same court ruled that Fort Bend County and FBCSO officer Taylor Rollins violated Justin Pulliam's First Amendment rights when Rollins excluded Pulliam from the scene of law enforcement activity and arrested Pulliam in retaliation for First Amendment activities on December 21, 2021; and

o All County personnel—all FBCSO personnel in particular—shall treat Pulliam the same as other journalists, which means:

- Pulliam shall be allowed to stage his reporting at the same locations as other journalists when reporting on scene;

- Pulliam shall be allowed to stage at locations deemed safe for other civilians to remain;

- Pulliam shall be permitted the same access as other journalists to County and FBCSO press events and County communications;

- Pulliam's requests for information from the County and FBCSO, including his open-records requests, shall be treated the same as requests from other journalists and members of the public;

- County personnel, including FBCSO personnel, shall not arrest Pulliam in retaliation for his reporting or his speech; and

- Any report that County personnel, including FBCSO personnel, are treating Pulliam differently than other journalists or worse than the general public in retaliation for his reporting or his speech shall be fully investigated by the County and any individuals found to be carrying out such treatment shall be disciplined accordingly.

- Fort Bend County shall provide this Court with an advisory confirming the steps that the County has taken to satisfy the above-ordered injunctive relief within one month of the Court's order.

97. The above-listed injunctive orders are necessary to prevent future constitutional violations, ensure fair treatment, and remedy the past violation of Pulliam's constitutional rights.

**B.     Pulliam is entitled to $272,288.27 in compensatory damages.**

98.     The Court finds that Pulliam is entitled to compensatory damages because "he proved actual injury caused by the denial of his constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Specifically, Pulliam is entitled to damages compensating him for lost profits; the cost of replacing equipment seized by FBCSO; impairment of his reputation, personal humiliation, and mental anguish; and the attorneys' fees he incurred in the criminal proceeding resulting from his retaliatory arrest.

99.     A Section 1983 plaintiff may recover damages for lost profits. *J & B Ent. v. City of Jackson*, 720 F. Supp. 2d 757, 764 (S.D. Miss. 2010) (awarding a Section 1983 plaintiff lost profits resulting from the violation of procedural and substantive due process rights based on Mississippi tort law). Texas law authorizes an award of lost profits where a plaintiff can prove the loss with reasonable certainty. *See Coll. Network, Inc. v. Moore Educ. Publishers, Inc.*, 378 F. App'x 403, 412 (5th Cir. 2010) (applying Texas law). Pulliam more than satisfied that standard. He proved that he lost considerable profits because of his chilled reporting and asks this Court to award him a conservative underestimate of his reasonably certain loss.

100.     Pulliam is entitled to lost-profit damages in the amount of **$42,214.51** for the loss of livestream profit. Pulliam is entitled to lost-profit damages in the amount of **$120,898.49** for the loss of his video upload profit.

101.     Pulliam attributed $98,227.79 of his lost profits to the violation of his rights related to the press conference and $64,885.21 of his lost profits to the violation of his

rights related to the scene of the welfare check. Pulliam proved that allocation to a reasonable certainty, and the Court endorses that division of the lost profits.

102.    In total, Pulliam is entitled to total lost-profit damages in the amount of **$163,113.00**, the sum of losses from his livestream profits and his video upload profit **($42,214.51 + $120,898.49)**.

103.    Pulliam is entitled to damages in the amount of **$1,444.35** for the amount he spent to replace the equipment that FBCSO seized following the retaliatory arrest— equipment that FBCSO never returned or, in the case of one item, returned damaged.

104.    Compensatory damages in Section 1983 suits may include not only out-of-pocket loss and other monetary harms, but also such injuries as "impairment of reputation . . . , personal humiliation, and mental anguish and suffering." *Stachura*, 477 U.S. at 307 (citation omitted). To prove a claim for such injuries, there must be a "specific discernable injury to the claimant's emotional state," but "a plaintiff's testimony, standing alone, can support an award of compensatory damages" for mental injuries. *Vadie v. Miss. State Univ.*, 218 F.3d 365, 376–77 (5th Cir. 2000) (citations omitted).

105.    Pulliam is entitled to an award of **$30,000** in reputation, humiliation, and mental anguish damages for the press-conference incident.

106.    Pulliam is entitled to an award of **$55,000** in reputation, humiliation, and mental anguish damages for the retaliatory arrest.

107.    Pulliam is entitled to a total award of **$85,000 ($30,000 + $55,000)** in reputation, humiliation, and mental anguish damages.

108.    Section 1983 plaintiffs may also recover attorneys' fees incurred from related criminal proceedings foreseeably resulting from constitutional violations as compensatory damages. *See Castellano v. Fragozo*, 311 F.3d 689, 711 (5th Cir. 2002), *vacated on other grounds*, 352 F.3d 939 (5th Cir. 2003); *Borunda v. Richmond*, 885 F.2d 1384, 1389–90 (9th Cir. 1988); *Kerr v. City of Chicago*, 424 F.2d 1134, 1141 (7th Cir. 1970).

109.    The Court finds that Pulliam's attorneys' fees "arose out of the necessity" of defending against "unwarranted criminal charges" and "were presented to the trier of fact as an item of damage." *Borunda*, 885 F.2d at 1389. Pulliam is entitled to recover the fees from his criminal action because the expenditures were, "*unquestionably,* a foreseeable result of [D]efendants' actions." *Castellano*, 311 F.3d at 711. The fees are also reasonable. Assuming a modest rate of $200, fees of approximately $22,000 correspond to 110 hours of work, which is slightly less than three weeks of full time work. Spending 110 hours on a criminal case, including a multi-day trial, is more than reasonable.

110.    Pulliam is therefore entitled to damages for the costs and fees associated with his prior criminal proceedings related to the arrest totaling **$22,730.91**, and those fees are not excessive or unreasonable under the circumstances.

111.    In sum, the Court awards Pulliam total compensatory damages of **$272,288.26 (lost profits of $163,113 + equipment replacement of $1,444.35 + reputation, humiliation, and mental anguish of $85,000 + criminal attorneys' fees of $22,730.91).**

**C.** **The Court awards punitive damages against Sheriff Fagan.**

112.    Pulliam is entitled to punitive damages from Sheriff Fagan in the amount of **$500**.

113.    Sheriff Fagan's order that Pulliam be removed from the press conference under the threat of arrest has been "shown to be motivated by evil motive or intent[.]" *Smith v. Wade*, 461 U.S. 30, 56 (1983). Alternatively, Sheriff Fagan's order "involve[d] reckless or callous indifference to [Pulliam's] federally protected rights[.]" *Id.*

114.    The Court awards punitive damages against Sheriff Fagan because the Court finds punitive damages of $500 will "punish [Sheriff Fagan] for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Id.* at 54 (quoting Restatement (Second) of Torts § 908(1) (1977)).

**D.** **Pulliam is entitled to a total compensatory and punitive damages of $272,788.26 plus interest.**

115.    Pulliam is entitled to total damages of **$272,788.26 (compensatory damages of $272,288.26 + punitive damages of $500).**

116.    Pulliam is entitled to prejudgment interest on his compensatory damages. In Section 1983 cases, like this one, the Fifth Circuit has held that state law governs the calculation of prejudgment interest. *See, e.g.*, *Pressey v. Patterson*, 898 F.2d 1018, 1026 (5th Cir. 1990). Like its sister court in *Tercero v. Texas Southmost College District*, this Court finds that prejudgment interest at the rate of 5% per annum is appropriate here. No. 1:16-CV-282, 2022 WL 292955, at *3 (S.D. Tex. Feb. 1, 2022), *aff'd*, No. 22-40004, 2022 WL 5101903 (5th Cir. Oct. 4, 2022). "Under Texas law, prejudgment interest begins to

accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Id.* (quotation omitted). In this case, the date suit was filed, December 5, 2022, governs.

117.    Pulliam is also entitled to postjudgment interest on both his compensatory and punitive damages. *See* 28 U.S.C. § 1961.

Dated: July 17, 2025                    Respectfully submitted,

                                        /s/ Christen Mason Hebert
                                        Christen Mason Hebert, Attorney-in-Charge
                                        Texas Bar No. 24099898
                                        Federal ID No. 3844981

                                        Jeffrey Rowes*, of counsel
                                        Texas Bar No. 24104956

                                        Michael Peña*, of counsel
                                        Texas Bar No. 24131580

                                        INSTITUTE FOR JUSTICE
                                        816 Congress Ave., Suite 970
                                        Austin, TX 78701
                                        (512) 480-5936
                                        chebert@ij.org
                                        jrowes@ij.org
                                        mpena@ij.org

                                        *Admitted *pro hac vice*

                                        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and served by the CM/ECF system to all counsel of record.

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge

*Counsel for Plaintiff*