## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JUSTIN PULLIAM, | |
| *Plaintiff*, | |
| v. | Civil Action No. 4:22-cv-4210 |
| COUNTY OF FORT BEND, TEXAS; SHERIFF ERIC FAGAN, in his individual capacity; OFFICER ROBERT HARTFIELD, in his individual capacity; OFFICER JONATHAN GARCIA, in his individual capacity; OFFICER TAYLOR ROLLINS, in his individual capacity; and OFFICER RICKY RODRIGUEZ, in his individual capacity, | |
| *Defendants*. | |

## PLAINTIFF'S RESPONSE TO LT. TAYLOR ROLLINS' POST TRIAL BRIEF REGARDING HIS ENTITLEMENT TO QUALIFIED IMMUNITY

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. ii

Introduction ........................................................................1

   I. Rollins' "the BOLO emails made me do it" excuse isn't credible. .................3

     A. The BOLO emails don't negate the overwhelming evidence that no one, including Rollins, thought the scene was dangerous at the time of arrest. ......................................................................3

     B. The "y'all" does nothing to rehabilitate Rollins' bogus safety narrative .......................................................................7

   II. Rollins violated clearly established law when he arrested Pulliam for speech under the guise of claiming that Pulliam did not immediately comply. ............................................................................9

   III. Pulliam falls within the *Nieves* exception....................................16

Conclusion .......................................................................19

Certificate of Service ............................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. Ramos*,
    125 F.4th 667 (5th Cir. 2025) .................................................................. 12, 13, 14, 15

*City of Houston v. Hill*,
    482 U.S. 451 (1987) ........................................................................................... 15

*Eisenbach v. Zatzkin*,
    728 F. App'x 307 (5th Cir. 2018) .................................................................... 15

*Gericke v. Begin*,
    753 F.3d 1 (1st Cir. 2014) ................................................................................. 8

*Gonzalez v. Trevino*,
    602 U.S. 653 (2024) .............................................................................. 10, 16, 17

*Haggerty v. Tex. S. Univ.*,
    391 F.3d 653 (5th Cir. 2004) .................................................................... 10, 15

*Lozman v. Riviera Beach*,
    585 U.S. 87 (2018) .................................................................................. 9, 10, 11

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ................................................... 1, 3, 10, 11, 16, 17, 18

*Turner v. Driver*,
    848 F.3d 678 (5th Cir. 2017) ............................................................................ 1

*Villarreal v. City of Laredo*,
    134 F.4th 273 (5th Cir. 2025) ........................................................................ 11

**Statutes**

Texas Penal Code § 38.15(a)(1) ........................................................................ 15

## INTRODUCTION

Lieutenant Taylor Rollins is not entitled to qualified immunity. Qualified immunity asks a two-part question: (1) was a right violated; and (2) was the right clearly established? That second half of the equation—the "clearly established" part—has a definitive answer here. Two First Amendment rights are at issue, and both were clearly established in December 2021 when Rollins arrested Pulliam. First, there is a clearly established "First Amendment right to record the police." *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017). Second, there is a clearly established First Amendment right prohibiting adverse action in retaliation for speech, including arrest. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)*.* There is no debate that these rights are and were clearly established as a matter of law.

And those rights are clearly established regardless of factual permutations. If a police officer restricts speech—either by order or arrest—with the *intention* of restricting or punishing speech and lacks a legitimate non-speech reason, it doesn't matter if the speech is anti-war on a college campus or pro-Elon Musk on the grounds of the Texas Capitol (or silently and peacefully filming on the Kraft property). Every reasonable officer knows that you can't silence or punish speech because of the speech itself or the status of the speaker.

Rollins too knows this. He knows that it is clearly established that you can't restrict the right to film without a legitimate non-speech reason. He also knows that you can't arrest someone to retaliate against their protected speech. Hence Rollins knows that he is individually liable if he was in fact motivated by Pulliam's speech and lacked a legitimate

1

safety reason. That is why his qualified immunity brief is a *factual* argument. He is trying to convince the Court that he didn't have that culpable state of mind (i.e., in interacting with Pulliam, he wasn't substantially motivated by Pulliam's speech) and that he had a legitimate non-speech justification for his actions—that Kraft could have started shooting at any moment.

That crystalizes the question for the Court. What did the trial evidence show about Rollins' motivation and the safety justification when Rollins kicked Pulliam out and then arrested him within 60 seconds of Rollins' arrival? That is easy. The evidence presented at trial overwhelmingly proved there was no legitimate safety concern warranting Rollins' decision to kick Pulliam off the Kraft property and arrest him within 60 seconds when he tried to assert a right to stay. Instead, Rollins' actions were motivated by hostility to Pulliam and his speech.

Reading that writing on the wall, Rollins filed an unrequested post-trial brief imploring this Court to ignore the totality of the trial evidence and instead believe that he did what he did because he sincerely believed that gunfire might erupt at any minute. And he asserts that he had this sincere belief, contrary to his actions as captured on video, because Fort Bend County Sheriff's officers had received blast emails over the course of two years warning officers to treat Edwin Kraft with caution. Rollins' narrative is devoid of credibility, and this Court should reject it.

As Pulliam explains below: (1) Rollins' safety justification based on prior emails lacks credibility; (2) arguable probable cause does not mean an officer gets qualified immunity for a retaliatory arrest and there was no such arguable probable cause here; and

2

(3) Pulliam falls squarely within the *Nieves* exception, which allows Pulliam's retaliatory arrest claim to proceed regardless of probable cause. Rollins is therefore not entitled to qualified immunity.

## I.    Rollins' "the BOLO emails made me do it" excuse isn't credible.

At trial, Pulliam proved that Rollins rolled up to a calm, controlled scene where Pulliam, an independent journalist, was quietly filming. Rollins then instigated a conflict and arrested Pulliam within 60 seconds. Multiple video recordings made those facts plain. There is no explanation for Rollins' treatment of Pulliam except for retaliation against Pulliam for his speaker status and his speech.

Rollins claims that, at worst, he made a good faith mistake, resting on a single fact to support this false narrative: Patrol officers received a handful of be-on-the-lookout emails (BOLOs) about Edwin Kraft over the course of two years leading up to the arrest. Rollins' QI Br. at 3–4. Rollins then points to his second order for "y'all" to go across the street—which expanded his initial order for "sir," meaning Pulliam, to go across the street—as evidence that he was acting lawfully.

But Rollins' account just isn't credible.

## A. The BOLO emails don't negate the overwhelming evidence that no one, including Rollins, thought the scene was dangerous at the time of arrest.

No one disputes that Rollins and all the other patrol deputies received email warnings about Edwin Kraft. The question at trial was: Did Rollins have a legitimate safety concern that merited immediately ejecting a peacefully filming Pulliam from the scene and

arresting him for asserting a right to stay? The evidence showed no immediate danger requiring Rollins to eject and arrest Pulliam within 60 seconds of arriving.

Rollins selectively quotes from the BOLO emails about Edwin Kraft's unstable and sometimes criminal behavior. *See* Rollins' QI Br. at 3–4. According to Rollins, the emails show that he "had reliable, trustworthy information that he faced significant danger on December 21, 2021." *Id.* at 4. He gravely informs the Court that "[n]o reasonable officer would have—or should have—ignored those risks." *Id.*

Rollins asks the Court to accept that he sincerely believed, based on these intermittent emails over two years, that gunfire might erupt at any second at the Kraft property, and hence that he sincerely believed that he had to eject and arrest Pulliam for Pulliam's own good. This is not remotely believable in light of the trial evidence.

Rollins' own actions show that he did not believe what his brief claims:

- Rollins arrived on the property and walked straight toward Pulliam without assessing the broader situation after he received a message that Pulliam was on scene. Pulliam FOF/COL at 12, 14, 16.

- Rollins stood with his back to the Kraft residence while talking to the Texana employees. *Id.* at 17. He testified that he did not act like a man who believed he was about to be shot.

- Rollins spoke courteously with and listened to the Texana employees but refused to do the same with Pulliam. *Id.* at 19.

- Rollins testified that he refused to speak to Pulliam because he wasn't respectful. *Id.* at 22.

- Rollins did not restrict the movement of the Texana workers, and they freely roamed the scene in his presence, including in the "line of fire." *Id.* at 17, 23.

- Rollins put Pulliam in a patrol vehicle directly in front of the residence. *Id.* at 23.

4

- Rollins stood outside the patrol vehicle fiddling with Pulliam's camera. *Id.* at 23–24.

- Rollins took the time to turn off the police radio so Pulliam couldn't hear what was going on well after Pulliam was arrested. *Id.* at 25.

- Rollins walked around in the supposed "line of fire" with no concern. *Id.* at 23–24.

- Rollins never asked about Ms. Kraft, who was at the gas pumps the whole time. *Id.* at 24.

The existence of BOLO emails doesn't change the fact that Rollins' own behavior conclusively proves that he never thought anyone was about to be shot.

And it wasn't only Rollins who treated the scene at the Kraft property as calm, controlled, and absent imminent danger. Rodriguez and Lacy strolled around in the "line of fire" without concern, just as Rollins did. So did the Texana mental health workers, who were assigned to Kraft's case. To be sure, caution was appropriate, but no one believed there was danger from sudden gunfire.

Rollins also offers no explanation for why he perceived the situation as so dangerous when Rodriguez and Lacy did not. If "[n]o reasonable officer" would have let Pulliam continue to quietly film given the risks Edwin Kraft posed, then Rollins apparently believes Rodriguez and Lacy weren't "reasonable officers" because they left Ms. Kraft and Pulliam alone. Pulliam FOF/COL at 9–10, 13. If that were true, surely someone from the Sheriff's Office would have at least counseled Rodriguez and Lacy on how they handled the scene. But no one did. *Id.* at 42.

The credibility of Rollins' BOLO safety narrative is further belied by Rollins' error-filled probable cause affidavit and his erroneous criminal trial testimony. As Rollins was

repeatedly forced to admit on the stand during this case, his probable cause affidavit was riddled with errors—every one of which made the scene seem more dangerous and Pulliam seem irresponsible. *Id.* at 32–33; *compare* PX 6 (Rollins' probable cause affidavit), *with* PX 51 & 52 (Pulliam dashcam and handheld videos). That litany of falsehoods about the arrest makes it impossible to trust Rollins' assertion that he acted in good faith and lacked any motivation to silence or retaliate against Pulliam for his speech. Rollins' credibility problem is worsened by the fact that he also admitted during this case's trial that he falsely testified at Pulliam's criminal trial and recanted only after being shown video of the arrest. Pulliam FOF/COL at 39. Why would the Court conclude that Rollins should be believed now, in the teeth of massive contrary evidence, when he has made false *sworn* statements about Pulliam twice before?

And even if, somehow, the Court were to credit Rollins' BOLO justification over all the other evidence, Rollins' insistence that it was reasonable for him to arrest Pulliam is flatly contradicted by Sheriff Fagan's campaign statements and trial testimony. As a candidate for office, Sheriff Fagan advised citizens to tell an officer who tries to restrict their right to film police that they have every right to record. Pulliam FOF/COL at 6. At trial, Sheriff Fagan confirmed that a natural variation on his advice is for a filming citizen to similarly assert the right to record if only he is ordered to leave a scene. *Id.* Rollins nevertheless maintains that it was reasonable for him to arrest Pulliam because he asserted his First Amendment rights for 10 seconds when only Pulliam alone was ordered to leave the scene. Because of BOLO emails? That is not remotely plausible. Rollins didn't like

6

Pulliam, didn't like his speech, didn't like that he asserted his rights. That's why Rollins kicked Pulliam out and arrested him.

### B. The "y'all" does nothing to rehabilitate Rollins' bogus safety narrative.

Rollins' story that he sought to order all bystanders, not just Pulliam, to leave the property for legitimate safety reasons when he used the word "y'all" conveniently ignores key facts. Rollins immediately strode over to Pulliam after he arrived at the Kraft property and barked, "**Sir**, I need you to go across the street." *Id.* at 15 (emphasis added). Rollins had been warned that "local journalist" Justin Pulliam was on scene, both via Rodriguez's statement on the radio and via dispatch's note in the mobile computer system. *Id.* at 12, PX 55 at 2. Thus, upon arrival, Rollins wanted to remove Pulliam because he "could have been distracting in the long run[,]" which is simply another way of saying that he wanted Pulliam gone because of speech—his filming and what he might say. Pulliam FOF/COL at 26.

Having no response to those facts, Rollins pretends that they don't exist and focuses on his second order for "y'all," meaning Pulliam and the two other civilian women (who turned out to be the Texana mental health workers), to go across the street. Rollins' QI Br. at 5–6. Rollins argues that he is entitled to qualified immunity, indeed that no First Amendment violation occurred, because of the "y'all." This word choice, Rollins argues, means that he was motivated by safety, not animus to Pulliam. *Id.* at 5 ("And, because it was directed at everyone and not just Mr. Pulliam, the order was lawful even though Mr. Pulliam happened to be recording police activity."). And, so the chain of reasoning goes, because the order to go across the street was "lawful," according to Rollins at least, "he is entitled to qualified immunity because no constitutional violation occurred." *Id.* at 6.

7

But even Rollins concedes that "a command that bystanders disperse—that would incidentally impact an individual's exercise of the First Amendment right to film"—is only appropriate for "legitimate safety reasons." *Id.* at 5–6 (quoting *Gericke v. Begin,* 753 F.3d 1, 8 (1st Cir. 2014) (emphasis omitted)). The key phrase is "*legitimate* safety reasons." As established at trial and discussed at length above, no legitimate safety reason existed for Rollins to order Pulliam and then the two civilian women to leave. Indeed, Rollins confirmed as much when he permitted all the civilian women— the Texana employees, Ms. Kraft, and, arguably, Ms. Pulliam—to remain on the property without restriction. If it was safe for these women to be there without restriction, it was safe for Pulliam, who had permission from Ms. Kraft to film the deputies on her property.

Rollins' QI brief offers nothing new. An order to multiple civilians reveals nothing about whether that order had a legitimate safety reason and whether the government can satisfy its affirmative burden to justify restricting Pulliam's right to film the police. In his pretrial memorandum of law and his post-trial FOF/COL, Pulliam explained in detail how Rollins and the County cannot carry their burden under intermediate scrutiny for kicking Pulliam off the Kraft property—and then maintaining the exclusion for only Pulliam. *See* Pulliam Pretrial Memorandum at 2–6; Pulliam FOF/COL at 54–59. Pulliam won't repeat that explanation a third time here, and Rollins does not even try to refute it.

But even if the order restricting Pulliam's right to film was somehow lawful, that doesn't change the fact that Rollins ultimately arrested Pulliam for asserting his *clearly established* right to record, thereby violating Pulliam's *clearly established* right not to be arrested in retaliation for protected speech. When Pulliam thought Rollins' order to go

8

across the street was evenhanded, Pulliam turned around and walked toward the street. He only stopped because the Texana employees ignored Rollins' order. Rollins let them stay and talked with them in a relaxed, calm manner. At that point, the order to go across the street wasn't evenhanded. And so Pulliam wanted to explain why he should stay, too. He stood there silently waiting while Rollins spoke to the Texana employees. Rollins interrupted his own conversation by shouting at Pulliam, who then asserted his rights (as candidate Fagan said to do). In response, Rollins marched over and arrested him.

That arrest had nothing to do with safety. It had nothing to do with an evenhanded order to "y'all." It had nothing to do with eliminating a distraction—Pulliam had been peaceful and silent before Rollins arrived and while Rollins spoke with the Texana employees. It had nothing to do with making the scene more efficient, as even Rollins conceded that arresting Pulliam was a far bigger distraction than talking to him civilly would have been. It was—as another officer would go on to remark when Pulliam was in jail—to "teach [Pulliam] for fucking with us." Rollins arrested Pulliam because he considered Pulliam's filming to be a squashable nuisance and his speech to be disrespectful. Rollins thus violated Pulliam's clearly established First Amendment rights.

## II.    Rollins violated clearly established law when he arrested Pulliam for speech under the guise of claiming that Pulliam did not immediately comply.

Since at least 2018, it has been clearly established that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). In arresting

Pulliam in retaliation for speech, Rollins violated that clearly established principle. He is not entitled to qualified immunity.

Rollins mistakenly argues that he is entitled to qualified immunity if there is "even arguably probable cause" for the arrest. Rollins' QI Br. at 7 (quoting *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656 (5th Cir. 2004)). Not so. Arguable probable cause may be a death sentence for Fourth Amendment false arrest claims, for which the absence of probable cause is always an element. But probable cause is *not* a death sentence for a First Amendment retaliatory arrest claim.

As Pulliam has repeatedly explained, there are two exceptions to the general rule that a plaintiff needs to prove the absence of probable cause to prevail on a retaliatory arrest claim: the *Lozman* exception (retaliatory policy) and the *Nieves* exception (arrest is atypical). Pulliam FOF/COL at 63. Both exceptions are intended to address the danger that government might violate the First Amendment by "exploit[ing] the arrest power as a means of suppressing disfavored speech[.]" *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (Alito, J., concurring) (discussing *Nieves*, 587 U.S. at 406–07); *see also Lozman*, 585 U.S. at 100 (reasoning that "when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress"). That's because it is—and was at all times relevant here—clearly established that arresting someone in retaliation for speech violates the Constitution even if there is arguable probable cause.[1]

---

[1] Defendants' mistake likely stems from their misunderstanding of the Supreme Court's cases on the causation element of a retaliatory arrest claim. The general rule for the causation element, which requires a plaintiff to prove the absence of probable cause,

Simple examples prove the point. If a mayor says to an officer, "I hate that guy for campaigning for my opponent, follow him around and arrest him for anything he does wrong," then the political activist has a retaliatory arrest claim under *Lozman* even if there was probable cause to arrest him for going five miles per hour over the speed limit. Likewise, if an officer stops someone for going five miles per hour over the speed limit, and reasonable officers don't ordinarily arrest for that, under *Nieves*, probable cause does not bar the driver's claim that the real reason for the arrest was her t-shirt reading "Defund the Police." In these examples, what matters is that the arrest was motivated by speech, not the existence of arguable probable cause. Probable cause doesn't preclude First Amendment retaliatory arrest claims as a whole and certainly not under the facts here.

In any case, Rollins didn't even have arguable probable cause. Rollins' brief asserts that "[f]ailure to 'immediately comply'" was probable cause to arrest. Rollins' QI Br. at 9. Except that Rollins testified the opposite. When he first arrived, he ordered "sir" to go

---

concerns only whether a First Amendment retaliatory arrest claim is actionable—i.e., whether § 1983 provides a remedy at all. *See Lozman*, 585 U.S. at 90 ("[I]f there is probable cause to believe the person has committed a criminal offense there is often no *recourse* for the [constitutional] deprivation." (emphasis added)). Qualified immunity, on the other hand, concerns whether a constitutional *right* was clearly established, not whether the cause of action exists. *See Villarreal v. City of Laredo*, 134 F.4th 273, 279–81 (5th Cir. 2025) (Oldham, J., concurring) ("It is irrelevant whether an officer should have known about the existence and nature of a cause of action to remedy that unlawful conduct."). The general probable-cause bar therefore has nothing to do with qualified immunity. That means the *Lozman* and *Nieves* exceptions to the general probable-cause bar also have nothing to do with qualified immunity. Rather, because the First Amendment right here was clearly established, the question is whether Rollins in fact violated Pulliam's right by arresting him without a legitimate, non-speech reason. And, regardless of whether Pulliam proceeds down the *Lozman* path, the general no-probable-cause path, or the *Nieves* path, Rollins violated Pulliam's clearly established right because Rollins did not have a non-speech reason for the arrest and is thus not protected by qualified immunity.

across the street and then expanded that "sir" to "y'all." Pulliam FOF/COL at 16. Then he and Pulliam had their "so you can shoot him?/what's wrong with you, man?" exchange. *Id.* Rollins testified that those statements were not interference with public duties, despite not involving instant compliance. *Id.* at 67. After that exchange, Pulliam started walking toward the street. The Texana employees went to talk to Rollins instead of going across the street. Rollins testified that they didn't commit the crime of interference with public duties when they talked to him rather than instantly complying. *Id.* at 17.

With none of the above constituting interference, Rollins appears to be arguing that he had probable cause because Pulliam did not immediately comply when Rollins shouted "across the street" while he was talking to the Texana employees. But if Rollins agrees it wasn't interference to have the "so you can shoot him?/what's wrong with you man?" exchange, then it can't even "arguably" have been interference for Pulliam to assert that he had permission to stay and state that no safety reason seemed apparent. Likewise, if Rollins agrees that it wasn't interference for the Texana employees to plead their case to Rollins, then it can't "arguably" be interference for Pulliam to do the same thing. Whatever latitude qualified-immunity doctrine grants officers, they can't literally contradict themselves on the stand.

The facts here are completely different from *Bailey v. Ramos*, which Rollins relies on for the erroneous proposition that failure to instantly comply with a police order is, at least arguably, the crime of interference. *See* Rollins' QI Br. at 8 (quoting 125 F.4th 667, 678 (5th Cir. 2025)). *Bailey* means no such thing. In *Bailey*, the people filming the police were within arm's reach of the officers and deliberately menacing them. *Bailey*, a Fourth

12

Amendment false arrest case (not a free-speech case and hence not about the clearly established right to film, and not about the *Lozman* and *Nieves* exceptions to probable cause), involved police trying to control a crowd and interview witnesses while "respond[ing] to an assault at a bar." *Id.* at 673. Bailey "gave the officers the middle finger and said 'f*** off'" while a companion "walked up to [Officer] Ramos while openly carrying a gun" and demanded to know, "What are you shaking your f***ing head at?" *Id.* After more arguing, another officer told Bailey and his companion to "just listen" and that the area was an active crime scene, but Bailey and his companion continued to shout over the officer. *Id.* That officer eventually told the men to "stand back behind that line," pointing to a line in the sidewalk. *Id.* Officer Ramos claimed that he then "lightly touched Bailey's shoulder to guide him toward the line," and Bailey responded by "swatting Officer Ramos' arm away, striking him, and causing him to stagger." *Id.* Bailey then "drop[ped] his left hand and clench[ed] it into a fist," and the situation escalated into a violent arrest within a few seconds after the order to step back. *Id.* Bailey denied assaulting Officer Ramos. The district court scheduled a trial, but the Fifth Circuit reversed, granting qualified immunity.

But the Fifth Circuit didn't reverse because Bailey "didn't immediately move away," as Rollins insists. *See* Rollins' QI Br. at 8 (bolding and italicizing "immediately move away"). In fact, Bailey was tackled so quickly after the order to step back that it wasn't clear whether he was trying to comply or not. *Bailey*, 125 F.4th at 677–78. What the Fifth Circuit said, in context, is that Bailey's apparent failure to immediately comply could reasonably have been construed by Ramos as a precursor to aggressive interference

13

or even assault: "Bailey continued to shout over the officers," and he and his gun-toting companion were "standing close to the officers" when told to "stand back behind that line." *Id.* at 677. Even if Ramos were mistaken about probable cause to arrest for interference, "Ramos [had] reason to believe the situation was tense and dangerous" because "Bailey had given the officers the middle finger and was cursing at them, and [his companion] had approached them while openly carrying a gun." *Id.* at 678 (quotation marks omitted). If someone is in your personal space, screaming obscenities for the specific purpose of angering you and commanding your attention, making aggressive gestures, especially while openly armed, it is at least debatable that interference may have occurred. Bailey and his companion were actively tormenting the police as they performed their duties.[2]

Pulliam, by contrast, wanted to be left alone to peacefully and quietly film. None of the plus-factors in *Bailey* were even arguably present at the Kraft property. Rollins instigated and escalated the conflict with Pulliam, not the other way around. Pulliam complied until Rollins rescinded the order for everyone to go across the street, at which point Pulliam silently waited to speak with Rollins the way the Texana employees had. Pulliam was never close to Rollins. Pulliam was not screaming obscenities, openly carrying

---

[2] In another telling contrast with this case, despite instigating the conflict and being violently arrested, Bailey was never prosecuted. "The charge [of interference] was later dismissed by the prosecutor's office for lack of evidence." *Bailey*, 125 F.4th at 674. Yet Pulliam was indicted by a grand jury and tried.

a gun, clenching his fists within arm's reach, or in any way menacing Rollins or anyone else.[3]

Asserting your First Amendment rights for 10 seconds under the facts of this case is not even arguably a crime. When a scene is completely calm and peaceful, it is not "criminal negligence" to assert your constitutional rights. Texas Penal Code § 38.15(a)(1) ("A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law."). As noted earlier, Sheriff Fagan told citizens on TV to assert their right to film if the police tell them not to. And the Supreme Court has long said we are allowed to assert our rights: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987). In America, the police don't get to harass and bully peaceful journalists, provoke conflict, issue arbitrary and unconstitutional orders to leave, and then slap handcuffs on journalists because they do not

---

[3] Pulliam also notes the *Bailey* panel's analysis of two other qualified-immunity decisions involving interference with public duties specifically pointed out that the citizens in those cases were actively walking towards the scene after being told to get back and doing so while the officer was trying to control the person who had been detained. *See Bailey*, 125 F.4th at 678 (stating in a case involving a fight that "in *Haggerty v. Texas Southern University*," the arrestee was "warned [not] . . . to interfere," was "within relative proximity of the crime scene," and "stepped forward"); *id.* (stating in a case about an active roadside stop, "in *Eisenbach v. Zatzkin* . . . the officer warned the plaintiff to leave the area of his investigation, but the plaintiff, believing the investigation was over, approached the area"). Pulliam didn't do anything like that.

15

instantly comply. These principles are all clearly established. Rollins is not entitled to qualified immunity.

### III.   Pulliam falls within the *Nieves* exception.

As noted earlier, even if probable cause existed, Pulliam is still able to proceed to the *Mt. Healthy* framework via the *Nieves* exception and ultimately prevail. Under *Nieves,* "[t]he existence of probable cause does not defeat a plaintiff's claim if he produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Gonzalez*, 602 U.S. at 655 (quoting *Nieves*, 587 U.S. at 407). A plaintiff like Pulliam does not need "virtually identical and identifiable comparators." *Id.* at 658.

Rollins does not dispute the applicability of two categories of Pulliam's comparators: (1) the Texana workers, who were not arrested for explaining to Rollins why they should be allowed to stay; and (2) Pulliam himself in encounters with other officers in which he asserts his right to remain close enough to film effectively and does not get arrested. Rollins only quibbles with Pulliam's third category—other arrests for the offense of interference with public duties—claiming that other people who engage in the same conduct as Pulliam did get arrested. Thus, even if the Court finds Rollins' argument about the other interference arrests convincing (and it should not), Pulliam still falls under the *Nieves* exception based on the other two categories of comparators and hence proceeds to the *Mt. Healthy* framework under which he prevails for the reasons explained in his post-trial FOF/COL.

16

Setting that aside, Rollins' own characterization of the evidence of other interference arrests confirms that Pulliam is entitled to the *Nieves* exception. The other arrests for interference constitute exactly the type of evidence that the Supreme Court endorsed as valid comparator evidence in *Gonzalez*. 602 U.S. at 658. In *Gonzalez*, the plaintiff, a city council member, alleged that she inadvertently misplaced a petition among her personal papers following a city council meeting, but, at the behest of political rivals, was investigated and arrested under a Texas statute that criminalizes tampering with government records. *Id.* at 655–56. The Supreme Court concluded that plaintiff's comparator evidence—a survey of "the past decade's misdemeanor and felony data" for the particular county—supported the conclusion "that the Texas anti-tampering statute had never been used in the county to criminally charge someone for trying to steal a nonbinding or expressive document." *Id.* at 657 (cleaned up). The plaintiff's evidence was therefore permissible *Nieves*-exception evidence.

As in *Gonzalez*, how Pulliam acted at the Kraft property doesn't look anything like the type of conduct that typically results in an arrest for interference. A quick skim of Rollins' own descriptions shows just how different other arrests for interference are— containing plus-factors such as physical aggression to the police that are completely absent in Pulliam's case. Again, Pulliam was arrested for spending about 10 seconds asserting his First Amendment right to continue peacefully and quietly filming on private property when he had the landowner's permission. No one among the comparators was arrested for peacefully asserting their free-speech rights.

Instead, as Rollins explicitly recognizes, they were arrested for doing things like unmistakably conveying that they were about to assault the police. *See, e.g.*, Rollins' QI Br. at 11 ("[The Officer] attempted to speak with Motola Gbaja-Biamila several more time[s] to gather information but Motola Gbaja-Biamila refused and walked towards me in an aggressive [manner], with her fists balled."); *id.* at 12 ("Leroy Diggs was arrested under Section 38.15 after he refused multiple commands to exit the apartment and became belligerent with Deputies, balling up his fists.") Yes, silently advancing on a police officer with your fists clenched or belligerently refusing to leave while clenching your fists is criminal behavior. That is Pulliam's point. People get arrested for interference when they do criminally negligent things like threaten the police with imminent violence. Rollins testified that Pulliam didn't do anything except assert his rights. He didn't threaten violence, wasn't disorderly, wasn't drunk, wasn't trespassing, wasn't impeding anyone's movement, etc. People do not get arrested just for peacefully asserting their First Amendment rights.

Rollins' emphasis on Edwin Kraft is also misplaced. Rollins points out that none of Pulliam's comparators involved someone with Edwin Kraft's history of mental illness and drug abuse. Rollins' QI Br. at 15. That is false.[4] It also doesn't matter under the facts here.

---

[4] Several of Pulliam's comparators involved a suspect or other individual who had a history of mental illness and/or drug abuse. *See* PX 12 at 4–5 (Hailey Ruiz), 24–25 (Kevin Baylor), 45–47 (Michael White), 87–89 (Leroy Diggs), 123–24 (Noe Ventura), 159–61 (Edgar Alarcon), 169–74 (Timothy Murphy), 236–37 (Benjamin Sanchez), 270–74 (Rafael Baretto), 281–82 (Latisha Brown), 292–93 (Kenneth Meadows), 309–11 (Antwon Seibert). Yet none were arrested for conduct resembling Pulliam's, despite what Defendants' cherry-picked versions of the facts indicate.

Kraft was nowhere to be seen when Rollins arrested Pulliam. Rollins' decision to arrest Pulliam was unjustified precisely because Kraft was nowhere to be seen. The Kraft property was peaceful and conflict-free until Rollins showed up. The *Nieves* exception is about comparing arrestees. All the other arrests for interference involve people who were doing things that everyone would agree is criminal, not simply asserting their rights. And, in contrast to the controlled conflict-free scene at the Kraft property, several of the other interference arrests occurred in tense domestic disturbance or domestic violence situations where violence had already occurred. Rollins cannot plausibly claim that Pulliam was like the arrestees who "started fighting" with an officer, physically obstructed law enforcement activities, or physically threatened officers. PX 12 (Redacted Offense Reports) at 5; PX 13 (Interference Arrests Summary) at 3.

Pulliam did none of those things. Rollins' decision to arrest him was caused purely by Pulliam's speech in violation of the First Amendment. That's why it looks nothing like the other arrests.

## CONCLUSION

For the preceding reasons and as more fully explained in Plaintiff's post-trial Proposed Findings of Fact and Conclusions of Law, Rollins is not entitled to qualified immunity.

Dated: July 22, 2025.                    Respectfully submitted,

                                         /s/ Christen Mason Hebert
                                         Christen Mason Hebert, Attorney-in-Charge
                                         Texas Bar No. 24099898
                                         Federal ID No. 3844981

                                         Jeffrey Rowes*, of counsel
                                         Texas Bar No. 24104956

                                         Michael Peña*, of counsel
                                         Texas Bar No. 24131580

                                         INSTITUTE FOR JUSTICE
                                         816 Congress Ave., Suite 970
                                         Austin, TX 78701
                                         (512) 480-5936
                                         chebert@ij.org
                                         jrowes@ij.org
                                         mpena@ij.org

                                         *Admitted *pro hac vice*

                                         *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2025, a true and correct copy of the foregoing document was served via the Court's CM/ECF system upon all counsel of record.

/s/ Christen Mason Hebert
Christen Mason Hebert, Attorney-in-Charge

*Attorney for Plaintiff*