**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JUSTIN PULLIAM | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO.: 4:22-CV-4210 |
| | § | |
| | § | |
| FORT BEND COUNTY, TEXAS, ET. | § | |
| AL., | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The case was tried in a bench trial before the Court. Plaintiff Justin Pulliam ("Pulliam") and Defendants Fort Bend County, Texas (the "County"), Fort Bend County Sheriff Eric Fagan ("Sheriff Fagan"), and Fort Bend County Lt. Taylor Rollins ("Rollins") (collectively, "Defendants") appeared by and through their counsel of record. The Court, having carefully considered the evidence admitted at trial and post-trial submissions, makes the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure. To the extent any finding of fact may be construed as a conclusion of law (or vice versa), the Court hereby adopts it as such.

This case arises from encounters between Pulliam and employees of the Ft. Bend County Sheriff's office ("FBCSO") at a press conference on July 12, 2021, and during a welfare check on December 21, 2021. After Sheriff Fagan learned that his orders excluding Pulliam from the press conference had violated Pulliam's constitutional rights as a journalist, he permitted Pulliam to attend future press conferences. He also instituted policies to prevent this violation from happening to other social media journalists. This is

the type of behavior citizens expect from their elected officials.

In contrast, the encounter at the welfare check between Pulliam and Rollins is not a paradigm of the kind of behavior citizens expect to see in interactions between journalists and law enforcement. Pulliam's inflammatory comments to Rollins at the scene were unwarranted and inappropriate. Professional journalists do not insult and taunt individuals to get a story or increase their subscription base. The Court understands how Rollins would be angry and frustrated by Pulliam's abrasiveness and comments, especially when they were made while Pulliam was filming the encounter for his subscribers. Still, being the subject of constant public scrutiny—and sometimes unfair criticism—is part of the job of every public servant. As discussed below, Pulliam's actions that day did not justify the violation of Pulliam's First Amendment and equal protection rights, nor do they justify Pulliam's unlawful arrest by Rollins.

### Findings of Fact

1. Pulliam is an independent journalist who films activities of public interest. Pulliam's coverage has primarily focused on local government in the Houston area, including in Fort Bend County, Texas. Pulliam publishes his reporting on social media platforms.

2. Pulliam has a YouTube channel containing long-form reporting and livestreams of police and local government events. Pulliam's long-form video reports incorporate footage of police officers in action with opinion commentary that he films at home.

3. Pulliam also has a separate YouTube channel which is specifically dedicated to live streaming.

2

4. Pulliam's online content and commentary is frequently critical of law enforcement and public officials.

5. Pulliam's interactions with law enforcement generally follow a pattern. Pulliam arrives on scene and is asked by officers to stand somewhere. Pulliam objects, often in a pointed, argumentative, and even insulting manner. Pulliam disputes the necessity of moving or objects to the specific location. Pulliam taunts officers in an attempt to, in the words of one officer, get the officer to "act out." After directing further insults to officers on the scene, Pulliam usually complies with the instructions to move.

6. Pulliam initiated this lawsuit on December 5, 2022, seeking damages and injunctive relief for alleged violations of his constitutional rights on July 12, 2021, and December 21, 2021.

July 12, 2021, Press Conference and Removal

7. On July 12, 2021, Pulliam traveled to a public park located in Fort Bend County, Texas known as Jones Creek Park. Most of what happened at the park that day was recorded by multiple video cameras operated by Pulliam. At all times FBCSO deputies were professional, polite, and courteous to Pulliam.

8. Pulliam traveled to Jones Creek Park for the purpose of livestreaming law enforcement's efforts to recover a submerged automobile from Jones Creek which was believed to contain the remains of a recently deceased woman.

9. While recording, Pulliam interacted with family members of the deceased woman and several members of FBCSO and the Fort Bend County Fire Marshal's Office.

10. A family member of the deceased woman was unhappy with Pulliam's presence on the scene. Local media at the scene also complained to FBCSO deputies regarding Pulliam's presence and conduct in the park. In Pulliam's subsequent discussions with deputies, he called the deputies "clowns" and "pathetic" and asked his viewers on camera whether he should believe the deputies' comments regarding recovery efforts. Pulliam referred to the FBCSO public relations officer as the "spin-master PR lady" who intended to cover up the deputies' alleged incompetence.

11. After Pulliam recorded law enforcement's efforts to recover the submerged automobile from Jones Creek for about an hour, FBCSO closed the park.

12. FBCSO then directed Pulliam, other members of the media who were present, and everyone else at the park to relocate to the park's entrance where a press conference would be held.

13. After being told FBCSO had closed the park, Pulliam complained to the FBCSO officer who announced the decision—calling him a "clown" and taunting him by repeatedly asking if the officer was going to arrest Pulliam for being at the scene.

14. Pulliam eventually walked to his truck and drove to the park entrance where reporters were gathered. Pulliam parked his truck about 10 parking spaces away from where the reporters had parked their cars and waited for the conference to begin.

15. Shortly thereafter, Sheriff Fagan arrived at the press conference in a golf cart. Fagan was aware of the complaints made against Pulliam and his earlier interaction with a family member of the deceased.

4

16. Once Sheriff Fagan arrived, Pulliam then walked towards the area where the other members of the media were staged.

17. As Pulliam approached, Fagan told FBCSO Detective Robert Hartfield ("Hartfield") to remove Pulliam from the area of the press conference. Fagan pointed at Pulliam and told Hartfield: "If he don't do it, arrest him, 'cause he is not part of the local media, so he [has] to go back."

18. Fagan's instruction was made pursuant to FBCSO media relations written policy in effect at that time, which specifically excludes social-media journalism from its definition of "media." Fagan instructed another officer to give Pulliam five minutes to comply with the order to leave.

19. Fagan gave these instructions because of local media complaints about Pulliam on the scene and because Pulliam "had gotten into it" with members of the media and the deceased woman's family earlier that day. Fagan did not want this to happen again.

20. Hartfield then told Pulliam: "Mr. Pulliam, uh, you are not, uh, media, so at the Sheriff's request, can you step back this way with us please?" Hartfield and Jonathan Garcia ("Garcia")—an officer from the Fort Bend County Constable's Office—escorted Pulliam back to his truck.

21. When they reached Pulliam's truck—about 80 feet away, beyond earshot of the press conference—Hartfield told Pulliam: "Mr. Pulliam, it would be greatly appreciated if you'd just stick right here. You're more than happy to film from right here. If you just stay back here that'd be great, okay, sir? Alright? I appreciate you."

Pulliam responded: "You're a joke. You're a joke, man. So I can be right here?" Hartfield and Garcia walked back toward the press conference without responding to Pulliam's question. Pulliam, standing alone, then told his viewers watching live: "Well, I guess that's what I get for parking my truck too far back." He then referred to the press conference as "B.S." and said that he could get the information from FBCSO later. Pulliam then filmed the conference from that location.

22. The press conference lasted approximately 9 minutes.

23. On Pulliam's motion, United States Magistrate Judge Andrew Edison recommended that Sheriff Fagan's order for Pulliam to relocate approximately 80 feet away from the press conference violated Pulliam's constitutional rights under the First and Fourteenth Amendments.

24. Judge Edison recommended that Fort Bend County was liable for Sheriff Fagan's order for Pulliam to relocate approximately 80 feet away from the press conference.

25. Judge Edison also recommended that Deputy Hartfield was entitled to qualified immunity in connection with this incident.

26. The entirety of Judge Edison's recommendation was adopted by this Court on September 24, 2024. As a result of these rulings, the only issue that was tried to the Court was the amount of damages, if any, Sheriff Fagan and Fort Bend County owe Pulliam as a result of these violations.

27. With respect to his removal from the July 12, 2021, press conference, Pulliam sought recovery of: (i) "lost profits" from livestreaming and video uploads, (ii)

reputation, humiliation, and mental anguish damages, and (iii) punitive damages against Sheriff Fagan individually.

28. Pulliam has not established a claim for lost profits. The evidence offered in connection with lost profits was generalized, speculative, and did not establish a sufficient causal connection between this incident and the amount of damages claimed.

29. The Court finds that Pulliam's claimed lost profits are too speculative and lack a sufficient evidentiary foundation to support an award of these damages. Pulliam has not established a claim for the recovery of lost profits with respect to this incident.

30. As for his claim for reputation and humiliation damages, Pulliam did not establish that his reputation was actually harmed or that he suffered humiliation beyond his own subjective belief. Pulliam also did not establish a causal connection between this incident and any such damages.

31. Pulliam has not established a claim for mental anguish damages. Pulliam testified that his exclusion from the July 12, 2021, press conference caused him fear and chilled his recording of police activity. The Court does not find this claim credible. Since the July 12, 2021, incident, Pulliam has continued to openly record and photograph FBCSO deputies, including Deputy Ricky Rodriguez ("Rodriguez"), Rollins, and Sheriff Fagan, contradicting his claim.

32. Deputy Rodriguez testified that Pulliam recently recorded police activity during a murder investigation and was treated identically to other members of the

mainstream media. Since July 12, 2021, Pulliam has never been told by any FBCSO deputy that he was not allowed to record police activity.

33. Pulliam is not entitled to an award of punitive damages. Sheriff Fagan testified under oath that his actions on July 12, 2021, were in error and expressed genuine remorse for his actions.

34. Sheriff Fagan further testified that he has taken affirmative steps to ensure that his actions on July 12, 2021, are not repeated by himself or anyone else in his department.

35. Sheriff Fagan testified that Pulliam has been included in the FBCSO media distribution list.

36. Sheriff Fagan testified that he personally instructed every patrol deputy at roll call to allow the public to record police activity unimpeded so long as the recording activity does not interfere with the deputy's constitutional duty as peace officers to protect and serve the public. This testimony was corroborated by the testimony of both Rodriguez and Rollins.

37. Sheriff Fagan testified that he now recognizes Pulliam, a citizen journalist, as a member of the media and treats him no differently than representatives of traditional mainstream media outlets.

38. Sheriff Fagan's expressions of remorse and commitment to improvement were credible and consistent with his actions since July 12, 2021.

39. Sheriff Fagan has not engaged in conduct similar to that on July 12, 2021, nor was it established that he engaged in past conduct similar to his conduct on that date.

40. No FBCSO deputy has engaged in conduct similar to Sheriff Fagan's conduct on July 12, 2021, nor was it established that any FBCSO deputy engaged in past misconduct similar to Sheriff Fagan's conduct on July 12, 2021.     .

41. The evidence reflects that Sheriff Fagan's actions were not malicious or undertaken with conscious indifference for the rights of others, and he has taken responsibility for his behavior.

42. The Court finds that the Sheriff Fagan's remorse and corrective measures weigh against an award of punitive damages in this case.

December 21, 2021, Welfare Check and Arrest

43. On December 21, 2021, FBCSO received a call from Texana, an entity that provides mental health services, requesting a "welfare check" for Edwin Kraft ("Edwin") and his mother Frances Kraft ("Frances") at their rural property in Fort Bend County.

44. Edwin was well known to FBCSO due to previous calls about his mental illness, and he was reportedly experiencing a mental health crisis.

45. Most of what happened on December 21, 2021, was recorded from various angles by video from Pulliam's equipment and the dashboard cameras on the vehicles of the deputies responding to the call.

46. Deputies Rodriguez and Matthew Lacy ("Lacy") responded to the call at the rural property where Edwin lived with his mother Frances. The Kraft property includes a convenience store and gas station that is no longer in operation. The building for the store is still there, as are the gas pumps under a canopy. There is also a mobile home where the Krafts live.

47. Although the officers knew that Edwin had serious mental health issues and had previously threatened his neighbors, Rodriguez and Lacy did not perceive the situation at the Kraft property as posing an immediate threat to themselves or bystanders.

48. The service call for a welfare check at the Kraft property was classified as a priority three call in FBCSO's electronic communication system, the lowest priority. The call was also classified as requiring a "standard" response, which indicated that the call was not for an abnormally dangerous situation. All FBCSO patrol officers are expected to know the information transmitted in FBCSO's electronic communication system and transmitted by radio when arriving at a scene.

49. Deputy Lacy arrived at the Kraft property first, and he spoke with Edwin's mother, Frances.

50. Lacy then radioed that he was standing by and that Edwin was behind the Kraft residence with a baseball bat. Lacy subsequently radioed that Frances was outside with him and Edwin was inside the residence. Approximately five minutes later, Lacy radioed that he was keeping an eye on the door of the residence from a distance until a supervisor arrived. Frances went to sit in the driver's seat of her car under the gas station canopy.

51. Deputy Rodriguez was the second FBCSO officer to arrive at the Kraft property. Rodriguez's patrol vehicle had a dash camera that recorded his arrival and some of the events.

52.    After Rodriguez arrived, Lacy and Rodriguez met directly in front of the Kraft residence and walked around the property.

53.    Prior to arriving at the scene, Edwin was well known to Rodriguez. The Kraft residence was within his patrol area.

54.    Rodriguez and Lacy waited for a supervisor to arrive. Rodriguez monitored the front of the Kraft residence and Lacy went around the back of the Kraft residence. Neither had their guns drawn. Other than the movement of the deputies, the scene was still.

55.    At the same time, Frances was standing by the gas pumps—which are located at the front of the property, by the street. Rodriguez did not believe that Frances was in an unsafe location or distance from the Kraft residence during that period. They did not tell Frances to move from her location under the gas canopy, and Edwin was nowhere to be seen by anyone.

56.    While Rodriguez was waiting, he returned to his patrol car twice. The first time he went to fetch his beanie, given the chilly weather. The second time he fetched his body microphone (which allows his dash camera to record what is said). For both of those trips to his patrol car, Rodriguez crossed in front of the Kraft residence.

57.    Despite the dispatch call reporting that Edwin had serious mental health issues, was potentially armed with a machete, and had made homicidal threats to Frances, the video reflects no urgency in Rodriquez's actions—nor does it appear that he was concerned about his safety or the safety of Frances under the station canopy.

11

58. A few minutes after Rodriguez arrived at the Kraft property, Pulliam arrived. While riding in his truck with his wife, Pulliam had seen Rodriguez driving in the direction of the Kraft property and suspected that the deputy was going to the Kraft residence.

59. Pulliam's truck also had a dash camera that recorded his arrival and some of the events. Upon seeing two FBCSO vehicles at the Kraft property, Pulliam had his wife park their truck along the road on the Kraft property. Pulliam then got out of his truck and began filming FBCSO officers' activities.

60. Immediately after Pulliam arrived, Rodriguez radioed, "Local journalist Justin Pulliam's on scene." Accordingly, any FBCSO officer arriving at the Kraft residence would have known that Pulliam was there.

61. At about the same time Rodriguez radioed about Pulliam's arrival, Pulliam approached Frances, who was still by her car under the gas canopy. Pulliam explained that he was a journalist who films FBCSO officers and wanted to film the welfare check for Edwin's safety. Frances agreed that it was okay for Pulliam to be on her property and film the scene. Pulliam quietly filmed the scene from a distance behind Frances.

62. When Rodriguez saw Pulliam, Rodriguez said to him, "Sir, we need you to stay back over there." Rodriguez testified that, through his order, he was instructing Pulliam to stay where he was and not come any closer to the Kraft residence.

63. Pulliam complied with Rodriguez's order and did not move closer to the Kraft residence. At no point was Pulliam ever between Rodriguez (or any other officer) and the residence.

12

64. A few minutes after Rodriguez ordered Pulliam to "stay back," two women arrived and walked over to where Frances was under the gas canopy.

65. Neither Rodriguez nor Lacy ordered Frances, Pulliam, or the two civilian women to leave the scene.

66. Rollins then arrived at the Kraft property.

67. Before arriving on the Kraft property, Rollins knew of Pulliam by Pulliam's reputation of posting negative commentary online regarding the conduct of FBCSO deputies and being at scenes where FBCSO deputies were dispatched.

68. As Rollins pulled into the parking area on the Kraft property, Rollins spotted a red-haired male who was filming with a nice camera. Rollins assumed that the red-haired man was Pulliam. Rollins was familiar with Pulliam by general appearance.

69. When Rollins arrived, Pulliam was still quietly filming and complying with Rodriguez's request to stay where he was. Pulliam had Frances' permission to be there. Rodriguez and Lacy were not in conflict with any of the women or Pulliam. Edwin was nowhere to be seen.

70. Rollins immediately got out of his patrol vehicle and started walking toward Pulliam, Frances, and the two women.

71. When Rollins arrived, the FBCSO officers believed that Edwin was inside the Kraft residence.

72. The following image provides a visual representation of the approximate locations of cars and individuals when Rollins arrived at the Kraft property:

13



73.   The orange R indicates which police vehicle was Rodriguez's and thus contained his dash camera. The red X shows where Rodriguez was standing. The green circle shows generally where Pulliam was standing when Rollins arrived and approached him. The blue triangle shows where Frances was standing, and the two blue squares show where the two women were standing. Finally, the black X indicates where Rodriguez believed Lacy was when Rollins arrived.

74.   Rollins exited his vehicle and initiated contact with Pulliam. Rollins walked toward Pulliam and said "Sir, I need you to go across the street."

75. Upon seeing the two women behind Pulliam, Rollins expanded his order to go across the street to the women with the statement, "I need y'all to go ahead and go across the street."

76. Rollins and Pulliam then had the following exchange:

Pulliam: "Across the street?"

Rollins: "Yes, across the street."

Pulliam: "So you can shoot him?"

Rollins: "What's wrong with you, man?"

Pulliam: "What's wrong with you?"

Rollins: "Please go across the street, thank you."

77. Pulliam's inflammatory comments to Rollins at the scene were unprofessional, unwarranted, and made primarily for the benefit of his social media subscribers. Still, these comments did not constitute the offense of interference with public duties.

78. Pulliam complied with Rollins's order and began to walk away from Rollins toward the street.

79. The two women did not comply. Instead, they approached Rollins and identified themselves as mental health professionals with Texana, the mental health organization that requested the welfare check on Edwin. They asked Rollins to be allowed to stay on the scene.

80. Rollins agreed that the Texana employees could remain on the scene and rescinded his order for them to go across the street. Allowing the Texana employees to remain

where they were was consistent with standard practice for FBCSO. The women's presence was for the purpose of de-escalation and improving the chances of a safe outcome.

81. During the conversation with the Texana employees, Rollins stood with his back toward the Kraft residence. At no point during this conversation did Rollins take any physical action or make any gesture indicating he was concerned that this location was dangerous to himself or to bystanders.  Rather, Rollins appeared unconcerned about what might have been going on behind him or any threat from the Kraft residence.

82. In agreeing to allow the Texana employees to stay, Rollins did not tell them they were in danger, order them to take cover, or place any restrictions on their movement on the scene.

83. As Rollins and the two Texana employees talked, Pulliam turned back around to film Rollins and the women, took several steps backwards, and stopped walking. Pulliam did not speak or make any effort to get Rollins' attention. Rollins interrupted his conversation with the two Texana employees to shout to Pulliam:

> Rollins: [pointing at Pulliam] "Across the street."
>
> Pulliam: "Well, hold on, if it's not for safety, I already have permission—"
>
> Rollins: "It is for safety."
>
> Pulliam: "from the landowner—I have her permission to stay."
>
> Rollins: "It is for safety."
>
> Pulliam: "So is everyone leaving or just me?"

Rollins: "Across the street."

Pulliam: "Everyone or just me?"

84. From across the street Pulliam would not have been able to clearly or easily record the actions of the FBCSO deputies on the scene.

85. In contrast to his tone and demeanor toward the Texana employees, Rollins' tone and demeanor toward Pulliam was hostile and impatient.

86. Rollins did not respond to Pulliam's question and instead immediately started walking toward Pulliam and counting down from five. In response, Pulliam began moving backward in the direction of the street, continuing to film Rollins. At the count of three Pulliam stated, "Oh, it's gonna be like that?" When Rollins reached one, he ordered Pulliam to turn around and placed Pulliam under arrest.

87. Pulliam was arrested 60 seconds after Rollins encountered Pulliam on the scene.

88. As Rollins handcuffed Pulliam, Rollins told Pulliam, "You're interfering with my job. You're making my job a lot harder than it needs to be."

89. Pulliam was not unlawfully interfering with Rollins' job. Pulliam was not in violation of Section 38.15 of the Penal Code at the time of his arrest. Pulliam did not act with criminal negligence in asserting a right to stay after Rollins changed his mind about the Texana employees. Pulliam was arrested because: (1) Rollins was angry that Pulliam had insulted his professionalism as a law enforcement officer by implying that Rollins planned to shoot Edwin once Pulliam left the scene and (2) Rollins considered Pulliam's request to speak to Rollins further as disrespectful and

17

a challenge to Rollins's authority. Accordingly, Rollins did not want Pulliam on the scene or filming it.

90. Pulliam's arrest was motivated by Rollins's hostility towards the content of Pulliam's speech and to discourage this speech. Rollins knew or reasonably should have known that his actions violated Pulliam's constitutional rights. Rollins would not have arrested Pulliam absent his hostility against Pulliam for his protected speech.

91. Pulliam's arrest was motivated by retaliation for the exercise of his First Amendment rights of free speech as a citizen and journalist and to discourage this speech based on its content. Rollins knew or reasonably should have known that his actions violated Pulliam's constitutional rights. Rollins would not have arrested Pulliam absent a motive to retaliate against Pulliam for his protected speech.

92. There were no exigent circumstances or other legitimate reasons that justify Pulliam's arrest within 60 seconds of Rollins arriving on the scene. Rollins' testimony that he could not spare a moment to respond to Pulliam's question without resorting to arrest is not credible.

93. Rollins disregarded Pulliam's rights under the First Amendment as a citizen and journalist to be present, film the scene, and speak to law enforcement. It was the content and viewpoint of Pulliam's speech and his presence as a citizen and journalist that motivated Rollins to arrest Pulliam.

94. Rollins's stated safety rationale for ordering Pulliam across the street—that he was concerned Edwin might start immediately shooting and he needed to secure the

scene for safety reasons—and his subsequent arrest are not credible. Neither Rollins, his fellow officers, nor any of the civilians at the scene acted like there was any imminent danger from Edwin when Rollins arrested Pulliam. Based on the totality of the facts known to Rollins and based on the actions of the FBCSO deputies on the scene, Rollins's assertion that he needed Pulliam—and only Pulliam—to immediately go across the street without the opportunity to ask questions is not credible. Other citizens who engage in behavior comparable to Pulliam's behavior are not typically arrested. Nor were they arrested at this scene.

95. Rollins testified that he did not find Pulliam to be physically threatening toward himself or anyone else. He also testified that he was emotionally calm during the encounter with Pulliam. Rollins was not making a split-second decision under stress. After reviewing the video of what transpired, Rollins testified that he would not change how he handled the situation.

96. Rollins did not believe, nor could he reasonably have believed, that Pulliam's conduct established probable cause to arrest Pulliam under Section 38.15 of the Texas Penal Code.

97. At no point before Rollins arrested Pulliam did Pulliam move closer to the Kraft residence after Rodriguez ordered him to "stay back." Pulliam never physically got in the way of the officers while they were responding to the call about Edwin.

98. Pulliam was treated differently from similarly situated civilians on the scene. Frances, the apparent target of Edwin's homicidal threats, was about the same distance—if not closer—to the Kraft residence than Pulliam. While Rollins was

aware that Frances was on the scene, he did not attempt to locate her, nor did he order her to go across the street. Rodriguez raised the topic of Frances's location several minutes after the arrest by asking Rollins if he wanted Frances to move. Rollins did not check other vehicles for civilians. Mrs. Pulliam, for example, was sitting in the driver's seat of the Pulliams' truck. Rollins walked right past the truck and even looked at it as he led Pulliam away in handcuffs.

99. Pulliam was also treated differently from the Texana workers. Pulliam was arrested for doing the same thing he had just witnessed the mental health workers do without being arrested: speak to Rollins about why he should change his mind in ordering him across the street. While Rollins was arresting Pulliam, the Texana employees remained standing next to the gas canopy, between the Kraft residence and where Rollins was arresting Pulliam—right in the area where Pulliam had been initially standing to film. Frances remained under the gas canopy, either by or in her car. Frances and the two Texana employees did not leave the Kraft property at that time and were not arrested.

100. Rollins placed Pulliam in the back of Rodriguez's patrol car that was parked right in the line of fire from the residence. Rollins confiscated all the recording equipment on Pulliam's person. Pulliam sat handcuffed in the car while the two Texana employees continued to walk around the Kraft property unaccompanied by any FBCSO officer.

101. Rollins stood outside in front of the vehicle inspecting Pulliam's handheld camera. He was fully exposed to the residence where Kraft could have begun shooting.

Rollins then began to walk around the residence with no apparent concern for a dangerous situation or shooting developing.

102. Over 20 minutes after Rollins arrested Pulliam and placed Pulliam in the back of Rodriguez's patrol car, Rollins opened the driver-side door of Rodriguez's patrol car and turned off the police radio. Rollins and Rodriguez also muted their body-worn microphones and turned their backs when they came near Pulliam in the car. Pulliam was unable to hear these conversations, nor were they recorded.

103. Any safety concern requiring civilians to leave the Kraft property arose well after Rollins arrested Pulliam

104. About 35 minutes after Rollins placed Pulliam under arrest, FBCSO officers learned that Edwin was not inside the Kraft residence and was instead on a neighboring property.

105. Approximately three minutes after FBCSO officers learned that Edwin was not in the Kraft residence, Lacy radioed that Edwin was "on foot" and possibly had a weapon. Lacy also instructed his fellow officers to set up a perimeter.

106. Before driving over to Edwin's location, Rodriguez asked Rollins "What do you want me to do with this guy, release him?"—with "him" referring to Pulliam. Rollins instructed Rodriguez that Pulliam would be going to jail.

107. As Rodriguez was preparing to leave the Krafts' property, he commented to Pulliam that "you probably should have left when you had the chance."

108. When Rodriguez drove away from the Kraft property with Pulliam, the Texana employees were still freely walking around the Kraft property.

109. When FBCSO officers confirmed that Edwin had a gun, Rodriguez returned to the gas station part of the Kraft property and ordered the Texana employees and Frances to leave the property—an order that was given more than 40 minutes after Rollins placed Pulliam in the backseat of Rodriguez's vehicle.

110. The first time that any FBCSO officer communicated to dispatch that Pulliam was in custody was over an hour after Rollins placed Pulliam in the back seat of Rodriguez's patrol vehicle.

111. Rodriguez took Pulliam to the Fort Bend County Jail, and someone at the jail notified Sheriff Fagan that Pulliam was there.

112. Sheriff Fagan went to see Pulliam personally, along with two other senior members of his department, because he knew that some FBCSO employees did not like Pulliam due to his negative reporting on FBCSO deputies and he thought some FBCSO employees might "jack with" Pulliam.

113. In the office, Sheriff Fagan asked Pulliam "are you all right?" two times and asked "do you know why you're here?" Pulliam did not answer Sheriff Fagan's questions but simply asked that he be provided with an attorney. Sheriff Fagan then stated, "do it by the book" and left. Sheriff Fagan was not attempting to harass or intimidate Pulliam by visiting him and asking these questions.

114. Pulliam's arrest was not made pursuant to a policy or practice by Fort Bend County or FBCSO promulgated by Sheriff Fagan to retaliate or discriminate against Pulliam, or social media journalists like him, based on the content of his speech as a citizen and journalist.

115. After Sheriff Fagan's questioning and Pulliam's refusal to respond, Pulliam was booked for the offense of interference with public duties. In support of that alleged offense, Rollins submitted a probable cause affidavit, which he signed under oath before a notary.

116. Rollins's probable cause affidavit for the arrest contains statements that Rollins knew or reasonably should have known were erroneous and created a misleading impression of his interactions with Pulliam. Rollins's affidavit depicts a very different interaction from the one seen on the video. Contrary to the statements in the affidavit: (1) Rollins did not tell Pulliam that he could not remain standing where he was "due to [his position] being directly in front of the residence and where Edwin Kraft was barricaded with a weapon"; (2) Rollins did not give Pulliam any kind of warning like "I wasn't going to say it again"; (3) Pulliam did not "just st[an]d there" and continue to film Rollins after being ordered to go across the street; (4) Pulliam did move backwards after Rollins began to countdown; (5) Rollins did not move Ms. Kraft to a safe location before interacting with Pulliam (she was not part of this encounter at all); and (6) Rollins did not move the Texana employees to a safe location before interacting with Pulliam. More generally, the affidavit is presented as a chronological account but presents the interaction with the Texana employees out of order. Contrary to Rollins's statements, it did not place either Rollins or Pulliam in danger to allow Pulliam to stay in the area. Rollins testified that he knows sworn affidavits are used as evidence to proceed with investigations.

117. Rollins knew or should have reasonably known that his statements depicted the scene as more dangerous than it was and depicted Pulliam as behaving in a way that video proved Pulliam did not.

118. While Pulliam was at the Fort Bend County jail during the booking process, Pulliam was ridiculed by several officers working in the jail. He was strip searched, which included the inspection of his genitals. An FBCSO staff member also followed Pulliam around with a video camera.

119. With assistance from his wife, Pulliam paid the $500 bond and was released from jail. From the point that Rollins put handcuffs on Pulliam until his release from Fort Bend County Jail, FBCSO held Pulliam in custody for approximately five hours.

120. Shortly after Pulliam was released from jail, on December 21, 2021, an FBCSO officer shared Pulliam's mugshot and a news story about his arrest on Facebook. That officer commented that Pulliam had been arrested for "interfering on a scene" and that Pulliam is "a prick who likes to show up on random officers['] scenes and try's [sic] to entice them to act out." The post received comments disparaging Pulliam from FBCSO officers, other law enforcement officers, and friends and family of officers. One poster commented on Pulliam's mugshot, "If pedophiles had a 'look.'"

121. Within two weeks of his arrest, Pulliam began posting on his social media page the details of his arrest and criticizing the actions of FBCSO during his arrest and its interactions with journalists and members of the public in general. While the arrest

itself did not significantly chill Pulliam's reporting activities, the taking of his video recording equipment by FBCSO during the arrest did.

122. FBCSO assigned Detective Travis James ("James") to investigate whether there was probable cause to search Pulliam's seized electronic equipment and whether Pulliam committed the offense of interference with public duties.

123. On March 18, 2022, James made notes in the Offense Report after viewing Pulliam's handheld camera footage. In his notes, James wrote that, as captured on the footage, Pulliam was "heard to refuse[.]" At the trial before this court, James testified that Pulliam never expressly refused to follow Rollins's order.

124. Rollins and James did not testify before the grand jury. The grand jury rested its indictment at least in part on the reports of Rollins and James, including Rollins's probable-cause affidavit.

125. The grand jury indictment of Pulliam was tainted by the combination of the errors and misleading statements in Rollins's probable cause affidavit and in James's notes.

126. In March 2023, Pulliam was tried before a jury for the offense of interference with public duties. The trial was declared a mistrial because of a hung jury. Five jurors voted to acquit, but one juror voted to convict.

127. At the criminal trial, Rollins's testimony was inconsistent with the video footage of the events at the Kraft property. Rollins initially testified that Pulliam committed the offense of interference because he did not move when he was ordered to do so.

When confronted with the video from Pulliam's dashboard camera by Pulliam's criminal defense attorney, Rollins conceded that this statement was incorrect.

128. At the criminal trial, Rodriguez's testimony was also inconsistent with the video footage of the events at the Kraft property. During the criminal trial, Rodriguez initially testified that Pulliam did not get back when Rodriguez ordered him to get back: "He just kept getting closer." When confronted with Pulliam's dashboard camera footage by Pulliam's criminal defense attorney, Rodriguez conceded that this testimony was incorrect.

129. For over a year, Pulliam's criminal case remained pending without any indication of whether he would be retried. On May 14, 2024, the state finally filed a motion to dismiss Pulliam's criminal case.

130. Because Pulliam was indicted by a grand jury through the district court and that criminal charge was then transferred to a county court, Pulliam is incorrectly listed in the Fort Bend County court's criminal records for two criminal cases: one felony and one misdemeanor. Some of Pulliam's background checks show both a felony charge and a misdemeanor charge.

131. Because Pulliam was charged with a crime, Pulliam lost his license to carry a handgun. Even though the charge against him has been dismissed, Pulliam has not been able to get his handgun license back.

132. Pulliam's arrest does not resemble any of the 30 other arrests for the offense of interference with public duties in Fort Bend County in 2020–22. Of the 30 other arrests for this offense in 2020–22, Pulliam's arrest was the only one involving a

journalist and the only one where the arrestee did nothing but engage in protected speech. It was also the only interference arrest indicted and taken to a criminal trial. The other arrests involved violence or threats of violence toward the police, physically obstructing the police, and lying to the police. And the arrestee was often intoxicated, engaged in a heated domestic dispute, or the subject of a traffic stop. Of these 30 other arrests, 26 were dismissed or the prosecutor declined to proceed; three resulted in convictions by plea; one was never resolved.

133. Rollins testified that none of these plus-factors were present in Pulliam's arrest. Pulliam was not violent, nor was he threatening violence. He was not intoxicated or disorderly. He was not trespassing. He was not lying. He was not inside anyone's personal space. He was not physically obstructing anyone or any vehicle from moving.

134. Pulliam's arrest is also different from other interactions that Pulliam himself has had with law enforcement officers over the years while filming them as part of his journalism. Pulliam introduced three videos into evidence as examples of prior interactions with the police. The video examples illustrate how Pulliam's other interactions with police follow a similar pattern. As explained previously, while Pulliam is typically rude and discourteous to officers, the officers have not arrested Pulliam in the past—nor do they in Pulliam's three video examples.

135. Two of the examples involved situations in which there was a concern about violence. In one, an FBCSO officer directly referenced his concern that Pulliam might be in the line of fire if a shooting were to occur in explaining why he needed

Pulliam to move. In the second, FBCSO officers were staging a SWAT operation and wanted space. The objective dangers presented in those videos are similar to those that Rollins was dealing with at the Kraft property the day he arrested Pulliam.

136. Pulliam's pattern of objecting to a law enforcement officer's order to stand somewhere else and arguing with the officer in a pointed and even insulting manner does not typically trigger an arrest.

137. FBCSO has not returned some of the property that it seized from Pulliam on December 21, 2021. Specifically, FBCSO still has two memory cards, an iPhone and its accessories, and a body camera. FBCSO has refused to return Pulliam's property unless he signs a form waiving claims against the County.

138. Sheriff Fagan and other officers in FBCSO leadership in good faith believed to be true the erroneous and misleading statements in Rollins's probable cause affidavit, in Rodriguez's account in the Offense Report, and in James's notes after reviewing the footage of Pulliam's arrest.

139. Pulliam suffered financial, reputational, and emotional injuries because of Rollins's violation of Pulliam's constitutional rights.

140. Pulliam feared that FBCSO might take away his ability to record police activity by confiscating his equipment again. To ensure the backup and protection of his electronic files from the potential of other seizures or search warrants, Pulliam purchased hardware to back up his reporting files.

28

CONCLUSIONS OF LAW

1.    The Court previously concluded Sheriff Fagan and Fort Bend County violated Pulliam's First Amendment and equal-protection rights in excluding him from the July 2021 press conference in granting partial summary judgment to Pulliam.

2.    Having reviewed and considered the evidence and the relevant law, the Court concludes that Rollins is liable for violating Pulliam's First Amendment rights in excluding him from the scene on December 21, 2021, and arresting him when he attempted to protest that exclusion. Fort Bend County is not liable for Rollins's violation of Pulliam's constitutional rights.

3.    Accordingly, for the reasons discussed below, Pulliam is entitled to relief for both incidents.

Fort Bend County

4.    "To prevail" against Fort Bend County, Pulliam "must show (1) an official policy (or custom), (2) that a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022) (quotation marks omitted); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978). Pulliam meets that burden.

5.    Under *Monell*'s first element, plaintiffs must show that "an official policy or custom existed that led to a constitutional violation." *LaSalle Mgmt. Co.*, 41 F.4th at 509.

29

6.  FBCSO had an official written policy that "excludes social media journalists from its definition of 'media' and the policy's protections[.]" Doc. 77 at 17. Acting on that policy, Sheriff Fagan—the County's "final policymaker in the area of law enforcement"—"had Pulliam removed from the press conference because, in Fagan's eyes, Pulliam is 'not media.'" *Id.* (citation omitted). That official policy violates the First Amendment, which affords journalists like Pulliam who report via social media the same rights as journalists who work for more traditional outlets, such as newspapers or television stations *See Citizens United v. Fed. Elections Comm'n*, 558 U.S. 310, 352 (2010).

7.  Under *Monell*'s second element, Pulliam must prove that Sheriff Fagan actually knew or constructively knew about FBCSO's written policy. *See LaSalle Mgmt. Co.*, 41 F.4th at 510. Sheriff Fagan was aware of the policy.

8.  Under *Monell*'s third element, Pulliam must prove the policy or custom caused a violation of his constitutional rights, that the policy or custom was the "moving force." *Id.* at 511. Sheriff Fagan's written policy was the moving force behind Pulliam's exclusion from the press conference. Fort Bend is liable for the July 12, 2021, violation of Pulliam's First Amendment and equal protection rights.

Rollins

9.  Rollins violated Pulliam's First Amendment and equal protection rights to film the police.

10. Fort Bend did not have an official policy or custom that led to the violation of Pulliam's constitutional rights by Rollins. Accordingly, Fort Bend is not liable for

Rollins's conduct. Fort Bend is not liable for the violation of Pulliam's First Amendment and equal protection rights arising from his December 21, 2021, encounter with Rollins.

11. Rollins's order for Pulliam to leave the scene and go across the street, excluding him from the Kraft property, violated Pulliam's First Amendment and equal protection rights. The right to film the police has been clearly established in the Fifth Circuit since *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017). Rollins knew, therefore, that Pulliam was engaged in protected First Amendment activity, but he ordered Pulliam to leave the scene anyway.

12. "Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." *Id.* at 689.

13. The right to record the police in public in the performance of their official duties "is not without limitations." *Id.* at 690. When doing so for content-neutral reasons such as public safety, police regulation of filming is "subject to reasonable time, place, and manner restrictions." *Id.* "[T]hose restrictions must be 'narrowly tailored to serve a significant governmental interest.'" *Id.* at 690 (quoting *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)). "Importantly, an individual's exercise of [his or] her First Amendment right to film police activity carried out in public . . . necessarily remains unfettered unless and until a reasonable restriction is imposed or in place." *Id.* at 690 n.50 (quoting *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014)). In other words, the government bears the burden of satisfying the "heightened First

Amendment scrutiny" if it restricts the right to film the police. *Turner*, 848 F.3d at 687. If it cannot meet that burden, its restrictions on the right to film are invalid. *Id.*

14. Even assuming content neutrality, Defendants have failed to carry their burden under intermediate scrutiny. *See Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 64 F.4th 287, 293 (5th Cir. 2023) ("[T]o survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a significant governmental interest."). Defendants assert that the significant government interest was public safety. The Court acknowledges that circumstances of a police call "might justify a safety measure—for example, a command that bystanders disperse—that would incidentally impact an individual's exercise of the First Amendment right to film." *Gericke*, 753 F.3d at 8. But such an order must address "legitimate safety reasons." *Id.*

15. No legitimate safety reason existed for Rollins to order Pulliam to go across the street or for Rollins to maintain that order for only Pulliam. Rollins ordered Pulliam to leave the scene because of his hostility to Pulliam and the content and viewpoint of his speech.

16. Rollins's order that Pulliam needed to "go across the street" therefore fails intermediate scrutiny, and Pulliam prevails on his claim that Rollins's order requiring him to go across the street violated the First Amendment.

17. Rollins also committed a separate First Amendment violation when he arrested Pulliam after Pulliam asserted his right not to be removed from the scene.

32

18. Rollins violated Pulliam's First Amendment and equal protection rights by arresting him in retaliation for Pulliam's protected speech.

19. "[T]he First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of [his or] her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999). "[G]overnment officials" may not "subject[] an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)).

20. Nor may the police arrest someone in retaliation for their protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* at 398 (citation omitted).

21. For Pulliam to prevail on his First Amendment retaliation claim against Rollins and Fort Bend County arising out of his December 2021 arrest, he must prove: "'(1) [he was] engaged in constitutionally protected activity, (2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [his] exercise of constitutionally protected conduct.'" *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

22. Pulliam satisfies the first element of a retaliation claim. He was engaged in constitutionally protected speech when he questioned the validity of Rollins's

33

insistence that Pulliam still leave even after Rollins allowed the Texana workers to stay. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987). The First Amendment protects the right to use "opprobrious language" when interacting with the police. *Lewis v. City of New Orleans*, 415 U.S. 130, 133 (1974).

23. Pulliam satisfies the second element of a retaliation claim. Rollins not only arrested Pulliam but confiscated his video recording equipment which prevented Pulliam from continuing to record police activities. This equipment had not been returned to Pulliam as of the time of the trial before this Court.

24. Pulliam also meets the third element of a retaliation claim. Because the retaliation here took the form of an arrest, to establish this element Pulliam must establish a "causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Nieves,* 587 U.S. at 398 (quotation marks omitted). Specifically, the plaintiff must show that retaliation for speech is "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399.

25. "[A]s a general rule, a plaintiff bringing a retaliatory-arrest claim must plead and prove the absence of probable cause for the arrest." *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (quotation marks omitted). First, "plaintiffs pressing such claims [must] prove the absence of probable cause as a threshold requirement." *Id.* at 664

34

(Alito, J., concurring). Second, if a plaintiff proves the absence of probable cause, the *Mt. Healthy* framework—the "two-step," burden-shifting framework from *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977)—is triggered. "At the first step [of *Mt. Healthy*], the plaintiff must demonstrate that he engaged in protected speech and that his speech was a 'substantial' or 'motivating' factor in the defendant's decision to take action against him." *Gonzalez*, 602 U.S. at 662–63 (Alito, J., concurring) (quoting *Mt. Healthy*, 429 U.S. at 287). "Once the plaintiff makes this showing, the burden shifts to the defendant at the second step to show that he would have taken the same adverse action even in the absence of the protected speech." *Id.* at 663. "To carry these burdens, parties operating within the *Mt. Healthy* framework may present a wide range of evidence—both objective and subjective." *Id.*

26. There are, however, exceptions to this general rule. One of these is set forth in the *Nieves* opinion. Under *Nieves*, "[t]he existence of probable cause does not defeat a plaintiff's claim if he produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Gonzalez*, 602 U.S. at 655 (quoting *Nieves*, 587 U.S. at 407). In other words, if the police ordinarily ignore technically illegal conduct or ordinarily let someone off with a warning, arresting someone who is also engaged in protected speech may very well be evidence of retaliation against the speech.

27. If the *Nieves* exception applies, the *Mt. Healthy* framework is triggered, even if probable cause technically existed. *Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018); *Nieves*, 587 U.S. at 406–08.

28. Rollins violated Pulliam's right against retaliatory arrest when he arrested Pulliam for his protected speech without probable cause.

29. Applying the general rule for a retaliatory-arrest claim, Pulliam must first prove the absence of probable cause. *Gonzalez,* 602 U.S. at 655. If he can do that, he may proceed through the *Mt. Healthy* framework, as just discussed.

30. Pulliam meets that burden and proceeds to the *Mt. Healthy* framework. Rollins lacked probable cause to arrest Pulliam. Rollins arrested Pulliam for protesting his exclusion from Kraft property and in furtherance of an unconstitutional policy of intimidation and exclusion.

31. Speech alone does not constitute the offense of interference with public duties. Tex. Pen. Code § 38.15(d) ("It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only."). The Fifth Circuit has held that "'merely arguing with police officers about the propriety of their conduct . . . falls within the speech exception to section 38.15' and thus does not constitute probable cause to arrest someone for interference." *Voss v. Goode*, 954 F.3d 234, 239 (5th Cir. 2020) (quoting *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007)); *see also Carney v. State,* 31 S.W.3d 392, 398 (Tex. App.—Austin 2000, no pet.) ("Under section 38.15, arguing with the officers does

not constitute an actionable offense. Speech is a statutory defense to the offense charge even if the end result is 'stalling.'").

32. Pulliam was not criminally negligent in his actions with respect to the order by Rollins to go across the street. *See* Tex. Pen. Code § 6.03(d) (defining "criminal negligence").

33. Pulliam did not cross the line between filming the police and hindering the police. He was engaged in a clearly established, constitutionally protected activity on private property—where he had permission to be and record. Pulliam was not a hazard, was not too close, and did not impede Rollins's or other officers' ability to perform their duties.

34. Rollins did not have probable cause to arrest Pulliam. No objectively reasonable officer would think otherwise.

35. Rollins asserts that the fact that a grand jury indicted Pulliam means that as a matter of law Rollins had probable cause to arrest Pulliam. The Court disagrees.

36. Under the independent intermediary doctrine, the decision of an independent intermediary, like a grand jury, "is sufficient to establish probable cause." *Russell v. Altom,* 546 F. App'x 432, 436 (5th Cir. 2013). Assuming without deciding that the independent intermediary doctrine applies to Pulliam's retaliation claims, this doctrine cannot establish probable cause for Pulliam's arrest.

37. The independent intermediary doctrine does not apply if the intermediary was tainted. "[T]he independent-intermediary doctrine is not absolute." *Loftin v. City of Prentiss,* 33 F.4th 774, 782 (5th Cir. 2022). "[T]his doctrine only applies 'where all

the facts are presented to the grand jury[.]'" *Winfrey v. Johnson*, 766 F. App'x 66, 71 (5th Cir. 2019) (quoting *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010)).

38.     Here, Rollins has not established that all material information regarding the arrest was presented to the grand jury. *See e.g. Hughes v. Garcia*, 100 F.4th 611, 623 (5th Cir. 2024) ("[A]n officer cannot avoid liability where a warrant affidavit (1) contains false statements or material omissions (2) made with at least reckless disregard for the truth that (3) were necessary to the finding of probable cause.") (quotations omitted). There were erroneous and misleading statements in the materials presented to the grand jury regarding Pulliam's arrest.

39.     Accordingly, Pulliam prevails on his retaliatory-arrest claim: Rollins lacked probable cause to arrest Pulliam, and retaliation for speech was the but-for cause of the arrest.

40.     Even if probable cause existed, Pulliam's arrest was still retaliatory under the *Nieves* exception.

41.     Assuming probable cause existed, applying the analysis in *Nieves*, this fact does not prevent Pulliam from recovering for his retaliatory arrest claim.

42.     Again, in *Nieves*, the Supreme Court "recognized a narrow exception to the no-probable-cause rule." *Gonzalez*, 602 U.S. at 665 (Alito, J., concurring). "Concerned that some police officers might exploit the arrest power as a means of suppressing disfavored speech, [the Supreme Court] explained that the no-probable-cause requirement may be set aside 'when a plaintiff presents objective evidence that he

was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Id.* (quoting *Nieves*, 587 U.S. at 407).

43. In applying the *Nieves* exception, "evidence regarding an officer's state of mind— e.g., evidence of bad blood between the officer and the plaintiff or allegations that the officer harbored animus—does not qualify." *Id.* at 666. Only objective evidence is considered. *Id.*

44. The question for the *Nieves* exception is whether there is objective evidence that reasonable officers do not arrest for interference with public duties under these circumstances. *Id.* at 658. A plaintiff like Pulliam does not need "virtually identical and identifiable comparators." *Id.*

45. Here, Pulliam has established three categories of comparators that show, objectively, that reasonable officers do not arrest for interference with public duties under circumstances like those present at the Kraft property that day: (1) the Texana case workers who were not arrested for asking Rollins to change his mind; (2) testimony and video evidence of Pulliam's similar interactions with other officers at other times at other locations in which Pulliam was not arrested for asking officers to clarify their orders; and (3) records of all 30 arrests by FBCSO in recent years for interference with public duties, all of which involved "plus factors" in addition to speech such as intoxication, violence, physical interference, and disorderly conduct during more pressing situations. The Court will address each category of comparator in turn.

46. First, the Texana employees. After Rollins ordered Pulliam to go across the street, he included the Texana employees in his second command to "go across the street." Rather than walking away, like Pulliam, the Texana employees approached Rollins to explain that they were case workers from Texana.

47. Rollins listened to the Texana employees and changed his mind, but arrested Pulliam after he requested the same reconsideration. Rollins's treatment of the Texana employees shows that officers typically do not arrest someone for failing to immediately comply with a police order or for asking the officer to reconsider that order.

48. Second, Pulliam himself. Pulliam presented testimony and video evidence of his interactions with law enforcement at other scenes over the years in which he (or someone he was with) had been ordered to stand and film somewhere else. These interactions are often testy and argumentative, and Pulliam sometimes insults officers or uses foul language. Sometimes these interactions occur at night, alongside darkened roadways, at crime scenes, and under circumstances where officers have duties to perform. Yet these interactions follow a discernable pattern. The officer orders Pulliam to go somewhere else, Pulliam demands an explanation or tries to persuade the officer that an alternative location is better, the two discuss it, and Pulliam moves. The officers, often commendably patient, do not arrest Pulliam. The objective evidence indicates that reasonable officers exercise their discretion not to arrest for interference with public duties when Pulliam asks for an

order to be clarified or modified, especially when the discussion will only take just a matter of seconds.

49. Third, police reports of all 30 arrests in Fort Bend County for interference with public duties issued in the roughly three years surrounding his arrest. All those arrests included the sorts of "plus factors" the Court identified earlier, such as physically or violently impeding an officer's movement or engaging in disorderly conduct while being intoxicated. Rollins testified that Pulliam exhibited none of these plus factors prior to his arrest.

50. Pulliam has carried his threshold burden under the *Nieves* exception of demonstrating, with objective evidence of comparators, that officers ordinarily exercise their discretion not to arrest for interference with public duties under circumstances like those in this case.

51. Having determined that Rollins violated Pulliam's First Amendment and equal protection rights, the question then becomes whether Rollins is entitled to qualified immunity.

52. Rollins is individually liable and not entitled to qualified immunity.

53. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Est. of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d

41

375, 380 (5th Cir. 2005). A defendant is not entitled to qualified immunity if "prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Bailey v. Iles,* 87 F.4th 275, 283 (5th Cir. 2023).

54. As of December 2021, prior decisions gave reasonable warning that Rollins's exclusion of Pulliam from the Kraft property and his arrest of Pulliam violated constitutional rights. *See Turner,* 848 F.3d at 688 ("We conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist[.]"). Similarly, it has been clearly established that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech" since at least 2018. *Lozman,* 585 U.S. at 90.

55. Rollins intentionally arrested Pulliam to retaliate against Pulliam's speech, and there is no alternate, non-speech justification for the arrest. He is therefore not entitled to qualified immunity.

56. The Court awards Pulliam injunctive and monetary relief for the violation of his constitutional rights.

57. Pulliam is entitled to permanent injunctive relief because he has shown that (1) "the failure to grant the injunction will result in irreparable injury," (2) that the injury "outweighs any damage that the injunction will cause the opposing party," and (3) "the injunction will not disserve the public interest." *Hill v. Washburne,* 953 F.3d 296, 309 (5th Cir. 2020) (quoting *United Motorcoach Ass'n, Inc. v. City of Austin,* 851 F.3d 489, 492-93 (5th Cir. 2017)).

42

58. The Court's final judgment will issue the following injunctive relief to address the violation of Pulliam's constitutional rights and the County policy that caused those violations:

- Fort Bend County's written policy and its actions treating reporters using social media differently than reporters using traditional reporting media are hereby permanently enjoined;

- Fort Bend County and FBCSO shall add Pulliam and any other journalists requesting notification of County or FBCSO press conferences to all media lists announcing press events; and

- FBCSO shall return to Pulliam his equipment seized at the Kraft residence on December 21, 2021.

59. Sheriff Fagan testified that these measures are essentially currently in place at FBCSO. To the extent that Fort Bend and FBCSO have not yet implemented the policies and procedures set forth in the above-listed injunctive order, this order is necessary to prevent future constitutional violations, ensure fair treatment, and remedy the past violation of Pulliam's constitutional rights.

60. The Court finds that Pulliam is entitled to compensatory damages because "he proved actual injury caused by the denial of his constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Specifically, Pulliam is entitled to damages compensating him for lost profits; the cost of replacing equipment seized by FBCSO; impairment of his reputation, personal humiliation,

43

and mental anguish; and attorneys' fees he incurred in the criminal proceeding resulting from his retaliatory arrest.

61. Pulliam is entitled to an award of $00.00 as damages for loss of livestream and video upload profits.

62. Pulliam is entitled to an award of $00.00 as reputation, humiliation, and mental anguish damages.

63. Pulliam is not entitled to an award of punitive damages. Pulliam is entitled to an award of $1.00 as nominal damages.

December 21, 2021, Welfare Check and Arrest Damages

64. Pulliam is entitled to an award of $30,000.00 as damages for the loss of livestream and video upload profits.

65. Pulliam is entitled to an award of $1,444.35 as damages for the cost of replacing equipment seized by FBCSO. Pulliam is also entitled to an award of $6,023.40 for the backup and protection of his electronic files from the potential of other unlawful seizures or search warrants.

66. Pulliam is entitled to an award of $15,000.00 as reputation, humiliation, and mental anguish damages.

67. Pulliam is entitled to an award of $22,730.91 as attorneys' fees incurred in the criminal proceedings resulting from his arrest. These are separate and apart from any reasonable attorneys' fees to which Pulliam may be entitled under 42 U.S.C. § 1988 as a result of this litigation.

68.    In sum, the Court awards Pulliam total compensatory damages of $75,199.66 (Nominal damages of $1.00 + lost profits of $30,000.00 + equipment replacement of $1,444.35 + $6,023.40 cost to prevent future destruction of his media by FBCSO + reputation, humiliation, and mental anguish of $15,000 + criminal attorneys' fees of $22,730.91).

69.    Pulliam is not entitled to any punitive damages from Sheriff Fagan.

70.    Pulliam is entitled to pre-judgment and post-judgment interest on his compensatory damages. *See* 28 U.S.C. § 1961.

SIGNED at Houston, Texas on March 26, 2026.

_George C. Hanks Jr_
_____
GEORGE C. HANKS, JR
UNITED STATES DISTRICT JUDGE